**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NATURAL RESOURCES DEFENSE COUNCIL, et al.,** | **1:05-CV-01207 OWW TAG** |
| **Plaintiffs,** | **ORDER GRANTING CALIFORNIA DEPARTMENT OF WATER RESOURCES' MOTION TO INTERVENE (DOC. 137)** |
| **v.** | |
| **GALE A. NORTON, in her official capacity as Secretary of the Interior, et al.,** | |
| **Defendants.** | |

## I.   INTRODUCTION

Plaintiffs, a coalition of environmental groups, challenge the legal validity of a Biological Opinion issued by the United States Fish and Wildlife Service ("USFWS") concerning the coordinated operation of the Central Valley Project ("CVP") and State Water Project ("SWP").  Before the court for decision is a motion to intervene filed by the California Department of Water Resources ("DWR").[1]  (Doc. 137, filed Oct. 12, 2005.)  Plaintiffs

---

[1]   A coalition of irrigation districts, led by the Glenn-Colusa Irrigation District, whose members hold senior rights to divert waters of the Sacramento river (the "Settlement Contractors"), also moved to intervene.  (Doc. 143, filed Nov.4, 2005.)  Plaintiffs stipulated to their intervention a few days before the December 12, 2005 hearing date.  (Doc. 158, filed Dec. 9, 2005.)

oppose.  (Doc. 142, filed Nov. 14, 2005.)  Existing intervenor defendants have filed statements of non-opposition to DWR's intervention.  (Docs. 149, 150.)  The Federal Defendants have filed no documents pertaining to the pending motions, but counsel has indicated that Federal Defendants take no position on the issue of intervention.

On September 6, 2005, this case was transferred to this court from the Northern District of California.  (Doc. 122.) Prior to the transfer, United States District Judge Claudia Wilken decided three motions to intervene, filed by: the San Luis & Delta-Mendota Water Authority and Westlands Water District (collectively the "Authority")(Doc. 5, filed March 14, 2005); the California Farm Bureau Federation ("Farm Bureau") (Doc. 19, filed March 30, 2005); and the State Water Contractors ("SWC") (Doc. 27, filed Apr. 8, 2005).  Judge Wilken granted the Authority and Farm Bureau's motions, but denied SWC's on the ground that SWC's interest "will be adequately represented by the Authority and the Farm Bureau."  (Doc. 45 at 11, filed June 13, 2005.)  SWC has appealed this decision and briefing before the Ninth Circuit is ongoing.  If the court is inclined to grant either or both of these motions to intervene, Plaintiffs request that any such decision be put off until the Ninth Circuit has an opportunity to decide the pending appeal.

//
//
//
//
//

**2**

## II.  BACKGROUND

**A.  The Central Valley Project, the State Water Project, and the California Bay Delta.**

This case concerns the coordinated operation of the federally-managed Central Valley Project ("CVP") and the State of California's State Water Project ("SWP").  The CVP alone is one of the largest water projects in the world, managing annually approximately nine million acre-feet of water.  (Compl. at ¶25.) The CVP managed by the United States Department of the Interior's Bureau of Reclamation ("Bureau") under licenses from the California State Water Board.  The SWP, the largest state-built water project in the country, is managed by the California Department of Water Resources ("DWR").  (Johns Decl. at ¶4.) Both projects divert large volumes of water from the California Bay Delta ("Delta") and use the Delta to store water.  The CVP, for example, operates the Tracy Pumping Plant, which draws billions of gallons of water per year out of the Delta and into the Delta-Mendota Canal.  (Compl. at ¶25.)  The SWP operates diversion facilities in both the southern and northern Delta, which divert water into the California Aqueduct (for distribution to the San Joaquin Valley and points south) and the North Bay Aquaduct (for distribution to Napa and Solano counties).

The Delta, from which these CVP and SWP facilities draw water, is home to a number of endangered and threatened species, including the endangered delta smelt (*Hypomesus transpacificus*), a small, slender-bodied fish endemic to the Delta.[2]

---

[2]     A typical Delta smelt will live for only one year and spend its entire lifespan in the Delta.

**3**

Historically, the Delta smelt could be found throughout the Delta, but the population has declined significantly in recent years.    (Compl. at ¶20.)

**B.  <u>Coordinated Operations and The Endangered Species Act</u>**.

The state and federal agencies charged with management of the CVP and SWP share certain facilities and coordinate operations with one another pursuant to a Coordinated Operating Agreement ("COA").  (Johns Decl. at ¶6.)  The COA, which originated in 1986, has evolved over time to reflect, among other things, changing facilities, delivery requirements, and regulatory restrictions.  The most recent document concerning coordinated management is the Operating Criteria and Plan (OCAP). The OCAP proposes a number of changes to the coordinated operation of the CVP and SWP, some of which are discussed in greater detail below.

Because the Delta smelt and a number of other endangered and/or threatened species reside in the area affected by the CVP and SWP, any coordinated management plan, including the OCAP, must comply with various provisions of the Endangered Species Act ("ESA").  Specifically, prior to authorizing, funding, or carrying out any action, a federal agency must first consult with USFWS and/or the National Marine Fisheries' Service ("NMFS") to "insure that [the] action...is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined...to be critical...." 16 U.S.C. § 1536(a)(2) [ESA § 7(a)(2)].  (This form of consultation is called "formal consultation."  50 C.F.R.

**4**

1  § 402.02.)  In addition, an independent consultation obligation

2  arises under § 1536(a)(3) where the federal agency "has reason to

3  believe that an endangered species or a threatened species may be

4  present in the area affected by this project and that

5  implementation of such action will likely affect such species."

6  (This form of consultation is called "early consultation."  50

7  C.F.R. § 402.02.)

8      In this case, the Bureau entered into formal and early

9  consultation with the USFWS concerning the OCAP.  The

10  consultation process resulted in the issuance by the USFWS of a

11  Biological Opinion ("BiOp") on June 30, 2004 (the "2004 OCAP

12  BiOp").

13      On August 4, 2005, the Ninth Circuit decided *Gifford Pinchot*

14  *Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059,

15  1069 (9th Cir. 2004), which held that the USFWS's definition of

16  "adverse modification" to critical habitat is an impermissible

17  interpretation of the ESA because it focuses on whether critical

18  habitat modifications would impact the <u>survival</u> of a species,

19  effectively ignoring the statutorily-mandated goal of "<u>recovery</u>."

20  In November 4, 2004, presumably in response to this ruling, the

21  Bureau requested reinitiation of formal consultation to address

22  critical habitat issues.

23      Plaintiffs, a coalition of non-profit conservation

24  organizations, filed suit on February 15, 2005, alleging that the

25  2004 OCAP BiOp is legally inadequate in light of *Gifford Pinchot*

26  and should be invalidated.  (Doc. 1.)  Plaintiffs named as

27  defendants the Department of the Interior and the USFWS.  (*Id*.)

28      On February 16, 2005, USFWS issued an amended BiOp (the

**5**

1  "OCAP BiOp"), which superceded the 2004 OCAP BiOp.  In this

2  document, the USFWS asserts that it relied on statutory

3  provisions of the ESA, not on the regulatory definition of

4  adverse modification invalidated in *Gifford Pinchot*.

5       **C.   Issues Addressed by the OCAP BiOp**.

6       The OCAP BiOp addresses current-day operations of the CVP

7  and SWP as well as several future actions.  These future actions,

8  some of which are discussed in greater detail below, are:

9  (1) increasing flows in the Trinity River; (2) "8500 Banks";

10  (3) operating permanent barriers in the South Delta;

11  (4) operating an intertie between the California Aqueduct and the

12  Delta-Mendota Canal; (5) a long-term Environmental Water Account

13  ("EWA"); (6) delivery of CVP water to the Freeport Regional Water

14  Project ("FRWP"); and (7) various other operational changes,

15  including changes to a monitoring program at the North Bay

16  Aqueduct.  (OCAP BiOp at 10; 76-77.)

17       A number of the proposed future actions discussed in the

18  OCAP BiOp are important to applicant DWR.  Two of these proposed

19  changes, "8500 Banks" and the operation of permanent barriers in

20  the South Delta, relate to the proposed South Delta Improvement

21  Project ("SDIP"), which has as its stated goal the improvement of

22  water supply reliability.  (Doc 137, Attch. 1, Johns Decl. at

23  ¶14.)  As part of SDIP, DWR proposes to (a) increase the average

24  diversion rate at its Clifton Court Forebay from the present rate

25  to 8500 cubic feet per second and (b) increase pumping at the

26  Banks Pumping Plant into the California Aqueduct.  (Collectively,

27  these changes are known as "8500 Banks".)  In addition, SDIP

28  proposes the operation of four permanent gates (also referred to

**6**

as "barriers") in the southern Delta for the protection of water

quality and fishery resources.

The OCAP BiOp also addresses a related program: the

Environmental Water Account ("EWA").  The EWA "buys water from

willing sellers or diverts surplus water when safe for fish, then

banks, stores, transfers and releases it as needed to protect

fish and compensate water users."[3]  The State of California has

been far more involved (both operationally and financially) in

the EWA than has the Bureau.  For example, for the water years

2001-2005, the total cost for acquiring water under the EWA was

$165.8 million.  The State of California provided $144.3 million,

or 87% of total funding. (Johns Decl. at ¶10.)  Currently, the

EWA has been extended through the end of 2007, but DWR and the

Bureau are considering extending the program over a longer period

of time.  (This extension beyond 2007 is referred to as the

"long-term EWA".) (*Id*. at ¶11.)

Finally, DWR highlights one additional operational change

addressed by the OCAP BiOp: proposed changes to the Delta smelt

monitoring protocol utilized at the North Bay Aqueduct ("NBA")

intake at Barker Slough.  According to the OCAP BiOp, the

"present NBA monitoring program is not very effective for the

management of smelt" in part because data from the past nine

years of monitoring show that catch of Delta smelt in Barker

Slough has been "consistently very low."  (OCAP BiOp at 77.)  The

DSWG has recommended the implementation, on a pilot basis, of an

---

[3]      *See* http://calwater.ca.gov/Programs/
EnvironmentalWaterAccount/FactSheet.htm (last visited on December
7, 2005).

**7**

1  alternative sampling approach that would use different equipment

2  and different seasonal start and stop dates.  DWR has already

3  begun using this new monitoring protocol.

4       DWR and the Bureau are currently preparing a joint

5  environmental document analyzing the SDIP under the California

6  Environmental Quality Act ("CEQA") and the National Environmental

7  Policy Act ("NEPA") and a separate document covering the possible

8  implementation of a long-term EWA.  (Kelly Decl. at ¶3.)  The

9  OCAP BiOp ostensibly provides early consultation coverage under

10 the ESA for these two programs.

11      The OCAP BiOp concludes that the coordinated operation of

12 the SWP and CVP, including the proposed future actions, will not

13 jeopardize the Delta smelt's continued existence.  (OCAP BiOp at

14 223.)  Although the OCAP BiOp recognizes that <u>existing</u> protective

15 measures may be inadequate, the USFWS concluded that certain

16 <u>proposed</u> protective measures, including the EWA and a proposed

17 "adaptive management" protocol would provide adequate protection.

18 The proposed adaptive management protocol is known as the Delta

19 Smelt Risk Assessment Matrix ("DSRAM").  The DSRAM utilizes a

20 list of trigger criteria monitored on a monthly basis from

21 December to July.  (*Id*. at 98-103.)  If any trigger criteria is

22 met or exceeded, a Delta Smelt Working Group ("DSWG") is

23 convened.  The DSWG consists of representatives from USFWS, the

24 California Department of Fish and Game, DWR, the United States

25 Environmental Protection Agency, the Bureau, and the California

26 Bay-Delta Authority.  The DSWG then recommends corrective actions

27 to a Water Operations Management Team ("WOMT").  The OCAP BiOp

28 identifies four specific actions that the DSWG and WOMT must

**8**

consider: (1) export reductions at one or both of the projects;
(2) changes in the south Delta barrier operations; (3) changes in
San Joaquin River flows; and (4) changes in the operation of the
Delta cross channel.

Finally, the OCAP BiOp also includes an incidental take
statement that insulates operations implemented according to the
OCAP from liability for taking Delta smelt.  (OCAP BiOp at 223.)

      **D.**  **The Claims in this Case**.

Plaintiffs filed a First Supplemental Complaint on May 20,
2005, which modified the central claims in the case in light of
the 2005 OCAP BiOp.  The substantive allegations are succinctly
summarized in Paragraphs 30 through 34:

> 30. The Biological Opinion states baldly that [USFWS]
> relied on the statutory provisions of the ESA and not
> the regulatory definition of adverse modification when
> reaching its conclusions. However, this statement is
> not supported by any new analysis or by the few changes
> made to the original biological opinion, and no new
> definition of adverse modification is provided or
> applied.

> 31. In reaching a "no jeopardy" conclusion, the
> Biological Opinion relies heavily on certain existing
> or potential future protective measures, the adequacy
> of which has not been demonstrated, and several of
> which may not be implemented in the form assumed by the
> Biological Opinion or at all. The Bureau has a long
> history of disregarding or violating such protective
> measures. For example, the Bureau failed to
> consistently meet the conservation obligations agreed
> upon in the biological opinions for the Friant Unit
> long- and short-term renewal contracts. In addition, in
> multiple years since the endangered Sacramento River
> winter-run Chinook salmon and the threatened delta
> smelt were listed under the ESA, the Bureau and the
> California Department of Water Resources have operated
> the CVP and SWP in such a way that the ESA-mandated
> incidental take limits for both species have been
> exceeded.

//
//

**9**

32. Among other defects, the Biological Opinion assumes benefits to the delta smelt from future, long-term implementation of an Environmental Water Account (EWA). The Environmental Water Account as it presently exists is a water redistribution program that maintains exports to entities with contracts for water from the Delta when protections for delta smelt or certain other species are put into effect. At the time the original biological opinion was signed, however, the then-existing EWA was scheduled to expire by September 2004. Although both the original and the revised Biological Opinion assume a future EWA, the Biological Opinion also states that "inclusion of the EWA in this description does not constitute a decision on future implementation of the EWA." *See* Biological Opinion at 84. Any benefits to delta smelt from any long-term EWA are, at best, speculative. Moreover, the Biological Opinion's characterization of the EWA does not agree with the description provided by the Bureau in the June 30, 2004 OCAP when consultation with the Service was requested.

33. Recognizing that assumed protective measures may be inadequate and, indeed, may not even be fully carried out, the Biological Opinion provides for an "adaptive management" process under which the Bureau and certain fisheries management agencies would discuss and *potentially* agree to *further* changes in the CVP operations that affect delta smelt through an "adaptive management" process. However, the Biological Opinion does not provide any assurance of any particular level of protection for the delta smelt as a result of this promise of future "adaptive management."

34. The Biological Opinion's adaptive management process involves the use of a so-called "Delta Smelt Risk Assessment Matrix" as a decision-making tool intended to be used by a Working Group to monitor the effects of the CVP and SWP on the delta smelt. The Matrix is a tool to identify when delta smelt may be negatively affected by a project and to suggest possible management strategies. The Biological Opinion generally requires that the Working Group be informed should the triggering conditions be met. However, the Biological Opinion does not require that the Working Group, or the Bureau, take any particular action if a triggering condition occurs. No particular level of protection for delta smelt or its critical habitat is ensured.

(emphasis added)

//

//

10

1        **E.    <u>Prior Motions to Intervene</u>**.

2        In March and April 2005, three sets of parties moved to

3   intervene: the San Luis & Delta-Mendota Water Authority and

4   Westlands Water District (collectively the "Authority") (Doc. 5);

5   the California Farm Bureau Federation ("Farm Bureau") (Doc. 19);

6   and the State Water Contractors ("SWC") (Doc. 27).  On June 13,

7   2005, prior to transferring the case Judge Wilken granted the

8   Authority and Farm Bureau's motions, but denied SWC's on the

9   ground that SWC's interests "will be adequately represented by

10  the Authority and the Farm Bureau."  (Doc. 45 at 11.)   In

11  reaching this decision, Judge Wilken examined the applicants'

12  interests:

13          Authority has thirty-two member water agencies that
            contract with the United States for water supply from
14          the CVP. Loss of water supplies from the CVP would
            adversely impact the regions the members serve.
15          Additionally, Authority is subject to direct regulation
            under the terms of the disputed OCAPBiOp because it
16          operates various CVP facilities. The Farm Bureau is
            composed of fifty-three county bureaus with 89,000
17          private members, over 50,000 of whom rely on contracted
            supplies of either CVP or SWP water for agricultural
18          purposes. The SWC has twenty-seven public agencies as
            members, all of whom receive water from the SWP. All
19          Applicants have an interest in continued sources of
            affordable supplies of water. Applicants and their
20          members have participated in regulatory and judicial
            processes relating to the Bay-Delta waterways.
21
22  (*Id*. at 4.)   Judge Wilken reasoned that

23          The central issue of this case is the validity of the
            OCAPBiOp and its analysis with regard to the delta
24          smelt. The amounts of water received by each Applicant,
            how that water is used and where it comes from are not
25          at issue in this case. Even if they were, Authority
            will represent the interests of CVP water users, and
26          Farm Bureau will represent the interests of SWP water
            users. Authority will represent public water agencies'
27          interests and Farm Bureau will represent individual
            consumers' interests. SWC and Authority share counsel.
28          SWC's interests as a public agency and user of SWP
            water are thus adequately represented by existing

                                11

1
2
3
4

> parties. The fact that SWC and Farm Bureau are on
> opposing sides in independent litigation concerning the
> Environmental Water Account (EWA) and its possible
> impact on the distribution of SWP water in the OCAP is
> inapposite because the EWA and distribution of SWP
> water are not at issue here.  Therefore, SWC may not
> intervene as of right.

5  (*Id*. at 8-9.)  SWC has appealed this determination.  (Doc. 113,

6  filed Aug. 8, 2005; *NRDC v. Norton*, No. 05-16581 (9th Cir. filed

7  Sept. 29, 2005).)  Plaintiffs request that this court apply a

8  similar analysis to the pending motions to intervene.  In the

9  alternative, Plaintiffs request that the district court defer

10 ruling on the pending motions until the Ninth Circuit has taken

11 action on SWC's appeal. (Doc. 142, Opp'n to DWR's Mot., at 7.)

12     The moving party, DWR, is the state agency charged with

13 management and operation of the SWP.  As described above, DWR

14 operates a number of facilities discussed in the OCAP BiOp and

15 has proposed a number of actions addressed by the OCAP BiOp.  It

16 is a joint contractor with the Bureau in managing some operations

17 of the CVP.

18

19                    **III.   DISCUSSION**

20     **A.    Intervention as of Right.**

21         **1.    Legal Standard.**

22     Intervention is governed by Federal Rule of Civil Procedure

23 24.  To intervene as a matter of right under Rule 24(a)(2), an

24 applicant must claim an interest, the protection of which may, as

25 a practical matter, be impaired or impeded if the lawsuit

26 proceeds without the applicant.  *Forest Conservation Council v.*

27 *United* States Forest Serv., 66 F.3d 1489, 1493 (9th Cir. 1993).

28 The Ninth Circuit applies Rule 24(a) liberally, in favor of

**12**

intervention, and requires a district court to "take all well-pleaded, non-conclusory allegations in the motion as true absent sham, frivolity or other objections." *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001). A four part test is used to evaluate a motion for intervention of right:

>    (1)   the motion must be timely;

>    (2)   the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action;

>    (3)   the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and

>    (4)   the applicant's interest must be inadequately represented by the parties to the action.

*Forest Conservation Council*, 66 F.3d at 1493.

### 2.   Timeliness; Significant Protectable Interests; Impairment of Interests.

Plaintiffs have not disputed that DWR satisfies the first three elements for intervention of right.

In assessing timeliness, courts in the Ninth Circuit must consider: (1) the current stage of the proceedings; (2) whether the existing parties would be prejudiced; and (3) the reason for any delay in moving to intervene. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).  In this case, Plaintiffs filed their initial complaint on February 15, 2005.  (Doc. 1.)  The Authority, the Farm Bureau, and the SWC, filed motions to intervene in March 2005.  Plaintiffs filed a First Supplemental Complaint on May 20, 2005.  (Doc. 40.)  A

13

1  decision on the motions to intervene issued June 13, 2005.  (Doc.

2  45.)  The administrative record was filed July 25, 2005.  On

3  September 6, 2005, the action was transferred to the Eastern

4  District.  An initial scheduling conference is set for February

5  8, 2006.  The district court has not yet made any jurisdictional

6  or merits rulings in this case.  The existing parties are not

7  prejudiced when "the motion was filed before the district court

8  made any substantive rulings."  *Northwest Forest Resource Council*

9  *v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996).  The motion to

10  intervene is timely.

11      To demonstrate a "significantly protectable interest," "a

12  prospective intervenor must establish that (1) the interest

13  asserted is protectable under some law, and (2) there is a

14  relationship between the legally protected interest and the

15  claims at issue."  *Id.*  A prospective intervenor has a sufficient

16  interest "where the contractual rights of the applicant may be

17  affected by a proposed remedy."  *Forest Conservation Council*, 66

18  F.3d at 1495.  Here, among other remedies, Plaintiffs seek to

19  have the OCAP BiOp declared invalid and request injunctive relief

20  to prevent the defendants "from taking any action in reliance on

21  the invalid Biological Opinion."  Either of these remedies would

22  affect "significant protectable interests" of the DWR in its

23  operation of the SWP and responsibilities for coordination of the

24  CVP.  For example, the incidental take statement contained within

25  the OCAP BiOp provides DWR with immunity from liability under the

26  ESA's take provisions, should DWR's operation of the SWP result

27  in take of the Delta smelt.  Paragraph 31 of the complaint

28  alleges that DWR has operated the SWP in such a way that the ESA-

**14**

mandated incidental take limits for both species have been
exceeded.  This means that, in addition to injunctive relief, DWR
is also subject to potential criminal liability.  It is hard to
formulate a more direct, specific, and non-representative
interest a perspective intervenor could have.  No one but the DWR
operates the SWP.  No party other than the DWR can adequately
represent that operator interest.

Finally, DWR can demonstrate that disposition of this action
may impair or impede its ability to protect its interests.  This
requirement demands only a showing that the applicant "would be
substantially affected in a practical sense by the determination
made in an action." *Southwest Ctr. for Biodiversity*, 268 F.3d at
822.  If the OCAP is invalidated, among other things, DWR may be
exposed to liability for unlawfully taking Delta smelt.
Similarly, injunctive relief may have differing effects upon the
various facilities governed by the OCAP.  Accordingly, DWR will
be substantially affected in a practical sense by any injunctive
relief issued in this action and faces potential criminal
liability for its actions or inactions in SWP management.  The
practical implications for DWR's separate operations of the SWP
are not representative of nor are they synonymous with the
practical impact upon the Bureau in its role as operator and
manager of the SVP.

### 3.    Adequate Representation of DWR's Interest by Existing Parties.

The crux of this dispute is whether DWR's interests are
adequately protected by other defendants or defendant-

**15**

intervenors.   In assessing the adequacy of representation, the Ninth Circuit looks at three factors:

> (1)   whether the existing parties will undoubtedly make all of the applicant's arguments;
>
> (2)   whether the existing parties are capable of and willing to make the applicant's arguments; and
>
> (3)   whether the applicant offers a necessary element to the proceedings that otherwise would be neglected.

*Southwest Center for Biological Diversity,* 268 F.3d at 823. "[T]he requirement of inadequacy of representation is satisfied if the applicant shows that representation of its interests may be inadequate....[T]he burden of making this showing is minimal." *Sagebrush Rebellion Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983).

It is "well-settled precedent in this circuit" that "[w]here an applicant for intervention and an existing party have the same ultimate objective, a presumption of adequacy of representation arises." *League of United Latin Am. Citizens*, 131 F.3d at 1305. This presumption is triggered here, Plaintiffs argue, because DWR and the Federal Defendants share the ultimate objective of upholding the validity of the OCAP BiOP. *See id.* (ultimate objective of upholding validity of a law shared by state defendants and prospective intervenor, a political interest-group).   However, the presumption is rebuttable upon a showing that the applicant and the existing parties "do not have sufficiently congruent interests." *Southwest Center for Biological Diversity*, 268 F.3d at 823.

DWR suggests that its interests diverge from the federal defendants' in several respects.   First, DWR submits that the

**16**

1   federal defendants will not adequately represent its interests in

2   the two components of the SDIP:  8500 Banks and the creation of

3   permanent barriers in the Southern Delta.  These proposed actions

4   involve <u>only</u> SWP facilities.  The federal defendants may be

5   "affected" by a change in the proposed actions, but have no

6   responsibility for these SWP operations.  The state has provided

7   the bulk of funding for SDIP-related environmental compliance

8   efforts and DWR will be solely responsible for implementation.

9   The federal defendants have no such interests.

10       Second, DWR argues that it has a unique interest in a long-

11   term EWA.  DWR has been far more involved in the EWA than has the

12   Bureau.  Almost all of the operational curtailments for the EWA,

13   intended to afford additional protection for fish, have been

14   provided by DWR.  The invalidation of the OCAP BiOp, which

15   provides early consultation coverage for the long-term EWA, would

16   have a disproportionate impact upon DWR, not shared by the

17   Bureau.

18       Third because the North Bay Aqueduct is a SWP operation, the

19   federal defendants have no direct management interest in the

20   Aqueduct and cannot adequately represent DWR's interest in

21   defending operational modifications (including the elimination of

22   certain monitoring requirements) applicable to the North Bay

23   Aqueduct set forth in the OCAP BiOp.  DWR apparently has already

24   shifted to the new monitoring approach set forth in the OCAP

25   BiOp.[4]

26

27           [4]   Finally, DWR asserts that neither the Authority nor the
    Farm Bureau hold water supply contracts with the State Water
28   Project, and as such their party status does not adequately
    represent DWR's unique interests.  This appears to be an
    incorrect, or at least misleading, assertion.  Plaintiffs

**17**

Plaintiffs rejoin by arguing that none of these "unique interests" are called into issue by the claims in the complaint. Plaintiffs summarize their five central claims as follows:

> The complaint alleges that the OCAP BO, which concludes that CVP-SWP operations pursuant to the OCAP will neither jeopardize the continued existence of the Delta smelt nor result in the destruction or adverse modification of its critical habitat, is legally inadequate in five respects:
>
> (1)   The BO failed to consider adequately how the OCAP would affect Delta smelt critical habitat's value for recovery of the species;
>
> (2)   the conclusions of the BO are unsupported by the record;
>
> (3)   the BO improperly relied on uncertain future mitigation measures and a promise of "adaptive management" but failed to provide adequate evidence that such mitigation measures would in fact be taken and be effective, and to identify concrete actions that would ensure that future "adaptive management" would be sufficient to ensure protection of the Delta smelt and its critical habitat;
>
> (4)   the BO failed properly to define the agency action or to consider the effects of the action, thereby significantly underestimating or ignoring the effects of the entire agency action; and
>
> (5)   the BO failed to consider the best available scientific information regarding the Delta smelt. First Supplemental Complaint at ¶¶ 51-56.

maintain that the Farm Bureau represents 89,000 farmers, some of whom <u>do</u> receive water from the SWP. Nevertheless, even if the Farm Bureau does represent SWP water users, DWR's interests, as an operator and adverse contracting party, are not identical to those of water users. A state agency has a broader duty to comply with environmental laws and to balance other interests. *See Southwest Center for Biological Diversity*, 268 F.3d at 823 (acknowledging argument that a city might have a broader range of interests and responsibilities than does a private developer).

(Doc. 152 at 5-6.)  Plaintiffs also suggest that "matters of remedy are distant and uncertain at this point in the litigation...."  (*Id*. at 6.)[5]

Plaintiffs arguments are unconvincing in two respects. First, by Plaintiffs' own description, their third central legal argument is a challenge to the DSRAM adaptive management process. The DSRAM directly implicates several programs in which DWR has unique management interests, and actions taken in accordance with DSRAM could modify state project operations over which DWR has sole responsibility.  For example, if any of the trigger criteria under the DSRAM are met or exceeded, the protocol calls for the convening of the Delta Smelt Working Group ("DSWG").  The DSWG is supposed to then recommend corrective actions to the Water Operations Management Team ("WOMT").  The OCAP BiOp identifies four specific actions that the DSWG and WOMT must consider: (1) export reductions at one or both of the projects; (2) changes in the south Delta barrier operations; (3) changes in San Joaquin River flows; and (4) changes in the operation of the Delta cross channel.  DWR is the agency with sole operational authority over any south Delta barrier.  The OCAP Biop serves as early

---

[5]     Plaintiffs also note that the Bureau, not DWR, was the primary force behind the OCAP BiOp, but this is not legally significant.  The intervention of state agencies is favored, as they are presumed to represent the citizens of the state. *See Nebraska v. Wyoming*, 515 U.S. 1, 21 (1983).

consultation for DWR's operation of the barriers as part of the SDIP. In this respect, DWR, as the responsible government agency, is far more technically capable of and directly interested in making arguments in defense of allowing the SDIP and related projects to continue should any injunctive relief issue in this case and is the only party with standing to represent the manager or operator interest in the SDIP.

Plaintiffs' also minimize the legal import of the requested remedies in this case. The Ninth Circuit places considerable weight on the practical consequences of a lawsuit. Courts must determine whether an applicant's ability to protect its interests will be, "as a practical matter, impaired or impeded by the disposition of the action." *Forest Conservation Council*, 66 F.3d at 1497-98.[6]

In *Forest Conservation Council*, environmental groups sued the Forest Service for failing to undertake appropriate environmental review of its guidelines for the management of Northern Goshawk habitat. The State of Arizona moved to intervene, arguing that the issuance of an injunction requested

---

[6] Although *Forest Conservation Council* applies this "practical matter" language in the context of the third element ("practical impairment") of the intervention of right test, this language has informed the Ninth Circuit's reasoning on the fourth element (adequacy of representation) as well. *See Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). The language is drawn from the Rule 24 advisory committee notes that state "if an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."

by plaintiffs would threaten state lands adjacent to forest service lands because suspension of forest management activities would increase the likelihood of catastrophic forest fires. Similarly, an Arizona county moved to intervene, asserting that the relief sought by plaintiffs would adversely affect its interest in the revenue it receives from taxes and fees imposed on the use of the federally-controlled lands. *Id*. at 1492. The Ninth Circuit held that both the State and the County had the right to intervene, rejecting the argument that "amicus curiae status is sufficient for [applicants] to protect their interests....[because if applicants] are not made a party to this action, they will have no legal means to challenge [any] injunction while it remains in effect." *Id*. at 1498.

In the same way, DWR has a direct interest in participating in this lawsuit to help shape and have standing to challenge any injunctive relief, which will be directly applicable to its management and operation of the SWP. DWR also has unique interests in the viability of the OCAP BiOp. If intervention is denied, DWR will be effectively prevented from challenging, or seeking to modify as necessary, any injunctive relief that is designed to control the DWR's management and operation of the SWP.

DWR's motion for intervention of right is **GRANTED subject to any conditions ordered after the scheduling conference in this case.** (*See infra* Part III.C.)

**21**

1

2   **B.   <u>Permissive Intervention</u>**.

3   Alternatively, DWR requests permission to permissively

4   intervene pursuant to Rule 24(b)(2), which provides that a court

5   may, in its discretion, permit intervention, "when an applicant's

6   claim or defense and the main action have a question of law or

7   fact in common."  In exercising its discretion the court "shall

8   consider whether the intervention will unduly delay or prejudice

9   the adjudication of the rights of the original parties."  *Id*.

10              The language of the rule makes clear that if the would
11              be intervenor's claim or defense contains no question
                of law or fact that is raised also by the main action,
12              intervention under Rule 24(b)(2) must be denied. But,
                if there is a common question of law or fact, the
13              requirement of the rule has been satisfied and it is
                then discretionary with the court whether to allow
14              intervention.

15  *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir.

16  2002).  "Where proposed intervenors would present no new

17  questions to the court, a motion for permissive intervention is

18  properly denied."  *Hallco Mfg. Co., Inc. v. Quaeck*, 161 F.R.D.

19  98, 103 (D. Or. 1995).  Here, however, as discussed, DWR presents

20  new questions concerning the propriety of certain forms of

21  potential relief that may be issued against it in this case.

22

23

24   **C.   <u>Conditions Upon Intervention</u>**.

25   Plaintiffs suggest that DWR's intervention will cause undue

26  burden for the existing parties, however any such burden can be

27  minimized by placing reasonable conditions upon DWR's

28

**22**

intervention and upon other parties' participation in briefing and argument with a view toward avoiding duplication, inefficiency, and undue burden on the court and party resrouces. The Advisory Committee Notes to the 1966 Amendment to Rule 24 state: "An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."[7]  Accordingly, DWR may be required to coordinate briefing or share oral argument with the existing parties.  Any such coordination will be discussed at the scheduling conference and will continue through management of the case to final judgment.

**D.   Request to Stay Decision on this Motion Pending Resolution of SWC's Appeal.**

Plaintiffs request that any decision permitting intervention be stayed until the Ninth Circuit has an opportunity to decide the pending appeal.  Plaintiffs, however, provide no justification for this request.  SWC's motion to intervene is entirely distinguishable from the circumstances of this motion.

---

[7]     DWR appears to argue that conditioning intervention would not be appropriate, citing *California v. United States*, 805 F.2d 857 (9th Cir. 1986), a case in which the Ninth Circuit happened not to place conditions on permissive intervention. This case does not suggest it would be inappropriate to do so when necessary to promote the efficient and economical disposition of the case.

**23**

Judge Wilken reasoned that SWC, which represents public agencies with contracts for CVP water, did not present any unique interests and could be adequately represented by other parties to the case:

> Authority will represent the interests of CVP water users, and Farm Bureau will represent the interests of SWP water users.  Authority will represent public water agencies' interests and Farm Bureau will represent individual consumers' interests.

(Doc. 45 at 8-9.)  As is obvious from a number of lawsuits already on file, the Farm Bureau's primary interest is in the preservation and protection of farmland and the effect of the water supply on farming generally.  To the contrary, CVP contractors have decidedly competing interests, inter se, as they compete for priority in entitlement to water allocations under their federal water service contracts.  SWP users, incidentally represented by the Farm Bureau, arguably have different legal positions and interests from State Water Contractors that are public agencies, all of whose interests are different from the DWR, both because DWR is an adverse contracting party, representing a different sovereign, and because DWR has independent duties to protect the public trust.  Further, in prior litigation over the CVP, DWR and Bureau interests have diverged, where state and federal scientists disagreed about the status of the species and presented different recommendations for its protection.  Nothing will be gained by delaying the decision

on the DWR's intervention, by reason of its wholly unique status and different interests in SWP operations and management.  The pending SWC appeal does not address the interests discussed in this decision.

## IV.   CONCLUSION

DWR's motion to intervene as a matter of right is **GRANTED** subject to any conditions set forth during the scheduling conference in this case.

**SO ORDERED**

**Dated: January 5, 2006**                    **/s/ OLIVER W. WANGER**

                                   **OLIVER W. WANGER**
                                   **United States District Judge**