1

2

3

4

5
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| 7 NATURAL RESOURCES DEFENSE COUNCIL, *et al.*, | 1:05-CV-01207 OWW LJO |
| 8         Plaintiffs, | ORDER DENYING MOTIONS TO DISMISS, REMAND, AND STAY. |

7 **NATURAL RESOURCES DEFENSE COUNCIL,** *et al.*,

        Plaintiffs,

    v.

**GALE A. NORTON, in her official capacity as Secretary of the Interior,** *et al.*,

        Defendants,

    v.

**SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,** *et al.*,

        Defendant-Intervenors.

**PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,** *et al.*,

        Plaintiffs,

    v.

**CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.*,

        Defendants,

    v.

**SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,** *et al.*,

        Defendant-Intervenors.

1:05-CV-01207 OWW LJO

ORDER DENYING MOTIONS TO DISMISS, REMAND, AND STAY.

1

1

## I.   **INTRODUCTION**

2   Before the court for decision are a number of procedural

3 motions in two parallel cases: *NRDC v. Kempthorne* ("*NRDC*"),

4 1:05-cv-01207, which concerns the impact of the 2004 Operations

5 and Criteria Plan ("OCAP")[1] on the endangered Delta smelt; and

6 *Pacific Coast Federation of Fishermen's Associations   v.*

7 *Gutierrez* ("*PCFFA*"), 1:06-cv-00246, which concerns the impact of

8 the OCAP on several endangered and threatened species of

9 salmonids.

10   In both cases, Plaintiffs challenge biological opinions

11 ("BiOps") issued under the ESA by the United States Fish and

12 Wildlife Service ("USFWS") (for the Delta smelt case) and the

13 National Marine Fisheries Service ("NMFS") (for the salmonid

14 case), which address whether the OCAP will jeopardize the

15 respective listed species.  Among other things, the lawsuits

16 allege that the BiOps fail to consider the best available science

17 and rely upon uncertain (and allegedly inadequate) adaptive

18 management processes to monitor and mitigate the potential

19 impacts of the OCAP.

20   In mid-2006, USFWS and NMFS announced that they would re-

21 initiate consultation, respectively, on the challenged biological

22 opinions.  It is anticipated that new BiOps will be issued within

23 18 months.  For several months during the fall of 2006, the

24 parties attempted to reach a settlement as to the management of

25 the SWP and CVP during the interim period.  These negotiations

26

27   [1]   The OCAP governs the coordinated operation of the
federal Central Valley Project ("CVP") and the State Water
28 Project.

**2**

failed to resolve the parties' remaining disputes.  Among others,
dispute continue over: (1) the fact that the Federal and State
Defendants plan to continue to implement the OCAP in accordance
with the challenged BiOps and (2) that the federal defendants
have not promised to maintain the pre-2004 status quo, although
the exact actions they plan to take are unclear.

In both *NRDC* and *PCFFA*, the federal defendants now move:
(1) to dismiss on prudential mootness grounds; (2) for a
voluntary remand without vacatur; or (3) for a stay pending the
completion of renewed consultation based on the doctrine of
primary jurisdiction.  In addition, federal defendants move to
consolidate *NRDC* and *PCFFA* for the purposes of deciding the above
motions and for the purpose of deciding how the CVP and SWP
should be operated during the interim period, should any such
decision be necessary.

Plaintiffs oppose dismissing, remanding, staying, or
consolidating these cases.  Rather, Plaintiffs request a prompt
hearing on the merits in the *NRDC* case.  If they prevail,
Plaintiffs anticipate asking the court to impose some form of
interim relief.

Defendant-Intervenors and the Sederal Defendants support the
issuance of a stay in this case, rather than dismissal, remand,
or a hearing on the merits.  Relative to a hearing on the merits,
which Defendant-Intervenors suggest would be a waste of judicial
resources, Defendant-Intervenors suggest that Plaintiffs always
have the option of appealing to the court for injunctive relief,
should any of the management activities threaten the species.

**3**

## II.   **BACKGROUND**

Both the Delta smelt (*NRDC*) and salmonid (*PCFFA*) cases concern the coordinated operation of the federally-managed Central Valley Project ("CVP") and the State of California's State Water Project ("SWP").  Both projects divert large volumes of water from the California Bay Delta ("Delta") and use the Delta to store water.

The Delta is home to a number of endangered and threatened species, including the endangered Delta smelt (*Hypomesus transpacificus*), a small, slender-bodied fish endemic to the Delta.  Historically, the Delta smelt could be found throughout the Delta, but the population has declined significantly in recent years.  The Delta and its tributaries are also home to various endangered salmonid species, including the endangered Sacramento River winter-run Chinook salmon; the threatened Central Valley spring-run Chinook salmon; the threatened Central Valley steelhead; the threatened Southern Oregon/Northern California coho salmon; and the threatened California Coast steelhead.  Plaintiffs concede that the population of one of these species, the winter-run Chinook, has increased somewhat in recent years, but the administrative record reveals that their population remains small and vulnerable.  All of the other salmonid species are alleged to remain low in abundance and face threats from limited habitat, low stream flows, higher than ideal water temperatures, and entrainment in CVP/SWP facilities.

//

//

//

1        **A.    Coordinated Operations and the ESA**.

2        The state and federal agencies charged with management of

3   the CVP and SWP share certain facilities and coordinate

4   operations with one another pursuant to a Coordinated Operating

5   Agreement ("COA").  The COA, which originated in 1986, has

6   evolved over time to reflect, among other things, changing

7   facilities, delivery requirements, and regulatory restrictions.

8   The most recent document concerning coordinated management is the

9   Operating Criteria and Plan (OCAP).  The OCAP proposes a number

10  of changes to the coordinated operation of the CVP and SWP, some

11  of which are discussed in greater detail below.

12       Because various endangered and/or threatened species reside

13  in the area affected by the CVP and SWP, the OCAP must comply

14  with various provisions of the ESA.[2]  In this case, the Bureau of

15  Reclamation entered into formal and early consultation with both

16  the USFWS and NMFS concerning the OCAP's impact on the various

17  species under each agency's jurisdiction.

18

19  _____

20       [2]    Specifically, prior to authorizing, funding, or
    carrying out any action, a federal agency must first consult with
21  USFWS and/or NMFS" to "insure that [the] action...is not likely
    to jeopardize the continued existence of any endangered species
22  or threatened species or result in the destruction or adverse
    modification of habitat of such species which is determined...to
23  be critical...." 16 U.S.C. § 1536(a)(2) [ESA § 7(a)(2)].  (This
    form of consultation is called "formal consultation."  50 C.F.R.
24  § 402.02.)  In addition, an independent consultation obligation
    arises under § 1536(a)(3) where the federal agency "has reason to
25  believe that an endangered species or a threatened species may be
    present in the area affected by this project and that
26  implementation of such action will likely affect such species."
    (This form of consultation is called "early consultation."  50
27  C.F.R. § 402.02.)

28

**5**

1        **B.    The Development of the 2005 USFWS OCAP BiOp**.

2        Prior to 2004, the OCAP operated under Biological Opinions
3   issued in 1993 and 1995.  (The age of these prior BiOps is
4   potentially important, as Plaintiffs seek to vacate the more
5   recent documents.  Although there is little information about the
6   1993/1995 BiOps in this record, USFWS asserts that the
7   information contained within them is now seriously outdated.)

8        On June 30, 2004, USFWS issued a Biological Opinion (the
9   "2004 USFWS OCAP BiOp"), addressing the impact of the OCAP on the
10  Delta smelt.[3]  On February 16, 2005, USFWS issued an amended BiOp
11  (the "2005 USFWS OCAP BiOp"), which superceded the 2004 USFWS
12  OCAP BiOp.

13       The 2005 USFWS OCAP BiOp addresses the operation of the CVP
14  and SWP as well as several future actions.  These future actions,
15  some of which are discussed in greater detail below, are:
16  (1) increasing flows in the Trinity River; (2) "8500 Banks";
17  (3) operating permanent barriers in the South Delta;

18

19       [3]    On August 4, 2005, the Ninth Circuit decided *Gifford
20  Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378
    F.3d 1059, 1069 (9th Cir. 2004), which held that the USFWS's
21  definition of "adverse modification" to critical habitat is an
22  impermissible interpretation of the ESA because it focuses on
    whether critical habitat modifications would impact the <u>survival</u>
23  of a species, effectively ignoring the statutorily-mandated goal
    of "<u>recovery</u>."  In November 4, 2004, presumably in response to
24  this ruling, the Bureau requested reinitiation of formal
    consultation to address critical habitat issues.
25       Plaintiffs, a coalition of non-profit conservation
26  organizations, filed suit on February 15, 2005, alleging that the
    2004 USFWS OCAP BiOp was legally inadequate in light of *Gifford
27  Pinchot* and should be invalidated.  (Doc. 1.)  Plaintiffs named
    as defendants the Department of the Interior and the USFWS.
28  (*Id.*)

**6**

1 (4) operating an intertie between the California Aqueduct and the

2 Delta-Mendota Canal; (5) a long-term Environmental Water Account

3 ("EWA"); (6) delivery of CVP water to the Freeport Regional Water

4 Project ("FRWP"); and (7) various other operational changes,

5 including changes to a monitoring program at the North Bay

6 Aqueduct.  (2005 USFWS OCAP BiOp at 10, 76-77.)

7      The 2005 USFWS OCAP BiOp concludes that the coordinated

8 operation of the SWP and CVP, including the proposed future

9 actions, will not jeopardize the Delta smelt's continued

10 existence.  (2005 USFWS OCAP BiOp at 223.)  Although the 2005

11 USFWS OCAP BiOp recognizes that existing protective measures may

12 be inadequate, the USFWS concluded that certain proposed

13 protective measures, including the EWA and a proposed "adaptive

14 management" protocol would provide adequate protection.  The

15 proposed adaptive management protocol is known as the Delta Smelt

16 Risk Assessment Matrix ("DSRAM").  The DSRAM utilizes a list of

17 trigger criteria monitored on a monthly basis from December to

18 July.  (Id. at 98-103.)  If any trigger criteria is met or

19 exceeded, a Delta Smelt Working Group ("DSWG") is convened.  The

20 DSWG consists of representatives from USFWS, the California

21 Department of Fish and Game, DWR, the United States Environmental

22 Protection Agency, the Bureau, and the California Bay-Delta

23 Authority.  The DSWG then recommends corrective actions to a

24 Water Operations Management Team ("WOMT").  The 2005 USFWS OCAP

25 BiOp identifies four specific actions that the DSWG and WOMT must

26 consider: (1) export reductions at one or both of the projects;

27 (2) changes in the south Delta barrier operations; (3) changes in

28 San Joaquin River flows; and (4) changes in the operation of the

**7**

1  Delta cross channel.[4]

2      The federal government now acknowledges that shortly before

3  the 2005 USFWS OCAP BiOp was completed, a fall midwater trawl

4  survey of Delta smelt revealed a "substantial decline in the

5  population index for the species."  At the time the BiOp was

6  issued, the government asserts that "limited analysis of this

7  data existed, and the Service relied on the raw data, and its own

8  professional judgments, as the best scientific and commercial

9  data available."  However, since the issuance of the BiOp, the

10 CALFED agencies have analyzed the new trawl data.  In part as a

11 result of their analyses, the Service and Bureau "have concluded

12 that substantial new information indicates that the agencies

13 should revisit the [2005 USFWS OCAP BiOp], including the jeopardy

14 and adverse modification analysis, and incidental take

15 statement."  (Doc. 240 at 4-5.)[5]

16     Scientists from CALFED Bay-Delta Program participant

17 agencies recently developed a document based upon the new data:

18 the Interagency Ecological Program Synthesis of 2005 Work to

19 Evaluate the Pelagic Organism Decline (POD) in the Upper San

20 Francisco Estuary (the "IEP POD Synthesis").  This document led

21 the federal defendants to conclude that the OCAP for the CVP and

22

23        [4]   The 2005 USFWS OCAP BiOp also includes an incidental

24 take statement that insulates operations implemented according to
the OCAP from liability for taking Delta smelt.  (2005 USFWS OCAP

25 BiOp at 223.)

26        [5]   50 C.F.R. § 402.16(b) calls for the reinitiation of

27 formal consultation "[i]f new information reveals effects of the
action that may affect listed species or critical habitat in a

28 manner or to an extent not previously considered."

**8**

SWP may affect Delta smelt in a manner or to an extent not previously considered.  (IEP POD Synthesis, Doc. 240, Attachment 1.)

       In addition, other new information recently became available, including information concerning changes to the operation of project elements and new studies on the impact of climate change.  The Federal Defendants submit that this new information may affect the 2005 USFWS OCAP Biop in several ways:

> First, the environmental baseline and jeopardy analysis
> will be revisited, because whether or not the OCAP
> implementation will appreciably reduce the likelihood
> of survival and recovery of the Delta smelt must be
> evaluated against what may likely be a new baseline,
> potentially with a lower species population than was
> previously understood to exist. Second, the critical
> habitat analysis will be revisited, because data on
> salinity concentrations, declining population
> recruitment activity from downstream areas, and
> invasion of the exotic clam species, potamocorbula
> amurensis, require further analysis of whether the
> implementation of the OCAP adversely modifies critical
> habitat, in terms of both survival and recovery of the
> species. Third, and finally, the existing incidental
> take statement may need to be revised to take into
> account recent Delta smelt populations changes.

(Doc. 242 at 6.)

       On July 6, 2006, the Bureau of Reclamation (the "Bureau") requested that the USFWS re-initiate consultation concerning the impact of the OCAP on the Delta smelt.  (Doc. 240.)  In a July 6, 2006 letter from the Bureau to the USFWS, the Bureau acknowledged that "emerging data indicates an apparent substantial decline in the Delta smelt population index."  (Doc. 240-2.)

//

//

//

//

**9**

C.   **The NMFS OCAP BiOp**.

In the *PCFFA* case, a parallel consultation process resulted in the issuance by NMFS of a Biological Opinion ("BiOp") on October 21, 2004, (the "2004 NMFS OCAP BiOp"), which addressed the impact of the OCAP on the salmonid species.  The 2004 NMFS OCAP BiOp concludes that the salmonid species may be adversely affected by the CVP and SWP.  For example the systems' dams and other water management structures have altered some salmonid species' habitat and limited the habitat available for spawning and rearing.  In addition the salmonid species may be adversely affected by project operations.  The storage and release of water will affect river flows and temperatures, and the diversion of water may result in entrainment at fish screens and pumps.

Subsequent to the issuance of the 2004 NMFS OCAP BiOp, NOAA listed the green sturgeon population segment as threatened and designated critical habitat for numerous salmonid and steelhead species.  The Bureau acknowledges that this is "new information" requiring the reinitiation of ESA § 7 consultation on the 2004 NMFS OCAP BiOp.  In addition, the federal defendants acknowledge that independent peer-reviews and an audit "provided important feedback" on the 2004 NMFS OCAP BiOp.  (Doc. 81 at 7.) Accordingly, the Bureau and NMFS are revisiting the 2004 NMFS OCAP BiOp, including "the potential effects of ongoing CVP and SWP operations to the newly listed species and newly designated critical habitat, the jeopardy and adverse modification, analysis and the incidental take statement."  (*Id*.)

**10**

1        **III.   EVIDENTIARY DISPUTES**

2        **A.   Plaintiffs' Requests for Judicial Notice**.

3        In opposition to the federal defendants motion to dismiss,

4   remand and or stay in the Delta smelt case, Plaintiffs request

5   that the district court take judicial notice of a number of

6   documents.  One of the documents is an unpublished court decision

7   in *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, No. CV

8   01-152-M-DWM (D. Mont. Mar. 19, 2002) (Docket No. 24).  This is a

9   judicially noticeable court record.  No party objects to the

10  court taking judicial notice of another court document,

11  consisting of excerpts from the CALFED Programmatic Record of

12  Decision, issued August 8, 2000, and obtained from the CALFED

13  website.

14       The remaining documents appear to post-date the issuance of

15  the challenged biological opinions.  Federal defendants object to

16  the court taking judicial notice of these documents on the ground

17  that the scope of review in this case should be limited to the

18  administrative record.  (*NRDC* Doc. 283; *PCFFA* Doc. 88.)  Section

19  706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706,

20  provides for judicial review of federal administrative actions

21  based upon "the whole record or those parts of it cited by the

22  party."  In general, review should be of "the full administrative

23  record that was before the [agency decisionmaker] at the time he

24  made his decision." *Citizens to Preserve Overton Park, Inc. v.*

25  *Volpe*, 401 U.S. 402, 420 (1971).  For example, post-decisional

26  documents are not ordinarily included in the administrative

27  record.  *See Rock Creek Alliance v. United States Fish and*

28  *Wildlife Serv.,* 390 F. Supp  2d 993, 998 (D. Mont. 2005)(refusing

**11**

to consider post-decisional information not available to the agency in that particular form at the time of the decision).  The Ninth Circuit recognizes several exceptions to this general rule, however.  District courts are permitted to admit extra-record evidence:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision,

> (2) if the agency has relied on documents not in the record,

> (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or

> (4) when plaintiffs make a showing of agency bad faith.

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004). "These limited exceptions operated to identify and plug holes in the administrative record...[and] are narrowly construed and applied."  *Id.*

> The scope of these exceptions permitted by our precedent is constrained, so that the exception does not undermine the general rule. Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that federal courts would be proceeding, in effect, de novo, rather than with the proper deference to agency process, expertise, and decision-making.

*Id.*

Plaintiffs make no effort to provide legal authority to support supplementation of the administrative record with these post-decisional documents, nor do they suggest why the record of this case should not be limited to the administrative record. Although post-decisional information might be relevant in the context of a motion for interim injunctive relief, Plaintiffs do not explain why these documents should be considered as part of

their continued challenge to the merits of the challenged BiOps.

The request for judicial notice is **DENIED WITHOUT PREJUDICE,**

except with respect to the unpublished decision from *Rock Creek*

*Alliance* and the excerpts from the 2000 CALFED Programmatic

Record of Decision of which judicial notice has been taken.


**B.   Defendant-Intervenors' Requests for Judicial Notice.**

In both cases, Defendant-Intervenors request that the

district court take judicial notice of:

> The August 15, 2002 order of The Honorable Robert E.
> Coyle, United States District Judge for the Eastern
> District of California in Association of California in
> *Water Agencies v. Evans*, E.D. Cal. Case No.
> CV-F-00-6148 REC/DLB.

This is a judicially noticeable public record. *Schweitzer v.*

*Scott*, 469 F. Supp. 1017, 1020 (C.D. Cal. 1979)("Although

each case must be viewed on its merits, the Court is empowered to

and does take judicial notice of court files and records.").

In addition, in the *NRDC* case, Defendant-Intervenors request

that the court take judicial notice of:

> The October 27, 2006 Memorandum to the Administrative
> Record from Deputy Assistant Secretary, Fish and
> Wildlife and Parks explaining the contents of an email
> sent by Deputy Assistant Secretary Julie MacDonald to
> Steve Thompson, et al., on April 1, 2004, regarding the
> Fish and Wildlife Service's five-year status review for
> the Delta smelt. This document was previously made part
> of the administrative record in *San Luis & Delta-*
> *Mendota Water Authority v. United States Department of*
> *the Interior* (E.D.Cal., Oct. 27, 2006)
> F-02-6461-OWW-DLB.

This document is capable of being judicially notice, because a

court can take judicial notice of its own files and records in

other cases.  *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956,

965-66 (C.D. Cal. 2005); *Del Puerto Water Dist. v. United States*

*Bureau of Reclamation*, 271 F. Supp. 2d 1224, 1233 (E.D. Cal. 2003) (holding that a federal court "may take notice of proceedings in other courts...if those proceedings have a direct relation to the matters at issue.").

Defendant-Intervenors' request for judicial notice is **GRANTED**.


C.   **Objections to Declaration of Christina Swanson, Submitted by Plaintiffs**.

Plaintiffs present the declaration of a Dr. Christina Swanson, PhD, an experienced fisheries biologist. (*NRDC* Doc. 280.)  In her declaration Dr. Swanson summarizes recent referenced literature and an oral presentation from a recent conference.  Defendant-Intervenors object to substantial portions of Dr. Swanson's declaration the grounds of hearsay.  They also argue that certain portions constitute inadmissible opinion testimony. (*NRDC* Doc. 294)   As a threshold matter, however, the district court need not address these evidentiary objections because Plaintiffs have not demonstrated why Dr. Swanson's declaration should be considered by the district court at this time.  Her opinions are based at least in part on post-decision evidence and are essentially irrelevant to the pending motions.


**IV.   ANALYSIS**

A.   **Overview**.

In both *NRDC* and *PCFFA*, the federal defendants move (1) to dismiss on prudential mootness grounds; (2) to remand the case to the agency; or (3) for a stay pending the completion of renewed

**14**

consultation based on the doctrine of primary jurisdiction. Defendant Intervenors oppose dismissal or remand, but support the issuance of a stay.  Plaintiffs oppose dismissing, remanding, or staying the case.  Instead, <u>emphasizing the fact that Defendants continue to rely on the challenged BiOps</u>, Plaintiffs advocate proceeding with a decision on the merits (i.e., they seek a determination as to whether the BiOps violate the ESA).  If they prevail, Plaintiffs intend to seek interim remedial relief.

The federal defendants have also moved to consolidate *NRDC* and *PCFFA* for all purposes.  The Defendant-Intervenors have all joined the motion to consolidate.  Plaintiffs oppose consolidation.

### B. **Motion to Dismiss on Prudential Mootness Grounds**.

The federal defendants argue that both cases should be dismissed based on the doctrine of prudential mootness.  The doctrine of prudential mootness permits a court, in its discretion, to dismiss a case when

> a controversy, though not moot in the strict Article III sense, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant... Under both Article III and prudential mootness doctrines, the central inquiry is essentially the same: have circumstances changed since the beginning of the litigation that forestall any occasion for meaningful relief.

*Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1244 (E.D. Cal. 1999).  "[T]he doctrine of prudential mootness...has particular applicability in cases...where the relief sought is an injunction against the government."  *Southern Utah Wilderness Alliance v.*

*Smith*, 110 F.3d 724, 727 (10th Cir. 1997).  A court should decline to grant declaratory or injunctive relief where the government "has already changed or is in the process of changing is policies or where it appears that any repeat of the actions in question is otherwise highly unlikely."  *Building and Const. Dept. v. Rockwell Intern. Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993).

Here, Federal Defendants assert that the reinitiation of formal consultation is a change in circumstance that forestalls any possibility of meaningful relief in this court.  Federal Defendants also assert that Plaintiffs' claims will be considered through the reinitiated consultation process.  (*NRDC* Doc. 242-1 at 8.)  Federal Defendants cite an unpublished district court case that considered the applicability of prudential mootness after a federal agency defendant reinitiated ESA § 7 consultation.  *See, e.g. Or. Natural Res. Council v. Keys*, 2004 WL 1048168 (D. Or. May 7, 2004) (applying doctrine of prudential mootness where agency was in the process of reinitiating consultation and "plaintiffs' concerns [would] be fully addressed in the new consultation").

But, Plaintiffs correctly point out that courts have refused to dismiss on prudential mootness grounds where the action agency did not indicate an intent to change its operations.  *See Am. Rivers, Inc. v. NOAA Fisheries*, No. CV-04-0061, 2004 WL 2075032 at *3 (D. Or. Sept. 14, 2004).  In that case, the district court refused to dismiss on prudential mootness grounds despite reinitiation of consultation because the agencies involved did not intend to change their opinion or alter their operations

**16**

significantly.

Here, the Defendants have volunteered to change their operations to a certain extent.  For example, DWR has promised that it will NOT increase pumping above pre-2004 levels.  The Federal Defendants have made a less firm commitment to maintain pumping from the Tracy Pumping Plant at "recent historic" levels. In addition, Federal Defendants have promised that, during the interim period, they will

•    not execute long-term water service contracts for CVP
     water deliveries; and

•    not further implement new construction activities or
     long term projects in the Sacramento Delta without
     necessary ESA consultation;

Apart from these promises, however, the Federal Defendants continue to maintain that the challenged BiOps are valid and lawful, continue to implement at least some portions of the measures set forth therein, and continue to operate under the protection of the incidental take statements included in the BiOps.

Plaintiffs point to some specific examples of actions the Federal Defendants plan to take in reliance on the challenged BiOps.  In the salmonid case, the Federal Defendants want to alter the the pre-2004 temperature compliance point at Bend Bridge[6] and refuse to promise compliance with the pre-2004

_____

[6]    This temperature compliance point is the geographical point at which the temperature must be maintained at or below a certain level, to protect the salmonids' ability to successfully spawn and ensure that their offspring can survive downstream migration.  The Federal Defendants advocate allowing the compliance point to move geographically upstream during non-critical times of the year, because this will conserve cold water resources for more critical times of the year.

**17**

requirement that 1.9 million acre feet ("MAF") be held behind Shasta Dam as a cold water carryover.[7]  Plaintiffs maintain that the corrective measures (such as the EWA) set forth in the BiOps are insufficient to protect the species against such changes.

Plaintiffs' concerns have not been fully addressed by the reinitation of consultation.  Federal Defendants are relying in part on the challenged BiOps in operating the CVP and intend to continue to do so.  The controversy over whether the BiOps and OCAP should have continued viability is real and substantial. and this court could provide relief, in the form of a decision invalidating the BiOps followed by hearings on interim remedies.[8] Under these circumstances, it is not appropriate to deem this case prudentially moot.[9]

---

[7]     The 1.9 MAF coldwater carryover refers to an amount of cold water that is to be held behind Shasta Dam for the purpose of maintaining the appropriate coldwater compliance point.

[8]     The Defendants and Defendant-Intervenors suggest in the alternative that the court should forgo a decision on the merits, opting instead to stay the case while allowing Plaintiffs the opportunity to move at any time for interim injunctive relief. This option is discussed in greater detail below.

[9]     The parties also engage in a detailed debate over issues that essentially go to the merits of the complaint or are relevant to the issuance of an interim remedy.  For example, Plaintiffs maintain that the record indicates that USFWS and NMFS relied upon flawed science and analyses in reaching the "no-jeopardy" conclusions contained in the BiOps.  Plaintiffs also point to evidence that calls into question the Federal Defendants prediction that interim operation of the CVP and SWP under the OCAP will not have any "long-term" impacts on the species. Essentially, Plaintiffs argue that the Federal Defendants have no way of knowing whether any long term impacts will result because their analyses have been based on flawed information.  Defendants strenuously dispute these assertions, maintaining that the BiOps were lawfully promulgated given the state of the record at the

1    Federal Defendants' motion to dismiss on prudential mootness

2 grounds is **DENIED**.

3

4    **C.   <u>Motion for Voluntary Remand Without Vacatur</u>**.

5    Alternatively, Federal Defendants move in both cases for

6 voluntary remand without vacatur.  (Doc. 242)

> Voluntary remand is consistent with the principle that
> "administrative agencies have an inherent authority to
> reconsider their own decisions, since the power to
> decide in the first instance carries with it the power
> to reconsider." *Trujillo v. General Electric Co.*, 621
> F.2d 1084, 1086 (10th Cir. 1980). Voluntary remand also
> promotes judicial economy by allowing the relevant
> agency to reconsider and rectify an erroneous decision
> without further expenditure of judicial resources. *See,*
> *e.g.*, *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C.
> Cir. 1993) (granting EPA's opposed motion for voluntary
> remand) ("We commonly grant such motions [for voluntary
> remand], preferring to allow agencies to cure their own
> mistakes rather than wasting the courts' and the
> parties' resources reviewing a record that both sides
> acknowledge to be incorrect or incomplete."); id. at
> 524 n.3 (collecting cases); cf. Marathon Oil v. EPA,
> 564 F.2d 1253, 1268-69 (9th Cir. 1977) (discussing
> motion for voluntary remand).

*NRDC v. United States Dept. of the Interior*, 275 F. Supp. 2d

1136, 1141 (C.D. Cal. 2002)(citations edited).  The district

court in *NRDC v. United States Department of the Interior* also

held that a voluntary remand need not lead to the vacatur of

the agency action being remanded:

> The test for whether to remand an arbitrary and
> capricious rule without vacating depends in part on
> "the <u>seriousness of the order's deficiencies</u> (and thus
> the extent of doubt whether the agency chose correctly)
> and the <u>disruptive consequences of an interim change</u>
> <u>that may itself be changed</u>."

time.  For the purposes of deciding the instant procedural
motions, these fact-specific disputes are largely irrelevant.  So
long as there is a live controversy and Plaintiffs can obtain
meaningful relief from the district court, dismissal on mootness
grounds is inappropriate.

*Id.* at 1143 (emphasis added).

Applying this general framework is difficult here, because the alleged deficiencies in the challenged BiOps have not yet been fully litigated.  In fact, Federal Defendants continue to maintain that the BiOps were, in whole or part, validly promulgated.  Federal Defendants do suggest that a change to the status quo "would have huge ramifications for regional water users and agriculture (a point on which Federal Defendants defer to Intervenors)."  (Doc. 242 at 12.)  But, the water user Defendant-Intervenors do not support a voluntary remand without vacatur, nor have they yet presented any evidence or argument regarding the nature of the prejudice they might suffer if the BiOps were invalidated.

Federal Defendants suggest that the district court's vacatur analysis should also consider whether continued operation of the CVP and SWP under the challenged biological opinions would constitute an irreversible or irretrievable commitment of resources, invoking the language of ESA § 7(d).[10]  Federal Defendants point to the 2001 unpublished opinion in *Southwest*

---

[10]  ESA § 7(d), 16 U.S.C. § 1536(d), provides:

Limitation on commitment of resources

After initiation of consultation required under subsection (a) (2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section.

1  *Center for Biological Diversity v. United States Forest Service*,

2  2001 U.S. Dist. LEXIS 25027 (D. Ariz. Mar. 30, 2001), which

3  applied the "irreversible or irretrievable commitment of

4  resources" test under somewhat similar circumstances.  *In*

5  *Southwest Center*, the agency sought a voluntary remand of a

6  biological opinion to evaluate impacts of new grazing allotments

7  on endangered species.  The plaintiffs sought an injunction

8  against implementation of the existing biological opinion.  The

9  *Southwest Center* court denied the injunction, applying a hybrid

10 injunctive relief standard that incorporated the standard set

11 forth in ESA §7(d).  The *Southwest Center* court reasoned:

12        Although the Supreme Court has made clear that in
          balancing the hardships of the parties, threatened and
13        endangered species are to be given the highest
          priority, under the circumstances of this case, where
14        the Forest Service and the FWS are committed to
          complying with the ESA, the economic hardship to
15        ranchers in issuing an injunction should be considered.
          Because there has been an insufficient showing that
16        continued grazing on these allotments would result in
          irreparable harm to the loach minnow and spikedace
17        while Defendants are consulting, Plaintiff's request
          for injunctive relief is denied...

18                              ***
19
          The record demonstrates that despite allowing cattle
20        grazing to continue, conditions on these allotments are
          improving. The Forest Service has excluded livestock
21        from directly accessing key watersheds in the national
          forests, in particular, watersheds containing loach
22        minnow and/ or spikedace habitat. This exclusion has
          contributed to improved watershed conditions and has
23        minimized the adverse effects of livestock grazing to
          the loach minnow and the spikedace. <u>Therefore, there is
24        no evidence that maintenance of the current status quo,
          which allows grazing, would result in an irreversible
25        and irretrievable commitment of resources foreclosing
          the implementation of future alternatives, especially
26        when as here the Forest Service can prevent any
          irreversible or irretrievable commitment of resources
27        by moving the livestock to other pastures or removing
          the livestock from national forest lands</u>.

28

**21**

1 *Southwest Center*, 2001 U.S. Dist. LEXIS 25027, 121-123 (emphasis

2 added). *See also Washington Toxics Coalition v. EPA*, 413 F.3d

3 1024, 1035 (9th Cir. 2005), (under ESA § 7(d) "non-jeopardizing

4 agency actions [may] continue during the consultation process.").

5      Federal Defendants maintain that, like in *Southwest Center*,

6 maintenance of the status quo will not present an irreversible or

7 irretrievable commitment of resources. In support of this

8 assertion, Federal Defendants argue that there are various

9 provisions in the existing OCAP BiOps designed to protect the

10 Delta smelt and the salmonid populations.

11      With respect to the Delta smelt, the Federal Defendants note

12 that the 2005 USFWS OCAP BiOp could require cessation of CVP

13 operations in some circumstances. In addition, the Federal

14 Defendants emphasize that numerous other rules, regulations,

15 subgroups, and teams exist to protect the Delta smelt, including

16 those teams and processes which make up the Delta Smelt Risk

17 Assessment Matrix (DSRAM), which is designed to recognize when

18 take limits are being exceeded and then take action to address

19 such problems. The problem with relying upon these protective

20 measures to justify voluntary remand without vacatur is that

21 Plaintiffs allege that the adaptive management structures relied

22 upon in the 2005 USFWS OCAP BiOp's no jeopardy finding are

23 inadequate and unlawful. The government preemptively responded

24 to this objection by offering to somewhat strengthen DSRAM.

25                Despite Plaintiffs' claims that the DSRAM process is
entirely voluntary, *Pl. Memo* at 13, there is a
26                significant record of actions taken to benefit the
smelt in response to recommendations made by the Delta
27                Smelt Working Group to the WOMT...However, in light of
recent data on the Delta smelt, and to ensure the
28                adequacy of actions taken to protect the Delta smelt by

1
2
3
4
5
6
7
8
9

the WOMT during the pendency of the reinitiation of the §7 consultation process, the Service will require the Delta Smelt Working Group to adequately document the technical reasons for its recommendations to the WOMT. If the WOMT does not accept the recommendations by the Delta Smelt Working Group, then the WOMT will need to document the technical justification for why the actions they are proposing for implementation will be sufficiently protective of the smelt. This finding will need to be transmitted to the Sacramento Fish and Wildlife Office of the Service, who will determine if the WOMT is correct in its determination, thereby finding that the operations of the facilities remain within the project description, or in the alternative, find that the action is inadequate to conserve the smelt.

(*NRDC* Doc. 242 at 19-20.)  But this does not definitively answer

the question of whether USFWS lawfully concluded that the DSRAM

process is adequate to protect the Delta smelt from harm caused

by implementation of other aspects of the OCAP.[11]

    With respect to the salmonid species, the Federal Defendants

similarly maintain that the 2004 NMFS OCAP BiOp contains

sufficient measures designed to protect salmonid species:

According to the National Marine Fisheries Service, the measures being undertaken by Reclamation to manage salmonid species concerns have, in the recent past, led to increases in salmonid populations, and decreases in salmonid species entrainment at the CVP and SWP project pumps. Declaration of Michael E. Aceituno, Attachment 3, ¶5 (also discussing charts accompanying the declaration.) Reclamation's ongoing measures, including properly timed cold water releases and dam operations along the Sacramento River, are expected to continue to provide a measure of protection for the salmonid species. Id. at ¶13 (discussing temperature control device at Shasta Dam, gate operations at the Red Bluff Diversion Dam, and continued real time management by the Interagency

---

[11]    Similarly, the Federal Defendants point to the EWA and to CVPIA(b)(2) water deliveries as protective measures that will ensure no harm comes to the smelt in the interim period.  Again, Plaintiffs assert in this lawsuit that these mechanisms are inadequate.

1

2

3

4

5

6

7
> Sacramento River Temperature Control Task Force.) In
> addition, no expected long-term effects on listed
> salmonids are expected within the interim period of
> consultation because of above normal hydrology (i.e.,
> full reservoirs and banked water available for fish
> protection) and because short-term effects (less than
> 18 months) are unlikely to have any effect on migratory
> salmon species that take 36 months to return as adults.
> Id. Accordingly, ongoing operation of the CVP and SWP
> in this case will not result in any irreversible or
> irretrievable commitment of resources which have the
> effect of foreclosing the formulation or implementation
> of any reasonable and prudent alternative measures.

8 (*PCFFA*, Doc. 81 at 16-17.)

9    Plaintiffs respond to each assertion by Federal Defendants

10 that the challenged BiOps will benefit or at least not harm the

11 salmonids.  For example, with respect to the alteration of the

12 temperature compliance point, Plaintiffs rejoin that "[t]he

13 Federal Defendants fail to explain how the diminution of cold

14 water spawning habitat in the Sacramento River as well as the

15 Feather and American Rivers as a result of interim operations is

16 consistent with ESA requirements."

17

18

19

20

21

22

23

24

25

26

27
> As discussed above, the 2004 Salmonid BO found that
> operations under the 2004 OCAP would have numerous,
> serious adverse impacts to salmonid spawning habitat
> due to moving the Sacramento River temperature
> compliance point 19 miles upstream, elimination of the
> Shasta Reservoir cold water carryover storage
> requirement, and reduced stream flows. According to
> NMFS's own analysis, which independent science
> reviewers suggested underestimated adverse impacts, the
> temperature and carryover "targets" identified in the
> 2004 BO are inadequate to maintain suitable spawning
> habitat. The 2004 Salmonid BO found, for example, that
> the change in the Sacramento River compliance point
> would eliminate over 40 percent of winter-run Chinook
> critical habitat, decrease spawning success, and
> effectively limit the population size due to restricted
> availability of suitable spawning habitat. NMFS AR
> 5844, 5920, 5939. Such adverse effects could easily
> reverse the rebound the winter-run population
> experienced after these temperature controls were put
> in place....

28

**24**

1   (*PCFFA*, Doc. 85 at 12.)

2        At the very least, there are factual disputes as to the

3   effectiveness of the various protective measures relied upon by

4   the challenged BiOps.  This makes it impossible to undertake a

5   proper § 7(d) analysis on the pleadings at this stage of the

6   case.  More critically, it is not entirely clear that the § 7(d)

7   analysis is relevant to deciding whether a remand without vacatur

8   is appropriate.  Although § 7(d) was taken into consideration in

9   *Southwest Center,* the instant case is in a very different

10  procedural posture than was *Southwest Center.*  In *Southwest*

11  *Center*, the court had already ruled in favor of the plaintiffs on

12  the merits of their ESA claim.  The district court subsequently

13  denied plaintiffs' request for a preliminary injunction that

14  would have vacated the BiOp, applying a test that incorporated a

15  detailed examination of the § 7(d) standard.  Here, in contrast,

16  the Federal Defendants request that the case be remanded without

17  vacatur prior to any decision on the merits.

18       Plaintiffs argue that the Federal Defendants should not be

19  permitted to "have it both ways," by being permitted to operate

20  under the challenged BiOps while maintaining that all litigation

21  regarding those BiOps should cease.  In support of this argument,

22  Plaintiffs cite *Rock Creek Alliance v. U.S. Fish & Wildlife*

23  *Serv.*, No. CV 01-152-M-DWM, Order (D. Mont. Mar. 19, 2002), in

24  which the district court refused to authorize a voluntary remand

25  where the agency refused to withdraw its BiOp.  Federal

26  Defendants attempt to distinguish *Rock Creek*, arguing:

27             In *Rock Creek*, a voluntary remand without vacatur was

28                              **25**

rejected because the agency sought to continue the
construction and operation of a copper and silver mine
in Montana. In contrast, here, Federal Defendants have
explained that any future construction actions require
further ESA §7 review. Declaration of Kirk Rodgers
(Oct. 18, 2006) at paragraph 4 and footnote 1. Instead,
this Court is asked only not to vacate the current,
ongoing operation of the nation's largest federal water
project, to which additional limitations were adopted
for the specific purposes of protecting Delta smelt and
salmonid species.

(*PCFFA*, Doc. 92 at 22.)

Federal Defendants' argument begs the question, however, of

what potentially detrimental aspects of the OCAP they intend to

implement during the interim period.  The mere presence in the

challenged BiOps of programs that might potentially benefit the

fish does not distinguish this case from *Rock Creek* if Defendants

intend to implement significant detrimental water management

actions (above and beyond those in place prior to the issuance of

the challenged BiOps).[12]

Again, the Ninth Circuit's general standard for vacatur is

as follows:

The test for whether to remand an arbitrary and
capricious rule without vacating depends in part on
"the <u>seriousness of the order's deficiencies</u> (and thus
the extent of doubt whether the agency chose correctly)
and the <u>disruptive consequences of an interim change
that may itself be changed</u>."

_____

[12]  Plaintiffs also cite *Greenpeace v. Nat'l Marine
Fisheries Serv.,* 80 F. Supp.2d at 1151 (W.D. Wash. 2000), in
which the district court rejected the agency's attempts to rely
on a BiOp to defend against a motion for summary judgment while
at the same time arguing the BiOp has been withdrawn and
plaintiffs' claims should be dismissed on Article III mootness
grounds.  The Greenpeace court reasoned that the agency "cannot
have it both ways."  Federal Defendants correctly point out that
this case is less relevant because it involved Article III
mootness.

**26**

*NRDC,* 275 F. Supp. 2d at 1143.  Similarly, in *Modesto Irrigation District v. Evans et. al.*, Case No. 1:02-cv-06553-OWW-DLB (May 12, 2004), Doc. 79 at 48, this district court considered whether to vacate the listing of a salmonid species and articulated seven factors to be evaluated in determining whether or not to set aside a rule when it was subjected to an APA based challenge and remand:

>    (1)   the purposes of the substantive statute under which the agency was acting;
>
>    (2)   the magnitude of the administrative error and how extensive, substantive and serious it was;
>
>    (3)   the possibility the agency will be able to substantiate its decision given an opportunity to do so;
>
>    (4)   the likelihood that the errors can be mended and that such changes can be made without altering the order;
>
>    (5)   equity and public interest considerations;
>
>    (6)   the potential prejudice to those who will be affected by maintaining the status quo; and
>
>    (7)   the disruptive consequences of an interim change, which could include invalidating or enjoining the agency action.

Here, there are significant factual disputes concerning most if not all of the factors noted above.  Federal Defendants continue to maintain that no administrative errors occurred in the promulgation of the challenged BiOps.  Moreover, Defendants continue to rely, at least to some extent, on the challenged BiOps, effectively adopting portions of the OCAP as of 2004 as the status quo.  Plaintiffs' lawsuits assert that the OCAP was never properly evaluated for its impacts on the Delta smelt and

27

salmonids and impliedly assert that a different status quo should
serve as the baseline.  Perhaps most critically, Federal
Defendants deferred to the water users, who arguably would be the
parties most disrupted by returning to the pre-2004 status quo,
to make such a showing.  However, the water users do not support
a voluntary remand without vacatur, nor have they presented any
evidence or argument regarding the nature of the prejudice they
might suffer.

Under all these circumstances it is not possible to conclude
that remand without vacatur is appropriate here.  This motion is
**DENIED.**

### D.   <u>Motion for Stay Pending Completion of Re-Consultation<br>(Based on Doctrine of Primary Jurisdiction)</u>.

Federal Defendants, along with all Defendant-Intervenors
invoke the doctrine of primary jurisdiction to support the
imposition of stays in both cases pending the completion of re-
consultation.  Federal Defendants and Defendant Intervenors
suggest, however, that the stay should include an exception that
would permit Plaintiffs to bring a motion for injunctive relief
under ESA § 7(d).  Plaintiffs oppose this approach, and instead
request that the cases be heard on their merits.

Whether to grant a stay lies within the sound discretion of
the district court:

> [T]he power to stay proceedings is incidental to the
> power inherent in every court to control the
> disposition of the causes on its docket with economy of
> time and effort for itself, for counsel, and for
> litigants. How this can best be done calls for the
> exercise of judgment, which must weigh competing

**28**

1        interests and maintain an even balance...

2 *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936).

3        In cases which "contain some issue within the special

4 competence of an administrative agency," a court may issue a stay

5 to permit the administrative agency an opportunity to apply its

6 special expertise. *Davel Communs., Inc. v. Qwest Corp., 460 F.3d*

7 *1075, 1080* (9th Cir. 2006).  The Ninth Circuit has considered a

8 number of factors when deciding whether a stay based on primary

9 jurisdiction is appropriate  The doctrine has been applied where

10 there is "(1) the need to resolve an issue that (2) has been

11 placed by Congress within the jurisdiction of an administrative

12 body having regulatory authority (3) pursuant to a statute that

13 subjects an industry or activity to a comprehensive regulatory

14 scheme that (4) requires expertise or uniformity in

15 administration." *Id*. at 1087.

16        In determining whether to grant a stay based on primary

17 jurisdiction, the Court must "weigh the benefits of obtaining the

18 agency's aid against the need to resolve the litigation

19 expeditiously." *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d

20 199, 201 (5th Cir. 1988).  In addition, a court should take into

21 consideration "the possible damage which may result from the

22 granting of a stay, the hardship or inequity which a party may

23 suffer in being required to go forward, and the orderly course of

24 justice measured in terms of the simplifying or complicating of

25 issues, proof, and questions of law which could be expected to

26 result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th

27 Cir. 1962).  "[A party seeking] a stay must make out a clear case

28

**29**

1  of hardship or inequity in being required to go forward, if there
2  is even a fair possibility that the stay for which he prays will
3  work damage to someone else." *Lockyer v. Mirant Corp.*, 398 F.3d
4  1098, 1109 (9th Cir. 2005)(emphasis added).   In *Lockyer*, the
5  plaintiff demonstrated the possibility of harm to its interests
6  from a stay and the defendant failed to make out a clear case of
7  hardship or inequity.  *Id*. at 1112-13.  The Ninth Circuit held
8  that "being required to defend a suit, without more, does not
9  constitute a 'clear case of hardship or inequity'..." *Id*.

10      The Federal Defendants contend that this case is one in
11  which there is a need for judicial consideration of the expert
12  and specialized knowledge of the agencies.  *Forest Guardians v.*
13  *United States Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir.
14  2003)("When the agency is making predictions, within its special
15  expertise, at the frontiers of science, we must be at our most
16  deferential.").  Applying the four-part analytical approach from
17  *Davel*, 460 F.3d at 1086-1087, the federal government argues that
18  a stay is appropriate here because there is a need to resolve an
19  issue – whether the operation of the CVP and SWP jeopardizes the
20  continued existence of Delta smelt - that is of a type that was
21  placed by Congress within the jurisdiction of an administrative
22  agency.

23      Plaintiffs respond that a stay here would harm their
24  interests because it would permit the defendants to implement the
25  challenged BiOps without observing the requirements of the ESA,
26  until at least April 2008.  In theory, this would permit the
27  defendants to operate the CVP and SWP pursuant to the 2004 OCAP

28                        **30**

(which calls for increased pumping and other types of potentially detrimental changes).  Plaintiffs maintain that the challenged BiOps provide inadequate protection for the Delta smelt and salmonids.  Plaintiffs submit that allowing the continued implementation of aspects of the OCAP under the admittedly flawed BiOps would likely result in harm to the species.

Federal Defendants and Defendant-Intervenors rejoin that, under the framework they propose, Plaintiffs' would have ample opportunity to protect their interests by moving for injunctive relief under the standard set forth in ESA § 7(d).  But, Plaintiffs would be at a disadvantage if they were required to proceed directly to a § 7(d) proceeding.  Without a ruling that the challenged BiOps were unlawful, Defendants start from a position of legal validity, with two "lawful" BiOps.  In contrast, if the BiOps are first declared unlawful, there is some authority suggesting that the government would then assume the burden to prove that its actions were non-jeopardizing.  For example, in *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1035 (9th Cir. 2005), a case relied upon by Federal Defendants, the EPA attempted to register a number of pesticides that plaintiffs feared might harm endangered fish species.  In approving the pesticides, EPA complied with the registration requirements of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 et seq., but did not consult with NMFS pursuant to the ESA.  The district court ruled that EPA must comply with the ESA as well as with FIFRA and ordered EPA to initiate and complete § 7 consultation according

**31**

to a prescribed schedule.  Having already ruled in favor of
plaintiffs on the merits, the district court entertained a motion
for interim injunctive relief under § 7(d).  The Ninth Circuit
affirmed the district court's decision to place the burden under
§ 7(d) of "showing that its actions were non jeopardizing to
endangered or threatened species" on the action agency.

> ....We have not [previously] expressly stated who bears
> the burden of showing that the action is
> non-jeopardizing, <u>but the burden should be on the
> agency, the entity that has violated its statutory
> duty.</u>
>
> <u>Placing the burden on the acting agency to prove the
> action is non-jeopardizing is consistent with the
> purpose of the ESA and what we have termed its
> "institutionalized caution mandate[ ].</u>" *Sierra Club v.
> Marsh*, 816 F.2d at 1389. We said as much in *Thomas v.
> Peterson*, where the defendant, the U.S. Forest Service,
> urged the district court to conclude that absent proof
> by the plaintiffs to the contrary, a proposed project
> was not likely to affect an endangered or threatened
> species. 753 F.2d at 765. We held that this was an
> inappropriate finding for the district court to make.
> *Id*. "It is not the responsibility of the plaintiffs to
> prove, nor the function of the courts to judge, the
> effect of a proposed action on an endangered species
> when proper procedures have not been followed." *Id*. <u>The
> district court correctly assigned EPA the burden of
> proving that its actions were non-jeopardizing</u>.
>
> The district court was not required to balance
> interests in protecting endangered species against the
> costs of the injunction when crafting its scope.
> <u>Congress has decided that under the ESA, the balance of
> hardships always tips sharply in favor of the
> endangered or threatened species</u>. *See Marbled Murrelet
> v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir.1996).

*Id*. at 1035 (emphasis added).  But, this ruling is premised on
the fact that the agency was found to have been in violation of a
statutory duty.  Without such a finding, there would be little
support for the application of this burden-shifting approach.

1   Even under Federal Defendants' and defendant-intervenors'

2   proposal that Plaintiffs would remain free to seek provisional

3   relief pending re-consultation, such relief will require the

4   parties to litigate on the merits the validity of the BiOps.

5        Plaintiffs are entitled to have their complaint decided on

6   the merits, particularly given the fact that Defendants continue

7   to rely on the challenged BiOps as if they were lawfully enacted.

8   The motion for a stay is **DENIED**.

9

10            **E.    Motion to Consolidate**.

11       The Federal Defendants move to consolidate *NRDC* with *PCFFA*

12  for all purposes.  Rule 42(a) of the Federal Rules of Civil

13  Procedure provides:

14            When actions involving a common question of law or fact
              are pending before the court, it may order a joint
15            hearing or trial of any or all the matters in issues in
              the actions; it may order all the actions consolidated;
16            and it may make such orders concerning proceedings
              therein as may tend to avoid unnecessary costs or
17            delay.

18       A district court has broad discretion to decide whether

19  consolidation is appropriate.  *In re Consol. Parlodel Litig.*, 182

20  F.R.D. 441, 444 (D.N.J. 1998).  A court "must balance the

21  interest of judicial convenience against the potential for delay,

22  confusion and prejudice that may result from such consolidation."

23  *Bank of Montreal v. Eagle Assoc.*, 117 F.R.D. 530, 532 (S.D.N.Y.

24  1987)  Factors such as differing trial dates or stages of

25  discovery usually weigh against consolidation.  9 Wright &

26  Miller, Federal Practice and Procedure § 2383 (2006).

27

28                                  **33**

1    The Federal Defendants first point out that the *PCFFA* case

2  was transferred to this Court because it was found to be related

3  to the *NRDC* case:

4           These two cases have (1) overlapping facts and legal
            issues and (2) arise out of the same agency action. In
5           light of the danger of inconsistent relief, these two
            cases should be decided by the same court.
6
7  (*PCFFA*, Doc. 13.)  But, as Plaintiffs point out, that these

8  factors favored a <u>transfer</u> does not necessarily indicate that

9  <u>consolidation</u> of two cases already before the same district judge

10 is necessary or appropriate.

11   Federal Defendants maintain that consolidation is

12 appropriate here because, although there may have been factual

13 distinctions when these cases were first filed, any factual

14 distinctions between the two cases vanished when the agencies

15 reinitiated consultation.  This argument, which is related to

16 Federal Defendants' contention that the cases are prudentially

17 moot on the merits, has been rejected.  The factually distinct

18 merits claims are still live.

19   Federal Defendants also point out that both *NRDC* and *PCFFA*

20 involve disputes over federal and state government management of

21 the same regional water resources and the Bureau's regional water

22 management obligations under the CVPIA.  From a practical

23 perspective, the Bureau is required to manage the water resources

24 for both species.  Accordingly, Federal Defendants maintain,

25 consolidation would facilitate the interim management of the CVP

26 and SWP in a manner that would benefit both species.  According

27 to the Federal Defendants, allowing the cases to proceed

28                              **34**

independently risks inconsistent judgments.  While true in
theory, if Plaintiffs prevail on the merits and the Delta smelt
case proceeds to a remedies phase, Reclamation will be afforded
an opportunity to explain not only how various remedies would
impact the Delta smelt, but how any altered management action
would impact the salmonids and/or any other legally protected
interests.

Finally, Federal Defendants note that all of the *NRDC*
plaintiffs are also plaintiffs in *PCFFA* and the same counsel are
assigned to both cases for these organizations.  Federal
Defendants maintain that consolidated briefing could help avoid
duplicative proceedings and redundancies.  But any efficiencies
gained by consolidation would be countered (or more likely
outweighed) by the additional confusion for the district court of
dealing with two independent sets of scientific facts, not to
mention separate administrative records.  For example, with
regard to Delta smelt, the district court may have to examine
whether the adaptive management system upon which FWS based its
original no jeopardy conclusion is adequate to protect Delta
smelt during interim operations.  In contrast, in the salmonids
case, the court may need to examine whether the weakening of
temperature controls on the upper Sacramento River will destroy
critical habitat and cause serious harm to the salmon and
steelhead species during the interim period.

Finally, Plaintiffs argue that consolidation of the two
cases would substantially delay resolution of the Delta smelt
case, prejudicing Plaintiffs' interests.  The *NRDC* and *PCFFA* are

**35**

1    at significantly different stages of development.  *NRDC* will be
2    ready for a merits-type hearing almost immediately, while *PCFFA*
3    is at a much earlier stage.  Plaintiffs emphasize that time is of
4    the essence in the Delta smelt case because of the species'
5    precarious state.

6         Under the totality of the circumstances, consolidation is
7    not appropriate at this time.  The sole factor weighing in favor
8    of consolidation is the possibility that a remedy in the Delta
9    smelt case might adversely impact the salmonid species.  However,
10   should Plaintiffs prevail in the Delta smelt case, the district
11   court can consider evidence of any such potential adverse impacts
12   at that time.  Moreover, any potential benefits of consolidation
13   are far outweighed by the benefits of allowing these cases to
14   proceed separately, namely (1) avoiding the confusion that would
15   be caused by litigating cases with independent factual
16   backgrounds and administrative records; and (2) avoiding further
17   delay to the Delta smelt case.
18   //
19   //
20   //
21   //
22   //
23   //
24   //
25   //
26   //
27   //
28
                                    **36**

**F.   Miscellaneous Issues**.

Federal Defendants also assert, in the context of their motion to dismiss/stay in the salmonid case, that "whatever legal mechanism this Court uses to allow Federal Defendants to complete a new biological opinion, Plaintiffs' future attorney's fees claims should be denied. Here, Federal Defendants are asking for an advisory opinion on an issue that has not yet been presented to the court for review. The court declines to rule on the issue of attorney's fees at this time.

## V.   CONCLUSION

For the reasons set forth above,

(1)   Federal Defendants' motion for Dismissal on prudential mootness grounds is **DENIED**;

(2)   Federal Defendants' motion for Voluntary remand without vacatur is **DENIED**;

(3)   All Defendants' and Defendant-Intervenors' motion for a stay is **DENIED**.

All Defendants shall have 20 days from the entry of this order to answer the complaints in both the *NRDC* and *PCFFA* cases.

IT IS SO ORDERED.

**Dated:   December 29, 2006**            _____/s/ Oliver W. Wanger_____
b2e55c                          UNITED STATES DISTRICT JUDGE