1
2
3
4

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA**

5
6

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,<br><br>             Plaintiffs,<br><br>       v.<br><br>DIRK KEMPTHORNE, in his official capacity as Secretary of the Interior, *et al.*,<br><br>             Defendants,<br><br>CALIFORNIA DEPARTMENT OF WATER RESOURCES,<br><br>             Defendant-Intervenor,<br><br>STATE WATER CONTRACTORS<br><br>             Defendant-Intervenor,<br><br>SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.,*<br><br>             Defendant-Intervenors, | 1:05-CV-01207 OWW (TAG)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. 231/232)** |

## I.  <u>INTRODUCTION</u>

      This case concerns the effect on a threatened species of fish, the Delta smelt (*Hypomesus transpacificus*)[1], of the coordinated operation of the federally-managed Central Valley Project ("CVP") and the State of California's State Water Project

_____

      [1] The Delta smelt was listed as a threatened species under the ESA, March 5, 1992, 58 Fed.Reg. 12863.

**1**

1  ("SWP"), among the world's largest water diversion projects.

2  Both projects divert large volumes of water from the California

3  Bay (Sacramento-San Joaquin) Delta ("Delta") and use the Delta to

4  store water.

5      For over thirty years, the projects have been operated

6  pursuant to a series of cooperation agreements.  In addition, the

7  projects are subject to ever-evolving statutory, regulatory,

8  contractual, and judicially-imposed requirements.  The Long-Term

9  Central Valley Project and State Water Project Operations

10  Criteria and Plan ("2004 OCAP" or "OCAP") surveys how the

11  projects are currently managed in light of these evolving

12  circumstances.  At issue in this case is a 2005[2] biological

13  opinion ("BiOp"), issued by the United States Fish and Wildlife

14  Service ("FWS" or "Service") pursuant to the Endangered Species

15  Act ("ESA"), which concludes that current project operations

16  described in the OCAP and certain planned future actions will not

17  jeopardize the continued existence of the Delta smelt or

18  adversely modify its critical habitat.

19      The Delta smelt is a small, slender-bodied fish endemic to

20  the Delta.  Historically, Delta smelt could be found throughout

21  the Delta.  Although abundance data on the smelt indicates that

22  the population has fluctuated wildly in the past, it is

23  undisputed that, overall, the population has declined

24  significantly in recent years, to its lowest reported volume in

25  fall 2004.

26

27        [2]    The biological opinion was first issued in July 2004.

28  Then, after reconsultation, was reissued in February 2005.

**2**

1    In this case, Plaintiffs, a coalition of environmental and
2  sportfishing organizations, challenge the 2005 BiOp's no jeopardy
3  and no adverse modification findings as arbitrary, capricious,
4  and contrary to law under the Administrative Procedure Act, 5
5  U.S.C. §§ 702 et seq.  Before the court for decision is
6  Plaintiffs' motion for summary judgment.  Among other things,
7  Plaintiffs allege that the BiOp fails to consider the best
8  available science, relies upon uncertain (and allegedly
9  inadequate) adaptive management processes to monitor and mitigate
10  the potential impacts of the OCAP, fails to meaningfully analyze
11  whether the 2004 OCAP will jeopardize the continued existence of
12  the Delta smelt, fails to consider the OCAP's impact upon
13  previously designated critical habitat, and fails to address the
14  impacts of the entire project.

15    Separate opposition briefs were filed by the Federal
16  Defendants (Doc. 242), the Department of Water Resources
17  ("DWR")(Doc. 246), and the State Water Contractors ("SWC") (Doc.
18  241), along with a final brief filed collectively by San Luis &
19  Delta-Mendota Water Authority, Westlands Water District, and the
20  California Farm Bureau Federation ("the San Luis Parties")(Doc.
21  247).

22               **II.   THE ENDANGERED SPECIES ACT**

23    A recent Ninth Circuit opinion in *National Wildlife*
24  *Federation v. National Marine Fisheries Service*, 481 F.3d 1224
25  (9th Cir. 2007)[hereinafter "*NWF v. NMFS*"], succinctly summarizes
26  the relevant provisions of the ESA:

27         The ESA requires federal agencies to "insure that any
           action authorized, funded, or carried out by such
28         agency ... is not likely to jeopardize the continued

                                **3**

existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat...." 15 U.S.C. § 1536(a)(2). The ESA imposes a procedural consultation duty whenever a federal action may affect an ESA-listed species. *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir.1985). To that end, the agency planning the action, usually known as the "action agency," must consult with the consulting agency. This process is known as a "Section 7" consultation. The process is usually initiated by a formal written request by the action agency to the consulting agency. After consultation, investigation, and analysis, the consulting agency then prepares a biological opinion. *See generally Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir.2001). In this case, the action agencies are the U.S. Army Corps of Engineers and the Bureau of Reclamation, while the consulting agency is NMFS.

The consulting agency evaluates the effects of the proposed action on the survival of species and any potential destruction or adverse modification of critical habitat in a biological opinion, 16 U.S.C. § 1536(b), based on "the best scientific and commercial data available," *id*. § 1536(a)(2). The biological opinion includes a summary of the information upon which the opinion is based, a discussion of the effects of the action on listed species or critical habitat, and the consulting agency's opinion on "whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat...." 50 C.F.R. § 402.14(h)(3). In making its jeopardy determination, the consulting agency evaluates "the current status of the listed species or critical habitat," the "effects of the action," and "cumulative effects." *Id*. § 402.14(g)(2)-(3). "Effects of the action" include both direct and indirect effects of an action "that will be added to the environmental baseline." *Id*. § 402.02. The environmental baseline includes "the past and present impacts of all Federal, State or private actions and other human activities in the action area" and "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation." *Id*. If the biological opinion concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a "reasonable and prudent alternative[ ]" to the agency action that avoids jeopardy and adverse modification and that the incidental taking of endangered or threatened species will not violate section 7(a)(2), the consulting agency can issue an "Incidental Take Statement" which, if followed, exempts the action agency from the

**4**

1   prohibition on takings found in Section 9 of the ESA.
    16 U.S.C. § 1536(b)(4); *ALCOA v. BPA*, 175 F.3d 1156,
2   1159 (9th Cir.1999).

3                              ***

4       The issuance of a biological opinion is considered a
        final agency action, and therefore subject to judicial
5       review. *Bennett v. Spear*, 520 U.S. 154, 178, 117 S.Ct.
        1154, 137 L.Ed.2d 281 (1997); *Ariz. Cattle Growers'*
6       *Ass'n*, 273 F.3d at 1235.

7
*Id.* at *2-*3.
8

### III.   **FACTUAL BACKGROUND**

9
     For over thirty years the state and federal agencies charged
10
with management of the CVP and SWP have operated the projects in
11
an increasingly coordinated manner pursuant to a Coordinated
12
Operating Agreement ("COA").   The COA, which dates to 1986, has
13
evolved over time to reflect, among other things, changing
14
facilities, delivery requirements, and regulatory restrictions.
15
The most recent document surveying how the COA is implemented in
16
light of these evolving circumstances is the 2004 Operating
17
Criteria and Plan ("2004 OCAP" or "OCAP") issued June 30, 2004.
18
(AR 489-728.)[3]
19

### A.   **Overview of the 2004 OCAP**.
20
     The OCAP begins with a "Purpose of Document" section which
21
states:
22
        This document has been prepared to serve as a baseline
23      description of the facilities and operating environment
        of the Central Valley Project (CVP) and State Water
24      Project (SWP).   The Central Valley Project - Operations
        and Criteria Plan (CVP-OCAP) identifies the many
25      factors influencing the physical and institutional
        conditions and decision-making process under which the
26

27
     [3]   All "AR" references are to the administrative record
28  provided by the U.S. Fish and Wildlife Service..

**5**

project currently operates.  Regulatory and legal instruments are explained, alternative operating models and strategies described.

The immediate objective is to provide operations information for the Endangered Species Act, Section 7, consultation.  The long range objective is to integrate CVP-OCAP into the proposed Central Valley document. It is envisioned that CVP-OCAP will be used as a reference by technical specialists and policymakers in and outside the Bureau of Reclamation (Reclamation) in understanding how the CVP is operated.  The CVP-OCAP includes numeric and nonnumeric criteria and operating strategies.  Emphasis is given to explaining the analyses used to develop typical operating plans for simulated hydrologic conditions.

All divisions of CVP are covered by this document, including the Trinity River Division, Shasta and Sacramento Divisions, American River Division and Friant Division.

(AR 506.)[4]

The introductory chapter provides an overview of all of the physical components of the CVP and SWP (AR 507-520), as well as all of the relevant legal authorities affecting CVP operations (508-512).

Chapter 2, explains, among other things, that water needs assessments have been performed for each CVP water contractor, to confirm each contractor's past beneficial use in order to anticipate future demands.  (AR 521.)  Chapter 2 also reviews the 1986 COA and how it is implemented on a daily basis by Reclamation and DWR.  (AR 523-25.)  Also provided is a detailed overview of the "changes in [the] operations coordination

---

[4]     Whether the 2004 OCAP is a "final agency action" for the purposes of the National Environmental Policy Act is at issue in a related lawsuit, *Pacific Coast Federation of Fishermen's Associations v. Gutierrez*, 1:06-cv-00245 OWW (TAG) ("*PCFFA*"). This overview of the OCAP does not prejudge the merits of the pending motion to dismiss in *PCFFA*.

**6**

environment since 1986," which include:

- Changes due to temperature control operations on the Sacramento River;

- Increases in the minimum release requirements on the Trinity River;

- Implementation of CVPIA 3406(b)(2) and Refuge Water Supply contracts;

- Commitments made by the CVP and SWP pursuant to the Bay-Delta Accord and the subsequent implementation of State Water Resources Control Board ("SWRCB") Decision-1641;

- The Monterey Agreement;

- The Operation of the North Bay Aqueduct (which was not included in the 1986 COA).

- The SWP's commitment to make up for 195,000 acre-feet of pumping lost to the CVP due to SWRCB Decision 1485;

- Implementation of the Environmental Water Account; and

- Constraints imposed by various endangered species act listings, including that of the Sacramento River Winter-Run Chinook Salmon, the Sacramento River Spring-Run Chinook Salmon, the Steelhead Trout, and the Delta Smelt (which resulted in the issuance of biological opinions in 1993, 1994, and 1995 concerning CVP/SWP operations and the South Delta Temporary Barriers Biological Opinion in 2001)

(AR 525-28.)   The OCAP also reviews the regulatory standards imposed by SWRCB D-1641, which include water quality standards based on the geographic position of the 2-parts-per-thousand

**7**

1  isohale (otherwise known as "X2"), a Delta export restriction

2  standard known as the export/inflow (E/I) ratio, minimum Delta

3  outflow requirements, and Sacramento River and San Joaquin River

4  flow standards.  (AR 530-537.)  In addition to imposing

5  requirements, D-1641 granted the Bureau and DWR permission to use

6  each project's capabilities in a coordinated manner.  (AR 537-

7  38.)

8      This is not a complete overview of the projects' operations

9  covered in the OCAP.  Numerous regulatory and operational changes

10 have taken place in recent years.  As the OCAP's "Purpose of

11 Document" section explains, the immediate objective of the OCAP

12 is to lay out all such regulatory and other operational

13 information so that ESA Section 7 consultation can proceed to

14 evaluate how project operations will effect the Delta smelt under

15 various projected future conditions.

16     **B.   <u>Applying the ESA to Project Operations</u>**.

17     Because endangered and/or threatened species, including the

18 Delta smelt, reside in the area affected by the CVP and SWP, the

19 2004 OCAP, administered on behalf of the federal government by

20 the Bureau of Reclamation ("Bureau"), must comply with various

21 provisions of the ESA.  Specifically, prior to authorizing,

22 funding, or carrying out any action, the acting federal agency

23 (in this case, the Bureau) must first consult with FWS and/or

24 NMFS to "insure that [the] action...is not likely to jeopardize

25 the continued existence of any endangered species or threatened

26 species or result in the destruction or adverse modification of

27 habitat of such species which is determined...to be critical...."

28 16 U.S.C. § 1536(a)(2) [ESA § 7(a)(2)].  This form of

**8**

1  consultation is called "formal consultation," and concludes with
2  the issuance of a biological opinion.  50 C.F.R. § 402.02.

3      Alternatively, under certain circumstances, a federal agency
4  may pursue "early consultation," on behalf of an agency or
5  private party (referred to as a "prospective applicant") who will
6  require formal approval or authorization to undertake a project.
7  *Id.*  Early consultation may be requested when the prospective
8  applicant "has reason to believe that an endangered species or a
9  threatened species may be present in the area affected by this
10  project and that implementation of such action will likely affect
11  such species."  50 C.F.R. § 402.11(b).  The result of early
12  consultation is a "preliminary biological opinion," the contents
13  of which are "the same as for a biological opinion issued after
14  formal consultation except that the incidental take statement
15  provided with a preliminary biological opinion does not
16  constitute authority to take listed species."
17  § 402.11(e).  Subsequently, the preliminary biological opinion
18  may be "confirmed" after the prospective applicant applies to the
19  federal agency for a permit or licence.  Once a request for
20  confirmation is received, the FWS must either confirm that the
21  preliminary biological opinion stands as the final biological
22  opinion or must request that the federal agency initiate formal
23  consultation.  § 402.11(f).

24      In this case, the 2004 OCAP BiOp[5] contemplates increases in
25

26          [5]  The OCAP itself does not plan for increased pumping or
    the construction or operation of any new facilities, nor does it
27  describe or model flow regimes under any of these future plans.
    These planned operational changes are set forth in the BA and the
28  BiOp.  (*See* AR 381-423 (describing the effects of those actions

**9**

1  water diversions and the construction of new facilities in the

2  Delta.  (AR 256-271.)  The maximum daily diversion rate in

3  Clifton Court Forebay will increase from 6,680 cubic feet per

4  second (CFS) to 8,500 CFS (27% increase in pumping) and

5  eventually to 10,300 CFS (54% increase).  Permanent barriers

6  within the south Delta will be constructed and operated.  An

7  intertie between the California Aqueduct and the Delta-Mendota

8  Canal will be constructed and operated.  Water deliveries from

9  the American River will be doubled.  New deliveries of CVP water

10 to the Freeport Regional Water Project will be made.  Water

11 transfers resulting in an annual 200,000 to 600,000 acre-feet

12 increase in Delta exports will result.  (AR 256, 339-40, 357-59,

13 371, 382-83, 465.)

14     The Bureau submitted some of these operational changes for

15 formal consultation with FWS concerning their impact on the Delta

16 smelt, while other changes were subject only to early

17 consultation:

18          This biological opinion covers formal and early
           consultation for the operations of the CVP and SWP. The
19         formal consultation effects described in this
           biological opinion cover the proposed 2020 operations
20         of the CVP including the Trinity River Mainstem ROD
           (Trinity ROD) flows on the Trinity River, the increased

21

22 included in formal consultation, including re-operation of the

23 Trinity River, increased demands on the American River, operation
   of the Freeport Regional Water Project ("FRWP"), and operation of

24 an intertie between the Delta-Mendota Canal and the California
   Aqueduct); AR 357-61 (describing the "items for early

25 consultation," including operation of components of the South

26 Delta Improvement Project, which calls for pumping at Banks to
   increase to 8500 cfs, operation of permanent barriers in various

27 places within the Delta, the operation of a long term EWA, the
   use of CVP/SWP capacity to facilitate expanded water transfers,

28 and further integration of CVP/SWP operations.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

water demands on the American River, the delivery of CVP water to the proposed Freeport Regional Water Project (FRWP), water transfers, the long term Environmental Water Account (EWA), the operation of the Tracy Fish Facility, and the operation of the SWP-CVP intertie. The effects of operations of the SWP are also included in this opinion and include the operations of the North Bay Aqueduct, the Suisun Marsh Salinity Control Gates, the Skinner Fish Facility and water transfers.

Early consultation effects include the effects of operations of components of the South Delta Improvement Program (SDIP). These operations include pumping of 8500 cubic feet per second (cfs) at the SWP and Banks Pumping Plant (hereafter referred to as 8500 Banks), permanent barrier operations in the South Delta, the long term EWA, water transfers, and CVP and SWP operational integration. There are two separate effects sections in this biological opinion, one for Formal Consultation and one for Early Consultation. In addition, there is an incidental take for formal consultation and a preliminary incidental take for early consultation.

(AR 2, 248.)[6]

   **C.   History of This Lawsuit**.

On July 30, 2004, FWS issued a Biological Opinion (the "2004 OCAP BiOp"), addressing both formal and early consultation for the above-described OCAP actions.  (AR 1.)[7]

On August 4, 2004, the Ninth Circuit decided *Gifford Pinchot*

20
21
22
23
24
25
26
27
28

------

   [6]   The first step in the consultation process is usually the preparation of a Biological Assessment ("BA") by the action agency (in this case, the Bureau), the purpose of which is to "evaluate the potential effects of the action on listed [] species and designated [] critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action...."  50 C.F.R. § 402.12(a).  In this case, the Bureau issued its BA regarding the "Long-Term Central Valley Project and State Water Project Operations and Criteria Plan" on June 30, 2004.  (AR 729.)  The BA describes the project on which consultation is being held, both early and formal, in much the same terms as are used in the BiOp.

   [7]   Prior to 2004, the OCAP operated under Biological Opinions issued in 1993 and 1995.

*Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004), which held that the FWS's definition of "adverse modification" to critical habitat is an impermissible interpretation of the ESA because it focuses on whether critical habitat modifications would impact the <u>survival</u> of a species, effectively ignoring the statutorily-mandated goal of "<u>recovery</u>." On November 4, 2004, in response to this ruling, the Bureau requested reinitiation of consultation to address critical habitat issues.

Plaintiffs in this case, a coalition of non-profit conservation organizations, filed suit on February 15, 2005, alleging that the 2004 OCAP BiOp was legally inadequate in light of *Gifford Pinchot* and should be invalidated.  (Doc. 1.) Plaintiffs named as defendants the Department of the Interior and the FWS.  (*Id.*)

On February 16, 2005, FWS issued an amended BiOp (the "2005 OCAP BiOp," "OCAP BiOp," or "BiOp"), which superceded the 2004 OCAP BiOp.  (AR 247.)  The 2005 OCAP BiOp concludes that the coordinated operation of the SWP and CVP, including the proposed future actions, will not jeopardize the Delta smelt's continued existence.  (AR at 469.)  Although the BiOp recognizes that <u>existing</u> protective measures may be inadequate, the FWS concluded that certain <u>proposed</u> protective measures, including the EWA and a proposed "adaptive management" protocol would provide adequate protection.  (*Id.*)

Since the filing of this complaint, Federal Defendants have reinitiated § 7 consultation and contend this case should be dismissed as moot, or stayed for a voluntary remand of the 2005

**12**

1  BiOp without vacatur.

2      Plaintiffs filed a supplemental complaint on May 20, 2005,

3  challenging the amended BiOp on various grounds.  (Doc. 128 pt.

4  8.)

5          **D.  <u>Delta Smelt Abundance</u>**.

6      Smelt once were one of the most common pelagic[8] fish in the

7  Delta, having previously occupied the waters from "Suisun Bay and

8  Montezuma Slough, upstream to at least Verona on the Sacramento

9  River, and Mossdale on the San Joaquin River."  (AR 365.)  Smelt

10  abundance has "declined irregularly" for at least the past 20

11  years.  (AR 365-67.)  FWS relies primarily upon two indices to

12  monitor Delta smelt abundance, calculated from the Summer Tow Net

13  Survey ("TNS") and the Fall Midwater Trawl ("FMWT").  (AR 366-67,

14  1022.)  The TNS index, which measures the abundance and

15  distribution of juvenile Delta smelt, constitutes "one of the

16  more representative indices because the data have been collected

17  over a wide geographic area (from San Pablo Bay upstream through

18  most of the Delta) for the longest period of time (since 1959)."

19  (AR 370.)  Since 1983, except for three years (1986, 1993, and

20  1994), the TNS has remained consistently lower than ever

21  previously recorded.  (*Id.*)

22      The FMWT index, which measures the abundance and

23  distribution of late juveniles and adult Delta smelt from San

24  Pablo Bay to Rio Vista on the Sacramento River and Stockton on

25  the San Joaquin River, is the second longest running survey

26

27          [8]    Pelagic fish live in open water, generally away from
   vegetation or the bottom.  (AR 365.)  A significant amount of the
28  smelt's habitat are the Delta waters and waters of surrounding
   areas.

(since 1967).  The BiOp reviewed the FMWT trends as follows:

> Although this index has fluctuated widely (AR 9201-02, 9222), it has "declined irregularly over the past 20 years."  (AR 370-71.)  Since 1983, the FMWT has registered more low indices for more consecutive years than previously recorded.  Until recently, except for 1991, this index has declined irregularly over the past 20 years. Since 1983, the delta smelt population has exhibited more low fall midwater trawl abundance indices, for more consecutive years, than previously recorded. The 1994 FMWT index of 101.7 is a continuation of this trend. This occurred despite the high 1994 summer townet index for reasons unknown. The 1995 summer townet was a low index value of 319 but resulted in a high FMWT index of 898.7 reflecting the benefits of large transport and habitat maintenance flows with the Bay-Delta Accord in place and a wet year. The abundance index of 128.3 for 1996 represented the fourth lowest on record. The abundance index of 305.6 for 1997 demonstrated that the relative abundance of delta smelt almost tripled over last years results, and delta smelt abundance continued to rise, peaking in 1999 to an abundance index of 863, only to fall back down to the low abundance indexes of 139 for 2002 and 213 for 2003.

(AR at 371.)

The 2004 FMWT index, which was not discussed in the BiOp, was calculated to be 74, the lowest ever recorded.  (AR 9202.) (This omission forms the basis of one of Plaintiffs' challenges to the BiOp.)  The survey was apparently released in December 2004, and was specifically cited to FWS in February 2005.

At the hearing on the summary judgment motions, Federal Defendants in substance argued that despite years of study, the abundance data for the annual Delta smelt population is fraught with uncertainties and "not enough is known about the species" to accurately and finitely measure with certainty the project's effects on Delta smelt.  FWS maintains the one to two year life expectancy of the smelt also contribute to this lack of certainty.

**14**

1      **E.**    **Relationship Between Abundance and Project Operations**.

2      The BiOp cites several reasons for the smelt's decline.

3 First, since the mid 1800s, mining, agricultural use, and levee

4 construction caused the loss of a large portion of smelt habitat.

5 (AR at 365.)  Second, recreational boating in the Delta has

6 resulted in the presence and propagation of "predatory non-native

7 fish" and an increase in the rate of smelt erosion resulting from

8 boat wakes.  (*Id.*)  Third, reduced water quality "from

9 agricultural runoff, effluent discharge and boat effluent has the

10 potential to harm the pelagic larvae and reduce the availability

11 of the planctonic food source."  (*Id.* at 366.)  Finally, the BiOp

12 acknowledges that "delta smelt have been increasingly subject to

13 entrainment, upstream or reverse flows of waters in the Delta and

14 San Joaquin River, and constriction of low salinity habitat to

15 deep-water river channels of the interior Delta."  (*Id.*)  The

16 BiOp acknowledges that these final adverse effects are "<u>primarily</u>

17 <u>a result of the steadily increasing proportion of river flow</u>

18 <u>being diverted from the Delta by the Projects, and occasional</u>

19 <u>droughts</u>."  (*Id.* (emphasis added).)  The BiOp in no way

20 quantifies the contribution of each of these factors to the

21 smelt's decline.  The parties dispute the extent to which project

22 operations jeopardize the smelt.

23      **F.**    **Relationship Between Smelt and "X2.**"

24      Smelt are euryhaline (tolerant of a wide range of

25 salinities), but generally occur in water with less than 10-12

26 parts per thousand (ppt) salinity.  (AR at 362.)  For a large

27 part of its life span, Delta smelt are thought to be associated

28 with the "freshwater edge of the mixing zone," where the salinity

**15**

1  is approximately 2 parts per thousand (often referred to as

2  "X2").   (AR at 366.)   The summer TNS index increases dramatically

3  whenever X2 is located between Chipps and Roe islands.   (*Id.*)

4  Whenever the location of X2 shifts upstream of the confluence of

5  the Sacramento and San Joaquin, either as a result of water

6  diversions or natural conditions, smelt abundance decreases.

7  (*Id.* at 371.)

8       **G.   The Concept of "Salvage."**

9       The BiOp's "no jeopardy" conclusion relies on the concept of

10 "salvage," which refers generally to the process of using

11 mechanical devices to screen fish that would otherwise be

12 entrained in project facilities (e.g., pumps) into holding tanks

13 for transport to other parts of the Delta.   *(See e.g.*, AR 321.)

14 Unlike many other fish species in the Delta, Delta smelt do not

15 survive the salvage process, "either due to stress and injury

16 from handling, trucking and release, or from predation in or near

17 the salvage facilities, the release sites, or in Clifton Court

18 Forebay."   (AR at 413.)   As a result, for Delta smelt, FWS uses

19 the terms salvage and entrainment essentially interchangeably.

20 (*See id.* ("To simplify predictions of the difference in salvage

21 (and by extension entrainment) between model scenarios....")[9]

22      Previous BiOps regarding CVP and SWP operations used salvage

23 to set take limits.   For example, the 1995 BiOp's incidental take

24 statement set take exceedence levels for Delta smelt based on

25 "[m]onthly average delta smelt salvage at the Federal and State

26

27      [9]   The BiOp contradictorily acknowledges that "although
    salvage is used to index delta smelt take, it does not reliably
28 index delta smelt entrainment."   (AR 419.)

Fish Facilities from 1980 to 1992 by water year type."  (AR at
11765.)  Essentially, take limits were set according to how much
salvage had occurred in the past.

     More recently, project managers, fisheries officials, and
other experts came to the consensus that the salvage approach was
insufficient on its own.  For example, one DWR biologist noted
that the singular focus on historic salvage had problems:

> Higher levels of take are allowed in below normal years
> merely because this is what the projects "took"
> historically.  However, the population is more
> condensed in below normal years and possibly more
> vulnerable to entrainment.

(AR 5532.)  Experts advocated (a) further research into the
relationship between the position of the Delta smelt and
environmental conditions (AR 4881); and (b) the adoption of a
flexible management approach, which would allow new information
to be "folded back into the operation and conservation
strategies."  (AR 4870.)  The result was a "layered" approach to
managing the smelt, made up of more protective take limits than
previously imposed along with the implementation of an adaptive
management protocol.

     **I.   <u>Revised Take Exceedence Levels Used In the BiOp</u>**.

     The BiOp includes "hard" take limits,[10] based on historic
"salvage density estimates," adjusted to account for operational
constraints under the 2004 OCAP and presumed increased
environmental water flows.  Separate take limits were established
for formal and early consultation purposes.

_____

     [10]   These "hard" take limits, as the Defendants and
Defendant Intervenors referred to them during oral argument are
different from a separate take trigger that is part of the DSRAM
process described below.

**17**

1   The revision of the take limits began with historic catch
2   data from periodic samples of salvaged fish.  (*See* AR 413.)  Data
3   about the volume of water diverted during the collection period
4   is then used to estimate the fish per volume of water diverted.
5   This is referred to as the "salvage density."[11]  (*Id.*)
6   Historically, salvage density varied greatly depending on whether
7   the year was wet (above normal), dry (below normal, dry, or
8   critical) year.  Wet and dry year data were analyzed separately.
9   (*Id.*)  The estimates were then inputted into a computer modeling
10  system, CALSIM II, to estimate take under varying assumptions
11  about future project operations, including programs designed to
12  improve environmental conditions, such as the Environmental Water
13  Account.  (AR 413-14.)

14      Several different scenarios or "Studies" were run through
15  CALSIM II and included in the BiOp.  For example, Study No. 1
16  reflects the 1995 regulatory base case, without any changes in
17  project operations and without the addition of any environmental
18  water programs.  Study No. 4a estimates a take level for flow
19  conditions planned under the operations subject to final
20  consultation (changes to flows in the Trinity River, future
21  development levels, and the operation of the Freeport Regional
22  Water Project and the Intertie).  Study 4a included flow
23  adjustments required by D-1641 and VAMP, along with projected
24  CVPIA (b)(2) flows, but <u>did not include</u> operation of the EWA.

25

26      [11]   DWR insisted during oral argument that the data used to
run the CALSIM II models was not "salvage" data but was rather
27  "density data."  The BiOp is explicit that the models were run
using a "salvage density" estimate generated from periodic
28  samplings of salvaged fish.

**18**

1   Study No. 5a was similar to 4a, except that it added projected

2   EWA flows.  Separately, in Study No. 5, CALSIM II simulated flow

3   modifications projected to occur as a result of "those projects

4   subject to early consultation," specifically the increased

5   pumping and permanent barriers called for in the planned South

6   Delta Improvement Project ("SDIP").  (AR 374, 414-19; Sommer

7   Decl. ¶5.)  Each modeling scenario was run separately for various

8   water year types (Wet, Above Normal, Below Normal, Dry, and

9   Critically Dry) and independently estimated take at CVP and SWP

10  facilities.

11      The BiOp based its conclusions for formal consultation on

12  the results of the Study No. 5a, and for early consultation on

13  the results of Study No. 5.  The results of the modeling

14  scenarios for Study No. 5a are set forth in several tables at

15  pages 414 through 419 of the AR.  The following table summarizes

16  the changes in estimated take for Study No. 5a, for each type of

17  water year, relative to the 1995 base case.  In other words, the

18  positive figures represent the number of additional smelt that

19  will be taken per month under formal consultation relative to the

20  1995 base case (Study No. 1) while negative numbers represent how

21  many fewer smelt will be taken per month relative to the 1995

22  base case.[12]

23  //

24  //

25  //

26

27

28      [12]    The information contained in these tables was derived
    by the court from the BiOp but was not presented in this form in
    the BiOp.

**19**

**Table 1:**
**Summary of Results for CVP Salvage Under Study No. 5a**

| Month | Wet Year | Above Normal Year | Below Normal Year | Dry Year | Critically Dry Year |
|---|---|---|---|---|---|
| Adults | | | | | |
| December | −1 | −1 | −3 | −3 | −41 |
| January | −13 | −13 | −12 | −10 | −98 |
| February | −33 | −36 | +63 | −60 | +9 |
| March | +29 | −40 | −83 | −19 | +1 |
| Largely Juveniles | | | | | |
| April | 0 | 0 | −16 | +5 | 0 |
| May | 0 | 0 | −9017 | −14469 | −11652 |
| June | 0 | 0 | 0 | −2910 | 0 |
| July | 0 | +11 | +7 | −74 | 0 |
| Net: December−March | −17 | −89 | −35 | +28 | −130 |
| Net: April−July | 0 | +11 | −9025 | −17448 | −11652 |

**Table 2:**
**Summary of Results for SWP Salvage Under Study No. 5a**

| Month | Wet Year | Above Normal Year | Below Normal Year | Dry Year | Critically Dry Year |
|---|---|---|---|---|---|
| Adults | | | | | |
| December | −6 | −6 | −16 | −15 | −11 |
| January | −76 | −87 | −82 | −87 | −104 |
| February | +86 | −94 | 0 | 0 | +51 |
| March | +98 | +91 | +63 | 0 | +2 |
| Largely Juveniles | | | | | |
| April | −60 | −77 | −365 | −144 | 0 |
| May | −27188 | −25933 | −31122 | −32083 | −7269 |
| June | −1096 | −129 | −53 | 1267 | 0 |
| July | 0 | +282 | +318 | +493 | +175 |
| Net: December−March | +102 | −95 | −35 | −102 | −62 |
| Net: April−July | −28346 | −25857 | −31213 | −33000 | −7095 |

For the CVP, CALSIM II predicts significant reductions in smelt salvage during the months of December through July in below normal and dry years, when compared to the regulatory base

20

1   case.[13]  However, under certain scenarios, CVP salvage increases

2   during other months of the year relative to the regulatory base

3   case, because pumping is predicted to increase during these

4   months to make up for water released from storage for fish

5   protection purposes.  For the SWP, salvage stays relatively level

6   for the months of December through March.  However, salvage

7   decreases for the months of April through July relative to the

8   regulatory base case.

9       Based on CALSIM II Study 5a, FWS calculated the amount of

10  "combined salvage" (i.e., for both projects) estimated under the

11  formal consultation scenario, for each month, according  to water

12  year type.  The BiOp rounded the numbers up to the nearest 100

13  and used those figures to set incidental take limits by water

14  year type.  (AR 471-472.)

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21

22

23       [13]     The tables at pages 414 and 419 of the AR do not list

24  the absolute number of smelt estimated to be taken in any given
    month under the 1995 regulatory base case (Study No. 1).

25  However, the incidental take limits (set forth in the Table 3
    below) were based on the absolute numbers of smelt that are

26  projected to be taken under Study No. 5a.  For example, the take
    limit for the month of May in a Critically Dry year, set at

27  30,500, under the CALSIM II results in a reduction of the 30,500
    to 18,921 (representing 11,652 reduction in CVP salvage plus

28  7,269 reduction in SWP salvage) lower than the 1995 regulatory
    base case.

**Table 3:**
**Incidental Take Limits by Water Year Type**
**(For Both CVP and SWP)**

| | Water Year Type | | |
|---|---|---|---|
| | Month | Wet or Above Normal | Below Normal, Dry, or Critical |
| | October | 100 | 100 |
| | November | 100 | 100 |
| | December | 700 | 400 |
| | January | 3000 | 1900 |
| Monthly Incidental Take | February | 2300 | 1700 |
| | March | 1300 | 1300 |
| | April | 1000 | 1100 |
| | May | 37800 | 30500 |
| | June | 45300 | 31700 |
| | July | 3500 | 2500 |
| | August | 100 | 100 |
| | September | 100 | 100 |

Because these incidental take levels are based on predictions produced by CALSIM II Study 5a, they do <u>not</u> assume any smelt protection actions under the DSRAM, but do assume continued availability of the EWA water.  (AR 374, 471.)

FWS determined that the level of anticipated take "is not likely to result in jeopardy to the smelt because this level of take is at or below historical levels of take."  (AR 474.)

However, the BiOp also acknowledges that "the operations of the Projects under formal consultation as described in the Project Description <u>will result in adverse effects to delta smelt</u> through entrainment at the CVP and SWP and by drawing delta smelt into poorer quality habitat in the south delta."  (AR 422 (emphasis added).)  The BiOp concludes that "with the inclusion of [certain] conservation measures described [in the BiOp] <u>and</u> the implementation of the [Delta Smelt Risk Assessment Matrix], these adverse effects would be avoided or minimized."  (*Id.*

**22**

(emphasis added).)  "[W]ith these conservation measures in place, the re-operation of the Trinity River, the increased level of development on the American River, the Freeport Diversion, the Suisun Marsh Salinity Control Gates, the Barker Slough Diversion, or due to changes to X2...are not expected to result in adverse effects to delta smelt."  (AR 423.)

FWS' conclusions admit project operations will result in adverse effects to delta smelt, which are unquantified, and can only be avoided by conservation measures and implementation of the DSRAM.

**H.   "<u>Conservation Measures</u>."**

The "conservation measures" contemplated are listed in the Summary of Effects section of the BiOp and include: (1) the Environmental Water Account ("EWA"); (2) Central Valley Project Improvement Act (b)(2) water; (3) State Water Resource Control Board's Water Rights Decision 1641; (4) the Vernalis Adaptive Management Plan ("VAMP"); and (5) the DSRAM adaptive management plan.  (AR 466-68.)

**1.   CVPIA(b)(2) Water.**

According to the 1992 Central Valley Project Improvement Act, the CVP must "dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the

**23**

Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act." Title XXXXIV of the Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. 102-575, 106 Stat. 4600, 4706 (1992).  (*See* AR 372.)

FWS, in consultation with the Bureau and other agencies, may use this "(b)(2) water" to meet Water Quality Control Plan (WQCP) obligations and any other requirements imposed by law after 1992.  "For example, (b)(2) water has been used to maintain flows on Clear Creek to provide adequate spawning and rearing habitat for Chinook salmon. Water exports at the CVP have also been reduced using (b)(2) water to reduce entrainment of salmon or delta smelt at the salvage facilities.  This ongoing action provides a benefit to delta smelt in most years."  (AR 372.)

The base CVP yield committed to fish restoration is fixed by statute and is mandatory.  This fixed supply is subject to reduction up to 25% in critically dry years under CVPIA § 3406(b)(2)(C).

## 2. Environmental Water Account.

The Environmental Water Account ("EWA") is "an adaptive management tool that aims to protect both fish and water users as it modifies water project operations in the Bay-Delta."  (AR 373.)

> The EWA provides water for the protection and recovery of fish beyond that which would be available through the existing baseline of regulatory protection related to project operations. The EWA buys water from willing sellers or diverts surplus water when safe for fish,

**24**

> then banks, stores, transfers and releases it as needed
> to protect fish and compensate water users for deferred
> diversions.

(*Id.*)

The EWA has been used to benefit smelt by allowing for the curtailment of project export pumping during critical time periods. (*Id.*)  The EWA could also be used to increase in-stream flows or increase outflows in the Delta, both of which would benefit the smelt. (*Id.*)  The EWA is not fixed by statute nor is annual funding assured, and the water supply it provides, though reasonably anticipated, is not immutable.

### 3.   Water Rights Decision 1641.

State Water Resource Control Board Decision 1641 (D-1641) imposes certain minimum flow and water quality objectives upon the projects:

> D-1641 includes specific outflow requirements
> throughout the year, specific export restraints in the
> spring, and export limits based on a percentage of
> estuary inflow throughout the year. D-1641 obligates
> the SWP and CVP to comply with the objectives in the
> 1995 Bay-Delta Plan. The Service issued a biological
> opinion on the Bay-Delta plan to the Environmental
> Protection Agency on November 2, 1994. The water
> quality objectives in the 1995 Bay-Delta Plan and in
> D-1641 are designed to protect in-Delta agricultural,
> municipal and industrial, and fishery uses and vary
> throughout the year and by water year type.... D-1641
> will also protect delta smelt by providing transport,
> habitat and attraction flows.

(AR 373 (citations omitted).)

The D-1641 requirements are mandatory under the projects' operating permits.  The water to satisfy D-1641 comes from 3406(b)(2) yield and supplemental sources the Bureau utilizes.

### 4.   Vernalis Adaptive Management Plan (VAMP).

The Vernalis Adaptive Management Plan (VAMP) is an experimental program that had its origin in D-1641.  (AR 373.) It provides for flows on the lower San Joaquin River and export curtailments at the projects.  (*Id*.)  VAMP's purpose is to "provide pulse flows on the San Joaquin River and improve habitat conditions in the Delta by reducing exports at the CVP and SWP" over a 31 day period in April and May for the benefit of Chinook salmon and Delta smelt.  (*Id*.)  Currently, water used to reduce exports at the CVP under VAMP is accounted for as CVPIA (b)(2) water.  (*Id*.)  If export reductions are taken, the EWA is used to supply contractors to  make up for the transfers.  VAMP flows "allow larval and juvenile smelt to avoid becoming entrained at the export facilities and to move downstream to Suisun Bay." (*Id*.)

The VAMP water supply is not irrevocably fixed or assured.

### I.   Delta Smelt Risk Assessment Matrix (DSRAM).

The BiOp's other, primary protection for the smelt is the implementation of a new adaptive management protocol, known as the Delta Smelt Risk Assessment Matrix ("DSRAM").  The DSRAM utilizes a list of trigger criteria to precipitate responses. (AR at 344.)  The criteria are:

(1) the previous year's FMWT index;

(2) the risk of smelt entrainment based upon the location of X2;

(3) the estimated duration of the smelt spawning period,

based on water temperature;

(4) the presence of spawning female smelt;

(5) the proximity of the smelt to project pumping facilities; and

(6) a salvage trigger for adult and juvenile smelt. (AR 346.)

### 1. The DSRAM Process.

If any trigger criteria is met or exceeded, a Delta Smelt Working Group ("DSWG") is convened. The DSWG consists of representatives from FWS, the California Department of Fish and Game, DWR, the United States Environmental Protection Agency, the Bureau, and the California Bay-Delta Authority. (*See* AR 344-45.) The DSWG then recommends corrective actions to a Water Operations Management Team ("WOMT"). (*Id.*) The OCAP BiOp identifies four specific actions that the DSWG and WOMT must consider taking if one or more trigger criteria occur: (1) export reductions at one or both of the projects; (2) changes in the south Delta barrier operations; (3) changes in San Joaquin River flows; and (4) changes in the operation of the Delta cross channel.[14] The DSRAM does not contain defined action criteria, but instead leaves any response wholly to the discretion of the two groups who administer the DSRAM (DSWG and WOMT).

### 2. DSRAM Implementation.

The BiOp acknowledges although FWS is "confident that use of

---

[14]  The DSRAM also includes a chart illustrating when during the year each of these actions will be available. (AR 346.)

1  the DSRAM will reduce the frequency with which actual salvage
2  exceeds the median predicted salvage, the exceedence frequency
3  could be as high as 50%." (AR 471.)  There is no analysis of the
4  duration or consequences from such exceedence.  The DSRAM
5  provides no operating criteria or action schedule, specifying
6  when mitigation actions must be taken.  It is not possible to
7  predict what, how and when DSRAM measures will be implemented.

8       **J.   Recent Experience with DSRAM.**

9       DWR offered post-record evidence regarding the manner in
10 which DSRAM has actually been implemented since its inception.
11 This post-record activity could not have been considered by the
12 agency.  A motion to strike the proffered evidence was sustained.
13 The offer of proof includes two "fish actions" that were taken in
14 2005 in response to "triggers" and a third that was planned but
15 avoided when project water increased in early 2006, a wet year.
16 DWR's offer of proof is to show positive experience in operation
17 of the DSRAM.

18      **K.   Recent Procedural History.**

19      The Federal Defendants acknowledge that "[s]hortly before
20 the 2005 OCAP BiOP was completed, a fall midwater trawl survey of
21 delta smelt revealed a substantial decline in the population
22 index for the species" to the lowest ever.  (Doc. 242-1, at 4.)
23 The Federal Defendants do not concede that the existence of this
24 data renders the BiOp arbitrary and capricious, because "limited
25 analysis of this data existed, and the Service relied on the raw
26 data, and its own professional judgments as the best available
27 scientific and commercial data available." (*Id*.)  Nevertheless,

28                              **28**

1  "the CALFED agencies have continued to assemble and analyze new
2  data and information." (*Id*.)  For example, scientists from
3  CALFED agencies "recently" developed a document based upon the
4  new data:  the Interagency Ecological Program Synthesis of 2005
5  Work to Evaluate the Pelagic Organism Decline (POD) in the Upper
6  San Francisco Estuary (the "IEP POD Synthesis").  This document
7  led the Federal Defendants to conclude that the OCAP for the CVP
8  and SWP may affect Delta smelt in a manner or to an extent not
9  previously considered. (IEP POD Synthesis, Doc. 240, Attachment
10 1.)

11     On July 6, 2006, the Bureau requested that the FWS
12 re-initiate consultation concerning the impact of the OCAP on the
13 Delta smelt.  (Doc. 240.)  In a July 6, 2006 letter to the FWS,
14 the Bureau acknowledged that "emerging data indicates an apparent
15 substantial decline in the Delta smelt population index."  (Doc.
16 240-2.)

17            **1.  <u>No Dismissal or Stay</u>**.

18     In light of the second re-initiation of consultation,
19 federal defendants sought dismissal on prudential mootness
20 grounds, a voluntarily remand without vacatur, or a stay pending
21 the completion of reconsultation.  (*See* Docs. 242-1, 273.)  The
22 motion for stay was joined by the DWR (Doc. 277), and various
23 Defendant-Intervenors (Doc. 274).  Plaintiffs opposed because
24 Federal Defendants refused to withdraw the challenged BiOp and
25 stated their intent to continue CVP and SWP operations under the
26 disputed BiOp and its incidental take statements during the time
27 period necessary to complete re-consultation, now projected to be

28

**29**

July 2008, more than two and one-half water years following the effective date of the disputed BiOp. (*See* Doc. 279.)

Defendants' motion to dismiss on prudential mootness grounds was denied:

> Plaintiffs' concerns have not been fully addressed by the reinitation of consultation. Federal Defendants are relying in part on the challenged BiOps in operating the CVP and intend to continue to do so. The controversy over whether the BiOps and OCAP should have continued viability is real and substantial. and this court could provide relief, in the form of a decision invalidating the BiOps followed by hearings on interim remedies. Under these circumstances, it is not appropriate to deem this case prudentially moot.

(Doc. 301 at 18 (footnotes omitted).)

The motion for voluntary remand without vacatur was denied based on the general standard for vacatur set forth in *Natural Resources Defense Council v. U.S. Dept. of the Interior*, 275 F. Supp. 2d 1136, 1143 (C.D. Cal. 2002), which considers "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." No evidence or argument was presented regarding the nature of the prejudice that might result from invalidating the BiOp (*id.* at 20), and numerous factual and legal disputes exist regarding the seriousness of the order's deficiencies (*see id.* at 27). The court was left to speculate what consequences to the species would result if injunctive relief were ordered against continued implementation of the disputed BiOp.

The stay motion, based on the primary jurisdiction doctrine, was denied on the authority of *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005)(a party seeking a stay "must make out a clear case of hardship or inequity in being required to go

forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else.").  The order held: "Plaintiffs are entitled to have their complaint decided on the merits, particularly given the fact that Defendants continue to rely on the challenged BiOps as if they were lawfully enacted."  (Doc. 301 at 33.)  The apparent increasing jeopardy to the smelt by and after February of 2005 militates against further delay while FWS continue "to study" the issue of jeopardy, an exercise that has continued for almost a decade.

## IV.  POST-RECORD EVIDENTIARY DISPUTES

### A.  Objections to Declaration of Ted Sommer.

DWR offers the post-record declaration of Ted Sommer, Ph.D, to explain (1) the concept of salvage and its relationship to the take exceedence levels in the BiOp; (2) the operation of DSRAM; (3) and the manner in which DSRAM has been implemented since its inception.

Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  However, the Ninth Circuit recognizes three main exceptions to this rule, allowing courts to consider extra-record evidence:

> (1) if necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) "when the agency has relied on documents not in the record," or (3) "when supplementing the record is necessary to explain technical terms or complex subject matter."

*Southwest Ctr. for Biological Diversity v. U.S. Forest Service*,

1   100 F.3d 1443, 1450 (9th Cir. 1996).  A court may also consider
2   extra-record evidence "when plaintiffs make a showing of agency
3   bad faith."  *Nat'l Audubon Soc. v. U.S. Forest Serv.*, 46 F.3d
4   1437, 1447 n.9 (9th Cir. 1993).

5       DWR maintains that the Sommer declaration explains
6   "technical or complex subject matters" admissible under the
7   exception for evidence "necessary to explain technical or complex
8   subject matters."  (Doc. 246-1 at 5-6 n.5.)  Plaintiffs move to
9   strike the declaration on the ground that subject matters covered
10  by Mr. Sommer are "neither technical nor complex."  (Doc. 305 at
11  4 n.1.)  Rather, Plaintiffs contend that the declaration is
12  offered to explain the agency's post-BiOp experience with DSRAM
13  in an effort to counter the Plaintiffs' argument that the DSRAM
14  is wholly discretionary and contains no defined standards or
15  enforceable requirements.

16      Generally, "post hoc rationalizations of the agency...cannot
17  serve as a sufficient predicate for agency action."  *Am. Textile*
18  *Manuf. Inst. v. Donovan*, 452 U.S. 490, 539 (1981); *see also*
19  *Sierra Club v. Bosworth*, 199 F. Supp. 2d 971, 986 (N.D. Cal.
20  2002)(refusing to consider post hoc explanations that were
21  "neither addressed nor supported by the record").  DWR does not
22  disagree with this general principle, but instead insists that
23  the declaration is offered only to explain complex and technical
24  aspects of the incidental take exceedence levels and the DSRAM.

25      Paragraphs 11 through 15 of the Sommer Declaration concern
26  the implementation measures taken under the DSRAM after the BiOp
27  issued.  There is no basis in the law for the admission of this
28  post-record evidence.  DWR does not assert otherwise.

**32**

Plaintiffs' motion to strike is **GRANTED** as to paragraphs 11 through 15.

The information contained in the remainder of the Sommers declaration is drawn directly from the BiOp itself, explaining in plain language how the incidental take limits were set and how DSRAM operates.  Although, much of the same information can be found in the BiOp, the subject matters covered are technical and complex and Dr. Sommer's declaration clarifies or explains them. This exception saves the remaining paragraphs of the Sommers declaration to explain the incidental take limits.

The motion to strike is **DENIED IN PART** as to the past record evidence paragraphs only.[15]


### B.   Federal Defendants' Renewed Objections to Previously Admitted Extra-Record Documents.

The May 13, 2006 memorandum decision admitted certain extra-record documents, for limited purposes (Doc. 219), including Document 10 (a Powerpoint presentation by Michael Dettinger given to the Bay-Delta Authority on December 8, 2004 entitled "Uncertainties & CALFED Planning What Are Current Observations

---

[15]   In a footnote at the end of Plaintiffs' motion to strike the Sommer Declaration, Plaintiffs also challenge Federal Defendants' reliance on the declaration of Ann Lubas-Williams, which Federal Defendants filed with their response to Plaintiffs' motion for summary judgment/cross motion to dismiss.  (*See* Doc. 242-4.)  The Lubas-Williams declaration concerns the implementation of DSRAM and the sources from which DWR plans to obtain water to protect Delta smelt in the near future.  Federal defendants relied on her declaration primarily to support their motion to dismiss or for voluntary remand.  No party has relied upon this declaration in the context of the pending motions; it was not considered by the court.  It is unnecessary to rule on this motion to strike.

and Models Saying?") for two purposes.  First, "for the limited

purpose[] of determining whether []FWS failed to adequately

consider the climate change issue and the scientific significance

of any such failure....;" but not legal opinions.  (Doc. 219 at

25.)  Second, to the extent appropriate, all twenty two extra

record documents presented by Plaintiffs, including Document 10,

may be referenced to aid the court's understanding of various

technical concepts under the "technical terms and complex subject

matter exception." (*Id.* at 32.)

      In the footnote to their opposition brief, Federal

Defendants renew their objection to consideration of any of the

documents under the technical terms and complex subject matter

exception.  (Doc. 242-1 at 22 n.12.)  The May 13, 2006 memorandum

decision notes: "Defendants and Defendant Intervenors suggest

that Plaintiff has failed to establish that the existing record

is inadequate to explain the technical terms, but point to no

authority requiring such a showing."  (Doc. 219 at 30.)  Federal

Defendants now assert: "numerous courts, including the Supreme

Court and district courts in this Ninth Circuit, have held that a

record may not be supplemented for explanatory purposes unless

the existing record has been demonstrated inadequate."  (Doc.

242-1 at 22 n.12.), citing an unpublished district court

decision, City of *Santa Clarita v. United Stats Dept. Of*

*Interior*, 2005 WL 2972987 at *2 n.3 (C.D. Cal. 2005):

                  ...Plaintiffs bear the burden of making an initial
                  showing that the administrative record is inadequate
                  for effective judicial review and that one of the
                  exceptions to record review applies.  *Animal Defense*
                  *Council v. Hodel*, 840 F.2d at 1436-38 (affirming
                  district court order limiting review to administrative
                  record and prohibiting discovery because plaintiffs did

**34**

1                   not show record presented was insufficient for review
2                   or that any of the exceptions to record review were
                   applicable)....

3 (emphasis added).

4    A district court decision not cited by Defendants, *Karuk*
5 *Tribe of Cal v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071, 1087
6 (N.D. Cal. 2005), reiterated this holding:

7             The Ninth Circuit allows a reviewing court to consider
             extra-record materials in an APA case only under four
8             narrow exceptions: (1) when it needs to determine
             whether the agency has considered all relevant factors
9             and has explained its decision; (2) when the agency has
             relied upon documents or materials not included in the
10           record; (3) when it is necessary to explain technical
            terms or complex matters; and (4) when a plaintiff
11           makes a showing of agency bad faith. Southwest Center
            for Biological Diversity v. United States Forest
12           Service, 100 F.3d 1443, 1450 (9th Cir. 1996). <u>For
            extra-record material to be considered, a plaintiff
13           must first make a showing that the record is
            inadequate</u>. *Animal Defense Council v. Hodel*, 840 F.2d
14           1432, 1437 (9th Cir.1988) ("The [plaintiff] makes no
            showing that the district court needed to go outside
15           the administrative record to determine whether the
            [agency] ignored information"). At the *1088  same
16           time, "[a] satisfactory explanation of agency action is
            essential for adequate judicial review, because the
17           focus of judicial review is not on the wisdom of the
            agency's decision, but on whether the process employed
18           by the agency to reach its decision took into
            consideration all the relevant facts." *Asarco, Inc. v.*
19           *U.S. Environmental Protection Agency*, 616 F.2d 1153,
            1160 (9th Cir.1980).
20
  (emphasis added).[16]  *Karuk Tribe*, and *Animal Defense Council v.*
21

22     [16]   Federal Defendants also cite *Pension Benefit Guar.*
23 *Corp. v. LTV Corp.*, 496 U.S. 633, 654-655 (1990), in which the
Supreme Court reasoned:  "Here, unlike in *Overton Park*, the Court
24 of Appeals did not suggest that the administrative record was
inadequate to enable the court to fulfill its duties under
25 § 706."
    Federal Defendants quote *Pension Benefit* entirely out of
26 context.  The quoted language is drawn from a part of the opinion
addressing the Second Circuit's ruling about the adequacy of
27 <u>procedures</u> used by the defendant agency.  Specifically, that
28 court ruled that the agency acted arbitrarily and capriciously

*Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988), on which it relies, do stand for the proposition that, before admitting documents under any exception to the general rule against extra-record evidence, a court should require that a plaintiff make an initial showing that the existing record is insufficient.  Here, defendants maintain that those documents plaintiffs have referenced to explain complex or technical matters, are "the cart before the horse," because Plaintiffs have not shown the existing record is inadequate.

First, Federal Defendants objection is arguably untimely. They did not cite cases requiring a preliminary showing of insufficiency when the motion to augment was briefed and heard. Nor did Federal Defendants timely move for reconsideration of the May 13, 2006 ruling on the motion to augment.  Striking the

---

because it failed to apprise the plaintiff of the material on which it was to base its decision, never gave plaintiff an adequate opportunity to offer contrary evidence, failed to proceed according to ascertainable standards, and failed to provide plaintiff a statement showing its reasoning.  *Id*. at 653. One party claimed that *Overton Park* validated a court's order that an agency undertakes additional procedures.  *Id*.  The Supreme Court rejected this argument, reasoning that, at most, *Overton Park* "imposes a general 'procedural' requirement of sorts by mandating that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision."  *Id*. at 654.  The Supreme Court then distinguished *Overton Park*, reasoning that "[h]ere, unlike in *Overton Park*, the Court of Appeals did not suggest that the administrative record was inadequate to enable the court to fulfill its duties under § 706."  *Id*. at 655.  This was a specific reference to language in *Overton Park* which criticized the lower courts for relying only on the litigation affidavits, rather than the whole administrative record.  *Pension Benefit* sheds absolutely no light on the admissibility of extra-record evidence.

36

challenged documents now, would cause prejudice to Plaintiffs,
who relied upon these rulings to prepare their dispositive
motions.

Even assuming a timely and specific objection, on the
merits, Plaintiffs' extra-record documents were properly
admitted.  Of these twenty-two documents, Plaintiffs' papers only
referenced eight: Docs. 9, 10, 11, 12, 13, 20, 21 & 22.  With the
exception of Documents 12 and 22, all were admitted on multiple
grounds.  (Documents 12 and 22 were admitted for the limited
purpose of explaining technical materials.)  The documents and
the bases for their admission are as follows:

Document 9:      Summary of Annual Joint Meeting of California
                 Bay-Delta Authority and Bay-Delta Public Advisory
                 Committee (December 8-9, 2004).

                 Admitted "for the limited purpose of determining
                 whether USFWS failed to adequately consider the
                 EWA/CVPIA(b)(2) issue," "for the limited purposes
                 of determining whether USFWS failed to adequately
                 consider the climate change issue and the
                 scientific significance of any such failure...,"
                 and, as appropriate, to explain complex and
                 technical matters.

Document 10:     Climate Change Uncertainties & CALFED Planning:
                 What Are Current Observations and Models Saying?
                 Powerpoint presentation by Michael Dettinger, U.S.
                 Geological Survey at the Scripps Institute for
                 Oceanography, et al. to Bay-Delta Authority
                 (December 8, 2004).

                 Admitted "for the limited purposes of determining
                 whether USFWS failed to adequately consider the
                 climate change issue and the scientific
                 significance of any such failure," and as
                 appropriate, to explain complex and technical
                 matters.

Document 11:     Summary of Annual Joint Meeting of California Bay-
                 Delta Authority and Bay-Delta Public Advisory
                 Committee (February 9-10, 2005).

1                               Admitted for the limited purpose of showing that
2                               USFWS failed to consider relevant Delta smelt
                              population data and its scientific significance,"
3                               and, as appropriate, to explain complex and
                              technical matters.

4 Document 12:     Letter from H. Candee and K. Poole, NRDC, to S.
                              Thompson re Consultation on OCAP: Significant New
5                               Delta Smelt Information, Service (Feb. 14, 2005).

6                               Admitted only to explain, as appropriate, complex
7                               and technical matters.

8 Document 13:     Delta smelt abundance trends, Powerpoint
                              presentation by Chuck Armor, DFG, to Bay-Delta
9                               Authority

10                             Admitted for the limited purpose of showing that
                              USFWS failed to consider relevant Delta smelt
11                             population data and its scientific significance,"
                            and, as appropriate, to explain complex and
12                             technical matters.

13 Document 20:     Supplemental Biological Opinion on CVP and SWP
                            Operations, April 1, 2004 through March 31, 2006
14                             (Feb. 27, 2004).

15                           Admitted "for the limited purpose of determining
                          whether USFWS failed to adequately consider the
16                           EWA/CVPIA(b)(2) issue," and, as appropriate, to
                          explain complex and technical matters.

17 Document 21:     Future Water Availability in the West: Will there
                          be enough? Powerpoint presentation by M. Dettinger
18                         to 24th Annual Conference on Water, Climate and
                        Uncertainty: Implications for Western Water Law,
19                         Policy, and Management (June 11-13, 2003).

20                           Admitted "for the limited purposes of determining
                          whether USFWS failed to adequately consider the
21                         climate change issue and the scientific
                        significance of any such failure...," and, as
22                         appropriate, to explain complex and technical
                        matters.
23
Document 22:     Letter from John W. Keys, Bureau, to Hon. George
24                         Miller, House of Representatives re Bureau's
                        renewal of CVP water contracts (Dec. 23, 2004).
25
                        Admitted only to explain, as appropriate, complex
26                         and technical matters.

27     With the exception of Documents 12 and 22, Plaintiffs were

28 permitted to reference these documents to show whether FWS

1  adequately considered included subject matter to support the

2  BiOp.  Although Plaintiffs did not expressly demonstrate that the

3  record was insufficient, a finding of insufficiency can be

4  implied from the rulings admitting the documents.  For example,

5  Document 10, the powerpoint presentation regarding "Climate

6  Change Uncertainties & CALFED Planning" presented to the

7  Bay-Delta Authority on December 8, 2004, references

8  climatological information and issues not otherwise discussed in

9  the administrative record, bearing on whether FWS failed to

10 adequately consider the climate change issue.  The same reasoning

11 applies to Documents 9, 10, 11, 13, 20 & 21.  As for Documents 12

12 and 22, were which were only admitted under the complex and

13 technical matters exception, no prior showing of insufficiency

14 was made.  However, Documents 12 and 22 were only referenced as

15 secondary citations or for context.  Even if, any document was

16 admitted in error, no prejudice has resulted.

17

18                    **V.   STANDARD OF REVIEW**

19      Summary judgment is appropriate where there are no genuine

20 issues of material fact and the moving party is entitled to

21 judgment as a matter of law.  Fed. R. Civ. Pro. 56(c).  This is a

22 challenge to the lawfulness of a biological opinion brought under

23 the ESA and the Administrative Procedure Act ("APA").  Agency

24 decisions made under the ESA are governed by the APA, which

25 requires that the agency action be upheld unless it is found to

26 be "arbitrary, capricious, an abuse of discretion, or otherwise

27 not in accordance with law," or "without observance of procedure

28 required by law."  5 U.S.C. § 706(2)(A), (D).  The inquiry is

**39**

1  designed to "ensure that the agency considered all of the
2  relevant factors and that its decision contained no clear error
3  of judgment." *Pacific Coast Fed'n of Fishermen's Ass'ns v. NMFS*,
4  265 F.3d 1028, 1034 (9th Cir. 2001).  Agency action should only
5  be overturned if the agency has "relied on factors which Congress
6  has not intended it to consider, entirely failed to consider an
7  important aspect of the problem, offered an explanation for its
8  decision that runs counter to the evidence before the agency, or
9  is so implausible that it could not be ascribed to a difference
10 in view or the product of agency expertise." *Id*.  In sum, a
11 court must ask "whether the agency considered the relevant
12 factors and articulated a rational connection between the facts
13 found and the choice made." *Id*.  "A biological opinion is
14 arbitrary and capricious and will be set aside when it has failed
15 to articulate a satisfactory explanation for its conclusions or
16 when it has entirely failed to consider an important aspect of
17 the problem." *Greenpeace v. NMFS,* 80 F. Supp. 2d 1137, 1147
18 (W.D. Wash. 2000).  Alternatively, a biological opinion may also
19 be invalid if it fails to use the best available scientific
20 information as required by 16 U.S.C. § 1536(a)(2).  *Id*. at 1150.

21     As a general rule, a court must defer to the agency on
22 matters within its expertise.  *See National Wildlife Federation*
23 *v. National Marine Fisheries Service,*  422 F.3d 782, 798 (9th
24 Cir. 2005).  However, "[t]he deference accorded an agency's
25 scientific or technical expertise is not unlimited." *Id.*
26 "Deference is not owed when the agency has completely failed to
27 address some factor consideration of which was essential to
28 [making an] informed decision." *Id*. (internal citations and

**40**

quotations omitted).

A final BiOp is final agency action for judicial review purposes. *American Rivers, infra*, 126 F.3d at 1124-25.

## VI.   SUMMARY OF PLAINTIFFS' MOTION

Plaintiffs move for summary judgment on the following grounds:

(1) First, the BiOp did not utilize the Best Available Science by: (a) failing to reference the "most recent Delta Smelt abundance data," namely the 2004 Fall Midwater Trawl Data; and (b) failing to consider the possible effects that climate change might have on the smelt's habitat.

(2) Second, the BiOp unlawfully relies upon the DSRAM as a mitigation measure because the DSRAM process is "entirely discretionary, uncertain, and unenforceable."  In addition, Plaintiffs allege that Federal Defendants acted arbitrarily and capriciously by relying upon the EWA, CVPIA(b)(2), and/or VAMP programs as water sources necessary to implement the DSRAM. Plaintiffs allege that Federal Defendants have (a) failed to demonstrate that EWA, CVPIA and/or VAMP will continue to be available over the 20-year term of the BiOp and (b) failed to demonstrate that DSRAM can reliably operate without water assets from those programs.

(3)   Third, there is no rational connection between the evidence in the record and the BiOp's "no jeopardy" conclusion. Specifically, Plaintiffs allege (a) that the BiOp's focus on salvage as the measure of harm to the species underestimates project impacts and results in a meaningless take limit; and (b)

**41**

1 that the BiOp fails to explain how its no jeopardy conclusion can
2 be justified in light of the identified adverse effects of the
3 project, along with indirect and cumulative effects.

4     (4) Fourth, the BiOp failed to adequately analyze whether
5 the OCAP's impacts on the Delta smelt's critical habitat are
6 consistent with the smelt's recovery.  In addition, the Federal
7 Defendants failed to adequately take into account smelt habitat
8 areas other than defined by X2.

9     (5) Finally, the BiOp is unlawfully narrow in its scope
10 because it (a) fails to provide a comprehensive analysis of the
11 effects of constructing facilities required to carry out long
12 term CVP and SWP operations and (b) fails to analyze the impacts
13 of the projects delivering the full amount of water authorized
14 under CVP and SWP water service contracts.

15

16                    **VII.  DISCUSSION**

17     **A.  Threshold Issues**.

18         **1.  ESA 60-day notice requirement**.

19     The San Luis Parties argue that Plaintiffs have not complied
20 with the ESA's citizen suit notice requirement, 16 U.S.C. §
21 1540(g)(2)(A)(I), that written notice be given to "the Secretary,
22 and to any alleged violator" at least sixty days in advance of
23 filing suit.  Failure to give this notice is a bar to bringing
24 suit under the ESA.  *Southwest Ctr. for Biological Diversity v.*
25 *U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998).

26     In *American Rivers v. National Marine Fisheries Serv.*, 126
27 F.3d 1118, 1124-25 (9th Cir. 1997), the Ninth Circuit held that
28 issuance of a biological opinion is a final agency action that is

**42**

properly pled as a challenge under the APA, rather than as a citizen suit claim under the ESA.  Failure to comply with the 60-day notice requirement does not deprive the court of jurisdiction.  *Id*.

The San Luis Parties advocate an approach that ignores *American Rivers,*[17] taken in an unpublished district court opinion, *Pacific Coast Fed' of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 2006 WL 1469390 at 27 n.8 (N.D. Cal. 2006). *Pacific Coast Federation* declined to apply *American Rivers'* general rule because the injunctive relief the Plaintiffs sought went beyond simply having the biological opinion invalidated. The *Pacific Coast Federation* Plaintiffs sought to have any new biological opinion first reviewed by the court.  This requested relief, fell outside the scope of the APA but was "within the scope of the ESA and thus trigger[ed] the notice period requirement."  *Id*.  Here, the requested relief is invalidation of the BiOp, a remedy undeniably available under the APA.  *American Rivers* controls.  There was no need to comply with the ESA 60-day notice requirement.  The district court has jurisdiction over APA review of the BiOp.

### 2.  Jurisdiction to Review Challenges to Early Consultation and Preliminary Biological Opinion.

Defendants contend the case is not ripe for decision.  The BiOp covers not only current operations, but also a variety of future actions, some subject to formal consultation, others to

---

[17]    At least one district court has followed the holding in *American Rivers*.  *See NRDC v. Rodgers*, 381 F. Supp. 2d 1212, 1230 (E.D. Cal. 2005).

early consultation:

> This biological opinion covers formal and early consultation for the operations of the CVP and SWP. The formal consultation effects described in this biological opinion cover the proposed 2020 operations of the CVP including the Trinity River Mainstem ROD (Trinity ROD) flows on the Trinity River, the increased water demands on the American River, the delivery of CVP water to the proposed Freeport Regional Water Project (FRWP), water transfers, the long term Environmental Water Account (EWA), the operation of the Tracy Fish Facility, and the operation of the SWP-CVP intertie. The effects of operations of the SWP are also included in this opinion and include the operations of the North Bay Aqueduct, the Suisun Marsh Salinity Control Gates, the Skinner Fish Facility and water transfers.

> Early consultation [issues address] the effects of operations of components of the South Delta Improvement Program (SDIP). These operations include pumping of 8500 cubic feet per second (cfs) at the SWP and Banks Pumping Plant (hereafter referred to as 8500 Banks), permanent barrier operations in the South Delta, the long term EWA, water transfers, and CVP and SWP operational integration. There are two separate effects sections in this biological opinion, one for Formal Consultation and one for Early Consultation. In addition, there is an incidental take for formal consultation and a preliminary incidental take for early consultation.

(AR 2, 248.)

The San Luis Parties object that the early consultation portions of the BiOp are not final agency action and any challenges to the early consultation process are not subject to judicial review. Early consultation, by definition, results in only a "preliminary opinion" and in a preliminary incidental take statement that "does not constitute authority to take listed species." 50 C.F.R. § 402.11(e). Upon request for "confirmation" of a preliminary biological opinion, FWS will review the proposed action to determine if there have been "significant changes in the action as planned or in the

44

1    information used during early consultation."   § 402.11(f).

2    Within 45 days of such request, FWS must either confirm the

3    preliminary biological opinion or request formal consultation.

4    *Id.*

5         Plaintiffs concede that they "are not challenging the

6    validity of FWS's early consultation or its preliminary

7    biological opinion regarding certain segregated components of the

8    2004 OCAP."  (Doc. 306 at 37.)   Rather, Plaintiffs argue that the

9    portion of the BiOp covering formal consultation is flawed

10   because it fails to examine the full impacts of all aspects of

11   the 2004 OCAP.  (Doc. 306 at 37.)   Plaintiffs maintain the formal

12   consultation should have covered certain planned actions included

13   in the early consultation that are interdependent with other

14   planned actions not included in either consultation.   This claim

15   is cognizable, as it challenges the scope of the formal

16   consultation and the completeness of evaluation of overall OCAP

17   operations on jeopardy to the smelt, not the lawfulness of the

18   early consultation on future actions.

19        **B.   The Biological Opinion Unlawfully Relies Upon
           Uncertain, Unenforceable Mitigation Measures**.

20
          The BiOp concludes that the "operations of the Projects
21
     under formal consultation...will result in adverse effects to the
22
     delta smelt through entrainment at the CVP and SWP facilities and
23
     by drawing delta smelt into poorer quality habitat in the south
24
     delta.  However with the inclusion of the conservation measures
25
     described above and the implementation of the DSRAM, these
26
     adverse effects would be avoided or minimized."  (AR 467
27
     (emphasis added).)   The "conservation measures" mentioned in the
28

                                   **45**

1  BiOp's conclusion are various regulatory mechanisms already in

2  place to "provide protection to delta smelt and/or their

3  habitats," including D-1641, the EWA, CVPIA (b)(2) water, and

4  VAMP.  (AR 421-22, 466-67.)

5               **1.    Law Governing Mitigation Measures.**

6         Mitigation measures must be "reasonably specific, certain to

7  occur, and capable of implementation; they must be subject to

8  deadlines or otherwise-enforceable obligations; and most

9  important, they must address the threats to the species in a way

10 that satisfies the jeopardy and adverse modification standards."

11 *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139,

12 1152 (D. Ariz. 2002)(citing *Sierra Club v. Marsh*, 816 F.2d 1376

13 (9th Cir. 1987)); *see also NWF v. NMFS*, 481 F.3d 1224 at *12 &

14 n.16 ("Although the record does reflect a general desire to

15 install structural improvements [to benefit fish] where feasible,

16 it does not show a clear, definite commitment of resources for

17 future improvements.").

18        Plaintiffs allege that, in depending on the DSRAM and the

19 other "conservation measures" to support its no jeopardy

20 conclusion, the BiOp unlawfully relies upon uncertain,

21 unenforceable mitigation measures which do not constitute a

22 clear, definite commitment of resources.  Specifically,

23 Plaintiffs argue: (a) the DSRAM process is "entirely

24 discretionary, uncertain, and unenforceable and (b) the

25 biological opinion unjustifiably assumes that the other,

26 currently operational "conservation measures" (e.g., the EWA and

27 CVPIA(b)(2) water) will continue to be available for use by DSRAM

28 in the future.

**46**

### 2.  The DSRAM is Unlawfully Uncertain and Unenforceable.

All Defendants argue that the DSRAM is an effective adaptive management program that provides the agency the necessary remedial flexibility that makes the BiOp lawful.  The BiOp describes the DSRAM as follows:

> The delta smelt risk assessment matrix (DSRAM) consists of month by month criteria which, when exceeded will trigger a meeting of the Delta Smelt Working Group (Working Group).  The purpose of the DSRAM is to take actions to protect delta smelt in a proactive manner prior to salvage events....The DSRAM is an adaptive management tool which may be further modified by the Working Group/WOMT as new information becomes available, without undergoing formal reconsultation.... Data will be updated at least weekly to determine the need for a meeting.
>
> Should a triggering criterion be met or exceeded, Reclamation and/or DWR will inform the members of the Working Group and the Working Group will determine the need to meet.  Any member of the Working Group may set up a meeting of the Working Group at any time.  A meeting of the Working Group may consist of an in-person meeting, a conference call, or a discussion by email. If needed, the Working Group will meet prior to the weekly meetings of the DAT and the WOMT and information will be shared with these groups.
>
> <u>Should a meeting of the Working Group prove necessary, the group will decide whether to recommend a change in exports, change in south delta barrier operations, San Joaquin River flows, or a change in delta cross channel operations</u>, and the extent and duration of the potential action. These <u>potential actions</u> are listed in the DSRAM by the months wherein each of these tools generally become available. <u>The group will recommend actions which will be shared with the DAT and forwarded to the WOMT for discussion and potential implementation.</u> This recommendation will include a discussion of the level of concern for delta smelt and will include who participated in the working group discussions. All dissenting opinions and/or discussion points will also be forwarded to the WOMT. The Working Group will meet at least weekly throughout the period in which the triggering criteria are met or exceeded, to determine the need to provide further recommendations to the WOMT.
>
> Notes and findings of Working Group meeting will be

**47**

1
2
3

submitted to the Service and members of the WOMT for their records. <u>The WOMT will respond to the Working Group's recommendations and the actions taken by the WOMT will be summarized by Reclamation and/or DWR annually and submitted to all WOMT agencies.</u>

4
5
6

<u>If an action is taken, the Working Group will follow up on the action to attempt to ascertain its effectiveness.</u> An assessment of effectiveness will be attached to the notes from the Working Group's discussion concerning the action.

7  (AR 344-45 (emphasis added).)

8       The trigger criteria, which vary slightly from month to

9  month, are set forth in a table (or matrix) at page 100 of the

10  BiOp.  (AR 346.)   The criteria include: (1) the previous year's

11  fall midwater trawl recovery index; (2) the risk of smelt

12  entrainment based upon the location of X2; (3) the estimated

13  duration of the smelt spawning period based upon water

14  temperature; (4) the presence of spawning female smelt; (5) the

15  proximity of the smelt to the Project pumping facilities; and,

16  (6) a salvage trigger for adult smelt (calculated as the ratio of

17  adult smelt salvage to the FMWT index) and juvenile smelt (set at

18  zero for May and June, the months of the year during which

19  salvage of smelt is highest).  (AR 346-49.)

20       Plaintiffs argue that the DSRAM is not "reasonably specific,

21  certain to occur, and capable of implementation" because: (1) the

22  DSWG has complete discretion over whether to meet and whether to

23  recommend mitigation measures; (2) even if the DSWG meets and

24  recommends mitigation measures, the WOMT group is free to reject

25  any recommendations; (3) there are no standards to measure the

26  effectiveness of actions taken; (4) reconsultation is not

27  required should mitigation measures prove ineffective; and (5)

28  ultimately, no action is ever required.

**48**

1    DWR responds that implementation of the DSRAM process is

2  "mandatory."  For example, the incidental take statement requires

3  that the projects shall be implemented "as described" in the

4  BiOp.  (AR 475.)  Because the BiOp "describes" operation of the

5  DSRAM, DWR asserts that its implementation is made mandatory by

6  the incidental take statement's command that the project shall be

7  implemented "as described;" if a DSRAM triggering criteria is

8  met, the DSWG "will determine the need to meet."  (AR 344

9  (emphasis added).)  If circumstances warrant action, the DSWG

10  will recommend fish protection actions and forward those

11  recommendations to the WOMT.  (*Id.*)  The BiOp provides that the

12  DSWG "will meet at least weekly throughout the period in which

13  the triggering criteria are met or exceeded, to determine the

14  need to provide further recommendations to the WOMT."  (*Id.* at

15  345 (emphasis added).)  The WOMT must then "respond" to DSWG's

16  recommendations.  (*Id.*)  If actions are taken, the DSWG will

17  monitor the action to determine its effectiveness.  (*Id.*)

18    DWR correctly asserts that the DSRAM process must be

19  followed; this does not address Plaintiffs' argument:  that the

20  DSRAM process itself does not require any mitigation actions be

21  taken.  Nothing in DSRAM requires the DSWG to make action

22  recommendations, whatever the circumstances, and no criteria

23  prescribe when the WOMT must act to effect DSWG's

24  recommendations.

25    DWR responds that as adaptive management, "DSRAM is

26  intentionally flexible, taking into consideration the

27  uncertainties surrounding delta smelt population abundance and

28  dynamics...[D]elta smelt abundance has fluctuated widely, without

**49**

a clear explanation why.  While experts can monitor trends in delta smelt populations, estimating overall population abundance presently is 'not possible,' nor are the sources of year-to-year variability in abundance well understood."  (Doc. 246-1 at 12. ) DWR suggests that "hard-wiring" the DSRAM to require specific actions be taken when triggering criteria occur would impair the DSRAM's flexibility.  For example, the trigger for salvage of juvenile smelt is set at zero.  This trigger was designed not to precipitate a meeting every time that standard is exceeded, but to cause heightened awareness of conditions that might require protective action.  (Doc. 246-1, at 12, citing AR at 8217-18.)

The conflict between Defendants' choice of a flexible management approach and Plaintiffs' concern to ensure enforceable protective actions are taken when necessary, highlights the extent to which overly flexible adaptive management may be incompatible with the requirements of the ESA.  Commentators recognize that adaptive management schemes do not fit neatly within the ESA's existing regulatory structure. *See J.B. Ruhl*, Taking Adaptive Management Seriously: A Case Study of the Endangered Species Act, 52 U. Kan. L. Rev. 1249, 1284 (2004)("The [ESA] as a whole lacks a cohesive adaptive management architecture....").  H. Doremus, *Adaptive Management, The Endangered Species Act, and the Institutional Challenges of "New Age" Environmental Protection*, 41 Washburn. L. J. 50, 52 (2000)("Adaptive Management...runs counter to human nature and the current structure of our management institutions."); ("One key institutional challenge is to combine the flexibility required by adaptive management with the long-term certainty we

1  often seek through our legal and political institutions.")   41
2  Washburn L. J. at 55.

3      The case law sheds little light on how to harmonize these
4  competing objectives.  The parties cite no cases applying the
5  "reasonably specific, certain to occur, and capable of
6  implementation" concept (or any closely related doctrine) to
7  mitigation measures employed under an adaptive management
8  protocol.  Most cases the parties cite are either wholly
9  inapplicable or factually distinguishable.

10     For example, mitigation measures have been found unlawfully
11 uncertain because their implementation was not within the control
12 of the relevant federal agencies.  *National Wildlife Federation*
13 *v. NMFS*, 254 F. Supp. 2d 1196, 1213 (D. Or. 2003), invalidated a
14 2000 biological opinion addressing the effects of the operation
15 of the Federal Columbia River Power System ("FCRPS") on several
16 listed fish species.  A 2000 biological opinion concluded that
17 continued operation of the FCRPS would jeopardize several of the
18 species and adversely modify their critical habitat and adapted
19 mitigation measures to avoid jeopardy.  The mitigation measures
20 included a variety of short- and long-term state, regional,
21 tribal, and private off-site mitigation actions.  The plaintiffs
22 argued that reliance on such "uncertain and vaguely defined
23 actions of third parties to protect and restore salmon habitat,"
24 violated the "reasonably certain to occur" standard.  *Id*. at
25 1209.  The district court agreed, concluding that the no jeopardy
26 determination unlawfully relied on "non-federal off-site
27 mitigation actions that are not reasonably certain to occur."
28 *Id*. at 1214.  *See also Sierra Club v. Marsh*, 816 F.2d 1376, 1385

1    (9th Cir. 1987)(invalidating biological opinion that relied on

2    mitigation measure involving the transfer of 188 acres of

3    marshland from private ownership to a publicly owned wildlife

4    refuge; land remained under private control and subject to

5    easements that rendered the land valueless for mitigation

6    purposes, and private owners and local government indicated

7    intent to increase use of one of the easements); *Oregon Natural*

8    *Desert Ass'n v. Lohn*, --- F. Supp. 2d ---, 2007 WL 1170629 (D.

9    Or. 2007)(setting aside biological opinion in part because it

10   overly relied on the actions of private individuals who had a

11   poor past record of compliance with standards*); Florida Key Deer*

12   *v. Brown*, 364 F. Supp. 2d 1345, 1355-56 (S.D. Fla. 2005)(setting

13   aside biological opinion that relied on mitigation measures to be

14   implemented by private landowners; nothing compelled the

15   landowners to act and "the record indicate[d] that some

16   landowners entirely disregarded [prior mitigation measures]").

17        Here, the BiOp's mitigation measures <u>are</u> largely under the

18   control of the action agency (the Bureau), which, operating in

19   concert with the DWR, directly regulates water pumping and

20   releases from upstream reservoirs. *Natural Resources Defense*

21   *Council v. Rodgers*, 381 F. Supp. 2d 1212, 1241 (E.D. Cal. 2004),

22   does not provide guidance.  In that case, plaintiffs contended a

23   BiOp's mitigation measures were not reasonably certain to occur

24   because the action agency had a poor track record of following

25   through on prior commitments.  The acknowledging that the

26   agency's track record was "discouraging" district court

27   recognized that the agency had made some progress toward

28   implementing its prior commitments, *id*., and declined to find

**52**

that the new commitments were not certain to occur. *Id*.
However, the *Rogers* plaintiffs did not attack the efficacy of the
mitigation measures themselves, only the likelihood that the
agency would not satisfy its commitment to implement them. Here,
Plaintiffs challenge the inherent uncertainty and
unenforceability of the DSRAM and the other conservation
measures.

Plaintiffs cite *American Rivers v. U.S. Army Corps of
Engineers*, 271 F. Supp. 2d 230, 252 (D.D.C. 2003), where, despite
the fact that a prior biological opinion required the Corps to
implement flow restrictions to mitigate impacts to listed
species, the Corps "made it perfectly clear" to the district
court "that it ha[d] no intention of ensuring that its future
operations will be consistent" with the mitigation requirements.
*Id*. at 253.  A motion for preliminary injunction was granted:
"Plaintiffs will be likely to prove that the 2003 Supplemental
BiOp violated the ESA and APA by improperly and unreasonably
relying on future actions by the Corps that are <u>virtually certain
not to occur</u>."  *Id*. at 254 (emphasis added).  Here, in contrast,
there is no such "smoking gun" evidence of the agency's intent to
disregard its mitigation responsibilities, just no definite,
certain, or enforceable measures.

*Center for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d
1139, 1151-53 (D. Ariz. 2002) addressed a biological opinion that
concluded the Army's continued operations at Fort Huachuca,
Arizona would not cause jeopardy to listed species that relied on
flows from the Upper San Pedro River, even though rapid
development in the area and uncontrolled groundwater pumping at

**53**

the Fort posed threats to the species.  The "no jeopardy" finding
was premised on several required mitigation measures.

First, the Army had to develop and implement an on-base plan
to protect and maintain populations of listed species and
habitats; *id.* at 1148, even though the on-base plan was not
designed to address the underlying problem of diminishing flows
in the San Pedro River, *see id*. at 1153.  Second, the Army had to
develop a regional water resources plan, sufficient to maintain
flows in the San Pedro River to sustain the protected species and
their habitats.  *Id*. at 1148.  The biological opinion
acknowledged, that the Army had no authority over the
implementation of the regional plan and was only required to
participate along with other stakeholders.  *Id*. at 1153.  Third,
the Army had to monitor progress and report on the implementation
of the various projects.  *Id*. at 1149.  Fourth, the biological
opinion assumed the operation of a water recharge facility
designed to temporarily delay the impact of groundwater
overdraft, which the *Rumsfeld* court acknowledged was "subject to
substantial uncertainty."  *Id*. at 1145.

Leaving it to the Army and other interested parties to
develop a regional water management plan "enables the Army to
sidestep any direct responsibility for addressing deficit
groundwater pumping," and was "an admission that what is
currently on the table as far as mitigation measures is
inadequate to support the [] 'no jeopardy' decision."  198 F.

**54**

1   Supp. 2d at 1153-54.[18]

2       DWR distinguishes *Rumsfeld*, claiming it is like *NWF v. NMFS*,

3   254 F. Supp. 2d 1196, where mitigation measures were unlawful

4   because they depended upon third parties without any guarantee

5   that those parties would implement the measures.  Here, the DSRAM

6   does not depend on actions by outsiders.  *Rumsfeld* further found

7   that the Army's on-base mitigation measures were insufficient

8   because they did not require any measurable goals or an

9   implementation schedule:

10          There are no requirements in the Final BO to reduce
            reliance on groundwater pumping by any particular
11  _____

12      [18]   *Rumsfeld* also found fault with the biological opinion's
    monitoring plan, characterizing it as a means of delaying the
13  implementation of necessary mitigation measures:

14          The Army may not delay identifying the measures
15          necessary to mitigate the effects of its ten-year plan
            based on the monitoring provisions in the Final BO....
16
            The Final BO's monitoring requirements do not measure
17          the success or failure of the on-base and/or regional
            mitigation measures to reduce the groundwater deficit.
18          It only requires the Army to develop "a monitoring
            program designed to assess progress," and requires an
19          annual review of the AWRMP, as to which projects have
            been implemented the past year and which are to be
20          implemented in the coming year. Especially since the
            Final BO and the AWRMP fail to quantify the remedial
21          value of the proposed projects, simply reporting
            project implementation is not a meaningful assessment
22          of the success or failure of the mitigation measures in
            protecting the water umbel, willow flycatcher, and
23          critical habitat from adverse impact. Such an
            assessment would require systematic monitoring of
24          either San Pedro baseflows or the groundwater aquifer.
25
26  198 F. Supp. 2d at 1154 (internal record citations omitted).  No
    such failure is alleged here.  Plaintiffs do not suggest that the
27  monitoring called for by the DSRAM is flawed.

28

> amount or to achieve any measurable goals with respect to water recharge. There is no date certain implementation requirement. The MOA includes a laundry list of possible mitigation measures related to water conservation and recharge that the Army may implement, but it does not establish which projects have to be undertaken, when, nor what the conservation objectives are for the respective projects. Without such specificity, the mitigation measures in the Final BO are merely suggestions.

*Id.* at 1153 (emphasis added). *Rumsfeld* stands for the proposition that, at a minimum, a mitigation strategy must have some form of measurable goals, action measures, and a certain implementation schedule; i.e., that mitigation measures must incorporate <u>some</u> definite and certain requirements that ensure needed mitigation measures will be implemented.

Here, the agency's BiOp admits that mitigation measures are essential. The no jeopardy finding is conditioned on conservation measures <u>and the DSRAM</u>. (*See* AR 422.)

DWR's protestations that hard-wiring the DSRAM would cripple its effectiveness ignore the ESA's requirements of reasonable certainty, timetables, and enforceability standards for mitigation measures. The existing DSRAM process provides <u>absolutely no</u> certainty that any needed smelt protection <u>actions</u> will be taken at any time by DSWG or WOMT. The DSRAM is in substance an organizational flow chart that prescribes that certain administrative processes (meetings) will be held whenever a trigger criteria is met or exceeded. Although mitigation measures are identified, no defined mitigation goals are required, nor is any time for implementation prescribed. Incorporating <u>some</u> ascertainable mitigation standards and enforceable mitigation measures is not inconsistent with avoiding

56

unduly restrictive "hard-wiring" of the DSRAM.

*National Wildlife Federation v. Babbit*, 128 F. Supp. 2d 1274 (E.D. Cal. 2000) ("*NWF v. Babbit*"), addresses an adaptive management approach that accommodated uncertainty by allowing regulators to apply new information gathered through monitoring to adjust and employ well-defined mitigation measures.  There, a Habitat Conservation Plan ("HCP") called for a development fee to be collected on all acreage developed in the Natomas Basin, north of Sacramento, home to a number of endangered species.  The HCP also incorporated adaptive management provisions designed to allow the mitigation fee to be modified if new information justified an adjustment:

> The [HCP] recognizes that the current state of knowledge as to the conservation needs of protected species is imperfect, and that its assumptions as to the amount, location, and pace of development in the Basin and as to the adequacy of the mitigation fee to accommodate increased expenses may prove inaccurate. The Plan addresses these uncertainties through its "adaptive management" provisions, which permit the Plan's conservation strategy to be adjusted based on new information.  The HCP's conservation program can be modified under the adaptive management provisions if: (1) new information results from ongoing research on the GGS or other covered species; (2) recovery strategies under Fish and Wildlife Service recovery plans for the GGS or the Swainson's hawk differ from the measures contemplated by the HCP; (3) certain of the HCP's mitigation measures are shown through monitoring to require modification; or (4) the HCP's required minimum block sizes for reserve lands are shown to require revision. The Plan anticipates that the NBC will make discretionary decisions in future years based upon new information. The NBC will decide, for example, which lands to purchase, depending on a variety of future considerations difficult now to predict, and whether to change the mix of in and out of Basin reserve lands and agricultural as opposed to marsh reserve lands.

*Id*. at 1281-82.[19]

Here, the adaptive management process has no quantified objectives or required mitigation measures.  Although the <u>process</u> must be implemented by holding meetings and making recommendations, nothing requires that any <u>actions</u> ever be taken.[20]  The BiOp asks the court to trust the agency to protect the species and its habitat.  Notwithstanding any required deference to expertise, the ESA requires more.

All parties agree that adaptive management can be beneficial and that flexibility is a necessary incident of adaptive management.  The law requires that a balance be struck between the dual needs of flexibility and certainty.  The DSRAM, as currently structured, does not provide the required reasonable certainty to assure appropriate and necessary mitigation measures will be implemented.  The DSRAM does not provide reasonable assurance admitted adverse impacts of the 2004 OCAP will be mitigated.  This aspect of the BiOp is arbitrary and capricious

---

[19]     In *NWF v. Babbit,* the district court expressly approved the design of the HCP as a whole, but invalidated the permit issued in connection with the plan on grounds wholly independent from the design of the HCP and/or the adaptive management plan. *See 128 F. Supp. 2d* at 1298-99.

[20]     The only clearly enforceable standard or benchmark in the BiOp is compliance with the BiOp's "hard" take exceedence limits.  But, the existence of enforceable take limits does not shield the DSRAM from scrutiny.  There is no provision to allow the "hard" take exceedence limits to be adjusted to reflect new information about the species.  Moreover, the BiOp expressly recognizes that the take limits alone are not enough to prevent jeopardy, requiring, among other things, implementation of the DSRAM as a reasonable and prudent measure.  (*See* AR 475 ("The Project shall be implemented as described.")  This is exactly the reason why the DSRAM must be made more certain and enforceable.

58

1   and contrary to law.  Plaintiffs' motion for summary adjudication
2   as to this claim is **GRANTED.**  The agency has not provided a
3   reasonable explanation showing the DSRAM will satisfy ESA
4   requirements to assure survival and recovery of the Delta smelt.

5       The Ninth Circuit's *recent NWF v. NMFS* decision suggests
6   that mitigation measures that are not reasonably certain to occur
7   should be excluded from the agency's no jeopardy analysis.  *See*
8   481 F.3d 1224 at *12 n.16.[21]  Because mitigation is
9   insufficiently certain to occur under the DSRAM, the DSRAM cannot
10  cure other shortcomings of the BiOp.

> **3.   Plaintiffs' Alternative Argument that the BiOp is Arbitrary and Capricious Because DSRAM Depends Upon EWA, VAMP, CVPIA(b)(2) Water, Programs that are Uncertain in Terms of Funding and Effectiveness.**

14      Plaintiffs maintain that the DSRAM cannot feasibly be
15  implemented without adequate water assets from the EWA,
16  CVPIA(b)(2), and VAMP programs.  Plaintiffs allege that
17  Defendants have not demonstrated that adequate assets from these
18  programs will be available during the 20 year term of the BiOp.
19  (*See* Doc. 306 at 17.)

20      Plaintiffs correctly observe that the BiOp does not assure
21  that adequate water assets from these programs will be available
22  for future use under DSRAM.  The BiOp itself acknowledges that
23  "[a]lthough VAMP and [EWA] have helped to ameliorate these
24  threats, it is unclear how effective these will continue to be
25  over time based on available funding and future demands for

---

27      [21] As of the date of oral argument, the mandate has not yet
28  issued in *NWF v. NMFS*.

water." (AR 367-68.) The BiOp recognizes that the "EWA Agencies envision implementation of a long-term EWA as part of the operation of the Project." (AR 335.) However, the BiOp cannot and does not commit to implement the EWA in the long run. (*Id.*)

The record reveals that the loss of EWA assets will "reduce the ability of the EWA agencies to provide [] fish protections...." (SAR 20.) Plaintiffs refer to statements made by FWS's D. Harlow during an annual joint meeting of CALFED and the Bay-Delta Public Advisory Committee, that a proposal to change CVPIA(b)(2) policy would "change fish protection envisioned in the Record of Decision (ROD)." (Doc. 9 at 4.) At the same time, Mr. Harlow also noted that this would "not necessarily diminish fish protection." (*Id.*) However, he opined that such a change would "necessitate an increase in the size of the EWA." (*Id.*) National Oceanic and Atmospheric Administration ("NOAA") staff questioned FWS's reliance on the EWA in the BiOp, noting that EWA assets would likely be used up for protective actions during the winter, before the peak months for Delta smelt salvage (May and June). (AR 8574.)

Plaintiffs' claim rests in part on the assumption that the EWA, CVPIA(b)(2), and VAMP programs are the only mechanisms by which DSRAM may be implemented. The record does not support this assumption. Under the BiOp, the DSWG is tasked to make recommendations regarding fish protection actions by selecting from a list of "tools for change," which include: (1) "export reduction[s] at one or both facilities"; (2) "change[s] in barrier operations"; (3) "change[s] in San Joaquin River flows"; and (4) "change[s] [in the] position of cross channel gates." (AR 346 and 348 n.7.) No mention is made of the EWA,

1  CVPIA(b)(2), or VAMP in the DSRAM or its description of the

2  "tools for change."  DWR rejoins that, regardless of whether

3  these programs are fully funded and/or remain functional

4  mechanisms to provide water to the Delta, "the burden....falls on

5  the Projects, not the smelt."  (Doc. 246 at 10.)

6      The EWA is simply a means by which the SWP and CVP can

7  obtain water by purchasing it from willing sellers.  (AR 373.)

8  EWA water may be used either to protect fish or to compensate

9  project water users for reduced exports at the project pumps.

10  (*Id.*)  If money is unavailable to fund the EWA, Defendants are

11  nonetheless required to prevent smelt take from exceeding

12  permissible take limits.

13      The BiOp sets forth a three-tier process to supply water to

14  protect the smelt:

15          • Tier 1 (Regulatory Baseline). Tier 1 is baseline
           water and consists of currently existing BOs, water
16          right decisions and orders, CVPIA Section 3406(b)(2)
           water, and other regulatory actions affecting
17          operations of the CVP and SWP. Also included in Tier 1
           are other environmental statutory requirements such as
18          Level 2 refuge water supplies.

19          • Tier 2 (EWA). Tier 2 is the EWA and provides fish
           protection actions supplemental to the baseline level
20          of protection (Tier 1). Tier 2 consists of EWA assets,
           which combined with the benefits of CALFED's ERP, will
21          allow water to be provided for fish actions when needed
           without reducing deliveries to water users. EWA assets
22          will include purchased (fixed) assets, operational
           (variable) assets, and other water management tools and
23          agreements to provide for specified level of fish
           protection. Fixed assets are those water supplies that
24          are purchased by the EWA Agencies. These purchased
           quantities are approximations and subject to some
25          variability. Operational assets are those water
           supplies made available through CVP and SWP operational
26          flexibility. Some examples include the flexing of the
           export-to-inflow ratio standard required [] for meeting
27          Delta water quality and flows, and ERP water resulting
           from upstream releases pumped at the SWP Banks Pumping
28          Plant. Water management tools provide the ability to

1    convey, store, and manage water that has been secured
     through other means. Examples include dedicated pumping
2    capacity, borrowing, banking, and entering into
     exchange agreements with water contractors. Chapter 8
3    of this BA contains a more detailed description of EWA
     operations, as characterized in the CALSIM II modeling
4    for the CVP OCAP.

5    • Tier 3 (Additional Assets). In the event the EWA
     Agencies deem Tiers 1 and 2 levels of protection
6    insufficient to protect at-risk fish species in
     accordance with the Act, Tier 3 would be initiated.
7    Tier 3 sets in motion a process based upon the
     commitment and ability of the EWA Agencies to make
8    additional water available, should it be needed. <u>This
     Tier may consist of additional purchased or operational</u>
9    <u>assets, funding to secure additional assets if needed,
     or project water if funding or assets are unavailable.</u>
10   It is unlikely that protection beyond those described
     in Tiers 1 and 2 will be needed to meet requirements of
11   the Act.

12   (*Id.* at 336-37.)  DWR emphasizes that, if all else fails, Tier 3

13   assets may be brought to bear, which include "additional

14   purchased or operational assets, funding to secure additional

15   assets if needed, or <u>project water</u> if funding or assets are

16   unavailable."  (*Id.* (emphasis added).)

17        There is a difference between the DSRAM's failure to require

18   mitigation actions in response to trigger events, designed to

19   assure the commitment of necessary resources to smelt protection,

20   and the duty to have available or acquire those necessary

21   resources.  A court must leave to the agency the application of

22   its expertise and authority to manage the complex hydrologic,

23   legal, financial, physical, and logistical aspects of protecting

24   the delta smelt.  Plaintiffs motion for summary adjudication is

25   **DENIED** as to the issue of the insufficiency of the EWA, VAMP, and

26   CVPIA(b)(2) programs.

27        C.   **Best Available Science**.

28        The § 7 formal consultation process is designed to "insure"

**62**

that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined...to be critical...." 16 U.S.C. § 1536(a)(2). "In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available." *Id*.

An agency has wide discretion to determine what is "the best scientific and commercial data available." *San Luis v. Badgley*, 136 F. Supp. 2d 1136, 1151 (E.D. Cal. 2000). Yet, an agency must make its decision about jeopardy based on the best science available at the time of the decision, and may not defer that jeopardy analysis by promising future studies to assess whether jeopardy is occurring. *Rumsfeld*, 198 F. Supp. 2d at 1156. While uncertainty is not necessarily fatal to an agency decision, *e.g., Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992)("*Greenpeace I*")(upholding agency decision even though there was uncertainty about the effectiveness of management measures because agency premised its decision on a reasonable evaluation of all available data), an agency may not entirely fail to develop appropriate projections where data "was available but [was] simply not analyzed," *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1149-50 (W.D. Wash. 2000) ("*Greenpeace II*") (where agency totally failed to develop any projections regarding population viability, it could not use as an excuse the fact that relevant data had not been analyzed). Here, EWS maintains the necessary data cannot be obtained.

### 1.    Does a "Benefit of the Doubt to the Species" Presumption Apply?

The parties debate at length whether the best available scientific information principle includes a requirement that the agency "give the benefit of the doubt to the species."  This language has its origins in the legislative history of the ESA, H.R. Conf. Rep. No. 96-697, 96th Cong., 1st Sess. 12, reprinted in 1979 U.S.C.C.A.N. 2572, 2576:

> Section 7(b) of the act requires the fish and wildlife service and the national marine fisheries service to render biological opinions which advise whether or not proposed agency actions would violate section 7(a)(2). Courts have given substantial weight to these biological opinions as evidence of an agency's compliance with section 7(a). The amendment would not alter this state of the law or lessen in any way an agency's obligation under section 7(a)(2).

> As currently written, however, the law could be interpreted to force the fish and wildlife service and the national marine fisheries service to issue negative biological opinions whenever the action agency cannot guarantee with certainty that the agency action will not jeopardize the continued existence of the listed species or adversely modify its critical habitat. The amendment will permit the wildlife agencies to frame their section 7(b) opinions on the best evidence that is available or can be developed during consultation. If the biological opinion is rendered on the basis of inadequate information then the federal agency has a continuing obligation to make a reasonable effort to develop that information.

> This language continues to give the benefit of the doubt to the species, and it would continue to place the burden on the action agency to demonstrate to the consulting agency that its action will not violate section 7(a)(2). Furthermore, the language will not absolve federal agencies from the responsibility of cooperating with the wildlife agencies in developing adequate information upon which to base a biological opinion. If a federal agency proceeds with the action in the face of inadequate knowledge or information, the agency does so with the risk that it has not satisfied the standard of section 7(a)(2) and that new information might reveal that the agency has not satisfied the standard of section 7(a)(2).

(emphasis added).

In *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), the Ninth Circuit applied this "benefit of the doubt" language to hold that FWS violated the ESA by "failing to use the best information available to prepare comprehensive biological opinions considering all stages of the agency action...."  At dispute in *Conner* was a biological opinion reviewing the proposed sale of oil and gas leases on National Forest land.  The biological opinion analyzed the impact of the "initial lease phase," but failed to address the potential impact of post leasing activities, such as oil and gas development.  FWS reasoned that there was "insufficient information available to render a comprehensive biological opinion beyond the initial lease phase," relying instead on "incremental-step consultation." *Id*. at 1452.  The Ninth Circuit recognized that "the precise location and extent of future oil and gas activities were unknown at the time," but, "extensive information about the behavior and habitat of the species in the areas covered by the leases was available." *Id*. at 1453.  With this information, "FWS could have determined whether post-leasing activities in particular areas were fundamentally incompatible with the continued existence of the species." *Id*. at 1454.

> In light of the ESA requirement that the agencies use the best scientific and commercial data available to insure that protected species are not jeopardized, 16 U.S.C. § 1536(a)(2), the FWS cannot ignore available biological information or fail to develop projections of oil and gas activities which may indicate potential conflicts between development and the preservation of protected species. We hold that the FWS violated the ESA by failing to use the best information available to prepare comprehensive biological opinions considering all stages of the agency action, and thus failing to

**65**

1
2
3
> adequately assess whether the agency action was likely
> to jeopardize the continued existence of any threatened
> or endangered species, as required by section 7(a)(2).
> To hold otherwise would eviscerate Congress' intent to
> "give the benefit of the doubt to the species."

*Id.* (emphasis added). *Conner* does not directly support the broader interpretation urged by Plaintiffs, that the agency should err on the side of the species when evaluating uncertain evidence. *Conner* stands for the proposition that an agency cannot abdicate its responsibility to evaluate the impacts of an action on a species by labeling available information "uncertain," because doing so violates Congress' intent that the agencies "give the benefit of the doubt to the species."

*Center for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223, 1239 (W.D. Wash. 2003)(rev'd on other grounds, --- F.3d --- , 2007 WL 1217738 (9th Cir.)), applied the *Conner* holding in conformity with Plaintiffs' interpretation. *Lohn* addressed the listing under the ESA of a population of orca whales. Despite considerable record evidence suggesting the Orca whales should be considered a separate species, the Orca population had not yet been identified as a separate <u>taxon</u>. NMFS decided not to list the species based on the scientific uncertainty that existed in the field of taxonomy, relying on the fact that the new taxon had not yet been designated. The district court ruled this decision was arbitrary and capricious:

> Given the considerable morphological, behavioral, and
> genetic evidence that the global Orcinus orca taxon is
> inaccurate and that residents and transients do not
> belong to the same taxon, the decision not to list the
> Southern Residents cannot be based upon a lack of
> consensus in the field of taxonomy regarding the
> precise, formal taxonomic redefinition of killer
> whales, particularly when that lack of agreement is
> compounded by the extreme difficulty in gathering

**66**

1    evidence to achieve consensus. <u>The best available
     science standard gives "the benefit of the doubt to the</u>
2    <u>species."</u> Conner v. Burford, 848 F.2d 1441, 1454 (9th
     Cir.1988) (observing one of the purposes of the best
3    available science standard in review of whether agency
     action may result in destruction or adverse
4    modification of listed species' habitat pursuant to 16
     U.S.C. § 1536(a)(2)). <u>To deny listing of a species</u>
5    <u>simply because one scientific field has not caught up
     with the knowledge in other fields does not give the</u>
6    <u>benefit of the doubt to the species and fails to meet
     the best available science requirement.</u>
7
     *Id.* at 1239 (emphasis added).[22]
8
9        In response, Defendant Intervenors cite *Oceana, Inc. v.*

10   _____

11       [22]   Plaintiffs cite another district court decision that
     applied the benefit of the doubt language:  "To the extent that
12   there is any uncertainty as to what constitutes the best
     scientific information, Congress intended for the agency to 'give
13   the benefit of the doubt to the species.'"  *Ctr. for Biological*
     *Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1127
14   (N.D. Cal. 2006)(citing *Conner*, 848 F.2d at 1454).  However, that
     district court did not apply the "benefit of the doubt" concept
15   in its analysis in any way, let alone as a presumption governing
     the agency's analysis of scientific information.
16
         Another case Plaintiffs cite, *Rock Creek Alliance v. U.S.*
17   *Fish & Wildlife Service*, 390 F. Supp. 2d 993, 1003 (D. Mont.
     2005), does not support imposing a "benefit of the doubt"
18   presumption to uncertain scientific evidence:

19
             Though the agency has discretion to make decisions
20           based in its expertise, the ESA expresses a legislative
             mandate "to require agencies to afford first priority
21           to the declared national policy of saving endangered
             species.... Congress has spoken in the plainest of
22           words, making it abundantly clear that the balance has
             been struck in favor of affording endangered species
23           the highest of priorities, thereby adopting a policy
             which it described as 'institutionalized caution.'"
24
25   *Id.* (quoting *Tennessee Valley Authority v. Hill*, 437 U.S. 153,
     185 (1978)).  However, as in *Center for Biological Diversity*,
26   this language was part of a general discussion of the legal
     framework; the *Rock Creek* court never applied a benefit of the
27   doubt presumption in the manner Plaintiffs suggest it should be
     applied here.
28

*Evans*, 384 F. Supp. 2d 203 (D.D.C. 2003), a challenge to NMFS's choice between two estimates of how much take a particular type of fishing gear would cause.  The agency chose the lower estimate, reasoning that it was the "best estimate possible." The plaintiff argued that this estimate failed to give the "benefit of the doubt" to the species.  *Id*. at 228.  Although the lower estimate was uncertain, the district court reasoned that "the ESA does not require the agency to reject the 'best estimate possible' in favor of a more 'conservative' estimate that, according to the scientists, would be lacking in support."  *Id*.

*Lohn* and *Oceana* appear irreconcilable, but, they can be harmonized.  *Lohn* rejected an agency's decision to follow the taxonomy in the face of significant and compelling scientific evidence favoring a different conclusion.  To side with the agency under such circumstances would "not give the benefit of the doubt to the species...."  *Id*. at 1239.  In contrast, *Oceana,* concerned an agency's choice of the "best estimate possible" over a more "conservative" estimate that lacked scientific support. The *Oceana* court refused to ignore the general rule that an agency must choose the best available science, simply because the ESA commands that the agency give the "benefit of the doubt" to the species.  <u>Both</u> cases stand for the proposition that the agency must carefully examine the available scientific data and models and rationally choose the most reliable.

### 2. The BiOp's Failure to Address the 2004 Fall Midwater Trawl Data.

Plaintiffs assert that "one of the most egregious errors in the [BiOp] is its failure to consider available fall 2004 Delta

smelt abundance data, which evoked grave concern among agencies involved in smelt management."[23]   (Doc. 232 at 5.)   On February 9, 2005, FWS and other CALFED members met to discuss Delta smelt abundance.   Among other things, participants discussed data from the 2004 fall midwater trawl ("FMWT") survey, which revealed that "estimates of Delta smelt appear to be their lowest since 1964." (Doc. 11 at 5; AR 9199-9200, 9202; Doc. 12.)   The February 16, 2005, BiOp, contained no mention of the 2004 FMWT data.

Plaintiffs assert that FWS acted arbitrarily, capriciously and unlawfully by "ignoring" the 2004 FMWT data and relying instead on the more favorable abundance data from earlier abundance surveys.   (AR 366-67 (noting that the 2003 FMWT results were more favorable than those from 2002, while simultaneously acknowledging that the 2003 summer townet index (1.6) was "well below the pre-decline average of 20.4 in (1959).").)   Despite the receipt of the new, even less favorable 2004 FMWT data, FWS made no substantive changes to its jeopardy analysis in the biological opinion and did not use or address the new data in any way, not even to explain why the data was not discussed.   At oral argument, the agency maintained that ESA analysis cannot go on forever, that there must be a cutoff.

Plaintiffs note that the low population numbers revealed by the FMWT data were "not unexpected," as smelt abundance had been on a downward trend for at least two years prior.   (AR 370-71;

---

[23]   Defendants and Defendant-Intervenors dispute whether the data "evoked grave concern."   The degree of concern is irrelevant to the inquiry, as it is undisputed that the 2004 FMWT data showed the lowest smelt abundance on record.

9199-9200, 9202.)  One prominent smelt biologist warned at a June 2003 OCAP symposium that managers should expect very low smelt abundance data in the near future and that water exports were a key factor in the population decline, noting that the "cumulative proportion of the population lost to exports relative to abundance" could be as high as 30 percent.  (AR 5069.)

Federal Defendants suggest that Plaintiffs' entire argument should be rejected as internally inconsistent.  (Doc. 242 at 26-27.)  Plaintiffs contend that FWS should have revised the BiOp in light of the 2004 FMWT data and that additional evidence of a downward trend was "not unexpected."  These contentions are consistent with the central premise of Plaintiffs' position -- that the 2004 FMWT data reflected a <u>record</u> low abundance (the data showed "estimates of Delta smelt appear to be at their lowest since 1964" (Doc. 11 at 5)); so low that the data should have been addressed in the BiOp, even if the agency already knew that smelt abundance was trending downward.

The State Water Contractors suggest that Plaintiffs' acknowledgment that the downward trend was "not unexpected," establishes that the BiOp fully recognizes the dire situation of the smelt.  (Doc. 241 at 4.)  The BiOp reflects that FWS had knowledge that smelt population levels were at extremely low levels, "[s]ince 1983, the delta smelt population has exhibited more low FMWT abundance indices, for more consecutive years, than previously recorded."  (AR 367.)

> The results of seven surveys conducted by the Interagency Ecological Program (IEP) corroborate the dramatic decline in delta smelt....According to seven abundance indices designed to record trends in the status of the delta smelt, this species was

**70**

consistently at low population levels during the last
ten years (Stevens et al. 1990). These same indices
also show a pronounced decline from historical levels
of abundance (Stevens et al. 1990).

(AR at 370.)  The State Water Contractors' argument ignores that
the 2004 FMWT data evidences <u>record</u> low (the lowest) smelt
abundance.  Plaintiffs maintain that FWS' acknowledgment of a
downward trend is inadequate as it does not address or analyze in
survival and recovery terms, that smelt abundance levels had
reached the lowest ever recorded.

The State Water Contractors argue that, although the BiOp
admits the <u>fact</u> of the smelt's declining population, it does not
and cannot explain the <u>cause</u> of the decline, because there is no
scientific consensus as to causation.  (Doc. 241 at 5.)
"Contributing to [this] uncertainty," "is the fact that SWP and
CVP operations have been ongoing for decades - a period during
which Delta smelt abundance has increased as well as declined."
(*Id*. at 6.)  The State Water Contractors assert that the DSRAM
was adopted in part to protect the smelt while further monitoring
and research is carried out to resolve these uncertainties.  They
conclude that even if the 2004 FMWT data had been addressed in
the BiOp, the ultimate opinion reached would not have differed;
i.e., that operation of the projects under the 2004 OCAP BiOp
would not jeopardize the smelt because, among other things, take
will remain at or below historic levels and the DSRAM will
protect smelt from salvage at project facilities.[24]  But, this is

---

[24]   The State Water Contractors maintain that CVP/SWP
operations have been on-going for decades, during which time
Delta smelt abundance has fluctuated greatly.

post hoc argument; neither the agency or the biological opinion

addressed the 2004 FMWT data and available scientific information

opined that Project operations contributed to the decline of the

smelt.

The cases the parties cite do not answer whether FWS did not

have to analyze most recent data because it would not have

altered the ultimate conclusion.  Some cases suggest that FWS

must use all available information to ensure that a biological

opinion analyzes the threats to a species in a comprehensive

manner.  Plaintiffs refer to *Greenpeace II,* 80 F. Supp. 2d at

1149-50, for the proposition that failure to analyze and

incorporate available data is fatal to a biological opinion.  In

that case, NMFS concluded in a biological opinion that the total

groundfish catch authorized in the Bering Sea and Gulf of Alaska

in a single fishing season (1999) would not jeopardize the

endangered Stellar sea lion.  NMFS limited the scope of the

biological opinion to that single year of fisheries management

activities.  The district court ruled that the agency should have

broadened the scope of the biological opinion to consider the

overall fishery management regime, including relevant regulations

and specifications.  *Id*. at 1146-47.  This failure to produce a

comprehensive biological opinion permeated all other aspects of

the agency's decision.  The district court found fault with the

BiOp's superficial analysis, emphasizing the agency's failure to

address the overall effects of the fisheries upon the sea lion:

> As far as the Court can ascertain, the focus of BiOp2
> is limited to analyzing whether the fisheries compete
> with the sea lion for prey. In particular, BiOp2
> focuses on the potential for localized depletions of
> prey caused by the fisheries. BiOp2 at 90, 112. <u>Even</u>

**72**

with respect to this limited topic of discussion, meaningful analysis is virtually non-existent. NMFS itself repeatedly concludes in BiOp2 that it simply lacks the information to make any determination one way or the other. See BiOp2 at 111-118. Thus, NMFS's analysis is admittedly incomplete and its conclusions inconclusive. Although inconclusive data does not necessarily render a particular scientific conclusion invalid, the limited scope and quality of analysis that is contained in BiOp2 serves to highlight its overall inadequacy. For example, NMFS relies substantially on its conclusion that many of the target groundfish species are not important sea lion prey, despite uncertain evidence. BiOp2 at 114. That many of the target species may not individually constitute a major prey source, however, does not mean the cumulative impact of these fisheries is insignificant. In other words, limited analysis which suggests the fisheries do not jeopardize the sea lion does not obviate the requirement that NMFS address the full scope of the FMPs in order to ascertain their overall effects.

In sum, BiOp2 is limited in scope, heavy on general background information, and deficient in focused and meaningful discussion and analysis of how these large fisheries, and the complex management measures which regulate them, affect endangered Steller sea lions. That NMFS now finds it necessary to undertake yet another "comprehensive consultation" is a final indication to this Court that BiOp2 is not the broad and in-depth consultation it was purported to be by NMFS, much less coextensive in scope with the FMPs as required under the ESA.

A biological opinion which is not coextensive in scope with the identified agency action necessarily fails to consider important aspects of the problem and is, therefore, arbitrary and capricious. Here, BiOp2 not only fails to consider important aspects of the problem, the analysis it does contain is simply not adequate. Although an agency need not rely on conclusive scientific proof in a biological opinion, its conclusions must be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Thus, an agency "cannot ignore available biological information or fail to develop projections" which may indicate potential conflicts between the proposed action and the preservation of endangered species. Conner, 848 F.2d at 1454.

*Id*. at 1149-50 (emphasis added).

In *Greenpeace II*, NMFS admitted that the information it needed to perform a more comprehensive review was available, but

argued that it "could not have been analyzed in the time

allowed." *Id.* at 1150.  The district court rejected this

argument:

> A federal agency...is not "excused from [fulfilling the
> dictates of the ESA] if, in its judgment, there is
> insufficient information available to complete a
> comprehensive opinion and it takes upon itself [a more
> limited analysis]." Conner, 848 F.2d at 1455. This is
> not a situation where NMFS fully addressed the problem
> based on uncertain scientific data. *See Greenpeace
> Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir.1992).
> <u>Rather, NMFS entirely ignored relevant factors and
> admittedly failed to analyze and develop projections
> based on information that was available</u>.

*Id*. at 1150 (emphasis added); *see also Conner*, 848 F.2d at 1454

(biological opinion invalidated because agency failed to "use

best information available to prepare comprehensive biological

opinions considering all stages of agency action").

Plaintiffs analogize this case to *Greenpeace II*, because the

agency has ignored available biological information.  Here,

Plaintiffs complain that FWS failed to incorporate into <u>existing</u>

models and analyses that already reflected concern over an

overall declining trend in smelt, the <u>most recent</u> survey

information, evidencing a more pronounced decline in smelt

populations than ever before recorded.  In *Greenpeace II*, the

agency entirely failed to perform a comprehensive review of

threats to the sea lion.  The difference in degree is not

significant.

Federal Defendants cite *Oceana*, 384 F. Supp. 2d 203, where

NMFS concluded that an amendment to the Atlantic Sea Scallop

Fishery Management Plan would not jeopardize the protected

loggerhead sea turtle, based on a population model that involved

a degree of uncertainty, but that the agency determined was the

1  "most reliable method." *Id*. at 215.  The *Oceana* plaintiffs did

2  not dispute that the model represented the "best available

3  science," instead arguing that the model was "so ill-suited to

4  the purpose for which it was used, and so fraught with

5  uncertainties," that the agency could not rationally reach its no

6  jeopardy conclusion. *Id*. at 218.  The district court upheld the

7  agency's use of the model, reasoning "[t]ime and again courts

8  have upheld agency action based on the 'best available' science,

9  recognizing that some degree of speculation and uncertainty is

10 inherent in agency decisionmaking, even in the precautionary

11 context of the ESA." *Id*. at 219.  Though the ESA should not be

12 implemented "haphazardly, on the basis of speculation, *id*. at

13 219, the model "bears a rational relationship to the reality it

14 purports to represent" and no other alternative model was

15 available, *id*. at 221.

16     The circumstances here are not analogous to those in *Oceana*,

17 where the plaintiffs <u>admitted</u> that the challenged model was the

18 best, albeit uncertain, available science.  Here, Plaintiffs

19 maintain the agency's failure to analyze the most recent smelt

20 population information prevented consideration of the best

21 available, consequential scientific information.

22     Federal Defendants also rely on *Greenpeace I,* 14 F.3d at

23 1337, an earlier challenge to a Stellar sea lion biological

24 opinion.  The *Greenpeace I* plaintiffs argued that the agency

25 acted arbitrarily and capriciously by approving certain fishery

26 management measures despite uncertainty about the effects of the

27 measures on the sea lion.  The Ninth Circuit concluded that the

28 presence of some uncertainty did not violate the best available

1  science requirement in part because that BiOp analyzed <u>all</u> the

2  available data:

> We hold that the Service has fulfilled its substantive
> duties as well. Despite Greenpeace's assertions to the
> contrary, the Service supported its conclusions with
> ample data and analysis. The June biological opinion
> indicates that the Service, the Alaska Fisheries
> Science Center, and the National Marine Mammal
> Laboratory "<u>analyzed all the available data on the
> pollock fishery and Steller sea lions</u>" in the Gulf of
> Alaska. The Service also sought the recommendations of
> the Steller Sea Lion Recovery Team. The opinion
> demonstrates that the Service evaluated the spatial and
> temporal distribution of commercial fishing across the
> Gulf of Alaska. It then addressed not only the total
> biomass of pollock in the Gulf and the effects of
> fishery removals on that biomass, but also the spatial
> and temporal distribution of pollock across the Gulf.
> And despite Greenpeace's claims to the contrary, the
> Service did not ignore hydroacoustic surveys of pollock
> biomass, but considered and compared them to bottom
> trawl surveys. <u>Finally, while the Service has
> repeatedly conceded that it was uncertain about the
> effectiveness of its management measures, it premised
> these measures on a reasonable evaluation of available
> data, not on pure speculation</u>.
>
> The biological opinions indicate that the Service, an
> expert agency, consulted with other teams of experts to
> consider all relevant factors pertaining to the effects
> of the Gulf fishery on the Steller sea lion. And they
> indicate that the Service did not ignore data, as
> Greenpeace suggests. The Service's decision to go ahead
> with the 1991 fishery under the proposed restrictions,
> despite some uncertainty about the effects of
> commercial pollock fishing on the Steller sea lion, was
> not a clear error of judgment.

21  (Emphasis added.)  *Id*. at 1337.  Here, unlike *Greenpeace I*, FWS

22  failed to analyze all of the available data on the Delta smelt,

23  as the 2004 FMWT data is not mentioned in the BiOp.  Nor has FWS

24  resolved uncertainties about the identified causes of the serious

25  decline in Delta smelt abundance by adopting unenforceable

26  management measures.

27     "Although a decision of less than ideal clarity may be

28  upheld if the agency's path may reasonably be discerned, [a

**76**

1    court] cannot infer an agency's reasoning from mere silence.

2    Rather, an agency's action must be upheld, if at all, on the

3    basis articulated by the agency itself." *Pacific Coast Fed'n of*

4    *Fishermen's Ass'ns v. United States Bureau of Reclamation*, 426

5    F.3d 1082, 1091 (9th Cir. 2005)(internal citations and quotations

6    omitted).  "[W]hen reviewing a biological opinion, [a court may]

7    rely only 'on what the agency actually said'...." *Id.* (quoting

8    *Gifford Pinchot Task Force*, 378 F.3d at 1072 & n. 9).  Had FWS

9    examined the FMWT 2004 data in the BiOp, the weight it gave to

10   that data would have been entitled to deference.  The agency's

11   silence cannot be afforded deference.

12              **a.    The timing of the 2004 FMWT Data relative to
                         the issuance of the BiOp**.

13

14        Federal Defendants complain the timing of the release of the

15   2004 FMWT data did not leave enough time to address the data

16   before issuance of the biological opinion.  The record shows at

17   the very latest, the 2004 FMWT data was presented to FWS and

18   other CALFED members on February 9, 2005, less than a week before

19   the February 16, 2005, issuance of the biological opinion.

20   Federal Defendants assert they were not required to rewrite the

21   BiOp at the "eleventh hour."  (Doc. 242 at 27).

22        Although the record shows the 2004 FMWT data was presented

23   at the February 9, 2005 CALFED meeting, it is unclear when FWS

24   first saw this data.  Plaintiffs' claim that the data was

25   available in December 2004, is not supported.[25]  However, even

26   assuming FWS was not aware of the 2004 FMWT data until February

27

28        [25]   Plaintiffs' record citations, AR 9199--9202, are print-
          outs of the FMWT data which post date the issuance of the BiOp.

9, 2005, the agency was not operating under a deadline.  As in *Greenpeace II*, where the agency's statutory duty was not excused because the data could not be "analyzed in the time allowed," 80 F. Supp. 2d at 1150, here, FWS could have delayed releasing the biological opinion until it had reviewed and analyzed the new abundance data, which was especially significant as it showed Delta smelt abundance at its nadir.

Defendants and Defendant-Intervenors rejoin that the failure of the BiOp to <u>directly</u> address the 2004 FMWT is harmless, because one of the DSRAM's trigger criteria is an index based upon the previous years' FMWT results, calling for any new abundance data to be incorporated into the adaptive management process.  However, even if the data were considered later in the DSRAM process, no designated protective actions are required to be taken in response to any of the triggering criteria.[26]

Federal Defendants raise a legitimate concern about having to prolong completion of the BiOp on the eve of its release.  In theory, new scientific information could arrive on FWS's doorstep on a daily basis.  If FWS was required to consider and address every new piece of information it received prior to publication of its decision, it would be effectively impossible for the

---

[26]   Abundance data is relevant to aspects of the BiOp that are independent of the DSRAM process.  For example, the agency's conclusion that the level of anticipated take "is not likely to result in jeopardy to the smelt because this level of take is at or below historical levels of take" (AR 474), is irrational because no consideration is given to the current decline in smelt abundance nor any explanation provided how the further decline of the smelt does not exacerbate jeopardy to the species' survival and recovery.

1   agency to complete a biological opinion.  But, this is not such a
2   case.  The FMWT is a credible and reliable Delta smelt population
3   abundance survey, regularly compiled on an annual basis, and
4   relied upon by the agency in the past.  There is no rational
5   reason to ignore such important data.  The BiOp places great
6   weight on the FMWT as "the second longest running survey."  (AR
7   366, 370).  The agency does not suggest the time of receipt of
8   the 2004 FMWT data was unexpected.  The agency's failure to
9   acknowledge and analyze the record low abundance levels revealed
10  by the 2004 FMWT is unreasonable and violated its duty to use the
11  best available scientific information.  16 U.S.C. § 1536(a)(2).

12      Plaintiffs' motion for summary adjudication is **GRANTED** as to
13  this claim.

14              **3.  Global Climate Change Evidence.**

15      Plaintiffs next argue that the BiOp ignored data about
16  Global Climate Change that will adversely affect the Delta smelt
17  and its habitat.  (Doc. 232 at 7.)  This is potentially
18  significant because the BiOp's conclusions are based in part on
19  the assumption that the hydrology of the water bodies affected by
20  the OCAP will follow historical patterns for the next 20 years.
21  (AR 375 (explaining that CALSIM II modeling involved making
22  "adjustments to historic water supplies...by imposing future
23  level land use on historical meteorological and hydrologic
24  conditions").)

25      In a July 28, 2004 comment letter, Plaintiff NRDC directed
26  FWS's attention to several studies on the potential effects of
27  climate change on water supply reliability, urging that the issue
28  be considered in the BiOp.  (AR 8552-56.)  The comment letter

**79**

stated:

> The best scientific data available today establishes that global climate change is occurring and will affect western hydrology. At least half a dozen models predict warming in the western United States of several degrees Celsius over the next 100 years (Redmond, 2003). Such sophisticated regional climate models must be considered as part of the FWS' consideration of the best available scientific data.

> Unfortunately, the Biological Assessment provided by the Bureau to FWS entirely ignores global climate change and existing climate change models. Instead, the BA projects future project impacts in explicit reliance on seventy-two years of historical records. In effect, the Biological Assessment assumes that neither climate nor hydrology will change. This assumption is not supportable.

> In California, a significant percentage of annual precipitation falls as snow in the high Sierra Nevada mountains. Snowpack acts as a form of water storage by melting to release water later in the spring and early summer months (Minton, 2001). The effects of global climate change are expected to have a profound effect on this dynamic. <u>Among other things, more precipitation will occur as rain rather than snow, less water will be released slowly from snowpack "storage" during spring and summer months, and flooding is expected to increase</u> (Wilkinson, 2002; Dettinger, 2003). <u>These developments will make it more difficult to fill the large reservoirs in most years, reducing reservoir yields and will magnify the effect of CVP operations on downstream fishes</u> (Roos, 2001). These developments will also dramatically increase the cost of surface storage relative to other water supply options, such as conservation.

> While the precise magnitude of these changes remains uncertain, judgments about the likely range of impacts can and have been made. *See e.g.*, U.S. Global Climate Action Report – 2002; Third National Communication of the United States Under the United Nations Framework Convention on Climate Change at 82, 101 (2002). [FN3]. The Service can and must evaluate how that range of likely impacts would affect CVP operations and impacts, including the Bureau's ability to provide water to contractors while complying with environmental standards. We therefore request that the Service review and consider the work cited above, as well as the background and Dettinger presentation at a recent climate change conference held in Sacramento, June 9-11, 2004 [citation omitted] and climate change reports [citation omitted].

1  (AR at 8554-55 (emphasis added).)

2  ____A second presentation by Michael Dettinger at a December 8-
3  9, 2004 CALFED meeting, attended by FWS staff, concluded that
4  "warming is already underway..."; that this would result in
5  earlier flows, more floods, and drier summers; and that
6  "California water supplies/ecosystems are likely to experience []
7  changes earliest and most intensely."  (Doc. 10 at 18.)
8  Following Dettinger's presentation, members of CALFED noted "the
9  need to reevaluate water storage policies and ERP [Ecosystem
10 Recovery Program] recovery strategies, all of which would be
11 affected by projected climate changes."  (Doc. 9 at 3.)  The
12 record reflects that extreme water temperatures can have dramatic
13 impacts upon smelt abundance.  (AR 8979-80.)

14      In addition to the specific studies and data cited by NRDC,
15 FWS scientists recognized the issue of climate change warranted
16 further consideration.  At a June 2003 symposium entitled
17 "Framing the issues for Environmental and Ecological Effects of
18 Proposed Changes in Water Operations: Science Symposium on the
19 State of Knowledge," a number of questions regarding climate
20 change were raised, including:  "How does the proposed operations
21 plan account for the potential effects of climate change (e.g.,
22 El Nino or La Nina, long term changes in precipitation and runoff
23 patters, or increases in water temperature)?"  (AR at 4839.)

24      Plaintiffs argue that, despite this evidence that climate
25 change could seriously impact the smelt by changing Delta
26 hydrology and temperature, the BiOp "did not so much as mention
27 the probable effects of climate change on the delta smelt, its
28 habitat, or the magnitude of impacts that could be expected from

**81**

1    the 2004 OCAP operations, much less analyze those effects."

2    (Doc. 232 at 8.)   Defendants and Defendant-Intervenors respond by

3    arguing (1) that the evidence before FWS at the time the BiOp was

4    issued was inconclusive about the impacts of climate change; and

5    (2) that, far from ignoring climate change, the issue is built

6    into the BiOp's analysis through the use of X2 as a proxy for the

7    location and distribution of Delta smelt.

8            **a.   *Inconclusive Nature of Available Information
                Regarding the Impacts of Global Climate*

9              *Change on Precipitation.*

10       Federal Defendants and the State Water Contractors

11   characterize Mr. Dettinger's presentation, as reflecting "a great

12   deal of uncertainty that climate change will impact future

13   precipitation."   The presentation is entitled "Climate Change

14   Uncertainties and CALFED Planning."   (Doc. 10 at 1.)   Dettinger

15   acknowledges that, although current climate models "yield

16   consistent warming scenarios for California" (*id.* at 6), there is

17   no similar consensus regarding the impact of warming on future

18   precipitation (*id.* at 7).   Federal Defendants suggest that FWS

19   "responsibly refused to engage in sheer guesswork, and properly

20   declined to speculate as to how global warming might affect delta

21   smelt."   (Doc. 242 at 23.)   But, the NRDC letter cited a number

22   of studies in addition to Mr. Dettinger's presentations, all of

23   which predict that anticipated climate change will adversely

24   impact future water availability in the Western United States.

25       At the very least, these studies suggest that climate change

26   will be an "important aspect of the problem" meriting analysis in

27   the BiOp.   *Pacific Coast Fed'n,* 265 F.3d at 1034.   However, as

28   with the 2004 FMWT data, the climate change issue was not

meaningfully discussed in the biological opinion, making it impossible to determine whether the information was rationally discounted because of its inconclusive nature, or arbitrarily ignored.[27]

### b.   *X2 as a Proxy for Climate Change*.

The State Water Contractors argue that the approaches taken in the DSRAM are "more than adequate to deal with the projected impacts of climate change – assuming they occur." (Doc. 241 at 8.)  For example, Plaintiffs' suggestion that climate change will produce earlier flows, more floods, and drier summers is addressed by the DSRAM's X2 trigger.  Flow level changes will be

---

[27]   Plaintiffs argue that "[r]egardless of the uncertainty involved in predicting the consequences of climate change, FWS had an obligation under the ESA to address the probable effects on Delta smelt." (Doc. 232 at 7.)  In response, the State Water Contractors quote the following passage from *Bennett v. Spear*, 520 U.S. 154, 176-177 (1997), in support of the proposition that the ESA intended to preclude exactly this kind of argument:

> The obvious purpose of the requirement that each agency "use the best scientific and commercial data available" is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise. While this no doubt serves to advance the ESA's overall goal of species preservation, we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives.

But, this passage from *Bennet* was part of a broader discussion holding that persons who are economically burdened by a decision made under the ESA fall within the zone of interests the statute protects for the purposes of standing.  *Bennett* sheds little light on the current inquiry -- whether and to what extent the data that was before the FWS regarding climate change should have been considered and addressed in the BiOp.

reflected in the position of X2.  If climate change alters water temperatures, DSRAM also includes a temperature trigger, that monitors the temperature range within which successful Delta smelt spawning occurs.

The DSRAM offers no assurance that any mitigating fish protection actions will be implemented if the X2 criteria is triggered.  That X2 indirectly monitors climate change does not assuage Plaintiffs' concerns that the BiOp has not adequately analyzed the potential impact of climate change on the smelt.

The BiOp does not gauge the potential effect of various climate change scenarios on Delta hydrology.  Assuming, *arguendo*, a lawful adaptive management approach, there is no discussion when and how climate change impacts will be addressed, whether existing take limits will remain, and the probable impacts on CVP-SWP operations.

FWS acted arbitrarily and capriciously by failing to address the issue of climate change in the BiOp.  This absence of <u>any</u> discussion in the BiOp of how to deal with any climate change is a failure to analyze a potentially "important aspect of the problem."[28]

Plaintiffs' motion for summary adjudication is **GRANTED** as to this claim.


D.   <u>**There is No Rational Connection Between the No Jeopardy Finding and the Status of the Species**</u>.

Plaintiffs next allege that there is no rational connection

_____

[28]      There is no basis to determine what weight FWS should ultimately give the climate change issue in its analysis.

between the record evidence and the BiOp's "no jeopardy"

conclusion.   Plaintiffs first argue that the BiOp's approach to

setting take limits is arbitrary and capricious because FWS

failed to consider defined take limits in the context of current

smelt abundance.   Plaintiffs complain that the BiOp does not

explain how its no jeopardy conclusion can be justified in light

of the admitted adverse effects of the project, along with

indirect and cumulative effects on the species.

In a formal consultation, the ESA requires FWS to

"[f]ormulate its biological opinion as to whether the action,

taken together with cumulative effects, is likely to jeopardize

the continued existence of a listed species or result in the

destruction or adverse modification of critical habitat."   50

C.F.R. § 402.14; *see also* 16 U.S.C. § 1536(a)(2).   The phrase

"jeopardize the continued existence of" means "to engage in an

action that reasonably would be expected, directly or indirectly,

to reduce appreciably the likelihood of both the survival and

recovery of a listed species in the wild by reducing the

reproduction, numbers, or distribution of that species."   50

C.F.R. § 402.02.

Agency action may be overturned if the agency has "relied on

factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency

expertise."   *Pacific Coast Fed'n,* 265 F.3d at 1034.   A court must

ask "whether the agency considered the relevant factors and

**85**

articulated a rational connection between the facts found and the choice made." *Id*. The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins.*, 463 U.S. 29, 43 (1983).

### 1. Plaintiffs' Argument that Salvage Underestimates Project Impacts on the Smelt.

Plaintiffs assert that the BiOp's reliance on salvage is arbitrary and capricious because salvage is not a reliable basis for setting Project take limits. Plaintiffs cite record evidence, including statements made by smelt biologists and FWS employees, that salvage does not accurately estimate incidental take of young Delta smelt. (*See* AR 8403, 7578.) The BiOp admits that salvages does not fully account for all smelt losses. (AR 419 ("It should be noted that although salvage is used to index delta smelt take, it does not reliably index delta smelt entrainment. Furthermore, delta smelt salvage is highly variable at all time scales....).") Plaintiffs have not shown that a better measure of smelt take could have been generated from available data. The agency is entitled to rely on this approach as it appears to be the "best estimate possible," no party has suggested an alternative. *See Oceana*, 384 F. Supp. 2d at 228.

This objection standing alone is insufficient to justify summary adjudication.

### 2. The BiOp's Approach to Estimating Future Take Without Considering the Smelt's Current Abundance Is Arbitrary and Capricious.

The take limits are based on historic sampling from "salvage

1  density" (number of fish taken per unit of water), which data is

2  adjusted using CALSIM II modeling to reflect water flows

3  anticipated under the circumstances of the final consultation.

4  FWS's no jeopardy determination is based in part on flow modeling

5  for the final consultation scenario that predicted <u>lower</u> than

6  historic salvage levels during critical times.  (AR 474 (finding

7  that the level of anticipated take "is not likely to result in

8  jeopardy to the smelt because this level of take is at or below

9  historical levels of take.")

10     A close examination of the administrative record reveals

11  that this conclusion relies upon an unsupported irrational

12  assumption not justified by the record, i.e., that maintaining

13  salvage at or below historic salvage levels will ensure that the

14  2004 OCAP is not likely to jeopardize the continued existence of

15  the Delta smelt.  First, by focusing only on how proposed

16  operations will either increase or decrease smelt take, FWS

17  effectively limited its analysis to determining whether the

18  magnitude of the OCAP's impact upon the smelt would be different

19  from the Projects' impact under the regulatory historical

20  baseline.  FWS did not analyze how the absolute number of smelt

21  taken during any given period of Project operations will impact

22  overall smelt abundance at the time of the 2005 BiOp or in the

23  future.  Nor does the finding the smelt "still persists," even at

24  the lowest recorded abundance levels, have any meaning if the

25  smelt's "persistence" is at a level at or near extinction.

26  Evaluating "persistence" instead of smelt population abundance is

27  irrational, arbitrary, and runs counter to the evidence before

28  the agency.

**87**

1    The Ninth Circuit, in *NWF v. NMFS*, 481 F.3d 1224 at *8,

2  invalidated a biological opinion in part because it failed to

3  view the agency action "in the present and future human and

4  natural contexts."  Here, the BiOp similarly fails to provide a

5  scientific explanation for why it is appropriate to set

6  incidental take without considering the most current smelt

7  population data.  This methodology fails to take most recent

8  available natural conditions (i.e., the smelt's current and/or

9  future population abundance) into consideration.  For example, if

10 the smelt's population is currently 600,000, it might be

11 justifiable to permit a monthly take of over 30,000.  However, if

12 the smelt's current population is only 60,000, allowing 30,000 to

13 be entrained in the pumps in a single month would represent a 50%

14 reduction in smelt population.  Even if the 30,000 figure was

15 significantly lower than historic take, Defendant-Intervenors

16 agree "that salvage impacts cannot be accurately identified

17 without a population estimate."  (Doc. 247 at 9 n.13.)

18    DWR asserts that, in setting the take limits, the BiOp took

19 into consideration concerns expressed by experts that using

20 historic information alone would not create an appropriate take

21 limit.  (*See* AR 4880, 5532, 5543).  The first of the citations

22 offered by DWR, an email sent by FWS's Wim Kimmerer to several

23 individuals at DWR, EPA and elsewhere, states that there was some

24 discussion at FWS about "getting away from take as the principle

25 criterion governing management and recovery of delta smelt."  (AR

26 4880.)  The next page of this email goes on to admit that

27 "determining what level of mortality is acceptable or 'safe' is

28 going to be difficult... Ultimately...this should be done through

**88**

some sort of population model or viability analysis." (AR 4881
(emphasis added).) The other cited communications express
similar concerns. (*See* AR 5532, 5543.) It is time to do it, yet
FWS continues to profess the smelt population cannot be reliably
measured.

DWR argues that, together, the take limits and the DSRAM
address these concerns by moving the focus of management away
from salvage. However, there is no way to know when or what
measures will be taken under the DSRAM, which leaves the existing
take limits as the only enforceable measures in the BiOp,[29] while
the species heads toward extinction. Using flawed take limits
and refusing to quantify smelt population and recent viability
trends create substantial doubt about the reliability of the
BiOp.

Defendants and Defendant-Intervenors suggest that sufficient
information was simply not available to accurately determine
smelt abundance.[30] Plaintiffs rejoin by referring to an email

---

[29] There is no recognized mechanism for introducing any
population viability data, collected through the adaptive
management process, into the setting of the take limits.

[30] The San Luis Parties mischaracterize Plaintiffs
argument as a request for FWS to undertake additional research
projects. (Doc. 247.) Defendant Intervenors are correct that
FWS is not required to undertake new research, *Greenpeace Action
v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992)(agency may
proceed despite uncertainty about accuracy of modeling effort);
Southwest Ctr for Biological Diversity, 215 F. 3d 58, 60 (D.C.
Cir. 2000)(agency could rely on inconclusive data to make
decision; not obligated to conduct new independent studies).
Plaintiffs do point out that FWS acknowledges in the AR that an
accurate determination of non-jeopardy would require knowledge of
how many smelt existed, what proportion would be lost due to the
projects, and what level of loss would be sustainable. (Doc. 232

1  sent by Zachary Hymanson to Ryan Olah at FWS, with copies to

2  others at concerned federal and state agencies.  Mr. Hymanson

3  opined:  "I think we are at the point where we should report and

4  use quantified estimates of the total number of individuals at

5  the various life stages monitories.  Quantified population and

6  life stage estimates of fishes around the world are routinely

7  made with A LOT less data than we have for delta smelt."  (AR

8  7542 (emphasis in original).)

9       The viability of Delta smelt has been under scrutiny for

10  over ten years.  No party has shown that producing a reliable

11  population estimate is scientifically unfeasible.  Information

12  does not have to be perfect or infallible for the agency to be

13  required to use it to create a population estimate.  *See*

14  *Greenpeace II*, 80 F. Supp. 2d at 1149-50 (finding it unlawful for

15  agency to entirely ignore relevant factor and fail to analyze and

16  develop projections regarding that factor based on information

17  that was available); *see also Conner*, 848 F.2d at 1454

18  (biological opinion invalidated because agency failed to "use

19  best information available to prepare comprehensive biological

20  opinions considering all stages of agency action.").  Without

21  population estimates, it is arbitrary for the agency to conclude

22  that project operations will not result in jeopardy simply

23  because the projects will take relatively fewer smelt than they

24  did in the past, in the face of the undisputed fact that the

25

26  at 23 (citing AR 8221).)  However, the crux of Plaintiffs'
    concern is that FWS has not developed such population data and
27  ignored important existing data on abundance in setting the take
    limits.
28

**90**

smelt population has been declining steadily in recent years. Failing to incorporate any information about smelt population abundance into the setting of the take limits is a fundamental failure rendering the BiOp arbitrary and capricious.

The San Luis Parties' rationalization of FWS's approach, setting the incidental take limits using a model that does not take current abundance data into consideration, is that historic records reveal "either no, or perhaps a very weak relationship, between juvenile abundance measured by the TNS and adult abundance measured by the FMWT." (Doc. 247 at 5.)  This "lack of [a] linear relationship between the two indices, shows that events after the TNS, in late summer and early fall, are probably affecting the number of juveniles that mature into spawners." (Doc. 247 at 6.)  From the lack of a linear relationship, San Luis infers that something other than salvage (i.e. entrainment in the pumps) is causing the smelt's decline.[31]

The BiOp interprets the data differently:

_____

[31]     The Administrative Record reflects various explanations for the lack of a linear relationship between the TNS and the FMWT.  (AR 1025-26.)  One possible explanation for why the number of spawning age smelt (indexed by the FMWT) seems to be a poor predictor of subsequent offspring (indexed by the TNS) is that there is some environmental factor (not directly related to entrainment at the projects) limiting survivability, inferring that there is a carrying capacity for the population.  (*Id.*)  Alternatively, some scientists question whether it is proper to try to draw statistical conclusions from the entire 1969-2002 data pool, given that the smelt experienced a precipitous decline in 1981.  These scientists have postulated that the data "may reflect two different relationships from two time periods with different delta smelt carrying capacities." (*Id.* at 1026.)  One study cited in the AR indicates that food supply may be the limiting factor during this time period.  (AR 8976.)

In a near-annual fish like delta smelt, a strong relationship would be expected between number of spawners present in one year and number of recruits to the population the following year. Instead, the stock-recruit relationship for delta smelt is weak, accounting for about a quarter of the variability in recruitment (Sweetnam and Stevens 1993). <u>This relationship does indicate, however, that factors affecting numbers of spawning adults (e.g., entrainment, toxics, and predation) can have an effect on delta smelt numbers the following year</u>.

(AR at 364 (emphasis added).)[32]  Plaintiffs refer to other record evidence creating doubt that salvage is not a statistically reliable indicator of smelt abundance, including high entrainment events in the early 1980s and other "extreme events," including the El Niño of 1982-83, which caused significant declines in smelt abundance.  (AR 8979.)

The BiOp acknowledges that salvage can have an impact on smelt abundance (although the statistical relationship is non-linear).  It is arbitrary and capricious for FWS to base take limits on a projection of future salvage calculated without considering the most current or future smelt abundance and without reliable smelt population estimate.

Plaintiffs' motion for summary adjudication is **GRANTED** as to this issue.  The BiOp's approach to setting incidental take limits is arbitrary and capricious because it fails to incorporate reliable smelt population data and the most recent

---

[32]    The San Luis Parties raise numerous questions regarding FWS's conclusion that there is a statistical relationship between the numbers of spawning adults and Delta smelt abundance the following year, criticizing the statistical analyses referenced in the BiOp.  (Doc. 247 at 5.)  It is unnecessary to adjudicate these issues, as the San Luis Parties have not separately challenged the conclusions reached in the BiOp on this ground nor have they moved for summary judgment on any issue in this case.

information regarding smelt abundance.

### 3. Plaintiffs' Argument That the Biop Fails to Explain How its No Jeopardy Conclusion Can Be Justified in Light of the Identified Adverse Effects of the Project, along with Indirect and Cumulative Effects.

In formulating a biological opinion, the ESA requires FWS to determine "whether the action, <u>taken together with cumulative effects</u>, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14 (emphasis added). "Jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, <u>directly or indirectly</u>, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (emphasis added).

The BiOp concludes that the 2004 OCAP will have numerous direct and indirect impacts apart from salvage, including habitat loss, increased vulnerability of Delta smelt to predation, and increased vulnerability to adverse temperature effects. (*See* AR 399, 443-44.) Plaintiffs allege that, although the BiOp lists indirect impacts, it fails to explain how they relate to the potential for jeopardy.

Federal Defendants respond to this allegation with a single paragraph, asserting generally that "the biological opinion considers the effects of dozens of project components, each with a multi-layered analysis," and indicating how many times the topics of predation (18), temperature changes (180 references), life cycle impacts (75 references to the term "juveniles") are

**93**

discussed in the BiOp.  (Doc. 242 at 30.)  What Federal
Defendants do not do is point to those portions of the BiOp which
analyze these issues in <u>a way that demonstrates why these</u>
<u>indirect impacts will not cause jeopardy or how they relate to</u>
<u>survival and recovery of the smelt</u>.  A review of the BiOp does
not reveal such an analysis.

The State Water Contractors suggest that the DSRAM trigger
criteria were designed to address all of the potential impacts
identified in the BiOp.  (Doc. 241 at 8.)  This leaves for future
consideration and speculation the impacts events activating DSRAM
triggers will have.

### a.    *Cumulative Impacts*.

Plaintiffs also argue that the BiOp fails to meaningfully
address cumulative impacts, "those effects of future State or
private activities, not involving Federal activities, that are
reasonably certain to occur within the action area of the Federal
action subject to consultation."  50 C.F.R. § 402.02.  The BiOp
highlights a number of predicted cumulative effects:

> Any continuing or future non-Federal diversions of
> water that may entrain adult or larval fish would have
> cumulative effects to the smelt. Water diversions
> through intakes serving numerous small, private
> agricultural lands contribute to these cumulative
> effects. These diversions also include municipal and
> industrial uses. State or local levee maintenance may
> also destroy or adversely modify spawning or rearing
> habitat and interfere with natural long term habitat-
> maintaining processes.
>
> Additional cumulative effects result from the impacts
> of point and non-point source chemical contaminant
> discharges. These contaminants include but are not
> limited to selenium and numerous pesticides and
> herbicides as well as oil and gasoline products
> associated with discharges related to agricultural and
> urban activities. Implicated as potential sources of
> mortality for smelt, these contaminants may adversely

1    affect fish reproductive success and survival rates.
2    Spawning habitat may also be affected if submersed
     aquatic plants, used a[s] substrates for adhesive egg
3    attachment, are lost due to toxic substances.

4    Other cumulative effects could include: the dumping of
     domestic and industrial garbage may present hazards to
5    the fish because they could become trapped in the
     debris, injure themselves, or ingest the debris; golf
6    courses reduce habitat and introduce pesticides and
     herbicides into the environment; oil and gas
7    development and production remove habitat and may
     introduce pollutants into the water; agricultural uses
8    on levees reduce riparian and wetland habitats; and
     grazing activities may degrade or reduce suitable
9    habitat, which could reduce vegetation in or near
     waterways.

10   (AR 468.)  There is no quantitative and qualitative analysis of

11   the potential impact of these cumulative effects on the smelt and

12   its habitat, except to identify the causes, the BiOp concludes

13   without explanation, "[t]he cumulative effects of the proposed

14   action [are] not expected to alter the magnitude of cumulative

15   effects on the above described actions upon the critical

16   habitat's conservation function for the smelt."  (*Id*.)

17        The San Luis Parties argue that FWS's no jeopardy conclusion

18   and impacts analysis is "rationally based on its determination

19   that the proposed future changes will not significantly increase

20   the magnitude of the ongoing Project's potential impacts."  (Doc.

21   247 at 9.)  This conclusion is the kind of analysis recently

22   rejected by the Ninth Circuit in *NWF v. NMFS*:

23        To "jeopardize the continued existence of" means "to
          engage in an action that reasonably would be expected,
24        directly or indirectly, to reduce appreciably the
          likelihood of both the survival and recovery of a
25        listed species in the wild by reducing the
          reproduction, numbers, or distribution of that
26        species." 50 CFR § 402.02; 16 U.S.C. § 1536(a)(2). NMFS
          argues that, under this definition, it may satisfy the
27        ESA by comparing the effects of proposed FCRPS
          operations on listed species to the risk posed by
28        baseline conditions. Only if those effects are

                                   **95**

"appreciably" worse than baseline conditions must a full jeopardy analysis be made. Under this approach, a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent.

Requiring NMFS to consider the proposed FCRPS operations in their actual context does not, as NMFS argues, effectively expand the "agency action" at issue to include all independent or baseline harms to listed species. Nor does it have the effect of preventing any federal action once background conditions place a species in jeopardy. To "jeopardize"--the action ESA prohibits--means to "expose to loss or injury" or to "imperil." Either of these implies causation, and thus some new risk of harm. Likewise, the suffix "-ize" in "jeopardize" indicates some active change of status: an agency may not "cause [a species] to be or to become" in a state of jeopardy or "subject [a species] to" jeopardy. American Heritage Dictionary of the English Language (4th ed.). Agency action can only "jeopardize" a species' existence if that agency action causes some deterioration in the species' pre-action condition.

Even under the so-called aggregation approach NMFS challenges, then, an agency only "jeopardize[s]" a species if it causes some new jeopardy. An agency may still take action that removes a species from jeopardy entirely, or that lessens the degree of jeopardy. However, an agency may not take action that will tip a species from a state of precarious survival into a state of likely extinction. Likewise, even where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm.

Our approach does not require NMFS to include the entire environmental baseline in the "agency action" subject to review. It simply requires that NMFS appropriately consider the effects of its actions "within the context of other existing human activities that impact the listed species." *ALCOA*, 175 F.3d at 1162 n. 6 (citing 50 C.F.R. § 402.02's definition of the environmental baseline). This approach is consistent with our instruction (which NMFS does not challenge) that "[t]he proper baseline analysis is not the proportional share of responsibility the federal agency bears for the decline in the species, but what jeopardy might result from the agency's proposed actions in the present and future human and natural contexts." *Pac. Coast Fed'n*, 426 F.3d at 1093 (emphasis added).

**96**

481 F.3d 1224 at *7-8 (emphasis added)(footnote omitted).

Here, the BiOp does not consider the cumulative effects of any future DSRAM actions, which it relies on to avoid jeopardy, nor does it meaningfully relate the most current abundance of the species to future OCAP operations to assess jeopardy.  The BiOp unlawfully fails to adequately analyze indirect and cumulative impacts of the 2004 OCAP.  Summary adjudication on this issue is appropriate.

### E.   Did the BiOp Fail to Adequately Consider Impacts to Critical Habitat?

Plaintiffs allege that the BiOp fails to adequately consider critical habitat in two respects.  First, by failing to analyze the impacts of the 2004 OCAP on the value of critical habitat for the recovery as opposed to just the survival of the smelt.  Second, failure to consider impacts to all of the Delta smelt's critical habitat because it focuses only on X2.

### 1.   Did the BiOp Fail to Consider Whether 2004 OCAP Would Diminish Value of Critical Habitat for Recovery?

The ESA requires FWS to determine whether the 2004 OCAP will destroy or adversely affect Delta smelt critical habitat.  16 U.S.C. § 1536(a)(2).  "Destruction or adverse modification of critical habitat" means "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical."  50 C.F.R. § 402.02

Initially, the critical habitat analysis was conducted

pursuant to agency regulations that defined adverse modification
as:

> [A] direct or indirect alteration that appreciably
> diminishes the value of critical habitat for **both
> survival <u>and</u> recovery** of a listed species.  Such
> alterations include, but are not limited to,
> alterations adversely modifying any of those physical
> or biological features that were the basis for
> determining the habitat to be critical.

50 C.F.R. § 402.02 (emphasis added).

Following the issuance of the 2004 BiOp, the Ninth Circuit
invalidated the adverse modification regulation, based on its own
interpretation of the regulation's language, "alteration that
appreciably diminish the value of critical habitat for both the
survival <u>and</u> recovery of a listed species," "reads the 'recovery'
goal out of the adverse modification inquiry." *Gifford Pinchot,*
378 F.3d at 1069-70.

The Bureau requested that FWS reinitiate consultation on the
2004 OCAP to ensure compliance with *Gifford Pinchot*.  The result
was the disputed 2005 BiOp, which expressly states that it does
not rely on the invalidated regulation.  (AR 248.)  Rather, the
BiOp "relied on the statutory provisions of the ESA to complete
the analysis with respect to critical habitat."  (*Id.*)  The ESA
defines critical habitat as including "the specific areas ...
occupied by the species ... which are ... essential to the
<u>conservation</u> of the species" and the "specific areas outside the
geographical area occupied by the species ... that ... are
essential for the <u>conservation</u> of the species...."  16 U.S.C. §
1532(5)(A).  This statutory reference to "conservation" was the
premise for the Ninth Circuit's *Gifford Pinchot* reasoning:

> "Conservation" is a much broader concept than mere

**98**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> survival. The ESA's definition of "conservation" speaks
> to the recovery of a threatened or endangered species.
> Indeed, in a different section of the ESA, the statute
> distinguishes between "conservation" and "survival."
> Requiring consultation only where an action affects the
> value of critical habitat to both the recovery and
> survival of a species imposes a higher threshold than
> the statutory language permits

378 F.3d at 1070 (internal citation omitted).

The 2005 BiOp uses the term "conservation," rather than "survival" and/or "recovery," several times in connection with its critical habitat analysis. In the "Critical Habitat Effects" section, the BiOp states that the "primary constituent elements essential to conservation of the species will not be affected by the proposed project." (AR 423.) In addition, after discussing critical habitat, including those areas essential to spawning, transport, rearing and migration, the BiOp acknowledges impacts, but explains that after the proposed diversions in the OCAP are implemented "the primary constituent elements [of critical habitat] essential to the conservation of the species still function." (*Id*. at 371.)[33] What specific effects any DSRAM

---

[33] Defendant-Intervenors argue that, because of these mentions of "conservation," FWS is entitled to a "presumption of regularity," and the court must <u>assume</u> that agency considered recovery. (Doc. 247 at 12.) In *Gifford Pinchot*, after invalidating the destruction and adverse modification regulation, the Ninth Circuit considered whether it should presume that the agency followed its own regulation that was valid at the time the biological opinion was issued. The Ninth Circuit concluded that, because the agencies must be afforded a "presumption of regularity," a court must assume that the agency followed the then applicable regulation. *Id*. at 1072. Applying this presumption here, given that the agency specifically applied the statute, not the invalid regulation, there is no evidence the agency applied an invalid regulation. However, Defendant-Intervenors' suggestion that the presumption should be applied to validate the BiOp's <u>analysis</u> of recovery is misplaced. The

measures will have on the smelt are not described, nor is there discussion of how the survival and recovery of the smelt will be accomplished.

The Ninth circuit explained in *NWF v. NFMS*, that the agency must conduct a "full analysis" of risks to recovery.

> The question before us is not whether, on the merits, recovery risks in fact require a jeopardy finding here, but whether, as part of the consultation process, NMFS must conduct a **full analysis** of those risks and their impacts on the listed species' continued existence. Although recovery impacts alone may not often prompt a jeopardy finding, NMFS's analytical omission here may not be dismissed as harmless: the highly precarious status of the listed fishes at issue raises a substantial possibility that considering recovery impacts could change the jeopardy analysis.  The only reasonable interpretation of the jeopardy regulation requires NMFS to consider recovery impacts as well as survival.

481 F.3d 1224 at *9-*10 (emphasis added).[34]

Plaintiffs claim that although the BiOp includes generic promises to consider recovery of the smelt, it does not competently analyze nor provide for recovery.  Federal Defendants and Defendant Intervenors respond that the BiOp's discussion of critical habitat effects, in conjunction with the BiOp's conclusion that "the smelt's primary constituent elements essential to the conservation of the species [will] still

---

agency still has an obligation to thoroughly consider the issue of recovery and to reach a reasoned conclusion based on the evidence in the administrative record.

[34]   Although this portion of *NWF v. NMFS* concerned analysis of recovery in the context of the "no jeopardy" determination, as opposed to the "destruction or adverse modification of critical habitat" analysis, the holding is equally applicable to habitat jeopardy.

**100**

function" (AR 371) under the 2004 OCAP, is a sufficient analysis
of the impacts on recovery.

The BiOp's overarching conclusion is that "the smelt's
primary constituent elements essential to the conservation of the
species [will] still function."  In designating critical habitat
for a listed species, FWS must "consider those physical and
biological features that are essential to the conservation of
[the] species and that may require special management
considerations or protection."  50 C.F.R. § 424.12.  The features
that must be considered include, but are not limited to, the
following:

> 1.  Space for individual and population growth, and for normal behavior;
>
> 2.  Food, water, air, light, minerals, or other nutritional or physiological requirements;
>
> 3.  Cover or shelter;
>
> 4.  Sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and
>
> 5.  Habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species.

*Id*.  The BiOp explained that, in designating critical habitat for
the Delta smelt, FWS identified the following primary constituent
elements "essential to the conservation of the species":

> Physical habitat, water, river flow, and salinity concentrations required to maintain delta smelt habitat for spawning, larval and juvenile transport, rearing, and adult migration.
>
> ***
>
> Specific areas that have been identified as important delta smelt spawning habitat include Barker, Lindsey, Cache, Prospect, Georgiana, Beaver, Hog, and Sycamore sloughs and the Sacramento River in the Delta, and

**101**

1    tributaries of northern Suisun Bay.

2    Larval and juvenile transport. Adequate river flow is
     necessary to allow larvae from upstream spawning areas
3    to move to rearing habitat in Suisun Bay and to ensure
     that rearing habitat is maintained in Suisun Bay. To
4    ensure this, X2 must be located westward of the
     confluence of the Sacramento-San Joaquin Rivers,
5    located near Collinsville (Confluence), during the
     period when larvae or juveniles are being transported,
6    according to historical salinity conditions. X2 is
     important because the "entrapment zone" or zone where
7    particles, nutrients, and plankton are "trapped,"
     leading to an area of high productivity, is associated
8    with its location. Habitat conditions suitable for
     transport of larvae and juveniles may be needed by the
9    species as early as February 1 and as late as August
     31, because the spawning season varies from year to
10   year and may start as early as December and extend
     until July.

11
     Rearing habitat. An area extending eastward from
12   Carquinez Strait, including Suisun, Grizzly, and Honker
     bays, Montezuma Slough and its tributary sloughs, up
13   the Sacramento River to its confluence with Three Mile
     Slough, and south along the San Joaquin River including
14   Big Break, defines the specific geographic area
     critical to the maintenance of suitable rearing
15   habitat. Three Mile Slough represents the approximate
     location of the most upstream extent of historical
16   tidal incursion. Rearing habitat is vulnerable to
     impacts of export pumping and salinity intrusion from
17   the beginning of February to the end of August.

18   Adult migration. Adequate flow and suitable water
     quality is needed to attract migrating adults in the
19   Sacramento and San Joaquin river channels and their
     associated tributaries, including Cache and Montezuma
20   sloughs and their tributaries. These areas are
     vulnerable to physical disturbance and flow disruption
21   during migratory periods.

22   (AR 368-69.)

23   The BiOp acknowledges that this Delta smelt critical habitat

24   has been adversely affected by numerous activities, but indicates

25   that the 1994 and 1995 OCAP BiOps "provide a substantial part of

26   the necessary riverine flows and estuarine outflows that allow

27   smelt larvae to move downstream to suitable rearing

28   habitat...outside the influence of marinas, agricultural

**102**

1   diversions, and Federal and State pumping plant." (AR 371.) The

2   BiOp also explains that increasing demands for surface water

3   "would likely result in lower delta outflows and increased

4   entrainment," but that the impacts of these demands "have not

5   altered critical habitat's conservation function for the delta

6   smelt, and <u>the smelt's primary constituent elements essential to</u>

7   <u>the conservation of the species still function</u>." (*Id*.) Finally,

8   the BiOp concludes:

> In evaluating the Status of the Species for critical
> habitat and the Environmental Baseline, while there are
> current actions that result in adverse effects to delta
> smelt critical habitat, the primary constituent
> elements continue to remain functional for the smelt.
> In the effects section, the Service determined that the
> primary constituent elements of delta smelt critical
> habitat would not be affected by the proposed project
> since there will not be a loss of physical habitat in
> the delta, river flows will continue to provide
> habitat, salinity will not be affected by the proposed
> project, and no breeding habitat will be affected and
> the sustainability of the food base will not be
> affected. In the cumulative effects section, we
> determined that the cumulative effects of the proposed
> action are not expected to alter the magnitude of
> future actions' effects on critical habitat's
> conservation function for the smelt. Based on the
> analysis in these four areas, it is our conclusion that
> Critical habitat is not likely to be adversely modified
> or destroyed as a result of implementing the proposed
> project.

(AR 469 (emphasis added).)

    These conclusions are not supported by most recent smelt

data to corroborate that the primary constituent elements of

Delta smelt habitat will still function in a manner consistent

with conservation (i.e. recovery). The functions and their

locations are identified, but impacts upon breeding habitat are

not analyzed. Second, although "there will still be water in the

Delta....whether the water will be of adequate quality and

**103**

1  quantity to allow the delta smelt to recover is an entirely

2  different question." (Doc. 306 at 25.) The BiOp does not

3  analyze the water supply, temperature, and quality under variable

4  conditions with results that demonstrate the impact on smelt, nor

5  is such an analysis found elsewhere in the administrative

6  record.[35]

7     The analysis of the predicted movement of X2 is more

8  specific. When X2 is located upstream of Chipps Island, smelt

9  are vulnerable to entrainment and are located in an area that is

10 not ideal for feeding or protection. (*See* AR 424.) FWS opines

11 that smelt reproduce better when X2 remains in a specific area,

12 west of the confluence of the Sacramento and San Joaquin Rivers.

13 That smelt reproduction is increased and the fish may be located

14 where there are better sources of food does not assure that the

15 smelt are on a path to recovery. The DSRAM is to provide the

16 means by which FWS will maintain X2 in the most beneficial

17 location. As the DSRAM is uncertain, speculative, and lacking

18 enforceable action measures, there is no reasonable assurance

19 that X2 will be maintained in the necessary protective location.

20    DSRAM utilizes other trigger criteria, arguably aimed at the

21 recovery of the smelt. (Doc. 241 at 13-14.) One criteria is the

22 "recovery index trigger," derived from the September and October

23 FMWT sampling. (AR 347; Sommer Decl. at ¶9a.) The number used

24

25    [35]    There is also merit to Plaintiffs' argument that

26 "[g]iven that the very same sorts of impacts to critical habitat

have contributed to the species decline, one might expect FWS to

27 examine carefully how the continuance and magnification of these

kinds of impacts could allow for the survival of the species,

28 much less its recovery." (Doc. 306 at 5.)

to trigger the DSWG is 74, the median value of the recovery index for the 1980-2002 period.  Whenever the recovery index falls below this median, the DSWG convenes to decide whether to recommend actions.  (AR 346-47.)  Use of the term "recovery" in the title of the trigger index, suggests that this index will serve to monitor the potential for the smelt population to recover.  This title is inaccurate.  All that this trigger criteria monitors is whether the abundance of smelt drops below the 1980-2002 median abundance.  As smelt have been in decline throughout the period to February 2005, the opinion that maintaining abundance slightly above this median leads to recovery of the smelt is unjustified.

The temperature trigger criterion of 12 - 18°C, the range within which the _most_ smelt spawning occurs, is more arguably focused on recovery.  (AR 347.)  If the number of days falling within the temperature range is 39 days or less by April 15, or 50 days or less by May 1, DSWG is triggered.  This trigger is arguably related to the recovery of smelt, because it focuses on spawning.  However, no action except a group meeting is required in response to the trigger.  Moreover, maximizing the potential for smelt to spawn is only one aspect of recovery.  If Project operations and/or other impacts kill more smelt than are produced during spawning, recovery does not occur.  The existence of this trigger, alone, does not establish that recovery of smelt was adequately considered or addressed.[36]

---

[36]   The San Luis Parties correctly note that the CALSIM II models indicate that increased pumping capacity and operational flexibility may actually _increase_ the smelt's prospects vis-a-vis

**105**

**2.   The Biop Does Not Adequately Assess Impacts to All Areas of Critical Habitat.**

Plaintiffs also allege that the BiOp arbitrarily ignores impacts to certain areas of critical habitat because it focuses on X2 as a proxy for Delta smelt habitat.  Plaintiffs argue that the focus on X2 ignores other areas of designated critical habitat.

The BiOp focuses on the impact project operations have had and will have on the position of X2.  Defendants and Defendant-Intervenors argue that critical habitat will be protected, because any impacts to the position of X2 will be addressed by the DSRAM.  The State Water Contractors contend that protecting critical habitat outside X2 "makes no sense if they are not the areas in which the fish resides."  (Doc. 241 at 17.)

Plaintiffs do not dispute the notion that X2 directly relates to where most smelt are located.  Rather, Plaintiffs maintain that critical habitat is not coextensive with X2.  The BiOp identifies numerous areas in which smelt occur (AR 362) and acknowledges that X2 "does not necessarily regulate smelt distribution in all years." (*Id.*)  Delta smelt critical habitat is defined by physical boundaries:

> California--Areas of all water and all submerged lands below ordinary high water and the entire water column bounded by and contained in Suisun Bay (including the contiguous Grizzly and Honker Bays); the length of Montezuma Slough; and the existing contiguous waters contained within the Delta, as defined by section 12220, of the State of California's Water Code of 1969 (a complex of bays, dead-end sloughs, channels

the regulatory baseline.  However, that the species will fare better than in the past does not assure that the totality of OCAP operations are consistent with the smelt's recovery.

1    typically less than 4 meters deep, marshlands, etc.) as
2    follows:

3    Bounded by a line beginning at the Carquinez Bridge
     which crosses the Carquinez Strait; thence,
     northeasterly along the western and northern shoreline
4    of Suisun Bay, including Goodyear, Suisun, Cutoff,
     First Mallard (Spring Branch), and Montezuma Sloughs;
5    thence, upstream to the intersection of Montezuma
     Slough with the western boundary of the Delta as
6    delineated in section 12220 of the State of
     California's Water Code of 1969; thence, following the
7    boundary and including all contiguous water bodies
     contained within the statutory definition of the Delta,
8    to its intersection with the San Joaquin River at its
     confluence with Suisun Bay; thence, westerly along the
9    south shore of Suisun Bay to the Carquinez Bridge.

10   59 Fed. Reg. 65,256, 65,277 (Dec. 19, 1994).

11       Federal Defendants respond that "the agencies have developed

12   an operating and adaptive management system that adequately

13   protects the existing critical habitat, that reasonably uses X2

14   as an evaluation tool, and that also ensures that 'additional

15   measures' will be taken in accordance with the DSRAM to

16   affirmatively and proactively manage habitat, as needed."  (Doc.

17   242 at 26.)  But, apart from the X2 analyses, Federal Defendants

18   identify no other record evidence that reflects the agency

19   analyzed impacts to critical habitat or that any "additional

20   measures" will be required under DSRAM, as the DSRAM does not

21   require any measure be implemented.

22       Defendant Intervenors assert that it is unnecessarily costly

23   to accommodate impacts to all of the geographically designated

24   critical habitats because the smelt are not located in the

25   entirety of their critical habitat range all of the time.  They

26   argue the focus must be on protecting the habitat occupied by the

27   smelt.  Even if more sensible, the law requires that the agency

28   analyze whether project operations will directly or indirectly

**107**

alter critical habitat in a way that "appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." 50 C.F.R. § 402.02.  "Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." *Id*.  The statute defines critical habitat to include both "the specific areas within the geographical area occupied by the species...on which are found those physical or biological features...essential to the conservation of the species" <u>and</u> "specific areas outside the geographical area occupied by the species...upon a determination by the Secretary that such areas are essential for the conservation of the species."  16 U.S.C. § 1532(5)(A).  The definition of critical habitat is broader than the specific areas of occupation.

Here, the agency defined critical habitat to have a geographic scope.  Absent any alterations to the critical habitat designation, the agency must address in the BiOp the full extent of impacts to the currently designated critical habitat,[37] which excluded "already degraded areas."  Alternatively, the Delta

---

[37]    Plaintiffs raise an additional contention why the critical habitat analysis is insufficient; i.e., that the BiOp unlawfully "writes off" areas of critical habitat because they have already been degraded.  For example, the BiOp concludes that "[a]n upstream movement of X2 of 0.5 km would not be significant when [X2] is located upstream of the [Sacramento-San Joaquin River] confluence because <u>smelt habitat is already poor</u> and the upstream movement does not result in any substantial additional loss of habitat or increase in adverse effects."  (AR 443.)  This issue need not be reached, as the critical habitat analysis is insufficient on other grounds.  Federal Defendants are already revising the BiOp to reflect new information and new law.

smelt's critical habitat should be redefined to reflect the actual location of the smelt, if such redesignation would be consistent with law.

This has not been done.  Plaintiffs motion for summary adjudication is **GRANTED** as to this issue.


### F.   Did the BiOp Fail to Address the Impacts of the Whole Project?

#### 1.   Plaintiffs' Argument That the Biop Should Have Analyzed the Effects of Constructing the SDIP, Intertie, and FRWP.

Plaintiffs complain that the BiOp's scope is unlawfully narrow because it fails to consider all planned actions.  The BiOp includes within its formal consultation, "delivery of CVP water to the proposed Freeport Regional Water Project (FRWP)" as well as the "operation of the SWP-CVP intertie."  The BiOp designates as an early consultation issue "operations of components of the South Delta Improvement Program (SDIP)," which include "permanent barrier operations in the South Delta."  (AR 248.)  The effects of constructing the FRWP, the Intertie, and the permanent barriers are to be covered in separate formal consultations.  (AR 256, 339, 341, 421.)

The ESA requires FWS to address impacts associated with the entire agency action.  *See Conner*, 848 F. 2d at 1453-54 (holding that agency violated ESA by choosing not to analyze the effects of all stages of oil and gas activity on federal lands). According to ESA regulations, the effects of an agency action include "direct and indirect effects of an action on the species or critical habitat, together with the effects of other

**109**

activities that are interrelated or interdependent with that

action, that will be added to the environmental baseline." 50

C.F.R. § 402.02.  "The meaning of 'agency action' is determined

as a matter of law by the Court, not by the agency." *Greenpeace*

*II*, 80 F. Supp. 2d at 1146 (citing *Pacific Rivers Council v.*

*Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994).)

The BiOp explains its approach to scope as follows:

> The proposed action is to continue to operate the CVP
> and SWP in a coordinated manner. In addition to current
> day operations, several future actions are to be
> included in this consultation. These actions are: (1)
> increased flows in the Trinity River, (2) 8500 Banks,
> (3) permanent barriers operated in the South Delta, (4)
> an intertie between the California Aqueduct (CA) and
> the Delta-Mendota Canal (DMC), (5) a long-term EWA, (6)
> delivery of CVP water to the FRWP, and (7) various
> operational changes that are identified in this project
> description. Some of these items will be part of early
> consultation including 8500 Banks, permanent barriers
> and the long-term EWA. These proposed actions will come
> online at various times in the future. Thus, the
> proposed action is continued operation of the Project
> without these actions, and operations as they come
> online.
>
> The actions listed in the preceding paragraph are not
> being implemented at present; however, they are part of
> the future proposed action on which Reclamation is
> consulting. Only the operations associated with the
> proposed activities are addressed in this consultation;
> i.e., the activities do not include construction of any
> facilities to implement the actions. All site
> specific/localized activities of the actions such as
> construction/screening and any other site specific
> effects will be addressed in separate action specific
> section 7 consultations.

(AR at 256 (emphasis added).)  In sum, only those aspects of the

2004 OCAP that will be implemented without further approval were

the subject of formal consultation.  However, certain other

changes that will be effectuated in the future were the subject

of early consultation.  With respect to future operational

changes, including some subject to formal consultation, full

implementation will require the construction of specified

facilities.   The impact of the construction activities themselves

will be the subject of separate § 7 consultation.

Plaintiffs argue that the BiOp should have addressed the

full impacts of construction of the Intertie, Freport diversion,

and the SDIP because those projects are within the scope of the

agency action as a whole and are "interrelated and

interdependent" with the 2004 OCAP.[38]

In response, Federal Defendants cite the Endangered Species

Consultation Handbook, which explains, in a hypothetical example,

that operation of an existing dam project need not be considered

an interrelated or interdependent activity, where the agency

action being evaluated in a biological opinion was the addition

---

[38]   The San Luis Parties cite *Gifford Pinchot* in support of
the proposition that this is a properly "tiered" biological
opinion.   *In Gifford Pinchot*, the Ninth Circuit approved for the
the tiering of a biological opinion for timber harvests in
specified forest areas.   The no jeopardy conclusion contained in
that biological opinion relied on compliance with a very
thorough, overarching forest management plan that was previously
approved by the court.   378 F.3d at 1067-68.   *Gifford Pinchot*
allowed the agency to tier its BiOp of a timber harvest with a
programmatic forest management plan that provided guidelines
regarding the harvesting of timber.   *Rodgers*, 381 F. Supp. 2d at
1228 n.27, interpreted the holding narrowly to apply tiering only
to cases in which the programmatic opinion was particularly
thorough.   Tiering of future construction projects is not
appropriate here, because the BiOp provides no programmatic
guidelines regarding construction activities.   However, just
because the later projects cannot be "tiered" off the current
BiOp does not mean they must be included in the current BiOp.
The relevant inquiry is whether the construction projects are
interrelated to and/or interdependent upon the BiOp and the 2004
OCAP.

of a new turbine to an existing dam.[39]   (Handbook at 4-25 to

4-29.)  Although not cited by the Federal Defendants for this

purpose, the Handbook also describes a general approach FWS

should use when determining whether certain actions are

"interrelated or interdependent," so as to be considered part of

the action:

> Interrelated and interdependent actions: Effects of the
> action under consultation are analyzed together with
> the effects of other activities that are interrelated
> to, or interdependent with, that action. An
> interrelated activity is an activity that is part of
> the proposed action and depends on the proposed action
> for its justification. An interdependent activity is an
> activity that has no independent utility apart from the
> action under consultation. (Note: the regulations refer
> to the action under consultation as the "larger action"
> [50 CFR § 402.02])....
>
> As a practical matter, the analysis of whether other
> activities are interrelated to, or interdependent with,
> the proposed action under consultation should be
> conducted by applying a "but for" test.  <u>The biologist
> should ask whether another activity in question would
> occur "but for" the proposed action under consultation</u>.
> If the answer is "no," that the activity in question
> would not occur but for the proposed action, then the
> activity is interrelated or interdependent and should
> be analyzed with the effects of the action. If the
> answer is "yes," that the activity in question would
> occur regardless of the proposed action under
> consultation, then the activity is not interdependent
> or interrelated and would not be analyzed with the
> effects of the action under consultation. There will be
> times when the answer to this question will not be
> apparent on its face. The biologist should ask
> follow-up questions to the relevant parties to
> determine the relationship of the activity to the
> proposed action under consultation. It is important to

---

[39]   Federal Defendants correctly point out that the FWS
uses as a guidance document the ESA Section 7 Consultation
Handbook (March 1998), available at "http://www.fws.gov/
endangered/consultations/s7hndbk/s7hndbk.htm" (last visited Apr.
27, 2006).  *See e.g., Oregon Natural Res. Council v.* Allen, 476
F.3d 1031, 1039 n.7 (9th Cir. 2007); Ariz. *Cattle Growers' Ass'n
v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001); .

remember that interrelated or interdependent activities are measured against the proposed action. That is, the relevant inquiry is whether the activity in question should be analyzed with the effects of the action under consultation because it is interrelated to, or interdependent with, the proposed action. Be careful not to reverse the analysis by analyzing the relationship of the proposed action against the other activity. For example, as cited below, if the proposed action is the addition of a second turbine to an existing dam, the question is whether the dam (the other activity) is interrelated to or interdependent with the proposed action (the addition of the turbine), not the reverse.

Section 7 Handbook at 4-26.

Here, applying the Handbook test, the question is whether the other activities (construction and operation of SDIP, Freeport, and the Intertie) are interrelated to or interdependent with the proposed actions subject to formal consultation?  The formal consultation, as described in the BiOp, covers

...the proposed 2020 operations of the CVP including the Trinity River Mainstem ROD (Trinity ROD) flows on the Trinity River, the increased water demands on the American River, the delivery of CVP water to the proposed Freeport Regional Water Project (FRWP), water transfers, the long term Environmental Water Account (EWA), the operation of the Tracy Fish Facility, and the operation of the SWP-CVP intertie. The effects of operations of the SWP are also included in this opinion and include the operations of the North Bay Aqueduct, the Suisun Marsh Salinity Control Gates, the Skinner Fish Facility and water transfers.

(AR 248 (emphasis added).)  The formal consultation admittedly covers delivery of CVP water to the proposed FRWP and operation of the Intertie.  But, the BiOp expressly excludes the impacts of construction associated with FRWP or the Intertie:

The actions listed in the preceding paragraph [including permanent barriers in the South Delta, an intertie, and the FRWP] are not being implemented at present; however, they are part of the future proposed action on which Reclamation is consulting. Only the operations associated with the proposed activities are

113

<u>addressed in this consultation; i.e., the activities do</u>
<u>not include construction of any facilities to implement</u>
<u>the actions</u>. All site specific/localized activities of
the actions such as construction/screening and any
other site specific effects will be addressed in
separate action specific section 7 consultations.

(AR 256 (emphasis added).)

Is there a "but-for" relationship between the 2004 OCAP and the new projects? The FRWP and the Intertie are designed to more effectively distribute CVP and SWP waters. There is no evidence in the record indicating that construction of either project is tied in any way to the pre-approval of delivery of water to the projects. Flow operations could be approved <u>after</u> or simultaneously with the approval of new construction. Under the Handbook test, the construction projects are not considered interdependent and interrelated. These projects may be consulted upon separately. By approving a flow regime before the construction, the Bureau may plann for the <u>possibility</u> that the FRWP will be constructed in the future. The entire OCAP BiOp would not need to be revised should the projects be constructed. This is a reasonable approach.

With respect to the SDIP, the BiOp currently excludes <u>both</u> its operation and related construction coverage under the formal consultation. Plaintiffs allege that <u>both</u> should have been covered by the BiOp because they are interrelated with or interdependent on the agency action. Applying the Handbook analysis, the operation and construction of the SDIP (which includes increased pumping at Banks and operation of permanent barriers) will not occur "but for" the approval of the 2004 OCAP for CVP-SWP operations? Each action is independent of the 2004

**114**

OCAP.  The SDIP is a separate addition that may or may not be constructed.  Project operations under the 2004 OCAP in no way depend upon the SDIP.  There is no prohibition to addressing the future operation, if and when the construction of the SDIP will occur, in a separate consultation.

Plaintiffs' motion for summary adjudication is **DENIED** as to the future projects issue.

## 2.   Plaintiffs' Argument that the BiOp Failed to Analyze the Impact of Full Contract Deliveries.

A biological opinion must consider the effects of the entire agency action, meaning "all activities or programs of any kind authorized, funded, or carried out," including "the granting of...contracts."  50 C.F.R. § 402.02.  One of the primary purposes of the 2004 OCAP is to "deliver water supplies to affected water rights holders as well as project contractors." (AR 259.)  The Bureau delivers water to numerous parties pursuant to long-term contracts ("CVP Contracts"), some of which were renewed shortly after the BiOp was issued.  (AR 4732, 4796, 4855.)

The CALSIM II model incorporated water deliveries into its various flow scenarios, but only performed its analysis based on the effects of delivering between 11 and 89 percent of the full CVP Contract allocations.  (*See* AR 1067; see also Doc. 242 at 31 (acknowledging that the agency "did not evaluate the impacts of 100% percent delivery of all contracted waters").)  This range of delivery scenarios is based on historic average water deliveries.

Plaintiffs allege that, by failing to evaluate the impact of delivering full amount (100%) of contracted water, the BiOp

**115**

violates the requirement that the it evaluate the entire agency action.  Plaintiffs cite *Rodgers*, 381 F. Supp. 2d at 1237-40, which examined a biological opinion approving long term water contracts in the Friant, Buchanan, and Hidden water units of the CVP.  The BiOp only examined the impacts of the amount of historical water deliveries, which amounted to less than half of the water deliveries authorized under the long term water service contracts.  *Id*. at 1237-28.

> The Friant long-term contracts cumulatively authorized the Bureau to deliver more than 2.1 million acre-feet of water per year, for twenty-five years. Rather than analyzing the effects of 2.1 million acre-feet of water delivery, FWS explained that its "effects analysis is conducted under the expectation that water will be delivered to CVP service contractors in quantities that approximate historic deliveries (1988 through 1997), as given in Appendix D of the November 21, 2000 programmatic long-term CVP contracts consultation." This assumption was made, the BiOp explained, because "delivery of full contract quantities is unrealistic."

*Id*. at 1238.  *Rodgers* rejected FWS's approach, reasoning that the "ESA requires that all impacts of agency action-both present and future effects-be addressed in the consultation's jeopardy analysis."

> The fact that it was thought by FWS that "delivery of full contract quantities is unrealistic" and that "deliveries continue to be impacted by existing climate, hydrology, actions and statutes, ... socio-economic factors" does not excuse consulting on the "entire agency action," which was the authorized delivery of over 2.1 million acre-feet of water, and nothing less than that.

*Id*. at 1239.

Federal defendants assert that the *Rodgers* decision was wrong, arguing that "[a]bsent alternative information that the agency failed to consider, and given the fact that the agency did

1   use the best available information, the *Rodgers* court should have

2   deferred to the agency." (Doc. 242 at 32.)  It is not the

3   province of another district court to decide whether *Rodgers* is

4   "wrong."  *Rodgers* is distinguishable as it specifically addressed

5   the government authorization of CVP water users' long-term water

6   service contracts.  Those contracts authorized 2.1 MAF of water

7   deliveries in total.  *Rodgers* found unlawful the biological

8   opinion's limitation in its scope to approximate historic

9   deliveries, instead of the full contract allocations.  Here,

10  however, the agency action subject to consultation is not the

11  authorization or merits of the water service contracts, rather,

12  it is the <u>operation</u> of the CVP and SWP under the OCAP and whether

13  those projected operations will cause jeopardy to the survival

14  and recovery of smelt or smelt habitat.  The government is

15  entitled to make <u>reasonable</u> assumptions about the operational

16  volume of water flows, water levels, temperature, and quality

17  based on the historical and projected data in the administrative

18  record.  The BiOp explains that the delivery of full water

19  service contract entitlements is expected only when excess water

20  conditions exist, i.e., in a wet water year when sufficient water

21  is available to meet all beneficial needs. (AR 259.)  Plaintiffs

22  do not suggest that this assumption is factually impossible.

23  (Nor would it be unreasonable for FWS to model a full (100%)

24  water contract delivery scenario, even if it has not happened in

25  the past fifteen years.)  The agency model for the worst case

26  scenario is indispensable.  Analysis of a "best of the best" case

27  in a wet water year is not indispensable, as such "wet" water

28  year conditions do not present any reasonable likelihood of

**117**

jeopardy, absent an additional showing.  However, because such a scenario could eventuate, it is not unlawful for the agency to analyze the effects on the smelt of 100% water contract deliveries.  However, the 100% delivery analysis is not required. This is a matter committed to the agency's expertise and discretion.

Plaintiffs motion for summary adjudication is **DENIED** as to this issue.

### VIII.   <u>CONCLUSION</u>

As the history of the many CVP water cases decided in this court evidences, the duty to defer to the agency's expertise is well recognized and honored, when the agency has acted reasonably and lawfully to discharge its statutory responsibilities.  The disputed BiOp depends in material measure for its no jeopardy finding on the DSRAM, which is legally insufficient.  The agency's recognition the Delta smelt is increasingly in jeopardy; that its operative BiOp is inadequate, as evidenced by its second initiation of reconsultation for the 2004 OCAP, now pending, and its insistence that it will nonetheless operate the Projects under the challenged BiOp is unreasonable.  The agency could have, but did not, offer a viable protective alternative. Adaptive management is within the agency's discretion to choose and employ, however, the absence of any definite, certain, or enforceable criteria or standards make its use arbitrary and capricious under the totality of the circumstances.

The agency's failure to reasonably estimate the Delta smelt population and to analyze most recent smelt abundance data make

**118**

the take limits based on historical data unreliable and
unreasonable.  The Delta smelt is undisputedly in jeopardy as to
its survival and recovery.  The 2005 BiOp's no jeopardy finding
is arbitrary, capricious, and contrary to law.

   For all the reasons set forth above, the 2005 OCAP BiOp is
unlawful and inadequate on the following grounds:

   (1)   The DSRAM, as currently structured, does not provide a
         reasonable degree of certainty that mitigation actions
         will take place, even if the agency retains the
         discretion to draw upon numerous sources of water, not
         just the EWA, CVPIA(b)(2), and VAMP programs, to
         support fish protection.

   (2)   The agency failed to utilize the best available
         scientific information by not addressing the 2004 FMWT
         data and the issue of climate change.

   (3)   The BiOp's historical approach to setting take limits
         fails to consider take in the context of most recent
         overall species abundance and jeopardy.

   (4)   The BiOp did not adequately consider impacts to
         critical habitat by (a) failing to analyze how project
         operations will impact the value of critical habitat
         for the recovery of the smelt and (b) failing to
         consider impacts upon the entire extent of known smelt
         critical habitat.

   The Plaintiffs' motions for summary judgment are GRANTED IN
PART AND DENIED IN PART, as delineated above.

   Based on the legally flawed BiOp, an appropriate interim

**119**

1  remedy must be implemented.  All parties agree that it is not

2  prudent to impose a remedy without further input from the

3  parties.  A separate remedies hearing will be scheduled within

4  thirty days at the parties' mutual convenience.[40]  During oral

5  argument, Federal Defendants and Defendant-Intervenors jointly

6  requested a stay of any order finding the BiOp unlawful to avoid

7  the draconian consequences of operating the CVP-SWP without a

8  lawful take limit.  Affording all parties the opportunity to

9  participate in a remedies hearing will not jeopardize the species

10 or the public interest during interim operation of the projects.

11 Plaintiffs did not object to such an approach.

12      A Scheduling Conference is set for May 30, 2007, at 8:45

13 a.m. in Courtroom 3 to afford the parties time for discussions to

14 set a remedies hearing, and to consider the entry of a stay, if

15 necessary.

16      Plaintiffs shall submit a form of order on the motions for

17 summary judgment consistent with this decision within five (5)

18 days following service of this decision.

19

20 IT IS SO ORDERED.

21 **Dated:    May 25, 2007**                    **/s/ Oliver W. Wanger**
                                            UNITED STATES DISTRICT JUDGE

22

23

24

25

26 _____

27      [40]    The parties stated that they may be able to reach an
   agreement as to interim remedies, avoiding the need for a
28 remedies hearing.

**120**