1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

9  NATURAL RESOURCES DEFENSE        )    1:05-cv-1207 OWW TAG
   COUNCIL, et al.,                 )
10                                  )    FINDINGS OF FACT AND
              Plaintiffs,           )    CONCLUSIONS OF LAW RE:
11                                  )    PLAINTIFFS' MOTION FOR A
        v.                          )    TEMPORARY RESTRAINING ORDER
12                                  )    AND PRELIMINARY INJUNCTION
   DIRK KEMPTHORNE, in his official )
13 capacity as Secretary of the     )
   Interior; and H. DALE HALL, in   )
14 his official capacity as         )
   Director, U.S. Fish and Wildlife )
15 Service,                         )
                                    )
16            Defendants,           )
                                    )
17 _____ )
                                    )
18 SAN LUIS & DELTA-MENDOTA WATER   )
   AUTHORITY, WESTLANDS WATER       )
19 DISTRICT, CALIFORNIA FARM BUREAU )
   FEDERATION, GLENN COLUSA         )
   IRRIGATION DISTRICT, et al.,     )
20 CALIFORNIA DEPARTMENT OF WATER    )
   RESOURCES, STATE WATER           )
21 CONTRACTORS, KERN COUNTY WATER    )
   AGENCY,                          )
22                                  )
              Defendant-Intervenors.)
23                                  )
   _____ )
24

25

26       On June 22, 2007, the Court held an expedited hearing to

27 consider the Plaintiffs' Motion for Temporary Restraining Order

28 and Preliminary Injunction, Docket Number 343 (filed June 19,

                              1

1  2007).

2       Plaintiff, Natural Resources Defense Council, was
3  represented by attorneys Katherine Poole, Esq., and Earth Justice
4  was represented by Andrea A. Treece, Esq., and Trent W. Orr, Esq.
5  Defendant Dirk Kempthorne, in his official capacity as Secretary
6  of the Interior, and Defendant Steven A. Williams, in his
7  official capacity as Director, U.S. Fish & Wildlife Service, were
8  represented by James A. Maysonette, Esq., Trial Attorney, U.S.
9  Department of Justice.  Defendant-Intervenors, San Luis & Delta-
10  Mendota Water Authority and Westlands Water District, were
11  represented by Kronick, Moskovitz, Tiedemann & Girard by Daniel
12  J. O'Hanlon, Esq.; Defendant-Intervenor, California Farm Bureau
13  Federation, was represented by Christian C. Scheuring, Esq.,
14  Brenda Washington Davis, Esq.; Defendant Glen-Colusa Irrigation
15  District, et al., were represented by Somach, Simmons & Dunn by
16  Andrew J. Hitchings, Esq., and Jackie McDonald, Esq.  The
17  California Department of Water Resources was represented by
18  Deputy Attorneys General Clifford J. Lee, Esq., and Deborah
19  Wordham, Esq.  Defendant State Water Contractors were represented
20  by Best, Best & Krieger, LLP, by Gregory K. Wilkinson, Esq.

21       The parties submitted Memoranda of Law, Declarations under
22  penalty of perjury of witnesses, and various exhibits in support
23  of and opposition to the application for injunctive relief.  No
24  oral testimony was presented.  The Court considered all such
25  submissions, the oral arguments of counsel and after full
26  consideration, announced an oral statement of decision to be
27  confirmed by written Findings of Fact and Conclusions of Law.
28  ///

1    ## FINDINGS OF FACT

2    __Jeopardy to the Delta Smelt__.

3        1.    The Declaration of Christina Swanson, Ph.D., shows an
4    alarming drop in the abundance of Delta smelt, a listed
5    threatened species indigenous to the Sacramento-San Joaquin Delta
6    of California.  She declares that "for an annual species such as
7    Delta smelt, failure to recruit a new year-class is an urgent
8    indicator that the species has become critically imperiled and an
9    emergency response is warranted."

10       2.    The Delta Smelt Working Group ("DSWG"), a group of
11   fishery biologists representing all concerned state and federal
12   agencies responsible for protection of species under the
13   Endangered Species Act ("ESA"), as of May 15, 2007, recommended
14   that the Water Operations Management Team (WOMT) implement two
15   actions: (1) a goal of "no further entrainment of Delta smelt" at
16   the state and federal pumps in the Delta; and (2) modifications
17   to the Projects' operations "to achieve a non-negative daily flow
18   (meaning daily net flow should not be southward) in the Old and
19   Middle Sacramento River . . . [to] be implemented as soon as
20   possible and continue until Southern Delta water temperatures
21   reach 25°C, the lab-lethal limit [ ]" to Delta smelt.

22       3.    On May 25, 2007, the Court found, in a Memorandum
23   Decision concerning Plaintiffs' challenge to the 2005 OCAP
24   Biological Opinion, that "the 2005 OCAP BiOp is unlawful and
25   inadequate," in part because "[t]he DSRAM, as currently
26   structured, does not provide a reasonable degree of certainty
27   that mitigation measures will take place."  The Court found that
28   existing take limits established by the BiOp are inadequate to

**3**

1 protect the species; that the DSRAM must be made more certain and
2 enforceable; that the BiOp did not use the best available
3 science; failed to adequately define and address the impacts of
4 joint Project operations on continued survival of the Delta
5 smelt; and failed to adequately consider impacts to critical
6 habitat.  The Court further found that the BiOp's no jeopardy
7 finding was arbitrary, capricious, and without rational
8 connection to the status of the species.

9     4.   The Court's decision on the 2005 OCAP BiOp and the
10 parties' agreement in open court at the June 22, 2007, TRO
11 hearing, confirms that the Delta smelt is indisputably in
12 jeopardy as to its survival and recovery.  The parties do not
13 agree about the imminency of that threat of extinction and
14 whether the DSWG recommendations to reduce pumping are necessary
15 and effective to protect the species from extinction.

16

17 The Government's Response.

18     5.   Commencing May 31, 2007, the State of California
19 Department of Water Resources ("DWR"), operator of the State
20 Water Project, and the United States Bureau of Reclamation
21 ("Bureau"), operator of the Central Valley Project ("CVP"),
22 implemented a reduction in pumping at the state and federal
23 pumps, which export water south of the Delta to irrigation
24 districts, municipal and industrial users, and other state and
25 federal water contractors, who in turn supply water to
26 approximately 20 million people.

27     6.   The pumps remained at minimum operating output for
28 approximately 10 days.  Pumping resumed around June 10, 2007, and

4

1 | has been ramped upward toward historic operating levels, in the
2 | 2,500 to 3,500 per cubic feet per second (cfs) range, which is
3 | normal for the critical water delivery months of June and July.

4 | 7.    Following June 10 and the increase in the rate of
5 | pumping, 468 Delta smelt were taken at the state pumps between
6 | June 10, 2007, and June 18, 2007, and 61 Delta smelt were taken
7 | at the federal pumps between June 13, 2007, and June 18, 2007.
8 | (Ex. 9, ¶2, Ex. 10 at 3).

9 | 8.    Plaintiffs assert that collectively, state and federal
10 | pumps killed more than ten times the number of Delta smelt
11 | between June 10 and June 18 than the California Department of
12 | Fish & Game was able to locate in the entire Delta during the
13 | spring of 2007.

14 | 9.    During the operation at minimum safe pumping levels,
15 | around 850 cfs, no entrainment of smelt were reported at the
16 | state or federal pumping facilities.

17 | 10.    In addition to reducing pumping to minimum safe levels
18 | for the approximately 10 day period from May 31 to June 10, the
19 | Federal Defendants have purchased approximately 5.2 million
20 | dollars worth of water to enhance fish protection flows.

21 | 11.    The parties acknowledge two identified trawl surveys
22 | are reliable and that the most recent survey for juvenile delta
23 | smelt, the California Department of Fish and Game's 20 mm survey
24 | (completed June 9, 2007), indicates that the population of the
25 | delta smelt seems to be located mostly in the north or west areas
26 | of the Delta in Suisun Bay and not in the areas immediately
27 | surrounding the CVP and SWP pumps.    (Docket No. 339, Ex. 2).

28 | 12.    Presently, the evidence in the record is not sufficient

1  to resolve certain scientific questions relating to the water

2  temperature in the south and central Delta near the location of

3  the pumps and its effect on the Delta smelt.

4      13.   To offset the drastic reduction in pumping, the Bureau

5  has taken water from the New Melones River to augment Sacramento

6  River flows and has drawn down the San Luis Reservoir to the

7  point where continued pumping at minimum safe levels, 850 cfs,

8  will exhaust the capacity of that reservoir within approximately

9  18 days.

10      14.   When the Bureau is temporarily unable, for any reason,

11  to deliver State Contractors substitute water from the Delta-

12  Mendota Canal or other sources, water is to be delivered from the

13  San Joaquin River according to the Exchange Contract.   (Exhibit A

14  to White Decl. ¶4).

15      15.   Given the amount of storage in Millerton Lake, a call

16  by the Exchange Contractors this summer on Friant Division Water

17  will result in almost the entire amount of storage being

18  dedicated to the requirements of the Exchange Contracting

19  Purchase Agreement.   (White Decl. ¶5).

20      16.   If the Bureau makes a call on Friant under the

21  temporary inability provisions of the Exchange Contract, such

22  releases from Millerton Lake must first re-water the San Joaquin

23  River, which will result in significant water losses through the

24  re-watering process of the dry river bed, approximating 70,000

25  acre-feet.   (White Decl. ¶8).

26      17.   If a call was made on Friant Water, such water would be

27  insufficient to meet Exchange Contractors' demands through the

28  remainder of the summer months.   (White Decl. ¶9).

1    <u>Relief Sought</u>.

2        18.    The Plaintiffs seek, and all Defendants oppose, a

3    temporary restraining order and preliminary injunction in the

4    following form:

5            NOW THEREFORE, good cause appearing, the Court grants
             Plaintiffs' motion.   THE COURT HEREBY ORDERS Federal
6            Defendants and Intervenor-Defendant California
             Department of Water Resources to implement immediately
7            and fully all recommendations of the Delta Smelt
             Working Group.   This order shall remain in effect until
8            the Court issues its remedy order, or until other order
             of the Court.

9

10        19.    To assess the irreparability and immediacy of injury

11   and the balance of hardships, additional facts provided by all

12   Defendants, were considered, but to which Plaintiffs did not have

13   the opportunity to respond due to the expedited hearing which

14   gave the court less than 24 hours to consider.

15        20.    Throughout the critical period of the weeks leading to

16   the June 22 hearing, the Bureau worked closely with state and

17   federal wildlife and water management agencies to monitor the

18   effects of CVP operations on the Delta smelt.   A preliminary

19   report was filed by the Bureau with the Court May 31, 2007.

20        21.    The DSWG has met frequently, made several sets of

21   recommendations to the WOMT, and the WOMT has reviewed those

22   recommendations and implemented some operational changes.

23        22.    Counsel for the Federal Defendants have been in

24   continuous communication with counsel for Plaintiffs to discuss

25   the status of Delta smelt and CVP operations.

26        23.    An initial step implemented by the WOMT was to reduce

27   combined exports from the CVP and SWP to 1,200 cfs, which

28   represents 850 cfs at the CVP and 350 cfs at the SWP around May

                                   7

1   15, 2007.

2       24.  The 850 cfs export level is the minimum water flow

3   necessary to avoid health and safety issues for municipal users

4   and keep the federal pumps operative and mechanically functional.

5       25.  Normal export operations for the Projects during the

6   month of June are between 3,000 cfs and 3,500 cfs.  (Milligan

7   Decl. ¶4.)

8       26.  The Bureau limited pumping at its Jones Pumping Plant

9   to 850 cfs from May 15 until June 12.

10      27.  Based on the WOMT's decision, the DWR initiated removal

11  of the Head of Old River barrier ("HORB") on May 15, 2007, and

12  opened all six of the culverts on the HORB on May 16, 2007.

13  (WOMT summary, May 22, 2007).

14      28.  The Bureau endeavored to operate the Projects to have

15  "no net effect," but further reduction in pumping with only one

16  pump in operation at the Jones Plant by "cycling" the pump on and

17  off, could cause significant damage to the pump itself, which

18  would result in the pump going out of service for a year to

19  rewind the pump.  (Milligan Decl. ¶10.)

20      29.  The Bureau attempted to offset diversions at Jones

21  Pumping Plant with additional releases to the tributaries of the

22  San Joaquin River.  (Gude Decl. ¶4.)

23      30.  Higher releases from New Melones Reservoir on the

24  Stanislaus River were made to increase flows on the San Joaquin

25  River.  (Milligan Decl. ¶8.)

26      31.  The Bureau later ramped-down flows on the Stanislaus

27  River to provide a cue to juvenile fall run Chinook salmon (not

28  listed) and listed Steelhead to "out-migrate" before water

**8**

1  temperatures in the Delta reached lethal levels.   (Oppenheim
2  Decl. ¶5.)

3      32.   Additional water was released from other San Joaquin
4  River tributaries to compensate for those reduced flows.
5  (Milligan Decl. ¶3.)

6      33.   The Bureau and the WOMT opined that "it was probably
7  not possible to achieve no negative flows on the Old and Middle
8  Rivers, even if the pumps were shut down entirely due to
9  increasing local diversions, tides, and other factors."
10  (Milligan Decl. ¶12.)

11     34.   To attempt to maintain Old and Middle River flows
12  greater than or equal to zero, the Bureau operated one pump unit
13  only at the Jones Plant to maintain supplies to the City of Tracy
14  and agricultural users upstream of the O'Neill Pumps."   (WOMT
15  meeting notes May 29, 2007).

16     35.   In late May the DSWG recommended the Delta Cross
17  Channel ("DCC") gates be opened to reduce entrainment risk for
18  Delta smelt.   (DSWG meeting notes June 4, 2007).

19     36.   The WOMT agreed to open the gates, but a few days later
20  concluded that it was appropriate to close the gates for several
21  days for "water quality protection," a competing priority.   (WOMT
22  meeting notes May 25 and 29, 2007).

23     37.   The WOMT then cycled the gates open and closed based on
24  WOMT advice and opinion that "(1) closing the DCC gates would
25  likely have only minimal benefit to smelt; (2) adverse impacts to
26  emigrating Sacramento Basin Salmonids, and (3) potential
27  violations of water quality standards/objectives."   (WOMT
28  Decision May 31, 2007) (reaffirmed June 5, 2007).

9

1        38.   On June 4, 2007, the DSWG advised the WOMT that further

2   reoperation of the DCC gates will not likely have a beneficial

3   affect on the risk of entrainment of Delta smelt.   (DSWG meeting

4   notes June 4, 2007).   DSWG acknowledged that WOMT took the DSWG

5   recommendation seriously, properly weighed other important

6   factors, including water quality and potential harm to salmonids

7   emigrating from the Sacramento tributaries.   (DSWG meeting notes

8   June 4, 2007).

9        39.   The WOMT concluded it properly recommended opening the

10  DCC gates, even though the benefits to the Delta smelt were "very

11  small" and uncertain and even though doing so could harm listed

12  salmon, because its recommendation was based <u>solely</u> on the

13  potential impacts of Project operations on Delta smelt."   (DSWG

14  meeting notes June 4, 2007).

15       40.   The Bureau increased pumping June 13, 2007 at the Jones

16  Plant from 850 cfs to 2,500 cfs, (Olah Decl. ¶2), after carefully

17  evaluating potential effect on Delta smelt.

18       41.   "Particle tracking" models were used to determine how

19  increased pumping would affect smelt, because Delta smelt are in

20  a state of development where they are unable to swim

21  independently of the movement of water and behave like particles

22  in the water column.   (Olah Decl. ¶2).

23       42.   Models showed that when pumping at DWR and CVP pumps

24  was increased to 2,500 cfs, Delta smelt located in the mainstem

25  of the Sacramento River and in the north Delta did not end up at

26  export facilities and did not face increased risk of entrainment.

27  Instead, the smelt continued downstream or remained in the Delta.

28  (Olah Decl. ¶4).

43.   Only a very low proportion of the Delta smelt located in the Central Delta ended up at the export facilities.   (Olah Decl. ¶4).   From this, Federal Defendants concluded that Delta smelt were mostly located in the north Delta, on the mainstream of the Sacramento River, or were already downstream of the confluence of the Sacramento and San Joaquin Rivers.   (Olah Decl. ¶5).

44.   For this reason, the increase in pumping was not expected to significantly increase the number of smelt being taken at the pumps.   Actual experience was to the contrary June 13-19.

45.   The USFWS and the DSWG reviewed these models.   The USFWS agreed with the Bureau's conclusion there should be no significant adverse effects to current population of juvenile Delta smelt from increasing combined diversions (export pumping) of the SWP and CVP to approximately 2,500 cfs.   (Olah Decl. ¶¶2, 3, 5).

46.   The DSWG concluded that the "[r]esults of salvage monitoring, recent surveys and particle modeling . . . indicate that most juvenile Delta smelt are outside the entrainment footprint . . . ."   (DSWG meeting notes June 11, 2007).

47.   As of June 10, 2007, the DSWG found it was appropriate for the Projects to increase export pumping to 2,500 cfs combined.   *Id.*

48.   The DSWG cautioned, however, that "[i]f any Delta smelt are taken at the export facilities, Project operations should immediately be modified to achieve a net flow in Old and Middle Rivers as close to zero as possible . . . ."   *Id.*

1       **49.  On June 12, 2007, the DSWG recommended that "water**

2 **project operations be modified to maintain non-negative daily net**

3 **flow" because some Delta smelt had been taken at the pumps at the**

4 **SWP, although the DSWG was uncertain whether the smelt had been**

5 **drawn in from the Delta, or were already resident in the Clifton**

6 **Forebay.**

7       **50.  The Bureau nonetheless concluded it was appropriate to**

8 **increase pumping to approximately 2,500 cfs commencing June 13,**

9 **2007.  (2d Milligan Decl. ¶2).**

10       **51.  The Bureau's decision was based on its models and**

11 **additional factors including: (1) there had been no "take" of**

12 **Delta smelt at Jones Pumping Plant from May 30 to June 13,**

13 **although approximately nine smelt were taken at the Jones Plant**

14 **by the time of the June 19 hearing; (2) current surveys did not**

15 **find any Delta smelt in the southern Delta; and (3) demands for**

16 **water in the Central Valley were increasing and significant**

17 **rationing would be required if diversions were not increased.**

18 **(2d Milligan Decl. ¶2(a)-(f)).**

19       **52.  By June 13, 2007, the Bureau increased diversions at**

20 **the Jones Plant from 850 cfs to 2,500 cfs.  (2d Gude Decl. ¶3).**

21       **53.  As of the hearing date, temperatures in the Delta were**

22 **rising near or above 100°F.  (2d Gude Decl. ¶4).**

23       **54.  As a result, water temperatures in the Delta were**

24 **rising.  (2d Gude Decl. ¶4).**

25       **55.  Once water temperatures reach 25°C, a temperature that**

26 **is lethal for Delta smelt under laboratory conditions, any smelt**

27 **remaining in the South Delta are not expected to survive, whether**

28 **entrained at the pumps or not.  (2d Gude Decl. ¶6).**

56.  The DSWG modified its recommendation that "non-negative flows" on the Old and Middle River be maintained only until "southern Delta water temperatures reach 25°C, the lab-lethal limit."  (2d Gude Decl. ¶¶3, 4) (Briefing Statement, DSWG May 15, 2007).

57.  On June 18, 2007, the average water temperature at relevant monitoring stations reached 25°C.  (3rd Milligan Decl. ¶3).

58.  At the hearing, the Plaintiffs offered evidence that the temperature also fell in the days immediately prior to the June 19 hearing, and that average temperatures in the Delta were ranging between approximately 24°C to 26°C.

59.  As the Delta moves from spring to neap tide, average depth in the south Delta waterway is reduced and those waterways will experience more rapid rise in water temperature.  (2d Gude Decl. ¶5).

60.  As of June 19, 2007, the Bureau opined that Delta water temperature conditions are such that any Delta smelt remaining in waters near the federal and state pumps are not expected to survive, regardless of entrainment.

61.  Following June 13, 2007, increased exports at the SWP and CVP pumps, "take" of Delta smelt occurred exceeding 300 smelt.  (DSWG meeting notes June 18, 2007).

62.  As of June 19, 2007, the DSWG continues to believe that, despite high water temperatures, "Delta smelt currently being salvaged could still be valuable to the population as a whole and exports should be curtailed."  (DSWG meeting notes June 18, 2007).

1  63.   The parties agree that salvage results in the death of
2  Delta smelt in all cases.

3  64.   The DSWG recommendation for curtailing export would
4  expire, "if no further salvage occurred" because "[h]istoric
5  salvage patterns . . . indicate that salvage is likely near
6  conclusion for the water year."   (DSWG meeting notes June 18,
7  2007).   No precise date was specified by the DSWG for when smelt
8  salvage concludes during each water year.

9  65.   From these facts it is the Bureau's opinion that when
10  water temperature is maintained at 25°C or above, salvage is
11  concluded for the water year.   All Defendants opine that there is
12  no benefit to curtailing exports by reduced pumping after salvage
13  concludes.

14  66.   There is no reasonable certainty when salvage will
15  conclude and reduction of export pumping will provide no benefit.

16  67.   The USFWS disagreed with the DSWG's recommendations and
17  drafted its own opinion that "any Delta smelt remaining [in] the
18  South Delta will not be able to survive for a period sufficiently
19  long enough to move to the vicinity of the confluence of the
20  Sacramento and San Joaquin Rivers . . ."   (DSWG meeting notes
21  June 18, 2007).

22  68.   The USFWS currently holds a contrary scientific opinion
23  from the DSWG about the benefits of reduced pumping, in that the
24  USFWS believes reductions in pumping at the SWP and CVP would not
25  provide a benefit to those Delta smelt remaining in the South
26  Delta, instead, "few smelt remained in the South Delta and these
27  fish are not likely to make it to the confluence area before
28  temperatures reach 25°C."

14

1    69.   As of the hearing, these conflicting scientific

2  opinions had been submitted to the WOMT and the differences

3  concerning the benefits of reduced exports were not resolved as

4  of the date of the June 19 hearing.   This scientific controversy

5  cannot be resolved without an evidentiary hearing.

6    70.   There are materially conflicting scientific opinions

7  between the DSWG and the USFWS:

8         a.   About the value of currently reducing exports and

9  its present and future effects on survival of the smelt during

10  the 2007 water year;

11         b.   About the present location of the existing Delta

12  smelt population;

13         c.   About the present abundance of and reliable

14  population data for the Delta smelt;

15         d.   About the effect of CVP and SWP operations on the

16  survival of the smelt now, and for the remaining 2007 water year;

17         e.   Whether other causes have materially contributed

18  to the decline of the smelt.

19

20  **LEGAL DISPUTES OVER JURISDICTION AND PARTIES**

21    71.   Plaintiffs' Complaint is based on an Administrative

22  Procedures Act challenge that the BiOp issued by the NMFS was

23  unlawful.   The Plaintiffs' Complaint does not name as a party,

24  the U.S. Bureau of Reclamation, an agency of the Department of

25  the Interior.

26    72.   Plaintiffs sent a 60-day notice to sue to the Bureau on

27  May 31, 2007.

28    73.   Plaintiffs contend they sent a prior "60-day notice to

15

1  the Bureau of Reclamation over one year ago."  There is a legal

2  dispute over whether the same issues joined in this case are

3  covered by the earlier ESA notice.

4      74.  The Complaint does not include an Endangered Species

5  Act claim.

6      75.  The Bureau is the action agency for ESA review.

7      76.  The Court has jurisdiction over the Secretary of the

8  Interior, but not the Bureau, at the present time.

9      77.  The present claims challenging the BiOp, do not include

10 Endangered Species Act claims that address the effects of the

11 Bureau's and DWR's operations on the Delta smelt.

12     78.  The adaptive management process ("DSRAM") that has been

13 found unlawful, does not require the Bureau to implement all

14 recommendations made by the DSWG.

15     79.  Under the Bureau's current operating protocol, the DSWG

16 presents its recommendations to the WOMT, which decides if and

17 how any DSWG recommendations are to be implemented.

18     80.  It is disputed whether the Bureau has implemented

19 substantial mitigation measures based on decisions of the WOMT to

20 address the existing jeopardy to the Delta smelt.

21     81.  It is disputed between the DSWG on one hand and the

22 WOMT and USFWS on the other, whether any remaining smelt in the

23 South and Central Delta will be able to survive rising water

24 temperatures and swim to cooler water.

25     82.  Bureau and FWS scientists currently believe most of the

26 Delta smelt population is north and west of the Delta in the

27 vicinity of the Suisun Bay.

28     83.  If Delta smelt cannot survive existing and rising water

16

temperatures in the Delta, shutting down the SWP and CVP pumps during June and July will not provide effective benefit to the species.

**MATERIAL EVIDENTIARY DISPUTES AND LIKELY HARDSHIPS**

84. The evidence does not preponderate that reducing exports to the minimum safety level of 1,200 cfs will maintain non-negative flows on the Old and Middle Rivers.

85. The DWR acknowledges that the abundance of Delta smelt at present is at its lowest point on record. Because the DWR facilities have a forebay (Clifton Court Forebay), in front of them, salvage at the CVP is a better indicator of current presence of Delta smelt in adjacent South Delta waterways. (Ford Decl. Ex. G).

86. DWR and State Department of Fish & Game ("DFG") scientists have concluded that the bulk of the smelt population have migrated away from the South Delta and the influence of project pumps.

87. The DWR is required to pump, daily, 333 cfs minimum exports to meet the demands of the Byron-Bethany Irrigation District turnout to supply agricultural users and the City of Mountain House; the South Bay Contractors (Alameda County Flood & Water Conservation District Zone 7, Alameda County Water District, and Santa Clara Valley Water District), and State and Federal Contractors on the California Aqueduct between Banks and the San Luis Reservoir.

88. If pumping at Banks and diversion into Clifton Court Forebay stops as of June 25, 2007, and goes through July 15,

17

1  2007, the reduction in deliveries would be between 125,000 and
2  250,000 acre-feet.  (Torgersen Decl. ¶15).

3      89.  With no diversion into CCF, and curtailed pumping at
4  Banks, immediate impacts would affect the Bethany Bay Irrigation
5  District ("BBID"), South Bay Contractors, and the California
6  Aqueduct State and Federal Diverters between Banks and the San
7  Luis Reservoir, including the San Joaquin Valley National
8  Cemetery and the Korean War Memorial, who will lose all water
9  supplies from the SWP.  Those locations rely exclusively on water
10 supply through Banks.  (Torgersen Decl. ¶17).

11     90.  BBID relies exclusively on water from CCF to irrigate
12 30,000 acres of farmland and to provide water to the City of
13 Mountain House.  BBID will have no water supply in as few as 26
14 days if diversions into the Clifton Court Forebay stop.
15 (Torgersen Decl. ¶18).

16     91.  If water is not replenished into Bethany Reservoir, six
17 of the South Bay Contractors' turnouts (including a water
18 treatment plant) would ultimately lose all supply.  These six
19 turnouts have no other source of supply except through Banks,
20 which requires a 30-35 cfs per day average to meet minimum needs.
21 At the current level of storage at the Bethany Reservoir, these
22 turnouts will be without water supply in as few as 18 days.

23     92.  Since the beginning of Vernalis Adaptive Management
24 Project Operations on April 23, 2007, the SWP has relied on
25 storage in the San Luis Reservoir to meet demands of the State
26 Water Contractors.  (Torgersen Decl. ¶20).

27     93.  If Delta exports continue to be curtailed through July
28 15, 2007, the elevation change in the San Luis Reservoir water

18

1   level since the beginning of VAMP, would be about 145 feet in

2   approximately 84 days, which, in the opinion of the DWR and the

3   Bureau, would produce a failure in the upstream face of the dam

4   as a result of rapid water withdrawal, similar to such an

5   occurrence in 1981.  This would necessitate the complete draining

6   of the San Luis Reservoir and would keep it out of service for up

7   to one year.  (Torgersen Decl. ¶20).

8        94.  The DWR opines a number of factors other than

9   entrainment have contributed to the very low numbers of juvenile

10  smelt observed in 2007, including (1) other diversions; (2) poor

11  food sources; and (3) potential toxic effects of pesticides.

12  (Ford Decl. ¶8).

13       95.  An expert for the San Luis & Delta-Mendota, et al.,

14  Defendants, Dr. Manly, opines that while the effects of flows and

15  exports are statistically significant, they do not "have much

16  affect on the long term trends in Delta smelt numbers and do not

17  seem to be important compared to other things going on."  (Manly

18  Decl. ¶9).

19       96.  The San Luis & Delta-Mendota, et al., Defendants claim

20  severe hardships from the DSWG reduced pumping proposal,

21  including, but not limited to:

22            a.   Immediate and severe water shortages of 44% for

23  CVP contractors other than the Exchange Contractors;

24            b.   Complete exhaustion of the CVP water supply in the

25  San Luis Reservoir by mid-July;

26            c.   Zero supply for CVP Contractors, other than the

27  Exchange Contractors from mid-July onward;

28            d.   Economic losses exceeding $13,250,000 to 12,650

                              19

acres of crops increasing to a worst-case scenario of potential losses affecting one million acres, approaching $1 billion if no CVP water is delivered after June 19, 2007, to CVP contractors, other than the Exchange Contractors (Harrison Decl. ¶12), (Nelson Decl. ¶3);

e.   The City of Tracy depends upon the CVP for one-half of its water supply (Daly Decl. ¶3);

f.   Rationing on municipal users would be required in the event of an injunction (Daly Decl. ¶6);

g.   Santa Clara Valley Water District is a municipal contractor for CVP and SWP water.  Draw-down from the San Luis Reservoir would impair its ability to divert water through the Pacheco Pumping Plant and will create significant water quality problems (Kao Decl. ¶¶5, 7);

h.   Without water deliveries, increased reliance on groundwater would likely result in overdraft, subsidence, and salinity build-up in the soils of CVP Contractors would occur. (Nelson Decl. ¶11);

i.   All Defendants claim the public has an interest in both protecting listed species and in ensuring that cities and farms have an adequate and reliable water supply.

FORM OF ORDER-IMPROPER DELEGATION, OVERBREADTH

97.   All Defendants and Defendant-Intervenors object to the text of the proposed order as too indefinite, overbroad, and an improper delegation of the Court's legal authority in violation of the separation of powers doctrine.

98.   All Defendants argue that an order delegating operation

1   of the CVP to the DSWG would improperly change the status quo.

2       99.    The proposed order submitted by the Plaintiffs, in its

3   present form, violates Article III of the Constitution by

4   delegating the operation of the CVP to the Delta Smelt Working

5   Group without any specific or enforceable provisions, directions,

6   or standards, and without assuring the protection of public

7   health and safety or the integrity of the CVP operations and

8   infrastructure and other Bureau facilities.  In its present form,

9   the Court concludes that the proposed order would amount to a

10  usurpation or improper encroachment by the Court on the lawful

11  authority of the Executive Branch to administer and exercise its

12  administrative authority and discretion in operating the CVP.

13      100.   All Defendants contend the DSWG lacks the competence

14  to operate the CVP.

15

16  **BOND**

17      101.   San Luis & Delta-Mendota, et al., Defendants and State

18  Water Contractors assert that a bond of at least $25 million is

19  necessary to protect against the damage that would be caused by

20  an improvident issuance of injunctive relief.

21      102.   Defendant-Intervenors claim the Plaintiffs have

22  sufficient resources to post a bond.

23

24  **HARDSHIPS TO DEFENDANTS**

25      103.   Maintenance of not less than zero net flow in Old and

26  Middle Rivers requires limiting diversions to 950 cfs.  (Erlewine

27  Decl. ¶8).

28      104.   In-Delta diversions of Old and Middle Rivers are

21

1   already around 600 cfs and diversions by Contra Costa Water

2   District are already greater than 400 cfs, the maintenance of a

3   zero net flow to Old and Middle Rivers precludes any diversion of

4   water at the Tracy Pumping Plants at the SWP or CVP.  A zero net

5   flow at Old and Middle Rivers could not be obtained because

6   pumping by others not before the court exceeds those flows.

7        105.  If existing water supplies in the San Luis Reservoir

8   are not replenished over the next 30 days, the SWP will meet only

9   57% of the 390,000 acre-feet in existing demands it has during

10  that period.  (Erlewine Decl. ¶10).

11       106.  Due to limited local supplies, the Alameda County Zone

12  7 Water Agency water delivery capacity, which relies on the SWP

13  for 80% of its water, would be in jeopardy.  (Duerig Decl. ¶3).

14       107.  Based on physical constraints in water systems, up to

15  200,000 residents of Eastern Alameda County would be in grave

16  danger of immediately losing 40-55% of their water deliveries if

17  the Banks Pumping Plant were shut down.  (Duerig Decl. ¶¶2, 9).

18       108.  The Zone 7 Water Agency is the sole, direct source of

19  water supply to the Veterans Administration Medical Center in

20  Livermore, Camp Parks Military Base, Alameda County Santa Rita

21  Jail, facilities of Livermore Area Recreation and Parks District,

22  and the Dublin Housing Authority.  (Duerig Decl. ¶2).

23       109.  This creates a potential public safety risk to the

24  communities of Dublin, Pleasanton and Livermore by reducing the

25  Zone 7 Water Agency's ability to provide adequate fire flow

26  during the summer fire season.  (Duerig Decl. ¶9).

27       110.  Limited local service in groundwater supplies would be

28  further taxed and most, if not all, local water supplies would be

1  exhausted in a matter of days in Zone 7 Water Agency territory.

2  (Duerig Decl. ¶12).

3      111.  If the DSWG reduced pumping were implemented,

4  thousands of Zone 7 Water Agency residential and business

5  customers, who will be most acutely affected, do not all

6  immediately comply with mandatory rationing requirements that

7  would be imposed, basic needs of schools, senior care facilities,

8  laboratories, and others in the area, will not be met.  (Duerig

9  Decl. ¶¶2, 11).

10     112.  In Santa Clara County the requested TRO and shut down

11 of pumping will put water supplies for nearly 2 million people at

12 risk.  (Kao Decl. ¶¶2, 4).

13     113.  The Santa Clara Valley Water District is supplied by

14 both SWP and CVP under contract and has annual water demand for

15 Santa Clara County of nearly 400,000 acre-feet.  (Kao Decl.

16 *ibid*.)

17     114.  In 2007, Santa Clara expects SWP and CVP supplies to

18 meet around 70% of its anticipated water demand.  (Kao Decl. ¶5).

19     115.  If pumping at the SWP's Banks Pumping Plant is

20 precluded, Santa Clara will not receive water it is contracted to

21 take through the SWP's South Bay Aqueduct.  (Kao Decl. ¶3).

22     116.  If water levels at San Luis Reservoir are reduced,

23 Santa Clara will be unable to take water contracted to receive

24 through the CVP San Felipe Project.  (Kao Decl. ¶¶5, 7).

25     117.  Santa Clara's ability to receive CVP water depends

26 upon combined level of storage of CVP and SWP water at the San

27 Luis Reservoir.  (Kao Decl. ¶5).

28     118.  Because the intake of San Felipe Division's Pumping

1  Plant is the outlet from San Luis Reservoir that serves all other
2  SWP and CVP contractors, the San Felipe Division experiences
3  significant water quality problems due to algae concentration
4  when the Reservoir is drawn below 300,000 acre-feet of storage.
5  (Kao Decl. ¶¶8 & 9).

6      119.   Algae problems will create concerns for drinking water
7  supplies and serious operational issues for drip agricultural
8  irrigation systems of agricultural water users through Santa
9  Clara and San Benito Counties.   (Kao Decl. ¶8).

10     120.   In the event San Luis Reservoir supplies drop below
11 110,000 acre-feet, CVP water deliveries in the San Felipe
12 Division may be interrupted for an extended period presenting
13 more serious health and safety issues.   (Kao Decl. ¶9).

14     121.   The Alameda County Water District ("ACWD") is a retail
15 water supplier with the service area of approximately 100 square
16 miles encompassing the cities of Fremont, Newark, and Union City
17 in Southern Alameda County.   (Stinson Decl. ¶2).

18     122.   ACWD provides drinking water to a population of over
19 320,000 people and is also the sole water supplier for numerous
20 business industries, schools, and hospitals in its service area.
21 (Stinson Decl. ¶2).

22     123.   ACWD has a contract right to 42,000 acre-feet of water
23 per year from the SWP and the SWP water supplied to ACWD
24 constitutes approximately 40% of its local potable water.
25 (Stinson Decl. ¶3).

26     124.   If SWP Banks is shut down again over the next 30 days,
27 releases from Del Valle Reservoir combined with limited amounts
28 of water currently stored in Bethany Reservoir, may provide up to

1  19 mgd of SWP supply for 10 days.  (Stinson Decl. ¶5).

2  125.  After 10 days, ACWD would be compelled to rely solely

3  on releases from Lake Del Valle to provide SWP water to the South

4  Bay Aqueduct.

5  126.  Since ACWD's share of Lake Del Valle releases would be

6  limited to 15 mgd, the shut down would result in a loss of 27 mgd

7  of SWP water supplies during the last three weeks of June,

8  representing a 64% reduction in ACWD's planned deliveries over

9  this three week period.  (Stinson Decl. ¶5).

10  127.  ACWD would then be forced to rely upon local

11  groundwater reserves, depleting supplies available for dry years

12  and emergencies.  (Stinson Decl. ¶¶6 & 7).

13  128.  In Kern County, SWP water comprises 98% of water

14  imported by the Kern County Water Agency.  (Beck Decl. ¶4).

15  129.  If the SWP is shut down for 30 days, groundwater

16  pumping will ensue.  (Beck Decl. ¶6).

17  130.  The combined recovery capacity from groundwater

18  banking projects is limited to 800 cfs while local demand to KWA

19  is about 3,000 cfs.  (Beck Decl. ¶6).

20  131.  A loss of available water would reduce local

21  groundwater supplies to approximately 25% of the demand within

22  KWA being unmet.  (Beck Decl. ¶6).

23  132.  A minimum 10% reduction in crop yields will occur and

24  if the shut down continues for a longer period, the impact will

25  be significantly larger.

26  133.  Due to these constraints, Plaintiffs could not offer

27  evidence addressing Defendants' hardship issues.

28

1

## CONCLUSIONS OF LAW

2      1.   A preliminary injunction is appropriate to protect a
3  party from irreparable harm and to preserve the Court's power to
4  render a meaningful decision on the merits.  *Alabama v. U.S. Army*
5  *Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005).

6      2.   In the Ninth Circuit, for injunctive relief, a
7  Plaintiff must demonstrate either (1) a likelihood of success on
8  the merits and the possibility of irreparable injury, or (2) the
9  existence of serious questions going to the merits and that the
10  balance of hardships tips in its favor.  *Fund for Animals, Inc.*
11  *v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992).  The degree of
12  irreparable injury required increases as the probability of
13  success on the merits decreases.  *Dr. Seuss Enters. L.P. v.*
14  *Penguin Books, USA*, 109 F.3d 1394, 1396 fn.1 (9th Cir. 1997).

15      3.   Under the ESA, the balance of harms and consideration
16  of the public interest favors the protected species.  *Tennessee*
17  *Valley Authority v. Hill*, 437 U.S. 153, 174 (1978); *Friends of*
18  *the Earth v. Navy*, 841 F.2d 927, 933 (9th Cir. 1988).

19      4.   A plaintiff must still demonstrate a likelihood of
20  success on the merits as well as "reasonable likelihood" of
21  irreparable harm for ESA injunctive relief.  *National Wildlife*
22  *Fed'n v. Burlington N.R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994);
23  *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 442 F.3d
24  782, 793-94 (9th Cir. 2005).

25      5.   As a matter of law, the court would be required to
26  enjoin the operation of the pumps at Jones and Banks pumping
27  plants (as part of the operation of the CVP and the SWP) if such
28  operation would extinguish the delta smelt (*Hypomesus*

*transpacificus*), a species listed as "threatened" under the Endangered Species Act ("ESA").

6. The evidentiary record currently before the Court does not support, by a preponderance of the evidence, a showing of irreparable harm, the conclusion that the current operation of the pumps would extinguish the Delta smelt as a species or the conclusion that the Delta smelt would be extinguished if the Court does not turn over all responsibility for its protection to the Delta Smelt Working Group.

7. Due to the complexity of the facts and science governing this dispute and the magnitude of risk and injury to all parties, there has been insufficient time and notice for all parties to prepare for, to present, and to oppose a preliminary injunction motion.

8. Here, evidence based on the current record is sharply in conflict as to whether:

a. Reduced pumping will effectively prevent the entrainment or further take of Delta smelt;

b. Under any CVP and SWP operating conditions, zero flows (non-negative) can be achieved in Old and Middle River;

c. Existing disputes can be resolved among the scientists over the effectiveness a reduction in exports will have to benefit the species in light of rising water temperatures to lethal limits;

d. Dispute over the whereabouts of the species can be resolved and whether Delta smelt are in the Northwest area of the Delta and Suisun Bay, out of harm's way from the SWP and CVP pumps;

27

1    e.    Other causes, including but not limited to, other

2  water diversions; effect of ocean tides; presence of toxics;

3  absence of Delta smelt prey, and existence of non-native

4  predators, are materially causing decline in the species;

5    9.    The balance of hardships to the species on the existing

6  record does not favor a TRO in the form sought, because, on the

7  one hand, the species is in grave jeopardy and threatened and, on

8  the other hand, severe pumping reductions will not effectively

9  result in the protection of the species when balanced against:

10    a.    Potential catastrophic loss of water supplies to

11  urban users including, but not limited to, cities, fire

12  protection agencies, hospital and health providers, schools,

13  laboratories, and potable water supplies for human consumption;

14    b.    Potential catastrophic loss of water supplies to

15  CVP and SWP contractors;

16    c.    Potential physical damage to the San Luis

17  Reservoir due to the gross reduction of its water supplies,

18  requiring taking the reservoir out of service for over one year;

19  and

20    d.    Economic damage to crops grown by Defendant

21  Irrigation Contractors in the range of $23 million to potential

22  losses approaching $1 billion.

23    10.    There is legal uncertainty about the Court's present

24  jurisdiction over the Bureau of Reclamation, the action agency, a

25  party against whom injunctive relief must necessarily be granted

26  for the injunction to be effective.

27    11.    As a Bureau of the Department of the Interior, the

28  Bureau of Reclamation is the action agency within the meaning of

28

1   Federal law for ESA and Administrative Procedure Act purposes.

2       12.     There is legal uncertainty over whether an effective

3   and timely 60-day ESA notice has been given to the Bureau of

4   Reclamation by Plaintiffs.

5       13.     There is legal uncertainty about the constitutional

6   ability of the Court in potential violation of the separation of

7   powers doctrine, to grant operating authority over the CVP to the

8   DSWG, a group of fishery biologists.

9       14.     The form of the order is so vague, overbroad, and

10  uncertain that it requires an agency of the United States

11  government to defer to and follow all the recommendations of the

12  DSWG, a group of fishery biologists, who are neither trained in

13  nor have competence in engineering, risk management, water

14  management, and the related disciplines that affect the

15  protection of health and safety and the human environment and

16  preservation of the infrastructure comprising CVP and SWP

17  facilities.

18                              CONCLUSION

19      As stated in open court, if the evidence was undisputed that

20  the species faces extinction due to the present operation of the

21  CVP and SWP, injunctive relief, in some form, would be required.

22  However, there is substantial dispute about whether the operation

23  of the Project's pumps throughout the summer months (June-

24  September) is a material contributing cause to or will effectuate

25  the extinction of the smelt.  Other reasons for the decline in

26  the smelt are offered by scientists and the historical migration

27  patterns of the smelt indicate that the majority of the

28  population should not now be in the vicinity of the pumps and at

                                29

1  risk of entrainment.

2     Defendants have submitted voluminous competing evidence
3  alleging many severe hardships and risks to public health and
4  human safety.  There has not been opportunity for in-depth
5  analysis of these alleged risks.

6     Legal uncertainty regarding Plaintiffs' standing to pursue
7  injunctive relief against the action agency has been raised on
8  approximately 24 hours notice.

9     The breadth and uncertainty of the form of the TRO is
10 legally infirm.  The proposed order grants apparent unlimited
11 authority to a group of fishery biologists to control the
12 operations of two of the largest water projects in the world,
13 which deliver water to over 20 million people for municipal,
14 industrial, agricultural and other uses.  The form of the
15 proposed order also raises constitutional concerns under the
16 Separation of Powers doctrine because it effectively results in
17 an encroachment by the judiciary on the operation, exercise of
18 discretion and policy of an agency of the Executive branch, the
19 United States Bureau of Reclamation.

20    Based of all these uncertainties and in view of the
21 potential for hardships arising from deprivation of water south
22 of the Delta and diminishing water supplies which have the real
23 potential to cause substantial harm to health and safety in the
24 human environment, the motion for Temporary Restraining Order is
25 DENIED, without prejudice to Plaintiffs' application for a
26 preliminary injunction.

27 IT IS SO ORDERED.

28 Dated:   July 3, 2007          _____/s/ Oliver W. Wanger_____

30

UNITED STATES DISTRICT JUDGE