1

2

3

4

5

6                  UNITED STATES DISTRICT COURT

7                 EASTERN DISTRICT OF CALIFORNIA

8

9   NATURAL RESOURCES DEFENSE      )    1:05-cv-1207 OWW GSA
    COUNCIL, et al.,               )
10                                 )    FINDINGS OF FACT AND
                   Plaintiffs,     )    CONCLUSIONS OF LAW RE
11                                 )    INTERIM REMEDIES RE:
         v.                        )    DELTA SMELT ESA REMAND
12                                 )    AND RECONSULTATION
    DIRK KEMPTHORNE, in his official )
13   capacity as Secretary of the  )
     Interior, et al.,             )
14                                 )
                   Defendants.     )
15                                 )
    CALIFORNIA DEPARTMENT OF WATER  )
16   RESOURCES,                    )
                                   )
17         Defendant-Intervenor,   )
                                   )
18   STATE WATER CONTRACTORS,      )
                                   )
19         Defendant-Intervenor,   )
                                   )
20   SAN LUIS & DELTA-MENDOTA WATER )
     AUTHORITY, et al.,            )
21                                 )
           Defendant-Intervenors. )
22                                 )
    _____ )

23

24

25              I.   BACKGROUND

26       On May 25, 2007, the Court, in a Memorandum Decision and

27   Order addressing Plaintiff's challenge to the 2005 Long-Term

28   Central Valley Operations Criteria and Plan ("OCAP") Biological

                              1

1  Opinion ("BiOp"), held that the "2005 OCAP BiOp is unlawful and

2  inadequate," in part because "[t]he Delta Smelt Risk Assessment

3  Matrix ("DSRAM"), as currently structured, does not provide a

4  reasonable degree of certainty that mitigation measures will take

5  place."  The Court found that existing take limits established by

6  the BiOp, without further restrictions on the operations of the

7  Central Valley Project ("CVP") and State Water Project ("SWP")

8  (collectively "Projects"), are inadequate to protect the species;

9  that the DSRAM must be made more certain and enforceable; that

10  the BiOp did not use the best available science; that the BiOp

11  failed to adequately find and address the impacts of joint

12  Project operations on the continued survival of the Delta smelt;

13  and failed to adequately consider impacts to the smelt's critical

14  habitat.  The Court found that the Biop's no jeopardy finding was

15  arbitrary, capricious, and without rational connection to the

16  status of the species.

17      The parties then submitted legal memoranda addressing

18  proposed interim remedies.  On August 30, 2007, the Court granted

19  Plaintiffs' Motion to Supplement Their Complaint, adding claims

20  that the United States Bureau of Reclamation ("Reclamation") had

21  violated Section 7(a)(2) of the Endangered Species Act, 16 U.S.C.

22  § 1536(a)(2)("ESA") because its operation of the CVP in

23  coordination with the State of California Department of Water

24  Resources' ("DWR"), SWP threatens to jeopardize the continued

25  existence and recovery of the Delta smelt and is adversely

26  affecting the Delta smelt's designated critical habitat. [Doc.

27  No. 495].

28      After taking evidence, considering all the written

2

1  submissions of the parties, and hearing oral argument, including
2  the parties' written proposals identifying the interim relief, if
3  any, that should be imposed on Reclamation's and DWR's operations
4  of the CVP and SWP until such time as the remand of the 2005 BiOp
5  is completed; [Fed. Def. Ex. 3 (Ex. 2 in evidence); Pl. Ex. 11
6  (App. 2); Pl. Ex. 4]; on August 31, 2007, the Court issued its
7  oral statement of decision granting a preliminary injunction and
8  remedial order to protect the species pending completion of a new
9  BiOp.

10      Following the summary judgment order, all parties recognized
11  that an interim remedies hearing was required because the BiOp
12  and Incidental Take Statement as well as the DSRAM were
13  invalidated.  Federal Defendants, U.S. Department of the Interior
14  ("Interior"); United States Fish & Wildlife Service ("FWS");
15  Reclamation; and all Intervenors, DWR; State Water Contractors
16  ("SWC"); San Luis & Delta-Mendota Water Users Authority;
17  Westlands Water District; et al., Defendant-Intervenors, have
18  argued that the 2005 BiOp and Incidental Take Statement should
19  remain in place without vacatur.

20      Plaintiffs' proposed remedial actions commence with fall
21  actions by September 1, 2007, for the upcoming 2007-2008 water
22  year.  By reason of the opinions of scientists and other experts
23  who testified at the evidentiary hearing, the Court has
24  determined that interim remedies should commence by December 25,
25  2007.

26      The species was first listed as threatened March 5, 1993.
27  The original BiOp for the OCAP was issued July 30, 2004, and
28  amended February 16, 2005.  Both BiOps found no jeopardy to the

1 | Delta smelt and its critical habitat.  These Biological Opinions
2 | concluded the Projects' combined operations did not jeopardize
3 | the smelt's survival or cause adverse modification of the smelt's
4 | critical habitat.  The Delta smelt species has been intensively
5 | studied for 12 years.  In July 2006, before a ruling on the
6 | legality of the 2005 OCAP BiOp was issued, FWS reinitiated
7 | consultation on the Delta smelt respecting the 2005 BiOp,
8 | implicitly recognizing its legal insufficiency and inadequacy of
9 | the No Jeopardy BiOps.

10 |

11 | II.  **FINDINGS OF FACT**

12 | A.  **CURRENT STATUS OF THE DELTA SMELT**

13 |     1.    The Delta smelt *(Hypomesus transpacificus)* was listed
14 | as a "threatened" species under the ESA by the FWS on March 5,
15 | 1993.  58 Fed. Reg. 12,863 (March 5, 1993).  The FWS designated
16 | critical habitat for the Delta smelt on December 19, 1994, which
17 | includes all waters and submerged lands within the Delta,
18 | including the CVP and SWP pumping facilities.  59 Fed. Reg.
19 | 65,256 (Dec. 19, 1994).

20 |     2.    The FWS recently reviewed the listing status of the
21 | Delta smelt and, on March 31, 2004, concluded the species still
22 | faces a "high degree of threat" and should remain listed under
23 | the ESA.  [Pl. Ex. 13].

24 |     3.    Based on the results of recent surveys, scientists
25 | believe that the Delta smelt is at one of the lowest levels of
26 | abundance on record.  [Fed. Def. Ex. 3 ¶2; Tr. 615:22-618:8; Tr.
27 | 617:18-21; Pl. Ex. 6].

28 |     4.    It is undisputed that the current status of the Delta

**4**

1   smelt is serious. [Tr. 72:19-20] [Tr. 620:4-10].  Some scientists

2   believe that the Delta smelt faces an imminent risk of extinction

3   in the near future. [Tr. 266:16-17].

4        5.    Many scientists opine that the decline of Delta smelt

5   is the result of multiple factors. [Tr. 73:4-16]; [Tr. 299:16-

6   22].  Those factors include: (a) the presence of toxic materials

7   (such as pesticides) in the Delta; (b) an overall reduction in

8   the abundance of the zooplankton that are the food of the Delta

9   smelt; (c) introduction and propagation of invasive species

10  including the Asian Overbite Clam, Corbula (a filter feeder which

11  feeds on some of the same zooplankton that the Delta smelt feeds

12  on); [Tr. 98:22-99:14; 104:16-105:2; 299:16-301:18; 1015:8-17;

13  1016-1017], another fresh water clam, Corbicula, may also have an

14  adverse impact on food supply; [Tr. 149:11-22; 196:8-17]; the

15  invasive Inland Silverside may prey upon larval Delta smelt.

16  [Tr. 533:20-25]; (d) other unscreened agricultural diversions in

17  the Delta; [Tr. 618:3; 803:17-23; 1005:8-17]; (e) power plant

18  diversions, including for consumptive use and for cooling water

19  that affect turbidity, [Tr. 618:4, 803:17-23]; and (f)

20  modifications to the hydrology of the San Joaquin-Sacramento

21  Delta and Estuary. [Tr. 151:3-9; 299:23-25; 534:6-14; 617:22-

22  618:6; 628:9-19; 701:3-12; 803:17-23].

23       6.    Scientists believe that the decline of the Delta smelt

24  is caused in part by the operations of the CVP and SWP (as well

25  as other water diversions within the Delta) because each

26  Project's operations result in the direct entrainment of Delta

27  smelt at the CVP and SWP export facilities (the Pumps) which they

28  do not survive.  [Tr. 82:11-12; 338:19; 628:1-6].  The Projects'

                              5

operations cause changes in the hydrology of the Delta that adversely affect the Delta smelt. [Tr. 84:6-8; 628:9-12; 73:4-16; 299:16-301:18; 618:24-618:26; Pl. Ex. 13 at p. 21-29; DWR Ex. D ¶2].

7.   The full effects of these factors on the Delta smelt, however, are not fully understood, and there is scientific uncertainty regarding the relative magnitude of the effects. [Tr. 52:3-20; 244:14-19; 303:25-304:3; 819:23-820:5].   In addition, despite research efforts, there is still scientific uncertainty regarding the cause of the recent, serious decline of the Delta smelt, which continues to not be fully understood. [Tr. 805:2-8].

8.   A preponderance of the evidence supports the conclusion that the Delta smelt is presently being adversely affected by several environmental factors, including the operations of the CVP and SWP.   [Tr. 1682:25-1683:2].   The evidence does not establish that there is a single efficient proximate cause that is solely responsible for the decline of the Delta smelt.   [Tr. 1682:14-24].

B.   BIOLOGY, LIFE STAGES, AND MOVEMENT OF THE DELTA SMELT

9.   The Delta smelt begins its life cycle as an egg.   [Tr. 67:21-25].   Most Delta smelt are spawned, as eggs, in the northern Delta, although they are widely distributed throughout the Delta.   [Tr. 67:21-25].   Smelt hatch between March and May. [Tr. 312:22-313:7].   After hatching, the larvae of the Delta smelt are carried downstream by rivers and tides, to the confluence of the Sacramento and San Joaquin Rivers and beyond,

1  often as far as Suisun Bay.  [Tr. 67:25-68:6; 312:22-313:7].  The
2  Delta smelt spend 6 to 9 months downstream of the Delta, and then
3  gradually begin to migrate upstream again for spawning.  [Tr.
4  68:7-9; 70:6-8; 313:5-7].

5      10.  Even when larval Delta smelt are not detected in
6  surveys or at the CVP and SWP export facility, their presence may
7  be inferred from other factors. [DWR Ex. D ¶5].  The most
8  successful Delta smelt spawning occurs when water temperatures
9  are in the range of 12°C to 18°C. [DWR Ex. D ¶5].  When water
10  temperatures in the Delta have risen to 12°C, the presence of
11  larval Delta smelt may be inferred.  [Tr. 396:2-5; DWR Ex. D ¶5].
12  In addition, the presence of "spent" Delta smelt females in
13  surveys also indicates that spawning has occurred.  [Tr. 396:1-
14  2].

15

16  C.  STATUS OF THE DELTA SMELT

17      11.  The threatened Delta smelt "is undisputedly in jeopardy
18  as to survival and recovery." [SJ Order at 119:2-3].  Experts in
19  fish biology testified that the Delta smelt is in jeopardy.
20  Plaintiffs' experts Dr. Peter B. Moyle and Dr. Christina Swanson,
21  Federal Defendants' expert Ms. Cay Collette Goude, and Defendant
22  Intervenor State Water Contractor's expert Dr. Charles H. Hanson,
23  all agree that the species is in a critical state at present.
24  [Tr. 72:19-73:1; 85:11-14; 266:16-269:17; 270:6-271:10; 613:23-
25  614:3; 617:18-21; 622:14-623:4; 889:20-890:11; 945:3-10].  San
26  Luis' expert, Dr. Miller, agreed.

27      12.  Population abundance indices have been at record low
28  levels for the past three years.  [Tr. 270:25-271:10].  Some

                                7

1   experts opined that the species' condition is so precarious that
2   it could become extinct within the year.  [Tr. 802:17-23; 1031:5-
3   1032:13].

4        13.   Dr. Miller's 2002 work opining the Delta smelt species
5   had recovered, was substantially criticized by peers.  He was
6   accused of using selective data to achieve result-oriented
7   opinions.  Dr. Miller offered the absolutely unsupportable and
8   erroneous opinion that within the last five years the Delta smelt
9   species had "recovered."

10       14.   The studies Dr. Miller submitted and the opinions
11  provided in his declarations are unduly limited, do not consider
12  the real life ramifications of conditions in the Delta, and the
13  actual condition of the Delta smelt.

14       15.   On the witness stand, Dr. Miller admitted the critical
15  decline in the species and that it is on the verge of extinction.
16  Dr. Miller now acknowledges that major actions have to be taken.
17  He opined that an immediate food supply study needed to be
18  conducted.  He further opined that more than one refuge
19  population should be established to attempt to save the species.
20  The locations of these preserves would be designed to protect
21  against single-event catastrophic elimination of the species.

22       16.   The Court does not find Dr. Miller's opinions on the
23  species persuasive or reliable.

24       17.   The critical habitat of the Delta smelt includes the
25  Sacramento-San Joaquin Delta waters at the confluence of those
26  rivers, as they approach San Francisco Bay, including the Central
27  and Northwest portions of the Delta.

28       18.   The evidence is undisputable that the CVP, operated by

**8**

1   the Bureau and the SWP operated by DWR, cause the entrainment and
2   salvage of unknown numbers of Delta smelt through the operation
3   of their respective pumping facilities located in the south Delta
4   pursuant to operations conducted under the 2004 Operations
5   Criteria and Plan ("OCAP").  [Tr. 82:6-84:5; 694:24-695:3].  The
6   number of Delta smelt killed at the pumping facilities is unknown
7   in part because smelt smaller than 20mm in length are not counted
8   and samples of fish larger than 20mm counted in existing surveys
9   are limited.  [Tr. 84:24-85:6; 85:19-25; 340:20-341:25; 342:22-
10  343:4; 695:9-20; 696:22-25].

11       19.   Pumping kills Delta smelt by sucking them directly into
12  the pumps; by drawing them into fish "salvage" facilities which
13  collect fish diverted from entering the pumps, a process that
14  kills the smelt; and drawing smelt into the SWP's Clifton Court
15  Forebay from which the fish cannot escape and where they will die
16  even if they are not drawn into the salvage facilities or the
17  pumps.  [Tr. 86:11-22; 87:16-25; 337:3-341:11; 628:22-629:6;
18  1147:18-1148:4].  These losses result from the combination of the
19  Delta smelt's natural migrations up and down the Delta during the
20  smelt's annual life cycle and flow conditions within the Central
21  and South Delta caused in part by the operation of the CVP and
22  SWP pumps.  [Tr. 84:6-18].  Pumping-induced negative flows not
23  only pull smelt to the pumps, where they are either killed by the
24  pumps or by the salvage process, the smelt are also drawn into
25  unfavorable habitat where they and their offspring do not
26  survive.  [Tr. 82:10-84:20; 95:7-96:3; 97:18-24; 317:10-20;
27  628:1-6; 631:7-15].

28       20.   The Projects' (CVP and SWP) operations are one of the

**9**

1    causes of the Delta smelt's decline.  [Tr. 82:6-9; 103:12-16;
2    104:10-13; 244:16-245:1; 299:16-22; 303:17-24; 354:21-356:6;
3    617:22-618:3; 685:5-10; 695:4-8; 766:22-767:1; 941:16-21].

4         21.  Delta smelt are more likely to be entrained at the
5    Projects' pumping facilities when smelt are in the general
6    vicinity of those facilities (for example in the Central or South
7    Delta).  [Tr. 631:11-15; DWR Ex. D ¶6].  Delta smelt face less
8    risk of entrainment at the Projects' pumping facilities when they
9    are farther away from those facilities.  [Tr. 631:7-10].

10

11   D.   SURVEYS AND MONITORING FOR DELTA SMELT

12        22.  Scientists rely on surveys conducted in the Delta to
13   monitor the abundance of the Delta smelt.  [Pl. Ex. 11 ¶3].
14   Those surveys include the Summer Townet, Fall Midwater Trawl,
15   Spring Kodiak Trawl, and 20-Millimeter surveys (collectively
16   "surveys").  [Pl. Ex. 11 ¶3]. The results of these Surveys are
17   critical to assessing the status of the Delta smelt.  [Tr. 73:23-
18   74:8; 297:14-21; 651:15-18].

19        23.  The operators of the CVP and SWP export facilities also
20   monitor for Delta smelt that are entrained in the pumps at those
21   facilities (known as "salvage").  [Tr. 629:7-13].  They do so by
22   taking samples at regular intervals during their operations and
23   counting the number of Delta smelt larger than 20mm found in
24   those samples.  [Tr. 629:7-13].  They then estimate the total
25   number of Delta smelt entrained in the pumps by multiplying the
26   number found in the samples by an "expansion" factor.  Delta
27   smelt do not survive the salvage or entrainment process.  [Tr.
28   86:11-22; 87:16-25; 337:3-341:11; 628:22-629:6].

                                10

1    24.   It is disputed whether the surveys described above and
2  the monitoring conducted at the CVP and SWP export facilities are
3  insufficient in light of the current low abundance of the Delta
4  smelt. [Tr. 1576:18-22].

5

6  E.   DATA INADEQUACIES.

7    25.   All parties agree that there is no firm and reliable
8  total population estimate for the Delta smelt and there never has
9  been.

10    26.   No scientist was able to explain how, despite the
11  marshaling of federal, state and private resources, over ten
12  testifying experts presented in this case, and over ten years of
13  study, what is necessary and how long it will take to produce a
14  reliable total population estimate for Delta smelt.

15    27.   Sampling data goes back over twenty-five years.  The
16  data is presented in the form of indices.  Regression analyses
17  are performed, which produce population "trends."

18    28.   It is unfeasible and imprudent to delay further "study"
19  and gathering of information, since studies have been intensively
20  conducted for the past twelve years.  Additionally, the
21  information gathering and analysis process concerning the
22  existence, survival, recovery, and viability of the smelt
23  population has redoubled since the filing of this lawsuit and
24  over 1,500 pages of scientific and engineering analysis of water
25  Projects' operations, water costs, physical resource costs,
26  monetary costs, and other burdens that will be required by the
27  granting of interim protection, were presented for this remedies
28  hearing.

F.    **MONITORING FREQUENCY**

29.   At their present lower levels of abundance, an increase
in the frequency of the monitoring at the CVP and SWP export
facilities will help to ensure that Delta smelt are detected when
they are present.  [Pl. Ex. 11 ¶34].  Currently, the monitoring
programs at the CVP and SWP export facilities only detect Delta
smelt that are 20mm in length or larger.  Expanding these
monitoring programs to detect Delta smelt smaller than 20mm in
length will help to confirm the presence of Delta smelt larvae at
the export facilities although their presence may also be
inferred from other factors.  [Tr. 387:21-24; 427:16-18; 431:23-
423:2].

30.   Reclamation and DWR will be required to overcome
certain technical obstacles to detect Delta smelt between 5mm and
20mm in length at the CVP and SWP export facilities including the
acquisition of new equipment to conduct this monitoring and the
training of personnel to distinguish between Delta smelt larvae
and the larvae of other fish species. [Tr. 653:17-656:12].  It
appears fine mesh nets may need to be acquired for this purpose.

31.   It is feasible to implement a monitoring program to
protect larval Delta smelt.  [Tr. 1686:16-22].  The need for
larval monitoring was demonstrated by the testimony of Dr. Peter
Moyle, who testified that large numbers of larval smelt may be
taken at the Projects' pumps to reduce the smelt population
significantly, especially when, as now, smelt numbers are
critically low.  [Tr. 82:20-83:1; 85:4-14].  Dr. Swanson
explained that, "given the new science which suggests that, in
fact, one of the more important impacts of water project

12

operations may be lethal entrainment of those very small life
history stages, I felt it was essential that monitoring for those
life stages of Delta smelt at the facilities be implemented."
[Tr. 386:23-387:3].

32.  Reclamation currently monitors for Delta smelt at the
CVP pumping facilities only approximately 8% of the time.  [Tr.
385:23-386:1].  More frequent monitoring at regular intervals to
detect the presence of Delta smelt will help to gauge more
accurately the abundance of smelt near the CVP pumps and the
numbers of smelt taken at those facilities.  [Pl. Ex. 11 ¶34; Tr.
386:2-15].

G.   PROPOSED INCREASED MONITORING

33.  Plaintiffs Recommended Interim Remedial Action Numbers
2 and 3 respectively propose an increase in frequency of sampling
for entrainment of fish at the CVP pumping facilities to a
minimum of 25% of the time at intervals evenly spaced throughout
the day.  [Pl. Ex. 4 Appendix].  Remedial Action #3 proposes
monitoring for larval Delta smelt (less than 20mm in length) in
the vicinity of the CVP and SWP pumping facilities a minimum of 4
times a day, evenly spaced through each 24-hour period, during
early winter to late spring.  [Pl. Ex. 4 Appendix].  That
monitoring action is proposed to begin when Delta smelt spawning
begins as indicated by (1) spring Kodiak survey data on the
maturation stage of the Delta smelt or the presence of spent
females in the survey or salvage samples; (2) when water
temperatures reach 12°C at any Delta monitoring station; or (3)
when larval Delta smelt are detected in the 20mm Survey or at the

13

CVP or SWP fish salvage facilities, whichever comes first.
Plaintiffs propose the action would end June 15, or a minimum of
five days after the last detection of larval or juvenile Delta
smelt at either the CVP or SWP facilities, whichever comes last.
This monitoring shall cease on June 15 or a minimum of five (5)
days after the last detection of larval and juvenile Delta smelt
at either the CVP or SWP protective facilities by either the
salvage or larval monitoring program, whichever comes last.

34.   Remedial action #2 would commence when (1) there is an
increase in Sacramento River flow at Freeport at 25,000 cfs; or
(2) there is an increase in San Joaquin River outflow by greater
than 10% over 3 days; or (3) Fall Midwater Trawl or Spring Kodiak
survey data indicate that Delta smelt are moving upstream of the
Sacramento-San Joaquin Confluence and into the Delta; or (4) by
January 15, whichever occurs first.   Plaintiffs propose the
action would end June 15, or a minimum of five days after the
last detection of larval or juvenile Delta smelt at either of the
CVP area facilities, whichever comes last.   [Tr. 1686:7-14, 21-
22].   Plaintiffs propose the action would end June 15, or a
minimum of five days after the last detection of larval or
juvenile Delta smelt at either the CVP or SWP facilities,
whichever comes last.   This monitoring shall cease on June 15 or
a minimum of five (5) days after the last detection of larval and
juvenile Delta smelt at either the CVP or SWP protective
facilities by either the salvage or larval monitoring program,
whichever comes last.

35.   Dr. Swanson provided two reasons for increased
monitoring: (1) the salvage sampling program at the CVP is less

**14**

efficient than the SWP sampling program; and (2) the Delta smelt population abundance is currently so low there is a risk of error by infrequent sampling, which misses fish that are actually there by only sampling for a very limited period of time.  [Tr. 386:4-12; 385:23-386:1 (documenting existing sampling frequencies at the CVP facilities)].  Dr. Moyle opined that more frequent sampling at the federal pumping facility is essential.  [Tr. 82:15-19].  Ms. Goude testified in support of this proposed increased sampling: "There is a concern that some of the surveys are not as robust because of the low numbers of smelt" and "I think [Plaintiff's action 2] would be useful."  [Tr. 651:2-24; 652:11].

H.   NEGATIVE FLOWS ON OLD AND MIDDLE RIVERS AND ENTRAINMENT EFFECTS

36.   The Old and Middle Rivers ("OMR") are tributaries of the San Joaquin River that flow through the South Delta and pass by the Project's pumping facilities.  OMR flows are strongly influenced by inflows from the San Joaquin River and by the magnitude of water diversions at the Projects' pumping facilities.  [Tr. 491:23-491:15; 316:18-25; Fed. Def. Ex. ¶4; Pl. Ex. 11 ¶9 n.1.].  These flows are also influenced by tides, the operation of the Head of Old River Barrier and certain agricultural barriers in the South Delta and other water diversions in the South Delta.  [Tr. 492:7-9; 631:16-632:5; Fed. Def. Ex. 1 ¶4; Fed. Def. Ex. 4 ¶12].  When OMR flows are upstream, when the flow is in the direction of the Project's pumping facilities (and away from the Confluence of the

1   Sacramento and San Joaquin Rivers), such flows are commonly
2   described as "negative" or "reverse."  [DWR Ex. D ¶4].  Export
3   pumping at the CVP and SWP facilities to south of Delta users,
4   cause flows to be negative on the OMR.  Plaintiffs' expert opined
5   the pumps' operations are the chief cause of this impact.  [Tr.
6   84:14-18].

7       37.  Delta smelt are poor swimmers and, when negative flows
8   on the OMR are high, Delta smelt located in the Central and
9   Southern Delta may be captured by those flows and drawn toward
10  the CVP and SWP export facilities, where they are entrained.
11  [Tr. 337:3-11; 351:25-352:5; Pl. Ex. 11 ¶28].  High negative
12  flows on the OMR may increase the risk that Delta smelt will be
13  entrained at the CVP and SWP export facilities.  [Tr. 630:18-22;
14  DWR Ex. D ¶4].

15      38.  Scientists have demonstrated an approximately linear
16  relationship between negative flows on the OMR and the number of
17  Delta smelt entrained at the CVP and SWP export facilities
18  (although the exact levels of entrainment also depend on other
19  factors, such as the abundance of the Delta smelt).  [Tr. 483:14-
20  15; 727:18-22; DWR Ex. D ¶4, Ex. 1; Pl. Ex. 11 (Fig. 7), at 12].
21  As the average combined flows on the OMR become more negative,
22  the number of Delta smelt within the zone of confluence of the
23  Projects entrained at the CVP and SWP export facilities
24  increases.  [Tr. 566:17-567:2].  The data on the exact
25  mathematical relationship between negative flows and the number
26  of Delta smelt entrained is limited.  [Tr. 348:11-16; 406:8-15;
27  566:20-22].  From available data it also appears that the number
28  of Delta smelt entrained at the CVP and SWP export facilities

1    begins to rise significantly when negative flows on the OMR

2    exceed approximately -5,000 cfs.  [Tr. 641:14-642:5; 725:16-17;

3    DWR Ex. D ¶4; DWR Ex. G ¶34; SWC Ex. N].

4         39.  Dr. Miller, the San Luis Intervenors' expert's

5    testimony on 2002 smelt abundance figures have been materially

6    questioned in the scientific peer community and the Court finds

7    Dr. Miller's analysis to be unpersuasive.  The statistical

8    analysis by Dr. Miller does not prove his opinion that the

9    projects have insignificant influence on the abundance of Delta

10   smelt.

11        40.  Negative OMR flows are lessened by reducing diversions

12   at the Projects' pumping facilities, by increasing releases to

13   the San Joaquin River from the CVP facilities upstream, or by a

14   combination of these.  Under certain conditions (including dry

15   conditions, when inflows to the San Joaquin River are low), even

16   stopping all diversions at the CVP and SWP export facilities may

17   not be sufficient to eliminate negative OMR flows. [Tr. 1555:18-

18   23; 1566:11-22].  In such a case, the negative OMR flows can only

19   be eliminated by releasing additional water to the San Joaquin

20   River or by asking other diverters in the South Delta to curtail

21   pumping. [Tr. 1567:4-19].  There is no evidence that any

22   Defendant or Intervenor in this case has any control over other

23   South Delta diverters.

24        41.  Flows on the OMR are strongly influenced by inflows

25   from the San Joaquin River and the magnitude of diversions at the

26   CVP and SWP export facilities. [Tr. 491:23-492:15; 316:18-25;

27   Fed. Def. Ex. 1 ¶4; Pl. Ex. 11 ¶9 n.1].  Negative flows on the

28   OMR may be reduced by reducing diversions at the CVP and SWP

1  export facilities or by increasing releases to the San Joaquin

2  River from the CVP facilities upstream (or by a combination of

3  such reductions in releases).

4

5  I.    PROPOSED OMR FLOW RESTRICTIONS TO REDUCE ENTRAINMENT

6         42.   Scientists have concluded that the number of Delta

7  smelt entrained at the Projects' pumping facilities often

8  increases after a winter "pulse flow," i.e., when the combined

9  winter flows on the Sacramento and San Joaquin Rivers increase to

10 about 30,000 cfs, and the Delta smelt begin to move upstream to

11 spawn and pass through the Central Delta, within the hydrological

12 influence of the Projects' pumps.  [DWR Ex. D ¶3; Tr. 368:23-

13 369:8].  Scientists hypothesize that the movement of the Delta

14 smelt may be triggered by the increased turbidity that results

15 from these winter pulse flow events.  Turbidity is a useful

16 indicator of the subsequent entrainment of adult Delta smelt.

17 [DWR Ex. D ¶3].  A restriction on negative OMR flows during a

18 winter pulse flow event is expected to help to minimize the

19 movement of Delta smelt into the South Delta and thus result in a

20 distribution of the Delta smelt population that reduces the risk

21 of entrainment at the Projects' pumping facilities.  [DWR Ex. D

22 ¶3].  FWS's witness, Ms. Goude, testified that a restriction

23 limiting negative OMR flows to -2,000 cfs during a winter pulse

24 flow event is expected to be protective of the Delta smelt.  [Tr.

25 638:24-639:15; 720:12-14].  Ms. Goude further testified that such

26 a restriction is not necessary during a wet year when high water

27 flows would themselves move the Delta smelt away from the

28 influence of the pumps.  [Tr. 639:24-640:13].

18

1   43.  After a winter pulse flow event, and in those years
2   when no pulse flow occurs, further restrictions on negative OMR
3   flows during the winter are expected to minimize the number of
4   pre-spawning adult Delta smelt entrained at the Projects' pumping
5   facilities and to reduce spawning in the South Delta (where
6   larval Delta smelt are more likely to be entrained at the
7   Projects' pumping facilities).  [DWR Ex. 4 ¶4; Tr. 638:20-23].

8   44.  During the spring and early summer, larval and juvenile
9   smelt again pass through the Central Delta, within the
10  hydrological influence of the Projects' pumps, as they move
11  downstream to their rearing areas, beyond the Confluence of the
12  Sacramento and San Joaquin Rivers and in Suisun Bay.  [DWR Ex.
13  ¶6].  Scientific studies suggest that smelt have benefitted from
14  pumping curtailments implemented under the Vernalis Adaptive
15  Management Plan ("VAMP") from mid-April to mid-May of each year.
16  [Tr. 304:22-305:11].  Restrictions on negative OMR flows during
17  the spring and early summer are expected to minimize the
18  entrainment of larval and juvenile Delta smelt at the CVP and SWP
19  export facilities.  [Tr. 389:2-9; 390:15-20; 391:5-10; 391:22-
20  392:3; 395:9-20; 641:16-19; DWR Ex. D ¶¶5, 6; Pl. Ex. 11 ¶35].
21  Such restrictions also help to facilitate the movement of larval
22  and juvenile Delta smelt downstream.  [Tr. 395:13-20].

23  45.  In general, Delta smelt face a greater risk of
24  entrainment at CVP and SWP facilities when they are located near
25  those facilities (for example, in the Central or Southern Delta)
26  than when they are located farther away (such as when they are in
27  the Suisun Bay).  [Tr. 631:7-10; 631:11-15; 642:22-23; DWR Ex. D
28  ¶6].  For that reason, it is appropriate to identify specific

1  target flow for the OMR (within a certain range) at the time when
2  the restriction is to come into effect, based on the best
3  scientific data available at that time, including, but not
4  limited to, survey results, salvage information, results of the
5  "particle tracking model" developed by the DWR, and information
6  on the actual hydrology occurring at the time, which also affects
7  smelt movements.

8       46.   The Delta is a dynamic aquatic environment and flows on
9  the OMR may be affected by the tides and unpredictable natural
10 factors such as high winds, rain events, storm surge, and other
11 meteorological conditions.  [Tr. 1494:6-1496:6; Fed. Def. Ex. 2
12 ¶41; DWR Ex. G ¶33].  Some variability in flows on the OMR cannot
13 be avoided, and to allow for that variability, any restriction on
14 those flows should be expressed as a seven-day running average.
15 There is conflict in the testimony regarding the value of use of
16 a shorter averaging period.  [Tr. 1499:5-18; 1500:3-19; DWR Ex. J
17 ¶¶30, 32].

18

19 J.   RESTRICTIONS ON INSTALLATION OF BARRIERS IN DELTA

20       47.   The Head of Old River Barrier, when installed, directs
21 flows on the San Joaquin River away from the Old River into the
22 Central Delta.  [DWR Ex. D ¶8].  The purpose of the Head of Old
23 River Barrier is to benefit migrating salmon.  [Tr. 134:3-12].
24 This measure tends to increase negative OMR flows which may
25 increase the risk that Delta smelt will be entrained at the
26 Projects' pumping facilities.  [Tr. 134:3-12; 400:14-18; 649:7-
27 16; DWR Ex. D ¶8].  A restriction prohibiting the installation of
28 the head of Old River Barrier until June 15 will allow the San

1  Joaquin River to contribute to more positive OMR flows and

2  minimize the risk that Delta smelt will be entrained at the

3  Projects' pumping facilities.  [Tr. 402:20-23; 408:25-409:7; Pl.

4  Ex. 4 Appendix].  The Barrier diverts salmon away from the pumps;

5  it does not improve flows for them.  [Tr. 134:3-12].

6      48.  There are agricultural barriers that when in operation,

7  retain more water in the South Delta (to facilitate agricultural

8  diversions) by using "flap gates."  [DWR Ex. D ¶8].  The flap

9  gates allow water to pass through the barriers on the incoming

10 tide, but prevent it from draining away when the tide ebbs.  [DWR

11 Ex. D ¶8].  In this way, these barriers also tend to increase

12 negative OMR flows.  A restriction requiring the flap gates on

13 these agricultural barriers to be tied open will allow this water

14 to contribute to more positive OMR flows.  [DWR Ex. D ¶8].

15 Plaintiffs' proposed actions 8 and 9 prohibiting the installation

16 of these agricultural barriers until the end of the VAMP measure

17 as prescribed in the Interim Remedial Order.

18

19 K.   FALL ACTIONS

20     49.  Plaintiffs' proposed fall action to maintain Delta

21 outflow at a minimum of 7,500 cfs or maintain X-2 (or as a

22 fourteen day running average at downstream of 80km, whichever

23 requires less fresh water outflow was not supported by a

24 preponderance of the evidence because: (1) not supported by peer-

25 reviewed analysis; (2) the Delta Smelt Working Group declined to

26 support similar actions put before them; and (3) there is

27 material uncertainty among scientists about the benefit of this

28 action for the Delta smelt in the face of its requirement of a

1  large commitment of water to users in times of summer heat.  [Tr.
2  1691:19-1692:11].

3        49.    The significant quantity of water that would be
4  required for proposed fall actions, approaching 500,000 acre feet
5  ("AF") in an average water year, in light of the scientific
6  dispute and other scientists' rejection of such a plan; the
7  scientific uncertainty; and the low risk reward benefit analysis
8  does not justify imposition of a fall remedial measure.

9

10  L.    OTHER NEGATIVE EFFECTS ON DELTA SMELT

11        51.    The evidence preponderates to show that the Projects'
12  operations adversely modify the Delta smelt's designated critical
13  habitat, the South and Central Delta waters, by rendering the
14  designated habitat in the South Delta unsafe to use for spawning
15  or migration because of the risk of pumping entrainment at
16  different times to all life stages of the species.  [Tr. 89:11-
17  90:11; 94:6-95:3; 589:11-591:8; 686:4-10].   The South Delta
18  represents roughly one-third of the Delta smelt's critical
19  habitat.  [Tr. 589:21-25; 591:5-8].

20        52.    The full range of causes of the Delta smelt's current
21  record low population abundance and the relative roles various
22  causes have played in the species are not fully understood.  [Tr.
23  73:4-16; 299:16-300:1; 301:1-18; 303:25-304:3; 617:22-618:6].
24  However, substantial evidence proves by more than a preponderance
25  that Delta smelt mortality is caused by the Projects' operations.
26  The evidence does not establish that the primary cause of the
27  Delta smelt's decline is lack of adequate food supply, a position
28  advanced by Dr. William J. Miller.  [Tr. 1682:3-17].

1    53.   Additional causes, not directly effectuated by CVP and
2  SWP operations, include, but are not limited to, toxicity
3  resulting from pesticides and other toxics in the species'
4  habitat; invasive predatory species, including the Asian Overbite
5  Clam; actions of other diverters in the Delta; and reduction of
6  the food supply of the species, are contributing to its decline.
7
8  M.   INADEQUACY OF TAKE LIMITS

9    54.   The 2005 BiOp identifies limits on the number of Delta
10  smelt that may be taken at the CVP and SWP export facilities
11  before consultation with FWS must be reinitiated under the ESA.
12  The existing take limits are unrealistically high and may
13  approach the current population numbers of the species as a
14  whole.  [Tr. 776:2-777:19; 1213:16-1215:22; 1679:15-18].  The
15  incidental take limits set in the 2005 BiOp are arbitrary and
16  capricious because, in setting those limits based on historical
17  take, FWS did not take into account the most recent uncontested
18  data about record-low Delta smelt abundance.  [SJ Order at 92:19-
19  93:1; Tr. 358:4-359:4].  The even higher incidental take limits
20  set in the out-dated 1995 BiOp on the Projects' operations may
21  exceed the species' current population.  [Tr. 633:12-644:12;
22  777:2-3; 1679:15-18].

23    55.   The take limits set out in the 2005 BiOp are
24  significantly more restrictive (allowing the taking of fewer
25  Delta smelt) than the take limits that were identified in the
26  previous biological opinion (issued in 1995).  [Tr. 777:10-19].
27  The latter-issued take limits are not sufficient by themselves in
28  the absence of interim and injunctive relief, to protect the

23

1  Delta smelt.

2

3  **N.    INADEQUACY OF DSRAM PROCESS TO MITIGATE EFFECTS OF PROJECTS'**
4       **OPERATIONS**

5       56.    The BiOp attempted to remediate the Projects' negative
6  impacts to the jeopardized Delta smelt through the implementation
7  of the DSRAM, a mitigation process that is the central remedial
8  plan for the 2005 BiOp.  [Tr. 1681:14-21].  The DSRAM process has
9  been found arbitrary and capricious because it did not provide
10 the reasonable certainty required by the ESA that necessary
11 mitigation measures will be implemented, nor the reasonable
12 assurance the ESA requires that OCAP operations will not
13 jeopardize the Delta smelt nor adversely modify its critical
14 habitat.  [SL Order at 58:12-59:4].

15      57.    Ronald Milligan, manager of Reclamation's CVP Office,
16 testified that the Delta smelt has declined in population
17 abundance in recent years, despite the agency's use of the DSRAM
18 in the last several years attempting to address the Projects'
19 impacts on the species.  [Tr. 1559:9-1560:6].  The Water
20 Operations Management Team ("WOMT") which includes
21 representatives from Reclamation and DWR, has declined at times
22 although presented with incontrovertible evidence, to take
23 actions to protect the smelt, that were recommended pursuant to
24 the DSRAM by the Delta Smelt Working Group ("DSWG"), a team of
25 Delta smelt scientists from the Project agencies and the Wildlife
26 Protection Agencies.  [Tr. 1552:21-1554:21; 1557:8-23].
27 Reclamation's and DWR's reliance on the DSRAM process has been
28 unsuccessful, as demonstrated by the record low population

abundance indices for the Delta smelt in the past three years.
[Tr. 270:25-271:10; 273:24-274:2; 1581:4-1580:2].

O.   OTHER MEASURES NECESSARY FOR FEDERAL DEFENDANTS' TO TAKE
     PENDING THE NEW BIOP

58.   Federal Defendants in their opening brief on injunctive
relief identified measures that they committed to implement, as
necessary to prevent an irreversible or irretrievable commitment
of resources under ESA Section 7(d) pending completion of a new
biological opinion.  [Fed. Def. Brief, Doc. 396 at pp. 19-20].
Federal Defendants committed, as of July 9, 2007, that:

1) The Bureau will not execute any long-term water
service contracts with CVP contractors until the new BiOp is
completed;

2) The Bureau will not implement construction
activities and long-term projects in the Delta until the new BiOp
is completed, including the South Delta Improvement Project, the
Delta Mendota Canal/California Aqueduct Intertie Program, the
Lower American River Flow Standards, and the Long Term
Environmental Water Account;

3)  The Bureau will "not increase exports from the
South Delta and will operate Jones Pumping Plant within recent
historic limits;" and

4)  The Bureau committed resources and staff to the
continuing study of pelagic organism decline in the Delta.

59.   These measures shall be implemented during the
reconsultation period as Federal Defendants admit the measures
are necessary to preserve the Delta smelt and its critical

25

1  habitat.

2

3  **P.    PUBLIC HEALTH, SAFETY AND THE HUMAN ENVIRONMENT**

4       60.   Plaintiffs' proposed restrictions on the operations of
5  the CVP and SWP have the ability to deleteriously affect public
6  health, safety, and the human environment in many ways.   The
7  Court recognizes it has limited ability to control the impact of
8  its ruling under ESA jurisprudence, particularly economic
9  impacts.   Plaintiffs proposed an exception to the implementation
10  of interim injunctive relief and remedial actions where such
11  requirements would threaten public health and safety.   The
12  Plaintiffs propose that this limitation be defined by
13  Reclamation's "M&I Shortage Policy," which provides that a public
14  health and safety problem exists "when there is a severely low
15  water supply with the sharing of water supplies for purposes of
16  interior residential, sanitation and fire protection."

17       61.   Although the ESA does not expressly recognize an
18  exception for human health and safety, Plaintiffs have offered
19  and it is prudent to apply a human health and safety exception as
20  part of the relief granted in this case.   Risks that will be
21  created by implementation of the interim remedial actions to be
22  imposed, include, but are not limited to:

23            a.   Adverse impacts affecting deliveries of water
24  necessary for water service districts, emergency water supplies,
25  municipal water supplies, and industrial power and related energy
26  sources;

27            b.   Adverse effects on agriculture including, but not
28  limited to, loss of jobs, increased groundwater pumping, fallowed

1  land, and land subsidence.

2      c.    Air pollution resulting from heavier reliance on
3  groundwater pumping and decrease in surface irrigation; and

4      d.    Damage to the structural integrity of CVP or SWP
5  facilities including reservoirs or dams, causing, for example,
6  significant damage to the earthen walls of the San Luis
7  Reservoir, if that reservoir is drawn down too rapidly.
8  [Tr. 1412:24-1413:3; 1414:6-17; 1414:1-5; 1482:15-1483:2].

9      62.   Diversions from CVP and SWP export facilities are also
10  necessary to meet health and safety demands of certain
11  contractors on the upper reach of the Delta-Mendota Canal, where
12  such contractors have few or no alternative sources of water.
13  [Fed. Def. Ex. 4 ¶5].

14

15              III.   CONCLUSIONS OF LAW

16  A.    JURISDICTION

17      1.    Jurisdiction in this case exists under 28 U.S.C. § 1331
18  (Federal Question); 16 U.S.C. § 1536 et seq. (the ESA); and 5
19  U.S.C. § 702 et seq. (the Administrative Procedure Act).

20      2.    All other Defendant-Intervenors have voluntarily
21  submitted themselves to the Court's jurisdiction by intervening
22  and fully participating in the litigation.  The DWR, by its
23  intervention and full participation throughout the pleading
24  phase, dispositive motion proceedings, temporary restraining
25  order proceedings, evidentiary hearing on remedies and by
26  presenting evidence, proposing interim remedies, and providing
27  oral and written arguments as well as additional written legal
28  authorities on the merits of all issues, claims and remedies,

                          27

1  that address DWR's joint operation with Reclamation of the CVP

2  and SWP, have waived any jurisdictional objection to the

3  imposition of the interim remedial orders on the DWR.  DWR and

4  other parties have reserved the right to address motions to the

5  issues of jurisdiction and efficacy of the most recent

6  supplements to Plaintiffs' complaint.

7      3.  On August 30, 2007, Plaintiffs' motion to supplement

8  their complaint was granted adding claims that Reclamation

9  violated §7(a)(2) of the Endangered Species Act, 16 U.S.C.

10 § 1536(a)(2).  The supplemental complaint claims that

11 Reclamation's and DWR's operation of the CVP and SWP is causing

12 decline in the smelt population and threatens extinction of the

13 species and is causing adverse effects on the Delta smelt's

14 designated critical habitat.

15     4.  Defendant Intervenors reserve the right to challenge the

16 Court's jurisdiction over the new ESA claim.  Plaintiffs assert a

17 further claim for violation of §7(d) for irretrievable or

18 irreversible commitments of resources during §7 consultation.

19     5.  The summary judgment proceedings and evidentiary hearing

20 were conducted with full participation of DWR (the State of

21 California, and the State Water Contractors, who offered

22 evidence, legal briefing and argument).  This conduct also

23 amounts to judicial estoppel against DWR and SWC.   The

24 principles of Fed. R. Civ. P. 15(b) apply to permit amendment of

25 pleadings, if necessary, to conform to the proof offered by DWR

26 and the SWC.

27     6.  The Federal Defendants, by initiating reconsultation,

28 have acknowledged the invalidity of the 2005 BiOp.  They have,

28

pursuant to Court direction, proposed interim remedial measures. The Federal Defendants have agreed to implement stand-by measures that will prevent the irreversible or irretrievable commitment of resources pending completion of a lawful biological opinion. These commitments are listed at Finding of Fact 57., p. 24:15-25:5, and are incorporated into the accompanying Interim Remedial Order.

B.    Judicial Non-Intervention

7.    The Court will not substitute its judgment for that of any administrative agency.  The Court lacks the expertise or background in fish biology, hydrology, hydraulic engineering, water project operations, and related scientific and technical disciplines that are essential to determining how the State and Federal Water Projects should be operated to protect and benefit the public and the species.

C.    IMPERILED STATUS OF SPECIES

8.    There is general agreement among the biologists and environmental experts who testified as to the current critical condition of the Delta smelt, which is at a historic low and could go extinct within one year, with or without all proposed remedial measures.  There is considerable difference of expert opinion as to whether and what remedial proposals are biologically necessary in the interim pending completion of a lawful biological opinion, which are all reasonably supported by available scientific data and information.

9.    Jarry Johns, DWR's Deputy Director who is also a member

1   of the Water Operations Management Team, has testified before a

2   Congressional Oversight Committee:  "It is DFG's position that

3   actions must be taken to protect as many individual smelt as can

4   be through manipulation of the water projects.  Each reproducing

5   organism is important to the survival of the species."

6       10.  Mr. Johns' declaration ¶ 58 explains:  The "dramatic

7   drop in juvenile smelt was a great concern to DFG and USFWS this

8   year and highlighted their concern about any further impacts to

9   the reduced population this year."

10      11.  The Delta Smelt Working Group recognized in spring of

11  2007 that the Delta smelt was "critically imperiled" and that the

12  Projects should seek to achieve "no further entrainment of Delta

13  smelt."  Swanson Dec. ¶ 16.

14      12.  The evidence clearly establishes by more than a

15  preponderance that the condition of the Delta smelt has worsened

16  in recent years and that the species is currently in a critical

17  state.  Some experts have opined that there may be no way to

18  prevent the extinction of the species.  There is a dispute

19  whether the operations of the CVP and SWP export facilities are

20  the principal cause of the decline in the Delta smelt or whether

21  other factors beyond the control of the Projects are the

22  principal cause.  Nonetheless, there is no dispute that Project

23  operations are taking Delta smelt through entrainment, salvage,

24  and alteration of Delta hydrology, principally reversal of

25  natural flows.

26      13.  Under the doctrine of concurrent causes, the impact

27  from Project operations is at least a concurrent cause which

28  jeopardizes the existence of the Delta smelt and endangers its

survival and its critical habitat, which necessitates remedial action.  The Court is under a legal and equitable duty to formulate remedial action.

14.   The interim remedial order has taken into account all evidence and opinions provided by the multitude of experts who have testified about the scientific issues and made the remedial proposals.  This is legally justified by the ESA requirement that the best scientific and commercial data available be brought to bear on the issues presented.

15.   Continued operation of the Projects' pumps in the interim period without imposition of a remedial order would not provide the necessary level of protection to prevent further risk to the survival of the Delta smelt.

16.   The interim remedial order must be and is based upon the best scientific and commercial data presented by the parties over an extended evidentiary hearing and in extensive written submissions, after oral argument.  The interim remedial order is narrowly tailored to impose burdens no greater than reasonably necessary to comply with the ESA.  *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 799-800 (9th Cir. 2005).

17.   A Plaintiff must still demonstrate a likelihood of success on the merits as well as "reasonable likelihood" of irreparable harm for ESA injunctive relief.  *National Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994); *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 442 F.3d 782, 793-94 (9th Cir. 2005).

18.   The extinction of a species and adverse effect on its critical habitat constitute irreparable injury.

1    19.    The Plaintiffs have prevailed in this action to the

2 extent that the BiOp under which Reclamation and DWR are

3 operating the CVP and SWP, the DSRAM, and Incidental Take Limits

4 are unlawful.

5    20.    The evidence described in the Findings of Fact

6 establishes by a preponderance of the evidence that the current

7 operations of the CVP and SWP could result "in irreparable harm"

8 by imminently threatening the continued existence of the Delta

9 smelt and adversely modifying its designated critical habitat.

10

11 D.    STANDARDS FOR APA INJUNCTIVE RELIEF

12    21.    Agency decisions are reviewed under the Administrative

13 Procedure Act, 5 U.S.C. § 706(2)(A) and should be set aside only

14 if the decision is arbitrary, capricious, an abuse of discretion,

15 or otherwise not in accordance with law.  *Sierra Club v. Marsh*,

16 816 F.2d 1376, 1384 (9th Cir. 1987).  To prove an APA violation,

17 the Plaintiff must show irreparable harm or a balance of

18 hardships tipping in the Plaintiff's favor.  For a NEPA claim, a

19 Plaintiff is required to make a traditional showing for

20 injunctive relief.  Establishing a procedural violation of NEPA

21 does not compel the issuance of a preliminary injunction.  *Fund*

22 *Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992).

23    22.    "Environmental injury, by its nature, can seldom be

24 adequately remedied by money damages and is often permanent or at

25 least of long duration, i.e., irreparable.  If such injury is

26 sufficiently likely, therefore, the balance of harms will usually

27 favor the issuance of an injunction to protect the environment."

28 *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545

1  (1987).  Here, all experts agree that the status of the Delta
2  smelt species is critical and the species could be extinct within
3  one year.  Experts have also testified that the species could go
4  extinct with or without any action by the parties.

5      23.   Injunctive relief is intended to be the least
6  intrusive and is not intended to limit the lawful exercise of
7  Agency discretion, competence, and expertise to operate the
8  Projects in compliance with APA and ESA requirements.

9

10 E.   ESA INJUNCTIVE RELIEF REQUIREMENTS

11     24.   ESA Section 7(a)(2) prohibits agency action that is
12 "likely to jeopardize the continued existence of any listed
13 species or to result in the destruction or adverse modification
14 of its critical habitat.  16 U.S.C. § 1536(a)(2).

15     25.   Agency regulations interpret § 7(a)(2) to prohibit any
16 agency action "that reasonably would be expected, directly or
17 indirectly, to reduce appreciably the likelihood of both the
18 survival and recovery of a listed species in the wild."  50
19 C.F.R. § 402.02; *National Wildlife Federation v. National Marine*
20 *Fisheries Service*, 481 F.3d 1224, 1235 (9th Cir. 2007).

21     26.   *Gifford Pinchot Task Force v. United States Fish &*
22 *Wildlife Service*, 378 F.3d 1059, 1070 (9th Cir. 2004), requires
23 that recovery as well as survival impacts be considered in
24 evaluating adverse modification of critical habitat.  Here, the
25 critical habitat for the Delta smelt is the Sacramento-San
26 Joaquin Delta, confluence of the Sacramento and San Joaquin
27 Rivers as they approach the San Francisco Bay, and the tributary
28 system that is contiguous to the North and Central Delta areas

33

1  where the smelt spawn and through which the species moves to the

2  Suisun Bay where the species remains until the spawning season.

3       27.   The Endangered Species Act mandates that federal

4  agencies take no action that will result in "destruction or

5  adverse modification" of designated critical habitat.   16 U.S.C.

6  § 1536(a)(2).  "Destruction or adverse modification" is defined

7  as follows:

8              A direct or indirect alteration that appreciably
             diminishes the value of critical habitat for both the
9            survival and recovery of a listed species.   Such
             alterations include, but are not limited to,
10           alterations adversely modifying any of those physical
             or biological features that were the basis for
11           determining habitat to be critical.

12  50 C.F.R. § 402.02.

13

14  F.   **ESA Injunctive Relief Jurisprudence**.

15       28.   The remedy for an ESA substantial procedural violation,

16  i.e., a violation that is not technical or de minimis, is an

17  injunction pending compliance with the ESA.   *Washington Toxics*

18  *Coalition v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005).

19       29.   After initiation of consultation required under

20  § 7(a)(2) of the ESA, the Federal agency shall not make any

21  irreversible or irretrievable commitment of resources with

22  respect to the agency action which has the effect of foreclosing

23  the formulation or implementation of any reasonable and prudent

24  alternative measures which would not violate § 7(a)(2).

25  *Washington Toxics*, 413 F.3d at 1034.   ESA consultation was

26  reinitiated on the OCAP BiOp July 6, 2006.

27       30.   Section 7(d) of the ESA was enacted to ensure the

28  status quo is maintained during the consultation process to

34

prevent agencies from sinking resources into a project to ensure its completion regardless of impacts on endangered species.  *Pac. Rivers Council v. Thomas*, 936 F.Supp. 738, 745 (D. Idaho 1996). Non-jeopardizing agency actions may continue during the ESA consultation process.  *Sierra Club v. Marsh*, 816 F.2d 1376, 1389.

31.  In *TVA v. Hill*, 437 U.S. 153, 173, 193-95, 98 S.Ct. 2279, 2291, 2301-02 (1978), the Supreme Court held that Congress explicitly foreclosed a court's exercise of traditional equitable discretion when faced with a violation of § 7 of the ESA.  *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987).  The obligation of Federal agencies is to "ensure that any action . . . is not likely to jeopardize the continued existence of any endangered species."  Section 7(a)(2).  "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'"  *Sierra Club*, 816 F.2d at 1383.

32.  In *TVA v. Hill*, where the threat to the snail darter resulted in injunctive relief against operation of the 100 million dollar Tennessee Valley Authority Dam, the Supreme Court stated: "Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute.  Once the meaning of enactment is discerned and its constitutionality determined, judicial process comes to an end."  *TVA*, 437 U.S. at 194-195.  Having determined an irreconcilable conflict between CVP and SWP operations and the explicit provisions of § 7 of the

Endangered Species Act to fashion a remedy, the words of the
Supreme Court provide guidance:

> "Our system of government is, after all, a tripartite
> one, with each branch having certain defined functions
> delegated to it by the Constitution.  While "[i]t is
> emphatically the province and duty of the judicial
> department to say what the law is," *Marbury v. Madison*,
> 1 Cranch 137, 177, 2 L.Ed. 60 (1803), it is equally –
> and emphatically – the exclusive province of the
> Congress not only to formulate legislative policies and
> mandate programs and projects, but also to establish
> their relative priority for the Nation.  Once Congress,
> exercising its delegated powers, has decided the order
> of priorities in a given area, it is for the Executive
> to administer the laws and for the courts to enforce
> them when enforcement is sought."

> Here, we are urged to view the Endangered Species Act
> "reasonably," and hence, shape a remedy "that accords
> with some modicum of common sense and the public weal."
> *Post*, at 302.  But is that our function?  We have no
> expert knowledge on the subject of endangered species,
> much less do we have a mandate from the People to
> strike a balance of equities on the side of the Teleco
> Dam.  Congress has spoken in the plainest of words,
> making it abundantly clear that the balancing has been
> struck in favor of affording endangered species the
> highest of priorities, thereby adopting a policy which
> it describes as "institutionalized caution."

33.  "In our Constitutional system, the commitment to the
separation of powers is too fundamental for us to preempt
Congressional action by judicially decreeing what accords with
common sense and the public weal."  Our Constitution vests such
responsibilities in the political branches.  *TVA v. Hill*, 437
U.S. at 195.

34.  The language, history and structure of the ESA
indicates beyond doubt that Congress intended "endangered species
be afforded the highest of priorities."  *TVA v. Hill*, 437 U.S. at
174.  "In Congress's view, projects that jeopardized the
continued existence of endangered species threatened incalculable

1    harm: accordingly, it decided that the balance of hardships in

2    the public interest tip heavily in favor of endangered species."

3    *TVA v. Hill*, at 187-88, 194-95; *Sierra Club v. Marsh*, 816 F.2d at

4    1383; *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1116,

5    1177 (9th Cir. 2002).  The Ninth Circuit has said, "We may not

6    use equities' scales to strike a different balance."  *Sierra Club*

7    *v. Marsh*, 816 F.2d at 1383.  In the context of the ESA, "Congress

8    [has] foreclosed the exercise of the usual discretion possessed

9    by a court of equity."  *Amoco Prod. Co. v. Village of Gambell,*

10   *Alaska*, 480 U.S. 531, 543 n.9, 544-45, 107 S.Ct. 1396 (1987),

11   cited in *Biodiversity Legal Foundation*, 309 F.3d at 1178.

12

13   G.   <u>EVIDENCE OF ESA VIOLATIONS</u>

14        35.  Direct evidence has established that CVP and SWP

15   pumping and water conveyance operations cause flows in the Old

16   and Middle Sacramento Rivers and easterly of the confluence of

17   the Sacramento and San Joaquin Rivers to flow in opposite

18   directions, which confuses the smelt and causes the fish to be

19   entrained or salvaged at the pumps.  Evidence further establishes

20   that export operations from the pumps caused a reduction of flows

21   through the Central Delta westward from the confluence of the

22   Sacramento and San Joaquin Rivers into the Suisun Bay which

23   affects the salinity of the water.

24        36.  D-1641 establishes salinity standards applicable

25   February through June as a establish a benchmark for the

26   isohaline referred to as X2, salinity measured as two parts per

27   thousand, prescribing that X2 be maintained at not more than two

28   parts per thousand at a point a certain number of kilometers from

1 the Golden Gate Bridge and eastward.  Evidence has shown that the

2 smelt's tolerance to water salinity declines substantially above

3 the four to five parts per thousand level.  Increases in exports

4 from the Bay Delta through the pumps southward cause increasing

5 salinity in the Bay Delta waters and estuary by virtue of lowered

6 volumes of fresh water after export.  Only one expert, Dr.

7 Miller, disagreed and his trial opinions ignored that water

8 temperature, water quality, salinity, turbidity, and Project

9 operations, have a direct effect on survival and recovery of the

10 Delta smelt.  For reasons stated above, the Court does not find

11 Dr. Miller's analysis sufficiently credible and relevant to cast

12 doubt that Project operations are an actual cause of the decline

13 and potential extinction to the Delta smelt species.

14      37.   Section 7(d) of the ESA prohibits an agency from making

15 any irreversible and irretrievable commitment of resources that

16 would foreclose the formulation or implementation of any

17 reasonable and prudent alternative measures to avoid jeopardy to

18 a listed species or adverse modification of its critical habitat

19 pending completion of a valid biological opinion.  16 U.S.C.

20 § 1536(d).

21      38.   The Delta smelt is listed as a threatened species.  58

22 Fed. Reg. 12,863 (Mar. 5, 1993).

23      39.   The ESA implementation regulations provide that

24 Section 7(a)(2)'s "no jeopardy" requirement prohibits any Federal

25 agency action "that reasonably would be expected, directly or

26 indirectly, to reduce appreciably the likelihood of both the

27 survival and recovery of a listed species in the wild by reducing

28 the reproduction, numbers, or distribution of that species."  50

1  C.F.R. § 402.02.

2      40.    The ESA implementation regulations define Section
3  7(a)(2)'s requirement that prohibits actions that would destroy
4  or adversely modify the listed species' critical habitat:
5  "*Destructive or adverse modification means a direct or indirect*
6  *alteration that appreciably diminishes the value of critical*
7  *habitat for both the survival and recovery of a listed species.*"
8  50 C.F.R. § 402.02 (emphasis in original).

9      41.    The Ninth Circuit rule is that an action that
10 "adversely modifies" a listed species' critical habitat is one
11 that would "threaten a species' recovery even if there remains
12 sufficient critical habitat for the species' survival." *Gifford*
13 *Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d
14 1059, 1070 (9th Cir. 2004).

15     42.    Operations of the CVP and SWP under the existing OCAP,
16 among other causes, are both increasing risk to the survival and
17 recovery of the Delta smelt and adversely modifying its critical
18 habitat.

19     43.    The Court's Summary Judgment Order found that the 2005
20 BiOp that covers day-to-day coordinated operations of the CVP and
21 the SWP was unlawful, arbitrary, and capricious. [SJ Order at
22 118:10-119:27].

23     44.    The DSRAM measures adopted as part of the 2005 BiOp
24 and the take limit have been found insufficient to satisfy ESA
25 requirements.  [SJ Order at 58:12-59:4; 92:19-93:1].

26     45.    The existing take limits without remedial measures will
27 not prevent the risk of extinction of the species within the
28 period of time a new lawful biological opinion can be completed.

1  Any injunctive relief should be narrowly tailored to remedy the
2  specific ESA violation.  *Nat'l Wildlife Fed'n v. NMFS*, 2005 U.S.
3  Dist. LEXIS 39509, Op. at 8 (D. Or. 2005), aff'd, 481 F.3d 1224
4  (9th Cir. 2007).

5      46.  To comply with ESA Sections 7(a)(2) there is no
6  requirement that Reclamation or FWS pick the best alternative or
7  the one that would most effectively protect the Delta smelt from
8  jeopardy.  *Southwest Center for Biological Diversity v. Bureau of*
9  *Reclamation*, 143 F.3d 515, 523, fn.5 (9th Cir. 1998).  However,
10 it is not required that an inflexible flow regime be imposed that
11 will expel precious, scarce water resources that will flow out to
12 the Pacific Ocean and cannot be recovered.

13     47.  Because evidence overwhelmingly establishes that
14 Project operations are a cause of the decline of the species,
15 Project operations must be addressed as mandated by the law to
16 protect against extinction of the species and adverse
17 modification of its habitat.

18

19 H.    Authority for Remand

20     48.  The District Court has broad latitude in fashioning
21 equitable relief when necessary to remedy an established wrong.
22 *NWF v. NMFS*, 481 F.3d at 1242, citing *Alaska Ctr. for the Envt.*
23 *v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994).

24     49.  Requirements of regular status reports during a remand
25 are permissible.  *NWF v. NMFS*, 481 F.3d at 1242; *Telecomms.*
26 *Research & Action Ctr. v. FCC*, 750 F.2d 70, 81 (D.C. Cir. 1984).
27 A status report shall be produced by FWS.

28     50.  The District Court has the discretionary authority to

1   impose a deadline for remand proceedings.  *Nat'l Org. of*

2   *Veterans' Advocates v. Sec'y of Veterans' Affairs*, 260 F.3d 1365,

3   1381 (Fed. Cir. 2001); *NWF v. NMFS*, 481 F.3d at 1242.  A deadline

4   for the remand shall be imposed.

5       51.  A court has the power to direct efforts that ensure

6   that the agency complies with the ESA's mandate that agencies

7   "use the best scientific and commercial data available" in their

8   decision-making.  16 U.S.C. § 1536(a)(2).  Monitoring will be

9   increased as described in the remedies order.

10

11  I.   Congressional Intent

12      52.  The plain intent of Congress in enacting the Endangered

13  Species Act was to halt and reverse the trend toward species'

14  extinction, whatever the cost.  *TVA*, 437 U.S. at 184.  Section 7

15  reveals an explicit Congressional decision "to require agencies

16  to afford first priority to the declared national policy of

17  saving endangered species."  *TVA* at 185.  As the Court in *TVA*

18  expressly stated:

19              One might dispute the applicability of these examples
            to the Teleco Dam by saying that in this case the
20          burden on the public through the loss of millions of
            unrecoverable dollars would greatly outweigh the loss
21          of the Snail Darter.  But neither the Endangered
            Species Act nor Article III of the Constitution
22          provides Federal Courts with authority to make such
            fine utilitarian calculations.
23

24      53.  On the contrary, the plain language of the Act,

25  buttressed by its legislative history shows clearly that Congress

26  viewed the value of endangered species as "incalculable."  Quite

27  obviously, it would be difficult for a court to balance the loss

28  of a sum certain, even $100 million, against a Congressionally

1 declared "incalculable" value, even assuming we had the power to
2 engage in such a weighing process, which we emphatically do not."
3 *TVA* 437 U.S. at 187-188.  As the Supreme Court requires, it is
4 not for the Court to substitute its judgment for that of Congress
5 or the Executive Branch, the Department of the Interior, and the
6 Bureau of Reclamation.  The Court has no such scientific
7 competence nor the legal authority.  Once the actions of an
8 administrative agency in operating the CVP and a voluntarily
9 appearing State Agency in operating the SWP, violate the ESA by
10 endangering the species to the point where, as the undisputed
11 evidence shows, it is critically imperiled and in imminent threat
12 of extinction, the Court cannot balance hardships nor does it
13 have any discretion, except to apply the mandate of Congress
14 prescribed by the ESA.

15    54.   It is Congress that struck the balance in favor of
16 affording endangered species the highest of priorities.  It is up
17 to the political branches of government, not the court, to solve
18 the dilemma and dislocation created by the required application
19 of the law.

20

21 J.    <u>NARROWLY TAILORED RELIEF</u>

22    55.   A court may make narrowly tailored orders to an agency
23 to take specific steps, subject to the overriding principal that
24 the substance and manner of achieving ESA compliance is
25 ultimately the responsibility and within the jurisdiction of the
26 administrative agencies, subject to the Court's equitable and
27 interstitial role to fashion a remedy for agencies' dereliction
28 of their statutory duties.  *NWF v. NMFS*, 481 F.3d at 1243; *FPC v.*

1  *Transcontinental Gas Pipeline Corp.*, 423 U.S. 326, 333, 96 S.Ct.
2  579 (1976).

3

4  **K.    Adequacy of Remedy.**

5      56.   Any interim remedial prescriptions must (1) not cause
6  jeopardy, i.e., not take action that reasonably would be
7  expected, directly or indirectly, to reduce appreciably the
8  likelihood of both the survival and recovery of a listed species
9  in the wild by reducing the reproduction, numbers, or
10 distribution of that species.  50 C.F.R. § 402.02;  to the Delta
11 smelt; (2) adversely modify its critical habitat; or (3)
12 irreversibly or irretrievably commit resources during the
13 pendency of the reconsultation on and issuance of the BiOp.

14

15 **L.    PUBLIC HEALTH AND SAFETY EXCEPTION**

16     57.   It is recognized that any interim remedial order has
17 the potential to create risk to human health and safety.  This
18 requires that a discretionary exception be included in the
19 interim remedial order that authorizes and grants discretion to
20 the Federal and State agencies having responsibility for
21 operation of the Projects, to take such measures, in good faith,
22 as are reasonably necessary and appropriate for protection of
23 human health and safety and the environment in accordance with
24 the requirements of law and equity.

25     58.   This exception includes, but is not limited to, supply
26 for emergency water services, and industrial water service for
27 domestic and emergency use.

28     59.   Plaintiffs have expressly offered and recognize that

43

1  any reduction in water deliveries should be effectuated in
2  accordance with the operating Agencies' standard practice for
3  allocating water during shortages, which recognizes the priority
4  of critical municipal and industrial (M&I) uses.

5      60.   Critical human health and safety needs will receive
6  priority protection.  The Plaintiffs have offered and the Court
7  specifically authorizes the Bureau and DWR to implement
8  operational measures different from those required to protect
9  Delta smelt for the purpose of meeting public health and safety
10  needs.  The Bureau and DWR have similar definitions of "public
11  health and safety" for water supply delivery and priority of use,
12  including but not limited to, interior residential use,
13  sanitation, and fire protection.

14

15  M.   LIMITS ON COURT'S AUTHORITY

16      61.   The Court recognizes its own limitations in approaching
17  the scientific and technical issues presented, some of which are
18  fraught with uncertainty.  The Court lacks the expertise and
19  authority to take over operation of the Projects, or to supervise
20  or second-guess the decisions of the biological, and other expert
21  staff of the USFWS and DWR and the hydrologists and engineers of
22  the Bureau of Reclamation.  It is appropriate for the Court to
23  defer to the expertise of the Projects' operators and Federal
24  Defendants in highly technical operational issues as they concern
25  protection of human health and safety and the environment.  The
26  court's role is limited to see that compliance with the
27  requirements of law is achieved.

28

1   **N.    STATUS REPORT AND DEADLINE**

2   **    62.    FWS shall provide the court and parties with a status**
3   **report on the progress of the biological opinion.  FWS's status**
4   **report shall be filed April 30, 2008.**

5   **    63.   FWS shall complete its consultation and issue its new**
6   **biological opinion on or before September 12, 2008.**

7

8   **IV.   CONCLUSION**

9   **    To the extent any finding of Fact may be interpreted as a**
10  **Conclusion of Law or the converse, it is so intended.  Based upon**
11  **these Findings of Fact and Conclusions of Law, the accompanying**
12  **Interim Remedial Order shall issue.**

13

14  IT IS SO ORDERED.

15  **Dated:    December 14, 2007          /s/ Oliver W. Wanger**
16                                 UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

45