1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8
   NATURAL RESOURCES DEFENSE COUNCIL,      1:05-CV-01207 OWW TAG
9  et al.,
                                           MEMORANDUM DECISION RE
10          Plaintiffs,                     CROSS MOTIONS FOR
                                           SUMMARY JUDGMENT RE CVP
11      v.                                  CONTRACT RESCISSION

12 DIRK KEMPTHORNE, et al.,

13          Defendants,

14      v.

15 SAN LUIS & DELTA-MENDOTA WATER
   AUTHORITY, et al.,
16
            Defendant-Intervenors.
17

18

19

20                    I.   INTRODUCTION

21      This case arises out of the execution and performance of

22 certain Central Valley Project ("CVP") long-term water service

23 contracts and the impact of those contracts on the threatened

24 Delta smelt.  Before the court for decision are cross motions for

25 summary judgment concerning claims raised by Plaintiffs in their

26 Third Amended Complaint ("TAC"), which alleges that Federal

27 Defendants acted unlawfully by executing 41 long-term CVP

28 contracts without performing adequate reviews under the

                              1

1  Endangered Species Act ("ESA"), (TOC, Doc. 575 at ¶¶ 74-80), and

2  that, by executing and implementing the contracts in reliance on

3  what it knew or should have known to be a faulty ESA review, the

4  Bureau of Reclamation ("Bureau" or "Reclamation") has failed and

5  is failing to comply with the ESA's substantive obligation to

6  avoid causing jeopardy and/or adverse critical habitat

7  modification, (TAC at ¶85).  The TAC requests an injunction to

8  prevent Federal Defendants from continuing to perform the water

9  service contracts identified in the TAC and an order rescinding

10  and invalidating those contracts.

11

12                    II.  **PROCEDURAL HISTORY**

13       This lawsuit began as a challenge to the 2005 biological

14  opinion ("BiOp") prepared by the Fish and Wildlife Service

15  ("FWS") to evaluate the impact of the 2004 Operations Criteria

16  and Plan ("OCAP") on the threatened Delta smelt.  The OCAP

17  describes the coordinated operations of the CVP and the State

18  Water Project ("SWP").  On May 25, 2007, after an initial round

19  of cross-motions for summary judgment, the BiOp covering the 2004

20  OCAP ("OCAP BiOp") was invalidated on the grounds that: (1) the

21  adaptive management plan that was to help minimize impacts upon

22  the Delta smelt, the Delta Smelt Risk Assessment Matrix

23  ("DSRAM"), did not reasonably guarantee that mitigation actions

24  would take place; (2) FWS failed to utilize the best available

25  scientific information on smelt population abundance and global

26  climate change; (3) the BiOp's historical approach to setting

27  take limits failed to consider take in the context of the most

28  recent overall species abundance and jeopardy; and (4) FWS did

2

not adequately consider impacts to critical habitat.   (Doc. 323 at 119.)   A briefing schedule was set to resolve whether remedies should be imposed pending the completion of reconsultation.

On June 19, 2007, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction.  (Doc. 343.)   After an expedited hearing, Plaintiffs' motion for a temporary restraining order was denied without prejudice to their motion for a preliminary injunction.  (Doc. 385.)   Thereafter, the parties proposed interim protective actions to prevent imminent jeopardy to and promote the survival and recovery of the Delta smelt, and Plaintiffs requested rescission of the long-term water contracts based on the invalidated OCAP BiOp.  (*See, e.g.*, Docs. 396-97, 412 & 416.)

Following a seven day trial on whether and what interim remedies should be imposed, the OCAP BiOp was remanded without vacatur, and an order was entered imposing specified injunctive relief to protect the Delta smelt and its critical habitat during reconsultation.  (Doc. 561, filed Dec. 14, 2007.)   A ruling on Plaintiffs' request for the equitable remedy of contract rescission was deferred.

Plaintiffs were granted leave to file a Second Supplemental Complaint ("SSC"), which added a claim against the Bureau under ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), and section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(a)(2), alleging that the Bureau has failed and is failing to ensure that its actions with respect to contracting for water deliveries will not jeopardize the continued existence of the Delta smelt nor adversely modify its critical habitat.  (Doc. 403, filed July 10,

1  2007; Doc. 495, filed Aug. 30, 2007.)

2      Defendant-Intervenors San Luis & Delta-Mendota Water
3  Authority, *et al.*, ("SLDMWA") moved to dismiss the contract
4  claims in the SSC for failure to join all of the parties to the
5  long-term water contracts executed in reliance on the OCAP BiOp.
6  (Doc. 502, filed Oct. 1, 2007.)  While that motion was pending,
7  Plaintiffs filed a motion for partial summary judgment on two
8  claims, which alleged that the long-term contracts were executed
9  in reliance on the unlawful OCAP BiOp in violation of the APA and
10  ESA sections 7(a)(2) and 7(d), respectively, and requested an
11  injunction against the Bureau's performance of the long-term
12  contracts as well as the equitable remedy of rescission.  (Doc.
13  537, filed Nov. 9, 2007.)  On January 23, 2008, the district
14  court granted SLDMWA's motion to dismiss, ruling that relief in
15  the form of an injunction against the performance of the long-
16  term water service contracts and/or rescission of those contracts
17  required Plaintiffs to join all absent contractors.  (Doc. 567 at
18  68.)  Claims as to the contracts held by existing Defendant-
19  Intervenors were permitted to proceed.  Plaintiffs were required
20  to amend their complaint to clarify whether they sought to take
21  action against absent contractors and, if so, to join such
22  contractors pursuant to Federal Rule of Civil Procedure 19.  *(Id.*
23  at 68-69.)  The section 7(d) claim was dismissed.  (*Id*. at 44.)
24  Only the section 7(a)(2) claim remains to be decided.

25      Eight of the existing Defendant-Intervenors hold long-term
26  water contracts that fall within one of the four groups of
27  informal consultations at issue here.  On April 8, 2008,
28  Plaintiffs filed the TAC, joining the parties to 33 additional

**4**

1   long-term water contracts.  (Doc. 575.)  Plaintiffs assert that
2   these 41 long-term water contracts are "of greatest concern to
3   the survival and recovery of the Delta smelt and the quality of
4   its critical habitat."  (Doc. 681 at 2.)

5       The pending motions address whether the Bureau's execution
6   and performance of the contracts were unlawful.  Plaintiffs'
7   requests for an injunction and rescission have not been fully
8   briefed, nor has discovery been conducted on the issue of
9   remedies.

10      Plaintiffs move for partial summary judgment on their ESA
11  section 7(a) claim against the Bureau and request a permanent
12  injunction against performance of the 41 contracts held by the
13  contracting parties before the Court.  (Doc. 681.)  Plaintiffs
14  maintain that to satisfy the terms of the disputed water service
15  contracts, the Bureau: (1) increases pumping to export water out
16  of the Delta to south-of-Delta water service contractors; and (2)
17  operates the CVP to make diversions to the Sacramento River
18  Settlement Contractors upstream of the Delta, which reduce
19  freshwater flows into the Delta.  (AR 521-23, 574-79.)
20  Plaintiffs argue that these combined deliveries "impair Delta
21  smelt survival, recovery, and critical habitat by increasing
22  entrainment in CVP export facilities, removing food organisms,
23  diminishing freshwater outflows, moving X2 upstream, [and]
24  interfering with migration...." among other impacts.  (Doc. 681
25  at 10.)  However, "because Plaintiffs seek to ensure the
26  integrity of the reconsultation process, and not to cut off water
27  deliveries under [those] contracts, Plaintiffs ask the Court to
28  stay the effect of [any] injunctive relief for one year to allow

1   the Bureau sufficient time to negotiate interim water contracts

2   to serve the affected service areas."  (*Id.* at 2.)

3        Federal Defendants cross move for summary judgment, arguing

4   that the Bureau complied with the ESA during section 7

5   consultations for the challenged contracts.  (Doc. 679.)  Cross-

6   motions were also filed by two groups of Defendant-Intervenors

7   and Joined Defendants.  A coalition of south-of-Delta water

8   service contractors within the Delta-Mendota Canal Unit of the

9   CVP (collectively, the "DMC Contractors") cross move for summary

10  judgment, arguing that Plaintiffs do not have standing to

11  challenge their contracts (the "DMC Contracts"), and,

12  alternatively, that consultation on the long-term DMC Contracts

13  complied with the ESA.  (Doc. 690, filed July 16, 2008.)

14  Similarly, a coalition of Sacramento River Settlement Contractors

15  (collectively, the "Settlement Contractors" or the "SRS

16  Contractors") cross move for summary judgment: (1) challenging

17  Plaintiffs' standing to bring these claims against their

18  contracts (the "Settlement Contracts" or "SRS Contracts"); (2)

19  maintaining (a) that the APA does not authorize judicial review

20  of the Bureau's implementation of the Settlement Contracts, and

21  (b) that the Supreme Court's recent decision in *National*

22  *Association of Home Builders v. Defenders of Wildlife*, 127 S. Ct.

23  2518 (2007), bars Plaintiffs' claims in this case; and,

24  alternatively, (3) arguing that the Bureau complied with the ESA

25  in renewing the Settlement Contracts.  (Doc. 707, filed July 17,

26  2008.)

27       Plaintiffs filed a joint opposition to the cross motions.

28  (Doc. 718, filed Aug. 6, 2008.)  Federal Defendants, the DMC

1  Contractors, and the SRS Contractors filed oppositions to

2  Plaintiffs' motion.  (Doc. 716, 723, 724, filed Aug. 6, 2006.)

3  Plaintiffs, Federal Defendants, the DMC Contractors, and the SRS

4  Contractors replied.  (Docs. 742, 734, 738 & 741, filed Aug. 15,

5  2008.)  Reclamation District 108, *et al.*, filed a separate reply.

6  (Doc. 735, filed Aug. 15, 2998.)  Oral argument was heard

7  September 12, 2008.

8

9                    III.  <u>EVIDENTIARY/RECORD ISSUES</u>

10         In response to the issues raised by the TAC, Defendants

11  filed a supplemental administrative record ("SAR") on June 6,

12  2008.  (Doc. 657-2.)  On July 16, 2008, the DMC Contractors and

13  Plaintiffs each filed motions to further augment the record.  The

14  DMC Contractors request inclusion of seven documents, dating from

15  1999 to 2001, relating to the Final Programmatic Environmental

16  Impact Statement for the CVPIA.  (Doc. 684.)  Plaintiffs request

17  inclusion of a memo concerning a request by the Bureau for

18  "consultation on delivery of the full contractual entitlement of

19  each CVP water service contractor."  (Doc. 682-2 at 1.)  Federal

20  Defendants do not oppose supplementation of the record to include

21  these documents.  (Doc. 714, filed Aug. 6, 2008.)

22         As a general rule, judicial review of an agency action must

23  be based on the administrative record in existence at the time of

24  the agency's decision.  5 U.S.C. § 706; *Citizens to Preserve*

25  *Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971),

26  overruled on other grounds by *Califano v. Sanders,* 430 U.S. 99

27  (1977).  The administrative record, however, is not simply

28  whatever documents the agency chooses to submit to the Court as

                                   7

1   the record.   Rather, "'[t]he whole record' includes everything

2   that was before the agency pertaining to the merits of its

3   decision." *Portland Audubon Soc. v. Endangered Species Comm.*,

4   984 F.2d 1534, 1548 (9th Cir. 1993) (internal citations omitted);

5   *see also Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555-56

6   (9th Cir. 1989) (administrative record consists of all documents

7   directly or indirectly considered by agency decision-makers and

8   must include evidence contrary to agency's position).

9       The documents offered by the DMC Contractors predate the

10   execution of the challenged contracts and provide relevant

11   history about the Federal Defendants' understanding of the

12   relationship between the DMC Contract consultation vis-a-vis

13   other ESA compliance activities for the CVP.   The document

14   offered by Plaintiffs, which also predates execution of the

15   challenged contracts, was part of the consultation process on the

16   renewal of the long-term contracts at issue in this case.   It is

17   appropriate to include all of these documents as relevant

18   background to the record of this case.   The motion to augment the

19   record is GRANTED as to these documents.

20       Plaintiffs also cite a recent Federal Register notice

21   soliciting comments on a petition to uplist the Delta smelt as

22   endangered.   Fed. Reg. 39,639 (July 10, 2008).   This subsequent

23   document is not part of the administrative record, nor do

24   Plaintiffs provide any basis for including it in the record, as

25   it is a post-decisional document.   The motion to augment is

26   DENIED as to this document.

27

28

IV.   **FACTUAL BACKGROUND**

The present claims challenge long-term contracts for the delivery of water from the CVP; how those contracts affect the coordinated operation of the CVP and SWP (the "Projects"), an extraordinarily complex management process described in the OCAP; and, in turn, how coordinated operations affect the threatened Delta smelt.  Previous decisions addressing CVP operations provide extensive background on the coordinated operation of the Projects and on the presently dire state of the survival and recovery of the threatened Delta smelt.  (*See* Docs. 323 and 561.)

A.   **Relevant Pre-Execution Regulatory Activity**.

In 1992, Congress passed the Central Valley Improvement Act ("CVPIA"), which mandates, among other things, the renewal of existing long-term water service contracts for successive periods of up to 25 years.  CVPIA § 3404(c)(1), Pub. L. No. 102-575, 106 Stat. 4600 (1992).  Completion of a required environmental review of CVPIA programs under the National Environmental Policy Act ("NEPA"), CVPIA § 3409, culminated in the Central Valley Project Improvement Act Final Programmatic Environmental Impact Statement ("CVPIA PEIS"), adopted in 2001.  (SAR 1311 at 1[1]; Sheehan Decl., Doc. 685, Ex. 7[2]).  One of the "core programs" covered by the

---

[1]   All references to the administrative record, lodged March 15, 2007, are designated "AR"; references to the supplemental administrative record, lodged June 6, 2008 and July 24, 2008, are designated "SAR."

[2]   Defendant-Intervenors' motion to augment the record with materials from the CVPIA PEIS has been granted.

1  CVPIA PEIS was renewal of all CVP water service, water rights,
2  and exchange contracts.  (CVPIA PEIS at II-9.)

3      In 2000, FWS issued a Biological Opinion on Implementation
4  of the CVPIA ("CVPIA BiOp").  (AR 12002.)  The CVPIA BiOp
5  addressed the impacts on listed species of long-term contract
6  renewals at a programmatic level.  (AR 12004, 12044-51, 12113-
7  115.)  The requirements and analysis of effects of CVP operations
8  on Delta smelt in the 1995 OCAP BiOp were considered part of the
9  baseline for the CVPIA BiOp.  (AR 12005-06, 12060, 12091, 12113.)
10 Future, tiered consultation was planned for individual contract
11 renewals; such consultations were to cover service area impacts,
12 not Delta operations.  (CVPIA BiOp, Ex. K, Sheehan Decl., Ex. 6.)
13 The CVPIA BiOp noted that further, site-specific consultation
14 might not need to consider the impacts of the OCAP or the
15 Coordinated Operations Agreement between the Bureau and DWR.
16 (*Id*.)

17     In 2003 and 2004, many CVP long-term water service contracts
18 were coming up for renewal.  The Bureau viewed completion of the
19 OCAP consultation as a necessary precursor to consultation on the
20 long-term contracts, urging completion of the OCAP consultation
21 by June 30, 2004 to "facilitate the renewals of subsequent long
22 term water service contracts...."  (AR 7227.)  Meanwhile, the
23 Bureau prepared and delivered to FWS on July 15, 2003 a draft
24 biological assessment of the renewal of long-term DMC Contracts,
25 (SAR 1294), and a final biological assessment of renewal of the
26 SRS Contracts in August 2003, (SAR 3180).  By mid-2004 the Bureau
27 completed prerequisite "water needs assessments" for most CVP
28 water contractors in preparation for renewal of their long-term

1  contracts.  (AR 521.)

2

3       B.   The Challenged Contracts & Corresponding Environmental
            Review.
4
        The challenged contracts fall into two categories: (1) the
5
   DMC Contracts, and (2) the SRS Contracts.
6

7

        1.   Delta-Mendota Canal Unit Water Service Contracts.
8
        On July 15, 2003, the Bureau requested consultation on 20 of
9
   the 21 DMC Unit proposed 25-year CVP water service contract
10
   renewals.  (SAR 1275.)  These contracts provide for annual water
11
   deliveries to DMC Contractors totaling 342,865 acre-feet.  (SAR
12
   1277-78.)  The DMC Contractors before the court hold contracts
13
   providing for total annual deliveries of 308,427 acre-feet.  *Id*.
14
   In a February 15, 2005 concurrence letter, FWS concluded that
15
   renewal of the DMC Contracts under consultation was not likely to
16
   adversely affect any listed species.  (SAR 1275-76.)  Regarding
17
   impacts upon aquatic resources, particularly aquatic species
18
   living in the Delta, the letter "incorporated by reference" the
19
   July 30, 2004[3] biological opinion, reasoning that it "analyzed
20

21 _____
        [3]   Plaintiffs note that, by February 25, 2005, the date on
22 which most of the DMC Contracts were executed, the July 30, 2004
   OCAP BiOp had already been superseded by a subsequent BiOp, dated
23 February 16, 2005.  (SAR 1282 (FWS's concurrence letter for the
   DMC Contracts "incorporated by reference" the July 30, 2004 FWS
24 OCAP BiOp).)  Shortly after FWS issued the July 30, 2004 OCAP
   BiOp, the Ninth Circuit issued its decision in *Gifford Pinchot
25 Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059 (9th
   Cir. 2004) (invalidating regulatory definition of "destruction or
26 adverse modification").  This prompted the Bureau to request that
   FWS reinitiate consultation on the OCAP to address the issues
27 raised in *Gifford Pinchot*.  A new BiOp issued on February 16,
28

                                11

effects of the action addressed in this consultation, and the findings of this consultation cannot be made independently of the analysis and findings of the OCAP biological opinion.  The OCAP analysis of effects to Delta smelt and its critical habitat also must be made a part of the analysis of the total effects of the long term contract renewals."  (SAR 1282.)  The contract renewals are inextricably tied to the OCAP BiOp.

## 2.  Sacramento River Settlement (SRS) Contracts.

Plaintiffs challenge three sets of SRS Contracts: (a) 25 of the 138 SRS Contracts for which a concurrence letter was received on February 18, 2005; (b) the City of Redding and Anderson-Cottonwood Irrigation District ("ACID") Settlement Contracts, for which a concurrence letter was received May 15, 2005; and (c) the Natomas Central Mutual Water Company ("NCMWC") Sacramento River settlement contract, for which a concurrence letter was received March 9, 2005.

### a.  The 25 Sacramento River Settlement Contracts.

On April 14, 2004, the Bureau requested consultation on proposed 40-year renewals of 145 SRS Contracts and the Colusa Drain Mutual Water Company's replacement water contract.  (SAR 3340(1).)  On February 18, 2005, FWS responded with a concurrence letter regarding 138 of those settlement contracts, amounting to

2005, superceding the 2004 BiOp.  (AR 245.)  It is not necessary to evaluate the legal significance of the reference to the superceded BiOp, given the outcome of the DMC Contractors' standing challenge.

1   potential diversions of "up to 1,830,188 acre-feet per year from

2   the Sacramento River."  (SAR 3348.)  Plaintiffs have challenged

3   25 of those contracts, which concern potential diversions of up

4   to 1,722,720 acre-feet per year.  (SAR 3349; SAR 1896; SAR 2609;

5   SAR 2648.)  The concurrence letter for those contracts expressly

6   relied on the OCAP BiOp's analysis of potential critical habitat

7   issues and effects of the OCAP on Delta smelt.

8           The OCAP consultation addressed the operation of the
            CVP/SWP in the Sacramento Valley, and included all
9           commitments of the SWP and CVP, such as ... obligations
            of CVP water service contracts, Sacramento River
10          Settlement contracts, San Joaquin exchange contracts,
            and other requirements. Therefore, <u>the OCAP [BiOp]</u>
11          <u>addressed all the aquatic effects of operating the</u>
            <u>CVP/SWP</u>.

12
            In contrast, the Service's consultations on the long-
13          term water-service contract renewals and Settlement
            contract renewals are addressing the diversion of
14          Sacramento River water at prescribed diversion points
            and times for the use of that water on a specified land
15          area (the contractors' service area).... In other
            words, the contracts create a demand (among other
16          demands) for CVP water and <u>the OCAP consultation</u>
            <u>addresses how the CVP/SWP projects are operated to meet</u>
17          <u>those demands. There clearly is a linkage between</u>
            <u>contract renewals and the operation of the CVP/SWP.</u>
18          <u>These linkages must, and are being, addressed in</u>
            <u>separate but parallel consultations</u> such that all
19          possible effects on listed species are being identified
            and consulted on.

20
    (SAR 3344 (emphasis added).)
21

22              b.   <u>City of Redding and Anderson-Cottonwood</u>
                     <u>Irrigation District (ACID) Settlement</u>
23                   <u>Contracts</u>.

24       Plaintiffs also challenge settlement contracts held by the

25  City of Redding and ACID, which provide for a total of 149,000

26  acre-feet of CVP water per year for the next 40 years.  (SAR 10.)

27  The Bureau requested consultation on these contracts on April 14,

28  2004.  FWS issued a concurrence letter on May 12, 2005, finding

                                13

that the OCAP BiOp addressed "all the aquatic effects of operating the CVP/SWP" on the Delta smelt.  (SAR 1, 5.)  FWS "incorporated by reference into this Settlement Contract renewal consultation" its prior "OCAP consultation analysis," which FWS claimed "analyzed the effects of numerous new actions on the Delta smelt and its designated critical habitat" and "addressed the effects of delivering CVP water for renewed long-term water contracts and other actions on Delta smelt and its critical habitat."  (SAR 35.)  FWS concluded that the proposed contracts were not "likely to adversely affect ... the Delta smelt."  (SAR 37.)  The Bureau executed the 40-year ACID and City of Redding settlement contracts on July 1, 2005.  (SAR 47, 252.)

### c.  Natomas Central Mutual Water Company (NCMWC) Settlement Contract.

Plaintiffs also challenge the 40-year renewal of NCMWC's Sacramento River Settlement Contract.  (SAR 1660.)  The proposed contract provides for yearly deliveries of 120,200 acre-feet of water.  (SAR 1668.)  The Bureau requested consultation on this contract on April 14, 2004.  In its March 9, 2005 concurrence letter, FWS stated that "the OCAP [BiOp] addressed all the aquatic effects of operating the CVP/SWP" and noted the need for "separate but parallel consultations" on the proposed contract renewals.  (SAR 1664.)  The OCAP BiOp "addressed the effects of delivering CVP water for renewed long-term water contracts ... on Delta smelt and its critical habitat" and incorporated by reference "the OCAP consultation analysis...."  (SAR 1689.)  FWS concluded that the proposed contract was not likely to adversely

14

1   affect any listed species or its habitat.  (SAR 1690.)  The

2   Bureau executed the 40-year NCMWC contract on May 10, 2005.  (SAR

3   1618.)

4

5       C.  <u>Water Supply Limitations</u>.

6       For most of the past decade, CVP deliveries have been

7   limited by insufficient water supply, lack of conveyance

8   capacity, and operational constraints.  (AR 605.)  Due to annual

9   hydrologic conditions and the intensity and volume of competing

10  water demands, CVP contractors often do not receive their full

11  contract allotments.  Under current circumstances, "[e]ven in

12  above normal runoff years, it may no longer be possible to meet

13  all competing needs for CVP water, especially south of the

14  Delta."  (AR 607.)

15

16      D.  <u>Impacts of Project Operations on Delta Smelt</u>.

17      This case has determined that the Delta smelt "is

18  undisputedly in jeopardy as to its survival and recovery."  (Doc.

19  323 at 119; *see also* Doc. 561 at ¶11.)  "Population abundance

20  indices have been at record low levels for the past three years.

21  Some experts opined that the species' condition is so precarious

22  that it could become extinct within the year."  (*Id.* at ¶12

23  (transcript citations omitted).)

24          Scientists believe that the decline of the Delta smelt
            is caused in part by the operations of the CVP and SWP

25          (as well as other water diversions within the Delta)
            because each Project's operations result in the direct

26          entrainment of Delta smelt at the CVP and SWP export
            facilities (the Pumps) which they do not survive. The

27          Projects' operations cause changes in the hydrology of
            the Delta that adversely affect the Delta smelt.... The

28          evidence is undisputable that the CVP, operated by the

                            15

1
2
3

> Bureau and the SWP operated by DWR, cause the
> entrainment and salvage of unknown numbers of Delta
> smelt through the operation of their respective pumping
> facilities located in the south Delta pursuant to
> operations conducted under the 2004 [OCAP].

4  (*Id.* at ¶¶ 6, 18 (transcript citations omitted).)

5       Losses of Delta smelt "result from the combination of the

6  Delta smelt's natural migrations up and down the Delta during the

7  smelt's annual life cycle and flow conditions within the Central

8  and South Delta, caused in part by the operation of the CVP and

9  SWP pumps.  Pumping-induced negative flows not only pull smelt to

10  the pumps, where they are either killed by the pumps or by the

11  salvage process, the smelt are also drawn into unfavorable

12  habitat where they and their offspring do not survive."  (*Id.* at

13  ¶19 (transcript citations omitted).)

14       Because CVP operations often control the amount of fresh

15  water entering the Delta, operations may increase Delta smelt

16  mortality by influencing population distribution and, thus,

17  exposure to predation and unscreened agricultural water

18  diversions.  (AR 1029, 1031.)

19

20                    V.  <u>STANDARD OF DECISION</u>

21       Summary judgment is appropriate where there are no genuine

22  issues of material fact and the moving party is entitled to

23  judgment as a matter of law.  Fed. R. Civ. Pro. 56(c).  The claim

24  against the Bureau, brought under the ESA citizen suit

25  provisions, is governed by APA section 706, because the ESA

26  contains no standard of review.  *Bennett v. Spear*, 520 U.S. 154

27  (1997)*; Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1073-73

28  (9th Cir. 2005).  The APA requires that the agency action be

                              **16**

1 upheld unless it is found to be "arbitrary, capricious, an abuse

2 of discretion, or otherwise not in accordance with law," or

3 "without observance of procedure required by law."  5 U.S.C. §

4 706(2)(A), (D).  The inquiry is designed to "ensure that the

5 agency considered all of the relevant factors and that its

6 decision contained no clear error of judgment."  *Pac. Coast Fed'n*

7 *of Fishermen's Ass'ns v. NMFS,* 265 F.3d 1028, 1034 (9th Cir.

8 2001).  Agency action should only be overturned if the agency has

9 "relied on factors which Congress has not intended it to

10 consider, entirely failed to consider an important aspect of the

11 problem, offered an explanation for its decision that runs

12 counter to the evidence before the agency, or is so implausible

13 that it could not be ascribed to a difference in view or the

14 product of agency expertise."  *Id.*  In sum, a court must ask

15 "whether the agency considered the relevant factors and

16 articulated a rational connection between the facts found and the

17 choice made."  *Id.*

18       As a general rule, a court must defer to the agency on

19 matters within its expertise.  *See Nat'l Wildlife Fed'n v. Nat'l*

20 *Marine Fisheries Serv.,* 422 F.3d 782, 798 (9th Cir. 2005).

21 However, "[t]he deference accorded an agency's scientific or

22 technical expertise is not unlimited."  *Id.*  "Deference is not

23 owed when the agency has completely failed to address some factor

24 consideration of which was essential to [making an] informed

25 decision."  *Id.* (internal citations and quotations omitted).

26

27                   **VI.   DISCUSSION AND ANALYSIS**

28       **A.   Challenge to an Executed Contract**.

         The agency action challenged here is the Bureau's execution

                                    17

of and continued performance under contracts that provide for the long-term delivery of water through CVP facilities. Plaintiffs allege that the execution of the contracts was unlawful because the Bureau did not properly consult with FWS over, nor recognize the adverse impacts of the contracts on the Delta smelt. Plaintiffs seek to enjoin performance under and to invalidate the contracts by rescission.

Where an agency acts arbitrarily and/or capriciously or not in accordance with the law, the APA requires that the court set aside the agency action. 5 U.S.C. § 706(2)(A)-(D).[4] If an

---

[4] The Settlement Contractors acknowledge that the APA standard of review applies in ESA cases, but argue that the ESA citizen suit provision, rather than the APA, provides the relevant remedial options. The APA provides that a court shall "set aside" unlawful agency actions, 5 U.S.C. § 706, while the ESA citizen suit provision only provides that an action may be brought "to enjoin" any person alleged to be in violation of the ESA and that the district court has jurisdiction "to enforce" the provisions of the ESA, 16 U.S.C. § 1540(g)(1). The Settlement Contractors cite *PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004), in which the Federal Circuit refused to set aside unlawful government contracts because express incorporation of the APA's standard of review into the Administrative Dispute Resolution Act, 28 U.S.C. § 1491(b), did not require incorporation of the APA's mandatory standard of relief. However, the Settlement Contractors cite no ESA cases that have rejected applicability of the APA's "set aside" remedy. To the contrary, the Ninth Circuit has, on numerous occasions, indicated that the APA's "set aside" remedy applies in ESA cases. *See, e.g., Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1072-73 (9th Cir. 2005)(holding in an ESA case that "[u]nder 5 U.S.C. § 706, we must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.'"); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 840-41 (9th Cir. 2003)(same); *Envt'l Protection Info. Ctr. v. Simpson Timber Co.,* 255 F.3d 1073, 1078 (9th Cir. 2001)(same). Courts routinely "set aside" agency action in suits brought under

1  agency has acted unlawfully in executing a contract, the court

2  retains the discretion to either rescind the contract, *Natural*

3  *Resources Defense Council v. Houston*, 146 F.3d 1118, 1126 (9th

4  Cir. 1998) ("*NRDC v. Houston*"), or preserve the contract, if the

5  legal flaw can be rectified in some another way.  *Id.* (*citing*

6  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)); *Conner*

7  *v. Burford*, 848 F.2d 1441, 1461-61 & n.50 (9th Cir. 1988)

8  (modifying district court order to clarify that oil leases

9  executed without full NEPA and ESA compliance need not be set

10 aside, while enjoining any "surface-disturbing" activities on the

11 leased properties until full compliance is achieved, thereby

12 "avoid[ing] the unnecessarily harsh result of completely

13 divesting the lessees of their property rights").  *See also*

14 *Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v.*

15 *U.S. Dep't of Energy,* 232 F.3d 1300, 1305 (9th Cir. 2000)(court

16 has authority under the APA to order recission of a contract for

17 sale if the federal agency "acted in excess of statutory

18 authority or without observance of the procedures required by

19 law"); *Port of Astoria v. Hodel*, 595 F.2d 467, 479 (9th Cir.

20 1979)(court may declare contract unenforceable pending

21 preparation of required environmental review)*; cf. Sealift, Inc.*

22 *v. United States,* 82 Fed. Cl. 527, 535 (2008) (reviewing Federal

23 ───────────────────

24 the ESA.  *Westlands Water Dist. v. U.S. Dept. of Interior*, 376
   F.3d 853, 877 (9th Cir. 2004)(affirming setting aside of agency

25 action that violated ESA regulations); *Ariz. Cattle Growers'*
   *Ass'n v. U.S. Dept. Fish* and Wildlife, 273 F.3d 1229 (9th Cir.

26 2001)(affirming district court's decision to set aside ESA take

27 permit).  Whether or not a court is required and/or empowered to
   <u>rescind</u> a contract executed in reliance on an unlawful ESA

28 consultation is a separate question.

19

Circuit holdings allowing courts to set aside bid awards where procurement official's decision either lacked a rational basis or involved a violation of regulation or procedure).  Whether the imposition of contract remedies, including injunctive relief and/or rescission, is appropriate in this case present different issues which have been bifurcated.

### B.   Final Agency Action.

The APA only authorizes review of "final agency action." 5 U.S.C. § 704.  Agency action is final when it: (1) represents the consummation of a decisionmaking process, and (2) determines the rights and obligations of the parties, or is an act from which legal consequences will flow.  *Rattlesnake Coal. v. U.S. Envt'l Prot. Agency*, 509 F.3d 1095, 1103 (9th Cir. 2007). Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), requires every federal agency to insure, in consultation with FWS and/or NMFS, "that any action authorized, funded, or carried out by such agency (...referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species...."  If an action is an "agency action" under the ESA, section 7 duties attach and the "final agency action" requirement of the APA is satisfied.[5]

_____

[5]   In ESA cases, the scope of the term "agency action" under the ESA can serve as a proxy for the APA's "final agency action" requirement.  *See, e.g., Wilderness Soc., Ctr. for Native Ecosystems v. Wisely*, 524 F. Supp. 2d 1285, 1299 (D. Colo. 2007)(using ESA implementing regulations' definition of "agency action" to address argument that an action was not a "final agency action" for purposes of the APA).

1  ESA implementing regulations define "action" to mean "all

2  activities or programs of any kind authorized, funded, or carried

3  out, in whole or in part, by Federal agencies in the United

4  States or upon the high seas."  50 C.F.R. § 402.02.

5              Examples include, but are not limited to: (a) actions
               intended to conserve listed species or their habitat;

6              (b) the promulgation of regulations; (c) the granting
               of licenses, <u>contracts</u>, leases, easements,

7              rights-of-way, permits, or grants-in-aid; or (d)
               actions directly or indirectly causing modifications to

8              the land, water, or air.

9  *Id.* (emphasis added).

10  It is not disputed that "the granting of ... contracts" by

11  an agency is "action" to which ESA section 7 duties attach.  *Id.*;

12  *see also Houston*, 146 F.3d at 1125 ("negotiating and executing

13  contracts is 'agency action'" under the ESA).  Plaintiffs'

14  allegation that the Bureau acted unlawfully by executing the

15  contracts in reliance on and by incorporating the now-invalid

16  OCAP BiOp is cognizable under the APA.

17  The SRS Contractors argue that Plaintiffs' other allegation

18  -- that the Bureau's ongoing <u>performance</u> under the contracts

19  (i.e., delivery of water to the contractors) violates the

20  Bureau's substantive obligation to avoid jeopardy and adverse

21  critical habitat modification -- fails to identify an "agency

22  action" reviewable under the ESA or APA.  (Doc. 707 at 22.)  They

23  contend that "by seeking to enjoin the daily operations of the

24  CVP, Plaintiffs seek improper judicial review under the APA of

25  ongoing agency operations rather than a discrete 'final agency

26  action for which there is no other adequate remedy in a court.'"

27  (*Id.*)

28  Plaintiffs suggest that the Ninth Circuit has consistently

1  held that <u>ongoing performance</u> of a contract constitutes final

2  agency action, (Doc. 718 at 13), citing *Bennett v. Spear*, 520

3  U.S. 154 (1997).  However, *Bennett* concerned whether the <u>issuance</u>

4  of a biological opinion constituted final agency action.  It is

5  not authority for whether ongoing contract performance is final

6  agency action.[6]

7      The law is more complex than the parties suggest.  Agency

8  action requires some "affirmative action" on the part of the

9  agency.  *Defenders of Wildlife v. EPA*, 420 F.3d 946, 967 (9th

10 Cir. 2005)("*DOW v. EPA*"), reversed on other grounds *Home*

11 *Builders*, 127 S. Ct. 2518.

12     Agency action must also be discretionary.  50 C.F.R. §

13 402.03 (consultation obligations "apply to all actions in which

14 there is discretionary federal involvement or control"); *see also*

15 50 C.F.R. § 402.16; *Home Builders*, 127 S. Ct. at 2534 (confirming

16 that ESA only applies to discretionary agency actions).  "If no

17 discretion to act is retained ... consultation would be a

18 meaningless exercise."  *Turtle Island Restoration Network v.*

19

20     [6]     Plaintiffs also cite a number of other cases:

21    *Pub. Utility Dist. No. 1 v. Bonneville Power Admin.*, 506
      F.3d 1145, 1152 (9th Cir. 2007) (amendments to contracts);
22    *Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.*, 501
      F.3d 1037, 1044 (9th Cir. 2007) (power sale contracts)*;*
23    *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 906 (9th
      Cir. 2002) (contract approval); *Houston*, 146 F.3d at 1125-29
24    (execution of long-term CVP water supply contracts); *Pac.*
      *Rivers Council v. Thomas*, 30 F.3d 1050, 1053-56 (9th Cir.
25    1994) (implementation of timber sales); *see also Mont.*
      *Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1149-50 (D.
26    Mont. 2004) (oil and gas lease sales).
27

28 (Doc. 718 at 13.)  None of these cases hold or imply that the
   <u>ongoing performance</u> of contracts constitutes final agency action.

1  *Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003).

2  Agency action occurs only when the discretion retained by the

3  agency enables the agency to take steps that benefit the

4  protected species.  *Id*. at 974.

5       Even where an agency has acted in the past to permit an

6  event to occur, there is no "ongoing agency action" where the

7  agency did not specifically retain authority to benefit the

8  species or was "otherwise constrained by statute, rule, or

9  contract."  *W. Watersheds Project v. Matejko,* 486 F.3d 1099,

10  1109-110 (9th Cir. 2006.)  In *Environmental Protection*

11  *Information Center v. Simpson Timber Co.*, 255 F.3d 1073, 1082

12  (9th Cir. 2001) ("*EPIC*"), the Ninth Circuit found no agency

13  action where FWS had issued a permit but did not retain

14  discretion to amend it to protect endangered species.  In *EPIC*,

15  there was no "ongoing agency involvement" because FWS had not

16  "retained the power to 'implement measures that inure to the

17  benefit of the protected species.'"  *Id*. at 1080; *see also Sierra*

18  *Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995) (holding

19  section 7(a)(2) did not apply because BLM had "no ability to

20  influence" a project based on a right-of-way granted before the

21  ESA was enacted).

22       By contrast, in *Washington Toxics Coalition v. Environmental*

23  *Protection Agency*, 413 F.3d 1024, 1033 (9th Cir. 2005)), the EPA

24  did retain such "continuing decisionmaking authority" where it

25  had a continuing duty "to register pesticides, alter pesticide

26  registrations, and cancel pesticide registrations" under the

27  Federal Insecticide, Fungicide and Rodenticide Act.  413 F.3d at

28

1033.   In *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053
(9th Cir. 1994), there was "ongoing agency action" because the
U.S. Forest Service maintained continuing authority under a
comprehensive, long-term management plan.   In *Turtle Island*
*Restoration Network*, NMFS retained the requisite discretion to
protect species in previously-granted fishing permits.   340 F.3d
at 977.

Here, the Bureau specifically retained discretion to modify
project operations by implementing measures that "inure to the
benefit of the protected species in accordance with the ESA."
This is best evidenced by the CVPIA and shortage provisions of
the disputed contracts which mandate that the Bureau and the
Department of the Interior operate the CVP to comply with the
ESA, the Clean Water Act, and provisions of State water law.   It
is undisputed that the concurrence letters for all the contracts
at issue in this case incorporate the environmental analysis and
protections contained within the OCAP BiOp, which is subject to
reconsultation as conditions change.   Plaintiffs' challenge to
the Bureau's "ongoing performance" of the contracts as violating
its Section 7(a)(2) obligation not to cause jeopardy or adverse
critical habitat modification is cognizable under the ESA and the
APA.[7]

---

[7]   Even if, *arguendo*, Plaintiffs' "ongoing performance"
claim was not cognizable, the APA permits Plaintiffs to challenge
the <u>execution</u> of the contracts.

1      **C.   Standing**.

2      The DMC and SRS Contractors each challenge Plaintiffs'

3  standing to prosecute the pending claims regarding their

4  respective contracts.   Federal Defendants join these standing

5  challenges but provide no additional argument.

6

7           **1.   Legal Standard**.

8      To maintain an action in federal court, Plaintiffs must

9  satisfy both Article III and prudential standing requirements.

10 *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872 (1990).

11 "[T]o satisfy Article III's standing requirements, a plaintiff

12 must show (1) it has suffered an 'injury in fact' that is (a)

13 concrete and particularized and (b) actual or imminent, not

14 conjectural or hypothetical; (2) the injury is fairly traceable

15 to the challenged action of the defendant; and (3) it is likely,

16 as opposed to merely speculative, that the injury will be

17 redressed by a favorable decision."   *Friends of the Earth v.*

18 *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

19     The burden of establishing these three elements falls upon

20 the party asserting federal jurisdiction.   *Lujan v. Defenders of*

21 *Wildlife*, 504 U.S. 555, 561 (1992).   The elements of standing are

22 "not mere pleading requirements."   *Id*.   Rather, they are an

23 "indispensable part of the plaintiff's case," and accordingly

24 must be supported at each stage of litigation in the same manner

25 as any other essential element of the case.   *Id*.   Although

26 defendants may base their challenges to Plaintiffs' standing on

27 arguments related to the merits of the case, a court must assume,

28

                                  25

1  for purposes of the standing analysis, that Plaintiffs will

2  prevail.  *See Defenders of Wildlife v. Gutierrez*, 532 F.3d 913,

3  924 (D.C. Cir. 2008)("In reviewing the standing question, the

4  court must be careful not to decide the questions on the merits

5  for or against plaintiff, and must therefore assume that on the

6  merits the plaintiffs would be successful in their claims.").

7        In addition to the Article III requirements, Plaintiffs must

8  establish that they fall within the "zone of interest" of the

9  statute under which they bring their lawsuit.  *See City of*

10 *Sausalito v. O'Neill*, 386 F.3d 1186, at 1199 (9th Cir. 2004).

11 The relevant inquiry is whether "a particular plaintiff has been

12 granted a right to sue by the statute under which he or she

13 brings suit."  *Id*.  This test "is not meant to be especially

14 demanding."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399

15 (1987).  It suffices that "the interest sought to be protected by

16 the complainant is arguably within the zone of interests to be

17 protected or regulated by the statute ... in question."  *Ass'n of*

18 *Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153

19 (1970).  Here, it is undisputed that Plaintiffs' interest in

20 protecting the Delta smelt falls within the zone of interests

21 contemplated by ESA section 7(a)(2).

22

23                    a.    Injury-In-Fact.

24        To satisfy the "injury in fact" requirement, Plaintiffs must

25 provide evidence of either actual or threatened injury.  *See U.S.*

26 *v. Ensign*, 491 F.3d 1109, 1116-17 (9th Cir. 2007).  The TAC

27 generally alleges that "execution and continued performance" of

28
                              26

the renewal contracts harms Delta smelt in violation of section 7(a)(2).  The TAC further alleges:

> [T]he Bureau has failed and is failing to comply with ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2), by executing and implementing the long-term water supply renewal contracts described above, in reliance on what it knew or should have known to be faulty analysis by the FWS.  The execution and continued performance of these renewal contracts has short and long-term adverse impacts on the threatened Delta smelt that jeopardize the species' continued existence and adversely modify its critical habitat.

(TAC ¶85.)

The DMC Contractors argue that Plaintiffs cannot satisfy the injury-in-fact test because the injury they allege relates to non-justiciable, ongoing implementation of project operations, not the execution of the DMC Contracts.  For example, the TAC repeatedly alleges that project operations, rather than the contracts themselves, harm the smelt.

> "The existing operations of these [CVP & SWP] pumps have altered natural flow patterns."  (TAC at ¶2 (emphasis added).)

> "The existing operations of the SWP and CVP have been major factors in the Delta smelt's decline and its listing under the [ESA]."  (TAC at ¶3 (emphasis added).)

> "Current and ongoing operations of the CVP and SWP under the existing OCAP - including but not limited to pumping and water conveyance and export operations from the Delta - jeopardize the continued existence of the Delta smelt and adversely modify its designated critical habitat."  (TAC at ¶49 (emphasis added).)[8]

---

[8]   Standing declarations previously submitted by Plaintiffs similarly focus on CVP and SWP operations:

> "[T]he enjoyment of these activities by me and other NRDC members has been adversely affected by the endangerment of the Delta smelt and associated impacts

1    The ongoing performance allegations are justiciable.  The

2  injury-in-fact requirement demands only that Plaintiffs allege

3  actual or threatened injury stemming from the challenged conduct.

4  *See Ensign*, 491 F.3d at 1116-17.  Here, Plaintiffs are a

5  coalition of non-profit organizations, that have missions which

6  include the protection of the Bay-Delta ecosystem.  Members of

7  these non-profits live near and/or use and enjoy the Delta and

8  its biological resources, and express specific educational,

9  recreational, spiritual, aesthetic, commercial, and/or other

10  interests in the Delta smelt.  (*See* Decls. of Gary Bobker,

11  Katherine Hopkins, Steve Evans, Brian Stranko, and Barry Nelson,

12  Docs. 233-236.)

13    Plaintiffs' members regularly "observe[] or work[] with ...

14  the particular animal[s] threatened by [the] federal decision,"

15  *Lujan*, 504 U.S. at 566, and assert that their "aesthetic and

16  recreational" interests in the Delta will be lessened by the

17  execution of the contracts.  *Id*. at 584 n.2 (citing *Sierra Club*

18  *v. Morton*, 405 U.S. 727, 735 (1972)).  Plaintiffs allege that the

19  _____

20         on the estuary by the project operations challenged in
21         this lawsuit."  (Nelson Decl., Doc. 236 at ¶7.)

22         "Baykeeper is deeply concerned about the operation of
23         the water projects and their causal role in the
          precipitous decline of Delta smelt."  (Hopkins Decl.,
24         Doc. 235 at ¶8 (emphasis added).)

25         "[The Bay Institute] believes that the operation of the
26         water projects has been a primary factor in the decline
          of the Delta smelt."  (Bobker Decl., Doc. 233 at  ¶11
27         (emphasis added).)

28
                                  28

execution and ongoing performance of the contracts result in
increased diversions upstream of the Delta and increased pumping
out of the Delta, which allegedly harm the Delta smelt.
Plaintiffs' seminal complaint is that the Bureau has
overcommitted project water to these contracts, which causes
exports and pumping that harm the species.  This is sufficient to
satisfy the injury-in-fact requirement.  *See Salmon Spawning and
Recovery Alliance v. Gutierrez*, --- F.3d ---, 2008 WL 4490533 *4
(9th Cir. Oct. 8, 2008)(allegation by conservation groups that
they have "scientific, educational, aesthetic, recreational,
spiritual, conservation, economic, and business interests" in
salmonid species satisfies injury-in-fact requirement in case
challenging decision of federal agency to enter into, and remain
a party to, a treaty concerning salmon harvest);[9] *Natural
Resources Defense Council v. Patterson*, 791 F. Supp. 1425 (E.D.
Cal. 1992) (a coalition of environmental organizations satisfied
the injury-in-fact requirement by alleging: (1) their members
earn a living from and engage in recreational activities on the

_____

[9]   On October 13, 2008, the DMC Contractors filed a notice
of supplemental authority, attaching, without argument, *Salmon
Spawning,* --- F.3d ---, 2008 WL 4490533 *4, a recent Ninth
Circuit Decision that addresses standing.  (Doc. 754.)
Plaintiffs filed a responsive brief, arguing, among other things,
that portions of the  *Salmon Spawning* decision are
distinguishable.  (Doc. 755.)  The SRS Contractors object to
Plaintiffs' response as an unauthorized brief, but also offer
their interpretation of *Salmon Spawning*. (Doc. 756.)  The DMC
Contractors filed their own brief, arguing their interpretation
of *Salmon Spawning*.  (Doc. 757.)  *Salmon Spawning* is binding
authority, but none of the parties' arguments will be considered,
as no leave was granted to file supplemental briefs.

San Joaquin River; (2) these interests were harmed by the drying up the San Joaquin below Friant Dam resulting from the Bureau's delivery of water pursuant to water service contracts; and (3) harm would continue should the contracts be renewed).  Plaintiffs satisfy the injury-in-fact requirement.

> **b.    Relaxed Causation & Redressibility Standard for Procedural Injury Claims**.

When a plaintiff seeks to vindicate a <u>procedural</u> harm, rather than a substantive right, the causation and redressibility requirements are relaxed.  This alternative approach to standing was articulated in footnote 7 of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992):

> The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressibility and immediacy.  Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.*

The Ninth Circuit has endorsed the use of this modified standard in procedural injury cases under the ESA:

> A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressibility. Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, <u>could</u> protect their concrete interests.

*Salmon Spawning*, --- F.3d ---, 2008 WL 4490533 at *4 (emphasis in

1  original)(internal citations and quotations omitted).

2      *DOW v. EPA*, 420 F.3d 946, 957-58 (9th Cir. 2005), reversed
3  on other grounds by *Home Builders*, 127 S. Ct. 2518, applied this
4  relaxed standard to a claim brought under the ESA alleging lack
5  of adequate consultation under Section 7(a)(2).  One ground for
6  challenge of the consultation process in *DOW v. EPA* was that the
7  action agency relied on a "legally improper Biological Opinion."
8  *Id*.  The Ninth Circuit concluded that plaintiffs had standing to
9  challenge the agency action because "the use of an improper
10 section 7 consultation by reason of an inadequate biological
11 opinion lessens the likelihood that the impact of the proposed
12 action on listed species and their habitats will be recognized
13 and accounted for in making the transfer decision."  *Id*. at 958.
14 The Ninth Circuit categorized as "procedural" a section 7(a)(2)
15 claim that the action agency improperly relied upon an inadequate
16 biological opinion.

17     This is consistent with other cases that classify as
18 "procedural" the ESA's three-step process designed to "ensure
19 compliance with its substantive provisions."  *See Thomas v.*
20 *Peterson*, 753 F.2d 754, 763 (9th Cir. 1985).  The three steps
21 are:

22              (1) An agency proposing to take an action must inquire
                of the [FWS] whether any threatened or endangered
23              species "may be present" in the area of the proposed
                action. *See* 16 U.S.C. § 1536(c)(1).
24
                (2) If the answer is affirmative, the agency must
25              prepare a "biological assessment" to determine whether
                such species "is likely to be affected" by the action.
26              *Id*. The biological assessment may be part of an
                environmental impact statement or environmental
27              assessment. *Id*.

28

(3) If the assessment determines that a threatened or endangered species "is likely to be affected," the agency must formally consult with [FWS]. *Id.* § 1536(a)(2). The formal consultation results in a "biological opinion" issued by [FWS]. *See id.* § 1536(b). If the biological opinion concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see* § 1536(a)(2), then the action may not go forward unless the [FWS] can suggest an alternative that avoids such jeopardization, destruction, or adverse modification. *Id.* § 1536(b)(3)(A). If the opinion concludes that the action will not violate the Act, [FWS] may still require measures to minimize its impact. *Id.* § 1536(b)(4)(ii)-(iii).

*Id.* In contrast, "[s]ubstantively, the Act prohibits the taking or importation of endangered species, *see* 16 U.S.C. § 1538, and requires federal agencies to ensure that their actions are not 'likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification' of critical habitat of such species." *Id.* (internal citations omitted).[10]

---

[10]    The law is not entirely consistent on the procedural versus substantive distinction.  The relatively clear lines drawn in *Thomas* are blurred by *Pyramid Lake Paiute Tribe v. U.S. Department of the Navy*, 898 F.2d 1410 (9th Cir. 1990), which examined the legality of the Navy relying on a FWS biological opinion that allegedly violated FWS's own regulations requiring examination of the indirect effects of an action.  The 9th Circuit first ruled that "the Navy properly consulted with the FWS before entering into each of [a] series of one-year leases for the buffer zone areas.... The Navy relied in large measure on these FWS opinions in finding that the outlease program would not jeopardize any threatened or endangered species."  However, satisfying this procedural requirement was not enough.  *Id.* at 1415.

[W]hile consultation with the FWS may have satisfied the Navy's procedural obligations under the ESA, the

1    Here, Plaintiffs allege that the Bureau violated the ESA by

2   executing the contracts in reliance on the OCAP BiOp, a document

3   Plaintiffs maintain was obviously flawed and has been ruled

4   unlawful.  *DOW v. EPA* closely parallels the facts of this case;

5   both concern reliance on a legally improper biological opinion.

6   The altered burden applies to Plaintiffs' procedural claim.

7   Plaintiffs "must show only that they have a procedural right

8   that, if exercised, <u>could</u> protect their concrete interests."

9   *Salmon Spawning*, --- F.3d ---, 2008 WL 4490533 at *4 (emphasis in

10  original).  While relaxed in comparison to the traditional

11  standard, this inquiry is "not toothless."  *See id.* (explaining

12  that while the redressability requirement under a relaxed,

13  procedural harm inquiry is "not a high bar to meet," it is "not

14  toothless" either).

15   Plaintiffs' other claim, that the Bureau's ongoing

16  performance under the contracts violates its duty to protect the

17  species against jeopardy and adverse critical habitat

18  modification, is substantive and governed by the traditional

19  standards for causation and redressability.

20  ─────────────────

21          Navy may not rely solely on a FWS biological opinion to
            establish conclusively its compliance with its
22          substantive obligations under section 7(a)(2).  A
            federal agency cannot abrogate its responsibility to
23          ensure that its actions will not jeopardize a listed
            species; its decision to rely on a FWS biological
24          opinion must not have been arbitrary or capricious.

25  *Id*.  An agency's reliance on an insufficient BiOp without more,

26  may be a substantive, rather than a procedural, violation.  But,

27  standing was not an issue in *Pyramid Lake Paiute Tribe*.  *DOW v.*
    *EPA* is directly on point and will be followed.

28

1

             **c.**   <u>**Causation**</u>.

2        The second standing requirement, causation, normally

3 requires that the injury be "fairly traceable" to the challenged

4 action of the defendant, and not be "the result of the

5 independent action of some third party not before the court."

6 *Tyler v. Cuomo*, 236 F. 3d 1124, 1132 (9th Cir. 2000).  Under the

7 modified standard, this requirement is relaxed to require only

8 that a proper section 7 consultation <u>could</u> protect Plaintiffs'

9 concrete interest in the Delta smelt.  *Salmon Spawning*, --- F.3d

10 ---, 2008 WL 4490533 at *4.

11

12                  **(1)**  <u>**General Evidence Connecting Water**</u>

13                     <u>**Deliveries to Harm to the Smelt**</u>.

        Plaintiffs point to evidence regarding the adverse impacts

14 to the Delta smelt resulting from the Bureau's delivery of water

15 to DMC Contractors (via Delta exports) and SRS Contractors (via

16 upstream diversions).  For example, in announcing the Delta

17 smelt's ESA listing, FWS identified as among the most important

18 factors contributing to the smelt's precarious situation,

19 "[r]educed river outflows, primarily in the Sacramento and San

20 Joaquin Rivers and their tributaries," and "entrainment mortality

21 caused by water diversion."  58 Fed. Reg. 12,854, 12,859 (March

22 5, 1993).  FWS found that the species' historic decline was

23 "concurrent with increased human changes to seasonal Delta

24 hydrology, freshwater exports, and the accompanying changes in

25 the temporal, spatial, and relative ratios of water diversions."

26 *Id*. at 12,854.  This decline, according to FWS, is associated

27

28

1  "with an increasing amount and proportion of freshwater
2  diversions that confine the mixing zone to the narrow, deep, and
3  less productive channels in the lower rivers." *Id*. at 12,860.
4  FWS specifically identified "Central Valley Project contract
5  renewals" as agency action that would impact the Delta smelt by
6  "increas[ing] water exports from the Delta" and "reduc[ing] water
7  inflow to the Delta." *Id*. at 12,859.

8       FWS's OCAP BiOp found that "the destruction, modification,
9  or curtailment of [the Delta smelt's] habitat or range resulting
10 from extreme outflow conditions, the operations of the State and
11 Federal water projects, and other water diversions as described
12 in the original listing" adversely affected the Delta smelt.  (AR
13 at 367.)  According to the 2005 OCAP BiOp, "Delta smelt have been
14 increasingly subject to entrainment ... and constriction of low
15 salinity habitat to deep-water river channels of the interior
16 Delta," impacts that the Service attributed "primarily" to "the
17 steadily increasing proportion of river flow being diverted from
18 the Delta by the Projects, and occasional droughts."  (AR 366;
19 *see also* AR 370.)

20      Defendants refer to record evidence of other causes,
21 separate from Project operations, that arguably reduce the
22 causative connection between exports and upstream diversions and
23 harm to the Delta smelt.  If the evidence on standing conflicts,
24 courts must assume Plaintiffs will succeed on the merits of their
25 assertion that water deliveries harm the smelt.  *See Defenders of*
26 *Wildlife v. Gutierrez*, 532 F.3d at 924.

27

28

### (2)  <u>Causation and the DMC Contract Shortage Provisions</u>.

The AR establishes a causal connection between water deliveries and harm to the smelt.  However, the DMC Contractors maintain that Plaintiffs cannot establish a causal connection between harm to the smelt and execution of and/or deliveries under <u>their contracts</u>, because the DMC Contracts "remain flexible to accommodate any operations required under federal law, expressly including the ESA, and [the Bureau] is not liable to the DMC Contractors for any loss of water or other damages incurred as a result of taking actions mandated by the ESA." (Doc. 690 at 17-18.)

Each DMC Contract requires that, "During each Year, consistent with all applicable State water rights, permits, and licenses; [and] Federal law; ..., the Contracting Officer shall make available [water] for [agricultural and/or M&I] ... purposes."  (*See, e.g.*, SAR 507 (Banta-Carbona Irrig'n Dist. Contract).)  The DMC Contracts acknowledge that "the capacity of the Project to deliver Project Water ... may be constrained in the future due to ... implementation of Federal and State laws" and that "[the Bureau's] modeling ... projected that the Contract Total set forth in this Contract will not be available to the Contractor in many years...."  (*See, e.g., id.*)

The DMC contracts specifically absolve the Bureau from any liability for non-delivery of water and other actions required to comply with the ESA and other Federal and State laws.  Each DMC Contract contains a "shortage provision" that relieves the Bureau

of liability for any direct or indirect damages arising from reduced deliveries to DMC Contractors as a result of, among other things, "actions taken by the Contracting Officer to meet legal obligations." (*See, e.g., id*. at 526.)  This contract term expressly allows the Bureau to take actions to protect Delta smelt, including not delivering any water to DMC contractors if required to comply with section 7(a)(2) "to meet legal obligations" without incurring liability.

In *O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995), the Ninth Circuit interpreted a similar shortage provision, which released the Bureau from liability for damages "arising from shortage on account of errors in operation, drought, or any other causes." *Id*. at 682 n.2.  The Ninth Circuit concluded that the "contract's liability limitation is unambiguous" and that "an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.'" *Id*. at 684.  This absolved Interior from any duty to deliver water to the contractors in that water year.  The current DMC Contract shortage provision contains even more specific language, replacing the "any other causes" language with the term "actions taken to ... meet legal obligations."[11]

---

[11]     The shortage provision contained in the DMC Contracts is unlike the provision at issue in *Houston*, known as Article 14, which permitted only minor modifications to the contracts in order to comply with federal law.  146 F.3d 1118.  *Houston* arose under ESA section 7(d) which prohibits during the consultation period the "irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable

1   The shortage and release provisions in the DMC Contracts
2   prevent the Bureau from suffering any liability for curtailing
3   deliveries to the DMC Contractors when necessary to effectuate
4   ESA purposes.  It is undisputed that the Bureau has, in numerous
5   prior water years, invoked this provision to withhold and reduce
6   water deliveries to the DMC Contractors.  These force majeure
7   rights break any chain of causal connection between the Bureau's
8   ongoing performance under the DMC Contracts and harm to the Delta
9   smelt, because the DMC Contracts provide no enforceable right to
10  water in the DMC Contractors, if water delivery will violate the
11  ESA.  Plaintiffs do not have standing to bring their "ongoing
12  performance" claim against the DMC Contracts.

13  Whether Plaintiffs' procedural claim against the DMC
14  Contracts satisfies the relaxed causation test is a more
15  difficult question.  Plaintiffs' theory is that the Bureau acted
16  unlawfully in executing the water service contracts in reliance
17  on the obviously flawed OCAP BiOp.  Will correcting the alleged
18  procedural harm, by conducting a proper consultation prior to

19  _____

20  and prudent alternative measures...."  *Id*. at 1127-28.  The
21  district court concluded that the execution of certain long-term
    water contracts constituted an irreversible and irretrievable
22  commitment of resources that was prohibited until FWS completed
    its ESA review.  The non-federal defendants argued that Article
23  14 prevented the foreclosure of reasonable and prudent
24  alternatives because it allowed the Bureau to modify the
    contracts to comply with federal law.  *Id*. at 1128.  The Ninth
25  Circuit disagreed, reasoning that Article 14 "is inadequate to
    serve that purpose here because it limits conservation-based
26  modifications to minor adjustments and prohibits an adjustment of
27  the amount of water delivered."  *Id*.   The shortage provision in
    the DMC Contracts contains no such limitation.

28

1  executing the DMC contracts, make a difference for the Delta

2  smelt?  Although relaxed, the causation and redressibility

3  requirements applicable in procedural injury cases are "not

4  toothless."  *Salmon Spawning*, --- F.3d ---, 2008 WL 4490533 at

5  *4.[12]

6      If reconsultation is invoked and the DMC Contracts are

7  renegotiated, the terms of the DMC Contracts could change.  Given

8  the force majeure effect of existing shortage provisions,

9  however, changes to the DMC Contracts will not make the

10  agreements more protective of the smelt, as the contracts are

11  already entirely defeasible if the ESA so requires.  The Bureau

12  and FWS are reconsulting and preparing a new OCAP BiOp.  They

13  also operate under a set of interim restrictions imposed to

14  protect the smelt.  If Plaintiffs believe the Bureau's delivery

15  of water under the DMC contracts violates the ESA, they have an

16  adequate remedy to protect smelt through appropriate interim

17  relief pending issuance of a new OCAP BiOp.  It is improper to

18  speculate whether the new BiOp will comply with the ESA.  Once a

19  new OCAP BiOp is in place, any reductions mandated by the OCAP

20  _____

21      [12]    In *Salmon Spawning*, plaintiffs challenged the decision
   of the State Department to enter into a fisheries management
22  treaty with Canada.  Plaintiffs argued that NMFS and the State
   Department did not engage in proper section 7(a)(2) consultation
23  prior to approving the treaty.  The Ninth Circuit found that even
   if plaintiffs obtained the ESA procedural remedy they requested -
24  - an order requiring NMFS and the State Department to reconsult -
   - the ultimate agency decision to enter into the treaty with
25  Canada, undertaken many years before the lawsuit, could never be
   influenced by the courts, because decisions regarding foreign
26  relations are committed to the Executive Branch alone.  *Id.* at
   *4-*5.  Those plaintiffs could not establish redressibility.
27

28

BiOp will be effected pursuant to express contractual shortage provisions.  Any harm to the smelt will not be the result of execution or performance of the DMC Contracts.

The DMC Contract renewal process is not where the Bureau chose to evaluate impacts to and/or protections for the smelt. Instead, the Bureau elected to evaluate the impacts to the smelt on a programmatic basis in the OCAP BiOp.  (Plaintiffs do not suggest this tiering approach is unlawful, only that the current OCAP BiOp is inadequate.)  The pass-through provisions contained in the DMC Contracts prevent the DMC Contracts themselves from causing any additional harm to the smelt, above and beyond that which might be caused by the OCAP BiOp.  Addressing the procedural harm alleged here by requiring renewed consultation on the DMC Contracts will accomplish nothing.  The Bureau has already provided maximum accommodation to the ESA, by wording the DMC water delivery obligations so that they are entirely defeasible, if necessary to comply with the law.  Plaintiffs cannot establish the requisite causal connection with respect to the claimed procedural injury against the DMC Contracts.

### (3)  Plaintiffs' Taint Theory.

Alternatively, Plaintiffs suggest that, regardless of any pass-through shortage and release provisions, the execution and continued performance of the contracts taints the ongoing OCAP consultation process by "creating a benchmark that the contractors will continue to use to push for the fullest deliveries possible."  (Doc. 742 at 3.)  Plaintiffs maintain that

1  if the contracts remain in effect, the reconsultation "will be

2  little more than a charade ... predestined to provide biological

3  justification for the Bureau's prior decisions." (Doc. 681 at 1,

4  24-26.)  Specifically, Plaintiffs argue that "[n]otwithstanding

5  the shortage provision and liability release in their contracts

6  with the Bureau ... CVP water-service contractors (including

7  Defendant-Intervenor Westlands Water District and Francis Orff, a

8  Westlands farmer) have aggressively, but unsuccessfully,

9  litigated the meaning of these provisions, claiming that the

10 United States owes them water or money damages when shortages

11 occur due to ESA-related reductions in water deliveries." (Doc.

12 718 at 23.)  Their argument continues:

13           These piecemeal challenges, which pressure the Bureau
             to negotiate its ESA duties against a backdrop of
14           ever-looming litigation, have not allowed for
             consideration of whether, at the Project-level, this
15           shortage language will allow the Bureau the flexibility
             it needs to comply with the ESA for the next 25 years,
16           especially when the needs of the listed species have
             never been defined by FWS in an adequate biological
17           opinion.  The adequacy of the shortage provision is
             thus precisely one of the issues that must be
18           reconsidered and evaluated during a valid
             reconsultation.  This reconsideration cannot occur if
19           the existing shortage provision and other contract
             terms are already set in stone.
20
   (*Id.* at 23-24.)
21
22      The legal enforceability and efficiency of the shortage

23 provisions are finally settled and no longer present a

24 justiciable controversy.  Undeniably, the Bureau's CVP operations

25 endure under the threat of litigation from all sides.  The

26 continuing threat of litigation is an insufficient basis for a

27 finding that contract rescission and renegotiation will redress

28
                              41

1  Plaintiffs' injury.  *Cf. Westlands Water Distr. v. United States*,

2  100 F.3d 94, 96-97 (9th Cir. 1996) (threat of future litigation

3  which causes uncertainty is insufficient to establish plain legal

4  prejudice for purposes of evaluating propriety of voluntary

5  dismissal under Rule 41(a)(2)).

6      Plaintiffs also point to recent congressional testimony on

7  behalf of several Defendant-Intervenors as "demonstrat[ing] the

8  real-world effects of the Bureau's over-commitment of CVP water

9  under [] these contracts, the existing shortage provisions

10  notwithstanding."  (Doc. 718 at 24.)   Specifically, Plaintiffs

11  quote the July 21, 2008 Congressional testimony of Westlands

12  Water District's General Manager:

13          Because of the initial 45% contract allocation [in
            2008], farmers had already fallowed large acreages;
14          however, when rationing was imposed many farmers were
            compelled to abandon crops that had been planted.
15          Decisions to abandon crops were made to keep alive
            other crops. Many farmers decided to abandon annual
16          crops, such as tomatoes, cotton, and corn, in order to
            have sufficient water to irrigate permanent orchards
17          and vineyards. Other farmers decided to abandon a
            portion of their annual crops, in order to have
18          sufficient water to irrigate the balance of their
            annual crops. In extreme situations, farmers abandoned
19          permanent crops, in order to have sufficient water to
            irrigate their remaining permanent crops.
20

21  (*See* Doc. 719-3. Crook Decl., Ex. 2 at 3.)  Plaintiffs cite the

22  separate congressional testimony of SLDMWA's Executive Director,

23  who indicated that "unprecedented rationing has resulted in

24  severe impacts to the farmers, farm-workers and the rural

25  communities that rely on our irrigated-agriculture based

26  economy."  (Crook Decl., Doc. 719, Ex. 3 at 2.)  Plaintiffs argue

27  that "[w]hile a shortage provision may allow the Bureau to take

28                              42

steps to reduce water deliveries under CVP contracts, it does not

obviate the impacts created when water users make plans and take

actions based on contractual promises of excessive water

deliveries that the Bureau cannot meet.  Only a more realistic

allocation of CVP water in the contracts following a valid ESA

consultation can cure this problem."  (Doc. 718 at 24.)

These are political, not legal arguments.  Whether and to

what extent water users take actions based upon contractual

promises to provide water service that historically have rarely,

if ever, been met in full is not cognizable under the ESA, which

deliberately prohibits the federal courts from considering the

economic impacts of actions taken to protect listed species.[13]  It

---

[13]    *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912 (D.C.
Cir. 2003), supports rejection of Plaintiffs' "taint" theory.  In
that case, the Crow Creek Sioux tribe challenged the Army Corps
of Engineer's ("Corps") transfer of land to the State of South
Dakota, claiming "this title transfer will eviscerate the
Secretary of the Army's ability to enforce federal cultural
protection on the transferred lands."  *Id.* at 913.  The D.C.
Circuit found the tribe "utterly failed to establish an actual or
imminent injury in fact," because the act requiring transfer of
the lands "explicitly provide[d] that the cultural protection
laws will continue to apply to the transferred lands," and
"[f]urthermore, the land transfer [did] not alter or impede the
legal authority of the Secretary to enforce the cultural
protection statutes."  *Id.* at 916-917.  The D.C. Circuit
reasoned:

> The Tribe presents no reason to believe that
> enforcement will diminish; it simply asserts the
> possibility that the Secretary will be less willing or
> less able to enforce federal law if the Corps no longer
> has title to the property.  This unsupported conjecture
> does not constitute injury in fact when the [relevant
> Act] itself provides that the Secretary will have an
> ongoing and undiluted enforcement role on the

1   also places the court in the untenable position of usurping the

2   Executive's right to decide and contract for allocation and use

3   of water resources of the United States, which is an infringement

4   of the Separation of Powers Doctrine. *See Painter v. Shalala,* 97

5   F.3d 1351, 1359-60 (10th Cir. 1996) (citing *Marbury v. Madison*, 5

6   U.S. 137 (1803), for the proposition that the Separation of

7   Powers Doctrine weighs against judicial review of an action

8   committed to an Executive agency's discretion).   The Executive

9   and Legislative branches fully understood the controversy over

10  water politics that underlie this case.   Change in priorities and

11  the operational regime of the CVP is not within the authority or

12  legal competence of the judiciary.

13

14                  **(4)   Causation and the SRS Contracts**.

15                  **(a)   Shortage Provisions**.

16       The SRS Contracts also have shortage provisions.

17  The SRS Contracts distinguish between "Base Supply" and "Project

18  _____

19           transferred lands.
    *Id*. at 917.   *Crow Creek* concluded that the "Tribe has not
20  suffered an injury in fact stemming from the transfer of lands
    ... [t]he only harms it alleges are speculative and hypothetical,
21  not actual or imminent."   *Id*. at 918.

22       Here, as in *Crow Creek*, the CVPIA mandates that the Bureau
    enter into the DMC Contracts, subject to the direction that "the
23  Secretary ... shall operate the [CVP] to meet all obligations
    under state and Federal law, including ... the Federal [ESA],"
24  and that "the Secretary shall incorporate all requirements
    imposed by existing laws ... within such renewal contracts."
25  CVPIA §§ 3404(c)(2), 3406(b).   Like *Crow Creek*, Plaintiffs theory
    that the execution and continued validity of the DMC contracts
26  will taint the Bureau's ability to comply with the ESA in the
    OCAP consultation process is without merit.
27

28                              **44**

Water."  Base Supply is "the quantity of Surface Water

established in Articles 3 and 5 which may be diverted by the

Contractor from its Source of Supply each month during the period

of April through October of each year without payment to the

United States for such quantities diverted."  (*E.g.*, SAR 2699

(GCID Settlement Contract).)  Project Water, is "water that is

developed, diverted, stored, or delivered by the Secretary in

accordance with the statutes authorizing the Project and in

accordance with the terms and conditions of water rights acquired

pursuant to California law."  (*E.g.*, SAR 1044 (Patterson Irrig'n

Dist. Settlement Contract).)

Project Water is subject to a shortage provision that is

similar to that contained within the DMC Contracts.  Article 3(i)

provides that "if there is a shortage of <u>Project Water</u> because of

actions taken by the Contracting Officer to meet legal

obligations then ... no liability shall accrue against the United

States or any of its officers, agents, or employees for any

damage, direct or indirect, arising therefrom."  (*E.g.*, SAR 2707

at ln. 252-256.)  This, like the shortage provision in *O'Neill*

and the DMC Contracts is a perfect pass-through shortage

provision, allowing the Bureau to completely withhold deliveries

if necessary, but this only applies to Project Water.[14]

_____

[14]     Arguably, like deliveries under the DMC Contracts,
because deliveries of Project Water are subject to a force
majeure shortage provisions, they cannot cause any harm to the
smelt that is not already being addressed by reconsultation on
the OCAP BiOp.  However, Plaintiffs challenge the Settlement
Contracts as a whole, not just the Project Water portion.  A
Plaintiffs standing to sue is evaluated claim by claim, *Valley*

1  Base Supply makes up the bulk of each Settlement Contract as
2  it is based on the Settlement Contractors' claimed senior water
3  rights.  For example, GCID's Settlement Contract is for 720,000
4  acre-feet of Base Supply and 105,000 acre-feet of Project Water.
5  The SRS Contracts do contain shortage provisions that apply to
6  the Base supply, but they are limited in scope.  (AR 2732.)
7  Article 5, entitled "Constraints on the Availability of Water,"
8  (*see, e.g.*, AR 2708), permits the Bureau to cut deliveries of
9  both Base Supply and Project Water by 25 percent when conditions
10  allow for the declaration of a "Critical Year" in which either of
11  the following eventualities exist: (1) "[t]he forecasted full
12  natural inflow to Shasta Lake ... is equal to or less than 3.2
13  million acre feet"; or (2) "[t]he total accumulated deficiencies
14  below 4 million acre-feet in the immediately prior Water Year or
15  series of successive prior Water Years each of which had inflows
16  of less than 4 million acre-feet, together with the forecasted
17  deficiency for the current Water Year, exceed 800,000 acre-feet."
18  (*E.g.*, SAR 1862 at Article 1(e), hereinafter the "Shasta Critical
19  Year shortage provision.")  The Shasta Critical Year shortage
20  provision is not an omnibus force majeure clause; rather, it is a
21  limited grant of authority to the Bureau to curtail deliveries
22  under the SRS Contracts.  Under no circumstances may the Bureau
23  reduce Base Supply deliveries below 75 percent, even if doing so
24  is required for ESA compliance.

25  The SRS Contracts also contain provisions absolving the

27  *Outdoor, Inc. v. City of Riverside,* 446 F.3d 948, 952 (9th Cir.
2006), not clause by clause.

Bureau of liability for "[a]ny damage whether direct or indirect arising out of or in any manner caused by a shortage of water whether such shortage be on account of errors in operation, drought, or unavoidable causes."  (AR 2707, ln 249-251.)  This provision applies generally to "the shortage of water" and does not distinguish between base supply and project water.  (*Id.*) This language is analogous to *O'Neill* (interpreting language that absolves Bureau of liability "arising from shortage on account of errors in operation, drought, or <u>any other causes</u>" as covering curtailments required by the CVPIA and ESA) and in the DMC Contracts (absolving the Bureau of liability for "actions taken by the Contracting Officer to meet legal obligations").  However, in past operations, the Bureau has not utilized the "unavoidable causes" language to curtail Base Supply when necessary to meet ESA obligations.  With the exception of the 25 percent curtailment in Shasta Critical Years, the Bureau essentially treats Base Supply as inviolate.  (*See PCFFA*, Doc. 367, at ¶67.)

The SRS Contractors maintain that the Base Supply is not subject to the ESA under the Supreme Court's recent *Home Builders* decision, 127 S. Ct. 2518.  (*See infra* at Part VI.D.1.)  However, in deciding standing, a court must assume that Plaintiffs will prevail on the merits.  Therefore, it is assumed for the purposes of standing that the ESA applies to any volume of Base Supply that does not represent senior water rights protected by law. Based on this premise, the shortage provisions in the SRS Contracts are not sufficiently comprehensive to break the causal chain.

1

2

                                   **(b)**   <u>**Causal Connection Between the SRS**</u>

3
                                        <u>**Contracts and Harm to Smelt**</u>.

4
     The SRS Contractors maintain that "Plaintiffs have not

5
demonstrated that their alleged injury is 'fairly traceable' to

6
any actions by the Settlement Contractors...." (Doc. 707 at 17.)

7
     Plaintiffs allege that "the amount and quality of suitable

8
habitat [for the smelt] has declined dramatically due to Delta

9
water diversions and exports." (TAC at ¶31.) The Settlement

10
Contractors rejoin that the record contains no specific evidence

11
that upstream diversions by the Settlement Contractors either

12
jeopardize the continued existence of the Delta smelt or

13
adversely modify its critical habitat, in large measure because

14
the smelt's habitat is geographically removed from the SRS

15
Contractors' operations and diversion points. (Doc. 707 at 18-

16
19.)

17
     Although the record does not specifically assign blame to

18
the Settlement Contractors, it does contain evidence that

19
upstream diversions contribute harm to the Delta smelt. In its

20
final rule announcing the Delta smelt's ESA listing, FWS

21
identified as among the three most important factors to its

22
decision, the adverse impacts of "[r]educed river outflows,

23
primarily in the Sacramento and San Joaquin Rivers and their

24
tributaries." 58 Fed. Reg. at 12,859. FWS found that the

25
species' historic decline "was concurrent with increased human

26
changes to seasonal Delta hydrology, freshwater exports, and the

27
accompanying changes in the temporal, spatial, and <u>relative</u>

28
<u>ratios of water diversions</u>." *Id*. at 12,854 (emphasis added).

1  This decline, according to FWS, has also been "concurrent with an
2  increasing amount and proportion of freshwater diversions that
3  confine the mixing zone to the narrow, deep, and less productive
4  channels in the lower rivers." *Id*. at 12860.  FWS specifically
5  identified "Central Valley Project contract renewals" as agency
6  action that would impact the Delta smelt by "increas[ing] water
7  exports from the Delta" and "reduc[ing] water inflow to the
8  Delta." *Id.* at 12,859.  Diversion by SRS Contractors of
9  approximately 2 million acre-feet of Sacramento River water per
10  year reduces water inflow to the Delta.

11      The OCAP BiOp contains similar findings, concluding that the
12  Delta smelt continues to be impacted by "the destruction,
13  modification, or curtailment of its habitat or range resulting
14  from extreme outflow conditions, the operations of the State and
15  Federal water projects, and other water diversions as described
16  in the original listing." (AR at 367.)  According to FWS, "Delta
17  smelt have been increasingly subject to entrainment ... and
18  constriction of low salinity habitat to deep-water river channels
19  of the interior Delta," impacts that the Service attributed
20  "primarily" to "the steadily increasing proportion of river flow
21  being diverted from the Delta by the Projects, and occasional
22  droughts." (AR 366; *see also* AR 370 (species' decline is
23  "primarily a result of drought and the steadily increasing
24  proportion of river flow being diverted from the Delta by the CVP
25  and SWP").)  The OCAP BiOp specifically links these effects to
26  Delta exports, (*see, e.g.*, AR 386, 428), as well as upstream
27  diversions, which "result in lower delta outflows and increased

28

entrainment," (AR at 371).  These facts sufficiently establish a causal connection between the execution of and performance under the SRS Contracts and harm to the smelt, particularly under the relaxed standard applicable to procedural violation claims.[15]

### d.  Redressibility.

To satisfy the final requirement of Article III standing, a plaintiff must show it is "likely that a favorable court decision will redress the injury to the plaintiff."  *Lujan*, 504 U.S. at 560; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 at 107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiffs into federal court; that is the very essence of the redressibility requirement").

"Redressibility requires an analysis of whether the court has the power to right or to prevent the claimed injury."  *Gonzales v. Gorsuch*, 688 F. 2d 1263, 1267 (9th Cir. 1982).  Where plaintiffs allege improper section 7 consultation, the redressibility requirement is satisfied when an order requiring proper consultation increases the likelihood that the impact of the

_____

[15]    The SRS Contractors take issue with some of Plaintiff's record citations in their opening brief to support the assertion that upstream diversions harm the Delta smelt.  (*See* Doc. 724 at 10-11.)  But, Plaintiffs' opposition relies on other cites which, for purposes of standing, support their position that upstream diversions are a cause of harm to the Delta smelt.  The SRS Contractors correctly object to Plaintiffs' reliance on the July 10, 2008 Federal Register notice regarding Plaintiffs' petition to reclassify the smelt as endangered.  (Doc. 724 at 11.) Plaintiffs reliance upon this extra-record document is not proper, and their motion to add it to the record has been denied.

1  proposed action on listed species and their habitats will be
2  recognized and accounted for in making the transfer decision.
3  *See DOW v. EPA*, 420 F.3d at 958.  It has been explained why the
4  DMC contracts failed to meet the redressability requirement, as
5  their new shortage provisions provide the Bureau all the
6  authority to reduce DMC water deliveries it needs to comply with
7  the ESA to protect the smelt.

8

9               **(1)   <u>Redressibility and the SRS Contracts</u>**.

10       Plaintiffs ask the Court to order the Bureau "to renegotiate
11  and re-execute these renewal contracts only upon completion of a
12  valid ESA § 7(a)(2) consultation."  (TAC, Prayer E.)  The SRS
13  Contractors maintain that Plaintiffs cannot demonstrate that
14  invalidating or enjoining the performance of the SRS Contracts
15  will redress the alleged harm to the smelt.  The Settlement
16  Contractors argue that their water rights to the Sacramento River
17  are "vested" under California law and are "senior to the water
18  rights [the Bureau] obtained to operate the CVP."  (Doc. 707 at
19  20.)  Therefore, even if the district court issued an order
20  invalidating these contracts and directing the parties to
21  renegotiate their terms, the Settlement Contractors would still
22  be able to divert water from the Sacramento River under their
23  own, pre-existing water rights, (*id.*), which, in turn, would
24  gravely disable the functioning of the CVP.  This is only
25  partially true.  The true extent of the SRS Contractors' senior
26  water rights and the finite volume of water rights the Bureau
27  holds in the Sacramento River has never been established.

28

1    However, "[i]n deciding whether a plaintiff's injury is

2   redressable, courts assume that plaintiff's claim has legal

3   merit." *Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir.

4   2004).  In determining standing, it must be assumed as correct

5   that: (1) the Bureau has discretion whether and on what terms to

6   execute and perform the long-term SRS Contracts; and (2) that the

7   Bureau violated ESA section 7(a)(2) by executing these contracts

8   without lawful consultation.  Arguendo, if the contracts are

9   rescinded, Plaintiffs' injury would be redressed by increasing

10  "the likelihood that environmental considerations will be

11  attended to" when the Bureau re-executes these contracts.  *DOW v.*

12  *EPA*, 420 F.3d at 958.  Moreover, if plaintiffs prevail on their

13  "ongoing operations" claim, they could be entitled to injunctive

14  relief against continued performance of the SRS Contracts, which

15  would redress the alleged injury.

16

17              e.   Overall Conclusion Re Standing.

18       Plaintiffs have failed to establish that they have standing

19  to bring their claims against the DMC Contracts, but they do have

20  standing to challenge the SRS Contracts.

21

22       D.   Merits.

23            1.   Threshold Issue: Does Section 7(a)(2) Apply to the
                   Execution of the Challenged Settlement Contracts
24                 Under *Home Builders*?

25       The Findings of Fact and Conclusions of Law Re: Remedies in

26  *PCFFA v. Gutierrez*, 1:06-CV-0245 OWW GSA, briefly discussed the

27  recent Supreme Court decision in *Nat'l Ass'n of Home Builders v.*

28
                                 52

*Defenders of Wildlife*, 127 S. Ct. 2518, 2526 (2008):

> [In Home Builders,] [t]he Supreme Court [] upheld an
> NMFS/FWS regulation interpreting ESA § 7(a)(2) as only
> applying to actions "in which there is discretionary
> federal involvement or control." *Home Builders*, 127 S.
> Ct. 2518 (interpreting 50 C.F.R. § 402.03). *Home
> Builders* concerned EPA's decision to transfer to the
> State of Arizona its National Pollutant Discharge
> Elimination System ("NPDES") permitting power under the
> Clean Water Act.  The Home Builders Court held that
> this [transfer] decision was non-discretionary:

>> While the EPA may exercise some judgment in
>> determining whether a State has demonstrated that
>> it has the authority to carry out § 402(b)'s
>> enumerated statutory criteria, the statute clearly
>> does not grant it the discretion to add another
>> entirely separate prerequisite to that list.
>> Nothing in the text of § 402(b) authorizes the EPA
>> to consider the protection of threatened or
>> endangered species as an end in itself when
>> evaluating a transfer application. And to the
>> extent that some of the § 402(b) criteria may
>> result in environmental benefits to marine
>> species, there is no dispute that Arizona has
>> satisfied each of those statutory criteria.

> *Id*. at 2536.  *See also NWF v. NMFS II*, 524 F.3d 917,
> 927-28 (9th Cir. 2008)(applying Home Builders, holding
> that despite existence of broad, unquantified statutory
> goals in applicable Reclamation statute, Bureau still
> retains discretion over Project operations and those
> operations are still subject to the ESA).

> Certain aspects of the management of the CVP/SWP are
> non-discretionary as that term is utilized in *Home
> Builders*.  Most importantly, in this case, federal
> Reclamation law requires the Bureau to comply with
> non-conflicting state water law.  Reclamation Act of
> 1902, Pub. L. 57-161, 32 Stat. 288 at § 8 (June 17,
> 1902); Central Valley Project Improvement Act ("CVPIA")
> § 3406(b), Pub. L. 102-575, 106 Stat. 4600 (Oct. 30,
> 1992).  Specifically, the Bureau must comply with State
> Water Resources Control Board ("SWRCB") water rights
> and water quality decisions.  See CVPIA § 3406(b) ("The
> Secretary ... shall operate the [CVP] to meet all
> obligations under State and Federal law, including....
> all decisions of the California State Water Resources
> Control Board establishing conditions on applicable
> licenses and permits for the project....").

> For example, the Bureau has a mandatory (i.e.,

non-discretionary) legal obligation to make releases from Shasta Reservoir for delivery to the Sacramento River Settlement Contractors.  Under the Sacramento River Settlement Contracts, Settlement Contractors are entitled to 100% of their contractual supply in all years except so-called "Shasta Critical Years."  In Shasta Critical Years, Settlement Contractors' priority supply may be reduced by 25 percent.  This mandatory obligation derives from the priority of the Settlement Contractors' water rights, which facilitated issuance of state water permits to the Bureau to operate the CVP.  The CVP's water rights are subject to the Settlement Contractors' rights.  *See e.g.*, SWRCB D-990 (granting water rights to the United States to operate the CVP, while also recognizing and prioritizing the protection of existing rights on the Sacramento River).[FN3]

> [FN3:  The Sacramento-San Joaquin Exchange Contractors arguably hold similar priority rights. *See generally Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 669, 675-76 (9th Cir. 1993).]

Non-priority water service contracts for irrigation and municipal and industrial uses by north-of-Delta, in-Delta, and south-of-Delta CVP contractors are, for the purposes of *Home Builders*, "discretionary" and are subject to the ESA.  *See NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998); *O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir. 1995).

When Congress authorized the CVP in 1937, it stated that Project "dams and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and, third, for power."  Act of Aug. 26, 1937, ch. 832, 50 Stat. 844, 850; *see also United States. v. SWRCB*, 182 Cal. App. 3d 82, 135 (1986).  In 1992, Congress explicitly amended this hierarchy of use by enacting sections 3406(a) and (b) of the CVPIA, which make protection of non-ESA listed fish and wildlife co-equal priorities with irrigation.  The CVPIA also expressly reaffirms the Bureau's obligation to comply with the ESA in operating the CVP.  See CVPIA § 3406(b) ("The Secretary ... shall operate the [CVP] to meet all obligations under State and Federal law, including.... the [ESA]....).

As a top priority, the Bureau must "'insure that actions authorized funded or carried out by [it] do not jeopardize the continued existence' of a listed species," even if doing so would require that the Bureau "alter ongoing projects in order to fulfill the

goals of the Act." *TVA v. Hill*, 437 U.S. 153, 186 (1978)(quoting 16 U.S.C. § 1536(a)(2)).

(*PCFFA*, Doc. 367 at ¶¶ 8-13.)[16]

The Settlement Contractors maintain that, under *Home Builders*, the Bureau lacks discretion to operate the CVP in any manner that would interfere with their senior water rights, and, consequently, that Plaintiffs cannot invoke Section 7(a)(2) to attack the SRS Contracts.  The SRS Contractors maintain that their water rights "emanate not from their contracts with [the Bureau], but from their own water rights, which are senior to Reclamation's."  (Doc. 707 at 14.)  Federal Defendants concur, at least in part, arguing:

> It is not the settlement contracts that constrain Reclamation's CVP operations, but the senior water rights claimed by the settlement contractors.  The contracts merely reflect the settlement of those claims.  If the contracts are rescinded, those claimed water rights will still constrain Reclamation's CVP operations."

(Doc. 742 at 4.)[17]

In *Home Builders*, the Supreme Court reaffirmed that the ESA applies to every discretionary agency action, "regardless of the expense or burden its application might impose."  127 S. Ct. at

---

[16]   As a threshold matter, the application of *Home Builders* to the SRS Contracts in *PCFFA* is not dispositive of whether *Home Builders* bars the present challenges to the SRS Contracts.  This issue was not fully briefed in the context of the remedies proceeding in *PCFFA*.

[17]   Federal Defendants "do not concede" the Settlement Contractors' various representations about the nature of the water rights they held before the construction of the CVP.  (Doc. 742 at 4 n.3.)

2537.  The Court also provided guidance to courts determining whether an agency act is an exercise of discretion:

> [Respondents and their amici] contend that the EPA's decision to authorize a transfer is not entirely mechanical; that it involves some exercise of judgment as to whether a State has met the criteria set forth in § 402(b); and that these criteria incorporate references to wildlife conservation that bring consideration of § 7(a)(2)'s no-jeopardy mandate properly within the agency's discretion.
>
> The argument is unavailing. While the EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out § 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list. Nothing in the text of § 402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application. And to the extent that some of the § 402(b) criteria may result in environmental benefits to marine species, there is no dispute that Arizona has satisfied each of those statutory criteria.

*Home Builders*, 127 S. Ct. at 2537 (emphasis added).

The SRS Contractors assert that both federal and state law "impose mandatory duties on [the Bureau] with respect to the Settlement Contractors' senior water rights," which allegedly cannot be diminished.  (Doc. 707 at 16.)  For example, the CVPIA mandates that the Secretary of the Interior operate the CVP to comply with "all decisions of the California Water Resources Control Board."  CVPIA § 3406(b).

Prior to the construction of the CVP, the SRS Contractors (or their predecessors-in-interest) were lawfully diverting water from the Sacramento River.  (SAR 3342.)  They divert water at their own diversion facilities located upstream from the Delta.  (Doc. 575, 45 & n.2; *see also* SAR 0003, 0036, 1662, 1690, 3342,

56

3372.)  The SRS Contractors claim the right to divert a
significant portion of the water (approximately 2.2 million acre
feet per year) available for appropriation in the Sacramento
River, particularly during the irrigation season (April through
October).  (SAR 3342, 3372.)

The SRS Contractors became concerned that the construction
of the CVP's Shasta Division would interfere with their
pre-existing water rights and uses.  (SAR 4146.)  Resolution of
the dispute involved 20 years of negotiations, protracted
technical studies, State of California and Congressional
hearings, and intervention by representatives of the Secretary of
the Interior.  (SAR 4147.)

Under Reclamation law, the Bureau had to obtain water rights
permits from the State of California in order to operate the
CVP.[18]  In Decision 990, the State Water Rights Board (the "Board"
-- a predecessor to the State Water Resources Control Board
("SWRCB")) granted the Bureau permits to appropriate water from
the Sacramento River, but directed the United States to reach a
settlement agreement with the Sacramento River water users who

---

[18]    Reclamation law provides that, unless a specific
congressional directive mandates otherwise, the Bureau must
comply with state laws relating to the "control, appropriation,
use, or distribution of water."  *See California v. United States*,
438 U.S. 645, 674-75 (1978); *see also* 43 U.S.C. § 383.  The
Settlement Contractors also point out, correctly, that under
California law, senior appropriative water rights must be
satisfied before junior water rights.  *Pasadena v. Alhambra*, 33
Cal. 2d 908, 926 (1947).  But, the extent to which the water
rights held by the Sacramento River Settlement Contractors are
senior to those held by the Bureau on behalf of the CVP is still
disputed.

1   held "existing rights" in the Sacramento River:

2           Throughout these proceedings, the Bureau's
3           representatives have consistently affirmed their policy
            to recognize and protect all water rights on the
4           Sacramento River and the Delta existing under State law
            at the times these applications were filed, including
5           riparian, appropriative and others....It is imperative,
            therefore, that the holders of existing rights and the
6           United States reach agreement concerning those rights
            and the supplemental water required to provide the
7           holders with a firm and adequate water supply, if a
            lengthy and extremely costly adjudication of the waters
8           of the Sacramento River and its tributaries is to be
            avoided.

9   Decision 990, at 75 (emphasis added).  However, the Board did not

10  provide the Bureau with any prescription of the terms on which

11  such water rights shall be settled, nor does the final settlement

12  reached define the full nature and extent of those rights.  This

13  is not the kind of specific, statutory command that rendered

14  agency action non-discretionary in *Home Builders*.  Nevertheless,

15  even though this case does not fit neatly into the *Home Builders*

16  framework, Congressional intent with respect to the Settlement

17  Contracts and the nature of their senior rights must be

18  considered.

19       Congress also urged the Bureau to reach an agreement with

20  the SRS Contractors.  In 1951, the House Interior and Insular

21  Affairs Committee issued a report recognizing the growing

22  possibility of conflict between existing Sacramento River water

23  users and the nascent CVP, urging the Bureau to avoid litigation.

24  *See* Engle, CVP Documents, Part I, S. Res. 1, 84th Cong. (2d

25  Sess.), H.R. Res. 416 at 675-783 (1956).  The Settlement

26  Contractors interpret this report as a declaration of "the

27  importance of protecting those existing water rights on the

28
                                58

1  Sacramento River that would be affected by new uses of Sacramento

2  River water that were facilitated by the construction of Shasta

3  Dam" (citing page 679); and as a Congressional command that the

4  Bureau "honor those existing water rights by settling the water

5  rights claims and disputes related to the operation of the CVP"

6  (citing pages 681 to 682).

7       This is not an entirely accurate description of the Report's

8  contents.  A thorough review of the excerpt provided by the

9  Settlement Contractors reveals that, rather than directing the

10 Bureau to "honor" existing water rights, Congress expressed its

11 concern about the possibility that the CVP could become involved

12 in "[a] monstrous lawsuit ... that would embroil the [CVP] in

13 litigation for decades."  *Id*.  On the one hand, the Report

14 acknowledges that the Bureau promised "that no water which is

15 needed in the Sacramento Valley will be sent out of it," (id. at

16 678), and that "instead of firm water rights necessary for the

17 operation of the [CVP] the Bureau ... had in effect merely 'four

18 pieces of paper' which the State of California ... in effect said

19 the Bureau should 'take to court' to find out if it has any water

20 rights," (*Id*. at 682).  On the other hand, the Committee nowhere

21 conceded that the CVP's rights were subordinate to any other

22 existing rights on the Sacramento River.  In fact, the Report

23 provides that, should the matter be taken to court, the

24 Department of Justice "would undoubtedly represent the interest

25 of the Federal Government and assert every possible claim to the

26 water...."  (*Id*. at 681.)  The House Committee did not concede

27 that any other rights were "senior" to those of the CVP nor did

28

59

1    the Committee require the Bureau to reach a settlement, let alone

2    a settlement on particular terms.   *See id.*

3         Operating under these generic commands from Congress and the

4    Board, the United States reached agreement with Settlement

5    Contractors and executed the first SRS Contract in 1964.   (SAR

6    4147.)   The SRS Contracts define the manner in which the parties

7    agreed to administer their respective legal entitlements to

8    Sacramento River water, to avoid conflict while preserving the

9    rights of either party in any subsequent water right litigation.

10   Article 9 of the SRS Contracts provides:

11            9 (a) During the term of this contract and any renewal
              thereof:
12
                 (1)   It shall constitute full agreement as between
13               the United States and the Contractor as to the
                 quantities of water and the allocation thereof
14               between Base Supply and Project Water which may be
                 diverted by the Contractor from its Source of
15               Supply for beneficial use on the land shown on
                 Exhibit B from April 1 through October 31, which
16               said diversion, use, and allocation shall not be
                 disturbed so long as the Contractor shall fulfill
17               all of its obligations hereunder;

18                                ***

19               (d)   In the event this Settlement Contract terminates,
                 the rights of the parties to thereafter divert and use
20               water shall exist as if this Settlement Contract had
                 not been entered into; and the fact that as a
21               compromise settlement of a controversy as to the
                 respective rights of the parties to divert and use
22               water and the yield of such right during the term
                 hereof, this Settlement Contract places a limit on the
23               Contract Total to be diverted annually by the
                 Contractor during the Settlement Contract term and
24               segregates it into Base Supply and Project Water shall
                 not jeopardize the rights or position of either party
25               with respect to its water rights or the yield thereof
                 at all times after the Settlement Contract terminates.
26               It is further agreed that the Contractor at all times
                 will first use water to the use of which it is entitled
27               by virtue of its own water rights, and neither the

28
                                   60

provisions of this Settlement Contract, action taken
thereunder, nor payments made thereunder to the United
States by the Contractor shall be construed as an
admission that any part of the water used by the
Contractor during the term of this Settlement Contract
was in fact water to which it would not have been
entitled under water rights owned by it nor shall
receipt of payment thereunder by the United States from
the Contractor be construed as an admission that any
part of the water used by the Contractor during the
term of this Settlement Contract was in fact water to
which it would have been entitled under water rights
owned by it.

(*See, e.g.*, SAR 2714-17 (Article 9 of Glenn-Colusa Irrigation
District's Settlement Contract).)[19]

Under the Settlement Contracts, the SRS Contractors continue
to divert directly from the Sacramento River and its tributaries,
with their own facilities, as they have historically done.  (Doc.
575, 45 & n. 2; *see also* SAR 0003, 0036, 1662, 1690, 3342, 3372.)
However, the SRS Contracts ceded the Bureau some authority over
the timing of the SRS Contractors' diversions.  (SAR 4488.)  In
exchange for the SRS Contractors giving up some of their
flexibility in the timing of their diversions, the Bureau agreed
to make stored water available to the Settlement Contractors
during the lower flow (summer) months.  (SAR 4488.)

It is undisputed that, historically, the execution of the
SRS Contracts facilitated the Bureau's ability to operate the

_____

[19]     The Settlement Contractors assert that Paragraph 9(d)
is an admission that the Settlement Contractors hold <u>senior</u> water
rights to divert natural flow from the Sacramento River.  (Doc.
707 at 6.)  Paragraph 9 contains no such admission, nor does it
resolve the issue of the relative seniority of the Settlement
Contractors' water rights vis-a-vis those held by the United
States, which has never been adjudicated, nor has SRS Contractor
seniority been conceded by the United States.

CVP, by providing the CVP with certainty as to the availability of water needed to schedule Project releases and deliveries throughout each water year. (*See* SAR 3372 ("The ability of Reclamation to operate the CVP depends in part on the negotiated agreements reached with the SRS Contractors over diversion of the Sacramento River water represented in the Settlement Contracts.").)

The Bureau's Final Environmental Impact Statement for renewal of the Settlement Contracts ("SRSC FEIS") explains that the amount and priority of the SRS Contractors' water rights has long been the subject of dispute between the Bureau and the SRS Contractors. (SAR 4146-47.)  Those disputes have never been finally resolved by formal adjudication of the SRS Contractors' claimed water rights, but were only "settled" between the Contractors and the Bureau in the previous Settlement Contracts, with a full reservation of rights. (SAR 4147, 4186; *see also* SAR 3191 (recognizing that the SRS Contractors' water rights are "unquantified").)[20]  Because the SRS Contractors' water rights have never been adjudicated, the Bureau concluded in the SRSC FEIS that "it is considered speculative to analyze the effects of [the SRS Contractors] diverting natural flow solely under their water rights because the final determination of those water rights would be determined by a general adjudication of rights to

_____

[20]     Plaintiffs point out that some of the SRS Contractors revived the controversy in a suit they filed against the Bureau in 2001, *Glenn-Colusa Irrigation District v. United States* Civ. 02:01-CV-01816 GEB JFM, but withdrew their suit shortly after NRDC and other groups successfully intervened.  (SAR 2699.)

1    the use of water of the Sacramento River system."   (SAR 3988.)

2    The FEIS discusses a scenario that the Bureau characterizes as

3    "probable" if the SRS Contractors did not have CVP contracts,

4    concluding that:

5               [It] would result in the inability of the SRSCs to
             divert water during the critical irrigation months....
6               Without contracts in place and in the absence of
             current CVP operations, the SRSCs could possibly revert
7               to their original water rights.  Those rights would
             enable them to divert water in accordance with the
8               natural hydrograph of the River; greater flows in the
             winter and spring months and lesser or none during the
9               peak irrigation months.

10   (SAR 4217-18.)[21]   The SRSC FEIS also predicts that reversion to

11   the pre-settlement regime would have potential effects on the

12   environment, because the Settlement Contractors would rely more

13   heavily on local groundwater, leading to air quality and soil

14   erosion problems, as well as impacts to local streams and

15   wildlife.   (SAR 4218.)

16

17         [21]    The concurrence letters indicate just the opposite:

18
     Reclamation believes that the frequency and timing of water
19   diversions that would be taken by a Settlement Contractor
     under their "claim of right" would be approximately the same
20   as that taken under the proposed renewal contracts, because
     crops and cropping patterns do not change and are not
21   affected by the renewal of their Settlement Contract.
     [citation omitted] Consequently, the operation and
22   maintenance of the ditches, canals and conveyance facilities
     inside a Settlement Contractors' water-service area would
23   have the same timing, degree, and frequency of the water
     diversions from the Sacramento River under the propsed
24   renewal contracts or under the Contractor's "claim of
     right."
25

26
27   (SAR 0036.)   No explanation for these contradictory positions is
     provided.
28

1    Federal Defendants correctly assert that Congress has
2  expressed intent that the Bureau avoid such a scenario.  Not only
3  is this reflected in the early legislative history discussed
4  above, but also by more recent expressions of Congressional
5  intent.  The CVPIA specifically exempts all Settlement Contracts
6  from the various new requirements imposed by that law.
7  Representative Fazio noted that such special treatment is
8  appropriate "given the seniority of their water rights."  138
9  Cong. Rec. H 11,493, 11,515-516 (Oct. 5, 1992).  "These
10  contractors have a prior right to the water they receive.  They
11  were entitled to this water before the project was constructed."
12  *Id*.

13    The Bureau has acknowledged in the context of the related
14  *PCFFA* case that, with the exception of the 25 percent curtailment
15  permitted in Shasta Critical Years,[22] it treats deliveries of Base
16  Supply under the Settlement Contracts as <u>mandatory</u> obligations,
17  on the same level of priority as SWRCB water quality decisions.
18  (*See PCFFA*, Doc. 267 at ¶67.)  This judicial admission has a

19

20    [22]    Article 5, entitled "Constraints on the Availability of
21  Water," (*see, e.g.*, AR 2708), permits the Bureau to cut
   deliveries of <u>both Base Supply and Project Water</u> by 25 percent
22  when conditions allow for the declaration of a "Critical Year" in
   which either of the following eventualities exist: (1) "[t]he
23  forecasted full natural inflow to Shasta Lake ... is equal to or
   less than 3.2 million acre feet"; or (2) "[t]he total accumulated
24  deficiencies below 4 million acre-feet in the immediately prior
   Water Year or series of successive prior Water Years each of
25  which had inflows of less than 4 million acre-feet, together with
   the forecasted deficiency for the current Water Year, exceed
26  800,000 acre-feet," (*see, e.g.*, SAR 1862 at Article 1(e) & 5
27  ("Shasta Critical Year shortage provision").)

28

double-edged effect.  On the one hand it establishes that, even in Shasta Critical Years, 75% of the SRS contract delivery commitments are treated as inviolate by the Bureau.  On the other hand, in Shasta Critical Years, the Bureau retains discretion over 25% of the total volume of water supplied the SRS Contractors, including the Base Supply.  The Settlement Contractors assert that the Base Supply is a proxy for their senior water rights, yet the Shasta Critical Year Shortage Provision represents a compromise of those rights and an exercise of discretion by the Bureau with respect to that water supply. If the Base Supply is a proxy, it is an imperfect one.  By way of example, the total volume of the GCID Settlement Contract is 825,000 acre-feet (720,000 of Base Supply and 105,000 acre-feet of Project Water).  (SAR 2732.)  If the Shasta Critical Year shortage provision is triggered, the total delivery volume can be reduced by 25 percent, amounting to 206,250 acre-feet of water, almost twice as much as the entire Project Water volume.  The existence of the Shasta Critical Year shortage provision is substantial evidence that the Base Supply is not a completely immutable "senior" right, but, instead, reflects compromise resulting from negotiation.

Plaintiffs emphasize that the Bureau also considered alternatives to the Shasta Critical Year shortage provision.  The SRSC FEIS explains that, when contemplating contract renewal, the Bureau "identified five alternatives that, on the basis of public input, scientific information, and professional judgment, are considered feasible and satisfy the stated purpose and need of

the proposed action." (SAR 4137.) According to the Bureau, these "five reasonable and feasible alternatives ... for the renewal of the Settlement Contracts ... represent a range of agreement provisions that could be implemented for contract renewals," (SAR 4195), which would have a range of different impacts on the aquatic environment. *Inter alia*, the alternatives, summarized at SAR 4139-42, are proposed modifications to the Shasta Critical Year shortage provision, some of which would "increase ... the frequency of drought years" and "would result in more frequent reductions" in deliveries of both Base Supply and Project Water and presumably would increase water available to the species. (SAR 4140.) Alternative 5 includes a shortage provision that would reduce deliveries to the SRS Contractors in 43 years out of the 80-year study period, (SAR at 4217), as opposed to the shortage provision in Alternative 1 (the preferred and adopted alternative), which reduces deliveries in only 9 years out of 80. (SAR at 4211; *see also* SAR at 4223 (Alternatives 2 and 4 would impose shortages in 16 years out of 80).) Table 2-3 in the FEIS illustrates the wide range of possible reductions in contract deliveries over different water year types, depending on which of the several "reasonable and feasible" shortage provisions the Bureau decided to implement. (SAR 4203-09.)

Additional contract terms the Bureau considered to be "reasonable and feasible" included a proposed "payment [to the SRS Contractors] in exchange for using quantities of water below their contracted amounts," (SAR 4140), and a revised 25-year term

instead of a 40-year contract term on the renewal contracts, (SAR 4140).  These proposed terms could affect both the total quantity and timing of the SRS Contractors' water diversions, which in turn have the potential to affect the survival and recovery of Delta smelt.  (*See, e.g.*, SAR at 3273 ("Delivery of this water to the points of diversion for the Settlement Contractors has the potential to affect listed fish species that inhabit the Sacramento River and the Sacramento-San Joaquin River Delta by influencing instream flows and water quality conditions.").)

The Settlement Contractors correctly point out that the Bureau's consideration of these alternative provisions in the context of a NEPA review of the SRS Contract renewals does not necessarily lead to the conclusion that the Bureau exercised unilateral discretion to impose or implement any of these alternatives.  (*See* Doc. 741 at 10.)  To the contrary, the Settlement Contractors would have to <u>agree</u> to the imposition of a modified shortage provision, a water purchase program, or a 25-year contract term before any such term became a part of the Settlement Contracts.  The alternative to reaching agreement would be reversion to the pre-settlement Sacramento River regime, a scenario with potentially devastating consequences.

Plaintiffs also suggest that the Bureau has "repeatedly asserted and exercised" its ability to modify the contract quantity terms of the Settlement Contracts.  (Doc. 718 at 14-15.)  In fact, the Bureau has only modified the contract quantities in two of the 141 Settlement Contracts, those for ACID and the Sutter Mutual Water Company ("SMWC").  In those two instances,

the needs assessments prepared by the Bureau concluded that ACID
and SMWC would only be able to put a reduced volume of water to
beneficial use.  (*See* SAR 4157.)   Reclamation Law requires that
the Bureau perform these needs assessments and precludes
contracting for the delivery of water that cannot be put to
beneficial use.  43 U.S.C. § 485h-1(4).  Although some Settlement
Contractors disagreed with the assumptions used by the Bureau in
their needs assessments, the Settlement Contractors <u>agreed</u> to the
final contract amounts.  (*Id.*)[23]

          This scenario does not allow for the straightforward

----

          [23]   The Bureau's biological assessment of the impacts of
renewing the Settlement Contracts ("SRSC BA") contains a section
entitled "Discussion of What Discretion We Have Under Contract
Authorities/Reclamation Law to Control Use of Contract Water."
(SAR at 3191.)   This section states:

          Reclamation has authority ... to enter into agreements
          with the Sacramento River Settlement Contractors to
          settle disputes over the respective rights of the
          parties to divert and use water from the Sacramento
          River.  The settlement of disputes allowed for the
          compromise of the quantities of water claimed by the
          Sacramento River Settlement Contractors, as of right,
          for quantities of CVP water.  <u>In this regard, these
          statutes also authorize Reclamation to determine the
          amount of CVP water to be made available to the
          Sacramento River Settlement Contractors subject to
          certain conditions</u>.

*Id.* (emphases added).  Similar language is found in a section of
each of the concurrence letters entitled "Discretion Reclamation
Has Under Contract Authorities and Reclamation Law to Control Use
of Settlement Contract Water."   (SAR 18, 1675-76, 3356.)   But, it
is not clear whether the Bureau is referring only to Project
Water or more generally to any water delivered via CVP
facilities.

application of *Home Builders'* relatively bright-line rule.  Here, in contrast to *Home Builders*, there are no enumerated statutory criteria (either federal or state) guiding the Bureau's negotiation and execution of the Settlement Contracts.  On the one hand, the Bureau is legally bound to comply with non-conflicting state law, *see* CVPIA § 3406(b), including SWRCB Decision 990, which directed the United States to reach a settlement agreement with the Sacramento River water users and precludes the Bureau from operating the projects in the absence of mutually agreed-upon Settlement Contracts.  On the other hand, the Bureau negotiated settlements that contains shortage provisions which compromise the SRS Contractors' claimed senior rights.

If the SRS Contractors held adjudicated senior rights to divert water in a finite quantity from the Sacramento River, and the SRS Contracts simply embodied the Bureau's obligations to ensure that its operation of the CVP did not impede the SRS Contractors' specifically quantified senior rights, the Bureau would lack discretion under *Home Builders* and any section 7(a)(2) challenge to the SRS Contracts would be barred.  However, the SRS Contracts were formed only after negotiation reflecting compromise over terms as to quantity of water to be delivered and timing of deliveries, over which the Bureau exercised some degree of discretion.

It would be arbitrary and capricious for the court to ignore the existence of the SRS Contractors' substantial senior rights, which have been recognized and are real under federal and state

law, although not definitely quantified.  These senior rights are beyond the reach of the ESA.  If the Base Supply is used as a proxy for the senior rights, it is an imperfect one, because: (a) the Base Supply is defined by the contracts themselves and was the product of negotiation; and (b) the Shasta Critical Year shortage provision affords the Bureau discretion over a quarter of the Base Supply under certain circumstances.

To resolve the applicability of *Home Builders* to the Settlement Contracts and to narrow the issues in this case, it is necessary for the Federal Defendants and/or the Settlement Contractors to present evidence on the nature and extent of their claimed senior water rights.  If, *arguendo*, this evidence establishes that the Settlement Contractors hold senior rights to a certain volume of water, it is appropriate to determine as a matter of law that the Bureau lacks any discretion under *Home Builders* over that volume of SRS Contract water.[24]  It is

---

[24]     This finding is not entirely consistent with the Findings of Fact and Conclusions of Law issued in the related *PCFFA*.  (Doc. 367.)  There, without the benefit of complete briefing on the *Home Builders* issue or textual analysis of the SRS Contracts, the court concluded:

9.     Certain aspects of the management of the CVP/SWP are non-discretionary as that term is utilized in Home Builders.  Most importantly, in this case, federal Reclamation law requires the Bureau to comply with non-conflicting state water law.  Reclamation Act of 1902, Pub. L. 57-161, 32 Stat. 288 at § 8 (June 17, 1902); Central Valley Project Improvement Act ("CVPIA") § 3406(b), Pub. L. 102-575, 106 Stat. 4600 (Oct. 30, 1992). Specifically, the Bureau must comply with State Water Resources Control Board ("SWRCB") water rights

recognized that jurisdiction to determine water rights is a matter of great complexity.  *See Colorado River Water Conservation Dist. v. United States*, 424 US 800 (1976) (concerning the exercise of jurisdiction over state water rights disputes).  No party has suggested that any state court has already begun to adjudicate Sacramento River water rights.

---

>       and water quality decisions. See CVPIA § 3406(b)("The
>       Secretary...shall operate the [CVP] to meet all
>       obligations under State and Federal law,
>       including....all decisions of the California State
>       Water Resources Control Board establishing conditions
>       on applicable licenses and permits for the
>       project....").
>
> 10.   For example, the Bureau has a mandatory (i.e.,
>       nondiscretionary) legal obligation to make releases
>       from Shasta Reservoir for delivery to the Sacramento
>       River Settlement Contractors. Under the Sacramento
>       River Settlement Contracts, Settlement Contractors are
>       entitled to 100% of their contractual supply in all
>       years except so-called "Shasta Critical Years." In
>       Shasta Critical Years, Settlement Contractors' priority
>       supply may be reduced by 25 percent. This mandatory
>       obligation derives from the priority of the Settlement
>       Contractors' water rights, which facilitated issuance
>       of state water permits to the Bureau to operate the
>       CVP. The CVP's water rights are subject to the
>       Settlement Contractors' rights. See e.g., SWRCB D-990
>       (granting water rights to the United States to operate
>       the CVP, while also recognizing and prioritizing the
>       protection of existing rights on the Sacramento River).

*Id.*

**2.   Plaintiffs' Procedural Claim:  Lawfulness of the Bureau's Execution of the Contracts.**

If *Home Builders* does not entirely bar Plaintiffs' claims against the Settlement Contractors, the issue remains whether the Bureau performed the required ESA review before executing the Settlement Contracts.  ESA Section 7(a)(2) prohibits agency action that is "likely to jeopardize the continued existence" of any endangered or threatened species or which will "result in the destruction or adverse modification" of its critical habitat.  16 U.S.C. § 1536(a)(2).[25]  The Supreme Court summarizes the operation of ESA Section 7:

> Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora. Section 7(a)(2) provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2).

---

[25]   To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  An action is "jeopardizing" if it keeps recovery "far out of reach," even if the species is able to cling to survival.  *Nat'l Wildlife Fed'n v. U.S. Fish & Wildlife Serv.*, 524 F.3d 917, 931 (9th Cir. 2008).

"[A]n agency may not take action that will tip a species from a state of precarious survival into a state of likely extinction.  Likewise, even where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm."  *Id*. at 930.

72

> Once the consultation process contemplated by § 7(a)(2)
> has been completed, the Secretary is required to give
> the agency a written biological opinion "setting forth
> the Secretary's opinion, and a summary of the
> information on which the opinion is based, detailing
> how the agency action affects the species or its
> critical habitat." § 1536(b)(3)(A); see also 50 CFR §
> 402.14(h). If the Secretary concludes that the agency
> action would place the listed species in jeopardy or
> adversely modify its critical habitat, "the Secretary
> shall suggest those reasonable and prudent alternatives
> which he believes would not violate [§ 7(a)(2)] and can
> be taken by the Federal agency...in implementing the
> agency action." 16 U.S.C. § 1536(b)(3)(A); see also 50
> CFR § 402.14(h)(3). Regulations promulgated jointly by
> the Secretaries of Commerce and the Interior provide
> that, in order to qualify as a "reasonable and prudent
> alternative," an alternative course of action must be
> able to be implemented in a way "consistent with the
> scope of the Federal agency's legal authority and
> jurisdiction." § 402.02. Following the issuance of a
> "jeopardy" opinion, the agency must either terminate
> the action, implement the proposed alternative, or seek
> an exemption from the Cabinet-level Endangered Species
> Committee pursuant to 16 U.S.C. § 1536(e).

*Home Builders*, 127 S. Ct. at 2526.

In making determinations under the ESA, agencies must "use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

### a.   The Bureau Followed the Formal Consultation Process.

There is no dispute that the Bureau followed the required process by initiating consultation with FWS and executing the contracts only after receiving concurrence letters from FWS.  The procedural obligations of the ESA do not depend "on whether [the Service] issues a biological opinion that is 'valid'" because, if they did, "federal agencies could be delayed from taking any actions previously proposed and later approved by a biological

73

1 opinion until litigation, including appeals, concluded." *Natural*

2 *Resources Defense Council v. Kempthorne,* 539 F. Supp. 2d 1155,

3 1177 (E.D. Cal. 2008)(discussing Section 7(d)).

4      This case is distinguishable from *NRDC v. Houston*, which

5 affirmed a district court order rescinding certain water

6 contracts that were executed <u>before</u> the Bureau had engaged in <u>any</u>

7 ESA consultation.  146 F.3d at 1123.  In *Houston*, the Bureau

8 independently determined the renewal of contracts that would

9 recommit all the water held behind Friant Dam was not likely to

10 adversely affect listed salmonid species.  *Id*. at 1126.  The

11 Bureau sought NMFS's concurrence with this assessment, taking the

12 position that formal consultation was not required.  *Id*.  NMFS

13 refused to concur with the Bureau's assessment that the contract

14 renewals were not likely to affect the listed species, but agreed

15 that formal consultation was not necessary because "the issue of

16 delta exports is being addressed in our ongoing consultation on

17 the CVP ... and we believe this will allow us to address the

18 adverse impacts from the activities interrelated to the renewal

19 of the Friant contracts*." Id.* at 1126-27.  The Ninth Circuit

20 concluded that it was a "procedural violation" of the ESA to

21 execute the contracts without engaging in any formal

22 consultation, because the Bureau had a "clear legal obligation to

23 at least request formal consultation."  The Appeals Court found

24 it was arbitrary and capricious to forgo a formal consultation

25 where NMFS specifically refused to provide the required

26 concurrence of "no adverse impact."  *Id*. at 1127.  Here, to the

27 contrary, all of the challenged contracts were executed <u>after</u> the

28

Bureau requested formal consultation and received a "no jeopardy" biological opinion from FWS.  *Houston* is not controlling.

### b.   Did the Bureau Unlawfully Rely on the Now-Invalid Biological Opinion?

Notwithstanding that the Bureau followed the required procedure, Plaintiffs maintain that the consultation process was fatally flawed.  Plaintiffs' seminal claim is that in executing the challenged contracts, the Bureau unlawfully relied upon the "obviously inadequate" OCAP BiOp's evaluation of the impacts of project operations upon the Delta smelt.  To corroborate this contention, Plaintiffs refer to FWS's concurrence letters, which for all of the challenged contracts, simply "incorporate by reference" the analysis contained in the July 30, 2004 OCAP BiOp.

An action agency's reliance on a "fatally flawed" OCAP BiOp is likely to be found arbitrary and capricious, but "the action agency need not undertake a separate, independent analysis of the issues addressed in the BiOp."  *City of Tacoma, Washington v. FERC*, 460 F.3d 53, 75-76 (D.C. Cir. 2006):

> [I]f the law required the action agency to undertake an independent analysis, then the expertise of the consultant agency would be seriously undermined.  Yet the action agency must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise.  Rather, the ultimate responsibility for compliance with the ESA falls on the action agency.

*Id.* (internal citations omitted).  The Ninth Circuit balances these "two somewhat inconsistent principles" as follows:

> [E]ven when the [consultant agency's] opinion is based on "admittedly weak" information, another agency's reliance on that opinion will satisfy its obligations

1
2
3

> under the Act if a challenging party can point to no "new" information- i.e., information the [consultant agency] did not take into account-which challenges the opinion's conclusions.

*Id.* (internal citations omitted).[26]

4
5
6
7
8
9
10
11
12

Even if, arguendo, the "new information" standard was not satisfied, the action agency must, whether through the BiOp or some other document, "consider all the relevant factors," *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1157 (D. Ariz. 2002), and "offer[] an explanation for its decision that is both plausible and internally coherent," *DOW v. EPA*, 420 F.3d at 959. Plaintiffs complain it was arbitrary and capricious for the Bureau to rely upon the OCAP BiOp for any purpose because

13
14
15
16
17
18
19
20
21

[26]Plaintiffs make one argument that is arguably governed by this standard. Plaintiffs maintain that the Bureau knew that FWS failed to consider the best available scientific data on Delta smelt abundance prior to issuing the 2005 OCAP BiOp. As is discussed in detail in the first summary judgment decision, *Kempthorne,* 506 F. Supp. 2d at 362-67, the data to which Plaintiffs refer is the 2004 fall midwater trawl data, which was released prior to the issuance of the OCAP BiOp but was not included or discussed therein. Plaintiffs allege that the Bureau was aware of this data, (*see* AR 272, 344), but "willingly followed FWS's lead in relying on the OCAP BiOp's incomplete analysis for the proposition that the contract renewals would not jeopardize the Delta smelt, notwithstanding hard evidence of immediate peril." (Doc. 681 at 20.)

22
23
24
25
26
27

Of all the OCAP BiOp's flaws, this was the least obvious. The summary judgment decision concluded, the law governing this issue was far from clear. From a practical perspective, the data that the BiOp did consider already evidenced marked declines in the Delta smelt population. The difference in the 2004 trawl data was that it demonstrated record low numbers. Although FWS acted unlawfully by not incorporating all the most recent data into the BiOp or explaining why it had not done so, this survey alone does not justify a finding that the Bureau acted unlawfully in relying on the BiOp.

28

76

its analysis of project operations' impact upon the smelt (a) obviously failed to consider all the relevant factors, and (b) was implausible and internally incoherent.

The prior summary judgment decision held that the OCAP BiOp had numerous serious flaws: (1) the DSRAM failed to provide a reasonable degree of certainty that necessary mitigation actions would take place; (2) it failed to use the best available scientific data on population abundance and global climate change in setting take limits; (3) it failed to consider take in the context of recent data on overall species abundance and jeopardy; and (4) failed to analyze the impact of project operations on critical habitat. *Kempthorne,* 506 F. Supp. 2d at 387-88.  These were obvious flaws.  It was arbitrary and capricious for the Bureau to rely upon the OCAP BiOp in this manner.

Defendants do not suggest otherwise.  They do, however, offer various reasons why the Bureau's execution of the contracts should otherwise be deemed lawful.

### c.   Did the Bureau Otherwise Satisfy its Section 7(a)(2) Obligations?

#### (1)   Tiering Off the CVPIA BiOp.

"[T]iered consultation is not explicitly described in the ESA or its implementing regulations...."  *Buckeye Forest Council v. U.S. Forest Serv.,* 378 F. Supp. 2d 835, 843 (S.D. Ohio 2005). Although some courts have expressed reservations about extending tiered analysis to ESA cases, *NRDC v. Rodgers,* 381 F. Supp. 2d 1212, 1228 n.27 (E.D. Cal. 2005) (worrying that tiering will

1  "tend to obscure when government action is prohibited" and noting

2  that segmented analysis is not permitted in the ESA context), the

3  Ninth Circuit approved a tiered ESA analysis in *Gifford Pinchot*

4  *v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067-68 (9th Cir.

5  2004). *Rodgers*, 381 F. Supp. 2d at 1228 n. 27, interpreted the

6  holding in *Gifford Pinchot* narrowly to apply tiering only to

7  cases in which the programmatic opinion was particularly

8  thorough.  *See also Buckeye*, 378 F. Supp. 2d at 1036 (upholding

9  tiered consultation where programmatic consultation established

10  strict conditions for subsequent site-specific consultations).

11  It is improper for a programmatic biological opinion (i.e., one

12  meant to be the top level of a tiered consultation process) to

13  completely defer analysis of particular types of impacts to

14  future site-specific consultations. *See PCFFA v. NMFS*, 482 F.

15  Supp. 2d 1248, 1267 (W.D. Wash. 2007).

16      Here, the DMC Contractors suggest that the challenged

17  consultations properly tier off from the still-valid CVPIA BiOp.

18  The DMC Contractors assert that FWS considered the CVP-wide

19  effects of contract renewal in the programmatic CVPIA BiOp.

20  (*See, e.g.*, AR FWS 12004, 12044-12045; CVPIA BiOp, Appendices K

21  and J, Sheehan Decl., Doc. 685, Exhs. 5 and 6.)  Then, according

22  to the DMC Contrators, FWS considered the site-specific impacts

23  of renewing the CVP contracts for individual CVP units, including

24  the disputed contracts in this case.  (*Id.*)  Based on the premise

25  that contract renewal for the same quantity of water was

26  mandatory, FWS concluded in the CVPIA BiOp that the contracts

27  would be renewed for the same quantity of water as the existing

28

1   contracts, subject to a water needs analyses for each contractor.

2   (AR FWS 12047; *see also*, SAR 4715-4716.)[27]

3         In the CVPIA BiOp, FWS reserved for future consultation,

4   modifications that might be made to other contract provisions,

5   because the Bureau and the contractors had yet to complete

6   contract negotiations.  (AR 12044.)  At the programmatic level,

7   FWS found that the renewal of the CVP water contracts was not

8   likely to cause jeopardy or result in destruction or adverse

9   modification of critical habitat for listed species, including

10  the Delta smelt.  (AR FWS 12140; CVPIA BiOp, Appendix B, Sheehan

11  Decl., Exh. 3.)

12        Critically, the CVPIA BiOp <u>defers to the then-operative OCAP</u>

13  <u>BiOp for any analysis of impacts caused by CVP operations on</u>

14  <u>aquatic species in the Delta</u>.  (*See, e.g.*, AR 12047 ("[U]ntil

15  OCAP has been reanalyzed, deliveries will be consistent with the

16  Service's 1995 biological opinions on OCAP and Los Vaqueros. For

17  example, certain contract amounts have never been delivered and

18  these effects would be analyzed in future Section 7

19  consultations."); AR 12049 ("Existing criteria for water

20  deliveries to CVP contractors are covered in the 1995 OCAP

21  Biological Opinion. Reclamation will operate under the existing

22  criteria until such time that new criteria are established and

23

24        [27]   The DMC Contractors have referred to general authority

25  to support the proposition that renewal for the same quantity of
    water was mandatory.  The SRS Contractors shall provide specific

26  citations of all legal authority supporting the principle that
    all CVP contract renewals must be for no less than the quantity

27  prescribed in existing contracts subject to renewal.

28

consultation has been completed with both the Service and NMFS.").)   The CVPIA BiOp explains that the tiered consultations for individual CVP service unit contracts are to be limited to impacts within the service areas, not impacts in the Delta, which will be addressed through the OCAP BiOp opinion.  (AR 12013 (study area includes areas where direct and indirect service area effects are expected to occur).)[28]  Therefore, even if the individual contracts had properly tiered off of the CVPIA BiOp, that BiOp did not address the critical issues:  whether and to what extent the contract renewals impact the Delta smelt.

Moreover, the CVPIA BiOp did not perform a jeopardy analysis of the effects of long-term CVP contract renewals because renewal negotiations were not yet complete.  (AR 12044-45.)  Until these negotiations were completed, there was no proposed final action on which FWS could consult.  (*Id.*)  FWS conditioned its CVPIA BiOp jeopardy analysis on the requirement that "[o]nce the long-term contract renewal negotiations are completed, the renewals will be subject to a separate, tiered analysis.... No contracts will be renewed until the appropriate environmental

_____

[28]   In response to comments regarding its ESA compliance, the Bureau explained in its Environmental Assessment for contract renewal that, "[t]he CVP-OCAP Biological Opinion updates and continues the analysis of CVP operations for implementing both the long-term contract renewals and other CVPIA programs."  (SAR 4634 (emphasis added).)  The Bureau also expressly explained that "the OCAP is part of the baseline for the purposes of assessing the potential impacts of the proposed action on protected species under the federal ESA.  It is, therefore, critical to the [DMC Contract] consultation."  (SAR 4628-4629; *see also* AR 12006.)

1  review has been completed."  *Id.*[29]

2

3                    (2)  <u>Were Effects on the Delta smelt</u>
                         <u>Incorporated into the CVPIA BiOp</u>
4                        <u>Baseline</u>?

5       It is also argued that the effects of project operations on

6  Delta smelt as discussed in the OCAP BiOp were already

7  incorporated into the consultation as part of the "environmental

8  baseline."  Code of Federal Regulations, Title 50, section 402.02

9  defines the "effects of the action" subject to consultation as

10  those that will be "added to the environmental baseline."  The

11  "environmental baseline" is defined to include:

12                    ...the past and present impacts of all Federal, State,
                    or private actions and other human activities in the
13                    action area, <u>the anticipated impacts of all proposed</u>
                    <u>Federal projects in the action area that have already</u>
14                    <u>undergone formal or early section 7 consultation</u>, and
                    the impact of State or private actions which are
15                    contemporaneous with the consultation in process.

16  *Id* (emphasis added).  The environmental baseline includes future

17  federal actions for which the FWS has already completed formal

18  consultation, through issuance of a biological opinion.

19       Yet, even assuming that the concurrence letters incorporated

20  the effect of project operations on the smelt as discussed in the

21  OCAP BiOp into the environmental baseline, this does not obviate

22  the fact that the OCAP BiOp, on which the CVPIA BiOp and the

23  ────────────────────

24       [29]  *NRDC v. Rodgers* similarly concluded that the 2000 CVPIA
    BiOp did not sufficiently consider Friant Division long-term
25  contract renewal because "the CVPIA BiOp considered the
    implementation of the CVPIA, not site-specific operations of the
26  CVP.  In fact, the 2000 CVPIA BiOp explicitly noted that
    'Long-term contract renewals are subject to a separate, tiered
27  analysis....'"  381 F. Supp. 2d at 1242.

28

1  consultation letters rely, was unlawfully flawed.

2              (3)  The SRS Contractors' Argument That There
                    Is Substantial Evidence, Notwithstanding
3                   the Invalidity of the OCAP BiOp, to
                    Support Execution of Their Contracts
4

5       The SRS Contractors argue that, notwithstanding the post-

6  execution invalidation of the OCAP BiOp, there is substantial

   evidence in the Administrative Record to support the Bureau's
7
   decision to execute the SRS Contracts.
8

9
                     (a)  Concurrence Letters.
10
        The SRS Contractors first point to statements in the FWS
11
   concurrence letters concerning the legal priority of the
12
   Settlement Contractors' water rights as to the CVP.  For example,
13
   the concurrence letter for the City of Redding and ACID indicate
14
   that "the Settlement Contractors do not depend on CVP water to
15
   supply their water needs."  (SAR 3; see also SAR 1690, 3372.)
16
              If Reclamation did not enter into renewal contracts
17            with the Settlement Contractors, they would revert to
              diverting water from the Sacramento River under their
18            "claim of right" (this differs from the CVP water-
              service contractors that also divert from the
19            Sacramento River; water-service contractors have no
              legal right to divert from the Sacramento River absent
20            their contract).  If a Settlement Contractor were to
              divert water under their "claim of right" (rather than
21            under a contract), Reclamation estimates that the acre-
              feet/year of water diverted under that claim of right
22            would be about the same (or even greater) than their
              renewal contract's Total Contract amount (Don Bultema
23            pers. comm. 1/31/05)[.]  The frequency and timing of
              any water diversions taken under a Contractors' "claim
24            of right" would likely be the same as under the
              proposed renewal contract because the Contractor's
25            crops and cropping patterns would not change or be
              affected by renewing their Settlement Contract (Don
26            Bultema pers. comm. 1/31/05.)

27  (SAR 3.)

28
                            82

1    The SRS Contractors insist that "[o]n their faces ... the

2    three concurrence letters indicate that the renewal of the

3    Settlement Contracts will <u>not increase</u> the diversions that can be

4    taken by the Settlement Contractors.  Hence, the concurrence

5    letters include facts to support the conclusion that the [SRS

6    Contract] renewals would not authorize any action that would

7    increase the risk of harm to the smelt or its habitat, as

8    compared to the conditions that would exist without the contract

9    renewals.  This evidence alone is sufficient to support the

10   concurrence letters' conclusions that renewal of the SRSC would

11   not jeopardize the Delta smelt or adversely modify or impair its

12   habitat."  (Doc. 724 at 16.)

13   The Bureau's own FEIS for the renewal of the SRS Contracts

14   contains a completely different interpretation of the impact of

15   the SRS Contracts on water deliveries.  The FEIS discusses a

16   scenario that the Bureau characterizes as "probable" if the SRS

17   Contractors did not have CVP contracts, concluding:

18            [It] would result in the inability of the SRSCs to
          divert water during the critical irrigation months....
19        Without contracts in place and in the absence of
          current CVP operations, the SRSCs could possibly revert
20        to their original water rights.  Those rights would
          enable them to divert water in accordance with the
21        natural hydrograph of the River; greater flows in the
          winter and spring months and lesser or none during the
22        peak irrigation months.

23   (SAR 4217-18.)  No attempt has been made to reconcile this

24   finding with the contrary conclusion in the concurrence letter.

25   This dispute calls into question the concurrence letters'

26   conclusions that the execution of the SRS Contracts will not

27   adversely impact the smelt.

28
                                83

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### (b)  SRS Operations' Effect on the Smelt.

The SRS Contractors refer to the record that reveals that the Delta smelt populations are located almost exclusively in the Delta.  AR 368-69.  The most upstream point of the Delta, and the northernmost boundary of the Delta smelt's designated critical habitat, is the "I" Street bridge in Sacramento.  Cal. Water Code § 12220; 59 Fed. Reg. 65278 (December 19, 1994); AR 11672-73. The Settlement Contractors only divert waters at locations that are miles upstream of the "I" Street bridge and well outside the Delta.  In fact, most of the Settlement Contractors' diversion points are 50 miles or more upstream from this landmark.  (*See* SRSC FEIS Table A.)  The SRS Contractors maintain that "there is no evidence that upstream diversions of the Settlement Contractors under the renewal contracts either jeopardize the continued existence of the Delta smelt or adversely modify its critical habitat."  (Doc. 707 at 10.)

The AR contains evidence that upstream diversions contribute to the Delta smelt's peril.  For example, the OCAP BiOp concludes that the Delta smelt continues to be impacted by "the destruction, modification, or curtailment of its habitat or range resulting from extreme outflow conditions, the operations of the State and Federal water projects, and other water diversions as described in the original listing."  (AR at 367.)  According to FWS, "Delta smelt have been increasingly subject to entrainment ... and constriction of low salinity habitat to deep-water river channels of the interior Delta," impacts that the Service

**84**

attributed "primarily" to "the steadily increasing proportion of river flow being diverted from the Delta by the Projects, and occasional droughts." AR 366. The OCAP BiOp specifically links these effects to Delta exports, (*see, e.g.*, AR 386, 428), as well as upstream diversions, which "result in lower delta outflows and increased entrainment," (AR at 371).

Given that the Bureau has nowhere explained the conflict between its own FEIS for the renewal of the SRS Conracts, which opines that the SRS Contracts likely altered the seasonal timing of the SRS Contractors' diversions, and contrary conclusions in the concurrence letters, it was arbitrary and capricious for the Bureau to accept the assertions made in the concurrence letters without explanation or addressing the apparent inconsistency. Moreover, the record reveals that upstream diversions like those made by the SRS Contractors adversely affect Delta smelt. The Bureau relied upon the OCAP BiOp to address any such effects.

### (4)   The Biological Assessments.

Federal Defendants assert that the Bureau's obligations were satisfied because the Bureau prepared separate "detailed biological assessments of the potential effects of these contract renewals on listed species, including the Delta smelt." (Doc. 679 at 14.) The analysis in the Biological Assessments is no more thorough than that found in the concurrence letters. (SAR 0323-25; 1281-82; 1689-92; 3371-72.) For example, the Biological Assessment for the DMC Contracts included only a brief (less than two-page) section containing background on the Delta smelt,

followed by the conclusion that "Delta smelt are potentially present within the project area.  The designated critical habitat established for Delta smelt does not occur within the project area."  (SAR 1371.)  No party points to any aspect of the Biological Assessments that appropriately addresses impacts of CVP operations on the smelt.

### d.   Improper Scope of Consultation.

Plaintiffs next argue that the Bureau knew that FWS consulted on the impacts of an action far more limited than the action that the Bureau intended to implement.  Plaintiffs maintain that the Bureau specifically requested that FWS analyze the impact of _full_ water delivery under the contracts on Delta smelt.  A memorandum from the Bureau to FWS "clarifi[ed]" that the Bureau was "requesting consultation on delivery of the _full contractual entitlement_ of each CVP water service contractor" and that the Bureau "is assuming all CVP contractors will have full build-out of municipal and industrial water use at year 25." (Pltf's Mot. to Augment, Ex. 1, Doc. 682-2, at 1.)  The Bureau acknowledged that this scope of consultation was essential "to assure Endangered Species Act coverage for those years when the full contract amount can be delivered."  _Id._

Nevertheless, FWS's concurrence relied exclusively on the analysis in the OCAP BiOp, which Plaintiffs maintain only analyzed the effects of delivering between 11 and 89% of the full CVP contract quantities.  (_See_ AR 372-469, 1067.)  The propriety of evaluating impacts from this range of deliveries was an issue

86

1    in the first round of cross motions for summary judgment, from

2    which the following finding was made:

3            Plaintiffs allege that, by failing to evaluate the
             impact of delivering full amount (100%) of contracted
4            water, the BiOp violates the requirement that [] it
             evaluate the entire agency action. Plaintiffs cite
5            Rodgers, 381 F.Supp.2d at 1237-40, which examined a
             biological opinion approving long term water contracts
6            in the Friant, Buchanan, and Hidden water units of the
             CVP. The BiOp only examined the impacts of the amount
7            of historical water deliveries, which amounted to less
             than half of the water deliveries authorized under the
8            long term water service contracts. Id. at 1237-28.

9            The Friant long-term contracts cumulatively authorized
             the Bureau to deliver more than 2.1 million acre-feet
10           of water per year, for twenty-five years. Rather than
             analyzing the effects of 2.1 million acre-feet of water
11           delivery, FWS explained that its "effects analysis is
             conducted under the expectation that water will be
12           delivered to CVP service contractors in quantities that
             approximate historic deliveries (1988 through 1997), as
13           given in Appendix D of the November 21, 2000
             programmatic long-term CVP contracts consultation."
14           This assumption was made, the BiOp explained, because
             "delivery of full contract quantities is unrealistic."
15
             Id. at 1238. Rodgers rejected FWS's approach, reasoning
16           that the "ESA requires that all impacts of agency
             action-both present and future effects-be addressed in
17           the consultation's jeopardy analysis."

18           The fact that it was thought by FWS that "delivery of
             full contract quantities is unrealistic" and that
19           "deliveries continue to be impacted by existing
             climate, hydrology, actions and statutes, ...
20           socio-economic factors" does not excuse consulting on
             the "entire agency action," which was the authorized
21           delivery of over 2.1 million acre-feet of water, and
             nothing less than that.
22
             Id. at 1239.
23
             Federal defendants assert that the *Rodgers* decision was
24           wrong, arguing that "[a]bsent alternative information
             that the agency failed to consider, and given the fact
25           that the agency did use the best available information,
             the Rodgers court should *387 have deferred to the
26           agency." (Doc. 242 at 32.) It is not the province of
             another district court to decide whether Rodgers is
27           "wrong." Rodgers is distinguishable as it specifically

28
                                    87

addressed the government authorization of CVP water users' long-term water service contracts. Those contracts authorized 2.1 MAF of water deliveries in total. Rodgers found unlawful the biological opinion's limitation in its scope to approximate historic deliveries, instead of the full contract allocations. Here, however, the agency action subject to consultation is not the authorization or merits of the water service contracts, rather, it is the operation of the CVP and SWP under the OCAP and whether those projected operations will cause jeopardy to the survival and recovery of smelt or smelt habitat. The government is entitled to make reasonable assumptions about the operational volume of water flows, water levels, temperature, and quality based on the historical and projected data in the administrative record. The BiOp explains that the delivery of full water service contract entitlements is expected only when excess water conditions exist, i.e., in a wet water year when sufficient water is available to meet all beneficial needs. (AR 259.) Plaintiffs do not suggest that this assumption is factually impossible. (Nor would it be unreasonable for FWS to model a full (100%) water contract delivery scenario, even if it has not happened in the past fifteen years.) The agency model for the worst case scenario is indispensable. Analysis of a "best of the best" case in a wet water year is not indispensable, as such "wet" water year conditions do not present any reasonable likelihood of jeopardy, absent an additional showing. However, because such a scenario could eventuate, it is not unlawful for the agency to analyze the effects on the smelt of 100% water contract deliveries. However, the 100% delivery analysis is not required. This is a matter committed to the agency's expertise and discretion.

Plaintiffs motion for summary adjudication is DENIED as to this issue.

*Kempthorne*, 506 F. Supp. 2d at 386-87 (emphasis added).

Plaintiffs suggest that because the Bureau specifically requested consultation on full deliveries in this case, a different conclusion is required. But, Plaintiffs fail to acknowledge that the *Kempthorne* decision accepted as valid the BiOp's assertion that "delivery of full water service contract entitlements is expected only when excess water conditions exist,

1  i.e., in a wet water year when sufficient water is available to

2  meet all beneficial needs," and that "'wet' water year conditions

3  do not present any reasonable likelihood of jeopardy" to the

4  smelt.  The Bureau could reasonably rely on these assertions in

5  the BiOp to conclude that there will be no material difference in

6  impact on smelt between an analysis of 11-89% deliveries and an

7  analysis of 100% deliveries.

8       For the first time here, Federal Defendants and the DMC

9  Conractors argue that the CALSIM II modeling in the BiOp in fact

10 did assume full contract deliveries.  (*See e.g.*, Decl. of John

11 Snow, Doc. 739 (explaining in detail the assumptions made about

12 demand and deliveries in the various CALSIM II models used in the

13 OCAP BiOp.)  It is not necessary to further scrutinize the

14 intricacies of the modeling runs, as Plaintiffs' argument has

15 already been rejected on other grounds.

16

17            e.   Federal Defendants' argument that the
                   Existence of the SRS Contractors' Senior
18                 Rights Prevents the Contracts from Harming
                   the Smelt.
19

20    In an argument that is closely related to the SRS

21 Contractors' contention that *Home Builders* bars Plaintiffs claims

22 against the Settlement Contracts, Federal Defendants argue that

23 the Settlement Contracts "have no adverse effect on the Delta

24 smelt because the settlement contractors already claim[] senior

25 water rights in the Sacramento River and could potentially divert

26 amounts far in excess of their provided Base Supply even if the

27 contracts were rescinded."  (Doc. 679 at 12-13.)  Because the

28

89

1  amounts fixed in the Settlement Contracts are settled terms,

2  Federal Defendants assert that it is more probable than not that

3  the contracted for amounts are <u>less</u> than the SRS Contractors

4  would claim if the contracts did not exist.  (*Id.*)  Moreover,

5  without those settlement contracts, "Reclamation [would have] no

6  legal right to interfere with the SRS Contractors' senior water

7  rights and [could not] short senior water rights holders...."[30]

8  (Doc. 679 at 12-13.)

9      This is speculation, because the Bureau has purposefully

10  avoided quantifying the SRS Contractors' senior water rights.  A

11  settlement is by its very nature the compromise of disputed

12  claims.  The ultimate nature and extent of the SRS Contractors'

13  water <u>rights</u> in the Sacramento River system remains unresolved.

14  The fact that the SRS Contractors hold senior water rights does

15  not, in and of itself, establish that the Settlement Contracts

16  cannot harm the smelt.

17

18

19

20

21      [30]  Federal Defendants' assertion that "the amounts set out

22  in the settlement contracts ... are far less than would be
    claimed if the contracts did not exist," is speculative and

23  contradicted by assertions made elsewhere in the record.  For
    example, Federal Defendants' opposition at n.2 explains that the

24  Federal Government generally disputes representations made by the
    Settlement Contractors' regarding the nature and extent of their

25  senior rights.  More directly, the SRSC FEIS concludes that in
    the absence of the Settlement Contracts, the SRS Contractors

26  would be unable to divert water during the critical irrigation

27  months.  (SAR 4217-18.)

28

1          **f.    Conclusion Re Lawfulness of Consultation**.

2          The Bureau relied upon the obviously flawed OCAP BiOp to

3     evaluate the impacts of contract deliveries on the smelt.   No

4     other appropriate analysis of the impacts of contract deliveries

5     on the smelt was performed.   As a result, unless *Home Builders*

6     bars Plaintiffs' claims, the environmental reviews of the SRS

7     Contracts are invalid.

8

9          **3.    Plaintiffs' Substantive Claim:   Lawfulness of
10              Ongoing Implementation/ Continued Delivery Under
              the Contracts**.

11         The parties' arguments on the ongoing implementation claim

12    are limited.   Plaintiffs argument for summary adjudication is

13    that an agency commits an "ongoing violation" of section 7(a)(2)

14    when it "continues to implement an agency action without ESA

15    procedural compliance."   (Doc. 681 at 22.)   "In the absence of an

16    adequate § 7 consultation, there can be no assurance that

17    jeopardy will not result from [the] agency action."   (*Id.*)

18    Plaintiffs rely on *Thomas v. Peterson*, 753 F.2d 754, 764 (9th

19    Cir. 1985), in which the U.S. Forest Service was found to have

20    committed a "substantial procedural violation of the ESA" by

21    failing to prepare a required biological assessment.   The Ninth

22    Circuit held that an injunction was the appropriate remedy for a

23    violation of the ESA's procedural requirements, reasoning:   "The

24    ESA's procedural requirements call for a systematic determination

25    of the effects of a federal project on endangered species.   If a

26    project is allowed to proceed without substantial compliance with

27    those procedural requirements, there can be no assurance that a

28

violation of the ESA's substantive provisions will not result."
*Id*.  Plaintiffs' argument that an injunction should automatically
issue following a procedural violation of the ESA was rejected in
the related *PCFFA* case based on an extensive review of Ninth
Circuit precedent.  (*See PCFFA* Doc. 367 at 19-21.)  But,
regardless of the validity of Plaintiffs' legal argument, <u>it is
an argument about the appropriate remedy for their procedural
violation claim</u>.  The present motions do not adequately address
whether the Bureau's ongoing performance under the SRS Contracts
currently violates the substantive requirements of section 7,
which require the Bureau to guard against jeopardy and/or adverse
critical habitat modification.  As there is no motion before the
court for summary adjudication on this claim, no ruling is
required.[31]

      E.   <u>Appropriateness of Rescission</u>.

      Despite the fact that the issue of remedies was bifurcated,
the parties engaged in extensive briefing on the issues under the
faulty premise that remedies are inextricably intertwined with
the liability issues.  They are not.  There is no need for
further judicial action on the DMC Contracts.  As to the SRS
Contracts, Plaintiffs strenuously argue that any action taken in
reliance on the invalid BiOp is an ongoing violation that must be
set aside.  5 U.S.C. § 706(2)(A)(court shall "set aside" agency

---

      [31]   The ongoing performance claim is addressed elsewhere in
this decision because it was raised directly by the parties in
the context of standing and APA justiciability.

1  action that is "arbitrary, capricious, an abuse of discretion, or
2  otherwise not in accordance with law."); *Houston*, 146 F.3d at
3  1129[32]; *Pac. Rivers Council*, 30 F.3d at 1054, 1056-57.
4  Plaintiffs' legal position that no bona fide reconsultation can
5  occur with the Settlement Contracts in place, ignores that at
6  least some significant volume of the Base Supply is beyond the
7  reach of the ESA because it is senior to water rights held by the
8  Bureau.  A court shall not assume the action agency will ignore
9  the law and will fail to reconsult in good faith based on a
10  court's express order to follow the law.

11      A full discussion of and ruling on the issue of remedies is
12  not apposite at this time.  If Plaintiffs prevail on the merits
13  after further evidence on the SRS Contractors' senior water
14  rights is heard, the parties will be afforded the opportunity to
15  supplement their remedies arguments and the issues will then be
16  addressed on the merits.

17
18                        VII.  CONCLUSION
19      For the reasons set forth above:
20      (1) Plaintiffs lack standing to challenge the DMC Contracts
21  because those Contracts' shortage provisions make it impossible
22  for Plaintiffs to establish causation.  Federal Defendants' and
23  Defendant-Intervenors' motions for summary judgment as to the DMC
24  Contract claims are GRANTED; Plaintiffs' cross-motion is DENIED.
25      (2) Plaintiffs have standing to challenge the SRS Contracts.
26  _____

27      [32]   On the issue of rescission, *Houston* is an outlier and
    factually distinguishable.
28
                            93

1        (3) In order to resolve the applicability of *Home Builders*

2    to the SRS Contracts and to further narrow the issues in this

3    case, Federal Defendants and/or the SRS Contractors shall provide

4    evidence on the full nature and extent of the SRS Contractors'

5    claimed senior water rights, including, *inter alia*, reference to

6    water rights permits, adjudications, and such other evidence of

7    finite, enforceable water rights that the SRS Contractors hold.

8        (4) Assuming the Bureau exercised discretion to negotiate

9    the amount of water to be committed to the SRS Contracts, it did

10   so unlawfully by relying upon the legally flawed OCAP BiOp which

11   failed to competently and completely evaluate the impacts of

12   water deliveries under the SRS Contracts on the Delta smelt.

13       (5) Final resolution of the cross-motions for summary

14   judgment as to the SRS Contracts is deferred, pending receipt of

15   the evidence called for on the SRS Contractors' claimed senior

16   water rights.

17       (6) A scheduling conference will be held on December 3,

18   2008, at 12:00 p.m., to discuss further proceedings.

19

20   SO ORDERED

21   DATED:  November 19, 2008

22

23                           ___/s/ Oliver W. Wanger___

                            Oliver W. Wanger

24                       United States District Judge

25

26

27

28