UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,<br><br>          Plaintiffs,<br><br>                    v.<br><br>DIRK KEMPTHORNE, Secretary, U.S. Department of the Interior, *et al.*,<br><br>          Defendants.<br><br>SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.*,<br><br>          Defendant-Intervenors.<br><br>ANDERSON-COTTONWOOD IRRIGATION DISTRICT, *et al.*,<br><br>          Joined Parties. | 1:05-CV-01207 OWW SMS<br><br>SUPPLEMENTAL MEMORANDUM DECISION RE CROSS MOTIONS FOR SUMMARY JUDGMENT ADDRESSING APPLICABILITY OF *NATIONAL ASSOCIATION OF HOME BUILDERS V. DEFENDERS OF WILDLIFE*, 127 S. CT. 2518 (2007), TO PLAINTIFFS' REQUEST FOR RESCISSION OF THE SACRAMENTO RIVER SETTLEMENT CONTRACTS. |

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . .   4

II.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . .   6

       A.   General History of The CVP and Relevant State Law
            Doctrines. . . . . . . . . . . . . . . . . . . .   6

       B.   The Bureau's Initiation of Permit Applications for the
            CVP Before the State Board. . . . . . . . . . .  10

       C.   The 1956 Cooperative Studies and Related Analyses.  12

       D.   Van Camp's Summary of the Evidence Underlying the 1956
            Cooperative Study Program and Related Investigations.
            . . . . . . . . . . . . . . . . . . . . . . . .  15

       E.   D-990 . . . . . . . . . . . . . . . . . . . . .  17

       F.   1951 House Interior and Insular Affairs Committee
            Report  . . . . . . . . . . . . . . . . . . . .  21

       G.   Negotiation of the SRS Contracts. . . . . . . .  22

1

H.   The SRS Contracts. . . . . . . . . . . . . . .   22

I.   Decision 1641. . . . . . . . . . . . . . . . .   23

J.   CVPIA. . . . . . . . . . . . . . . . . . . . .   24

III. ANALYSIS . . . . . . . . . . . . . . . . . . . .   25

A.   Threshold Issues. . . . . . . . . . . . . . .   25

     1.   Federal Defendants' Argument that Summary Judgment
          Should be Granted on Other Grounds Raised in Their
          Summary Judgment Briefs. . . . . . . . . . .   25

     2.   Proceedings Not Intended to Adjudicate Any Party's
          Water Rights.  . . . . . . . . . . . . . . .   25

     3.   Preliminary Nature of Previous Discussions
          Regarding Home Builders.  . . . . . . . . .   25

     4.   The ESA and CVPIA Apply to the SRS Contractors.
          . . . . . . . . . . . . . . . . . . . . . .   26

     5.   Evidentiary Matters. . . . . . . . . . . . .   27

B.   Does Section 7 of the ESA Apply to the Bureau's
     Implementation and/or Execution of the SRS Contracts?
     . . . . . . . . . . . . . . . . . . . . . . . .   28

     1.   Legal Framework. . . . . . . . . . . . . . .   28

     2.   Do the SRS Contracts Significantly Constrain the
          Bureau's Discretion to Modify Deliveries Under the
          SRS Contracts? . . . . . . . . . . . . . . .   38

          a.   Article 3(g)(3). . . . . . . . . . . .   39

          b.   The Shasta Critical Year Shortage Provision.
               . . . . . . . . . . . . . . . . . . .   41

     3.   Do the Original SRS Contracts Significantly
          Constrain the Bureau's Discretion to Negotiate
          Upon Renewal for New or Modified Terms for the
          Benefit of the Smelt? . . . . . . . . . . .   44

          a.   Basic Principles of Federal Contract
               Interpretation. . . . . . . . . . . .   45

          b.   Application to Relevant SRS Contract Language
               . . . . . . . . . . . . . . . . . . .   47

               (1)  Article 9. . . . . . . . . . . .   47

               (2)  Article 2. . . . . . . . . . . .   50

2

     (3) **Alternative interpretations of Article 9(a)** . . . . . . . . . . . . . . . 52

   c. **The Unmistakability Doctrine.** . . . . . . 53

   d. **Scope of Article 9(a).** . . . . . . . . 59

   e. **Conclusion Regarding Article 9(a).** . . . 61

   f. **Anderson Cottonwood Irrigation District & Sutter Mutual Water Company Renewal Contracts Water Reductions.** . . . . . . . . . . . . 61

   g. **Impact of the CVPIA and D-1641 on SRS Contract Renewal.** . . . . . . . . . . . 63

  4. **Effect of Reclamation Act Section 8 on the Bureau's Discretion** . . . . . . . . . . 64

   a. **Relevant Background Principles of California Water Law.** . . . . . . . . . . . . . 69

     (1) **California's Dual System of Water Rights.** . . . . . . . . . . . . . 69

     (2) **Area of Origin Protections.** . . . . 70

     (3) **Reasonable & Beneficial Use/Prohibition of Unreasonable Use.** . . . . . . . . 71

     (4) **Public Trust Doctrine.** . . . . . . . 73

   b. **D-990.** . . . . . . . . . . . . . . 74

   c. **D-990's Reliance on the 1956 Study & Its Progeny Does Not Demonstrate the Exact Nature and Extent of the SRS Contractors' Underlying Water Rights.** . . . . . . . . . . . . . 75

   d. **The Effect of Condition 23.** . . . . . . . 79

   e. **D-990 Does Not Substantially Constrain the Bureau's Discretion to Negotiate Modifications to the Settlement Contracts.** . . . . . . . . . . . . . . . . . . . . 83

   f. **Preemption Analysis Unnecessary.** . . . . 84

IV. **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . 85

## I.  INTRODUCTION

The November 19, 2008, Memorandum Decision Re: Cross Motions for Summary Judgment Re Contract Rescission ("Memorandum Decision"), called for further briefing addressing the applicability of the recent Supreme Court case, *National Association of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2008), to Plaintiffs' request for rescission of a number of Sacramento River Settlement Contracts ("SRS Contracts"):

> To resolve the applicability of *Home Builders* ... it is necessary for the Federal Defendants and/or the Settlement Contractors to present evidence on the nature and extent of their claimed senior water rights. If, *arguendo*, this evidence establishes that the Settlement Contractors hold senior rights to a certain volume of water, it is appropriate to determine as a matter of law that the Bureau lacks any discretion under *Home Builders* over that volume of SRS Contract water.

Memorandum Decision, Doc. 761, at 70:8-16 (emphasis added).

A December 3, 2008 scheduling conference confirmed that these proceedings do not involve an actual adjudication of the water rights of any parties in this case.  *See* Reporters' Transcript, Dec. 3, 2008, Doc. 764, at 7-8, 18, 28.

A January 14, 2009 Supplemental Scheduling Conference Order defined the remaining issues.

> By January 30, 2009, the Sacramento River Settlement Contractor parties shall file further admissible evidence and supporting pleadings regarding the nature and extent of the Settlement Contractors' water rights in order to resolve the applicability of the Supreme Court's decision in *[Home Builders]*, 127 S. Ct. 2518 (2007), and to further narrow the issues in this case.

*See* Doc. 769 at 2.

On January 28, 2009, Plaintiffs filed a motion for certification of interlocutory appeal or, in the alternative, for

reconsideration of the district court's November 19, 2008 memorandum decision. Doc. 770. This motion was denied without prejudice as premature on the ground that the November 19, 2008 decision was not completed nor final. Doc. 811, filed Feb. 12, 2009.

On January 30, 2008, two groups of Sacramento River Settlement Contractors ("SRS Contractors"), Glenn Colusa Irrigation District ("GCID"), *et al.*, and Reclamation District No. 108 ("RD 108"), *et al.*, filed separate memoranda addressing the district court's request. Docs. 772 & 773. GCID also filed the declaration of Marc Van Camp along with voluminous supporting documentation. *See* Docs. 775-810. Federal Defendants and Plaintiffs responded. Doc. 815, filed Feb. 27, 2009; Doc. 820, corrected version, filed Mar. 2, 2009. Oral argument was heard on March 13, 2009, after which the matter was submitted for decision. Doc. 826. On March 24, 2009, Federal Defendants sought to file a supplemental brief to address the application of *Home Builders* to this case. Doc. 827. The same day, Plaintiffs opposed the request, objecting that supplemental briefing would further delay a decision in this case: "Plaintiffs are anxious to obtain a ruling on this matter, as the Bureau's implementation of the Sacramento River Settlement Contracts is likely to have a significant effect on threatened and endangered fish and their critical habitat this year." Doc. 828. at 2.

This Memorandum Decision incorporates the November 19, 2008 Memorandum Decision, except that: (a) where inconsistent, this Decision shall control, and (b) Part VI.D.1. of the November 19, 2008 Decision is superceded by this Memorandum Decision.

# II.  FACTUAL BACKGROUND

Earlier decisions in this case set forth extensive background describing the coordinated operations of the Central Valley Project ("CVP") and State Water Project ("SWP").  *See, e.g.*, Doc. 363, filed May 25, 2007; Doc. 761.  As some of the disputed water rights predate the Projects themselves, a review of the Projects' history and the legal relationship between the SRS Contractors and Interior is necessary.


A.  <u>General History of The CVP and Relevant State Law Doctrines.</u>

The California Court of Appeal, Third Appellate District, performed a comprehensive review of the relevant history in *El Dorado Irrigation Dist. v. State Water Resources Control Board*, 142 Cal. App. 4th 937 (2006):

> <u>The History Of Comprehensive Water Planning In California</u>
> ***
>
> As former Presiding Justice John T. Racanelli explained in *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 98: "California's critical water problem is not a lack of water but uneven distribution of water resources. The state is endowed with flowing rivers, countless lakes and streams and abundant winter rains and snowfall. But while over 70 percent of the stream flow lies north of Sacramento, nearly 80 percent of the demand for water supplies originates in the southern regions of the state."
>
> > Efforts to solve this problem date back more than 100 years. In the early 1870's, President Ulysses Grant appointed a commission under the leadership of Colonel B.S. Alexander (Alexander Commission) to study California's "irrigation problem." (Cooper, *Aqueduct Empire*, [1968], p. 42.) The Alexander Commission "was the first to point out ... that the Central Valley's most bountiful water supplies lay in the Sacramento River region, in contrast to potential shortages in the valley of the San Joaquin." (*Id.* at pp. 42-43.) The

6

Commission "made several proposals for basin-wide storage and distribution of water." (*Id.* at p. 42.)

The work of the Alexander Commission was followed in the late 1870's by the work of William Hammond Hall, the first State Engineer, who was appointed to investigate, among other things, "the problems of irrigation" in California. (Stats. 1878, ch. 429, § 3, p. 634; Cooper, *Aqueduct Empire*, supra, at p. 43.) Hall "took his assignment seriously and spoke out for coordinated region-wide water development. But in that respect he was a generation ahead of his time.... In a time of rampant self-interest Hall's farsighted vision of systematic development went largely unrecognized." (Cooper, *supra*, at pp. 43-44.)

Forty years later, in 1919, Colonel Robert Bradford Marshall, chief hydrographer of the United States Geological Survey, followed in Hall's footsteps when he "proposed to the governor of California a series of storage reservoirs and canals in the Central Valley." (Cooper, *Aqueduct Empire, supra*, at p. 50; see also Rogers and Nichols, *Water for California* (1967) § 27, p. 46.) "[I]n the hortatory language of a crusader, [Colonel Marshall] sketched, summarized and espoused for California the inevitable water logistics which seventy years of cumulative geographic and hydrologic evidence demanded: redistribution of water from north to south; an integrated system of statewide waterworks; the Central Valley Project in all its splendid promise; the east and west side canals flanking that valley; tunnels and pumps conveying to southern California a share of the state's endowment." (*Cooper, supra*, at pp. 50-51.)

In 1921, the California Legislature took up the search for a solution to California's water problem when it directed the state engineering department "to determine a comprehensive plan for the accomplishment of the maximum conservation, control, storage, distribution and application of all the waters of the state, and to estimate the cost of constructing dams, canals, reservoirs or other works necessary in carrying out this plan." (Stats.1921, ch. 889, § 4, p. 1686.) Development of this comprehensive water plan for California continued over the next decade, with periodic reports to the Legislature. (*See* Rogers and Nichols, *Water for California, supra*, § 27, p. 46; *Ivanhoe Irr. Dist. v. All Parties* (1957) 47 Cal.2d 597, 614, revd. 357 U.S. 275.)

In 1927, while the water plan was still being developed, a joint Senate-Assembly committee recognized the need " 'to file on, or withdraw from filing by

7

private parties, the water rights to be utilized and required for the consummation of the co-ordinated plan.' " (25 Ops.Cal.Atty.Gen. 8, 11 (1955).) Accordingly, the Legislature passed the Feigenbaum Act (Stats.1927, ch. 286, pp. 508-510), which was later codified as Water Code section 10500 et seq.[] (*See* 25 Ops.Cal.Atty.Gen., *supra*, at p. 11.) The Feigenbaum Act directed the Department of Finance "to make and file an application or applications for any water or the use thereof which in the judgment of the state department of finance is or may be required in the development and completion of the whole or any part of a general or coordinated plan looking towards the development, utilization or conservation of the water resources of the state." (Stats.1927, ch. 286, § 1, pp. 508-509; see § 10500.) The act further provided that the priority of any such application would be the effective date of the act, which was July 29, 1927.[] (Stats.1927, ch. 286, § 1.) "The effect of the [Feigenbaum Act] was to withdraw the then unappropriated waters of the State filed on by the Department of Finance from any further appropriation by private parties." (25 Ops.Cal.Atty.Gen., *supra*, at p. 11.) The Feigenbaum Act also gave the Department of Finance the "power, in its discretion, to release from priority or to assign any portion of or all of any of the appropriations that may be filed under the provisions of this act when such release or assignment is for the purpose of development not in conflict with such general or coordinated plan." (Stats.1927, ch. 286, § 1, p. 509; *see* § 10504 ["The board may release from priority or assign any portion of any application filed under this part when the release or assignment is for the purpose of development not in conflict with such general or coordinated plan or with water quality objectives established pursuant to law"].)

"It was under th[e] authorization [of the Feigenbaum Act] that the Director of Finance, beginning in 1927, filed some 37 applications on behalf of the state on streams within the central valley area ...." (*Ivanhoe Irr. Dist. v. All Parties, supra*, 47 Cal.2d at p. 614.) One of those state-filed applications, application No. 5645, was filed on July 30, 1927. That application sought a permit to appropriate for irrigation and domestic use various amounts of water from various points in El Dorado County on tributaries to the American and Cosumnes Rivers, including-as relevant here-the South Fork of the American River.

<u>The History Of The Area Of Origin Protections</u>

In 1931, the Division of Water Resources submitted a comprehensive series of reports on the State Water Plan to the Legislature. (25 Ops.Cal.Atty.Gen., *supra*, at p.

8

13.) That same year, "the Legislature was called upon to amend the Feigenbaum Act of 1927 by extending the date to which State filings would be exempted from requirements of diligence." (*Id.* at p. 14.) The bill introduced to make this amendment "was [itself] amended before final passage to provide a further restriction on the authority of the Department of Finance to release from priority or to assign any of the State's filings." (*Ibid.*) Specifically, the Legislature amended the Feigenbaum Act to provide that "no such priority shall be released, or assignment made of any such appropriation that will, in the judgment of the state department of finance, deprive the county in which such appropriated water originates, of any such water necessary for the development of such county." (Stats.1931, ch. 720, § 1, p. 1515.) This amendment was the culmination of several attempts since 1925 "to protect the counties of origin against exportation of water which might be needed by them in their own future development." (25 Ops.Cal.Atty.Gen., supra, at p. 12.)

Two years later, in 1933, "[a]s the result of the prolonged studies and planning by the state, the Legislature ... enacted a statute designating the Sacramento-San Joaquin coordinated project as the Central Valley Project" (the CVP). (*Ivanhoe Irr. Dist. v. All Parties, supra*, 47 Cal.2d at p. 614.) Part of the Central Valley Project Act of 1933 was a provision that later became section 11460, which provides: "In the construction and operation by the department of any project under the provisions of this part a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the department directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein." FN5 (Stats.1933, ch. 1042, § 11, pp. 2650-2651.)

> FN5. Although on its face this provision applies only to the Department, section 11128 makes the statute applicable to the Bureau as well. "The limitations prescribed in Section 11460 and 11463 shall also apply to any agency of the State or Federal Government which shall undertake the construction or operation of the project, or any unit thereof, including, besides those specifically described, additional units which are consistent with and which may be constructed, maintained, and operated as a part of the project and in furtherance of the single object contemplated by this part." (§ 11128.)

The CVP

"Construction of the CVP began in 1937. It is now one of the world's most extensive water transport systems.... Shasta Dam on the upper Sacramento River is the focal point of the CVP. Shasta Dam was completed in 1945 but began storing water and generating electric power in 1944. The waters of the Sacramento River which flow past the Shasta Dam are augmented by additional water supplies brought through a tunnel from the Trinity River and from reservoirs formed by Folsom and Nimbus Dams on the American River. About 30 miles south of Sacramento, the Delta Cross Channel regulates the passage of Sacramento River water through the Delta to the Tracy Pumping Plant." [*United States v. State Water Resources Control Board, supra*, 182 Cal.App.3d at p.99.]

***

The appropriative water rights necessary for operation of the CVP included rights acquired by assignment of various state-filed applications. Indeed, as of 1957, "[t]he greater portion of water to which the United States ha[d] acquired rights [wa]s by assignments from the state's Director of Finance. [Citation.] Four assignments of applications for the appropriation of unappropriated water of the Sacramento River, totaling 35,000 second-feet diversion and 12,690,000 acre-feet annual storage, were made on September 3, 1938...." (*Ivanhoe Irr. Dist. v. All Parties*, *supra*, 47 Cal.2d at p. 618.)

142 Cal. App. 4th at 945-949 (parallel citations and footnotes omitted).

B.    The Bureau's Initiation of Permit Applications for the CVP Before the State Board.

The Bureau of Reclamation ("Bureau" or "Reclamation") took over operation of the CVP on behalf of the United States in the late 1930s.  *See* SC 03663[1]; *see also* State Water Board Decision

─────────────

    [1]    All "SC" references are to the corresponding bates stamped documents submitted as exhibits to the Van Camp Declaration, Doc. 781-806.

990 at 5-6.[2]  In 1938, the State of California assigned to the United States a number of pending water rights applications related to the mainstem Sacramento River.  SC 03663.  In 1952, another application for direct diversion from Delta channels was assigned to the United States.  SC 03664.  The United States applied to the State Water Rights Board (the "Board" -- a predecessor to the State Water Resources Control Board ("SWRCB"))[3] for permits to operate the CVP with water from the assigned water rights, along with a 1943 water rights application for power and incidental domestic purposes at Keswick Power Plant.  D-990 at 6, 10-14.

One of the central purposes of the state water rights application/permitting process is to determine whether there is sufficient water available to satisfy both senior rights-holders and the applicant's requested appropriation.  California Water Code ("CWC") § 1375 ("As prerequisite to the issuance of a permit to appropriate water ... [t]here must be unappropriated water available to supply the applicant"); 23 Cal. Admin. Code § 731(a) ("A person who claims an existing right to the use of water shall be granted a permit or license to appropriate no more water than

---

[2]    Available at http://www.waterrights.ca.gov/hearings/decisions/WRD990.PDF (last visited, April 6, 2009).

[3]    The Water Rights Board was created by the California Legislature in 1956 to administer water rights.  *See SWRCB Cases*, 136 Cal. App. 4th 674, 695 n.9 (2006) (citing Cal. Stats. 1957, 1st Ex. Sess. 1956, ch. 52, §7, pp. 425-27).  In 1967, the Legislature consolidated the Water Rights Board with the State Water Quality Control Board to create the State Water Resources Control Board.  *Id*. at 695 (citing Cal. Stats. 1967, ch. 284).

is needed over that which is available under the existing right to meet the beneficial use requirements of the project.").[4]  The SWRCB disclaims authority to directly adjudicate or otherwise resolve disputes over the validity, nature, or extent of pre-1914 water rights.  *See* SWRCB, *Information Pertaining to Water Rights in California - 1990* at p.8.[5]  Instead, the parties may file suit in a court of competent jurisdiction to determine the extent and nature of such water rights.  The court may, in turn, refer the matter to the Board, as referee, for investigation.  *See* CWC §§ 2000, 2001.  Alternatively, "one or more claimants to water of any stream system" may request "the determination of the rights of the various claimants to the water of that stream system." CWC § 2525.  If "the facts and conditions are such that the public interest and necessity will be served by a determination of the water rights involved," the Board may "enter an order granting the petition and make proper arrangements to proceed with the determination."  *Id*.

C.   The 1956 Cooperative Studies and Related Analyses.

On July 7, 1952, Reclamation, the State of California, and the Sacramento Valley Water Users Committee entered into a "Memorandum of Understanding Relating to a General Approach to

---

[4]   After the passage of the California Water Commission Act in 1914, any appropriation of water must comply with the provisions of Division 2, Part 2 of the California Water Code.

[5]   Available at http://www.waterrights.ca.gov/Forms/app_geninfo.pdf (last visited, April 6, 2009).

Negotiations for Settlement of Water Diversions from the
Sacramento River and Sacramento-San Joaquin Delta with the
Objective of Avoiding Litigation." SC 03629-32 ("1952 MOU").
The signatories agreed that:

> The Federal Government acting through the Bureau of
> Reclamation is applying for certain permits to
> appropriate un-appropriated water from the Sacramento
> River, in aid of the Central Valley Project. The water
> users along the Sacramento River, hereinafter referred
> to as "the water users", who are for the purposes
> hereof acting through the Sacramento Valley Water Users
> Committee, have protested the applications of the
> Federal Government for such permits and seek various
> conditions and limitations. The State Engineer, before
> whom the applications are pending, encourages
> satisfactory agreements between applications and
> protestants providing for withdrawal of protests.

> The Federal Government has also indicated that an
> <u>authoritative determination of the validity and extent</u>
> <u>of rights to the use of water of the Sacramento River</u>
> <u>is necessary, and the parties hereto are in accord that</u>
> <u>this determination should be made by agreement</u>, if
> possible, rather than by litigation.

> The water users and the Federal Government are
> accordingly undertaking to negotiate an adjustment of
> the various matters just referred to without litigation
> and with a minimum of formal proceedings, for their
> mutual benefit. Such adjustment would eliminate the
> delay, expense and uncertainty attendant upon complex
> and difficult lawsuits, with a view of apportioning the
> water of the Sacramento River in an equitable manner so
> that the Central Valley Project can function in the
> manner intended without injury to the water users. The
> state of California will participate and assist in
> these negotiations through its State Engineer and its
> Attorney General.

***

> [The] general approach [suggested by this memorandum]
> shall not in any way prejudice any water rights claimed
> by any of the parties...

SC 03629-30 (emphasis added).

     The unambiguous intent of the MOU is to reach, by agreement
and compromise, "an authoritative determination of the validity

13

and extent of rights to the use of water of the Sacramento River," as between Sacramento River water users and the United States. To do this, the parties "entered into a cooperative study program" in an "effort to reach an agreement on existing water rights along the Sacramento River and in the Delta." D-990 at 28. The results of the 1956 studies were published in the "Report on 1956 Cooperative Study Program," which reaffirmed that the studies were intended to "produce information that would be used to further negotiations aimed at reaching an agreement on water rights along the Sacramento River and in the Delta." SC 00065. The Report explained that the assumptions utilized in the studies were "solely for the purpose of evaluating the effects of [those] assumptions upon water right yields, deficiencies, and supplemental water requirements, <u>and no implications as to the legal status of such assumed rights are intended</u>." SC 00066 (emphasis added).

Using the results of the cooperative study program, the parties presented separate studies to the Board to support an "<u>equitable basis for determining the yields of existing rights along the Sacramento River and in the Delta</u>." D-990 at 31 (emphasis added). Study C-2BR was prepared by Reclamation and Study C-650D was submitted by the Sacramento River and Delta Water Association. *Id*. A description of the C-650 Study published by the California Department of Water Resources ("DWR") in 1959 reiterates that the purpose of the then-ongoing negotiations between Sacramento River water users and the Bureau is "to find a <u>basis for agreement upon the respective water rights of these parties and upon a suitable arrangement for the</u>

14

1water users to obtain a supplemental water supply from the

Central Valley Project."  SC 03451 (emphasis added).

 

      D.    **Van Camp's Summary of the Evidence Underlying the 1956
          Cooperative Study Program and Related Investigations.**

     GCID submits the declaration of Marc Van Camp, a registered
civil engineer with extensive experience in the fields of
hydrology, hydraulics, irrigation, drainage, groundwater, water
supply, water rights, and related subjects.  Doc. 775.  His
declaration summarizes and explains voluminous technical
information pertaining to the SRS Contractors' relevant
underlying water rights.  *Id*.  Much of Van Camp's information is
from the 1956 Cooperative Studies, C-2BR, and C-650.  *Id*. at ¶9.

     Van Camp presents a series of tables to summarize the nature
and extent of the senior water rights held by each of the SRS
Contractors.  Exhibits C-1 through C-28 summarize those senior
rights considered and used to arrive at the original contract
quantities.  *Id*. at ¶11.  Exhibits D-1 through D-28 are plots for
each of the SRS Contractors, showing the monthly contract
quantities ultimately provided for within each of the original
SRS Contracts, together with the water rights data from C-1
through C-28.  *Id*. at ¶12.  Exhibit E depicts the combined
monthly water rights quantities and the combined monthly contract
quantities of 27 of the 28 challenged SRS Contracts,
distinguishing between the various types of underlying and
contractual water rights involved.  *Id*. at ¶13.[6]

---

     [6]    The City of Redding is treated separately, because the
City diverts water year-round for municipal, industrial, and

According to Van Camp's uncontradicted review of the information contained in these Studies, the underlying water rights held by the SRS Contractors included pre-1914 appropriative water rights, post-1914 appropriative rights, riparian rights, and a small volume of "other" types of water rights. Most of the underlying water rights included only a maximum rate of diversion and a season of diversion. None of the underlying water rights included any monthly diversion limits, other than the maximum rate of diversion.[7]

Van Camp opined that in all but six cases, the monthly contract quantities eventually agreed to in the original set of SRS Contracts were less than the "documented" underlying water rights.[8] *Id*. at ¶41. The sum of the monthly contract quantities that exceed the face value of the underlying water rights accounts for approximately one percent of the total contract quantity for the 28 contractors at issue in this case. *Id*. Van Camp opines that some of these exceedences are attributable to small differences in assumptions used to estimate monthly demand,

domestic purposes. *Id*.

[7] It is undisputed that Reclamation's operation of the CVP depended on placing limits on the SRS Contractors' <u>monthly</u> diversions.

[8] Van Camp opined, specifically, that "in all but six cases, the monthly contract quantities agreed to are less than what was authorized for diversion under the documented water rights that were considered and used to arrive at the contract quantities provided for within the original SRS Contracts." Van Camp Decl. at ¶41. The phrase "authorized for diversion under the documented water rights" is, at least in part, an improper legal conclusion and is disregarded, as the Board, Bureau, and SRS Contractors did not reach such an agreement.

rounding, and the failure to identify all "other" water rights concerned. *Id*. at ¶56. Van Camp explains that other exceptions, such as the fact that Anderson Cottonwood Irrigation District's ("ACID") pre-1914 claim is less than the monthly contract quantities provided for in their contract, was the result of Reclamation and ACID's consideration of "unusually high conveyance losses, porous soils, and projected crop patters within ACID...." *Id*. at ¶50.

    E.    <u>D-990.</u>

    In response to the United States' applications, the Board held more than 75 days of hearings over the course of more than a year. D-990 at 6-7. The Board first rejected the United States' position that it should be issued an unconditional permit to appropriate water for the operation of the CVP, reasoning:

> [This] demand ... is irreconcilable with the provisions of Section 8 of the Reclamation Act of 1902 that federal reclamation law is not intended to interfere with state laws "relating to the control, appropriation, use, or distribution of water used in irrigation ... and the Secretary of the Interior, in carrying out the provisions of this act shall proceed in conformity with such laws ...." There is no such thing as an unconditional water right under the law of California, or of any other western state for that matter.

*Id*. at 25.

    D-990 recognized that "[t]he final report acknowledged [that the] assumptions [made in the studies], particularly with respect to water rights, may differ considerably from the rights as may be determined by a court of law." *Id*. at 31.

    The Board also examined the data to determine the maximum quantity that the Bureau should be permitted to divert to storage

17

during any given year:

> In fixing the rates of direct diversion to be allowed, the Board is inclined to greater liberality than usual because of the magnitude of the Project and the complexities involved in determining at this time the direct diversion as distinguished from rediversions of stored water. However, notwithstanding these considerations, we would require greater particularity in proof of direct diversion requirements were we not assured that no prejudice to others will result from failure of applicant to produce such proof. This assurance is provided by conditions which will be imposed in the permits subjecting exports of water from the Delta to use within the Sacramento River Basin and Delta so that there can be no interference with future development of these areas.

*Id.* at 40.

The Board concluded:

> [T]he public interest requires that water originating in the Sacramento Valley Basin be made available for use within the Basin and the Sacramento-San Joaquin Delta before it is exported to more distant areas, and the permits granted herein will so provide.

> However, the Board will limit the period of time in which such preference may be exercised. This limitation is necessary in order to best conserve in the public interest the water to be appropriated. The Board considers that, in view of the length of time the Project has been in operation, a period of approximately three years is a reasonable time in which the users within the watershed who are currently using water from [the] Sacramento River or the Delta may have a preferred right to Project water. Accordingly, the permits will provide that until March 1, 1964, requests for water service contracts from such users within the Sacramento Valley and Delta shall be preferred over requests from users outside the watershed.

> The Board concurs with Counsel for the Association that a period of approximately ten years is a reasonable length of time in which users within the watershed who are not presently diverting water from the Sacramento River or Delta may consummate contracts for Project water [citation]. Accordingly, the permits will provide that until March 1, 1971, requests for water service contracts from such users shall be preferred over requests from users outside the watershed.

> Users within the watershed who do not presently hold appropriative rights but who wish to initiate such

18

1    rights by application to this Board should also be
     afforded preference.  Accordingly the permits granted
2    for use outside the watershed shall be subject to
     rights initiated by applications for use within the
3    watershed.

4    *Id.* at 72-73.

5        The Board directly encouraged the United States to reach a

6    settlement agreement with the Sacramento River water users who

7    held "existing rights" in the Sacramento River:

8        Throughout these proceedings, the Bureau's
         representatives have consistently affirmed their policy
9        to recognize and protect all water rights on the
         Sacramento River and in the Delta existing under State
10       law at the times these applications were filed,
         including riparian, appropriative and others.
11       Unfortunately, these rights have never been
         comprehensively defined.  It is imperative, therefore,
12       that the holders of existing rights and the United
         States reach agreement concerning these rights and the
13       supplemental water required to provide the holders with
         a firm and adequate water supply, if a lengthy and
14       extremely costly adjudication of the waters of the
         Sacramento River and its tributaries is to be avoided.
15
     *Id.* at 75 (emphasis added).
16
         The Board found:
17
         [U]nappropriated water exists in the Sacramento river
18       and in the Delta at times and in sufficient amounts to
         justify approval of [the] Applications.... [T]he uses
19       proposed are beneficial; that such waters in general,
         but with certain exceptions and subject to certain
20       conditions, may be taken and used as proposed without
         interference with the exercise of prior rights; and
21       that the applications should be approved and permits
         issued pursuant thereto, subject to the usual terms and
22       conditions and subject to those additional terms and
         conditions indicated in ... this decision for the
23       protection of prior rights and in the public interest.
         The Board finds that as so conditioned the developments
24       proposed in these applications will best develop,
         conserve and utilize in the public interest the water
25       sought to be appropriated.

26   *Id.* at 79.  The position of the United States is unequivocal: to

27   "recognize and protect" existing Sacramento River water rights

28   already held by SRS users at the time (1952) the Bureau's

                                    19

applications were filed.  The parties did so by agreement.

On February 9, 1961, the board granted the Bureau's applications, subject to, among others, the following relevant conditions:

> 20.  The quantity of water which may be diverted under permits issued pursuant to Applications 5625, 5626, 9364 and 9365 shall remain subject to depletion of stream flow above Shasta Dam by the exercise of lawful rights to the use of water for the purpose of development of the counties in which such water originates, whether such rights have been heretofore or may be hereafter initiated or acquired; such depletion shall not exceed in the aggregate 4,500,000 acre-feet of water in any consecutive 10-year period and not to exceed a maximum depletion in any one year in excess of 700,000 acre-feet.

> 21.  In conformity with Water Code Section 10505, permits issued pursuant to Applications 9363, 9366, 9367 and 9368 shall be subject to any and all rights of any county in which the water sought to be appropriated originates to the extent that any such water may be necessary for the development of such county.

> 22.  Direct diversion and storage of water under permits issued pursuant to Applications 5626, 9363, 9364, 9366, 9367 and 9368 for use beyond the Sacramento-San Joaquin Delta or outside the watershed of Sacramento River Basin shall be subject to rights initiated by applications for use within said watershed and Delta regardless of the date of filing said applications.

> 23.  The export of stored water under permits issued pursuant to Applications 5626, 9363 and 9364 outside the watershed of Sacramento River Basin or beyond the Sacramento-San Joaquin Delta shall be subject to the reasonable beneficial use of said stored water within said watershed and Delta, both present and prospective, provided, however, that agreements for the use of said stored water are entered into with the United States prior to March 1, 1964, by parties currently diverting water from Sacramento River and/or Sacramento-San Joaquin Delta and prior to March 1, 1971, by parties not currently using water from Sacramento River and/or Sacramento-San Joaquin Delta.

*Id*. at 84-86.  The parties place particular emphasis on Condition 23.

20

**F. 1951 House Interior and Insular Affairs Committee Report.**

Congress also urged the Bureau to reach an agreement with the SRS Contractors. In 1951, the House Interior and Insular Affairs Committee issued a report recognizing the growing possibility of conflict between existing Sacramento River water users and the nascent CVP, urging the Bureau to avoid litigation. *See* Engle, *CVP Documents*, Part I, S. Res. 1, 84th Cong. (2d Sess.), H.R. Res. 416 at 675-783 (1956). In this report, Congress expressed its concern about the possibility that the CVP could become involved in "[a] monstrous lawsuit ... that would embroil the [CVP] in litigation for decades." *Id. at 681*.

On the one hand, the Committee nowhere conceded that the CVP's rights were subordinate to any other existing rights on the Sacramento River. The Report provides that, should the matter be taken to court, the Department of Justice "would undoubtedly represent the interest of the Federal Government and assert every possible claim to the water...." *Id*. However, the Report simultaneously acknowledged that any dispute over the relative priority of the Bureau's water rights would be a heated one, as the Bureau promised "that no water which is needed in the Sacramento Valley will be sent out of it." *Id*. at 678. Moreover, "instead of firm water rights necessary for the operation of the [CVP] the Bureau ... had in effect merely 'four pieces of paper' which the State of California ... in effect said the Bureau should 'take to court' to find out if it has any water rights." *Id*. at 682.

1    G.    Negotiation of the SRS Contracts.

2        The proposed contracts were developed and forwarded to
3    interested Sacramento River water users in 1962.  A February 15,
4    1963 Memorandum Report on Sacramento River Water Diversions,
5    developed by a specially appointed panel, made recommendations to
6    the Secretary of the Interior on the negotiations.  The Report
7    recommended, among other things, that "the water studies C-2BR
8    and C-650-B, which were the principal bases for derivation of
9    schedule A quantities applicable to diverters above the city of
10   Sacramento, continue to be the principal bases for determining
11   each diverter's entitlement to the so-called base supply of
12   Sacramento River water...."  SC 03685.  However, the possibility
13   was left open that "adjustments [could] be made in individual
14   cases where there is specific and convincing justification for
15   departure."  *Id*.

16

17   H.    The SRS Contracts.

18       The United States reached agreement with the Settlement
19   Contractors and executed most of the original SRS Contracts in
20   1964.  SAR 004147.[9]  The SRS Contracts fixed the specific volume
21   of water and place of use for each SRS Contractor for 40 years
22   and during any renewals of those contracts, all subject to the
23   condition subsequent that if a general stream adjudication or
24   other proceeding to judicially and/or administratively determine
25   Sacramento River System water rights eventuates, the parties are

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27        [9]    All "SAR" References are to the Supplemental
     Administrative Record submitted by the Bureau of Reclamation in
28   this case.

                              22

no longer bound by the contract settlements, and all parties are then free to assert the full extent of their claimed SRS water rights.  SC 04447-05760.

## I.   Decision 1641.

In Decision 1641 ("D-1641"), issued December 1999 and revised March 2000[10], the SWRCB modified the United States' permits to operate the CVP to implement flow objectives for the Sacramento San-Joaquin Bay-Delta Estuary, in response to petitions to change points of diversion of the CVP and SWP in the Southern Delta, and to address a petition to change places and purposes of use for the CVP.  Among other things, D-1641 amended the United States' permits to operate the CVP to include the following conditions concerning endangered species:

> This permit does not authorize any act which results in the taking of a threatened or endangered species or any act which is now prohibited, or becomes prohibited in the future, under either the California Endangered Species Act (Fish and Game Code sections 2050 to 2097) or the Federal Endangered Species Act (16 U.S.C.A sections 1531 to 1544).  If a "take" will result from any act authorized under this water right, the permittee/licensee shall obtain authorization for an incidental take prior to construction or operation of the project.  Permittee/Licensee shall be responsible for meeting all requirements of the applicable Endangered Species Act for the project authorized under this permit/license.

D-1641 at 148.  This does not diminish the SRS Contractors' rights.

---

[10]    Available at: "http://www.waterrights.ca.gov/hearings/decisions/WRD1641.pdf" (last visited April 9, 2009).

23

J.   **CVPIA.**

Effective October 31, 1992, Congress enacted the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4600 (1992), mandating changes in management of the CVP.   Among other provisions, § 3406(b) provides that:

> The Secretary, immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project.

This provision does not elevate or subordinate any of the specified laws or decisions of the SWRCB over any other.   With respect to the renewal of contracts, § 3404(c) provides:

> Renewal of Existing Long-Term Contracts -- Notwithstanding the provisions of the Act of July 2, 1956 (70 Stat. 483), the Secretary shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of twenty-five years and may renew such contracts for successive periods of up to 25 years each.

> ***

> (2) Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the Central Valley Project, the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts. The Secretary shall also administer all existing, new, and renewed contracts in conformance with the requirements and goals of this title.

//
//
//
//
//

24

# III.  ANALYSIS

## A.  Threshold Issues.

### 1.  Federal Defendants' Argument that Summary Judgment Should be Granted on Other Grounds Raised in Their Summary Judgment Briefs.

Federal Defendants argue that they are entitled to summary judgment for all of the reasons set forth in their original summary judgment motion, Doc. 679.  The November 19, 2008 Memorandum decision rejected these other grounds upon which Federal Defendants sought summary judgment, finding them without merit.  *See* Doc. 761.  There is no basis to reconsider those decisions.

### 2.  Proceedings Not Intended to Adjudicate Any Party's Water Rights.

Federal defendants renew their concern that this proceeding cannot adjudicate the extent of the SRS Contractors' historical water rights.  Such an adjudication is beyond the court's jurisdiction over these proceedings.  The sole focus of this proceeding is the applicability of *Home Builders* to the facts and circumstances of the existing record.

### 3.  Preliminary Nature of Previous Discussions Regarding Home Builders.

To the extent any party has interpreted the discussion in Part VI.D.1. of the November 19, 2008 Memorandum Decision to be a final decision, it was not so intended, as explained in the response to Plaintiffs' request for certification of an interlocutory appeal of the *Home Builders* portion of that decision.  *See* Doc. 811, filed February 12, 2009.

### 4. The ESA and CVPIA Apply to the SRS Contractors.

The November 19, 2008 Memorandum Decision found:

> The CVPIA specifically exempts all Settlement Contracts from the various new requirements imposed by that law. Representative Fazio noted that such special treatment is appropriate "given the seniority of their water rights." 138 Cong. Rec. H 11,493, 11,515-516 (Oct. 5, 1992). "These contractors have a prior right to the water they receive. They were entitled to this water before the project was constructed." *Id.*

Doc. 761 at 64. This statement needs clarification. While certain sections of the CVPIA apply only to "water service and repayment" contractors, *e.g.* § 3404(c) (requiring renewal of all "existing long-term repayment or water service contract[s]" for periods of up to 25 years), other provisions explicitly include "water rights settlement contracts," as distinguished from "water service or repayment contracts," *e.g.*, § 3405 (permitting "all individuals ... who receive Central Valley Project water under water service or repayment contracts, water rights settlement contracts, or exchange contracts" to transfer water, subject to certain conditions, "to any other California water user or water agency").

The November 19, 2008 Decision also found that any truly "senior" rights held by the SRS Contractors "are beyond the reach of the ESA." This statement is overbroad. Even if, under *Home Builders*, section 7(a)(2) does not apply to the Bureau's water allocation actions and the SRS Contractors' diversion of their "senior" rights, it is undisputed that other sections of the ESA may apply, including section 9, 16 U.S.C. § 1539, which prohibits

the "take"[11] of an endangered species by any person without a permit.  *See United States v. Glenn-Colusa Irr. Dist.*, 788 F. Supp. 1126 (E.D. Cal. 1992).

### 5.   Evidentiary Matters.

A number of evidentiary issues are pending.  First, Plaintiffs filed a motion to strike portions of the Van Camp declaration.  Doc. 821, filed March 2, 2009.  GCID opposed the motion to strike.  Doc. 823, filed Mar. 6, 2009.  During the March 13, 2009 hearing on the *Home Builders* issue, the court overruled all of Plaintiffs' objections to the Van Camp declaration, except that Mr. Van Camp's use of the term "senior" in connection with this analysis of water rights is an inadmissible legal conclusion.  Any legal conclusions advanced by the Van Camp declaration are inadmissible as irrelevant.

Second, the SRS Contractors object to portions of Plaintiffs' Request for Judicial Notice.  Doc. 825, filed March 9, 2009.  These objections are resolved in a concurrently-filed memorandum decision, incorporated by this reference.

The SRS Contractors request the court take judicial notice of a number of documents, the existence of which are judicially noticeable as publically-filed documents in court proceedings. Doc. 774.  A large number of these documents relate to the 1956 Cooperative Study Program and related investigations and the underlying water rights considered in those investigations.  *See*

---

[11]   The ESA defines "take" to mean: "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

*id.*  In their *Home Builders* brief, Plaintiffs object to the "vast majority" of this evidence as "beyond the scope of these proceedings."  Doc. 820-2 at 25.  Specifically, Plaintiffs argue that this evidence fails to document the kind of "finite, enforceable water rights," evidence of which the district court called for at the start of these proceedings.  *Id.*  Plaintiffs objection goes to the weight, not the admissibility of this evidence.  Plaintiffs' objection is OVERRULED; the SRS Contractors' Request for Judicial Notice is GRANTED.  The documents are admissible only for the limited purpose of ascertaining whether the SRS Contractors hold definite and certain senior water rights.

> B.  Does Section 7 of the ESA Apply to the Bureau's Implementation and/or Execution of the SRS Contracts?

> 1.  Legal Framework.

Section 7(a)(2) of the Endangered Species Act ("ESA"), which requires federal agencies to consult with one of the federal wildlife agencies to determine whether their actions will affect threatened or endangered species or their habitat, only applies to those agency actions "in which there is discretionary federal involvement or control."  *Home Builders*, 127 S. Ct. at 2534.  As a general rule, the Bureau retains considerable discretion to "choos[e] what specific actions to take in order to implement" the general goals of Reclamation Law.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929 (9th Cir. 2008) ("*NWF II*").  The parties dispute whether and to what extent the Bureau's discretion over the delivery of water to and contracting

with the SRS Contractors has been constrained either by law or contract.

*Home Builders*, 127 S. Ct. at 2524, addressed the transfer of permitting authority under the Clean Water Act's ("CWA") National Pollution Discharge Elimination System ("NPDES") from the Environmental Protection Agency ("EPA") to the State of Arizona pursuant to CWA § 402(b). Under section 402(b), the EPA "shall approve" a State's request to assume the permitting program "unless [it] determines that adequate authority does not exist" to ensure that nine specific criteria set forth in the statute are satisfied. If the criteria are met, the transfer must be approved. *Id.* at 2525.

At the same time, § 7 of the ESA requires federal agencies to consult with either FWS or NMFS to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize" endangered or threatened species or their habitats. *Id.* (quoting ESA §7). *Home Builders* recognized that "[a]lthough a later enacted statute (such as the ESA) can sometimes operate to amend or even repeal an earlier statutory provision (such as the CWA), repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest." *Id.* at 2532. The Supreme Court reasoned that requiring the EPA to comply with ESA § 7 when approving a transfer application "would effectively repeal § 402(b)'s statutory mandate by engrafting a tenth criterion onto the CWA." *Id.*

> Section 402(b) of the CWA commands that the EPA "shall"
> issue a permit whenever all nine exclusive statutory
> prerequisites are met. Thus, § 402(b) does not just set

29

> forth *minimum* requirements for the transfer of
> permitting authority; it affirmatively mandates that
> the transfer "shall" be approved if the specified
> criteria are met. The provision operates as a ceiling
> as well as a floor. By adding an additional criterion,
> the Ninth Circuit's construction of § 7(a)(2) raises
> that floor and alters § 402(b)'s statutory command.

*Id*. at 2532-33 (emphasis in original).

*Home Builders* approved a joint NMFS/FWS regulation that provided: "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.

> Pursuant to this regulation, § 7(a)(2) would not be
> read as impliedly repealing nondiscretionary statutory
> mandates, even when they might result in some agency
> action. Rather, the ESA's requirements would come into
> play only when an action results from the exercise of
> agency discretion. This interpretation harmonizes the
> statutes by giving effect to the ESA's no-jeopardy
> mandate whenever an agency has discretion to do so, but
> not when the agency is forbidden from considering such
> extrastatutory factors.
>
> ***
>
> We conclude that this interpretation is reasonable in
> light of the statute's text and the overall statutory
> scheme, and that it is therefore entitled to deference
> under *Chevron*. Section 7(a)(2) requires that an agency
> "insure" that the actions it authorizes, funds, or
> carries out are not likely to jeopardize listed species
> or their habitats. To "insure" something-as the court
> below recognized-means "'[t]o make certain, to secure,
> to guarantee (some thing, event, etc.).'" 420 F.3d, at
> 963 (quoting 7 Oxford English Dictionary 1059 (2d
> ed.1989)). The regulation's focus on "discretionary"
> actions accords with the commonsense conclusion that,
> when an agency is *required* to do something by statute,
> it simply lacks the power to "insure" that such action
> will not jeopardize endangered species.

*Id*. at 2533-35 (emphasis in original).

*Home Builders* reasoned that "[a]gency discretion presumes that an agency can exercise 'judgment' in connection with a particular action," *id*. at 2535, and that while the EPA might

exercise "some judgment" in determining whether to approve a transfer application under CWA § 402(b), "the statute clearly does not grant it the discretion to add another entirely separate prerequisite to [the listed criteria,]" *id.* at 2537.[12]

_____

[12]    In discussing why its reasoning was supported by its decision in *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), *Home Builders* mentioned *California v. United States*, 438 U.S. 645 (1978). *Public Citizen* concerned safety regulations promulgated by the Federal Motor Carrier Safety Administration ("FMCSA") that had the effect of triggering a Presidential directive allowing Mexican trucks to ply their trade on United States roads:

> [In *Public Citizen*,] [t]he Court held that the National Environmental Policy Act (NEPA) did not require the agency to assess the environmental effects of allowing the trucks entry because "the legally relevant cause of the entry of the Mexican trucks is *not* FMCSA's action, but instead the actions of the President in lifting the moratorium and those of Congress in granting the President this authority while simultaneously limiting FMCSA's discretion." *Id.*, at 769, 124 S.Ct. 2204 (emphasis in original). The Court concluded that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Id.*, at 770, 124 S.Ct. 2204.

> We do not suggest that *Public Citizen* controls the outcome here; § 7(a)(2), unlike NEPA, imposes a substantive (and not just a procedural) statutory requirement, and these cases involve agency action more directly related to environmental concerns than the FMCSA's truck safety regulations. But the basic principle announced in Public Citizen-that an agency cannot be considered the legal "cause" of an action that it has no statutory discretion *not* to take-supports the reasonableness of the FWS's interpretation of § 7(a)(2) as reaching only discretionary agency actions. *See also California v. United States*, 438 U.S. 645, 668, n. 21 (1978) (holding

Where a statute articulates broad goals or leaves sufficient room for an agency to maneuver, the consultation requirements apply. A recent example is *Home Builders'* application to the operation of Federal Columbia River Power System ("FCRPS") dams and related facilities *in NWF II*, 524 F.3d at 928. *NWF II* held the federal statutes authorizing operation of the FCRPS merely set forth "broad goals" for the agency to follow when operating the System, leaving the agency "considerable" discretion to balance its mandates with the requirements of the ESA. *Id*. at 928-929. Similarly, *Natural Resources Defense Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998), a pre-*Home Builders* case, examined a statute that directed Reclamation to give contracting districts "a first right...to a stated share or quantity of the project's available water supply...." (quoting 43 U.S.C. § 485h-1(4)). Although Congress directed Reclamation to give the CVP Friant Unit water service contractors the first right to water, the statute qualified that obligation by indicating that only "available" water must be provided, leaving it to Reclamation to determine whether water needed for ESA purposes

---

that a statutory requirement that federal operating agencies conform to state water usage rules applied only to the extent that it was not "inconsistent with other congressional directives").

*Id*. at 2535 (italics in original, underlining added). By this reference, the Supreme Court suggests there are parallels between Section 8 of the Reclamation Act, 43 U.S.C. §§ 372, 383, and the ESA, insofar as neither statute overrides "other congressional directives." *Home Builders* does not directly address whether and to what extent the ESA takes priority over the state laws made applicable to the Bureau as a result of Section 8 of the Reclamation Act.

was "[un]available" for delivery. *Id*. at 1126.

In contrast, where a prior agreement or enforceable permit or license fails to retain for the federal agency the right to take action on behalf of a now-listed species, consultation requirements may not apply. In *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995), another pre-*Home Builders* case, a federal agency entered into a reciprocal right-of-way agreement with a landowner prior to passage of the ESA. Under the agreement, the agency only reserved the right to object to projects built in the right-of-way in limited circumstances. *Id*. at 1505-06. Because the agency did not retain discretion to "implement measures that inure to the benefit of ... protected species," it was not required to reinitiate consultation when the spotted owl was listed. *Id*. at 1509.[13] An analogous result was reached in *Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073, 1079-82 (9th Cir. 2001)("*EPIC*"), where the Fish and Wildlife Service ("FWS") was not required to reinitiate consultation when two species found on affected land were listed as threatened <u>after</u> FWS issued an incidental take permit to the landowner. Although FWS retained some discretion over activities pursuant to the take permit, it did not "retain discretionary control to make new requirements to protect species that subsequently might be listed as endangered or threatened." *Id*.

---

[13]    *Sierra Club* cited the water service contracts at issue in *O'Neill v. United States*, 50 F.3d 677, 680-81 (9th Cir. 1995), as examples of contractual agreements to which the procedural requirements of section 7(a)(2) <u>do</u> apply because under those contracts the United States must determine each year the quantity of water to supply. 65 F.3d at 1508.

at 1081.

An unambiguous limitation on agency discretion in the context of contract renewal exists under the Federal Power Act ("FPA"), which authorizes the Federal Energy Regulatory Commission ("FERC") to issue long term licenses to operators of hydro-electric projects for periods not to exceed fifty years. 16 U.S.C. §§ 797, 799.  When any such licenses come up for renewal, the applicant must begin a lengthy and complex relicensing process.  18 C.F.R. § 16.6.  If FERC does not issue a new license before the expiration of the existing license, FERC is <u>required</u> to issue annual licenses "to the then licensee <u>under the terms and conditions of the original license</u> until ... a new license is issued," 16 U.S.C. § 808(a)(1)(emphasis added), a clear example of mandatory, albeit temporary, renewal on terms and conditions of an original license.

*Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 876 F.2d 109 (D.C. Cir. 1989) ("*Platte I*"), and a subsequent decision in the same case, 962 F.2d 27 (D.C. Cir. 1992)("*Platte II*"), concerned the issuance of annual FERC licences to two licensees.  An environmental organization sued, arguing that FERC had an obligation to consider inserting conditions in the annual licenses that would benefit the Whooping Crane.  *Id*. at 110-11.  The D.C. Circuit upheld FERC's interpretation of the FPA as empowering FERC "to amend an annual license, for example by adding conditions for the protection of fish and wildlife, only if the existing license contains such reservation of authority or the licensee agrees to such additional conditions."  *Id*.  One of the disputed licenses

included such a reservation of authority; the other did not.  *Id.*
at 112.  Despite the reservation of authority in one of the
licenses, FERC refused to consider inserting conditions for the
protection fo the Whooping Crane into underline either license.  *See id*. at
114.  FERC abused its discretion by "refusing even to explore the
need for protective conditions."  *Platte II*, 962 F.2d at 30
(citing *Platte I*, 876 F.2d at 119).  The D.C. Circuit "suggested
that [FERC] could seek [the] cooperation [of the licensee whose
original license did not contain a reservation of rights] in
implementing any conditions deemed necessary," but agreed that
FERC only possessed authority to impose conditions unilaterally
on the licensee whose original license contained a reservation of
the authority to do so.  *Id*.  *But see Turtle Island Restoration
Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 977 (9th
Cir. 2003)(where wildlife agency issues permits under a statute
designed to promote compliance with international conservation
treaties, the agency retains "substantial discretion to condition
permits to inure to the benefit of listed species").

An agency's discretion may also be constrained by
previously-concluded management decisions subject to the
consultation process.  In a recent (post-*Home Builders*),
unpublished decision, an Arizona district court examined water
releases for power generation on the Colorado River.  *Grand
Canyon Trust v. United States Bureau of Reclamation*, 2008 U.S.
Dist. LEXIS 83853 (D. Ariz. Sept. 26, 2008).  An environmental
organization claimed that Reclamation's practice of allowing non-
seasonal fluctuating releases of water into the Colorado River to
generate electricity jeopardized the continued existence and

35

habitat of an endangered fish.  After close examination of the system's operational history, the district court concluded that the release practices had been approved by a series of decisions in 1996 and 1997, which followed full, lawful consultation processes.  The plaintiff's contention that Reclamation should be required to complete consultation every year when it prepares its Annual Operating Plan ("AOP") for a number of reservoirs on the Colorado was rejected.  The court held the agency's action was "legally foreordained" by the 1996 and 1997 decisions, and that Reclamation lacked discretion to modify the regime to benefit the species.  *Id.* at *47 (citing *Defenders of Wildlife v. United States EPA*, 420 F.3d 946, 967 (9th Cir. 2005)); *but see Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) (where an agency's management planning document specifically provides that every "plan, permit, contract, or any other document pertaining to the use of the [resource]" must be consistent with the management plan, the management plan constitutes "continuing agency action" because the agency retains discretion to constantly control forest management projects).

*Defenders of Wildlife v. Norton*, 257 F. Supp. 2d 53, 57 (D.D.C. 2003), concerned Reclamation's management of the lower Colorado River and the agency's decision that it was not required to pursue formal consultation as to the impacts of Colorado River operations on a species that resided in the Colorado River Delta, located across the border in Mexico.  The environmental plaintiffs argued that the consultation requirement should apply because Reclamation retained "some discretionary ability" to "handle river regulation, improvement of navigation, and flood

control" in a manner that could result in indirect releases of excess water to Mexico. *Id*. at 68. The court held that any such discretion was significantly constrained as to how much water would be released to Mexico, because "a Supreme Court injunction, an international treaty, federal statutes, and contracts between the government and water users ... account for every acre foot of lower Colorado River water." *Id*. at 69. Because the agency's discretion was constrained in this manner, the court held that Section 7 did not "extend[] to operations affecting ... species ... downstream from river flows over which Reclamation has no discretionary control." *Id*. at 62.

To trigger *Home Builders*' application, an agency's discretion must be substantially constrained by a federal statutory command, international treaty, or prior contract, permit, or management decision. The cases demand a careful examination of the authority claimed to constrain the agency's discretion.

Here, the SRS Contractors and the Federal Defendants argue that the Bureau's discretion to withhold deliveries for species protection under the SRS Contracts and/or to negotiate new terms for renewed contracts is substantially constrained: (1) because the original SRS Contracts themselves, executed in the mid-1960s, require the SRS Contracts be renewed on the same or substantially similar terms; and/or (2) by D-990, made applicable to the Bureau by Section 8 of the Reclamation Act of 1902.

//

//

//

37

## 2. Do the SRS Contracts Significantly Constrain the Bureau's Discretion to Modify Deliveries Under the SRS Contracts?

Under certain circumstances, a prior agreement, permit, or management decision that predates the listing of a species may constrain a federal agency's ability to take action on behalf of that listed species, absolving the agency from the requirement of consultation. *See Sierra Club*, 65 F.3d at 1509 (federal agency's reciprocal right-of-way agreement with a landowner that predated passage of the ESA and only reserved the right to object to projects built in the right-of-way in limited circumstances did not retain for the agency discretion to "implement measures that inure to the benefit of ... protected species"); *see also EPIC*, 255 F.3d at 1081 (agency not required to reinitiate consultation when two species found on affected land were listed as threatened <u>after</u> FWS issued an incidental take permit to the landowner because permit did not "retain discretionary control to make new requirements to protect species that subsequently might be listed as endangered or threatened"); *Defenders of Wildlife*, 257 F. Supp. 2d at 62, 69 (Reclamation's discretion to affect operations downstream of the Mexican border to benefit species significantly constrained by "a Supreme Court injunction, an international treaty, federal statutes, and <u>contracts between the government and water users</u> that account for every acre foot of lower Colorado River water")(emphasis added); *Grand Canyon Trust*, 2008 U.S. Dist. LEXIS 83853 at *47 (series of management decisions in 1996 and 1997, which followed full, lawful consultation processes, "legally foreordained" Reclamation's discretion to modify the regime to benefit the species on an annual basis).

38

Here, the original SRS Contracts, executed before the passage of the ESA and the listing of the Delta smelt, constitute binding, renewable forty year contracts for the diversion, allocation, and place of use of water. This case does not challenge the right of the Bureau to take action on behalf of the now-listed species during the term of those original contracts, all of which have expired. Rather, Plaintiffs' allege: (1) that the Bureau's ongoing performance under the renewed contracts violates its duty to protect the species against jeopardy and adverse critical habitat modification; and (2) that the Bureau violated the ESA by executing renewal contracts without performing adequate consultation under ESA § 7(a)(2). Doc. 575 at ¶85; Doc. 761 at 33. With respect to the first allegation, the November 19, 2008 Decision concluded that "[t]he present motions do not adequately address whether the Bureau's ongoing performance under the SRS Contracts currently violates the substantive requirements of section 7, which require the Bureau to guard against jeopardy and/or adverse critical habitat modification. As there is no motion before the court for summary adjudication on this claim, no ruling is required." Doc. 761 at 92. Nevertheless, the parties focus on a number of SRS Contract provisions that arguably address whether the Bureau retains discretion to modify deliveries under the existing contracts.

### a.  Article 3(g)(3).

Article 3(g)(3) of the original SRS Contracts provides:

> The United States does not guarantee the quality of water to be diverted by the Contractor and assumes no responsibility for and neither it nor its officers,

39

> agents, or employees shall have any liability for or on account of ... [a]ny damage whether direct or indirect arising out of or in any manner caused by a shortage of water whether such shortage be on account of errors in operation, drought, or unavoidable causes.

*E.g.* SC 04459-60 (original ACID Settlement Contract). Similarly, Article 3(h)(4) of the renewal SRS Contracts provides:

> The United States assumes no responsibility for and neither it nor its officers, agents, or employees shall have any liability for or on account of ... [a]ny damage whether direct or indirect arising out of or in any manner caused by a shortage of water whether such shortage be on account of errors in operation, drought, or unavoidable causes.

*E.g.* SAR 002707 (GCID renewal Settlement Contract).

In *O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995), the Ninth Circuit interpreted a nearly identical shortage provision in a 1963 long-term water service contract between the Bureau and Westlands Water District, which released the Bureau from liability for damages "arising from a shortage on account of errors in operation, drought, or any other causes." *Id.* at 682 n.2. The Ninth Circuit concluded that the "contract's liability limitation is unambiguous" and that "an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.'" *Id.* at 684. This absolved Interior from any liability in connection with a failure to deliver water to the contractors in any given water year.

GCID argues that, in the context of the SRS Contracts, this language simply absolves Reclamation of <u>liability</u> if water is unavailable due to hydrological conditions or legal or regulatory mandates. Doc. 773 at 24. GCID maintains that nothing in the SRS Contracts affords Reclamation discretion to reduce the amount of water that can be diverted by the SRS Contractors. *Id.*

Although the *O'Neill* contracts use the arguably narrower "unavoidable causes" language, rather than the "any other causes" language in the SRS Contracts, the more critical distinction involves the express reservation of discretion to reduce deliveries in the *O'Neill* contracts:

> In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit in accordance with conclusive determinations of the Contracting Officer ....

*O'Neill*, 50 F.3d at 683 n.2. No such supply reduction language is present in the SRS Contracts. In this regard, the SRS Contracts are distinguishable from the *O'Neill* contracts as the SRS Contracts do not grant the Bureau the right to apportion differently in shortage years, except as specifically mandated by the Shasta Critical Year Shortage Provision.

b. <u>The Shasta Critical Year Shortage Provision.</u>

The November 19, 2008 Memorandum Decision addressed the contention that the Shasta Year Shortage Provision arguably exemplified a mechanism by which the Bureau exercises discretion over the quantity of water diverted by the SRS Contractors. Doc. 761 at 70. Article 5 of the original SRS Contracts provides:

<u>CRITICAL YEAR REDUCTION</u>

> 5. In a critical year the Contractor's base supply and Project water during the period April through October of the year in which the principal portion of the critical year occurs and each monthly quantity of said period shall be reduced by twenty-five percent (25%).

SC 04461 (original ACID Settlement Contract). "Critical year" is

41

precisely defined in Article 1(h) as:

> any year in which either of the following eventualities exists:
>
>> (1)   The forecasted full natural inflow to Shasta Lake for the current water year, as such forecast is made by the United States on or before February 15 and reviewed as frequently thereafter as conditions and information warrant, is equal to or less than three million two hundred thousand (3,200,000) acre-feet; or
>>
>> (2)   The total accumulated actual deficiencies below four million (4,000,000) acre-feet in the immediately prior water year or series of successive prior water years each of which had inflows of less than four million (4,000,000) acre-feet, together with the forecasted deficiency for the current water year, exceed eight hundred thousand (800,000) acre-feet.
>
> For the purpose of determining a critical year the computed inflow to Shasta Lake under present upstream development above Shasta Lake shall be used as the full natural inflow to Shasta Lake.  In the event that major construction completed above Shasta Lake after September 1, 1963, materially alters the present regimen of the stream systems contributing to Shasta Lake, the computed inflow to Shasta Lake used to define a critical year will be adjusted to eliminate the effect of such material alterations.  After consultation with the State, the Weather Bureau, and other recognized forecasting agencies, the Contracting Officer will select the forecast to be used and will make the details of it available to the Contractor. The same forecasts used by the United States for the operation of the Project shall be used to make the forecasts hereunder.

SC 04453-54 (original ACID Settlement Contract).  The relevant language in the renewal contracts is not changed in any material sense.  *Compare* SC 04461 *with* SAR 002708.[14]

---

[14]   GCID's renewal contract provides at Article 5(a):

In a Critical Year, the Contractor's Base Supply and Project Water agreed to be diverted during the period April through October of the Year in which the principal portion of the Critical Year occurs and, each monthly quantity of said

42

Contrary to the November 19, 2008 Memorandum Decision's preliminary finding, the SRS Contractors correctly point out that the Shortage Provision affords the Bureau no "discretion" whatsoever.  When a set of natural conditions that are defined as a "Critical Year" are present, Article 5 provides that the contractor's base supply and project water "shall" be reduced by 25 percent.  The Bureau has no discretion to decline to make that reduction, to adjust the amount of the reduction, or to determine when the reduction must take place.  The mandatory Shasta Critical Year Provision does not, by its terms, provide the Bureau discretion to modify deliveries under the existing contracts.

Plaintiffs identify no other language reserving to the Bureau the right to reduce SRS Contractors' contractual diversions.  The SRS Contracts represent a settlement of a dispute over the contracting parties' respective water rights and Article 9(a) expresses that it is the mutual intent of the parties not to disturb the quantities of water allocated thereunder, so long as the Contractor fulfills all of its obligations under the contract:

> During the term of this contract and any renewal thereof it shall constitute full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between base supply and Project water which may be diverted by the Contractor from the Sacramento River for beneficial use on the land shown on Exhibit B which said diversion, use, and allocation shall not be disturbed so long as the Contractor shall fulfill all of its

_____

period shall be reduced by 25 percent.

SAR 002708.

43

> obligations hereunder, and the Contractor shall not claim any right against the United States in conflict with the provisions hereof.

SC 04465 (emphasis added). Given the express language of Article 9(a), and the absence of any language reserving for the Bureau the right to alter the quantities of water that may be diverted by the SRS Contractors pursuant to their contracts, the Bureau lacks discretion to reduce diversions under the existing contracts for the benefit of listed species. Under *Home Builders*, section 7(a)(2) does not apply to the Bureau's implementation of the SRS contracts. These are historically protected, vested Senior Water rights that take priority over the United States' SRS water rights and the water allocation operations of the CVP.

The remaining dispute centers on what binding effect the expired contracts and Water Rights decisions have on the Bureau's ability to renegotiate the contracts to reduce or impair contractual or Board-authorized water rights held by the SRS Contractors for the benefit of the smelt. If the Bureau retains significant discretion in negotiating renewals, section 7(a)(2) consultation requirements may apply to the contract renewal process.

> 3. <u>Do the Original SRS Contracts Significantly Constrain the Bureau's Discretion to Negotiate Upon Renewal for New or Modified Terms for the Benefit of the Smelt?</u>

Federal Defendants assert that a distinction exists between the Bureau's discretion to reduce diversions under the original SRS Contracts and its discretion to modify the contract terms

44

during the renewal process.  The Bureau argues that it retains "broad" discretion to negotiate the terms of the SRS Contracts.[15] Doc. 827-2, at 10.  The SRS Contractors maintain that the original Article 9(a) requires the Bureau to execute renewal contracts for the quantity of water specified in the original contracts.

### a.    Basic Principles of Federal Contract Interpretation.

When interpreting a contract entered into pursuant to federal law and to which the United States is a party, interpretation is controlled by federal common law.  *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).  For guidance, courts look to general principles concerning the interpretation of contracts.  *Id.*

> A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. Whenever possible, the plain language of the contract should be considered first.

*Id.* (internal citations omitted).  Courts must, if possible, interpret contracts "so as to avoid internal conflict."  *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 566 (9th Cir.

---

[15]    Despite arguing that the Bureau retains considerable discretion during the renewal process, Doc. 827-2 at 10-12, Federal Defendants assert that *Home Builders* bars application of ESA § 7 to the renewal process because, under D-990, "Reclamation lacks the discretion to use water being put to 'reasonable and beneficial use' by the SRS Contractors for the benefit of the Delta smelt," *id.* at 2.

1988). "The interpretation of a contract is a mixed question of law and fact." *Tyler v. Cuomo*, 236 F.3d 1124, 1134 (9th Cir. 2000)(internal citation and quotation omitted).

A contract's language is ambiguous if "reasonable people could find its terms susceptible to more than one interpretation." *Id.* "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *Id.* "[T]he determination whether contract language is ambiguous is a question of law." *Tyler*, 236 F.3d at 1134 (internal citation and quotation omitted).

"Under the parol evidence rule, a court looks to, and enforces, the plain language of a contract and does not look to extrinsic evidence to interpret the terms of an unambiguous written instrument." *United States v. Nunez*, 223 F.3d 956, 958 (9th Cir. 2000) (internal citation and quotation omitted). However, the Uniform Commercial Code ("U.C.C.") is another source of federal common law to aid contract interpretation where the federal government is a party, permitting the use of extrinsic evidence "in a manner that substantially narrows the traditional application of the parole evidence rule." *O'Neill*, 50 F.3d at 684. For example, pursuant to U.C.C. § 2-202(a), evidence of prior dealings, usage, and performance is also relevant in determining whether the contract is ambiguous. *See* U.C.C. § 2-202(a). Only if a contractual term is ambiguous, may extrinsic evidence (other than evidence of prior dealings, usage, and performance) be utilized to interpret the parties' intent in light of "earlier negotiations, later conduct, related agreements, and industry-wide custom." *Pace v. Honolulu Disposal*

46

*Serv., Inc.*, 227 F.3d 1150, 1158 (9th Cir. 2000).

> ### b. Application to Relevant SRS Contract Language.
>
> #### (1) Article 9.

Article 9(a) provides in pertinent part:

> During the term of this contract <u>and any renewal thereof</u> it shall constitute <u>full agreement</u> as between the United States and the Contractor <u>as to the quantities of water</u> and the allocation thereof between base supply and Project water which may be diverted by the Contractor from the Sacramento River for beneficial use on the land shown on Exhibit B <u>which said diversion, use, and allocation shall not be disturbed so long as the Contractor shall fulfill all of its obligations hereunder</u>, and the Contractor shall not claim any right against the United States in conflict with the provisions hereof.

SC 04465 (emphasis added). Each contract sets forth a schedule of monthly diversions in Exhibit A and the place of use on lands identified in Exhibit B. For each month in which diversions are authorized, the volume is divided into Base Supply and Project Water Supply. *See, e.g.*, SC 04486.[16]

On its face, there is at least one reasonable way to interpret Article 9(a): as a declaration that the original contracts and any "renewal[s] thereof" must be for the same quantity of water "and allocation thereof between base supply and Project water" set forth in the original contracts.

Articles 9(b) and (c) provide the only exception to Article 9(a). Article 9(b) introduces a condition subsequent that the contract quantities may change if any party or others undertake a

---

[16] Some Contractors are allocated no Project Water. *See* Van Camp. Decl., Ex. D-23 (Sacramento River Ranch) & Ex. D-27 (Windswept Land & Livestock Company).

general stream adjudication.  In that event, the existing contractual water rights continue until the Contractor elects to either accept the adjudication and amend the contract accordingly, or terminate the contract:

> Nothing herein contained is intended to or does limit rights of the Contractor against others than the United States or of the United States against any person other than the Contractor:  _Provided_, _however_, That in the event the Contractor, the United States, or any other person shall become a party to a general adjudication of rights to the use of water of the Sacramento River system, this contract shall not jeopardize the rights or position of either party hereto or of any other person and the rights of all such persons in respect to the use of such water shall be determined in such proceedings the same as if this contract had not been entered into, and if final judgment in any such general adjudication shall determine that the rights of the parties hereto are different from the rights as assumed herein, the Contracting Officer shall submit to the Contractor an amendment to give effect to such judgment and the contract shall be deemed to have been amended accordingly unless within sixty (60) days after submission of such amendment to the Contractor the Contractor elects to terminate the contract or within the same period of time the parties agree upon mutually satisfactory amendments to give effect to such judgment.

SC 04465-66.  Article 9(c) explains that, if the contract terminates because the parties are unable to agree upon amendments to give affect to the judgment resulting from a general stream adjudication, the parties shall no longer be bound by the contract quantites and return to the pre-contract conditions:

> In the event this contract terminates, the rights of the parties to thereafter divert and use water shall exist as if this contract had not been entered into; and the fact that as a compromise settlement of a controversy as to the respective rights of the parties to divert and use water and the yield of such rights during the term hereof, this contract places a limit on the total supply to be diverted annually by the Contractor during the contract term and segregates it into base supply and Project water, shall not

48

jeopardize the rights or position of either party with respect to its water rights or the yield thereof at all times after the contract terminates. It is further agreed that the Contractor at all times will first use water to the use of which it is entitled by virtue of its own water rights, and neither the provisions of this contract, action taken thereunder, nor payments made thereunder to the United States by the Contractor shall be construed as an admission that any part of the water used by the Contractor during the term of this contract was in fact water to which it would not have been entitled under water rights owned by it nor shall receipt of payments thereunder by the United States from the Contractor be construed as an admission that any part of the water used by the Contractor during the term of this contract was in fact water to which it would have been entitled under water rights owned by it.

SC 04466-67. Articles 9(a) and 9(b) describe a "condition subsequent" or an "event that terminates a duty,"[17] whereby the entire contractual relationship may be terminated if a general stream adjudication occurs and the parties fail to amend the contract consistent with such a judgment.

//

---

[17] The Restatement (Second) of Contracts prefers the label "event that terminates a duty" over "condition subsequent," as such an occurrence is "subject to the rules on discharge," covered by Restatement (Second) § 230, and not the rules on conditions covered by § 224. *See* § 224, comment e. Section 230 provides:

> (1) Except as stated in Subsection (2), if under the terms of the contract the occurrence of an event is to terminate an obligor's duty of immediate performance or one to pay damages for breach, that duty is discharged if the event occurs.
>
> (2) The obligor's duty is not discharged if occurrence of the event (a) is the result of a breach by the obligor of his duty of good faith and fair dealing, or (b) could not have been prevented because of impracticability and continuance of the duty does not subject the obligor to a materially increased burden.

49

(2)    <u>Article 2.</u>

Federal Defendants and Plaintiffs argue that the SRS Contractors' interpretation of Article 9(a) cannot be reconciled with Article 2, which provides:

<u>TERM OF CONTRACT</u>

> For purposes of payment this contract shall be effective as of April 1, 1964, and remain in effect until and including March 31, 2004:  <u>Provided</u>, That *under terms and conditions agreeable to the parties hereto, renewals may be made for successive periods not to exceed forty (40) years each.*  The terms and conditions of each renewal shall be agreed upon not later than one (1) year prior to the expiration of the then existing contract:  <u>Provided further</u>, That upon written request by the Contractor of the Secretary made not later than one (1) year prior to the expiration of this contract, whenever, account being taken of the amount then credited to the costs of construction of water supply works, the remaining amount of construction costs of water supply works which is properly assignable for ultimate return by the Contractor as established by the Secretary of the interior pursuant to (3) of Section 1 of Public Law 643 (70 Stat. 483), probably can be repaid to the United States within the term of a contract under subsection (d), Section 9 of the 1939 Reclamation Project Act (53 Stat. 1187), this contract may be converted to a contract under said subsection (d) upon terms and conditions agreeable to the United States and the Contractor.  Notwithstanding any provisions of this contract, the Contractor reserves and shall have all rights and benefits under Public Law 643.

SC 04455 (underlining in original, italics provided).  This provision calls generally for renewal contracts to be executed "under terms and conditions agreeable to the parties."  Given that this provision begins with the phrase "[f]or purposes of payment"; largely discusses costs of construction and repayment; and does not mention contract quantity, it arguably has no bearing on the reasonableness of the SRS Contractors' interpretation of Article 9.  Yet, the heading "TERM OF CONTRACT" suggests general applicability to the entire contract, rather

50

than just issues of payment.

Plaintiffs and Federal Defendants argue that Article 2's general provision that "under terms and conditions agreeable to the parties ... renewals may be made for successive periods not to exceed forty (40) years each," allows for renewals may be made on "any" terms and conditions the Bureau is able to negotiate. However, this general language is followed by the more specific requirement of Article 9(a) that any renewals contain the same terms with respect to water quantity, allocation between Base Supply and Project Water, and place of use as provided in the original SRS Contracts.

It is a generally accepted principle of contract interpretation that "specific terms and exact terms are given greater weight than general language." Rest. (Second) of Contracts § 203 (1981); *see also Info. Sciences Corp. v. United States*, 80 Fed. Cl. 759, 792 (2008)(citing *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (1992)("Where specific and general terms in a contract are in conflict, those which relate to a particular matter control over the more general language.")).[18] To the extent Article 2 and Article 9(a) are in conflict, Article 9(a) controls with respect to water quantity upon renewal.

---

[18] In California, "under well established principles of contract interpretation, when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision." *Prouty v. Gores Tech. Group*, 121 Cal. App. 4th 1225, 1235 (2004); *see also* Cal. Civ. Code § 3534 ("particular expressions [in a contract] qualify those which are general").

### (3) **Alternative interpretations of Article 9(a).**

Plaintiffs and Federal Defendants suggest that Article 9(a) may alternatively be read as a partial integration clause, by arguing that, at least as to the quantity of water, the contract constitutes the "full agreement" between the parties. Under this interpretation, the quantity portion of the agreement is not to be interpreted in light of any "claims in conflict with the provisions" of the contract. *See Ayala Rios v. Rios Hernandez*, 189 F.R.D. 38, 41 (D. P.R. 1999)("When an agreement states that it constitutes the full agreement between the parties, there is little room for considering outside evidence.").

However, this interpretation effectively reads the "and any renewals" out of Article 9(a). There would be no need for the original contracts to explicitly apply <u>an integration clause</u> to any subsequent renewal contract, when the subsequent contract could include an integration clause to evidence the parties' mutual agreement that the renewed contract is integrated.

The interpretation advanced by the SRS Contractors gives meaning to the phrase "any renewal thereof." There is no reason to mention renewal unless the language is intended to prescribe the volume of water to be provided under a renewal contract. "An interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, <u>or of no effect</u>." Restatement (Second) of Contracts § 203 (1981)(emphasis added); *see also Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1288 (Fed. Cir. 2008) (contract interpretation should avoid any

meaning that "renders some part of the contract inoperative"); *United States v. Franco-Lopez*, 312 F.2d 984, 991 (9th Cir. 2002) (applying Restatement (Second) of Contracts § 203 to construe plea agreement to give some effect to all promises).

The meaning of Article 9(a) is clear, not ambiguous. It requires any renewals of the SRS Contracts to be for the same quantity of water, the same allocation between Base Supply and Project Water, and the same place of use as set forth in the original contracts.

### c.  The Unmistakability Doctrine.

Plaintiffs argue that the original SRS Contracts do not include an unmistakable surrender of sovereign power and are therefore subject to subsequent legislation by the sovereign. Doc. 820-2 *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986), *O'Neill*, 50 F.3d at 686, and *Peterson v. United States Deptartment of the Interior*, 899 F.2d 799 (9th Cir. 1990), cited by Plaintiffs, apply the so-called "unmistakability doctrine," which provides the government with a defense against contract claims where existing terms of a contract to which the United States is a party conflict with subsequently enacted federal legislation. *See DBSI/TRI IV Ltd. P'ship, v. United States*, 465 F.3d 1031, 1040 (9th Cir. 2006). The doctrine allows the United States to enter into contracts that "bind future Congresses, but only if those contracts contain an unmistakable promise." *Kimberly Assoc. v. United States*, 261 F.3d 864, 869 (9th Cir. 2001).

The Supreme Court's *United States v. Winstar Corp.*, 518 U.S.

53

839 (1996), decision has engendered continuing debate over application of the unmistakability doctrine. *See generally Westlands Water Dist. v. United States*, 134 F. Supp. 2d 1111, 1145-54 (E.D. Cal. 2001). The unmistakability doctrine does not apply when the government is acting as a private contracting party, *Kimberly*, 261 F.3d at 869 (citing *Winstar*, 518 U.S at 895), or where the legislative act targets particular contract rights, *e.g., Westlands*, 134 F. Supp. 2d at 1145-54 (where legislation particularly targets water users with contrary contract rights, the legislation is not a "sovereign act" for purposes of the unmistakability doctrine).

> [The] unmistakability doctrine analysis requires examination of two questions: (1) in what capacity was the United States acting when it breached its contractual obligations[] and (2) if the United States acted in its sovereign capacity, did the contract waive sovereign rights in unmistakable terms?

*Kimberly*, 261 F.3d at 869.

It appears established that ESA constitutes a sovereign act for purposes of the unmistakability doctrine. *See Klamath Irrig'n Dist. v. United States*, 75 Fed. Cl. 677, 685 (2007)(post-*Winstar* decision); *Madera Irrigation District v. Hancock*, 985 F.2d 1397 (9th Cir. 1993)("*MID*")(pre-*Winstar* decision).

Plaintiffs argue that Article 9(a) contains no unmistakable surrender of sovereign authority and therefore cannot reasonably be interpreted as the SRS Contractors suggest, because such an interpretation would preclude the application and effect of subsequent legislation (the ESA). This is an offensive application of the unmistakability doctrine, which normally operates as a defense to a breach of contract action brought

54

against the United States, *Far West Fed. Bank, S.B. v. Office of Thrift Supervision-Director*, 119 F.3d 1358, 1365 n.3 (9th Cir. 1997).[19]  The interpretation sought is to apply the ESA to over-write the SRS Contracts' agreed quantity, allocation of contract water, and place of use on renewal.  There is authority to support the use of the unmistakability doctrine as an interpretive tool.  *Winstar*, 518 U.S. at 879, explains "that a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), <u>nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power</u>."  However, Article 9(a) is not ambiguous.  It explicitly precludes the government from renewing SRS contracts to provide different volume terms.  Article 9(a) of the original contracts has contractually binding effect and unmistakably binds future Congresses on this subject matter, subject to the condition subsequent of stream adjudication.  Cal. Civ. Code § 1438 ("A condition subsequent is one referring to a future event, upon the happening of which the obligation [to perform] becomes no longer binding upon the other party...."); 13 Williston on Contracts (4th ed. 2008) § 38.9 (same).

---

[19]     The unmistakability doctrine "provides that contracts limiting the government's future exercise of regulatory authority must be expressed in unmistakable terms," while the sovereign acts doctrine, "provides that government as contractor cannot be held liable for the acts of government as regulator."  *Far West Fed. Bank, S.B. v. Office of Thrift Supervision-Director*, 119 F.3d 1358 (9th Cir. 1997).  The caselaw does not clearly delineate the relationship between these two doctrines.  *Id.*

This case is distinguishable from *MID*, 985 F.2d 1397, which applied the unmistakability doctrine to a dispute over water contract renewals. MID sued for declaratory and injunctive relief to prevent the United States from changing the terms of its original forty year water contract when that contract came up for renewal. Previous contracts, executed in 1939 and 1951, recited that MID sold land and San Joaquin water rights to the United States in exchange for a "permanent" annual supply of 270,000 acre-feet of water. *Id*. at 1399, 1401.[20] During the 1951 contract renewal, the United States sought to add new contract terms, including a term making the contract subject to modification by the United States arising from ESA consultation. *Id*. at 1405. This ESA term reserved MID's right to "challenge the legality and validity of any such modifications made to the contract..." *Id*.

The Ninth Circuit rejected the United States' argument that MID had no renewal right under the 1951 contract, an

_____

[20] According to MID's Petition for a Writ of Certiorari, 1993 WL 13076836, *16 (Apr. 28, 1993), the 1951 Contract provided:

"... the District and the United States on May 24, 1939 executed a contract ... under the terms of which the District ... became entitled to purchase from Friant Dam and reservoir ... a permanent supplemental supply of Class I and Class 2 water..."

"... the United States recognizes that the District in contracting to transfer and surrender its properties and rights hereinabove referred to relied upon its right to purchase a permanent supplemental supply of water from Friant Dam and Reservoir and the agreement that the United States would construct the facilities described..."

interpretation that would have left the government "free to offer renewal on any terms." *Id*. at 1401. This proposition could not be reconciled with the terms of the 1939 and 1951 contracts providing for (a) a "permanent" supply of water, and (b) renewal at the expiration of the 40-year term of that contract. *Id*. at 1401.

However, the court held the United States <u>could</u> include in the renewal contract a term permitting modifications arising from ESA consultation, because that provision was qualified by language permitting MID to challenge the legality and validity of any such modifications. In analyzing the unmistakability doctrine, the Court examined the renewal provision, which provided:

> The executory portions of the [original] contract ... remain and shall remain in full force and effect, and the parties, upon the expiration of [the original contract] shall be entitled to all of the rights conferred upon them by article 14 of the [original contract] and shall be subject to all of the terms and conditions of said article.

*Id*. at 1401-02. Section 14 of the original contract provided for future purchases of water:

> Whenever the United States shall be prepared to furnish service for irrigation or other purposes from Friant reservoir ..., the United States shall notify the District in writing relative to the availability and character of such service, and shall define the classes and quantities of service then and thereafter to be made available and the respective prices and methods of payment therefor. The District shall have six (6) months from the date of receipt of said notice within which to contract for the purchase of water on the basis of the classes and quantities of service so offered to the District; <u>provided</u>, that, having due regard for the District's procedure required or expedient in negotiating for and securing approval of such contract, the Secretary may grant such extensions of time as he deems desirable. It is mutually understood between the parties hereto that it is not

57

> possible at this time to fix a price to be paid by the District for said water, but the United States agrees that the cost of said water to the District shall not exceed charges made to others than the District for the same class of water and service from the said Friant Dam and Reservoir.

*Id.* (emphasis in original).

The Ninth Circuit found that this renewal provision "does not say that all the terms in a renewal contract must be identical to the expired contract," *id.* at 1406, and further found:

> Whether the environmental terms added into the renewal threaten the proprietary rights preserved in Madera's contract, a permanent right to a certain amount of water at rates no higher than those charged to other purchasers of the same class of water and service from Friant Dam and Reservoir, depends on how the environmental provisions are implemented. The government has not "'surrendered in unmistakable terms'" its power to impose any environmental laws on the contractual relationship, so the required clause is not necessarily violative of Madera's contractual rights. *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)).

*Id.* at 1406 (parallel citations omitted). *MID* did not reach the question of what "conditions" would be permissible, as the issue was not before the court. *Id.*

Here, in contrast, the original contracts <u>do</u> state in specific, unmistakable terms that the defined volume of Sacramento River water dedicated to the SRS Contractors' beneficial use in the original contracts must be preserved in identical amounts upon renewal. *MID* is distinguishable.

This conclusion is not altered by the fact that the preamble to each SRS Contract indicates that it was executed "in pursuance generally of the act of June 17, 1902 (32 Stat. 388), and acts

58

amendatory or supplementary thereto...."  SC 04450.  One of those "amendatory or supplementary" acts is the CVPIA, which, in § 3406(b), requires the Bureau to immediately operate the CVP to meet all obligations under state and federal law, including the ESA.[21]  However, the general "acts amendatory or supplementary thereto" language is subordinate to the specific language of Article 9(a).

### d.   Scope of Article 9(a).

The original SRS Contracts completely surrender the United States' power to change the quantities and place of use of water dedicated for beneficial use in the original SRS Contracts.  This does not resolve the issue whether and to what extent the Bureau retains discretion to add non-conflicting conditions that protect species of concern under the ESA.  Plaintiffs suggest that, even if contract quantities cannot be altered, the Bureau still retains discretion to seek modifications to provisions related to the timing of diversions and/or times of shortage.  The November 19, 2008 Memorandum Decision recognizes the Bureau considered alternatives to the Shasta Critical Year Shortage provision in

---

[21]   *See also Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109, 1140-42 (10th Cir. 2003)(Seymour, J., concurring), *vacated on other grounds by* 355 F.3d 1215 (2004)(rejecting dissent's argument that the unmistakability doctrine does not apply to certain water delivery contracts because the government has no discretion under the contracts themselves to change contract terms, reasoning that this "stands the unmistakability doctrine on its head," and explaining that contracts "written under the reclamation laws and all 'acts amendatory and supplementary thereto,' envision applying subsequent legislation in their interpretation").

the Sacramento River Settlement Contract Final Environmental Impact Statement ("SRSC FEIS"), prepared pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq.:

> Additional contract terms the Bureau considered to be "reasonable and feasible" included a proposed "payment [to the SRS Contractors] in exchange for using quantities of water below their contracted amounts," (SAR 4140), and a revised 25-year term instead of a 40-year contract term on the renewal contracts, (SAR 4140). These proposed terms could affect both the total quantity and timing of the SRS Contractors' water diversions, which in turn have the potential to affect the survival and recovery of Delta smelt. (See, e.g., SAR at 3273 ("Delivery of this water to the points of diversion for the Settlement Contractors has the potential to affect listed fish species that inhabit the Sacramento River and the Sacramento-San Joaquin River Delta by influencing instream flows and water quality conditions.").)

Doc. 761 at 65-66. That the Bureau considered these alternative contract provisions in the context of a NEPA review of the SRS Contract renewals does not necessarily demonstrate that the Bureau could exercise unilateral discretion to impose or implement any of the alternatives spelled out in the FEIS.

Article 9(a) is broadly worded:

> During the term of this contract and any renewal thereof it shall constitute full agreement as between the United States and the Contractor <u>as to the quantities of water and the allocation thereof between base supply and Project water which may be diverted by the Contractor</u> from the Sacramento River <u>for beneficial use on the land shown on Exhibit B</u> which said <u>diversion, use, and allocation shall not be disturbed so long as the Contractor shall fulfill all of its obligations hereunder</u>, and the Contractor shall not claim any right against the United States in conflict with the provisions hereof.

SC 04465 (emphasis added). Issues related to place of use of diversions are explicitly covered by Article 9(a), which addresses not only the quantities of water, but the "allocation thereof between base supply and Project water," for use on the

land shown on Exhibit B to each SRS Contract. Issues related to shortage also come within Article 9(a)'s reach. The Shasta Critical Year Shortage Provision, which is triggered by hydrologic conditions, is part of the overall agreement with respect to the quantity of water that may be delivered. Notwithstanding the hypothetical alternative contract terms suggested in the SRSC FEIS, the Bureau has no discretion to unilaterally modify terms of the contracts with respect to timing of diversions or cutbacks in times of shortage.

Neither Plaintiffs nor Federal Defendants point to other types of contract modifications that arguably could enure to the benefit of the smelt but which would fall outside the coverage of Article 9(a).

### e. Conclusion Regarding Article 9(a).

The unambiguous language of Article 9(a) requires SRS Contract renewals to be for the same volume of water, allocation between Base Supply and Project Water, and place of use on specifically designated land as the original contracts. This substantially limits the Bureau's discretion to modify the renewal contracts in ways that would benefit the smelt.

### f. Anderson Cottonwood Irrigation District & Sutter Mutual Water Company Renewal Contracts Water Reductions.

Plaintiffs and Federal Defendants point out that contract volumes were in fact reduced on contract renewal for two SRS Contractors: Anderson Cottonwood Irrigation District ("ACID") and Sutter Mutual Water Company ("SMWC"). The parties vigorously

61

debate whether the reductions were the result of "mutual agreement," the Bureau's own water needs assessments, or a combination of the two. Regardless, because Article 9(a) is not ambiguous, this is irrelevant extrinsic evidence. The contracts in no way prevent mutual agreement by parties to the contracts from waiving or modifying an existing contract term for their mutual benefit, and subject to the requirement that contract water be beneficially used.

Because the contractual language of 9(a) is not reasonably susceptible to multiple interpretations, the parol evidence rule bars admission of extrinsic evidence. Pursuant to U.C.C. § 2-202(a), evidence of prior dealings, usage, and performance may provide support for a finding of ambiguity. However, a course of performance requires a "sequence of conduct" between the parties to a particular transaction if the agreement "involves repeated occasions for performance by a party." U.C.C. § 1-303(a)(1). A "course of dealing" is similarly defined as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." U.C.C. § 1-303(b). The original SRS Contracts have only been renewed once. No evidence of any course of performance on repeated occasions was submitted. Evidence from the renewal process, including the reduced volumes in the renewed ACID and SMWC contracts, does not constitute a "course of dealing" or "course of performance."

A "usage of trade" is "any practice or method of dealing having such regularity of observance in a place, vocation, or

trade as to justify an expectation that it will be observed with respect to the transaction in question." U.C.C. § 1-303(c). No argument has been made that any relevant "usage of trade" evidence exists.

> g.  **Impact of the CVPIA and D-1641 on SRS Contract Renewal.**

CVPIA § 3404(c) provides:

> Renewal of Existing Long-Term Contracts -- Notwithstanding the provisions of the Act of July 2, 1956 (70 Stat. 483), the Secretary shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of twenty-five years and may renew such contracts for successive periods of up to 25 years each.

The SRS Contractors argue that because this provision commands the Bureau to renew all existing long-term water service contracts, the Bureau must do so on the same terms as provided in the original contracts. On its face, § 3404(c) does not address the terms upon which long-term water service contracts must be renewed. The CVPIA contains no language directing, nor does it otherwise mandate that SRS Contracts be renewed on the same terms as the original contracts. This obligation arises from the SRS Contracts themselves, not the CVPIA.

CVPIA § 3404(c)(2) does specifically direct the Bureau to modify the terms of renewal contracts to incorporate "all requirements imposed by existing law":

> Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the Central Valley Project, the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts.

Similarly, D-1641 included the following conditions concerning endangered species in its amendment to the United States permit to operate the CVP:

> This permit does not authorize any act which results in the taking of a threatened or endangered species or any act which is now prohibited, or becomes prohibited in the future, under either the California Endangered Species Act (Fish and Game Code sections 2050 to 2097) or the Federal Endangered Species Act (16 U.S.C.A sections 1531 to 1544). If a "take" will result from any act authorized under this water right, the permittee/licensee shall obtain authorization for an incidental take prior to construction or operation of the project. Permittee/Licensee shall be responsible for meeting all requirements of the applicable Endangered Species Act for the project authorized under this permit/license.

D-1641 at 148.

Arguably, CVPIA § 3404(c)(2) is a subsequent statutory command to apply the ESA to the renewed SRS Contracts. However, the original SRS Contracts, at Article 9(a), contain unmistakable language precluding the sovereign from modifying terms related to the volume, allocation, and place of use of diversions by the SRS Contractors on renewal.

### 4. Effect of Reclamation Act Section 8 on the Bureau's Discretion.

Alternatively, the SRS Contractors and Federal Defendants maintain that the Bureau's discretion to modify the renewal contracts for the benefit of the Delta smelt is constrained by D-990, made applicable to the Bureau by Section 8 of the Reclamation Act of 1902 ("Section 8"). Section 8 provides:

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with <u>the laws of any State</u> or Territory <u>relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder,</u>

64

and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

43 U.S.C. § 383 (emphasis added). Section 8 commands Reclamation to obey state law when securing the water rights necessary to operate federal Reclamation Projects. *See California v. United States*, 438 U.S. 645, 674-75 (1978).[22] A state may impose conditions upon the United States' appropriation of water, so long as the condition "actually imposed" is not inconsistent with other Congressional directives. *See id*. at 679; *United States v. SWRCB*, 694 F.2d 1171 (9th Cir. 1982).[23]

The Ninth Circuit on remand from the Supreme Court in *California v. United States*, 438 U.S. 645, considered whether an SWRCB-imposed condition upon the operation of New Melones Dam, prohibiting appropriation of water for power generation, was void as contrary to Congressional intent. *United States v. SWRCB*, 694 F.2d 1171 (9th Cir. 1982). The decision rejected California's

[22] The SRS Contracts were first executed before the Supreme Court decided *United States v. California*. At that time, Reclamation advanced a narrow interpretation of Section 8 that did not permit California to place conditions on water rights held by the United States, even to protect senior, state water rights-holders and area-of-origin users. The Water Board rejected the United States' position in D-990, but it was not until 1978 that *United States v. California* recognized Section 8 to permit California to place conditions on Reclamation's water rights.

[23] The Board, in D-1641, also acknowledges that the Bureau's duty to comply with state law only extends insofar as there is no federal preemption. D-1641 at 125.

65

argument that "only explicit federal statutory policies, such as those the [Supreme] Court found decisive in *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275 (1958)(160 acre limitation), and *City of Fresno v. California*, 372 U.S. 627 (1963)(preference for irrigation use over municipal use), are sufficient to preempt the operation of inconsistent state law," and concluded:

> We agree with the district court that California's broad contentions must be rejected. We do not think that section 8 of the 1902 Reclamation Act was intended to require any later Congress to tolerate state laws whose operation would otherwise be curtailed by the Supremacy Clause, nor to require any particular form of clear statement by a later Congress before inconsistent state laws were overridden. *See* Sax, *Problems of Federalism in Reclamation Law*, 37 U.Colo.L.Rev. 49, 66-68 (1964). Section 8 requires only that state law will apply unless the contrary is intended by Congress; as we stated in *United States v. Tulare Lake Canal Co.*, 677 F.2d 713, 717 (9th Cir. 1982), the Supreme Court decision in *California v. United States* requires "that the United States follow state water law absent a pre-empting federal statute." The question before us, therefore, is whether state law, otherwise applicable by virtue of section 8, is displaced by subsequent congressional action. The analysis undertaken by the district court, consistent with settled preemption principles, was therefore appropriate.

*Id* at 1176 (footnote and parallel citations omitted).[24]

_____

[24]     Federal Defendants' suggest that the key question is whether the ESA and the Reclamation Act can be reconciled, and assert that reconciliation can be accomplished simply by not applying the ESA to "senior" water rights.  The law is clear on that question; the ESA is not a super-statute that automatically trumps other federal laws.  *See e.g., Home Builders*, 127 S. Ct. 2518.  However, *United States v. SWRCB*, 694 F.2d 1171, holds that, in applying state laws made applicable to federal agencies by virtue of section 8 of the Reclamation Act, the question is not whether the ESA trumps section 8.  Rather, does the ESA preempt the state laws that purportedly apply to the federal agency action by operation of Section 8?  The ESA has been found to preempt conflicting state laws in other contexts*, see Strahan v. Coxe*, 127 F.3d 155, 168 (1st Cir. 1997); *Nat'l Audubon Soc.,*

66

The Ninth Circuit looked to then-prevailing preemption doctrines to guide its evaluation of whether state law was displaced by a specific provision of the Flood Control Act of 1962 pertaining to the sale and delivery of power from the New Melones dam and powerplant:

> A state statute or regulation is preempted by a federal rule "to the extent it conflicts with a federal statute," *Maryland v. Louisiana*, 451 U.S. 725, 747 (1981), or where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Perez v. Campbell*, 402 U.S. 637, 649 (1971), quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981).

> In the case before us, therefore, a state limitation or condition on the federal management or control of a federally financed water project is valid unless it clashes with express or clearly implied congressional intent or works at cross-purposes with an important federal interest served by the congressional scheme. Similar formulations were found appropriate by the Supreme Court of California in *Environmental Defense Fund, Inc. v. East Bay Municipal Utility District*, 20 Cal.3d 327, 338 (1978), and by Professor Sax in his article, *Problems of Federalism in Reclamation Law*, 37 U.Colo.L.Rev. 49, 68 (1964).

*Id.* at 1176-77 (parallel citations omitted).[25]

_____

*Inc. v. Davis*, 307 F.3d 835, 307 F.3d 835, 852-53 (9th Cir. 2002); *Swan View Coal., Inc., v. Turner*, 824 F.Supp. 923, 938 (D. Mont. 1992); *United States v. Glenn Colusa Irr. Dist.*, 788 F. Supp. 1126, 1134 (E.D. Cal. 1992). Whether the ESA preempts state laws made applicable to the Bureau by section 8 of the Reclamation Act has never been addressed.

[25] The preemption standard has evolved since *United States v. SWRCB* was decided:

Congress has the constitutional power to preempt state law, Art. VI, cl. 2; [citation], and may do so either expressly-through clear statutory language-or implicitly. Defendants acknowledge that Congress has not expressly preempted any of Whistler's claims, but argue that Section

The Ninth Circuit cautions against deciding a case on preemption grounds where other resolutions might be possible.

> We are mindful, in deciding whether later federal law overrides inconsistent state law, that we may not seek out conflicts between state and federal regulation where none clearly exists. *Joseph E. Seagram & Sons v. Hostetter*, 384 U.S. 35, 45 (1966). The Supreme Court noted in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978), that "when a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the states were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* at 157, quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). This admonition is particularly applicable in the reclamation context. In this very litigation, the Supreme Court has detailed the long history of "purposeful and continued deference to state water law by Congress." 438 U.S. at 648-70, 653. "If the term 'cooperative federalism' had been in vogue in 1902, the Reclamation Act of that year would surely have qualified as a leading example of it." *Id.* at 650.

*Id.* at 1176 (parallel citations omitted).

Here, the SRS Contractors argue that the Bureau's discretion

---

> 17A of the Securities Act implicitly preempts the claims.
>
> There are two types of implied preemption: field preemption and conflict preemption. Under field preemption, preemption is implied when Congress "so thoroughly occupies a legislative field," that it effectively leaves no room for states to regulate conduct in that field. [citation] Under conflict preemption, Congress's intent to preempt state law is implied to the extent that federal law actually conflicts with any state law. [citation] Conflict preemption analysis examines the federal statute as a whole to determine whether a party's compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives. [citation]

*Whistler Investments, Inc. v. Depository Trust and Clearing Corp.*, 539 F.3d 1159, 1164 (9th Cir. 2008).

68

is constrained by D-990, made applicable to the Bureau by Section 8's express language.

>                    a.    **Relevant Background Principles of California**
>                          **Water Law.**
>
>                          (1)   **California's Dual System of Water**
>                                **Rights.**

By express provision of Section 8, the Bureau's appropriation of water occurs under California's "dual or hybrid system of water rights[,] which recognizes both doctrines of riparian rights and appropriation rights...." *United States v. SWRCB*, 182 Cal. App. 3d 82, 101 (1986)(internal quotations omitted).

> The riparian doctrine confers upon the owner of land
> the right to divert the water flowing by his land for
> use upon his land, without regard to the extent of such
> use or priority in time.... The appropriation doctrine
> confers upon one who actually diverts and uses water
> the right to do so provided that the water is used for
> reasonable and beneficial uses and is surplus to that
> used by riparians or earlier appropriators.
> Appropriators need not own land contiguous to the
> watercourse, but appropriation rights are subordinate
> to riparian rights so that in times of shortage
> riparians are entitled to fulfill their needs before
> appropriators are entitled to any use of the water.
> And, as between appropriators, the rule of priority is
> "first in time, first in right." The senior
> appropriator is entitled to fulfill his needs before a
> junior appropriator is entitled to use any water.

*Id*. at 101-102.  "[W]ater right priority has long been the central principle in California water law." *City of Barstow v. Mojave Water Agency*, 23 Cal. 4th 1224, 1243 (2000).

> [T]he rule of priority applies only to the use of
> natural or abandoned flows in a watercourse. No
> riparian or appropriator has a right to use water that
> was previously stored or imported by another upstream
> and then released into the watercourse for use
> downstream. (*See* §§ 1201 ["All water flowing in any
> natural channel, excepting so far as it has been or is

being applied to useful and beneficial purposes upon,
or in so far as it is or may be reasonably needed for
useful and beneficial purposes upon lands riparian
thereto, or otherwise appropriated, is hereby declared
to be public water of the State and subject to
appropriation in accordance with the provisions of this
code"], 7075 ["Water which has been appropriated may be
turned into the channel of another stream, mingled with
its water, and then reclaimed"]....)

Furthermore, it is important to understand that
priority of right is significant only when the natural
or abandoned flows in a watercourse are insufficient to
supply all demands being made on the watercourse at a
particular time. Obviously, when flows are of
sufficient abundance that every water user can fulfill
his or her needs, the rule of priority does not matter.

As for the determination of an appropriator's priority
over other appropriators, for appropriations since 1914
an appropriator's priority is generally fixed by the
date of his or her application to appropriate the
water. (See § 1450; Hutchins, *The California Law of
Water Rights, supra,* at pp. 94-95, 97, 116.) Section
10500 specifically confirms this application-date
priority with respect to applications filed by the
state under the Feigenbaum Act. (§ 10500 ["Applications
filed pursuant to this part shall have priority, as of
the date of filing, over any application made and filed
subsequent thereto"].)

*El Dorado*, 142 Cal. App. 4th at 961-962.


(2)    Area of Origin Protections.

The Bureau's appropriation of water in California for the

CVP is also subject to statutory provisions designed to protect

water users in the so-called "areas of origin" (i.e., those

wetter areas of California from which the Projects export water).

CWC § 11460 provides:

In the construction and operation by the department of
any project under the provisions of this part a
watershed or area wherein water originates, or an area
immediately adjacent thereto which can conveniently be
supplied with water therefrom, shall not be deprived by
the department directly or indirectly of the prior
right to all of the water reasonably required to
adequately supply the beneficial needs of the

70

watershed, area, or any of the inhabitants or property owners therein.

CWC § 11128 provides that § 11460 applies to the Bureau in its operation of the CVP, as well as to DWR in its operation of the SWP.

### (3) Reasonable & Beneficial Use/Prohibition of Unreasonable Use.

In California, "Superimposed on those basic principles defining water rights is [an] overriding constitutional limitation that the water be used as reasonably required for the beneficial use to be served." *United States v. SWRCB*, 182 Cal. App. 3d 105 (citing Cal. Const., art. X, § 2[26]). The "'rule of

---

[26] The amendment provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be

71

reasonable use' is now the cardinal principle of California's water law." *Id.* (citing CWC § 100).

> The courts have construed this rule as a valid exercise of the police power of the state to regulate the use and enjoyment of water rights for the public benefit .... Thus, no water rights are inviolable; all water rights are subject to governmental regulation.

*Id.* at 106 (citations omitted).

The Reclamation Act incorporates the concept of reasonable and beneficial use:

> The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.

43 U.S.C. § 372 (emphasis added). The beneficial use inquiry is "intended to be governed by state law" doctrines concerning beneficial use. *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 854 (9th Cir. 1983). Moreover, if state law dictates an outcome in a water rights dispute that is contrary to the outcome suggested by a beneficial use inquiry, the beneficial use approach prevails, as the beneficial use requirement in the Reclamation Act constitutes a "'specific congressional directive' which acts as a 'restraint upon [the Bureau].'" *Id.* at 855; *see also United States v. Clifford Matley Family Trust*, 354 F.3d 1154 (9th Cir. 2004).

The Ninth Circuit defines "beneficial use" as the "general rule that water is beneficially used (in an accepted use such as irrigation) when it is usefully employed by the appropriator,"

---

self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

*Alpine*, 697 F.2d at 854, subject to two qualifications:

(1) "[T]he use cannot include any element of 'waste' which, among other things, precludes unreasonable transmission loss and use of cost-ineffective methods," *id.*;

(2) "[T]he use cannot be 'unreasonable' considering alternative uses of the water," *id.*

The Board was required to make a finding  beneficial use of SRS Contract water in the designated areas of use.  Moreover, the Bureau made beneficial use findings in connection with execution of the renewal contracts.  Plaintiffs do not challenge these beneficial use findings.

### (4)   Public Trust Doctrine.

"Another important principle that may compete with the rule of priority is the public trust doctrine."  *El Dorado*, 142 Cal. App. 4th at 966.

> That doctrine recognizes that "the sovereign owns 'all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people."'" *(National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434.) Ecological values are among those values protected by the public trust. (*Id.* at p. 435.) "The state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*Id.* at p. 446.) Indeed, this duty "prevents any party from acquiring a vested right to appropriate water in a manner harmful to the interests protected by the public trust." (*Id.* at p. 445.) Thus, like the rule against unreasonable use, when the public trust doctrine clashes with the rule of priority, the rule of priority must yield. Again, however, every effort must be made to preserve water right priorities to the extent those priorities do not lead to violation of the public trust doctrine.

*Id.*  The *National Audubon* court recognized that "[t]he courts and

the Water Board have concurrent jurisdiction" in public trust cases. *Id.* Whether diversion of water by the SRS Contractors pursuant to the SRS Contracts violates the public trust is not before the court for adjudication in these cross-motions.

Neither the SRS Contractors nor the Federal Defendants argue that any of these general principles of California water law constrain the Bureau's discretion in the abstract. Rather, it is argued that any such constraint on the Bureau arises as a result of the application of these principles through D-990.

               b.    <u>D-990.</u>

When the United States applied for water permits to operate the CVP, the process necessarily required a determination of whether there was unappropriated water in the applicable watershed. CWC § 1375 ("As prerequisite to the issuance of a permit to appropriate water ... [t]here must be unappropriated water available to supply the applicant...."). After more than 75 days of hearings over the course of more than a year, the Board issued a conditional water permit to the United States, as documented in D-990, which analyzed applicable considerations of California's dual water rights system, the rules of priority, the area of origin protections, and the concept of reasonable and beneficial use.

The SRS Contractors and the Federal Defendants maintain that D-990 constrains the Bureau's discretion in a number of ways.

c. **D-990's Reliance on the 1956 Study & Its Progeny Does Not Demonstrate the Exact Nature and Extent of the SRS Contractors' Underlying Water Rights.**

D-990 relied upon the 1956 Cooperative Studies, C-2BR, and C-650 ("the Studies") as bases for the finding that unappropriated water remained available to support a permit for the Bureau's proposed use. *See, e.g.*, D-990 at 28-32. The SRS Contractors assert that the underlying water rights relied upon in the Studies "demonstrate the nature and extent" of their water rights; and because, at least according to Van Camp's analysis, the total volume of their underlying water rights relied upon in the applicable historical studies exceeds the total volume of water contracted for in the SRS Contracts, the Bureau possesses no discretion under *Home Builders* to diminish the volume of deliveries to the SRS Contractors without their prior consent.

There is no doubt that <u>some</u> volume of water rights possessed by the SRS Contractors in the Sacramento River system are vested and senior to the United States' water rights. The SRS Contractors argue that the water rights identified in the Studies reflect the true nature and extent of their senior rights, and the Board relied upon those water rights in D-990. This is only partially true.

The "Report on 1956 Cooperative Study Program" reiterated that the studies were intended to "produce information that would be used to further negotiations aimed at reaching an agreement on water rights along the Sacramento River and in the Delta." SC 00065. It acknowledged that the assumptions utilized in the studies were "solely for the purpose of evaluating the effects of

[those] assumptions upon water right yields, deficiencies, and supplemental water requirements, and <u>no implications as to the legal status of such assumed rights are intended.</u>"  SC 00066 (emphasis added).  The supplemental studies (C-2BR and C-650) were intended to support an "<u>equitable basis</u> for determining the yields of existing rights along the Sacramento River and in the Delta." D-990 at 31.

D-990 accepted that the Studies' assumptions, "particularly with respect to water rights, may differ considerably from the rights as may be determined by a court of law." *Id*.  D-990 recognizes the uncertain nature of using the Studies to approximate the volume of unappropriated water remaining for the Bureau's proposed uses.  Neither the Studies nor D-990 purport to finally and exactly delineate and quantify legally binding, vested senior water rights of the SRS Contractors.  Rather, they facilitated informed consensual agreements among the SRS Contractors and the Bureau that specifically defined forty year water service entitlements, renewable as to the same quantities, allocations, and places of use, to achieve the requisite certainty absolutely essential to the long term operations of the CVP.

> In fixing the rates of direct diversion to be allowed, the Board is inclined to greater liberality than usual because of the magnitude of the Project and the complexities involved in determining at this time the direct diversion as distinguished from rediversions of stored water.  However, notwithstanding these considerations, we would require greater particularity in proof of direct diversion requirements were we not assured that no prejudice to others will result from failure of [the] applicant to produce such proof.  This assurance is provided by conditions which will be imposed in the permits subjecting exports of water from the Delta to use within the Sacramento River Basin and

Delta so that there can be no interference with future development of these areas.

*Id.* at 40.  In encouraging settlement between the parties, the Board acknowledged that the pre-existing rights had never been quantified:

> Throughout these proceedings, the Bureau's representatives have consistently affirmed their policy to recognize and protect all water rights on the Sacramento River and the Delta existing under State law at the times these applications were filed, including riparian, appropriative and others.  <u>Unfortunately, these rights have never been comprehensively defined</u>. It is imperative, therefore, that the holders of existing rights and the United States <u>reach agreement concerning those rights and the supplemental water required to provide the holders with a firm and adequate water supply</u>, if a lengthy and extremely costly adjudication of the waters of the Sacramento River and its tributaries is to be avoided.

*Id.* at 75 (emphasis added).[27]

The United States has consistently disputed the nature and extent of the SRS Contractors' underlying water rights.  This is reflected in Article 9(b) of the SRS Contracts, which expressly reserves the right of all parties to advance their respective positions concerning the extent of their water rights in any general Sacramento River adjudication:

> (b)    Nothing herein contained is intended to or does limit rights of the Contractor against others than the United States or of the United States against any person other than the Contractor:  <u>Provided</u>, <u>however</u>, *That in the event the Contractor, the United States, or any other person shall become a party to a general adjudication of rights to the use of water of the Sacramento River system, this contract shall not*

---

[27]    The Board disclaims authority to directly adjudicate or otherwise resolve disputes over the validity, nature, or SWRCB, Information Pertaining to Water Rights in California - 1990 at p.8, *see supra* note 5.  Accordingly, D-990 cannot be read as definitively establishing the nature, extent, or quantity of any of the pre-1914 water rights held by the SRS Contractors.

> *jeopardize the rights or position of either party*
> *hereto or of any other person and the rights of all*
> *such persons in respect to the use of such water shall*
> *be determined in such proceedings the same as if this*
> *contract had not been entered into....*

SC 04465-66 (original ACID Contract)(underlining in original, italics added).  This means that upon the occurrence of the condition subsequent, the mutual obligations under those contracts are no longer binding.  13 Williston on Contracts, § 38:9.

Congress also urged the Bureau to reach an agreement with the SRS Contractors to avoid "[a] monstrous lawsuit ... that would embroil the [CVP] in litigation for decades," *see* Engle, CVP Documents, Part I, S. Res. 1, 84th Cong. (2d Sess.), H.R. Res. 416 at 675-783 (1956), but noted that, should the matter be taken to court, the Department of Justice "would undoubtedly represent the interest of the Federal Government and assert every possible claim to the water...."  *Id*. at 681.

The record indicates that the Studies were intended to facilitate a settlement to firmly quantify the SRS Contractors' and Bureau's contractual water rights that would become the basis for the issuance of water right permits to the Bureau and for the long-term water service contracts and renewals that utilized those firm quantities (subject to a mandatory 25% reduction in drought conditions).  The Board explicitly disclaimed that the SRS Contractors' rights have never been "comprehensively defined."  The United States has never conceded and consistently reserved the right to challenge the SRS Contractors' representations as to the nature and extent of their "senior" rights, except as set forth in the long term SRS Contracts and

their renewals.  The essence of the settlement was to define

contract quantities so that there could be certainty in

allocation of water entitlements in the Sacramento River System.

That settlement, except for performance under the contracts, does

not permanently, legally define the nature and extent of the SRS

Contractors' senior water rights.[28]

### d.   The Effect of Condition 23.[29]

Whether and to what extent Condition 23 in D-990 constrains

Reclamation's discretion presents a more difficult question.

Condition 23 provides:

> The export of stored water under permits issued
> pursuant to Applications 5626, 9363 and 9364 outside
> the watershed of Sacramento River Basin or beyond the
> Sacramento-San Joaquin Delta shall be subject to the
> reasonable beneficial use of said stored water within
> said watershed and Delta, both present and prospective,
> provided, however, that agreements for the use of said

---

[28]   Plaintiffs argue in the alternative that the water
rights records relied upon in the Studies and D-990 do not
accurately quantify the SRS Contractors water rights.
Specifically, Plaintiffs assert that D-990's ultimate conclusion
that 6.5 million acre feet of water per year ("MAFY") is
available to the United States as unappropriated water is
inconsistent with the fact that the SRS Contractors claim water
rights that exceed the entire natural flow of the Sacramento
River.  Doc. 820-2 at 7, n. 6.  The SRS Contractors responded
during oral argument that Plaintiffs' calculations fail to
consider the re-use by SRS Contractors and the Bureau of return
flows.

[29]   It appears undisputed that the other conditions
subordinate the United States' water rights to other uses that
are not relevant here.  Condition 20 concerns diversions above
Shasta Dam, D-990 at 84; Condition 21 covers water appropriations
by counties, id. at at 84-85; and Condition 22 governs the
retention of water permitting authority by the SWRCB, id. at 73,
85.

> stored water are entered into with the United States
> prior to March 1, 1964, by parties currently diverting
> water from Sacramento River and/or Sacramento-San
> Joaquin Delta and prior to March 1, 1971, by parties
> not currently using water from Sacramento River and/or
> Sacramento-San Joaquin Delta.

D-990 at 85-86.[30]

In general, this provision conditions the United States'
export of water outside the watershed on the reasonable and
beneficial use of water within the watershed and Delta.  It gives
in-basin users a period of time within which to enter into
contracts with the Bureau to attain priority water rights subject
to a Board-imposed time limit:

> [T]he public interest requires that water originating
> in the Sacramento Valley Basin be made available for
> use within the Basin and the Sacramento-San Joaquin
> Delta before it is exported to more distant areas, and
> the permits granted herein will so provide.
>
> However, the Board will limit the period of time in
> which such preference may be exercised.  This
> limitation is necessary in order to best conserve in
> the public interest the water to be appropriated.

---

[30]  Plaintiffs raise a serious question that is unaddressed
by any of the SRS Contractors' or Federal Defendants' briefs.
Condition 23, on its face, applies only to the "export" of water
"outside the watershed of the Sacramento River Basin or beyond
the Sacramento-San Joaquin Delta...."  Could acts taken by the
Bureau for benefit of the smelt ever trigger this provision,
given that the smelt's entire critical habitat lies within the
confines of the Bay-Delta Estuary?  *See* Doc. 820-2 (citing 58
Fed. Reg. 12,854 (Mar. 5, 1993).  It is difficult to understand
how actions taken by the Bureau to benefit the smelt could ever
be considered an "export" of water outside the Sacramento
watershed and Delta.  However, given that the Bureau has never
attempted to restrict diversions by the SRS Contractors, reduce
SRS Contract quantities, or otherwise seek to modify the SRS
Contract terms upon renewal, it is unclear how this language
would apply to actions not yet proposed or implemented.  As the
pending motion is resolved on alternative grounds, it is not
necessary to decide this issue.

80

*Id.* at 72-73.

RD 108 asserts that D-990 (presumably through Condition 23) was intended to insure that the United States' "honor[ed] senior water rights and the rights established under the area-of origin laws." Doc. 772 at 2. D-990 does not explicitly impose such a duty upon the Bureau. Rather, Condition 23 specifically subjects the Bureau's export of water to the "reasonable and beneficial use" of stored water as embodied by any contracts entered into prior to specific deadlines. The Board balanced the goal of protecting existing rights-holders and area of origin interests against the broader public interest in beneficial use by requiring existing rights-holders to memorialize their claimed water rights in the written Settlement Contracts. Condition 23 requires compliance with the provisions of any contract entered into by the deadlines, nothing more.[31] Although D-990 adopts the Studies as an appropriate basis for negotiating the quantity terms of the Settlement Contracts, D-990 does not prescribe the exact terms nor the quantities that should be included in any final contract.

GCID suggests, alternatively, that Condition 23 incorporates the SRS Contracts, making all of their terms binding upon the Bureau as conditions of their water right. Doc. 773 at 18.

---

[31] GCID suggests that the United States' failure to enter into the SRS Contracts or abide by existing SRS contracts would nullify the United States' water rights. *See* Doc. 773 at 14-15. Accepting this premise, *arguendo*, if the Bureau had not entered into the SRS Contracts, there would have been no water rights in the Bureau to approve. Any breach by the Bureau of the terms of the SRS Contracts would give rise to relief for breach prescribed by the contract itself under applicable federal and state law.

81

Condition 23 makes the United States' export of stored water subject to the "reasonable and beneficial use of said stored water within said watershed and Delta, both present and prospective, <u>provided, however, that agreements for the use of said stored water are entered into with the United States</u>" prior to certain deadlines. Nothing in Condition 23 or any other part of D-990 evidences an intent to condition the United States' export of stored water upon compliance with the terms of the "agreements" referenced in Condition 23. Rather, export of SRS water is conditioned on reasonable and beneficial use of stored water within the watershed and Delta. The contracts themselves constrain the federal agency's exercise of its discretion in a variety of ways.[32]

The United States contends that it has "broad" authority to negotiate the terms of the SRS contracts, but that this "does not matter" for purposes of the *Home Builders* analysis, because "Reclamation lacks the discretion to use water being put to 'reasonable beneficial use' by the SRS Contractors for the

_____

[32] GCID suggests that "it is the policy of federal courts to promote settlement before trial," citing *Exxon Valdez v. Exxon Mobile Corp.*, 490 F.3d 1066, 1079 (9th Cir. 2007), and *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1225 (9th Cir. 1989), and that this general policy "drove the decision to employ the alternative of entering into the SRS Contracts, as opposed to embarking upon litigation." Doc. 773 at 17-18. GCID further argues that "once the SRS Contracts were wisely entered into, the United States became bound to the terms of those settlements as a condition of their own water rights." *Id*. at 18. Although the United States' discretion may be bound by any agreement it enters into, any federal policy favoring settlement does not determine whether the SRS Contracts do or do not significantly constrain the Bureau's discretion.

82

benefit of the Delta smelt." Doc. 827-2 at 3. Although D-990 affirms that the reasonable and beneficial use of SRS Contract water within the Sacramento River watershed and Delta is given priority over the Bureau's export of water, D-990 requires any users that exercise such preference to enter into contracts with the United States. The United States rejoins it has the discretion to negotiate the terms of the SRS contracts upon renewal, which impliedly includes the power to use any water subject to its discretion for the benefit of Delta smelt. This position is not consistent with the United States' contentions that it had no discretion to deliver any quantity of water less than the SRS Contract amounts subject to the mandatory 25% drought reduction price. The Bureau's arguments are irreconcilably contradictory and are rejected.

e.    **D-990 Does Not Substantially Constrain the Bureau's Discretion to Negotiate Modifications to the Settlement Contracts**.

Although D-990 conditions the Bureau's water rights permit for the operation of the Shasta Division of the CVP upon satisfaction of "vested rights," D-990 does not quantify those rights in a manner that definitively precludes the Bureau from exercising discretion. Condition 23 mandates that the Bureau's export of stored water be subject to the reasonable and beneficial use within the Sacramento River and Delta so long as those uses were reduced to writing by dates certain. The parties chose to agree on contract quantities that must remain fixed on renewal unless a general stream adjudication occurs. It is the contracts, not D-990, that constrain the Bureau's discretion in

1    this case.

2

3              f.    **Preemption Analysis Unnecessary.**

4         D-990 does not constrain the Bureau's discretion to

5    negotiate modifications to the Settlement Contracts.  In light of

6    the principle that findings of preemption should be avoided

7    whenever possible, *see United States v. SWRCB*, 694 F.2d at 1176,

8    it is not necessary to engage in a preemption analysis here.[33]

9    //

10   //

11

12   _____

13        [33]    Plaintiffs' argue in the alternative that it is not
     necessary to engage in the preemption analysis because, as a
14   result of both D-990 and Federal Reclamation law, the Bureau is
     obligated to ensure that any water delivered pursuant to its
15   contracts is put to reasonable and beneficial use.  Plaintiffs
     assert that the reasonable and beneficial use standard
16   incorporates within it concepts that give the Bureau discretion
     to protect wildlife and related environmental values.  It is
17   undisputed that Federal Defendants must perform a reasonable and
     beneficial use analysis as part of the contracting process.
18   Federal Defendants take the position that the reasonable and
     beneficial use analysis the Bureau is required to undertake does
19   not extend to an evaluation of whether the contract quantities
     should be reduced to protect fisheries resources under the
20   reasonable and beneficial use and/or public trust doctrines.
     Doc. 815 at 18.  Federal defendants argue that "Reclamation, as
21   operator of the CVP, is generally not the regulator here, but is
     itself regulated by state water law."  *Id*.  There is authority to
22   support the proposition that a federal court must look to state
     law when interpreting and applying the Reclamation Act's
23   reasonable and beneficial use requirement, *see United States v.
     Alpine Land & Reservoir Co.*, 697 F.2d 851, 854 (9th Cir. 1983),
24   but neither side identifies authority that resolves whether the
     Bureau is required to do so.  As the need for a preemption
25   analysis is obviated by other findings, it is unnecessary to
     resolve this issue.
26

27

28

                              84

## IV.  CONCLUSION

More than forty-five years ago, the United States and the SRS Contractors accepted the directions of the Water Board and the United States Congress to bring certainty to, and to enable the long-term operation of, the CVP through their compromised contractual recognition of senior Sacramento River System water rights, rather than undergo a complex, years-long stream adjudication.  After a more than one-year study of the history and extent of all parties' SRS water rights, the parties settled on long-term water contracts to continue for a 40 year term and renewals thereafter, for fixed, contractually defined quantities, allocations, and places of use.  This facilitated the continued operation of the CVP.

Article 9(a) of the Contracts provides for the exact definition of water rights achieved in the original SRS Contracts to be preserved upon renewal.  This substantially constrains the Bureau's discretion to reduce diversions of Sacramento River System water for the benefit of the Delta smelt or any other reason, by fixing SRS Contractor quantities, allocations, and places of use upon renewal.  If the Bureau decides to terminate or abandon these settled water rights, its discretion will be restored at that time.  Until then, under *Home Builders*, ESA § 7(a)(2) does not apply to the SRS Contract renewal process. The SRS Contracts contain the fail-safe of a condition subsequent, permitting non-renewal of the SRS Contracts if a general stream adjudication establishes that the full nature and extent of the SRS Contractors' vested senior water rights differs from the rights defined in the Contracts.  This is not unfair,

unjust, or against the public interest, because without the SRS
Contractors' contribution of their senior water rights to the
CVP, the CVP Units served by the Sacramento River System could
not exist or effectively function.

Plaintiffs' motion for summary judgment as to the ESA
§ 7(a)(2) claims against the SRS Contracts is DENIED; the SRS
Contractors' and Federal Defendants' cross-motions as to the SRS
Contracts are GRANTED.

Federal Defendants shall submit a form of order consistent
with this memorandum decision within five (5) days of electronic
service.


SO ORDERED

Dated: April 27, 2009

                              ___/s/ Oliver W. Wanger___
                                 Oliver W. Wanger
                           United States District Judge