UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DIRK KEMPTHORNE, Secretary, U.S. Department of the Interior, *et al.*,<br><br>    Defendants. | 1:05-CV-1207 OWW SMS<br><br>CLARIFYING MEMORANDUM RE DECISIONS INTERPRETING THE TERM "PROJECT WATER," DOCS. 761 and 834. |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.*,<br><br>    Defendant-Intervenors. | |
| ANDERSON-COTTONWOOD IRRIGATION DISTRICT, *et al.*,<br><br>    Joined Parties. | |

   The parties have recently raised questions regarding the application of shortage provisions to the term "Project Water," as that term is used in the Sacramento River Settlement Contracts ("SRS Contracts"), and discussed in the November 19, 2008 Memorandum Decision Re Cross Motions For Summary Judgment Re CVP Contract Rescission ("November 19, 2008 Decision"), Doc. 761, and April 27, 2009 Supplemental Memorandum Decision Re Cross Motions for Summary Judgment Addressing Applicability of *National*

1

*Association of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2007), to Plaintiffs' Request for Rescission of the Sacramento River Settlement Contracts ("April 27, 2009 Decision"), Doc. 834.

The November 19, 2008 Decision incorrectly quoted a non-SRS Contract for the definition of "Project Water" in the SRS Contracts. *See* Doc. 761 at 45. The actual definitions of "Base Supply" and "Project Water" in the original SRS Contracts are found at Article 1:

> (d) "base supply" shall mean the quantity of water established in Articles 3 and 5 which the United States agrees may be diverted by the Contractor from Sacramento River each month during the period April through October of each year without payment to the United States for such quantities diverted.
>
> (e) "Project water" shall mean all water diverted or scheduled to be diverted each month during the period April through October of each year by the Contractor from Sacramento River which is in excess of the base supply. The United States recognizes the right of the Contractor to make arrangements for acquisition of water from projects of others than the United States for delivery through the Sacramento River and tributaries subject to agreement between the Contractor and the United States as to identification of such water which water when so identified shall not be deemed Project water under this contract.

*E.g.*, SC 04452-53 (Original Anderson-Cottonwood Irrig'n Dist. ("ACID") Settlement Contract). The definitions remained materially the same in the renewal contracts. *See, e.g.*, SAR 49, 52 (ACID Renewal Contract at Article 1(a), (m).)

The November 19, 2008 Decision also erroneously referred to as SRS Contract language, wording taken from a liability waiver contained in a non-SRS Contract. Such language has previously been interpreted as a *force majeure* shortage provision to excuse non-delivery of Project Water in the context of non-SRS

2

Contracts.[1]  *See* Doc. 761 at 45; *O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995) (interpreting shortage arising from "any cause" language).  The original SRS Contracts contain a similar liability waiver in Article 3(g):

> The United States does not guarantee the quality of water to be diverted by the Contractor and assumes no responsibility for and neither it nor its officers, agents, or employees shall have any liability for or on account of the following:
>
> ***
>
> (3) Any damage whether direct or indirect arising out of or in any manner caused by a shortage of water whether such shortage be on account of errors in operation, drought, or unavoidable causes.

SC 4459-60 (Original ACID Contract).[2]

The April 24, 2009 Decision distinguished the operation of the SRS Contracts' liability waiver from the similar language found to operate as exonerating shortage provision in *O'Neill*:

> In *O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995), the Ninth Circuit interpreted a nearly identical shortage provision in a 1963 long-term water service contract between the Bureau and Westlands Water District, which released the Bureau from liability for damages "arising from a shortage on account of errors in operation, drought, or any other causes." *Id*. at 682 n.2. The Ninth Circuit concluded that the "contract's liability limitation is unambiguous" and that "an

---

[1]  Article 3(i) in the Delta-Mendota Canal water service contracts ("DMC Contracts") provides that "if there is a shortage of Project Water because of actions taken by the Contracting Officer to meet legal obligations then ... no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom."  *E.g.*, SAR 2707.

[2]  Substantially similar language is found at Article 3(h)(4) of the renewal SRS Contracts.  *See, e.g.*, SAR 57-58.

3

unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.'" *Id*. at 684. This absolved Interior from any liability in connection with a failure to deliver water to the contractors in any given water year.

GCID argues that, in the context of the SRS Contracts, this language simply absolves Reclamation of liability if water is unavailable due to hydrological conditions or legal or regulatory mandates. Doc. 773 at 24. GCID maintains that nothing in the SRS Contracts affords Reclamation discretion to reduce the amount of water that can be diverted by the SRS Contractors. Id. Although the *O'Neill* contracts use the arguably narrower "unavoidable causes" language, rather than the "any other causes" language in the SRS Contracts, the more critical distinction involves the express reservation of discretion to reduce deliveries in the *O'Neill* contracts:

> In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit in accordance with the conclusive determinations of the Contracting Officer....

*O'Neill*, 50 F.3d at 683 n.2. <u>No such supply reduction language is present in the SRS Contracts. In this regard, the SRS Contracts are distinguishable from the O'Neill contracts as the SRS Contracts do not grant the Bureau the right to apportion differently in shortage years, except as specifically mandated by the Shasta Critical Year Shortage Provision.</u>

Doc. 834 40-41 (emphasis added).

The liability waiver language in the SRS Contracts does not operate as an independent shortage provision relative to "Project Water." To find otherwise would render meaningless the express application by the SRS Contracts of the Shasta Critical Year Shortage Provision to Project Water:

//

//

4

**CRITICAL YEAR REDUCTION**

> 5.  In a critical year the Contractor's base supply <u>and project water</u> during the period April through October of the year in which the principal portion of the critical year occurs and each monthly quantity of said period shall be reduced by twenty-five percent (25%).

SC 04461 (original ACID Settlement Contract)(emphasis added).

"Critical year" is precisely defined in Article 1(h) as:

> any year in which either of the following eventualities exists:
>
> (1)  The forecasted full natural inflow to Shasta Lake for the current water year, as such forecast is made by the United States on or before February 15 and reviewed as frequently thereafter as conditions and information warrant, is equal to or less than three million two hundred thousand (3,200,000) acre-feet; or
>
> (2)  The total accumulated actual deficiencies below four million (4,000,000) acre-feet in the immediately prior water year or series of successive prior water years each of which had inflows of less than four million (4,000,000) acre-feet, together with the forecasted deficiency for the current water year, exceed eight hundred thousand (800,000) acre-feet.
>
> For the purpose of determining a critical year the computed inflow to Shasta Lake under present upstream development above Shasta Lake shall be used as the full natural inflow to Shasta Lake.  In the event that major construction completed above Shasta Lake after September 1, 1963, materially alters the present regimen of the stream systems contributing to Shasta Lake, the computed inflow to Shasta Lake used to define a critical year will be adjusted to eliminate the effect of such material alterations.  After consultation with the State, the Weather Bureau, and other recognized forecasting agencies, the Contracting Officer will select the forecast to be used and will make the details of it available to the Contractor.  The same forecasts used by the United States for the operation of the Project shall be used to make the forecasts hereunder.

5

SC 04453-54 (original ACID Settlement Contract).[3]  The Shasta Critical Year Shortage Provision leaves the Bureau no discretion with respect to allocation of water in times of shortage.  Base Supply and Project Water "shall" be reduced by 25% if, and only if, the objective hydrologic thresholds described in Article 1(h) are triggered.  The Bureau has no discretion to reduce diversions or deliveries to the SRS Contractors, whether Base Supply or Project Water, for any other reason or in any other amount.

To the extent that any language in either the November 19, 2008 or April 24, 2009 Decisions is inconsistent with this Clarifying Memorandum, this Memorandum controls.


SO ORDERED

Dated:   June 3, 2009

                                          /s/ Oliver W. Wanger
                                            Oliver W. Wanger
                                      United States District Judge

---

[3] The relevant language in the renewal contracts is not changed in any material sense.  *Compare id.* to SAR 50-51, 58-59.