**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NATURAL RESOURCES DEFENSE COUNCIL,** *et al.*, <br><br>    Plaintiffs, <br><br>    v. <br><br> **DIRK KEMPTHORNE,** Secretary, U.S. Department of the Interior, *et al.*, <br><br>    Defendants. | 1:05-CV-1207 OWW SMS <br><br> ORDER RE MOTION FOR RECONSIDERATION RE PROJECT WATER (DOC. 854). |
| **SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,** *et al.*, <br><br>    Defendant-Intervenors. | |
| **ANDERSON-COTTONWOOD IRRIGATION DISTRICT,** *et al.*, <br><br>    Joined Parties. | |

Before the Court for decision is Federal Defendants' Motion for clarification, or in the alternative, for reconsideration of previous decisions in this case interpreting the application of certain shortage provisions in the Sacramento River Settlement Contracts ("SRS Contracts") to the term "Project Water,"[1] as that

---

[1] The original SRS Contracts define "Base Supply" and "Project Water" in Article 1:

   (d) "base supply" shall mean the quantity of water established in Articles 3 and 5 which the United States agrees may be diverted by the Contractor from [the] Sacramento River each month during the period April through October of each year without payment to the United States

1

1  term is used in the SRS Contracts.  Doc. 855, filed June 17,
2  2009.  Reclamation District No. 188, *et al.*, and Glenn-Colusa
3  Irrigation District, *et al.*, oppose clarification and/or
4  reconsideration.  Doc. 859.  The parties agreed to submit this
5  motion for decision without oral argument.
6      Federal Defendants' motion is appropriate, as the parties
7  recognize that the clarifying memorandum decision of June 3 2009,
8  Doc. 851 at 3 n.1, incorrectly quotes language from an SRS
9  Contract and attributes it to a DMC Contract, and inadvertently
10 failed to consider SRS Renewal Contract Article 3(i).  A motion
11 for reconsideration brought under Federal Rule of Civil Procedure
12 60(b)(1) permits a court to correct its own inadvertence,
13 mistakes of fact, or mistakes of law.  *Kingvision Pay-Per-View*
14 *Ltd. v. Lake Alice Bar*, 168 F.3d 347, 350 (9th Cir. 1999); *see*
15 *also San Luis & Delta-Mendota Water Auth. v. U.S. Dept. of*
16 *Interior*, --- F. Supp. 2d ---, 2009 WL 1362652, *9 (E.D. Cal.,
17 May 14, 2009).
18     The April 27, 2009 Supplemental Memorandum Decision Re Cross
19 Motions for Summary Judgment Addressing Applicability of *National*

---

for such quantities diverted.

(e) "Project water" shall mean all water diverted or scheduled to be diverted each month during the period April through October of each year by the Contractor from [the] Sacramento River which is in excess of the base supply.  The United States recognizes the right of the Contractor to make arrangements for acquisition of water from projects of others than the United States for delivery through the Sacramento River and tributaries subject to agreement between the Contractor and the United States as to identification of such water which water when so identified shall not be deemed Project water under this contract.

*E.g.*, SC 04452-53 (Original Anderson-Cottonwood Irrig'n Dist. ("ACID") Settlement Contract).  The definitions remained materially the same in the renewal contracts.  *See, e.g.*, SAR 000049, 000052 (ACID Renewal Contract at Article 1(a), (m).)

2

*Association of Home Builders v. Defenders of Wildlife,* 127 S. Ct. 2518 (2008), to Plaintiffs' Request for Rescission of the Sacramento River Settlement Contracts ("April 27, 2009 Decision"), addressed the question of whether the Original SRS Contracts significantly constrained the Bureau's discretion to modify diversions by the SRS Contractors under the Renewal Contracts. Doc. 834. Under *Home Builders* and other cases discussed in the April 27, 2009 Decision at pages 28-37, the consultation requirements set forth in ESA § 7 do not apply if the agency's discretion is "substantially constrained by a federal statutory command, international treaty, or <u>prior contract</u>, permit, or management decision." Doc. 834 at 37 (emphasis added). The April 27, 2009 Decision focused on the language of Original SRS Contract Article 9(a), which provides:

> During the term of this contract and any renewal thereof it shall constitute full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between base supply and Project water which may be diverted by the Contractor from the Sacramento River for beneficial use on the land shown on Exhibit B which said diversion, use, and allocation shall not be disturbed so long as the Contractor shall fulfill all of its obligations hereunder, and the Contractor shall not claim any right against the United States in conflict with the provisions hereof.

SC 04465. This "unambiguous language ... requires SRS Contract renewals to be for the same volume of water, allocation between Base Supply and Project Water, and place of use on specifically designated land as the [O]riginal Contracts." Doc. 843 at 61. By this language, the Original SRS Contracts did "substantially limit[] the Bureau's discretion to modify the renewal contracts

3

in ways that would benefit the smelt," rendering section 7 consultation unnecessary for the renewal process under *Home Builders*. *Id*.

The April 27, 2009 Decision rejected Federal Defendants' and Defendant-Intervenors' arguments that certain shortage provisions included in the Original and/or Renewal SRS Contracts evidenced that the United States retained discretion to modify diversions by the SRS Contractors. The Original SRS Contracts contain a liability waiver in Article 3(g)(3):

> The United States does not guarantee the quality of water to be diverted by the Contractor and assumes no responsibility for and neither it nor its officers, agents, or employees shall have any liability for or on account of the following:
>
> ***
>
> (3) Any damage whether direct or indirect arising out of or in any manner caused by a shortage of water whether such shortage be on account of errors in operation, drought, or unavoidable causes.

SC 4459-60 (Original ACID Contract). Substantially similar language is found at Article 3(h)(4) of the renewal SRS Contracts. *See, e.g.*, SAR 000057-000058.

The April 24, 2009 Decision distinguished the operation of this liability waiver from the similar language found to operate as a *force majeure* shortage provision in *O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995)*:*

> In *O'Neill* [], the Ninth Circuit interpreted a nearly identical shortage provision in a 1963 long-term water service contract between the Bureau and Westlands Water District, which released the Bureau from liability for damages "arising from a shortage on account of errors in operation, drought, or any other causes." *Id*. at 682

4

> n.2. The Ninth Circuit concluded that the "contract's liability limitation is unambiguous" and that "an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.'" *Id*. at 684. This absolved Interior from any liability in connection with a failure to deliver water to the contractors in any given water year.
>
> GCID argues that, in the context of the SRS Contracts, this language simply absolves Reclamation of liability if water is unavailable due to hydrological conditions or legal or regulatory mandates. Doc. 773 at 24. GCID maintains that nothing in the SRS Contracts affords Reclamation discretion to reduce the amount of water that can be diverted by the SRS Contractors. Id. Although the *O'Neill* contracts use the arguably narrower "unavoidable causes" language, rather than the "any other causes" language in the SRS Contracts, the more critical distinction involves the express reservation of discretion to reduce deliveries in the *O'Neill* contracts:
>
>> In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit in accordance with the conclusive determinations of the Contracting Officer....
>
> *O'Neill*, 50 F.3d at 683 n.2. No such supply reduction language is present in the SRS Contracts. In this regard, the SRS Contracts are distinguishable from the O'Neill contracts as the SRS Contracts do not grant the Bureau the right to apportion differently in shortage years, except as specifically mandated by the Shasta Critical Year Shortage Provision.

Doc. 834 40-41. Because the language in Original Article 3(g)(3) and Renewal Article 3(h)(4) lacked language specifically reserving to the United States the right to affirmatively reduce diversions by the SRS Contractors for any, as opposed to unavoidable, causes, neither Original Article 3(g)(3) nor Renewal Article 3(h)(4) introduce a degree of discretion into the contracts sufficient to overcome the clear command in Article

5

9(a) that the SRS Contracts be renewed for the same quantity of water and "allocation thereof between base supply and Project water" negotiated in the Original SRS Contracts.

However, this ruling did not consider all of the relevant contract language.  The Renewal SRS Contracts, at Article 3(i), also include the following, entirely new, shortage provision, applicable to "Project Water":

> In addition to the provisions of subdivision (h) of Article 3 of this Contract, if there is a shortage of Project Water because of actions taken by the Contracting Officer to meet legal obligations then, except as provided in subdivision (a) of Article 30 of this Contract, no liability shall accrue against the United States or any of its officers, agents or employees for any damage, direct or indirect, arising therefrom.

*See, e.g.*, SAR 000058 (ACID Renewal Contract).  Unlike Original Article 3(g)(3) and Renewal Article 3(h)(4), Renewal Article 3(i) specifically gives the Contracting Officer the right to take affirmative action to reduce Project Water "to meet legal obligations."  This absolving language is only distinguished from that found in the *O'Neill*[2] and DMC Contracts[3] by its limitation to

---

[2]  Article 11 of the *O'Neill* contracts, which absolves the United States from liability for water shortages arising from operational errors, drought, or any other causes, provides:

**UNITED STATES NOT LIABLE FOR WATER SHORTAGE**

(a) There may occur at times during any year a shortage in the quantity of water available for furnishing to the District through and by means of the Project, but in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising from a shortage on account of errors in operation, drought, or any other causes. In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and

>    others entitled under the then existing contracts to receive water from
>    the San Luis Unit in accordance with conclusive determinations of the
>    Contracting Officer as follows:
>
>    >    (i) A determination shall be made of the total quantity of water
>    >    agreed to be accepted during the respective year under all
>    >    contracts then in force for the delivery of Central Valley Project
>    >    water by the United States from the San Luis Unit, the quantity so
>    >    determined being hereinafter referred to as the contractual
>    >    commitments;
>    >
>    >    (ii) A determination shall be made of the total quantity of water
>    >    from the Central Valley Project which is available for meeting the
>    >    contractual commitments, the quantity so determined being
>    >    hereinafter referred to as the available supply;
>    >
>    >    (iii) The total quantity of water agreed to be accepted by the
>    >    District during the respective year, under Article 3 hereof, shall
>    >    be divided by the contractual commitments, the quotient thus
>    >    obtained being hereinafter referred to as the District's
>    >    contractual entitlement; and
>    >
>    >    (iv) The available supply shall be multiplied by the District's
>    >    contractual entitlement and the result shall be the quantity of
>    >    water required to be delivered by the United States to the
>    >    District for the respective year, but in no event shall such
>    >    amount exceed the total quantity of water agreed to be accepted by
>    >    the District pursuant to Article 3 hereof.
>
>    Insofar as determined by the Contracting Officer to be practicable, the
>    United States will, in the event a shortage appears probable, notify the
>    District of such determinations in advance of the irrigation season.
>
>    (b) In the event that in any year there is delivered to the District by
>    reason of any shortage or apportionment as provided in subdivision (a)
>    of this article or any discontinuance or reduction of service as set
>    forth in subdivision (d) of Article 9 hereof, less than the quantity of
>    water which the District otherwise would be entitled to receive, there
>    shall be made an adjustment on account of the amounts paid to the United
>    States by the District for water for said year in a manner similar to
>    that provided for in Article 7. To the extent of such deficiency, such
>    adjustment shall constitute the sole remedy of the District or anyone
>    having or claiming to have by, through, or under the District the right
>    to the use of any of the water supply provided for herein.
>
>    (c) The United States assumes no responsibility with respect to and does
>    not warrant the quality of the water to be furnished pursuant to this
>    contract....

*O'Neill*, 50 F.3d at 683 n.2.

[3] The DMC Contracts' shortage provisions, which have also been interpreted to have *force majeure* effect, are at Article 12(b)-(c):

>    (b)   If there is a Condition of Shortage because of error in physical
>    operations of the Project, drought, other physical causes beyond the
>    control of the Contracting Officer or actions taken by the Contracting

only satisfying legal obligations.  The *O'Neill* and DMC Contracts

> Officer to meet legal obligations then, except as provided in
> subdivision (a) of Article 18 of this Contract, no liability shall
> accrue against the United States or any of its officers, agents, or
> employees for any damage, direct or indirect, arising therefrom.
>
> (c)  In any Year in which there may occur a Condition of Shortage for
> any of the reasons specified in subdivision (b) of this Article, and
> subject to subdivision (d) of this Article, the Contracting Officer will
> first allocate the available project Water consistent with the draft CVP
> M&I Water Shortage Policy on the effective date of this Contract as
> finally adopted after environmental review for determining the amount of
> Project Water available for delivery to the Project Contractors.
> Subject to the foregoing allocation, in any year in which there may
> occur a Condition of Shortage, the Contracting Officer shall then
> apportion Project Water among the Contractor and others entitled to
> Project Water from Delta Division Facilities under long-term water
> service or repayment contracts (or renewals thereof or binding
> commitments therefore) in force on February 28, 2005, as follows:
>
> (1)  The Contracting officer shall make an initial and subsequent
> determination as necessary of the total quantity of Project Water
> estimated to be scheduled or actually scheduled under subdivision
> (b) of Article 4 of this Contract and under all other long-term
> water service or repayment contracts then in force for the
> delivery of Project Water by the United States from Delta Division
> Facilities during the relevant Year, the quantity so determined
> being hereinafter referred to as the scheduled total;
>
> (2)  A determination shall be made of the total quantity of
> Project Water that is available for meeting the scheduled total,
> the quantity so determined being hereinafter referred to as the
> available supply;
>
> (3)  The total quantity of Project Water estimated to be
> scheduled or actually scheduled by the Contractor during the
> relevant Year, under subdivision (b) of Article 4 hereof, shall be
> divided by the scheduled total, the quotient thus obtained being
> hereinafter referred to as the Contractor's proportionate share;
> and
>
> (4)  The available supply shall be multiplied by the contractor's
> proportionate share and the result shall be the quantity of
> Project Water made available by the United States to the
> Contractor for the relevant Year in accordance with the schedule
> developed by the Contracting Officer under subdivision (c)(1) of
> this Article 12, but in no event shall such amount exceed the
> Contract total.  In the event the Contracting Officer subsequently
> determines that the Contracting Officer can increase or needs to
> decrease the available supply for delivery from Delta Division
> Facilities to long-term water service and repayment Contractors
> during the relevant Year, such additions or reductions to the
> available supply shall be apportioned consistent with
> subparagraphs (1) through (4), inclusive.

*See, e.g.*, SAR 001068-70 (Patterson Irrig'n Dist. Renewal Contract).

contain additional, specific language reserving to the United States the power to allocate Project Water and describing the procedures for allocating available Project Water, SRS Renewal Contract Article 3(i) specifically and unmistakably reserves to the United States the right to reduce Project Water diversions by SRS Contractors.  Article 3(i) also operates as a complete *force majeure* provision with respect to Project Water.

Because supplies may only be reduced when necessary to meet legal obligations, this does not create a level of discretion in the Contracting Officer or the Bureau that satisfies the *Home Builders* standard and does not change the overall conclusion of the April 27, 2009 Decision.  Legal obligations are defined by law and must be performed without any exercise of discretion.  Even if Article 3(i) was the product of mutual negotiation, it only affects the prior allocation scheme embodied in Original Article 9(a), by reducing available Project Water required to satisfy legal obligations, a nondiscretionary duty.  This is not a grant of discretion to the Bureau that triggers application of ESA § 7 consultation requirements.

Article 3(i) of the SRS Renewal Contracts creates an additional question:  if 3(i) is interpreted to operate as a total *force majeure* shortage provision with respect to Project Water, does it conflict with the Shasta Critical Year Shortage Provision, which leaves the Bureau no discretion but to reduce

9

Project Water and Base Supply by no more and no less than 25% when defined critical shortage conditions exist?

### CRITICAL YEAR REDUCTION

>    5.   In a critical year the Contractor's base supply <u>and project water</u> during the period April through October of the year in which the principal portion of the critical year occurs and each monthly quantity of said period shall be reduced by twenty-five percent (25%).

SC 04461 (original ACID Settlement Contract)(emphasis added).

"Critical year" is precisely defined in Article 1(h) as:

>    any year in which either of the following eventualities exists:
>
>       (1)   The forecasted full natural inflow to Shasta Lake for the current water year, as such forecast is made by the United States on or before February 15 and reviewed as frequently thereafter as conditions and information warrant, is equal to or less than three million two hundred thousand (3,200,000) acre-feet; or
>
>       (2)   The total accumulated actual deficiencies below four million (4,000,000) acre-feet in the immediately prior water year or series of successive prior water years each of which had inflows of less than four million (4,000,000) acre-feet, together with the forecasted deficiency for the current water year, exceed eight hundred thousand (800,000) acre-feet.
>
>    For the purpose of determining a critical year the computed inflow to Shasta Lake under present upstream development above Shasta Lake shall be used as the full natural inflow to Shasta Lake.  In the event that major construction completed above Shasta Lake after September 1, 1963, materially alters the present regimen of the stream systems contributing to Shasta Lake, the computed inflow to Shasta Lake used to define a critical year will be adjusted to eliminate the effect of such material alterations.  After consultation with the State, the Weather Bureau, and other recognized forecasting agencies, the Contracting Officer will select the forecast to be used and will make the details of it available to the Contractor. The same forecasts used by the United States for the operation of the Project shall be used to make the forecasts hereunder.

SC 04453-54 (original ACID Settlement Contract).[4]  Pursuant to the nondiscretionary Shasta Critical Year Shortage Provision, Base Supply and Project Water "shall" be reduced by 25% if, and only if, the objective hydrologic thresholds described in Article 1(h) are triggered.

The Shasta Critical Year Shortage Provision and Article 3(i) can be harmonized to give effect to both provisions.  The Shasta Critical Year Shortage Provision reflects the historic natural hydrology of the Sacramento River watershed and by a settlement process reduced to writing a rough approximation of the effect that critically dry hydrologic conditions had on the SRS Contractors' underlying water rights.[5]  When hydrologic conditions reduce available water supplies by a certain, significant amount, diversions by the SRS Contractors mandatorily must be reduced by 25%.

At the same time, by mutual agreement during the renewal process, Article 3(i) was added to the SRS Renewal Contracts, giving the United States the additional authority to reduce Project Water supplies when required to meet legal obligations. Article 3(i) operates to permit such reductions in all water year

---

[4]  The relevant language in the renewal contracts is not changed in any material sense.  *Compare id.* to SAR 50-51, 58-59.

[5]  As discussed in the April 27, 2009 Decision, the water studies C-2BR and C-650-B, formed the principal bases for determining each SRS Conractors' entitlement to base supply.  *See* Doc. 834 at 22 (citing SC 03685).  Those studies revealed that, periodically, there were very dry years when the natural flow of the Sacramento River was not adequate to meet all demands. *See* Decl. of Marc Van Camp, Doc. 775 at ¶37.

11

types, so long as those reductions are taken to meet legal obligations.

The role of the court is limited to interpretation of contractual language.  So long as all provisions of a contract can be given reasonable and harmonious interpretations, the intent behind the SRS Contractors' consent to the addition of Renewal Article 3(i), which consent pre-dated the Supreme Court's decision in *Home Builders*, is not relevant or admissible under the parol evidence rule.  *See Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1158 (9th Cir. 2000).

For the reasons set forth above, Federal Defendants' motion for reconsideration is GRANTED.  Article 3(i) in the SRS Renewal Contracts operates as a *force majeure* shortage provision with respect to Project Water only when Project Water must be used to meet legal obligations.  The April 24, 2009 Decision with respect to the application of *Home Builders* is not changed by the grant of reconsideration.

Federal Defendants shall submit a form of order consistent with this and previous Memoranda Decisions within ten (10) days following electronic service.

SO ORDERED
Dated:   August 6, 2009

                                      /s/ Oliver W. Wanger
                                           Oliver W. Wanger
                                   United States District Judge