**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NATURAL RESOURCES DEFENSE COUNCIL,** *et al.,* <br><br>            **Plaintiffs,** <br><br> **vs.** <br><br> **DIRK KEMPTHORNE, Secretary, U.S. Department of the Interior,** *et al.,* <br><br>            **Defendants.** | **Case No. 1:05-cv-01207 LJO-GSA** <br><br> **ORDER GRANTING MOTION TO STAY (Doc. 954) and DENYING AS MOOT MOTIONS TO BIFURCATE (Docs. 960 & 961).** |
| **SAN LUIS & DELTA MENDOTA WATER AUTHORITY; et al.,** <br><br>            **Defendant-Intervenors.** | |
| **ANDERSON-COTTONWOOD IRRIGATION DISTRICT; et al.,** <br><br>            **Joined Parties.** | |

## I. __INTRODUCTION__

Plaintiffs, a coalition of environmental interest groups led by the Natural Resources Defense Council (collectively, "Plaintiffs"), allege in the currently operative Third Amended Complaint ("TAC") that the U.S. Bureau of Reclamation ("Bureau" or "Reclamation") and the U.S. Fish and Wildlife Service ("FWS" or "Service") (collectively, "Federal Defendants") acted unlawfully by renewing and implementing and approving of the renewal and implementation of certain long-term water contracts in reliance on a 2005 Biological Opinion issued pursuant to the Endangered Species Act ("ESA") the agencies knew, or should have known, was inadequate to protect the ESA-listed delta smelt. Doc. 575. Before the Court is Federal Defendants' motion to stay proceedings in this case so that the Bureau and

1  FWS can reinitiate ESA consultation on the existing long-term contracts. Doc. 954. Federal Defendants

2  argue that a stay will permit the agencies to devote their time and resources to undertaking the ESA

3  consultation, rather than to defending against this lawsuit. Doc. 955 at 8. Plaintiffs oppose the stay,

4  arguing that a stay would be prejudicial to their interests because: (1) Defendants would continue

5  operating under unlawful contracts that have not received proper ESA review; and (2) mechanisms in

6  place to protect the delta smelt in the interim are inadequate and/or are not being implemented. Doc.

7  965. Federal Defendants replied on May 15, 2015. Doc. 970. Pursuant to Local Rule 230(g), the Court

8  decides the motions on the papers without oral argument. For the reasons set forth below, Federal

9  Defendants' motion is GRANTED with certain conditions.

10  ## II. LEGAL BACKGROUND

11  "Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with

12  identifying threatened and endangered species and designating critical habitats for those species."

13  *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 778 (9th Cir. 2014) (en banc) ("*NRDC v. Jewell*")

14  (citing 16 U.S.C. § 1533). FWS and the National Marine Fisheries Service ("NMFS") administer the

15  ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11,

16  222.101(a), 223.102, 402.01(b). Section 7 of the ESA ("Section 7") requires federal agencies to ensure

17  that their activities do not jeopardize the continued existence of listed endangered or threatened species

18  or adversely modify those species' critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal.*

19  *v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). Section 7's implementing regulations provide

20  that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any

21  action may affect listed species or critical habitat[s]." 50 C.F.R. § 402.14(a). An agency proposing to

22  take an action (often referred to as the "action agency") must first inquire of FWS[1] whether any

23  _____

24  [1] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l*
*Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), as corrected (Oct. 31, 2008). NMFS is granted
25  jurisdiction over fish species which (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in

2

1  threatened or endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. §

2  1536(c)(1). If endangered species may be present, the action agency must prepare a "biological

3  assessment" ("BA") to determine whether such species "is likely to be affected" by the action. *Id.* If the

4  BA determines that a threatened or endangered species "is likely to be affected," the agency must

5  formally consult with FWS. *See id.* § 1536(a)(2); 50 C.F.R. 402.14. Formal consultation results in the

6  issuance of a "biological opinion" ("BiOp") by FWS. *See id.* § 1536(b). If the BiOp concludes that the

7  proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id.* §

8  1536(a)(2), then the action may not go forward unless FWS can suggest a "reasonable and prudent

9  alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id.* § 1536(b)(3)(A). If

10  the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical

11  habitat, or that there is a "reasonable and prudent alternative[ ]" to the agency action that avoids

12  jeopardy and adverse modification, and that the incidental taking of endangered or threatened species

13  will not violate section 7(a)(2), the consulting agency can issue an "Incidental Take Statement" which, if

14  followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. 16

15  U.S.C. § 1536(b)(4); *ALCOA v. BPA*, 175 F.3d 1156, 1159 (9th Cir. 1999).

16        Even after consultation is complete, an agency has a duty to reinitiate formal consultation under

17  certain circumstances, including where (1) "the amount or extent of taking specified in the incidental

18  take statement is exceeded"; (2) "if new information reveals effects of the action that may affect listed

19  species or critical habitat in a manner or to an extent not previously considered"; or (3) "[i]f the

20  identified action is subsequently modified in a manner that causes an effect to the listed species or

21  critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16. "The consultation

22  requirement reflects "a conscious decision by Congress to give endangered species priority over the

23  'primary missions' of federal agencies." *Karuk Tribe*, 681 F.3d at 1020 (quoting *Tenn. Valley Auth. v.*

24
25  estuarine waters, if the remaining portion is spent in ocean water. *Id.* FWS exercises jurisdiction over the delta smelt. Therefore, the remainder of this Memorandum Decision references only FWS as the agency administering the ESA.

1  *Hill*, 437 U.S. 153, 185 (1978)).

2  ### III. FACTUAL AND PROCEDURAL HISTORY

3  The Central Valley Project ("CVP") and the State Water Project ("SWP"), "operated

4  respectively by [Reclamation] and the State of California, are perhaps the two largest and most

5  important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747

6  F.3d 581, 592 (9th Cir. 2014) ("*San Luis v. Jewell*"). "These combined projects supply water originating

7  in northern California to more than 20,000,000 agricultural and domestic consumers in central and

8  southern California." *Id.* As part of CVP operations, Reclamation releases water stored in CVP

9  reservoirs in northern California, which then flows down the Sacramento River to the Sacramento-San

10  Joaquin Delta ("Delta"). *Id.* at 594. Pumping plants in the southern region of the Delta then divert to

11  various users south of the Delta. *See id.* at 594-95.

12  The delta smelt (*Hypomesus transpacificus*) is a "small, two-to-three inch species of fish

13  endemic to the [Delta]." *Id.* at 595. In 1993, FWS concluded the delta smelt's population had declined

14  by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA.

15  Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854, 12,855 (Mar. 5, 1993).

16  FWS further determined that "Delta water diversions," including those resulting from operations of the

17  CVP, are the most significant "synergistic cause[ ]" of the decline in the delta smelt population. *Id.* at

18  12,859.

19  "In the 1960s, the Bureau entered into a number of long-term contracts pertaining to the CVP."

20  *NRDC v. Jewell*, 749 F.3d at 778. In 2004, two groups of these contracts had expired or were about to

21  expire: (1) the Delta-Mendota Canal Unit Water Service Contracts ("DMC Contracts"); and (2) the

22  Sacramento River Settlement Contracts ("Settlement Contracts") (collectively, "the Contracts"). *Id.* The

23  DMC Contracts allow junior water users to draw water from the Delta-Mendota Canal. *Id.* "The

24  Settlement Contracts are forty-year agreements between the Bureau and holders of certain senior water

25  rights." *Id.* "These contracts grant the Bureau some rights to the encumbered water while also providing

4

1  senior rights holders a stable supply of water." *Id.*

2      In the early 2000s, the Bureau prepared an operational plan, the Operations Criteria and Plan

3  ("OCAP"), to provide, among other things, a basis for renewing various contracts, including the DMC

4  and Settlement Contracts. *Id.* at 780. Pursuant to Section 7, the Bureau initiated consultation with FWS

5  regarding the effect of the OCAP on the delta smelt. *Id.* at 780-81. FWS issued an initial BiOp in 2004

6  (the "2004 BiOp"), which concluded that the OCAP would not jeopardize the delta smelt. *Id.* at 781.

7  The Bureau re-initiated consultation after the Ninth Circuit's decision in *Gifford Pinchot Task Force v.*

8  *U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004). *NRDC v. Jewell*, 749 F.3d at 781. In

9  2005, FWS issued a revised BiOp (the "2005 BiOp"), which also concluded that the OCAP would not

10  jeopardize the delta smelt. *Id.*

11      Also in 2004 and 2005, in an effort to comply with the ESA, the Bureau prepared BAs that

12  concluded that renewal of the Contracts would not adversely affect the delta smelt. *Id.* The Bureau

13  requested additional consultation with FWS regarding its plans to renew the Contracts. *Id.*

14          FWS responded via a series of letters, in which it concurred with the
Bureau's determination that renewing the Contracts was not likely to

15          adversely affect the delta smelt. Each FWS concurrence letter explained
that renewing the Contracts would increase the demand for water, but that,

16          according to the 2004 and 2005 BiOps, this demand would not adversely
affect the delta smelt. <u>The letters did not assess the Contracts' potential</u>

17          <u>effects on the delta smelt beyond the reasoning borrowed from the now-</u>
<u>invalidated 2004 Opinion and 2005 Opinion.</u>

18  *Id.* (emphasis added). In 2004 and 2005, the Bureau renewed 141 Settlement Contracts and 18 DMC

19  Contracts based on the FWS's concurrence letters. *Id.*

20      In February 2005, Plaintiffs initiated this lawsuit, challenging the 2004 BiOp. Doc. 1.

21  Subsequent amendments to the Complaint updated Plaintiffs' allegations to include challenges to the

22  2005 BiOp. Doc. 403 (Second Amended Complaint ("SAC")). Plaintiffs raised numerous challenges to

23  the legal sufficiency of the 2005 BiOp in the SAC, filed on July 10, 2007. *Id.* Among other things, the

24  SAC alleged that the 2005 BiOp did not "adequately consider or address the effects of [the] long-term

25

1   water service contracts on threatened and endangered species," *id*. at ¶ 32, and that the Bureau "has

2   taken and is taking actions that could foreclose implementation of reasonable and prudent alternatives

3   that would avoid jeopardy, including but not limited to signing and implementing new long-term

4   contracts promising delivery of substantially increased quantities of water, in violation of [ESA] section

5   7(d)." *Id*. at ¶ 81. In 2007, the 2005 BiOp was set aside as unlawful. *Natural Res. Def. Council v.*

6   *Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007), Doc. 323. The Bureau did not appeal.

7      In June 2008, Plaintiffs filed the TAC, directly challenging the sufficiency of the ESA

8   consultation undertaken in connection with renewal of 41 of the Contracts. *See* Doc. 575 at ¶¶ 44-47, 69,

9   72-73. In seeking to set aside these contracts, Plaintiffs argued that the Bureau violated Section 7(a)(2)

10   of the ESA by failing to consult adequately with the FWS prior to renewing the Contracts. *Id*. at ¶ 85.

11      On December 15, 2008, the FWS issued a revised BiOp (the "2008 BiOp"), which, contrary to

12   the findings of the 2004 and 2005 BiOps, concluded that the OCAP <u>would</u> jeopardize the delta smelt and

13   adversely modify its critical habitat. *NRDC v. Jewell*, 749 F.3d at 781. The 2008 BiOp became the

14   subject of numerous lawsuits. *See generally San Luis & Delta Mendota Water Auth. v. Salazar*, 1:09-cv-

15   407-LJO-BAM. Plaintiffs in this matter intervened as <u>defendants</u> in the challenge to the 2008 BiOp. *See*

16   *id*.

17      In rulings in late 2008 and 2009 in this matter, the previously assigned District Judge held that

18   Plaintiffs did not have standing to challenge renewal of the DMC contracts and that Plaintiffs' challenge

19   as to the Settlement Contracts failed as a matter of law because Federal Defendants lacked discretion to

20   modify the Settlement Contracts to benefit Plaintiffs' interests. *Natural Res. Def. Council v.*

21   *Kempthorne*, 2008 WL 5054115 (E.D. Cal. Nov. 19, 2008) ("*NRDC v. Kempthorne*"), Doc. 761. A

22   divided three-judge panel of the Ninth Circuit affirmed. *Natural Res. Def. Council v. Salazar,* 686 F.3d

23   1092 (9th Cir. 2012).

24      The Ninth Circuit subsequently voted to hear the case en banc, and the en banc panel reversed

25

and remanded. *NRDC v. Jewell*, 749 F.3d 776.[2] The en banc decision first found that the issuance of the

2008 BiOp did not moot Plaintiffs' challenge to the Contracts:

> This action is not moot because the 2008 Opinion does not provide
> Plaintiffs with the relief that they seek. The 2008 Opinion concluded that
> the Bureau's Plan would likely jeopardize the delta smelt and adversely
> modify its critical habitat. In so doing, the 2008 Opinion explained that the
> Bureau's Plan must be modified from what the Bureau envisioned in 2004
> and 2005, and the Opinion identified a "reasonable and prudent
> alternative" to the proposed Plan that would avoid jeopardizing the delta
> smelt.
>
> The issuance of the 2008 Opinion does not moot this appeal. The 2008
> Opinion merely assesses the general effects of the Bureau's Plan, and it
> does not represent a consultation with the FWS concerning the impact of
> the Bureau's decision to renew the specific contracts before us. Although
> the DMC Contracts and Settlement Contracts were renewed based on
> now-invalidated opinions, the Bureau has never reconsulted with the FWS
> regarding the effects of renewing these contracts, nor has it sought to
> amend the challenged contracts to incorporate the protections proposed in
> the 2008 Opinion. The remedy Plaintiffs seek is an injunction requiring
> reconsultation with the FWS and renegotiation of the challenged contracts
> based on the FWS' assessment. This relief remains available.

*Id.* at 782.

On the issue of standing related to the DMC Contracts, this Court held that Plaintiffs could not

establish that their injury is fairly traceable to the Bureau's alleged procedural violation because: (1) the

DMC Contracts contain a shortage provision that absolves the government from liability for breaches

that result from complying with its legal obligations; (2) this provision permits the Bureau to take

necessary actions to meet its legal obligations under the ESA; so (3) the Bureau could not have

negotiated any contractual terms that better protect the delta smelt, and, therefore, any injury to the delta

smelt is not traceable to the contract renewal process. *NRDC v. Kempthorne*, No. 1:05-CV-1207 OWW

TAG, 2008 WL 5054115, at **11-18 (E.D. Cal. Nov. 19, 2008).

The Ninth Circuit rejected this reasoning, finding instead that, "to establish standing, a litigant

---

[2] This ruling came only a few months after the Ninth Circuit upheld the validity of the 2008 BiOp. *San Luis v. Jewell*, 747 F.3d 581.

who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with

Section 7(a)(2) *could* protect his concrete interests." *Id*. at 783 (emphasis in original). The Ninth Circuit

concluded that the consultation could have led to revisions that would have benefitted the delta smelt:

> Contrary to the district court's finding, the shortage provision does not
> provide the delta smelt with the greatest possible protection. Nothing
> about the shortage provision requires the Bureau to take actions to protect
> the delta smelt. The provision is permissive, and merely absolves the
> United States of liability if there is a water shortage resulting from, inter
> alia, "actions taken ... to meet legal obligations." But even if we read the
> provision to place an affirmative obligation on the Bureau to take actions
> to benefit the delta smelt, the provision only concerns the quantity of
> water that will be made available to the DMC Contractors. There are
> various other ways in which the Bureau could have contracted to benefit
> the delta smelt, including, for example, revising the contracts' pricing
> scheme or changing the timing of water deliveries. Because adequate
> consultation and renegotiation could lead to such revisions, Plaintiffs have
> standing to assert a procedural challenge to the DMC Contracts.

*Id*. at 783-84.

With regard to the Settlement Contracts, this Court held that, although Plaintiffs have standing to

assert procedural challenges to the Settlement Contracts, the Bureau was not required to consult under

Section 7(a)(2) prior to renewing the Settlement Contracts because the Bureau's discretion in

renegotiating these contracts was "substantially constrained," in light of a line of cases, including *Nat'l*

*Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007), which stand for the

proposition that there is no duty to consult for actions "that an agency is required by statute to

undertake." *Natural Res. Def. Council v. Kempthorne*, 621 F. Supp. 2d 954, 1000 (E.D. Cal. 2009),

decision clarified, 627 F. Supp. 2d 1212 (E.D. Cal. 2009), on reconsideration, No. 1:05-CV-1207 OWW

SMS, 2009 WL 2424569 (E.D. Cal. Aug. 6, 2009). In holding that the Bureau was not required to

consult under Section 7(a)(2) prior to renewing the Settlement Contracts, the district court focused on

Article 9(a) of the original Settlement Contracts, which provides in pertinent part:

> During the term of this contract and any renewals thereof: (1) It shall
> constitute full agreement as between the United States and the Contractor
> as to the quantities of water and the allocation thereof between base supply
> and Project water which may be diverted by the Contractor from its source

of supply for beneficial use on the land shown on Exhibit B ...; (2) The
Contractor shall not claim any right against the United States in conflict
with the provisions hereof.

*Id*. at 979. This provision, according to the district court, "substantially constrained" the Bureau's

discretion to negotiate new terms in renewing the contracts, thereby absolving the Bureau of the duty to

consult under *Home Builders*. *Id*.

The Ninth Circuit rejected this reasoning:

Section 7(a)(2)'s consultation requirement applies with full force so long
as a federal agency retains "some discretion" to take action to benefit a
protected species. [citations] While the parties dispute whether Article 9(a)
actually limits the Bureau's authority to renegotiate the Settlement
Contracts, it is clear that the provision does not strip the Bureau of all
discretion to benefit the delta smelt and its critical habitat. F

First, nothing in the original Settlement Contracts requires the Bureau to
renew the Settlement Contracts. Article 2 of the original contracts
provides that "renewals *may* be made for successive periods not to exceed
forty (40) years each." (emphasis added). This language is permissive and
does not require the Bureau to execute renewal contracts. Since the FWS
has concluded that "Delta water diversions" are the most significant
"synergistic cause[ ]" of the decline in delta smelt, 58 Fed. Reg. at 12,859,
it is at least plausible that a decision not to renew the Settlement Contracts
could benefit the delta smelt and their critical habitat.

But even assuming, arguendo, that the Bureau is obligated to renew the
Settlement Contracts and that Article 9(a) limits the Bureau's discretion in
so doing, Article 9(a) simply constrains future negotiations with regard to
"the quantities of water and the allocation thereof...." Nothing in the
provision deprives the Bureau of discretion to renegotiate contractual
terms that do not directly concern water quantity and allocation. And, as
[is the case] with respect to the DMC Contracts, the Bureau could benefit
the delta smelt by renegotiating the Settlement Contracts' terms with
regard to, inter alia, their pricing scheme or the timing of water
distribution.

For these reasons, we conclude that, in renewing the Settlement Contracts,
the Bureau retained "some discretion" to act in a manner that would
benefit the delta smelt. The Bureau was therefore required to engage in
Section 7(a)(2) consultation prior to renewing the Settlement Contracts.

*NRDC v. Jewell*, 749 F.3d at 784-85. The matter was reversed and remanded for further proceedings. *Id*.

at 785.

1

2
# IV. DISCUSSION

3
## A.    General Standard Applicable to Requests to Stay.

4       United States district courts have inherent authority to stay proceedings, for the power to stay "is

5 incidental to the power inherent in every court to control the disposition of the causes on its docket with

6 economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248,

7 254 (1936); *accord Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion

8 to stay proceedings as an incident to its power to control its own docket.").

9               A trial court may, with propriety, find it is efficient for its own docket and
                the fairest course for the parties to enter a stay of an action before it,
10              pending resolution of independent proceedings which bear upon the case.

11 *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979). This is true even if the

12 issues in such proceedings are not necessarily controlling with respect to the action before the court. *Id*.

13 In exercising its discretion, a court must evaluate the competing interests affected by either granting or

14 refusing a stay, including "the hardship or inequity which a party may suffer in being required to go

15 forward, and the orderly course of justice measured in terms of the simplifying or complicating of

16 issues, proof, and questions of law which could be expected to result from a stay." *Lockyer v. Mirant*

17 *Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citation omitted). Put another way, "[i]n determining

18 whether to stay proceedings, the Court considers the following factors: (1) judicial economy; (2) the

19 moving party's hardship; and (3) potential prejudice to the non-moving party." *Single Chip Sys. Corp. v.*

20 *Intermec IP Corp.*, 495 F. Supp. 2d 1052, 1057 (S.D. Cal. 2007). A court must "balance the length of the

21 stay against the strength of the justification given for it." *Yong v. I.N.S.*, 208 F.3d 1116, 1119 (9th Cir.

22 2000). "If a stay is especially long or its term is indefinite," a court should "require a greater showing to

23 justify." *Id.*

24
## B.    The Requested Stay.

25       Federal Defendants initially proposed an indeterminate stay to permit the agency to proceed with

1    re-consultation. Specifically, Federal Defendants requested that the Court set a deadline of August 1,

2    2015 for Reclamation to <u>initiate</u> re-consultation with FWS, with the understanding that the agencies

3    would complete the re-initiated consultation within the 90-day timeframe prescribed by the ESA and its

4    implementing regulations, *see* 16 U.S.C. § 1536(b), "unless the agencies mutually agree to extend those

5    periods as provided by the ESA." Doc. 955 at 19. In their reply, Federal Defendants modified their

6    request. They now seek a six-month stay, subject to renewal if consultation has not been completed

7    within that period. Doc. 970 at 13-14.

8    **C.    <u>Judicial Efficiency/Prejudice to Non-Moving Party.</u>**

9          Federal Defendants argue that the proposed stay will allow the agencies "to administratively

10   consider and likely resolve" the question of whether the original ESA consultation was flawed because it

11   relied on a biological opinion that was later invalidated. Doc. 955 at 10. Federal Defendants also point

12   out that the stay will permit Reclamation to: (1) update the existing administrative record; (2) based on

13   that updated record, determine if the renewed contracts are likely to adversely affect the delta smelt; and,

14   (3) "if so,[determine] whether any different terms are needed in the renewed contracts to avoid jeopardy

15   to the species." *Id*.

16         Where agencies propose to resolve disputed issues administratively, courts should ordinarily

17   "allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources

18   reviewing a record that both sides acknowledge to be incorrect or incomplete." *Ethyl Corp. v. Browner*,

19   989 F.2d 522, 524 (D.C. Cir. 1993). Forcing Federal Defendants to proceed "when it is already clear that

20   the outcome of the administrative proceedings will impact the final resolution of this case, would be

21   prejudicial" to movants. *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv*., No. 2:13-CV-

22   42-MCE, 2013 WL 4094777, at *9 (E.D. Cal. Aug. 13, 2013) (internal citation and quotation omitted).

23   Federal Defendants maintain that, without a stay, the parties will be required to litigate, and the Court to

24   adjudicate, the same fundamental issues that would be reconsidered by the expert agencies during the

25   stay. Doc. 955 at 11.

1   The Court agrees with Federal Defendants. To proceed on the present record would require the

2   Court and the parties to consider whether Federal Defendants acted unlawfully by relying on the now-

3   invalidated 2005 BiOp. Federal Defendants' proposal would, at the very least, obviate the need for the

4   Court to consider whether ESA approval of the Contract renewals could stand on the 2005 BiOp alone.

5   As Plaintiffs point out, continued reliance on the 2005 BiOp may be "legally impossible." *Greenpeace v.*

6   *Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000).[3] Federal Defendants'

7   proposal would allow the agencies to revisit whether approval of the Contracts comports with the ESA

8   in light of the most up-to-date information. Federal Defendants further indicate that if FWS determines

9   Contract renewal will cause jeopardy or adverse modification, FWS will examine "whether any different

10  terms are needed in the renewed contracts to avoid jeopardy to the species." Doc. 970 at 10.[4]

11      The efficiencies of Federal Defendants' proposed approach are obvious. The Court would avoid

12  having to adjudicate a merits challenge based on ten-year-old information and agency actions.

13  Depending on the outcome of the re-consultation, the Court's intervention may not be needed at all.

14  Even if further judicial intervention is sought, the Court and the parties would benefit from an updated

15  record that may address some of the numerous issues raised in this case over the past ten years (*e.g.*, the

16  scope of the Bureau's discretion to modify the Settlement Contracts). Moreover, to the extent the

17  Defendant federal agencies would be required to dedicate staff time and resources to litigating the merits

18  of Plaintiffs' claims, those resources could be re-directed to other efforts, including re-consultation.

---

20  [3] The Court does not agree with Plaintiffs' suggestion that any party has conceded the merits of Plaintiffs' claims. *See* Doc.
21  965 at 11. Federal Defendants maintained before the Ninth Circuit that the invalidity of the 2005 BiOp did <u>not</u> entitle
    Plaintiffs to an automatic finding that the ESA had been violated in connection with the Contract consultation. *See* Doc. 970
    at 12:1-12 and citations therein. Moreover, Plaintiffs misrepresent the "concession" made by the Settlement Contractors in
22  their reply brief in support of certiorari before the Supreme Court. Plaintiffs contend that in this brief, Glenn-Colusa
    Irrigation district conceded that the "Ninth Circuit squarely ruled on the merits of the alleged procedural violation of the
23  ESA." *See* Doc. 965 at 11. However, the procedural violation on which the petitioners agreed the Ninth Circuit ruled was that
    "consultation was required." *Glenn-Colusa Irr. Dist. v. Natural Resources Defense Council, Reply Br. in Supp. of Cert.*, 2014
    WL 5489476, at *4 (Oct. 29. 2015). This is not dispositive of the merits issues presently before the Court.

24  [4] Although it is not entirely clear how and under what legal authority the Bureau may unilaterally impose new terms on
    already-executed contracts or require re-negotiation of those contracts, the Court will, for now, assume Federal Defendants
25  possess such authority. As discussed below, as a condition of imposing the stay in this case, the Court will require Federal
    Defendants to substantiate this assumption.

**D.      Prejudice to Non-Moving Party.**

Plaintiffs insist that they will be harmed if a stay is imposed because, they argue, they are

entitled to an immediate adjudication on the merits and a judgment that would set aside the Contracts.

*See* Doc. 965 at 11. First, set-aside is far from automatic in cases such as this one. The standards

relevant to remand without vacatur were reviewed recently in *Klamath-Siskiyou Wildlands Ctr. v. Nat'l*

*Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, No. 13-CV-03717-NC, 2015 WL

3466314, at *3-4 (N.D. Cal. May 29, 2015):

> When a court finds an agency's decision unlawful under the
> Administrative Procedure[] Act, vacatur is the standard remedy. *See* 5
> U.S.C. § 706(2)(A) ("The reviewing court shall ... set aside agency action,
> findings, and conclusions found to be ... arbitrary, capricious, an abuse of
> discretion, or otherwise not in accordance with law[.]"; *Se. Alaska*
> *Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th
> Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency
> action is to 'set aside' the action. In other words, a court should vacate the
> agency's action and remand to the agency to act in compliance with its
> statutory obligations.") (internal quotation marks and citation omitted),
> rev'd on other grounds sub nom.
>
> ***
>
> The Ninth Circuit, however, does not mandate vacatur. *Cal. Communities*
> *Against Toxics v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir.
> 2012) (per curiam) ("A flawed rule need not be vacated."). Indeed,
> "[w]hen equity demands, [a flawed action] can be left in place while the
> agency follows the necessary procedures to correct its action." *Id.* (quoting
> *Idaho Farm*, 58 F.3d at 1405 (internal quotation marks omitted)).
>
> In these instances, to determine whether it should vacate an agency
> decision, a court must look at two factors: (1) the seriousness of an
> agency's errors and (2) the disruptive consequences that would result from
> vacatur. *Cal. Communities Against Toxics*, 688 F.3d at 992 ("Whether
> agency action should be vacated depends on how serious the agency's
> errors are and the disruptive consequences of an interim change that may
> itself be changed.") (internal quotation marks omitted) (quoting *Allied–*
> *Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51
> (D.C. Cir. 1993)). Put differently, "courts may decline to vacate agency
> decisions when vacatur would cause serious and irremediable harms that
> significantly outweigh the magnitude of the agency's error." *League of*
> *Wilderness Defenders/Blue Mts. Biodiversity Project v. U.S. Forest Serv.*,

2012 U.S. Dist. LEXIS 190899, at *6 (D. Or. Dec. 10, 2012). In balancing these factors in ESA cases, courts will tip the scales in favor of the endangered species under the "institutionalized caution" mandate. *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987) (citation and quotation omitted); *see also Native Fish Soc'y & McKenzie Flyfishers v. Nat'l Marine Fisheries Serv*., 2014 U.S. Dist. LEXIS 33365, at *8 (D.Or. Mar. 14, 2014) (noting "institutionalized caution" mandate in weighing Allied–Signal factors).

But courts in the Ninth Circuit decline vacatur only in rare circumstances. *See Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("In rare circumstances, when we deem it advisable that the agency action remain in force until the action can be reconsidered or replaced, we will remand without vacating the agency's action."); *Ctr. for Food Safety v. Vilsack*, No. 08–cv–00484 JSW, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury.").

In *California Communities Against Toxics*, for example, the Ninth Circuit found that the Environmental Protection Agency violated the APA's notice-and-comment requirements during the rule-making process when it failed to disclose certain documents in the electronic docket concerning a soon-to-be completed power plant. *Cal. Communities Against Toxics*, 688 F.3d at 993. Nevertheless, the court found the technical error harmless. *Id*. And while it also did find substantive errors, the court balanced these errors with the "significant public harms" that would result from vacatur: community blackouts, efforts on the part of the California legislature to pass a new bill, and economic disaster from stopping construction of a "billion-dollar venture employing 350 workers." *Id*. at 994. Applying the *Allied–Signal* standard, the Ninth Circuit declined to vacate the agency decision and permitted the plant's construction to continue while the EPA made corrections on remand. *Id*. *4

The *Allied–Signal* approach also accords with earlier Ninth Circuit cases involving remand without vacatur. *Idaho Farm*, for instance, involved FWS's proposal listing the Bruneau Hot Springs Snail, a rare snail species in southwest Idaho, as an endangered species under the ESA. 58 F.3d at 1395. Yet FWS failed to provide the public with an opportunity to review a provisional report concerning the snails before the comment period's close. *Id*. at 1402–04. Even though the Ninth Circuit recognized the procedural error, it held that the district court erred in vacating the rule listing the snail as endangered: vacatur risked contributing to "the potential extinction of an animal species." *Id*. at 1405. Moreover, the agency's error was unlikely to alter the agency's final decision. *Id*. at 1405-06.

Such cases highlight the "significant disparity between the agencies' relatively minor errors, on the one hand, and the damage that vacatur

could cause the very purpose of the underlying statutes, on the other."
*League of Wilderness Defenders*, 2012 U.S. Dist. LEXIS 190899, at *9.

(Emphasis added.)

While the equities here are unlikely to be analogous to any of the cases discussed in *Klamath-Siskiyou*, this Court nevertheless must balance the seriousness of the agency's errors against the disruptive consequences that would result from vacatur. Here, any party that assumes vacatur would be the automatic result in this case ignores the 800-pound gorilla in the room. As this Court has previously explained, non-renewal of the Settlement Contracts could result in potentially catastrophic consequences for California's entire water delivery system. *See NRDC v. Kempthorne*, 2008 WL 505115, **27-29. This is because the Settlement Contractors hold water rights that pre-existed the creation of the CVP. *Id.* at *25. While the exact priority of these rights vis-à-vis the Bureau's rights to divert water for the CVP has never been conclusively determined, Congress has expressed intent that the Bureau avoid the "monstrous lawsuit ... that would embroil the CVP in litigation for decades," should the matter ever be adjudicated. *Id.* at **26, 28. It is also entirely unsettled whether the Bureau possesses unilateral discretion to impose any different non-volume contract terms upon the Settlement Contractors. While *NRDC v. Jewell* did find that the "Bureau retained 'some discretion' to act in a manner that would benefit delta smelt," 749 F.3d at 785, the Ninth Circuit did not settle the numerous, difficult legal questions that surround the scope of the Bureau's discretion in connection with the renewal of the Settlement Contracts.

Nor would set-aside be an automatic remedy in connection with the DMC Contracts, due to the serious economic and underlined environmental damage that could result from disruption of those contractual relationships. *Cf. San Luis v. Jewell*, 747 F.3d at 653 ("[I]t is beyond dispute that Reclamation's implementation of the [2008 BiOp's RPA] has important effects on human interaction with the natural environment."). In making these points, the Court is not pre-judging the propriety of any available remedy. Rather, the point is that imposing a set-aside remedy is likely to require a highly involved and

1   complex equitable balancing process. At the very least, the Court believes this process would benefit

2   from an updated record. Moreover, Federal Defendants' proposal has the potential to resolve some of

3   the disputes between the parties.

4          Plaintiffs cite a previous ruling in this case, issued January 3, 2007, *Natural Res. Def. Council v.*

5   *Norton*, 2007 WL 14283, at *16 (E.D. Cal. 2007), in which the previously assigned district judge

6   declined to stay earlier proceedings in this matter, in part to facilitate the imposition of protective

7   measures while the agency re-consulted on the OCAP. But the circumstances surrounding that ruling

8   were very different. In January 2007, Federal Defendants requested a stay of Plaintiffs' challenge to the

9   2005 BiOp on the ground that Federal Defendants had re-initiated consultation on the OCAP to take into

10  account certain information discovered shortly before the 2005 BiOp was completed, including

11  information indicating there had been a "substantial decline in the population index for the species." *Id*.

12  at *3. Federal Defendants argued that the case should be stayed to permit completion of re-consultation,

13  with an exception that would permit Plaintiffs to bring a motion for injunctive relief under ESA § 7(d).[5]

14  The Court found that a stay would be inappropriate because any effort by Plaintiffs to seek injunctive

15  relief would require the parties to litigate the merits of the validity of the then-operative 2005 BiOp. *Id*.

16  at *16. The Court held: "Plaintiffs are entitled to have their complaint decided on the merits, particularly

17  given the fact that Defendants continue to rely on the challenged BiOps as if they were lawfully

18  enacted." *Id*. Here, in contrast, Defendants are operating the CVP pursuant to the 2008 BiOp, which has

19  been deemed <u>lawful</u> by the Ninth Circuit. *San Luis v. Jewell*, 747 F.3d 581. The 2008 BiOp's RPA

20  contains numerous actions designed to prevent jeopardy to the delta smelt as a result of operations

21  pursuant to the OCAP.  *See id*. at 598-99. As a result, the rationale applied in the January 3, 2007

22  decision does not apply here.

23  _____

24  [5] ESA § 7(d), 16 U.S.C. § 1536(d), prohibits during ongoing consultation any federal agency from making "any irreversible
    or irretrievable commitment of resources with respect to the agency action [under consultation] which has the effect of
25  foreclosing the formulation or implementation of any reasonable and prudent alternative measures" designed to avoid
    jeopardy to a listed species or adverse modification to its critical habitat.

Plaintiffs assert that the 2008 BiOp will not protect adequately the delta smelt during the pendency of a stay. Doc. 965 at 18. First, Plaintiffs point out, correctly, that the 2008 BiOp is not a substitute for consultation on renewal of the Contracts themselves. *NRDC v. Jewell*, 749 F.3d at 782 ("The 2008 Opinion merely assesses the general effects of the Bureau's Plan, and it does not represent a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts before us."). However, how the 2008 BiOp addresses contractual deliveries is relevant when determining the prejudice to Plaintiffs that would result from a stay. It is undisputed that the 2008 BiOp in fact does consider the impacts of <u>maximum</u> water deliveries under existing water service contracts and concludes that the RPA actions identified in the 2008 BiOp will avoid jeopardy to the delta smelt associated with such deliveries. 2008 BiOp at 9-36 - 9-52 (attached to the Declaration of Ronald Milligan ("Milligan Decl.") as Ex. A, Doc. 958-1). Plaintiffs did not challenge the 2008 BiOp and in fact consistently argued that it was promulgated lawfully. *See generally San Luis & Delta Mendota Water Auth. v. Salazar*, 1:09-cv-407-LJO-BAM.

Rather than challenge the adequacy of the analyses in the 2008 BiOp itself, Plaintiffs argue that Federal Defendants are "failing to comply with even minimum requirements set by the 2008 BiOp and the RPA." Doc. 965 at 19. These alleged failures fall into two general categories: (1) Reclamation's failure to implement aspects of the 2008 BiOp's RPA; and (2) Reclamation filing with the State Water Resources Control Board ("SWRCB") of several temporary urgency change petitions ("TUCPs"). As to the first category of arguments, the Court finds Plaintiffs' assertions that they would be prejudiced during a stay because Reclamation is failing to implement the 2008 BiOp's RPA's unsupported. For example, Plaintiffs claim that "in December 2014 and January 2015," Reclamation "did not meet requirements of RPA Component 1, which is designed to protect delta smelt from entrainment at the CVP/SWP pumps so they can safely enter the Delta to spawn." Doc. 965 at 20. Plaintiffs assert that "[r]ather than abiding by the determinations of the Smelt Working Group [('SWG')] during this period, as called for in the RPA, the agencies repeatedly ignored the SWG's calls for reduced pumping and

1    allowed negative [Old and Middle River] flows to exceed the levels called for by the SWG." *Id*. (citing

2    the Declaration of Jonathan Rosenfield ("Rosenfield Decl."), Doc. 967, at ¶ 7). Plaintiffs further assert

3    that "[a]fter several weeks of ignoring the SWG's calls for reduced pumping, delta smelt salvage and

4    take levels rapidly approached the 'concern level' in the BiOp, set at 75% of the incidental take limit...."

5    *Id*. at 21. (citing Rosenfield Decl. at ¶ 8). Instead of "ramping down pumping in the wake of this" event,

6    Reclamation "asked FWS to increase the take limit so it could kill more delta smelt." *Id*. This is, at best,

7    a gross oversimplification of the situation. Federal Defendants present credible evidence explaining how

8    Reclamation consulted with FWS at every stage of its efforts to deal with implementation of the 2008

9    BiOp's RPA in the midst of an unprecedented drought. Doc. 970 at 6-7.

10         With respect to the second category of arguments, Plaintiffs point out that, beginning in early

11   2014 and continuing to this date, Reclamation filed with the SWRCB several TUCPs seeking permission

12   to alter flow requirements set forth in SWRCB Decision 1641, which sets Delta outflow requirements

13   designed to protect Delta water quality. Declaration of Doug Obegi ("Obegi Decl."), Doc. 966, Ex. V at

14   21-27 (excerpts from 2008 BiOp); Ex. O (SWRCB Water Rights Order (Sept. 24, 2014)) at 5; Ex. Q

15   (SWRCB Water Rights Order (Feb. 3, 2015)) at 7-9; Ex. R (SWRCB Revised Order Regarding TUCP

16   (Apr. 6, 2015)) at 12-14. The SWRCB approved those waivers, which reduced and waived baseline

17   CVP/SWP outflow requirements for 2014 and 2015. Obegi Decl., Ex. O at 51-58, Ex. Q at 21-25, Ex. R

18   at 37-42. Plaintiffs point out, correctly, that the outflow requirements of D-1641 form part of the

19   baseline upon which the 2008 BiOp is built and that "departure from D-1641 was not anticipated in the

20   Project Description of the [2008] BiOp, or the modeling in [Reclamation's] biological assessment"

21   prepared in anticipation of the consultation that led to the issuance of the 2008 BiOp. Obegi Decl., Ex. P

22   (FWS consultation on Reclamation-DWR Jan. 29 2014 TUCP (Jan 31, 2014)) at 2. Plaintiffs argue that

23   FWS concurred with Reclamation's determination that the proposed TUCPs would not adversely affect

24   the delta smelt despite "never [having] analyzed comprehensively the effects of D-1641 modifications

25   on delta smelt or the 2008 BiOp's findings." Doc. 965 at 19.

1        With this argument, Plaintiffs lose track of the thrust of this lawsuit, which challenges the

2   sufficiency of the ESA consultation over renewal of the Contracts. While Plaintiffs might be entitled to

3   independent relief against implementation of the temporary changes permitted by the TUCPs if

4   Plaintiffs challenged the TUCP consultation directly,[6] Plaintiffs' conclusory allegations that the TUCP

5   approval process was flawed does little to demonstrate that they will be harmed by imposition of a stay

6   while Reclamation re-consults over Contract renewal. Plaintiffs attempt to draw a direct connection

7   between the TUCP approval process and the Contracts by citing an April 6, 2015 SWRCB Order for the

8   proposition that the TUCPs were approved, at least in part, "to allow more water to be delivered south of

9   the Delta to agencies such as the DMC Contractors, and to allow Reclamation to preserve enough water

10  in upstream reservoirs to enable 75% deliveries to the [Settlement Contractors] pursuant to their

11  contracts." Doc. 965 at 20 (citing Obegi Decl., Ex. R at 33). It is true that the April 6, 2015 Order

12  identified certain water supply benefits:

13          Water supply benefits include allocations to senior water right holders and
    senior water supply contractors on the Sacramento Stanislaus, and San
14          Joaquin Rivers, as well as refuges. As discussed above, increased water
    supplies available to users upstream of the Delta are also likely to benefit
15          users south of the Delta who engage in transfers, which are expected to
    occur later this year. Transfer supplies are critically important sources of
16          supply to south of Delta users during dry conditions when there are low to
    no contract allocations. These transfers help to ensure that permanent
17          crops and other economically important agricultural uses are sustained.
    Transfers also reduce the reliance on groundwater to some extent. As
18          mentioned previously, groundwater supplies after four years of drought
    are significantly depleted. Prolonged overdraft of groundwater basins may
19          result in a permanent reduction in the capacity of those storage basins,
    subsidence, and associated significant infrastructure effects. All of these
20          effects present significant concerns that must be balanced with protections
    for fish and wildlife.

21

22  Id. But, this paragraph does not demonstrate Plaintiffs will be prejudiced by the proposed stay. First,

23  while the Order indicates that south-of-Delta contractors, such as the DMC Contractors, might benefit

24  ───────────────────

25  [6] In fact, just such a lawsuit recently was filed by different plaintiffs. See California Sportfishing Protection Alliance, et al. v.
    U.S. Bureau of Reclamation, 2:15-cv-01201 MCE DAD.

1  from additional access to water transfers as a result of the TUCP, the Order says nothing about the

2  TUCP increasing the likelihood that the DMC Contractors would be entitled to deliveries pursuant to

3  their contracts. In fact, the record reflects that DMC Contractors received no (*i.e.*, zero percent)

4  contractual allocations during 2014 or 2015. Milligan Decl. at ¶ 9.

5      The April 6, 2015 Order does suggest that the TUCPs were designed in part to ensure allocations

6  to "senior water supply contractors" on the Sacramento River, such as the Settlement Contractors.

7  Plaintiffs assert that this demonstrates how "the 2005 contracts are driving decisions today that are

8  worsening the condition of the delta smelt and its critical habitat." Doc. 965 at 20. According to the

9  Ninth Circuit's reasoning in *NRDC v. Jewell*, it is possible that if the Bureau were to re-negotiate the

10  Settlement Contracts as part of any re-consultation process, the Bureau may choose not to renew the

11  Settlement Contracts or may renegotiate contractual terms so as to lessen the Settlement Contractors'

12  demands for water. *See NRDC v. Jewell*, 749 F.3d at 784-85. If any such scenario prevails, it is likewise

13  possible that Plaintiffs' interests would be benefitted vis-à-vis the status quo in which the CVP is

14  operated to satisfy the existing demands of the Settlement Contractors, which, in drought years, may

15  require extraordinary measures (such as those permitted by the TUCPs). But, in opposing Federal

16  Defendants' proposed stay, Plaintiffs take this logic too far and again ignore the 800-pound gorilla. As

17  discussed above, the Settlement Contractors have been given contractual priority for a reason. No player

18  in this game, least of all the Court, can take lightly the prospect of any remedial scheme that would set

19  aside the Settlement Contracts. The Court firmly is of the opinion that the agency must be given the first

20  opportunity to sort through all of these difficult issues during the re-consultation process.

21                              **V. CONCLUSION**

22      In sum, the Court finds that imposition of a stay to permit Reclamation and FWS to re-initiate

23  consultation may resolve, narrow, or clarify the issues, thereby avoiding "wasteful duplication of effort."

24  *Chronicle Publ'g. Co. v. Nat'l. Broad. Co.,* 294 F.2d 744, 747–48 (9th Cir. 1961). Federal Defendants'

25  proposed re-consultation gives Plaintiffs everything they requested, with the possible exception of

1    contractual rescission (*i.e.*, the set-aside remedy). Whether rescission ever would be an appropriate

2    remedy is an extremely complex issue the resolution of which the Court believes requires a more

3    fulsome and up-to-date record. The Court also agrees with Federal Defendants that Plaintiffs' claims of

4    prejudice are best described as collateral attacks on other agency actions. These attacks do not overcome

5    the potential efficiencies to be gained from the imposition of a brief stay.

6        Federal Defendants have requested a six-month stay, subject to renewal if consultation has not

7    been completed within that period. Doc. 970 at 13-14. The Court finds this to be a reasonable request.

8    However, if Federal Defendants anticipate renewal will be required, they must notice any such request

9    as a formal motion at least one month in advance of the expiration of the six-month deadline. In support

10   of any such request, Federal Defendants must provide the Court with legal authorities demonstrating that

11   Federal Defendants do possess authority to re-negotiate and/or unilaterally impose upon the contracting

12   parties any additional terms that may be required to avoid jeopardy, should jeopardy be found.

13       Accordingly, this action is **STAYED** for six months from the date of entry of this order. Any

14   renewal application is subject to the above-described conditions.

15       In light of the above rulings, the pending motions to bifurcate are **DENIED WITHOUT**

16   **PREJUDICE** as moot.

17   IT IS SO ORDERED.

18   Dated:   **June 15, 2015**                    **/s/ Lawrence J. O'Neill**
                                                 UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

21