# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

NATURAL RESOURCES DEFENSE
COUNCIL, et al.,

                Plaintiffs,

vs.

DIRK KEMPTHORNE, Secretary,
U.S. Department of the Interior, et al.,

                Defendants.

SAN LUIS & DELTA MENDOTA WATER
AUTHORITY; et al.,

                Defendant-Intervenors.

ANDERSON-COTTONWOOD IRRIGATION
DISTRICT; et al.,

                Joined Parties.

Case No. 1:05-cv-01207 LJO-GSA

MEMORANDUM DECISION AND
ORDER GRANTING MOTION TO
AMEND (Doc. 999).

## I. <u>INTRODUCTION</u>

      Plaintiffs, a coalition of environmental interest groups led by the Natural Resources Defense Council (collectively, "Plaintiffs"), allege in the currently-operative Third Amended Complaint ("TAC") that the U.S. Bureau of Reclamation ("Bureau" or "Reclamation") and the U.S. Fish and Wildlife Service ("FWS" or "Service") (collectively, "Federal Defendants") acted unlawfully by renewing, implementing, and approving the renewal and implementation of certain long-term water contracts in reliance on a 2005 Biological Opinion ("2005 FWS Smelt BiOp") issued by FWS pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., that the agencies knew, or should have known, was inadequate to protect the ESA-listed delta smelt. Doc. 575 (filed Apr. 8, 2008). Specifically, Plaintiffs challenged renewal of two sets of contracts: (1) those held by the Sacramento River Settlement

1  ("SRS") Contractors; and (2) those held by the Delta-Mendota Canal Unit ("DMC") Contractors. *Id.*

2  On June 15, 2015, the Court stayed this litigation to allow Reclamation to reinitiate ESA-

3  consultation on the contract renewals. Doc. 979. Thereafter, Reclamation requested FWS's concurrence

4  that the impacts of these contract renewals on delta smelt were assessed in the more recent 2008

5  Biological Opinion on the Long-Term Central Valley Project Operations Criteria and Plain ("2008 FWS

6  OCAP Smelt BiOp"). FWS responded by sending Reclamation a letter ("2015 Letter of Concurrence" or

7  "2015 LOC") concurring with Reclamation's conclusion that "all of the possible effects to delta smelt

8  and its critical habitat by operating the CVP to deliver water under the SRS and DMC Contracts were

9  addressed in the [2008 FWS OCAP Smelt BiOP]".

10  Before the Court is Plaintiffs' motion to file a Fourth Supplemental Complaint ("4SC"), seeking

11  to add three new claims to the case: one claim (the proposed Fourth Claim for Relief) pertaining to

12  FWS's renewed consultation, and two claims (the proposed Fifth and Sixth Claims for Relief) arising

13  out of the absence of any parallel consultation on how SRS Contract renewals would impact endangered

14  Sacramento River winter-run Chinook salmon ("winter-run Chinook") and threatened Central Valley

15  spring-run Chinook salmon ("spring-run Chinook"). Doc. 999. Federal Defendants (Doc. 1007); the San

16  Luis & Delta-Mendota Water Authority, Westlands Water District, and the DMC Unit Contractors

17  Defendants[1] (collectively "CVP Water Service Contractors") (Doc. 1008); and the SRS Contractors

18  (Doc. 1009) filed oppositions, objecting only to the addition of the Fifth and Sixth Claims for relief.

19  After Plaintiffs filed their reply, the Court vacated the hearing date to afford additional time to review

20  the complex history and context of this case. Doc. 1017. Having thoroughly reviewed the record, the

21  Court deems the matter sufficiently briefed and suitable for decision on the papers without oral

22  argument pursuant to Local Rule 230(g), and GRANTS Plaintiffs' motion to supplement the complaint.[2]

23  _____

24  [1] Coelho Family Trust, Eagle Field Water District, Fresno Slough Water District, Mercy Springs Water District, Oro Loma Water District, and Tranquility Irrigation District.

25  [2] Plaintiffs filed a request for judicial notice, Doc. 1005, to which the SRS Contractors have interposed several objections. Doc. 1010. The Court has not relied upon any of the objected to information (at least not for any objected to purpose), so it is

2

## II. <u>LEGAL BACKGROUND</u>

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) ("*NRDC v. Jewell*") (citing 16 U.S.C. § 1533). FWS and the National Marine Fisheries Service ("NMFS") administer the ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). Section 7 of the ESA requires federal agencies to ensure that their activities do not jeopardize the continued existence of listed endangered or threatened species or adversely modify those species' critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). Section 7's implementing regulations provide that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat[s]." 50 C.F.R. § 402.14(a). An agency proposing to take an action (often referred to as the "action agency") must first inquire of FWS or NMFS[3] whether any threatened or endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. § 1536(c)(1). If endangered species may be present, the action agency must prepare a "biological assessment" ("BA") to determine whether such species "is likely to be affected" by the action. *Id*. If the BA determines that a threatened or endangered species "is likely to be affected," the agency must formally consult with FWS. *See id*. § 1536(a)(2); 50 C.F.R. 402.14(a).

Formal consultation results in the issuance of a "biological opinion" ("BiOp") by FWS. *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action would jeopardize the species or

---

not necessary to rule on the objections.
[3] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), as corrected (Oct. 31, 2008). NMFS is granted jurisdiction over fish species which (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id*. FWS exercises jurisdiction over the delta smelt; NMFS exercises jurisdiction over the winter-run and spring-run Chinook.

1   destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not go forward

2   unless FWS can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy,

3   destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If the BiOp concludes that jeopardy is not

4   likely and that there will not be adverse modification of critical habitat, or that there is a RPA to the

5   agency action that avoids jeopardy and adverse modification and that the incidental taking of

6   endangered or threatened species will not violate Section 7(a)(2), the consulting agency can issue an

7   "Incidental Take Statement" which, if followed, exempts the action agency from the prohibition on

8   takings found in Section 9 of the ESA. 16 U.S.C. § 1536(b)(4); *Aluminum Co. of Am. v. Administrator,*

9   *Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

10   Even after consultation is complete, an agency has a duty to reinitiate formal consultation under

11   certain circumstances, including if: "the amount or extent of taking specified in the incidental take

12   statement is exceeded"; "new information reveals effects of the action that may affect listed species or

13   critical habitat in a manner or to an extent not previously considered"; or "the identified action is

14   subsequently modified in a manner that causes an effect to the listed species or critical habitat that was

15   not considered in the biological opinion." 50 C.F.R. § 402.16. "The consultation requirement reflects 'a

16   conscious decision by Congress to give endangered species priority over the 'primary missions' of

17   federal agencies.'" *Karuk Tribe*, 681 F.3d at 1020 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185

18   (1978)).

19   ### III. FACTUAL AND PROCEDURAL HISTORY[4]

20   **1.     The Central Valley Project and the State Water Project.**

21   The Central Valley Project ("CVP") and the State Water Project ("SWP"), "operated

22   respectively by [Reclamation] and the State of California, are perhaps the two largest and most

23   important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747

24

25   [4] The factual and procedural history is presented roughly in chronological order, with deviations from this ordering scheme where subject-matter grouping is more appropriate.

4

1   F.3d 581, 592 (9th Cir. 2014) ("*San Luis v. Jewell*"). "These combined projects supply water originating

2   in northern California to more than 20,000,000 agricultural and domestic consumers in central and

3   southern California." *Id*. As part of CVP operations, Reclamation releases water stored in CVP

4   reservoirs in northern California, which then flows down the Sacramento River to the Sacramento-San

5   Joaquin Delta ("Delta"). *Id*. at 594. Pumping plants in the southern region of the Delta then divert to

6   various users south of the Delta. *See id*. at 594-95.

7       **2.    Delta Smelt.**

8       The delta smelt (*Hypomesus transpacificus*) is a "small, two-to-three inch species of fish

9   endemic to the [Delta]." *Id*. at 595. In 1993, FWS concluded the delta smelt's population had declined

10  by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA.

11  Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854, 12,855 (Mar. 5, 1993).

12  FWS further determined that "Delta water diversions," including those resulting from operations of the

13  CVP, are the most significant "synergistic cause[ ]" of the decline in the delta smelt population. *Id*. at

14  12,859.

15      **3.    Winter-Run Chinook.**

16      Winter-run Chinook (*Oncorhynchus tshawytscha*) are listed as "endangered" under the ESA.

17  Endangered and Threatened Species: Final Listing Determinations for 16 ESUs of West Coast Salmon,

18  and Final 4(d) Protective Regulations for Threatened Salmonid ESUs, 70 Fed. Reg. 37,160 (June 28,

19  2005). According to the 4SC, the winter-run Chinook's population "has declined precipitously since the

20  early 1980s, from an estimated historic high of 117,808 in 1969 to as few as 191 adult individuals

21  returning to spawn in 1991." 4SC ¶ 64. Winter-run Chinook historically inhabited the upper Sacramento

22  River and its tributaries. *Id*. ¶ 66. The construction of Shasta Dam blocked access to almost all of the

23  winter-run Chinook's rearing waters. *Id*. Today, the upper Sacramento River below Keswick Dam is the

24  only remaining spawning area used by winter-run Chinook. *Id*. It is alleged that the winter-run Chinook

25  is "at high risk of extinction" and that a prolonged drought could have devastating effects on the species.

*Id.* It is further alleged that winter-run are particularly vulnerable during the "temperature management season," which generally lasts from June through October. *Id.* ¶ 67.

> Adult winter-run Chinook migrate up the Sacramento River in the winter and spring and then hold below the Keswick Dam for several months before spawning. During these critical months, the salmon require cold water for the maturation of their gonads and the development of fertilized eggs and embryos.

*Id.*

### 4.   <u>Spring Run Chinook.</u>

The spring-run Chinook (*Oncorhynchus tshawytscha*) historically displayed the second largest salmon run in the Central Valley watershed and supported the bulk of the region's commercial fishery. *Id.* ¶ 68. Only remnant independent natural spring-run Chinook populations survive, relying principally upon small tributaries of the Sacramento River below Shasta Dam for spawning. *Id.* ¶¶ 68, 71. Like winter-run Chinook, spring-run Chinook require cold water temperatures for successful spawning, egg incubation, and rearing. *Id.* ¶ 72.

### 5.   <u>Long-Term Contract Renewal/Operations and Criteria Plan.</u>

"In the 1960s, the Bureau entered into a number of long-term contracts pertaining to the CVP." *NRDC v. Jewell*, 749 F.3d at 780. "The [SRS] Contracts are forty-year agreements between the Bureau and holders of certain senior water rights." *Id.* "These contracts grant the Bureau some rights to the encumbered water while also providing senior rights holders a stable supply of water." *Id.* The DMC Contracts allow junior water users to draw water from the Delta-Mendota Canal. *Id.* By 2004, the DMC Contracts and the SRS Contracts had expired or were about to expire. *Id.* In the early 2000s, the Bureau prepared an operational plan, the Operations Criteria and Plan ("OCAP"), to, among other things, provide a basis for renewing various contracts, including the DMC and Settlement Contracts. *Id.*

### 6.   <u>ESA § 7 Consultations Leading Up to Contract Renewal.</u>

Pursuant to ESA § 7, the Bureau initiated consultation with FWS regarding the effect of the OCAP on the delta smelt. *Id.* at 780-81. FWS issued an initial BiOp in 2004 (the "2004 FWS Smelt

1   OCAP BiOp"), which concluded that the OCAP would not jeopardize the delta smelt. *Id*. at 781. The

2   Bureau re-initiated consultation after the Ninth Circuit's decision in *Gifford Pinchot Task Force v. U.S.*

3   *Fish & Wildlife Serv*., 378 F.3d 1059, 1069 (9th Cir. 2004), which invalidated a regulation upon which

4   the 2004 OCAP BiOp relied. *NRDC v. Jewell*, 749 F.3d at 781. In 2005, FWS issued a revised BiOp

5   ("2005 FWS Smelt BiOp"), which also concluded that the OCAP would not jeopardize the delta smelt.

6   *Id*.

7   Reclamation separately requested a BiOp from NMFS on whether continued operation of the

8   CVP pursuant to the OCAP would jeopardize various species under that agency's jurisdiction, including

9   the winter-run and spring-run Chinook. *See PCFFA v. Gutierrez*, No. 1:06-cv-245 OWW GSA

10  ("*PCFFA*"), Doc. 69 ¶ 77 (First Amended Complaint) ("*PCFFA* FAC*"*). NMFS issued a BiOp on

11  October 22, 2004 regarding the effects of the OCAP on the species under its jurisdiction, including

12  several salmonid species ("2004 NMFS OCAP Salmonid BiOp"). 4SC ¶ 107.

13  Also in 2004 and 2005, the Bureau prepared BAs that concluded that renewal of the Contracts

14  would not adversely affect the delta smelt. *NRDC v. Jewell*, 749 F.3d at 781. The Bureau requested

15  additional consultation with FWS regarding its plans to renew the Contracts. *Id*.

16  FWS responded via a series of letters, in which it concurred with the
    Bureau's determination that renewing the Contracts was not likely to

17  adversely affect the delta smelt. Each FWS concurrence letter explained
    that renewing the Contracts would increase the demand for water, but that,

18  according to the 2004 and 2005 [FWS OCAP Smelt] BiOps, this demand
    would not adversely affect the delta smelt. The letters did not assess the

19  Contracts' potential effects on the delta smelt beyond the reasoning
    borrowed from the now-invalidated 2004 Opinion and 2005 Opinion.

20  *Id*. (emphasis added).

21  Again, Reclamation separately consulted with FWS on the effects of renewing the Contracts on

22  the listed salmonid species under NMFS's jurisdiction. 4SC ¶ 108. As was the case with FWS, NMFS

23  concurred that executing the Contracts would not adversely impact listed salmonids. *Id*.

24  In 2004 and 2005, the Bureau renewed 141 Settlement Contracts and 18 DMC Contracts based

25

1   on FWS's and NMFS's concurrence letters. *NRDC v. Jewell*, 749 F.3d at 781.

2       **7.      Plaintiffs Challenge the 2004/2005 FWS OCAP Smelt BiOp.**

3           In February 2005, Plaintiffs initiated this lawsuit, challenging the 2004 FWS OCAP Smelt BiOp.

4   Doc. 1. Subsequent amendments to the Complaint updated Plaintiffs' allegations to include challenges

5   to the 2005 FWS OCAP Smelt BiOp. Doc. 403 (Second Amended Complaint ("SAC")). Plaintiffs raised

6   numerous challenges to the legal sufficiency of the 2005 FWS OCAP Smelt BiOp in the SAC, filed July

7   10, 2007. *Id*. Among other things, the SAC alleged that the 2005 FWS OCAP Smelt BiOp did not

8   "adequately consider or address the effects of [the] long-term water service contracts on threatened and

9   endangered species," *id*. ¶ 32, and that the Bureau "has taken and is taking actions that could foreclose

10  implementation of reasonable and prudent alternatives that would avoid jeopardy, including but not

11  limited to signing and implementing new long-term contracts promising delivery of substantially

12  increased quantities of water, in violation of [ESA] section 7(d)." *Id*. ¶ 81. In 2007, the 2005 FWS Smelt

13  BiOp was set aside as unlawful. *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal.

14  2007). The Bureau did not appeal.

15      **8.      Plaintiffs Challenge the 2004 NMFS OCAP Salmonid BiOp.**

16          On August 9, 2005, Plaintiffs filed a parallel complaint against Reclamation and NMFS alleging

17  that the NMFS 2004 OCAP Salmonid BiOp was inadequate. *Pac. Coast Fed'n of Fishermen's*

18  *Associations v. Gutierrez*, 606 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008) ("*PCFFA I*"). Plaintiffs

19  similarly sought to "[e]njoin and set aside any and all actions" that relied on it, including the delivery of

20  water under long-term water contracts at issue here. *Id.* at 1183 ("Existing renewal and any new water

21  service contracts have already been challenged in this litigation."); *PCFFA* FAC at 38.

22      **9.      District Court Ruling in *PCFFA*.**

23          On May 20, 2008, the previously assigned district judge found that NMFS acted arbitrarily and

24  capriciously by failing to consider certain facts in the NMFS 2004 OCAP Salmonid BiOp. *PCFFA I*,

25  606 F. Supp. 2d at 1193-94. In July 2008, the Court considered Plaintiffs' motion for injunctive relief,

seeking implementation of remedies designed to aid salmonids in the Sacramento River basin. In the context of this request for injunctive relief, the Court concluded that the Bureau had a "mandatory (*i.e.*, non-discretionary) legal obligation to make releases from Shasta Reservoir for delivery to the [SRS] Contactors." *Pac. Coast Fed'n of Fishermen's Associations v. Gutierrez*, 606 F. Supp. 2d 1195, 1201 (E.D. Cal. 2008) ("*PCFFA II*"). Plaintiffs did not seek to amend or supplement their complaint in *PCFFA*.

### 10.   <u>Third Amended Complaint in This Case.</u>

In June 2008, Plaintiffs filed the TAC, directly challenging the sufficiency of FWS's ESA consultation undertaken in connection with renewal of 41 Contracts. *See* Doc. 575 ¶¶ 44-47, 69, 72-73. In seeking to set aside these contracts, Plaintiffs argue that the Bureau violated § 7(a)(2) of the ESA by failing to adequately consult with the FWS prior to renewing the Contracts. *Id*. ¶ 85.

### 11.   <u>FWS Issues Revised Biological Opinion.</u>

On December 15, 2008, the FWS issued a revised BiOp (the "2008 FWS OCAP Smelt BiOp"), which, contrary to the findings of the 2004 and 2005 FWS OCAP Smelt BiOps, concluded that the OCAP <u>would</u> jeopardize the delta smelt and adversely modify its critical habitat. *NRDC v. Jewell*, 749 F.3d at 781. The 2008 BiOp became the subject of numerous lawsuits. *See generally San Luis & Delta Mendota Water Auth. v. Salazar*, 1:09-cv-407 LJO BAM. Plaintiffs in this matter intervened as <u>defendants</u> in the challenge to the 2008 BiOps. *See id*.

### 12.   <u>NMFS Issues a Revised BiOp</u>

On June 4, 2009, NMFS issued a revised BiOp ("2009 NMFS OCAP Salmonid BiOp"). *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 988 (9th Cir. 2014). Three months later, the previously assigned district judge entered final judgment in *PCFFA*, and closed the matter. *PCFFA*, 1:06-CV-0245-OWW-GSA, Doc. 458 (Judgment, Sept. 9, 2009).

//

//

**13.    District Court and Ninth Circuit Rulings on Plaintiffs' Third Amended Complaint in This Case.**

In rulings in late 2008 and 2009 in this matter, the previously assigned district judge held that Plaintiffs did not have standing to challenge renewal the DMC Contracts and that Plaintiffs' challenge as to the Settlement Contracts failed as a matter of law because Federal Defendants lacked discretion to modify the Settlement Contracts to benefit Plaintiffs' interests. *Nat. Res. Def. Council v. Kempthorne*, 2008 WL 5054115, at *22 (E.D. Cal. Nov. 19, 2008) ("*NRDC v. Kempthorne*"). A divided three-judge panel of the Ninth Circuit Court of Appeals affirmed. *Natural Res. Def. Council v. Salazar*, 686 F.3d 1092 (9th Cir. 2012).

The Ninth Circuit subsequently voted to hear the case en banc, and the en banc panel reversed and remanded. *NRDC v. Jewell*, 749 F.3d 776. The en banc decision first found that the issuance of the 2008 BiOp did not moot Plaintiffs' challenge to the Contracts:

> This action is not moot because the 2008 Opinion does not provide Plaintiffs with the relief that they seek. The 2008 Opinion concluded that the Bureau's Plan would likely jeopardize the delta smelt and adversely modify its critical habitat. In so doing, the 2008 Opinion explained that the Bureau's Plan must be modified from what the Bureau envisioned in 2004 and 2005, and the Opinion identified a "reasonable and prudent alternative" to the proposed Plan that would avoid jeopardizing the delta smelt.
>
> The issuance of the 2008 Opinion does not moot this appeal. The 2008 Opinion merely assesses the general effects of the Bureau's Plan, and it does not represent a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts before us. Although the DMC Contracts and Settlement Contracts were renewed based on now-invalidated opinions, the Bureau has never reconsulted with the FWS regarding the effects of renewing these contracts, nor has it sought to amend the challenged contracts to incorporate the protections proposed in the 2008 Opinion. The remedy Plaintiffs seek is an injunction requiring reconsultation with the FWS and renegotiation of the challenged contracts based on the FWS' assessment. This relief remains available.

*Id.* at 782.

On the issue of standing related to the DMC Contracts, the previously assigned judge held that Plaintiffs could not establish that their injury is fairly traceable to the Bureau's alleged procedural

1    violation because: (1) the DMC Contracts contain a shortage provision that absolves the government

2    from liability for breaches that result from complying with its legal obligations; (2) this provision

3    permits the Bureau to take necessary actions to meet its legal obligations under the ESA; so (3) the

4    Bureau could not have negotiated any contractual terms that better protect the delta smelt, and, therefore,

5    any injury to the delta smelt is not traceable to the contract renewal process. *NRDC v. Kempthorne*, 2008

6    WL 5054115, at *11-18.

7         The Ninth Circuit rejected this reasoning, finding instead that "to establish standing, a litigant

8    who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with

9    Section 7(a)(2) *could* protect his concrete interests." 749 F.3d at 783 (emphasis in original). The Ninth

10   Circuit concluded that the consultation could have led to revisions that would have benefitted the delta

11   smelt:

12              Contrary to the district court's finding, the shortage provision does not
                provide the delta smelt with the greatest possible protection. Nothing
13              about the shortage provision requires the Bureau to take actions to protect
                the delta smelt. The provision is permissive, and merely absolves the
14              United States of liability if there is a water shortage resulting from, inter
                alia, "actions taken ... to meet legal obligations." But even if we read the
15              provision to place an affirmative obligation on the Bureau to take actions
                to benefit the delta smelt, the provision only concerns the quantity of
16              water that will be made available to the DMC Contractors. There are
                various other ways in which the Bureau could have contracted to benefit
17              the delta smelt, including, for example, revising the contracts' pricing
                scheme or changing the timing of water deliveries. Because adequate
18              consultation and renegotiation could lead to such revisions, Plaintiffs have
                standing to assert a procedural challenge to the DMC Contracts.

19   *Id.* at 783-84.

20         With regard to the Settlement Contracts, the previously-assigned district judge held that,

21   although Plaintiffs have standing to assert procedural challenges to the Settlement Contracts, the Bureau

22   was not required to consult under Section 7(a)(2) prior to renewing the Settlement Contracts because the

23   Bureau's discretion in renegotiating these contracts was "substantially constrained," in light of a line of

24   cases, including *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007), which

25

11

1   stands for the proposition that there is no duty to consult for actions "that an agency is required by

2   statute to undertake." *Natural Res. Def. Council v. Kempthorne*, 621 F. Supp. 2d 954, 1000 (E.D. Cal.

3   2009), *decision clarified*, 627 F. Supp. 2d 1212 (E.D. Cal. 2009), *on reconsideration*, No. 1:05-CV-1207

4   OWW SMS, 2009 WL 2424569 (E.D. Cal. Aug. 6, 2009). In holding that the Bureau was not required to

5   consult under Section 7(a)(2) prior to renewing the Settlement Contracts, the district court focused on

6   Article 9(a) of the original Settlement Contracts, which provides in pertinent part:

7               During the term of this contract and any renewal thereof it shall constitute
                full agreement as between the United States and the Contractor as to the
8               quantities of water and the allocation thereof between base supply and
                Project water which may be diverted by the Contractor from the
9               Sacramento River for beneficial use on the land shown on Exhibit B which
                said diversion, use, and allocation shall not be disturbed so long as the
10              Contractor shall fulfill all of its obligations hereunder, and the Contractor
                shall not claim any right against the United States in conflict with the
11              provisions hereof.

12  *Id.* at 979 (emphasis omitted). This provision, according to the district court, "substantially constrained"

13  the Bureau's discretion to negotiate new terms in renewing the contracts, thereby absolving the Bureau

14  of the duty to consult under *Home Builders*. *Id.*

15          The Ninth Circuit rejected this reasoning:

16              Section 7(a)(2)'s consultation requirement applies with full force so long
                as a federal agency retains "some discretion" to take action to benefit a
17              protected species. [citations] While the parties dispute whether Article 9(a)
                actually limits the Bureau's authority to renegotiate the Settlement
18              Contracts, it is clear that the provision does not strip the Bureau of all
                discretion to benefit the delta smelt and its critical habitat. F

19
                First, nothing in the original Settlement Contracts requires the Bureau to
20              renew the Settlement Contracts. Article 2 of the original contracts
                provides that "renewals *may* be made for successive periods not to exceed
21              forty (40) years each." (emphasis added). This language is permissive and
                does not require the Bureau to execute renewal contracts. Since the FWS
22              has concluded that "Delta water diversions" are the most significant
                "synergistic cause[ ]" of the decline in delta smelt, 58 Fed. Reg. at 12,859,
23              it is at least plausible that a decision not to renew the Settlement Contracts
                could benefit the delta smelt and their critical habitat.

24
                But even assuming, arguendo, that the Bureau is obligated to renew the
25              Settlement Contracts and that Article 9(a) limits the Bureau's discretion in

                                        12

so doing, Article 9(a) simply constrains future negotiations with regard to "the quantities of water and the allocation thereof...." Nothing in the provision deprives the Bureau of discretion to renegotiate contractual terms that do not directly concern water quantity and allocation. And, as [is the case] with respect to the DMC Contracts, the Bureau could benefit the delta smelt by renegotiating the Settlement Contracts' terms with regard to, inter alia, their pricing scheme or the timing of water distribution.

For these reasons, we conclude that, in renewing the Settlement Contracts, the Bureau retained "some discretion" to act in a manner that would benefit the delta smelt. The Bureau was therefore required to engage in Section 7(a)(2) consultation prior to renewing the Settlement Contracts.

*NRDC v. Jewell*, 749 F.3d at 785. The matter was reversed and remanded for further proceedings. *Id.*

### 14. <u>Stay of this Case and Further FWS Consultation.</u>

On June 15, 2015, the Court stayed this litigation to allow Reclamation to reinitiate ESA-consultation on the contract renewals. Doc. 979. Thereafter, Reclamation requested FWS's concurrence that the impacts of these contract renewals on delta smelt were assessed in the 2008 FWS OCAP BiOp. 4AC ¶¶ 103, 105. FWS responded by sending the 2015 LOC, concluding that "all of the possible effects to delta smelt and its critical habitat by operating the CVP to deliver water under the SRS and DMC Contracts were addressed in the [2008 FWS OCAP Smelt BiOp]." *Id.* ¶ 106.

### 15. <u>Proposed Supplemental Claims.</u>

Plaintiffs now seek leave to file the 4SC, which proposes to add three new claims. Doc. 999. First, Plaintiffs seek to add a claim challenging the adequacy of FWS's consultation on the effects of the SRS and DMC Contract renewals on delta smelt. 4SC ¶¶ 177-182. Plaintiffs specifically allege it was improper for FWS to rely in the 2015 LOC exclusively on the 2008 FWS OCAP Smelt BiOp to evaluate impacts to delta smelt because: (1) the Ninth Circuit already held that the 2008 FWS OCAP Smelt BiOp is insufficient for this purpose (4SC ¶ 133); (2) the 2008 FWS OCAP Smelt BiOp only addresses effects of system operations through 2030, while the SRS Contract renewals do not expire until 2045 (4SC ¶ 134); (3) the 2008 FWS OCAP Smelt BiOp did not include analysis of the effects of the specific terms of the contract renewals (4SC ¶ 135); and (4) FWS assumed in the 2008 FWS OCAP Smelt BiOp that

species-protective flow requirements and export limits described therein would remain intact, an assumption Plaintiffs now assert is "unreasonable" in light of repeated waivers of those requirements in 2014 and 2015" (4SC ¶ 137). In addition, Plaintiffs allege that the 2015 LOC (5) fails to reflect the best scientific data available (4SC ¶¶ 138-143); (6) impermissibly relies on future consultations to ensure adequate protection of delta smelt (4SC ¶ 145); and (7) assumes that "if increased outflows are needed" to satisfy ESA requirements, Article 7(b) of the SRS Contracts allows Reclamation to take species-protective measures that may limit the water available to the SRS Contractors, an assertion that is directly contradicted by Reclamation's own assertions that it has no discretion to "alter the quantities … of SRS diversions" (4SC ¶ 146).

Plaintiffs' proposed claim alleges that while Reclamation reinitiated consultation on the impact of contract renewal on delta smelt, Reclamation did not request re-initiation of consultation with NMFS on the impacts of SRS Contract renewals on the winter-run and spring-run Chinook. Plaintiffs seek to add a claim to require Reclamation to reinitiate consultation on the impacts of the SRS Contract renewals on winter-run and spring-run Chinook and their critical habitats. 4SC ¶¶ 183-188 (Fifth Claim for Relief).

Third, Plaintiffs seek to add a related claim that Reclamation and the SRS Contractors illegally caused the direct loss (or "take") of winter-run and spring-run Chinook during 2014 and 2015 because Reclamation made excessive deliveries to the SRS Contractors that depleted the cold water reserves in Shasta Reservoir, causing temperature increases fatal to the 2014 and 2015 "brood years" of winter-run and spring-run Chinook. 4SC ¶¶ 189-193 (Sixth Claim for Relief).

**IV. DISCUSSION**

**A.      General Standard Applicable to Requests for Leave to Amend.**

Federal Rule of Civil Procedure 15(d) allows supplemental pleadings to add claims regarding any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The Ninth Circuit has entrusted application of this rule to the district court's broad discretion:

Rule 15(d) is intended to give district courts broad discretion in allowing supplemental pleadings. The rule is a tool of judicial economy and convenience. Its use is therefore favored. As Judge Haynsworth observed more than two decades ago:

Rule 15(d) of the Federal Rules of Civil Procedure provides for ... supplemental pleading. It is a useful device, enabling a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted. So useful they are and of such service in the efficient administration of justice that they ought to be allowed as of course, unless some particular reason for disallowing them appears, though the court has the unquestioned right to impose terms upon their allowance when fairness appears to require them.

....The clear weight of authority, however, in both the cases and the commentary, permits the bringing of new claims in a supplemental complaint to promote the economical and speedy disposition of the controversy....

*Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988) (internal citations omitted).

Generally, although supplemental pleading is "favored" in certain circumstances, it cannot be used to introduce "separate, distinct and new causes of action." *Planned Parenthood of S. Arizona v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997). Supplementation should be permitted where doing so would serve Rule 15(d)'s goal of judicial efficiency, and a court should assess whether an entire controversy can be settled in one action. *Id.* "To determine if efficiency might be achieved, courts assess 'whether the entire controversy between the parties could be settled in one action....'" *Id.* (citation omitted). "While the matters stated in a supplemental complaint should have some relation to the claim set forth in the original pleading, the fact that the supplemental pleading technically states a new cause of action should not be a bar to its allowance, but only a factor to be considered by the court in the exercise of its discretion, along with such factors as possible prejudice or laches." *Keith*, 858 F.2d at 474.

Courts also commonly apply the five factors used to evaluate Fed. R. Civ. P. 15(a) motions to amend to Rule 15(d) motions to supplement, which are: (1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) repeated failure of previous amendments, (4) undue prejudice to the

1  opposing party, and (5) futility of the amendment. *Lyon v. U.S. Immigration & Customs Enf't*, 308

2  F.R.D. 203, 214 (N.D. Cal. 2015) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Oregon*

3  *Nat. Desert Ass'n v. McDaniel*, 282 F.R.D. 533, 537 (D. Or. 2012). Of these factors, "consideration of

4  prejudice to the opposing party . . . carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*,

5  316 F.3d 1048, 1052 (9th Cir. 2003).

6  **B.    Proposed Fourth Claim for Relief Regarding Sufficiency of FWS's Reconsultation and**
   **2015 LOC.**

7

8      As mentioned, Plaintiffs seek to add a Fourth Claim for Relief challenging the sufficiency of

9  FWS's re-consultation, which resulted in the issuance of the 2015 LOC. No party objects to

10 supplementation with this claim, which is a natural extension of the existing litigation, nor does any

11 party suggest that this claim would be futile. The Court concludes that supplementation with the Fourth

12 Cause of Action would serve the interests of judicial efficiency, because it would permit adjudication of

13 closely related claims in one case. Therefore, the request to supplement the Complaint with the Fourth

14 Cause of Action is GRANTED.[5]

15 **C.    Proposed Fifth Claim for Relief Regarding NMFS's Failure to Re-Initiate Consultation**
   **Regarding SRS Contract Renewals and Proposed Sixth Claim for Relief Regarding Alleged**
   **Take Stemming from SRS Contract Deliveries.**

16

17     **1.    Overview of Claims.**

18     Plaintiffs' Proposed Fifth Claim for Relief alleges that Reclamation unlawfully failed to request

19 re-initiation of consultation with NMFS on the impacts of SRS Contract renewals on the winter-run and

20 spring-run Chinook ("spring-run Chinook"). 4SC ¶¶ 183-188. Specifically, Plaintiffs allege that the

21 2009 NMFS OCAP Smelt BiOp constituted new information that revealed effects of the SRS Contracts

22 that NMFS did not consider in consultation over the contracts. *Id*. ¶ 186. Plaintiffs also allege that

23 _____

24 [5] The CVP Water Service Contractors argue that the Complaint should be revised because it includes allegations regarding
   already resolved claims, pointing specifically to paragraphs 5-10, 11, 52, 80-86, 164-70, 173, 174. *See* Doc. 1008 at 10 & n.7.
   The CVP Water Service Contractors have not identified any authority requiring Plaintiffs do so, and the Court does not
25 necessarily agree that revision will help to clarify the record moving forward. To the extent claims have been resolved, the
   relevant allegations continue to serve as background information regarding the procedural and substantive history of the case.

1    massive mortality episodes impacting the 2014 and 2015 generations of winter-run and spring-run

2    Chinook constituted independent new information that should have triggered re-consultation. *Id*. ¶ 187.

3          Plaintiffs' Proposed Sixth Claim for relief alleges Reclamation and the SRS Contractors illegally

4    caused the take of winter-run and spring-run Chinook during 2014 and 2015 because Reclamation made

5    excessive deliveries to the SRS Contractors that depleted the cold water reserves in Shasta Reservoir,

6    causing temperature increases fatal to the 2014 and 2015 "brood years" of winter-run and spring-run

7    Chinook. 4SC ¶¶ 189-193.

8          **2.**      **Futility of Supplementation.**

9          Leave to supplement may be denied if supplementation would be futile. *San Luis & Delta-*

10   *Mendota Water Auth. v. U.S. Dep't of Interior*, 236 F.R.D. 491, 500 (E.D. Cal. 2006). Because futility

11   can operate as a threshold bar to supplementation, the Court will address the parties' futility arguments

12   first.

13          **a.**      **Legal Standard.**

14         A proposed claim may be deemed futile if it would fail to state a claim under Federal Rule of

15   Civil Procedure 12(b)(6). *See Miller v. Rykoff–Sexton, Inc*., 845 F.2d 209, 214 (9th Cir. 1988). A motion

16   to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the

17   complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or

18   "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police*

19   *Dept*., 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim,

20   the court generally accepts as true the allegations in the complaint, construes the pleading in the light

21   most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y.*

22   *Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). To survive a 12(b)(6) motion to dismiss, the

23   plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*

24   *v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual

25   content that allows the court to draw the reasonable inference that the defendant is liable for the

1    misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

2         **b.    Res Judicata.**

3         Federal Defendants argue that the two new salmonid claims (Fifth and Sixth Claims for Relief)

4    are barred by res judicata. Doc. 1007 at 16-17[6]. "The doctrine of *res judicata* provides that a final

5    judgment on the merits bars further claims by parties or their privies based on the same cause of action."

6    *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997) (citation and quotation marks omitted). The doctrine

7    includes

8              two distinct types of preclusion, claim preclusion and issue preclusion.
             Claim preclusion treats a judgment, once rendered, as full measure of
9              relief to be accorded between the same parties on the same "claim" or
             "cause of action".... The doctrine of issue preclusion prevents relitigation
10            of all issues of fact or law that were actually litigated and necessarily
             decided in a prior proceeding.

11

12   *Robi v. Five Platters, Inc*., 838 F.2d 318, 321-22 (9th Cir. 1988) (footnote, quotation marks, and

13   citations omitted). Res judicata "bars relitigation of all grounds of recovery that were asserted, or could

14   have been asserted, in a previous action between the parties, where the previous action was resolved on

15   the merits." *Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1078 (9th Cir.

16   2003) (citation omitted).

17        "The elements necessary to establish res judicata are: '(1) an identity of claims, (2) a final

18   judgment on the merits, and (3) privity between the parties." *Headwaters, Inc. v. U.S. Forest Serv*., 399

19   F.3d 1047, 1052 (9th Cir. 2005) (internal quotation and citation omitted). To determine whether an

20   identity of claims exists, a court should assess:

21             (1) whether rights or interests established in the prior judgment would be
             destroyed or impaired by prosecution of the second action;
22             (2) whether substantially the same evidence is presented in the two
             actions;
23             (3) whether the two suits involve infringement of the same right; and
             (4) whether the two suits arise out of the same transactional nucleus of

24   _____

25   [6] Internal page references to documents in the electronic case file ("ECF") are to the page numbering provided in the ECF file
     stamp header in the upper right corner of each document.

                                                        18

1    facts.

2    *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201-02 (9th Cir. 1982).

3         The crux of the res judicata analysis here is whether there is an "identity of claims." Federal

4    Defendants argue that the relevant "transactional nucleus of facts" delineating the claims that <u>could</u> have

5    been brought in PCFFA encompasses all challenges to the 2004 NMFS OCAP Salmonid BiOp,

6    Reclamation's reliance on it in its ESA consultation with NMFS over the Contracts, and Reclamation's

7    subsequent execution of the renewed Contracts following ESA consultations with NMFS on the effects

8    of the renewal. *See* Doc. 1007 at 17.

9         Plaintiffs do not appear to dispute this, but instead point out, correctly, that where the

10   "governmental conduct" is different in the second action, there is no claim preclusion. *Cent. Delta Water*

11   *Agency v. United States*, 306 F.3d 938, 952 (9th Cir. 2002) (citing *Fund for Animals, Inc. v. Lujan*, 962

12   F.2d 1391, 1399 (9th Cir. 1992), for the proposition that res judicata does not bar a subsequent challenge

13   to separate "governmental conduct").

14        The central "governmental conduct" that gave rise to the *PCFFA* litigation was the issuance of

15   the 2004 NMFS Salmonid BiOp. Encompassed within the scope of the *PCFFA* lawsuit was a challenge

16   to Reclamation's execution of the renewal Contracts based upon the 2004 NMFS Salmonid BiOp. *See*

17   *PCFFA FAC* ¶¶ 2, 49, 74, 112. However, the proposed Fifth and Sixth Causes of action arise from

18   separate "governmental conduct," namely, the failure to re-initiate consultation and the continued

19   delivery of water to SRS Contractors despite alleged take of listed salmonids. The proposed claims are

20   distinct from any that were or could have been brought as part of PCFFA. *See* Doc. 1013 at 14.

21   Therefore, the Fifth and Sixth Claims for Relief are not barred by res judicata.

22        **c.    <u>Statute of Limitations.</u>**

23        The Fifth Claim for Relief in this case alleges "the Bureau arbitrarily and capriciously violated,

24   and continues to violate, Section 7(a)(2) of the ESA and the ESA's implementing regulations, 50 U.S.C.

25   § 402.16, by failing to reinitiate consultation on the SRS Contracts based on the issuance of the [2009]

1    NMFS OCAP [Salmonid] BiOp and subsequent amendments." 4SC ¶ 186.

2          Claims arising under the Administrative Procedure Act ("APA") or the ESA are subject to a six-

3    year statute of limitations. *See Wind River Mining Corp. v. United States*, 946 F.2d 710, 714-15 (9th Cir.

4    1991); *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1106

5    (E.D. Cal. 2011). The SRS Contractors argue that the six-year statute of limitations bars Plaintiffs' claim

6    that NMFS was required to reinitiate consultation upon the issuance of the 2009 NMFS OCAP Salmonid

7    BiOp because that document was adopted more than six years ago. Doc. 1009 at 11.

8          Plaintiffs skirt this argument by pointing out that the statute of limitations "does not bar a

9    challenge to an 'ongoing agency action,' such as the SRS Contracts."[7] Doc. 1013 at 17. But, the SRS

10   Contractors do not appear to be challenging the entirety of the Fifth Claim for Relief, but rather only

11   whether the <u>issuance</u> of the 2009 NMFS OCAP Salmonid BiOp can be considered a "triggering event"[8]

12   that would require re-initiation of consultation. Plaintiffs suggest that "subsequent amendments to and

13   implementation of the [2009 NMFS OCAP Salmonid BiOp] certainly triggered Reclamation's duty to

14   reinitiate." Doc. 1013 at 14 (citing 4SC ¶113). Whether and to what extent Reclamation's

15   implementation of the 2009 NMFS OCAP Salmonid BiOp constitutes an "ongoing agency action" for

16   statute of limitations purposes, and/or whether several more recent actions constitute "amendments" to

17   the 2009 NMFS OCAP Salmonid BiOp are beyond the scope of the present motion. *See Coal. for a*

18   *Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1107-23 (E.D. Cal. 2011)

19   (reviewing complex state of relevant caselaw on "ongoing agency action" doctrine). What the Court can

20   state definitively is that the 4SC alleges sufficiently that temperature control events in 2014 and 2015

21   triggered the requirement for re-initiation. *See* 4SC ¶¶ 113, 192. Therefore, the Sixth Claim for Relief is

22   not barred in any general sense by the statute of limitations. Further refinement of the scope of that

23

24   [7] Plaintiffs' appear to reference as an "ongoing action" ongoing <u>deliveries</u> pursuant to the SRS Contracts, not <u>execution</u> of those Contracts. *See* 4SC ¶¶ 150-53.
     [8] A federal agency must reinitiate consultation when it retains "Federal involvement or control over the action," and one of

25   several triggering events occurs including that "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).

1  claim must wait for another day.

2           **d.**    <u>**Mootness**</u>

3          The SRS Contractors and Federal Defendants argue that Plaintiffs' claims that NMFS was

4  required to re-initiate consultation based upon 2014 and 2015 temperature control events are moot

5  because Reclamation has already reinitiated consultation regarding 2014/2015 drought operations. Doc.

6  1007 at 21-22; Doc. 1009 at 11. The consultation letter cited by Federal Defendants, *see* Doc. 1007 at 21

7  n. 15, explains that it was issued in response to Reclamation's request for NMFS's concurrence that the

8  biological effects of implementing "drought operations" (*i.e.*, modifications to normal operations

9  required because of unprecedented drought conditions) would be "within the limits of the existing

10  Incidental Take Statement" issued in connection with the 2009 NMFS OCAP Salmonid BiOp. *Id.*

11  Plaintiffs are correct that this consultation document does not address the SRS Contracts specifically. As

12  the Ninth Circuit has made abundantly clear, system-wide consultation (such as consultation over the

13  OCAP that produced the 2009 NMFS OCAP Salmonid BiOp) does not obviate the need for contract-

14  specific consultation. *See NRDC v. Jewell*, 749 F.3d at 784. This logic would also seem to mean that

15  system-wide <u>re-consultation</u> does not obviate the need for contract-specific re-consultation.

16          Relatedly, the SRS Contractors also argue that the 2009 NMFS Samonid BiOp considered the

17  effects of full diversions under the SRS Contracts and therefore that re-consultation is not warranted.

18  Doc. 1009 at 11. Again, this reasoning was rejected in *NRDC v. Jewell*, 749 F.3d 782 (explaining that

19  the 2008 FWS OCAP Smelt BiOp "merely assesses the general effects of the Bureau's [OCAP] Plan,

20  and it does not represent a consultation with the FWS concerning the impact of the Bureau's decision to

21  renew the specific contracts" challenged).

22          **e.**    <u>**Section 9 Claim Based on Purely Past Violations.**</u>

23          Federal Defendants also argue that the Sixth Claim for Relief, alleging take in violation of ESA

24  § 9, is futile because it is based purely on allegations of past violations. Doc. 1007 at 20-21. In support

25  of this proposition, Federal Defendants cite the text of the ESA's citizen suit provision, 16 U.S.C. §

1  1538, and *Gwaltney of Smithfield Ltd. v. Chesapeak Bay Found.*, 484 U.S. 49, 50-60 (1987) (interpreting

2  identical language in Clean Water Act ("CWA") citizen suit provision as conferring no jurisdiction over

3  citizen suits for wholly past violations). *See also Fox v. Palmas Del Mar Properties, Inc.*, 620 F. Supp.

4  2d 250, 262-63 (D.P.R. 2009) (concluding plaintiffs lack standing to bring Section 9 claim because

5  plaintiffs consistently referenced construction project alleged to pose harm to species in the past tense

6  and failed to allege plausibly that construction was ongoing or imminent); *Forest Conservation Council*

7  *v. Rosboro Lumber Co.*, 50 F.3d 781, 787 (9th Cir. 1995) (citing *Gwaltney* in ESA case for the

8  proposition that "the interest of the citizen-plaintiff is primarily forward-looking").

9  Plaintiffs assert in reply that because the contracts in question do not expire until 2045, the

10  resultant take of salmon "is not wholly past" insofar as "[d]eliveries and diversions that may cause take

11  will occur again this year and every year the contracts are in effect." Doc. 1013 at 15 n. 10. The 4SC

12  makes this clear in Prayer "J," which asks the Court to "[e]njoin the Secretary from continuing to make

13  releases of water from Shasta Reservoir, and the SRS Contractors from diverting such water, to satisfy

14  the terms of the SRS Contracts where such releases and diversions will cause the unauthorized take of

15  winter-run and spring-run Chinook." 4SC at 66-67. Therefore, the Court concludes that, even if the

16  ESA's citizen suit provision precludes claims based upon purely past violations, the Sixth Claim for

17  Relief is "forward looking" and therefore not futile.

18  **3.    <u>Judicial Estoppel</u>**

19  The CVP Water Service Contractors argue that Plaintiffs should be estopped from arguing that

20  supplementation with these new claims should be permitted because they previously argued against

21  combining the delta smelt and salmon claims. Doc. 1008 at 5-6. Specifically, in response to a motion to

22  consolidate Plaintiffs' initial challenge to the 2005 FWS Smelt BiOp with their parallel challenges to the

23  2004 NMFS Salmonid BiOp, Plaintiffs argued against consolidation for the following reasons, among

24  others:

25  • The claims "arise from separate agency actions involving separate factual records, are at very

different stages of litigation, and concern the effects of different water project operations on entirely distinct species that have different biological needs and are under the protection of separate agencies." Doc. 278 at 1.

- "Any facial similarity in the legal claims made in each case must yield to the vastly different facts needed to prove the inadequacy of the biological opinion for delta smelt versus that for the salmonid species." Doc. 278 at 9.

"[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks omitted). "[I]ts purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749-50 (citation and internal quotation marks omitted). As the Ninth Circuit recently summarized:

> Although judicial estoppel is "probably not reducible to any general formulation of principle, ... several factors typically inform the decision whether to apply the doctrine in a particular case." [*New Hampshire*, 532 U.S.] at 750 (citations and internal quotation marks omitted). "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* (internal quotation marks omitted). "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751. "In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." *Id.*

*Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 270-71 (9th Cir. 2013) (emphasis added).

Here, the Court does not believe that Plaintiffs' present position is "clearly inconsistent" with the position they took in connection with the prior motion to consolidate. In the context of the previous motion to sever, the parties and the previously-assigned district judge were faced with the prospect of highly complex, direct challenges to two, separate biological opinions, including numerous arguments

1    that those biological opinions were not based upon the best available science.

2        The present motion to supplement presents a different procedural situation. First, the salmonid

3    claims sought to be added to this smelt case by supplementation are more narrowly focused than those

4    discussed in the previous motion to consolidate. Second, as discussed below, the proposed salmonid

5    claims share common legal issues with the remaining smelt claims, a situation that was at least not

6    entirely apparent in the prior motion. In addition, over the course of the two parallel smelt and salmonid

7    litigations, it has become clear that actions taken to protect the smelt may actually harm salmonids and

8    vice versa, presenting a risk of inconsistent rulings if claims regarding the two sets of species are not

9    treated together. Because Plaintiffs' present position is not clearly inconsistent with its prior position,

10   judicial estoppel does not apply.

11       ### 4.   **Prejudice to Non-Moving Party.**

12       As mentioned, "consideration of prejudice to the opposing party . . . carries the greatest weight"

13   in evaluating a motion to supplement or amend. *See Eminence Capital*, 316 F.3d at 1052. "While

14   prejudice to the non-movant is a valid reason for denying leave to amend, such prejudice must in fact be

15   'undue.'" *Dove v. Wash. Metro. Area Transit Auth*., 221 F.R.D. 246, 248 (D.D.C. 2004). "Undue

16   prejudice is not mere harm to the non-movant but a denial of the opportunity to present facts or evidence

17   which would have been offered had amendment been timely." *Id*.

18       Federal Defendants claim that they will suffer undue prejudice if they are forced to defend

19   against claims that concern listed salmonids in a case that originally concerned only smelt. *See* Doc.

20   1007 at 22. In support of this assertion, they cite *Sierra Club v. Penfold*, 857 F.2d 1307, 1316 (9th Cir.

21   1988), for the proposition that adding a "new claim for relief" was sufficient to cause prejudice to the

22   opposing party. But, that case evaluated prejudice in the context of the Sierra Club's argument that a

23   particular claim (otherwise barred by the statute of limitations) should relate back under Fed. R. Civ. P.

24   15(c) to the original complaint. *Id*. at 1315-16. In that context, the opposing party is not prejudiced by

25   relation back where the new claim arises out of the same facts as the original claim because the opposing

1   party would already have notice of the nature of the action. *See id.* This reasoning is not applicable

2   outside the context of the relation back procedure.

3       The CVP Water Service Contractors assert that supplementation with the new salmonid claims

4   would prejudice them because it would "further delay[] final resolution of the only remaining claim

5   against them regarding water service contracts they signed over 10 years ago and which have 25-year

6   terms." Doc. 1008 at 3. They complain that the "lingering legal uncertainty" caused by this litigation

7   hinders long-term planning by the DMC Unit Contractors and their constituent water users for things

8   such as capital improvements and investments to infrastructure or farms. Doc. 1008 at 8. The Court

9   takes this concern seriously, but does not believe that denying the motion to supplement is likely to

10  shorten the period of legal uncertainty in any significant sense. Until the fate of the long-term contracts

11  held by senior rights holders (*e.g.*, the SRS Contractors) is settled, it is unclear how any legal uncertainty

12  plaguing long-term contracts held by the DMC Unit Contractors can be resolved.[9]

13      **5.   Undue Delay.**

14      Federal Defendants argue Plaintiffs unduly delayed requesting leave to file their supplemental

15  claims. Doc. 1007 at 18-20. Undue delay has been described as "delay that prejudices the nonmoving

16  party or imposes unwarranted burdens on the Court." *Davis v. Powell*, 901 F. Supp. 2d 1196, 1212 (S.D.

17  Cal. 2012) (citation and quotation marks omitted). In evaluating an assertion of undue, a court may

18  inquire "whether the moving party knew or should have known the facts and theories raised by the

19  amendment in the original pleading." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953

20  (9th Cir. 2006) (citation and quotation marks omitted).

21      The Fifth Claim for Relief alleges that the obligation to re-initiate consultation was triggered by,

22  among other things, the issuance of the 2009 NMFS OCAP Salmonid BiOp. *See* 4SC ¶ 186 ("The

23  [2009] NMFS OCAP [Salmonid] BiOp constituted new information that undermined the January 10,

24

---

25  [9] The CVP Water Service Contractors also argue prejudice would result from addition of new plaintiffs, but fail to explain why. Doc. 1008 at 8.

1   2005 letters of concurrence and revealed effects of the SRS Contracts that were not previously

2   considered."). As discussed above, it is not clear whether this aspect of the Fifth Claim for Relief will

3   survive a dispositive motion on statute of limitations grounds. Critically, however, there are aspects of

4   this claim that arose more recently, including the allegation that the 2009 NMFS OCAP Salmonid BiOp

5   was amended in 2011, 2014 and 2015, *id.* ¶113, and the separate allegation that Federal Defendants

6   acted unlawfully "by failing to reinitiate consultation based on information relating to the massive

7   mortality to the 2014 and 2015 generations of winter-run and spring-run Chinook that occurred when it

8   made excessive releases to satisfy the renewed SRS Contracts." *Id.* ¶ 187. Federal Defendants suggest

9   that that these events should be viewed as "additional chances, going back years," at which points

10  Plaintiffs could have filed their claims. Doc. 1007 at 19.[10]

11          Plaintiffs counter by asserting that they are bringing their claims now because of the mortality

12  events that took place in 2014 and 2015. *See* Doc. 1013 at 12. After the 2015 mortality event, Plaintiffs

13  filed motions to lift the stay and for leave to supplement the complaint, Doc. 981, which were held in

14  abeyance pursuant to the stipulation of all parties. Doc. 990.

15          On balance, the Court concludes Federal Defendants have not established any "undue" delay.

16  Several relatively recent events underpin the salmonid claims. The scope of those claims is more

17  properly determined in the context of a dispositive motion.

18      **6.      Judicial Efficiency.**

19          The Court is mindful that Fed. R. Civ. P. 15(d) is, at its core, "a tool of judicial economy and

20  convenience," the use of which "is therefore favored." *Keith v. Volpe*, 858 F.2d at 473. The interests of

21

22  [10] Relatedly, Federal Defendants argue they will be prejudiced if they have to compile an administrative record addressing decisions that are not "reasonably close in time." Doc. 1007 at 23. Federal Defendants suggest this process will be made more difficult because some relevant material may have been archived and staff members may have left. *Id.* While Federal

23  Defendants' practical concern is valid, denying Plaintiffs' motion to amend would not preclude Plaintiffs from filing a separate action to prosecute the proposed salmonid claims. In either circumstance, the scope of the proposed claim may be subject to narrowing on various grounds (*e.g.*, statute of limitations). This motion really raises the question of how the

24  various claims should be organized – as one case or in several. Therefore, the Court does not find Federal Defendants' argument persuasive.

25

1    judicial economy and convenience are served where "the plaintiffs' motion to supplement their

2    complaint raises similar legal issues to those already before the court, thereby averting a separate,

3    redundant lawsuit." *Fund For Animals v. Hall*, 246 F.R.D. 53, 55 (D.D.C. 2007). As all parties are well

4    aware, if Plaintiffs' motion to supplement is denied, any separate lawsuit based upon the additional

5    claims is likely to end up litigated before the undersigned as a related case. *See* Local Rule 123. It is

6    through this lens that the Court evaluates the judicial efficiency impacts of supplementation.

7           The Fifth and Sixth Claims for relief will bring into the smelt case issues pertaining to salmonid

8    species and the salmonid consultation history. This will undoubtedly complicate the case. However,

9    again, the question is not whether the Court will ever have to tackle both sets of issues; rather, the

10   question is whether merging the sets of issues into one case will serve the interests of judicial efficiency.

11   There are significant overlapping legal issues among the existing and proposed supplemental claims. For

12   example, a major legal issue in all of the claims concerning the SRS Contracts (both smelt and salmonid

13   claims) is likely to be the extent, nature, and implications of any discretion Reclamation may have to

14   reduce deliveries to the SRS Contractors. Permitting supplementation will allow for more efficient

15   adjudication of claims that turn on this issue. There are also common legal issues that link the smelt

16   claims concerning the DMC Contracts to the salmonid claims, namely, whether and to what extent FWS

17   and NMFS can rely on the 2008 FWS OCAP Smelt BiOp and 2009 NMFS OCAP Salmonid BiOp,

18   respectively, to satisfy their obligations to consult about the long-term contracts. There are linkages

19   between the smelt and salmon facts as well. For example, it is alleged that in both 2014 and 2015,

20   Reclamation sought and received approval to decrease Delta flow requirements designed to protect delta

21   smelt in order to increase Shasta Reservoir reserves to satisfy the SRS Contracts in the dry months and

22   to increase cold-water reserves to manage temperatures for salmonids in the summer. 4SC ¶¶ 57-59.

23          This case is unlike *Neely*, 140 F.3d at 401, where supplementation was not permitted. In *Neely*,

24   the plaintiffs sought to enjoin a state statute requiring parental consent prior to an abortion. *Id.* The

25   district court entered a final order granting that relief. *Id.* at 402. Plaintiffs later sought to supplement

1    their complaint to challenge a new consent statute. *Id*. The Ninth Circuit did not permit supplementation,

2    concluding that the supplemental complaint constituted a "separate, distinct and new cause of action"

3    that should be filed separately because it (1) challenged a different statute, (2) final judgment had been

4    entered in the original action, and (3) the district court did not retain jurisdiction. *Id*. Here, the Court has

5    yet to reach the merits of Plaintiffs' challenge to the DMC and SRS Contracts based upon failure to

6    consult over impacts to the delta smelt and the Court has not relinquished jurisdiction.

7            In contrast, in *Keith*, 858 F.2d at 471, the plaintiffs originally filed suit in 1972, alleging that, in

8    planning a freeway construction project, defendants failed to comply with environmental laws and other

9    federal statutes addressing transit impacts to communities. In 1981, the parties signed a consent decree

10   that included commitments to build low-income housing. *Id*. In 1985, new plaintiffs joined several

11   original plaintiffs to add supplemental claims against new municipal defendants for denying housing

12   permits. *Id*. at 471-72. The supplemental claim proposed to add numerous, entirely new claims,

13   including constitutional claims and allegations that defendants violated federal and state statutes.

14   *Compare id. with Keith v. Volpe*, 352 F. Supp. 1324, 1382-29 (C.D. Cal. 1972). The Ninth Circuit

15   rejected defendants' arguments against supplementation, explaining that "some relationship" existed

16   between the newly alleged matters and the subject of the original action." *Keith*, 858 F.2d at at 474.

17   Here, for the reasons discussed above, the Court finds there is "some relationship" between the salmonid

18   claims and the smelt claims.

19          The new salmonid claims will require the preparation of an additional administrative record

20   covering the consultation history vis-à-vis the SRS Contracts and salmonid impacts. Federal Defendants

21   cite *Center for Food Safety v. Vilsack*, No. C-10-04038-JSW, 2011 WL 672802, at *3 (N.D. Cal. Feb.

22   18, 2011), for the proposition that a supplemental pleading that requires preparation of a new

23   administrative record should be deemed to constitute a "separate, distinct, and new cause of action"

24   warranting denial of a motion to supplement. In *Vilsack*, plaintiffs originally challenged a decision by

25   the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS") to issue

permits for the use of "Roundup Ready" Sugar Beets without conducting environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4335, and other statutes. *Id.* at *1. The district court granted plaintiffs' request for a preliminary injunction in November 2010. *Id.* In February 2011, APHIS completed and released relevant NEPA environmental review documents. *Id.* Plaintiffs proposed to amend the complaint to add allegations regarding the new NEPA documents. *Id.* The district court denied the request, mentioning that the new claims would need a "separate administrative record," which suggested that the claim "should be the subject of a separate action." *Id.* at *3. But, the district court was still "[m]indful that Rule 15(d) 'permits the bringing of new claims in a supplemental complaint to promote the economical and speedy disposition of the controversy.'" *Id.* at *4 (quoting *Keith*, 858 F.2d at 473). What ultimately drove the district court's decision to deny amendment was the fact that the February 2011 NEPA documents were already the subject of a lawsuit in the District Court for the District of Columbia, such that the interest of judicial economy would be better served by presenting plaintiffs' new claims in that court. *Id.*

The unique circumstances in *Vilsack* are not present here, so the Court does not find *Vilsack* to be helpful. While it is true that having multiple administrative records in one case will complicate record review, this Court is prepared to handle a complex record and has handled cases (some related to this one) in which multiple records have been submitted by different agencies agencies.[11]

Of more concern to the Court is the addition of the Sixth Claim for Relief, arising under ESA § 9, which may require an entirely separate discovery procedure. *See Oregon Nat. Desert Ass'n v. Kimbell*, 593 F. Supp. 2d 1217, 1220 (D. Or. 2009) ("[T]he scope of judicial review in a claim brought under the ESA [§ 9] may not be subject to APA limitations."); *see also Aransas Project v. Shaw*, 775 F.3d 641, 653-63 (5th Cir. 2014) (reviewing bench trial ruling addressing ESA § 9 take claim). It is unclear at this stage of the case what types of extra-record evidence and/or discovery will be appropriate in this case. It

---

[11] The new claims will require bringing in at least one new defendant: NMFS. Yet, any negative impact to judicial efficiency of that addition is likely to be relatively minor.

is also unclear how long it will take to develop any extra record evidence and/or whether such development should be delayed until after the preparation of the administrative record(s). Moreover, the Court cannot determine at this time whether there are dispositive issues that can be placed before the Court for decision while extra record evidence is being developed. All of these issues are best dealt with during the scheduling process. In this and related cases, the parties have worked well together to come up with litigation schedules that allow merits issues to be placed before the Court on a staggered basis. If the Sixth Claim for relief proves to be unwieldy or threatens to delay significantly merits decisions on other issues, ruling on that claim can be delayed relative to other merits issues or, if that proves impracticable, a motion to sever will be entertained by the Court.

Overall, the Court believes that the interests of judicial efficiency will be served by allowing supplementation.

## V. <u>CONCLUSION</u>

Overall, the Court concludes that the claims sought to be added by way of supplementation are not futile and are not barred by judicial estoppel. The Court further concludes that no party will be prejudiced and that, as a whole, Plaintiffs did not unduly delay bringing these claims. Finally, the Court finds that the interests of judicial efficiency will be served by allowing supplementation. Should unexpected difficulties render continued treatment of these new salmonid claims within the smelt case unwieldy, appropriate adjustments can be made.

IT IS SO ORDERED.

Dated:   **April 22, 2016**                          **/s/ Lawrence J. O'Neill**
                                                                   UNITED STATES DISTRICT JUDGE