JOHN C. CRUDEN, Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
BRADLEY H. OLIPHANT, Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
999 18th St., South Terrace, Ste. 370
Denver, CO 80202
(303) 844-1381 (tel)
(303) 844-1350 (fax)

Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>S.M.R. JEWELL, U.S. Department of the Interior, *et al.*,<br><br>                    Defendants. | Case No. 1:05-cv-01207 LJO-EPG<br><br>**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIFTH AND SIXTH CLAIMS**<br><br>Judge: Lawrence J. O'Neill<br>Hearing Date: TBD<br>Time: TBD<br>Courtroom: 4 |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.*,<br><br>                    Defendants-Intervenors. | |
| ANDERSON-COTTONWOOD IRRIGATION DISTRICT, *et al.*,<br><br>                    Joined Parties. | |

# TABLE OF CONTENTS

<u>PAGE</u>

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................3

I.  The Endangered Species Act. ............................................................... 3

II.  The Fourth Supplemental Complaint ("4SC") (Doc. 1020) ............................... 5

STANDARD OF REVIEW ...............................................................................................6

I.  Legal Standard Governing Motions to Dismiss under Rule 12(b)(1). ............... 6

II.  Legal Standard Governing Motions to Dismiss under Rule 12(b)(6) ................... 7

ARGUMENT .....................................................................................................................7

I.  Plaintiffs' Fifth Claim should be dismissed because it fails to state a claim for failure to reinitiate consultation under the ESA. ............................................. 7

    A.  Plaintiffs' Fifth Claim must be dismissed because Reclamation has not retained discretionary federal involvement or control over the SRS contracts in a manner that triggers a duty to reinitiate consultation……………………………………………8

    B.  Assuming *arguendo* that Plaintiffs could show an action over which Reclamation retained discretion or control sufficient to trigger reinitiation, their Fifth Claim is time-barred because it accrued more than six years ago…………………………10

    C.  Even if Plaintiffs' Fifth Claim is not time-barred and Reclamation did retain some involvement over the contracts themselves, Reclamation fulfilled its obligations under the ESA by ensuring that activities related to contract implementation (i.e., water releases) are not likely to jeopardize the continued existence of listed species……………………………………………………………………………13

    D.  None of the other alleged triggering events can support a claim for relief………15

II.  Plaintiffs' Sixth Claim must be dismissed. ...................................................... 18

CONCLUSION...................................................................................................................22

CERTIFICATE OF SERVICE .........................................................................................22

i

1

**TABLE OF AUTHORITIES**

2

<u>CASES</u>                                                                                                    <u>PAGE</u>

3

*Acri v. Int'l Ass'n of Machinists*,
    781 F.2d 1393 (9th Cir. 1986) ........................................................ 10

4

*Alsea Valley Alliance v. Evans*,
    161 F. Supp. 2d 1154 (D. Or. 2001) ............................................... 10

5

6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................... 7

7

*Ass'n of Am. Med. Colls. v. United States*,
    217 F.3d 770 (9th Cir. 2000) .......................................................... 6

8

9

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
    515 U.S. 687 (1995) .................................................................. 20, 21

10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................... 7

11

12

*Cal. Sportfishing Prot. Alliance v. FERC*,
    472 F.3d 593 (9th Cir. 2006) .......................................................... 8

13

*Coalition for a Sustainable Delta v. FEMA*,
    812 F. Supp. 2d 1089 (E.D. Cal. 2011) ................................... 11, 12

14

15

*Cold Mountain v. Garber*,
    375 F.3d 884 (9th Cir. 2004) .................................................. 20, 21

16

*Conservation Cong. v. Finley*,
    774 F.3d 611 (9th Cir. 2014) ...................................................... 4, 5

17

18

*Conservation Cong. v. U.S. Forest Serv.*,
    720 F.3d 1048 (9th Cir. 2013) ................................................... 3, 4

19

*Coos Cty. Bd. of Cty. Comm'rs v. Kempthorne*,
    531 F.3d 792 (9th Cir. 2008) ........................................................ 10

20

21

*Ctr. for Biological Diversity v. EPA*,
    No. 11–cv–00293–JCS, 2013 WL 1729573 (N.D. Cal. Apr. 22, 2013) ................................. 11

22

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ...................................................... 3

23

24

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) .................................................................. 20, 21

25

*Environmental Protection Information Center v. Simpson*,
    255 F.3d 1073 (9th Cir. 2001) ..................................................... 8, 9

26

27

*Epstein v. Wash. Energy Co.*,
    83 F.3d 1136 (9th Cir. 1996) .......................................................... 7

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Forest Guardians v. Johanns,*
    450 F.3d 455 (9th Cir. 2006) ........................................................................ 3

*Glenn-Colusa Irrigation Dist. v. Nat. Res. Def. Council,*
    135 S. Ct. 676 (2014) ................................................................................... 3

*Golden Nw. Aluminum v. Bonneville Power Admin.,*
    501 F.3d 1037 (9th Cir. 2007) ...................................................................... 8

*Gros Ventre Tribe v. United States,*
    344 F.Supp.2d 1221 (D. Mont. 2004) ......................................................... 12

*Huynh v. Chase Manhattan Bank,*
    465 F.3d 992 (9th Cir. 2006) ........................................................................ 7

*In re Hunter,*
    66 F.3d 1002 (9th Cir. 1995) ........................................................................ 6

*Jablon v. Dean Witter & Co.,*
    614 F.2d 677 (9th Cir. 1980) ........................................................................ 7

*Kokkonen v. Guardian Life Ins. Co.,*
    511 U.S. 375 (1994) ...................................................................................... 6

*Lauwrier v. Garcia,*
    NO. CV 12-07381 MMM (SHx), 2013 WL 11238497 (C.D. Cal. Mar. 8, 2013) .................... 7

*Morongo Band of Mission Indians v. Cal. State Bd. of Equalization,*
    858 F.2d 1376 (9th Cir. 1988) ...................................................................... 6

*Nat. Res. Def. Council v. Houston,*
    146 F.3d 1118 (9th Cir. 1998) ...................................................................... 8

*Nat. Res. Def. Council v. Jewell,*
    749 F.3d 776 (9th Cir. 2014) ..................................................................... 3, 9

*Nat'l Wildlife Fed'n v. Burlington Northern R.R.,*
    23 F.3d 1508 (9th Cir. 1994) ...................................................................... 19

*Nesovic v. United States,*
    71 F.3d 776 (9th Cir. 1995) ........................................................................ 12

*Nulankeyutmonen Nkihtaqmikon v. Impson,*
    503 F.3d 18 (1st Cir. 2007) ........................................................................... 6

*Pacific Rivers Council v. Thomas,*
    30 F.3d 1050 (9th Cir. 1994) ...................................................................... 12

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) ...................................................................... 6

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014) ................................................................ passim

*San Luis & Delta–Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ........................................................................ 3

*Sisseton-Wahpeton Sioux Tribe v. United States*,
  895 F.2d 588 (9th Cir. 1990) ...................................................................... 10

*Spannaus v. U.S. Dep't of Justice*,
  824 F.2d 52 (D.C. Cir. 1987) ...................................................................... 10

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ...................................................................... 7

*State Water Contractors v. Jewell*,
  135 S. Ct. 950 (2015) .................................................................................... 4

*Stock West  v. Confederated Tribes of the Colville Reservation*,
  873 F.2d 1221 (9th Cir. 1989) ...................................................................... 6

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
  143 F.3d 515 (9th Cir. 1998) ...................................................................... 11

*United States v. Estate of Hage*,
  810 F.3d 712 (9th Cir. 2016) ...................................................................... 12

*Washington Toxics Coalition, v. EPA*,
  413 F.3d 1024 (9th Cir. 2005) .................................................................... 12

*Wind River Mining Corp. v. United States*,
  946 F.2d 710 (9th Cir. 1991) ................................................................ 10, 11

*Wolfe v. Strankman*,
  392 F.3d 358 (9th Cir. 2004) ........................................................................ 6


STATUTES

16 U.S.C. § 1536(a)(2) ............................................................................... 3, 13
16 U.S.C. § 1536(b)(3)(A) ................................................................................ 4
16 U.S.C. § 1536(b)(4) ................................................................................... 18
16 U.S.C. § 1536(b)(4)(iv) ............................................................................. 18
16 U.S.C. § 1536(o)(2) ...................................................................... 4, 18, 19
16 U.S.C. § 1538 ............................................................................................ 20
16 U.S.C. § 1540(g)(1)(A) ............................................................................. 10
16 U.S.C. § 1532(19) ..................................................................................... 20
16 U.S.C. § 1536(b)(4)(ii) ............................................................................... 4
28 U.S.C. § 2401(a) ................................................................................. 10, 12


FEDERAL REGULATIONS

50 C.F.R. § 402.03 ........................................................................................... 3
50 C.F.R. § 402.14 ........................................................................................... 4
50 C.F.R. § 402.14(g)(4) ................................................................................. 4
50 C.F.R. § 402.16 .......................................................................... 5, 8, 13, 16

iv

50 C.F.R. § 402.16(b) ...................................................................................................... 16

50 C.F.R. §§ 402.13(a)...................................................................................................... 4

**INTRODUCTION[1]**

In their Fifth Claim, Plaintiffs allege that the U.S. Bureau of Reclamation ("Reclamation") was required to reinitiate consultation under section 7(a)(2) of the Endangered Species Act ("ESA") with the National Marine Fisheries Service ("NMFS") on the impacts of the execution of the Sacramento River Settlement Contracts ("SRS Contracts") on listed winter-run and spring-run Chinook and their critical habitats. In their related Sixth Claim, Plaintiffs insist that Reclamation's release of water pursuant to those contracts violates ESA section 9.

Federal Defendants respectfully move to dismiss these claims for several reasons, which we detail below. In brief, Plaintiffs' Fifth Claim fails to allege (and cannot show) any affirmative agency action by Reclamation that could give rise to a duty to reinitiate on the execution of the decade-old SRS Contracts. Even if there were, the Fifth Claim allegedly accrued outside the statute of limitations period and is time-barred. Nor do Plaintiffs offer any basis to conclude that events that subsequently occurred constitute new information that revealed effects of the SRS Contracts not previously considered. The Sixth Claim is also subject to dismissal. As a matter of law, "any taking" of listed salmon resulting from Reclamation's Central Valley Project ("CVP") operations, including water deliveries called for in the 2004-2005 SRS Contracts, are covered by the Incidental Take Statement ("ITS") accompanying NMFS's *Biological Opinion and Conference Opinion on the Long-Term Operations of the Central Valley Project and State Water Project*, dated June 4, 2009 ("2009 NMFS OCAP BiOp"). Plaintiffs fail to allege that Reclamation's 2014 and 2015 operations were inconsistent with that ITS.  The Sixth Claim fails.

Before addressing these arguments in detail, however, it is important to underscore that Plaintiffs' concerns are, at bottom, really about the on-the-ground operations of the CVP, particularly water deliveries that may flow from execution of the SRS Contracts, not the mere execution of the SRS Contracts. Put another way, the relevant concern for listed species and the ESA is whether the effects of agency action on species have been considered and properly

---

[1] To avoid duplicative argument, Federal Defendants concur with the SRS Contractors Motion to Dismiss, filed today, June 20, 2016, that Plaintiffs' First, Second, and Third Claims are moot and subject to dismissal. Doc. 1031. Federal Defendants further concur with the SRS Contractors that the Fifth Claim is subject to dismissal and that the Sixth Claim is subject to dismissal for challenging wholly past alleged violations. *Id.*

addressed consistent with ESA requirements. Here, the effects on listed species of the actual water deliveries provided for in the 2004 and 2005 SRS Contracts were consulted upon and addressed in the two biological opinions on the coordinated operations of the entire CVP. Accordingly, while doubtlessly sincere, Plaintiffs' claims about the execution of the SRS Contracts are fundamentally misplaced.

Indeed, more than a decade ago, Reclamation and the consulting agencies made the conscious decision to separate contract execution and the broader long-term coordinated operations of the CVP and State Water Project ("SWP") for ESA purposes. The agencies separately consulted on each. But delivery of contract water was clearly one aspect included in the coordinated operations of the CVP. The agencies thus determined that it was appropriate to consider the delivery of contract water in a broader operational context, alongside the myriad other activities comprising the long-term coordinated operations of the CVP and SWP. Critically, as in the ESA consultation with the U.S. Fish and Wildlife Service ("FWS"), Reclamation and NMFS considered the impacts of full water delivery under all of these SRS Contracts. As noted above, that consultation concluded with the 2009 NMFS OCAP BiOp.

This broader consultation, the agencies determined, would insure that winter-run and spring-run Chinook salmon would not be jeopardized. After lengthy litigation, the Ninth Circuit agreed, upholding the 2009 NMFS OCAP BiOp and its 72 component reasonable and prudent alternative ("RPA") in their entirety on ESA grounds. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 989 (9th Cir. 2014). Reclamation is implementing that RPA, which allows for the delivery of water exactly as negotiated in the executed SRS Contracts. Thus, as a matter of law, its overall operation of the CVP avoids jeopardy to the listed species.

Plaintiffs here vigorously defended the 2009 NMFS OCAP BiOp and its RPA. Now, they seek to dissect and excise one operational component from the 2009 NMFS OCAP BiOp and subject it to further scrutiny. But that would improperly displace the agencies' judgment and unravel their reasoned consultation framework for lawfully managing this complex water project. And it would do so needlessly. As of this filing, all CVP operations covered in the 2009 NMFS OCAP BiOp—including the full delivery of water under these contracts—avoid jeopardy as a

matter of law. Notably, dismissing Plaintiffs' Fifth and Sixth Claims would not foreclose Plaintiffs or others from alleging that reinitiating on the long-term operations of the CVP and SWP was required. Nor would it prevent Reclamation from reaching that conclusion in the future. It would, however, preserve the agencies' reasoned approach to managing the CVP and maintain a *status quo* that is legally sufficient for ESA purposes.

## BACKGROUND

### I.      The Endangered Species Act.

The ESA is "a comprehensive scheme with the 'broad purpose' of protecting endangered and threatened species." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1106 (9th Cir. 2012) (citation omitted); *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir.) ("*NRDC v. Jewell*"), *cert. denied sub nom. Glenn-Colusa Irrigation Dist. v. Nat. Res. Def. Council*, 135 S. Ct. 676 (2014). ESA section 7(a)(2) governs the consultations between agencies, 16 U.S.C. § 1536(a)(2), and imposes substantive and procedural duties on that consultation. *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006).

Substantively, agencies contemplating certain kinds of federal action are required to "insure" that the action they take "is not likely to jeopardize the continued existence" or "result in the destruction or adverse modification of [critical] habitat" of an endangered or threatened species. *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1051 (9th Cir. 2013) (alteration in original) (*quoting* 16 U.S.C. § 1536(a)(2)). Agencies must consult with either FWS (for land-based and non-anadromous species) or NMFS (for marine and anadromous species) to determine the likely effects of their proposed actions on ESA-listed species. *Id*. Section 7 applies to "action in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.

The first step in the consultation process is for the action agency to independently determine whether its proposed action "may affect" an endangered or threatened species or that species' critical habitat. *Id.* § 402.14(a). If so, the agency must initiate either informal or formal consultation with the consulting agency. *San Luis & Delta–Mendota Water Auth. v. Jewell*, 747 F.3d 581, 596 (9th Cir. 2014), *cert. denied sub nom., Stewart & Jasper Orchards v. Jewell*, 135 S. Ct. 948 (2015), *State Water Contractors v. Jewell*, 135 S. Ct. 950 (2015); *see also* 50 C.F.R. §

402.14. Informal consultation is an "optional process that includes all discussions, correspondence, etc." between the two agencies and is "designed to assist the Federal agency in determining whether formal consultation or a conference is required." *Id*. § 402.13(a).

If, upon completion of informal consultation, the two agencies agree in writing that the proposed action "is not likely to adversely affect" any endangered or threatened species, no further action is necessary. *Conservation Cong.*, 720 F.3d at 1051; *see also* 50 C.F.R. §§ 402.13(a), 402.14(b)(1). If either agency determines that the proposed action is "likely to adversely affect" a listed species or habitat, formal consultation is required. *See id*. § 402.14. Formal consultation entails the consulting agency preparing a "biological opinion" stating whether the proposed action, "taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014); *quoting* 50 C.F.R. § 402.14(g)(4). If the consulting agency concludes that the proposed agency action would place the listed species in jeopardy or adversely modify its critical habitat, "the Secretary shall suggest those [RPAs] which he believes would not violate [section 7(a)(2)] and can be taken by the Federal agency ... in implementing the agency action." 16 U.S.C. § 1536(b)(3)(A).

If an action as proposed or modified by an RPA is not likely to jeopardize the species, but is reasonably likely to result in the "incidental take" of members of the species, the relevant consulting agency provides an "incidental take statement" identifying the impact of such taking and specifying reasonable and prudent measures and terms and conditions considered "necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(i-v). If the action agency implements the action as proposed and complies with the terms and conditions of the incidental take statement, the specified level of take is exempt from ESA section 9's "take" prohibition. 16 U.S.C. § 1536(o)(2).

After consultation is completed, an agency has a duty to reinitiate formal consultation under the following circumstances:

> Reinitiation of formal consultation is required and shall be requested … where discretionary Federal involvement or control over the action has been retained or is authorized by law and: (a) If the amount or extent of taking specified in the

1

2

3

4

> incidental take statement is exceeded; (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

5

50 C.F.R. § 402.16.

6

## II.   The Fourth Supplemental Complaint ("4SC") (Doc. 1020)

7

8

9

10

11

Plaintiffs' Fifth Claim for Relief seeks to require Reclamation to reinitiate consultation with NMFS on the impacts of the SRS Contract renewals on winter-run and spring-run Chinook and their critical habitats "based on the issuance of the [2009] NMFS OCAP BiOp and subsequent amendments." 4SC ¶ 186. Plaintiffs allege that Reclamation has "'discretionary federal involvement and control over' the SRS Contracts," *see e.g.*, 4SC ¶¶ 152, 186, and that

12

13

14

15

16

17

18

there is "ongoing" involvement in contract implementation. *Id.* ¶ 153. Specifically, Plaintiffs allege that Reclamation "makes real-time determinations regarding the timing and volume of releases that allow the SRS Contractors to make diversions of water," and has sought waivers from the state to "increase the amount of water it can provide to the SRS Contractors." *Id.* Plaintiffs ask the Court to enjoin Reclamation from "continuing to perform under the unlawfully executed long-term water supply contracts … and order them to renegotiate and re-execute these renewal contracts …." 4SC at 66.

19

20

21

22

23

24

25

26

Plaintiffs' related Sixth Claim alleges that Reclamation violated section 9 of the ESA because its "nondiscretionary" deliveries to the SRS Contractors during April, May, and early June of 2014, and April and May of 2015, caused the "unauthorized" "take" of winter-run and spring-run Chinook in 2014 and 2015. Mem. Dec. and Order Granting Mot. to Amend, Doc. 1018, at 14, citing 4SC ¶¶ 73, 75; 189-193.[2] Plaintiffs ask the Court to enjoin Reclamation from "continuing to make releases of water from Shasta Reservoir … to satisfy the terms of the SRS contracts where such releases … will cause the unauthorized take of winter-run and spring-run Chinook." *Id.* at 65-66.

27

28

---

[2] Plaintiffs' Sixth Claim for Relief alleges Reclamation and the SRS Contractors have violated section 9 of the ESA. *See* 4SC ¶¶ 189-193. Federal Defendants' motion is limited to Plaintiffs' claim against Reclamation, which, as discussed below, is without merit and subject to dismissal.

FED. DEFS.' MEMO OF PS AND AS ISO MOTION TO DISMISS                     5

1

**STANDARD OF REVIEW**

2
3
4
5
6
7
8

"A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West  v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989) (citation omitted). The party seeking to sue in federal court bears the burden of establishing that the court has subject matter jurisdiction to hear the action. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 778–79 (9th Cir. 2000); *Stock West*, 873 F.2d at 1225. Absent such proof, jurisdiction presumptively does not exist. *See In re Hunter*, 66 F.3d 1002, 1005 (9th Cir. 1995).

9

**I.      Legal Standard Governing Motions to Dismiss under Rule 12(b)(1).**

10
11
12
13
14
15
16
17
18
19
20
21
22

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) may take the form of a "facial attack" or a "factual attack." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Where a facial attack is brought, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id*. "Whether subject matter jurisdiction exists therefore does not depend on resolution of a factual dispute, but rather on the allegations in [the] complaint." *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Safe Air for Everyone*, 373 F.3d at 1039. The court need not presume the truthfulness of the plaintiff's allegations. *Id*. Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction. *Id*.

23
24
25
26
27

As noted above, Plaintiffs bear the burden of "clearly alleging definite facts to demonstrate that jurisdiction is proper," *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 25 (1st Cir. 2007) (citation omitted); where they fail to do so, the Court "has no power to do anything with the case except dismiss." *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988) (citation omitted).

28

FED. DEFS.' MEMO OF PS AND AS ISO MOTION TO DISMISS                                    6

## II.     Legal Standard Governing Motions to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that the defendant has committed the violation alleged. While a court "must take all of the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation," *id.* (quoting *Twombly*, 550 U.S. at 555), and a "formulaic recitation of the elements of a cause of action" is not enough. *Twombly*, 550 U.S. at 555. In particular, a court must grant a motion to dismiss under Fed. R. Civ. P. 12(b)(6) when "the running of the statute [of limitations] is apparent on the face of the complaint." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) (citations omitted); *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006). Likewise, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) (citation omitted). The allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "A court may convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion where appropriate." *Lauwrier v. Garcia*, NO. CV 12-07381 MMM (SHx), 2013 WL 11238497, at *4 (C.D. Cal. Mar. 8, 2013) (citing cases).

## ARGUMENT

## I.     Plaintiffs' Fifth Claim should be dismissed because it fails to state a claim for failure to reinitiate consultation under the ESA.

To survive a 12(b)(6) motion to dismiss on their claim for failure to reinitiate consultation under section 7, Plaintiffs must allege facts to show that Reclamation retained sufficient discretionary involvement or control over the SRS Contracts "to implement measures that inure to the benefit of the listed species." *Environmental Protection Information Center v. Simpson*,

255 F.3d 1073, 1080 (9th Cir. 2001) ("*EPIC*"). They must also allege that one or more triggers for reinitiation is met. 50 C.F.R. § 402.16. As detailed below, Plaintiffs can clear neither hurdle.

A.   **Plaintiffs' Fifth Claim must be dismissed because Reclamation has not retained discretionary federal involvement or control over the SRS contracts in a manner that triggers a duty to reinitiate consultation.**

The Ninth Circuit has made clear that the duty to re-initiate consultation under ESA section 7 is triggered only when the agency has retained sufficient discretionary involvement or control over an action "to implement measures that inure to the benefit of the listed species." *EPIC*, 255 F.3d at 1080. It has made equally clear that where there remains no further affirmative agency action to be undertaken and the agency action is completed, re-initiation of consultation is not required. *Id.*; *Cal. Sportfishing Prot. Alliance v. FERC*, 472 F.3d 593, 595, 598 (9th Cir. 2006) (no duty to consult about the effects of a license issued in 1980, even though the license remained in effect because "[t]he action was concluded in 1980 when [agency] issued the license"). This is true even where the agency possessed discretion over the action at the outset that required it to undertake ESA consultation. *EPIC*, 255 F.3d at 1082-83. It is equally true even where the completed agency action remains in effect and the agency retains some discretion in the continuing implementation of its terms. *Id.*

Here, consistent with these requirements, Reclamation consulted with NMFS under ESA section 7 when it undertook the affirmative action of executing the SRS Contracts in 2004 and 2005. 4SC ¶ 108; Doc. 1018 at 7. The execution of those contracts, once finalized, is completed final agency action. *See Golden Nw. Aluminum v. Bonneville Power Admin.*, 501 F.3d 1037, 1044 (9th Cir. 2007) (federal agency "sale contracts are final agency actions," and "statute of limitations begins to run from the date such contracts are executed"); *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998) ("negotiating and executing contracts is 'agency action'"). While the contracts indisputably remain in effect, Reclamation does not now retain the discretion to alter the terms of those contracts to inure to the benefit of listed species. *EPIC*, 255 F.3d at 1082 (finding *Houston* "inapposite" and holding that the fact that Reclamation was required to consult on the renewal of water contracts does not necessarily mean that "once the renewed contracts were executed, the agency had continuing discretion to amend them at any

1   time to address the needs of endangered or threatened species"). And, while Reclamation retains

2   some limited discretionary control or involvement in implementing the terms of the SRS

3   Contracts, that level of involvement is not sufficient to trigger re-initiation because in the end,

4   Reclamation ultimately cannot unilaterally alter the existing terms of the contracts in a manner

5   that will inure to the benefit of species. *Id.*

6         Plaintiffs' conclusory allegation that Reclamation had discretionary involvement or

7   control sufficient to trigger reinitation on the execution of the SRS Contracts does not hold

8   water. *See e.g.*, 4SC ¶ 152 (broadly alleging Reclamation has continuing control over "the SRS

9   Contracts"), ¶ 186. Plaintiffs fail to allege, for instance, which specific contract provisions

10  allegedly provide Reclamation the power to alter the contracts' terms, or in what specific way

11  Reclamation has any ongoing involvement or control over these agreements. Tellingly, Plaintiffs

12  do not even allege that any purported involvement "has been retained" by Reclamation.

13        In truth, Reclamation negotiated and executed the SRS Contracts once, more than a

14  decade ago. 4SC, ¶ 79; *see NRDC v. Jewell*, 749 F.3d at 780 (SRS Contracts "are forty-year

15  agreements between Reclamation and holders of certain senior water rights"); *see also*

16  Supplemental Administrative Record ("SAR") 002703 (Article 2(a) of the Glenn-Colusa

17  Irrigation District ("GCID") Contract, No. 14-06-200-855A-R-1). Once executed, Reclamation

18  administers the SRS Contracts as written; it has no authority to unilaterally amend the contracts

19  to protect listed species. *See EPIC*, 255 F.3d at 1082. Indeed, the SRS Contracts "constitute full

20  agreement as between the United States and the Contractor as to the quantities of water and the

21  allocation thereof …." *See, e.g.*, SAR 002714 (Article 9(a)(1) of the GCID Contract). There is

22  no general provision in the SRS Contracts providing for amendment of the contracts, let alone a

23  clause providing for the unilateral amendment of the contracts by Reclamation. *Id*. at 002695 –

24  002731 (GCID Contract). In fact, there are only limited provisions providing for amendment of

25  the SRS Contracts that are of no import here. The contracts may be amended, for instance, to

26  conform to a final judgment issued in a general stream adjudication of the Sacramento River

27  system or if the California State Water Resources Control Board or court of competent

28  jurisdiction modifies the terms and conditions of water rights to either party. *Id*. at 002715

(Articles 9(b) and 9(c) of the GCID Contract).  At the request of a contractor and at specific points in time, the Project Water provisions of the contracts can be converted to a contract under section 9(d) of the Reclamation Act of 1939, which would require some amendment to the current contracts. *Id*. at 002703 (Article 2(b) of the GCID Contract). The contracts can also be amended to reflect an assignment or partial assignment of water rights under the contracts. *Id*. at 002725 (Article 23 of the GCID Contract).

In sum, once executed, the terms of the SRS Contracts are set and Reclamation administers the contracts as executed. Reclamation does not retain the authority to alter the contract terms to inure to the benefit of listed species and thus, re-initiation on the execution of the SRS contracts has not been triggered.  Accordingly, Plaintiffs Fifth Claim must be dismissed.

**B.      Assuming *arguendo* that Plaintiffs could show an action over which Reclamation retained discretion or control sufficient to trigger reinitiation, their Fifth Claim is time-barred because it accrued more than six years ago.**

Plaintiffs' Fifth Claim for relief alleges that Reclamation "fail[ed] to reinitiate consultation on the SRS contracts" after "issuance" of the June 4, 2009 NMFS OCAP BiOp triggered that obligation. 4SC ¶ 186. As such, it is a citizen suit under 16 U.S.C. § 1540(g)(1)(A). As court have recognized, the general six-year statute of limitations in 28 U.S.C. § 2401(a) for claims against the federal government applies to claims brought under the ESA citizen suit provision. *Coos Cty. Bd. of Cty. Comm'rs v. Kempthorne*, 531 F.3d 792, 812 n.16 (9th Cir. 2008) (applying section 2401(a) to ESA citizen suit); *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154, 1160 (D. Or. 2001); *see generally Wind River Mining Corp. v. United States*, 946 F.2d 710, 713 (9th Cir. 1991). Section 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). "Under federal law a cause of action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action." *Acri v. Int'l Ass'n of Machinists*, 781 F.2d 1393, 1396 (9th Cir. 1986) (citation omitted). As a waiver of the government's sovereign immunity, section 2401(a) "must be strictly construed." *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987); *Sisseton-Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 592 (9th Cir. 1990) (courts should be

1    reluctant to extend the waiver).

2          Here, Plaintiffs allege that "issuance" of the 2009 NMFS OCAP Salmonid BiOp

3    triggered Reclamation's duty to reinitiate consultation on the execution of the SRS Contracts.

4    4SC ¶ 186. Assuming that is true, their claim accrued for statute of limitations' purposes on June

5    4, 2009, and Plaintiffs could have been in court 60 days later (August 4, 2009). *Sw. Ctr. for*

6    *Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998); *citing* 16

7    U.S.C. § 1540(g)(2)(A)(i). Plaintiffs did not bring their claim until they filed their 4SC on April

8    28, 2016, more than six years after it accrued. 4SC. Consequently, even if Plaintiffs could show

9    an action over which Reclamation retained discretionary control, their claim is time-barred,

10   because they failed to sue Reclamation when the claim was ripe and justiciable, i.e., within six

11   years of accrual. *See, e.g., Ctr. for Biological Diversity v. EPA*, No. 11–cv–00293–JCS, 2013

12   WL 1729573, at *22 (N.D. Cal. Apr. 22, 2013) (section 7 claims not brought within six years of

13   challenged agency actions are time-barred); *Wind River*, 946 F.2d at 712-13  (explaining that if

14   every agency action allowed a challenge to a procedural violation in the adoption of the

15   regulation statute of limitations would be nullified).

16         Nor can Plaintiffs save their stale claim by characterizing "the SRS Contracts" as an

17   "ongoing agency action," as they have attempted to do. Doc. 1013 at 17. As discussed above,

18   once executed, the contracts are final and Reclamation has no unilateral power to renegotiate or

19   change them. Even assuming water releases under the contracts covered by the 2009 NMFS

20   OCAP BiOp were "ongoing action," Plaintiffs cannot rely on *Coalition for a Sustainable Delta*

21   *v. FEMA*, 812 F. Supp. 2d 1089 (E.D. Cal. 2011) as they have attempted to do, for the

22   proposition that no statute of limitations could ever apply. Pls.' Reply in Supp. of Am. Mot. to

23   File 4SC, Doc. 1013, at 9.

24         In relevant part, *Coalition* merely stated that a challenge to the lawfulness of an agency's

25   *current, continued* administration and enforcement of regulations was not time-barred because

26   the relevant regulations were issued in 1976. *Id.* at 1107-1123 (noting also that a challenge to the

27   original regulations would be time-barred). Unlike here, however, the challenged actions

28   allegedly giving rise to plaintiffs' claim were not themselves decades or even years old, but were

1    ongoing. *Id.* Thus, *Coalition* did not hold or even suggest that a party could challenge an action

2    (even "ongoing") that accrued years or even decades outside the six-year limitations window.

3         Nor do the cases described therein support such a conclusion. In *Pacific Rivers Council v.*

4    *Thomas*, 30 F.3d 1050 (9th Cir. 1994), for example, it is clear that plaintiffs' claim first accrued

5    in 1992, when specific salmonid species were listed as threatened; that was the event occurring

6    after the agency initially adopted its forest plans that triggered the agency's duty to consult under

7    an "ongoing action" theory. *See Pac. Rivers*, 30 F.3d at 1051-53. But plaintiffs also filed their

8    lawsuit in 1992, so the Ninth Circuit had no occasion to discuss the statute of limitations. And

9    nothing in *Pacific Rivers* suggests that, even though all the material facts were in place in 1992,

10   plaintiffs could have filed suit decades later, without regard to 28 U.S.C. § 2401(a). The same is

11   true for *Washington Toxics Coalition, v. EPA*, 413 F.3d 1024 (9th Cir. 2005), which made no

12   reference to the statute of limitations. And Federal Defendants are unaware of any analogous

13   case that would allow a party to disregard section 2401(a) and file an ESA citizen suit more than

14   six years after knowing it had accrued. In short, neither *Coalition* nor the Ninth Circuit has

15   silently amended the unambiguous language of section 2401(a) to exclude an entire class of

16   claims involving alleged "ongoing" action from it unambiguous limitations period.[3]

17        Instead, the Ninth Circuit has made clear that section 2401(a) must be "strictly construed"

18   and "[t]he words 'every civil action' must be interpreted to mean what they say." *Nesovic v.*

19   *United States*, 71 F.3d 776, 778 (9th Cir. 1995). Applying *Nesovic*'s bright-line rule forecloses

20   the Fifth Claim, which accrued with issuance of the 2009 NMFS OCAP BiOp but was not

21   brought until more than six years later. Holding otherwise would violate the strict construction

22   that section 2401(a) demands as a waiver of sovereign immunity. In fact, it would reduce "every

23   civil action" to a nullity.[4] The Fifth Claim therefore fails.

---

[3] The Ninth Circuit has also never applied the "continuing violation theory" to claims asserting an ongoing violation under the ESA or APA.  Instead, the Ninth Circuit has rejected application of this doctrine to claims brought under the APA. *See United States v. Estate of Hage*, 810 F.3d 712, 721 (9th Cir. 2016), *cert. pet. Pending*; *Gros Ventre Tribe v. United States*, 344 F.Supp.2d 1221, 1229 n.3 (D. Mont. 2004), *aff'd* 469 F.3d 801 (9th Cir. 2006) ("continuing violation doctrine" "has evolved in the context of tort and nuisance law; it is not applicable in the context of an APA claim for judicial review").

[4] Moreover, as noted above, the 2009 NMFS OCAP BiOp considered the impacts of maximum

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.    Even if Plaintiffs' Fifth Claim is not time-barred and Reclamation did retain some involvement over the contracts themselves, Reclamation fulfilled its obligations under the ESA by ensuring that activities related to contract implementation (i.e., water releases) are not likely to jeopardize the continued existence of listed species.**

While section 7(a)(2) requires that each Federal agency insure that any action is not likely to jeopardize the continued existence of any endangered species or threatened species, 16 U.S.C. § 1536(a)(2), that provision does not speak to *the manner* in which ESA consultation must be conducted. Thus, even if the executed SRS Contracts were an "action," section 7(a)(2) does not require Reclamation to re-consult on the contracts themselves upon the occurrence of an alleged triggering event under 50 C.F.R. § 402.16. Rather, the ESA would simply require Reclamation to engage in consultation in such a manner as is necessary to "insure" that specific operational activities carried out under SRS Contracts would not be likely to jeopardize the continued existence of listed species.

That is what occurred here. As noted above, Plaintiffs essentially ask the Court to order reinitiation on the SRS Contracts in the hopes of changing CVP operations that have been, *inter alia,* delivering water pursuant to these contracts for years. Plaintiffs highlight Reclamation's purported "real-time determinations regarding the timing and volume of releases that allow the SRS Contractors to make diversions of water," and its seeking waivers to "increase the amount of water it can provide to the SRS Contractors." 4SC ¶ 153. Critically, however, even if these releases were an action, there is no duty to re-consult on the SRS Contracts themselves, because Reclamation and NMFS considered the impacts of water releases under the contracts as part of their inter-agency consultation on the coordinated long-term operations of the CVP and SWP. *See*, *e.g.*, NMFS OCAP BiOp at 729. The agencies determined that this overarching consultation would be sufficient to insure that winter-run and spring-run Chinook salmon would not be jeopardized. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 989 (9th Cir. 2014).

---

water deliveries under existing water service contracts and concluded that the RPA actions identified in the 2009 NMFS OCAP BiOp will avoid jeopardy to the species associated with such deliveries. Reclamation accepted and implemented that RPA, so for purposes of section 7, the effect of the annual delivery of water under the SRS contracts is the same, as it avoids jeopardy to listed species.

FED. DEFS.' MEMO OF PS AND AS ISO MOTION TO DISMISS                    13

As noted above, that consultation concluded with the 2009 NMFS OCAP BiOp. Doc. 1018 at 9. Like the 2008 FWS OCAP BiOp, the 2009 NMFS OCAP BiOp considered the impacts of maximum water deliveries under existing water service contracts on listed salmonids by incorporating the renewed contract terms into the operational assumptions used to model the operations of the CVP and SWP using CalSim-II Model. *See* Sacramento River Contractors' Request for Judicial Notice In Support of Motion to Dismiss Fourth Supplemental Complaint ("SRS RJN") Ex. B (Appx. D of Reclamation's OCAP Biological Assessment).[5] After considering these deliveries and the host of other operations included in CVP/SWP operations, NMFS crafted a sweeping RPA that avoided jeopardy to listed salmonids, while allowing for implementation of the SRS Contracts exactly as executed.

Plaintiffs defended the opinion and consistently argued that both the 2009 NMFS OCAP BiOp and its RPA were promulgated lawfully. Ultimately, in 2014, the Ninth Circuit agreed, upholding the NMFS 2009 OCAP BiOp and its RPA in their entirety. *Locke*, 776 F.3d 971. Reclamation has adopted and is implementing that RPA. *Locke*, 776 F.3d at 988. Thus, as a matter of law, Reclamation's operations of the CVP—including the release of water pursuant to the SRS Contracts—satisfy Reclamation's legal obligations under section 7(a)(2) to winter-run and spring-run Chinook. Consequently, assuming *arguendo* that Reclamation retained discretionary involvement over "real-time" water release decisions, as Plaintiffs allege, the agencies considered the very same water-delivery impacts from the SRS Contracts in their separate consultation on the operation of the CVP and SWP. Those deliveries, made in accordance with the 2009 NMFS OCAP BiOp as one part of overall CVP operations, avoid jeopardy to the listed salmonids.

Tellingly, Plaintiffs do not challenge that consultation or allege that reinitiation is required for the 2009 NMFS OCAP BiOp. They instead seek to displace the reasoned decision of the agencies to consider the operational impacts of water deliveries in the broader context of all long-term CVP and SWP operations, by singling out and demanding the "re-negotiation" of the

---

[5] To avoid filing duplicative supporting documents, Federal Defendants rely on the exhibits filed by the SRS Contractors in their Request for Judicial Notice in support of the motion to dismiss, filed today, June 20, 2016. Doc. 1031-2.

contracts. 4SC at 66. That is improper, as the ESA allows the agencies flexibility in determining how to satisfy section 7(a)(2)'s requirements.

Here, the agencies determined that their consultation on the long-term coordinated operations of the CVP and SWP would provide an ecosystem-wide approach to managing these enormous water projects that complied with the ESA. *Locke*, 776 F.3d at 983-86. The Ninth Circuit agreed that their approach met the agencies' ESA obligations under section 7(a)(2). Plaintiffs' collateral attack on a component of these operations would substantially undermine the agencies' continuing effort to lawfully manage the CVP and implement the NMFS OCAP BiOp and RPA. Moreover, if successful, it would unduly disrupt "the largest federal water management project in the United States." *Id.* at 984 (citation omitted). As the Court knows, the SRS Contracts settled water rights disputes over the right to use Sacramento River water. If the contracts were invalidated and must be renegotiated, there is no guarantee that they will be executed again, or that the parties will not be driven to a general adjudication of the Sacramento River. As the Court previously explained, non-renewal "could result in potentially catastrophic consequences for California's entire water delivery system." Doc. 979 at 15 (citation omitted). In short, Plaintiffs' claims about operations analyzed and included in the 2009 NMFS OCAP BiOp and RPA rest elsewhere.

### D. None of the other alleged triggering events can support a claim for relief.

In addition to issuance of the 2009 NMFS OCAP BiOp, Plaintiffs identify three other alleged reinitiation triggers.[6] None supports a claim for re-initiation either. For example, Plaintiffs allege that NMFS's 2011 amendments to the 2009 NMFS OCAP BiOp RPA, 4SC ¶ 113, "certainly triggered" a duty to reinitiate consultation, Doc. 1013 at 19, because it satisfied 50 C.F.R. § 402.16(b). 4SC ¶ 150. Plaintiffs ignore that subsection (b) of the reinitiation regulations requires an effect to the *relevant listed species or critical habitat*, which, for purposes

---

[6] If Plaintiffs' delay in bringing their Fifth Claim based on issuance of the 2009 NMFS OCAP BiOp does not bar their claim entirely, it should prevent Plaintiffs from relying on this stale event to support their Fifth Claim. Neither *Coalition*, nor the litany of cases described therein allowed a party to rely on an event that occurred years or even decades outside the applicable six-year limitations window as a valid basis for stating a claim for relief.

of Plaintiffs' Fifth Claim, are winter-run and spring-run Chinook in the Sacramento River. 4SC ¶ 183-88. While Plaintiffs allege that the 2011 RPA amendments constitute new information revealing such an effect, they fail to support their conclusory statement.

Nor can Plaintiffs show how any such an effect is possible on winter-run and spring-run Chinook in the Sacramento River. Under the 2009 NMFS OCAP BiOp, the release of water for the SRS Contracts relates only to Shasta operations, which are controlled by the Sacramento River Division of the CVP and are covered by Suite I.2 of the 2009 RPA. *See* SRS RJN, Ex. A (2009 NMFS OCAP BiOp) at 590-603. Critically, the 2011 amendments did not relate to Shasta Operations or the Sacramento River Division RPA at all. They instead concerned flexibility in the Stanislaus Operations Group to adjust the timing and shape of various pulse flows within the Stanislaus River. *See* SRS RJN Ex. D (2011 Amendments) at 2 (Cover Letter), Encl. 1 (Track Changes Version of the 2009 RPA that Includes Only the Pages that have 2011 Amendments). The 2011 amendments also provided a second trigger for Old and Middle River ("OMR") Flow Management, Action IV.2.3 (Delta Division), clarified language for the other triggers and the action response in that division of the RPA and some of the monitoring provisions of RPA Action 11.2.1.3. *Id.* Lastly, the 2011 amendments corrected minor errors in the 2009 RPA. *Id.*

In other words, the 2011 amendments did not modify or affect RPA Suite 1.2, the Sacramento River Division of the CVP, or Shasta Operations. They thus did not change the RPA as it relates to the delivery of SRS Contract water and could not logically reveal any effect of Shasta Operations that were different than those analyzed in the 2009 NMFS OCAP BiOp. If it were otherwise, Reclamation would arguably need to reinitiate consultation with NMFS on OCAP operations. But Plaintiffs do not allege this was necessary, and Reclamation consulted with NMFS and NMFS confirmed that such reinitiation was not needed:

> NMFS does not believe the 2011 amendments meet any of the criteria for reinitiation of consultation listed in 50 CFR 402.16. Consequently, NMFS has not advised Reclamation to reinitiate consultation. Rather … the amendment have been developed using the collaborative process established in the 2009 Opinion.

*See* SRS RJN, Ex. D Encl. 1 at 2 of 189. In light of the foregoing, Plaintiffs cannot show the 2011 amendments constitute new information that revealed previously unconsidered effects of

1    the SRS Contracts on listed salmon or their critical habitat.

2          Plaintiffs next allege that NMFS "again amended the NMFS OCAP BiOp in 2014 and

3    2015, when it responded to the Bureau's request for reinitiation to analyze the impacts of the

4    Bureau's Drought Operations Plan and the impacts of the T[emporary] U[rgency] C[hange]

5    P[etition]." 4SC ¶ 113. These amendments, Plaintiffs insist, required the re-initiation of

6    consultation on the execution of the SRS Contracts. *Id*.

7          Plaintiffs are wrong. While drought operations during the historic drought of 2014 and

8    2015 certainly affected the Sacramento River, Reclamation consulted with FWS and NMFS on

9    those operations, *including delivery of water to the SRS contractors*. Specifically, Reclamation

10   recognized that the drought would make it impossible to meet all requirements of D-1641, which

11   is included in the Project Description in Reclamation's 2008 Biological Assessment and the 2009

12   NMFS OCAP BiOp. *See* SRS RJN, Ex. C at 21; SRS RJN, Ex. E at 1-2, N at 2. Reclamation

13   further realized that nondiscretionary SRS contractor diversions would be difficult to meet.

14   Accordingly, Reclamation asked the SRS contractors to reschedule April and May diversions to

15   later in the water year to provide cold water and fishery benefits in the Sacramento River, and the

16   SRS Contractors agreed. *See* Declaration of Natalie L. Wolder Decl. ¶ 6 (Attachs. 1-5).

17   Significantly, however, Reclamation did not (and could not) unilaterally mandate that

18   rescheduling. Reclamation separately consulted with FWS and NMFS on these drought

19   operations that, as relevant here, included releases to the SRS contractors with the understanding

20   that some SRS diversions in April and May would be rescheduled to later in the water year. SRS

21   RJN, Ex. L at 1-2, Ex. P (Enclosure 1 at 2). Following consultation, NMFS concurred that the

22   effects of those drought operations in 2014 and 2015 were within the effects disclosed in its 2009

23   NMFS OCAP BiOp, and would avoid jeopardy. *See id.*, Exs. K, M, Q, T.

24         In other words, the agencies addressed the new information in these ESA consultations.

25   Once the agencies did so, there was no further need for a redundant consultation on precisely the

26   same information, operation, and effects, except this time under the label of SRS Contracts

27   consultation. Indeed, NMFS's concurrences in 2014 and 2015 show that there was no new

28   information about the effects of executing the SRS Contracts that was not previously considered.

If the drought operations in 2014 and 2015, including the delivery of SRS water, did constitute such new information, or had NMFS concluded that these operations might not avoid jeopardy to winter-run and spring-run Chinook, NMFS could have determined so and asked Reclamation to reinitiate consultation. Instead, NMFS concurred in the proposed drought operations in both 2014 and 2015. Thus, Plaintiffs cannot show that Reclamation was required to reinitiate on the execution of the SRS Contracts. For these reasons, the Fifth Claim should be dismissed.

**II.      Plaintiffs' Sixth Claim must be dismissed.**

Plaintiffs' Sixth Claim for Relief alleges that Reclamation's releases of water pursuant to the SRS Contracts caused a violation of Section 9 of the ESA by depleting the cold water pool in Shasta Reservoir. Doc. 1020 ¶¶ 189-193. This claim fails as to Reclamation. As a matter of law, an agency is not liable for "any taking" where it consulted on its proposed action under section 7 of the ESA and is operating consistent with the terms and conditions of an ITS.  16 U.S.C. § 1536(b)(4), (o)(2). More specifically, under the ESA, the ITS must "set[] forth the terms and conditions (including but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the [reasonable and prudent measures] …" 16 U.S.C. § 1536(b)(4)(iv). In turn, section 7(o)(2) of the ESA provides that "*any taking* that is in compliance with the terms and conditions specified in a written [incidental take] statement … shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1536(o)(2) (emphasis added). Thus, an agency that complies with the terms and conditions of the incidental take statement does not run afoul of the "take" prohibition in ESA section 9 even if its action results in "take" of a member of the species.

Here, the physical delivery of SRS contract water is one component of Reclamation's operation of the Sacramento River Division of the CVP. *See* SRS RJN, Ex. A (NMFS OCAP BiOp) at 729 (consultation addresses "overall impacts of the total volume of water diverted from the Central Valley"). Reclamation consulted on all operations that comprise the Sacramento River Division with NMFS, and the ITS included in the 2009 NMFS OCAP BiOp covers Reclamation's operations of the CVP. *Id*. (consultation addresses "overall impacts of the total volume of water diverted from the Central Valley"). Specifically, Section 13.4 of the 2009

1  NMFS OCAP BiOp provides all relevant "terms and conditions" for Reclamation's operations of

2  the CVP. *See* RJN, Ex. A (NMFS OCAP BiOp) at 782-85.

3      Plaintiffs' theory that Reclamation had no take authority for its releases in 2014 and 2015

4  fundamentally fails, as it ignores that operation of the Sacramento River Division of the CVP in

5  2014 and 2015 is covered by that ITS. Nor is their Sixth Claim saved by Plaintiffs' general

6  suggestion that an agency may be liable for "disregarding" the "terms and conditions" of an ITS.

7  4SC ¶ 158. Even assuming that were true, Plaintiffs fail to allege that Reclamation disregarded

8  any of the terms and conditions provided in Section 13.4 of the 2009 NMFS OCAP BiOp.[7]

9  Plaintiffs also note that the 2009 NMFS OCAP BiOp stated that incidental take from

10 nondiscretionary water deliveries to a contractor is not exempt from the ESA section 9 take

11 prohibition. 4SC, ¶ 160; *see e.g.,* SRS RJN Ex. A at 35. That too is immaterial as to

12 Reclamation, because the language of section 7(o)(2) admits no exception for take arising from

13 non-discretionary activities. It instead plainly states that "*any* taking," regardless of cause, "shall

14 not be considered to be prohibited take," if it is in compliance with the terms and conditions of

15 an applicable ITS. 16 U.S.C. § 1536(o)(2). Accordingly, Plaintiffs' Sixth Claim fails.

16     Nonetheless, even if Plaintiffs could segregate the release of SRS Contract water "during

17 the temperature management season of 2014 and 2015" from all other CVP components covered

18 by the 2009 NMFS OCAP BiOp, 4SC ¶ 192, dismissal would still be compelled.[8] Specifically,

19 the Sixth Claim fails because it alleges no legally relevant causal link between Reclamation's

20 alleged act and Plaintiffs' alleged take. *See* Doc. 1018 at 14, citing 4SC ¶¶ 73, 75, 189-193.

21

22 [7] Nor could they make this showing. Because Reclamation consulted on drought operations with
   NMFS, which found them to be within that the effects analyzed under the BiOp and within the
23 coverage under ITS, there is no basis to allege that Reclamation's operation of the CVP in
   accordance with those opinions caused unauthorized take. *See supra*, § I.D.

24 [8] As previously explained, Doc. 1007 at 20-21, Plaintiffs' Sixth Claim, as pled, is based only on
   past violations. Indeed, Plaintiffs fail to allege any facts regarding future or ongoing violations
25 and instead seek injunctive relief under the ESA solely based on allegations of past conduct. *See*
   4SC ¶¶ 21, 73, 75, 77, 151, 159, 193. While the Court noted that the Sixth Claim appeared to be
26 forward-looking in its requested relief, Doc. 1018 at 21-22, Plaintiffs fail to allege any
   continuing or likely future harm that could substantiate such relief. *See Nat'l Wildlife Fed'n v.*
27 *Burlington Northern R.R.,* 23 F.3d 1508, 1511 (9th Cir. 1994) (plaintiff must show a violation of
   the ESA is "likely in the future"). Accordingly, the Sixth Claim fails for lack of jurisdiction. *See*
28 Doc. 1007 at 20-21.

In order to show that an agency is liable under section 9, a plaintiff must show that an agency's act actually and proximately caused harm to the species in question. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 700, n. 13 (1995) (noting that the "ordinary requirements of proximate causation and foreseeability" apply to the ESA). To that end, a "'but for' causal relationship is insufficient" if the agency "has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767-70 (2004)). Thus, while section 9 makes it unlawful for any person (including an agency) without authorization to "take" a listed endangered species, 16 U.S.C. § 1538, and "take," is broadly defined, 16 U.S.C. § 1532(19), the ESA also necessarily contemplates a causal link between the alleged harm and a discretionary act that the agency has the ability to modify or forego. *See Cold Mountain v. Garber*, 375 F.3d 884, 890 (9th Cir. 2004) (affirming grant of summary judgment for federal government on section 9 claim because plaintiff failed to establish link between agency action and effect allegedly causing "take").

Here, Plaintiffs' 4SC alleges no such action. Plaintiffs instead challenge water released by Reclamation pursuant to the SRS Contracts in April, May, and early June 2014, and in April and May 2015, which Plaintiffs ask the Court to presume was non-discretionary. *See* 4SC ¶¶ 160, 189-193. Indeed, the language of the SRS Contracts, which shows that this water was in fact Base Supply water, confirms that presumption. *See* Wolder Decl. ¶¶ 5-12.[9] As previously explained, Reclamation has no discretion under the SRS Contracts to reduce Base Supply for a

---

[9] In April and May of 2014 and 2015 the only releases made for SRS contractor diversions were to meet nondiscretionary Base Supply demands of the SRS contractors. Wolder Decl. ¶ 5. The same is true for the early-June releases in 2014. *Id*. ¶ 12. Although four of the SRS contractors in this case seemingly diverted minute amounts of Project Water in June, 2014, the SRS Contracts require that in months where a contractor is allocated both Base Supply and Project Water (for example, June 2014), the contractors first divert water grounded in their senior water rights. *Id*. ¶¶ 11, 12. In June, 2014, the SRS contractors in this case were entitled to divert up to 265,996 acre-feet of available Base Supply water and up to 1,284 acre-feet of Project Water (about 0.5% of Base Supply available that month). *Id*. ¶ 7. The total amount of Project Water actually diverted in June, 2014, was 387 acre-feet, compared to 265,581 acre-feet of Base Supply. *Id*. The total water (Base Supply and Project Water) diverted by the SRS contractors in this case in June, 2014 (265,968 acre-feet of water) is less than the total amount of Base Supply available to the same SRS contractors for the month of June (265,996 acre-feet). *Id*. ¶ 9. The diversions of SRS water in the first half of June, 2014, were diversions of Base Supply water. *Id*. ¶ 12.

legal obligation;[10] nor could Reclamation unilaterally reduce Base Supply at renewal of the SRS contracts due to state water law, D-990, and the reasonable beneficial use of water by the SRS contractors. *See NRDC v. Salazar*, Case No. 09-17661, Doc. 49-1 (Response Brief of the Federal Defendants) (Dec. 10, 2010) at 53-58 (explaining Reclamation has no authority to unilaterally impose changes to Base Supply water in the renewed SRS Contracts affecting water diversions).

The Sixth Claim thus necessarily fails, because Plaintiffs allege no discretionary act on Reclamation's part that could be the legal cause of any unlawful take of winter-run and spring-run Chinook. The SRS Contractors instead retain the independent, legal authority to receive Base Supply water and Reclamation has no discretion to short those deliveries for ESA purposes. As to the Sixth Claim, Reclamation cannot be considered the legally relevant cause of "take" resulting from its nondiscretionary legal duty. *Pub. Citizen*, 541 U.S. at 767-70; *Cold Mountain*, 375 F.3d at 890; *Marbled Murrelet*, 83 F.3d at 1066; *Babbitt*, 515 U.S. at 696 n.9 & 700 n.13.

Indeed, no court has ever transposed section 9 liability to the Federal government when, as here, it cannot control the action that may result in "take." And other courts that have considered the issue have rejected Plaintiffs' interpretation of the ESA. For example, in *Strahan v. Linnon*, plaintiffs asserted that the Coast Guard was liable for "take" of endangered whales hit by private vessels operating under Certificates of Documentation issued by the Coast Guard. 967 F. Supp. 581, 601 (D. Mass. 1997), *aff'd* 187 F.3d 623 (1st Cir. 1998 (table)). The *Strahan* Court flatly rejected this claim, finding that, because the Coast Guard's issuance of Certificates of Documentation is not discretionary, its issuance of Certificates did not trigger section 9. *Id.* at 602. *Strahan* applies equally to Plaintiffs' assertion that Reclamation is liable for "take" that flowed from its mandatory release of Base Supply water. Because Plaintiffs' Sixth Claim presumes that Reclamation's obligation is not discretionary, as in *Strahan*, Reclamation's act does not trigger section 9. Thus, the Sixth Claim must be dismissed for this independent reason.

---

[10] The SRS Contracts provide for the delivery of two types of water: Base Supply and Project Water. *See* Wolder Decl. ¶ 5; *see also* SAR 002699 (GCID contract Article 1(b)), 002702 (GCID contract Article 1(n)), 002732 (Exhibit A). Article 3(i) of the SRS Contracts shields Reclamation from liability if there is a shortage of Project Water, but not Base Supply.  SAR at 002707. There is no similar provision in the SRS Contracts allowing Reclamation to short Base Supply due to a legal obligation or otherwise shielding Reclamation from liability if any such shortage occurred.  SAR at 002695-002732 (GCID contract).

1

**CONCLUSION**

2      Based on the foregoing, Federal Defendants respectfully ask the Court to dismiss

3   Plaintiffs' Fifth and Sixth Claims.

4   Dated: June 20, 2016

5                                          Respectfully submitted,
                                           JOHN C. CRUDEN, Assistant Attorney General
6

7                                          */s/ Bradley H. Oliphant*
                                           BRADLEY H. OLIPHANT, Senior Trial Attorney
8                                          United States Department of Justice
                                           Environment & Natural Resources Division
9                                          Wildlife & Marine Resources Section
                                           999 18th St., South Terrace, Ste. 370
10                                         Denver, CO 80202
                                           Tel: (303) 844-1381
11                                         Fax: (303) 844-1350
12

13                                         Attorneys for Federal Defendants

14

**CERTIFICATE OF SERVICE**

15      I hereby certify that on June 20, 2016, I electronically filed the foregoing with the Clerk

16   of the Court via the CM/ECF system, which will send notification of the attorneys of record in

17   this case.

18                                         */s/ Bradley H. Oliphant*
                                           BRADLEY H. OLIPHANT
19                                         Senior Trial Attorney

20

21

22

23

24

25

26

27

28

FED. DEFS.' MEMO OF PS AND AS ISO MOTION TO DISMISS                          22