1

2

3

4

5

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

6   NATURAL RESOURCES DEFENSE
    COUNCIL, et al.,

7                              Plaintiffs,

8   vs.

9   GAIL A. NORTON, Secretary, U.S. Department
    of the Interior, et al.,

10                             Defendants.

11  SAN LUIS & DELTA MENDOTA WATER
    AUTHORITY, et al.,

12                             Defendant-Intervenors.

13  ANDERSON-COTTONWOOD IRRIGATION
    DISTRICT, et al.,

14                             Joined Parties.

15

Case No. 1:05-cv-01207 LJO-EPG

MEMORANDUM DECISION AND
ORDER RE MOTIONS TO DISMISS &
REQUESTING SUPPLEMENTAL
BRIEFING (Docs. 1029, 1030, 1031, 1032,
1036).

16

17                          I. **INTRODUCTION**

18          On April 28, 2016, Plaintiffs, a coalition of environmental interest groups led by the Natural

19  Resources Defense Council, filed the currently operative Fourth Supplemental Complaint ("4SC"),

20  which includes three pre-existing claims brought under the Administrative Procedure Act ("APA"), 5

21  U.S.C. § 701 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, alleging that

22  the U.S. Bureau of Reclamation ("Bureau" or "Reclamation") and the U.S. Fish and Wildlife Service

23  ("FWS" or "Service") acted unlawfully by renewing, implementing, and approving the renewal and

24  implementation of certain long-term water contracts in reliance on a 2005 Biological Opinion ("2005

25  FWS Smelt OCAP BiOp") issued by FWS pursuant to the ESA, that the agencies knew, or should have

1

known, was inadequate to protect the ESA-listed delta smelt. Doc. 575 (filed Apr. 8, 2008). Specifically, the pre-existing claims challenged renewal of two sets of contracts: (1) those held by the Sacramento River Settlement ("SRS") Contractors; and (2) those held by the Delta-Mendota Canal Unit ("DMC") Contractors. *Id.*

The 4SC added three new claims to this action: the Fourth Claim for Relief alleges FWS failed to conduct an adequate consultation on the effects of the SRS and DMC Contract renewals on delta smelt; the Fifth Claim for Relief alleges Reclamation failed to reinitiate consultation on the alleged impact of the SRS Contracts on ESA-listed winter-run and spring-run Chinook salmon; and the Sixth Claim for Relief alleges Reclamation and the SRS Contractors have unlawfully "taken" winter-run and spring-run Chinook in violation of Section 9 of the ESA ("Section 9"), 16 U.S.C. § 1538(a).

The SRS Contractors move to dismiss the First, Second, Third, Fifth, and Sixth Claims for Relief. Doc. 1031 ("SRS MTD"). The Federal Defendants move to dismiss the Fifth and Sixth Claims for Relief. Doc. 1032 ("FD MTD"). The DMC Contractors move to dismiss the First, Second, and Third Claims for Relief. Doc. 1033 ("DMC MTD"). James Irrigation District and Del Puerto Water District (collectively, "JID Parties") join in the motions to dismiss the First, Second, and Third Claims for Relief, Docs. 1029 & 1030 ("JID Joinder"), as does the Banta-Carbona Irrigation District, Patterson Irrigation District, West Stanislaus Irrigation District, and the West Side Irrigation District (collectively, "Banta-Carbona Parties"). Doc. 1036 ("Banta-Carbona Joinder"). Plaintiffs oppose the motions. Doc. 1039 ("Pltf. Opp."). All moving parties filed replies. Docs. 1040 & 1041 ("JID Reply"), 1042 ("DMC Reply"), 1043 ("FD Reply"), 1044 ("SRS Reply"). No party moves to dismiss the Fourth Claim for Relief.

The Court has spent an inordinate amount of time sorting through the parties' legal arguments and the relevant legal authorities. Some of the issues proved to be highly complex, yet have not been given sufficient attention by the parties. This order resolves as many of the legal disputes as possible, while permitting supplemental briefs on those issues that require further consideration by the parties and

1    the Court. The Court notes that at times the parties' own arguments proved to be internally inconsistent,

2    adding to the layered confusion and further delaying resolution of this motion and progress of this

3    already more than a decade-old case.

4    ## II. LEGAL BACKGROUND

5         "Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with

6    identifying threatened and endangered species and designating critical habitats for those species." *Nat.*

7    *Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) ("*NRDC v. Jewell*") (citing 16 U.S.C. §

8    1533). FWS and the National Marine Fisheries Service ("NMFS") administer the ESA on behalf of the

9    Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102,

10   402.01(b). Section 7 of the ESA requires federal agencies to ensure that their activities do not jeopardize

11   the continued existence of listed endangered or threatened species or adversely modify those species'

12   critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d

13   1006, 1020 (9th Cir. 2012). Section 7's implementing regulations provide that "[e]ach Federal agency

14   shall review its actions at the earliest possible time to determine whether any action may affect listed

15   species or critical habitat[s]." 50 C.F.R. § 402.14(a). An agency proposing to take an action (often

16   referred to as the "action agency") must first inquire of FWS or NMFS[1] whether any threatened or

17   endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. § 1536(c)(1). If

18   endangered species may be present, the action agency must prepare a "biological assessment" ("BA") to

19   determine whether such species "is likely to be affected" by the action. *Id.* If the BA determines that a

20   threatened or endangered species "is likely to be affected," the agency must formally consult with FWS.

21   *See id.* § 1536(a)(2); 50 C.F.R. 402.14(a).

22   _____

23   [1] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), as corrected (Oct. 31, 2008). NMFS is granted

24   jurisdiction over fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id.* FWS exercises jurisdiction over the delta smelt; NMFS

25   exercises jurisdiction over the winter-run and spring-run Chinook.

1    Formal consultation results in the issuance of a "biological opinion" ("BiOp") by FWS. *See* 16

2    U.S.C.§ 1536(b). If the BiOp concludes that the proposed action would jeopardize the species or destroy

3    or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not go forward unless FWS

4    can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or

5    adverse modification. *Id*. § 1536(b)(3)(A). If the BiOp concludes that jeopardy is not likely and that

6    there will not be adverse modification of critical habitat, or that there is a RPA to the agency action that

7    avoids jeopardy and adverse modification, and that the incidental taking of endangered or threatened

8    species will not violate Section 7(a)(2), the consulting agency can issue an "Incidental Take Statement"

9    ("ITS") which, if followed, exempts the action agency from the prohibition on takings found in Section

10   9 of the ESA. 16 U.S.C. § 1536(b)(4); *Aluminum Co. of Am. v. Administrator, Bonneville Power Admin.*,

11   175 F.3d 1156, 1159 (9th Cir. 1999).

12   Even after consultation is complete, an agency has a duty to reinitiate formal consultation under

13   certain circumstances, including if: "the amount or extent of taking specified in the incidental take

14   statement is exceeded"; "new information reveals effects of the action that may affect listed species or

15   critical habitat in a manner or to an extent not previously considered"; or "the identified action is

16   subsequently modified in a manner that causes an effect to the listed species or critical habitat that was

17   not considered in the biological opinion." 50 C.F.R. § 402.16.

18   Section 9, prohibits, among other actions, the "take" of any listed animal species by any "person

19   subject to the jurisdiction of the United States." 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" as

20   "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any

21   such conduct." 16 U.S.C. § 1532(19). Two safe harbor provisions described in greater detail below

22   immunize persons from Section 9 liabilities and penalties where takings committed during otherwise

23   lawful activities occur in compliance with the terms and conditions of either an ITS issued after

24   Section 7 consultation or an Incidental Take Permit ("ITP") issued pursuant to ESA Section 10. 16

25   U.S.C. § 1539.

4

### III. <u>FACTUAL AND PROCEDURAL HISTORY</u>

**1.     <u>The Central Valley Project and the State Water Project</u>**

The Central Valley Project ("CVP") and the State Water Project ("SWP"), "operated respectively by [Reclamation] and the State of California, are perhaps the two largest and most important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014) ("*San Luis v. Jewell*"). "These combined projects supply water originating in northern California to more than 20,000,000 agricultural and domestic consumers in central and southern California." *Id*. As part of CVP operations, Reclamation releases water stored in CVP reservoirs in northern California, which then flows down the Sacramento River to the Sacramento-San Joaquin Delta ("Delta"). *Id*. at 594. Pumping plants in the southern region of the Delta then divert the water to various users south of the Delta. *See id*. at 594-95.

**2.     <u>Delta Smelt</u>**

The delta smelt (*Hypomesus transpacificus*) is a "small, two-to-three inch species of fish endemic to the [Delta]." *Id.* at 595. In 1993, FWS concluded the delta smelt's population had declined by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA. Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854, 12,855 (Mar. 5, 1993). FWS further determined that "Delta water diversions," including those resulting from operations of the CVP, are the most significant "synergistic cause[ ]" of the decline in the delta smelt population. *Id*. at 12,859.

**3.     <u>Winter-Run Chinook</u>**

Winter-run Chinook (*Oncorhynchus tshawytscha*) are listed as "endangered" under the ESA. Endangered and Threatened Species: Final Listing Determinations for 16 ESUs of West Coast Salmon, and Final 4(d) Protective Regulations for Threatened Salmonid ESUs, 70 Fed. Reg. 37,160 (June 28, 2005). According to the 4SC, the winter-run Chinook's population "has declined precipitously since the early 1980s, from an estimated historic high of 117,808 in 1969 to as few as 191 adult individuals

5

returning to spawn in 1991." 4SC ¶ 64. Winter-run Chinook historically inhabited the upper Sacramento River and its tributaries. *Id*. ¶ 66. The construction of Shasta Dam blocked access to almost all of the winter-run Chinook's rearing waters. *Id*. Today, the upper Sacramento River below Keswick Dam is the only remaining spawning area used by winter-run Chinook. *Id*. It is alleged that the winter-run Chinook is "at high risk of extinction" and that a prolonged drought could have devastating effects on the species. *Id*. It is further alleged that winter-run Chinook are particularly vulnerable during the "temperature management season," which generally lasts from June through October. *Id*. ¶ 67.

> Adult winter-run Chinook migrate up the Sacramento River in the winter and spring and then hold below the Keswick Dam for several months before spawning. During these critical months, the salmon require cold water for the maturation of their gonads and the development of fertilized eggs and embryos.

*Id*.

### 4.   Spring-Run Chinook

The spring-run Chinook (*Oncorhynchus tshawytscha*) historically displayed the second largest salmon run in the Central Valley watershed and supported the bulk of the region's commercial fishery. *Id*. ¶ 68. Only remnant independent natural spring-run Chinook populations survive, relying principally upon small tributaries of the Sacramento River below Shasta Dam for spawning. *Id*. ¶¶ 68, 71. Like winter-run Chinook, spring-run Chinook require cold water temperatures for successful spawning, egg incubation, and rearing. *Id*. ¶ 72.

### 5.   Long-Term Contract Renewal/Operations and Criteria Plan

"In the 1960s, the Bureau entered into a number of long-term contracts pertaining to the CVP." *NRDC v. Jewell*, 749 F.3d at 780. "The [SRS] Contracts are forty-year agreements between the Bureau and holders of certain senior water rights." *Id*. "These contracts grant the Bureau some rights to the encumbered water while also providing senior rights holders a stable supply of water." *Id*. The DMC Contracts allow junior water users to draw water from the Delta-Mendota Canal. *Id*. By 2004, the DMC Contracts and the SRS Contracts had expired or were about to expire. *Id*. On June 30, 2004, the Bureau

1    prepared an operational plan, the Operations Criteria and Plan ("OCAP" or "2004 OCAP"), to provide,

2    among other things, a basis for renewing various contracts, including the DMC and SRS Contracts. *Id.*

3    **6.    ESA § 7 Consultations Leading Up to Contract Renewal**

4            Pursuant to ESA § 7, the Bureau initiated consultation with FWS regarding the effect of the

5    OCAP on the delta smelt. *Id.* at 780-81. FWS issued an initial BiOp in 2004 (the "2004 FWS Smelt

6    OCAP BiOp"), which concluded that the OCAP would not jeopardize the delta smelt. *Id.* at 781. The

7    Bureau re-initiated consultation after the Ninth Circuit's decision in *Gifford Pinchot Task Force v. U.S.*

8    *Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004), which invalidated a regulation upon which

9    the 2004 FWS Smelt OCAP BiOp relied. *NRDC v. Jewell*, 749 F.3d at 781. In 2005, FWS issued a

10   revised BiOp (the "2005 FWS Smelt OCAP BiOp"), which also concluded that the OCAP would not

11   jeopardize the delta smelt. *Id.*

12           Reclamation separately requested a BiOp from NMFS on whether continued operation of the

13   CVP pursuant to the OCAP would jeopardize various species under that agency's jurisdiction, including

14   the winter-run and spring-run Chinook. *See PCFFA v. Gutierrez*, No. 1:06-cv-245-OWW-GSA

15   ("*PCFFA*"), Doc. 69 ¶ 77 (First Amended Complaint) ("*PCFFA* FAC"). NMFS issued a BiOp on

16   October 22, 2004 regarding the effects of the OCAP on the species under its jurisdiction, including

17   several salmonid species ("2004 NMFS Salmonid OCAP BiOp"). 4SC ¶ 107.

18           Also in 2004 and 2005, the Bureau prepared BAs that concluded that renewal of the Contracts

19   would not adversely affect the delta smelt. *NRDC v. Jewell*, 749 F.3d at 781. The Bureau requested

20   additional consultation with FWS regarding its plans to renew the Contracts. *Id.*

21           FWS responded via a series of letters, in which it concurred with the
             Bureau's determination that renewing the Contracts was not likely to
22           adversely affect the delta smelt. Each FWS concurrence letter explained
             that renewing the Contracts would increase the demand for water, but that,
23           according to the 2004 and 2005 [FWS Smelt OCAP] BiOps, this demand
             would not adversely affect the delta smelt. The letters did not assess the
24           Contracts' potential effects on the delta smelt beyond the reasoning
             borrowed from the now-invalidated 2004 Opinion and 2005 Opinion.

25

7

*Id.* (emphasis added).

Again, Reclamation separately consulted with FWS on the effects of renewing the Contracts on the listed salmonid species under NMFS's jurisdiction. 4SC ¶ 108. As was the case with FWS, NMFS concurred that executing the Contracts would not adversely impact listed salmonids. *Id.*

In 2004 and 2005, the Bureau renewed 141 SRS Contracts and 18 DMC Contracts based on FWS's and NMFS's concurrence letters. *NRDC v. Jewell*, 749 F.3d at 781.

### 7. Plaintiffs Challenge the 2004/2005 FWS Smelt OCAP BiOp

In February 2005, Plaintiffs initiated this lawsuit, challenging the 2004 FWS Smelt OCAP BiOp. Doc. 1. Subsequent amendments to the Complaint updated Plaintiffs' allegations to include challenges to the 2005 FWS Smelt OCAP BiOp. Doc. 403 (Second Amended Complaint ("SAC")). Plaintiffs raised numerous challenges to the legal sufficiency of the 2005 FWS Smelt OCAP BiOp in the SAC, filed July 10, 2007. *Id.* Among other things, the SAC alleged that the 2005 FWS Smelt OCAP BiOp did not "adequately consider or address the effects of [the] long-term water service contracts on threatened and endangered species," *id.* ¶ 32, and that the Bureau "has taken and is taking actions that could foreclose implementation of reasonable and prudent alternatives that would avoid jeopardy, including but not limited to signing and implementing new long-term contracts promising delivery of substantially increased quantities of water, in violation of [ESA] section 7(d)." *Id.* ¶ 81. In 2007, the 2005 FWS Smelt OCAP BiOp was set aside as unlawful. *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007). The Bureau did not appeal.

### 8. Parallel Challenge to the 2004 NMFS Salmonid OCAP BiOp

On August 9, 2005, a coalition of environmental organizations largely overlapping with the present Plaintiffs filed a parallel complaint against Reclamation and NMFS alleging that the NMFS 2004 OCAP Salmonid BiOp was inadequate. *Pac. Coast Fed'n of Fishermen's Associations v. Gutierrez*, 606 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008) ("*PCFFA I*"). Plaintiffs similarly sought to "[e]njoin and set aside any and all actions" that relied on it, including the delivery of water under long-

8

1  term water contracts at issue here. *Id.* at 1183 ("Existing renewal and any new water service contracts

2  have already been challenged in this litigation."); *PCFFA* FAC at 38.[2]

3  **9.    District Court Ruling in *PCFFA***

4  On May 20, 2008, the previously assigned district judge found that NMFS acted arbitrarily and

5  capriciously by failing to consider certain facts in the NMFS 2004 Salmonid OCAP BiOp. *PCFFA I*,

6  606 F. Supp. 2d at 1193-94. In July 2008, the Court considered Plaintiffs' motion for injunctive relief,

7  seeking implementation of remedies designed to aid salmonids in the Sacramento River basin. In the

8  context of this request for injunctive relief, the Court concluded that the Bureau had a "mandatory (*i.e.*,

9  non-discretionary) legal obligation to make releases from Shasta Reservoir for delivery to the [SRS]

10  Contactors." *Pac. Coast Fed'n of Fishermen's Associations v. Gutierrez*, 606 F. Supp. 2d 1195, 1201

11  (E.D. Cal. 2008) ("*PCFFA II*"). Plaintiffs did not seek to amend or supplement their complaint in

12  *PCFFA*.

13  **10.    Third Amended Complaint in This Case**

14  In June 2008, Plaintiffs filed the TAC, directly challenging the sufficiency of FWS's ESA

15  consultation undertaken in connection with the renewal of 41 Contracts. *See* Doc. 575 ¶¶ 44-47, 69, 72-

16  73. In seeking to set aside these contracts, Plaintiffs argued that the Bureau violated § 7(a)(2) of the ESA

17  by failing to consult adequately with the FWS prior to renewing the Contracts. *Id.* ¶ 85.

18  **11.    FWS Issues Revised Biological Opinion**

19  On December 15, 2008, the FWS issued a revised BiOp (the "2008 FWS Smelt OCAP BiOp"),

20  which, contrary to the findings of the 2004 and 2005 FWS Smelt OCAP BiOps, concluded that the

21  OCAP <u>would</u> jeopardize the delta smelt and adversely modify its critical habitat. *NRDC v. Jewell*, 749

22  _____

23  [2] The Court is cognizant of the fact that some parties to these related cases prefer to cite to the Electronic Case File ("ECF")
automatic page stamp references. This Court will continue to cite to the internal page references of documents wherever
possible, primarily because some parties continue to present courtesy copies to the Court that do not bear ECF page stamps.

24  Rather than re-print lengthy documents at taxpayer expense or take time to correlate page citations to the ECF page stamps,
the Court uses the courtesy copies and cites to them the only way it can efficiently do so: using the document's own internal
page references. For reasons of consistency, the Court therefore always cites to internal page references unless none is

25  available, in which case it references ECF page stamp pages as "p. __ of ___."

1   F.3d at 781. The 2008 BiOp became the subject of numerous lawsuits. *See generally San Luis & Delta*

2   *Mendota Water Auth. v. Salazar*, 1:09-cv-407-LJO-BAM. Plaintiffs in this matter intervened as

3   defendants in the challenge to the 2008 FWS Smelt OCAP BiOp. *See id.*

4   **12.   NMFS Issues a Revised BiOp**

5   On June 4, 2009, NMFS issued a revised BiOp ("2009 NMFS Salmonid OCAP BiOp"). *See San*

6   *Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 988 (9th Cir. 2014) ("*San Luis v. Locke*").

7   Three months later, the previously assigned district judge entered final judgment in *PCFFA*, and closed

8   the matter. *PCFFA*, 1:06-CV-0245-OWW-GSA, Doc. 458 (Judgment, Sept. 9, 2009).

9   **13.   District Court and Ninth Circuit Rulings on Plaintiffs' Third Amended Complaint**

10   In rulings in late 2008 and 2009 in this matter, the previously assigned district judge held that

11   Plaintiffs did not have standing to challenge renewal of the DMC Contracts and that Plaintiffs' challenge

12   to the SRS Contracts failed as a matter of law because Federal Defendants lacked discretion to modify

13   the SRS Contracts to benefit Plaintiffs' interests. *Nat. Res. Def. Council v. Kempthorne*, 2008 WL

14   5054115, at *22 (E.D. Cal. Nov. 19, 2008) ("*NRDC v. Kempthorne*"). A divided three-judge panel of the

15   Ninth Circuit Court of Appeals affirmed. *Nat.Res. Def. Council v. Salazar*, 686 F.3d 1092 (9th Cir.

16   2012).

17   The Ninth Circuit subsequently voted to hear the case en banc, and the en banc panel reversed

18   and remanded. *NRDC v. Jewell*, 749 F.3d 776. The en banc decision first found that the issuance of the

19   2008 FWS Smelt OCAP BiOp did not moot Plaintiffs' challenge to the Contracts:

20   This action is not moot because the 2008 Opinion does not provide
   Plaintiffs with the relief that they seek. The 2008 Opinion concluded that
21   the Bureau's Plan would likely jeopardize the delta smelt and adversely
   modify its critical habitat. In so doing, the 2008 Opinion explained that the
22   Bureau's Plan must be modified from what the Bureau envisioned in 2004
   and 2005, and the Opinion identified a "reasonable and prudent
23   alternative" to the proposed Plan that would avoid jeopardizing the delta
   smelt.

24   The issuance of the 2008 Opinion does not moot this appeal. The 2008
25   Opinion merely assesses the general effects of the Bureau's Plan, and it

10

does not represent a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts before us. Although the DMC Contracts and Settlement Contracts were renewed based on now-invalidated opinions, the Bureau has never reconsulted with the FWS regarding the effects of renewing these contracts, nor has it sought to amend the challenged contracts to incorporate the protections proposed in the 2008 Opinion. The remedy Plaintiffs seek is an injunction requiring reconsultation with the FWS and renegotiation of the challenged contracts based on the FWS' assessment. This relief remains available.

*Id.* at 782.

On the issue of standing related to the DMC Contracts, the previously assigned district judge held that Plaintiffs could not establish that their injury is fairly traceable to the Bureau's alleged procedural violation because: (1) the DMC Contracts contain a shortage provision that absolves the government from liability for breaches that result from complying with its legal obligations; (2) this provision permits the Bureau to take necessary actions to meet its legal obligations under the ESA, so (3) the Bureau could not have negotiated any contractual terms that better protect the delta smelt, and, therefore, any injury to the delta smelt is not traceable to the contract renewal process. *NRDC v. Kempthorne*, 2008 WL 5054115, at *11-18.

The Ninth Circuit rejected this reasoning, finding instead that "to establish standing, a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests." 749 F.3d at 783 (emphasis in original). The Ninth Circuit concluded that the consultation could have led to revisions that could have benefitted the delta smelt:

Contrary to the district court's finding, the shortage provision does not provide the delta smelt with the greatest possible protection. Nothing about the shortage provision requires the Bureau to take actions to protect the delta smelt. The provision is permissive, and merely absolves the United States of liability if there is a water shortage resulting from, inter alia, "actions taken ... to meet legal obligations." But even if we read the provision to place an affirmative obligation on the Bureau to take actions to benefit the delta smelt, the provision only concerns the quantity of water that will be made available to the DMC Contractors. There are various other ways in which the Bureau could have contracted to benefit the delta smelt, including, for example, revising the contracts' pricing

11

1    scheme or changing the timing of water deliveries. Because adequate
2    consultation and renegotiation could lead to such revisions, Plaintiffs have
     standing to assert a procedural challenge to the DMC Contracts.

3    *Id*. at 783-84.

4    With regard to the SRS Contracts, the previously assigned district judge held that, although

5    Plaintiffs have standing to assert procedural challenges to them, the Bureau was not required to consult

6    under Section 7(a)(2) prior to renewing the SRS Contracts because the Bureau's discretion in

7    renegotiating these contracts was "substantially constrained," in light of a line of cases, including *Nat'l*

8    *Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007), which stands for the

9    proposition that there is no duty to consult for actions "that an agency is required by statute to

10   undertake." *Nat. Res. Def. Council v. Kempthorne*, 621 F. Supp. 2d 954, 1000 (E.D. Cal. 2009), *decision*

11   *clarified*, 627 F. Supp. 2d 1212 (E.D. Cal. 2009), *on reconsideration*, No. 1:05-CV-1207 OWW SMS,

12   2009 WL 2424569 (E.D. Cal. Aug. 6, 2009). In holding that the Bureau was not required to consult

13   under Section 7(a)(2) prior to renewing the SRS Contracts, the previously assigned district judge

14   focused on Article 9(a) of the original SRS Contracts, which provides in pertinent part:

15                During the term of this contract and any renewal thereof it shall constitute
                 full agreement as between the United States and the Contractor as to the
16               quantities of water and the allocation thereof between base supply and
                 Project water which may be diverted by the Contractor from the
17               Sacramento River for beneficial use on the land shown on Exhibit B which
                 said diversion, use, and allocation shall not be disturbed so long as the
18               Contractor shall fulfill all of its obligations hereunder, and the Contractor
                 shall not claim any right against the United States in conflict with the
19               provisions hereof.

20   *Id*. at 979 (emphasis omitted). This provision, according to the district court, "substantially constrained"

21   the Bureau's discretion to negotiate new terms in renewing the contracts, thereby absolving the Bureau

22   of the duty to consult under *Home Builders*. *Id*.

23   The Ninth Circuit rejected this reasoning:

24                Section 7(a)(2)'s consultation requirement applies with full force so long
                 as a federal agency retains "some discretion" to take action to benefit a
25               protected species. [citations] While the parties dispute whether Article 9(a)

12

1       actually limits the Bureau's authority to renegotiate the Settlement
        Contracts, it is clear that the provision does not strip the Bureau of all
2       discretion to benefit the delta smelt and its critical habitat.

3       First, nothing in the original Settlement Contracts requires the Bureau to
        renew the Settlement Contracts. Article 2 of the original contracts
4       provides that "renewals *may* be made for successive periods not to exceed
        forty (40) years each." (emphasis added). This language is permissive and
5       does not require the Bureau to execute renewal contracts. Since the FWS
        has concluded that "Delta water diversions" are the most significant
6       "synergistic cause[ ]" of the decline in delta smelt, 58 Fed. Reg. at 12,859,
        it is at least plausible that a decision not to renew the Settlement Contracts
7       could benefit the delta smelt and their critical habitat.

8       But even assuming, arguendo, that the Bureau is obligated to renew the
        Settlement Contracts and that Article 9(a) limits the Bureau's discretion in
9       so doing, Article 9(a) simply constrains future negotiations with regard to
        "the quantities of water and the allocation thereof...." Nothing in the
10      provision deprives the Bureau of discretion to renegotiate contractual
        terms that do not directly concern water quantity and allocation. And, as
11      [is the case] with respect to the DMC Contracts, the Bureau could benefit
        the delta smelt by renegotiating the Settlement Contracts' terms with
12      regard to, inter alia, their pricing scheme or the timing of water
        distribution.
13
        For these reasons, we conclude that, in renewing the Settlement Contracts,
14      the Bureau retained "some discretion" to act in a manner that would
        benefit the delta smelt. The Bureau was therefore required to engage in
15      Section 7(a)(2) consultation prior to renewing the Settlement Contracts.

16      *NRDC v. Jewell*, 749 F.3d at 785. The matter was reversed and remanded for further proceedings. *Id.*

17              **14.    Stay of this Case and Further FWS Consultation**

18              On June 15, 2015, the Court stayed this litigation to allow Reclamation to reinitiate ESA-

19      consultation on the contract renewals. Doc. 979. Thereafter, Reclamation requested FWS's concurrence

20      that the impacts of these contract renewals on delta smelt were assessed in the 2008 FWS Smelt OCAP

21      BiOp. 4AC ¶¶ 103, 105. FWS responded by sending the a letter of concurrence ("2015 LOC"),

22      concluding that "all of the possible effects to delta smelt and its critical habitat by operating the CVP to

23      deliver water under the SRS and DMC Contracts were addressed in the [2008 FWS Smelt OCAP

24      BiOp]." *Id*. ¶ 106.

25      //

                                    13

### 15. __Plaintiffs Obtain Leave to Amend__

On April 22, 2016, the Court granted Plaintiffs' motion for leave to file the 4SC, permitting the addition of three new claims. Doc. 1018. The Fourth Claim for Relief challenges the sufficiency of FWS's re-consultation, which resulted in the issuance of the 2015 LOC. No party objected to adding this claim, which is a natural extension of the existing litigation.

Plaintiffs' Fifth Claim alleges that Reclamation unlawfully failed to request re-initiation of consultation with NMFS on the impacts of SRS Contract renewals on the winter-run and spring-run Chinook. 4SC ¶¶ 183-188. Specifically, Plaintiffs allege that the 2009 NMFS Smelt OCAP BiOp constituted new information that revealed effects of the SRS Contracts that NMFS did not consider in consultation over the contracts. *Id*. ¶ 186. Plaintiffs also allege that massive mortality episodes impacting the 2014 and 2015 generations of winter-run and spring-run Chinook constituted independent new information that should have triggered re-consultation. *Id*. ¶ 187.

Plaintiffs' Sixth Claim for relief alleges Reclamation and the SRS Contractors illegally caused the take of winter-run and spring-run Chinook during 2014 and 2015 because Reclamation made excessive deliveries to the SRS Contractors that depleted the cold water reserves in Shasta Reservoir, causing temperature increases fatal to the 2014 and 2015 "brood years" of winter-run and spring-run Chinook. 4SC ¶¶ 189-193.

Federal Defendants argued that the two new salmonid claims (Fifth and Sixth Claims for Relief) are barred by res judicata. Doc. 1007 at 16-17. This argument was rejected because the central governmental conduct that gave rise to the *PCFFA* litigation was the issuance of the 2004 NMFS Salmonid OCAP BiOp. Doc. 1018 at 19. Encompassed within the scope of the *PCFFA* lawsuit was a challenge to Reclamation's execution of the renewal Contracts based upon the 2004 NMFS Salmonid OCAP BiOp. *See PCFFA* FAC ¶¶ 2, 49, 74, 112. However, the proposed Fifth and Sixth Causes of action arise from separate governmental conduct, namely, the failure to re-initiate consultation and the continued delivery of water to SRS Contractors despite alleged take of listed salmonids. Doc. 1018 at

19.

The SRS Contractors argued that the applicable six-year statute of limitations bars Plaintiffs' claim that NMFS was required to reinitiate consultation upon the issuance of the 2009 NMFS Salmonid OCAP BiOp because that document was adopted more than six years ago. Doc. 1009 at 11. The Court deferred addressing Plaintiffs' argument that the statute of limitations "does not bar a challenge to an 'ongoing agency action,' such as the SRS Contracts," Doc. 1013 at 17, and Plaintiffs' related argument that several more recent actions constitute "amendments" to the 2009 NMFS Salmonid OCAP BiOp, *id.* at 14, as beyond the scope of their motion. Doc. 1018 at 20. The Court did hold that because the 4SC alleges sufficiently that temperature control events in 2014 and 2015 triggered the requirement for re-initiation, *see* 4SC ¶¶ 113, 192, the Sixth Claim for Relief is not barred in any general sense by the statute of limitations. *Id.* at 20-21.

The Court rejected the SRS Contractors' and Federal Defendants' argument that Plaintiffs' claims that NMFS was required to re-initiate consultation based upon 2014 and 2015 temperature control events are moot because Reclamation has already reinitiated consultation regarding 2014/2015 drought operations. Doc. 1007 at 21-22; Doc. 1009 at 11.

> As the Ninth Circuit has made abundantly clear, system-wide consultation (such as consultation over the OCAP that produced the 2009 NMFS Salmonid OCAP BiOp) does not obviate the need for contract-specific consultation. *See NRDC v. Jewell*, 749 F.3d at 784. This logic would also seem to mean that system-wide re-consultation does not obviate the need for contract-specific re-consultation.

Doc. 1018 at 21.

Finally, the Court rejected Federal Defendants' argument that the Sixth Claim for Relief, alleging take in violation of ESA § 9, is futile because it is based purely on allegations of past violations. *Id.* at 21-22; Doc. 1007 at 20-21. Because the 4SC asks the Court in Prayer "J" to "[e]njoin the Secretary from continuing to make releases of water from Shasta Reservoir, and the SRS Contractors from diverting such water, to satisfy the terms of the SRS Contracts where such releases and diversions will

1   cause the unauthorized take of winter-run and spring-run Chinook," 4SC at 66-67, the Court concluded

2   that, even if the ESA's citizen suit provision precludes claims based upon purely past violations, the

3   Sixth Claim for Relief is "forward looking" and therefore not futile. Doc. 1018 at 22.

4   ## IV. STANDARD OF DECISION

5   ### A.   Motion to Dismiss for Lack of Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1)

6   Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of subject-

7   matter jurisdiction." Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the

8   existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir.

9   1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary

10  affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968-69 (9th Cir. 1981).

11  A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214,

12  1242 (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir.

13  2004):

14  > In a facial attack, the challenger asserts that the allegations contained in a
    > complaint are insufficient on their face to invoke federal jurisdiction. By
15  > contrast, in a factual attack, the challenger disputes the truth of the
    > allegations that, by themselves, would otherwise invoke federal
16  > jurisdiction.

17  In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint

18  without converting the motion to dismiss into a motion for summary judgment. *Savage v. Glendale*

19  *Union High School*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003); *McCarthy v. United States*, 850 F.2d 558,

20  560 (9th Cir. 1988). "If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that

21  the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the

22  existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule

23  12(b)(6) motion is made." *Cervantez v. Sullivan*, 719 F. Supp. 899, 903 (E.D. Cal. 1989), *rev'd on other*

24  *grounds*, 963 F.2d 229 (9th Cir. 1992). "The factual allegations of the complaint are presumed to be

25  true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter

1   jurisdiction." *Id.*; *see also Cassirer v. Kingdom of Spain,* 580 F.3d 1048, 1052 n. 2 (9th Cir. 2009), *rev'd*

2   *on other grounds en banc,* 616 F.3d 1019 (9th Cir. 2010) (applying *Ashcroft v. Iqbal,* 556 U.S. 662

3   (2009), to a facial motion to dismiss for lack of subject matter jurisdiction).

4          A Rule 12(b)(1) motion can be made as a speaking motion—or factual attack—when the

5   defendant submits evidence challenging the jurisdiction along with its motion to dismiss. *Thornhill*

6   *Publ'g Co. v. Gen. Tel. & Elecs. Corp.,* 594 F.2d 730, 733 (9th Cir. 1979); *see Savage v. Glendale*

7   *Union High Sch.,* 343 F.3d 1036, 1039-40 & n. 2 (9th Cir. 2003). A proper speaking motion allows the

8   court to consider evidence outside the complaint without converting the motion into a summary

9   judgment motion. *See Safe Air for Everyone,* 373 F.3d at 1039. "Once the moving party has converted

10  the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought

11  before the court, the party opposing the motion must furnish affidavits or other evidence necessary to

12  satisfy its burden of establishing subject matter jurisdiction." *Savage,* 343 F.3d at 1039-40, n. 2. In a

13  speaking motion, "[t]he court need not presume the truthfulness of the plaintiff's allegations." *Safe Air,*

14  373 F.3d at 1039. Few procedural limitations exist in a factual challenge to a complaint's jurisdictional

15  allegations. *St. Clair v. City of Chico*, 880 F.2d 199, 200-202 (9th Cir. 1989). The court may permit

16  discovery before allowing the plaintiff to demonstrate the requisite jurisdictional facts. *Id.* A court may

17  hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question

18  prior to trial, if the jurisdictional facts are separable from the merits. *Rosales v. United States*, 824 F.2d

19  799, 802-803 (9th Cir. 1987). However, if the jurisdictional issue and substantive claims are so

20  intertwined that resolution of the jurisdictional question is dependent on factual issues going to the

21  merits, the court should dismiss for lack of jurisdiction only if the material facts are not in dispute and

22  the moving party is entitled to prevail as a matter of law. Otherwise, the intertwined facts must be

23  resolved by the trier of fact. *Id.*

24  **B.**     **Motion to Dismiss for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6)**

25          A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is a challenge to the

17

1    sufficiency of the allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is

2    either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable

3    legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a

4    motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the

5    complaint, construes the pleading in the light most favorable to the party opposing the motion, and

6    resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir.

7    2008).

8              To survive a 12(b)(6) motion to dismiss, the plaintiffs must allege "enough facts to state a claim

9    to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim

10   has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the

11   reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

12   662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for

13   more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at

14   556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

15   allegations, a Plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more

16   than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

17   *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing

18   more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556

19   U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . may not simply

20   recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to

21   give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d

22   1202, 1216 (9th Cir. 2011). In practice, "a complaint . . . must contain either direct or inferential

23   allegations respecting all the material elements necessary to sustain recovery under some viable legal

24   theory." *Twombly*, 550 U.S. at 562; *see also Starr*, 652 F.3d at 1216 ("the factual allegations that are

25   taken as true must plausibly suggest an entitlement to relief"). To the extent that the pleadings can be

1   cured by the allegation of additional facts, a plaintiff should be afforded leave to amend. *Cook, Perkiss*

2   *and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

3                                                **V. <u>DISCUSSION</u>**

4   **A.      <u>First & Third Claims for Relief</u>**

5          The DMC Contractors and SRS Contractors move to dismiss the First and Third Claims for

6   Relief. DMC MTD; SRS MTD. The previously assigned district judge entered final judgment on the

7   First and Third Claims for Relief and no appeal was taken. Doc. 873; *NRDC v. Jewell*, 749 F.3d 776.

8   Plaintiffs admit that they include these claims in the 4SC for informational purposes only. Pltf. Opp. at

9   35. It is not unreasonable to leave claims on which judgment has already entered in an operative

10  complaint for this reason, particularly given the exceedingly complex procedural history of this case.

11  The Court therefore DENIES the motions to dismiss the First and Third Claims for Relief.

12  **B.      <u>Second Claim for Relief</u>**

13          **1.      <u>Mootness</u>**

14          The DMC Contractors and SRS Contractors move to dismiss the Second Claim for Relief as

15  moot. DMC MTD at 6-7; SRS MTD at 4-7. An issue is moot "when the issues presented are no longer

16  'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529

17  U.S. 277, 287 (2000). "The underlying concern is that, when the challenged conduct ceases such that

18  there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the

19  court to grant any effectual relief whatever to the prevailing party." *Id.* (internal citations and quotations

20  omitted). If the parties cannot obtain any effective relief, any opinion about the legality of a challenged

21  action is impermissibly advisory. *Id.* "Mootness has been described as the doctrine of standing set in a

22  time frame: The requisite personal interest that must exist at the commencement of the litigation

23  (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v.*

24  *Arizona*, 520 U.S. 43, 68 n. 22 (1997) (internal citation and quotation omitted). "[A]n actual controversy

25  must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* at 67. "The party

1    asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court

2    to provide." *In re Palmdale Hills Property, LLC*, 654 F.3d 868, 874 (9th Cir. 2011). Mootness is

3    evaluated on a claim-by-claim basis. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 52 F. Supp. 3d

4    1020, 1045 (E.D. Cal. 2014).

5         Plaintiffs' Second Claim for Relief alleges that the Bureau acted unlawfully because it relied

6    upon what it knew or should have known to be an inadequate consultation with FWS. 4SC ¶ 172. More

7    specifically, Plaintiffs allege that the 2005 FWS Smelt OCAP BiOp incorrectly concluded that the 2004

8    OCAP would not jeopardize the delta smelt or adversely modify its critical habitat. *Id*. at ¶ 173. The

9    Second Claim for Relief further alleges that "notwithstanding the 2005 FWS Smelt OCAP BiOp, by

10   implementing the 2004 OCAP and related actions, the Bureau has failed and is failing to perform its

11   affirmative obligation to insure that its actions will not jeopardize the continued existence of the delta

12   smelt, in violation of ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2)." *Id*. Relatedly, and "for the same reasons,"

13   the 4SC alleges that "the Bureau also has failed and is failing to insure that its actions are not likely to

14   adversely modify the designated critical habitat of the delta smelt." *Id*. at ¶ 174. These allegations, which

15   pertain to Reclamation's reliance on the 2005 FWS Smelt OCAP BiOp, are therefore moot in light of the

16   fact that FWS issued the 2008 FWS Smelt OCAP BiOp, which superseded and in large part rejected the

17   2005 FWS Smelt OCAP BiOp. Plaintiffs do not appear to dispute this. *See* Pltf. Opp. 36-37.

18        However, the Second Claim for Relief does not stop there. In paragraph 175, Plaintiffs allege:

19              [T]he Bureau has failed and is failing to comply with ESA § 7(a)(2), 16
                U.S.C. § 1536(a)(2), by executing and implementing the long-term water
20              supply renewal contracts described above, in reliance on what it knew or
                should have known to be faulty analysis by the FWS. The execution and
21              continued performance of these renewal contracts has short- and long-term
                adverse impacts on the threatened delta smelt that jeopardize the species'
22              continued existence and adversely modify its critical habitat.

23   Plaintiffs also point to earlier allegations in the 4SC that are incorporated by reference into the Second

24   Claim for Relief. 4SC ¶ 171. For example, paragraph 15 alleges that Reclamation unlawfully limited the

25   scope of its 2015 reinitiated consultation with FWS by "requesting only that FWS concur with

[Reclamation's] assessment that the effects of the contracts were analyzed in the 2008 FWS [Smelt] OCAP BiOp," even though the Ninth Circuit had ruled that the 2008 FWS Smelt OCAP BiOp "merely assesses the general effects of the [system-wide OCAP]" and did not address Reclamation's "decision to renew the specific contracts" at issue. The 4SC further alleges that Reclamation undermined its 2015 FWS consultation by representing to FWS "that [Reclamation] lacked authority to change the terms in the SRS contracts for the benefit of the delta smelt," despite the Ninth Circuit's directly contrary ruling. 4SC ¶¶15-16, 103-05 (citing *NRDC v. Jewell*, 749 F.3d at 785). In light of these allegations, Plaintiffs argue they have properly stated a claim that "Reclamation has continuously failed to carry out its affirmative duty to ensure that the SRS and DMC contracts do not jeopardize the delta smelt, or that the 2015 consultation was flawed and, as a result, Reclamation 'has failed and is failing to comply' with its obligation to engage in a valid Section 7 consultation on the contracts' effects delta smelt and its critical habitat." Pltf. Opp. at 37 (citing 4SC ¶ 175). These allegations, which assert wrongs that have not been corrected, are not moot.

### 2. **60-Day Notice**

To the extent the allegations in the Second Claim for Relief assert claims regarding the Bureau's 2015 re-initiated consultation with FWS, the DMC Contractors argue that Plaintiffs failed to provide the 60-day notice letter required of any claim brought under the citizen suit provision of the ESA. DMC MTD at 2-4.

The ESA provides that "no action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A). "The notice requirement provides agencies with 'an opportunity to review their actions and take corrective measures if warranted.'" *Alliance for the Wild Rockies v. U.S. Dep't of Agric*., 772 F.3d 592, 601 (9th Cir. 2014) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998)). Thus, to satisfy the notice requirement, a plaintiff must "provide sufficient information of a violation so that [the defendant] could identify and

1  attempt to abate the violation." *Sw. Ctr. for Biological Diversity*, 143 F.3d at 522. The requirement is a

2  "mandatory condition [ ] precedent to commencing suit" under the ESA. *Alliance*, 772 F.3d at 601. "A

3  failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the

4  ESA." *Sw. Ctr. for Biological Diversity*, 143 F.3d at 520. A district court may not disregard such a

5  notice requirement at its discretion. *See Hallstrom*, 493 U.S. at 31.

6      Here, Plaintiffs' 60-day notice letter dates to February 7, 2008. Doc. 1020-1 ("2008 Notice

7  Letter"). On the one hand, the DMC Contractors are correct that the 2008 Notice Letter focused on the

8  allegation that the Bureau was violating its substantive duty under section 7(a)(2) to avoid jeopardy to

9  the delta smelt or adverse modification of the smelt's habitat. For example, the 2008 Notice Letter

10  states:

11      "[T]he Bureau has continued to perform and implement actions authorized
        under the discredited OCAP Biological Opinion. In particular, following
12      issuance of the unlawful OCAP Biological Opinion, the Bureau relied
        upon that Biological Opinion and implemented one aspect of the OCAP
13      by signing several long-term water delivery and settlement contracts…."
        [2008 Notice Letter at 6.]

14
        "The ESA consultation conducted by the Bureau for each of these sets of
15      contracts explicitly depended on the analysis in and tiered off of the now
        invalidated Biological Opinion." [*Id*. at 7.]

16
        "The sole basis for the Bureau's conclusions that these long-term contracts
17      were not likely to jeopardize the delta smelt or destroy or adversely
        modify its critical habitat was the OCAP Biological Opinion's no jeopardy
18      and no adverse modification determinations (or, in the case of the DMCU
        contracts, the superseded July 30, 2004 biological opinion)." [*Id*. at 8.]

19
20  Moreover, the 2008 Notice Letter warned that continuing to perform on the identified contracts and/or

21  renegotiate contract terms would constitute a violation of section 7(a)(2) unless and until the

22  "completion of a new, lawful OCAP biological opinion." [*Id*. at 10.]

23      On the other hand, the 2008 Notice Letter does broadly complain of an "ongoing violation" of

24  section 7(a)(2), stating, for example:

25      The Bureau has an independent and continuing duty to ensure that its
        actions avoid jeopardy. Continued implementation of the OCAP, when

1

> added to the environmental baseline and cumulative effects, has both
> short-term and long-term adverse impacts on the protected Delta smelt that
> jeopardize the species' continued existence. Accordingly, by
> implementing the long-term contracts under the OCAP, the Bureau is in
> <u>ongoing violation</u> of section 7(a)(2).

2

3

4   *Id*. at 7 (emphasis added).

5       In support of their position that this 2008 notice of an "ongoing violation" is sufficient to

6   encompass a challenge to the sufficiency of the Bureau's 2015 re-initiated consultation with FWS,

7   Plaintiffs cite *Water Keeper Alliance v. U.S. Dep't of Defense*, 271 F.3d 21 (1st Cir. 2001). In that case,

8   the plaintiffs sent a 60-day notice of intent to sue regarding the Navy's plan to engage in training

9   exercises on the island of Vieques that had potential to harm ESA-listed species. Specifically, plaintiffs'

10  notice complained that the Navy was relying on BAs and BiOps from the early 1980s, despite new

11  scientific information about impacts to those species plaintiffs alleged required the Navy to reinitiate

12  consultation. *Water Keeper Alliance v. U.S. Dep't of Defense*, 152 F. Supp. 2d 163, 172-74 (D. P.R.

13  2001). After plaintiffs sent the notice, the Navy consulted with FWS regarding interim exercises it

14  planned to conduct. *Id*. at 174. Plaintiffs filed suit alleging that the Navy's consultation with FWS

15  regarding the interim exercises was flawed because the Navy presented a "consultation package" to

16  FWS, rather than a biological assessment. *Water Keeper Alliance*, 271 F.3d at 28, 30.

17      The district court concluded that plaintiffs' 60-day notice was inadequate because it "did not

18  (indeed could not have, since it predated it) reference the . . . biological opinion[] which was the

19  culmination of the formal consultation for the interim exercises, as the basis for its grievance." *Id*. at 29.

20  The First Circuit reversed, explaining that although the letter did not reference the specific consultation

21  plaintiffs challenged, it "d[id] take issue with the fact that the Navy has been conducting military

22  activities on Vieques for some years without the benefit of a [BA] incorporating new scientific

23  evidence." *Id*. at 30. The court reasoned that, "to say that the Navy was not on notice that Water Keeper

24  would object to the failure to prepare a [BA] for its interim activities, when the Notice makes it clear

25  that Water Keeper intended to challenge an ongoing delinquency in the preparation of a [BA], would be

1   setting the bar for adequacy of notice too high." *Id*. at 30.

2       Plaintiffs interpret *Water Keeper* to permit suit in this case because the 2008 Notice Letter

3   "makes it clear that [Plaintiffs] intended to challenge an ongoing delinquency" to properly consult on the

4   contracts and ensure the contracts do not cause jeopardy. Pltf. Opp. at 40. The DMC Contractors argue

5   for a more narrow interpretation of *Water Keeper*, emphasizing that there was a strong common thread

6   between the 60-day notice in *Water Keeper* and the complaint eventually brought in that case.

7   Specifically, because the *Water Keeper* notice complained that the Navy never prepared a BA regarding

8   ongoing, long-term training activities, the Navy was on notice that it was violating the ESA by

9   conducting interim training activities without first preparing a BA. DMC Reply at 9.

10       Here, there is no such common thread. The claim expressly noticed in the 2008 Notice Letter

11   concerned reliance on a flawed and superseded BiOp. This is factually and legally distinct from

12   Plaintiffs' concerns regarding the sufficiency of the Bureau's 2015 re-initiated consultation with FWS.

13   *Id*. The 4SC alleges that the 2015 re-initiated consultation was flawed because the Bureau

14       instructed that the scope of reinitiation should be limited in at least two
     ways: first, requesting only that FWS concur with the Bureau's assessment

15       that the effects of the contracts were analyzed in the 2008 FWS [Smelt]
     OCAP BiOp; and, second, by asserting that it lacked authority to change

16       the terms in the SRS contracts for the benefit of the delta smelt.

17   4SC ¶ 15. Neither factual allegation is even alluded to in the 2008 Notice Letter.

18       The Court cannot find that the 2008 Notice Letter "provide[s] sufficient information of a

19   violation so that [the defendant] could identify and attempt to abate the violation." Unlike the notice

20   letter in *Water Keeper*, the 2008 Notice Letter provides no information that could possibly help the

21   Bureau understand what was wrong with its 2015 re-initiated consultation. Therefore, the Court

22   concludes that the 2008 Notice Letter does not provide adequate pre-suit notice of a claim based upon

23   the 2015 re-initiated consultation.

24       One additional argument merits some discussion. Plaintiffs cite *Marbled Murrelet v. Babbitt*, 83

25   F.3d 1068, 1073 (9th Cir. 1996), which held that the test for an ESA notice is whether it "afford[s] the

1   opportunity to rectify the asserted ESA violations." Plaintiffs suggest that any defects in the 2008

2   Notice Letter should be excused because "recent events demonstrate that Reclamation had additional

3   opportunities to take corrective measures." Pltf. Opp. at 39. As an example, Plaintiffs point to

4   allegations in the 4SC concerning correspondence between Reclamation, FWS, and Plaintiffs regarding

5   Reclamation's continued assertion that it lacked discretion to make any species-protective changes to the

6   SRS contracts, and Plaintiffs' continued assertion that this position contradicted the ruling in *NRDC v.*

7   *Jewell*, 749 F.3d 776. Plaintiffs maintain that this correspondence demonstrates that "Reclamation

8   remained on notice of its ongoing failure to properly consult on the contracts and protect the delta smelt

9   and had sufficient 'opportunities to rectify' its violation." Pltf. Opp. at 39 (citing *Marbled Murrelet*, 83

10  F.3d at 1073). Plaintiffs essentially argue that actual notice can supplant the formal notice required by 16

11  U.S.C. § 1540(g)(2)(A)(i).

12      *Marbled Murrelet* does not support this proposition. *Marbled Murrelet* held that reference to

13  Section 7 in only one part of a five-page ESA notice letter did not preclude suit under Section 7 because

14  "the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA

15  violations." 83 F.3d at 1073. Nothing in *Marbled Murrelet* suggests that the formal notice requirement

16  may be supplanted by subsequent events or communications that may otherwise provide notice of the

17  violation but do not satisfy the formal requirements of 16 U.S.C. § 1540(g)(2)(A)(i) (*e.g.*, notice to the

18  Secretary of the Interior). To so hold would render the formal requirements meaningless.

19      The DMC Contractors' and SRS Contractors' motions to dismiss the Second Claim for Relief are

20  GRANTED on the ground that this Court lacks subject matter jurisdiction over the Second Claim for

21  relief because certain allegations in the claim are moot and because Plaintiffs have failed to comply with

22  the ESA's 60-day notice requirement as to any non-moot allegations. Because amendment cannot cure

23  these defects, leave to amend is not appropriate at this time.[3]

24  ───────────────

25  [3] The Court expresses no opinion as to whether this jurisdictional notice defect could be cured by appropriate notice or

**C.**     **Fifth Claim for Relief**

Plaintiffs' Fifth Claim alleges that Reclamation unlawfully failed to request re-initiation of consultation with NMFS on the impacts of SRS Contract "implementation" on the winter-run and spring-run Chinook. 4SC ¶¶ 183-188. Specifically, Plaintiffs allege that the 2009 NMFS Salmonid OCAP BiOp constituted new information that revealed effects of the SRS Contracts that NMFS did not consider in consultation over the contracts. *Id*. ¶ 186. Plaintiffs also allege that massive mortality episodes impacting the 2014 and 2015 generations of winter-run and spring-run Chinook constituted independent new information that should have triggered re-consultation. *Id*. ¶ 187.

An agency is required to reinitiate consultation where

>discretionary Federal involvement or control over the action has been
>retained or is authorized by law and:

>>(a) If the amount or extent of taking specified in the incidental take
>>statement is exceeded;

>>(b) If new information reveals effects of the action that may affect
>>listed species or critical habitat in a manner or to an extent not
>>previously considered;

>>(c) If the identified action is subsequently modified in a manner
>>that causes an effect to the listed species or critical habitat that was
>>not considered in the biological opinion; or

>>(d) If a new species is listed or critical habitat designated that may
>>be affected by the identified action.

50 C.F.R. § 402.16 (emphasis added). The duty to reinitiate consultation lies with both the action agency and the consultation agency. *See id*.; *see also Envtl. Prot. Info. Ctr. v. Simpson Timber Co*., 255 F.3d 1073, 1076 (9th Cir. 2001) ("*EPIC*").

Plaintiffs allege that Reclamation has "discretionary federal involvement and control over the implementation of the SRS Contracts." 4SC ¶ 186. Federal Defendants dispute this, arguing that "while Reclamation retains some limited discretionary control or involvement in implementing the terms of the

---

whether a subsequent motion to amend would be appropriate.

1   SRS Contracts, that level of involvement is not sufficient to trigger re-initiation because in the end,

2   Reclamation ultimately cannot unilaterally alter the existing terms of the contracts in a manner that will

3   inure to the benefit of [the] species." FD MTD at 9.

4         Plaintiffs argue that the Ninth Circuit's decision in *NRDC v. Jewell* controls on the issue of

5   discretionary involvement and control. The relevant portion of that decision addressed Plaintiffs' claim,

6   contained in the TAC, that Reclamation violated Section 7(a)(2) by failing to consult adequately with

7   FWS over impacts to delta smelt prior to <u>renewing</u> the SRS Contracts. *See* 749 F.3d at 781. The

8   previously assigned district judge ruled that Reclamation was not required to comply with Section 7 in

9   connection with renewal of the SRS contracts because the terms of the original SRS Contracts

10  "substantially constrained" Reclamation's discretion to modify the terms during the renewal process. *Id*.

11  at 784. The Ninth Circuit reversed, holding that the appropriate question is not whether the agency's

12  discretion is "substantially constrained" but rather whether the agency retains "some discretion" to take

13  action for the benefit of a protected species. *Id*. Applying the "some discretion" standard, the Ninth

14  Circuit reasoned:

15          In holding that the Bureau was not required to consult under Section
            7(a)(2) prior to renewing the Settlement Contracts, the district court
16          focused on Article 9(a) of the original Settlement Contracts, which
            provides in pertinent part:
17

18              During the term of this contract and any renewals thereof: (1) It
                shall constitute full agreement as between the United States and the
19              Contractor *as to the quantities of water and the allocation thereof*
                between base supply and Project water which may be diverted by
20              the Contractor from its source of supply for beneficial use on the
                land shown on Exhibit B ...; (2) The Contractor shall not claim any
21              right against the United States in conflict with the provisions
                hereof.

22          (emphasis added). According to the district court, the Bureau was not
            required to consult because this provision "substantially constrained" the
23          Bureau's discretion to negotiate new terms in renewing the contracts.

24          In so concluding, the district court applied an erroneous standard. Section
            7(a)(2)'s consultation requirement applies with full force so long as a
25          federal agency retains "some discretion" to take action to benefit a

protected species. [Citations] While the parties dispute whether Article 9(a) actually limits the Bureau's authority to renegotiate the Settlement Contracts, it is clear that the provision does not strip the Bureau of all discretion to benefit the delta smelt and its critical habitat.

First, nothing in the original Settlement Contracts requires the Bureau to renew the Settlement Contracts. Article 2 of the original contracts provides that "renewals *may* be made for successive periods not to exceed forty (40) years each." (emphasis added). This language is permissive and does not require the Bureau to execute renewal contracts. Since the FWS has concluded that "Delta water diversions" are the most significant "synergistic cause[ ]" of the decline in delta smelt, 58 Fed. Reg. at 12,859, it is at least plausible that a decision not to renew the Settlement Contracts could benefit the delta smelt and their critical habitat.

But even assuming, *arguendo*, that the Bureau is obligated to renew the Settlement Contracts and that Article 9(a) limits the Bureau's discretion in so doing, Article 9(a) simply constrains future negotiations with regard to "the quantities of water and the allocation thereof...." Nothing in the provision deprives the Bureau of discretion to renegotiate contractual terms that do not directly concern water quantity and allocation. …[T]he Bureau could benefit the delta smelt by renegotiating the Settlement Contracts' terms with regard to, inter alia, their pricing scheme or the timing of water distribution.

For these reasons, we conclude that, in renewing the Settlement Contracts, the Bureau retained "some discretion" to act in a manner that would benefit the delta smelt. The Bureau was therefore required to engage in Section 7(a)(2) consultation prior to renewing the Settlement Contracts.

*Id*. at 784-85 (italics in original; underlining added). *NRDC v. Jewell* unambiguously held that the

Section 7(a)(2) consultation requirement applies to the renewal of the SRS Contracts.

*NRDC v. Jewell*'s holding is directly relevant to the Fourth Claim for Relief in the 4SC, which

challenges the sufficiency of the consultation between Reclamation and FWS as to impacts to delta

smelt related to renewal of the SRS Contracts. Although the SRS Contracts were renewed in 2004 and

2005, the Fourth Claim for Relief, based upon Reclamation's failure to consult over impacts of renewal

upon delta smelt, was first raised in the TAC filed in 2008 and has been preserved throughout the

present case.

In contrast, no party has identified a previously filed claim that preserves Plaintiffs' right to

challenge the 2004 and 2005 renewals of the SRS Contracts based upon how those renewals impacted

1   salmonids.[4] Plaintiffs now attempt to bring a claim demanding re-initiation of consultation regarding the

2   SRS Contracts. Before analyzing the motions to dismiss this Fifth Claim for Relief, it is important to

3   define the exact nature and scope of the claim. As discussed, re-initiation is only required where

4   "discretionary Federal involvement or control over the action has been retained or is authorized by law."

5   50 C.F.R. § 402.16 (emphasis added). The 4SC indicates that Reclamation has "discretionary federal

6   involvement and control over the implementation of the SRS Contracts." 4SC ¶ 186 (emphasis added). It

7   would therefore follow that Plaintiffs seek re-initiation of consultation regarding impacts of

8   implementation of the SRS Contracts on salmonids, not regarding the impacts of renewal/adoption of

9   those contracts on salmonids. This position is reinforced in certain portions of Plaintiffs' opposition.

10  See, e.g., Pltf. Opp. at 10:1-3 ("[T]he 4SC is rife with allegation that Reclamation retains ongoing

11  discretionary involvement with and control over the implementation of the SRS contracts."); id. at

12  10:22-23 ("Federal Defendants' own proffered documentation further demonstrates Reclamation's

13  ongoing discretion over the SRS contracts' implementation.").

14        Having identified that the Fifth Claim for Relief alleges that Reclamation has discretionary

15  involvement or control over implementation of the SRS Contracts, it is less clear what consultation

16  Plaintiffs seek to force Federal Defendants to re-initiate. The OCAP consultation (which culminated in

17  the 2009 NMFS Salmonid OCAP BiOp) arguably addresses impacts of CVP Contract (including SRS

18  Contract) implementation. See Declaration of Meredith E. Nikkel, ("Nikkel Decl."), Ex. A at 728 (Doc.

19  1031-5) (excerpt from 2009 NMFS Salmonid OCAP BiOp stating that incidental take statement issued

20  in connection with that consultation "is applicable to all activities related to the long-term operations of

---

22  [4] As discussed above, on August 9, 2005, a coalition of environmental organizations (overlapping in part with the Plaintiffs in
    this case) filed a complaint against Reclamation and NMFS alleging that the 2004 NMFS Salmonid OCAP BiOp, which
23  purported to address impacts of the OCAP on listed salmonid species, was inadequate. PCFFA FAC; PCFFA I, 606 F. Supp.
    2d at 1131. The lawsuit sought to "[e]njoin and set aside any and all actions" that relied on the NMFS 2004 OCAP Salmonid
    BiOp, including the delivery of water under the SRS Contracts. PCFFA FAC at 38. On May 20, 2008, the previously
24  assigned district judge found that NMFS acted arbitrarily and capriciously by failing to consider certain facts in the NMFS
    2004 NMFS Salmonid OCAP BiOp. PCFFA I, 606 F. Supp. 2d at 1193-94. On June 4, 2009, NMFS issued the revised 2009
25  NMFS Salmonid OCAP BiOp. San Luis v. Locke, 776 F.3d at 988. The previously assigned district judge then entered final
    judgment in PCFFA, and closed the matter. PCFFA, Doc. 458. No appeal was taken.

the CVP and SWP . . . including . . . administration of water contracts . . . .").[5] Yet, nothing in the 4SC

or Plaintiffs' filings indicates Plaintiffs seek re-initiation of the OCAP consultation process. Rather, the

4SC alleges that the Bureau has failed to reinitiate consultation "on the SRS contracts." 4SC ¶ 186.

Plaintiffs' opposition brief likewise suggests they seek re-initiation of consultation over the renewal of

the SRS contracts. For example, Plaintiffs point to Reclamation's re-initiation of consultation regarding

impacts of adoption of the SRS contracts on delta smelt as an example of why Reclamation possesses

authority to "take the same action" (i.e., re-initiate consultation on adoption of the SRS Contracts) "with

regard to … effects on listed Chinook." Pltf. Opp. 9 (emphasis added).

In light of the above, the only logical reading of the Fifth Claim for Relief is that Plaintiffs allege

Reclamation retains discretionary involvement or control over SRS Contract implementation and that

the new information alleged in the complaint regarding impacts of SRS Contract implementation on

salmonids requires re-initiation of the consultation regarding SRS Contract adoption. There is a

significant hurdle associated with such an allegation, rooted in a line of authority highlighted by Federal

Defendants.

While acknowledging the holding of *NRDC v. Jewell*, Federal Defendants argue that once

executed, "the terms of the SRS Contracts are set and Reclamation administers the contracts as

executed." FD MTD at 10. Therefore, Federal Defendants' argument continues: "Reclamation does not

retain the authority to alter the contract terms to inure to the benefit of listed species and thus, re-

initiation on the execution of the SRS contracts has not been triggered." *Id.*

Federal Defendants' position finds support in *EPIC*, which concerned a lawsuit brought against

FWS for its alleged failure to re-initiate consultation over the impact an ITP issued to a Simpson Timber

for the northern spotted owl might have on two other species (the marbled murrelet and the coho

---

[5] This document, a record downloaded from a public agency's website, is subject to judicial notice. *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1093 (E.D. Cal. 2011). Judicially noticed documents may be considered only for limited purposes, including "to prove their existence and content, but not for the truth of the matters asserted therein." *Id.* Here, the document may be considered to establish what the authoring agency asserts to be the scope of the document it authored.

salmon) listed after the issuance of the ITP. FWS retained some ongoing authority over the ITP:

> ten years after the permit's issuance, the FWS will review the permit and evaluate whether Simpson has complied with its terms before allowing Simpson to continue logging operations under the permit. The FWS can also suspend the permit at any time in the event of "any significant violation or breach" of the permit; it also has the authority to revoke the permit if activities authorized under it result in the taking of threatened species not the subject of the permit, including the marbled murrelet and coho salmon.

*Id*. at 1078. In evaluating whether FWS retained sufficient discretionary involvement or control, the Ninth Circuit first confirmed that the appropriate standard comes from *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995). *EPIC*, 255 F.3d at 1079. As *EPIC* summarized:

> *Sierra Club* involved a suit against the Bureau of Land Management ("BLM") for its failure to consult with the FWS about the effect of a proposed logging road on the northern spotted owl. A private timber company was going to build a road on public land pursuant to a right-of-way agreement with the BLM. The Sierra Club claimed that agreement represented ongoing agency action and that the BLM was required to consult with the FWS about the potential impact of the road on a newly listed species, the spotted owl, because the BLM retained discretionary involvement and control over the right-of-way. Under the right-of-way agreement, the BLM could object to the timber company's project in three limited instances, none of which was at issue or related to endangered or threatened species. [*Sierra Club*, 65 F.3d] at 1509 n. 10. We held that the BLM did not have a duty to consult with the FWS because it could not influence construction of the roadway for the benefit of the spotted owl:
>
> > In light of the statute's plain language, the agency's regulations, and the case law construing the scope of "agency action," we conclude that where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species.
>
> *Id*. at 1509 (emphasis added). Under *Sierra Club*, to survive a Rule 12(b)(6) motion to dismiss, EPIC must allege facts to show that the FWS retained sufficient discretionary involvement or control over Simpson's permit "to implement measures that inure to the benefit of the" [species in question]. *Id*.

*EPIC*, 255 F.3d at 1079-80 (emphasis added).

The Ninth Circuit rejected EPIC's contrary contention that *Pacific Rivers Council v. Thomas*, 30

31

1  F.3d 1050 (9th Cir. 1994), controlled. *EPIC*, 255 F.3d at 1080. *Pacific Rivers* held that the Forest

2  Service was obligated to consult with NMFS upon its listing of the Snake River Chinook salmon as

3  threatened because the Forest Service's Land Resource Management Plans ("LRMPs"), which establish

4  fifteen-year plans for government lands, "have an ongoing and long-lasting effect even after adoption"

5  and therefore "represent ongoing agency action." 30 F.3d at 1053. The Ninth Circuit reasoned that

6  Simpson Timber's ITP was not analogous to the LRMPs at issue in *Pacific Rivers*:

7            LRMPs are comprehensive management plans which govern agency
          action in forest planning decisions. The Forest Service has plenary control
8          in this area because it is the agency charged with promulgating, approving
          and implementing LRMPs on Forest Service land. In contrast, Simpson's
9          [ITP], like the right-of-way agreement in *Sierra Club*, involves agency
          authorization of a private action and a more limited role for the FWS. In
10          such a case, the issue of ongoing agency involvement turns on whether the
          agency has retained the power to "implement measures that inure to the
11          benefit of the protected species." *Sierra Club*, 65 F.3d at 1509.

12  *EPIC*, 255 F.3d at 1080. The Ninth Circuit then examined the ITP issued to Simpson Timber to

13  determine whether it reserved to FWS "discretionary involvement and control to such an extent that it

14  must reconsult on the impact of Simpson's spotted owl permit on marbled murrelet and coho salmon."

15  *Id*. at 1080. Ultimately, the Ninth Circuit concluded that neither the ITP nor any permit-related

16  documents reserved to FWS such discretionary involvement or control. *Id*. at 1080-82.

17            Critically for purposes of this case, the *EPIC* court next addressed the applicability of *Natural*

18  *Resources Defense Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998). In *Houston*, Reclamation

19  was required to consult with NMFS because Reclamation's renewal of certain CVP water contracts,

20  which were statutorily mandated to be negotiated on "mutually agreeable" terms with water users,

21  involved at least "some" agency discretion to set the contract terms because Reclamation had

22  discretionary power to decrease the total supply of water for sale and thereby decrease the amount of

23  water granted in the renewed contracts. *Id*. The Ninth Circuit applied similar reasoning in *NRDC v.*

24  *Jewell* to the SRS Contract <u>renewal</u> process.

25            In *EPIC*, however, the Ninth Circuit emphasized that *Houston* should not be read to "suggest …

32

1    that once the renewed contracts were executed, the agency had continuing discretion to amend them at

2    any time to address the needs of endangered or threatened species." 255 F.3d at 1082. Rather, the terms

3    of the contract or agreement must be examined to determine whether and to what extent the agency

4    retained discretion to impose measures to protect the species in question. *See id*. (finding terms of ITP

5    permit issued regarding impacts to spotted owl did not give FWS the power to implement measures to

6    benefit species other than the spotted owl); *see also Crowman Corp. v. United States*, 51 Fed. Cl. 654,

7    656 (2002) (finding contract term permitting agency to adjust the time period for contract operations in

8    the event that an "act of Government" disrupted contract operations reserved to the agency the

9    discretionary authority to re-initiate consultation to evaluate impact of contracted operations on recently-

10   listed species").

Contrary to Plaintiffs' suggestion, Pltf. Opp. at 8, in light of *EPIC*, the Ninth Circuit's holding in

12   *NRDC v. Jewell* is <u>not</u> law of the case with respect to Plaintiffs' Fifth Claim for relief. In other words,

13   *NRDC v. Jewell*'s holding that Reclamation has discretion <u>in the renewal</u> process to alter the timing of

14   water distribution and the pricing scheme related to contracted-for water does not necessarily mean

15   Reclamation retained similar discretion in the <u>executed</u> contracts (or otherwise possess similar discretion

16   pursuant to law) that would permit revisions to executed contracts.

In an effort to demonstrate that *EPIC* does not control here, Plaintiffs argue that because a valid

18   consultation is a prerequisite for a final agency action, the SRS Contracts are not yet final. Pltf. Opp. at

19   9-10 n. 4. But this begs the question of whether the SRS Contracts are in fact final. The Fourth Claim for

20   Relief alleges, <u>but has not yet demonstrated</u>, that the consultation undertaken regarding the impacts of

21   SRS Contract renewal on delta smelt is invalid, nor have any of the SRS Contracts been set aside. While

22   *NRDC v. Jewell* stands for the proposition that Reclamation retains sufficient discretion over SRS

23   Contract <u>renewal</u> to require consultation over impacts to listed species during the renewal process, the

24   4SC acknowledges that some form of consultation has taken place. *See* 4SC ¶ 16. Therefore, at least for

25   purposes of the present analysis of the Fifth Claim for Relief, the SRS Contracts <u>are</u> still final, and *EPIC*

1  controls analysis of this claim, which challenges <u>implementation</u> of executed contracts.[6]

2  *Houston*, itself cited by Plaintiffs, *see* Pltf. Opp. at 9-10 n. 4, is not to the contrary. There, the

3  Ninth Circuit was addressing one party's argument that, even if the Bureau violated the procedural

4  provisions of the ESA by <u>executing</u> water contracts before the completion of appropriate ESA

5  consultation, any such procedural violation was rendered moot when consultation was completed.

6  *Houston*, 146 F.3d at 1128. The Ninth Circuit disagreed, indicating that remedies were still available,

7  noting that "[t]he failure to respect the process mandated by law cannot be corrected with post-hoc

8  assessments of a done deal." *Id.* at 1129. Plaintiffs take this quote out of context in an effort to argue that

9  the SRS Contracts should not be considered final. *Houston* stands for the proposition that remedies (such

10  as contract rescission) may be available in a challenge to a consultation over contract execution and

11  therefore that such a challenge is not moot upon completion of consultation. *Id*. *Houston* does not stand

12  for the proposition that such remedies should be presumed applicable prior to adjudication of the merits

13  of a claim.

14      As Federal Defendants point out, the SRS Contracts contain limited provisions providing for

15  amendment that appear inapplicable under the present circumstances. For example, the SRS Contracts

16  may be amended to conform to a final judgment issued in a general stream adjudication of the

17  Sacramento river system or if the California State Water Resources Control Board or a court of

18  competent jurisdiction modifies the terms and conditions of water rights to either party. Supplemental

19  Administrative Record ("SAR"), 2695-2731 (Glenn-Colusa Irrigation District ("GCID") Contract, No.

20  14-06-200-855A-R-1), at 2714-15.[7]

21  _____

22  [6] The Court is cognizant of the fact that this creates a bizarre procedural situation. Unless and until Plaintiffs prevail on their
Fourth Claim for Relief, the Court must consider the SRS Contracts final for purposes of analyzing the Fifth Claim for Relief
23  and, under *EPIC*, must evaluate the contract itself to determine the extent of any retained discretion. If Plaintiffs prevail on
the Fourth Claim for Relief, a subsequent analysis of the Fifth Claim for Relief might warrant a different analysis.

24  [7] The SAR was lodged at an earlier stage of this litigation. The specific document cited here, the GCID Contract, may be
considered at this stage of the proceedings without converting the motion to one for summary judgment because of the
25  incorporation by reference doctrine. The Ninth Circuit has extended that doctrine to "situations in which the plaintiff's claim
depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not

1    Plaintiffs do not attempt to point to contractual language to establish that Reclamation retained

2    discretion to act on behalf of salmonids. Rather, they focus on Reclamation's <u>conduct</u>, which they assert

3    demonstrates the existence of discretion. *See, e.g.*, 4SC ¶¶ 58-59 (Reclamation sought changes to flow

4    requirements and export limits); *id*. ¶73 (Reclamation must conduct temperature modeling to determine

5    quantity and timing of releases to SRS Contractors); *id*. (Reclamation schedules releases to SRS

6    Contractors to maintain adequate temperatures for salmon spawning); *id*. ¶75 (Reclamation ignored

7    NMFS's warnings and made excessive releases to SRS Contractors); *id*. ¶76 (Reclamation issued

8    temperature management plan for Shasta releases to SRS Contractors); *id*. ¶153 (Reclamation "makes

9    real-time determinations regarding the timing and volume of releases").

10    Even assuming all of these examples do demonstrate the <u>actual</u> exercise of discretion,[8] relying on

11    them may be putting the cart before the horse. In *EPIC*, the Ninth Circuit did not look to extrinsic

12    evidence to determine whether the agency retained discretion in the ITP to act on behalf of the recently

13    listed marbled murrelet. 255 F.3d at 1081-82. The court focused only on the relevant contractual terms.

14    *See id.* at 1082.

15    If Plaintiffs' argument is treated as a pure question of contract interpretation, the consideration of

16    extrinsic evidence is limited by contract-law principles. As summarized in *Tehama-Colusa Canal Auth.*

17    *v. U.S. Dep't of Interior*:

18    > Federal law governs the interpretation of a contract if the United States is
19    > a party, especially federal reclamation contracts. *See Mohave Valley*
     > *Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164, 1165 (9th Cir.

20    _____

21    dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in
     the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Here, at least one of Plaintiffs' claims depends on the

22    content of the SRS Contracts, of which the GCID Contract is one, the document is already in the record of this case, and no
     party disputes the authenticity of the document.

23    [8] Federal Defendants point to correspondence between Reclamation and the SRS contractors to demonstrate that Reclamation
     "did not (and could not) unilaterally mandate" the rescheduling of deliveries to the SRS Contractors. *See* FD MTD at 17

24    (citing Declaration of Natalie L. Wolder ("Wolder Decl."), Doc. 1032-2, ¶ 6 & Att. 1-5). In connection with this Fed. R. Civ.
     P. 12(b)(6) motion to dismiss, the Court cannot consider this evidence without converting the motion to one for summary
     judgment. Plaintiffs object to the Court doing so without giving Plaintiffs the benefit of an opportunity to review the

25    complete administrative record. Assuming the Fifth Claim for Relief cannot be resolved on other grounds, given the
     complexity of the issue, the Court declines to convert the motion to one for summary judgment until the record is complete.

2001) (citing cases) [additional citations]. For guidance, federal courts also follow general principles of contract interpretation. *See* [*United States v. Westlands Water Dist.*], 134 F. Supp. 2d [1111,] 1135 [(E.D. Cal. 2001)]).

The plain language within the four corners of the contract must first be examined to determine the mutual intent of the contracting parties. *See, e.g.*, *United States v. Clark*, 218 F.3d 1092, 1096 (9th Cir. 2000) ("Following traditional rules of contract interpretation, we must examine the plain language of the term in the context of the document as a whole.") (quoting sources). In "cases of contracts, language is to be given, if possible, its usual and ordinary meaning. The object is to find out from the words used what the parties intended to do." *Fla. Cent. R.R. Co. v. Schutte*, 103 U.S. 118, 140 (1880). "A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath*, 204 F.3d at 1210. "[C]ourts should attempt to construe contracts to avoid absurdity, and must reject interpretations which would make the contract unusual, extraordinary, harsh, unjust, or inequitable." *Blecher & Collins, P.C. v. N.W. Airlines, Inc.*, 858 F. Supp. 1442, 1459 (C.D. Cal. 1994) (citing sources).

"In fashioning federal rules, guidance is gained from general principles for interpreting contracts." *Saavedra*, 700 F.2d at 498 (citing *United States v. Seckinger*, 397 U.S. 203, 209-11 (1970)). The Uniform Commercial Code ("U.C.C.") is one source of federal common law used to interpret any contract to which the federal government is a party. *See O'Neill*, 50 F.3d at 684 (applying the U.C.C. to the disputed contracts). "[T]he backdrop of the legislative scheme that authorized" a government contract may also be examined to interpret that contract. *Peterson v. U.S. Dept. of Interior*, 899 F.2d 799, 807 (9th Cir. 1990) (citing Fed. Hous. Admin. v. Darlington, Inc., 358 U.S. 84, 87-88 (1958)).

Additional contract interpretation rules apply:

(1) the four corners of the contract must be read as a whole;

(2) preference is given to reasonable interpretations, favoring those that avoid internal conflict;

(3) under the U.C.C., extrinsic evidence, including usage of trade; course of dealing; and course of performance, is admissible to determine whether the contract is ambiguous;

(4) if the contract is ambiguous, i.e., whether "reasonable people could find its terms susceptible to more than one interpretation," extrinsic evidence may be considered to interpret the parties' intent in light of earlier negotiations, later conduct, related agreements, and industry-wide custom;

36

(5) whether a contract (or any term) is ambiguous is a question of law.

819 F. Supp. 2d 956, 987-88 (E.D. Cal. 2011) (certain internal citations and all footnotes omitted).

It is not clear how any of the offered conduct-based examples of the exercise of discretion in practice are relevant without some reference to a contract provision that is at least ambiguous as to the existence of discretion to act on behalf of salmonids during contract implementation. Accordingly, and because this issue was not addressed by any party's briefs on the pending motions, the Court will permit supplemental briefing. Specifically, Plaintiffs shall submit a supplemental brief, no longer than ten pages in length, addressing the following questions:

(1) In light of the Court's ruling that *EPIC* controls as to the Fifth Claim for Relief and necessitates an examination of SRS Contracts themselves to determine whether Reclamation retains discretion under the Contracts to act on behalf of salmonid species, are there provisions in the SRS Contracts that support Plaintiffs' allegation that Reclamation retains such discretion?

(2) Relatedly, on what authority may the Court consider Plaintiffs' allegations that Reclamation actually has exercised discretion over contract implementation in practice?

Given that resolution of these issues may be dispositive, the Court declines at this time to address the other issues raised in connection with the Fifth Claim for Relief.

**D.    Sixth Claim for Relief**

Plaintiffs' Proposed Sixth Claim for relief alleges Reclamation and the SRS Contractors illegally caused the take of winter-run and spring-run Chinook during 2014 and 2015 because Reclamation made excessive deliveries to the SRS Contractors, who in turn diverted the delivered water, which in combination depleted the cold water reserves in Shasta Reservoir, causing temperature increases fatal to the 2014 and 2015 "brood years" of winter-run and spring-run Chinook. 4SC ¶¶ 189-193.

**1.    Sufficiency of Factual Allegations against SRS Contractors**

The SRS Contractors argue that the Sixth Claim for Relief does not contain sufficient factual

1   allegations regarding an act or omission by the SRS Contractors that could plausibly state a claim for

2   relief. SRS MTD at 15-17.

3        To prevail on a Section 9 claim, a plaintiff must prove by a preponderance of the evidence that a

4   "reasonably certain threat of imminent harm to a protected species" exists. *Marbled Murrelet v. Babbitt*,

5   83 F.3d 1060, 1066 (9th Cir. 1996). Thus, Plaintiffs have the burden of proving that the

6   deliveries/diversions will harm one of the five listed fish species identified in the complaint "by killing

7   or injuring it." *Protect Our Water v. Flowers*, 377 F. Supp. 2d 844, 880 (E.D. Cal. 2004) (citing *Defs. of

8   Wildlife v. Bernal*, 204 F. 3d 920, 925 (9th Cir. 2000)). Habitat modification may constitute "harm" to a

9   listed species, but only if it "actually kills or injures wildlife." *Babbitt v. Sweet Home Chapter of

10  Communities for a Great Oregon*, 515 U.S. 687, 691 (1995) (quoting and affirming the definition in 50

11  C.F.R. § 17.3). A "potential" injury to the species is "inadequate to establish Section 9 liability."

12  *Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262, 1270 (W.D.

13  Wash. 2008) (quoting *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir.

14  1995)). Take can result from *direct* harm to a single, individual animal. *See, e.g.*, *United States v.

15  Nuesca*, 945 F.2d 254 (9th Cir. 1991) (affirming criminal convictions under the ESA for the direct take

16  by hunting of a single Hawaiian monk seal and two green sea turtles). In contrast, "the balance of the

17  authority suggests that a population level effect is necessary for harm resulting from habitat modification

18  to be considered a take." *Coal. for a Sustainable Delta*, 725 F. Supp. 2d at 1170 (collecting cases).

19       The SRS Contractors are correct that some sections of the 4SC focus on the Bureau's conduct

20  regarding temperature control. For example, paragraph 73 alleges:

21          The Bureau is responsible for conducting temperature modeling to
             determine how much water stored in Shasta Reservoir can be released to
22           contractors in the spring and summer months. The Bureau must retain
             sufficient cold water reserves in Shasta Reservoir so that it can make
23           timed releases from Keswick Dam throughout the temperature
             management season to maintain temperatures conducive to salmonid
24           spawning, egg incubation, and rearing. The Bureau's ability to meet the
             needs of salmonids and their habitat throughout the temperature
25           management season is heavily affected by the SRS contracts, the terms of

which are met by releases from Shasta Dam. In 2014, in order to meet the demands of the SRS contracts, <u>the Bureau made releases</u> from Keswick Dam in April, May, and early June that depleted the cold water pool behind Shasta Dam and ultimately led to the loss of temperature control. State and federal agencies estimate that the Bureau's failure to maintain temperature control led to 95% mortality of the 2014 brood year of winter-run Chinook. Additionally, high temperatures in September led to virtually complete mortality of spring-run Chinook eggs in the Sacramento River.

(emphasis added). However, the 4SC does contain allegations that tie the SRS Contractors to the alleged take. Specifically, paragraph 21 alleges:

In 2014, the Bureau delivered to the SRS Contractors, <u>and the SRS Contractors diverted</u>, excessive amounts of water from Shasta Reservoir to satisfy the terms of the SRS contracts. <u>These releases and diversions caused the Bureau to lose control of water temperatures in the upper Sacramento River</u> during the "temperature management season" for threatened and endangered Chinook salmon, which generally lasts from June through October. <u>As a result, almost the entire generation of endangered winter-run Chinook that had hatched, or would have hatched, in the upper Sacramento River in 2014 ("2014 brood year") was killed.</u> The last remaining wild population of endangered winter-run Chinook survives solely in the Sacramento River below Shasta Dam. There were similar devastating impacts to the 2014 spring-run Chinook brood year in the Sacramento River.

The Sixth Claim for Relief repeats a substantially identical allegation in paragraph 192:

As alleged above, the Bureau's excessive releases, <u>and the SRS Contractors' diversions</u>, of water during the temperature management season in 2014 and 2015 caused massive take of winter-run and spring-run Chinook. The Bureau's excessive releases depleted the cold water pool in Shasta Reservoir, causing the Bureau to lose control of temperatures in the upper Sacramento River, which is critical habitat for winter-run and spring-run Chinook. The Bureau's excessive releases caused fatal increases in water temperatures that led to the near total loss of the 2014 and 2015 generations of winter-run and spring-run Chinook. The Bureau's releases and the SRS Contractors' diversions were the predominant and direct cause of the loss, or "take," of winter-run and spring-run Chinook in 2014 and 2015.

While the SRS Contractors are correct that "but for" causation is the relevant standard, *see Sweet Home*, 515 U.S. at 700, n. 13 ("but for" causation required for a takings claim), it is reasonable to infer from these allegations that the SRS Contractors' diversions were the actual physical mechanism by which water was removed from the watershed, that Reclamations would not have released the same volume of

1   water from upstream reservoirs were it not for the SRS Contractors' planned downstream diversions,

2   and therefore that the SRS Contractors' diversions were a "but for" cause of the resulting loss of

3   temperature control that is described in detail in the 4SC. The SRS Contractors' assertion that the 4SC

4   does not allege any "action or omission" by the SRS Contractors ignores the fact that "diversion" is an

5   "action." While straightforward, the allegations against the SRS Contractors are not conclusory and

6   certainly put the SRS Contractors on notice of how they are alleged to have acted unlawfully. This is

7   sufficient for pleading purposes. The SRS Contractors' motion to dismiss on this ground is DENIED.

8            **2.**     **Past Conduct**

9        The SRS Contractors next argue that the Sixth Claim for Relief must be dismissed because

10   Plaintiffs fail to allege any ongoing or future harm. Plaintiffs' Section 9 claim is brought pursuant to the

11   ESA's citizen suit provision, 4SC ¶ 191[9], which permits "any person" to commence a civil suit to

12   "enjoin any person, including the United States and any other governmental instrumentality or agency

13   (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation

14   of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C.

15   1540(g)(1)(A) (emphasis added).

16        The SRS Contractors cite *National Wildlife Federation v. Burlington Northern Railroad*, 23 F.3d

17   1508 (9th Cir. 1994), in support of their contention that Section 9 clams cannot be based upon wholly

18   past conduct. In *Burlington*, plaintiffs appealed the denial of their motion for a preliminary injunction in

19   a Section 9 case. *Id*. at 1509. The Ninth Circuit held that, despite the fact that requests for injunctive

20   relief under the ESA must be evaluated in light of "Congress' determination that the balance of

21   hardships and the public interest tips heavily in favor of protected species," to obtain an injunction under

22   Section 9, a plaintiff still "must make a showing that a violation of the ESA is <u>at least likely in the</u>

23   <u>future</u>." *Id*. at 1511 (emphasis added); *cf. Ctr. for Biological Diversity v. Marina Point Dev. Co*., 566

24   _____

25   [9] Federal Defendants join this argument in a footnote. FD MTD at 19 n. 8.

40

1   F.3d 794, 804 (9th Cir. 2009) (finding Section 9 claim against developer regarding take of bald eagles

2   moot because eagle had been delisted by the time appeal was decided, reasoning that the delisting made

3   it impossible for developer to "violate" the ESA regarding the bald eagle).

4        The SRS Contractors also cite *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc*.,

5   484 U.S. 49 (1987). In *Gwaltney*, several weeks before plaintiffs filed a lawsuit under the citizen suit

6   provision of the Clean Water Act ("CWA"), the defendant ceased violating its CWA permit. *Id*. at 53-

7   54. The Fourth Circuit concluded that the *Gwaltney* plaintiffs could pursue their CWA citizen suit claim

8   based entirely on past conduct. *Id*. at 56. The CWA's citizen suit provision provides that "any citizen

9   may commence a civil action on his own behalf . . . against any person [or agency] . . . who is alleged to

10  be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the

11  Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365.[10] The Supreme

12  Court reversed, noting that Congress, by using the phrase "to be in violation" in the CWA's citizen suit

13  provision, intended for citizens to be able to abate only ongoing violations, and thus required plaintiffs

14  to "allege a state of either continuous or intermittent violation-that is, a reasonable likelihood that a past

15  polluter will continue to pollute in the future." *Id*. at 57. The Supreme Court further noted that a contrary

16  conclusion would render the CWA's 60-day notice requirement "incomprehensible," because the

17  purpose of that notice "is to give [the alleged violator] an opportunity to bring itself into compliance

18  with the Act and thus render unnecessary a citizen suit." *Id*. at 59-60.

19       The SRS Contractors make an analogous argument here based upon ESA's 60-day notice

20  provision, the purpose of which is, at least in part, to give defendants "notice of a perceived violation"

21  and "give them the opportunity to review their actions and take corrective measures if warranted."

22  *Conservation Cong. v. Finley*, 774 F.3d 611, 618 (9th Cir. 2014) (internal citation and quotation

23  _____

24  [10] The ESA's citizen suit provision contains similar language. 16 U.S.C. § 1540(g)(1)(A)(providing that "any person may commence a civil suit on his own behalf . . . to enjoin any person [or agency] . . . who is alleged to be in violation of any

25  provision of this chapter or regulation issued under the authority thereof.").

1   omitted). The SRS Contractors argue that if a citizen suit could be brought for wholly past violations,

2   this purpose of the 60-day notice provision would be thwarted. SRS MTD at 18.

3          Plaintiffs argue that *Gwaltney* does not apply to the ESA and that nothing in the ESA requires a

4   citizen suit plaintiff to plead facts establishing a likelihood of future harm. Pltf. Opp. at 28-30. Plaintiffs

5   point to *Stout v. U.S. Forest Serv*., 869 F. Supp. 2d 1271 (D. Or. 2012), in which the defendants argued,

6   at the summary judgment stage, that plaintiffs had to prove "that take is likely to occur in the future to

7   prevail on their [Section] 9 claim." *Id*. at 1280. Rejecting this argument, the district court reasoned:

8              In arguing that plaintiffs must prove a likelihood of future take to prevail
9              on their § 9 claim, defendants confuse the forward looking nature of the
              relief offered by the ESA's citizen suit provision and the violation of the
              Act that justifies the injunction. In order to prevail on their § 9 claim,
10             plaintiffs must prove that the Forest Service is "in violation of any
              provision of the" ESA. 16 U.S.C. § 1540(g)(1)(A). While injunctive relief
11             is forward looking, it is often used to remedy past or present harms and the
              term "in violation" connotes past, present, or future violations of the ESA.
12             To require a citizen plaintiff to prove that "take" is likely to occur in the
              future tips the balance away from the preservation of species and would
13             thwart Congress' overriding purpose of providing "a means whereby the
              ecosystems upon which endangered species and threatened species depend
14             may be conserved" and of providing "a program for the conservation of
              such ... species." 16 U.S.C. § 1531(b); *Forest Conservation Council [v.
15             Rosboro Lumber Co.*], 50 F.3d [781,] 785 [(9th Cir. 1985)]. That said, it is
              equally clear that the relative likelihood of future harm, as well as the need
16             of a species for recovery from past harm, are factors a court should
              consider in tailoring the scope of injunctive relief.

17   *Id*. at 1280-81.

18          While not illogical, it is very difficult to square the reasoning of *Stout* with *Gwaltney*, which

19   interpreted language from the CWA that is materially identical to the relevant ESA language. It is true

20   that some complicating ESA jurisprudence exists. For example, as the district court in *Stout* pointed out,

21   *id*. at 1281 n.7, prior to the Ninth Circuit's ruling in *Forest Conservation Council*, 50 F.3d at 785, it was

22   not settled that a plaintiff could obtain relief under the ESA for wholly <u>future</u> harm to listed species. In

23   that case, the Ninth Circuit noted that "[a] take may involve a <u>past</u> or current injury, or the prospect of an

24   imminent threat of harm to a protected species." *Id*. at 784 (emphasis added). This holding is entirely

25

1    consistent with *Stout*'s conclusion that the prospective nature of the injunctive relief permitted by the

2    citizen suit provision does not require allegations of future harm to maintain a Section 9 claim.

3            It is not necessary, however, for the Court to determine definitively whether *Gwaltney* applies to

4    the ESA's citizen suit provision because, even if it does, Plaintiffs' claim is not based wholly on past

5    violations. Plaintiffs allege generally that "the Bureau and the SRS Contractors have violated and are

6    likely to continue to violate Section 9 of the ESA by unlawfully and without required authorization

7    taking winter-run and spring-run Chinook." 4SC at ¶ 23; *see also id*. at ¶ 29 ("[T]he Bureau and SRS

8    Contractors have taken, and are taking, winter-run and spring-run Chinook in violation of 16 U.S.C. §

9    1538(a).")·  More specifically, paragraph 76 alleges NMFS's conclusion that continued drought

10   conditions would lead to similar mortality in the future:

11                  It is now very clear through evaluating operations in both 2014 and 2015
                    that the volume of cold water available for real-time management in June
12                  through October is highly dependent on Keswick releases in April through
                    early June. In 2016, should drought conditions persist, these releases in
13                  April through early June will need to be held to minimal levels to achieve
                    adequate temperatures only.

14   4SC ¶ 76. Relatedly, paragraph 137 alleges "the duration and intensity of droughts are anticipated to

15   increase in California." Taken together, along with the other allegations in the 4SC, these allegations are

16   sufficient to allege plausibly that the Bureau and the SRS Contractors are likely to continue to violate

17   Section 9. *Id*. at ¶ 137.[11] The SRS Contractors' motion to dismiss on this ground is DENIED.

18           **3.      Federal Defendants' Motion to Dismiss the Sixth Claim for Relief**

19           Federal Defendants argue that the Plaintiffs' Section 9 claims against them is barred because the

20   alleged take was covered by the ITS included in the 2009 NMFS Salmonid OCAP BiOp. Relatedly,

21   Federal Defendants also argue that an agency cannot, as a matter of law, be the proximate cause of any

22

23   _____

24   [11] The SRS Contractors' suggestion that a higher standard than plausibility applies, *see* SRS Reply at 10, is without merit.
     They cite, for example, *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1094 (E.D. Wash. 2006), for the proposition
     that a Section 9 claim requires allegations of a "definitive threat of future harm" to a protected species. But, *Martin* required a
25   showing of "a definitive threat of future harm" to obtain a preliminary injunction. That court was not addressing whether a
     Section 9 claim could survive a motion to dismiss.

                                                        43

1    take that occurs as a result of that agency implementing a legally mandated water delivery (*i.e.*, a non-

2    discretionary action).

3         As mentioned, Section 7 requires that every federal agency, before undertaking an "action

4    authorized, funded, or carried out by" that agency, must ensure that the action is not likely to jeopardize

5    the continued existence of a protected species or harm the critical habitat of a protected species. 16

6    U.S.C. § 1536(a)(2). When effects on protected species are likely, the agency must go through a formal

7    consultation process with FWS and/or NMFS. *Id*. If the resulting BiOp concludes that the proposed

8    action (or its reasonable and prudent alternative) will cause "the taking of a[] [listed] species incidental

9    to the agency action," but that despite this taking, the action will not jeopardize the species or threaten

10   critical habitat, FWS or NMFS shall provide the agency with a written statement that:

11              (i) specifies the impact of such incidental taking on the species,
                (ii) specifies those reasonable and prudent measures that the Secretary
12              considers necessary or appropriate to minimize such impact
                (iii) ..., and
13              (iv) sets forth the terms and conditions (including, but not limited to,
                reporting requirements) that must be complied with by the Federal agency
14              or applicant (if any), or both, to implement the measures specified under
                clauses (ii) and (iii).

15   16 U.S.C. § 1536(b)(4). The resulting ITS provides the applicant agency with immunity from Section 9.

16   Section 7 provides that "any taking that is in compliance with the terms and conditions specified in a

17   written [ITS] ... shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. §

18   1536(o )(2). "Where the agency's action involves authorization or approval of private party conduct,

19   then the private party is also protected from Section 9 by compliance with the agency's [ITS]." *Defs. of*

20   *Wildlife v. U.S. Fish,* No. 16-CV-01993-LHK, 2016 WL 4382604, at *2 (N.D. Cal. Aug. 17, 2016).

21        A related provision governs incidental take by private parties and authorizes FWS and NMFS to

22   issue an ITP "under such terms and conditions as [the service] may prescribe." 16 U.S.C. § 1539(a)(1).

23   As with an ITS, an ITP may excuse take that "is incidental to, and not the purpose of, the carrying out of

24   an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). An applicant for an ITP must submit a habitat

25

1    conservation plan demonstrating that the take "will not appreciably reduce the likelihood of the survival

2    and recovery [of the species] in the wild." ESA § 10(a)(2)(B)(iv).[12]

3          Federal Defendants maintain that the salmonid mortality that occurred in 2014 and 2015 was

4    covered by the ITS issued in connection with the 2009 NMFS Salmonid OCAP BiOp. FD MTD at 18-

5    19. On the one hand, the 2009 NMFS Salmonid OCAP BiOp explicitly indicated that it considered "the

6    overall impacts of the total volume of water diverted from the Central Valley." 2009 NMFS Salmonid

7    OCAP BiOp at 729.[13] On the other hand, the 2009 NMFS Salmonid OCAP BiOp is direct about its own

8    limitations, indicating:

9            This consultation addresses the long-term operations of the CVP and
             SWP, and does not satisfy Reclamation's ESA section 7(a)(2) obligations
10           for issuance of individual water supply contracts. Reclamation should
             consult with NMFS separately on their issuance of individual contracts.
11           The analysis of effects of the proposed actions, however, assumes water
             deliveries under the contracts, as described and modeled in the BA.

12   2009 NMFS Salmonid OCAP BiOp at 35. Even more importantly, the 2009 NMFS Salmonid OCAP

13   BiOp also recognized that, at least at the time of its issuance, Reclamation claimed certain contracted-for

14   volumes were "nondiscretionary." *Id*. As a result, NMFS requested that "Reclamation provide written

15   notice to NMFS . . . of any contract that it believes is [sic] creates a nondiscretionary obligation to

16   deliver water, including the basis for this determination and the quantity of nondiscretionary water

17   delivery required by the contract." *Id*. Critically, and in direct reference to such nondiscretionary

18   deliveries, the 2009 NMFS Salmonid OCAP BiOp indicated: "Any incidental take due to delivery of

19   water to such a contractor is <u>not be [sic] exempt from the ESA section 9 take prohibition in this

20   Opinion</u>." *Id*.; *see also id*. at 729 ("In the event that Reclamation determines that delivery of quantities

21   of water to any contractor is nondiscretionary for purposes of the ESA, any incidental take due to

22

23   [12] The record does not reveal any information that suggests the SRS Contractors applied for or possess an ITP regarding their diversion of water and its alleged impacts on salmonids.

24   [13] The 2009 NMFS Salmonid OCAP BiOp is attached to the Request for Judicial Notice submitted by the SRS Contractors. *See* Nikkel Decl., Ex. A (Docs. 1031-4 & 1031-5). It is a judicially noticeable document that may be considered for its content, not for the truth of the matters asserted therein.

25

1  delivery of water to that contractor would not be exempted from the ESA section 9 take prohibition in

2  this Opinion."); *id.* at 601 ("The incidental take statement for this Opinion also provides limitations of

3  ESA incidental take coverage for Settlement Contractors under the terms of this Opinion.").

4        It is difficult to square this language with Federal Defendants' opening position that the ITS

5  covers take caused in connection with the delivery of water under the SRS Contracts. As acknowledged

6  by NMFS in the 2009 NMFS Salmonid BiOp, Reclamation maintained at the time of the issuance of that

7  BiOp that deliveries to the SRS Contractors were non-discretionary. *See, e.g.*, 2009 NMFS Salmonid

8  OCAP BiOp at 684 (explaining that "[t]emperature related effects on spring-run in the mainstem

9  Sacramento River will persist into the future, and cannot be fully off-set through Shasta reservoir storage

10  actions, due to physical and hydrological constraints on the CVP system, and the <u>delivery of water to</u>

11  <u>non-discretionary CVP contractors</u> (*e.g.*, Sacramento River Settlement Contractors)") (emphasis added).

12  Likewise, as discussed, the ITS itself explicitly excludes from its coverage non-discretionary activities.[14]

13  Federal Defendants even point out that an ITS, which is issued pursuant to Section 7(b)(4), 16 U.S.C. §

14  1536(b)(4), is only available as part of the Section 7 consultation process, which in turn <u>only applies to</u>

15  <u>non-discretionary agency action</u>. *See* 50 C.F.R. § 402.03; *see also Nat'l Ass'n of Home Builders v. Defs.*

16  *of Wildlife*, 551 U.S. 644, 667 (2007) (Section 7 does not apply where an agency "simply lacks the

17  power to 'insure' that [its] action will not jeopardize endangered species."). All this leads the Court to

18  conclude, at least for the purpose of this motion, that the ITS issued in connection with the 2009 NMFS

19  Salmonid OCAP BiOp could not possibly cover deliveries to the SRS Contractors, which Reclamation

20  (the agency that applied for the ITS) maintained at the time the BiOp and ITS issued were non-

21  discretionary.[15]

22

---

23  [14] While it is true that the 2009 NMFS Salmonid OCAP BiOp purports to evaluate the impacts of all deliveries, including
24  deliveries to the SRS Contractors, *see* 2009 NMFS Salmonid OCAP BiOp at 729, this merely points out an internal
inconsistency in the 2009 NMFS Salmonid OCAP BiOP that no party has even attempted to resolve or explain.

25  [15] The consequences of this finding for the SRS Contractors should be noted. As mentioned, when an ITS issued under
Section 7 "involves authorization or approval of private party conduct, then the private party is also protected from Section 9

46

This is where Federal Defendants' second argument—that an agency cannot, as a matter of law, be the proximate cause of any take that occurs as a result of that agency implementing a legally mandated action—becomes intertwined with its first. To understand why, the Court must side-step to review briefly the second argument and its supporting (and contrary) legal authority.

Federal Defendants argue that dismissal of the Sixth Cause for Relief is required because Plaintiffs fail to allege any "legally relevant causal link between Reclamation's alleged act and Plaintiffs' alleged take." FD MTD at 19. It is well-established that concepts of proximate cause apply to Section 9 claims. *See Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1084 (D. Or. 2012) (collecting cases supporting the proposition that "[i]t is well accepted that proximate cause is an element of ESA Section 9 claims," and explaining that "[i]n the context of the ESA, proximate cause issues entail determining whether the alleged injury . . . is fairly traceable to the challenged action of [d]efendants.").

Federal Defendants cite *U.S. Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), for the proposition that a sufficient causal connection cannot possibly exist if the agency "has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions." *Id*. at 770. In that case, the Supreme Court held that the defendant federal agency, the Federal Motor Carrier Safety Administration ("FMCSA") did not violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-370, when it failed to analyze the environmental impact of permitting cross-border truck traffic. The Supreme Court noted that "NEPA requires a reasonably close causal relationship between the environmental effect and the alleged cause," analogous to the "familiar doctrine of proximate cause from tort law," and instructed that "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." 541 U.S. at 767 (internal citation and quotation omitted). Because

by compliance with the agency's [ITS]." *Defs. of Wildlife*, 2016 WL 4382604, at *2. If the private party has assumed an ITS provides such protection but that ITS actually does not cover the conduct in question, then, presumably, the private party is not insulated by the ITS from Section 9 liability.

1  FMCSA was statutorily required to allow the trucks to enter the country, an environmental analysis of

2  any alternative action would not serve "the underlying policies behind NEPA" to provide information to

3  the public and to inform the decision-making process. *Id.* at 768. Put another way, "[s]ince FMCSA has

4  no ability categorically to prevent the cross-border operations of Mexican motor carriers, the

5  environmental impact of the cross-border operations would have no effect on FMCSA's

6  decisionmaking—FMCSA simply lacks the power to act on whatever information might be contained in

7  the EIS." *Id.*

8       Federal Defendants maintain that *Public Citizen* applies with equal force to the ESA and that, as

9  a result, an agency cannot be held liable under Section 9 for an action it is legally mandated to perform.

10  FD MTD at 20.

11      Plaintiffs argue that *Public Citizen* is inapplicable in the context of the ESA. Pltf. Opp. at 27. At

12  least one district court has so held. In *Seattle Audubon Soc'y v. Sutherland*, No. C06-1608MJP, 2007

13  WL 1577756, at *1 (W.D. Wash. May 30, 2007), the defendant agency argued that under *Public Citizen*

14  agency officials could not be the proximate cause of any alleged take because those officials did not

15  have discretion to deny permits that comply with the requirements of the Forest Practices Act. The

16  district court rejected this argument, reasoning that "[a]lthough [*Public Citizen*'s] holding makes sense

17  in the context of a procedural, information-forcing statute like NEPA, it is inapplicable under the ESA,

18  which serves completely different purposes."*Id.*[16]

19      With this in mind, the Court returns to the first dispute: whether any ITS (let alone the one

20  associated with the 2009 NMFS Salmonid OCAP BiOP) may provide take exemption for activities

21

22  ───────────

[16] The Court agrees with Plaintiffs that Federal Defendants' reliance on *Strahan v. Linnon*, 967 F. Supp. 581 (D. Mass. 1997),

23  is unhelpful. Although that case facially held that the Coast Guard could not be liable for takings by non-Coast Guard vessels to whom the Coast Guard issued certain permits because the Coast Guard's issuance of those permits was not discretionary, the only authority the district court cited for that holding was its own prior order in which it held that the Coast Guard did not

24  have to comply with Section 7 of the ESA in connection with non-discretionary acts. *Strahan* did not provide any authority to support its imposition of Section 7's well-established discretionary action prerequisite, *Home Builders*, 551 U.S. at 669, to

25  Section 9 claims.

48

1    assumed by the applicant and issuing agency to be non-discretionary. Because, as discussed, Section 7

2    only applies to non-discretionary agency action, *see* 50 C.F.R. § 402.03; *see also Home Builders*, 551

3    U.S. at 667, it is logical to—and the Court does conclude—that an ITS can never provide an incidental

4    take exemption for non-discretionary agency activities.[17] [18]

5         Assuming an ITS cannot cover incidental take caused by non-discretionary agency action, the

6    Federal Defendants argue that Plaintiffs' entire claim is "untenable" because, under Plaintiffs' theory of

7    the case, "Reclamation would at once be legally required to comply with [a mandatory legal requirement

8    regarding water deliveries], yet face ESA liability for any associated incidental take that resulted,"

9    without any way to obtain incidental take protection. FD Reply at 10 (emphasis added).

10        Key to Federal Defendants argument is their assumption that there is no way other than via an

11   ITP for a federal agency to obtain incidental take authorization. Federal Defendants assert, without

12   citing any authority that "while private actors can apply for an [ITP] under [S]ection 10, no such

---

14   [17] The Court acknowledges the judicially noticeable documents cited by Federal Defendants as proof that Reclamation
consulted with NMFS over Reclamation's 2014 and 2015 drought operations plans. *See* FD MTD at 17 (citing Nikkel Decl.
at Ex. C at 21, Ex. E at 1-2, Ex. N at 2, Ex. L at 1-2, Ex. P (enclosure 1 at 2)). Those consultations resulted in NMFS

15   concurring that the effect of those plans were encompassed within the effects disclosed in the 2009 NMFS Salmonid OCAP
BiOP and would avoid jeopardy. *See* Nikkel Decl. at Exs. K, M, Q, T. According to Federal Defendants, this amounted to

16   NMFS's confirmation that the 2014 and 2015 drought operations plans were covered by the 2009 NMFS Salmonid OCAP
BiOP ITS. But, Federal Defendants press their logic too far. To the extent drought operations plans were built around

17   Reclamation's claimed mandatory duties to delivery water to the SRS Contractors, it is hard to understand how take that
allegedly occurred as a result of those mandatory deliveries would be covered by an earlier ITS that explicitly excluded

18   coverage of non-discretionary deliveries.

19   [18] The Court notes that with respect to this issue, Federal Defendants have not presented a consistent position. On the one
hand, Federal Defendants maintain in their opening brief that the 2009 NMFS Salmonid OCAP BiOP ITS covered all

20   deliveries to the SRS Contractors because the scope of the 2009 NMFS Salmonid OCAP BiOP encompassed full deliveries
under the contract. FD MTD at 18-19. At the same time, as discussed in the previous footnote, Federal Defendants suggest
that Reclamation's consultation with NMFS over 2014 and 2015 Drought Operations confirmed that 2014 and 2015 Drought

21   Operations were covered by the 2009 NMFS Salmonid OCAP BiOP ITS. *Id.* at 17. On the other hand, in reply, Federal
Defendants structure a key argument around the assertion that the Section 7 process can only encompass discretionary federal
action. FD Reply at 10. In the supplemental briefing requested herein, Federal Defendants are encouraged to clarify their

22   position on these issues.
        Plaintiffs' positions are, at first glance, somewhat inconsistent as well. On the one hand, Plaintiffs continue to

23   maintain that the Bureau does retain discretion over the contracts. Pltf. Opp. at 28. However, Plaintiffs also rely on the 2009
NMFS Salmonid OCAP BiOP's distinction between discretionary and non-discretionary activities, and its apparent exclusion
from coverage under its ITS of non-discretionary activities. *Id.* at 34. Yet, these positions are not necessarily inconsistent.

24   Plaintiffs may continue to insist that Reclamation has discretion while acknowledging that, at the time the 2009 NMFS
Salmonid OCAP BiOP was authored, Reclamation maintained that it did not have discretion over implementation or renewal

25   of the SRS Contracts, a position that was incorporated by NMFS into the 2009 NMFS Salmonid OCAP BiOP.

49

permitting option exists for federal action." *Id.* The relevant language of Section 10 is quite generic:

"The Secretary may permit, under such terms and conditions as he shall prescribe . . . any taking

otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the

purpose of, the carrying out of an otherwise lawful activity."16 U.S.C. § 1539(a)(1)(B). Likewise, a key

NMFS regulation outlining the ITP process does not appear to prohibit federal agencies from applying

for an ITP. *See* 50 C.F.R. § 222.307. The fact that Federal Defendants assume this avenue is unavailable

does not make it so. This is not an esoteric inquiry. The existence of an alternative mechanism for

obtaining incidental take authorization would undermine significantly Federal Defendants' only

response to the fact that the 2009 NMFS Salmonid OCAP BiOp appears to exempt on its face deliveries

pursuant to non-discretionary contract obligations. If there is an alternative path to take authorization,

Federal Defendants are not stuck in the "untenable" Catch-22 they describe. Federal Defendants are

directed to provide supplemental authority to support the assertion that a federal agency may not apply

for an ITP. If any party asserts otherwise (*i.e.*, that a federal agency may apply for an ITP), they may so

assert in response, but should also address whether and to what extent the reasoning of *Home Builders*

would impact the applicability of Section 10 to non-discretionary federal activities.

Assuming there is no alternative mechanism by which a federal agency could obtain take

authorization, Congress cannot have intended to place the agency in such an impossible bind. The most

logical way out of this conundrum would be to apply *Public Citizen* to Section 9 of the ESA, thereby

barring claims against an agency under Section 9 where non-discretionary duties render the agency

powerless to act in a manner that could prevent the take in question.

But it cannot be ignored that Plaintiffs allege that Federal Defendants <u>do</u> possess discretionary

authority over contract implementation, specifically alleging that Reclamation demonstrated this

discretion in various ways. *See* Pltf. Opp at 28. In the discussion regarding the Fifth Claim for Relief, the

Court requested supplemental briefing to determine whether any of Plaintiffs' allegations of conduct

demonstrating the existence of discretion could be considered in the context of that claim, given *EPIC*'s

1  apparent focus on contractual language. To what extent such conduct-based allegations of discretion are

2  relevant to the Sixth Claim for Relief remains equally, if not more unclear.

3      Plaintiffs' allegations related to the existence of discretion may be important to the applicability

4  of *Public Citizen* to this case. In *Public Citizen*, the Supreme Court examined <u>whether in fact</u> the agency

5  action was non-discretionary. 541 U.S. at 765-67. Therefore, even assuming *Public Citizen* applies to

6  Section 9 claims, its holding would only apply if, <u>in fact</u>, Reclamation did not possess discretion over

7  contract implementation. In contrast, *Public Citizen* would not entitle Reclamation to dismissal if

8  Plaintiffs have plausibly alleged that <u>in fact</u> Reclamation possesses discretion over contract

9  implementation. Given that the request for supplemental briefing articulated in connection with the Fifth

10  Claim for Relief is relevant to this inquiry, the Court will await that supplemental briefing before

11  determining whether *Public Citizen* bars Plaintiffs' Sixth Claim for Relief. In addition, given that the

12  key authority underlying the Court's analysis of the Fifth Claim for Relief, *EPIC*, concerns the

13  consultation re-initiation process, rather than liability under Section 9, the parties also will be given an

14  opportunity to address whether Plaintiffs' allegations of <u>conduct</u> indicating the existence of discretion to

15  implement the SRS Contracts (as opposed to reliance upon contractual provisions) may be considered in

16  a different manner in the context of the Sixth Claim for relief.[19]

17      In summary:

18      (1) Because Reclamation asserted in the context of consultation leading up to the 2009 NMFS

19  Salmonid OCAP BiOp that deliveries under the SRS Contracts were non-discretionary, it cannot now

20  obtain outright dismissal of Plaintiffs' Sixth Claim for Relief on the ground that any take was covered

21  by the 2009 NMFS Salmonid OCAP BiOp ITS, at least not on the present record. Because Section 7

22  does not apply to non-discretionary activities, the ITS that resulted from a Section 7 consultation could

23  not possibly apply to activities assumed at the time to be non-discretionary, as the impacts of those

24  _____

25  [19] As discussed, *supra*, in footnote 8, Federal Defendants have submitted evidence to demonstrate that Reclamation did not possess discretion regarding the implementation of the SRS Contracts. The Court's conclusion in the context of the Fifth Claim for Relief that such issues are best left for resolution on a full record at summary judgment is equally applicable here.

activities would not have been considered, at least not in full. Moreover, the ITS itself disclaims providing any take authorization for non-discretionary activities. This does not preclude Reclamation from making a similar argument on summary judgment that, among other things, addresses the apparent conflict within the 2009 NMFS Salmonid OCAP BiOp, insofar as it also purports to evaluate the impacts of all deliveries, including deliveries to the SRS Contractors.

(2) Reclamation may nevertheless escape liability under Section 9 for making non-discretionary deliveries because, under *Public Citizen*, Reclamation cannot be the proximate cause of take when the agency is legally required to perform the acts that purportedly result in the take. Adopting Plaintiffs' argument that *Public Citizen* should be limited in its application to NEPA claims would leave Federal Defendants with no mechanism under the law to obtain incidental take authorization for any non-discretionary federal activity. (This conclusion depends in part on Federal Defendants' unsupported assertion that the Section 10 process for obtaining an ITP is unavailable to federal agencies. Federal Defendants shall include in any supplemental briefs citations to support this assertion.)

(4) Notwithstanding the above conclusion regarding *Public Citizen*, if Plaintiffs have plausibly alleged that Reclamation's deliveries are, in fact, discretionary, *Public Citizen* would not apply. Because Plaintiffs' allegations involve conduct, rather than contract provisions, that tend to demonstrate discretion, the Court's request for supplemental briefing made in connection with the Fifth Claim for Relief may inform the analysis regarding the Sixth Claim for Relief. Relatedly, the parties are invited to address whether the Court should treat these allegations of "conduct" extrinsic to the contract terms differently in the context of the Sixth Claim for Relief from how it should be treated in the context of the Fifth Claim for Relief governed by *EPIC*.

## VI. CONCLUSION

For the reasons set forth above:

(1)  Because the previously assigned district judge entered final judgment on the First and Third Claims for Relief and no appeal was taken, and Plaintiffs admit that these claims are included in the 4SC

1    for informational purposes only, the motions to dismiss the First and Third Claims for relief are

2    DENIED as unnecessary.

3         (2)  The DMC Contractors' and SRS Contractors' motions to dismiss the Second Claim for

4    Relief are GRANTED because Plaintiffs failed to comply with the ESA's 60-day notice requirement as

5    to any non-moot aspects of that claim.

6         (3)  Plaintiffs are directed to submit supplemental briefing addressing the specific inquiries

7    highlighted by the Court in connection with the Fifth and Sixth Claims for Relief. Any such

8    supplemental brief, not to exceed fifteen pages in length, shall be submitted on or before November 18,

9    2016. Federal Defendants may file a response of equal length within twenty-five days of the filing of

10   Plaintiffs' supplemental brief. As these issues concern matters raised in Federal Defendants' moving

11   papers, upon review of Plaintiffs' supplemental brief and after meeting and conferring with Federal

12   Defendants, the DMC Contractors and the SRS Contractors are directed to seek leave of court within

13   fourteen days of the filing of Plaintiffs' supplemental brief if they wish to file responsive briefs,

14   outlining with specificity the matters to be addressed and proposing reasonable page limits.

15

16   IT IS SO ORDERED.

17   Dated:   __October 20, 2016__          _____/s/ Lawrence J. O'Neill_____
                                           UNITED STATES CHIEF DISTRICT JUDGE
18

19

20

21

22

23

24

25