KATHERINE POOLE (SBN 195010)
DOUGLAS ANDREW OBEGI (SBN 246127)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Telephone:  (415) 875-6100
Facsimile:  (415) 875-6161
kpoole@nrdc.org; dobegi@nrdc.org

Attorneys for Plaintiff Natural Resources Defense Council

HAMILTON CANDEE (SBN 111376)
BARBARA JANE CHISHOLM (SBN 224656)
TONY LOPRESTI (SBN 289269)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone:  (415) 421-7151
Facsimile:  (415) 362-8064
hcandee@altber.com; bchisholm@altber.com; tlopresti@altber.com

Attorneys for Plaintiff Natural Resources Defense Council

TRENT W. ORR (SBN 77656)
EARTHJUSTICE
50 California St. Suite 500
San Francisco, CA 94111
Telephone:  (415) 217-2000
Facsimile:  (415) 217-2040
torr@earthjustice.org

Attorneys for All Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>SALLY JEWELL, U.S. Department of the Interior, *et al.*,<br><br>                    Defendants. | Case No. 1:05-cv-01207-LJO-EPG<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING ISSUES IDENTIFIED IN COURT'S OCTOBER 20, 2016 ORDER** |

1 | SAN LUIS & DELTA MENDOTA
2 | WATER AUTHORITY, *et al.*,

3 |               Defendants-Intervenors.

4 | ANDERSON-COTTONWOOD
5 | IRRIGATION DISTRICT, *et al.*,

6 |               Joined Parties.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. ii

I.     Introduction .................................................................................................................1

II.    Reclamation Has Discretion to Take Action During the Term of the SRS Contracts to Benefit Winter-Run and Spring-Run Chinook Salmon and Their Habitat ..........................1

    A.    The SRS Contracts Give Reclamation Broad Discretion over Project Water .........3

    B.    The SRS Contracts Give Reclamation Discretion to Approve SRS Contractors' Proposed Sales, Transfers, and Exchanges of Water ...............................................6

    C.    The SRS Contracts Reserve to Reclamation the Right to Administer the Contracts Consistent with Federal and State Law....................................................................7

    D.    The SRS Contracts Give Reclamation Discretion to Adjust the Computation of Inflow to Shasta Lake that Is Used to Define a "Critical Year" ...........................10

    E.    The SRS Contracts Allow Reclamation to Require Specific Points of Diversion..................................................................................................................10

III.    Reclamation's Releases to SRS Contractors Are Subject to the Prohibition on Take........12

    A.    Federal Agencies Can Obtain Incidental Take Permits Under ESA Section 10.....12

    B.    *Home Builders* Does Not Limit Section 10 to Discretionary Activity....................14

    C.    Reclamation's Discretionary Conduct Caused and Will Cause Illegal Takes ........15

Proof of Service..........................................................................................................................17

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Babbitt v. Sweet Home Chapter of Cmties. for a Great Or.*,
   515 U.S. 687 (1995) .................................................................................. 11

*California v. United States*,
   438 U.S. 645 (1978) .................................................................................... 9

*Cottonwood Environmental Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) ............................................................... 4, 5

*Crowman Corp. v. United States*,
   51 Fed. Cl. 654 (2002) ............................................................................... 4

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) .................................................................................. 15

*N. Cal. River Watch v. Wilcox*,
   633 F.3d 766 (9th Cir. 2011) ................................................................... 13

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) .................................................................................. 14

*NRDC v. Duvall*,
   777 F. Supp. 1533 (E.D. Cal. 1991) ..................................................... 5, 6

*NRDC v. Houston*,
   146 F.3d 1118 (9th Cir. 1998) ................................................................... 5

*NRDC v. Jewell*,
   749 F.3d 776 (9th Cir. 2014) ............................................................ 2, 5, 9

*O'Neill v. United States*,
   50 F.3d 677 (9th Cir. 1995) ....................................................................... 7

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima Res. v. California*,
   813 F.3d 1155 (9th Cir. 2015) ................................................................... 8

*San Luis & Delta-Mendota Water Authority v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ........................................................... *passim*

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ....................................................................... 11, 12, 15

*United States v. Alpine Land & Reservoir Co.*,
   697 F.2d 851 (9th Cir. 1983) ................................................................ 9, 10

*United States v. GCID*,
   788 F. Supp. 1126 (E.D. Cal. 1992) .......................................................... 7

*Westlands Water District v. United States*,
   337 F.3d 1092 (9th Cir. 2003) ................................................................... 7

*Yocupicio v. PAE Grp., LLC*,
   795 F.3d 1057 (9th Cir. 2015) ................................................................. 13

**STATE CASES**

*City of Barstow v. Mojave Water Agency*,
   23 Cal. 4th 1224 (2000) .............................................................................. 9

*Joslin v. Marin Mun. Water Dist.*,
   67 Cal.2 d 132 (1967) ................................................................................. 9

# STATUTORY AUTHORITIES

16 U.S.C. §1532(13) ............................................................................................. 12

16 U.S.C. §1532(19) ............................................................................................. 12

16 U.S.C. §1538(a)(1)(B) ..................................................................................... 12

16 U.S.C. §1539(a)(1)(B) ..................................................................................... 12

16 U.S.C. §1539(a)(1)(A) ..................................................................................... 14

43 U.S.C. §§372, 383 ............................................................................................. 9

Central Valley Project Improvement Act, Title 34 of Public Law 102-575, §3402(a) ................... 2

Central Valley Project Improvement Act, Title 34 of Public Law 102-575, §3404(c) ................... 2

Central Valley Project Improvement Act, Title 34 of Public Law 102-575, §3406(b) ................. 2

Central Valley Project Improvement Act, Title 34 of Public Law 102-575, §3407(a) ................ 14

# RULES AND REGULATIONS

50 C.F.R. §222.102(b) .......................................................................................... 12

50 C.F.R. §222.301(b) .......................................................................................... 12

50 C.F.R. §222.307(a)(1) ..................................................................................... 12

50 C.F.R. §402.16 ................................................................................................... 1

Endangered and Threatened Species; Take of Anadromous Fish, 81 Fed. Reg. 76565 (2016) .......................................................................................................... 14

Endangered Species; Issuance of Recovery Permits, 81 Fed. Reg. 60720 (2016) ........................ 14

# LEGISLATIVE MATERIALS

H.R. 6133, 97th Cong. §§4, 6 (1982) ...................................................................... 13

H.R. Conf. Rep. 97-835 (1982) ............................................................................. 13

H.R. Rep. 97-567 (1982) ........................................................................................ 13

1    **I.      Introduction**

2           On April 28, 2016, with leave of the Court, Plaintiffs filed the Fourth Supplemental

3    Complaint ("4SC"), which added three new claims for relief to three pre-existing claims.  Docs.

4    1018, 1020 (4SC).  Federal Defendants moved to dismiss the Fifth and Sixth Claims for Relief.

5    Doc. 1032.  The Fifth Claim alleges that, in violation of Section 7 of the Endangered Species Act

6    ("ESA"), Defendant Bureau of Reclamation ("Reclamation") failed to reinitiate consultation

7    regarding the impacts of the Sacramento River Settlement ("SRS") contracts on ESA-listed

8    winter-run and spring-run Chinook salmon.  4SC ¶¶18-20, 107-13, 147-53, 183-88.  The Sixth

9    Claim alleges that Reclamation and defendant SRS Contractors have unlawfully "taken" listed

10   Chinook without permission for that take, in violation of Section 9 of the ESA.  *Id.* ¶¶21-23, 64-

11   77, 154-63, 189-92.  On October 20, 2016, the Court ordered supplemental briefing regarding the

12   Federal Defendants' arguments with respect to the Fifth and Sixth Claims.  Doc. 1045 (10/20/16

13   Order).  Plaintiffs provide this supplemental brief in response to the Court's questions.

14   **II.     Reclamation Has Discretion to Take Action During the Term of the SRS Contracts
        to Benefit Winter-Run and Spring-Run Chinook Salmon and Their Habitat**

15

16          The Court, in evaluating whether Plaintiffs sufficiently allege that Reclamation retains

     discretionary involvement or control in implementing the SRS contracts or that such discretion is
17
     otherwise authorized by law, asked Plaintiffs to identify which provisions in the SRS contracts
18
     support a finding of such discretion.  *Id.* at 37[1]; *see* 50 C.F.R. §402.16 (federal agency has duty to
19
     reinitiate Section 7 consultation when "discretionary Federal involvement or control over the
20
     action has been retained or is authorized by law" and one or more of certain enumerated
21
     circumstances exist).[2]  Below, Plaintiffs detail several SRS contract provisions that demonstrate
22
     Reclamation has retained the requisite discretionary involvement and control, as alleged in the
23
     Fourth Supplemental Complaint, *see, e.g.*, 4SC ¶¶152-53.  The Court also asked whether extrinsic
24

25   _____

     [1] Plaintiffs' citations refer to the internal page numbers of filed documents.

26   [2] Circumstances that trigger an obligation to reinitiate consultation include, *inter alia*, when "new
     information reveals effects of the action that may affect listed species or critical habitat in a
27   manner or to an extent not previously considered" and when "the identified action is subsequently
     modified in a manner that causes an effect to the listed species or critical habitat that was not
28   considered in the biological opinion."  50 C.F.R. §402.16(b), (c).  Plaintiffs have alleged such
     circumstances here.  *See* 4SC ¶¶113, 150-51.

1   evidence of the parties' intent may be considered in interpreting the contracts.  The answer to that

2   question is clearly yes.  In discussing the various sources of Reclamation's discretion identified

3   below, Plaintiffs identify instances where Reclamation's conduct demonstrates the discretion

4   available to it under the contracts' terms.

5        As the Court notes, one source of discretionary control and involvement retained by

6   Reclamation is the contracts themselves.  10/20/16 Order at 33 (citing *Envt'l Prot. Info. Ctr. v.*

7   *Simpson Timber Co.* ("*EPIC*"), 255 F.3d 1073, 1082 (9th Cir. 2001)).  Reclamation, at a

8   minimum, has all the discretion reserved to it by the terms of the SRS contracts.  *Id.*[3]

9   Reclamation itself has conceded that it has significant discretion over the delivery of project

10  water to the SRS Contractors, *see infra* Section II.A, and the contracts provide Reclamation with

11  significant additional control of their implementation.  This discretion can and has been used to

12  inure to the benefit of listed salmon and is, therefore, sufficient to provide a basis for reinitiating

13  consultation in light of the new information regarding the devastating impacts of diversions in

14  2014 and 2015 on listed Chinook salmon species.  *See NRDC v. Jewell,* 749 F.3d 776, 784-85

15  (9th Cir.) (2014) ("Section 7(a)(2)'s consultation requirement applies with full force so long as a

16  federal agency retains some discretion to take action to benefit a protected species") (internal

17  quotation marks omitted).  Once the Section 7 consultation requirement is triggered, it applies to

18  discretionary and non-discretionary aspects of the agency action under review:  "*Home Builders*

19  does not require the [consulting] agency to segregate discretionary from non-discretionary actions

20  when it considers the environmental baseline."  *San Luis & Delta-Mendota Water Auth. v. Jewell*

21

[3] Reclamation also has discretionary control and involvement to the extent authorized by law.
22  Here, the underlying water permits with which Reclamation is legally required to comply, the
    state law doctrine of beneficial use, and federal law all provide additional sources of
23  Reclamation's discretion during the term of the contracts.  For example, Reclamation's water
    permit from the State Water Resources Control Board ("State Board") assigns to it the
24  responsibility of meeting the water quality objectives established by the State Board. *See infra*
    Section II.C.  Reclamation is also obligated under the Central Valley Project Improvement Act
25  ("CVPIA") to administer the contracts in conformance with that law's requirements, including
    that the Central Valley Project ("CVP") be operated to protect and restore fish and wildlife and
26  comply with the ESA.  CVPIA, §§3402(a), 3404(c)(2), 3406(b).  Reclamation is further obligated
    by state law to ensure that the water allocated pursuant to the contracts is for beneficial use.  *See*
27  *infra* Section II.C.  Consistent with the Court's direction, Plaintiffs here address the discretion
    provided by the SRS contracts themselves; Plaintiffs, however, do not waive any arguments that
28  non-contractual legal obligations also provide discretionary authority to Reclamation in
    implementing the contracts.

1  ("*SLDMWA*"), 747 F.3d 581, 639 (9th Cir. 2014).[4]

2  **A.  The SRS Contracts Give Reclamation Broad Discretion over Project Water**

3  Federal Defendants have previously argued to this Court and to the Ninth Circuit that,

4  pursuant to the terms of the SRS contracts, Reclamation retains discretion to reduce and make

5  other adjustments to the diversion of project water by SRS Contractors that may be necessary to

6  protect ESA-listed species.  Given this concession, Federal Defendants cannot now assert that

7  they have no ability, in implementing and administering the SRS contracts, to take action to

8  benefit the winter-run and spring-run Chinook salmon.

9  The SRS contracts identify two types of water that contractors are permitted to divert from

10  the Sacramento River: "base supply" and "project water," which are subject to different terms and

11  conditions.  The SRS contracts provide for the diversion of approximately 350,000 acre-feet of

12  project water, or around 17% of all the water diversions provided for in the SRS contracts.  *See*

13  Doc. 742 at 7 n.13 (citing SAR 3191 (Reclamation's BA for SRS contracts' renewal)).

14  Article 3(i) of the SRS contracts allows Reclamation to reduce the diversion of project

15  water by SRS Contractors in order "to meet legal obligations."  *See* SAR 2695-2737 (GCID

16  Contract) Art. 3(i); *see also* SAR 45-84 (ACID Contract) Art. 3(i).  Federal Defendants confirmed

17  to the Ninth Circuit that Article 3(i) means project water diversions "can be reduced for

18  Reclamation to meet a legal obligation, such as compliance with the ESA."  Poole Dec. Ex. A

19  (Fed. Defs. App. Br.) at 49, 66.[5]  And in this Court, Federal Defendants explained that the SRS

20  contracts thus "do not prevent Reclamation from reducing deliveries or taking any other actions

21  that are necessary to avoid jeopardizing the continued existence of the Delta smelt."  Doc. 679

22  (Fed. Defs. MSJ) at 18-19; *see also* Doc. 855 (Fed. Defs. Mem. ISO Mot. for Recon.) at 1-3 (Art.

23

24  _____

[4] If Plaintiffs prevail on their claim that the SRS contracts' execution was never the subject of a valid consultation, that will affect the Court's analysis of the Fifth Claim because there will have

25  been no valid final agency action.  *See* 10/20/16 Order at 34 & n.6.

26  [5] Plaintiffs' Poole declaration attaches and authenticates certain judicially noticeable documents. Plaintiffs provide these documents in the context of a motion to dismiss because of the Court's

27  inquiry into Reclamation's exercise of discretion in contract implementation.  *See* 10/20/16 Order at 37.  Although the contracts themselves reflect Reclamation's retention of discretion, to the

28  extent the Court deems any additional factual allegations necessary to the Fifth Claim, Plaintiffs could amend the complaint to detail the undisputed facts reflected in the proffered documents.

1    3(i) in SRS contracts equivalent to the shortage provision in the DMC Contracts "allowing the

2    Bureau to completely withhold deliveries" of project water).  Relevant legal obligations include,

3    but are not limited to, Reclamation's duty to provide sufficient cold water spawning and rearing

4    habitat for listed Chinook salmon species below Shasta Dam, as imposed by the National Marine

5    Fisheries Service's ("NMFS") 2009 BiOp.  *See* 4SC ¶67.  Legal obligations also include

6    conditions on Reclamation's water rights permit requiring it to meet cold water habitat conditions

7    below Shasta Dam, as well as to comply with state and federal endangered species requirements.

8    Poole Dec. Exs. B (Order 90-5) at 54-55, C (Decision 1641) at 146-48.  Thus, there can be no

9    doubt that, through Article 3(i), Reclamation retains discretionary control and involvement that

10   could benefit listed species affected by the diversions of project water, including Chinook salmon.

11   *See* 4SC ¶¶66-68; *see also Crowman Corp. v. United States*, 51 Fed. Cl. 654, 656 (2002)

12   (reinitiation of consultation warranted where agency had discretion under contract to act for

13   benefit of listed species); *EPIC*, 255 F.3d at 1080 ("[T]he issue of ongoing agency involvement

14   turns on whether the agency has retained the power to implement measures that inure to the

15   benefit of the protected species."); *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d

16   1075, 1087 (9th Cir. 2015) (Forest Service remains "involved" in land use plans when it "make[s]

17   additional decisions after approval that implement land use plans at the site-specific level").

18        A number of other provisions in the SRS contracts further confirm Reclamation's retained

19   control over project water diversions.  For example, Article 29(a) requires contractors to

20   implement effective water conservation and efficiency programs and provides Reclamation

21   ongoing discretion to determine whether the contractors' programs "meet the conservation and

22   efficiency criteria for evaluating water conservation plans established under Federal law."  GCID

23   Contract Art. 29(a).  The article further provides that diversion of project water pursuant to the

24   contract is "contingent upon" the contractors' "continued implementation of such water

25   conservation program[s]."  *Id.*  Article 29(e) also gives Reclamation discretion to provide

26   financial incentives to SRS Contractors to encourage water conservation.  *Id.* Art. 29(e).  Such

27   conservation and efficiency efforts, which can lead to reduced diversions at critical times in the

28   salmonid life-cycle, inure to the benefit of winter-run and spring-run Chinook salmon, whose

PLS.' SUPP. BRIEF RE ISSUES IDENTIFIED IN
COURT'S OCT. 20, 2016 ORDER;
CASE NO.  1:05-CV-01207-LJO-EPG

1    survival as a species depends on adequate flows and habitat conditions during their spawning,

2    incubating, and rearing seasons.  *See* 4SC ¶¶73-76, 151, 159.

3          The SRS contracts also give Reclamation ongoing discretion to increase the price of

4    project water – a measure that could encourage reduced diversions of project water.  Articles 1(d)

5    and 1(o) expressly provide that Reclamation retains the right, "on an annual basis, [to] determine

6    the extent of" the "charges" for project water, payments that are used for "habitat restoration,

7    improvement, and acquisition," CVPIA §3407(a), and to determine the separate, additional

8    "rates" paid for project water.  GCID Contract Arts. 1(d) & 1(o); *see also id.* Art. 8(a)(2)

9    (Reclamation retains ongoing right to adjust rate-setting policy, as well as rates and charges

10   applicable to project water); *id.* Art. 8(g) (Reclamation may make changes in rate-setting policy).

11   Reclamation also retains the ability to make determinations regarding contractors' ability to pay

12   and to adjust rates and charges based on these determinations.  *See id.* Art. 8(h), (i).

13         The Ninth Circuit, in the context of assessing Reclamation's discretion in renewing the

14   SRS contracts, concluded that revision of "the contracts' pricing scheme" was discretion that

15   could benefit the listed species.  *See Jewell*, 749 F.3d at 783-84; *accord NRDC v. Houston*, 146

16   F.3d 1118, 1126 (9th Cir. 1998) (authority to set project rates during contract negotiations is

17   source of discretion); *NRDC v. Duvall*, 777 F. Supp. 1533, 1542 (E.D. Cal. 1991) (failure to

18   analyze whether higher rates would have beneficial environmental effects rendered NEPA

19   analysis inadequate).  Here, too, Reclamation's retained pricing authority could benefit listed

20   salmon.  Reclamation itself has previously recognized that "[p]ricing is the driving force to

21   achieve water conservation."  SAR 4154 (2004 FEIS on SRS contracts) ("increasing efficiency[]

22   can result in lower diversions from the river"); *see also* SAR 3354-55 (2005 FWS concurrence

23   letter: "The Project Water rate changes, rather than the Plans, are expected to be the greatest

24   incentive to encourage contractors to use water more efficiently.").  This retained discretion over

25   project water charges and rates is another example of Reclamation's ongoing control and

26   involvement in administering the contracts.

27         Finally, in addition to Reclamation's obligation to ensure that all water allocated under the

28   contracts is for beneficial use, *see infra* Section II.C, the SRS contracts provide Reclamation

1   discretion to prohibit use of project water for purposes beyond those identified in the contracts.

2   *See, e.g.*, GCID Contract Art. 7(a) (prohibiting use of project water for "any purposes other than

3   agricultural purposes" without Reclamation's consent; ACID Contract Art. 7(a) (limiting project

4   water use to "municipal and industrial purposes"). Reclamation's contractual right to limit the

5   use of project water is further evidence of its ongoing discretion in the contracts' implementation.

6   **B. The SRS Contracts Give Reclamation Discretion to Approve SRS Contractors'**
    **Proposed Sales, Transfers, and Exchanges of Water**
7

8       Article 3(e) provides that, during the contract term, Reclamation must approve any "sale,

9   transfer, exchange, or other disposal of any of the Contract Total ... or the right to the use thereof

10  for use on land other than" for uses designated in the contract. GCID Contract Art. 3(e). The

11  "Contract Total" refers to all water made available to the contractor for diversion under the

12  contract. *See id.* Art. 1(e). This retained control over the manner in which contractors dispose of

13  their water allocations is significant. To the extent Reclamation rejects a transfer of water by the

14  contractors or conditions the transfer on protections for listed salmon, the discretion could inure

15  to the benefit of listed species. In fact, Reclamation explicitly considers the impact on listed

16  species when reviewing proposed transfers of SRS contract water and retains the right to

17  disapprove transfers that would adversely affect water supplies for fish and wildlife. *See, e.g.*,

18  Poole Dec. Ex. D (EA for 2014 Tehama-Colusa Canal Authority ("TCCA") water transfers) at 2-

19  7 ("Reclamation approves transfers consistent with provisions of state and federal law that protect

20  against injury to third parties as a result of water transfers. Several important principles include

21  requirements that the transfer will not violate the provisions of federal or state law … and will not

22  adversely affect water supplies for fish and wildlife purposes.").

23      Under the plain language of the contracts, there can be no doubt that Reclamation retains

24  discretionary control over water transfers. To the extent Reclamation denies this discretion, the

25  Uniform Commercial Code ("U.C.C.") rules permit consideration of extrinsic evidence of parties'

26  course of performance to explain or supplement contract language. *See* U.C.C. §2-202; *see also*

27  10/20/16 Order at 35-37.[6]  Here, Reclamation consistently exercises its retained discretion to

28

---

[6] A course of performance is demonstrated by a transaction "involv[ing] repeated occasions for

1    review and condition or disapprove transfers by the SRS Contractors.  For example, in 2014,

2    Reclamation approved a transfer of up to 155,000 acre-feet from 18 SRS Contractors to TCCA,

3    but only after concluding that the effects of decreased river flows during the transfer period would

4    not be detrimental to fish.  *See* Poole Dec. Ex. E (FONSI for 2014 TCCA transfers) at 2, 6.

5    Similarly, in 2014, Reclamation approved a transfer of up to 175,226 acre-feet of water from SRS

6    Contractors to CVP south-of-Delta contractors but imposed conditions on those transfers that

7    were designed to benefit threatened and endangered fish species.  *Id.* Ex. F (FONSI for 2014

8    south-of-Delta transfers) at 3.  Indeed, Reclamation explicitly considered the impact on winter-

9    run and spring-run spawning and rearing habitat below Shasta Dam of expanding the transfer

10   window to October and November, but concluded that the limited releases would not adversely

11   impact the species.  *Id.* Ex. G (Revised EA) at iii.  Reclamation clearly has ongoing discretion to

12   take actions to benefit ESA-listed salmon in approving and imposing conditions on transfers.

13   **C.  The SRS Contracts Reserve to Reclamation the Right to Administer the Contracts
          Consistent with Federal and State Law**

14

15        Article 30(b) of the SRS contracts grants Reclamation the "right to make determinations

16   necessary to administer [the] Settlement Contract[s] that are consistent with the provisions of [the

     contracts], the laws of the United States and of the State of California, and the rules and

17
     regulations promulgated by the Secretary of the Interior."  GCID Contract Art. 30(b).  Article

18
     30(b) thus reserves to Reclamation the right, and indeed the obligation, to administer the contracts

19
     consistently with federal and state law.  Although Article 30(b) also provides that Reclamation's

20
     administration of the contracts must be consistent with the contracts themselves, the article

21
     confirms that Reclamation retains the ability and the obligation to administer the contracts in a

22
     manner that would meet existing environmental and other legal requirements.  *See United States*

23
     *v. GCID*, 788 F. Supp. 1126, 1134 (E.D. Cal. 1992) (rejecting GCID's argument that "state water

24
     law rights should prevail over" "restrictions set forth in the [ESA]").

25

26

27   performance by a party," where the party accepts or acquiesces in the performance.  *See* U.C.C.
     §1-303; *O'Neill v. United States*, 50 F.3d 677, 685 (9th Cir. 1995); *see also Westlands Water*

28   *Dist. v. United States*, 337 F.3d 1092, 1101 (9th Cir. 2003) ("Extrinsic evidence cannot contradict
     a clear contract term ..., but it may be used to explain or supplement the agreement.").

PLS.' SUPP. BRIEF RE ISSUES IDENTIFIED IN
COURT'S OCT. 20, 2016 ORDER;
CASE NO.  1:05-CV-01207-LJO-EPG

1    This interpretation of Article 30(b) as requiring Reclamation to administer the contracts in

2    compliance with state and federal law is supported by Article 7(b).  *See Pauma Band of Luiseno*

3    *Mission Indians of Pauma & Yuima Res. v. California*, 813 F.3d 1155, 1170 (9th Cir. 2015)

4    ("written contract must be read as a whole").  Article 7(b) imposes an obligation on the SRS

5    Contractors to comply with any requirements of biological opinions prepared as part of a Section

6    7 consultation conducted during the term of the contract.  *See* GCID Contract Art. 7(b).

7    Reclamation itself has explained that this provision requires the SRS Contractors to comply with

8    the most recent OCAP BiOp and its reasonable and prudent alternatives, as well as any

9    subsequent reinitiated consultation, and expressly recognized that this provision "may affect the

10   availability of water under [those] contracts."  *See* Doc. 1002-3 at 8 (quoting Reclamation's 2015

11   Supp. BA (Doc. 1001-3) at 12).  Thus, Reclamation, in administering the contracts, may require

12   modifications necessary to meet the existing (and any future) ESA requirements, including

13   modifications that affect the availability of water under the contracts.

14   Reclamation's obligation to administer the contracts consistent with state law also requires

15   it to protect listed salmon.  For example, Reclamation retains the right and the obligation to

16   implement the contracts consistent with its state water rights permits.  State Board Order 90-5,

17   which amends those permits, imposes water quality objectives for the upper Sacramento River

18   and, *inter alia*, requires Reclamation to operate Shasta Dam to "meet a daily average water

19   temperature of 56ºF in the Sacramento River at Red Bluff Diversion Dam during periods when

20   higher temperatures will be detrimental to the [salmon] fishery."  Poole Dec. Ex. B (Order 90-5)

21   at 54-55.  Similarly, Reclamation must comply with State Board Decision 1641, which imposes

22   multiple requirements on Reclamation's permits for the protection of listed salmon, including

23   that, "[i]f a 'take' will result from any act authorized under this water right, [Reclamation] shall

24   obtain authorization for an incidental take prior to ... operation of the project."  *See id.* Ex. C

25   (Decision 1641) at 148; *see also id.* at 183-84, Tbl. 3 (describing water quality objectives for fish

26   and wildlife beneficial uses).  Reclamation's discretionary action to seek exemptions from state

27   law requirements in recent years has caused severe harm to listed salmonids.  *See, e.g.,* 4SC ¶¶57,

28   58, 73-77.

1   To the extent the contracts' terms do not unambiguously reserve to Reclamation the right

2   to administer the contracts as necessary to meet federal and state law requirements, Reclamation's

3   conduct in administering the contracts demonstrates that the contracts should be interpreted to

4   that effect.  Reclamation has (at times) sought to administer the contracts in a manner that would

5   allow it to meet its obligations under the ESA to avoid take of listed Chinook salmon and to

6   ensure that its operations do not jeopardize the species or their habitat, and the SRS Contractors

7   have acquiesced to such administration.  For example, Reclamation expressly considers ESA

8   obligations in approving and imposing conditions on transfers.  *Supra* Section II.B.  Additionally,

9   Reclamation required the SRS Contractors to shift planned April and May diversions pursuant to

10  the SRS contracts to later in the year in both 2014 and 2015, with the goal of protecting ESA-

11  listed salmon.  *See* 4SC ¶¶104, 136, 153; Doc. 1039 (Pls. Opp. to MTD) at 10.[7]

12  Finally, Article 9(a) of the SRS contracts requires that the water allocated pursuant to the

13  contracts be for "beneficial use" only.  GCID Contract Art. 9(a).  Beneficial use is an evolving

14  and dynamic requirement of federal and state law.  *See Joslin v. Marin Mun. Water Dist.*, 67

15  Cal.2 d 132, 140 (1967).  Section 8 of the 1902 Reclamation Act requires that all water provided

16  pursuant to the Act be put to "beneficial use," as defined by state law.  43 U.S.C. §§372, 383;

17  *California v. United States*, 438 U.S. 645, 665-67 (1978); *see also City of Barstow v. Mojave*

18  *Water Agency*, 23 Cal. 4th 1224, 1242 (2000) (holding that Article X, §2 of the California

19  Constitution "dictates the basic principles defining water rights: that no one can have a protectible

20  [sic] interest in the unreasonable use of water, and that holders of water rights must use water

21  reasonably and beneficially"); *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 854-

22  55 (9th Cir. 1983) (assessment of beneficial use requires consideration of "alternative uses of the

23  water" which is "variable according to conditions" and "therefore over time").  For example, the

24  State Board recently exercised this authority to curtail diversions under otherwise lawful water

25

26  [7] There can be no doubt that the timing of water diversions affects and could inure to the benefit
    of listed salmon. *See* 4SC ¶76 (quoting Doc. 1039-6 (NMFS 2015 Letter to Reclamation) at 5,
27  which explains that "it is … very clear through evaluating operations in both 2014 and 2015 that
    the volume of cold water available for real-time management in June through October is highly
28  dependent on Keswick releases in April through early June"); *see also Jewell*, 749 F.3d at 785
    (discretion regarding "timing of water distribution" sufficient to trigger consultation duty).

PLS.' SUPP. BRIEF RE ISSUES IDENTIFIED IN
COURT'S OCT. 20, 2016 ORDER;
CASE NO. 1:05-CV-01207-LJO-EPG

1   rights to provide minimum in-stream flows to protect salmon habitat.  *See* Poole Dec. Ex. H (Res.

2   No. 2014-0023) at 6.  Given the beneficial use requirement, Article 9(a) must be interpreted not

3   as freezing the water quantities and allocations provided in the SRS contracts, but as allowing

4   changes in those quantities and allocations in light of current conditions and competing uses for

5   the water.  The SRS contracts' express incorporation of the beneficial use standard in Article 9(a),

6   together with Article 30(b), provides a continuing basis for Reclamation to assess whether the

7   contracts are being administered consistent with these federal and state law standards.

8      **D.  The SRS Contracts Give Reclamation Discretion to Adjust the Computation of**
       **Inflow to Shasta Lake that Is Used to Define a "Critical Year"**

9          Under Article 1(f), Reclamation is charged with computing the inflow to Shasta Lake.

10  GCID Contract Art. 1(f).  The inflow to Shasta Lake is integral to determining what constitutes a

11  "Critical Year," a determination that – when made – requires Reclamation to reduce diversions to

12  the contractors of both base supply and project water by 25 percent.  *Id.* Arts. 1(f), 5(a).

13  Reclamation is responsible for selecting the forecast and has discretion to choose which forecast

14  will be used.  *Id.* Art. 1(f).  This discretion can be exercised in a manner to benefit listed salmon

15  species.  For example, Reclamation currently uses a conservative 90% exceedance forecast,

16  which helps "protect the cold water pool in Shasta Reservoir so that suitable spawning habitat can

17  be maintained in the Sacramento River during the summer and fall seasons for" winter-run and

18  spring-run Chinook.  *See* Poole Dec. Ex. I (2/20/14 NMFS Letter to Reclamation) at 1.

19  Reclamation's role in determining how much inflow there has been into Shasta Lake and

20  selecting the forecast to be used for determining a "Critical Year" represents discretionary control

21  and involvement in the contracts' implementation – discretion that the SRS Contractors concede

22  exists.  *See* Doc. 966-23 (2/21/14 SRS Contractors Letter to Reclamation) at 1 (admitting that

23  "there is some discretion to be exercised in forecasting" a Critical Year under the SRS contracts).

24      **E.  The SRS Contracts Allow Reclamation to Require Specific Points of Diversion**

25          Article 10(a), which permits Reclamation to require SRS Contractors to divert water from

26  specific points, also provides Reclamation discretionary control over the contracts'

27  implementation.  *See, e.g.*, GCID Contracts Art. 10(a) (government retains "right to require that

28

PLS.' SUPP. BRIEF RE ISSUES IDENTIFIED IN
COURT'S OCT. 20, 2016 ORDER;
CASE NO.  1:05-CV-01207-LJO-EPG

1  the Contractor shall divert all of its Contract Total, or any portion thereof," from Sacramento

2  River and/or Stony Creek); ACID Contract Art. 10(a) (absent agreement by Reclamation, only

3  specified points of diversion are permitted).  Reclamation could exercise this authority to benefit

4  listed salmon by, for example, requiring GCID to divert some or all of its April and May base

5  supply of 240,000 acre-feet from Stony Creek, reducing the need to release those flows from

6  Shasta Reservoir and preserving cold water for later in the season for salmon's needs.

7  **III.    Reclamation's Releases to SRS Contractors Are Subject to the Prohibition on Take**

8           The Court requested supplemental briefing addressing Section 9's operation in the context

9  of allegedly non-discretionary agency conduct, in particular: (1) whether, if the Section 7

10  consultation process is unavailable, a federal agency can nonetheless obtain permission to take

11  listed species under Section 10;[8] (2) if so, whether *Home Builders* limits Section 10's

12  applicability to discretionary agency conduct; and (3) whether the Court can consider Plaintiffs'

13  allegations that Reclamation's conduct caused take of listed salmon if that conduct is untethered

14  to discretionary activities or specific contractual provisions.  *See* 10/20/16 Order at 50-51.

15           Disputes over discretion and the ability of Reclamation to obtain permission for take

16  aside, there can be no question that Reclamation is subject to the ESA's take prohibition.  As the

17  Supreme Court has recognized, "'The plain intent of Congress in enacting this statute … was to

18  halt and reverse the trend toward species extinction, whatever the cost.  This is reflected not only

19  in the stated policies of the Act, but in literally every section of the statute.'"  *Babbitt v. Sweet*

20  *Home Chapter of Cmties. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *Tenn. Valley Auth.*

21  *v. Hill* ("*TVA*"), 437 U.S. 153, 184-85 (1978)).  "All persons, *including federal agencies*, are

22  specifically instructed not to 'take' endangered species, meaning that no one is 'to harass, harm,

23  pursue, hunt, shoot, wound, kill, trap, capture, or collect' such life forms."  *TVA*, 437 U.S. at 184-

24  85 (emphasis added) (quoting 16 U.S.C. §§1532(19), 1538(a)(1)(B)).  These foundational

25  conservation principles underlying the ESA's "declared national policy of saving endangered

26

27
─────────────────────

[8] Plaintiffs assume for purposes of this discussion that the Section 7 process is not an available avenue for receiving permission to take listed species, but dispute the conclusion that the Section 7 consultation process can *never* provide permission for take caused by non-discretionary conduct.  A Section 7 consultation is required for agency action that includes both discretionary and non-discretionary aspects.  *SLDMWA*, 747 F.3d at 630.

28

PLS.' SUPP. BRIEF RE ISSUES IDENTIFIED IN
COURT'S OCT. 20, 2016 ORDER;
CASE NO.  1:05-CV-01207-LJO-EPG

1    species," *id.* at 185, necessarily inform the Court's inquiries regarding Plaintiffs' Sixth Claim.

2    **A. Federal Agencies Can Obtain Incidental Take Permits Under ESA Section 10**

3    As the Court recognized, neither Section 10 nor its implementing regulations prohibit a

4    federal agency from receiving an incidental take permit ("ITP") under Section 10. *See* 10/20/16

5    Order at 50. In fact, the plain language of the statute and regulations unambiguously makes ITPs

6    available to *any entity* seeking permission for incidental take.

7    Specifically, Section 10 provides: "The Secretary may permit, under such terms and

8    conditions as he shall prescribe … *any taking* otherwise prohibited by section 9(a)(1)(B) … if

9    such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful

10   activity." 16 U.S.C. §1539(a)(1)(B) (emphasis added). Section 9(a)(1)(B) provides: "[I]t is

11   unlawful for *any person* subject to the jurisdiction of the United States to … take any [listed]

12   species." *Id.* §1538(a)(1)(B). The ESA's definition of "person" expressly includes "any officer,

13   employee, agent, department, or instrumentality of the Federal Government." *Id.* §1532(13);

14   *accord TVA*, 437 U.S. at 185. Given that Section 9(a)(1)(B) prohibits federal agencies from

15   taking listed species, and Section 10 allows ITPs for "any taking … prohibited by Section

16   9(a)(1)(B)," the plain reading of Section 10 is that ITPs are available to federal agencies.

17   NMFS's regulations governing applications for incidental take permits cast no doubt on

18   that conclusion. *See* 50 C.F.R. §§222.301(b) ("No person shall take … any species of fish or

19   wildlife … without a valid permit issued pursuant to these regulations."), 222.102 ( "person"

20   includes "any officer, employee, agent, department, or instrumentality of the Federal

21   government"), 222.307(a)(1) ("[NMFS] may issue permits to take endangered and threatened

22   species incidentally to an otherwise lawful activity under section 10(a)(1)(B) of the Act.").

23   Against that unambiguous statutory and regulatory language, Federal Defendants are

24   likely to argue that, *as a matter of practice*, federal agencies do not seek ITPs under section 10.[9]

25   But such agency practice is not evidence that ITPs are unavailable as a matter of law. At most,

26   agency guidance indicates that the Section 7 consultation and incidental take statement ("ITS")

27   _____

28   [9] Although Plaintiffs attempt to anticipate Reclamation's arguments on this topic, they reserve the right to seek leave to respond if Reclamation raises new arguments. *See* 10/20/16 Order at 50.

1    process is the "standard method" of authorizing take for federal agencies.  *See, e.g.*, FWS &

2    NMFS, HCP and ITP Processing Handbook at 1-4, 3-1 (1994); FWS & NMFS, Consultation

3    Handbook at 2-4 (1998).[10]  That guidance's description of how agencies normally obtain take

4    permission does not establish that agencies *cannot* utilize Section 10 when necessary.[11]  *See also*

5    *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 778-80 (9th Cir. 2011) (handbook not entitled to

6    deference); *SLDMWA*, 747 F.3d at 634 (handbook entitled only to *Skidmore* deference).

7         Section 10's legislative history provides Federal Defendants no support.  *See Yocupicio v.*

8    *PAE Grp., LLC*, 795 F.3d 1057, 1060 (9th Cir. 2015) ("If the plain meaning of the statute is

9    unambiguous, that meaning is controlling and we need not examine legislative history as an aid to

10   interpretation unless the legislative history clearly indicates that Congress meant something other

11   than what it said.") (quotation omitted).  The 1982 amendments added both Section 10's ITP and

12   Section 7's ITS provisions to the ESA.  *See* H.R. 6133, 97th Cong. §§4, 6 (1982).  The legislative

13   history to those amendments shows Congress intended federal agencies to obtain a permit before

14   taking listed species.  *See* H.R. Rep. 97-567 at 43, 56 (1982) (discussing prior version of the bill

15   requiring federal and private actors alike to obtain permits through Section 10 *in addition* to

16   completing any Section 7 consultation).  Although Congress ultimately included the ITS process

17   under Section 7 for actions subject to that section, the legislative history reflects that the Section

18   10 ITP process was added to fill the gap in situations where Section 7 consultations were

19   unavailable.  *See* H.R. Conf. Rep. 97-835 at 29 (1982) ("As amended, section 10(a) of the act will

20   authorize the secretary to permit *any taking otherwise prohibited* by section 9(a)(1)(b) ….")

21   (emphasis added); *see also id.* (same standard for issuing ITS under Section 7 applies to issuance

22   of ITP under Section 10); *see also* H.R. Rep. 97-567 at 31 (same).[12]  The House and Committee

23   
24   [10] *Available at* http://www.nmfs.noaa.gov/pr/pdfs/laws/esa_section7_handbook.pdf and
     https://www.fws.gov/midwest/endangered/permits/hcp/hcphandbook.html.

25   [11] In fact, the Consultation Handbook takes the view that an agency that fails to comply with the
     terms of an ITS issued under Section 7 will be liable for any resulting takes under Section 9
26   *unless the agency obtains a Section 10 permit*.  *See* Consultation Handbook at 4-56.

27   [12] While the legislative history references private activities lacking a federal nexus as an example
     of the gap that Section 10 would fill, Congress gave no indication that this was the only gap, or
     that it intended federal activities for which a Section 7 ITS is unavailable to be effectively
28   immunized from the permit requirement and, more importantly, from the unambiguous
     prohibition on taking listed species of Section 9.

1   reports are devoid of any statement suggesting that federal agencies *cannot* receive a permit under

2   Section 10.[13]  As the final, unambiguous language of the statute reflects, there is no prohibition on

3   an agency receiving a Section 10 incidental take permit.  The Court should adhere to that plain

4   language and find that ITPs are available to federal agencies.[14]

5       **B.  *Home Builders* Does Not Limit Section 10 to Discretionary Activity**

6         The primary justifications for *Home Builders*' holding are inapplicable in this context.  In

7   *Home Builders*, the Court gave *Chevron* deference to a regulation providing, "Section 7 and the

8   requirements of this part apply to all actions in which there is discretionary Federal involvement

9   or control," 50 C.F.R §402.03.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S.

10   644, 665-67 (2007).  The Court held that regulation was a reasonable way to address the conflict

11   between Section 7's consultation requirement and other mandatory federal statutes that

12   "prohibited [an agency] from considering [Section 7's] extra-statutory factors."  *Id.* at 665.

13         Here, unlike *Home Builders*, there is no regulation that limits Section 10 to discretionary

14   federal action.  *Chevron* deference is not at issue.  Nor does this case implicate conflicting

15   statutory mandates.  *See SLDMWA*, 747 F.3d at 640 n.45 ("[W]ater exchange contracts with

16   senior water rights holders … do not approach the statutory mandate that the Court found EPA

17   was under in *Home Builders*.").

18         Moreover, *Home Builders* expressly cautioned against extending *Public Citizen* outside

19   the NEPA context:  "We do not suggest that *Public Citizen* controls the outcome here; § 7(a)(2),

20   unlike NEPA, imposes a substantive (and not just a procedural) statutory requirement, and these

---

22   [13] In fact, federal agencies regularly seek – and obtain – Section 10 science and recovery permits.
      *See, e.g.*, Endangered Species; Issuance of Recovery Permits, 81 Fed. Reg. 60720 (2016)

23   (granting permits to Reclamation, United States Geological Survey ("USGS"), Bureau of Land
      Management, Army Corps of Engineers, Forest Service, and National Park Service, among

24   others);  Endangered and Threatened Species; Take of Anadromous Fish, 81 Fed. Reg. 76565
      (2016) (USGS application for a permit to take listed salmon).  Section 10's provision for

25   scientific and recovery take parallels the language of the incidental take provision.  *Compare* 16
      U.S.C. §1539(a)(1)(A) ("Secretary may permit … *any act otherwise prohibited by section 9 … for*

26   *scientific purposes*") *with id.* §1539(a)(1)(B).  The availability of permits under that mirror
      provision contradicts Federal Defendants' assertions that ITPs are unavailable to federal agencies.

27   [14] Any other conclusion would lead to absurd results.  There is no doubt that Section 9's
      prohibition on take applies to federal agencies, and a conclusion that Section 10 permits are

28   unavailable to the agencies would mean that they have no means of avoiding Section 9 liability in
      instances when the action is not subject to a Section 7 consultation.

1    cases involve agency action more directly related to environmental concerns than the … truck

2    safety regulations [at issue in *Public Citizen*]."  *Home Builders*, 551 U.S. at 667.  Relying on

3    *Home Builders* and *Public Citizen* to limit Section 10 to discretionary federal actions – and by

4    extension to hold that *Section 9's* prohibition on take is limited to discretionary federal actions (in

5    conflict with *TVA* and with the statute's clear language) – would exempt large swaths of federal

6    activity from the ESA's prohibition against taking listed species and vitiate "the plain intent of

7    Congress in enacting this statute … to halt and reverse the trend toward species extinction,

8    whatever the cost."  *TVA*, 437 U.S. at 184.  *Home Builders* does not support – let alone require –

9    such a result.  *See also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ("courts must

10   look to the underlying policies or legislative intent" when assessing proximate cause).

11       **C.  Reclamation's Discretionary Conduct Caused and Will Cause Illegal Takes**

12           To the extent the Court limits Plaintiffs' Sixth Claim against Reclamation to take caused

13   by discretionary agency action, Plaintiffs allege Reclamation's discretionary implementation of

14   the contracts, including, for example, by agreeing to transfers of SRS contract water, caused and

15   will continue to cause take of listed salmon species.  *See supra* Section II; *see also, e.g.,* 4SC,

16   ¶¶73-77, 151, 153, 162, 192-93.  Further, as the Court recognized, even assuming that Section 9's

17   prohibition on take is limited to take caused by discretionary federal conduct, the correct inquiry

18   is whether Plaintiffs allege that Reclamation *in fact* did and does take discretionary action causing

19   take.  *See* 10/16/20 Order at 51.  Together with the specific discretionary control Reclamation

20   exercises pursuant to the contracts, Reclamation possesses broad discretion over management of

21   day-to-day CVP operations, including Shasta Dam operations.  *See* 4SC ¶¶2-3, 153.

22   Reclamation's mismanagement of releases from Shasta and Keswick Dam has previously harmed

23   listed salmon.  *See id.* ¶¶73-77.  Plaintiffs thus adequately allege that Reclamation's conduct,

24   including discretionary conduct, caused the take complained of in the Sixth Claim.

25   Dated:  December 5, 2016                    Respectfully submitted,

26

27                                        By:    */s/ Barbara J. Chisholm*
                                               Barbara J. Chisholm

28

1  |  KATHERINE POOLE (SBN 195010)
DOUGLAS ANDREW OBEGI (SBN 246127)
2  |  NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter Street, 21st Floor
3  |  San Francisco, CA 94104
Telephone:  (415) 875-6100
4  |  Facsimile:  (415) 875-6161
kpoole@nrdc.org; dobegi@nrdc.org
5

Attorneys for Plaintiff Natural Resources Defense
6  |  Council

7  |  HAMILTON CANDEE (SBN 111376)
BARBARA JANE CHISHOLM (SBN 224656)
8  |  TONY LOPRESTI (SBN 289269)
ALTSHULER BERZON LLP
9  |  177 Post St., Suite 300
San Francisco, CA 94108
10  |  Telephone:  (415) 421-7151
Facsimile:   (415) 362-8064
11  |  hcandee@altber.com; bchisholm@altber.com;
tlopresti@altber.com
12

Attorneys for Plaintiff Natural Resources Defense
13  |  Council

14  |  TRENT W. ORR (SBN 77656)
EARTHJUSTICE
15  |  50 California St. Suite 500
San Francisco, CA 94111
16  |  Telephone:  (415) 217-2000
Facsimile:  (415) 217-2040
17  |  torr@earthjustice.org

18  |  Attorneys for All Plaintiffs

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

CASE:       *NRDC v. Jewell, et al.*

CASE NO:    U.S. Dist. Ct., E.D. Cal., Case No. 1:05-cv-01207 LJO-GSA

      I am employed in the City and County of San Francisco, California.  I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108.  I hereby certify that on December 5, 2016 I electronically filed the following with the Clerk of the Court for the United States District Court for the Eastern District by using the CM/ECF system:

**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING ISSUES IDENTIFIED IN COURT'S OCTOBER 20, 2016 ORDER**

All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this December 5, 2016 at San Francisco, California.

*/s/ Barbara J. Chisholm*
Barbara J. Chisholm
