JOHN C. CRUDEN, Assistant Attorney General
SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Assistant Section Chief
BRADLEY H. OLIPHANT, Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
999 18th St., South Terrace, Ste. 370
Denver, CO 80202
(303) 844-1381 (tel)
(303) 844-1350 (fax)

Attorneys for Federal Defendants

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>S.M.R. JEWELL, U.S. Department of the Interior, *et al.*,<br><br>        Defendants. | Case No. 1:05-cv-01207 LJO-EPG<br><br>**FEDERAL DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIFTH AND SIXTH CLAIMS**<br><br>Judge: Lawrence J. O'Neill<br>Hearing Date: TBD<br>Time: TBD<br>Courtroom: 4 |
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.*,<br><br>        Defendant-Intervenors. | |
| ANDERSON-COTTONWOOD IRRIGATION DISTRICT, *et al.*,<br><br>        Joined Parties. | |

**INTRODUCTION**

More than a decade ago, the Bureau of Reclamation ("Reclamation") and National Marine Fisheries Service ("NMFS") set out to comply with the Endangered Species Act ("ESA") in the complex world of the Central Valley Project ("CVP"), the nation's largest federal water management project. To accomplish this task, the agencies developed a framework that, as relevant here, called for separate ESA consultations on *two* discretionary federal actions. The first action was Reclamation's *execution* of the Sacramento River Settlement Contracts ("SRS Contracts"), a set of long-term water delivery contracts with senior water rights holders. The second was the sweeping, multi-faceted "Proposed Action" consulted on in the OCAP Consultation,[1] which encompassed "all activities related to the long-term operations of the CVP," including implementation of the SRS Contracts.

In their Fourth Supplemental Complaint ("4SC"), Plaintiffs seek to advance claims against Reclamation based on the alleged effects of implementing these contracts on listed salmonids. Implementing these contracts, they complain, has triggered the need for further ESA consultation and caused unauthorized take of listed salmon. While the claims differ, the bedrock for both is the notion that contract implementation can be reviewed as a standalone federal action. We moved to dismiss those claims and the Court requested further briefing. *See* Dkt. 1045 (Oct. 20, 2016) ("October Order").

As the Court sifts through the arguments prompted by our motion and the ensuing briefing, one theme rises to the top: implementing these contracts is not a third federal action. Instead, that portion of the CVP was indisputably *part* of the OCAP Proposed Action, which was the subject of the OCAP Consultation. With this key fact in mind, the issues raised in the October Order dissolve and Plaintiffs' claims fail for straightforward reasons. The Fifth Claim, seeking reinitiation of consultation on the SRS Contracts, fails because Plaintiffs cannot show Reclamation had the power to revise the executed contracts to meet the needs of listed species.

---

[1] The "OCAP Consultation" refers to the ESA consultation between Reclamation and NMFS on the coordinated long-term operations of the State Water Project ("SWP") and CVP. There, Reclamation and NMFS expressly defined the "Proposed Action" as "all activities related to the long-term operations of the CVP … as … revised by NMFS's [Reasonable and Prudent Alternative] … including … administration of water contracts." Dkt. 1031-5 (2009 Salmonid BiOp) at 728. We refer to that Proposed Action herein as the "OCAP Proposed Action."

FED. DEFS.' SUPPLMENTAL BRIEF ISO FED. DEFS.' MOTION TO DISMISS                    1

The Sixth Claim, seeking to impose ESA liability on Reclamation for "unauthorized take" caused by contract implementation, is also readily resolved. Under the ESA, "*any* taking"—whether allegedly caused by a discretionary or mandatory activity—that complies with the terms and conditions of an incidental take statement ("ITS") is exempt from ESA section 9 liability. The OCAP Consultation resulted in an ITS (which did not limit Reclamation's take coverage at all) and Plaintiffs do not allege Reclamation has not complied with its terms and conditions. The Sixth Claim therefore fails.

Yet Plaintiffs now openly treat contract implementation as though it were a standalone federal action. But this idea is cut from whole cloth, and accepting it raises a muddle of potential errors. Fundamentally, Plaintiffs wrongly segregate one aspect of the OCAP Proposed Action for separate scrutiny[2] and demand ESA consultation on a completed action that Reclamation cannot revise.[3] They ask the Court to parse incidental take coverage among aspects of an agency action[4] and extend the incidental take permit ("ITP") process to federal agencies.[5] And they attempt to impose on an agency inescapable legal liability.[6]

Moreover, to save their Fifth Claim, Plaintiffs present arguments about a host of esoteric contract terms that they assert gives Reclamation discretion over contract implementation. But this is a red herring, because Plaintiffs' allegations all boil down to allegedly new information about the effects of the OCAP Proposed Action on salmonids. Even if true, any need for further consultation on the effects of CVP operations would be of the OCAP Consultation. Similarly, it is only because Plaintiffs cleave contract implementation from the OCAP Proposed Action that

---

[2] *See Nat'l Wildlife Fed'n v. NMFS ("NWF")*, 524 F.3d 917, 928 (9th Cir. 2008) (agency cannot segregate those operations it deems nondiscretionary); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 639 (9th Cir. 2014) (proper not to segregate discretionary from nondiscretionary operations of the OCAP Proposed Action); and *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1008 (9th Cir. 2014) (same).

[3] *Envt'l Prot. Info. Ctr. v. Simpson Timber Co. ("EPIC")*, 255 F.3d 1073, 1082-83 (9th Cir. 2001).

[4] *Ramsey v. Kantor*, 96 F.3d 434, 439 (9th Cir. 1996); 16 U.S.C. § 1536 (o)(2); 50 C.F.R. § 402.14(i)(5).

[5] *Ramsey*, 96 F.3d at 439, n.6.

[6] *Compare* 4SC (Dkt. 1020) ¶ 161 (alleging Reclamation "did not have take authorization" under 2009 Salmonid biological opinion ("BiOp") if releases were "discretionary") and *id.* ¶ 193 (alleging Reclamation did not have "authorization to take" species if same releases were nondiscretionary). *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004) (agency is not liable for harm it cannot avoid); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007); (extending principle of *Public Citizen* to ESA); *Ctr. for Food Safety v. Vilsack*, 844 F. Supp. 2d 1006, 1019–20 (N.D. Cal. 2012), aff'd, 718 F.3d 829 (9th Cir. 2013) (applying *Home Builders*' principle to reject ESA claim against agency for harm it could not avoid).

FED. DEFS.' SUPPLMENTAL BRIEF ISO FED. DEFS.' MOTION TO DISMISS   2

the issues raised in the October Order—splicing take coverage and expanding the ITP beyond its limits—arise. In truth, the Sixth Claim succumbs to its pleading failures. Yet, even if the Court accepted Plaintiffs' premise *arguendo*, the Sixth Claim fails, as Reclamation cannot be liable for harm it cannot avoid.

## RELEVANT STATUTORY BACKGROUND

By amendments to ESA sections 7 and 10, Congress in 1982 authorized the Secretary to allow takings that would otherwise be prohibited under section 9(a)(1)(B), "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). The Ninth Circuit summarized these two exceptions:

> Under both the statutory exceptions to [ESA] § 9, the incidental taking of an endangered species is permitted if it is determined that such action does not jeopardize the survival of the species. One exception is embodied in § 7 of the ESA, the other in § 10. The § 7 exception provides a procedure whereby <u>federal agencies and certain statutorily-defined "applicants"</u> may obtain determinations in the form of incidental take statements through a comparatively informal consultation process. By contrast, § 10 prescribes a more rigorous and time-consuming procedure <u>whereby private parties</u> may apply for and obtain permits authorizing incidental taking.

*Ramsey*, 96 F.3d at 439 (emphasis added). Both are relevant here, as discussed further below.

## ARGUMENT

**I.    With contract implementation in its correct context—as indistinguishable from the OCAP Proposed Action—the Fifth and Sixth Claims fail for obvious reasons.**

   **A.    The Fifth Claim fails because Plaintiffs have not shown that Reclamation had discretion to revise the terms of the SRS Contracts to benefit listed species.**

The Court correctly found that "*EPIC* controls analysis" of Plaintiffs' Fifth Claim. Dkt. 1045 at 33. Under that precedent, to state a claim for further consultation on these executed contracts, Plaintiffs must show that "Reclamation retained … discretion in the executed contracts … that would permit <u>revisions</u> <u>to</u> <u>executed</u> <u>contracts</u>" to address the needs of listed species. *Id.* (emphasis added); *see EPIC*, 255 F.3d at 1082. The Court noted that Plaintiffs faced a "significant hurdle" in plausibly alleging that contract implementation could require further consultation on contract adoption. Dkt. 1045 at 30, 33.

In fact, this hurdle is insurmountable. Indeed, in their supplemental brief, Plaintiffs do not

even attempt to show that Reclamation could "permit revisions" of the executed contracts. Instead, they argue that Reclamation's alleged "control of [contract] implementation" is the "basis for reinitiating consultation." *See* Dkt. 1048 at 2. This assertion does not salvage their claim; it underscores that their claim is misplaced. Indeed, considering contract implementation in its proper context—as an inseparable part of the OCAP Proposed Action—is illustrative:

> [T]he contracts provide Reclamation significant additional control of [the OCAP Proposed Action]. This discretion … is … sufficient to provide a basis for reinitiating consultation in light of new information regarding … impacts of [the OCAP Proposed Action] in 2014 and 2015 ….

*See id*. Replacing "contract implementation" with "the OCAP Proposed Action" is not only revealing, but also appropriate. The Ninth Circuit has repeatedly held that an agency cannot segregate nondiscretionary aspects of a comprehensive agency action. *See e.g*., *NWF*, 524 F.3d at 928. In fact, in *Jewell,* 747 F.3d at 639, and *Locke*, 776 F.3d at 1008, the panel confirmed this principle in litigation involving the OCAP Consultation and held that the government lawfully included all CVP operations—discretionary and mandatory—within the OCAP Proposed Action.[7] Plaintiffs' effort here to isolate contract implementation for review flouts this precedent and amounts to an improper collateral attack on the OCAP Consultation. Dkt. 1045 at 33-34; *EPIC*, 255 F.3d at 1082. In sum, Plaintiffs fail to show Reclamation had authority to "revis[e]" the SRS Contracts to benefit listed species. Nor, in fact, could they, as Reclamation lacks any such authority. Dkt. 1043 at 4. Thus, under *EPIC*, Plaintiffs fail to state a viable claim for reinitiation of consultation on the execution of the contracts.

**B.    The Sixth Claim fails because any alleged take caused by Reclamation was in compliance with the 2009 Salmonid BiOp ITS and, thus, not prohibited.**

The October Order sought clarification on whether the ITS accompanying the 2009 Salmonid BiOp provided take coverage for nondiscretionary aspects of the OCAP Proposed Action. Dkt. 1045 at 49 n.18. As to Reclamation, the answer is categorically "yes."

---

[7] In defining its action to include "all" CVP operations, Reclamation did not segregate discretionary from nondiscretionary activities. Nor did NMFS, which analyzed the effects of all CVP operations on listed species and critical habitat. This approach was litigated and the Ninth Circuit confirmed that NMFS was not required to segregate discretionary from nondiscretionary CVP actions in its consultation. *See Locke*, 776 F.3d at 1008; *Jewell*, 747 F.3d at 638-40 (same). Plaintiffs defended this approach and argued that the ESA did not require the agencies to parse discretionary and nondiscretionary CVP activities.

FED. DEFS.' SUPPLMENTAL BRIEF ISO FED. DEFS.' MOTION TO DISMISS              4

### 1. As a matter of law, "*any* taking"—whatever the cause—that complies with the terms and conditions of an ITS is exempt from section 9.

The statutory language added to section 7 of the ESA in 1982 to allow the incidental taking of listed species does not limit the protection afforded by an ITS to take arising from particular aspects of a discretionary, multi-faceted action. That language reads in pertinent part:

> [A]ny taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iii) of this section shall not be considered to be a prohibited taking of the species concerned.

16 U.S.C. § 1536 (o)(2) (emphasis added). The implementing regulations similarly provide that "[a]ny taking" that "is in compliance with the terms and conditions of that statement is not a prohibited taking under the Act." 50 C.F.R. § 402.14(i)(5). And, two decades ago, the Ninth Circuit in *Ramsey* considered this language and confirmed that "any taking—whether by a federal agency, private applicant, or other party—that complies with the conditions set forth in the [ITS] is permitted." 96 F.3d at 441 (emphasis added). Thus, whether a particular aspect of Reclamation's discretionary action that triggered consultation was discretionary or not (or whether the agency assumed it was or not), is immaterial; as a matter of law, an ITS exempts "any taking" that is "conducted in compliance with the requirements of that statement." *Ramsey*, 96 F.3d at 442; *see id.* at 441-442 (any "taking that is in compliance with a § 7 [ITS] need not be authorized by a § 10 permit or any other permit in order to be exempt from § 9's prohibition").

### 2. Because Reclamation is indisputably in compliance with the terms and conditions of the 2009 ITS, "*any* [alleged] taking" is permitted.

Here, there is no dispute that the OCAP Proposed Action was Reclamation's discretionary action, which triggered ESA consultation and resulted in NMFS's ITS. *See Locke*, 776 F.3d at 988. Nor is there any dispute that the agencies consulted on drought operations in 2014 and 2015. Plaintiffs further concede that, once the OCAP Proposed Action triggered consultation, ESA section 7 (including any resulting ITS) "applie[d] to discretionary and nondiscretionary aspects of the agency action under review[.]" Dkt. 1048 at 2. Thus, as a matter of law, "*any* taking" allegedly caused by Reclamation—regardless of whether from a discretionary or nondiscretionary aspect of the OCAP Proposed Action—that complied with the terms and conditions of NMFS's 2009 ITS "is permitted." *Ramsey*, 96 F.3d at 441; 16 U.S.C. §

FED. DEFS.' SUPPLMENTAL BRIEF ISO FED. DEFS.' MOTION TO DISMISS          5

1536 (o)(2); 50 C.F.R. § 402.14(i)(5). Here, the Sixth Claim fails because it does not allege Reclamation failed to comply with the OCAP ITS. Dkt. 1043 at 9.[8]

### 3. As a matter of fact, the ITS for the 2009 Salmonid BiOp did not limit ESA incidental take coverage for Reclamation.

Plaintiffs' assertion that Reclamation had no take coverage under the 2009 Salmonid BiOp for allegedly nondiscretionary CVP operations also fails as a matter of fact. In support, Plaintiffs point to language in the BiOp and suggest that it limited Reclamation's take coverage. *See* Dkt 1039 at 34. In response, the Court similarly noted that NMFS's ITS appeared to disclaim take authorization for nondiscretionary activities. Dkt. 1045 at 52. A closer reading of the 2009 Salmonid BiOp, however, belies Plaintiffs' assertion that it limited *Reclamation's* take coverage:

> Reclamation does not have discretion to curtail the Sacramento Settlement contractors to meet Federal ESA requirements. Therefore …. [t]he <u>incidental take statement</u> for this Opinion … <u>provides limitations of ESA incidental take coverage *for Settlement Contractors*</u> under the terms of this Opinion.

Dkt. 1031-5 at 601 (emphasis added). Whatever the purported limitation, it only applied to the "Settlement Contractors," and not to Reclamation. The BiOp, therefore, placed no limits of the incidental take coverage for Reclamation, meaning that the coverage was for all Reclamation actions, whether discretionary or nondiscretionary. This passage also resolves the "apparent conflict" between NMFS's evaluation of the impacts of "all activities related to the long-term operation[] of the CVP" and its seeming to limit *Reclamation's* coverage for those activities. Dkt. 1045 at 29-30. In truth, the BiOp included no such limitation.

## II. Even if the Court were to accept Plaintiffs' unfounded premise that contract implementation could be reviewed as a standalone action, their claims fail.

### A. The Fifth Claim fails because Plaintiffs have not shown Reclamation retained discretion over contract implementation to support reinitiated consultation.

In their supplemental brief, Plaintiffs confirm that alleged "new information regarding … impacts of [these] diversions in 2014 and 2015," is the "basis for reinitiating consultation" on the execution of the SRS Contracts. *See* Dkt. 1048 at 2. To state a viable claim based on contract

---

[8] The October Order correctly noted that ESA consultation would not be triggered—and no ITS would issue—for wholly nondiscretionary activities. *See* Dkt. 1045 at 51-52; *Jewell*, 747 F.3d at 639. Consistent with *Ramsey*, we understand "activities" to mean wholly nondiscretionary federal actions. That non-controversial finding is inapplicable, as the ITS flowed from consultation on the discretionary (if multi-faceted) OCAP Proposed Action.

implementation, Plaintiffs had to "show that [Reclamation] retained sufficient discretionary involvement or control" over these spring releases "to implement measures that inure to the benefit of the [listed species]." Dkt. 1045 at 31; *EPIC*, 255 F.3d at 1079-80. They cannot do so. Initially, however, whether SRS Contract terms reserved discretion is ultimately another red herring, because issues related to contract implementation amount to a collateral attack on the OCAP Consultation, not contract execution. *See supra*.

That notwithstanding, Plaintiffs fail to show that any contract term supports their contention that Reclamation retains the requisite discretion over the 2014 and 2015 releases. Under *EPIC*, the Court must "examin[e the] SRS Contracts themselves to determine whether Reclamation retains discretion under the Contracts to act on behalf of salmonid species." Dkt. 1045 at 37. Here, only three articles address shortages of Base Supply or Project Water. The first, Article 3(h), is irrelevant as it only applies to shortages of water caused by drought and other matters out of the Contracting Officer's control.  The second, Article 3(i), is irrelevant because it only applies to shortages of Project Water, *infra*. The third, Article 5(a), provides for automatic reductions by 25% when specific inflow criteria are triggered, so there is no discretion. Moreover, the SRS Contracts include neither the term "salmonid species," nor "salmon," so no contract provision specifically retained discretion to act on behalf of those species. Nor can Plaintiffs show that the contracts otherwise reserved Reclamation such discretion.

### 1. Discretion regarding Project Water is immaterial to Plaintiffs' claims.

Plaintiffs first assert that the contracts give Reclamation "broad discretion over Project water." Dkt. 1048 at 3. Perhaps, but that is irrelevant. As the Court noted, the 4SC alleges "mortality episodes impacting the 2014 and 2015 generations of winter-run and spring-run Chinook … should have triggered re-consultation." Dkt. 1045 at 26, citing 4SC ¶ 187. Specifically, Plaintiffs assert that "[i]n 2014, in order to meet the demands of the SRS contracts, the Bureau made releases … in April, May, and early June [2014] that depleted the cold-water pool … and ultimately led to the loss of temperature control."  4SC ¶ 73. They similarly allege that Reclamation "again made excessive releases in April and May of 2015 to satisfy its contractual obligations," which "depleted the cold water pool and severely compromised …

winter-run Chinook." *Id.* ¶ 75; *id.* ¶¶ 76, 161, 162, 187. These complained-of releases in 2014 and 2015 were exclusively of Base Supply water. Dkt. 1045 at 26; Dkt. 1032-2 ¶¶ 8-12; Supp. Administrative Record ("SAR") 02732 (GCID Contract, Ex. A (only Base Supply in April, May, June)). Because the SRS Contracts diverted zero Project Water during this timeframe, arguments about Articles 1(d), 1(o), 3(i), and 29(a), Dkt. 1048 at 5-6, which apply only to Project Water, cannot satisfy *EPIC*, as there was no such water over which Reclamation had discretion.

### 2. Contract "Definitions" do not give Reclamation discretion to implement measures that inure to the benefit of listed salmonids.

In addition to being exclusively related to "Project Water" and thus irrelevant, Articles 1(d) and 1(o) are also merely definitions for "charges" and "rates." SAR02700, 2702. Neither gives Reclamation authority to change rates or charges to provide more water for listed species. As Reclamation explained, its ability to set rates for Project Water, even if relevant, is limited. Dkt. 1001-3 at 11; *see also* Dkt. 1002-3 at 5-6.[9] Additionally, Article 8(g) expressly states that rates "will be established to recover only reimbursable operation and maintenance and capital costs of the Project." SAR02712. There is no mention of setting rates to provide water for listed species. Moreover, Plaintiffs' suggestion that changing the rates will affect diversions ignores that Article 8(a)(1) requires the contractors to pay 75% of the amount shown as Project Water each year, regardless of price or whether or not it is used. SAR02709.

Plaintiffs suggest that the definition of "Critical Year" in Article 1(f) "represents discretionary control" because Reclamation can "select[] the forecast to be used" to determine Critical Year. Dkt. 1048 at 10. But Article 1(f) requires Reclamation to use "[t]he same forecasts" for determining Critical Year as it does "for the operation of the [Central Valley]

---

[9] The relevant language states: "Although Reclamation has some limited discretion to generally negotiate rates and pricing terms for the use of Project Water, rates are determined according to specific rate-setting authorities. Reclamation's rate-setting authorities and processes for project water are grounded in: Section 9 of the Reclamation Act, Sections 3, 5, and 6 of the Act of July 2, 1956, Section 205 of the Reclamation Reform Act, Section 105 of the Act of October 27, 1986, and Sections 3405(d) and 3407 of the Central Valley Project Improvement Act (CVPIA). Under Section 9 of the Reclamation Act (RRA), Reclamation may charge CVP water users such rates as in Reclamation's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation, maintenance, and construction costs. Because Reclamation's authority to set rates is tied to reimbursing the Government for the cost of constructing, operating, and maintaining the CVP, any increase in rates must reflect what is needed to reimburse the Government, not additional costs above-and-beyond that amount. Restoration Fund charges are set in accordance with the provisions of CVPIA § 3407(c), and charges under the RRA are also dictated by statute, Section 205 of the RRA. Reclamation cannot charge additional amounts for other purposes under those authorities."

Project …." SAR29700-01; *see* SAR2702 (Art. 1(n) (defining "Project")). To that end, NMFS's 2009 Salmonid BiOp and RPA, which apply to all CVP operations, provide requirements about which forecasts Reclamation must use. *See* Dkt. 1031-5 at 595-598, 600, 602 (NMFS determined that 90% forecast was required in its RPA to ensure no jeopardy). Plaintiffs' suggestion that Reclamation tinker with the "forecasted full natural inflow" also ignores that the February forecast must be "reviewed as frequently as conditions and information warrant …." SAR2700. This review-and-update requirement recognizes that the February forecast is only a prediction of Shasta inflows. Decl. of Ronald Milligan ¶ 4. As the year progresses, inflows and hydrologic conditions are developed sufficiently to determine whether the "Critical Year" criteria will be triggered. *Id.* In short, while the forecast is a useful planning tool, whether inflows trigger the "Critical Year" criteria is based on actual measured inflows to Shasta Lake. *Id.* ¶ 5.

### 3. Articles 3(e) and 3(i) do not provide the requisite authority to act for the benefit of listed species.

Plaintiffs' argument that Reclamation's authority to approve sales, transfers, and exchanges shows the agency can act to benefit Winter Run and Spring Run Chinook salmon, Dkt. 1048 at 6-7, also fails. Article 3(e) is a limitation on the contractors' ability to transfer water in ways that would be inconsistent with Federal and State law. Sec. Wolder Decl. ¶ 5. Any approval of such transfer is subject to its own ESA and National Environmental Policy Act compliance, as well as applicable California state law. *Id*. This Article does not give Reclamation unilateral authority to change contract deliveries for the benefit of listed species.

While Article 3(i) allows Reclamation to alter deliveries, it relates only to "Project Water." SAR02707. Because Plaintiffs' claims are based on spring 2014 and 2015 "mortality episodes" that arose exclusively from releases of Base Supply water, *supra*, withholding Project Water cannot inure to the benefit of salmonids as there was no Project Water at issue.

### 4. Article 7(b) imposes an obligation on contractors concerning execution of the contracts, not subsequent implementation.

Plaintiffs' assertion that Article 7(b) requires contractors to comply with "any requirements of biological opinions prepared as part of a Section 7 consultation conducted during the term of the contract," Dkt. 1048 at 8, is incorrect. Article 7(b)'s language is limited to

requirements in opinions prepared "as a result of a consultation regarding the <u>execution</u> of this Settlement Contract." SAR2709 (emphasis added). It says nothing about <u>performance</u> of the contracts. Nor does Article 7(b) give Reclamation discretion to act under the contracts for the benefit of listed salmonids. It recognized that the contractors must comply with subsequently issued opinions "regarding the execution of" the contract. Under the ESA, Reclamation itself has no power to issue biological opinions. To the extent that the contractor's compliance with such an opinion relates to implementation of the SRS contracts, it reflects an obligation on Reclamation, not authority to implement the contracts to inure to the benefit of listed salmonids.

### 5. Articles 9(a) and 10(a) give Reclamation no discretion to require changes to contract implementation to protect ESA species.

Plaintiffs argue that Article 9(a) "allows changes" to contract quantities during implementation because it requires water be allocated for "beneficial use." Dkt. 1048 at 10. This completely misreads this provision, which memorialized the "full agreement" about the "quantities of water" that "may be diverted … for beneficial use" "[d]uring the term" of the contract and "any renewals" thereof." SAR2714-15. Reclamation cannot unilaterally change this quantity, which "shall not be disturbed" during the term of the contract so long as the contractor fulfills its contractual obligations. *Id.* Moreover, to the extent any entity has authority to determine if diversions must be curtailed due to drought, waste, or other beneficial uses, it is the State Water Resources Control Board ("SWRCB"), not Reclamation. *See* Cal. Water Code §§ 174, 275; *Imperial Irrigation Dist. v. SWRCB*, 186 Cal. App. 3d 1160, 1164-70 (Cal. Ct. App. 1986) (discussing SWRCB jurisdiction).

Plaintiffs' arguments regarding Article 10(a) betray a misunderstanding about the differences between contractors and their respective rights. This article does not give Reclamation general authority to "require SRS Contractors to divert water from specific points," as Plaintiffs assert. Dkt. 1048 at 10. Rather, Article 10(a) is unique to Glenn-Colusa Irrigation District ("GCID"), which the parties carried forward from the original GCID contract to recognize GCID's existing water rights. Sec. Wolder Decl. ¶ 6. Specifically, the contract defines the "Source of Supply" in Article 1(q) as "Sacramento River and Stony Creek, from which the

Contractor has rights to divert, has diverted, and may continue to divert." SAR2702, 2717. GCID had additional water rights "from Stony Creek pursuant to the Angle Decree," SAR2698, and was thus entitled to divert from there "under its right thereto adjudicated in the Angle Decree[.]" SAR2717. As a practical matter, however, there is no direct diversion point through which water from Stony Creek can be diverted into GCID's main canal. Welsh Decl. ¶ 4. There is now a Stony Creek Siphon, installed to ensure water supplies to Wildlife refuges, preventing GCID from directly diverting water from Stony Creek into its main canal. *Id*. ¶¶ 3-4. In addition, contrary to Plaintiffs' suggestion, Article 10(a) merely limits GCID's points of diversion; it does not give Reclamation the unilateral power to change diversion points. SAR 002717 (requiring "mutual[] agree[ment]" to change points of diversion).

### 6. Articles 29(a) and 30(b) also give Reclamation no such discretion.

Plaintiffs argue that, because the contracts require compliance with a conservation plan, and conservation could lead to additional water, Article 29(a) gives Reclamation discretion that inures to the benefit of the species. Dkt. 1048 at 4. This argument is unavailing. First, Article 29(a) applies only to Project Water, which was not delivered during the relevant time in the 4SC, so Plaintiffs cannot show that any curtailments of water covered by the provision inure to the benefit of listed salmonids. *Supra*. Nor does Article 29(a) allow Reclamation to require the SRS contractors to adjust diversions to protect ESA species. It is a requirement that the contractors implement water conservation plans "[p]rior to the diversion of Project Water," and then comply with those plans, along with a potential remedy for noncompliance. SAR2727-28.

Plaintiffs' argument that article 30(b) gives Reclamation the "obligation to administer the contracts consistent with … law," Dkt. 1048 at 8, mischaracterizes the purpose of Article 30(b). Article 30 is intended to ensure that any action under the contract is consistent with the terms of the contract and applicable law. Critically, however, it does not give Reclamation any power to act in ways not otherwise specifically identified in the SRS Contracts. Indeed, Article 30(b) does not obligate the Contracting Officer to take any specific action at all. It merely established the framework and boundaries on how Reclamation will "make determinations" when such decisions are required. It thus generally provides authority to make determinations that are

consistent with the terms of the contracts and applicable law.

### B. The Sixth Claim fails because Reclamation cannot be the legally relevant cause of take arising from allegedly nondiscretionary water deliveries.

In their 4SC, Plaintiffs allege that Reclamation's 2014 and 2015 deliveries were nondiscretionary and caused "unauthorized" take of listed fish. 4SC ¶¶ 160, 189-193. As detailed *supra*, the Sixth Claim does not really turn on whether Reclamation's actions are the legally relevant cause of take. It fails because Plaintiffs do not allege that Reclamation failed to comply with the terms and conditions of the 2009 ITS. Yet, even assuming *arguendo* that these deliveries could (i) be segregated from the OCAP Proposed Action and (ii) treated as a standalone, nondiscretionary agency action (which they cannot), Reclamation is not the legally relevant cause of alleged "take," because it could not get an ITP for allegedly nondiscretionary water deliveries. In its October Order, the Court sought support for the fact that the ITP process did not apply to federal agencies. Dkt. 1045 at 52.

As detailed below, both the structure of the ESA and the legislative history clearly show Congress' intent to create two separate mechanisms for addressing federal obligations and those of non-federal actors as they relate to activities that incidentally take listed species. Specifically, the ESA has a robust discussion of federal obligations in section 7, and therein provides a procedure for "federal agencies and certain statutorily-defined 'applicants'" to obtain an incidental take statement exempting incidental take for discretionary actions. *Ramsey*, 96 F.3d at 439. Section 10, as the Ninth Circuit recognized, prescribes a separate procedure for "private parties" to obtain permits authorizing incidental taking from lawful activities. *Id.* Interpreting the statute to allow federal agencies to seek permits for nondiscretionary legal obligations, as Plaintiffs propose, would cause absurd results. Agencies would trigger section 7 consultation for undertaking the discretionary act of seeking a permit to perform a nondiscretionary act that does not trigger section 7.

Plaintiffs' assertion that Reclamation nonetheless can apply for such a permit, Dkt. 1048 at 12-13, fails for additional reasons. First, while the ESA is silent on the definition of "applicant," regulations issued jointly by NMFS and the Fish and Wildlife Service (50 C.F.R. §

402) define "applicant" as "any person, as defined in section 3(13) of the [ESA], who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action." 50 C.F.R. § 402.02. While Plaintiffs are correct that a federal agency is a "person," Dkt. 1048 at 12, they ignore that Reclamation needs no "formal approval or authorization from a Federal agency" before implementing the SRS Contracts. Under the ESA, Reclamation consulted on all of its CVP operations (including contract implementation), but no agency "authorized" them, as Reclamation "retain[ed] ultimate responsibility for determining whether and how a proposed action shall go forward …." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997); 50 C.F.R. § 402.15(a). As Reclamation did not "require formal approval" before making the complained-of releases, it cannot be an ITP "applicant."

Nor can Plaintiffs show that the term "applicant" in the context of an ITP reasonably extends to federal agencies. As noted above, the Ninth Circuit has explained that the ITP is a "procedure whereby private parties may apply for and obtain permits authorizing incidental taking." *Ramsey*, at 96 F.3d at 439; *id*. n. 6 ("If the private party complies with the requirements of the [ITP], any taking … will not violate ESA Section 9"). Plaintiffs do not discuss *Ramsey*, and instead assert that NMFS's "incidental take permit" regulations "cast no doubt" that federal agencies can apply for an ITP. Dkt. 1048 at 12. Yet Plaintiffs offer no example of an agency ever doing so, let alone before performing a mandatory duty. Nor, as explained above, could they.

They also overstate the clarity of the regulations. Plaintiffs cite the "general requirements" of 50 C.F.R. § 222.301, which provide "generic rules and procedures applicable to all permits," but also explain that "other sections may provide more specific rules and procedures with respect to certain types of permits." 50 C.F.R. § 222, 301(a)(1). They do not cite 50 C.F.R. § 222.307, the specific section for "[p]ermits for incidental taking of species." This regulation avoids the term "person," and instead refers only to an "applicant," which it describes narrowly, as one representing "a single entity, such as a corporation," or "a group or organization whose members conduct the same or a similar activity in the same geographical area." *Id*. § 222.307(a)(2).[10]

---

[10] Plaintiffs note that agencies seek science and recovery permits. Dkt. 1048 at 14. This undermines their argument,

FED. DEFS.' SUPPLMENTAL BRIEF ISO FED. DEFS.' MOTION TO DISMISS        13

Similarly, Plaintiffs mention the House and Senate Committee reports, Dkt. 1048 at 14, but ignore Congress' intent to create the ITP process for "private applicants" on "private lands":

> There are [] situations where the unintentional taking may occur on <u>private lands owned by a developer who has no need of a Federal permit</u>. These individuals have no access to the consultation and exemption provisions of the Act since they do not apply for any Federal permit or license to conduct their activities, but, nevertheless, they are subject to the taking prohibitions of Section 9.… <u>For private land owners, the Committee designed a solution through the permit provisions of Section 10</u> by authorizing the Secretary to <u>issue permits to individuals</u> …. [T]o obtain a permit, <u>the private applicant</u> must present … a conservation plan demonstrating that <u>he</u> will minimize the incidental taking, and specifying the number <u>he</u> will likely take. [The ITP] addresses the concerns of <u>private landowners</u> who are faced with having otherwise lawful actions not requiring federal permits prevented by the Section 9 prohibitions against taking.

H.R. Rep. No. 97-567, at 15, 31 (1982); *see* S. Rep. No. 97-418, at 10 (1982) ("section 10 permit" assures "the applicant and any subsequently involved Federal agency" comply with section 7; ITP "should [resolve] potential conflicts between endangered species and the actions of <u>private developers</u>, while … encouraging <u>these</u> <u>developers</u> to become … involved in … conservation"); 128 Cong. Rec. 26188 (Sept. 30, 1982) ("second … initiative … involved <u>permits</u> for the taking … species <u>when no other Federal action is involved</u>").

Plaintiffs' use of the *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* ("ITP Handbook"), Dkt. 1048 at 13, is also selective. Here, too, they ignore the handbook's opening passages that detail Congress' intent to provide "private interests and non-Federal … agencies" a "clear regulatory mechanism" to permit incidental take:

> In the 1982 amendments to the ESA, Congress established a provision in section 10 that allows for the 'incidental take' of endangered and threatened species of wildlife by <u>non-Federal entities</u>…. Prior to 1982, <u>non-Federal parties</u> undertaking otherwise lawful activities … risked violating the section 9 prohibition <u>but had no recourse under the law for an exemption</u>…. The 'incidental take permit' process was established under section 10(a)(1)(B) … <u>precisely</u> to resolve <u>this</u> <u>difficulty</u>.

ITP Handbook at 1-1 through 1-2 (emphasis added);[11] *see* 63 Fed. Reg. 8859, 8859 (Feb. 23, 1998) (ITP "address[ed] situations in which a property owner's otherwise lawful activities"

---

as 50 C.F.R. § 222.308, which specifically covers such permits, expressly allows "[a]ny person," to "make application" for such a permit. *Id.* at § 222.308(b). The ITP regulation excludes this language.

[11] ITP Handbook is publicly available at https://www.fws.gov/midwest/endangered/permits/hcp/hcphandbook.html.

FED. DEFS.' SUPPLMENTAL BRIEF ISO FED. DEFS.' MOTION TO DISMISS      14

caused take).[12] In sum, "section 10, as revised, provides a clear regulatory mechanism to permit the incidental take of federally listed … species <u>by private interests and non-Federal government agencies</u> during lawful … activities." ITP Handbook at 1-2 (emphasis added).

## CONCLUSION

Plaintiffs' effort to treat SRS Contract implementation as if it were a standalone agency action raises unworkable dilemmas that flout the ESA and controlling precedent and yield absurd results. When the Court instead reviews contract interpretation in its proper context—as identical and coextensive with the OCAP Proposed Action, Plaintiffs' claims fail based on the application of straightforward principles and established law. Nor is there any need to interpret contract terms, contradict controlling case law, or tangle with issues raised by Plaintiffs' untenable theory. For these reasons, the Court should consider contract implementation as indistinguishable from the OCAP Proposed Action, and dismiss the Fifth and Sixth Claims against Reclamation for the reasons detailed in our motion and above.

Dated: January 9, 2017

                                        Respectfully submitted,
                                        JOHN C. CRUDEN, Assistant Attorney General

                                        */s/ Bradley H. Oliphant*
                                        BRADLEY H. OLIPHANT, Senior Trial Attorney

---

[12] As we explained, the Supreme Court addressed the issue of legally relevant causation in *Public Citizen*, 541 U.S. 752. There, it held an agency did not have to account for environmental effects it had "no ability to" change, because the agency's action was not the proximate cause of the impacts. *Id*. at 752, 766-67. Thus, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Id*. at 770. Plaintiffs assert that *Public Citizen* is "inapplicable under section 9 of the ESA." Dkt. 1039 at 27. Their position is unavailing. In support, they relied on a single, unreported 2007 case, *Seattle Audubon Society v. Sutherland*, No. C06-1608MJP, 2007 WL 1577756, at *1 (W.D. Wash. May 30, 2007), which limited *Public Citizen* to "procedural, information-forcing statute[s]." *Id*. We found no case citing this decision, and later precedent holds otherwise. Specifically, in *Home Builders*, the Supreme Court extended the principle "that an agency cannot be considered the legal 'cause' of an action that it has no statutory discretion *not* to take" to the ESA. *Home Builders*, 551 U.S. at 667. Recently, the *Vilsack* Court explained that the Supreme Court: "found that <u>the principle</u> enunciated in *Public Citizen*—"that an agency cannot be considered the legal 'cause' of an action that it has no statutory discretion not to take"—also applied in the context of section 7 of the ESA." *Vilsack*, 844 F. Supp. 2d at 1019–20 (emphasis added); *quoting Home Builders*, 551 U.S. at 667. The *Vilsack* Court then held that an agency was "not the legally relevant cause" of adverse effects of an herbicide it had no authority to regulate. 844 F. Supp. 2d at 1021 (granting government summary judgment on Plaintiff's ESA claim based on basic principle in *Public Citizen* and applied to the ESA in *Home Builders*). Plaintiffs ignore *Vilsack*, but note that *Home Builders* "cautioned against extending *Public Citizen* outside the NEPA context[.]" Dkt. 1048 at 14. Yet both *Home Builders* and *Vilsack* extended the underlying "principle" that an agency cannot be the legal cause of an action that it must perform under the ESA, and the Court recognized the principle applied here. Dkt. 1045 at 52.

FED. DEFS.' SUPPLMENTAL BRIEF ISO FED. DEFS.' MOTION TO DISMISS          15

United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th St., South Terrace, Ste. 370
Denver, CO 80202
Tel: (303) 844-1381
Fax: (303) 844-1350

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2017, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which will send notification to the attorneys of record in this case.

*/s/ Bradley H. Oliphant*
BRADLEY H. OLIPHANT
Senior Trial Attorney