1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

9  | NATURAL RESOURCES DEFENSE
   | COUNCIL, et al.,

Case No. 1:05-cv-01207 LJO-EPG

10 |                                    Plaintiffs,

MEMORANDUM DECISION AND
ORDER RE MOTIONS TO DISMISS
(Docs. 1029, 1030, 1031, 1032, 1036).

11 | vs.

12 | GAIL A. NORTON, Secretary, U.S. Department
   | of the Interior, et al.,

13 |                                    Defendants.

14 | SAN LUIS & DELTA MENDOTA WATER
15 | AUTHORITY, et al.,

   |                          Defendant-Intervenors.

16 | ANDERSON-COTTONWOOD IRRIGATION
   | DISTRICT, et al.,

17 |                                    Joined Parties.

18

19

20

## I. **INTRODUCTION**

21   On April 28, 2016, Plaintiffs, a coalition of environmental interest groups led by the Natural

22 Resources Defense Council, filed the currently operative Fourth Supplemental Complaint ("4SC"),

23 which includes three pre-existing claims brought under the Administrative Procedure Act ("APA"), 5

24 U.S.C. § 701 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, alleging that

25 the U.S. Bureau of Reclamation ("Bureau" or "Reclamation") and the U.S. Fish and Wildlife Service

("FWS" or "Service") acted unlawfully by renewing, implementing, and approving the renewal and implementation of certain long-term water contracts in reliance on a 2005 Biological Opinion ("2005 FWS Smelt OCAP BiOp") issued by FWS pursuant to the ESA, that the agencies knew, or should have known, was inadequate to protect the ESA-listed delta smelt. Doc. 575 (filed Apr. 8, 2008). Specifically, the pre-existing claims challenged renewal of two sets of contracts: (1) those held by the Sacramento River Settlement ("SRS") Contractors; and (2) those held by the Delta-Mendota Canal Unit ("DMC") Contractors. *Id.*

The 4SC added three new claims to this action: the Fourth Claim for Relief alleges FWS failed to conduct an adequate consultation on the effects of the SRS and DMC Contract renewals on delta smelt; the Fifth Claim for Relief alleges Reclamation failed to reinitiate consultation on the alleged impact of the SRS Contracts on ESA-listed winter-run and spring-run Chinook salmon; and the Sixth Claim for Relief alleges Reclamation and the SRS Contractors have unlawfully "taken" winter-run and spring-run Chinook in violation of Section 9 of the ESA ("Section 9"), 16 U.S.C. § 1538(a).

The SRS Contractors move to dismiss the First, Second, Third, Fifth, and Sixth Claims for Relief. Doc. 1031 ("SRS MTD"). The Federal Defendants move to dismiss the Fifth and Sixth Claims for Relief. Doc. 1032 ("FD MTD"). The DMC Contractors move to dismiss the First, Second, and Third Claims for Relief. Doc. 1033 ("DMC MTD"). James Irrigation District and Del Puerto Water District (collectively, "JID Parties") join in the motions to dismiss the First, Second, and Third Claims for Relief, Docs. 1029 & 1030 ("JID Joinder"), as does the Banta-Carbona Irrigation District, Patterson Irrigation District, West Stanislaus Irrigation District, and the West Side Irrigation District (collectively, "Banta-Carbona Parties"). Doc. 1036 ("Banta-Carbona Joinder"). No party moves to dismiss the Fourth Claim for Relief.  Plaintiffs oppose the motions. Doc. 1039 ("Pltf. Opp."). All moving parties filed replies. Docs. 1040 & 1041 ("JID Reply"), 1042 ("DMC Reply"), 1043 ("FD Reply"), 1044 ("SRS Reply").

On October 20, 2016, the Court issued a Memorandum Decision and Order resolving certain

2

1   aspects of the pending motions and requesting supplemental briefing on others. Doc. 1045 ("October 20,

2   2016 Order"). After stipulating to an extension of time for the filing of supplemental briefs, Doc. 1047,

3   supplemental briefs were filed in December 2016 and January 2017. Docs. 1048, 1052, 1054.

## II. LEGAL BACKGROUND

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) ("*NRDC v. Jewell*") (citing 16 U.S.C. § 1533). FWS and the National Marine Fisheries Service ("NMFS") administer the ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). Section 7 of the ESA requires federal agencies to ensure that their activities do not jeopardize the continued existence of listed endangered or threatened species or adversely modify those species' critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). Section 7's implementing regulations provide that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat[s]." 50 C.F.R. § 402.14(a). An agency proposing to take an action (often referred to as the "action agency") must first inquire of FWS or NMFS[1] whether any threatened or endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. § 1536(c)(1). If endangered species may be present, the action agency must prepare a "biological assessment" ("BA") to determine whether such species "is likely to be affected" by the action. *Id*. If the BA determines that a threatened or endangered species "is likely to be affected," the agency must formally consult with FWS. *See id*. § 1536(a)(2); 50 C.F.R. § 402.14(a).

---

[1] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), as corrected (Oct. 31, 2008). NMFS is granted jurisdiction over fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id*. FWS exercises jurisdiction over the delta smelt; NMFS exercises jurisdiction over the winter-run and spring-run Chinook.

Formal consultation results in the issuance of a "biological opinion" ("BiOp") by FWS. *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id.* § 1536(a)(2), then the action may not go forward unless FWS can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id.* § 1536(b)(3)(A). If the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a RPA to the agency action that avoids jeopardy and adverse modification, and that the incidental taking of endangered or threatened species will not violate Section 7(a)(2), the consulting agency shall issue an "Incidental Take Statement" ("ITS") which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. 16 U.S.C. § 1536(b)(4); *Aluminum Co. of Am. v. Administrator, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999). Even after consultation is complete, an agency has a duty to reinitiate formal consultation under certain circumstances, including if: "the amount or extent of taking specified in the incidental take statement is exceeded"; "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered"; or "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16.

Section 9, prohibits, among other actions, the "take" of any listed animal species by any "person subject to the jurisdiction of the United States." 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Two safe harbor provisions described in greater detail below immunize persons from Section 9 liability and penalties where takings committed during otherwise lawful activities occur in compliance with the terms and conditions of either an ITS issued after Section 7 consultation or an Incidental Take Permit ("ITP") issued pursuant to ESA Section 10. 16 U.S.C. § 1539.

### III. FACTUAL AND PROCEDURAL HISTORY

**A.      The Central Valley Project and the State Water Project**

The Central Valley Project ("CVP") and the State Water Project ("SWP"), "operated respectively by [Reclamation] and the State of California, are perhaps the two largest and most important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014) ("*San Luis v. Jewell*"). "These combined projects supply water originating in northern California to more than 20,000,000 agricultural and domestic consumers in central and southern California." *Id*. As part of CVP operations, Reclamation releases water stored in CVP reservoirs in northern California, which then flows down the Sacramento River to the Sacramento-San Joaquin Delta ("Delta"). *Id*. at 594. Pumping plants in the southern region of the Delta then divert the water to various users south of the Delta. *See id*. at 594-95.

**B.      Delta Smelt**

The delta smelt (*Hypomesus transpacificus*) is a "small, two-to-three inch species of fish endemic to the [Delta]." *Id*. at 595. In 1993, FWS concluded the delta smelt's population had declined by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA. *Determination of Threatened Status for the Delta Smelt*, 58 Fed. Reg. 12,854, 12,855 (Mar. 5, 1993). FWS further determined that "Delta water diversions," including those resulting from operations of the CVP, are the most significant "synergistic cause[ ]" of the decline in the delta smelt population. *Id*. at 12,859.

**C.      Winter-Run Chinook**

Winter-run Chinook (*Oncorhynchus tshawytscha*) are listed as "endangered" under the ESA. *Endangered and Threatened Species: Final Listing Determinations for 16 ESUs of West Coast Salmon, and Final 4(d) Protective Regulations for Threatened Salmonid ESUs*, 70 Fed. Reg. 37,160 (June 28, 2005). According to the 4SC, the winter-run Chinook's population "has declined precipitously since the early 1980s, from an estimated historic high of 117,808 in 1969 to as few as 191 adult individuals

5

1   returning to spawn in 1991." 4SC ¶ 64. Winter-run Chinook historically inhabited the upper Sacramento

2   River and its tributaries. *Id*. ¶ 66. The construction of Shasta Dam blocked access to almost all of the

3   winter-run Chinook's rearing waters. *Id*. Today, the upper Sacramento River below Keswick Dam is the

4   only remaining spawning area used by winter-run Chinook. *Id*. It is alleged that the winter-run Chinook

5   is "at high risk of extinction" and that a prolonged drought could have devastating effects on the species.

6   *Id*. It is further alleged that winter-run Chinook are particularly vulnerable during the "temperature

7   management season," which generally lasts from June through October. *Id*. ¶ 67.

8          Adult winter-run Chinook migrate up the Sacramento River in the winter
           and spring and then hold below the Keswick Dam for several months

9          before spawning. During these critical months, the salmon require cold
           water for the maturation of their gonads and the development of fertilized

10         eggs and embryos.

11  *Id*.

**D.      Spring-Run Chinook**

12         The spring-run Chinook (*Oncorhynchus tshawytscha*) historically displayed the second largest

13  salmon run in the Central Valley watershed and supported the bulk of the region's commercial fishery.

14  *Id*. ¶ 68. Only remnant independent natural spring-run Chinook populations survive, relying principally

15  upon small tributaries of the Sacramento River below Shasta Dam for spawning. *Id*. ¶¶ 68, 71. Like

16  winter-run Chinook, spring-run Chinook require cold water temperatures for successful spawning, egg

17  incubation, and rearing. *Id*. ¶ 72.

18  **E.      Long-Term Contract Renewal/Operations and Criteria Plan**

19         "In the 1960s, the Bureau entered into a number of long-term contracts pertaining to the CVP."

20  *NRDC v. Jewell*, 749 F.3d at 780. "The [SRS] Contracts are forty-year agreements between the Bureau

21  and holders of certain senior water rights." *Id*. "These contracts grant the Bureau some rights to the

22  encumbered water while also providing senior rights holders a stable supply of water." *Id*. The DMC

23  Contracts allow junior water users to draw water from the Delta-Mendota Canal. *Id*. By 2004, the DMC

24  Contracts and the SRS Contracts had expired or were about to expire. *Id*. On June 30, 2004, the Bureau

25

6

1   prepared an operational plan, the Operations Criteria and Plan ("OCAP" or "2004 OCAP"), to provide,

2   among other things, a basis for renewing various contracts, including the DMC and SRS Contracts. *Id.*

3   **F.      ESA § 7 Consultations Leading Up to Contract Renewal**

4            Pursuant to ESA § 7, the Bureau initiated consultation with FWS regarding the effect of the

5   OCAP on the delta smelt. *Id.* at 780-81. FWS issued an initial BiOp in 2004 (the "2004 FWS Smelt

6   OCAP BiOp"), which concluded that the OCAP would not jeopardize the delta smelt. *Id.* at 781. The

7   Bureau re-initiated consultation after the Ninth Circuit's decision in *Gifford Pinchot Task Force v. U.S.*

8   *Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004), which invalidated a regulation upon which

9   the 2004 FWS Smelt OCAP BiOp relied. *NRDC v. Jewell*, 749 F.3d at 781. In 2005, FWS issued a

10  revised BiOp (the "2005 FWS Smelt OCAP BiOp"), which also concluded that the OCAP would not

11  jeopardize the delta smelt. *Id.*

12           Reclamation separately requested a BiOp from NMFS on whether continued operation of the

13  CVP pursuant to the OCAP would jeopardize various species under that agency's jurisdiction, including

14  the winter-run and spring-run Chinook. *See PCFFA v. Gutierrez*, No. 1:06-cv-245-OWW-GSA

15  ("*PCFFA*"), Doc. 69 ¶ 77 (First Amended Complaint) ("*PCFFA* FAC"). NMFS issued a BiOp on

16  October 22, 2004 regarding the effects of the OCAP on the species under its jurisdiction, including

17  several salmonid species ("2004 NMFS Salmonid OCAP BiOp"). 4SC ¶ 107.

18           Also in 2004 and 2005, the Bureau prepared BAs that concluded that renewal of the Contracts

19  would not adversely affect the delta smelt. *NRDC v. Jewell*, 749 F.3d at 781. The Bureau requested

20  additional consultation with FWS regarding its plans to renew the Contracts. *Id.*

21           FWS responded via a series of letters, in which it concurred with the
             Bureau's determination that renewing the Contracts was not likely to
22           adversely affect the delta smelt. Each FWS concurrence letter explained
             that renewing the Contracts would increase the demand for water, but that,
23           according to the 2004 and 2005 [FWS Smelt OCAP] BiOps, this demand
             would not adversely affect the delta smelt. The letters did not assess the
24           Contracts' potential effects on the delta smelt beyond the reasoning
             borrowed from the now-invalidated 2004 Opinion and 2005 Opinion.

25

7

1    *Id.* (emphasis added).

2           Again, Reclamation separately consulted with NMFS on the effects of renewing the Contracts on

3    the listed salmonid species under NMFS's jurisdiction. 4SC ¶ 108. As was the case with FWS, NMFS

4    concurred that executing the Contracts would not adversely impact listed salmonids. *Id.*

5           In 2004 and 2005, the Bureau renewed 141 SRS Contracts and 18 DMC Contracts based on

6    FWS's and NMFS's concurrence letters. *NRDC v. Jewell*, 749 F.3d at 781.

7    **G.      Plaintiffs Challenge the 2004/2005 FWS Smelt OCAP BiOp**

8           In February 2005, Plaintiffs initiated this lawsuit, challenging the 2004 FWS Smelt OCAP BiOp.

9    Doc. 1. Subsequent amendments to the Complaint updated Plaintiffs' allegations to include challenges

10   to the 2005 FWS Smelt OCAP BiOp. Doc. 403 (Second Amended Complaint ("SAC")). Among other

11   things, the SAC alleged that the 2005 FWS Smelt OCAP BiOp did not "adequately consider or address

12   the effects of [the] long-term water service contracts on threatened and endangered species," *id.* ¶ 32,

13   and that the Bureau "has taken and is taking actions that could foreclose implementation of reasonable

14   and prudent alternatives that would avoid jeopardy, including but not limited to signing and

15   implementing new long-term contracts promising delivery of substantially increased quantities of water,

16   in violation of [ESA] section 7(d)." *Id.* ¶ 81. In 2007, the 2005 FWS Smelt OCAP BiOp was set aside as

17   unlawful. *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007). The Bureau did

18   not appeal.

19   **H.      Parallel Challenge to the 2004 NMFS Salmonid OCAP BiOp**

20          On August 9, 2005, a coalition of environmental organizations largely overlapping with the

21   present Plaintiffs filed a parallel complaint against Reclamation and NMFS alleging that the NMFS

22   2004 OCAP Salmonid BiOp was inadequate. *Pac. Coast Fed'n of Fishermen's Associations v.*

23   *Gutierrez*, 606 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008) ("*PCFFA I*"). Plaintiffs similarly sought to

24   "[e]njoin and set aside any and all actions" that relied on it, including the delivery of water under long-

25   term water contracts at issue here. *Id.* at 1183 ("Existing renewal and any new water service contracts

1    have already been challenged in this litigation."); *PCFFA* FAC at 38.[2]

2    **I.**    **District Court Ruling in *PCFFA***

3        On May 20, 2008, the previously assigned district judge found that NMFS acted arbitrarily and

4    capriciously by failing to consider certain facts in the NMFS 2004 Salmonid OCAP BiOp. *PCFFA I*,

5    606 F. Supp. 2d at 1193-94. In July 2008, the Court considered Plaintiffs' motion for injunctive relief,

6    seeking implementation of remedies designed to aid salmonids in the Sacramento River basin. In the

7    context of this request for injunctive relief, the Court concluded that the Bureau had a "mandatory (*i.e.*,

8    non-discretionary) legal obligation to make releases from Shasta Reservoir for delivery to the [SRS]

9    Contactors." *Pac. Coast Fed'n of Fishermen's Associations v. Gutierrez*, 606 F. Supp. 2d 1195, 1201

10    (E.D. Cal. 2008) ("*PCFFA II*"). Plaintiffs did not seek to amend or supplement their complaint in

11    *PCFFA*.

12    **J.**    **Third Amended Complaint in This Case**

13        In June 2008, Plaintiffs filed the Third Amended Complaint ("TAC") in this case, directly

14    challenging the sufficiency of FWS's ESA consultation undertaken in connection with the renewal of 41

15    Contracts. *See* Doc. 575 ¶¶ 44-47, 69, 72-73. In seeking to set aside these contracts, Plaintiffs argued

16    that the Bureau violated § 7(a)(2) of the ESA by failing to consult adequately with the FWS prior to

17    renewing the Contracts. *Id.* ¶ 85.

18    **K.**    **FWS Issues Revised Biological Opinion**

19        On December 15, 2008, the FWS issued a revised BiOp (the "2008 FWS Smelt OCAP BiOp"),

20    which, contrary to the findings of the 2004 and 2005 FWS Smelt OCAP BiOps, concluded that the

21    OCAP <u>would</u> jeopardize the delta smelt and adversely modify its critical habitat. *NRDC v. Jewell*, 749

---

23   [2] The Court is cognizant of the fact that some parties to these related cases prefer to cite to the Electronic Case File ("ECF")
automatic page stamp references. This Court will continue to cite to the internal page references of documents wherever
possible, primarily because some parties continue to present courtesy copies to the Court that do not bear ECF page stamps.

24   Rather than re-print lengthy documents at taxpayer expense or take time to correlate page citations to the ECF page stamps,
the Court uses the courtesy copies and cites to them the only way it can efficiently do so: using the document's own internal
page references. For reasons of consistency, the Court therefore always cites to internal page references unless none is

25   available, in which case it references ECF page stamp pages as "p. __ of ___."

1    F.3d at 781. The 2008 BiOp became the subject of numerous lawsuits. *See generally San Luis & Delta*

2    *Mendota Water Auth. v. Salazar*, 1:09-cv-407-LJO-BAM. Plaintiffs in this matter intervened as

3    <u>defendants</u> in the challenge to the 2008 FWS Smelt OCAP BiOp. *See id*.

4    **L.      NMFS Issues a Revised BiOp**

5            On June 4, 2009, NMFS issued a revised BiOp ("2009 NMFS Salmonid OCAP BiOp"). *See San*

6    *Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 988 (9th Cir. 2014) ("*San Luis v. Locke*").

7    Three months later, the previously assigned district judge entered final judgment in *PCFFA*, and closed

8    the matter. *PCFFA*, 1:06-CV-0245-OWW-GSA, Doc. 458 (Judgment, Sept. 9, 2009).

9    **M.      District Court and Ninth Circuit Rulings on Plaintiffs' TAC**

10           In rulings in late 2008 and 2009 in this case, the previously assigned district judge held that

11   Plaintiffs did not have standing to challenge renewal of the DMC Contracts and that Plaintiffs' challenge

12   to the SRS Contracts failed as a matter of law because Federal Defendants lacked discretion to modify

13   the SRS Contracts to benefit Plaintiffs' interests. *Nat. Res. Def. Council v. Kempthorne*, 2008 WL

14   5054115, at *22 (E.D. Cal. Nov. 19, 2008) ("*NRDC v. Kempthorne*"). A divided three-judge panel of the

15   Ninth Circuit Court of Appeals affirmed. *Nat. Res. Def. Council v. Salazar*, 686 F.3d 1092 (9th Cir.

16   2012).

17           The Ninth Circuit subsequently voted to hear the case en banc, and the en banc panel reversed

18   and remanded. *NRDC v. Jewell*, 749 F.3d at 776. The en banc decision first found that the issuance of

19   the 2008 FWS Smelt OCAP BiOp did not moot Plaintiffs' challenge to the Contracts:

20                   This action is not moot because the 2008 Opinion does not provide
                     Plaintiffs with the relief that they seek. The 2008 Opinion concluded that
21                   the Bureau's Plan would likely jeopardize the delta smelt and adversely
                     modify its critical habitat. In so doing, the 2008 Opinion explained that the
22                   Bureau's Plan must be modified from what the Bureau envisioned in 2004
                     and 2005, and the Opinion identified a "reasonable and prudent
23                   alternative" to the proposed Plan that would avoid jeopardizing the delta
                     smelt.
24
                     The issuance of the 2008 Opinion does not moot this appeal. The 2008
25                   Opinion merely assesses the general effects of the Bureau's Plan, and it

does not represent a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts before us. Although the DMC Contracts and Settlement Contracts were renewed based on now-invalidated opinions, the Bureau has never reconsulted with the FWS regarding the effects of renewing these contracts, nor has it sought to amend the challenged contracts to incorporate the protections proposed in the 2008 Opinion. The remedy Plaintiffs seek is an injunction requiring reconsultation with the FWS and renegotiation of the challenged contracts based on the FWS' assessment. This relief remains available.

*Id.* at 782.

On the issue of standing related to the DMC Contracts, the previously assigned district judge held that Plaintiffs could not establish that their injury is fairly traceable to the Bureau's alleged procedural violation because: (1) the DMC Contracts contain a shortage provision that absolves the government from liability for breaches that result from complying with its legal obligations; (2) this provision permits the Bureau to take necessary actions to meet its legal obligations under the ESA, so (3) the Bureau could not have negotiated any contractual terms that better protect the delta smelt, and, therefore, any injury to the delta smelt is not traceable to the contract renewal process. *NRDC v. Kempthorne*, 2008 WL 5054115, at *11-18.

The Ninth Circuit rejected this reasoning, finding instead that "to establish standing, a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests." 749 F.3d at 783 (emphasis in original). The Ninth Circuit concluded that the consultation could have led to revisions that could have benefitted the delta smelt:

Contrary to the district court's finding, the shortage provision does not provide the delta smelt with the greatest possible protection. Nothing about the shortage provision requires the Bureau to take actions to protect the delta smelt. The provision is permissive, and merely absolves the United States of liability if there is a water shortage resulting from, inter alia, "actions taken ... to meet legal obligations." But even if we read the provision to place an affirmative obligation on the Bureau to take actions to benefit the delta smelt, the provision only concerns the quantity of water that will be made available to the DMC Contractors. There are various other ways in which the Bureau could have contracted to benefit the delta smelt, including, for example, revising the contracts' pricing

11

scheme or changing the timing of water deliveries. Because adequate
consultation and renegotiation could lead to such revisions, Plaintiffs have
standing to assert a procedural challenge to the DMC Contracts.

*Id*. at 783-84.

With regard to the SRS Contracts, the previously assigned district judge held that, although

Plaintiffs have standing to assert procedural challenges to them, the Bureau was not required to consult

under Section 7(a)(2) prior to renewing the SRS Contracts because the Bureau's discretion in

renegotiating these contracts was "substantially constrained" in light of a line of cases, including *Nat'l*

*Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007), which stands for the

proposition that there is no duty to consult for actions "that an agency is required by statute to

undertake." *Nat. Res. Def. Council v. Kempthorne*, 621 F. Supp. 2d 954, 1000 (E.D. Cal. 2009), *decision*

*clarified*, 627 F. Supp. 2d 1212 (E.D. Cal. 2009), *on reconsideration*, No. 1:05-CV-1207-OWW-SMS,

2009 WL 2424569 (E.D. Cal. Aug. 6, 2009). In holding that the Bureau was not required to consult

under Section 7(a)(2) prior to renewing the SRS Contracts, the previously assigned district judge

focused on Article 9(a) of the original SRS Contracts, which provides in pertinent part:

> During the term of this contract and any renewal thereof it shall constitute
> full agreement as between the United States and the Contractor as to the
> quantities of water and the allocation thereof between base supply and
> Project water which may be diverted by the Contractor from the
> Sacramento River for beneficial use on the land shown on Exhibit B which
> said diversion, use, and allocation shall not be disturbed so long as the
> Contractor shall fulfill all of its obligations hereunder, and the Contractor
> shall not claim any right against the United States in conflict with the
> provisions hereof.

*Id*. at 979 (emphasis omitted). This provision, according to the district court, "substantially constrained"

the Bureau's discretion to negotiate new terms in renewing the contracts, thereby absolving the Bureau

of the duty to consult under *Home Builders*. *Id*.

The Ninth Circuit rejected this reasoning as well:

> Section 7(a)(2)'s consultation requirement applies with full force so long
> as a federal agency retains "some discretion" to take action to benefit a
> protected species. [citations] While the parties dispute whether Article 9(a)

1   actually limits the Bureau's authority to renegotiate the Settlement
    Contracts, it is clear that the provision does not strip the Bureau of all
2   discretion to benefit the delta smelt and its critical habitat.

3   First, nothing in the original Settlement Contracts requires the Bureau to
    renew the Settlement Contracts. Article 2 of the original contracts
4   provides that "renewals *may* be made for successive periods not to exceed
    forty (40) years each." (emphasis added). This language is permissive and
5   does not require the Bureau to execute renewal contracts. Since the FWS
    has concluded that "Delta water diversions" are the most significant
6   "synergistic cause[ ]" of the decline in delta smelt, 58 Fed. Reg. at 12,859,
    it is at least plausible that a decision not to renew the Settlement Contracts
7   could benefit the delta smelt and their critical habitat.

8   But even assuming, arguendo, that the Bureau is obligated to renew the
    Settlement Contracts and that Article 9(a) limits the Bureau's discretion in
9   so doing, Article 9(a) simply constrains future negotiations with regard to
    "the quantities of water and the allocation thereof...." Nothing in the
10  provision deprives the Bureau of discretion to renegotiate contractual
    terms that do not directly concern water quantity and allocation. And, as
11  [is the case] with respect to the DMC Contracts, the Bureau could benefit
    the delta smelt by renegotiating the Settlement Contracts' terms with
12  regard to, inter alia, their pricing scheme or the timing of water
    distribution.
13
    For these reasons, we conclude that, in renewing the Settlement Contracts,
14  the Bureau retained "some discretion" to act in a manner that would
    benefit the delta smelt. The Bureau was therefore required to engage in
15  Section 7(a)(2) consultation prior to renewing the Settlement Contracts.

16  *NRDC v. Jewell*, 749 F.3d at 785. The matter was reversed and remanded for further proceedings. *Id.*

17  **N.      Stay of this Case and Further FWS Consultation**

18          On June 15, 2015, the Court stayed this litigation to allow Reclamation to reinitiate ESA-

19  consultation on the contract renewals. Doc. 979. Thereafter, Reclamation requested FWS's concurrence

20  that the impacts of these contract renewals on delta smelt were assessed in the 2008 FWS Smelt OCAP

21  BiOp. 4SC ¶¶ 103, 105. FWS responded by sending a letter of concurrence ("2015 LOC"), concluding

22  that "all of the possible effects to delta smelt and its critical habitat by operating the CVP to deliver

23  water under the SRS and DMC Contracts were addressed in the [2008 FWS Smelt OCAP BiOp]." *Id.* ¶

24

25

13

106.[3]

**O.    Plaintiffs Obtain Leave to Amend**

On April 22, 2016, the Court granted Plaintiffs' motion for leave to file the 4SC, permitting the addition of three new claims. Doc. 1018. The Fourth Claim for Relief challenges the sufficiency of FWS's re-consultation, which resulted in the issuance of the 2015 LOC. 4SC ¶¶ 177-182. No party objected to adding this claim, which is a natural extension of the existing litigation.[4]

Plaintiffs' Fifth Claim alleges that Reclamation unlawfully failed to request re-initiation of consultation with NMFS on the impacts of SRS Contract renewals on the winter-run and spring-run Chinook. 4SC ¶¶ 183-188. Specifically, Plaintiffs allege that the 2009 NMFS Smelt OCAP BiOp constituted new information that revealed effects of the SRS Contracts that NMFS did not consider in consultation over the contracts. *Id*. ¶ 186. Plaintiffs also allege that massive mortality episodes impacting the 2014 and 2015 generations of winter-run and spring-run Chinook constituted independent new information that should have triggered re-consultation. *Id*. ¶ 187.

Plaintiffs' Sixth Claim for relief alleges Reclamation and the SRS Contractors illegally caused the take of winter-run and spring-run Chinook during 2014 and 2015 because Reclamation made excessive deliveries to the SRS Contractors that depleted the cold water reserves in Shasta Reservoir, causing temperature increases fatal to the 2014 and 2015 "brood years" of winter-run and spring-run Chinook. 4SC ¶¶ 189-193.

**P.    October 20, 2016 Order**

In response to multiple motions to dismiss, the Court issued an order resolving some aspects of those motions and requesting supplemental briefing on others. *See* October 20, 2016 Order. Specifically,

---

[3] According to the 4SC, Reclamation has not engaged in further consultation with NMFS over impacts of the contracts on salmonids. *See* 4SC at ¶ 29 (explaining that NMFS issued a final letter of concurrence regarding the effects of the Settlemetn Contracts on salmonids on January 10, 20015).

[4] Although the SRS Contracts were renewed in 2004 and 2005, the Fourth Claim for Relief, based upon Reclamation's failure to consult over impacts of renewal upon delta smelt, was first raised in the TAC filed in 2008 and has been preserved throughout the present case.

1    the Court denied the DMC Contractors' and SRS Contractors' motion to dismiss the First and Third

2    Claims for Relief because Plaintiffs admit they included these claims in the 4SC for informational

3    purposes only. The Court found it was not unreasonable to leave claims on which judgment has already

4    entered in an operative complaint for this reason, particularly given the exceedingly complex procedural

5    history of this case. *Id*. at 19.

6         The Court found that allegations in the Second Claim for Relief that pertain directly to

7    Reclamation's reliance on the 2005 FWS Smelt OCAP BiOp are moot in light of the fact that FWS

8    issued the 2008 FWS Smelt OCAP BiOp, which superseded and in large part rejected the 2005 FWS

9    Smelt OCAP BiOp. *Id*. at 19-20. While the Court found other allegations in the Second Claim pertaining

10   to ongoing obligations and the 2015 consultation were not moot, the Court nevertheless concluded those

11   remaining allegations must be dismissed for failure to comply with the ESA's 60-day notice

12   requirement. *Id*. at 20-25.

13        The Court resolved some challenges to the Fifth and Sixth Claims for Relief, but requested

14   supplemental briefing on other issues, which are discussed in greater detail below.

15                   **IV. <u>STANDARD OF DECISION</u>**

16        A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is a challenge to the

17   sufficiency of the allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is

18   either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable

19   legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a

20   motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the

21   complaint, construes the pleading in the light most favorable to the party opposing the motion, and

22   resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir.

23   2008).

24        To survive a 12(b)(6) motion to dismiss, the plaintiffs must allege "enough facts to state a claim

25   to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim

1   has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the

2   reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

3   662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for

4   more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at

5   556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

6   allegations, a Plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more

7   than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

8   *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing

9   more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556

10   U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . may not simply

11   recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to

12   give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d

13   1202, 1216 (9th Cir. 2011). In practice, "a complaint . . . must contain either direct or inferential

14   allegations respecting all the material elements necessary to sustain recovery under some viable legal

15   theory." *Twombly*, 550 U.S. at 562; *see also Starr*, 652 F.3d at 1216 ("the factual allegations that are

16   taken as true must plausibly suggest an entitlement to relief"). To the extent that the pleadings can be

17   cured by the allegation of additional facts, a plaintiff should be afforded leave to amend. *Cook, Perkiss*

18   *and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

19   ## V. <u>DISCUSSION</u>

20   ### A.   <u>Fifth Claim for Relief</u>

21   Plaintiffs' Fifth Claim alleges that Reclamation unlawfully failed to request re-initiation of

22   consultation with NMFS on the impacts of SRS Contract "implementation" on the winter-run and

23   spring-run Chinook. 4SC ¶¶ 183-88. Specifically, Plaintiffs allege that the 2009 NMFS Salmonid OCAP

24   BiOp constituted new information that revealed effects of the SRS Contracts that NMFS did not

25   consider in consultation over the contracts. *Id*. ¶ 186. Plaintiffs also allege that massive mortality

1   episodes impacting the 2014 and 2015 generations of winter-run and spring-run Chinook constituted

2   independent new information that should have triggered re-consultation. *Id.* ¶ 187.

3       An agency is required to reinitiate consultation where

4           <u>discretionary Federal involvement or control over the action has been retained or is authorized by law</u> and:

5

6               (a) If the amount or extent of taking specified in the incidental take statement is exceeded;

7               (b) <u>If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;</u>

8

9               (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

10

11               (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

12

13   50 C.F.R. § 402.16 (emphasis added). The duty to reinitiate consultation lies with both the action agency

and the consultation agency. *See id.*; *see also Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d

14   1073, 1076 (9th Cir. 2001) ("*EPIC*").

15       Plaintiffs allege that Reclamation has "discretionary federal involvement and control over the

16   implementation of the SRS Contracts." 4SC ¶ 186. Federal Defendants dispute this, arguing that "while

17   Reclamation retains some limited discretionary control or involvement in implementing the terms of the

18   SRS Contracts, that level of involvement is not sufficient to trigger re-initiation because in the end,

19   Reclamation ultimately cannot unilaterally alter the existing terms of the contracts in a manner that will

20   inure to the benefit of [the] species." FD MTD at 9.

21       Plaintiffs argued in the initial round of briefing that the Ninth Circuit's decision in *NRDC v.*

22   *Jewell* controls on the issue of discretionary involvement and control. The relevant portion of that

23   decision addressed Plaintiffs' claim, contained in the TAC, that Reclamation violated Section 7(a)(2) by

24   failing to consult adequately with FWS over impacts to delta smelt prior to <u>renewing</u> the SRS Contracts.

25

17

1   *See* 749 F.3d at 781. The previously assigned district judge ruled that Reclamation was not required to

2   comply with Section 7 in connection with renewal of the SRS contracts because the terms of the original

3   SRS Contracts "substantially constrained" Reclamation's discretion to modify the terms during the

4   renewal process. *Id*. at 784. The Ninth Circuit reversed, holding that the appropriate question is not

5   whether the agency's discretion is "substantially constrained" but rather whether the agency retains

6   "some discretion" to take action for the benefit of a protected species. *Id*. Applying the "some

7   discretion" standard, the Ninth Circuit reasoned:

8       In holding that the Bureau was not required to consult under Section
        7(a)(2) prior to renewing the Settlement Contracts, the district court
9       focused on Article 9(a) of the original Settlement Contracts, which
        provides in pertinent part:

10
            During the term of this contract and any renewals thereof: (1) It
11          shall constitute full agreement as between the United States and the
            Contractor *as to the quantities of water and the allocation thereof*
12          between base supply and Project water which may be diverted by
            the Contractor from its source of supply for beneficial use on the
13          land shown on Exhibit B ...; (2) The Contractor shall not claim any
            right against the United States in conflict with the provisions
14          hereof.

15      (emphasis added). According to the district court, the Bureau was not
        required to consult because this provision "substantially constrained" the
16      Bureau's discretion to negotiate new terms in renewing the contracts.

17      In so concluding, the district court applied an erroneous standard. Section
        7(a)(2)'s consultation requirement applies with full force so long as a
18      federal agency retains "some discretion" to take action to benefit a
        protected species. [Citations] While the parties dispute whether Article
19      9(a) actually limits the Bureau's authority to renegotiate the Settlement
        Contracts, it is clear that the provision does not strip the Bureau of all
20      discretion to benefit the delta smelt and its critical habitat.

21      First, nothing in the original Settlement Contracts requires the Bureau to
        renew the Settlement Contracts. Article 2 of the original contracts
22      provides that "renewals *may* be made for successive periods not to exceed
        forty (40) years each." (emphasis added). This language is permissive and
23      does not require the Bureau to execute renewal contracts. Since the FWS
        has concluded that "Delta water diversions" are the most significant
24      "synergistic cause[ ]" of the decline in delta smelt, 58 Fed. Reg. at 12,859,
        it is at least plausible that a decision not to renew the Settlement Contracts
25      could benefit the delta smelt and their critical habitat.

18

> But even assuming, *arguendo*, that the Bureau is obligated to renew the Settlement Contracts and that Article 9(a) limits the Bureau's discretion in so doing, Article 9(a) simply constrains future negotiations with regard to "the quantities of water and the allocation thereof...." <u>Nothing in the provision deprives the Bureau of discretion to renegotiate contractual terms that do not directly concern water quantity and allocation. …[T]he Bureau could benefit the delta smelt by renegotiating the Settlement Contracts' terms with regard to, inter alia, their pricing scheme or the timing of water distribution</u>.

> For these reasons, we conclude that, <u>in renewing the Settlement Contracts,</u> the Bureau retained "some discretion" to act in a manner that would benefit the delta smelt. The Bureau was therefore required to engage in Section 7(a)(2) consultation prior to renewing the Settlement Contracts.

*Id.* at 784-85 (italics in original; underlining added). *NRDC v. Jewell* unambiguously held that the Section 7(a)(2) consultation requirement applies to the <u>renewal</u> of the SRS Contracts.

In the October 20, 2016 Order, the Court concluded that *NRDC v. Jewell*'s holding is "directly relevant to the Fourth Claim for Relief in the 4SC, which challenges the sufficiency of the consultation between Reclamation and FWS as to impacts to delta smelt related to <u>renewal of the SRS Contracts</u>." October 20, 2016 Order at 28. However, Plaintiffs' Fifth Claim for relief demands <u>re-initiation</u> of consultation regarding the previously-executed SRS Contracts. After carefully considering the nature and scope of the Fifth Claim for relief, the Court concluded in the October 20, 2016 Order that "the only logical reading of the Fifth Claim for Relief is that Plaintiffs allege Reclamation retains discretionary involvement or control over SRS Contract <u>implementation</u> and that the new information alleged in the complaint regarding impacts of SRS Contract <u>implementation</u> on salmonids requires re-initiation of the consultation regarding SRS Contract <u>adoption</u>." *Id.* at 30. The Court then explained that "[t]here is a significant hurdle associated with such an allegation, rooted in a line of authority highlighted by Federal Defendants." *Id.* Because it is critical to the analysis here, the Court repeats its explanation of that line of authority here:

> While acknowledging the holding of *NRDC v. Jewell*, Federal Defendants argue that once executed, "the terms of the SRS Contracts are set and Reclamation administers the contracts as executed." FD MTD at 10.

Therefore, Federal Defendants' argument continues: "Reclamation does not retain the authority to alter the contract terms to inure to the benefit of listed species and thus, re-initiation on the execution of the SRS contracts has not been triggered." *Id*.

Federal Defendants' position finds support in *EPIC*, which concerned a lawsuit brought against FWS for its alleged failure to re-initiate consultation over the impact an ITP issued to [] Simpson Timber for the northern spotted owl might have on two other species (the marbled murrelet and the coho salmon) listed after the issuance of the ITP. FWS retained some ongoing authority over the ITP:

> ten years after the permit's issuance, the FWS will review the permit and evaluate whether Simpson has complied with its terms before allowing Simpson to continue logging operations under the permit. The FWS can also suspend the permit at any time in the event of "any significant violation or breach" of the permit; it also has the authority to revoke the permit if activities authorized under it result in the taking of threatened species not the subject of the permit, including the marbled murrelet and coho salmon.

*Id*. at 1078. In evaluating whether FWS retained sufficient discretionary involvement or control, the Ninth Circuit first confirmed that the appropriate standard comes from *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995). *EPIC*, 255 F.3d at 1079. As *EPIC* summarized:

> *Sierra Club* involved a suit against the Bureau of Land Management ("BLM") for its failure to consult with the FWS about the effect of a proposed logging road on the northern spotted owl. A private timber company was going to build a road on public land pursuant to a right-of-way agreement with the BLM. The Sierra Club claimed that the agreement represented ongoing agency action and that the BLM was required to consult with the FWS about the potential impact of the road on a newly listed species, the spotted owl, because the BLM retained discretionary involvement and control over the right-of-way. Under the right-of-way agreement, the BLM could object to the timber company's project in three limited instances, none of which was at issue or related to endangered or threatened species. [*Sierra Club*, 65 F.3d] at 1509 n. 10. We held that the BLM did not have a duty to consult with the FWS because it could not influence construction of the roadway for the benefit of the spotted owl:

>> In light of the statute's plain language, the agency's regulations, and the case law construing the scope of "agency action," we conclude that where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement

measures that inure to the benefit of the protected species.

> *Id*. at 1509 (emphasis added). Under *Sierra Club*, to survive a Rule 12(b)(6) motion to dismiss, EPIC must allege facts to show that the FWS retained sufficient discretionary involvement or control over Simpson's permit "to implement measures that inure to the benefit of the" [species in question]. *Id*.

*EPIC*, 255 F.3d at 1079-80 (emphasis added).

***

The Ninth Circuit then examined the ITP issued to Simpson Timber to determine whether it reserved to FWS "discretionary involvement and control to such an extent that it must reconsult on the impact of Simpson's spotted owl permit on marbled murrelet and coho salmon." *Id*. at 1080. Ultimately, the Ninth Circuit concluded that neither the ITP nor any permit-related documents reserved to FWS such discretionary involvement or control. *Id*. at 1080-82.

Critically for purposes of this case, the *EPIC* court next addressed the applicability of *Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998). In *Houston*, Reclamation was required to consult with NMFS because Reclamation's renewal of certain CVP water contracts, which were statutorily mandated to be negotiated on "mutually agreeable" terms with water users, involved at least "some" agency discretion to set the contract terms because Reclamation had discretionary power to decrease the total supply of water for sale and thereby decrease the amount of water granted in the renewed contracts. *Id*. The Ninth Circuit applied similar reasoning in *NRDC v. Jewell* to the SRS Contract renewal process.

In *EPIC*, however, the Ninth Circuit emphasized that *Houston* should not be read to "suggest … that once the renewed contracts were executed, the agency had continuing discretion to amend them at any time to address the needs of endangered or threatened species." 255 F.3d at 1082. Rather, the terms of the contract or agreement must be examined to determine whether and to what extent the agency retained discretion to impose measures to protect the species in question. *See id*. (finding terms of ITP permit issued regarding impacts to spotted owl did not give FWS the power to implement measures to benefit species other than the spotted owl); *see also Crowman Corp. v. United States*, 51 Fed. Cl. 654, 656 (2002) (finding contract term permitting agency to adjust the time period for contract operations in the event that an "act of Government" disrupted contract operations reserved to the agency the discretionary authority to re-initiate consultation to evaluate impact of contracted operations on recently-listed species").

Contrary to Plaintiffs' suggestion, Pltf. Opp. at 8, in light of *EPIC*, the

Ninth Circuit's holding in *NRDC v. Jewell* is <u>not</u> law of the case with respect to Plaintiffs' Fifth Claim for relief. In other words, *NRDC v. Jewell*'s holding that Reclamation has discretion <u>in the renewal</u> process to alter the timing of water distribution and the pricing scheme related to contracted-for water does not necessarily mean Reclamation retained similar discretion in the <u>executed</u> contracts (or otherwise possess similar discretion pursuant to law) that would permit revisions to executed contracts.

October 20, 2016 Order at 30-33.

The Court then requested supplemental briefing addressing the following questions:

(1) In light of the Court's ruling that *EPIC* controls as to the Fifth Claim for Relief and necessitates an examination of SRS Contracts themselves to determine whether Reclamation retains discretion under the Contracts to act on behalf of salmonid species, are there provisions in the SRS Contracts that support Plaintiffs' allegation that Reclamation retains such discretion?

(2) Relatedly, on what authority may the Court consider Plaintiffs' allegations that Reclamation actually has exercised discretion over contract implementation in practice?

*Id*. at 37.

### 1.   <u>Interpretation of *EPIC*</u>

While the Court has determined that *EPIC* controls disposition of the Fifth Claim for Relief, the parties are not on the same page as to how *EPIC* should be applied. *EPIC* generically holds that "to survive a Rule 12(b)(6) motion to dismiss, [a plaintiff] must allege facts to show that [the action agency] retained sufficient discretionary involvement or control over [the permit or contract in question] to implement measures that inure to the benefit of the [relevant species]." *EPIC*, 255 F.3d at 1080. Plaintiffs point to numerous contract provisions and other aspects of law[5] they claim grant to Reclamation the discretion to take action to implement the SRS Contracts in ways that would benefit winter-run and spring-run Chinook salmon and their habitats. Doc. 1048 at 1-10.

Federal Defendants advocate for a more narrow reading of *EPIC*, based in part on *EPIC's*

---

[5] *See infra* note 13 for a discussion of the "other aspects of law" cited by Plaintiffs.

1  application of *Houston*. As in the October 20, 2016 Order, in *Houston,* Reclamation was required to

2  consult under the ESA <u>before renewing</u> certain water contracts because in negotiations Reclamation had

3  the power to decrease the total supply of water granted in those contracts. *EPIC*, 255 F.3d at 1082

4  (citing *Houston*, 146 F.3d at 1125-16, internal quotations omitted). The Plaintiffs in *EPIC* argued that

5  *Houston* demonstrated that "existing contracts and permits that are in no way related to the ESA or do

6  not provide mechanisms to protect threatened and endangered species may require alteration if

7  necessary to comply with the ESA." *EPIC*, 255 F.3d at 1082. The Ninth Circuit rejected this

8  interpretation of *Houston*, instead finding that *Houston* did not stand for the proposition that "once the

9  renewed contracts were executed, the agency had continuing discretion to amend them at any time to

10 address the needs of endangered or threatened species." *Id*.[6] Federal Defendants advocate for turning

11 this negative into an affirmative rule that would require allegations that the agency retained continuing

12 discretion to amend the renewed contracts to address the needs of endangered or threatened species. *See*

13 Doc. 1052 at 3-4. According to Federal Defendants, *EPIC*'s generic holding—that "to survive a Rule

14 12(b)(6) motion to dismiss, [a plaintiff] must allege facts to show that [the action agency] retained

15 sufficient discretionary involvement or control over [the permit or contract in question] to implement

16 measures that inure to the benefit of the [relevant species]," 255 F.3d at 1080—is further limited by the

17 more specific requirement that the type of discretion the action agency must retain under the

18 circumstances is <u>discretion to modify the contracts</u> themselves to benefit the species.

19     A close examination of how the *EPIC* court evaluated the terms of the ITP at issue in that case

20 suggests Federal Defendants are correct. *EPIC* focused on examining the ITP to determine whether the

21 action agency retained discretionary control to modify or add to the ITP's terms by: "<u>mak[ing] new</u>

---

23 [6] The Court relied on the reasoning of *Houston* to find that *NRDC v. Jewell* is not the law of the case with respect to
24 Plaintiff's Fifth Claim for Relief because "*NRDC v. Jewell*'s holding that Reclamation has discretion <u>in the renewal process</u>
   to alter the timing of water distribution and the pricing scheme related to contracted-for water does not necessarily mean that
   Reclamation retained similar discretion in the executed contracts (or otherwise possesses similar discretion pursuant to law)
25 that would permit revisions to the <u>executed</u> contracts." October 20, 2016 Order at 33 (emphasis in original).

requirements to protect species that subsequently might be listed as endangered or threatened";

"expand[ing] the conservation goals of the [ITP]"; and "demand[ing] additional measures to protect new

species." *Id*. at 1081-82 (emphasis added).[7] *See Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*,

345 F. Supp. 2d 1151, 1170 (W.D. Wash. 2004) (emphasizing that *EPIC* involved a completed contract

between the agency and a private entity and interpreting *EPIC* as holding that FWS did not "'retain

discretionary control [under the permit] to make new requirements to protect' the marbled murrelet or

the coho salmon . . . or impose new requirements on the company" (quoting *EPIC*, 255 F.3d at 1081-

83)). In other words, in order to trigger the requirement for re-consultation under *EPIC* and 50 C.F.R. §

402.16 in the context of an executed and otherwise valid contract, the action agency must have retained

sufficient discretion in that contract to permit material revisions to it that might benefit the listed species

in question.

This interpretation harmonizes *EPIC* with its discussion of *Houston*. As mentioned above, *EPIC*

found that even though the statutory mandate to negotiate the contracts at issue in *Houston* on mutually

agreeable terms created sufficient discretion to require consultation prior to contract execution, nothing

suggested that "once the renewed contracts were executed, the agency had continuing discretion to

amend them at any time to address the needs of endangered or threatened species." 255 F.3d at 1082.

This was a direct repudiation of the *Houston* plaintiffs' argument that "existing contracts and permits

that are in no way related to the ESA or do not provide mechanisms to protect threatened and

---

[7] Some language in *EPIC* suggests that the Ninth Circuit was looking more generically at "the scope of [the action agency's] authority to implement measures to benefit species other than the" species that was the focus of the ITP, and whether the ITP gave the action agency "the power ... to act to benefit" the species. *Id*. at 1081 (emphasis added). But, a close examination of surrounding language suggests otherwise. The following paragraph from *EPIC* provides a helpful example:

> EPIC also argues that other provisions of the HCP and IA authorize the FWS to require protection for species other than owls. The provisions to which EPIC refers identify thresholds for the owl population that trigger plan modifications and corrective measures, and establish a contingency plan when thresholds are exceeded or unforeseen events occur. The provisions also allow the FWS to review corrective action to eliminate plan deficiencies, suspend the permit for significant violations or breaches of the permit, and incorporate revisions to the HCP as necessary to ensure that the conservation goals of the HCP are met. None of these provisions addresses the scope of the FWS's authority to implement measures to benefit species other than the spotted owl.

*EPIC*, 255 F.3d at 1081. The overall thrust of this paragraph suggests a search for authority to add requirements to the contractual arrangement.

endangered species may require alteration if necessary to comply with the ESA." *Id.* *EPIC*'s discussion

of *Houston* strongly suggests that in the context of a previously-executed contract, the type of discretion

*EPIC* demands is discretion to modify that contract. Put another way, the re-consultation regulation

requires as a pre-requisite "discretionary Federal involvement or control over the <u>action</u>." 50 C.F.R. §

402.16. In light of EPIC's discussion of Houston, the "action" in the present circumstances is contract

execution. Once executed, Reclamation would only retain discretion over contract execution if the

contract in question provided Reclamation authority to modify the contractual arrangement.

This interpretation also makes sense from a practical perspective. Imagine under the

circumstances of the present case that discretion to act on behalf of the species in question (without

discretion to modify the contracts) triggered a re-consultation that led to a jeopardy determination.

Imagine further that jeopardy could not be avoided simply through modifications to the way

Reclamation exercised the discretion it did possess (within the existing contractual arrangement) to act

on behalf of the species. Without any discretion to modify the contract, this would result in Reclamation

being required to invalidate an existing and otherwise valid Reclamation contract. In other words, this

would force Reclamation to breach the contract in question. This practical implication is particularly

meaningful in the present case because the SRS Contracts are crucial to Reclamation operating the CVP

in compliance with state law.[8] This cannot be what Congress intended to be the result of the Section 7

consultation requirement, and the Court will not interpret the re-consultation regulation, 50 C.F.R. §

402.16's, to produce such an absurd result.

Plaintiffs have pointed to no provision in the SRS Contracts, nor to any other authority, that

---

[8] In portions of the district court decision in *Nat. Res. Def. Council v. Kempthorne*, not addressed on appellate review, the previously-assigned district judge discussed the interplay between the SRS Contracts; Section 8 of the 1902 Reclamation Act, which requires Reclamation to operate in compliance with state law, which in turn gives priority to prior appropriators such as the SRS Contractors; and the CVPIA, which requires Reclamation to operate the CVP in compliance with state law and the ESA. *See* 621 F. Supp. 2d at 989. That opinion concluded that the current SRS Contracts, which were renewed in part based upon renewal provisions contained within the original SRS Contracts, continue to embody an agreement on "contract quantities that must remain fixed on renewal unless a general stream adjudication occurs" and that this "facilitated the continued operation of the CVP." *Id.* at 1000.

1    suggests Reclamation has retained discretion to impose revisions to the executed contracts to address the

2    needs of the relevant listed species. Rather, as mentioned, Plaintiffs point to numerous provisions that

3    they allege provide discretion over contract implementation. None of the contractual provisions cited

4    satisfies *EPIC*.

5    ### 2.   **SRS Contract Background**

6    Before evaluating each of the purported sources of contractual discretion highlighted by

7    Plaintiffs, it is helpful to review the SRS Contracts in a more general sense. Subject to the conditions in

8    each contract, an SRS Contractor is "authorized to divert from its Source of Supply at the locations

9    shown in Exhibit A, for beneficial use within the area delineated on Exhibit B . . . the Contract Total

10   designated in Exhibit A . . . in accordance with the monthly operating schedule" submitted by the SRS

11   Contractor. Glenn-Colusa Irrigation District Contract No. 14-06-200-855A-R-1 ("GCID Contract"), art.

12   3(a), located in the Supplemental Administrative Record ("SAR") at 2695-2737. Before April 1 in each

13   Water Year, and as revisions are needed, each SRS Contractor submits a written schedule, "indicating

14   the Contract Total to be diverted by the Contractor during each month under this Settlement Contract.

15   The United States shall furnish water to the Contractor in accordance with the monthly operating

16   schedule or any revisions thereof." *Id*. at art. 3(c), SAR 2705. The Contract Total is defined as the sum

17   of Base Supply and Project Water and is set forth in each Exhibit A. *See, e.g*., *id*. at art. 1(e) & Ex. A,

18   SAR 2700, SAR 2732. The Contract Total may be reduced only in a Critical Year, and then only by 25

19   percent. *Id*. at art. 5(a), SAR 2708. The Contractor in turn agrees to pay for Project Water as provided

20   for in Article 8 at "Rates and Charges established in accordance with: (i) the Secretary's then current

21   rate setting policies for the Project; and (ii) applicable Reclamation law and associated rules and

22   regulations, or policies." *Id*. at art. 8(a). SAR 2709-10.

23   ### 3.   **Article 3(i)**

24   Article 3(i) of the SRS Contracts provides:

25       [I]f there is a shortage of Project Water because of actions taken by the

26

> Contracting Officer to meet legal obligations then . . . no liability shall
> accrue against the United States of any of its officers, agents, or
> employees for any damage direct or indirect, arising therefrom.

*Id*. at art. 3(i), SAR 2707. Plaintiffs argue that this provision allows Reclamation to reduce the diversion of project water by SRS Contractors in order "to meet legal obligations." Doc. 1048 at 3. Citing the 2009 NMFS Salmonid OCAP BiOp as an example of a relevant legal obligation, Plaintiffs argue that under Article 3(i) Reclamation retains discretionary control and involvement that could benefit listed species "affected by the diversions of project water." *Id*. at 4.

Federal Defendants rejoin that discretion over project water is immaterial to Plaintiffs' claims because project water was not at issue during the complained-of releases in 2014 and 2015, which consisted exclusively of base supply water. *See* Doc. 1052 at 7-8. As discussed above, under the circumstances presented in this case, an agency is required to reinitiate consultation where two elements are present: (1) "discretionary Federal involvement or control over the action has been retained or is authorized by law"; and (2) "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16. According to Federal Defendants' position, to trigger reconsultation under § 402.16, the discretion retained must be discretion that could allow Reclamation to modify a contract to address or ameliorate the exact "new effects of the action" complained of. However, nothing in the regulation limits the reconsultation obligation in this way. It is not beyond credulity to imagine ways that Reclamation could modify a contract to mitigate harm caused by one aspect of SRS Contract implementation by exercising discretion over other aspects of SRS Contract implementation.

More compelling are the SRS Contractors' arguments regarding interpretation of Article 3(i). The SRS Contractors maintain that Article 3(i) simply limits the federal government's liability for damages when there is a shortage of project water due to actions taken by Reclamation to comply with legal obligations. This Court's predecessor previously concluded that Article 3(i) is a "*force majeure*

1    clause"[9] and that "because supplies of Project Water may only be reduced when Project Water is

2    necessary to meet legal obligations, this does not create a level of discretion in the Contracting Officer

3    or the Bureau that satisfies" the standard set forth in *Home Builders*, 551 U.S. at 673. *Nat. Res. Def.*

4    *Council v. Kempthorne*, No. 1:05-CV-01207-OWW-SMS, 2009 WL 2849626, at *2 (E.D. Cal. Sept. 1,

5    2009), *rev'd on other grounds sub nom. Nat. Res. Def. Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014).

6    In *Home Builders,* the Supreme Court deferred to a regulatory interpretation of Section 7's consultation

7    and no-jeopardy requirements as applying only to "actions in which there is discretionary Federal

8    involvement or control," 551 U.S. at 673 (quoting 50 C.F.R. § 402.03), and found that actions that are

9    legally mandated do not qualify as such. *Id*. This Court's previous interpretation of Article 3(i) as not

10   constituting "discretionary Federal involvement or control" for purposes of 50 CFR § 402.03 was not

11   called into question by the Ninth Circuit's en banc opinion in this case. The Court sees no reason why

12   the *force majeure* language in Article 3(i) would any more qualify as "discretionary Federal involvement

13   or control" in the context of 50 C.F.R. § 402.16(b).[10]

14       **4.    Article 29(a) & (e)**

15       Plaintiffs next point to Article 29(a) and (e) as sources of the necessary discretion. Article 29(a)

16   provides:

17           Prior to the diversion of Project Water, the Contractor shall be
             implementing an effective water conservation and efficiency program
18           based on the Basin-Wide Water Management Plan and/or Contractor's
             water conservation plan that has been determined by the Contracting
19

---

20   [9] A force majeure clause is "[a] contractual provision allocating the risk of loss if performance becomes impossible or
     impracticable, esp. as a result of an event or effect that the parties could not have anticipated or controlled. *Force-majeure*
21   *clause, Blacks Law Dictionary* 718 (9th ed. 2009).

22   [10]  Plaintiffs point out that Federal Defendants previously acknowledged that Article 3(i) allows Reclamation to reduce
     project water diversions "'to meet a legal obligation, such as compliance with the ESA.'" Doc. 1048 at 3 (citing Doc. 1048-2,
23   Federal Defendant's Appellate Brief, at 49). Plaintiffs argue that in light of this admission Federal Defendants "cannot now
     assert" they have no discretion to take action to benefit the winter-run and spring-run Chinook. To the extent Plaintiffs are
24   arguing Federal Defendants are judicially estopped from asserting a contrary position at this stage of the litigation, the Ninth
     Circuit has "restricted the application of judicial estoppel to cases where the court relied on, or accepted, the party's previous
     <u>inconsistent</u> position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001). Here, among other things,
25   there is no inconsistency. To the extent Federal Defendants have admitted anything, it is that Article 3(i) is a *force majeure*
     clause. As discussed, this is not the same thing as admitting the existence of discretion over water deliveries.

28

> Officer to meet the conservation and efficiency criteria for evaluating water conservation plans established under Federal law. The water conservation and efficiency program shall contain definite water conservation objectives, appropriate economically feasible water conservation measures, and time schedules for meeting those objectives. Continued diversion of Project Water pursuant to this Settlement Contract shall be contingent upon the Settlement Contractor's continued implementation of such water conservation program.

GCID Contract, art. 29(a), SAR 2727. Plaintiffs argue that this provides Reclamation with ongoing discretion to determine whether the contractors' programs "meet the conservation and efficiency criteria for evaluating water conservation plans established under Federal Law." *See* Doc. 1048 at 4. The SRS Contractors correctly point out, however, that nothing in Article 29(a) permits Reclamation to reject a water conservation plan that meets the "conservation and efficiency criteria for evaluating water conservation plans established under Federal law." Doc. 1054 at 8. Although no party has addressed specifically the nature of the "conservation and efficiency criteria" utilized by Reclamation, the Court presumes this is a reference to the criteria developed by Reclamation to meet the requirements of the CVPIA and the Reclamation Reform Act of 1982, which are released for public comment and periodically updated. *See, e.g.*, *Central Valley Project Improvement Act Water Management Plans*, 79 Fed. Reg. 65,989-01 (Nov. 6, 2014); *Central Valley Project Improvement Act, Regional Criteria For Evaluating the Water Management Plan for the Sacramento River Contractors*, 69 Fed. Reg. 4,317-01 (Jan. 29, 2004) (describing "Regional Criteria for the Sacramento Valley [developed as] an alternative pilot program to the current Standard Criteria"). Plaintiffs do not challenge the nature of the applicable criteria, the method of their promulgation, or suggest that Reclamation has authority to modify the criteria in the context of Settlement Contract renewal. The existence of relevant criteria promulgated through a separate process suggests application of Article 29(a) is nondiscretionary. *See Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015) (finding no discretionary federal involvement or control where agency charged with determining whether enumerated statutory criteria have been achieved).

29

1    Article 29(e) states that: "In order to provide incentives for water conservation, the Contractor

2    may reduce the amount of Project Water for which payment is required under Article 8(a)." Plaintiffs

3    interpret this language as granting to Reclamation discretion to "provide financial incentives to SRS

4    Contractors to encourage water conservation." Doc. 1048 at 4. But, the plain language of Article 29(e)

5    reveals a different arrangement. Application of Article 29(e) is triggered by an SRS Contractor filing an

6    "offer to reduce Project Water use," which Reclamation may accept or decline. Only if Reclamation

7    accepts the SRS Contractor's offer can project water deliveries be reduced and the SRS Contractor's

8    obligation to pay for the water waived or reduced. Article 29(e)(1)&(2). Although there may be some

9    discretion involved in Reclamation's decision whether or not to accept the offer, it defies logic to

10   conclude that this is the type of "discretionary Federal involvement or control" envisioned by 50 C.F.R.

11   § 402.16, because Reclamation would only have the opportunity to reduce project water deliveries if the

12   SRS Contractor voluntarily offered to do so. Even in the presence of "new information reveal[ing]

13   effects of the action that may affect listed species or critical habitat in a manner or to an extent not

14   previously considered," 50 C.F.R. § 402.16(b), Reclamation would be powerless to modify the action in

15   any way under Article 29(e) unless the SRS Contractors agreed in advance to do so and nothing in

16   Article 29(e) provides Reclamation discretion to add to or modify terms in the Settlement Contracts.

17   **5.    Article 1(d) & (o)**

18   Article 1 defines terms used elsewhere in the SRS Contracts. Article 1(d) defines the term

19   "Charges" to mean "payments for project water that the Contractor is required to pay to the United

20   States in addition to the 'Rates' specified in [the] Settlement Contract." GCID Contract, art. 1(d), SAR

21   2700.[11] This definition further provides that Reclamation "will, on an annual basis, determine the extent

22   of . . . Charges" imposed for project water. *Id.* "The type and amount of each Charge shall be specified

---

24   [11] The numbering, but not the text, of the provisions discussed in this section is different within the Anderson Cottonwood Irrigation District ("ACID") Contract. For example, "Charges" is defined in Article 1(c) in the ACID Contract. *See* SAR

25   0050. Hereinafter, the Court will reference only the GCID contract numbering scheme where the text is materially indistinguishable.

1    in Exhibit D." *Id.*

2        Article 1(o) defines the term "Rates" to mean "the payments for Project Water determined

3    annually by the Contracting Officer in accordance with then current applicable water ratesetting policies

4    for the Project, as described in subdivision (a) of Article 8." GCID Contract, art. 1(o), SAR 2702.

5    Article 8(a), in turn, requires Reclamation to set Project Water Rates in accordance with the Secretary of

6    the Interior's rate setting policies for the CVP, and applicable Reclamation law and associated rules and

7    regulations. *Id.*, art. 8(a)(2), SAR 2710. Rates set under those policies must be established to recover

8    "only reimbursable operation and maintenance . . . and capital costs of the Project." *Id.*, art. 8(g), SAR

9    2712. Plaintiffs suggest that Articles 1(d) and (o) give Reclamation "ongoing discretion to increase the

10   price of project water—a measure that could encourage reduced diversions of project water." Doc. 1048

11   at 5.

12       To the extent Plaintiffs suggest Reclamation has discretion regarding the setting of "Rates," the

13   contract and applicable legal framework indicate otherwise. As mentioned, Article 1(o) defines the term

14   "Rates" to mean "the payments for Project Water determined annually by the Contracting Officer in

15   accordance with then current applicable water ratesetting policies for the Project, as described in

16   subdivision (a) of Article 8." GCID Contract, art. 1(o), SAR 2702. Article 8(a) requires Reclamation to

17   set Project Water Rates and Charges in accordance with the Secretary of the Interior's rate setting

18   policies for the CVP, and applicable Reclamation law and associated rules and regulations. *Id.*, art.

19   8(a)(2), SAR 2710. Furthermore, Rates set under those policies must be established to recover "only

20   reimbursable operation and maintenance . . . and capital costs of the Project." *Id.*, art. 8(a)(2), SAR

21   2712. Again, these parameters substantially constrain any discretion Reclamation may have over rate-

22   setting, rendering Reclamation incapable of setting rates in a manner that would aid listed species.[12]

23   _____

24   [12] Plaintiffs point out that the Ninth Circuit, in the context of assessing the extent of Reclamation's discretion over SRS
     Contract <u>renewal</u>, concluded that Reclamation retained sufficient discretion during contract negotiations and execution to

25   revise "the contracts' pricing scheme" in ways that could benefit the listed species. *See Jewell*, 749 F.3d at 783-84; *accord
     NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998) (authority to set project rates during contract negotiations is source of

1   More specifically, these provisions do not afford Reclamation any authority to revise the Settlement

2   Contracts to impose a different Rate structure.

3        With respect to Charges, Article 1(d) defines "Charges" as "payments for project water that the

4   Contractor is required to pay to the United States in addition to the 'Rates' specified in [the] Settlement

5   Contract." GCID Contract, art. 1(d), SAR 2700 (emphasis added). At first glance, this definition is

6   ambiguous as to whether the Charges may include only those the Contractor "is required to pay" as a

7   result of some extra-contractual requirement (e.g., a statutory obligation), or whether Reclamation can

8   require the Contractor to pay additional "Charges," to be set by Reclamation at its discretion. When

9   viewed in context, however, Article 1(d) is not ambiguous. As with Rates, Charges must be set in

10  accordance with the Secretary of the Interior's rate setting policies for the CVP, and applicable

11  Reclamation law and associated rules and regulations. *Id.*, art. 8(a)(2), SAR 2710. The only example of a

12  Charge in the record stems from applicable Reclamation law: a per acre-foot charge for Restoration

13  Payments pursuant to § 3407 of the Central Valley Project Improvement Act, Pub. L. No. 102-575, 105

14  Stat. 4600, 4726-28 (1992) ("CVPIA"). SAR 0087. As the SRS Contractors point out, under CVPIA §

15  3407, Restoration Payments must be assessed in "an amount that can be reasonably expected to equal

16  the amount appropriated each year." CVPIA § 3407(c)(2). Restoration Fund payments are limited by

17  statute to $50 million per year, CVPIA 3407(b), and to the extent Reclamation has any discretion

18  regarding the amount appropriated, the statute requires total collections to equal $50 million per year on

19  a three-year rolling average basis. CVPIA 3407(c)(2). CVPIA § 3407 does not afford Reclamation

20  discretion to adjust the Restoration Payment Charge in any significant or relevant way. Nor has any

21  party identified any other provision of Reclamation law or associated rules and regulations that affords

22  Reclamation any discretion to add additional Charges.

23

24  discretion). These cases stand for the proposition that Reclamation may be able to negotiate pricing structures that permit
    rates to take into account additional interests (i.e., interests other than recoupment of operation, maintenance and capital
    costs) and/or charges other than those mandated by law. However, these cases are not dispositive of whether Reclamation

25  retained discretion over the pricing scheme in the executed SRS Contracts sufficient to permit rate changes that would benefit
    the listed species.

1

    **6.**    <u>**Articles 8(h) and 8(i)**</u>

2

    Plaintiffs further argue that pursuant to Article 8(h) and (i), Reclamation retains the discretion to

3

make determinations regarding a contractors' ability to pay and to adjust rates and charges based on

4

those determinations. Doc. 1048 at 5.

5

    Article 8(h) allows Reclamation to adjust Rates to "reflect the changed costs of delivery (if any)

6

of [] transferred, exchanged, or otherwise disposed of Project Water to the transferee's point of delivery

7

in accordance with the then-current ratesetting policies for the Project." GCID Contract, art. 8(h), SAR

8

2713. Given that any discretion afforded Reclamation by this provision is tied to the "costs of delivery,"

9

the Court cannot conclude that this language grants to Reclamation any discretion to act on behalf of

10

listed species, let alone any discretion to modify contract terms or add protections for the listed species.

11

    Likewise, Article 8(h) indicates Reclamation may impose "lower Rates and Charges because of

12

inability to pay." *Id*. Article 8(i) provides that "Pursuant to the Act of October 27, 1986 (100 Stat. 3050),

13

[Reclamation] is authorized to adjust determinations of ability to pay every five years." GCID Contract,

14

art. 8(i), SAR 2713. However, Plaintiffs do not explain and the Court cannot imagine how the power to

15

adjust rates downward to reflect inability to pay could possibly constitute discretion that could inure to

16

the benefit of listed species, let alone any discretion to modify contract terms to increase protections for

17

the listed species.

18

    **7.**    <u>**Article 3(e)**</u>

19

    Article 3(e) provides that, during the contract term, Reclamation must approve any "sale,

20

transfer, exchange, or other disposal of any of the Contract Total ... or the right to the use thereof for use

21

on land other than" for uses designated in the contract. GCID Contract, art. 3(e), SAR 2706. The

22

"Contract Total" refers to all water made available to the contractor for diversion under the contract. *See*

23

*id*., art. 1(e), SAR 2700. Plaintiffs argue that "[t]o the extent Reclamation rejects a transfer of water by

24

the contractors or conditions the transfer on protections for listed salmon, the discretion could inure to

25

the benefit of listed species." Doc. 1048 at 6. This argument fails for the same reason articluated in the

analysis of Article 29(e): it does not provide the type of "discretionary Federal involvement or control"

envisioned by 50 C.F.R. § 402.16 and *EPIC*. Even assuming Reclamation's rejection of a proposed

water transfer would inure to the benefit of the species (as opposed to just encouraging the SRS

Contractor to use the water itself), Reclamation would only have the opportunity to reject a water

transfer if the SRS Contractor proposed making one. If re-consultation could be triggered in the presence

of conditional discretion, there would be no limit to the reach of 50 C.F.R. § 402.16. Taking Plaintiffs'

position to its logical extreme, re-consultation might be triggered under *EIPC* and 50 C.F.R. § 402.16

simply by the ever-present possibility that an SRS Contractor might willingly agree to re-negotiate its

own contract, which would trigger Reclamation's "discretion" to accept or reject any newly offered

terms.

### 8.    Article 30(b) & Article 7(b)

Article 30(b) of the SRS contracts grants Reclamation the "right to make determinations

necessary to administer [the] Settlement Contract[s] that are consistent with the provisions of [the

contracts], the laws of the United States and of the State of California, and the rules and regulations

promulgated by the Secretary of the Interior." GCID Contract, art. 30(b), SAR 2730. Plaintiffs argue that

this provision requires Reclamation to administer the contracts in compliance with not only the contracts

themselves but with existing environmental and other legal requirements. Doc. 1048 at 7. But this

entirely begs the question of whether any such administrative determinations would involve the exercise

of discretion.[13] Article 30(b) does not, on its own, reveal the existence of any relevant discretion.

Plaintiffs also maintain that this interpretation of Article 30(b) is supported by the text of Article

---

[13] Plaintiffs make no attempt to explain how the various provisions of federal and state law they point to, including the ESA and California State Water Resources Control Board Decisions and orders, *see* Doc. 1048 at 8, provide Reclamation with any discretion to act on behalf of the relevant listed species in the context of the SRS Contracts. As the Supreme Court made abundantly clear in *Home Builders*, an agency's action to fulfill mandatory legal obligations is not discretionary for purposes of 50 C.F.R. § 402.03. *Home Builders*, 551 U.S. at 667 ("[W]hen an agency is required to do something by statute, it simply lacks the power to "insure" that such action will not jeopardize endangered species."). Plaintiffs further argue that "Reclamation's discretionary action to seek exemptions from state law requirements in recent years has caused severe harm to listed salmonids," but fail to explain how the existence and/or exercise of any such discretion would translate into the form of discretion required to trigger re-consultation under *EPIC*.

7(b), which provides that the SRS Contractors must "comply with requirements applicable to the

Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of [the

Contractor's respective SRS] Contract pursuant to Section 7 . . . that are within the Contractor's legal

authority to implement." GCID Contract, art. 7(b), SAR 2709. The Court declines to engage in a

discussion of what this provision might mean for the SRS Contractors, but it plainly does not imbue

Reclamation with any discretion not otherwise retained in the SRS Contracts.

### 9. __Article 9(a) & Beneficial Use__

Plaintiffs next point to Article 9(a) of the SRS contracts, which provides:

> During the term of this Settlement Contract and any renewals thereof [] it shall constitute full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between Base Supply and Project water which may be diverted by the Contractor from its Source of Supply for beneficial use on the land shown on Exhibit B from April 1 through October 31, which said diversion, use, and allocation shall not be disturbed so long as the Contractor shall fulfill all of its obligations hereunder.

GCID Contract, art. 9(a), SAR 2714-15 (emphasis added).

Plaintiffs point out, correctly, that beneficial use is an evolving and dynamic requirement of

federal and state law. *See Joslin v. Marin Mun. Water Dist.*, 67 Cal. 2d 132, 140 (1967) (While "what is

a reasonable use of water depends on the circumstances of each case, such an inquiry cannot be resolved

in vacuo isolated from statewide considerations of transcendent importance."). Section 8 of the

Reclamation Act of 1902 requires that all water provided pursuant to the Act be put to "beneficial use,"

as defined by state law. 43 U.S.C. §§ 372, 383; *California v. United States*, 438 U.S. 645, 665-67

(1978); *see also City of Barstow v. Mojave Water Agency*, 23 Cal. 4th 1224, 1242 (2000) (holding that

Article X, § 2 of the California Constitution "dictates the basic principles defining water rights: that no

one can have a protectible interest in the unreasonable use of water, and that holders of water rights must

use water reasonably and beneficially"); *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851,

854- 55 (9th Cir. 1983) (assessment of beneficial use requires consideration of "alternative uses of the

water" which is "variable according to conditions" and "therefore over time"). Plaintiffs cite as an example, the State Water Resources Control Board's recent exercise of its authority to curtail diversions under otherwise lawful water rights to provide minimum in-stream flows to protect salmon habitat. *See* Declaration of Kate Poole ("Poole Decl."), Ex. H (Res. No. 2014-0023), Doc. 1048-9 at 6.

Plaintiffs argue that "[g]iven the beneficial use requirement, Article 9(a) must be interpreted not as freezing the water quantities and allocations provided in the SRS contracts, but as allowing changes in those quantities and allocations in light of current conditions and competing uses for the water." Doc. 1048 at 10. Plaintiffs further argue that "[t]he SRS contracts' express incorporation of the beneficial use standard in Article 9(a), together with Article 30(b), provides a continuing basis for Reclamation to assess whether the contracts are being administered consistent with these federal and state law standards." *Id*.

There is no support for Plaintiffs' interpretation of Article 9(a). Even assuming that Reclamation has the authority to determine whether a particular use is beneficial, nothing in the plain language of Article 9(a) suggests Reclamation may adjust contract quantities based on a beneficial use determination made after contract execution. To the contrary, the plain language of Article 9(a) indicates the SRS Contracts "constitute full agreement . . . as to the quantities of water and the allocation thereof between Base Supply and Project water" and that the "allocation shall not be disturbed so long as the Contractor shall fulfill all of its obligations" under the SRS Contract. (Emphasis added.) This language cannot support Plaintiffs' theory that Reclamation retains discretion to modify SRS Contract quantities (or deliveries under an existing SRS Contract) upon determining that additional water is needed to protect in-stream beneficial uses.

### 10.   Article 1(f)

Article 1(f) defines the term "Critical Year" to mean, in pertinent part:

[A]ny Year in which either of the following eventualities exists:

(1) The forecasted full natural inflow to Shasta Lake for the current

36

1
2

> Water Year, as such forecast is made by the United States on or before
> February 15 and reviewed as frequently thereafter as conditions and
> information warrant, is equal to or less than 3.2 million acre-feet; or

3
4
5

> (2) The total accumulated actual deficiencies below 4 million acre-
> feet in the immediately prior Water Year or series of successive prior
> Water Years each of which had inflows of less than 4 million acre-feet,
> together with the forecasted deficiency for the current Water Year, exceed
> 800,000 acre-feet.

6   GCID Contract, art. 1(f), SAR 2700. "In a Critical Year, the Contractor's Base Supply and Project

7   Water . . . shall be reduced by 25 percent." GCID Contract, art. 5(a), SAR 2708.

8          According to Plaintiffs, "Reclamation is responsible for selecting the forecast and has discretion

9   to choose which forecast will be used." Doc. 1048 at 10 (citing GCID Contract, art. 1(f)). Plaintiffs

10  further maintain that this discretion can be exercised in a manner to benefit listed species and provides

11  the following example:

12
13
14

> Reclamation currently uses a conservative 90% exceedance forecast,
> which helps "protect the cold water pool in Shasta Reservoir so that
> suitable spawning habitat can be maintained in the Sacramento River
> during the summer and fall seasons for" winter-run and spring-run
> Chinook.

15  Doc. 1048 at 10 (citing Poole Decl. Ex. I (2/20/14 NMFS Letter to Reclamation), Doc. 1049-10 at 1).

16  However, the SRS Contractors correctly point out that the 2009 NMFS OCAP Salmonid BiOp requires

17  Reclamation to use the 90% exceedance forecast. Declaration of Meredith Nikkel ("Nikkel Decl."), Ex.

18  A at 597-600, Doc. 1031-5.[14] Accordingly, Reclamation does not have any discretion to choose another

19  forecasting method. The SRS Contractors further point out that Article 1(f)(1) requires Reclamation to

20  review its forecast "as frequently thereafter as conditions and information warrant." Given this language,

21  even if Reclamation had discretion to select a forecast that might be more likely to trigger a Critical

22  Year determination, any such forecast would have to be revised as real data became available and

23  _____

24  [14] The court may take judicial notice of the 2009 NMFS Salmonid OCAP BiOp "for the purpose of determining what
    statements are contained therein, not to prove the truth of the contents or any party's assertion of what the contents mean."
    *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004). Here, the Court simply relies upon this
25  document to demonstrate what it facially requires.

1   therefore Reclamation's purported discretion would not have any practical import to listed species.[15]

2   **11.     Article 10(a) in the GCID Contract[16]**

3   Finally, Plaintiffs point to Article 10(a) in the GCID Contract as a source of Reclamation's

4   "discretionary involvement or control" over contract implementation. This Article provides in pertinent

5   part:

> All water diverted by the Contractor from its Source of Supply will be
> diverted at the existing point or points of diversion shown on Exhibit A or
> at such other points as may be mutually agreed upon in writing by the
> Contracting Officer and the Contractor; _Provided that in any Year the_
> _United States reserves the right to require that the Contractor shall divert_
> _all of its Contract Total, or any portion thereof, from either the_
> _Sacramento River or Stony Creek or from each stream in the quantities_
> _specified by the Contracting Officer but only if the quantities so specified_
> _to be diverted from Stony Creek are available for such diversion._ This
> proviso shall not be construed to deny the Contractor its right to divert its
> Contract Total nor the right to divert from the Sacramento River sufficient
> water to meet its minimum requirements north of Stony Creek. Any time
> during the period April through October of any Year that the Contracting
> Officer requires the Contractor to take water from the Sacramento River
> that it would otherwise be entitled to divert from Stony Creek under its
> rights thereto adjudicated in the Angle Decree, the Contractor authorizes
> the United States to divert, store, or use such Stony Creek water. The
> Contractor also authorizes the diversion, storage, or use of Stony Creek
> water by the United States prior to April 1 of any Year to the extent of the
> Contractor's rights under the Angle Decree. In the event of such diversion,
> storage, or use prior to April 1, the United States will furnish the
> Contractor may divert a quantity of water from the Sacramento River
> equivalent to the quantity of such Stony Creek water so diverted, stored, or
> used by the United States. Notwithstanding the other provisions of this

---

[15] In at least one communication in the record between the SRS Contractors and Reclamation, the Settlement Contractors conceded that "there is some discretion to be exercised in forecasting" a Critical Year under the SRS contracts. _See_ Doc. 966-23 (2/21/14 Letter from SRS Contractors to Reclamation) at 1. But this communication does not detail the nature or source of the "some discretion" it references. Nor would these communications bar the SRS Contractors from now denying that sufficient discretion exists to trigger 50 C.F.R. § 402.16 and _EPIC_. Judicial estoppel does not apply to assertions in that letter because, among other things, the assertion was not presented to the Court. _Hamilton_, 270 F.3d at 783 (judicial estoppel applies only "where the court relied on, or accepted, the party's previous inconsistent position").

[16] Plaintiffs also cite Article 10(a) of the ACID Contract, which provides that "[a]ll water diverted by the Contractor from the Sacramento River will be diverted at existing point or points of diversion show on Exhibit A or at such other points as may be mutually agreed upon in writing by the Contracting Officer and the Contractor." SAR 0069. However, Plaintiffs fail to explain how this language retains for Reclamation any relevant discretion. As discussed above, retaining the power to make changes to a contractual arrangement by mutual agreement does not amount to discretion to do so unilaterally. Absent unilateral discretion, the Court fails to see how "discretion" to accept an offered change could amount to discretion that could inure to the benefit of salmonids in the manner intended by _EPIC_ and 50 C.F.R. § 402.16.

1

2

3

> subdivision, the Contractor reserves the right to divert water from Stony
> Creek to the extent of its entitlements under the Angle Decree, for periods
> not to exceed 5 consecutive days, whenever its Sacramento River pumps
> are temporarily unable to meet its diversion requirements because said
> pumps are partially or wholly inoperable due to an emergency or an
> unforeseeable cause.

4

GCID Contract, art. 10(a), SAR 2717 (italics added).

5

6

Plaintiffs argue that Reclamation could utilize the emphasized proviso, which permits

7

Reclamation to require GCID to divert "all of its Contract Total, or any portion thereof, from either the

8

Sacramento River or Stony Creek," to benefit listed salmon by, for example, requiring GCID to divert

9

some or all of its April and May base supply of 240,000 acre-feet from Stony Creek, reducing the need

10

to release those flows from Shasta Reservoir and preserving cold water for later in the season for

salmon's needs." Doc. 1048 at 11.

11

12

As a threshold matter, Plaintiffs' assertion of the volume of water potentially subject to diversion

13

from Stony Creek is off by an order of magnitude. Article 1(q) of the GCID Contract defines the

14

"Source of Supply" as "Sacramento River and Stony Creek, from which the Contractor has rights to

15

divert, has diverted, and may continue to divert." SAR 2702. GCID's right to divert from Stony Creek is

16

in turn limited by the "Angle Decree," a "judgment rendered January 13, 1930, by the United States

17

District Court, Northern District of California . . . entitled '*The United States of America, Plaintiff v.*

18

*H.C. Angle et al., Defendants.*'" GCID Contract, art. 1(a), SAR 2699; *see also* Art. 10(a) (explaining

19

that Contracting Officer may require that GCID divert water from the Sacramento River it otherwise

20

would be entitled to take from Stony Creek pursuant to the Angle Decree). The Angle Decree itself,

21

which is part of the administrative record in this case, in turn states that GCID's diversion from Stony

22

Creek is limited to 20,315 AF annually, at a rate of diversion not to exceed 500 cubic feet per second.

23

SC 03986 (available at Doc. 801-4 & 801-5)[17]. GCID's diversion is also limited to the <u>point and method</u>

24

25

_____

[17] It is appropriate to consider the content of the Angle Decree in the context of this motion to dismiss in accordance with the incorporation by reference doctrine. The terms of the Settlement Contracts themselves may be considered incorporated into the 4SC by reference. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a

1   of diversion on Stony Creek identified in the Angle Decree: where Stony Creek intersects the GCID

2   Main Canal by "closing of the lower or easterly embankment of [GCID's] main canal where it crosses

3   Stony Creek . . . thereby damming said flow and diverting same into its said main canal."[18] SC 3985.

4       Federal Defendants and the SRS Contractors point out that in 1997, a siphon was constructed as

5   part of the Bureau of Reclamation's Refuge Water Supply Project. The siphon was designed to

6   "preclude the need for the annual installation of a temporary dam in Stony Creek during the irrigation

7   season." *Final Environmental Assessment/Initial Study for the Conveyance of Refuge Water Supply

8   Project West Sacramento Valley Study Area*, at IV-2, Doc. 1060-1; *see also id*. at IV-20 (Stony Creek

9   siphon would "allow for stabilization and enhancement of riparian vegetation in the area now seasonally

10  impacted by the temporary dam, and may improve fish passage and rearing habitat, in addition to

11  allowing for year-round flows from Stony Creek to the Sacramento River."). Plaintiffs do not dispute the

12  existence and location of the siphon, but nonetheless maintain that Reclamation could order GCID to

13  once again make direct diversions from Stony Creek into the GCID canal via a berm. [19] For example,

14  Plaintiffs suggest Defendants could require GCID to remove or alter the siphon to allow direct

15  diversions. *See* Doc. 1061 at 2 ("[T]here is no evidence that Defendants are prohibited over the

16  contract's 40-year term from removing or altering the siphon to allow direct diversions. Indeed, the fact

17  ———————————————————————————

18  complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the
    document forms the basis of the plaintiff's claim."). In turn, language in the GCID Settlement Contract unambiguously
19  incorporates into itself the extent of GCID's entitlements under the Angle Decree. For example, in Article 10(a) "the
    Contractor reserves the right to divert water from Stony Creek to the extent of its entitlements under the Angle Decree" under
20  certain circumstances. The "extent of [GCID's] entitlements under the Angle Decree" are not specifically enumerated in the
    GCID Contract, but the Angle Decree is formally cited in the Contract. Therefore, the Court believes it is appropriate to
    consider GCID's entitlements under the Angle Decree incorporated into the 4SC by reference as well.

21  [18] Because the Angle Decree identifies a specific location and method of diversion, Plaintiffs' suggestion that Reclamation
    could require GCID to divert water indirectly via diversion points on Stony Creek controlled by other, nearby water districts,
22  *see* Doc. 1061 at 3-4, is without merit. Nothing in the GCID Settlement Contract gives (or could give) GCID the right to
    divert water from Stony Creek in any volume or in any manner other than defined in the Angle Decree.

23  [19] The Court takes judicial notice of the existence of the siphon, as the existence and location of the siphon are not subject to
    reasonable dispute. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1197 (E.D. Cal. 2008)
24  (taking judicial notice of the geographic proximity of two fish hatcheries to two dams because it was "a matter not subject to
    reasonable dispute"); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 969 F. Supp. 2d 1211 (E.D. Cal. 2013) (taking
25  judicial notice of the locations of reservoirs, dams, Indian reservations, and the confluence of rivers relative to those Indian
    reservations based on a map that was inadvertently not admitted into evidence).

that Defendants retained authority to [order GCID to] divert from Stony Creek in the contract which was

executed several years *after* the siphon was constructed, demonstrates Defendants preserved the option

of [requiring] divers[sion] from Stony Creek, whether or not physical limitations on diversions currently

exist.") (emphasis in original). The General Manager of GCID indicates that "GCID does not currently

have any diversion or temporary pumping facilities at the Stony Creek Siphon location to indirectly

divert water from Stony Creek into GCID's Main Canal and distribution system," but impliedly

acknowledges that diversion from Stony Creek into GCID's Main Canal might nevertheless be possible

by indicating that "[i]nstallation and use of any new diversion or temporary pumping facilities at the

Stony Creek Siphon location would likely require a streambed alteration agreement approval by the

California Department of Fish and Wildlife, a permit from the U.S. Army Corps of Engineers for any

installation or channel work, and potentially other regulatory approvals and environmental review."

Declaration of Thaddeus Bettner ("Bettner Decl."), Doc. 1063-1 at ¶ 4. On the present record, the Court

can identify no provision of the GCID Contract or any principle of contract interpretation that would

preclude Reclamation from requiring GCID to once again use its permitted method of diversion.

However, even assuming (1) that GCID could once again make arrangements to divert directly

from Stony Creek into the GCID Main Canal via the method of diversion permitted by the Angle

Decree, and (2) the diversion of 20,315 AF from Stony Creek (as opposed to from the Sacramento

River) would make some material difference to salmonids, the fact that Article 10(a) appears to afford

Reclamation discretion to require GCID to do so <u>still</u> does not trigger the re-consultation requirement

under *EPIC* because this is still not a form of discretion that would allow Reclamation to <u>amend the</u>

<u>GCID Contract to require additional protections for salmonids</u>.[20] In other words, the fact that

---

[20] The Court notes that under the 2009 NMFS Salmonid OCAP BiOp, in dry years Reclamation is already required to "conserve Shasta storage to the maximum extent possible, in order to increase the probability of maintaining cold water supplies necessary for egg incubation for the following summer's cohort of winter-run." 2009 NMFS Salmonid OCAP BiOp at 596. Re-consultation over GCID Contract implementation based on existing forms of discretion, absent discretion to modify the Contract in other ways, would therefore be redundant. There would simply be no way for the consultation process to produce any additional protections. This is yet another reason why the Court believes its interpretation of *EPIC*, discussed

1   Reclamation may have an opportunity to <u>act</u> on behalf of salmonids within the bounds of the existing

2   contractual arrangement does not trigger the re-consultation requirement under *EPIC* because the

3   contract's terms offer no means by which Reclamation can modify the contractual arrangement.

4        For all the reasons set forth above, Plaintiffs' Fifth Claim for Relief must be DISMISSED.

5   Plaintiffs have failed to plausibly allege that Reclamation retains "discretionary Federal involvement or

6   control" sufficient to trigger re-consultation under 50 C.F.R. § 402.16 and *EPIC*.

7        Despite the Court's invitation to do so, Plaintiffs failed to provide any authority to support

8   consideration under *EPIC*'s framework of allegations of conduct (as opposed to contract provisions)

9   evidencing discretion. As an example of conduct evidencing discretion, Plaintiffs discuss

10  correspondence between the SRS Contractors and Reclamation in the late winter and spring of 2014 and

11  2015. A February 21, 2014 letter from the SRS Contractors to Reclamation objects to Reclamation's

12  preliminary decision to allocate only 40% of the SRS Contract total that year. Declaration of Natalie

13  Wolder, Doc. 132-2, at 8. An April 2014 letter from Reclamation to the SRS Contractors indicated that

14  updated model supported provision of 75% of Contract supply "but only if the SRS contractors defer

15  diversions of Base Supply in April and May 2014 to later in the water year." *Id*. at 13. Similarly, in April

16  2015, Reclamation informed the SRS Contractors that their 75% allocation for 2015 was "contingent"

17  on their agreement to five measures designed to improve temperature control and other factors relevant

18  to salmonid survival, including an alteration of the SRS Contractors' diversion schedule. *Id*. at 26.

19  "Absent this rescheduling of your Base Supply, due to continued drought and hydrologic conditions this

20  Water Year, Reclamation cannot guarantee that conditions will allow for the diversion of 75% of

21  Contract Total. *Id*. at 27. Plaintiffs assert that "[e]ven though the SRS Contractors may have agreed to

22  these changes, [these letters] illustrate[] Reclamation's discretion both to negotiate changes and to

23  provide less than a 75% allocation if the SRS Contractors did not agree to Reclamation's conditions."

24

25  above in Part V.A.1, is logical under the circumstances.

1    Pltf. Opp. at 11. The Court does not agree. As discussed in the context of the analysis of Article 29(e)

2    and Article 3(e), without more, the fact that Reclamation may attempt to renegotiate contractual terms

3    does not constitute "discretion." Moreover, nothing in these letters suggests Reclamation would be

4    exercising "discretion" of any kind if it ultimately had to deliver less than 75% of Contract Total to SRS

5    Contractors due to hydrologic conditions. *See* GCID Contract at art. 3(h)(4), SAR 2707 (United States

6    "assumes no responsibility for . . . nor . . . shall have any liability for or on a account of . . . [a]ny

7    damage whether direct or indirect arising out of or in any manner caused by a shortage of water whether

8    such shortage be on account of errors in operation, drought, or unavoidable causes.").

9         In light of the findings articulated above and in the interest of expedience, the Court declines to

10   address the parties' other, alternative arguments regarding dismissal of the Fifth Claim for Relief. It is

11   time for the surviving claims in this case to move forward.

12   **B.    Sixth Claim for Relief**

13        Plaintiffs' Proposed Sixth Claim for Relief alleges Reclamation and the SRS Contractors

14   illegally caused the take of winter-run and spring-run Chinook during 2014 and 2015 because

15   Reclamation made excessive deliveries to the SRS Contractors, who in turn diverted the delivered water,

16   which in combination depleted the cold water reserves in Shasta Reservoir, causing temperature

17   increases fatal to the 2014 and 2015 "brood years" of winter-run and spring-run Chinook. 4SC ¶¶ 189-

18   193.

19        The SRS Contractors moved to dismiss this claim as against them on the ground that the claim

20   does not contain sufficient factual allegations regarding an act or omission by the SRS Contractors that

21   could plausibly state a claim for relief. In the October 20, 2016 Order, the Court rejected this argument,

22   reasoning: "it is reasonable to infer from [the] allegations [in the 4SC] that the SRS Contractors'

23   diversions were the actual physical mechanism by which water was removed from the watershed, that

24   Reclamation would not have released the same volume of water from upstream reservoirs were it not for

25   the SRS Contractors' planned downstream diversions, and therefore that the SRS Contractors'

1  diversions were a 'but for' cause of the resulting loss of temperature control that is described in detail in

2  the 4SC." October 20, 2016 Order at 39-40. The Court also rejected the SRS Contractors' alternative

3  argument that the Sixth Claim for Relief must be dismissed because Plaintiffs failed to allege any

4  ongoing or future harm, finding that Plaintiffs' claim "is not based wholly on past violations." *Id*. at 43.

5  The Sixth Claim for Relief therefore may proceed against the SRS Contractors.

6        The Court then analyzed Federal Defendants' motion to dismiss. Federal Defendants argued that

7  the Plaintiffs' Section 9 claim against them is barred because the alleged take was covered by the ITS

8  included in the 2009 NMFS Salmonid OCAP BiOp. Relatedly, Federal Defendants also argue that an

9  agency cannot, as a matter of law, be the proximate cause of any take that occurs as a result of that

10  agency implementing a legally mandated water delivery (*i.e.*, a non-discretionary action). The Court

11  began its analysis by providing background on Section 7 ITSs and Section 10 ITPs, which is helpful to

12  repeat here:

> Section 7 requires that every federal agency, before undertaking an "action authorized, funded, or carried out by" that agency, must ensure that the action is not likely to jeopardize the continued existence of a protected species or harm the critical habitat of a protected species. 16 U.S.C. § 1536(a)(2). When effects on protected species are likely, the agency must go through a formal consultation process with FWS and/or NMFS. *Id*. If the resulting BiOp concludes that the proposed action (or its reasonable and prudent alternative) will cause "the taking of a[] [listed] species incidental to the agency action," but that despite this taking, the action will not jeopardize the species or threaten critical habitat, FWS or NMFS shall provide the agency with a written statement that:
>
> > (i) specifies the impact of such incidental taking on the species,
> > (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact
> > (iii) ..., and
> > (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).
>
> 16 U.S.C. § 1536(b)(4). The resulting ITS provides the applicant agency with immunity from Section 9. Section 7 provides that "any taking that is in compliance with the terms and conditions specified in a written [ITS] ...

44

shall not be considered to be a prohibited taking of the species concerned."
16 U.S.C. § 1536(o)(2). "Where the agency's action involves
authorization or approval of private party conduct, then the private party is
also protected from Section 9 by compliance with the agency's [ITS]."
*Defs. of Wildlife v. U.S. Fish,* No. 16-CV-01993-LHK, 2016 WL 4382604,
at *2 (N.D. Cal. Aug. 17, 2016).

A related provision[, ESA Section 10,] governs incidental take by private
parties and authorizes FWS and NMFS to issue an ITP "under such terms
and conditions as [the service] may prescribe." 16 U.S.C. § 1539(a)(1). As
with an ITS, an ITP may excuse take that "is incidental to, and not the
purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. §
1539(a)(1)(B). An applicant for an ITP must submit a habitat conservation
plan demonstrating that the take "will not appreciably reduce the
likelihood of the survival and recovery [of the species] in the wild." ESA §
10(a)(2)(B)(iv).

October 20, 2016 Order at 44-45.

In evaluating Federal Defendants' argument that the salmonid mortality that occurred in 2014

and 2015 was covered by the ITS issued in connection with the 2009 NMFS Salmonid OCAP BiOp, the

October 20, 2016 Order acknowledged that the 2009 NMFS Salmonid OCAP BiOp explicitly indicated

that it considered "the overall impacts of the total volume of water diverted from the Central Valley." *Id.*

at 45 (citing 2009 NMFS Salmonid OCAP BiOp at 729). Thus, the 2009 NMFS Salmonid OCAP BiOp

evaluated the impacts of any possible water deliveries that might occur pursuant to the SRS Contracts.

*See* 2009 NMFS Salmonid OCAP BiOp at 35 ("The analysis of effects of the proposed actions . . .

assumes water deliveries under the contracts, as described and modeled in the BA.").

However, the October 20, 2016 Order also noted that the 2009 NMFS Salmonid OCAP BiOp

was "direct about its own limitations," by indicating:

This consultation addresses the long-term operations of the CVP and
SWP, and does not satisfy Reclamation's ESA section 7(a)(2) obligations
for issuance of individual water supply contracts. Reclamation should
consult with NMFS separately on their issuance of individual contracts.

October 20, 2016 Order at 45 (citing 2009 NMFS Salmonid OCAP BiOp at 35). Furthermore, the 2009

NMFS Salmonid OCAP BiOp also recognized that, at least at the time of its issuance, Reclamation

claimed certain contracted-for volumes were "nondiscretionary." *Id.* As a result, NMFS requested that

1   "Reclamation provide written notice to NMFS . . . of any contract that it believes is [sic] creates a

2   nondiscretionary obligation to deliver water, including the basis for this determination and the quantity

3   of nondiscretionary water delivery required by the contract." *Id*. In direct reference to such

4   nondiscretionary deliveries, the 2009 NMFS Salmonid OCAP BiOp indicated: "Any incidental take due

5   to delivery of water to such a contractor is <u>not be [sic] exempt from the ESA section 9 take prohibition</u>

6   <u>in this Opinion</u>." *Id*. (emphasis in October 26, 2016 Order). Similar language is contained in the section

7   of the 2009 NMFS Salmonid OCAP BiOp designated as the ITS:

8           In the event that Reclamation determines that delivery of quantities of
        water to any contractor is nondiscretionary for purposes of the ESA, any
9           incidental take due to delivery of water to that contractor would not be
        exempted from the ESA section 9 take prohibition in this Opinion.

10  2009 NMFS Salmonid OCAP BiOp 729.[21]

11          The Court found it "difficult to square this language with Federal Defendants' opening position

12  that the ITS covers take caused in connection with the delivery of water under the SRS Contracts."

13  October 20, 2016 Order at 46. The Court's reasoning continued:

14          As acknowledged by NMFS in the 2009 NMFS Salmonid OCAP BiOp,
15          Reclamation maintained at the time of the issuance of that BiOp that
        deliveries to the SRS Contractors were non-discretionary. *See, e.g.*, 2009
16          NMFS Salmonid OCAP BiOp at 684 (explaining that "[t]emperature
        related effects on spring-run in the mainstem Sacramento River will
17          persist into the future, and cannot be fully off-set through Shasta reservoir
        storage actions, due to physical and hydrological constraints on the CVP
18          system, and the <u>delivery of water to non-discretionary CVP contractors</u>
        (*e.g.*, Sacramento River Settlement Contractors)") (emphasis added).
19          Likewise, as discussed, the ITS itself explicitly excludes from its coverage
        non-discretionary activities. Federal Defendants even point out that an
20          ITS, which is issued pursuant to Section 7(b)(4), 16 U.S.C. § 1536(b)(4),
        is only available as part of the Section 7 consultation process, which in
21          turn <u>only applies to []discretionary agency action</u>. *See* 50 C.F.R. § 402.03;
        *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644,

22  _____

23  [21] Other text reiterates that the 2009 NMFS Salmonid OCAP BiOp covered the "overall impacts of the total volume of water
    diverted from the Central Valley," while also calling for Reclamation to consult separately on the "issuance of individual
24  contracts," including analysis of the effects of "activities of parties to agreements with the U.S. that recognize a previous
    vested water right." 2009 NMFS Salmonid OCAP BiOp at 729.

25

1   667 (2007) (Section 7 does not apply where an agency "simply lacks the
2   power to 'insure' that [its] action will not jeopardize endangered
    species.").

3   *Id.* (emphasis in original). "All this [led] the Court to conclude, at least for the purpose of [the pending

4   motion to dismiss], that the ITS issued in connection with the 2009 NMFS Salmonid OCAP BiOp could

5   not possibly cover deliveries to the SRS Contractors, which Reclamation (the agency that applied for the

6   ITS) maintained at the time the BiOp and ITS issued were non-discretionary." *Id.*

7          Federal Defendants appear to request reconsideration of this finding in their supplemental

8   briefing. Doc. 1052 at 4-6. To the extent any of the threshold findings the Court made in the October 20,

9   2016 Order constitute law of the case, under the law of the case doctrine, "a court is generally precluded

10  from reconsidering an issue that has already been determined by the same court, or a higher court, on the

11  identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (citation omitted). A court

12  may depart from the law of the case if: (1) the first decision was clearly erroneous; (2) an intervening

13  change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed

14  circumstances exist; or (5) a manifest injustice would otherwise result. *Id.* If none of the requisite factors

15  are present, failure to apply the law of the case is an abuse of discretion. *Id.*

16         For the sake of clarity, the Court concludes that it is appropriate to depart from its previous

17  reasoning in one respect. The Court made a threshold finding that "[b]ecause, as discussed, Section 7

18  only applies to []discretionary agency action, *see* 50 C.F.R. § 402.03; *see also Home Builders*, 551 U.S.

19  at 667, it is logical to—and the Court does[—]conclude [] that an ITS can never provide an incidental

20  take exemption for non-discretionary agency activities." October 26, 2016 Order at 49. In justifying this

21  finding, the Court assumed that because Section 7 consultation is not required for non-discretionary

22  activities, *see Home Builders*, 551 U.S. at 667 (upholding regulation that provides "Section 7 . . .

23  appl[ies] to all actions in which there is discretionary Federal involvement or control), an ITS issued in

24  the context of Section 7 consultation could <u>never</u> apply to non-discretionary activities. Upon further

25  review, the Court concludes this assumption runs counter to established precedent. Rather, a federal

1  agency may request Section 7 consultation regarding a project that involves both discretionary and non-

2  discretionary actions. In fact, the 2009 NMFS Salmonid OCAP BiOp does just that for the OCAP. *See*

3  2009 NMFS Salmonid OCAP BiOp at 729 (indicating that BiOp considered "the overall impacts of the

4  total volume of water diverted from the Central Valley."); *id.* at 35 ("The analysis of effects of the

5  proposed actions . . . assumes water deliveries under the contracts, as described and modeled in the

6  BA."); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 639 (9th Cir. 2014)

7  (proper not to segregate discretionary from nondiscretionary operations of the OCAP Proposed Action

8  in describing project baseline); and *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971,

9  1008 (9th Cir. 2014) (same).

10  However, this does not necessarily mean that every time an action agency requests Section 7

11  consultation on a project that includes both discretionary and non-discretionary actions, the ITS that

12  results provides take coverage for all aspects of the project. ESA Section 7(o) provides that "any taking

13  that is in compliance with the terms and conditions specified in a written [ITS] ... shall not be considered

14  to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2). Federal Defendants argue

15  that pursuant to this provision, "any taking"—whether from a discretionary or nondiscretionary aspect of

16  the OCAP action—that complied with the terms of the 2009 NMFS Salmonid OCAP BiOp ITS is

17  permitted. Doc. 1052 at 5. But this begs the question of whether the 2009 NMFS Salmonid OCAP BiOp

18  ITS covers the particular aspect of the OCAP action in question. *See Strahan v. Roughead*, 910 F. Supp.

19  2d 358, 374 (D. Mass. 2012) ("[W]hile an incidental take statement may . . . shield an agency from § 9

20  liability, it does so only if the ITS and its accompanying biological opinion address the agency's actions,

21  and the agency complies with the conditions and take limits established by the ITS.").

22  Here, the express language of the ITS strongly suggests Reclamation's deliveries to the SRS

23  Contractors are <u>excluded</u> from coverage. In addition to the limiting language discussed above, within the

24  section of the RPA prescribing actions in the Sacramento River Division required to avoid jeopardy,

25  NMFS describes Action I.2.3.C, which provides for "Drought Exception Procedures" to be triggered if

48

1    forecasting indicates temperature compliance in the Upper Sacramento River is not achievable. 2009

2    NMFS Salmonid OCAP BiOp at 600-601. The Action assumes "Reclamation does not have discretion

3    to curtail [deliveries to] the [SRS] contractors to meet Federal ESA requirements," and that "[t]herefore,

4    NMFS is limited in developing an RPA that minimizes take to acceptable levels in these circumstances."

5    *Id*. In light of this, the Action requires that notice be given to the State Water Resources Control Board

6    that "delivery of water to nondiscretionary [SRS] Contractors, and Delta outflow requirements per [State

7    Water Resources Control Board Decision 1641] may be in conflict in the coming season and requesting

8    the Board's assistance in determining appropriate contingency measures and exercising their authorities

9    to put these measures in place." *Id*. at 601. In addition, the rationale provided for the action states:

10               Separate from this consultation, NMFS will work with the SWRCB to
                 determine whether contingency plans within the Board's authority are
11               warranted, and to assist in developing such plans that will allow
                 Reclamation to meet ESA requirements. The incidental take statement for
12               this Opinion also provides limitations of ESA incidental take coverage for
                 Settlement Contractors under the terms of this Opinion.

13    *Id*. Read alongside the other language in the 2009 NMFS Salmonid OCAP BiOp, this Action

14    acknowledges the real possibility that making non-discretionary deliveries to the SRS Contractors could

15    cause loss of temperature control (and presumably threaten jeopardy) and that NMFS is powerless to

16    design an RPA that would effectively eliminate this possibility because the applicant agency

17    (Reclamation) does not have the power to curtail the potentially jeopardizing deliveries. Instead, the

18    Action requires Reclamation to seek the assistance of state regulators, leaving open the possibility that

19    state regulators will either be unwilling or unable to intervene in any material way. The emphasized

20    sentence in the above-quoted paragraph also clearly indicates that the ITS issued as part of the BiOp

21    would <u>not</u> provide take coverage <u>to the SRS Contractors</u> for any take caused by non-discretionary

22    deliveries.

23               What exactly this means for Reclamation's take coverage is less clear. Does the omission of any

24    mention of Reclamation in the emphasized sentence imply, as Federal Defendants suggest (*see* Doc.

25

1052 at 6), that Reclamation's non-discretionary deliveries are protected from Section 9 liability by the

ITS? The Court thinks not. In the face of a jeopardy BiOp, a proposed action may not go forward unless

the consulting agency can suggest an RPA that avoids jeopardy, destruction, or adverse modification, 16

U.S.C. § 1536(b)(3)(A), and concludes the taking of the listed species "incidental to the agency action

will not violate" Section 7(a)(2)'s jeopardy prohibition. *Id*. at § 1536(b)(4)(B). Only if those, and certain

other conditions, are satisfied, can an ITS issue. In the case of Action I.2.3.C, NMFS admits that "NMFS

is limited in developing an RPA that minimizes take to acceptable levels in these circumstances." NMFS

Salmonid OCAP BiOp at 601. This is tantamount to an admission that NMFS cannot avoid jeopardy in

all circumstances related to the non-discretionary deliveries. Put simply, NMFS cannot lawfully issue an

ITS to cover a potentially jeopardizing circumstance for which it has no mechanism to suggest

appropriate RPA. Accordingly, the Court declines to depart from its preliminary conclusion that the

2009 NMFS Salmonid OCAP BiOp ITS does not provide take protection to Reclamation for non-

discretionary deliveries under the SRS Contracts.

The Court must turn to Federal Defendants' alternative argument: that an agency cannot, as a

matter of law, be the proximate cause of any take that occurs as a result of that agency implementing a

legally mandated water delivery (*i.e*., a non-discretionary action). As mentioned in the October 20, 2016

Order, it is well-established that concepts of proximate cause apply to Section 9 claims. *See Cascadia

Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1084 (D. Or. 2012) (collecting cases supporting the

proposition that "[i]t is well accepted that proximate cause is an element of ESA Section 9 claims," and

explaining that "[i]n the context of the ESA, proximate cause issues entail determining whether the

alleged injury . . . is fairly traceable to the challenged action of [d]efendants.").

Federal Defendants rely on *U.S. Department of Transportation v. Public Citizen*, 541 U.S. 752

(2004), for the proposition that a sufficient causal connection cannot possibly exist if the agency "has no

ability to prevent a certain effect due to its limited statutory authority over the relevant actions." *Id*. at

770. In that case, the Supreme Court held that the defendant federal agency, the Federal Motor Carrier

1  Safety Administration ("FMCSA"), did not violate the National Environmental Policy Act ("NEPA"),

2  42 U.S.C. §§ 4321-4370f, when it failed to analyze the environmental impact of permitting cross-border

3  truck traffic. The Supreme Court noted that "NEPA requires a reasonably close causal relationship

4  between the environmental effect and the alleged cause," analogous to the "familiar doctrine of

5  proximate cause from tort law," and instructed that "courts must look to the underlying policies or

6  legislative intent in order to draw a manageable line between those causal changes that may make an

7  actor responsible for an effect and those that do not." 541 U.S. at 767 (internal citation and quotation

8  omitted). Because FMCSA was statutorily required to allow the trucks to enter the country, an

9  environmental analysis of any alternative action would not serve "the underlying policies behind NEPA"

10  to provide information to the public and to inform the decision-making process. *Id*. at 768. Put another

11  way, "[s]ince FMCSA has no ability categorically to prevent the cross-border operations of Mexican

12  motor carriers, the environmental impact of the cross-border operations would have no effect on

13  FMCSA's decisionmaking—FMCSA simply lacks the power to act on whatever information might be

14  contained in the EIS." *Id.*

15     Federal Defendants maintain that *Public Citizen* applies with equal force to ESA Section 9 and

16  that, as a result, an agency cannot be held liable under Section 9 for an action it is legally mandated to

17  perform. FD MTD at 20.

18     Plaintiffs cite the Supreme Court's decision in *Home Builders* to argue that *Public Citizen* is

19  inapplicable in the context of the ESA. Doc. 1048 at 14-15. *Home Builders* concerned the

20  Environmental Protection Agency's decision to transfer to the State of Arizona regulatory responsibility

21  under the National Pollutant Discharge Elimination System ("NPDES"), a program described in Section

22  402(b) of the Clean Water Act ("CWA"), 33 U.S.C. § 1342. *See Home Builders*, 551 U.S. at 649-51.

23  Under CWA Section 402(b), the EPA "shall approve" a State's request to assume the permitting

24  program "unless [the EPA] determines that adequate authority does not exist" to ensure that nine

25  specific criteria set forth in the statute are satisfied. If the criteria are met, the transfer must be approved.

*Id*. at 650-51. At the same time, ESA Section 7 requires federal agencies to consult with either FWS or NMFS to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize" endangered or threatened species or their habitats. *Id*. at 652 (quoting ESA Section 7). *Home Builders* recognized that "[a]lthough a later enacted statute (such as the ESA) can sometimes operate to amend or even repeal an earlier statutory provision (such as the CWA), repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest." *Id*. at 662. The Supreme Court reasoned that requiring the EPA to comply with ESA Section 7 when approving a transfer application "would effectively repeal § 402(b)'s statutory mandate by engrafting a tenth criterion onto the CWA." *Id*.

> Section 402(b) of the CWA commands that the EPA "shall" issue a permit whenever all nine exclusive statutory prerequisites are met. Thus, § 402(b) does not just set forth minimum requirements for the transfer of permitting authority; it affirmatively mandates that the transfer "shall" be approved if the specified criteria are met. The provision operates as a ceiling as well as a floor. By adding an additional criterion, the Ninth Circuit's construction of § 7(a)(2) raises that floor and alters § 402(b)'s statutory command.

*Id*. at 663-64 (emphasis in original).

*Home Builders* approved a joint NMFS/FWS regulation that provided: "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.

> Pursuant to this regulation, § 7(a)(2) would not be read as impliedly repealing nondiscretionary statutory mandates, even when they might result in some agency action. Rather, the ESA's requirements would come into play only when an action results from the exercise of agency discretion. This interpretation harmonizes the statutes by giving effect to the ESA's no-jeopardy mandate whenever an agency has discretion to do so, but not when the agency is forbidden from considering such extrastatutory factors.
>
>                      * * *
>
> We conclude that this interpretation is reasonable in light of the statute's text and the overall statutory scheme, and that it is therefore entitled to deference under *Chevron [U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984) ]. Section 7(a)(2) requires that an agency "insure" that the actions it authorizes, funds, or carries out are not likely to jeopardize listed species or their habitats. To "insure" something-

1 as the court below recognized-means "'[t]o make certain, to secure, to guarantee (some thing, event, etc.).'" 420 F.3d, at 963 (quoting 7 Oxford

2 English Dictionary 1059 (2d ed. 1989)). The regulation's focus on "discretionary" actions accords with the commonsense conclusion that,

3 when an agency is required to do something by statute, it simply lacks the power to "insure" that such action will not jeopardize endangered species.

4

*Id*. at 665-67 (emphasis in original).

5

  Of particular import to the present case, the *Home Builders* Court addressed *Public Citizen*, a

6

NEPA case, directly:

7

  We do not suggest that *Public Citizen* controls the outcome here; §

8 7(a)(2), unlike NEPA, imposes a substantive (and not just a procedural) statutory requirement, and these cases involve agency action more directly

9 related to environmental concerns than the FMCSA's truck safety regulations. But the basic principle announced in *Public Citizen*—that an

10 agency cannot be considered the legal "cause" of an action that it has no statutory discretion not to take—supports the reasonableness of the FWS'

11 interpretation of § 7(a)(2) as reaching only discretionary agency actions. *See also California v. United States*, 438 U.S. 645, 668, n. 21 (1978)

12 (holding that a statutory requirement that federal operating agencies conform to state water usage rules applied only to the extent that it was not

13 "inconsistent with other congressional directives").

14

*Id*. at 667-68. Contrary to Plaintiffs' suggestion, the Court does not read this as an absolute bar to

15

applying the logic of *Public Citizen* to the ESA.

16

  At least one district court has declined to apply *Public Citizen's* logic to a Section 9 case. In

17

*Seattle Audubon Soc'y v. Sutherland*, No. C06-1608MJP, 2007 WL 1577756, at *1 (W.D. Wash. May

18

30, 2007), the defendant agency argued that under *Public Citizen* agency officials could not be the

19

proximate cause of any alleged take because those officials did not have discretion to deny permits that

20

comply with the requirements of the Forest Practices Act. The district court rejected this argument,

21

reasoning that "[a]lthough [*Public Citizen*'s] holding makes sense in the context of a procedural,

22

information-forcing statute like NEPA, it is inapplicable under the ESA, which serves completely

23

different purposes." *Id*.

24

  *Seattle Audubon* is not binding and its limited reasoning regarding this issue fails to apply the

25

broader principle articulated in *Public Citizen* and relied upon in *Home Builders*' *Chevron* analysis—

1   that wherever principles of proximate causation are applicable, "courts must look to the underlying

2   policies or legislative intent in order to draw a manageable line between those causal changes that may

3   make an actor responsible for an effect and those that do not." *Public Citizen*, 541 U.S. at 767 (internal

4   citation and quotation omitted). Although *Public Citizen* does not give detailed instructions as to how to

5   perform this analysis, it provides some guidance. For example, *Public Citizen* observes that "proximate

6   cause analysis turns on policy considerations and considerations of the 'legal responsibility' of actors."

7   *Public Citizen*, 541 F.3d 767 (quoting *W. Keeton, D. Dobbs, R. Keeton, & D. Owen*, *Prosser and*

8   *Keeton on Law of Torts* 264, 274-275 (5th ed. 1984)). In general terms, as Justice O'Connor noted in her

9   concurrence in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687

10  (1995), "[p]roximate causation is not a concept susceptible of precise definition." *Id.* at 713 (O'Connor,

11  J., concurring). Black's Law Dictionary defines "proximate cause" as (1) a cause that is legally sufficient

12  to result in liability; an act or omission that is considered in law to result in a consequence, so that

13  liability can be imposed on the actor; and (2) a cause that directly produces an event and without which

14  the event would not have occurred. *Proximate Cause*, *Black's Law Dictionary* 250 (9th ed. 2009).

15      NEPA, the statute considered in *Public Citizen*, is an information-forcing statute with the dual

16  purpose of ensuring both that a federal agency "will have available, and will carefully consider, detailed

17  information concerning significant environmental impacts" of any proposed action, and "that the

18  relevant information will be made available to the larger audience that may also play a role in both the

19  decisionmaking process and the implementation of that decision." 541 U.S. at 768. *Public Citizen* found

20  that this purpose would not be served by requiring an agency to "prepare a full [Environmental Impact

21  Statement] due to the environmental impact of an action it could not refuse to perform." *Id.* at 769.

22      The ESA's purpose is decidedly different. It was designed to be "the most comprehensive

23  legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S.

24  153, 180 (1978). "Whereas predecessor statutes enacted in 1966 and 1969 had not contained any

25  sweeping prohibition against the taking of endangered species except on federal lands, the 1973 Act

applied to all land in the United States and to the Nation's territorial seas." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698 (1995). As stated in ESA Section 2, among the ESA's central purposes is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id.* (quoting 16 U.S.C. § 1531(b)). But this does not mean that there should be no "line between those causal changes that may make an actor responsible for an effect and those that do not" in the context of Section 9. In *Home Builders*, the Supreme Court ultimately approved of an agency regulation that drew such a line in the context of Section 7, precluding Section 7 from applying to non-discretionary agency action. *Home Builders*, 551 U.S. at 667-68.

Plaintiffs correctly point out that the Supreme Court has held that "[a]ll persons, including federal agencies, are specifically instructed not to 'take' endangered species." *TVA*, 437 U.S. at 184 (emphasis added). But this does not resolve the key question: whether a federal agency acting to implement a non-discretionary duty imposed by a valid contract should be subject to Section 9 liability. Here, to be blunt, analogizing to *Public Citizen*, the Court does not believe it is appropriate to impose Section 9 liability on a government agency for take caused by an action over which it has no control. In this case, to do the opposite would require Reclamation to either breach still-valid[22] SRS Contracts necessary to operation of the CVP in compliance with state law, or obtain a Section 10 ITP[23] before implementing any non-discretionary aspect of the SRS Contracts. Accordingly, the Court finds that a federal agency that is legally required to take an action pursuant to federal law, such as by implementing

_____

[22] As mentioned in the October 20, 2016 Order, the Court mentioned the "bizarre procedural situation" created by the fact that "[u]nless and until Plaintiffs prevail on their Fourth Claim for Relief," which alleges that the Settlement Contracts were not validly executed because they were executed without proper Section 7 compliance, "the Court must consider the SRS Contracts final." *See* October 20, 2016 Order at 34 n. 6 (discussing the Fifth Claim for Relief). If Plaintiffs prevail on the Fourth Claim for Relief, a subsequent analysis of the Sixth Claim for Relief might warrant a different analysis, provided the Sixth Claim for Relief is not mooted by such a result.

[23] As the Court previously discussed in the October 20, 2016 Order, it is far from clear that Section 10 ITPs are even available to federal agency applicants. October 20, 2016 Order at 49-50. But, for the purposes of the present discussion, the Court will assume that they are.

1    non-discretionary terms in an otherwise valid water delivery contract, that agency cannot be the

2    proximate cause of Section 9 take by undertaking that non-discretionary action. While the concept of

3    proximate cause limits a federal agency's Section 9 liability for actions over which it has no control,

4    such a limit naturally would not apply where the federal agency does retain some degree of control.

5    Accordingly, Section 9 take liability may attach to take otherwise proximately caused by actions over

6    which a federal agency <u>does</u> have control.[24]

7         As discussed above, the text of Article 10(a) of the GCID Contract indicates, at least facially,

8    that Reclamation retains discretion to require GCID to directly divert up to 20,315 AF of water from

9    Stony Creek, rather than from the Sacramento River. The Court has concerns that factual impossibility

10   may in reality eviscerate any discretion Reclamation may facially retain in Article 10(a) of the GCID

11   Contract. *See, e.g., Gaines v. Sargent Fletcher, Inc. Grp. Life Ins. Plan*, 329 F. Supp. 2d 1198, 1221

12   (C.D. Cal. 2004) ("under basic principles of contract law, impossibility generally excuses breach and

13   renders the impossible contract term unenforceable"). The Court also questions whether Plaintiffs will

14   be able to demonstrate that Reclamation's failure to require GCID to divert up to 20,315 AF of water

15   from Stony Creek, rather than from the Sacramento River, could have proximately caused any of the

16   harms alleged in the Sixth Claim for Relief. These are factual issues best resolved in light of a complete

17   record. Accordingly, because the Sixth Claim for Relief survives as against the SRS Contractors, the

18   Claim will also be allowed to proceed against Federal Defendants on this narrow ground.

19        In addition, Plaintiffs argue that other aspects of "Reclamation's discretionary conduct caused

20   and will cause illegal takes." Doc. 1048 at 15. As one example, Plaintiffs point to Reclamation's ability

21   to agree (or not agree) to transfers of SRS Contract water. In the context of the *EPIC* analysis applicable

22   to the Fifth Claim for Relief, the Court found above that this approval authority did not constitute

23

24   [24] The Court is cognizant of the fact that during Section 7 consultation, an agency is not required to distinguish discretionary from non-discretionary activities and may evaluate the impacts of both simultaneously. *See San Luis v. Jewell*, 747 F.3d at ,
639. But given that Section 9 liability turns in part on whether the defendant proximately caused "take," the Court believes it

25   is necessary to parse discretionary from non-discretionary activities in the Section 9 context.

discretion to modify the contracts. However, there is no authority that suggests the type of discretion that is necessary to trigger Section 9 liability is so limited. Accordingly, the Sixth Claim for Relief may also proceed as against Federal Defendants on this second, narrow ground: that approval of transfers proximately caused the take alleged in the Sixth Claim for Relief.[25]

## VI. CONCLUSION AND ORDER

For the reasons set forth above:

(1) Federal Defendants' motion to dismiss the Fifth Claim for Relief is GRANTED;

(2) Federal Defendants' motion to dismiss the Sixth Claim for Relief is GRANTED IN PART AND DENIED IN PART. The Claim may proceed against Federal Defendants on the two limited theories outlined above based upon Reclamation's purported discretion to require GCID to divert up to 20,315 AF from Stony Creek and to approve transfers of SRS Contractor water.

IT IS SO ORDERED.

Dated:   __February 23, 2017__          _____/s/ Lawrence J. O'Neill_____
                                        UNITED STATES CHIEF DISTRICT JUDGE

---

[25] Plaintiffs also point generically to other paragraphs of the 4SC in which they claim they allege Reclamation engaged in discretionary conduct that caused or will cause illegal takes. Doc. 1048 at 15 (citing 4SC at ¶¶ 73-77, 151, 153, 162, 192-93). The only potentially discretionary act the Court is able to isolate from Paragraphs 73-77 concerns temperature modeling. As discussed *supra* at Part V.A.10, "even if Reclamation had discretion to select a forecast that might be more likely to trigger a Critical Year determination, any such forecast would have to be revised as real data became available and therefore Reclamation's purported discretion would not have any practical import to listed species." Paragraph 152 discusses the fact that "the Bureau makes real-time determinations regarding the timing and volume of releases that allow the Contractors to make diversions of water," but fails to even remotely suggest how these determinations could have proximately caused take under the circumstances. Paragraphs 151, 162 and 192-193 do not articulate any particular form of relevant discretion, at least not in any way that allows the Court to distinguish between acts that may have been taken to fulfill non-discretionary obligations and those that may have involved the exercise of some discretion.

Finally Plaintiffs argue "Reclamation's discretionary action to seek exemptions from state law requirements in recent years has caused severe harm to listed salmonids." Doc. 1048 at 8 (citing 4SC ¶¶57, 58, 73-77). But, in light of the fact that the 2009 NMFS Salmonid OCAP BiOp <u>requires</u> Reclamation to apply for exemptions when necessary, the Court does not view Reclamation's conduct in seeking exemptions under these circumstances as discretionary. 2009 NMFS Salmonid OCAP BiOp at 600-601.