KATHERINE POOLE (SBN 195010)
DOUGLAS ANDREW OBEGI (SBN 246127)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 875-6100
Facsimile: (415) 875-6161
kpoole@nrdc.org; dobegi@nrdc.org

Attorneys for Plaintiff NRDC

HAMILTON CANDEE (SBN 111376)
BARBARA JANE CHISHOLM (SBN 224656)
TONY LOPRESTI (SBN 289269)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
hcandee@altber.com; bchisholm@altber.com; tlopresti@altber.com

Attorneys for Plaintiff NRDC

TRENT W. ORR (SBN 77656)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
Telephone: (415) 217-2000
Facsimile: (415) 217-2040
torr@earthjustice.org

Attorneys for Plaintiffs NRDC, San Francisco Baykeeper, Friends of the River, The Bay Institute, Winnemem Wintu Tribe, and Pacific Coast Federation of Fishermen's Associations/Institute for Fisheries Resources

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, SAN FRANCISCO BAYKEEPER, FRIENDS OF THE RIVER, THE BAY INSTITUTE OF SAN FRANCISCO, WINNEMEM WINTU TRIBE, and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS/INSTITUTE FOR FISHERIES RESOURCES, | Case No. 1:05-cv-01207 LJO-EPG |
| Plaintiffs, | **FIFTH SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| SALLY JEWELL, in her official capacity as Secretary of the Interior, DAN ASHE, in | |

1  his official capacity as the Director of the
U.S. Fish and Wildlife Service, and
2  ESTEVAN LÓPEZ, in his official capacity
as Commissioner of the Bureau of
3  Reclamation,

4  Defendants.

5

6  SAN LUIS & DELTA MENDOTA
WATER AUTHORITY, STATE WATER
7  CONTRACTORS, WESTLANDS
WATER DISTRICT, CALIFORNIA
8  DEPARTMENT OF WATER
RESOURCES, CALIFORNIA FARM
9  BUREAU FEDERATION, GLENN-
COLUSA IRRIGATION DISTRICT,
10  NATOMAS CENTRAL MUTUAL
WATER COMPANY, PELGER
11  MUTUAL WATER COMPANY,
PLEASANT GROVE-VERONA
12  MUTUAL WATER COMPANY,
PRINCETON-CODORA-GLENN
13  IRRIGATION DISTRICT, PROVIDENT
IRRIGATION DISTRICT,
14  RECLAMATION DISTRICT 108, and
RIVER GARDEN FARMS,

15  Defendants-Intervenors.

16

17  ANDERSON-COTTONWOOD
IRRIGATION DISTRICT, BEVERLY F.
18  ANDREOTTI *et al.*, BANTA-CARBONA
IRRIGATION DISTRICT, CHRISTO D.
19  BARDIS *et al.*, BYRON BETHANY
IRRIGATION DISTRICT, CARTER
20  MUTUAL WATER COMPANY,
COEHLHO FAMILY TRUST,
21  CONAWAY PRESERVATION GROUP,
DEL PUERTO WATER DISTRICT,
22  EAGLE FIELD WATER DISTRICT,
FRESNO SLOUGH WATER DISTRICT,
23  HOWALD FARMS, INC., JAMES
IRRIGATION DISTRICT, LOMO COLD
24  STORAGE, MAXWELL IRRIGATION
DISTRICT, MERCY SPRINGS WATER
25  DISTRICT, MERIDIAN FARMS WATER
COMPANY, OJI BROTHERS FARM,
26  INC., OJI FAMILY PARTERNSHIP, ORO
LOMA WATER DISTRICT, PACIFIC
27  REALTY ASSOCIATES, L.P.,
PATTERSON IRRIGATION DISTRICT,
28  ABDUL AND TAHMINA RAUF,
RECLAMATION DISTRICT NO. 1004,

CITY OF REDDING, HENRY D.
RICHTER *et al.*, DAVID AND ALICE TE
VELDE FAMILY TRUST, SUTTER
MUTUAL WATER COMPANY,
KNIGHTS LANDING INVESTORS, LLC,
TISDALE IRRIGATION DISTRICT AND
DRAINAGE COMPANY,
TRANQUILITY IRRIGATION
DISTRICT, WEST SIDE IRRIGATION
DISTRICT, WEST STANISLAUS
IRRIGATION DISTRICT, and
WINDSWEPT LAND AND LIVESTOCK
COMPANY,

                    Joined Parties.

**PREFACE TO FIFTH SUPPLEMENTAL COMPLAINT**

1.      Plaintiffs hereby supplement their complaint to add the jurisdictional allegation, set forth in paragraph 32, that plaintiffs mailed a 60-day notice letter regarding their Second Claim for Relief to the Secretary of Interior and to the Commissioner and the Mid-Pacific Regional Director of the United States Bureau of Reclamation on November 14, 2016.  With the exception of that change, this Fifth Supplemental Complaint incorporates and restates the Fourth Supplemental Complaint in full.

**PREFACE TO FOURTH SUPPLEMENTAL COMPLAINT**

2.      Plaintiffs hereby supplement their complaint to add claims against the federal Bureau of Reclamation ("Bureau"), and the Sacramento River Settlement contractors that are parties to this case for violations of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and against the U.S. Fish and Wildlife Service for violating the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706.  These violations have occurred, and are occurring, subsequent to the filing of Plaintiffs' Third Supplemental Complaint.  This Fourth Supplemental Complaint incorporates the allegations and causes of actions set forth in the Third Supplemental Complaint and identifies additional bases for Plaintiffs' newly alleged claims in separately identified sections.

**INTRODUCTION**

3.    This case centers on the long-term future operations of the massive Central Valley Project ("CVP") and State Water Project ("SWP"), which are operated by the federal Bureau of

Reclamation ("Bureau") and the California Department of Water Resources ("DWR"), respectively, as set forth in a June 30, 2004 document known as the "Long-Term Central Valley Project Operations Criteria and Plan" ("OCAP").

4.     The CVP and SWP are among the largest water storage and diversion projects in the world.  Together, the CVP and SWP annually manage more than 11 million acre-feet of water.  That is roughly enough water to supply all of the water requirements for fifteen cities the size of Los Angeles.  As part of their operations, the two projects run massive pumping facilities in the Delta, an estuary at the confluence of the Sacramento and San Joaquin Rivers in northern California, which presently export an average of 1.6 to 2.0 *trillion* gallons of water annually out of the Delta for delivery to irrigation agencies and other water users further south.  The existing operations of these pumps have altered natural flow patterns in the Delta and San Francisco Bay and even cause the San Joaquin River — one of the San Francisco Bay-Delta estuary's two major tributaries — to flow backwards.  Now, as set forth in the OCAP, the Bureau and DWR will significantly expand these existing operations of the CVP and SWP.

5.     The delta smelt is a two- to three-inch-long fish endemic to the Delta.  Unlike many fishes, the delta smelt typically lives just one year, making it particularly vulnerable to short-term environmental fluctuations and threats.  Extinction of the delta smelt could result from just a single year of spawning failure or from just a few consecutive years of high fish kills or poor spawning or rearing conditions.  The existing operations of the CVP and SWP have been major factors in the delta smelt's decline and its listing under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*

6.     The U.S. Fish and Wildlife Service ("FWS" or "the Service") nevertheless bowed to intense political pressure and, in July 2004, rendered its original biological opinion that the intensification of CVP and SWP operations as set forth in the OCAP will not jeopardize the continued existence of the delta smelt or adversely modify its critical habitat.  Plaintiffs initially filed a complaint on February 15, 2005, alleging that the original biological opinion was arbitrary, capricious, an abuse of discretion, and not in accordance with the law because its conclusion had no basis in the record and the Service failed to consider the cumulative effects of the action, failed to

rely on the best available science, and improperly relied on uncertain mitigation measures.

7.    At the Bureau's request, the Service reinitiated consultation on this matter in order to reexamine "potential critical habitat issues" and issued a new biological opinion ("Biological Opinion") on February 16, 2005.  Despite, or perhaps because of, plaintiffs' allegations of impropriety, this "no jeopardy" opinion contained only minor alterations and is substantially identical to the original.

8.    Despite revisiting the impacts of the sweeping changes proposed to this project and issuing two separate, though almost identical, biological opinions, the Service's analysis violated the most basic standards of rational decision-making.  The biological opinions concluded that implementation of the OCAP would neither jeopardize the survival of the delta smelt nor cause adverse modification of the delta smelt's critical habitat, even though the proposed operations would dramatically alter the Delta's hydrology and aggravate some of the very threats that led to the delta smelt's ESA listing in the first place. Plaintiffs renew their challenge to this politically expedient series of decisions because the second biological opinion, like the original biological opinion, violates the ESA's core purposes of preventing extinctions and recovering threatened species and, in addition, fails to add anything of substance to the Service's deficient analysis of whether the OCAP will impact delta smelt critical habitat in a manner that affects recovery of the species.

9.    In rendering these biological opinions, the Service simply ignored factors that Congress required the Service to consider and reached a conclusion based on political expedience rather than sound science.  In particular, the Service's decision ignored the recent decline of smelt abundance and the correspondence between periods of decline and increases in export.

10.    Notwithstanding the patent inadequacy of the Service's biological opinions, the Bureau has taken and is taking agency action in reliance on those opinions' faulty analysis regarding the likely impacts of the OCAP on the delta smelt and its critical habitat.

11.    By this action, plaintiffs Natural Resources Defense Council, Inc..; California Trout;[1] Baykeeper; Friends of the River; and The Bay Institute (hereinafter collectively "plaintiffs")

---

[1] California Trout was dismissed by stipulated dismissal from this case on January 29, 2016.  Doc. (cont'd next page)

supplement their challenge to the Service's July 30, 2004 original biological opinion in order to challenge the superseding February 16, 2005 Biological Opinion and the Bureau's reliance thereon to implement the 2004 OCAP and related actions.

12.     Plaintiffs allege, among other things, that the Biological Opinion is legally invalid because it failed to analyze the factors Congress required be considered (including, despite the intervening reinitiation of consultation on just this issue, whether the proposed CVP and SWP operations would cause adverse modification of delta smelt habitat in a manner that affects the recovery of the species) and reached its "no jeopardy" conclusion by relying on an undefined promise of "adaptive management" that provides no assurance of protection whatsoever.

13.     Plaintiffs further supplement their challenge to the Bureau's ongoing violations of the ESA and allege that, notwithstanding the patent inadequacy of the Service's biological opinions, the Bureau has acted in reliance on those opinions, for example by implementing the 2004 OCAP and by executing long-term water supply renewal contracts based on the opinions' faulty analysis regarding the likely impacts of the OCAP on the delta smelt and its critical habitat.  In doing so, the Bureau has failed and is failing to fulfill its affirmative duty to insure that its actions are not likely to jeopardize the species' continued existence or adversely modify its critical habitat.

**ADDITIONAL INTRODUCTION TO FOURTH SUPPLEMENTAL COMPLAINT**

14.     After the February 16, 2005 Biological Opinion was invalidated by a federal court, FWS issued a new Biological Opinion in 2008 ("2008 FWS OCAP BiOp").  Unlike the 2005 Biological Opinion, the 2008 FWS OCAP BiOp found that the OCAP jeopardizes the continued existence of the delta smelt and is likely to adversely modify the delta smelt's critical habitat.

15.     Plaintiffs' Third Supplemental Complaint challenged, and Plaintiffs continue to challenge, the long-term water contracts that the Bureau executed in 2005 in reliance on the now-superseded 2005 Biological Opinion and informal consultations with FWS.  The Bureau executed approximately 145 contracts with the Sacramento River Settlement contractors, including the 28

996-97.

parties that intervened or have been joined as defendants to this action ("SRS Contractors"),[2] and

approximately 20 contracts with the Delta-Mendota Canal Unit contractors, including the 13 parties

that have intervened or have been joined as defendants to this action ("DMC Contractors").[3]

16.     On July 30, 2015, following the April 16, 2014 en banc decision by the Ninth Circuit

requiring consultation and remanding to this Court, and the subsequent June 15, 2015 order of this

Court staying this litigation, the Bureau requested reinitiation of consultation with FWS on the

effects of the Sacramento River Settlement contract renewals ("SRS contracts") and the Delta-

Mendota Canal Unit contract renewals ("DMC contracts") (collectively, "the contracts") to the delta

smelt and its critical habitat.  The Bureau, however, instructed that the scope of reinitiation should be

limited in at least two ways:  first, requesting only that FWS concur with the Bureau's assessment

that the effects of the contracts were analyzed in the 2008 FWS OCAP BiOp; and, second, by

asserting that it lacked authority to change the terms in the SRS contracts for the benefit of the delta

smelt.  The Bureau sent several subsequent memoranda to FWS clarifying that it was not reinitiating

consultation on the current status of the delta smelt.

17.     On December 14, 2015, FWS sent a letter concurring with the Bureau that the 2008

FWS OCAP BiOp analyzed the effects of the contracts on the delta smelt and its critical habitat

("Letter of Concurrence" or "2015 LOC").  As the Bureau requested, FWS limited its consultation to

the scope of the 2008 FWS OCAP BiOp and the analysis provided therein.  The Ninth Circuit ruled

---

[2] The SRS Contractors that intervened or have been joined as defendants include: Carter Mutual, Meridian Farms, Natomas Central Mutual, Pelger Mutual, Pleasant Grove-Verona Mutual, and Sutter Mutual Water Companies; Anderson-Cottonwood, Glenn-Colusa, Maxwell, Princeton-Codora-Glenn, and Provident Irrigation Districts; Tisdale Irrigation and Drainage Company; Reclamation Districts 108 and 1004; Beverly Andreotti *et al*; Christo Bardis *et al*; Conaway Preservation Group; Howald Farms, Inc.; Oji Brothers Farm; Oji Family Partnership; Pacific Realty Associates, L.P.; Abdul and Tahmina Rauf; Henry Richter *et al*; River Garden Farms; David and Alice te Velde Family Trust (formerly Sacramento River Ranch LLC); Windswept Land and Livestock Company; the City of Redding; and Knights Landing Investors, LLC (formerly Fred Tehhunfeld *et al*).

[3] The DMC Contractors that intervened or have been joined as defendants include: Tranquility, West Stanislaus, Banta Carbona, Patterson, James, and West Side Irrigation Districts; the Eagle Field, Del Puerto, Fresno Slough, Mercy Springs, Oro Loma and Byron-Bethany Water Districts; and the Coehlo Family Trust.

in its unanimous 2014 en banc opinion, however, that the 2008 FWS OCAP BiOp *did not* consider all the effects of the specific terms in the contract renewals. *NRDC v. Jewell*, 749 F.3d 776 (9th Cir. 2014) (en banc). For example, the 2008 FWS OCAP BiOp only analyzed impacts to the delta smelt through 2030, and did not analyze the impacts of operating the CVP and SWP during the entire term of the SRS contract renewals, which run through 2045. Nor did the 2008 FWS OCAP BiOp consider terms in the SRS and DMC contract renewals such as pricing, timing, and water conservation. Thus, like the 2008 FWS OCAP BiOp, the 2015 LOC failed to adequately address the effects of the contract renewals. Further, by relying exclusively on the 2008 FWS OCAP BiOp, FWS failed to utilize the best available scientific data and to update its analysis to reflect critical information that post-dates the 2008 FWS OCAP BiOp, including the continuing decline of delta smelt abundance, the failure of the Bureau to adhere to several of its baseline operating assumptions incorporated in the 2008 FWS OCAP BiOp, and post-2008 analysis of the effects on the delta smelt of failing to adhere to those baseline operating assumptions. Additionally, FWS's 2015 LOC impermissibly postpones a full analysis of the effects of the SRS contract renewals on the delta smelt to an unspecified future date. Finally, in light of the Bureau's assertion to FWS that the Bureau has no discretion to alter the quantities of water it provides to the SRS Contractors, FWS unreasonably relied on the assumption that the SRS contract renewals permit FWS to reduce the quantities of water allocated to the SRS Contractors to meet the conservation and recovery needs of the delta smelt.

18.     Plaintiffs Natural Resources Defense Council, The Bay Institute, San Francisco Baykeeper, and Friends of the River hereby supplement their challenge to Defendants' ongoing violations of the ESA and allege that FWS acted arbitrarily and capriciously in issuing its 2015 LOC because FWS relied explicitly and exclusively on the 2008 FWS OCAP BiOp, which did not adequately analyze the effects of the contract renewals on the delta smelt and its critical habitat.

19.  Plaintiffs also supplement their complaint to add claims against the Bureau for failing to reinitiate consultation on the impacts of the SRS contract renewals to endangered Sacramento River winter-run Chinook salmon ("winter-run Chinook") and threatened Central Valley spring-run Chinook salmon ("spring-run Chinook") and their critical habitat and against the Bureau and SRS

Contractors that are parties to this case for the unlawful take of winter-run and spring-run Chinook. In 2004, the Bureau initiated consultation with the National Marine Fisheries Service ("NMFS") regarding the effects of the OCAP to listed anadromous fish species, including the endangered winter-run and spring-run Chinook and their critical habitat. On October 22, 2004, NMFS issued a biological opinion ("NMFS 2004 BiOp") determining that the OCAP would not cause jeopardy to these species.

20. The Bureau also initiated consultation with NMFS in 2004 regarding the effects that the terms of the SRS contract renewals would have on listed anadromous species, including the winter-run and spring-run Chinook salmon. On January 10, 2005, NMFS concurred with the Bureau's finding that the decision to renew and implement the SRS contracts would not cause jeopardy to these species. NMFS based its determination exclusively on the NMFS 2004 BiOp.

21. After the NMFS 2004 BiOp was invalidated by a federal court, NMFS issued a new Biological Opinion on June 4, 2009 ("NMFS OCAP BiOp") that, unlike the prior BiOp, determined that the OCAP *would* cause jeopardy to the winter-run and spring-run Chinook salmon and other anadromous species. The NMFS OCAP BiOp expressly stated that it did not analyze the impacts of the Bureau's decision to renew and implement water contracts and that it does not provide incidental take authority for water deliveries under contracts that are not discretionary. On April 7, 2011, NMFS amended the NMFS OCAP BiOp to reflect the report of an independent review panel. NMFS also amended the NMFS OCAP BiOp in 2014 and 2015 when the Bureau petitioned the California State Water Resources Control Board ("SWRCB") to modify the Bureau's obligations to implement water quality standards in the San Francisco Bay/Sacramento-San Joaquin Delta Estuary Water Quality Control Plan ("Bay-Delta Plan") and to modify provisions of the Bureau's obligations under the NMFS OCAP BiOp. None of these amendments analyzed the impacts of the Bureau's decision to renew and implement water contracts. The Bureau did not reinitiate consultation with NMFS on the SRS contracts after the NMFS 2004 BiOp was invalidated, nor after the NMFS OCAP BiOp was issued, nor after the NMFS OCAP BiOp was subsequently amended.

22. In 2014, the Bureau delivered to the SRS Contractors, and the SRS Contractors diverted, excessive amounts of water from Shasta Reservoir to satisfy the terms of the SRS contracts. These

releases and diversions caused the Bureau to lose control of water temperatures in the upper Sacramento River during the "temperature management season" for threatened and endangered Chinook salmon, which generally lasts from June through October.  As a result, almost the entire generation of endangered winter-run Chinook that had hatched, or would have hatched, in the upper Sacramento River in 2014 ("2014 brood year") was killed.  The last remaining wild population of endangered winter-run Chinook survives solely in the Sacramento River below Shasta Dam.  There were similar devastating impacts to the 2014 spring-run Chinook brood year in the Sacramento River.

23.  In spite of the Bureau's repeated assurances to the SWRCB and NMFS that another loss of temperature control would not occur in 2015, the agency again made excessive releases to satisfy the terms of the SRS contracts and again failed to provide adequate cold water below Shasta Dam to sustain Chinook spawning and rearing throughout the 2015 temperature management season.  Although the full effects of the Bureau's excessive releases and failure to control temperatures in 2015 are not yet known, data collected through January 2016 indicates that there was even higher mortality to winter-run Chinook in 2015 than there was in 2014.

24.  Plaintiffs hereby supplement their challenge to the Bureau's ongoing violations of the ESA and allege that the Bureau violated, and is violating, Section 7(a)(2) of the ESA and the ESA's implementing regulations by failing to reinitiate consultation on the SRS contracts based on new information that reveals that the SRS contracts may affect the winter-run and spring-run Chinook in a manner not previously considered.  Plaintiffs further supplement their challenge to the Bureau's ongoing violations of the ESA and allege that the Bureau and the SRS Contractors have violated and are likely to continue to violate Section 9 of the ESA by unlawfully and without required authorization taking winter-run and spring-run Chinook and by impairing these species' critical habitat.

**JURISDICTION AND VENUE**

25.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States); 16 U.S.C. § 1540(c), (g) (action arising under the ESA); and 5 U.S.C. §§ 702, 703, and 706 (judicial review of federal agency actions).

26.   The Secretary has issued a final Biological Opinion on the effects of the OCAP on delta smelt pursuant to 16 U.S.C. § 1536(b).  Plaintiffs assert that the Biological Opinion is arbitrary and capricious, an abuse of discretion, and not in accordance with law within the meaning of 5 U.S.C. § 706(2).  An actual controversy therefore exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

27.   On February 7, 2008, more than 60 days prior to the filing of this Third Supplemental Complaint,[4] plaintiffs provided defendants with written notice of the violations of the ESA alleged herein, as required by 16 U.S.C. § 1540(g)(2).  A copy of this written notice is attached hereto as Exhibit 1.

28.   This case was originally filed in the Northern District of California.  The case was transferred to the Eastern District of California on September 28, 2005.

**ADDITIONAL JURISDICTION FOR FOURTH SUPPLEMENTAL COMPLAINT**

29.   The Secretary issued a final letter of concurrence on the effects of the contracts on the delta smelt and its critical habitat on December 14, 2015, pursuant to 16 U.S.C. § 1536(a)(2).  Plaintiffs assert that the letter of concurrence is arbitrary and capricious, an abuse of discretion, and not in accordance with law within the meaning of 5 U.S.C. § 706(2).  An actual controversy therefore exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), as to the claims against the FWS that are newly alleged in the Fourth Supplemental Complaint.

30.   A final letter of concurrence on the effects of the SRS contracts on winter-run and spring-run Chinook and their critical habitat was issued on January 10, 2005, pursuant to 16 U.S.C. § 1536(a)(2).  Plaintiffs assert that the Secretary's decision not to reinitiate consultation with NMFS is arbitrary and capricious and violates 16 U.S.C. § 1536(a)(2) and the ESA's implementing regulations, 50 C.F.R. § 402.16.  Plaintiffs further contend that the Bureau and SRS Contractors have taken, and are taking, winter-run and spring-run Chinook in violation of 16 U.S.C. § 1538(a).  An actual controversy therefore exists between the parties within the meaning of the Declaratory

_____

[4] The reference to "this Third Supplemental Complaint" refers to the prior complaint.

Judgment Act, 28 U.S.C. § 2201(a), as to the claims against the Bureau that are newly alleged in plaintiffs' Fourth Supplemental Complaint.

31.   On August 10, 2015, more than 60 days prior to the filing of this Fourth Supplemental Complaint, plaintiffs provided the Secretary, the Bureau, and the SRS Contractors with written notice of the Bureau's additional violations of the ESA regarding winter-run and spring-run salmonid species alleged in the Fourth Supplemental Complaint, as required by 16 U.S.C. § 1540(g)(2).  A copy of this written notice is attached hereto as Exhibit 6.

### ADDITIONAL JURISDICTION FOR FIFTH SUPPLEMENTAL COMPLAINT

32.   On November 14, 2016, more than 60 days prior to the filing of this Fifth Supplemental Complaint, plaintiffs provided the Secretary and Bureau with written notice of the Bureau's additional violations of the ESA subsequent to the issuance of the 2008 FWS OCAP BiOp, as required by 16 U.S.C. § 1540(g)(2).  A copy of this written notice is attached hereto as Exhibit 7.

### PARTIES

33.   Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a non-profit environmental organization with more than 294,000 members nationwide, including more than 54,000 members in California.  NRDC's purpose is to safeguard the Earth:  its people, its plants and animals and the natural systems on which all life depends.  The organization works to restore the integrity of the elements that sustain life — air, land and water — and to defend endangered natural places.  NRDC seeks to establish sustainability and good stewardship of the Earth as central ethical imperatives of human society and strives to protect nature in ways that advance the long-term welfare of present and future generations.  For more than three decades, NRDC has advocated extensively for the protection of the nation's waterways and wildlife, including the delta smelt and salmon species at issue here.  In July 2003, NRDC submitted formal comments and scientific information to the Bureau raising concerns about the impacts of the Bureau's then-proposed OCAP on delta smelt and salmonids, and in July 2004, NRDC submitted formal comments and scientific information to FWS regarding the impacts of the Bureau's OCAP on delta smelt, during the pendency of the ESA consultation that resulted in the original FWS biological opinion.  In February 2005, NRDC submitted recent scientific data to FWS indicating that delta smelt are at the lowest

levels ever measured in the history of monitoring.  In addition, NRDC has long worked to protect the San Francisco Bay-Delta estuary and the fish for which it provides habitat, including the delta smelt, winter-run Chinook, and spring-run Chinook, in non-litigation settings.  For example, NRDC was involved in the development of, and actively supported the enactment of, the Central Valley Project Improvement Act and participated deeply in the negotiation of the record of decision for the CALFED Bay-Delta Program, a joint federal-state process the mission of which is to develop and implement a long-term comprehensive plan that will restore ecological health and improve water management for beneficial uses of the Bay-Delta estuary.  NRDC has submitted formal comments and scientific information to NMFS regarding the impacts of the 2004 OCAP on the salmonid species at issue here during the ESA consultation that resulted in the NMFS 2004 BiOp.  NRDC has urged the Bureau to reinitiate consultation with NMFS on the contracts.

34.     Plaintiff SAN FRANCISCO BAYKEEPER ("Baykeeper") is a regional non-profit public benefit corporation organized under the laws of the State of California.  Baykeeper's mission is to protect and enhance the water quality of the San Francisco Bay-Delta estuary for the benefit of its ecosystems and human communities.  Founded in 1989, Baykeeper is the premier legal and policy advocate for the San Francisco Bay-Delta estuary.  Through its on-the-water presence, Baykeeper patrols hundreds of miles of waterways throughout the Bay-Delta, investigating pollution problems and bringing enforcement actions against polluters directly when necessary.  Baykeeper also uses targeted administrative and legal advocacy before state and regional regulators, playing a lead role in developing sound and legal standards, permits, and regulations.  A key area of the group's focus is ensuring that state and federal environmental laws are implemented properly and enforced.  Baykeeper's office is located in Oakland, California.  Baykeeper has approximately 3,000 members and supporters, most of whom reside in the San Francisco Bay-Delta watershed.

35.   Plaintiff FRIENDS OF THE RIVER ("FOR") was founded in 1973 and is incorporated under the non-profit laws of the State of California, with its principal place of business in Sacramento, California.  FOR has more than 5,600 members dedicated to the protection, preservation, and restoration of California's rivers, streams, watersheds and aquatic ecosystems.  Half of FOR's members live in the San Francisco bay area, near the Delta and river areas that

provide delta smelt habitat.  FOR has been involved in the protection and management of California's rivers and estuaries for more than 30 years, with an emphasis on protecting free flowing rivers and streams, watersheds, water quality, aquatic habitat, and aquatic species.  FOR was an original plaintiff in the lawsuits to list the delta smelt and challenge the FWS's biological opinion for the species. Many members of FOR utilize California rivers and the Sacramento-San Joaquin Bay Delta Estuary for outdoor recreation and spiritual renewal.

36.     Plaintiff THE BAY INSTITUTE OF SAN FRANCISCO ("TBI") is a nonprofit conservation organization incorporated under the laws of California and dedicated to the preservation, protection, and restoration of the San Francisco Bay, its estuary, the accompanying watershed (including the Delta), and this region's fish and wildlife resources, from the Sierra to the sea.  TBI's headquarters are located in San Francisco, California.  TBI and its more than 1,600 members have a direct interest in the survival and perpetuation of fish species and other aquatic resources that are dependent upon Central Valley Rivers, the Sacramento-San Joaquin Delta, the San Francisco Bay, and its estuary.  Most of TBI's members live in the San Francisco Bay's watershed, and many rely on this region for their livelihood in the commercial and sports fishing and boating industries.  In addition, many TBI members regularly visit and use the San Francisco Bay, its estuary, and the Central Valley rivers that flow into the Bay and its estuary for recreational experiences and aesthetic enjoyment.  TBI regularly participates in administrative and judicial proceedings on behalf of its members to protect, enhance, and restore declining populations of native California fishes, including ESA-listed salmon, steelhead, and delta smelt, throughout the Bay's watershed.  Since its founding in 1981, TBI has pioneered a research, advocacy, and education approach to the San Francisco Bay Estuary's issues that considers not just the Bay, but the entire ecosystem related to the Bay's estuary as a single, interdependent watershed.  TBI's efforts therefore encompass a region extending from the headwaters of the Sacramento and San Joaquin River systems to the Golden Gate.  In 1992, TBI and other environmental organizations sued the Service over its failure to list the delta smelt under the ESA, and since then TBI has carefully monitored the federal government's efforts to protect this species.  TBI was one of three environmental organizations that negotiated the historic 1994 Bay-Delta Accord, which forged a consensus among the state and federal governments,

and environmental, agricultural, and urban interests to achieve improvements in the water quality of the Bay-Delta.  The 1994 Bay-Delta Accord also set in motion CALFED, in which TBI has been heavily engaged.  In July 2003, TBI submitted formal comments and scientific information to the Bureau regarding the impacts of its then-proposed OCAP on delta smelt.  The Bay Institute works collaboratively with government agencies, independent academic experts, water users, and land owners to design and implement large-scale ecological restoration programs through the CALFED Bay-Delta Program, the Central Valley Project Improvement Act ("CVPIA") (Pub. L. No. 102-575, 106 Stat. 4714 (1992)), and other initiatives.  TBI commented on the original environmental impact statement and environmental impact report ("EIS/EIR") for the 1986 CVP/SWP Coordinated Operating Agreement ("COA").  In July 2003, The Bay Institute submitted formal comments and scientific information to the Bureau regarding the impacts of its then-proposed OCAP on the five salmon and steelhead evolutionarily significant units present in the Central Valley.

37.  Plaintiffs and their respective members have been and will continue to be actively involved in efforts to protect and restore delta smelt and the winter-run and spring-run Chinook in the Delta and Sacramento River watershed.  Among other things, they have written to numerous federal, state, and local agencies and officials to urge increased protection for the delta smelt and winter-run and spring-run Chinook and their habitat.

38.  Plaintiffs and their respective members live and/or work in communities near or on the Delta.  In addition to advocating for protections for the delta smelt, members of the plaintiff organizations, all environmental, conservation, or fishing organizations, are active participants in the life of the Delta.  Individual members of each organization frequently visit the Delta, critical habitat for the delta smelt, to use and appreciate the Delta ecosystem.  The health and survival of the delta smelt species is considered indicative of the health of the Delta itself.  *See* U.S. Fish and Wildlife Service, Recovery Plan for the Sacramento-San Joaquin Delta Native Fishes at 1 (Nov. 26, 1996).  Plaintiffs' use of the Delta for educational and recreational activities, such as hiking, boating, bird watching, swimming, and fishing, would be detrimentally affected by the decline of the delta smelt and the corresponding decline in the health of the Delta.  Plaintiffs and their members regularly derive scientific, educational, and conservation benefit and enjoyment from the existence of the delta

smelt and will continue to do so by regularly engaging in scientific, education, and conservation activities involving the delta smelt.  These benefits and enjoyments would increase if the delta smelt were to recover from its precarious status of being threatened with extinction.

39.     Delta smelt populations will continue to decline, and the fish may soon become extinct, unless the utmost care is taken in protecting the fish's limited critical habitat in the Delta. The health of the delta smelt population is one indicator of the overall health of the Delta.  Therefore, while the extirpation of the delta smelt from any portion of the Delta would constitute an irreparable environmental loss in and of itself, it would also indicate more generally that the health and diversity of the fish's Delta habitat had been severely degraded.  These events, and the threat of these events, would deprive plaintiffs and their members of the recreational, spiritual, professional, aesthetic, educational, and other benefits they presently derive from the Delta ecosystems.

40.     The above-described aesthetic, conservation, recreational, scientific, educational, wildlife and fisheries preservation, and other interests of plaintiffs and their respective members, have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by the defendants' arbitrary and capricious issuance of a Biological Opinion that found that the implementation of intensified CVP and SWP operations, as set forth in the OCAP and in the Biological Opinion's project description, would not jeopardize the survival of the delta smelt or adversely modify its critical habitat.  These injuries are actual and concrete and would be redressed by the relief sought herein.  Plaintiffs have no adequate remedy at law.

41.     The Defendants in this action are:

a.      SALLY JEWELL:  Ms. Jewell is sued in her official capacity as Secretary of the Interior, the Bureau and FWS's parent agency.  She is ultimately responsible for implementing the ESA and for ensuring that the consultations required by Section 7 of the ESA regarding impacts to the delta smelt and winter-run and spring-run Chinook from the OCAP and SRS and DMC contracts are completed in accordance with the letter and intent of the law.  She is also ultimately responsible for ensuring that the Bureau's operation of the CVP does not violate the ESA.

b.      DAN ASHE:  Mr. Ashe is sued in his official capacity as Director of the Service.  He has been delegated the responsibilities of the Secretary of the Interior described in the

preceding paragraph.  He is responsible for administering the ESA, including reviewing and approving the findings of the delta smelt biological opinions and letters of concurrence.

        c.      ESTEVAN LÓPEZ:  Mr. López is sued in his official capacity as Commissioner of the Bureau of Reclamation.  Under the supervision and direction of the Secretary of the Interior, he is responsible for insuring that the operations of the CVP are consistent with ESA requirements.

      42.     The following Defendant-Intervenors voluntarily intervened in this action, thereby submitting themselves to the jurisdiction of this Court:

        a.      CALIFORNIA DEPARTMENT OF WATER RESOURCES ("DWR").

        b.      CALIFORNIA FARM BUREAU FEDERATION.

        c.      GLENN-COLUSA IRRIGATION DISTRICT.

        d.      NATOMAS CENTRAL MUTUAL WATER COMPANY ("NCMWC").

        e.      PELGER MUTUAL WATER COMPANY.

        f.      PLEASANT GROVE-VERONA MUTUAL WATER COMPANY.

        g.      PRINCETON-CODORA-GLENN IRRIGATION DISTRICT.

        h.      PROVIDENT IRRIGATION DISTRICT.

        i.      RECLAMATION DISTRICT 108.

        j.      RIVER GARDEN FARMS.

        k.      SAN LUIS & DELTA-MENDOTA WATER AUTHORITY ("SLDMWA").

        l.      STATE WATER CONTRACTORS ("SWC").

        m.      WESTLANDS WATER DISTRICT.

      43.     The following parties were joined as defendants pursuant to Federal Rule of Civil Procedure 19 in the Third Supplemental Complaint:

        a.      ANDERSON-COTTONWOOD IRRIGATION DISTRICT ("ACID").

        b.      BEVERLY F., ARNOLD A., MICHAEL D., AND MARK C. ANDREOTTI.

        c.      BANTA-CARBONA IRRIGATION DISTRICT.

        d.      CHRISTO D. BARDIS, JOHN D. REYNEN, AND JUDITH REYNEN.

        e.      BYRON BETHANY IRRIGATION DISTRICT.

f.      CARTER MUTUAL WATER COMPANY.

g.      COELHO FAMILY TRUST.

h.      CONAWAY PRESERVATION GROUP.

i.      DEL PUERTO WATER DISTRICT.

j.      EAGLE FIELD WATER DISTRICT.

k.      FRESNO SLOUGH WATER DISTRICT.

l.      HOWALD FARMS, INC.

m.     JAMES IRRIGATION DISTRICT.

n.      LOMO COLD STORAGE.

o.      MAXWELL IRRIGATION DISTRICT.

p.      MERCY SPRINGS WATER DISTRICT.

q.      MERIDIAN FARMS WATER COMPANY.

r.      OJI BROTHERS FARM, INC.

s.      OJI FAMILY PARTNERSHIP.

t.      ORO LOMA WATER DISTRICT.

u.      PACIFIC REALTY ASSOCIATES, L.P.

v.      PATTERSON IRRIGATION DISTRICT.

w.     ABDUL AND TAHMINA RAUF.

x.      RECLAMATION DISTRICT NO. 1004.

y.      CITY OF REDDING.

z.      HENRY D. RICHTER et al.

aa.     DAVID AND ALICE TE VELDE FAMILY TRUST (FORMERLY
        SACRAMENTO RIVER RANCH, LLC.)[5]

bb.     SUTTER MUTUAL WATER COMPANY.

cc.     KNIGHTS LANDING INVESTORS, LLC (FORMERLY FRED

---

[5] On June 14, 2013, the Ninth Circuit granted a motion to replace Sacramento River Ranch LLC with the David and Alice te Velde Family Trust as a named party of record.  *NRDC v. Salazar*, Case No. 09-17661, App. Doc. 212 (9th Cir. June 14, 2013).

TENHUNFELD et al.)[6]

dd.    TISDALE IRRIGATION AND DRAINAGE COMPANY.

ee.    TRANQUILITY IRRIGATION DISTRICT.

ff.    WEST SIDE IRRIGATION DISTRICT.

gg.    WEST STANISLAUS IRRIGATION DISTRICT.

hh.    WINDSWEPT LAND AND LIVESTOCK COMPANY.

**ADDITIONAL PLAINTIFFS FOR SALMONID CLAIMS AGAINST THE BUREAU AND SACRAMENTO RIVER SETTLEMENT CONTRACTORS IN THE FOURTH SUPPLEMENTAL COMPLAINT**

44.    Plaintiff WINNEMEM WINTU TRIBE (the "Winnemem") is a historic California Native Tribe recognized by the California Native American Heritage Commission.  The Winnemem's historical territory included the east side of the upper Sacramento River watershed, the McCloud River watershed from origin to termination, the Squaw Creek watershed from origin to termination, and approximately 20 miles of the Pit River from the confluence of the McCloud River, Squaw Creek, and Pit River up to Big Bend.  The Winnemem has tribal members living, and tribal concerns, in areas including Clear Creek from Whiskeytown Dam to the Sacramento River, the Sacramento River from Shasta Dam to the Delta, and Spring Creek from the Debris Dam to Keswick Dam.  For centuries, the Winnemem has had a deep cultural and spiritual relationship with the salmon that use these rivers.  Prior to the advent of the CVP and throughout implementation of the CVP and the CVPIA, the Winnemem have been voicing their concerns for the salmon.  In 1872, for example, the United States Fish Commission (now the FWS) sought to build a Salmon Fish Hatchery on the McCloud River, which the Winnemem opposed due to the serious threat it would pose to the salmon.  Similarly, in 1937, the Bureau began construction of Shasta Dam, which the Winnemem also opposed because it blocked salmon migration.  At these and all other opportunities of which they were aware, the Winnemem have voiced concern and advocated for the salmon.  The Winnemem have testified in numerous hearings before the Bureau, the United States Senate, and the

---

[6] On October 7, 2015, counsel for Mr. Tenhunfeld sent a letter to Plaintiffs stating that Mr. Tenhunfeld's contract had been assumed by Knights Landing Investors, LLC.

1  CALFED Bay Delta Authority, in attempts to achieve protection for Sacramento River salmon and

2  steelhead.

3      45.    PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS/

4  INSTITUTE FOR FISHERIES RESOURCES.  Pacific Coast Federation of Fisherman's

5  Associations ("PCFFA") is the largest trade organization of commercial fishing men and women on

6  the West Coast.  PCFFA is a federation of port associations and marketing associations in California,

7  Oregon, and Washington.  PCFFA's Southwest Regional Office is located in San Francisco,

8  California.  Collectively, PCFFA's members represent more than 1,000 commercial fishing families,

9  most of whom are small and mid-sized commercial fishing boat owners and operators.  Most of

10 PCFFA's members derive all or part of their income from the harvesting of salmonids, a valuable

11 business enterprise for the West Coast and California economies.  The decline of California's salmon

12 species has severely impacted PCFFA members in California by limiting commercial harvest

13 opportunities, both through lost production of impaired stocks and because of restrictions imposed

14 on the fishing fleet to protect impaired salmon populations.  Habitat losses to date already have cost

15 the West Coast salmon fishing industry (including both commercial and recreational components)

16 tens of thousands of jobs in the last thirty years.  These losses are directly related to widespread

17 inland habitat destruction resulting from the construction of dams and diversions of water as part of

18 the CVP and SWP.  PCFFA has been active for over 30 years in efforts to rebuild salmon

19 populations in Central Valley streams and rivers as well as watersheds connected naturally and

20 unnaturally to the Central Valley rivers.  The SRS contracts have an adverse effect on salmonid

21 species that are critical to PCFFA's members' livelihoods.  PCFFA has presented written comments

22 and/or testimony to the Bureau and CALFED on numerous CVP contracts.

23      The INSTITUTE FOR FISHERIES RESOURCES ("IFR") is a sister organization of PCFFA.

24 IFR is a nonprofit organization with headquarters in San Francisco, California.  Established in 1993

25 by PCFFA, IFR is responsible for meeting the fishery research and conservation needs of working

26 men and women in the fishing industry by executing PCFFA's expanding habitat protection

27 program.  From its inception, IFR has helped fishing men and women in California and the Pacific

28 Northwest address salmon protection and restoration issues, with particular focus on dam, water

diversion, and forestry concerns.  IFR is an active leader in several restoration programs affecting winter-run and spring-run Chinook, including removal of antiquated storage and hydroelectric dams. PCFFA and IFR both operate ongoing programs aimed at addressing recovery of salmonids affected by the OCAP and the SRS contracts, including winter-run Chinook.  PCFFA and IFR have actively advocated for the protection and restoration of flows critical to the health of the Bay and Delta.

46.   NRDC, Baykeeper, TBI, the Winnemem Wintu Tribe, and PCFFA/IFR, and their respective members, live, work, recreate, research, and worship in the Sacramento River watershed. They depend on the winter-run and spring-run Chinook for professional, recreational, and spiritual sustenance, and the health of these runs impacts the availability of the commercially and recreationally fished fall-run Chinook, on which PCFFA members rely for a substantial portion of their economic well-being and livelihood.  In addition to advocating for protections for the winter-run and spring-run Chinook, members of these plaintiff organizations, all environmental, conservation, tribal, or fishing organizations, are active participants in the life of the Sacramento River watershed.  Individual members of each organization either live in, work in, or frequently travel to the Sacramento River watershed, critical habitat for the winter-run and spring-run Chinook. Plaintiffs' use of the Sacramento River watershed for educational, professional, spiritual, and recreational activities, such as hiking, boating, bird watching, swimming, and fishing, would be detrimentally affected by the decline of the winter-run and spring-run Chinook.  Plaintiffs and their members regularly derive scientific, educational, spiritual, professional, economic, and conservation benefit and enjoyment from the existence of the winter-run and spring-run Chinook and will continue to do so by regularly engaging in activities involving these species.  These benefits and enjoyments would increase if necessary measures were taken to provide for the recovery of these species.

47.   Winter-run and spring-run Chinook populations will continue to decline, and the species may soon become extinct, unless the utmost care is taken in protecting their limited remaining critical habitat.  The winter-run and spring-run Chinook are important to the natural balance of the Sacramento River watershed, and their extinction would adversely affect the entire ecosystem.  These events, and the threat of these events, would deprive plaintiffs and their members

of the recreational, spiritual, professional, aesthetic, educational, economic, and other benefits they presently derive from the Sacramento River watershed.

48.     The above-described aesthetic, conservation, recreational, scientific, educational, economic, wildlife and fisheries preservation, and other interests of plaintiffs and their respective members have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by the defendants' failure to comply with the provisions of the Endangered Species Act discussed herein.  These injuries are actual and concrete and would be redressed by the relief sought herein.  Plaintiffs have no adequate remedy at law.

**FACTUAL BACKGROUND**

**The Delta Smelt**

49.     The delta smelt (*Hypomesus transpacificus*) is a slender-bodied fish typically reaching just over 2 inches in length.  The delta smelt is the only native estuarine species found in the Delta that spends its entire life span in the Delta.

50.     Historically, delta smelt could be found throughout the Delta.  However, during the past 30 years, the population has declined by 85 percent; in 2004, delta smelt abundance was just 8 percent of the average abundance measured from 1967-1973.

51.     Delta smelt typically live for only one year, and, therefore, they are particularly vulnerable to extinction resulting from atypically harsh conditions.  One year in which the population fails to spawn or in which a high proportion of juveniles are killed could result in the extinction of the species.  Similarly, increased abundance from a good year will not serve to mitigate damage to population caused by a subsequent bad year.  As a result, delta smelt are affected greatly by any disturbance to their reproductive habitat or larval nursery areas.

52.     Delta smelt live for most of their year-long life spans in the low-salinity zone at the saltwater-freshwater interface, but they migrate upstream to spawn.  However, the amount and the quality of suitable habitat has declined dramatically due to Delta water diversions and exports.  As freshwater is exported, the low-salinity zone shifts upstream from large-area, shallow habitats, such as Suisun Bay, to narrow, deep river channels, which are less productive and have less habitat area.  This impact to the critical rearing habitat of the smelt is compounded by the disastrous levels of

direct mortality that occur at the Projects' pumps:  Both pre-spawning adult fish moving upstream to spawn and their larval and juvenile progeny moving downstream to low-salinity rearing habitat are killed in large numbers at the Projects' fish salvage facilities and pumps.

53.     In response to a lawsuit brought against the Service by TBI, FOR, and other conservation groups to compel such listing, the Service listed the delta smelt as a threatened species under the ESA on March 5, 1993.  These same groups were forced to bring litigation to compel designation of critical habitat for delta smelt, which the Service designated on December 19, 1994.  The critical habitat includes all waters and submerged lands within the Delta, including those at the pumping plants for the CVP and the SWP.

54.     The California Department of Fish and Game has confirmed that data from the 2004 abundance measurements for the delta smelt indicate that the species abundance is at the lowest level ever measured in over 30 years of monitoring.  Population viability analysis conducted for the species indicates that the risk for extinction within the next 20 years is high.  *See, e.g.*, Bennett, W.W. and K.T. Honey, *Modeling the Canary: How Do We Assess Population Viability for the Threatened Delta Smelt?*, Proceedings of the 2004 CALFED Bay-Delta Program Science Conference.

### ADDITIONAL FACTUAL BACKGROUND FOR FOURTH SUPPLEMENTAL COMPLAINT

### Effects of Contractual Water Diversions and Deliveries on Delta Smelt

55.     As FWS explains in its 2015 LOC, "the contracts create a demand … for CVP water and the OCAP consultation addresses how the CVP/SWP projects are operated to meet those demands." Doc. 993-1 at 4.  In recent years, the devastating effects of CVP/SWP operations to meet the demands created by specific contract terms have become increasingly clear, as the abundance of delta smelt has plummeted to new lows, and endangered winter-run chinook salmon and other imperiled fish species have suffered overwhelming mortality.

56.     CVP/SWP water deliveries and diversions pursuant to SRS and DMC contracts cause the degradation and loss of delta smelt habitat and the direct and indirect deaths of delta smelt.  CVP/SWP operations to meet contractual requirements—including pumping in the Delta and

releases from upstream reservoirs—affect Delta flows, causing delta smelt to be drawn into unfavorable habitat where they are unable to successfully spawn or survive.  Among other impacts, CVP/SWP operations move the location of salinity zones conducive to delta smelt spawning and migration.  When CVP/SWP operations reduce outflows of fresh water through the Delta, smelt-habitable salinity zones move upstream into the channelized, inhospitable interior Delta, away from far more favorable spawning and rearing habitat in Suisun Bay.  The change in outflow also brings the delta smelt into areas where they are more likely to be entrained by the CVP/SWP pumps, encounter predators, and suffer exposure to poor water quality and invasive species.

57.     Pumping at the CVP and SWP facilities often causes the channels near the CVP and SWP pumps to flow backwards.  Delta smelt are captured by these negative flows and pulled towards the pumps.  *Id.* at 16.  There is an approximately linear relationship between certain negative flows created by the pumps in the Old and Middle Rivers ("OMR")—channels of the San Joaquin River that pass by the pumping facilities—and delta smelt entrainment at the facilities.  When the negative flows of the OMR exceed approximately -5,000 cubic feet per second (cfs), delta smelt entrainment rises significantly.  The level of negative flow in the OMR is thus as an indicator of pumping levels that are dangerous for the smelt.

58.     Except during excess conditions, CVP/SWP operations largely control Delta inflow and outflow based on upstream reservoir regulation and diversions.  Maintaining a minimum level of Delta outflow (the amount of water flowing through the Delta and into the San Francisco Bay Estuary) during certain times of the year is critical to protecting estuarine habitat in the Delta and strongly affects the abundance of native fish species in the Bay-Delta, including delta smelt.  Because of the importance of these flows, the SWRCB established water quality standards in the Bay-Delta Plan that require minimum Delta outflows at different times of the year.

**Waiver of Delta Smelt Protections in 2014 and 2015**

59.     In 1999, the SWRCB adopted Water Rights Decision 1641 ("D-1641"), which the Board later revised in 2000.  D-1641 imposes terms and conditions on the Bureau's permit to operate the CVP.  Amongst other conditions, D-1641 requires that the Bureau operate the CVP in a manner that meets the flow requirements in the Bay-Delta Plan water quality standards.  Relatedly, D-1641

places limits on the proportion of the water flowing into the Delta that the Bureau can export to its contractors.

60.     In 2014 and 2015, the Bureau determined that it could not simultaneously meet its contractual obligations and protect listed species.  Thus, the Bureau, together with DWR, filed numerous temporary urgency change petitions ("TUCPs") with the SWRCB.  The TUCPs requested that the SWRCB waive the flow requirements and export limits in D-1641 so that the Bureau and DWR could meet their obligations to contractors, including the SRS and DMC contractors.  The Bureau and DWR also stated that waiving the flow requirements and export limits would help preserve cold water in upstream reservoirs to be used later in the season to provide suitable cold water habitat for listed salmonid species.

61.     The SWRCB approved numerous TUCP requests by the Bureau and DWR in 2014 and 2015 to waive the flow requirements and export limits in D-1641 so that the Bureau and DWR could meet their contractual obligations.  The SWRCB explained in its orders approving the TUCPs that, although modifications of the flow and export standards in D-1641 would adversely affect spawning and rearing conditions for the delta smelt in February and March, the approval would allow the Bureau and DWR to preserve water in reservoirs for later use in meeting the needs of agricultural and other water users.  Specifically, the SWRCB agreed to waive the flow and export requirements in D-1641 that were designed to protect the delta smelt so that the Bureau could satisfy the terms of the contracts.  SWRCB also approved the TUCPs for the purpose of preserving water for the benefit of listed salmonid species.

**Record-Low Abundance of Delta Smelt in 2014 and 2015**

62.     All surveys conducted on delta smelt abundance in 2014 and 2015 confirm that the species is more vulnerable than ever, and faces an immediate and unprecedented risk of extinction.

63.     The Fall Midwater Trawl ("FMWT") survey, which is mandated by FWS to measure the delta smelt's relative abundance based on catch data at 100 locations throughout the Delta, hit a record low in 2014.  Scientists collected eight delta smelt between September and December 2014, yielding a FMWT index of nine.  This was the first time in the 46-year history of the FMWT, which is widely regarded as the best measure of long-term abundance, that the index had dipped into single

digits for the species.  In 2015, the FMWT hit another record low.  Scientists collected six delta smelt between September and December 2015, yielding an FMWT index of just seven.

64.     The Spring Kodiak Trawl Survey ("SKT"), which is mandated by FWS to determine the relative abundance of pre-spawning and spawning delta smelt based on samples from 39 locations throughout the delta, was 13.8 in 2015, the lowest index total on record. Members of the Smelt Working Group ("SWG"), a group of federal and state agency experts charged with reviewing data on the delta smelt's status, expressed concern that, in addition to the low numbers in the SKT, the adult smelt they did catch were in poor condition, indicating diminished resilience in the depleted population.

65.     As with the FMWT and SKT, the Summer Townet Survey ("STN"), which measures juvenile delta smelt distribution and abundance during the June-July period based on catch at 31 stations, also hit its lowest total in the 54-year history of the survey when it reached 0.0 in 2015.

**The Sacramento River Winter-Run Chinook Salmon**

66.     The winter-run Chinook's population has declined precipitously since the early 1980s, from an estimated historic high of 117,808 in 1969 to as few as 191 adult individuals returning to spawn in 1991.  The winter-run Chinook was declared threatened on November 5, 1990 (55 Fed. Reg. 46515) and reclassified as endangered on January 4, 1994 (59 Fed. Reg. 440).  NMFS re-affirmed the listing of the winter-run Chinook as an endangered species on June 28, 2005.  70 Fed. Reg. 37160, 37191.

67.     Critical habitat for the winter-run Chinook was first designated on August 4, 1989 (54 Fed. Reg. 32085) to include the portion of the Sacramento River from Red Bluff Diversion Dam in Tehama County (River Mile 243) to Keswick Dam in Shasta County (River Mile 302), including adjacent riparian areas as well as the river water and river bottom.  On June 16, 1993, critical habitat was extended downstream to Chipps Island (River Mile 0) at the westward margin of the Sacramento-San Joaquin Delta.  Critical habitat now includes all waters from Chipps Island westward to Carquinez Bridge, including Honker Bay, Suisun Bay, and Carquinez Strait, all waters of San Pablo Bay westward of the Carquinez Bridge, and all waters of San Francisco Bay (north of the San Francisco-Oakland Bay Bridge) from San Pablo Bay to the Golden Gate Bridge.  58 Fed.

Reg. 33212.

68.     The NMFS OCAP BiOp stated that the winter-run Chinook is "at high risk of extinction" and warned that a prolonged drought could have devastating effects on the species. NMFS OCAP BiOp at 672, 674.  Winter-run Chinook inhabit the upper Sacramento River and its tributaries, where the flow of cold water throughout the summer allows for successful spawning, egg incubation, and rearing.  Historically, winter-run Chinook relied on the McCloud, Pit, and Little Sacramento rivers, as well as Hat and Battle creeks, for habitat conducive to egg and fry development and survival and juvenile rearing.  The construction of Shasta Dam blocked access to almost all of these rearing waters.  Today, the upper Sacramento River below Keswick Dam is the only remaining spawning area used by winter-run Chinook.  The survival of the winter-run Chinook is therefore completely dependent on the Bureau's management of the temperature and flow conditions below Keswick dam.

69.     Winter-run Chinook are particularly vulnerable during the "temperature management season," which generally lasts from June through October.  Adult winter-run Chinook migrate up the Sacramento River in the winter and spring and then hold below the Keswick Dam for several months before spawning.  During these critical months, the salmon require cold water for the maturation of their gonads and the development of fertilized eggs and embryos.  The optimal temperature for egg incubation is at maximum daily water temperatures of between 41 and 54.5 degrees Fahrenheit.  Egg viability is reduced when maximum daily water temperatures exceed this optimal temperature range. Additionally, the adverse effects of high incubation temperatures extend beyond the egg stage, causing higher rates of mortality in later salmonid life stages.  As a result, the NMFS OCAP BiOp requires the Bureau to manage releases from Keswick Dam such that there is sufficient volume in Shasta Reservoir's cold water pool to enable the Bureau to maintain daily average water temperatures that do not exceed 56 degrees at compliance locations between Balls Ferry and Bend Bridge from May 15 through September 30 of each year.

**The Central Valley Spring-Run Chinook Salmon**

70.     The spring-run Chinook was historically the second largest salmon run in the Central Valley watershed and supported the bulk of the commercial fishery.  Only remnant independent

natural spring-run Chinook populations survive.  These remnant populations represent the last vestige of the once robust populations in the Sacramento-San Joaquin River system.

71.     The Central Valley spring-run Chinook salmon was listed as threatened on September 16, 1999.  64 Fed. Reg. 50394.  NMFS reaffirmed its threatened status on June 28, 2005.  70 Fed. Reg. 37160, 37191.

72.     On September 2, 2005, NMFS published the final designation of critical habitat for the spring-run Chinook, which is described and illustrated in detail in the Federal Register at 70 Fed. Reg. 52488, 52518, and 52590-52603.

73.     Spring-run Chinook enter the Sacramento River between March and September, primarily between May and June, and spawn in the river's tributaries in September and October. Historically, the mainstem of the Sacramento River has sustained a substantial portion of the spring-run Chinook population.  Between 1969 and 1986, an average of over 10,000 spring-run Chinook used the upper mainstem to spawn, incubate, and rear.  Since the early 1990s, however, only a few hundred fish have successfully returned to spawn in this reach of the river.  The remaining remnant populations of the spring-run Chinook rely principally upon small tributaries of the Sacramento River below Shasta Dam.

74.     Spring-run Chinook require cold water temperatures similar to those needed by winter-run Chinook for successful spawning, egg incubation, and rearing.

**Loss of Sacramento River Temperature Control in 2014 and 2015**

75.     The Bureau is responsible for conducting temperature modeling to determine how much water stored in Shasta Reservoir can be released to contractors in the spring and summer months.  The Bureau must retain sufficient cold water reserves in Shasta Reservoir so that it can make timed releases from Keswick Dam throughout the temperature management season to maintain temperatures conducive to salmonid spawning, egg incubation, and rearing.  The Bureau's ability to meet the needs of salmonids and their habitat throughout the temperature management season is heavily affected by the SRS contracts, the terms of which are met by releases from Shasta Dam.  In 2014, in order to meet the demands of the SRS contracts, the Bureau made releases from Keswick Dam in April, May, and early June that depleted the cold water pool behind Shasta Dam and

ultimately led to the loss of temperature control.  State and federal agencies estimate that the Bureau's failure to maintain temperature control led to 95% mortality of the 2014 brood year of winter-run Chinook.  Additionally, high temperatures in September led to virtually complete mortality of spring-run Chinook eggs in the Sacramento River.

76.     In February 2015, in reviewing the Bureau's forecast and water supply allocation for water year 2015, NMFS stated that, "in light of the high mortality (95%) associated with water temperatures observed in 2014 for juvenile winter-run Chinook salmon that spawned in upper Sacramento River, it is critically important to improve the accuracy of water temperature forecasting, and specifically the Bureau's temperature model."  Letter from Maria Rea, Assistant Regional Administrator, NMFS, to Ron Milligan, Operations Manager, Bureau of Reclamation 2 (Feb. 27, 2015).  NMFS specified that "it is . . . important to conserve storage in Shasta Reservoir, and specifically the cold water pool, in order to provide for the needs of winter-run eggs and alevin throughout the temperature management season."  *Id.*

77.     In spite of NMFS's clear warnings, the Bureau again made excessive releases in April and May of 2015 to satisfy its contractual obligations to the SRS Contractors.  These releases again depleted the cold water pool and severely compromised the spawning, egg incubation, and rearing habitat for the annual brood of winter-run Chinook.  By the end of May of 2015, the Bureau's updated forecasting showed that daily average water temperatures of 56 degrees at the Clear Creek compliance point *could not* be met for the duration of the temperature management season.  From June 2, 2015, through the end of October, 2015, the daily average water temperature at the Clear Creek compliance point was above 56 degrees almost every day.  Specifically, temperatures at Clear Creek were above 56 degrees at Clear Creek for 137 of 153 days between June 1 and October 31.

78.     In June of 2015, at NMFS's request, the Bureau issued a revised Temperature Management Plan.  Reviewing that plan, NMFS stated that, "It is now very clear through evaluating operations in both 2014 and 2015 that the volume of cold water available for real-time management in June through October is highly dependent on Keswick releases in April through early June.  In 2016, should drought conditions persist, these releases in April through early June will need to be held to minimal levels to achieve adequate temperatures only."  Letter from William Stelle, Jr.,

Regional Administrator, NMFS, to David Murillo, Regional Director, Bureau of Reclamation 9 (July 1, 2015).  Mr. Stelle explained that due to the Bureau's April and May releases, "the quantity and quality of the cold water pool[] will not provide for suitable winter-run [Chinook] habitat needs throughout their egg and alevin incubation and fry rearing periods" and that the "conditions. . . could have been largely prevented through upgrades in monitoring and modeling, and reduced Keswick releases in April and May."  *Id.*

79.     Releases to satisfy the terms of the SRS contracts are the primary reason why devastating mortality of winter-run occurred again in 2015.  The Bureau and DWR's 2016 Drought Contingency Plan reported that, as of January 14, 2016, juvenile winter-run past Red Bluff Diversion Dam ("RBDD")—an indicator of brood year survival—was even lower for the 2015 winter-run brood year than for the 2014 winter-run brood year.  Only 2.1% of eggs survived to juveniles and passed the RBDD, placing the most current estimates of mortality of winter-run at a dire 97.9%.

## PROCEDURAL BACKGROUND

**Operational Changes to the Central Valley Project and the State Water Project and the Biological Opinion**

80.     The CVP is a federal water storage and diversion project.  It is one of the largest water projects in the world, annually managing an average of approximately 9 million acre-feet of water and annually delivering an average of approximately 6.8 million acre-feet of water.  The CVP is comprised of approximately 20 dams and reservoirs (including some of the largest storage facilities in the State, such as Shasta Dam on the Sacramento River, the Trinity and Whiskeytown Dams, which divert water from the Trinity River to the Sacramento River for export through the Delta, and Folsom Dam on the American River), the Tracy Pumping Plant (which draws hundreds of billions of gallons of water per year out of the Delta and into the Delta-Mendota Canal), and some 500 miles of major canals, as well as conduits, tunnels, power plants, and related facilities.  The SWP is a major water storage and diversion project of the State of California that coordinates operations with the CVP and shares the use of the San Luis Reservoir, among other facilities, with the CVP.  As set forth in the OCAP, the Bureau proposes to further coordinate operations of the CVP and the SWP and to expand and intensify existing CVP and SWP operations in a manner that would significantly affect

the hydrology of the Delta, including the hydrology of areas designated as critical habitat for the delta smelt.  The implementation of these and other changes to and expansions of CVP-SWP operations, as set forth in the OCAP and the Biological Opinion, significantly increase water exports from the Delta.

81.     As part of its CVP operations, the Bureau contracts with approximately 253 long-term water contractors to deliver CVP water.  A central goal of the OCAP was the execution of many of these long-term CVP water supply renewal contracts.  Upon completion of its OCAP consultation with the Service, between February 2005 and April 2006 the Bureau executed at least 144 long-term water supply renewal contracts that collectively provide for the export and diversion of CVP water totaling approximately 2.5 million acre-feet per year.

82.     The Biological Opinion purports to provide "early consultation" for operational changes that are a part of the South Delta Improvement Program ("SDIP").  These changes would include those listed above, as well as permanent barriers placed in the South Delta and further water diversions.  The Biological Opinion expressly states that it does not consider the impacts of construction activities associated with the SDIP or the effects of other interrelated and interdependent activities.  This Biological Opinion indicates that its "early consultation" will be formalized as a final consultation when the specific implementation plan for the South Delta is completed, assuming that the project description does not change.

83.     Despite the Bureau's request that the Service reinitiate consultation more completely to address the impacts of the OCAP on delta smelt critical habitat, the Biological Opinion does not consider or reach any conclusion as to how changes to the critical habitat of delta smelt caused by the proposed CVP and SWP operations would adversely affect recovery of the delta smelt.  This reinitiation of consultation was necessary because courts have found that the Service's definition of adverse modification to critical habitat is an impermissible interpretation of the ESA because it reads the goal of "recovery" out of the inquiry by holding that a proposed action "adversely modifies" critical habitat only if the value of the critical habitat for *survival* is also appreciably diminished. *See, e.g.*, *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004).

84.     The Biological Opinion states baldly that the Service relied on the statutory provisions of the ESA and not the regulatory definition of adverse modification when reaching its conclusions.  However, this statement is not supported by any new analysis or by the few changes made to the original biological opinion, and no new definition of adverse modification is provided or applied.

85.     In reaching a "no jeopardy" conclusion, the Biological Opinion relies heavily on certain existing or potential future protective measures, the adequacy of which has not been demonstrated, and several of which may not be implemented in the form assumed by the Biological Opinion or at all.  The Bureau has a long history of disregarding or violating such protective measures.  For example, the Bureau failed to consistently meet the conservation obligations agreed upon in the biological opinions for the Friant Unit long- and short-term renewal contracts.  In addition, in multiple years since the endangered Sacramento River winter-run Chinook salmon and the threatened delta smelt were listed under the ESA, the Bureau and the DWR have operated the CVP and SWP in such a way that the ESA-mandated incidental take limits for both species have been exceeded.

86.     Among other defects, the Biological Opinion assumes benefits to the delta smelt from future, long-term implementation of an Environmental Water Account ("EWA").  The EWA as it presently exists is a water redistribution program that maintains exports to entities with contracts for water from the Delta when protections for delta smelt or certain other species are put into effect.  At the time the original biological opinion was signed, however, the then-existing EWA was scheduled to expire by September 2004.[7]  Although both the original and the revised Biological Opinion assume a future EWA, the Biological Opinion also states that "inclusion of the EWA in this description does not constitute a decision on future implementation of the EWA."  *See* Biological Opinion at 84.  Any benefits to delta smelt from any long-term EWA are, at best, speculative.  Moreover, the Biological Opinion's characterization of the EWA does not agree with the description provided by the Bureau in the June 30, 2004, OCAP when consultation with the Service was

---

[7] CALFED temporarily extended the EWA through December 2007.  The EWA has not been (cont'd next page)

1  requested.

2       87.    Recognizing that assumed protective measures may be inadequate and, indeed, may

3  not even be fully carried out, the Biological Opinion provides for an "adaptive management" process

4  under which the Bureau and certain fisheries management agencies would discuss and *potentially*

5  agree to *further* changes in the CVP operations that affect delta smelt through an "adaptive

6  management" process.  However, the Biological Opinion does not provide any assurance of any

7  particular level of protection for the delta smelt as a result of this promise of future "adaptive

8  management."

9       88.    The Opinion's adaptive management process involves the use of a so-called "Delta

10  Smelt Risk Assessment Matrix" as a decision-making tool intended to be used by a Working Group

11  to monitor the effects of the CVP and SWP on the delta smelt.  The Matrix is a tool to identify when

12  delta smelt may be negatively affected by a project and to suggest possible management strategies.

13  The Biological Opinion generally requires that the Working Group be informed should the triggering

14  conditions be met.  However, the Biological Opinion does not require that the Working Group, or the

15  Bureau, take any particular action if a triggering condition occurs.  No particular level of protection

16  for delta smelt or its critical habitat is insured.

17       89.    The day before the Service issued its revised OCAP Biological Opinion, it issued a

18  concurrence letter in response to the Bureau's July 15, 2003, request for consultation on its proposed

19  renewals of water service contracts with twenty water districts in the Delta Mendota Canal Unit

20  ("DMCU").  Pursuant to these twenty contracts, the Bureau has committed to annual exports of

21  342,865 acre-feet of CVP water from the Delta, via the Tracy Pumping Plant and the Delta-Mendota

22  Canal.  Combined with other existing demands on CVP water, these exports will further deteriorate

23  water quality in the Delta; shift the delta smelt's preferred habitat to less optimal upstream locations;

24  and increase the risk of entrainment at the Tracy Pumping Plant, which has a diversion capacity of

25  4,600 cubic feet per second ("cfs").

26       90.    Despite the clear threat to the delta smelt and its critical habitat posed by the renewal

27  _____

28  reauthorized since that time.

of these twenty long-term water service contracts, and notwithstanding its own recognition in the 2004 Biological Opinion that water exports from the Delta pose a serious threat to the delta smelt's survival, the FWS concluded in its February 15, 2005, concurrence letter that the proposed renewals were not likely to jeopardize the continued existence of the delta smelt or any other listed species, or to adversely modify any species' critical habitat.  The FWS expressly based this conclusion on its 2004 Biological Opinion.

91.     Just three days later, on February 18, 2005, the FWS issued the first of three concurrence letters responding to the Bureau's April 14, 2004, request for consultation on the proposed renewals of 145 Sacramento River settlement contracts.  Sacramento River settlement contractors own and maintain their own water diversion and conveyance facilities on the banks of the Sacramento River.[8]  Delta smelt, which may currently be found as far north as Verona, are at risk of being entrained at diversion points located at or south of Verona.  The delta smelt and its critical habitat are further imperiled by substantial upstream diversions by north-of-Verona settlement contractors.  Among other impacts, these upstream diversions increase the risk of entrainment by shifting delta smelt closer to the site of diversion points, decrease outflows, and cause a shift in the location of delta smelt's preferred habitat to non-optimal areas.  Sacramento River diversions from January through June pose a particular threat because they reduce outflows into the Delta and alter Delta flow patterns during critical pre-spawning and spawning months.

92.     Nonetheless, the FWS concluded that the Bureau's proposed renewals of 138 settlement contracts, which collectively provide for yearly diversions of 1,830,188 acre-feet of CVP water, were not likely to jeopardize the delta smelt's continued existence or adversely modify its critical habitat.  On March 9, 2005, the FWS issued a second concurrence letter in which it concluded that the proposed renewal of the NCMWC settlement contract, which provides for yearly diversions totaling 120,000 acre-feet of CVP water, was not likely to jeopardize the delta smelt's continued existence or adversely modify its critical habitat.  On May 12, 2005, the FWS issued a third concurrence letter in which it concluded that the proposed renewals of the ACID and City of

---

[8] Four Sacramento River settlement contractors divert from Sutter Bypass or the Natomas Cross (cont'd next page)

Redding settlement contracts were not likely to jeopardize the delta smelt's continued existence or adversely modify its critical habitat.  The FWS expressly based each of these no jeopardy conclusions on the OCAP Biological Opinion.

93.     Together, these water-service and settlement renewal contracts provide for the maximum delivery of far more water from the CVP than the CVP has, in recent years, been able to deliver.  In fact, the Bureau intends to increase water deliveries substantially during the life of these renewed contracts.  For example, in the Bureau's projections of water deliveries dated January 20, 2004, and attached as Exhibit 2 hereto, annual deliveries to the south-of-Delta Westlands Water District are anticipated to increase steadily to an average of 1.127 million acre-feet from 2026 to 2030 — a full 98 percent of the 1.15 million acre-foot total in the current Westlands contract.  These planned delivery increases are inconsistent with previous statements regarding the quantity of water to be exported from the Delta.  The Bureau's OCAP Biological Assessment suggests that long-term deliveries to south-of-Delta agricultural contractors will only average 58 to 61 percent of the full contract amount.  The Environmental Protection Agency highlighted this discrepancy in a letter dated December 15, 2004, and attached hereto as Exhibit 3, where it noted that the Bureau is contractually authorizing much higher future water deliveries than it is analyzing in environmental impact documents or has delivered in recent years.  If the Bureau is to deliver the maximum quantities of water provided for in the contracts, it will need significantly to intensify CVP operations and increase its deliveries north of the Delta and its water exports out of the Delta, as compared to the operations assumed and analyzed in the Biological Opinion.  Neither the Biological Opinion nor the subsequently issued concurrence letters adequately consider or address the effects of these long-term water service contracts on the delta smelt or its critical habitat.

**Recent Developments in This Litigation and Regarding the Condition of the Delta Smelt**[9]

94.     On May 25, 2007, the Court granted in part and denied in part plaintiffs' motion for summary judgment herein.  The Court summarized its holdings as follows:

Channel.

1     The Delta smelt is undisputedly in jeopardy as to its survival and recovery. The 2005 BiOp's no jeopardy finding is arbitrary, capricious, and contrary to law.  For all the reasons set forth above, the 2005 OCAP BiOp is unlawful and inadequate on the following grounds:

2

3     (1)  The DSRAM, as currently structured, does not provide a reasonable degree of certainty that mitigation actions will take place, even if the agency retains the discretion to draw upon numerous sources of water, not just the EWA, CVPIA(b)(2), and VAMP programs, to support fish protection.

4

5     (2)  The agency failed to utilize the best available scientific information by not addressing the 2004 FMWT data and the issue of climate change.

6

7     (3)  The BiOp's historical approach to setting take limits fails to consider take in the context of most recent overall species abundance and jeopardy.

8

9     (4) The BiOp did not adequately consider impacts to critical habitat by (a) failing to analyze how project operations will impact the value of critical habitat for the recovery of the smelt and (b) failing to consider impacts upon the entire extent of known smelt critical habitat.

10

11     Order at 119 (Doc. 323).

12     95.     Current and ongoing operations of the CVP and SWP under the existing OCAP—

13 including but not limited to pumping and water conveyance and export operations from the Delta—

14 jeopardize the continued existence of the delta smelt and adversely modify its designated critical

15 habitat.

16     96.     Data from 2007 showed serious threat to the delta smelt's continued existence.  The

17 2007 spring larval survey located only 98 smelt in the entire Delta, a number representing only 9% of

18 the number of smelt found by that time in 2006, a year in which smelt abundance was already

19 extremely low.  The Delta Smelt Working Group ("DSWG"), a group of agency biologists

20 responsible for evaluating the current status of the delta smelt and recommending operational

21 measures to protect the smelt, explained that this data indicated cause for alarm:  "For an annual

22 species such as delta smelt, failure to recruit a new year-class is an urgent indicator that the species

23 has become critically imperiled and an emergency response is warranted."

24     97.     In light of the spring larval survey and increasing take of delta smelt at SWP and CVP

25 pumps during early summer 2007, throughout June and July the DSWG  recommended that the

26 Bureau and DWR operate the CVP and SWP so as to achieve non-negative flows in Old and Middle

27

28 [9] This section contains "recent developments" as of the filing of the Third Supplemental Complaint.

Rivers ("OMR") and to prevent any entrainment of delta smelt at the Project pumps; to alter Project operations to maintain average Delta temperatures of 25°C until delta smelt left the south and central Delta; and to pump at reduced rates during periods of take.

98.     The Bureau and DWR reduced pumping at CVP and SWP export facilities for approximately 10 days in June 2007, during which time no delta smelt were taken at the CVP and SWP pumps.  But, over the DSWG's objections, starting on or about June 10, 2007, the Bureau and DWR rapidly increased pumping at their respective facilities, and by July 9, 2007, combined daily pumping had risen to 10,160 cfs.  As the pumping increased, so too did take of delta smelt.  From the beginning of May 2007 through July 9, 2007, 2,588 delta smelt were killed at CVP and SWP pumping plants.  However, until the Court's December 14, 2007 remedial order, neither the SWP nor the CVP decreased pumping or otherwise made any effort to follow DSWG recommendations for protecting the delta smelt.

99.     In light of these data and the Court's May 25, 2007 summary judgment order, on December 14, 2007, the Court entered a remedial order (Doc. 560) requiring that:

a.      The federal defendants complete a new biological opinion regarding the combined effects of CVP and SWP operations on the delta smelt.

b.      The Bureau meet a 25% minimum frequency for sampling delta smelt entrained at the Jones Pumping Plant.

c.      The Bureau and DWR conduct larval delta smelt monitoring at the Jones and Banks Pumping Plants, respectively, pursuant to the Court's specifications for frequency and timing of such monitoring.

d.      The Bureau and DWR meet the Court's specifications for limiting net upstream flow in Old and Middle Rivers.

e.      The Bureau and DWR continue to implement the Vernalis Adaptive Management Plan ("VAMP"), San Joaquin River flow enhancement, and CVP and SWP export curtailment.

f.      Until the end of the VAMP action implementation, the Bureau and DWR minimize the tidal effects to the south Delta agricultural barriers and not install the spring Head of Old River Barrier.

g.      That the federal defendants implement any and all measures that are necessary to prevent an irreversible or irretrievable commitment of resources pending completion of the reinitiated OCAP consultation and the issuance of a valid Biological Opinion.

100.    These interim remedies, while necessary, may not be sufficient to protect the delta smelt and its critical habitat.  The species' 20 mm index for 2007 was 1.0, an approximately 90% drop from 2006 and the lowest on record.  The species' 2007 FMWT index was 28, an approximately 30% drop from 2006 and the second lowest on record.  The most recent salvage data show that during March 2008, 83 delta smelt were taken at SWP and CVP facilities, for a total of more than 350 adult delta smelt salvaged at the pumps since January 1, 2008.

101.    In recent flow recommendations, attached as Exhibit 4 hereto, the Smelt Working Group[10] has identified several current active risk factors for the delta smelt, including the low 2007 delta smelt FMWT index and early results from the Spring Kodiak Trawl, water temperatures exceeding 12º Celsius for a five-week period and other indications that spawning has begun in earnest, a corresponding increase in the number of larval delta smelt that are being transported to the south Delta and thus more susceptible to entrainment at export facilities, higher than normal recent adult smelt salvage, and adult distribution in the Delta.  The Smelt Working Group described these risk factors as grounds for a March 31, 2008, recommendation that the Bureau and DWR maintain a combined OMR flow more positive than –2,000 cfs.  The Bureau and DWR, however, have determined to allow more negative flows than the Smelt Working Group recommended and operate to a combined OMR flow level of -2,500 cfs, as explained in Exhibit 5 attached hereto.

---

[10] The DSWG has been renamed the Smelt Working Group.

**ADDITIONAL PROCEDURAL BACKGROUND FOR FOURTH SUPPLEMENTAL COMPLAINT**

**Developments in This Litigation Leading to the Bureau's 2015 Reinitiation of Consultation with FWS on Delta Smelt**

102.   On July 16, 2008, Plaintiffs moved for summary judgment on their claim that the Bureau violated section 7(a)(2) of the ESA by executing long-term water contracts based on an invalid consultation.  On November 19, 2008, the Court held Plaintiffs had standing to challenge the SRS contracts but not the DMC contracts.  *NRDC v. Kempthorne*, 2008 WL 5054115, at *40 (E.D. Cal. Nov. 19, 2008) (Doc. 761).  In a subsequent order, the Court also held that the ESA did not apply to Reclamation's renewal of the SRS contracts because the original contracts left the Bureau without sufficient discretion to negotiate new terms that would benefit the delta smelt, *NRDC v. Kempthorne*, 621 F. Supp. 2d 954, 1000-01 (E.D. Cal. 2009) (Doc. 834).

103.   After a divided three-judge panel of the Ninth Circuit affirmed the Court's decision, *NRDC v. Salazar*, 686 F.3d 1092 (9th Cir. 2012), the Court of Appeals granted Plaintiffs' petition for rehearing en banc, *NRDC v. Salazar*, 710 F.3d 874 (9th Cir. 2013).  The en banc panel unanimously reversed.  *NRDC v. Jewell*, 749 F.3d 776.  Responding to Defendants' argument that the 2008 FWS OCAP BiOp mooted the case because it analyzed the effects of the contracts, the court held that the BiOp "merely assesses the general effects of the [OCAP], and it does not represent a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts before us."  *Id.* at 782.  The court then ruled that Plaintiffs have standing to challenge the DMC contracts "[b]ecause adequate consultation and renegotiation could lead to . . . revisions [that would benefit the delta smelt]."  *Id.* at 782-84.  The court also rejected the district court's conclusion that the ESA does not apply to the SRS contracts because Reclamation lacks sufficient discretion to renegotiate terms more protective of the delta smelt.  *Id.* at 784-85.  The court explained that, at minimum, the Bureau retained discretion that required ESA consultation on the SRS contracts because "the Bureau could benefit the delta smelt by renegotiating the Settlement contracts' terms with regard to, *inter alia*, their pricing scheme or the timing of water distribution."  *Id.* at 785.  The en banc panel remanded to this Court for "further proceedings consistent with [its] opinion."  *Id.*

104.   On remand, the Defendants moved to stay the litigation to allow Reclamation to

reinitiate consultation under 50 C.F.R. § 402.16.  Doc. 955, 962.  The Court granted the motion and stayed the case until December 15, 2015, to "allow the agencies to revisit whether approval of the Contracts comports with the ESA in light of the most up-to-date information."  Doc. 979 at 12.[11]

105.   On July 30, 2015, the Bureau sent a letter to FWS requesting reinitiation of consultation.  Specifically, the Bureau requested that FWS concur with the Bureau's assessment that the 2008 FWS OCAP BiOp "adequately covered" the potential effects of the contracts.  In a supplemental document that the Bureau submitted along with the request, the Bureau claimed that it lacked discretion to "alter the quantities, allocations, or timing of SRS diversions from those set forth in the initial SRS contracts."  *Supplemental Information to the Sacramento River Settlement Contractors Biological Assessment, Long-term Contract Renewal; and Supplemental Information to the Long Term Renewal of Water Service Contracts in the Delta-Mendota Canal Unit* 10 (July 2015) ("Supp. Info. BA").  The Bureau also claimed that it "lacks discretion to set pricing terms in the SRS contracts for the sole purpose of protecting delta smelt."  *Id.* at 11.  The Bureau did not request reinitiation of consultation with NMFS on the effects of the SRS contracts on listed anadromous species and their critical habitat.

106.   On October 20, 2015, NRDC sent a letter notifying FWS that Reclamation's assertions regarding discretion contradicted the Ninth Circuit en banc panel's ruling in *NRDC v. Jewell*, 749 F.3d 776, and explaining other deficiencies in the reinitiation package that Reclamation had submitted to FWS.  On October 28, 2015, NRDC alerted FWS of new environmental documents issued by Reclamation on October 26, 2015, demonstrating Reclamation's exercise of discretion on the timing of diversions under the SRS contracts.

107.   In November and December 2015, the Bureau sent several letters to FWS responding to NRDC's letter and clarifying its request for reinitiation.  The Bureau stated that it was not requesting reinitiation of consultation on the status of the delta smelt and that it only sought clarification from FWS that water deliveries under the contracts were addressed in the 2008 FWS OCAP BiOp.

---

[11] All pincites to docket entries use CM/ECF pagination, not the documents' internal pagination.

108.     On December 14, 2015, after receiving the Bureau's clarifying letters, the FWS issued the 2015 LOC concurring with the Bureau that the 2008 FWS OCAP BiOp addressed "all of the possible effects to delta smelt and its critical habitat by operating the CVP to deliver water under the contracts."  Letter from FWS to Bureau re: Reinitiation of Section 7 Consultations 3 (Dec. 14, 2015). The 2015 LOC relied explicitly and exclusively on the 2008 FWS OCAP BiOp.  The 2015 LOC did not include, nor reference, any analysis of data that post-dates the 2008 FWS OCAP BiOp.

**The Bureau's Consultations with NMFS as Relevant to the Fourth Supplemental Complaint**

109.     On October 22, 2004, NMFS issued the NMFS 2004 BiOp on the impacts of the OCAP to listed anadromous species.  It concluded that the OCAP would not jeopardize the survival of the winter-run or spring-run Chinook or adversely modify their critical habitat.

110.     On January 10, 2005, NMFS issued a letter of concurrence concluding that 145 SRS contracts, including the contracts with the SRS Contractors, would not jeopardize the winter-run and spring-run Chinook and other listed species.  NMFS's analysis relied expressly and exclusively on the NMFS 2004 BiOp.  NMFS's concurrence letter stated, "we find that the effects of the Valley [sic] spring-run Chinook salmon . . . and the designated critical habitat of winter-run Chinook salmon were previously considered as part of the OCAP action and fully analyzed in the [NMFS 2004 BiOp]."  The concurrence letter stated that "no additional incidental take is authorized for these contract specific actions beyond the amount or extent of incidental take authorized in the October 22, 2004 OCAP BiOp" and that reinitiation of consultation on SRS contracts may be necessary if new information revealed an effect to listed species or their critical habitat that was not considered in NMFS's concurrence letter.

111.     In 2008, a federal district court invalidated the NMFS 2004 BiOp because it contained "inexplicabl[e] inconsisten[cies] as to the species' survival and recovery," was "unlawfully silent on critical habitat effects," did not analyze the impact of global warming, and failed to analyze species recovery. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1193 (E.D. Cal. 2008).  The court further ruled that the Bureau violated Section 7 of the ESA by relying on a biological opinion "with such obvious flaws," and "obviously contradictory evidence." *Id.* at 1188-

91.

112.    On June 4, 2009, NMFS issued the NMFS OCAP BiOp.  Unlike the NMFS 2004 BiOp, the new BiOp concluded that the OCAP *would* cause jeopardy to listed anadromous species, including the winter-run and spring-run Chinook, and adversely modify critical habitat.

113.    The NMFS OCAP BiOp affirmatively states that it *did not* analyze the effects of water contracts, such as the SRS contracts:  "[T]his consultation does not address ESA section 7(a)(2) compliance for individual water supply contracts.  Reclamation and DWR should consult with NMFS separately on their issuance of individual water supply contracts."  NMFS OCAP BiOp at 35; *id.* at 729.

114.    The NMFS OCAP BiOp also clarifies that the Bureau *does not have ESA authorization* to take listed salmonid species to satisfy terms of the SRS contracts it deems nondiscretionary: "In the event that Reclamation determines that delivery of quantities of water to any contractor is nondiscretionary for purposes of the ESA, any incidental take due to delivery of water to that contractor would not be exempted from the ESA section 9 take prohibition in this Opinion."  *Id.*  At the time of the NMFS OCAP BiOp, a federal court had deemed deliveries of water to the SRS Contractors non-discretionary.  The NMFS OCAP BiOp states that, "Sacramento Settlement Contract withdrawal volumes from the Sacramento River can be quite substantial during these months. The court has recently concluded that Reclamation does not have discretion to curtail the Sacramento Settlement contractors to meet Federal ESA requirements. Therefore, NMFS is limited in developing an RPA that minimizes take to acceptable levels in these circumstances…. The incidental take statement for this Opinion also provides limitations of ESA incidental take coverage for Settlement Contractors under the terms of this Opinion."  *Id.* at 601.

115.    NMFS has amended the NMFS OCAP BiOp several times.  In 2011, NMFS amended the BiOp in response to a report by an independent review panel ("IRP").  Specifically, NMFS amended the reasonable and prudent alternative ("RPA") so that the actions and implementation procedures were consistent with the recommendations of the IRP.  NMFS also revised the BiOp to correct errors and provide clarification.  NMFS again amended the NMFS OCAP BiOp in 2014 and 2015, when it responded to the Bureau's request for reinitiation to analyze the impacts of the

Bureau's Drought Operations Plan and the impacts of the TUCP it jointly filed with DWR to modify the water quality standards in D-1641, Bay-Delta water quality standards, and provisions of the NMFS OCAP BiOp.  Although the Bureau sought modifications to the NMFS OCAP BiOp, D-1641, and the Bay-Delta water quality standards to provide more water to the SRS Contractors, the Bureau did not reinitiate consultation on the renewed SRS contracts themselves when it filed the TUCPs. Nor has the Bureau reinitiated consultation to address the take of winter-run and spring-run Chinook caused by the loss of temperature control in the Sacramento River during the 2014 and 2015 temperature management seasons.

## LEGAL BACKGROUND

### Consultation under the ESA

116.    Section 7(a)(2) of the ESA requires that each Federal agency, in consultation with the Secretary,[12] insure that any activity which it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any threatened or endangered species or destroy or adversely modify any listed species' critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14 (1986).

117.    An action would jeopardize a species if it reasonably would be expected to reduce appreciably the likelihood of both the survival and recovery of the species in the wild.  50 C.F.R. § 402.02 (1986).

118.    Following consultation, the Secretary must issue a "biological opinion" in which he determines whether the activity is likely to jeopardize a listed species or adversely affect its critical habitat and provides a summary of the reasons for this conclusion.  16 U.S.C. § 1536(b)(3)(A).  In formulating his opinion, the Secretary must use the best scientific and commercial data available.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8) (1986).

119.    The Secretary has delegated his duties under the ESA to the Service.  50 C.F.R. § 402.01(b) (1986).

---

[12] The Secretaries of the Interior and Commerce share responsibilities under the ESA according to the type of species involved.  16 U.S.C. § 1532(15).  For the delta smelt, the Secretary of the Interior is the responsible official.

**Adverse Modification of Critical Habitat under the ESA**

120.    The Service has defined the phrase "destruction or adverse modification" of critical habitat in Section 7(a)(2) as:

> [A] direct or indirect alteration that appreciably diminishes the value of critical habitat for both survival and recovery of a listed species.  Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

50 C.F.R. § 402.02.

121.    As discussed above, courts have found that the Service's definition of adverse modification to critical habitat is an impermissible interpretation of the ESA because it reads the goal of "recovery" out of the inquiry by holding that a proposed action "adversely modifies" critical habitat only if the value of the critical habitat for *survival* is also appreciably diminished.  *See, e.g.*, *Gifford Pinchot*, 378 F.3d at 1069.  Established case law demands that the agency be afforded a presumption of regularity, meaning a presumption that the Service relied upon its own regulations. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).  The Service can rebut this presumption and, therefore, establish that its presumed reliance on the flawed regulation was harmless error if it can establish that it considered recovery in its analysis despite the existence of the regulatory definition.  *Gifford Pinchot*, 378 F.3d at 1072.

122.    The Service states that it did not rely on this definition but rather on "statutory provisions of the ESA" to complete the analysis in the Biological Opinion.  This unsupported statement does not alleviate the problem unless there is sufficient evidence in the record to support that claim.  *Gifford Pinchot*, 378 F.3d at 1071.  There is no such evidence in the Biological Opinion. In fact, the Biological Opinion lacks any discussion of how the OCAP will impact the recovery of the species through changes to critical habitat.  The Biological Opinion only adds the word "recovery" to the discussion three times, and each of those instances merely involved renaming a variable, previously termed the "Midwinter trawl index," to the "recovery index"; no changes were made to the accompanying graphs or discussion of those graphs or that variable.  *See* Reinitiation of Formal and Early Section 7 Endangered Species Consultation on the Coordinated Operations of the

Central Valley Project and State Water Project and the Operational Criteria and Plan to Address Potential Critical Habitat Issues (Feb. 16, 2005) (*i.e.*, the Biological Opinion) at 110, 113.

123.    The Biological Opinion fails adequately to consider or to render any conclusion as to whether the action on which consultation was conducted would adversely impact delta smelt critical habitat in a manner that would adversely impact recovery of that species.  The action in question would have such an adverse impact to delta smelt critical habitat.

**Reliance on Uncertain Measures as Basis for No Jeopardy Opinion**

124.    According to Section 7(a)(2) of the ESA, the Service must "insure that any action authorized . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C § 1536(a)(2).

125.    A biological opinion must include a discussion "as to whether the action, taken together with its cumulative effects, is likely to jeopardize [the species]."  50 C.F.R. §402.14(g)(4). The Service has defined the "effects of the action" as "the direct and indirect effects on the species or the critical habitat."  50 C.F.R. §402.02.  The definition goes on to define indirect effects as "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.*

126.    "Mitigation measures must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards."  *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002); *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987).

127.    Reliance on the uncertain "adaptive management" and unproven future mitigation measures to conclude that the project will not put the species in jeopardy or adversely modify its critical habitat violates Section 7(a)(2) the ESA.  Such reliance allows take of and potential jeopardy to smelt, and destruction or adverse modification of smelt habitat, without first insuring that the species will not be jeopardized and recovery will not be delayed or impaired.

1

**Failure to Consider the Entire Effects of the Action**

2      128.   Section 7(a)(2) of the ESA and its implementing regulations require the Service to

3   "[e]valuate the effects of the action and cumulative effects" and to render its biological opinion "as

4   to whether the action, taken together with cumulative effects, is likely to jeopardize the continued

5   existence of listed species or result in the destruction or adverse modification of critical habitat."  50

6   C.F.R. § 402.14(g)(3), (4).  The Service's regulations specify that the "actions" on which ESA § 7

7   consultation is required include "all activities or programs of any kind *authorized*, funded or carried

8   out" by any federal agency, including "the granting of . . . contracts."  50 C.F.R. §§ 402.02, 402.14

9   (emphasis added).  The Service's regulations further define the phrase "effects of the action" to

10  include "the direct and indirect effects of an action . . . , together with the effects of other activities

11  that are interrelated or independent."  50 C.F.R. § 402.02 (emphasis added).  "Indirect effects" are

12  those effects "caused by the proposed action and later in time, but still reasonably certain to occur."

13  *Id.*  "Interrelated actions" are actions that are "part of a larger action and depend on the larger action

14  for their justification."  *Id.*  "Interdependent actions" are actions that "have no independent utility

15  apart from the action under consideration."  *Id.*  In short, the ESA requires a biological opinion to

16  analyze the effects of the entire action authorized by the agency, without piecemealing the

17  consultation into incremental steps.

18      129.   FWS did not comply with this mandate in issuing the challenged Biological Opinion.

19  Among other inadequacies, the FWS failed to consider the full effects of the action authorized in

20  impending long-term water supply contracts, which were the chief motivating force behind the

21  Bureau's and FWS' rush to complete the Biological Opinion, and did not consider the effects of

22  construction activities associated with the SDIP.

23      **Failure to Consider the Best Available Science**

24      130.   Section 7(a)(2) of the ESA requires consultations to be based on the best available

25  scientific information.  FWS did not adhere to that mandate in rendering the challenged Biological

26  Opinion.  Among other deficiencies, the Service failed to consider current population viability

27  analyses indicating that the species has a high risk of extinction within the next 20 years.  In addition,

28  the Service wholly failed to consider the effects of global climate change.  Scientific data available

today predict warming in the western United States of several degrees centigrade over the next 100 years and indicate that this temperature change will dramatically change western hydrology.  The Biological Opinion did not consider these changes in evaluating the effects of future CVP and SWP operations on delta smelt.

**Failure to Insure that Project Operations Are Not Likely to Jeopardize Delta Smelt or Adversely Modify Its Critical Habitat**

131.    As the action agency, the Bureau has an independent obligation under ESA § 7(a)(2) to insure that its actions are not likely to jeopardize the continued existence of the delta smelt or adversely modify its critical habitat.

132.    Agency action that is based on what the action agency knows to be an inaccurate or incomplete jeopardy analysis by the consulting agency violates ESA § 7(a)(2).  *See, e.g.*, *Resources Ltd. v. Robinson*, 35 F.3d 1300, 1305-06 (9th Cir. 1994).  The Bureau knew or had reason to know that the Biological Opinion was inadequate and, consequently, that the four contract consultations that tiered off the analysis in the Biological Opinion were also inadequate.  For example, the Bureau knew that the FWS failed to consider the best available science prior to issuing the Biological Opinion; that the Biological Opinion did not analyze the impact of full water delivery under the proposed renewal contracts; and that the FWS's DMCU concurrence letter was based on the withdrawn 2004 Biological Opinion.

133.    Despite this, the Bureau has taken and is taking actions in reliance on the faulty jeopardy analysis set forth in the Biological Opinion and four concurrence letters, even in the face of significant take of delta smelt by the export facilities and adverse modification of critical habitat caused by water exports and diversions.  These actions include the Bureau's continued implementation of expanded Project operations, as set forth the 2004 OCAP, and the execution and continuing performance of the long-term water supply renewal contracts described above.  The Bureau has thus failed to insure that its actions are not likely to jeopardize the continued existence of the delta smelt or adversely modify its critical habitat.

## ADDITIONAL LEGAL BACKGROUND FOR FOURTH SUPPLEMENTAL COMPLAINT

### FWS's Unreasonable Reliance in the 2015 Letter of Concurrence on the FWS 2008 OCAP BiOp

134.    In arriving at its jeopardy determination, a consulting agency must "evaluate the effects of the action." 50 C.F.R. § 402.14(g)(3). There must be a "detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h)(2).

135.    The Ninth Circuit en banc panel ruled that the 2008 FWS OCAP BiOp "merely assesses the general effects of the [OCAP]" and did not address the "Bureau's decision to renew the specific contracts" at issue in this case. *Jewell*, 747 F.3d at 782. The 2015 LOC does not include any analysis of the contract renewals, and did not refer to any analysis, except for the analysis in the 2008 FWS OCAP BiOp. Thus, the 2015 LOC relies exclusively on the 2008 FWS OCAP BiOp's aggregate system-wide analysis of the OCAP and does not analyze the specific terms of the contracts and their effects on the delta smelt and its critical habitat.

136.    FWS unreasonably relied in the 2015 LOC on the 2008 FWS OCAP BiOp because the 2008 FWS OCAP BiOp did not consider the term of the SRS contract renewals pertaining to the duration of the contracts. Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), requires that a consulting agency consider the "*entire* agency action" in a consultation that is "co-extensive" with the authorized action. *Conner v. Burford*, 848 F.2d 1441, 1453, 1458 (9th Cir. 1988). FWS concurred with the Bureau in the 2015 LOC that "all of the possible effects to delta smelt and its critical habitat by operating the CVP to deliver water under the SRS and DMC contracts were addressed in the [2008 FWS OCAP BiOp]." FWS 2015 LOC at 3. Although the term of the 40-year SRS contracts runs from 2005-2045, the 2008 FWS OCAP BiOp repeatedly states that the modeling and analysis underlying the consultation does not extend beyond 2030. Further, the studies in Reclamation's 2008 BA, upon which FWS relied in completing the 2008 FWS OCAP BiOp, make clear that Reclamation's own modeling and analysis only extends to the 2030 "consultation horizon" for the 2008 FWS OCAP BiOp. Thus, neither the 2015 LOC, nor the 2008 FWS OCAP BiOp upon which it relies, analyzed the entire 40-year term of the SRS contracts. FWS failed to conduct a consultation that was co-extensive with the authorized action, as required by the ESA.

137.     FWS unreasonably relied in the 2015 LOC on the 2008 FWS OCAP BiOp because the 2008 FWS OCAP BiOp did not analyze other specific terms of the contract renewals on the delta smelt and its critical habitat.  Amongst other deficiencies, neither the 2015 LOC, nor the 2008 FWS OCAP BiOp upon which it relies, considers: (1) the effects of pricing terms in the contracts, and more specifically, how the pricing of water in the contracts affects water demand and conservation; (2) the effects of the timing and quantity terms of the contracts on the ability of the Bureau to comply with the RPA in the 2008 FWS OCAP BiOp in tandem with other obligations, including D-1641 and the NMFS OCAP BiOp; (3) the effects of the authority provided in the SRS contracts to the SRS Contractors to dictate the timing of water diversions, even when hydrological conditions require that diversions be made on a different schedule for species-protection purposes; and (4) the effects of the water conservation terms in the renewals and their impact on water demands.

138.     To the extent that FWS claims that it was not required to consult on certain terms of the SRS contracts because of the Bureau's assertions regarding its lack of discretion to modify those terms, FWS's claims (and the Bureau's assertions) are unreasonable and contrary to the law of the case, as established in the Ninth Circuit en banc panel's opinion.  *See Jewell*, 749 F.3d at 785.  When the Bureau requested reinitiation on July 30, 2015, it sent supplemental information to FWS effectively claiming that the Bureau lacked discretion to modify the SRS contracts to protect the delta smelt.  The Bureau's claims regarding discretion contradicted rulings by the Ninth Circuit en banc panel.  For example, in spite of the en banc panel's ruling that the Bureau has discretion to alter the "timing of water distribution" to the SRS Contractors, *id.*, the Bureau claimed that it does not have discretion to "alter the . . . timing of SRS diversions from those set forth in the initial SRS contracts," Supp. Info. BA at 10.  And, in spite of the en banc panel's ruling that the Bureau has discretion to change the contracts' "pricing scheme" to benefit the delta smelt, *Jewell*, 749 F.3d at 785, the Bureau claimed that it "lacks discretion to set pricing terms in the SRS contracts for the sole purpose of protecting delta smelt."  Supp. Info. BA at 11.  On October 20, 2015, NRDC sent a letter to FWS explaining that the Bureau had made assertions regarding its discretion to modify the contract renewals that contravened the en banc panel's ruling.   And, on October 28, 2015, NRDC alerted FWS that the Bureau had issued new environmental documents on October 26, 2015 that

demonstrated the Bureau's exercise of the very discretion that it denied it had in its earlier correspondence with FWS: to modify the timing of deliveries under the SRS contracts.  Specifically, the Bureau authorized the modification of terms related to timing in the SRS contracts to allow for the extended use of diverted water.

139.    FWS's reliance on the 2008 FWS OCAP BiOp was further unreasonable because the 2008 FWS OCAP BiOp and RPA relied on the assumption that Delta flow requirements and export limits in D-1641 which are designed to protect the delta smelt at key points in the spawning, rearing, and migration phases of its life cycle would remain intact throughout the consultation period.  When the Bureau requested reinitiation of consultation with FWS on July 30, 2015, the Bureau had already sought and received approval from the SWRCB in both 2014 and 2015 to waive these protections multiple times.  Such waivers are likely to become increasingly frequent in the future as the duration and intensity of droughts are anticipated to increase in California.  Moreover, in its concurrence letter, FWS acknowledged the signficance of waived Delta outflow requirements on delta smelt but failed to address it.  It was therefore unreasonable for FWS to rely in the 2015 LOC on the FWS 2008 OCAP BiOp because the assumptions underlying the analysis in the FWS 2008 OCAP BiOp are no longer valid.

**FWS's Failure to Consider the Best Available Science and Update Its Analysis in the 2015 Letter of Concurrence**

140.    Section 7(a)(2) of the ESA requires that both the action agency and the consulting agency use the best available scientific and commercial data available in fulfilling their respective obligations under the ESA. 16 U.S.C. § 1536(a)(2).  Agencies are prohibited "from disregarding available scientific evidence that is in some way better than the evidence [they] rely upon."  *Kern Cnty. Farm Bur. v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006).  Agencies "cannot ignore available biological information."  *Id.*

141.    The requirement that agencies use the best available science applies in reinitiated consultations.  As FWS explained in a recent case to the court's approval, "[a]fter an action agency reinitiates consultation, nothing in the statute or the regulations limits the agency's authority or the scope of the reinitiated consultation process.  Rather, the Service is obligated to update the analyses

of its biological opinion to conform to all of the requirements of ESA Section 7." *Ridge Top Ranch, LLC v. U.S. Fish & Wildlife Serv.*, No. CIV. S-13-2462, 2014 WL 841229, at *14 (E.D. Cal. Mar. 4, 2014).

142.   When the Court stayed this litigation on June 15, 2015, it did so to "allow the agencies to revisit whether approval of the Contracts comports with the ESA *in light of the most up-to-date information*." Doc. 979 at 12 (emphasis added).  The Bureau's July 30, 2015 request for reinitiation and subsequent clarifying memoranda, however, evidence the Bureau's intention to limit the scope of FWS's analysis in the 2015 LOC to the 2008 FWS OCAP BiOp and to prevent analysis of changes in hydrology, science, and the status of the delta smelt since 2008.  FWS complied with the Bureau's request to limit the scope of its analysis to the 2008 FWS OCAP BiOp.  FWS's 2015 LOC did not include, nor reference, any analysis of data on hydrology, new scientific information on the impacts of low Delta outflow, the status of the delta smelt, or CVP/SWP operational changes that post-dates the 2008 FWS OCAP BiOp.

143.   Amongst other deficiencies, FWS did not analyze new survey data showing that the delta smelt population has reached record-low levels for two consecutive years, nor how the contract renewals affected the recent decline in the delta smelt population.  FWS acknowledges in the 2015 LOC that it is "concerned about the continued decline of delta smelt as demonstrated by the historically low numbers in all recent survey efforts."  Doc. 993-1 at 5.  FWS failed, however, to update its analysis and modeling using this new abundance data.  Instead, FWS relied exclusively on outdated data in the 2008 FWS OCAP BiOp.

144.   FWS also failed to consider new information pertaining to hydrology and flows in the Delta.  The Bureau sought, and received approval, to waive D-1641's flow requirements and export limits in 2014 and 2015 because it determined that, due to unanticipated hydrological conditions, there was not enough water to meet the delta smelt-protective flow requirements and export limits, satisfy the Bureau's obligations under the contract renewals, and effectuate other species protections.  FWS acknowledged that "we may require greater certainty as to Reclamation's ability to provide needed outflow through the Delta," but entirely failed to consider the effects of the contract renewals on delta smelt and its critical habitat when the flow requirements and export limits in D-1641 are not

in effect due to hydrological conditions and competing contract demands such as those that occurred in 2014 and 2015.

145.     In addition, new scientific information identified in the January 2015 report of the Interagency Ecological Program indicated that reductions in Delta outflow in the winter and spring months were likely to cause significant adverse effects on Delta smelt subsequent abundance. Interagency Ecological Program, Management, Analysis, and Synthesis Team, *An Updated Conceptual Model of Delta Smelt Biology: Our Evolving Understanding of an Estuarine Fish* 153-62 (January 2015).  This is new scientific information that FWS entirely failed to consider in the 2015 LOC.

**FWS's Impermissible Postponement of Consultation and Unreasonable Assumptions Regarding Quantity Modifications Under the SRS Contracts**

146.     The ESA does not permit consulting agencies to postpone determinations regarding the effects of an action.  *See Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003) (explaining that agencies must finish consultation "*before* engaging in a discretionary action, which may affect listed species" (emphasis added)); *see also NRDC v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1999) ("The failure to respect the process mandated by law cannot be corrected with post-hoc assessments of a done deal.").

147.     FWS impermissibly relied in the 2015 LOC on unspecified "future consultations" to analyze and address the impacts of the SRS contract terms on the delta smelt.  Doc. 993-1 at 5.  After FWS acknowledged the "continued decline" of delta smelt and the species "historically low numbers," it stated that "[i]n future consultations to ensure the adequate protection of delta smelt and its critical habitat under the [ESA], we may require greater certainty as to Reclamation's ability to provide needed outflow through the Delta.  If increased outflows are needed and cannot be met under the SRS contracts, those contracts may need to be revisited to ensure consistency with the [ESA]." *Id.*  If the Bureau cannot reduce water quantities under the SRS contract renewals, then FWS was required to analyze the impacts of the SRS contract renewals on the delta smelt and its critical habitat using the assumption that there *is not flexibility* in the SRS contract renewals to reduce water quantities to meet the conservation and recovery requirements in the ESA.  It was unreasonable and

not in accordance with the law for FWS to postpone a determination regarding the potentially

necessary flexibility in the SRS contracts to unspecified "future consultations." *Id.*

148.     Relatedly, FWS assumed in the 2015 LOC that "if increased outflows are needed" to

meet the conservation and recovery requirements of the ESA, Article 7(b) of the SRS contract

renewals allows the Bureau to limit the water available to the SRS Contractors.  In a supplemental

document the Bureau provided to FWS with its request for reinitiation, however, the Bureau declared

that it has no discretion to "alter the quantities . . . of SRS diversions."  Supp. Info. BA 10.  FWS

unreasonably assumed in its 2015 LOC that the Bureau can take species-protective actions that the

Bureau itself declared it has no discretion to take.

**Duty to Reinitiate Consultation Under the ESA**

149.     Even in those circumstances when an initial, valid consultation is completed, and the

action that was the subject of that consultation is being implemented, federal agencies have a duty to

reinitiate consultation pursuant to Section 7(a)(2) of the ESA under specified circumstances.  The

ESA's implementing regulations, 50 C.F.R. §402.16, provide that:

> Reinitiation of formal consultation is required and shall be requested by the Federal
> agency or by the Service, where discretionary Federal involvement or control over the
> action has been retained or is authorized by law and: (a) If the amount or extent of
> taking specified in the incidental take statement is exceeded; (b) If new information
> reveals effects of the action that may affect listed species or critical habitat in a
> manner or to an extent not previously considered; (c) If the identified action is
> subsequently modified in a manner that causes an effect to the listed species or critical
> habitat that was not considered in the biological opinion; or (d) If a new species is
> listed or critical habitat designated that may be affected by the identified action.

150.     The Ninth Circuit has clarified that "an agency's responsibility to reinitiate

consultation does not terminate when the underlying action is complete." *Cottonwood Envtl. Law*

*Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1086 (9th Cir. 2015).  An agency's duty to reinitiate can be

triggered so long as the agency retains some modicum of "involvement or control" over the

implementation of the action.  *Id.*

151.     The reinitiation requirements under the ESA apply to both formal and informal

consultations. *Conservation Cong. v. Finley*, 774 F.3d 611, 619 (9th Cir. 2014).  When reinitiation

is triggered, the consulting agency must conduct a new consultation that is compliant with Section

7(a)(2) of the ESA and its implementing regulations. *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992); *Ctr. for Biological Diversity v. Envtl. Prot. Agency*, 65 F. Supp. 3d 742, 770 (N.D. Cal. 2014).

**The Bureau's Failure to Reinitiate Consultation on Impacts to Salmonid Species**

152.    The Bureau violated, and is violating, 50 C.F.R. § 402.16 by failing to reinitiate consultation on the SRS contracts to determine how the NMFS OCAP BiOp and its subsequent amendments affect the winter-run and spring-run Chinook.  NMFS's letter of concurrence on the SRS contracts did not include independent analysis of the effects of the SRS contracts but instead came to its conclusion because it determined that the effects of the renewals were fully analyzed in the NMFS 2004 BiOp.  The NMFS 2004 BiOp thus provided the sole basis for NMFS's letter of concurrence.  When a federal court ruled that the NMFS 2004 BiOp was invalid and illegal, it undermined the basis for the letter of concurrence.  The NMFS OCAP BiOp (which, unlike the prior BiOp, found that the OCAP *would* cause jeopardy) and NMFS's subsequent amendments constitute "new information [that] reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," triggering the Bureau's mandatory duty to reinitiate consultation under 50 C.F.R. § 402.16(b).  The Bureau is engaged in an ongoing agency violation by implementing the SRS contracts without reinitiating consultation.

153.    The Bureau also violated, and is violating, 50 C.F.R. § 402.16 by failing to reinitiate consultation based on new information regarding the massive mortality of the 2014 and 2015 generations of winter-run and spring-run Chinook.  Specifically, the Bureau's excessive releases from Keswick Dam in 2014 and 2015 to satisfy the terms of the SRS contracts depleted the cold water pool in Shasta Reservoir and led to fatal increases in temperatures throughout the temperature management season.  Data showing near-total mortality of two consecutive winter-run brood years constituted new information that triggered the Bureau's obligation to reinitiate consultation on the SRS contracts.  The Bureau is engaged in an ongoing agency violation by implementing the SRS contracts without reinitiating consultation.

154.    The Bureau's "discretionary Federal involvement or control over" the SRS contracts has been established multiple times during this litigation.  The Ninth Circuit en banc panel

unanimously ruled that the Bureau retained discretion to take species-protective measures with regards to the SRS contracts.  The Bureau itself obtained a stay on the premise that it would reinitiate consultation with FWS under 50 C.F.R. § 402.16 to evaluate the impacts of the contracts on the threatened delta smelt.  Doc. 979.

155.    There is also ongoing "Federal involvement" in the SRS contracts' implementation.  The contracts require that the Bureau implement the contracts in compliance with the ESA.  Further, the Bureau is involved in the ongoing implementation of the SRS contracts.  For instance, the Bureau makes real-time determinations regarding the timing and volume of releases that allow the SRS Contractors to make diversions of water.  And the Bureau has sought and received approval to waive requirements under D-1641 to increase the amount of water it can provide to the SRS Contractors.

**The Bureau's and SRS Contractors' Unlawful Take of Winter-Run Chinook Under ESA Section 9**

156.    Section 9 of the ESA prohibits the "take" of any endangered or threatened species of fish or wildlife within the United States.  16 U.S.C. § 1538(a)(1)(B).  No person may directly take a protected species nor "cause to be committed" any take.  *Id.* § 1538(g).

157.    Congress defined take broadly to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  The ESA's implementing regulations further define "harass" and "harm."  "Harass . . . means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3.  "Harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."  *Id.*

158.    The ESA's legislative history supports "the broadest possible" reading of take.  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704-05 (1995).  The Supreme Court has explained that "Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions."  *Id.* at 704.  For instance, "harming a species may be indirect, in that the

harm may be caused by habitat modification." *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 924-25 (9th Cir. 1999).

159.    Any "person" under the jurisdiction of the United States can be liable for violating ESA section 9. 16 U.S.C. § 1538(a)(1). The ESA defines "person" to include "any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State" and "any State, municipality, or political subdivision of a State." *Id.* §1532(13). Government actions authorizing third parties to engage in harmful activities can constitute illegal take under Section 9 of the ESA. *See, e.g.*, *Strahan v. Coxe*, 127 F.3d 155, 164 (1st Cir. 1997).

160.    Pursuant to section 7(b)(4) of the ESA, a consulting agency may issue an "incidental take statement" if the agency concludes both that the federal action in question will not jeopardize a listed species, or can be carried out pursuant to a RPA without jeopardizing a species, and that the taking of the species is incidental to the action and will not cause jeopardy. 16 U.S.C. § 1536(b)(4)(A)-(B). The consulting agency must "specif[y] the impact" of the incidental taking, "specif[y] those reasonable and prudent measures . . . necessary or appropriate to minimize such impact," and "set forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant . . . to implement the measures specified" under the incidental take statement. 16 U.S.C. § 1536(b)(4)(i)-(ii), (iv). "If the terms and conditions of the Incidental Take Statement are disregarded and a taking does occur, the action agency or the applicant may be subject to potentially severe civil and criminal penalties under Section 9." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1239.

161.    The Bureau's excessive releases, and the SRS Contractors' diversions, of water from Shasta Reservoir in 2014 and 2015 violated Section 9 of the ESA. The Bureau's releases depleted the cold water reserves behind Shasta Dam, causing the Bureau to lose temperature control in the upper Sacramento River throughout the temperature management season. The Bureau's excessive releases and the SRS Contractors' diversions were the predominant and direct cause of the loss, or "take," of an estimated 95% of the winter-run brood in 2014, and the almost complete loss, or "take," of spring-run Chinook eggs in the Sacramento River that year. The Bureau's excessive

releases, and the SRS Contractors diversions, were the predominant and direct cause of the loss, or "take," of an estimated 97.9% of the winter-run brood in 2015.  The Bureau's actions in 2014 and 2015 not only killed endangered winter-run and threatened spring-run Chinook, they also harmed the species by causing "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

162.    The NMFS OCAP BiOp, as amended, states that the Bureau and SRS Contractors do not have authorization to take winter-run or spring-run Chinook in the course of delivering quantities of water it deems non-discretionary under a water contract.  In addition, the NMFS OCAP BiOp, as amended, states that water deliveries to SRS Contractors are nondiscretionary, and that "[t]he incidental take statement for this Opinion also provides limitations of ESA incidental take coverage for Settlement Contractors under the terms of this Opinion."  BiOp at 601. During the relevant time period, the Bureau has taken the position that it has no discretion to alter the quantities of water to SRS Contractors.  Because the biological opinion concludes that SRS Contract deliveries are nondiscretionary and because the Bureau similarly claims to lack discretion as to the quantities of water it delivers to satisfy the terms of the SRS contracts, the NMFS OCAP BiOp makes clear that the Bureau did not have authorization for the take of winter-run and spring-run Chinook in 2014 and 2015.

163.    In 2014, the Bureau and DWR reinitiated consultation with NMFS on the Bureau and DWR's Drought Operations Plan.  The Drought Operations Plan included further modifications to the NMFS OCAP BiOp.  NMFS approved the Drought Operations Plan and modifications to the NMFS OCAP BiOp on the condition that it "[c]onserv[e] storage in Shasta Reservoir by limiting releases from Keswick Dam to no greater than 3,250 cfs … unless necessary to meet nondiscretionary obligations or legal requirements."  Letter from William Stelle, NMFS Regional Administrator, to David Murillo, the Bureau's Regional Director, at 4 (undated, but posted on April 8, 2014: http://www.waterboards.ca.gov/waterrights/water_issues/programs/drought/docs/tucp/031814order_ urgchg_swcv/20140408_nmfs_to_usbr_dop.pdf).  The Bureau made releases during that time period

far in excess of 3,250 cfs, including for deliveries to the SRS Contractors.  If the Bureau has discretion as to the quantities of water it delivers to the SRS Contractors, it violated the conditions of NMFS's reinitiated consultation and therefore did not have take authorization under the NMFS OCAP BiOp.

164.    In 2015, the Bureau and DWR reinitiated consultation with NMFS on the Bureau and DWR's 2015 Drought Contingency Plan.   Given the disastrous outcomes in 2014, NMFS directed the Bureau to plan its operations throughout the summer and fall to maintain temperatures below 56 degrees at the Clear Creek compliance point.  The Bureau, however, again made releases well in excess of what was required to maintain temperature control.  In doing so, the Bureau violated the conditions of NMFS's reinitiated consultation for a second consecutive year.

165.    Because the NMFS OCAP BiOp did not include analysis of the impacts of water contracts, it does not provide the SRS Contractors with take authority.

### FIRST CLAIM FOR RELIEF

### (By Plaintiffs NRDC, Baykeeper, FOR and TBI)

### Violation of the Administrative Procedure Act
### (5 U.S.C. § 706)

166.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

167.    The Secretary's conclusion, in the Biological Opinion for the Coordinated Operations of the CVP/SWP, that the changes, including operational changes and future operations, will not jeopardize the continued existence of the delta smelt and will not result in the destruction or adverse modification of the critical habitat of delta smelt is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

168.    The Biological Opinion unlawfully failed adequately to consider or to render a biological opinion on how the actions on which consultation was undertaken would affect delta smelt critical habitat's value for recovery of the species.

169.    The Secretary's conclusion, in the Biological Opinion, that the planned operational and other changes to the CVP and SWP, and their future operations, will not jeopardize the

continued existence of the delta smelt or cause adverse modification to the delta smelt's critical habitat has no basis in the Biological Opinion or elsewhere in the record.  The Biological Opinion improperly relies on uncertain future mitigation measures and a promise of adaptive management without adequate evidence that the mitigation measures will be undertaken and will be effective and without identifying concrete actions sufficient to insure protection of the delta smelt and its critical habitat as a result of any future "adaptive management."

170.    The Biological Opinion failed properly to define the agency action or to consider the "effects of the action," thereby significantly underestimating and/or ignoring the effects of the entire agency action.

171.    The Biological Opinion failed to consider the best available scientific information.

172.    The analysis, reasoning, and conclusion of the Biological Opinion, and the Secretary's actions described herein, are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law, in violation of ESA § 7 and its implementing regulations and the standards of the Administrative Procedure Act, 5 U.S.C. § 706.

**SECOND CLAIM FOR RELIEF**

**(By Plaintiffs NRDC, Baykeeper, FOR and TBI)**

**Violations Of ESA And APA:**
**Bureau's Failure To Insure That Its Actions Are Not Likely To Jeopardize**
**The Continued Existence Of The Species Or Adversely Modify**
**Its Critical Habitat**
**(16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706)**

173.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

174.    The Bureau has an independent duty to insure that its actions avoid jeopardy.  The Bureau cannot satisfy this duty by relying on what it knows or should know to be an inadequate consultation with the FWS.

175.    As alleged above, the Biological Opinion incorrectly concludes that the 2004 OCAP will not jeopardize the delta smelt or adversely modify its critical habitat, as the Bureau knew or

should have known.  Implementation of the 2004 OCAP operations, including its direct, indirect, and cumulative effects, has both short-term and long-term adverse impacts on the delta smelt that jeopardize its continued existence and that adversely modify its critical habitat.  Accordingly, notwithstanding the Biological Opinion, by implementing the 2004 OCAP and related actions, the Bureau has failed and is failing to perform its affirmative obligation to insure that its actions will not jeopardize the continued existence of the delta smelt, in violation of ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2).

176.    For the same reasons, the Bureau also has failed and is failing to insure that its actions are not likely to adversely modify the designated critical habitat of the delta smelt.  The final rules designating critical habitat for the delta smelt describe many features of critical habitat essential for these species' recovery, including, among other things, adequate water quality and quantity, water temperature, and safe passage conditions.  Implementation of the 2004 OCAP is adversely impacting these features of designated critical habitat and will adversely modify the ability of the critical habitat to contribute to the recovery of the species, in violation of ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2).

177.    Furthermore, the Bureau has failed and is failing to comply with ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2), by executing and implementing the long-term water supply renewal contracts described above, in reliance on what it knew or should have known to be faulty analysis by the FWS.  The execution and continued performance of these renewal contracts has short- and long-term adverse impacts on the threatened delta smelt that jeopardize the species' continued existence and adversely modify its critical habitat.

178.    The Bureau's failure to insure that its actions do not jeopardize the continued existence of the delta smelt or adversely modify its critical habitat is arbitrary, capricious, an abuse of discretion, and not in accordance with law, contrary to the APA, 5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**

**(By Plaintiffs NRDC, Baykeeper, FOR and TBI)**

**Violations Of ESA And APA:**
**Irretrievable And Irreversible Commitments Of Resources**
**That Foreclose Reasonable And Prudent Alternatives**
**(16 U.S.C. § 1536(d); 5 U.S.C. § 706)**

[Dismissed pursuant to the Court's order of January 23, 2008 (Doc. 567).][13]

**ADDITIONAL CLAIMS IN FOURTH SUPPLEMENTAL COMPLAINT**

**FOURTH CLAIM FOR RELIEF**

**(By Plaintiffs NRDC, Baykeeper, FOR and TBI)**

**Violation of the APA: FWS's Failure to Conduct an Adequate Reinitiated Consultation**
**on the Effects of the Contract Renewals on Delta Smelt and Its Critical Habitat**
**(5 U.S.C. §§701, *et seq.*)**

179.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

180.     The Secretary failed to conduct an adequate consultation on the effects of the contract renewals on delta smelt and its critical habitat.  The Secretary's actions, analysis, and conclusions were arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law, in violation of the ESA, its implementing regulations, and the standards set forth in the APA, 5 U.S.C. § 706(2), including for the reasons set forth below.

181.     The Secretary unreasonably relied on the 2008 FWS OCAP BiOp as the sole basis for its analysis in the 2015 LOC.  ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), and its implementing regulations, 50 C.F.R. §§ 402.02, 402.14(g)(3), (h)(2), require that a consulting agency consider all the effects of an authorized action.  The 2008 FWS OCAP BiOp, however, did not analyze the effects of the specific terms of the contract renewals on the delta smelt and its critical habitat.  Further, the Secretary unreasonably relied on the assumption in the 2008 FWS OCAP BiOp that

---

[13] Plaintiffs in the Third Supplemental Complaint preserved all rights to challenge the Court's
(cont'd next page)

species-protective flow requirements and export limits in the Delta would remain intact, even though those protections had been waived in both 2014 and 2015.  The Secretary's reliance in the 2015 LOC on the 2008 FWS OCAP BiOp was therefore arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law, in violation of the ESA, its implementing regulations, and the standards set forth in the APA, 5 U.S.C. § 706(2).

182.    ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), requires consultation on the entire agency action at issue.  Even though the SRS contracts do not expire until 2045, neither the 2015 LOC, nor the 2008 FWS OCAP BiOp upon which it exclusively relies, considered any impacts of the contracts on delta smelt and its critical habitat beyond 2030.  The Secretary's failure to consider the entire agency action was arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law, in violation of the ESA, its implementing regulations, and the standards set forth in the APA, 5 U.S.C. § 706(2).

183.    ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), requires that a consulting agency utilize the best scientific and commercial data available in rendering its consultation.  Further, when an action agency reinitiates consultation under 50 C.F.R. § 402.16, the consulting agency must update its analyses using current data.  The Secretary arbitrarily and capriciously failed to consider the best scientific data available and did not conduct, nor reference, any analysis of data that post-dates the FWS OCAP BiOp, including recent data on the further decline of the species and scientific studies showing the effect of reductions in Delta outflow on the subsequent abundance of Delta Smelt.  .  The Secretary's failure to consider the best available scientific data was arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law, in violation of the ESA, its implementing regulations, and the standards set forth in the APA, 5 U.S.C. § 706(2).

184.    FWS impermissibly postponed its analysis of the impacts of the SRS contract renewals on the delta smelt and its critical habitat to unspecified "future consultations," Doc. 993-1

---

dismissal order on appeal.

at 5, rather than assessing the impacts in the 2015 LOC, as it was required to do under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).  Relatedly, FWS unreasonably assumed in the 2015 LOC that it could alter the quantity of water available to the SRS Contractors if necessary to meet the conservation and recovery requirements of the ESA, even though the Bureau informed the FWS that it has no discretion to alter the quantities of water available to the SRS Contractors.  The Secretary's postponement of full consultation on the impacts of the SRS contract renewals, and unreasonable assumption regarding the Bureau's ability to reduce allocations to the SRS Contractors, was arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law, in violation of the ESA, its implementing regulations, and the standards set forth in the APA, 5 U.S.C. § 706(2).

### FIFTH CLAIM FOR RELIEF

### (By Plaintiffs NRDC, TBI, Baykeeper, Winnemem and PCFFA/IFR)

### Violations of ESA And APA:
### Bureau's Failure To Reinitiate Consultation Pursuant to Section 7(a)(2) of the ESA
### (16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16; 16 U.S.C. § 1540(g); 5 U.S.C. § 706)

185.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

186.     The ESA's implementing regulations, 50 C.F.R. § 402.16, require the Bureau to reinitiate ESA section 7(a)(2) consultation when the Bureau retains discretionary involvement or control over a federal action that was the subject of a prior consultation and new information reveals effects of that action that were not previously considered.

187.     The ESA citizen suit provision authorizes suits to enforce the ESA and its implementing regulations against any person who is alleged to be in violation of any provision of the ESA or regulations implementing the ESA.  16 U.S.C. § 1540(g).

188.     As alleged above, the Bureau arbitrarily and capriciously violated, and continues to violate, Section 7(a)(2) of the ESA and the ESA's implementing regulations, 50 U.S.C. § 402.16, by failing to reinitiate consultation on the SRS contracts based on the issuance of the NMFS OCAP BiOp and subsequent amendments.  The Bureau retains discretionary federal involvement and

control over the implementation of the SRS contracts.  The NMFS OCAP BiOp constituted new information that undermined the January 10, 2005 letters of concurrence and revealed effects of the SRS contracts that were not previously considered.

189.    Furthermore, and also alleged above, the Bureau arbitrarily and capriciously violated, and continues to violate, Section 7(a)(2) of the ESA and the ESA's implementing regulations, 50 U.S.C. § 402.16, by failing to reinitiate consultation based on information relating to the massive mortality to the 2014 and 2015 generations of winter-run and spring-run Chinook that occurred when it made excessive releases to satisfy the renewed SRS contracts. Additionally, the Bureau's excessive deliveries to the SRS Contractors triggered a mandatory obligation to reinitiate consultation because the deliveries caused effects to the winter-run and spring-run Chinook that were not considered in the January 10, 2005 letter of concurrence.

190.    The Bureau's ongoing failure to ensure that its actions do not jeopardize the continued existence of the winter-run and spring-run Chinook or adversely modify the species' critical habitat is arbitrary, capricious, an abuse of discretion, and not in accordance with law, contrary to the APA, 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF

### (By Plaintiffs NRDC, TBI, Baykeeper, Winnemem and PCFFA/IFR)

### Violations Of ESA:
### Bureau's and SRS Contractors' Violation of Section 9 of the ESA
### (16 U.S.C. § 1538(a)(1)(B); 16 U.S.C. § 1540(g))

191.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

192.    Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the Bureau and the SRS Contractors from taking any endangered or threatened fish or wildlife within the United States without authorization.

193.    The ESA citizen suit provision authorizes suits to enforce the ESA and its implementing regulations against any person who is alleged to be in violation of any provision of the ESA or regulations implementing the ESA.  16 U.S.C. § 1540(g).

194.    As alleged above, the Bureau's excessive releases, and the SRS Contractors'

diversions, of water during the temperature management season in 2014 and 2015 caused massive take of winter-run and spring-run Chinook.  The Bureau's excessive releases depleted the cold water pool in Shasta Reservoir, causing the Bureau to lose control of temperatures in the upper Sacramento River, which is critical habitat for winter-run and spring-run Chinook.  The Bureau's excessive releases caused fatal increases in water temperatures that led to the near total loss of the 2014 and 2015 generations of winter-run and spring-run Chinook. The Bureau's releases and the SRS Contractors' diversions were the predominant and direct cause of the loss, or "take," of winter-run and spring-run Chinook in 2014 and 2015.

195.    Neither the Bureau nor the SRS Contractors had authorization to take winter-run or spring-run Chinook to meet the terms of the renewed SRS contracts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Find and declare that the Secretary's issuance of the Biological Opinion, and the Biological Opinion itself, are arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).[14]

B.    Order the Secretary to comply with the law forthwith by withdrawing the Biological Opinion and reinitiating consultation with respect to the proposed changes to and future operation of the CVP-SWP.[15]

C.    Enjoin the defendants and defendant-intervenors from taking any action in reliance on the invalid Biological Opinion.

D.    Enjoin the defendants and defendant-intervenors from taking any action that would jeopardize the continued existence of the delta smelt or adversely modify its critical habitat.

---

[14] This paragraph pertains to Plaintiffs' challenge to FWS's 2005 Biological Opinion on the OCAP, which has been resolved in Plaintiffs' favor.
[15] This paragraph pertains to Plaintiffs' challenge to FWS's 2005 Biological Opinion on the OCAP, which has been resolved in Plaintiffs' favor.

E.      Find and declare that the Secretary's issuance of the 2015 LOC, and the 2015 LOC itself, are arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

F.      Order the Secretary to comply with the law forthwith by withdrawing the 2015 LOC and initiating a valid section 7 consultation with respect to the contracts.

G.      Enjoin the defendants and defendant-intervenors from taking any action in reliance on the invalid 2015 LOC.

H.      Order the Secretary to comply with the law forthwith by reinitiating consultation with NMFS on the effects of the SRS contracts on winter-run and spring-run Chinook.

I.      Enjoin the Secretary from continuing to make releases of water from Shasta Reservoir, and the SRS Contractors from diverting such water, to satisfy the terms of the SRS contracts where such releases and diversions will cause the unauthorized take of winter-run and spring-run Chinook.

J.      Enjoin the defendants and defendant-intervenors from continuing to perform the unlawfully executed long-term water supply contracts identified herein and order them to renegotiate and re-execute these renewal contracts only upon completion of a valid ESA § 7(a)(2) consultation.

K.      Retain jurisdiction over this matter until such time as the Secretary and DWR have fully complied with the Court's order.

L.      Award Plaintiffs their costs of litigation, including reasonable attorney and expert witness fees.

M.      Grant Plaintiffs such further and additional relief as the Court may deem just and proper.


DATED:  January 18, 2017                    */s Trent W. Orr/*_____
                                            Trent W. Orr

                                            Attorney for Plaintiffs