# EXHIBIT 7
to Fifth Supplemental Complaint





**November 14, 2016**

**_Via Certified Mail, Return Receipt Requested_**

Sally Jewell                              Estevan López
Secretary of the Interior                 Commissioner of Reclamation
Department of the Interior                Bureau of Reclamation
1849 C St., NW                            1849 C St., NW
Washington D.C.  20240                    Washington D.C.  20240

David Murillo
Regional Director, Mid-Pacific Region
Bureau of Reclamation
2800 Cottage Way
Sacramento, CA  95825-1898


Re:     Sixty-Day Notice of Intent to Sue for Violations of the Endangered Species Act
        Regarding Impacts of the Sacramento River Settlement Contracts and Delta-Mendota
        Canal Unit Contracts on Threatened Delta Smelt

        This letter provides notice that the United States Bureau of Reclamation ("Reclamation")
is in violation of section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. §1536(a)(2).
The violation arises from Reclamation's ongoing failure to engage in a valid Section 7
consultation regarding Sacramento River Settlement ("SRS") and Delta-Mendota Canal Unit
("DMC") water delivery contracts (collectively, "the contracts") and to ensure that those
contracts do not jeopardize delta smelt or adversely impact the species' critical habitat.  This
letter is provided pursuant to the sixty-day notice requirements of section 11(g) of the ESA, 16
U.S.C. §1540(g).

**I.      Factual Background**

**A.      The Contracts**

        Reclamation manages and operates the dams, reservoirs, diversion pumps and canals, and
other facilities in the Sacramento-San Joaquin River Delta ("Delta") and the river system that
feeds it as part of the federal Central Valley Project ("CVP").  The CVP is among the largest
water storage and diversion projects in the nation.  In conjunction with the State Water Project
("SWP") operated by the California Department of Water Resources, the CVP and SWP

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 2

collectively export an average of 1.6 to 2.0 trillion gallons of water annually out of the Delta for delivery to water users.  As part of its CVP operations, Reclamation contracts with approximately 253 long-term water contractors to deliver CVP water.

The SRS and DMC contracts comprise 165 of those long-term CVP contracts.  Together, the SRS and DMC contracts authorize annual diversions from the Sacramento River and Delta in excess of 2.5 million acre-feet per year.  Originally executed for forty- and twenty-five-year terms, respectively, the contracts were due to expire in 2004 and 2005.  Reclamation renewed the SRS and DMC contracts at that time and has been implementing them since.

### B.      The Delta Smelt

The delta smelt is a native estuarine species found in the Delta that spends its entire life span in the Delta.  It was listed as threatened under the ESA in 1993.  *See* 58 Fed. Reg. 12854 (March 5, 1993) (threatened).  In 2010, the U.S. Fish and Wildlife Service determined that the delta smelt's status warranted reclassifying its listing as endangered but found that the agency was precluded from doing so by competing actions.  73 Fed. Reg. 39639 (July 10, 2008) (ninety-day endangerment finding); 75 Fed. Reg. 17667 (April 7, 2010) (warranted but precluded).  The delta smelt's designated critical habitat encompasses all waters and submerged lands within the Delta, including those at the pumping plants for the CVP and the SWP.  *See* 59 Fed. Reg. 65256 (Dec. 19, 1994).  Historically, delta smelt was one of the most common and abundant pelagic fishes in the estuary.  Since the early 1980s, however, its abundance has declined by more than ninety percent.  Recent surveys report unprecedented and historically low abundance levels and confirm that the species is more vulnerable than ever.  Population viability analyses conducted for the species indicate that the risk for extinction within the next twenty years is high.

The operations of the CVP and SWP—including execution and implementation of the SRS and DMC contracts— have been major factors in the delta smelt's decline and its listing under the ESA.  Maintaining a minimum level of Delta outflow (the amount of water flowing through the Delta and into the San Francisco Bay Estuary) during certain times of the year is critical to protecting estuarine habitat in the Delta and strongly affects the abundance of delta smelt.  CVP/SWP contractual water deliveries pursuant to the SRS and the DMC contracts reduce Delta inflow and outflow and accordingly cause degradation and loss of delta smelt habitat and the direct and indirect deaths of delta smelt.  In recent years, the devastating effects of CVP/SWP operations to meet the demands created by specific contract terms have become increasingly clear, as the abundance of delta smelt has plummeted to new lows.

### C.      The 2005 and 2008 Biological Opinions

In June 2004, Reclamation issued the Long-Term Central Valley Project Operations Criteria and Plan ("OCAP").  The OCAP guides the coordinated operation of the CVP and SWP.  Reclamation intended for the OCAP to provide the basis for renewing long-term water contracts that were expiring.  In 2005, the United States Fish and Wildlife Service ("FWS") issued a revised biological opinion ("2005 BiOp") concluding the OCAP would not jeopardize delta smelt or adversely modify its critical habitat.

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 3

The environmental organizations represented in this letter challenged the 2005 BiOp as violating ESA section 7. A federal court invalidated the 2005 BiOp and remanded to FWS to commence a new consultation. *See Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007). In December 2008, FWS issued a new BiOp ("2008 BiOp") concluding that the OCAP operations *would* likely jeopardize the continued existence of delta smelt and adversely modify its critical habitat. As required, the 2008 BiOp included a reasonable and prudent alternative ("RPA") that specified terms under which the CVP and SWP could be operated compliant with the ESA. The 2008 BiOp did not consider any proposed changes to the terms of the SRS and DMC contracts.

### D.      Contract Renewal and Consultation

During 2004 and 2005, Reclamation renegotiated and renewed the expiring SRS and DMC contracts for forty- and twenty-five-year terms, respectively, pursuant to the OCAP. In doing so, Reclamation and FWS relied on the 2005 BiOp to conclude that the contracts would not jeopardize delta smelt. After the 2005 BiOp was invalidated, the environmental organizations represented in this letter challenged the contract renewals, contending that Reclamation violated ESA section 7(a)(2) by executing the long-term SRS and DMC water contracts based on an invalid consultation with FWS.

In 2014, an en banc Ninth Circuit panel agreed, unanimously holding that "[t]he Bureau was … required to engage in Section 7(a)(2) consultation prior to renewing the Settlement Contracts." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 785 (9th Cir.). The en banc panel ruled that the 2008 BiOp did not moot the plaintiffs claim because that biological opinion "merely assesses the general effects of the [OCAP]" and did not address the "Bureau's decision to renew the specific contracts" at issue. *Jewell*, 747 F.3d at 782. The en banc panel further ruled that Reclamation had "some discretion" over the SRS contracts, concluding that, at a minimum, Reclamation can negotiate species-protective contract terms such as the "pricing scheme or the timing of water distribution." *Id.* at 785.

On remand from that decision, Reclamation requested reinitiation of consultation with FWS on the renewed contracts' effects on delta smelt. Reclamation, however, instructed that the scope of reinitiation should be limited in at least two ways: First, it requested only that FWS concur with Reclamation's assessment that the effects of the contracts were analyzed in the 2008 OCAP BiOp; and, second, it asserted that it lacked authority to change the terms in the SRS contracts for the benefit of the delta smelt. Reclamation sent several subsequent memoranda to FWS clarifying that it was not reinitiating consultation on the current status of the delta smelt.

In December 2015, FWS sent a letter concurring with Reclamation that the 2008 BiOp analyzed the effects of the contracts on the delta smelt and its critical habitat ("2015 LOC"). As Reclamation requested, FWS limited its consultation to the scope of the 2008 BiOp and the analysis provided therein. FWS explained in its 2015 LOC the agency's concern "about the continued decline of delta smelt as demonstrated by the historically low numbers in all recent survey efforts" and stated that "in future consultations" the agency "may require greater certainty

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 4

as to Reclamation's ability to provide needed outflow through the Delta.  If increased outflows are needed and cannot be met under the SRS contracts, those contracts may need to be revisited to ensure consistency with the Act."

## II.     Endangered Species Act Section 7(a)(2)

ESA section 7(a)(2) provides that "[e]ach federal agency *shall . . . insure* that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. §1536(a)(2) (emphasis added). Section 7's substantive protections are implemented in part through the consultation process, which Congress designed explicitly "to ensure compliance with the [ESA's] substantive provisions."  *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).  Pursuant to that process, federal agencies must consult with the appropriate federal fish and wildlife agency (here, FWS) to evaluate the effects of the agency action in question on listed species and their critical habitat. *See id.*  If FWS concludes a proposed action is likely to jeopardize a listed species or adversely modify its critical habitat, it must propose reasonable and prudent alternatives that will mitigate the proposed action to avoid jeopardy and adverse habitat modification.  *See* 16 U.S.C. §1536(b)(3).

The purpose of section 7(a)(2) consultation is to "obtain the expert opinion of wildlife agencies."  *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc).  Agencies must fulfill that purpose "*before* engaging in a discretionary action which may affect listed species."  *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003) (emphasis added); *see also Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998) ("The failure to respect the process mandated by law cannot be corrected with post-hoc assessments of a done deal.").  As the Ninth Circuit has explained, "[i]f a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result." *Thomas*, 753 F.2d at 764.

Even after the procedural requirements of consultation are complete, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency (here, Reclamation).  Because Section 7 includes "*substantive* obligations," an action agency cannot "abrogate its responsibility to ensure that its actions will not jeopardize a listed species" simply by requesting formal consultation or by relying on the mere fact that a consultation occurred. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990); *see also Res. Ltd. v. Robinson*, 35 F.3d 1300, 1304 (9th Cir. 1994) ("Consulting with the FWS alone does not satisfy an agency's duty under the Endangered Species Act."); *City of Tacoma v. FERC*, 460 F.3d 53, 75-76 (D.C. Cir. 2006) ("[T]he ultimate responsibility for compliance [with Section 7] . . . falls on the action agency.").  The decision to rely on a consulting agency's opinion must not be arbitrary and capricious.  *Res. Ltd.*, 35 F.3d at 1304; *see also Lone Rock Timber Co. v. U.S. Dep't of the Interior*, 842 F. Supp. 433, 440 (D. Or. 1994) ("Consultation is not an end in itself, but merely the means to reach a reasoned decision.").

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 5

The substantive duty imposed by section 7(a)(2) is constant and continuing, relieved only by an exemption from the Endangered Species Committee.  16 U.S.C. §1536(h); *Conner v. Burford*, 848 F.2d 1441, 1452 n.26 (9th Cir. 1988).  Thus, the substantive duty not to jeopardize listed species (or adversely modify critical habitat) remains in effect regardless of the status of the consultation.

**III.    Reclamation's Violations of ESA Section 7(a)(2)**

Reclamation's execution and implementation of the contracts constitutes an ongoing violation of the procedural and substantive requirements of ESA Section 7(a)(2), 16 U.S.C. §1536(a)(2).  Specifically, Reclamation undermined the 2015 consultation with FWS by improperly limiting the scope of its request for reinitiation of consultation.  Although Reclamation knows or should know that the resulting analysis in the 2015 LOC is faulty, Reclamation continues to rely on that flawed and invalid consultation to implement the SRS and DMC contracts.  Reclamation's continued performance of the contracts in light of the obviously invalid 2015 consultation violates its obligation to engage in a valid Section 7 consultation on the contracts, as well as its affirmative duty under that section to ensure that its actions avoid jeopardy to the delta smelt.

**A.  Reclamation's Reinitiation Request Was Deficient Under Section 7(a)(2).**

Reclamation's reinitiation request was deficient because it (1) failed to provide a sufficient basis for consultation and (2) was inconsistent with established law.

First, in contravention of the requirements for formal consultations, the request did not provide a complete or accurate description of the manner in which contract renewal might affect delta smelt and omitted other relevant and necessary information.[1]  The renewed contracts obligate Reclamation to deliver over 2.5 million acre-feet of water per year to the contractors' diversion facilities.  The contractors' resulting diversions cause a significant reduction in downstream inflow and Delta outflow, which in turn deprives the delta smelt of critical flows and impacts salinity, turbidity, and food availability

In its rule listing the delta smelt, FWS identified reduced river and Delta flows due to water diversion as among the most important factors contributing to the smelt's decline.  *See* 58 Fed. Reg. 12854, 12859-60.  FWS reiterated these concerns in a more recent rule to change the smelt's status to endangered:  Continuing habitat loss and degradation resulting from Delta exports and other water diversions—including upstream diversions by SRS Contractors—remain significant threats and warrant the species' reclassification as endangered.  *See* 73 Fed. Reg.

---

[1] *See* 50 C.F.R §402.14(c) (FWS regulations for formal consultations).  The requirements for formal consultation apply where, as here, federal agency action "may affect listed species or critical habitat."  *Id.* at §402.14(a).

5

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 6

39639 (July 10, 2008).  Since then, evidence supporting the importance of timely and adequate Delta and river flows to delta smelt abundance and critical habitat has only strengthened.[2]

Reclamation's request ignored this recent evidence and the best available science and instead relied primarily on out-of-date biological assessments prepared in 2003, when the status, condition, and understanding of threatened delta smelt and its critical habitat was very different. As a result, Reclamation's request completely failed to recognize or analyze how contract demand and deliveries would affect river and Delta outflows at different times throughout the year, let alone how those effects would continue to contribute to the smelt's downward trend and/or adverse critical habitat modification.

Reclamation also failed to discuss the fact that water quality standards on which the 2008 BiOp was based have repeatedly been weakened and waived during the drought in order to enable greater water deliveries to contractors.[3]  The water quality standards imposed on Reclamation through D-1641 form the foundation for the 2008 BiOp on which Reclamation relied.  The repeated waivers and weakening of those standards over the past several years have changed the conditions in the Delta from those assessed and assumed in the 2008 BiOp. Therefore, Reclamation knew that the 2008 BiOp did not accurately portray the conditions to which the delta smelt and its critical habitat have been subjected as a result of Reclamation's operations during the last several years.  For at least those reasons, Reclamation's reinitiation request to FWS was incomplete and insufficient to permit a valid Section 7 consultation.

Second, Reclamation's reinitiation request was inconsistent with applicable law because it incorrectly asserted that the 2008 BiOp adequately addressed the contracts and that Reclamation had essentially no discretion to modify the SRS contracts' terms.  The Ninth Circuit Court of Appeals has already rejected the conclusion that the 2008 BiOp addressed the contracts. *See Jewell*, 749 F.3d at 782 ("[T]he 2008 Opinion … does not represent consultation with the FWS concerning the impact of [Reclamation's] decision to renew the specific contracts before us.").  The 2008 BiOp evaluated the effect of system-wide aggregated water exports and

---

[2] *See, e.g.*, MAST Report 47-49, Ch. 9 (spring outflow is likely to have significant effects on delta smelt abundance and recruitment); Summary of Fish Agency Scenario Modeling, Nov. 14, 2012, and BDCP CS5 Update NGO meeting, Nov. 14, 2012, available at http://www.essexpartnership.com/bdcp/summary-of-fish-scenario-modeling/ (modeling flows necessary to allow species recovery); Cal. Nat. Resources Agency, Delta Smelt Resiliency Strategy (July 2016), available at http://resources.ca.gov/docs/Delta-Smelt-Resiliency-Strategy-FINAL070816.pdf.  River and Delta flows also affect other crucial ecosystem processes. *See, e.g.*, Thompson et al 2012; Winder et al 2011; Cloern and Jassby 2012; Kimmerer and Thompson 2014.

[3] *See, e.g.,* Declaration of Jonathan Rosenfield, Ph.D., May 5, 2015 (attached as Exhibit 1).

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 7

diversions.  *Id.*  It did not analyze the impacts of specific contracts, the demand created by those contracts  for CVP water, nor the particular contract terms for water diversion or delivery.

Although implementation of the BiOp's reasonable and prudent alternative is necessary to avoid jeopardy, the 2008 BiOp made *no determination* about the impacts the contract renewals would have on Reclamation's ability to comply with its RPA, or the compatibility of the contract terms with the RPA.  In fact, by the time of the 2015 consultation, the 2008 BiOp was a wholly inadequate basis for assessing the impacts of contract renewals on a delta smelt population that had recently declined to unprecedented and historically low levels.  The 2008 BiOp was especially inadequate given that Reclamation's recent waiver requests to the State Water Resources Control Board ("State Board") had justified weakening the flow requirements integral to the 2008 BiOp on the grounds that those changes were necessary to satisfy contract terms.  It is foreseeable that future operations during the terms of the contracts will continue to fall short of the baseline requirements assumed by the 2008 BiOp, to the great detriment of delta smelt and its habitat.

 Similarly, the assertion that Reclamation has no discretion to modify the SRS contract terms has been resoundingly rejected not only by the Ninth Circuit, but by Reclamation itself on numerous previous occasions, and is belied by the actual history of SRS contract renewal in 2005, which included numerous changes to quantity, timing, and other terms.  In *Jewell*, the en banc Ninth Circuit panel explicitly held that there is "nothing in the original [SRS] contracts [that] requires the Bureau to renew the [SRS] contracts," and that Reclamation "could benefit the delta smelt by renegotiating the [SRS] contracts' terms with regard to, *inter alia*, their pricing scheme or the timing of water distribution." 749 F.3d at 785.  Moreover, in the final environmental impact statement for SRS contract renewals, Reclamation acknowledged that it has extensive discretion to modify contract terms upon renewal,[4] and, in fact, Reclamation *did* modify terms upon renewal for multiple contractors, including negotiating reduced quantity terms, increased project water rates, and different delivery times.[5]  That acknowledgement is

---

 [4] *See* Final Environmental Impact Statement at 1-5 to 1-6.  The final environmental impact statement (EIS) is available here: http://www.usbr.gov/mp/cvpia/3404c/env_docs/final_eis/index.html.  The relevant provisions are found at 1-5 to 1-6, 2-10.

 [5] These changes in quantity terms total a net reduction of 170,000 acre-feet from the original contracts.  Base supply was reduced for ACID and the Sutter Mutual Water Company ("SMWC").  Project water quantities were reduced in the renewals of contracts with ACID, Carter Mutual, Conaway, Natomas, Pelger Mutual, Pleasant Grove-Verona, Princeton, Provident, RD 1004, River Garden Farms, Sacramento River Ranch, SMWC, Tisdale, Wallace/Tenhunfeld, M& T Chico Ranch, RD 108, and Windswept.  Base supply was increased for four contractors: Carter Mutual, Provident, Richter, and River Garden Farms, although project water allocations were decreased for three of them.  Glenn-Colusa Irrigation District obtained a 30,000 acre-feet increase in its project water allocation.  All of the changes demonstrate that Reclamation has discretion to modify the quantity terms in the contracts and the allocation between base supply

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 8

consistent with a long history of Reclamation statements that it has discretion to modify and renegotiate SRS Contract terms.[6]

Finally, the reinitiation request's assertions that state water rights law prohibits Reclamation from changing the quantities or timing of deliveries under the SRS contracts were and are at odds with federal and state law. Section 8 of the Reclamation Act of 1902, 43 U.S.C. §383, requires that Reclamation comply with state law only to the extent that doing so would not conflict with a "clear congressional directive." *Westlands Water Dist. v. United States*, 153 F. Supp. 2d 1133, 1171 (E.D. Cal. 2001).[7]  The ESA constitutes a "clear congressional directive" that preempts any conflicting state law.[8]  Indeed, Congress expressly amended Reclamation's enabling acts to require that Reclamation "immediately … operate the Central Valley Project to meet all obligations under state and federal law, including but not limited to the federal Endangered Species Act …."  Furthermore, under California law—in particular, the doctrines of public trust and reasonable and beneficial use—the SRS Contractors do not hold inviolable rights to divert fixed quantities of water in excess of the dynamic limitations created by reasonable and

---

and project water.  In addition, Reclamation negotiated reduced September deliveries for five settlement contracts—a time when more flow in the Delta could benefit smelt—and increased the price for project water.

[6] For instance, in a 2009 brief in the environmental litigation referenced in Section I.C-D *supra*, Reclamation confirmed that it "had broad discretion to negotiate the terms of th[e] renewal contracts, including the quantities of water provided" and that this discretion "is not constrained by the [Central Valley Improvement Act], the terms of the original contracts, or [order] D-990." Fed. Defs. 2d Supp. Mem. iso MSJ at 10 (attached as Exhibit 2).  That position is not a recent development:  A 1999 letter from Reclamation's Regional Manager stated that "the language contained within the [SRS] Contracts provides each party discretion as the term of the contracts comes due. Options include allowing the contracts to expire, contract renewal, and contract renegotiation."  Letter from Michael Ryan, Reclamation Area Management, to Basin-Wide Water Management Plan Steering Committee, Aug. 2, 1999 (attached as Exhibit 3).

[7] *See also United States v. California*, 694 F.2d 1171, 1176 (9th Cir. 1982) (section 8 does not "require any later Congress to tolerate state laws whose operation would otherwise be curtailed by the Supremacy Clause"); *United States v. Tulare Lake Canal Co.*, 677 F.2d 713, 717 (9th Cir. 1982) (section 8 only requires "that the United States follow state water law absent a pre-empting federal statute").

[8] *See, e.g.*, *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 852-53, *amended by* 312 F.3d 416 (9th Cir. 2002).  Indeed, Congress expressly amended Reclamation's enabling acts to require that Reclamation "immediately … operate the Central Valley Project to meet all obligations under state and federal law, including but not limited to the federal Endangered Species Act …."  *See* Central Valley Project Improvement Act of 1992, §3406(b), Pub. L. No. 102-575.

8

Case 1:05-cv-01207-JLT-EPG   Document 1071-7   Filed 03/01/17   Page 10 of 47
60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 9

beneficial use and public trust doctrines.[9]  Whatever historic water rights they may hold must be adjusted to reflect these dynamic limitations.

In conclusion, by omitting crucial information regarding the contracts' impacts on delta smelt and its critical habitat and misrepresenting relevant applicable law, Reclamation failed to provide FWS an adequate basis for Section 7 consultation and thereby violated its affirmative obligation under that section to ensure that its actions avoid jeopardy to the delta smelt.  *See* 16 U.S.C. §1536(a)(2).

### B.  Reclamation's Reliance on the Invalid 2015 Consultation Violates Section 7(a)(2).

Reclamation has violated and continues to violate ESA section 7(a)(2) by executing and performing the contracts without completing a valid consultation.  As Reclamation requested, FWS limited its consultation to the scope of the 2008 BiOp and the analysis provided therein.  However, as discussed in Section III.A *supra*, the Ninth Circuit ruled in its unanimous 2014 en banc opinion that the 2008 BiOp *did not* consider all the effects of the specific terms in the contract renewals.  *See Jewell*, 749 F.3d at 782 (holding that the 2008 BiOp "merely assesses the general effects of the [OCAP]" and did not address the "Bureau's decision to renew the specific contracts").  Agency action that is based on what the action agency knows to be an inaccurate or incomplete jeopardy analysis by the consulting agency violates ESA §7(a)(2).  *See, e.g.*, *Res. Ltd.*, 35 F.3d at 1305-06.  Reclamation knows or has reason to know that FWS's exclusive reliance on the 2008 BiOp, and the 2015 LOC's resulting analysis, is fundamentally flawed for at least the following reasons.

First, FWS failed to analyze the entire agency action because the 2008 BiOp only addressed the effects of system operations through 2030, while the SRS contract renewals do not expire until 2045.  Second, the 2008 BiOp did not include analysis of the effects of the specific terms of the contract renewals, such as pricing, timing, and water conservation.  Third, FWS assumed in the 2008 BiOp that species-protective flow requirements and export limits would remain intact, an assumption that is now unreasonable in light of repeated waivers of those requirements due to temporary use change petitions granted by the State Board in 2014 and 2015.  Fourth, FWS failed to utilize the best available scientific data and to update its analysis to

---

[9] *See United States v. State Water Resources Control Board*, 182 Cal. App. 3d 82, 100, 104, 106, 147 (1986)) (California does not recognize inviolable or fixed rights to divert a specified quantity of water; "all water rights are subject to government regulation"); U*nited States v. Alpine Land & Reservoir Co.,* 697 F.2d 851, 855 (9th Cir. 1983) ("[B]eneficial use expresses a dynamic concept, which is variable according to conditions, and therefore over time."); Letter to John Kirlin, Executive Director, Delta Vision, from Virginia Cahill, Cal. Attorney General's Office, July 9, 2008, at 1-3, 12-23 (explaining that the public trust and beneficial use doctrines may override the rule of priority), available at http://deltavision.ca.gov/BlueRibbonTaskForce/July2008/Handouts/Item_3_Attachment2.pdf.

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 10

reflect critical information that post-dates the 2008 BiOp, including the continuing decline of delta smelt abundance, Reclamation's failure to adhere to several of its baseline operating assumptions incorporated in the 2008 BiOp, and post-2008 analysis of the effects on the delta smelt of failing to adhere to those baseline operating assumptions.  Fifth, FWS's 2015 LOC impermissibly postpones a full analysis of the effects of the SRS contract renewals on the delta smelt to an unspecified future date.

Despite this, Reclamation has taken and is taking action in reliance on the faulty 2015 LOC.  Namely, Reclamation has not sought to renegotiate and/or validly execute the SRS and DMC contracts and continues to perform those contracts even in the face of significant take of delta smelt by the export facilities and adverse modification of critical habitat caused by water exports and diversions.  Reclamation has thus failed and is failing to comply with its obligation to engage in a valid Section 7 consultation on the effects of the contract renewals on delta smelt and its critical habitat.

### C. Reclamation's Continued Performance of the Contracts Violates Section 7(a)(2).

The substantive goal of consultation under section 7(a)(2) of the ESA is to ensure that federal actions do not jeopardize the continued existence of a listed species or adversely modify its critical habitat. Federal agencies may not take action that could harm a listed species until they have completed the ESA section 7(a)(2) consultation process and have received a *valid* biological opinion.  For the reasons stated above, the 2008 BiOp is not valid and consequently Reclamation may not rely on it to conclude that its actions will avoid jeopardy to the delta smelt. Under these circumstances, the ESA requires that Reclamation avoid any action that causes harm to listed species or designated critical habitat pending valid compliance with the procedural requirements of section 7(a)(2) of the ESA.  Here, however, Reclamation has continued to implement the unlawfully executed long-term contracts.  Reclamation has taken this action in spite of the continuing and alarming decline in the status and condition of the delta smelt and worsening habitat conditions, information of which Reclamation is fully aware.  Reclamation's continuing performance of the contracts therefore constitutes an ongoing violation of the ESA for this reason as well.

## IV.    CONCLUSION

Reclamation has violated and continues to violate ESA section 7(a)(2) by failing to complete a valid consultation on the contract renewals and by executing and continuing to implement the contract renewals to the detriment of delta smelt based on an incomplete and/or invalid consultation.  For the foregoing reasons, after sixty days from the date of this notice, the undersigned plan to bring suit against Reclamation and the Secretary of the Interior on behalf of Natural Resources Defense Council, Friends of the River, San Francisco Baykeeper, and The Bay Institute.

60-day Notice Letter to Secretary Sally Jewell, *et al.*
November 14, 2016
Page 11

     Sincerely,

Katherine S. Poole
Natural Resources Defense Council
111 Sutter Street, 21st Fl.
San Francisco, CA  94104
Tel: 415.875.6100
Email: kpoole@nrdc.org

*Attorney for Natural Resources Defense
Council*

Trent Orr
Earthjustice
50 California Street, #500
San Francisco, CA  94111
Tel: 415.217.2000
Email: torr@earthjustice.org

*Attorney for Natural Resources Defense
Council; Friends of the River; San Francisco
Baykeeper; The Bay Institute*

CC (by email):

     Bradley Oliphant, Department of Justice
     Kevin Tanaka, Department of Interior

# Exhibit 1

1 | KATHERINE POOLE (SBN 195010)
DOUGLAS ANDREW OBEGI (SBN 246127)
2 | NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter Street, 20th Floor
3 | San Francisco, CA 94104
Telephone:  (415) 875-6100
4 | Facsimile:  (415) 875-6161
kpoole@nrdc.org; dobegi@nrdc.org
5 |
Attorneys for Plaintiff Natural Resources Defense Council
6 |
HAMILTON CANDEE (SBN 111376)
7 | BARBARA JANE CHISHOLM (SBN 224656)
TONY LOPRESTI (SBN 289269)
8 | ALTSHULER BERZON LLP
177 Post St., Suite 300
9 | San Francisco, CA 94108
Telephone:  (415) 421-7151
10 | Facsimile:  (415) 362-8064
hcandee@altber.com; bchisholm@altber.com; tlopresti@altber.com
11 |
Attorneys for Plaintiff Natural Resources Defense Council
12 |
TRENT W. ORR (SBN 77656)
13 | EARTHJUSTICE
50 California St. Suite 500
14 | San Francisco, CA 94111
Telephone:  (415) 217-2000
15 | Facsimile:  (415) 217-2040
torr@earthjustice.org
16 |
Attorneys for Plaintiffs Natural Resources Defense Council,
17 | California Trout, San Francisco Baykeeper, Friends of the River
and The Bay Institute
18 |

19 |                UNITED STATES DISTRICT COURT

20 |                EASTERN DISTRICT OF CALIFORNIA

21 | NATURAL RESOURCES DEFENSE          Case No. 1:05-cv-01207-LJO-GSA
COUNCIL, *et al.*,
22 |                                     **DECLARATION OF JONATHAN
                 Plaintiffs,            ROSENFIELD, Ph. D.**
23 |
             v.
24 |
SALLY JEWELL, U.S. Department of the
25 | Interior, *et al.*,
26 |                 Defendants.
27 |
28 |

1  SAN LUIS & DELTA MENDOTA
   WATER AUTHORITY, *et al.*,
2
                    Defendants-Intervenors.
3
   _____
4  ANDERSON-COTTONWOOD
   IRRIGATION DISTRICT, *et al.*,
5
                    Joined Parties.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I, Jonathan Rosenfield, declare as follows:

2        1.      I am a conservation biologist employed by The Bay Institute, with more than

3    twenty years of experience working on management of fish species, including those in the Bay-

4    Delta watershed. I received a Bachelors of Science degree in natural resources from Cornell

5    University in 1991, a Masters of Science degree in conservation biology and environmental

6    management from the University of Michigan in 1996, and a Ph.D. in biology from the

7    University of New Mexico in 2001. The focus of my academic studies and research was the

8    forces that drive speciation and extinction of native fishes. Throughout my professional career, I

9    have conducted theoretical and applied research and published scientific journal articles and

10   technical memoranda on habitat requirements and environmental management of native fishes.  I

11   served as the Director of Scientific Peer-review for the CALFED Ecosystem Restoration

12   Program, and I have authored a conceptual model of longfin smelt life history and draft

13   conceptual models of Central Valley Chinook salmon and steelhead for the Delta Regional

14   Ecosystem Restoration Implementation Plan (DRERIP). A copy of my curriculum vitae is

15   attached hereto as Exhibit A.

16       2.      For the past thirteen years I have worked on the management of native fish

17   populations in the Bay-Delta estuary and watershed, including longfin smelt, Delta smelt, Central

18   Valley steelhead, winter-run Chinook salmon, spring-run Chinook salmon, and fall-run Chinook

19   salmon. This includes analysis of the effects of water diversions and other stressors on these fish

20   populations. The discussion that follows accurately reflects my understanding of the best

21   available science on Delta smelt and other native fishes, including current implementation of

22   existing biological opinions and other legal protections for Delta smelt and other native fish

23   species.

24       3.      I have reviewed the declaration of Mr. Ren Lohoefener, Regional Director of the

25   Southwest Region of the U.S. Fish and Wildlife Service ("FWS") dated April 10, 2015. In

26   particular, I am aware that the Regional Director claims that the U.S. Bureau of Reclamation

27   ("Reclamation") will continue to implement the 2008 Biological Opinion ("BiOp") and its

28   Reasonable and Prudent Alternative ("RPA") and that implementation of the RPA and existing

DECLARATION OF JONATHAN ROSENFIELD
CASE NO.  1:05-CV-01207-LJO-GSA

water contracts during the period of reinitiated consultation should not have an adverse effect on Delta smelt. Mr. Lohoefener's assurances are not supported by the facts.

4.      I have also reviewed innumerable additional documents associated with Central Valley Project and State Water Project operations in recent years, the impacts of those operations on Delta smelt and other native fish, and scientific analyses of the same, including but not limited to the documents appended to the Declaration of Doug Obegi filed with this declaration.

5.      The risk of extinction has increased for Delta smelt since they were initially listed as threatened under the state and federal endangered species acts in 1993; abundance indices for this species are now less than 10% of what they were in the mid-1990's. Furthermore, Delta smelt abundance indices are lower now than they were when the 2008 FWS BiOp and RPA were published. In fact, the abundance of Delta smelt, as estimated by several different trawl surveys conducted by state and federal agencies, has declined to the lowest levels ever recorded.  The California Department of Fish and Wildlife ("Department") has operated the Fall Midwater Trawl ("FWMT") since 1967.  The Department reported that the 2014 FMWT survey resulted in an abundance index of 9, nearly fifty percent less than the next lowest FMWT abundance index in the history of the survey. Similarly, the Department has operated the Spring Kodiak Trawl ("SKT") survey since 2002, this survey is specifically designed to capture Delta smelt and the FWS BiOp has criteria pertaining to Delta smelt protection based on SKT survey results.  In the April 2015 SKT survey, the Department caught a single Delta smelt and in the March 2015 Spring Kodiak Trawl survey only caught 6 Delta smelt. These results represented the lowest numbers of Delta smelt caught in these months, respectively, in the history of the survey. In contrast, in April 2014, the SKT survey caught 36 delta smelt, and in March 2014, the SKT survey caught 88 delta smelt. The Department also found very few Delta smelt in surveys by the 20 mm trawl and the smelt larval survey in 2015. Taken together, this information demonstrates that the risk of extinction for Delta smelt is extremely high and has never been higher than it is today.

6.      In addition, Mr. Lohoefener's statement that the Bureau will continue to implement the 2008 BiOP and its RPA is incorrect. As discussed below, at the request of the

DECLARATION OF JONATHAN ROSENFIELD
CASE NO.  1:05-CV-01207-LJO-GSA

1    Bureau and FWS, the water quality regulations and operations upon which the 2008 BiOp was

2    based have been significantly altered this and last year in ways that substantially reduce the

3    protections afforded to the Delta smelt and other native species. Furthermore, the FWS has

4    altered the 2008 BiOp RPA to allow for much greater take of Delta smelt at the state and federal

5    water export facilities. Thus, the Delta smelt is at higher risk of extinction than it has ever been

6    and the BiOp and RPA provisions that protect this species from operational impacts have been cut

7    dramatically this year.  Continued operation of the state and federal water projects under these

8    conditions is likely to result in irreparable harm to the Delta smelt, other native species, and the

9    Bay-Delta estuary as a whole.

10           7.       The FWS is not implementing the 2008 Delta smelt BiOp and its failure to do so is

11   resulting in irreparable harm to Delta smelt. For instance, in December 2014 and January 2015,

12   the agencies did not implement the requirements of RPA Component 1 of the Delta smelt

13   biological opinion, which is designed to protect Delta smelt from entrainment at the CVP/SWP

14   pumps.

15           a.       Pages 281 and 329 of the 2008 Delta smelt BiOp state that RPA

16           Component 1 of the BiOp requires that the Smelt Working Group ("SWG") "shall

17           determine" if Delta smelt are vulnerable to entrainment, and that if turbidity criteria are

18           met or if the Smelt Working Group otherwise recommends initiation of Action 1, FWS

19           "shall require initiation of Action 1," which "requires the Projects to maintain OMR flows

20           no more negative than -2,000 cfs" on a 14-day average.

21           b.       The SWG meeting summary for December 16, 2014, states that, due to risk

22           of entrainment, Action 1 should be "implemented immediately." Despite that

23           determination, FWS did not require initiation of Action 1 and took no formal action at all

24           on the SWG's determination.  Instead of increasing Old and Middle River (OMR) flows to

25           levels no more negative than -2,000 cfs as required by Action 1, Reclamation's Old and

26           Middle River flow data for December 2014 show that Reclamation maintained OMR

27           flows more negative than -6,500 cfs for the entire week.

28

DECLARATION OF JONATHAN ROSENFIELD
CASE NO.  1:05-CV-01207-LJO-GSA

1        c.      The SWG meeting summary for December 29, 2014 noted that Action 1

2  was never implemented and stated that "adult Delta Smelt currently are at an elevated risk

3  for entrainment and that the Service should begin implementing Action 2 immediately."

4  Page 281 of the BiOp states that Action 2 of RPA Component 1 allows for OMR flows in

5  the range of -3,500 to -5,000 cfs "when turbidity and salvage are low" but states that

6  "when turbidity and flow conditions in the Delta may result in increased salvage, the

7  range may be between -1,250 and -2,000 cfs." The SWG recommended flows no more

8  negative than -5,000 cfs, but stated that, if salvage were to occur, flows should not be

9  more negative than -2,000 cfs. The first Delta smelt salvage occurred on January 2, 2015.

10  Nonetheless, Reclamation's Old and Middle River flow data for January 2015

11  demonstrates that Reclamation maintained flows more negative than -5,000 cfs even after

12  the salvage occurred. The SWG Meeting Summary for January 5, 2015 demonstrates that

13  the SWG again recommended "an immediate reduction in export pumping with a

14  correspondingly less negative OMR is warranted," and warned that take was likely to

15  exceed the incidental take limit without improvements in Old and Middle River flows

16  (i.e., less negative average flow). Despite these repeated recommendations of the Smelt

17  Working Group, OMR exceeded -5,000 cfs until January 14, 2015.

18        d.      As a result of the failure to fully implement Action 1 and Action 2, the high

19  negative OMR resulted in substantial entrainment of Delta smelt into the central Delta,

20  and increased salvage of Delta smelt by the CVP and SWP, nearly exceeding the

21  incidental take limit. The projects have reported salvage of 68 Delta smelt so far this year;

22  although this may seem to be a small amount of mortality, research conducted by FWS

23  and others reveals that, for every Delta smelt captured at the salvage facility, hundreds or

24  thousands of smelt die as a direct or indirect result of water exports from the state and

25  federal water project facilities in the south Delta. E.g., Castillo et al., "Pre-Screen Loss

26  and Fish Facility Efficiency for Delta Smelt at the South Delta's State Water Project,

27  California" (Dec. 2012). The BiOp sets the salvage limit for Delta smelt based on the

28  results of previous population surveys such that the number of fish that may be salvaged

without resulting in jeopardy is proportional to the estimated population size. Because Delta smelt indices are at record lows, salvage of 68 Delta smelt (and the likely loss of hundreds or thousands more) by this one stressor is cause for alarm.

8.      Increasing the incidental take limit for the CVP and SWP's south Delta export facilities is another way that the FWS is failing to implement its 2008 BiOp and associated RPA. Instead of reducing export pumping and improving OMR flows as the Smelt Working Group recommended, in January 2015 FWS modified the incidental take limit for Delta smelt, allowing for the salvage and death of more than twice as many Delta smelt (from 196 rather than 78) at the CVP and SWP pumps than had originally been allowed this year. This increase in the incidental take limit arose from a change in the methodology for calculating the ITL that was applied this year.  The methodological modification and the resulting increase in allowable salvage are inconsistent with the BiOp and allowed for a significant increase in the direct and indirect harm caused by CVP and SWP operations on Delta smelt as compared to that anticipated in the 2008 BiOp and RPA. The new methodology adopted by FWS this winter is not based on the best available science and is insufficiently protective of Delta smelt.

        a.      In November 2014, an independent scientific review panel organized by the Delta Science Program reviewed a proposal to revise the method of calculating the incidental take limit prepared by the Metropolitan Water District of Southern California. In its final report issued in December 2014, this scientific review panel recommended that FWS not modify the incidental take limit as proposed, stating that, "We do not recommend switching to the regression model for setting an ITL."

        b.      The methodology used in calculating the new incidental take limit is very different from the methodology that was used in the 2008 BiOp. As noted in our October 2014 comments on the proposal to revise the incidental take limit, FWS failed to provide scientific justification for several of the key assumptions used in their calculations. In addition, FWS disregarded the recommendations of their own statisticians and biologists, and failed to assess the impact of the increased incidental take limit on the survival and recovery of Delta smelt.

9. Third, in 2014 and 2015 FWS and Reclamation sought and obtained approval by the State Water Resources Control Board to not meet the state water quality standards for the Bay-Delta that protect fish and wildlife, as required under water rights decision 1641 ("D-1641"). The BiOp assumed compliance with D-1641 as part of the project description, and the waiver of these standards was never analyzed in that BiOp. The waiver of these water quality standards has had the effect of substantially weakening environmental protections for Delta smelt and other native fish species as compared to the project operations analyzed in the BiOp, and has contributed to the very low abundance levels of Delta smelt observed today.

a. D-1641, which establishes flow objectives and export limits that the CVP-SWP must observe to meet water quality standards and protect Delta fisheries, is integral to the 2008 BiOp's environmental baseline. Beginning in early 2014 and continuing to date, Reclamation filed several Temporary Urgency Change Petitions ("TUCP") to modify and weaken D-1641's flow requirements; these TUCP's have largely been approved by the State Water Resources Control Board. This included waiver of the D-1641 outflow standard that was part of the project description for the 2008 BiOp.

b. In its review of the TUCP dated January 29, 2014, FWS acknowledged that the "departure from D-1641 was not anticipated in the Project Description of the [2008] BiOp, or the modeling in [Reclamation's] biological assessment."

c. In its February 3, 2015 order approving the TUCP, the State Water Resources Control Board, the agency that establishes water quality standards and enforces D-1641, explained that "[t]he Delta outflow objective is intended to protect estuarine habitat for anadromous fish and other estuarine dependent species," including Delta smelt. These reductions in outflow, not surprisingly, have contributed to the collapse of several populations of native species, including Delta smelt.

d. In addition, highly negative OMR flows, reduced Delta outflow requirements (which also result in lower Delta inflow), and the corresponding alteration of flows in other Delta channels represents an adverse effect on Delta smelt critical habitat

1    and that of other threatened and endangered species that use the Delta during the winter

2    and spring.

3            e.      As noted in objections filed with the State Water Resources Control Board

4    dated February 13, 2015, recent scientific information prepared by state and federal

5    agencies provides additional evidence that the reduction in winter and spring outflow, as

6    approved by the TUCP orders waiving the requirements of D-1641, harms Delta smelt.

7            f.      At its February 18, 2015 meeting, the Executive Director of the State

8    Water Resources Control Board admitted that the waiver of D-1641 standards in 2014

9    caused "unreasonable effects" on fish and wildlife that year.  Although this is a different

10   legal standard from the ESA, it is clear that these operations are causing substantial harm

11   that was not analyzed in the 2008 biological opinion, and that operations are not

12   complying with the requirements of the 2008 biological opinion for Delta smelt, including

13   compliance with D-1641.

14           g.      The State Water Resources Control Board approved waivers of D-1641

15   water quality standards in order to increase water supply for agricultural and urban

16   contractors of the State Water Project and Central Valley Project, including contractors

17   both north and south of the Delta.  The TUCP orders were approved to allow for delivery

18   of substantial water to Sacramento River Settlement Contractors, among others.

19       10.    Other species, including species listed under state and/or federal endangered

20   species acts, have also been harmed as a result of operations of the state and federal water

21   projects; project operations were among the most important stressors on these species even prior

22   to the onset of the most recent drought. Operations of the federal and state water projects during

23   the current drought and changes to the regulatory regime governing water and fish management

24   in the Bay-Delta watershed have contributed to the ongoing decline in these species. During the

25   current drought, state and federal agencies estimate that more than 95% of endangered winter-run

26   Chinook salmon eggs and juveniles died in the Sacramento River in 2014 before the population

27   migrated past Red Bluff Diversion Dam.  This very high loss rate resulted from the direct and

28   indirect effects of high water temperatures and low flow rates below Shasta and Keswick dams.

DECLARATION OF JONATHAN ROSENFIELD
CASE NO.  1:05-CV-01207-LJO-GSA

11.     Longfin smelt is listed as a threatened species in California under the California Endangered Species Act, and the FWS has concluded that the San Francisco Bay-Delta estuary population of longfin smelt warrants listing under the federal Endangered Species Act but that such listing is currently precluded. The abundance of longfin smelt is significantly correlated with the amount of water that flows through the Delta into the San Francisco Estuary ("Delta outflow"), during the winter and spring months. As a result of diversions and storage by the state and federal water projects during the drought, including reservoir storage for the Sacramento River Settlement Contractors, outflow in the winter and spring months of 2014 and 2015 was exceptionally low. Not surprisingly, the abundance of longfin smelt as indexed by the 2014 FMWT survey was the second lowest in the history of the survey; the number of longfin smelt detected by another state-operated fishery survey, the Bay Study, confirmed the recent declines in this species.  Furthermore, the longfin smelt incidental take limit issued by California Department of Fish and Wildlife for operation of the State Water Project relies on the Delta smelt 2008 BiOp and RPA to provide operational conditions deemed to be protective of the longfin smelt; thus, when the Delta smelt RPA was weakened and Delta outflow requirements were reduced, as described above, the San Francisco Estuary's longfin smelt population was harmed as well.

12.     Compliance with the existing terms of the Sacramento River Settlement Contracts jeopardizes the continued existence and recovery of winter-run Chinook salmon and increases impacts to threatened spring-run Chinook salmon, and the commercially valuable fall-run Chinook salmon. In 2014 and again in 2015, FWS, Reclamation, NMFS and Sacramento River Settlement Contractors agreed to operations that effectively modified the Sacramento River Settlement contracts with respect to the timing of deliveries. However, this has been insufficient to avoid massive mortality and increased risk of extinction of winter-run Chinook salmon.

a.     In 2014, Sacramento River Settlement Contractors negotiated with Reclamation and FWS over water deliveries pursuant to their contract with Reclamation. They agreed to changes in the timing of water deliveries under their contract, but still received a 75% allocation as called for by the contract.  However, the changes in the timing of deliveries were inadequate to avoid depleting the pool of cold water in Shasta

- 8 -

1     reservoir. CVP operations, including deliveries to Sacramento River Settlement

2     Contractors, were a direct and indirect cause of the 95% mortality of winter-run Chinook

3     salmon in 2014 and 2015 and likely high levels of mortality for spring-run Chinook

4     salmon and fall-run Chinook salmon and other species.

5           b.     Modeling by Reclamation that was submitted to the State Water Resources

6     Control Board in 2015 demonstrates that reservoir releases from Shasta and Keswick

7     dams in 2014 were in excess of the reservoir releases necessary to maintain temperature

8     control for salmon egg incubation and early juvenile rearing. This modeling included

9     alternatives that limited reservoir releases to those necessary for temperature control.

10    These excessive releases were intended, in part, to provide water deliveries to Sacramento

11    River Settlement Contractors under their existing contract with Reclamation. I expect that

12    releases from Shasta and Keswick dams will again exceed those needed to maintain water

13    temperature control for endangered winter-run Chinook salmon in 2015, and create

14    substantial risk that this endangered population will suffer extremely high mortality again

15    this year.

16           c.     In its 2009 biological opinion, the NMFS warned that the "winter run ESU

17    is at high risk of extinction," and that "A prolonged drought could result in extinction of

18    the species by resulting in significant egg mortality for three years in a row." The risk of

19    extinction is even higher today as a result of lowered abundance, harm to winter-run

20    outmigrating from the Central Valley in 2014 (those that were hatched in 2013), the likely

21    year class failure in 2014, and the small (and perhaps entirely inadequate) amount of cold

22    water that is available for protection of winter-run eggs deposited in 2015.

23    13.     As demonstrated above, FWS has not fully implemented the Delta smelt biological

24    opinion and current operations of the CVP and SWP during the drought were not anticipated in

25    the formulation of the 2008 BiOp and its RPA. Current operation of the SWP and CVP, including

26    deliveries to Sacramento River Settlement Contractors, are jeopardizing the continued existence

27    and recovery of Delta smelt and other listed fish species and adversely modifying critical habitat

28    for those species.

DECLARATION OF JONATHAN ROSENFIELD
CASE NO.  1:05-CV-01207-LJO-GSA

1      I declare under penalty of perjury that the foregoing is true and correct to the best of my

2  knowledge.

3

DATED: May 5, 2015

4                               Jonathan Rosenfield, Ph.D.

DECLARATION OF JONATHAN ROSENFIELD
CASE NO. 1:05-CV-01207-LJO-GSA

Scanned by CamScanner

1

**PROOF OF SERVICE**

2  CASE:          *NRDC v. Jewell, et al.*

3  CASE NO:       U.S. Dist. Ct., E.D. Cal., Case No. 1:05-cv-01207 LJO-GSA

4          I am employed in the City and County of San Francisco, California.  I am over the age of
eighteen years and not a party to the within action; my business address is 177 Post Street, Suite
5  300, San Francisco, California 94108.  I hereby certify that on May 5, 2015, I electronically filed
the following with the Clerk of the Court for the United States District Court for the Eastern
6  District by using the CM/ECF system:

7          **DECLARATION OF JONATHAN ROSENFIELD**

8  All participants in the case are registered CM/ECF users and will be served by the CM/ECF
system.

9

10         I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.  Executed this May 5, 2015, at San Francisco, California.

11                            */s/ Barbara Jane Chisholm*
                              Barbara Jane Chisholm
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Jonathan Alan Rosenfield, Ph.D.

3101 Deakin St.; Berkeley, CA 94705
510 684-4757; jarosenfield@gmail.com

## PROFESSIONAL EXPERIENCE

**CONSERVATION BIOLOGIST**            THE BAY INSTITUTE                              2008-PRESENT
Represent a regional environmental non-profit in efforts to protect and restore the native biological diversity and ecosystem services of the San Francisco Estuary.  Advocate in policy forums, including testimony before state and federal regulators and legislative committees, for integration of best available science into management plans for the Estuary and its watershed in order to protect imperiled and economically valuable species.  Analyze datasets to uncover ecosystem dynamics and recommend management of vital aquatic resources. Collaborate with technical experts and managers from the public, NGO, academic, and private sectors.

**SOLE PROPRIETOR**            AQUATIC RESTORATION CONSULTING                2005-PRESENT
Initiate and manage consulting projects focusing on fish, wildlife, and habitat restoration in and around the San Francisco Estuary and its tributaries.  Selected recent projects include:
- ecological consultant for *Environmental Law Foundation's* public trust litigation regarding California's Scott River
- lead an expert panel for the *CA Department of Water Resources'* Delta Risk Management Strategy (DRMS) in development of quantitative models and metrics for assessing impacts to aquatic ecosystems resulting from catastrophic levee collapse
- review and critique the City of San Francisco's Water System Improvement Program (WSIP) on behalf of the *Tuolumne River Trust*,
- develop conceptual life-history models for salmonids and longfin smelt for CDFG's Delta Regional Ecosystem Restoration Implementation Plan (DRERIP)
- collaborate on design and content of *Calfed's Ecosystem Restoration Program* conceptual model describing ecological effects of low dissolved oxygen in the Stockton Ship Channel (http://www.sjrdotmdl.org/concept_model/about.htm)

**DIRECTOR, SCIENTIFIC PEER-REVIEW**    CALFED ERP                              2004-05
Manage peer-review of proposals for a multi-million dollar ecosystem restoration grant program.  Collaborate on design of web-based proposal and reviewer management databases.  Recruit and assign scientists to review technical proposals for both, CalFED's ERP and Science programs.  Plan, host, and manage review panels.

**POST-DOCTORAL RESEARCHER**            UC DAVIS                              2002-04
Explore long-term datasets to uncover causes of longfin smelt (*Spirinchus thaleichthys*) population decline in the San Francisco Estuary.  Products of this research form the basis of an Endangered Species Act petition to list the San Francisco Estuary.

**STAR FELLOW**                    US EPA                              1998-00
Investigate ecology, behavior, and evolution of a rare desert fish species under the US EPA's graduate fellowship program.  Manage 5 student employees and multi-year budgets for 3 government grants totaling >$85,000/yr.

**RESEARCH ASSOCIATE**        SIERRA CLUB LEGAL DEFENSE FUND              1991-93
Analyze technical issues for lawyers in a public-interest, non-profit, environmental law firm.  Selected projects include:

- develop technical and factual basis for litigation to protect Chinook salmon, Delta smelt, Northern Goshawk, and desert tortoise.
- initiate petitions to list populations of coho salmon in CA, OR, and WA and steelhead in CA under the federal ESA.

## EDUCATION

**UNIVERSITY OF NEW MEXICO**      PHD, BIOLOGY                     *2001*
   Dissertation:  Conservation of North American freshwater fish species:  the micro and macro of speciation and extinction.

**UNIVERSITY OF MICHIGAN**      MS, CONSERVATION BIOLOGY             *1996*
**CORNELL UNIVERSITY**          BS, NATURAL RESOURCES                *1991*

## PUBLICATIONS

Rosenfield, J.A. 2010.  Conceptual life-history model for longfin smelt (*Spirinchus thaleichthys*) in the San Francisco Estuary.  *CBDA Delta Regional Ecosystem Restoration Implementation Plan*, Sacramento, CA.

Rosenfield, J.A. and R. Baxter. 2007. Population dynamics and distribution patterns of longfin smelt in the San Francisco Estuary.  *Transactions of the American Fisheries Society* 136:1577-1592.

Rosenfield, J.A., S. Nolasco, S. Lindauer, C. Sandoval, and A. Kodric-Brown.  2004.  The role of hybrid vigor in the replacement of Pecos pupfish by its hybrids with sheepshead minnow. *Conservation Biology* 18:1-10.

Kodric-Brown, A. and J.A. Rosenfield.  2004.  Populations of Pecos pupfish (*Cyprinodon pecosensis*) differ in their susceptibility to hybridization with sheepshead minnow (*C. variegatus*).  *Behavioural Ecology & Sociobiology* 56: 116-123.

Rosenfield, J.A. and A. Kodric-Brown. 2003. Sexual selection promotes hybridization between Pecos pupfish, *Cyprinodon pecosensis* and sheepshead minnow, *C. variegatus. J Evol Biol* 16:595-606

Parker, T., R. Knapp, and J.A. Rosenfield. 2002. Social mediation of sexually selected ornamentation and steroid hormone levels in male junglefowl.  *Animal Behaviour* 64:291-298.

Rosenfield, J.A. 2002. Pattern and process in the geographic ranges of freshwater fishes. *Global Ecology and Biogeography* 11:323-332.

Rosenfield, J.A., T. Todd, and R. Greil. 2000. Molecular evidence of unidirectional hybridization and introgression between pink and chinook salmon of the St. Mary's River, MI. *Transactions of the American Fisheries Society*, 129:670-679.

Rosenfield, J.A. 1998. Detection of natural hybridization between pink salmon (*Oncorhynchus gorbuscha*) and chinook salmon (*Oncorhynchus tshawytscha*) in the Laurentian Great Lakes using meristic, morphological, and color evidence. *Copeia* 1998:706-714.

Smith, G.R., J.A. Rosenfield, and J. Porterfield. 1995. Processes of origin and criteria for preservation of fish species. Pages 44-57 *in* J.L. Nielsen, P. Brouha, and D. Powers, eds. *Evolution and the aquatic ecosystem: Defining unique units in population conservation.*  American Fisheries Society special publication #17.  Bethesda, MD.

Rosenfield, J.A. 1991. *Municipal Compost Management: Study Guide.*  Cornell University Home Study Program, Cornell University, College of Agriculture and Life Sciences.  Ithaca, NY.  50 pp.

Cobb, K. and J.A. Rosenfield, eds. 1991. *Municipal Compost Management.* Cornell University Home Study Program, Cornell Univ., College of Agriculture and Life Sciences.  Ithaca, NY.  250 pp.

## PROFESSIONAL SERVICE

**Manuscript/Grant Referee**   North American Journal of Fisheries Management, Journal of
  Heredity, Conservation Biology, Behaviour, Behavioral Ecology, Biological Invasions, Global
  Ecology & Biogeography, Transactions of the American Fisheries Society, Reviews in Fish
  Biology & Fisheries, CalFed, California Fish & Game

**Doctoral Committee Member**   Dr. Andy Fields, University of the Pacific

# Exhibit 2

1    JOHN C. CRUDEN, Acting Assistant Attorney General
    JEAN E. WILLIAMS, Section Chief
2    JAMES A. MAYSONETT, Trial Attorney (D.C. Bar No. 463856)
    Environment & Natural Resources Division
3    U.S. Department of Justice
    Benjamin Franklin Station, P.O. Box 7369
4    Washington, D.C. 20044-7369
    Telephone: (202) 305-0216 / Facsimile:(202) 305-0275
5    Attorneys for the Federal Defendants

6

7

                    **UNITED STATES DISTRICT COURT**
                  **EASTERN DISTRICT OF CALIFORNIA**
                      **FRESNO DIVISION**

8

9    NATURAL RESOURCES DEFENSE     )
    COUNCIL, et al.,                      )
                               )   Case No.:  05-cv-01207 (OWW) (LJO)
10         Plaintiffs,             )
    v.                              )
11                              )   **Federal Defendants' Second Supplemental**
    DIRK KEMPTHORNE, et al.,       )   **Memorandum in Support of Motion for**
12                              )   **Summary Judgment on CVP Contract**
        Defendants.            )   **Rescission**
13                                )
    SAN LUIS & DELTA MENDOTA       )
14     WATER AUTHORITY, et. al.         )
                             )
15         Defendant-Intervenors      )
    _____ )

16

17         On November 19, 2008, the Court issued a preliminary decision on the Plaintiffs'

18 "contract" claims and called for further evidence on the nature and extent of the senior water

19 rights claimed by the Sacramento River Settlement ("SRS") Contractors.  Memorandum

20 Decision re Cross-Motions for Summary Judgment re CVP Contract Rescission, Docket No. 761

21 (Nov. 19, 2008) ("SJ Decision").  The parties, including the Federal Defendants, submitted

22 evidence and additional briefing.  Federal Defendants' Supplemental Memorandum in Support

23 of Motion for Summary Judgment on CVP Contract Rescission, Docket No. 815 (Feb. 27, 2009)

24 ("Fed. Def. Memo.").  On March 13, 2009, the Court held a hearing on those issues.  Docket No.

25 826.  At the hearing, the Court found the position taken by the Federal Defendants on these

26 issues to be unclear.  In light of the Court's comments, the Federal Defendants submit this

27 additional brief to ensure that the Court has a clear statement of their position.

28

1　　　　　**1.　　Summary of the Federal Defendants' position.**

2　　　　　The Federal Defendants draw a distinction in this case between two kinds of discretion

3　exercised by the Bureau of Reclamation ("Reclamation").  The first is Reclamation's discretion

4　to operate the Central Valley Project ("CVP") and, in particular, its discretion to limit deliveries

5　of water to the SRS Contractors so that such water may be used instead for the benefit of the

6　Delta smelt under the Endangered Species Act ("ESA").  For the reasons discussed below, it is

7　the position of the Federal Defendants that the limits of that discretion are defined by the water

8　rights held by the United States and, in particular, by the terms and conditions of State Water

9　Resources Control Board ("SWRCB," the "Board") Decision 990 ("D-990").  D-990 sharply

10　constrains Reclamation's discretion regarding CVP operations where the senior water rights

11　claims of the SRS Contractors are concerned.

12　　　　　The second kind of discretion at issue here is Reclamation's discretion to negotiate and

13　execute settlement contracts with the SRS Contractors (both the original and renewed contracts).

14　It is the position of the Federal Defendants that, because the settlement contracts were intended

15　to compromise senior water right claims, Reclamation had broader discretion to negotiate the

16　terms of those contracts, including the quantities of water provided, both when they were

17　originally executed and upon renewal.  That discretion is not constrained by statute or the terms

18　of the contracts themselves.

19　　　　　The Court itself drew a distinction between these two kinds of discretion in its

20　preliminary decision, discussing Reclamation's "obligations to ensure that its operation of the

21　CVP did not impede the SRS Contractors' . . . senior rights," but also noting that the agency

22　"exercised some degree of discretion" over the negotiation of the "terms as to quantity of water

23　to be delivered and timing of deliveries" in the SRS Contracts.  SJ Decision at 69.  As the Court

24　also recognized, the fact that Reclamation retained discretion to negotiate the terms of the SRS

25　Contracts does not mean that the Plaintiffs prevail on their ESA challenges to the execution of

26　these contracts.  To the contrary, the Plaintiffs' claims fail because the SRS Contracts "simply

27　embod[y]" Reclamation's obligations under state water law, as limited by the water rights held

28

by the United States.  *Cf.* SJ Decision at 69.  As such, Reclamation lacks "discretion under *Home Builders* and any section 7(a)(2) challenge to the SRS Contracts" is "barred."  *Id.*

The Federal Defendants submit that the Court should resolve these claims by focusing on the water rights held by the United States, rather than the rights claimed by the SRS Contractors. Fed. Def. Memo. at 2-3 (arguing that it is impossible for the Court to determine the "full nature and extent of the SRS Contractors' claimed senior water rights" in this proceeding).  As discussed below, the United States' water rights constrain Reclamation's discretion and do not allow the agency to withhold water being put to "reasonable beneficial use" by the SRS Contractors for the benefit of the Delta smelt.  Because Reclamation does not have that discretion, the ESA does not require consultation on this aspect of Reclamation's operations – such a consultation "would be a meaningless exercise" because "the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995).  Ultimately, it does not matter that Reclamation had broad discretion to negotiate the terms of the SRS Contracts because Reclamation lacks the discretion to use water being put to "reasonable beneficial use" by the SRS Contractors for the benefit of the Delta smelt.  For these reasons, and all the reasons discussed below, summary judgment on the Plaintiffs' "contract" claims should be entered on behalf of the Federal Defendants.

> **2.   Reclamation's discretion to use this water for the benefit of the Delta smelt is constrained by state water law and its own water rights as defined in D-990.**

Congress could have eliminated the role of state law in the operation of the CVP, but it did not.  *See* U.S. Constitution, Art. VI, § 2.  Instead, Section 8 of the Reclamation Act of 1902 requires Reclamation to operate the CVP "in conformity with" California water law.[1]  43 U.S.C.

---

[1]The full text of Section 8 reads: "Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to,

§ 383; *see California v. United States*, 438 U.S. 645 (1978) (holding that the State of California may impose conditions on permits granted to the United States for operation of the CVP).  That includes the "full recognition" of any "vested right acquired" under California water law.  43 U.S.C. § 383; *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 734 (1950).

Section 8 means that the United States had to acquire its own water rights for the operation of the CVP under California law.  Those rights were granted by California's SWRCB in D-990.  Decision 990, State of California State Water Rights Board (Feb. 9, 1961) ("D-990") (available at http://www.waterrights.ca.gov/hearings/decisions/WRD990.PDF), at 79-89.  D-990 defines the United States' water rights and imposes 29 terms and conditions on them.  *Id.*  It should be noted that D-990 is the source of the United States' water rights for the CVP, not the SRS Contractors' claimed senior water rights.  D-990, in fact, does not attempt to define or quantify the SRS Contractors' water rights (although it is based on the Board's general conclusion that "unappropriated water exists in the Sacramento River and in the Delta").  *Id.* at 79.

Here, the relevant condition of D-990 is Condition 23.[2]  *Id.* at 85-86.  Under Condition 23, Reclamation has no right to "export" water outside of the Sacramento River basin (or beyond the Delta) if that water is being put to "reasonable beneficial use" by parties in the basin or the Delta (like the SRS Contractors), but only if those parties entered into water contracts with the United States by certain deadlines set out in D-990 (which the SRS Contractors did).[3]  *Id.*  By its

_____

or from any interstate stream or the waters thereof: *Provided*, That the right to use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."  32 Stat. 390.

[2]Other conditions in D-990 subordinate the United States' water rights to certain other uses, but they are not relevant here.  Condition 20, for example, deals with certain diversions above Shasta Dam.  D-990 at 84.  Condition 21 concerns water appropriations by counties.  D-990 at 84-85.  Condition 22 concerns the retention of water permitting authority by the SWRCB.  D-990 at 85 (setting forth Condition 22) and 73 (describing purpose).

[3]Condition 23 states in full: "The export of stored water under [these] permits . . . outside the watershed of Sacramento River Basin or beyond the Sacramento-San Joaquin Delta shall be

plain language, Condition 23 did not compel Reclamation or the SRS Contractors to enter into the settlement contracts. But it did allow parties in the Sacramento River basin and the Delta to exercise a preference to this water, and it made the United States' water rights "subject to" that preference.

Because the SRS Contractors exercised that preference, and because the water needs assessments prepared by Reclamation support the conclusion that this water is being put to reasonable beneficial use, Fed. Def. Memo. at 7-8, Condition 23 now constrains Reclamation's discretion. It limits the United States' water rights such that Reclamation does not have the discretion to take water that is being put to "reasonable beneficial use" by the SRS Contractors and instead allocate that water for the benefit of the Delta smelt. And because Reclamation lacks this discretion, as discussed above, the Plaintiffs' "contract" claims are barred under *Home Builders*.

The SRS Contractors have presented their own arguments based on Condition 23. Glenn-Colusa Irrigation District's Supplemental Memorandum in Support of Motion for Summary Judgment Adjudication of Plaintiffs' Second Claim, Docket No. 773 (Jan. 30, 2009) ("GCID Mem."), at 7-15. But while they reach the same ultimate conclusion as the Federal Defendants – that the Plaintiffs' claims fail because this water is beyond Reclamation's discretion – there are two important differences in the details of these arguments. *See, generally*, Fed. Def. Memo. at 8-11 (responding to arguments on Condition 23 presented by SRS Contractors).

First, the SRS Contractors argue that Condition 23 required Reclamation to execute these contracts. GCID Mem. at 13-15. The Court included a similar finding in its preliminary

---

subject to the reasonable beneficial use of said stored water within said watershed and Delta, both present and prospective, provided, however, that agreements for the use of said stored water are entered into with the United States prior to March 1, 1964, by parties currently diverting water from Sacramento River and/or Sacramento-San Joaquin Delta and prior to March 1, 1971, by parties not currently using water from Sacramento River and/or Sacramento-San Joaquin Delta." D-990 at 85-86.

1   decision, stating that D-990 "directed the United States to reach a settlement agreement with the

2   Sacramento River water users" and "precludes [Reclamation] from operating the projects in the

3   absence of mutually agreed-upon Settlement Contractors."  SJ Decision at 69.

4          The Federal Defendants respectfully submit that nothing in D-990 compelled the Federal

5   Defendants to enter into these contracts.  The plain language of Condition 23 certainly does

6   nothing of the kind: it merely makes the United States' water rights "subject to" reasonable

7   beneficial uses within the basin and the Delta "provided, however, that agreements for the use of

8   said stored water are entered into with the United States prior to" certain deadlines.  D-990 at 85;

9   *see also* D-990 at 72-73 (discussing basis for inclusion of Condition 23).  If the parties had not

10  executed the settlement contracts, the preference created by Condition 23 would never have

11  become effective and it would not constrain the United States' water rights or Reclamation's

12  discretion.

13         Of course, the Board, like Congress, and the parties to this dispute, recognized that it was

14  "imperative . . . that the holders of existing rights and the United States reach agreement

15  concerning these rights . . . if a lengthy and extremely costly adjudication of the waters of the

16  Sacramento River and its tributaries is to be avoided."  D-990 at 75.  But if the Board had

17  wanted to make the water rights held by the United States contingent on the execution of these

18  contracts, it could have included a condition plainly stating such a requirement in D-990.  It did

19  not.

20         Second, the SRS Contractors argue that Condition 23 effectively incorporates the terms

21  of these settlement contracts into D-990 and makes the United States' water rights subject to

22  those contracts.  GCID Mem. at 18.  Again, this argument is not supported by the plain language

23  of Condition 23.  That language does not make the United States' water rights "subject to" the

24  terms of the contracts.  It makes the United States' water rights "subject to the reasonable

25  beneficial use of said stored water within said watershed and Delta, both present and prospective

26  . . . ."  D-990 at 85.  Right now, Reclamation's water needs assessments support the conclusion

27  that the SRS Contractors are putting this water to reasonable beneficial use, so the end result of

28

1    these arguments is the same.  But under the SRS Contractors' interpretation, those amounts can

2    never change, even if the water is not being put to reasonable beneficial use, and that

3    interpretation is not consistent with D-990.

4          The Plaintiffs, in contrast, argue that Reclamation is not required to honor water rights

5    created by California state law or even the requirements of D-990 to the extent that they conflict

6    with the ESA.  As the Plaintiffs note, Congress did not "relinquish total control" over the

7    operation of the CVP to the state of California, and Section 8 of the Reclamation Act of 1902

8    does not require Reclamation to follow state water law where it is "inconsistent with other

9    congressional directives."  *California v. United States*, 438 U.S. at 668, n.21.  But the courts

10    have identified only a handful of "congressional directives" that trump Section 8's command to

11    follow state water law, and all of those have been in the reclamation law itself.  The Supreme

12    Court, for example, held that Section 8 (and thus state water law) must yield to the express

13    requirements of Section 5 of the Reclamation Act of 1902, which bars the United States from

14    entering into water contracts for lands in excess of 160 acres.  *Ivanhoe Irrigation Dist. v.*

15    *McCracken*, 357 U.S. 275, 292 (1958).

16          In contrast, the Ninth Circuit has stated that the "beneficial use" provision of Section 8

17    was intended to be governed by state law.  *See United States v. Alpine Land & Reservoir Co.*,

18    697 F.2d 851, 854 (9th Cir. 1983).  Thus, in general, state law is "valid" and governs "the federal

19    management or control of a federally financed water project" unless "it clashes with express or

20    clearly implied congressional intent or works at cross-purposes with an important federal interest

21    served by the congressional scheme."  *United States v. State of California*, 694 F.2d 1171, 1177

22    (9th Cir. 1982).

23          None of the cases cited by the Plaintiffs holds that the ESA is the kind of congressional

24    directive that trumps the requirements of Section 8 and state water law.  Instead, those cases

25    simply held that the ESA "pre-empts" conflicting state law through the Supremacy Clause.

26    Plaintiffs' Corrected Response to Sacramento River Settlement Contractors' Supplemental

27    Memoranda in Support of Motion for Summary Adjudication of Plaintiffs' Second Claim,

28

1   Docket No. 820-2 (Mar. 2, 2009) ("Pl. Mem."), at 3 (citing *National Audubon Soc'y, Inc. v.*
2   *Davis*, 307 F.3d 835 (9th Cir. 2002); *Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997); *Swan View*
3   *Coal., Inc. v. Turner*, 824 F. Supp. 923 (D. Mont. 1992); *United States v. Glenn-Colusa*
4   *Irrigation Dist.*, 788 F. Supp. 1126 (E.D. Cal. 1992)).  That is undisputed – Congress could have
5   eliminated the role of California state law in the operation of the CVP.  But it did not, so the
6   question here is not whether the ESA trumps state law, but whether the ESA trumps Section 8 of
7   the Reclamation Act of 1902, another aspect of Federal law.

8       It does not.  As we have already discussed, the ESA does not expand an agency's
9   authority or broaden its discretion where it is otherwise constrained.  Fed. Def. Mem. at 14-17.
10  Section 7 of the ESA is limited, by regulation, to those agency actions "in which there is
11  discretionary Federal involvement or control."  50 C.F.R. § 402.03.  For that reason, the duties to
12  consult and avoid jeopardy "cover[] only discretionary agency actions and do[] not attach to
13  actions . . . that an agency is required [by law] . . . to undertake . . . ."  *National Ass'n of Home*
14  *Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2536 (2007).  Here, state water law, made
15  applicable to Reclamation through Section 8, constrains Reclamation's discretion and does not
16  allow Reclamation to use water that is being put to "reasonable beneficial use" by the SRS
17  Contractors instead for the benefit of the Delta.  The ESA does not change that because it does
18  not give Reclamation any additional authority or expand its discretion.  If Reclamation's water
19  rights (or the rights of the SRS Contractors) should be adjusted for the protection of fish and
20  wildlife, that is a matter for the SWRCB under state law.

21      The Central Valley Project Improvement Act ("CVPIA"), Pub. L. 102-575 (Oct. 30,
22  1992), is also not the kind of "congressional directive" that trumps Section 8 and allows
23  Reclamation to violate state law here.  The CVPIA took several steps to adjust the operation of
24  the CVP to provide additional benefits for fish and wildlife, but nothing in the Act suggests that
25  it empowers Reclamation to disregard state water rights for the benefit of listed species.  As the
26  Plaintiffs note, it does direct Reclamation to "operate the [CVP] to meet all obligations under
27  State and Federal law, including but not limited to the Federal Endangered Species Act . . . ."

28

CVPIA § 3406(b).  But this hardly shows that Congress expected Reclamation to ignore state

water law where it conflicted with the ESA, especially since the very same sentence also

commands Reclamation to comply with "State [] law," including "all decisions of the California

[SWRCB] establishing conditions on applicable licenses and permits for the project."  *Id.*; *see

also* CVPIA § 3406(a)(4) (stating that "[n]othing in this title shall affect the State's authority to

condition water rights permits for the Central Valley Project.").  It would have been a simple

matter for Congress to include a congressional directive in the CVPIA that trumped Section 8 of

the Reclamation Act of 1902, but it did not do so.[4]

    The Ninth Circuit has noted that there is a long history in the reclamation context of

Congress deferring to state water law.  *United States v. State of California*, 694 F.2d at 1176,

1178.  It has cautioned that the courts "may not seek out conflicts" between Section 8 and other

federal law "where none clearly exists."  *Id.*  And it has gone so far as to hold that the United

States must "attempt to reconcile its interests with California law before a court can override the

state's position as conflicting with federal policy."  *Id.* at 1178.

    Here, the ESA and Section 8 can be reconciled.  State water law, which Section 8 makes

applicable to Reclamation, defines Reclamation's water rights and the limits of its discretion.

---

[4]Similarly, the Plaintiffs argue that D-990 was amended by D-1641, and that D-1641 releases Reclamation from the obligations of D-990 to the extent that they conflict with the ESA.  Pl. Mem. at 6-7.  In fact, D-1641 did nothing of the kind.  It merely clarified that it did not authorize any take of listed species itself and that, if the agencies anticipated that take would occur, they were still required to obtain authorization for that take through the ESA, as the full text of the cited provision shows:

> This permit does not authorize any act which results in the taking of a threatened or endangered species or any act which is now prohibited, or becomes prohibited in the future, under either the California Endangered Species Act or the federal Endangered Species Act.  If a 'take' will result from any act authorized under this water right, the permittee/licensee shall obtain authorization for an incidental take prior to construction or operation of the project.  Permittee/Licensee shall be responsible for meeting all requirements of the applicable Endangered Species Act for the project authorized under this permit/license.

D-1641 at 148.

The ESA then governs how Reclamation must use the water that Reclamation has a right to use, as defined by California law.  That approach reconciles the ESA and Section 8 and is consistent with the ESA's regulations, *Home Builders*, and other ESA precedent holding that Section 7 of the ESA only applies where an agency has discretion.

> **3.    Reclamation had broad discretion to negotiate the terms of the SRS Contracts.**

The Federal Defendants' position is that the CVPIA required Reclamation to renew the settlement contracts, *see* Fed. Def. Memo. at 13-14 (citing CVPIA § 3404(c)), but that Reclamation had broad discretion to negotiate the terms of those renewal contracts, including the quantities of water provided.  The discretion to negotiate those terms is not constrained by the CVPIA, the terms of the original contracts, or D-990.  *See, generally*, Fed. Def. Memo. at 11-14.  It is the long-standing position of the Federal Defendants that these contracts were not intended as permanent water rights settlements, and that they only resolve this dispute during the term of the contracts.

The CVPIA, for example, requires Reclamation to renew these contracts "upon request."  CVPIA § 3404(c).  It does not state, however, that the contracts must be renewed on exactly the same terms – to the contrary, it expressly requires that Reclamation modify the terms of many of these contracts.  *See, e.g.,* CVPIA § 3404(c)(2) ("Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the Central Valley Project, the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts.").  Of course, contracts can only be renewed with the consent of the contracting parties and on terms that are agreed to by both parties.  But the consent of the parties is required whether the contracts are renewed on the same or modified terms, so that fact offers no support to the argument that the CVPIA requires renewal on exactly the same terms.

It is also important to note that the requirement to renew these contracts is not based on some recognition of the senior water rights claimed by the SRS Contractors.  In fact, this

1    provision of the CVPIA applies not only to the "hybrid" settlement contracts, but also to all

2    "existing long-term repayment or water service contract[s] for the delivery of water from the

3    Central Valley Project," including, for example, the Delta-Mendota Canal Unit ("DMCU")

4    contracts that were also challenged in the Plaintiffs' "contract" claims.

5         The SRS Contractors have also argued that the original settlement contracts deprived

6    Reclamation of the discretion to negotiate the terms of the renewal contracts.  Reclamation

7    District No. 108's Supplemental Memorandum in Support of Motion for Summary Adjudication

8    of Plaintiffs' Second Claim, Docket No. 772 (Jan. 30, 2009) ("RD 108 Mem."), at 2-3, 8-10.

9    Their arguments are based largely on Article 9 of the contracts, which states that the settlement

10   contracts "constitute full agreement . . . as to the quantities of water and the allocation thereof

11   between Base Supply and Project Water which may be diverted by the Contractors" during "the

12   term of this Settlement Contract and any renewals thereof . . . ."  Article 9(a)(1), Rec. AR 2714.

13        Article 9 does not state that it deprives either party of their discretion to negotiate new

14   terms upon renewal of the contract.  It simply means that the parties have reached agreement on

15   the quantities of water that the SRS Contractors may divert during the term of the contract or any

16   renewal that was not subject to further modification.  If the parties had intended this contract to

17   be a permanent settlement of this water rights dispute, the contract could have (and should have)

18   clearly stated that.

19        Moreover, the argument that Article 9 requires renewal on the same terms is impossible

20   to reconcile with other provisions of the settlement contracts.  For example, Article 2(a) of the

21   settlement contracts allows the parties to renew the contracts "under terms and conditions

22   mutually agreeable to the parties hereto" for periods "not to exceed 40 years," which would be

23   meaningless if renewal was required on exactly the same terms.  Similarly, Article 2(a) further

24   provides that "[t]he terms and conditions of each renewal shall be agreed upon not later than one

25   year prior to the expiration of the then existing Settlement Contract."  The SRS Contractors'

26   interpretation of Article 9 renders these provisions of Article 2 meaningless.  Similarly, if these

27   contracts had been intended to settle these disputes permanently, it would have been unnecessary

28

1   for the parties to enter into them with a full reservation of their rights.  Article 9(d), Rec. AR

2   2716.

3         Finally, as discussed above, nothing in D-990 compelled Reclamation to execute these

4   contracts or to renew them, on these or any other terms.  *See also* Fed. Def. Memo. at 8-11.

5         The fact that Reclamation retains broad discretion to negotiate the terms of these renewal

6   contracts, however, does not mean that the Plaintiffs prevail on their claims.  To the contrary,

7   because Reclamation lacks the discretion under Section 8 of the Reclamation Act of 1902 and D-

8   990 to withhold this water from the SRS Contractors for the benefit of the Delta smelt, Section 7

9   of the ESA does not apply to that aspect of its CVP operations and summary judgment on the

10  Plaintiffs' "contract" claims should be entered on behalf of the Federal Defendants.

11                                    Respectfully submitted this 25th day of March, 2009,

12                                    JOHN C. CRUDEN, Acting Assistant Attorney General
                                      JEAN E. WILLIAMS, Section Chief

13
14                                    /s/   *James A. Maysonett*
                                      JAMES A. MAYSONETT, Trial Attorney
15                                    United States Department of Justice
                                      Environment & Natural Resources Division
16                                    Wildlife and Marine Resources Section
                                      P.O. Box. 7369
17                                    Washington, D.C.  20044-7369
                                      Telephone: (202) 305-0216
18                                    Facsimile: (202) 305-0275
                                      james.a.maysonett@usdoj.gov
19                                    Attorneys for the Federal Defendants

20  OF COUNSEL:

21  Jim Monroe
    Office of the Regional Solicitor
22  Department of the Interior
    2800 Cottage Way, Room E-1712
23  Sacramento, CA 95825-1890

24
25
26
27
28

# Exhibit 3



# United States Department of the Interior



BUREAU OF RECLAMATION
Northern California Area Office
16349 Shasta Dam Boulevard
Shasta Lake, California 96019-8400

IN REPLY REFER TO:

NC-100
RES-3.10

AUG - 2 1999

Basin-Wide Water Management Plan Steering Committee
c/o Mr. Luther P. Hintz
Reclamation District No. 108
PO Box 50
Grimes, California 95950

Dear Mr. Hintz:

Thank you for your March 18, 1999, letter regarding implementation of technical studies in preparation for renewal of Sacramento River Settlement Contracts. As you know, these technical studies are a result of Reclamation and certain Sacramento River Settlement Contractors entering into a Memorandum of Understanding in January of 1997 to settle litigation. It's understandable that differences of opinion about how to best proceed will arise during the course of our cooperative efforts over the next several years.

Your letter discussed two topics that we are not currently in agreement. Those areas may generally be described as: renewal of Sacramento River Settlement Contracts at existing water supply levels; and, update and extension of the 1956 Cooperative Study. The following paragraphs describe the foundation for Reclamation's point of view on these two topics.

Regarding Contract Renewal at Existing Water Supply Levels

Reclamation has not determined that Settlement Contracts must be renewed at existing base and project water supply levels. We believe the language contained within the Settlement Contracts provides each party discretion as the term of the contracts comes due. Options include allowing the contracts to expire, contract renewal, and contract renegotiation. It would not be appropriate to limit any party's alternatives at this time.

Regarding Update and Extension of the 1956 Cooperative Study

The 1956 Cooperative Study program is often referred to as the technical basis for negotiations resulting in the existing Sacramento River Settlement Contracts. By necessity, the individuals involved in conducting the study were required to make assumptions including those related to hydrology, water rights, diversions from and return flows to the Sacramento River, and salinity

**EXHIBIT D**

control for the river's delta. Four decades have passed, and information related to water management has increased significantly. Reclamation believes the reasonable course of action includes updating and extending the 1956 Cooperative Study as agreed and described in our January 1997 Memorandum of Understanding.

If we work together, efforts to update and extend the 1956 Cooperative Study can complement our collaboration to develop the basin-wide water management plan described in the January 1997 Memorandum of Understanding. Like you, Reclamation is not interested in duplication of effort that needlessly increases project costs. Updating and extending the 1956 Cooperative Study concurrent with developing the basin-wide water management plan may help us identify areas of conflict early so we can work together to resolve them. Reclamation is interested in technical work products that help us develop practical and equitable solutions.

I look forward to working with you and others to prepare for contract renewal negotiations. Please feel free to call me if you have questions or concerns. I can be reached by telephone at (530) 275-1554, TDD: (530) 275-8991.

Sincerely,

Michael J. Ryan
Area Manager

cc: Mr. Jack Baber, Chairman
Reclamation District No. 1004
134 5ᵗʰ Street
Colusa, California 95932

Mr. Lance Boyd, General Manager
Princeton-Codora-Glenn and Provident Irrigation Districts
PO Box 98
Princeton, California 95970

Mr. Peter Hughes, General Manager
Natomas Central Mutual Water Company
2601 West Elkhorn Boulevard
Rio Linda, California 95673

Mr. Harold Myers, President
Maxwell Irrigation District
PO Box 217
Maxwell, California 95955

Mr. Max Sakato, General Manager
Sutter Mutual Water Company
PO Box 128
Robbins, California  95676

Mr. Dee Swearingen, Manager
Anderson-Cottonwood Irrigation District
2810 Silver Street
Anderson, California  96007

Mr. Van Tenney, District Manager
Glenn-Colusa Irrigation District
PO Box 150
Willows, California  95988

Mr. Scott Tucker, Manager
Pelger Mutual Water Company
PO Box 1193
Woodland, California  95776