1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, et al.,<br><br>          **Plaintiffs,**<br><br>vs.<br><br>RYAN ZINKE, Secretary, U.S. Department of the Interior, et al.,<br><br>          **Defendants.** | Case No. 1:05-cv-01207 LJO-EPG<br><br>**MEMORANDUM DECISION AND ORDER RE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO SIXTH CLAIM FOR RELIEF AGAINST SACRAMENTO RIVER SETTLEMENT CONTRACTORS AND CROSS-MOTIONS FOR SUMMARY JUDGMENT ON SIXTH CLAIM FOR RELIEF AGAINST FEDERAL DEFENDANTS (ECF NOS. 1175, 1207, 1209, 1210).** |
| SAN LUIS & DELTA MENDOTA WATER AUTHORITY, et al.,<br><br>          **Defendant-Intervenors.** | |
| ANDERSON-COTTONWOOD IRRIGATION DISTRICT, et al.,<br><br>          **Joined Parties.** | |

## I. <u>INTRODUCTION</u>

On March 12, 2018, Plaintiffs, a coalition of environmental interest groups led by the Natural Resources Defense Council ("NRDC"), filed the currently operative Sixth Supplemental Complaint ("6SC"), which includes numerous claims brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, against the U.S. Bureau of Reclamation ("Bureau" or "Reclamation"), the U.S. Fish and Wildlife Service ("FWS"

or "Service"), and various Joined Defendants and Defendant Intervenors. *See generally* ECF No. 1187. The remaining claims in the case[1] allege that the renewal, implementation, and approval of renewal and implementation of certain long-term water contracts violate the ESA and/or APA. *Id.*

Before the Court for decision are cross-motions for summary judgment on the second, fourth, and sixth claims for relief in the 6SC. The fourth claim for relief alleges a 2015 Letter of Concurrence ("2015 LOC") authored by FWS was the culmination of an inadequate ESA consultation regarding the effects of certain long-term contract renewals on delta smelt. 6SC at ¶¶ 189-194. The second claim for relief alleges that Reclamation acted unlawfully by accepting the 2015 LOC and implementing the long-term water supply contracts in reliance on the 2015 LOC. *Id.* at ¶¶ 176-182. The sixth claim for relief alleges that some holders of a certain type of long-term water contract, known as Sacramento River Settlement Contracts ("SRS Contracts" or "SRS Contractors" when referring to the holders), and Reclamation violated the ESA's prohibition against taking listed species because they caused substantial temperature-dependent mortality of Sacramento River winter-run Chinook salmon ("winter-run") and Central Valley spring-run Chinook salmon ("spring-run") eggs and fry in the Upper Sacramento River in 2014 and 2015. *Id.* at ¶¶ 201-205.

The motions concerning the second and fourth claims are limited to the administrative record ("AR"),[2] while review of the sixth claim is not.[3] Because the sixth claim is set for a bench trial beginning March 5, 2019, *see* ECF No. 1194, in the interest of expedience, the Court addresses the motions that pertain to the sixth claim in this Memorandum Decision and Order, leaving the remaining matters for separate resolution.

---

[1] Final judgment has been entered on the First and Third Claims for Relief. ECF No. 873. Plaintiffs have included the First Claim for Relief in the SAC for informational purposes only. *See* ECF No. 1045 at 19.
[2] The AR has been submitted in pieces over time. A complete set of the entire AR applicable to the present motions has been compiled and lodged. *See* ECF Nos. 1261-62. For purposes of this Decision, the Court frequently relies on bates-stamped documents submitted by Reclamation. The Court refers to these documents with the designation "BOR" followed by the bates number.
[3] Federal Defendants' suggestion to the contrary is addressed below.

## II. PROCEDURAL HISTORY

The Court has reviewed the factual and procedural history of this case in painstaking detail in prior orders. *See Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1203-10 (E.D. Cal. 2017) ("*NRDC v. Norton*") (ECF No. 1069 at 5-15). That review is incorporated herein by reference. Upon resolution of the most recent round of motions to dismiss, only certain aspects of the sixth claim for relief remain. First, as mentioned, Plaintiffs allege that the named SRS Contractor Defendants caused substantial temperature-dependent mortality of winter-run and spring-run Chinook salmon by diverting and transferring water pursuant to the terms of the SRS Contracts in 2014 and 2015, without an appropriate permit under the ESA. *See* 6SC ¶ 204. Only two narrow aspects of the Section 9 claim remain pending against Reclamation: that Reclamation unlawfully "took" ESA-listed salmonids by (1) approving water transfers SRS Contractors to others in 2014 and 2015; and (2) by failing to require one SRS Contractor, the Glenn Colusa Irrigation District ("GCID"), to divert a certain volume of water from Stony Creek, rather than directly from the Sacramento River, during those same years. *See NRDC v. Norton*, 236 F. Supp. 3d at 1240.

## III. LEGAL STANDARDS

### A. General Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

1   (1986). "[T]the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248.

2   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly

3   preclude the entry of summary judgment." *Id*. A factual dispute is "genuine" "if the evidence is such that

4   a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. "Where the record taken as

5   a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue

6   for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

7   citation omitted).

8       The moving party bears the initial burden of informing the Court of the basis for its motion, and

9   of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a

10  genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. Put another way:

>   A moving party without the ultimate burden of persuasion at trial-usually,
>   but not always, a defendant-has both the initial burden of production and
>   the ultimate burden of persuasion on a motion for summary judgment. *See*
>   10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal
>   Practice and Procedure § 2727 (3d ed.1998). In order to carry its burden of
>   production, the moving party must either produce evidence negating an
>   essential element of the nonmoving party's claim or defense or show that
>   the nonmoving party does not have enough evidence of an essential
>   element to carry its ultimate burden of persuasion at trial. *See High Tech
>   Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.
>   1990). In order to carry its ultimate burden of persuasion on the motion,
>   the moving party must persuade the court that there is no genuine issue of
>   material fact. *See id*.

18  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). If the

19  moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its

20  own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in

21  order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250. "If a moving party fails

22  to carry its initial burden of production, the nonmoving party has no obligation to produce anything,

23  even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210

24  F.3d at 1102-1103; *see Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970).

25

4

## B.    General ESA Framework

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) ("*NRDC v. Jewell*") (citing 16 U.S.C. § 1533). FWS and the National Marine Fisheries Service ("NMFS") administer the ESA on behalf of the Departments of the Interior and Commerce, respectively[4]. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). The district court in *Environmental Protection Information Center, Inc. v. Pacific Lumber Co.*, summarized succinctly the relationship between the sections of the ESA pertinent to the present motion:

> Section 9 of the ESA makes it unlawful for any person to "take," *i.e.*, to harm, kill or harass, any listed endangered species of fish or wildlife within the United States unless an incidental take permit ("ITP") or other exemption is obtained pursuant to section 10 of the ESA. 16 U.S.C. § 1538. In order to qualify for an ITP, a permit applicant must submit a habitat conservation plan that includes, among other things, the steps an applicant will take to minimize and mitigate impacts on endangered species and alternative actions being considered. 16 U.S.C. § 1539(a)(2)(A).
>
> Section 7(a)(2) imposes a procedural duty on the federal agencies to consult with the FWS or NMFS, depending on the protected species, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitats of listed species. 16 U.S.C. § 1536(a)(2). An agency "action" is defined to mean all activities carried out by federal agencies, including, among other things, the granting of licenses and permits. *See* 50 C.F.R. § 402.02. "If a contemplated agency action may affect a listed species, then the agency must consult with the Secretary of the Interior, either formally or informally." *American Rivers [v. NMFS]*, 126 F.3d [1118,] 1122 [(9th Cir. 1997)].

---

[4] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), *as corrected* (Oct. 31, 2008). NMFS is granted jurisdiction over fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id.* FWS exercises jurisdiction over the delta smelt; NMFS exercises jurisdiction over the winter-run and spring-run Chinook salmon.

67 F. Supp. 2d 1113, 1117-18 (N.D. Cal. 1999), *vacated in part on other grounds*, 257 F.3d 1071 (9th Cir. 2001).

Formal consultation results in the issuance of a "biological opinion" ("BiOp") by the relevant wildlife agency (FWS or NMFS). *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id.* § 1536(a)(2), then the action may not go forward unless the wildlife agency can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id.* § 1536(b)(3)(A). If a BiOp concludes that the proposed action (or the action implemented in conjunction with actions described in the RPA) will cause incidental taking of protected species, but that despite this taking, the action will not jeopardize the species or threaten critical habitat, the wildlife agency

> shall provide the Federal agency and the applicant concerned, if any with a written statement that—
>
> (i) specifies the impact of such incidental taking on the species,
>
> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
>
> (iii) . . . , and
>
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

*Id.* § 1536(b)(4). This written statement, with its "reasonable and prudent measures" ("RPM") and associated terms and conditions, is referred to as an "Incidental Take Statement" ("ITS"), which, if followed, exempts the action agency from the prohibition on takings found in Section 9. *Id.* § 1536(o); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

A related provision contained within ESA Section 10 governs incidental take by private parties and authorizes FWS and NMFS to issue an "Incidental Take Permit" ("ITP") "under such terms and conditions as [the service] may prescribe." 16 U.S.C. § 1539(a)(1). As with an ITS, an ITP may excuse

take that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *Id*. §

1539(a)(1)(B). An applicant for an ITP must submit a habitat conservation plan demonstrating that the

take "will not appreciably reduce the likelihood of the survival and recovery [of the species] in the

wild." *Id*. § 1539(a)(2)(B)(iv).

## IV. FACTUAL BACKGROUND RELEVANT TO THE SIXTH CLAIM

The sixth claim for relief concerns water diversions made pursuant to SRS Contracts held by 28

of the more than 140 SRS Contractors. Plaintiffs' Statement of Undisputed Facts ("PSUF"), ECF Nos.

1210-2 & 1224,[5] # 48; Federal Defendants' Response to PSUF ("FDR"), ECF No. 1210-2, #48; SRS

Contractors' Response to PSUF ("SRSR"), ECF No. 1224, #48. Understanding the relationship between

the SRS Contractors and the United States requires some historical context the Court draws from an

earlier decision in this case for background purposes only:

> Prior to the construction of the [Central Valley Project ("CVP")], the SRS
> Contractors (or their predecessors-in-interest) were lawfully diverting
> water from the Sacramento River. They divert water at their own diversion
> facilities located upstream from the Delta. The SRS Contractors claim the
> right to divert a significant portion of the water . . . available for
> appropriation in the Sacramento River, particularly during the irrigation
> season (April through October).
>
> The SRS Contractors became concerned that the construction of the
> CVP's Shasta Division would interfere with their pre-existing water rights
> and uses. Resolution of the dispute involved 20 years of negotiations,
> protracted technical studies, State of California and Congressional
> hearings, and intervention by representatives of the Secretary of the
> Interior.
>
> Under Reclamation law, the Bureau had to obtain water rights permits
> from the State of California in order to operate the CVP. In Decision 990,
> the State Water Rights Board (the "Board"—a predecessor to the State
> Water Resources Control Board ("SWRCB")) granted the Bureau permits
> to appropriate water from the Sacramento River, but directed the United
> States to reach a settlement agreement with the Sacramento River water
> users who held "existing rights" in the Sacramento River:

[5] The referenced documents are compilations of Plaintiffs' asserted undisputed facts and the Federal Defendants and SRS Contractors' responses thereto, respectively. Where a responding parties' response informs the Court's description of the facts, the Court references the response relied upon.

> Throughout these proceedings, the Bureau's representatives have consistently affirmed their policy to recognize and protect all water rights on the Sacramento River and the Delta existing under State law at the times these applications were filed, including riparian, appropriative and others. . . . It is imperative, therefore, that the holders of existing rights and the United States reach agreement concerning those rights and the supplemental water required to provide the holders with a firm and adequate water supply, if a lengthy and extremely costly adjudication of the waters of the Sacramento River and its tributaries is to be avoided.

Decision 990, at 75 (emphasis added) . . . .

Congress also urged the Bureau to reach an agreement with the SRS Contractors. In 1951, the House Interior and Insular Affairs Committee issued a report recognizing the growing possibility of conflict between existing Sacramento River water users and the nascent CVP, urging the Bureau to avoid litigation. *See* Engle, CVP Documents, Part I, S. Res. 1, 84th Cong. (2d Sess.), H.R. Res. 416 at 675-783 (1956) . . . .

. . . Congress expressed its concern about the possibility that the CVP could become involved in "[a] monstrous lawsuit . . . that would embroil the [CVP] in litigation for decades." *Id.* On the one hand, the Report acknowledges that the Bureau promised "that no water which is needed in the Sacramento Valley will be sent out of it," (*id.* at 678), and that "instead of firm water rights necessary for the operation of the [CVP] the Bureau . . . had in effect merely 'four pieces of paper' which the State of California . . . in effect said the Bureau should 'take to court' to find out if it has any water rights," (*Id.* at 682) . . . .

Operating under these generic commands from Congress and the Board, the United States reached agreement with Settlement Contractors and executed the first SRS Contract in 1964. The SRS Contracts define the manner in which the parties agreed to administer their respective legal entitlements to Sacramento River water, to avoid conflict while preserving the rights of either party in any subsequent water right litigation.

Under the Settlement Contracts, the SRS Contractors continue to divert directly from the Sacramento River and its tributaries, with their own facilities, as they have historically done. However, the SRS Contracts ceded the Bureau some authority over the timing of the SRS Contractors' diversions. In exchange for the SRS Contractors giving up some of their flexibility in the timing of their diversions, the Bureau agreed to make stored water available to the Settlement Contractors during the lower flow (summer) months.

It is undisputed that, historically, the execution of the SRS Contracts facilitated the Bureau's ability to operate the CVP, by providing the CVP

with certainty as to the availability of water needed to schedule Project releases and deliveries throughout each water year.

*Nat. Res. Def. Council v. Kempthorne*, No. 1:05-CV-01207 OWW TAG, 2008 WL 5054115, at \*24-27 (E.D. Cal. Nov. 19, 2008) (internal record citations omitted), *superseded in part and clarified on other grounds in numerous orders*.

In 2005, Reclamation renewed more than 140 SRS Contracts for a period of 40 years each. FDR #48. The evidence in the present case confirms that all of the SRS Contracts in combination, including those held by SRS Contractors not party to this case, provide for diversion of up to approximately 2.1 million acre feet (a single acre-foot[6] is referenced as "AF"; a million acre feet is referenced as "MAF") of water each year from the Sacramento River. PSUF #50. The SRS Contracts held by defendants account for more than 94 percent of that total. SRSR #55. Of note for this case, the SRS Contracts provide in Article 5 that in a "Critical Year,"[7] the Contract Total shall be reduced by 25 percent.[8] SRSR #52.

In a very general sense, the SRS Contracts require Reclamation to furnish water to each SRS Contractor in accordance with a written monthly schedule submitted by the SRS Contractor. PSUF #51. Reclamation stores water behind Shasta Dam from where it may be released into Keswick Reservoir, which sits downriver of Shasta Dam. *See* Declaration of Lee Bergfeld ("Bergfeld Decl."), ECF No. 1211 at ¶ 5; *see* also BOR 7777 (map of upper Sacramento River facilities).[9] When an SRS Contractor schedules a diversion of water, Reclamation makes releases from Keswick Dam to ensure sufficient

---

[6] An acre foot of water is the volume of water required to cover one acre of surface area to the depth of one foot, which is equivalent to 325,851 gallons or approximately 43,560 cubic feet of water. *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1139 n.61 (E.D. Cal. 2001).

[7]. The term "Critical Year" as used in the SRS Contracts refers to a standardized water year classification used by California regulators. SRSR #138.

[8] The Contract Total may be reduced only in a Critical Year, and then only by 25 percent. *See, e.g*., GCID Contract No. 14-06-200-855A-R-1 (BOR 2695-2737), at art. 5(a), BOR 2708.

[9] Water is also released into Keswick Reservoir through the Spring Creek Power Plant, which is able to divert water impounded in Whiskeytown Lake. Whiskeytown lake impounds water from Clear Creek and water diverted from the Trinity River basin. *See* SRSR #122 (citing Bergfeld Decl. ¶ 5). It is unclear what volume, relatively speaking, of water released from Keswick in 2014 and 2015 came from the Spring Creek Power Plant.

water is flowing down the Sacramento River to permit the scheduled diversions. *See* Bergfeld Decl. ¶ 5. This process requires Reclamation to take into consideration a wide range of factors, including other legal and contractual obligations pertaining to water operations. *Id*. It is also possible that the volume of water diverted under an SRS Contract may include water that was not released from Keswick Reservoir but was instead available from a downstream tributary source. *Id*. at 8.

Both species of concern to Plaintiffs, the winter-run and spring run Chinook, presently are listed under the ESA. PSUF ## 94, 104. NMFS also has designated critical habitat for both species. Winter-run critical habitat includes the portion of the Sacramento River from Red Bluff Diversion Dam to Keswick Dam. PSUF # 95. Winter run spawn between mid-April and mid-August and fry emerge from their eggs from late June through October. BOR 7675; SRSR #102. Spring-run critical habitat includes portions of the upper Sacramento River. PSUF #105. Spring-run spawn in September and October. BOR 7689.

In 2009, NMFS issued a Biological Opinion ("BiOp") under the ESA evaluating the impact of CVP/SWP operations on various species under NMFS jurisdiction, including the winter-run and spring-run ("2009 NMFS OCAP BiOp" or "NMFS BiOp"). PSUF #109.[10] The NMFS BiOp indicates that winter-run salmon spawn and rear in the reaches of the Sacramento River below Keswick Dam, BOR 7675, and that a population of spring-run Chinook salmon also spawns and rears in the mainstem Sacramento River below Keswick, with other spring-run populations spawning and rearing in tributaries

---

[10] For purposes of this factual background section, the Court may take judicial notice of the BiOp and other public records to elicit what those records state, but not for the truth of what is stated therein. *See* Fed. R. Evid. 201; *San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1032 (E.D. Cal. 2009) (taking judicial notice of public records for their content, not for the truth of that content).

    As for using such materials for the truth of their contents, the SRS Contractors object on numerous grounds (including hearsay, lack of personal knowledge, and improper expert opinion) to almost every document and factual assertion made by Plaintiffs. Some of those objections are dealt with generally *infra*, but are largely not ruled upon because, even assuming all of Plaintiffs' evidence is admissible, Plaintiffs are still not entitled to summary judgment because there are disputes of material fact.

    Federal Defendants do not articulate the kind of wide-ranging general objections set forth by the SRS Contractors, but do object to the relevance of information presented by Plaintiffs (including to information drawn from the BiOp) and as to the accuracy of Plaintiffs' description of the evidence presented. Accordingly, the Court has relied here only upon material that appears salient at this time (at least for background purposes) and has gone directly to the source documents where appropriate (*e.g.*, to the BiOp itself) to avoid concerns over misrepresentation.

of the Sacramento River and other watercourses. BOR 7695. The NMFS BiOp provides additional,

helpful background information:

> Alterations to the natural hydrologic systems of the Sacramento and San Joaquin River basins began in the late 1800s, accelerating in the early 1900s, including the construction of three dams owned and operated by Reclamation, a fourth dam owned and operated by the California Department of Water Resources (DWR), and a multitude of pumps and hundreds of miles of gravity-fed water diversions constructed and operated by private water users and by Reclamation and DWR. None of the major dams were constructed with fish ladders to pass anadromous fish and, as a result, salmon and steelhead have effectively been blocked from accessing the upper reaches of the basin. Beginning in 1993, Shasta and Keswick Dam releases on the upper Sacramento River have been managed to provide cold water to the spawning habitat below Keswick Dam as per requirements of NMFS' winter-run biological opinion on the operations of the CVP and SWP.

BOR 7626.

The NMFS BiOp further indicates that winter-run and spring-run are dependent, at least in part, upon sufficiently cold temperatures during certain periods of the year to ensure successful egg incubation and development. BOR 8185, 8279. In light of these and other findings, the NMFS BiOp concludes that, unless modified, the long-term operation of the CVP/SWP is likely to jeopardize the continued existence and adversely modify critical habitat for winter-run and spring-run. BOR 8170. However, NMFS set forth an RPA which NMFS "believes would enable the project to go forward in compliance with the ESA." *Id*. In introducing the RPA, which is wide-ranging and impacts many aspects of CVP/SWP operations, including in ways not directly relevant to this ruling, NMFS indicates:

> Water operations result in elevated water temperatures that have lethal and sub-lethal effects on egg incubation and juvenile rearing in the upper Sacramento River. The immediate operational cause is lack of sufficient cold water in storage to allow for cold water releases to reduce downstream temperatures at critical times and meet other project demands. This elevated temperature effect is particularly pronounced in the Upper Sacramento for winter-run and mainstem spring-run . . . . The RPA includes a new year-round storage and temperature management program for Shasta Reservoir and the Upper Sacramento River, as well as long-term passage prescriptions at Shasta Dam and re-introduction of winter-run into its native habitat in the McCloud and/or Upper Sacramento rivers.

BOR 8171-72. The RPA describes an entire suite of actions addressing "Shasta Operations" in Action Suite I.2, the introduction of which helps set the stage for the dispute in this case:

> Maintaining suitable temperatures for egg incubation, fry emergence, and juvenile rearing in the Sacramento River is critically important for survival and recovery of the winter-run ESU. The winter-run ESU has been reduced to a single population, which has been blocked from its historical range above Shasta Dam. Consequently, suitable temperatures and habitat for this population must be maintained downstream of Shasta Dam through management of the cold water pool behind the dam in the summer. Maintaining optimum conditions for this species below Shasta is crucial until additional populations are established in other habitats or this population is restored to its historical range. Spring-run are also affected by temperature management actions from Shasta Reservoir.

> The effects analysis in this Opinion highlights the very challenging nature of maintaining an adequate cold water pool in critically dry years, extended dry periods, and under future conditions, which will be affected by increased downstream water demands and climate change. This suite of actions is designed to ensure that Reclamation uses maximum discretion to reduce adverse impacts of the projects to winter-run and spring-run in the Sacramento River by maintaining sufficient carryover storage and optimizing use of the cold water pool. In most years, reservoir releases through the use of the [temperature control device] are a necessity in order to maintain the bare minimum population levels necessary for survival (Yates et al. 2008, Angilletta et al. 2008).

> The effects analysis in this Opinion, and supplemental information provided by Reclamation, make it clear that despite Reclamation's best efforts, severe temperature-related effects cannot be avoided in some years. The RPA includes exception procedures to deal with this reality. Due to these unavoidable adverse effects, the RPA also specifies other actions that Reclamation must take, within its existing authority and discretion, to compensate for these periods of unavoidably high temperatures. These actions include restoration of habitat at Battle Creek that may be support a second population of winter-run, and a fish passage program at Keswick and Shasta dams to partially restore winter-run to their historical cold water habitat.

BOR 8185-86. The RPA sets as one of the primary goals of Action Suite I.2 ensuring "a sufficient cold water pool to provide suitable temperatures for winter-run spawning between Balls Ferry and Bend Bridge in most years, without sacrificing the potential for cold water management in a subsequent year," while acknowledging that other actions are needed to compensate for "increased vulnerability of the population to temperature effects" attributable to various factors. BOR 8186.

12

Important to this case is Action 1.2.4's call for Reclamation to develop and implement an annual "Temperature Management Plan," to "manage the cold water supply within Shasta Reservoir and to make cold water releases from Shasta Reservoir and Spring Creek to provide "suitable temperatures for listed species . . . ." BOR 8196. Specifically, this Action requires Reclamation to manage operations to achieve daily average water temperatures in the Sacramento River at specific "compliance locations" between Balls Ferry (25 river miles downstream of Keswick) and Bend Bridge (44 river miles downstream of Keswick)

> [n]ot in excess of 56°F at compliance locations between Balls Ferry and Bend Bridge from May 15 through September 30 for protection of winter-run, and not in excess of 56°F at the same compliance locations between Balls Ferry and Bend Bridge from October 1 through October 31 for protection of mainstem spring run, whenever possible.

*Id.*; *see also* Declaration of Kate Poole ("Poole Decl."), Ex. 21 (ECF No. 1176-22) (showing temperature compliance points in terms of river miles from Keswick). Another temperature compliance point ("TCP") is identified at Clear Creek, located 10 river miles downstream of Keswick, upstream of Balls Ferry. BOR 8195; Poole Decl., Ex. 21.

The NMFS BiOp also sets forth targets for end-of-September ("EOS") storage in Shasta Reservoir. An earlier BiOp required Reclamation to maintain a minimum storage level of 1.9 MAF behind Shasta Dam "to protect the cold water pool in Shasta Reservoir, in case the following year was critically dry (drought year insurance). This was because a relationship exists between EOS storage and the cold water pool. The greater the EOS storage level, typically the greater the cold water pool." BOR 7676. Since 1997, Reclamation has been able to control water temperatures in the upper Sacramento River through use of at Temperature Control Device ("TCD") that was installed in Shasta Dam. *Id.* Thereafter, NMFS changed the 1.9 MAF storage "requirement" to a "target." *Id.* Modeling revealed that higher EOS targets improved the probability of meeting the temperature targets at the Balls Ferry TCP. BOR 7845. NMFS has indicated more recently that "the volume of cold water available for real-time management in June through October is highly dependent on Keswick releases in April through early

June." BOR 12569.

The NMFS BiOp sets forth of "performance measures" related to TCPs and EOS Storage in Action 1.2.1, which the Court sets forth in their entirety due to their importance to the present disputes:

**Action 1.2.1 Performance Measures.**

**Objective:** To establish and operate to a set of performance measures for temperature compliance points and End-of-September (EOS) carryover storage, enabling Reclamation and NMFS to assess the effectiveness of this suite of actions over time. Performance measures will help to ensure that the beneficial variability of the system from changes in hydrology will be measured and maintained.

**Action:** The following long-term performance measures shall be attained. Reclamation shall track performance and report to NMFS at least every 5 years. If there is significant deviation from these performance measures over a 10-year period, measured as a running average, which is not explained by hydrological cycle factors (e.g., extended drought), then Reclamation shall reinitiate consultation with NMFS.

Performance measures for EOS carryover storage at Shasta Reservoir:
- 87 percent of years: Minimum EOS storage of 2.2 MAF
- 82 percent of years: Minimum EOS storage of 2.2 MAF and end-of-April storage of 3.8 MAF in following year (to maintain potential to meet Balls Ferry compliance point)
- 40 percent of years: Minimum EOS storage 3.2 MAF (to maintain potential to meet Jelly's Ferry compliance point in following year)

Measured as a 10-year running average, performance measures for temperature compliance points during summer season shall be:
- Meet Clear Creek Compliance point 95 percent of time
- Meet Balls Ferry Compliance point 85 percent of time
- Meet Jelly's Ferry Compliance point 40 percent of time
- Meet Bend Bridge Compliance point 15 percent of time

Rationale: Evaluating long-term operations against a set of performance measures is the only way to determine the effectiveness of operations in preserving key aspects of life history and run time diversity. For example, maintaining suitable spawning temperatures down to Bend Bridge in years when this is feasible will help to preserve the part of winter-run distribution and run timing that relies on this habitat and spawning strategy. This will help to ensure that diversity is preserved when feasible . . . .

BOR 8187.

The BiOp also prescribes various actions Reclamation must undertake under various EOS

storage scenarios. Under all scenarios, NMFS is to develop Keswick release schedules and submit them to NMFS early in the water year. *See* BOR 8188-8191. In addition, for example, if EOS storage is at 1.9 MAF or below, indicative of periods of drought, the NMFS BiOp requires certain actions designed to preserve the cold water pool in Shasta Reservoir "to the maximum extent possible, in order to increase the probability of maintaining cold water supplies necessary for egg incubation for the following summer's cohort of winter-run." BOR 8191. The NMFS BiOp provides for "Drought Exception Procedures" if maintaining temperature compliance at Clear Creek is not possible and/or if 1.9 MAF EOS storage is not achievable. BOR 8195. These exception procedures require Reclamation to provide NMFS with a contingency plan and written justification "that all actions within Reclamation's authorities and discretion are being taken to preserve cold water at Shasta Reservoir for the protection of winter-run," along with other requirements, including notification to the SWRCB that "meeting the biological needs of winter-run and the needs of resident species in the Delta, delivery of water to nondiscretionary Sacramento Settlement Contractors, and Delta outflow requirements per D-1641, may be in conflict in the coming season and requesting the Board's assistance in determining appropriate contingency measures. . . ." *Id.*

The NMFS BiOp contains an entire section setting forth an ITS that permits "incidental take" (*i.e.*, exempts from Section 9 liability) associated with at least a portion of CVP/SWP operations, provided that Reclamation and DWR implement certain RPMs and terms and conditions set forth within the ITS. BOR 8322-8380. By its own terms, the ITS

> is applicable to all activities related to the long-term operations of the CVP and SWP, as described in appendix 1 to this [BiOp] and revised by the proposed RPA in section 11 . . . including dams and reservoirs, power plants and pumping facilities, administration of water contracts, implementation of habitat mitigation measures, operation of hatchery programs, fish salvage facilities, and research and monitoring activities.

BOR 8323. However, the ITS specifically disclaims coverage for nondiscretionary water deliveries as follows:

> In the event that Reclamation determines that delivery of quantities of water to any contractor is nondiscretionary for purposes of the ESA, any incidental take due to delivery of water to that contractor would not be exempted from the ESA section 9 take prohibition in this [BiOp].

BOR 8324. Based in part on this language, this Court previously held that the ITS does not provide take protection to Reclamation for non-discretionary deliveries under the SRS Contracts. *NRDC v. Norton*, 236 F. Supp. 3d at 1235. Relatedly, it appears to be undisputed that no ITP has been issued to any SRS Contractor (or anyone else) related to the diversion of water pursuant to the mandatory delivery provisions of the SRS Contractors.

It is with all this in mind that the case turns to the events of 2014 and 2015. According to SWRCB hydrologic classifications, 2012 was considered a "below normal" year, 2013 was a "dry" year, and 2014 was a "critical" year, with the latter designation triggering Article 5 of the SRS Contracts for the first time since 1994. SRSR #138. In February 2014, Reclamation projected that the Clear Creek temperature compliance point "did not appear to be achievable" and therefore that the NMFS BiOp RPA required development of a drought contingency plan to be submitted to NMFS by March 1, 2014. FDR # 139 (citing BOR 8859).

The SRS Contractors named in the 6SC diverted 270,089 AF of water in May 2014, 264,641 AF in June, and 284,773 in July. SRSR # 147. In addition, also in the spring of 2014, Reclamation designated for transfer certain volumes of SRS Contract water to other water users. PSUF #148. Some of this water was transferred in the months of designation, while other volumes were designated as transfer water but delivery was deferred to other months. It is difficult to discern from the present record exactly the volumes of water released for immediate transfer in the spring, but Federal Defendants have admitted to transferring more than 40,000 AF in April through June 2014, ECF No. 1210-1 at 37 n.25, with an additional 21,000 AF in July 2014.[11] In total, it appears that Reclamation approved[12] for transfer

---

[11] Plaintiffs evidence indicates 21,000 AF was transferred in July, PSUF #148, and the SRS Contractors do not suggest any of this volume was deferred. SRSR #148.

[12] This Court previously held that Reclamation retains some degree of discretion to approve or not to approve proposed

16

and actually transferred more than 100,000 AF of SRS Contract water by the end of the 2014 water year. BOR 10859.

Plaintiffs assert that "water to satisfy the SRS Contractors' diversions and transfers" totaled 900,000 AF in May through July 2014 and that this represented more than two-thirds of the more than 1.3 MAF total water releases from Keswick during that timeframe. PSUF #150. Taking the more conservative numbers related to transfer water discussed above (*i.e.*, counting only water that was actually released for transfer, rather than all water designated for transfer) during that time period, the total released "to satisfy the SRS Contractors" nonetheless exceeded 880,000 AF. Likewise accepting the SRS Contractors' evidence indicating that the total volume of water released from Keswick from May through July was more than 1.6 MAF, SRSR # 150, the ratio of water released related to the SRS Contracts versus overall releases is still more than half. But, the relationship between Keswick releases and the SRS Contracts is complex. As pointed out by the SRS Contractors, some water diverted under SRS Contractors named in the 6SC may include water that was not released from Keswick but rather was available from a downstream tributary source; relatedly, Reclamation is required by the NMFS BiOp to make potentially large underline minimum releases (possibly as much as 193,400 AF a month) of water from Keswick for other purposes.[13] *Id.*

According to records kept by Reclamation, by August 2014, daily average temperatures at Clear Creek exceeded 56°F on more than half of the days of the month, with a monthly average of 56.1°F; in September the average daily temperature was 58.5°F; and for the month of October, the daily average temperature rose to 61.0°F. FDR #155 (citing records available at https://www.usbr.gov/mp/cvo/temperature.html (last visited Sept. 24, 2018)).

---

transfers of this nature. *NRDC v. Norton*, 236 F. Supp. 3d at 1240.
[13] The relationship between minimum release requirements and SRS Contractor diversions is unclear on the present record. Relatedly, the record also contains a considerable amount of information about flows released from Keswick, in terms of cubic feet per second. While this information likely will be relevant on ultimate liability questions, the Court declines to review it here, and finds that information would not alter the outcome of any aspect of the present motions.

By the end of September 2014, EOS storage in Shasta Reservoir was 1.157 MAF. SRSR #161.

The record reflects that by early 2015, Reclamation concluded that "[t]he effects of limited cold water storage and loss of temperature control out of Keswick Dam from early September through the fall of 2014 led to substantial egg and fry mortality." BOR 13442. NMFS similarly concluded that "the egg and fry life history stages of winter-run in broodyear 2014 experienced approximately 95% temperature-related mortality last year – far greater than what was predicted by last year's forecast." BOR 12531.

A similar pattern was observed in 2015, which was once again designated a "Critical Year." *See* PSUF #167 (referencing BOR 12869-70, which discusses 2015 as a Critical Year). In February 2015, Reclamation forecasted that EOS Shasta Reservoir storage would be approximately 1.3 MAF, triggering RPA 1.2.3.C's drought contingency procedures. FDR #166. Corresponding Sacramento River temperature modeling indicated that 56 degrees Fahrenheit could not be achieved through the season at the Clear Creek TCP. *Id*.

The SRS Contractors named in the 6SC diverted 82,476 AF of water in April 2015; 249,660 AF in May; 264,641 AF in June; and 256,422 AF in July. SRSR # 180. In addition, Reclamation approved for transfer more than 25,000 AF of water in May 2015, more than 40,000 AF in June, and more than 38,000 AF in July. PSUF #181. It appears, however, that the volumes of water approved for transfer in May and June 2015 may not have actually been transferred until later in the water year. SRSR #181. That 38,000 AF was actually transferred in July appears to remain undisputed. *Id*.

In April and May of 2015, daily average temperatures at the Clear Creek compliance point remained below 56°F. FDR #188. In June 2015, daily average temperatures at the Clear Creek temperature compliance point exceeded 56°F on all but one day of that month. *Id*. (citing records available at https://www.usbr.gov/mp/cvo/vungvari/sactemprpt_0615.pdf (last visited Sept. 24, 2018)). But, as Federal Defendants point out, the temperature threshold was adjusted up to 58°F from June 5 through the end of that month. FDR #189. On July 1, 2015, NMFS formally approved Reclamation's proposal to target an average water temperature of "57°F at [Clear Creek], not to exceed 58°F unless

going above is needed to conserve water pool based on real-time temperature management team guidance," subject to certain other conditions. BOR 12566-12582. The average daily temperature at Clear Creek was 57.1°F for July 2015, 56.9°F for August, 56.7°F for September, and 56.8°F for October of 2015. BOR 13480-83.

By the end of the 2015 season, fisheries agencies estimated that winter-run Chinook egg and fry mortality had reached more than 97%. Poole Decl., Ex. 64 (ECF No. 1178-18) (NOAA Fisheries presentation indicating few winter-run eggs in 2015 survived due to "very little cold water in Shasta to cool the upper Sacramento"); Ex. 83 (ECF No. 1179-12) at 1, 3-4 (NMFS describing an 85% temperature dependent mortality to winter-run in 2015); Ex. 72 (ECF No. 1179-1) at 1 (indicating juvenile spring-run likely suffered higher than average mortalities in the mainstem Sacramento River).

## V. <u>APPLICABLE CAUSATION STANDARDS</u>

As mentioned, Section 9 of the ESA makes it unlawful for "any person" to "take" a listed species. 16 U.S.C. § 1538(a)(l)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). As used in the statutory definition of "take," the term "harm" is further defined by regulation to mean "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

In applying the take prohibition of Section 9, courts apply concepts from tort law. For example, it is well established that principles of proximate cause apply to Section 9 claims. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 700 n.13 (1995); *see also United States v. Glenn-Colusa Irr. Dist.*, 788 F. Supp. 1126, 1133-34 (E.D. Cal. 1992) (indicating federal common law, rather than state law regarding tort principles applies to Section 9 claims). As the Supreme Court has held in a different context, "to say one event proximately caused another is a way of making two separate but related assertions." *Paroline v. United States*, 572 U.S. 434, 444 (2014). "First, it means the

former event caused the latter. This is known as actual cause or cause in fact." *Id.*

> The concept of actual cause "is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence . . . of a causal relation as laypeople would view it." 4 F. Harper, F. James, & O. Gray, Torts § 20.2, p. 100 (3d ed. 2007).

*Id.* Second, because "[e]very event has many causes . . . only some of them are proximate, as the law uses that term." *Id.* "So to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result." *Id.*

> The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary. It is "a flexible concept," *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 654 (2008), that generally "refers to the basic requirement that . . . there must be 'some direct relation between the injury asserted and the injurious conduct alleged,'" *CSX Transp., Inc. v. McBride*, 564 U.S. [84 U.S. 685, 707] (2011) (Roberts, C.J., dissenting) (quoting *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992)). The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances. 1 W. LaFave, Substantive Criminal Law § 6.4(c), p. 471 (2d ed. 2003) [ ]. Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. *See, e.g., ibid.*; 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 29, p. 493 (2005) (hereinafter Restatement).

*Id.* at 444-45. "A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* at 445 (internal citation omitted). Whether a court should impose a requirement of proximate cause upon a statutory cause of action, as opposed to a less restrictive requirement of factual cause alone, is a matter of statutory interpretation. *See id.* at 446. As mentioned, it is well established that proximate cause applies to Section 9. *See Sweet Home*, 515 U.S. at 700 n.13; *see also Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1084 (D. Or. 2012) ("It is well accepted that proximate cause is an element of ESA Section 9 claims."); *see also Seattle Audubon Soc'y v. Sutherland*, 2007 WL 1300964, *11 (W.D. Wash. May 1, 2007) ("*Sweet Home* established that proximate causation is a relevant consideration of the ESA inquiry").

## A. **Causation in Fact**

The Parties dispute how exactly the "causation in fact" standard should be applied in the present case. The SRS Contractors argue that proof of actual causation under the ESA must meet a strict "but-for" test of causation, which requires proof that harm would not have occurred but for the defendants' action. ECF No. 1225 at 30 (citing *Sweet Home*, 515 U.S. at 700 n.13). Plaintiffs seem to recognize that strict but-for causation may be difficult to establish in this case, where impacts to listed species likely are measurable (if at all) only as the result of aggregate diversions by a group of defendants. Plaintiffs maintain that strict but-for causation is not required here, citing the Supreme Court's 2014 decision in *Paroline v. United States*, 572 U.S. 434 (2014), as well as the Federal Register notice promulgating the harm definition set forth in 50 C.F.R. § 222.102: Endangered and Threatened Wildlife and Plants; Definition of "Harm," 64 Fed. Reg. 60727-01 (Nov. 8, 1999). ECF No. 1184 at 32-33.

Plaintiffs' reference to *Paroline* merits close examination. In *Paroline*, the Supreme Court addressed whether strict "but-for" causation should be required to demonstrate causation in fact under 18 U.S.C. § 2259, the restitution provisions of the federal criminal statute that prohibits possession of images of child pornography. 514 U.S. at 449-50. The Court recognized that the "traditional way to prove that one event was a factual cause of another is to show that the latter would not have occurred 'but for' the former." *Id*. However, a showing of but-for causation could not be made against Paroline because, given that the defendant was an anonymous possessor of images in wide circulation on the internet, "it [could not] be shown that [the victim's] trauma and attendant losses would have been any different but for Paroline's offense." *Id*. at 450. Therefore, the victim and the government urged application of a less restrictive causation standard. *Id*. at 451. The Court noted that the "most common" exception to the but-for causation requirement is applied where "multiple sufficient causes independently . . . produce a result." *Id*. (internal citations omitted). That was rejected as an "ill fit" to the circumstances because "Paroline's possession of two images of the victim was surely not sufficient to cause her entire losses from the ongoing trade in her images. Nor is there a practical way to isolate

some subset of the victim's general losses that Paroline's conduct alone would have been sufficient to cause." *Id*.

As an alternative, the Court examined a causal test strikingly similar to the one advanced by Plaintiffs here: "[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." *Id*. at 451 (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 268 (5th ed. 1984)). The Court also discussed a "similar exception" for "[m]ultiple sufficient causal sets," set forth in 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27, Comment f, at 380-381. *Paroline*, 572 U.S. at 451-52. At the Court explained:

> This is where a wrongdoer's conduct, though alone "insufficient . . . to cause the plaintiff's harm," is, "when combined with conduct by other persons," "more than sufficient to cause the harm." The Restatement offers as an example a case in which three people independently but simultaneously lean on a car, creating enough combined force to roll it off a cliff. Even if each exerted too little force to move the car, and the force exerted by any two was sufficient to the move the car, each individual is a factual cause of the car's destruction.

*Id*. at 452 (internal citations omitted). The Supreme Court explained that such alternative causal tests are necessary in some circumstances to "vindicate the law's purposes."

> It would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm. And it would be nonsensical to adopt a rule whereby individuals hurt by the combined wrongful acts of many (and thus in many instances hurt more badly than otherwise) would have no redress, whereas individuals hurt by the acts of one person alone would have a remedy.

*Id*.

Yet, the *Paroline* Court warned that "[t]hese alternative causal standards, though salutary when applied in a judicious manner, also can be taken too far." *Id*. Specifically, the Court found it would be inappropriate to impose full restitution upon the defendant for the entire aggregately caused harm to the victim, in part because there was no language expressing suggesting Congress intended such an

approach, particularly in the context of criminal restitution, which serves "purposes that differ from (though they overlap with) the purposes of tort law," keeping in mind the "bedrock principle that restitution should reflect the consequences of the defendant's own conduct." *Id.* at 453.

Nonetheless, although the Court rejected the suggestion that the victim's <u>entire</u> losses from the ongoing trade in her images were "suffered . . . as a proximate result" of Paroline's offense for purposes of restitution, the Court nonetheless found it would "produce anomalous results to say that no restitution is appropriate in these circumstances." *Id.* at 456-57. Examining the harms the statute meant to prevent, and finding there was no doubt "Congress wanted victims to receive restitution for harms like this," the Court found it "unacceptable to adopt a causal standard so strict that it would undermine congressional intent where neither the plain text of the statute nor legal tradition demands such an approach." *Id.* at 457-58. The Court therefore held that "where it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id.* at 458. *Paroline* therefore stands for the proposition that adopting a strict but-for causal standard would be inappropriate where doing so would conflict with congressional intent, but also that courts must be extremely cautious when applying alternative causal standards.

This must be harmonized with the Supreme Court's decision in *Sweet Home*, the only Supreme Court case addressing the causal standard under Section 9. In *Sweet Home*, the dissent asserted that the regulatory definition of harm[14] "dispenses with the foreseeability of harm." 515 U.S. at 731 (Scalia, J.,

---

[14] *Sweet Home* was interpreting FWS's definition of harm in 50 C.F.R. § 17.3 ("Harm in the definition of 'take' in the [ESA] means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."), *see Sweet Home*, 515 U.S. at 691, which is substantially identical to NMFS's present definition in 50 C.F.R. § 222.102.

dissenting). In footnote 13, the majority rejected this position:

> [T]he regulation merely implements the statute, and it is therefore subject to the statute's "knowingly violates" language, *see* 16 U.S.C. §§ 1540(a)(1), (b)(1), and ordinary requirements of proximate causation and foreseeability. Nothing in the regulation purports to weaken those requirements. To the contrary, the word "actually" in the regulation should be construed to limit the liability about which the dissent appears most concerned, liability under the statute's "otherwise violates" provision.[15] The Secretary did not need to include "actually" to connote "but for" causation, which the other words in the definition obviously require.

515 U.S. at 700 n.13 (citations omitted).

At first glance, this language seems incompatible with Plaintiffs' position on causation. However, it is important to recognize that the dispute before the Court in *Sweet Home* was a facial challenge to FWS's inclusion of "habitat modification" within the regulatory definition of "harm." *Id*. at 699. Challengers, small landowners, logging companies, and families dependent on the forest products industries, argued that the regulation should have limited "harm" to "direct application of force against protected species." *Id*. at 697. The *Sweet Home* majority rejected this position for several reasons. First, the Court held that "unless the statutory term 'harm' encompasses indirect as well as direct injuries, the word has no meaning that does not duplicate the meaning of other words [the ESA] uses to define

---

[15] This is a reference to the following argument made by the dissenting Justices:

> The penalty provisions of the Act counsel this interpretation as well. Any person who "knowingly" violates § 1538(a)(1)(B) is subject to criminal penalties under § 1540(b)(1) and civil penalties under § 1540(a)(1); moreover, under the latter section, any person "who otherwise violates" the taking prohibition (*i.e.*, violates it *un*knowingly) may be assessed a civil penalty of $500 for each violation, with the stricture that "[e]ach such violation shall be a separate offense." This last provision should be clear warning that the regulation is in error, for when combined with the regulation it produces a result that no legislature could reasonably be thought to have intended: A large number of routine private activities—for example, farming, ranching, roadbuilding, construction and logging—are subjected to strict-liability penalties when they fortuitously injure protected wildlife, no matter how remote the chain of causation and no matter how difficult to foresee (or to disprove) the "injury" may be (*e.g.*, an "impairment" of breeding). The Court says that "[the strict-liability provision] is potentially sweeping, but it would be so with or without the Secretary's 'harm' regulation." *Ante*, at 2412, n. 9. That is not correct. Without the regulation, the routine "habitat modifying" activities that people conduct to make a daily living would not carry exposure to strict penalties; only acts directed at animals, like those described by the other words in § 1532(19), would risk liability.

*Sweet Home*, 515 U.S. at 721-22.

24

'take.'" *Id*. at 697-98. Second, the broad purpose of the ESA supported the "decision to extend protection against activities that cause the precise harms Congress enacted the statute to avoid," *id*. at 698, including provision of "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id*. (quoting 16 U.S.C. § 1531(b)). Third, the fact that the 1982 amendments to the ESA permitted the issuance of permits for takings Section 9 would otherwise prohibit "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," strongly suggested that Congress understood Section 9 to prohibit indirect as well as direct takings. *Id*. at 700. Finally, the Court concluded that FWS's interpretation of the statutory term "harm" found support in the legislative history of the ESA, which indicated "take" should be interpreted in "the broadest possible terms." *Id*. at 704; *see also id.* at 705 (discussing House Report that noted "take" included "harassment, *whether intentional or not*") (emphasis in original). It was within the context of refusing to "invalidate the Secretary's understanding of 'harm' in every circumstance, even when an actor knows that an activity, such as draining a pond, would actually result in the extinction of a listed species by destroying its habitat," that the Supreme Court noted that the regulatory term "actually" requires "but-for" causation.

Is Footnote 13 dispositive even in light of *Paroline's* later and far more detailed (and thoughtful) exposition of exceptions to "but-for" causation? This presents a very difficult question. As in *Paroline*, the facts of this case may present a circumstance where but-for causation is impossible to prove as to at least some individual defendants. Yet, as the *Sweet Home* Court acknowledges, Congress intended "take" to be interpreted in "the broadest possible terms." The Court also notes that at least one of the concerns underpinning the "cautionary" mandate of *Paroline* is arguably unique to the restitution context, namely the fact that an expansive causation pathway in that context would undermine the "bedrock principle that restitution should reflect the consequences of the defendant's own conduct." 572 U.S. at 455. In contrast, what Footnote 13 of *Sweet Home* seems most concerned with is avoiding the dissent's concern over imposing "strict liability" upon "routine" activities of landowners (e.g., farming,

ranching, roadbuilding, construction and logging). This is avoided by requiring every cause to be proximate, not by imposing a strict "but-for" actual causation standard. On balance, the Court finds the most appropriate conclusion here is that strict but-for causation cannot be required under the circumstances. Any other finding would exclude categorically from Section 9 liability any party whose conduct is individually insignificant, but is collectively significant, no matter how foreseeable to each of the individual actors the collective consequences of their actions.

This conclusion finds support in the 1999 Federal Register notice promulgating an NMFS definition of "harm" substantially identical to the FWS definition upheld in *Sweet Home* several years earlier.[16] NMFS indicated that a "principal purpose" of promulgating the definition "is to provide clear notification to parties that habitat modification or degradation may harm listed species and, therefore, constitute a 'take' under the ESA." 64 Fed. Reg. at 60,730. NMFS provided a list of several examples of "habitat-modifying activities that may fall within the scope" of the definition, including "[r]emoving water or otherwise altering streamflow when it significantly impairs spawning, migration, feeding or other essential behavioral patterns." *Id*. Pertinent to the causation inquiry, NMFS noted that "[i]n all instances a causal link must be established between the habitat modification and the injury or death of listed species." *Id*. In response to comments urging NMFS to specifically adopt the legal principles of "proximate cause" and "foreseeability" as limitations of liability for "harm" to listed species, NMFS responded:

> NMFS agrees that the regulation does not create liability for hypothetical, speculative or conjectural injury as can be deduced from the term "actual." NMFS notes that that same term "actual" provides for cause-in-fact liability. NMFS' definition of "harm" is consistent with the views articulated in the opinion of the U.S. Supreme Court in *Sweet Home v. Babbitt*. In that opinion, the Court did not limit its discussion to a single term of art for the causal links necessary to show "harm" to a species

---

[16] As mentioned, NMFS interprets the term "harm" as "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

> resulting from habitat modification. The specific elements of causation to
> be proved, including foreseeability, will be determined on a case-by-case
> basis. Further, this document and the examples discussed in it, are
> intended to provide the public with information about activities which may
> result in injury or death of listed species. In NMFS' view, it is reasonably
> foreseeable that these activities and similar activities may injure or kill
> fish and wildlife, including listed species. While an action "harms" a listed
> species only if it actually results in the death or injury of a listed species,
> NMFS continues to encourage members of the public to consult with its
> staff whenever an activity is undertaken in the habitat of listed species
> and/or when listed species are present.

*Id*. at 60,729-30.

Another comment on the proposed rule expressed concern that "it is very difficult to determine when and whether modifications to aquatic habitat will injure fish. Sometimes it is activities occurring upstream from the apparent injury and sometimes it is simply cumulative degradation of the fish habitat." *Id*. at 60,728. NMFS responded by agreeing "that sometimes it is difficult to isolate factors causing injury to listed species," and offered the following guidance:

> All factors that reasonably could have caused the habitat modification or
> the injury itself must be carefully examined. Whenever an action alone or
> in combination with, or in concert with other actions is reasonably certain
> to injure or kill listed species, it will constitute a take. An action which
> contributes to injury can be a "take" even if it is not the only cause of the
> injury. This concept includes actions reasonably certain to contribute to
> the death or injury of listed species by significantly impairing the essential
> behavioral patterns of listed species.

*Id*. at 60,728. NMFS's position on the application of causation is entirely consistent with Plaintiffs' position here.

The Court finds *Glenn-Colusa*, 788 F. Supp. 1126, is not dispositive on this issue. There, a district court in this District examined whether GCID's diversions from the Sacramento River, which at certain times made up "nearly one third of the river flow," caused "take" of winter run in violation of Section 9. *Id*. The district court found that GCID's pumping operations at its Hamilton City pumping facility proximately caused take of winter run fry which "may be impinged on [a fish] screen" installed to prevent fish from being drawn into the GCID's pumps, "entrained through the screen or fall prey to

predation by other fish in [GCID's] diversion channel. Moreover, it is undisputed that winter-run salmon fry which safely negotiate their way through the screen, are 'taken' by [GCID's] pumps." *Id*. at 1129, 1133. Ultimately, the district court issued an injunction precluding GCID from pumping water from the Sacramento River at its Hamilton City pumping plant from July 15 through November 30 (the winter run's peak downstream migration season). *Id*. at 1135-36. GCID argued that California's causation standard, which permits a finding of causation where a defendant's conduct was a "substantial factor" in bringing about the injury, should apply to the ESA claim against GCID. *Id*. at 1133-34. GCID maintained that, if the inquiry considered the "substantial factor" test, then the California Department of Fish and Game ("CDFG"), rather than GCID, was responsible for the take of winter run because CDFG installed the fish screens at which many of the winter-run fry perished. *Id*. at 1129, 1133-34. The district court rejected this argument in part because GCID had presented no authority to support application of a state causation standard rather than federal common law. *Id*. at 1134 ("It is doubtful that Congress intended that the Endangered Species Act would apply differently in different states depending on state law definitions of proximate cause."). The *Glenn-Colusa* case predates both *Sweet Home* and, most importantly, *Paroline*, which substantially develops federal common law on the issue of causation.

In sum, the Court finds that it the facts and circumstances of this case, in light of *Paroline* and the purposes of the ESA, may require application of a relaxed but for causation standard, at least with respect to some defendants in this case. The Parties are directed to present their positions as to the appropriate causation standard the form of a motion *in limine*, as informed by the Parties' evolving understanding of the factual disputes as trial approaches.

**B.** **Proximate Cause**

In the context of the ESA, the proximate cause inquiry requires determining whether the alleged injury is fairly traceable to the challenged action of the defendants. *Cascadia Wildlands*, 911 F. Supp. 2d at 1084 (citing standing analysis in *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc*., 528 U.S. 167, 180-81 (2000)). The Court of Appeals for the Fifth Circuit provided a succinct summary of the

relevant Supreme Court jurisprudence in *Aransas Project v. Shaw*:

> Proximate cause and foreseeability are required to affix liability for ESA violations. In the course of holding that "harm" under the ESA validly includes "significant habitat modification or degradation that actually kills or injures wildlife," 50 C.F.R. § 17.3 (1994), the Supreme Court squarely rejected the dissenters' assertions that a form of strict liability, unlimited by causal connection, could be imposed. *Sweet Home*, 515 U.S. at 690-708 (Stevens, J., majority), 714-735 (Scalia, J., dissenting). The Court reasoned that the ESA prohibits "takes" so long as they are "foreseeable rather than merely accidental." *Sweet Home*, 515 U.S. at 700. Indeed, the statute should be read to incorporate ordinary requirements of proximate causation and foreseeability. *Id*. at 696 n. 9, 700 n. 13 ("Nothing in the regulation purports to weaken [ordinary requirements of foreseeability and proximate cause].") . Justice O'Connor's concurrence elaborates that proximate cause, while "not susceptible of precise definition," is a concept that "'normally eliminates the bizarre'" and has "'functionally equivalent' alternative characterizations in terms of foreseeability . . . and duty. Proximate causation depends to a great extent on considerations of the fairness of imposing liability for remote consequences." *Id*. at 713 (citations omitted).

> The Court was not asked to apply its proximate cause definition to the facts in *Sweet Home*, but acknowledged that "[i]n the elaboration and enforcement of the ESA, the Secretary and all persons who must comply with the law will confront difficult questions of proximity and degree." *Id*. at 708. Later, in *Exxon Co., U.S.A. v. Sofec, Inc*., the Supreme Court affirmed that "proximate causation principles are generally thought to be a necessary limitation on liability." *Exxon Co*., 517 U.S. 830, 838 (1996). "'In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond.'" *Id*. (quoting W. Keeton, et al, Prosser and Keeton on the Law of Torts 264 (5th ed. 1984)) []. Nevertheless, the *Exxon* Court continued:

> > the careless actor will [not] always be held for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuous-that what is claimed to be consequence is only fortuity. Thus, if the [negligent] destruction of the Michigan Avenue Bridge had delayed the arrival of a doctor, with consequent loss of a patient's life, few judges would impose liability.

> *Id*. at 838-39 (quoting *Petition of Kinsman Transit Co*., 338 F.2d 708, 725 (2nd Cir.1964) (Friendly, J.), quoted in 1 T. Schoenbaum, Admiralty and Maritime Law § 5–3, at 164 (2d ed. 1994)). Most recently, the Court reiterated that "[a] requirement of proximate cause thus serves, inter alia, to preclude liability in situations where the causal link between conduct

and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline*[, 572 U.S. at 445] (citing *Exxon Co*., 517 U.S. at 838-39).

Applying a proximate cause limit to the ESA must therefore mean that liability may be based neither on the "butterfly effect"[FN] nor on remote actors in a vast and complex ecosystem. Justice O'Connor's concurrence in *Sweet Home* is instructive. It disavows foreseeability, and thus ESA liability, where a farmer tills his field, causes erosion that makes silt run into a nearby river, which depletes oxygen in the water, and thereby injures protected fish. *Sweet Home*, 515 U.S. at 713 (O'Connor, J., concurring).

> [FN] The "butterfly effect" is a theory of remote causation. Under this theory, present conditions are the result of a sting of events set off by a seemingly inconsequential act. An example is the idea that a butterfly stirring the air today in China can transform storm systems next month in New York. James Gleick, *Chaos 8* (Penguin Books 1987). Edward N. Lorenz is credited to have coined the term in a speech. See Edward N. Lorenz, Predictability: Does the Flap of a Butterfly's Wings in Brazil Set Off a Tornado in Texas?, at the American Association for the Advancement of Science (Dec. 29, 1972), available at http://eaps4.mit.edu/research/Lorenz/Butterfly_1972.pdf.

775 F.3d 641, 656-58 (5th Cir. 2014).

By way of example, "[m]istakenly shooting a wolf is the reasonably anticipated or foreseen natural consequence of knowingly shooting wildlife." *WildEarth Guardians v. United States Dep't of Justice*, 283 F. Supp. 3d 783, 812 (D. Ariz. 2017). Other courts have noted that proximate causation is "linked to foreseeability" in that it holds that defendant is "liable for all kinds of harms he foreseeably risked" by his conduct. *Seattle Audubon v. Sutherland,* No. CV-06-1608-MJP, 2007 WL 1300964, at *11 (W.D. Wash. May 1, 2007) (citing *Sweet Home*, 515 U.S. at 713). "The definition of proximate cause is fluid, in part, because it merely reflects 'the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct . . . . As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such

significance that the law is justified in imposing liability.'" *Id.* (citations omitted).[17]

The moving party's burden on summary judgment is to show that no reasonable trier of fact could find other than for them. *Seattle Audubon*, 2007 WL 1300964, at *11-12 (citation omitted) (determining that there was a material dispute of fact as to proximate cause, noting that "[t]he Court cannot decide the proximate cause question as a matter of law" because "the alleged harm to spotted owls is not so remote or unforeseeable that the Court can conclude at this stage that State Defendants never proximately cause take when they approve certain forest practice applications"); *see also Ctr. for Envtl. Sci. Accuracy & Reliability*, 2016 WL 4524758, at *28 (denying plaintiff's motion for summary judgment, concluding that undisputed evidence failed to establish proximate causation because it "implicate[d] multiple (tenuous) sources of harm"); *Aransas Project v. Shaw*, 835 F. Supp. 2d 251, 265, 273 (S.D. Tex. 2011) (concluding that there was a genuine issue of fact precluding summary judgment as to whether actions of state defendant in reducing water flow negatively impacted the health of Whooping Cranes and thus was the proximate cause of a "take" of Whooping Cranes).

# VI. <u>ANALYSIS</u>

## A.      <u>Plaintiffs' Motion for Summary Judgment on the Section 9 Claim (Sixth Claim for Relief)</u>

Plaintiffs move for summary judgment on the sixth claim for relief, asserting that the SRS Contractor defendants' diversions and transfers of water and Reclamation's approval of SRS Contractor water transfers took listed winter-run and spring-run Chinook salmon in 2014 and 2015. *See generally* ECF No. 1184 34-40.[18] Plaintiffs maintain that there are no material disputes of fact and that they are entitled to judgment as a matter of law as to the Section 9 claim against the SRS Contractors and Reclamation. *Id.* The SRS Contractors oppose summary judgment as to this claim; they do not cross-move for summary judgment. *See* ECF No. 1225 at 24-40. Federal Defendants, within a broader cross-

---

[17] As mentioned, federal common law, not California law, applies to the determination of cause under the ESA. *Glenn-Colusa*, 788 F. Supp. at 1133-34.

[18] Plaintiffs do not mention Stony Creek flows in their motion for summary judgment, *see* ECF No. 1184, but, as mentioned, have not abandoned that theory of liability. ECF No. 1267 at 5.

motion for summary judgment, request dismissal of the Section 9 claim against Reclamation on various jurisdictional grounds, ECF No. 1210-1 at 26-34 and, in the alternative, summary judgment on the merits of the Section 9 claim against Reclamation. *Id*. at 35-40. Federal Defendants' cross-motion is dealt with separately below.

### 1. <u>Evidentiary Disputes</u>

The SRS Contractor Defendants object on numerous grounds to much of Plaintiffs' evidence pertaining to the sixth claim. Because the Court concludes *infra* that, even considering this evidence, Plaintiffs are not entitled to summary judgment against the SRS Contractors (or the Federal Defendants), the Court need not definitively resolve these objections herein. However, because it seems likely to come up at later stages of the case, the Court provides some guidance on one of the objections now.

Defendants direct a hearsay objection to a broad swath of documents relied upon by Plaintiffs. First, Defendants raise this hearsay objection regarding statements of fact premised entirely on the administrative record. *See* ECF No. 1224 at 2; *e.g.*, *id*. at # 95, 97. No party appears to have given a great deal of thought to how the hearsay prohibition applies in the context of the documents Plaintiffs seek to enter into evidence in support of their Section 9 claim.

If this claim were governed by the APA's record review rule, hearsay would not be an issue for documents within the AR. This is because the AR "is what it is." *Koloff v. Metro. Life Ins. Co.*, No. 1:13-CV-02060 LJO JL, 2014 WL 3420990, at *4 n.6 (E.D. Cal. July 14, 2014) (internal citations omitted), *report and recommendation adopted*, No. 1:13-CV-02060-LJO-JLT, 2014 WL 12572872 (E.D. Cal. July 29, 2014). If the AR "contains hearsay that would be inadmissible in a court of law under the Federal Rules of Evidence, so be it." *Id*. The question before a court reviewing an agency decision under the APA is whether that decision was "arbitrary or capricious" or "contrary to law." The rules of evidence do not apply to what the agency may consider in reaching its decision. *See id*. "If they rely on unreliable evidence, then that could and should be considered by the reviewing court in making a determination as to whether" the APA has been violated. *Id*.

Here, however, because the APA's record review strictures do not apply to the Section 9 claim, *Nat. Res. Def. Council v. Zinke*, No. 1:05-CV-01207-LJO-EPG, 2017 WL 3705108, at *4 (E.D. Cal. Aug. 28, 2017) ("*NRDC v. Zinke*"); *Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271, 1276 (D. Or. 2012), the evidence must be treated in a more traditional manner. While an expert may rely on hearsay in forming his or her opinions, Fed. R. Evid. 703, Plaintiffs do not offer expert evidence at this stage of the case. However, they do cite Federal Rule of Evidence 803(8), which <u>exempts</u> from the hearsay prohibition:

> A record or statement of a public office if:
>
> > (A) it sets out:
> >
> > > (i) the office's activities;
> > >
> > > (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
> > >
> > > (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> >
> > (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Plaintiffs appear to rely upon Rule 803(8) to assert that any "government document" on which they rely is therefore not subject to the rule against hearsay. *See* 1247-4 at 2-3. In support of this proposition, Plaintiffs cite *Shorter v. Baca*, 101 F. Supp. 3d 876, 906 (C.D. Cal. 2015), *vacated on other grounds*, 895 F.3d 1176 (9th Cir. 2018). *Shorter* applied Rule 803(8)(A)(iii) to exempt from the hearsay prohibition a report on jail violence issued by a citizens' commission formed by the Los Angeles County Board of Supervisors specifically to conduct a review of use of force in jails, finding that the report constituted "factual findings from a legally authorized investigation," and specifically noting that as to that form of public record, the law draws no distinction between "fact" and "opinion" contained within such reports. *Id*. (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 164 (1988)). But, admissibility

under any of the three alternatives discussed in 803(8)(A) is a fact-specific inquiry. While some records in the AR, such as tables recording water diversions, fish observations, temperatures, etc., appear likely to qualify under 803(8)(A)(ii) as "observations" made "under a legal duty to report," the application of 803(8) to other documents is not so obvious. Would an entire BiOp qualify under 803(8)(A)(ii) or (iii)? The Court thinks it unlikely.[19] Moreover, some of the documents on which Plaintiffs rely contain hearsay within hearsay. For example, Plaintiffs rely on third-party scientific papers attached to agency analyses. *See*, *e.g.*, Poole Decl., Ex. 58 (ECF No. 1178-12). To be admissible, both layers of hearsay would need to be addressed.

If disputes over documents the Parties intend to enter into evidence directly (*i.e.*, without an expert) remain in advance of the bench trial, the Parties are directed to present any such disputes to the Court by way of organized, focused motions *in limine*.

## 2. Disputes of Fact Remain as to Plaintiffs' Section 9 Claim Precluding Summary Judgment in Favor of Plaintiffs

Assuming for purposes of Plaintiffs' motion for summary judgment that all evidence Plaintiffs have presented is admissible, the Court turns to determining whether there are disputes of material fact precluding summary judgment. The Court could take many dozens of pages (and many additional months) to meticulously review the record as to all the various steps in the causal chain outlined by Plaintiffs, but it is not required to do so. Rather, if there is a dispute as to any one of many fundamental lynchpins in the causal chain, summary judgment in inappropriate.

Plaintiffs' central theory is that "[b]ecause the SRS Contractors' diversions and transfers from the Sacramento River cause temperature-dependent mortality to winter-run and spring run-chinook eggs and fry," the SRS contractors and Reclamation are in violation of Section 9. ECF No. 1184 at 34, 39.

---

[19] The Court is aware that a judge in this District concluded, without detailed analysis, that a lengthy BiOp was admissible (presumably for the truth) under Fed. R. Evid. 803(8). *See Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1095 (E.D. Cal. 2011). At a bare minimum, the Court requires further briefing before it would make a similar admissibility ruling here, as, at least at first glance, it seems a stretch to conclude that the Rule meant to sweep into evidence for the truth the entire contents of documents like a BiOp.

According to Plaintiffs' own description of their case, one of the "core" facts fundamental to this theory is that in 2014 and 2015 "the upper Sacramento River reached temperatures legal to listed Chinook salmon eggs and fry." ECF No 1247 at 29. Underpinning this factual assertion is Plaintiffs' position that maintaining water temperatures at or below 56°F is "necessary to avoid substantial mortality to Chinook eggs and fry." ECF No. 1184 at 26. Plaintiffs' causal proof, at least for purposes of the present motion, depends heavily on evidence demonstrating that water temperatures at the various TCPs exceeded 56°F. While it is undisputed that Chinook salmon require "cold" water for successful egg incubation and embryo and alevin[20] development, PSUF #110, the details and exact temperature requirements are disputed.

There is significant record evidence to support Plaintiffs' position that significant mortality is likely at temperatures of 56°F and above. For example, a scientific paper by Martin, *et al*. attached to an NMFS review of Reclamation's 2016 preliminary temperature modeling indicated that "up to around 54F" there is "no predicted mortality due to temperature," but "above this critical temperature mortality rate increased rapidly; a week at 56F resulted in a loss of approximately 20% of the population, and a loss of 60% after a month." Poole Decl., Ex. 58 (ECF No. 1178-12), Enclosure 1, Attachment 1 at ECF page 15 of 23. It is notable that the NMFS BiOp adopted 56°F as the temperature compliance target in its RPA. There is also evidence in the record that supports Plaintiffs' position that temperatures below 50°F are "optimal" for egg incubation. Plaintiffs cite a March 18, 2018 memorandum from an NMFS fisheries biologist regarding Shasta temperature compliance in which that biologist summarizes research on the subject of the effects of water temperature on the development of incubating salmon eggs as follows:

> The effects of water temperature in regulating developmental rates of incubating eggs are well documented (e.g., Hicks 2000, McCullough 1999). During incubation, water temperature affects the rate of embryo

---

[20] Defined in the NMFS BiOp as a "yolk-sac fry." BOR 7573.

and alevin development, the amount of dissolved oxygen in the water, and, to a significant extent, the survival of early fry (Bjornn and Reiser 1991). Within an acceptable range, the higher the temperature is, the faster the rate of development will be, and the shorter the incubation period and time to emergence (Beacham and Murray 1990). Temperatures from 39.2 to 53.6°F (4-12°C) tend to produce relatively high survival to hatching and emergence, with approximately 42.8-50°F (6-10°C) being optimum. Exposure to temperatures above the optimal range results in sub-lethal or chronic effects (e.g., decreased juvenile growth, which results in smaller, more vulnerable fish; increased susceptibility to disease which can lead to mortality; and decreased ability to compete and avoid predation), as temperatures rise until at some point they become lethal.

Poole Decl., Ex. 58 (ECF No. 1178-12), Enclosure 1 at ECF page 6 of 23. In a 2016 document, NMFS identified the "Martin model" as "NMFS's Southwest Fisheries Science Center's . . . new temperature-dependent mortality model," and acknowledged that it identified 53.7°F as the "critical temperature at which temperature-related winter-run egg and fry mortality increases significantly with increasing water temperatures." Poole Decl., Ex. 71 (ECF No. 1178-25) at 2.

The Martin study also provides support for one of Plaintiffs' more important factual assertions: that substantial numbers of eggs failed to successfully hatch in 2014 and 2015 because of temperatures observed during those periods of time. Poole Decl., Ex. 58, Enclosure 1, Attachment 1 at ECF page 15 of 23 ("Although in many years temperature had little influence on [egg-to-fry ("ETF")] survival, in the years it did affect survival, the impact was substantial. Most notably, in 2014 and 2015 temperature dependent mortality alone resulted in a loss of ~77% and 85% of the population. When combined with background survival, this resulted in the extremely low ETF survival both predicted and observed in these years (~5%)."). Martin's "temperature-dependent mortality model" was used by NMFS to find that in 2014 and 2015, winter-run "temperature dependent mortality alone resulted in a loss of approximately 77% and 85% of the population, respectively." *Id*., Enclosure 1, at ECF page 4 of 23.

Plaintiffs argue that "[w]hile [the SRS Contractors] may quibble with the exact temperature that is "optimal" for egg and fry survival, [they] cannot and do not dispute that warmer water temperatures result in mortality (and thus take)." ECF No. 1247 at 29. After careful examination of the record,

applying the standard of decision applicable on summary judgment, the Court concludes that the SRS Contractors have presented a material dispute, not just a quibble. The SRS Contractors' defense expert, Bradley Cavallo, who submitted a declaration in opposition to Plaintiffs' motion for summary judgment, points out that at least one panel of experts, the Delta Stewardship Council Independent Review Panel, has questioned foundational assumptions underpinning the Martin study, calling into question the extent to which it can be applied with precision in the field. *See* Declaration of Bradley Cavallo ("Cavallo Decl.") (ECF No. 1223) ¶ 13. Mr. Cavallo points to studies that indicate normal embryo development can take place at temperatures up to 57°F. Cavallo Decl. ¶ 13. Mr. Cavallo also highlights a 2006 study by Geist, *et al*., which reported no significant differences in survival of Chinook salmon embryos between 55.4 and 61.7°F, assuming certain background dissolved oxygen levels, with rapid declines in survival occurring over 61.7°F. *Id*. It is Mr. Cavallo's position that research indicating "lower thermal tolerance" is not supported by the data, in part because the relevant research did not measure dissolved oxygen levels, which Geist found to interact with temperature levels. *Id*. Nothing in the record suggests Mr. Cavallo's opinion is inadmissible or otherwise entirely invalid or irrelevant. So, what the SRS Contractors contend (and have supported with some evidence) is that temperature-related mortality may not actually occur until considerably higher temperatures than Plaintiffs suggest.

Even if Plaintiffs are correct that that "warmer temperatures result in mortality (and thus take)," Plaintiffs' Section 9 claim requires a showing of proximate cause. As presented in the pending motions, Plaintiffs' proximate cause case against all Defendants turns in large part on actual temperature measurements during 2014 and 2015. But, in 2014, daily average temperatures never reached 61.7°F during the entire temperature management season, with average temperatures staying below 56°F for May, June, and July, reaching 56.1° for August, 58.5°F for September, and 61.0° for October. (Notably, the RPA's protections for winter-run do not extend into October, BOR 8196, and the level of temperature-dependent mortality to spring-run is not as well documented in the present record as it is for winter-run.) In 2015, daily average temperatures were 55.2°F in May, 57.3°F in June, 57.1°F in July,

56.9°F in August, 56.7°F in September, and 56.8°F in October. Assuming the truth of the evidence submitted by Mr. Cavallo and viewing that evidence in a light most favorable to Defendants, as this Court <u>must</u> on summary judgment, there is a hole in Plaintiffs' causal chain because the upper Sacramento River never reached temperatures lethal to listed Chinook. For purpose of summary judgment, the Court <u>may not weigh the relative value of these competing threads of information</u>. In other words, at this stage, this is not about which side's evidence represents the most up-to-date or even the more compelling interpretation of existing scientific information.

While it is compelling that relevant agencies, including Reclamation, concluded there was significant temperature related mortality in 2014 and 2015, these conclusions seem to be based, at least in part, on the Martin model. *See* Poole Decl., Ex. 58, Enclosure 1. The SRS Contractors' evidence casts some doubt upon these conclusions, enough doubt to preclude summary judgment.

For this reason, Plaintiffs' motion for summary judgment must be and is DENIED.

**B.      Federal Defendants' Cross-Motion/ Motion to Dismiss**

This Court previously held that in the context of a Section 9 claim, Reclamation cannot be the proximate cause of take resulting from the implementation of actions Reclamation was required to take (either by law or by a still-valid contract), but that no such limitation precluded Section 9 liability for take caused by actions over which Reclamation does have discretionary control. *See generally NRDC v. Norton*, 236 F. Supp. 3d 1198. As mentioned, as a result of that prior ruling, only two narrow aspects of the Section 9 claim remain pending against Reclamation: that Reclamation unlawfully "took" ESA-listed salmonids by (1) approving water transfers from SRS Contractors to others in 2014 and 2015 ("transfer theory"); and (2) by failing to require one SRS Contractor, GCID, to divert a certain volume of water from Stony Creek, rather than directly from the Sacramento River, during those same years ("Stony Creek theory"). *See id.* at 1240.

Federal Defendants title their opening brief a "Cross Motion for Summary Judgment." Within that motion, they: (1) request dismissal of Plaintiffs' Section 9 claim on various jurisdictional grounds

and (2) argue in the alterative that they are entitled to summary judgment on the merits of the Section 9 claim.

### 1. **Motion to Dismiss**

Federal Defendants move to dismiss the Section 9 claim against Reclamation on three grounds: (1) that Plaintiffs failed to comply with the ESA's 60-day notice requirement as to the Section 9 Claim against Reclamation; (2) that the claim improperly challenges wholly past agency action; and (3) that Plaintiffs cannot establish Article III standing as to the Section 9 claim against Reclamation.

### a. **Should the APA's Record Review Rule Limit Plaintiffs' Sixth Claim Against Reclamation?**

Before taking on the various aspects of Federal Defendants' motion to dismiss, it is necessary to address a threshold issue raised by Federal Defendants in a footnote. This Court previously held that Plaintiffs' sixth claim for relief is not limited to the administrative record. Specifically, in its August 2017 Order, the undersigned reasoned:

> For claims that arise directly under the ESA, the APA's record review provision does not apply and "evidence outside the administrative record [may be considered] for the limited purposes of reviewing Plaintiffs' ESA claim." [*Western Watersheds Project v.*] *Kraayenbrink*, 632 F.3d [472,] 497 [(9th Cir. 2011)]; *Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, 467 (N.D. Cal. 2017).[FN]

> [FN] There has been some debate over whether post–*Kraayenbrink* Ninth Circuit authority overrules *Washington Toxics [Coal. v. EPA*, 413 F.3d 1024, 1030 (9th Cir. 2005)] and *Kraayenbrink*. *See Yurok Tribe*, 231 F. Supp. 3d at 469; *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1123–25 (N.D. Cal. 2017); *see also Ellis v. Housenger*, No. C–13–1266 MMC, 2015 WL 3660079, at *3 (N.D. Cal. June 12, 2015). This Court agrees with the reasoning provided by the district courts in *Yurok Tribe* and *Hoopa Valley Tribe* both of which held that while the APA's standard of review applies to claims arising directly under the ESA because the ESA provides no standard of review, the APA's record review limitations do not apply, so evidence outside the administrative record may be considered. *Yurok Tribe*, 231 F. Supp. 3d at 469; *Hoopa Valley Tribe*, 230 F. Supp. 3d at 1123-25; *see also Oregon Nat. Desert Ass'n v. Kimbell*, 593 F. Supp. 2d 1217, 1220 (D. Or. 2009); *but see Wildwest Inst., v. Ashe*, No. CV 13–6–M–DLC, 2013 WL 12134034, at *2 (D. Mont. Oct. 18,

2013) (refusing to interpret *Kraayenbrink* as precluding application of APA record review principles to ESA claims and requiring Plaintiffs demonstrate proposed supplemental documents fall under one of the four exceptions articulated by the court in *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)).

*NRDC v. Zinke*, 2017 WL 3705108, at *4 & n.10; *see also Stout*, 869 F. Supp. 2d at 1276 n.1 ("It is difficult to see how a claim regarding § 9's take prohibition could be analyzed pursuant to anything but a *de novo* standard with the admission of extra record evidence.").

In a footnote to their opening brief, Federal Defendants now question that conclusion, arguing that Plaintiffs' sixth claim against Reclamation should be limited to the administrative record because of 5 U.S.C. § 559, which provides that the entirety of Chapter 7 of the APA (including 5 U.S.C. § 706, the source of the APA's record review limitation) applies to any "[s]ubsequent statute" unless the later-enacted statute "expressly" supersedes or modifies the APA's judicial review provisions. Federal Defendants maintain that because the ESA's citizen suit provision does not "expressly" provide that it supersedes the APA's judicial review provisions. ECF No. 1210-1 at 35 n.24. The Court rejects this argument. In *Kraayenbrink*, the Ninth Circuit clearly held that courts in this Circuit "may consider evidence outside the administrative record for the limited purposes of reviewing" a claim brought under the ESA's citizen suit provision because "the APA applies only where there is 'no other adequate remedy in court,'" a situation that does not pertain to claims brought directly under the ESA because the ESA provides such a remedy. 632 F.3d at 497. Federal Defendants fail to explain why this language from *Kraayenbrink* does not control here. This Court does not make law and cannot ignore an express holding of the Ninth Circuit that is directly on point.

b.     **Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of subject-matter jurisdiction." Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary

40

affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968-69 (9th Cir. 1981). A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004):

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

Because the present motion to dismiss is presented at the summary judgment stage and both Plaintiffs and Federal Defendants reference documents outside the pleadings, the Court will treat it as a speaking motion.[21] *Id.* at 1039 (allowing the court to consider evidence outside the complaint without converting the motion into a summary judgment motion).

In a speaking motion, "[t]he court need not presume the truthfulness of the plaintiff's allegations." *Id.* The Court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony. . . ." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988); *see also Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co.*, 361 F. Supp. 2d 1244, 1247 (E.D. Wash. 2004). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003). A court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are separable from the merits. *Rosales v. United States*, 824 F.2d 799, 802-803 (9th Cir. 1987). However, if the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual

---

[21] Federal Defendants frame their motion as one to dismiss rather than for summary judgment, and the Court takes the motion as it is presented. As this analysis will reveal, however, this largely is a distinction without a difference. Because the relevant facts are wrapped up with the merits, a summary judgment type standard applies.

issues going to the merits, the court should dismiss for lack of jurisdiction only if the material facts are not in dispute and the moving party is entitled to prevail as a matter of law. Otherwise, the intertwined facts must be resolved at trial. *Id.*

### c. <u>60-Day Notice</u>

The ESA provides that "no action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A). "The notice requirement provides agencies with 'an opportunity to review their actions and take corrective measures if warranted.'" *Alliance for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998)). Thus, to satisfy the notice requirement, a plaintiff must "provide sufficient information of a violation so that [the defendant] could identify and attempt to abate the violation." *Sw. Ctr. for Biological Diversity*, 143 F.3d at 522. The requirement is a "mandatory condition [ ] precedent to commencing suit" under the ESA. *Alliance*, 772 F.3d at 601 (quoting *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989)). "A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Sw. Ctr. for Biological Diversity*, 143 F.3d at 520. A district court may not disregard such a notice requirement at its discretion. *See Hallstrom*, 493 U.S. at 31 (discussing similar notice requirement in the Resource Conservation and Recovery Act).

However, a citizen "is not required to list every specific aspect or detail of every alleged violation. Nor is the citizen required to describe every ramification of a violation." *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015) (quoting *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) (internal quotation omitted)). Rather, the analysis turns on the "overall sufficiency" of the notice. *Id.* "A reviewing court may examine both the notice itself and the behavior of its recipients to determine whether they understood or

reasonably should have understood the alleged violations." *Id*. (citations omitted).[22]

Here, Plaintiffs rely on an August 10, 2015 notice letter which contains general allegations that Reclamation violated the ESA by making "excessive reservoir releases in 2014 and 2015." *See* 6SC, Ex. 6 (ECF No. 1287-6) ("Notice Letter") at 17. As mentioned, this Court has found that releases made by Reclamation to satisfy the SRS Contracts mandatory deliveries are nondiscretionary actions that cannot give rise to a Section 9 claim against Reclamation. ECF No. 1069 at 55-56. Federal Defendants assert that the Notice Letter only concerns releases to meet non-discretionary contractual obligations, so it did not put Reclamation on notice of any claim pertaining to discretionary water transfer approvals. *See* ECF No. 1210-1 a 33.

The Court agrees with Plaintiffs that the Notice Letter provided sufficient information to put Reclamation on notice of a potential violation involving Reclamation's discretionary approval of SRS Contractor water transfers. While the Notice Letter addressed deliveries the 2009 NMFS BiOp characterized as "nondiscretionary," the Notice Letter also alleged that "[t]o the extent that Reclamation's deliveries to the SRS Contractors are discretionary, Reclamation and the Contractors failed to comply with the protective measures required by NMFS to minimize or avoid take." Notice Letter at 13. More generally, the Notice Letter informed Reclamation that Reclamation was unlawfully taking winter-run and spring-run Chinook and that the cause of the take was Reclamation's failure to conserve enough cold water to maintain temperature control of the upper Sacramento River during salmon spawning and rearing, the primary cause of which was meeting the demands of the SRS

---

[22] The Court finds it inappropriate to rely upon a line of cases cited by Federal Defendants in their opening brief, *see* ECF No. 1210-1 at 32-33, requiring a high degree of precision for notices issued under the Clean Water Act's ("CWA") notice provision, as the EPA has adopted regulatory language requiring notice under the CWA to contain certain, highly specific information. *See Ctr. For Biological Diversity v. Marina Point Dev. Co.,* 566 F.3d 794, 801 (9th Cir. 2009) (citing 40 C.F.R. § 135.3(a)). No party has suggested similar regulatory language pertains to the ESA's 60-day notice provision.

The Court also finds that Federal Defendants misread *Southwest Center*. In footnote 22 of their opening brief, Federal Defendants assert that *Southwest Center* rejected an argument that a plaintiff is "not required to list every specific aspect or detail of every alleged violation relied upon in the complaint or to describe every ramification of every alleged opinion. *See* ECF No. 1210-1 at 33 n.22 (citing *Southwest Center*, 143 F.3d at 515). In fact, *Southwest Center* merely repeated that assertion and clarified it, finding that "[a]t a minimum, [the plaintiff] was obligated to provide sufficient information of a violation so that the [defendant agency] could identify and attempt to abate the violation." 143 F.3d at 522.

43

Contractors. *See* ECF No. 1247 at 36 (citing 6SC, Ex. 6 at 13-18).

The distinction at issue—between non-discretionary deliveries to the SRS Contractors under the SRS Contract's on the one hand and Reclamation's discretionary actions in connection with approving the transfer of certain volumes of SRS Contract water to other water users on the other—is a subtle one. As mentioned, in a previous order, the Court narrowed Reclamation's potential take liability to a subset of the discretionary actions Reclamation can take in connection with the SRS contracts, including transfer approvals. *NRDC v. Norton*, 236 F. Supp. 3d at 1240-41. This narrowing was triggered by Federal Defendants' motion to dismiss, in which they argued that the Section 9 claim against Reclamation must be dismissed because Reclamation cannot, as a matter of law, be the proximate cause of any take that occurs as a result of the agency implementing a legally mandated water delivery. *See* ECF No. 1069 at 50. The Court agreed with this general proposition, finding "that a federal agency that is legally required to take an action pursuant to federal law, such as by implementing non-discretionary terms in an otherwise valid water delivery contract, that agency cannot be the proximate cause of Section 9 take by undertaking that non-discretionary action." *Id.* at 55-56. But, the claim was permitted to proceed against Reclamation based upon a subset of water deliveries over which Reclamation does retain discretion. This narrowing process does not automatically pull the remaining subset of claims outside the scope of the allegation made in the Notice Letter. The Notice Letter encompassed all releases to satisfy SRS Contractor demands, whether those releases be discretionary (e.g., water transfer approvals) or non-discretionary. That Reclamation successfully asserted a defense (lack of discretion) against liability for certain releases does not mean the Notice Letter failed to provide Reclamation with sufficient information about Plaintiffs' theory that all releases (including releases to implement Reclamation -approved transfers) were a violation of the ESA.

The Court sees Plaintiffs' Stony Creek theory differently. That theory arises from a provision in the contract between Reclamation and GCID, one of the SRS Contractors, that on its face authorizes Reclamation to require GCID to divert up to 20,315 AF of its contract total from Stony Creek instead of

44

from the Sacramento River. *NRDC v. Norton*, 236 F. Supp. 3d at 1240. Plaintiffs describe their theory of take liability under this provision as follows in their supplemental brief: "If [Reclamation] had exercised its authority to require Stony Creek diversions in 2014 and 2015, that could have resulted in approximately 20,000 [AF] less of water released to the Sacramento River each year." ECF No. 1267 at 5. This is indisputably a theory based upon Reclamation's <u>failure to require GCID to divert water from somewhere other than the Sacramento River</u>. Nothing in the Notice Letter puts Reclamation on notice that it might face such a claim. The Notice Letter speaks to "excessive reservoir releases" to satisfy SRS Contractor demands. Notice Letter at 17. It mentions "Reclamation's decision to make large early releases in 2014, and its resultant failure to maintain adequate temperature control." *Id.* at 15. While transfers are a species of such releases, the Stony Creek theory is a different beast entirely. The Notice Letter nowhere mentions that Reclamation had any authority to require SRS Contractors to use alternative sources of supply, nor does it mention Stony Creek or the relevant GCID contract provision.

Accordingly, Federal Defendants' motion to dismiss based upon failure to comply with the ESA's 60-day notice provision is DENIED as to the transfer theory and GRANTED as to the Stony Creek theory.

### d. Past v. Future Actions

Federal Defendants next argue that the allegations against them in the sixth claim for relief should be dismissed because they involve wholly past agency actions. (ECF No. 1210-1 at 33-34.) In its October 20, 2016 MTD Order, the Court rejected a closely related argument that the allegations made against the SRS Contractors in the sixth claim of the Fourth Supplemental Complaint ("4SC") should be dismissed because those allegations involved wholly past conduct. As the applicable legal framework is identical, and in the interest of expedience, the Court begins its analysis here by repeating its analysis from the October 20, 2016 MTD Order:

> Plaintiffs' Section 9 claim is brought pursuant to the ESA's citizen suit provision, [ ] which permits "any person" to commence a civil suit to "enjoin any person, including the United States and any other

45

governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. 1540(g)(1)(A) (emphasis added).

The SRS Contractors cite *National Wildlife Federation v. Burlington Northern Railroad*, 23 F.3d 1508 (9th Cir. 1994), in support of their contention that Section 9 clams cannot be based upon wholly past conduct. In *Burlington*, plaintiffs appealed the denial of their motion for a preliminary injunction in a Section 9 case. *Id*. at 1509. The Ninth Circuit held that, despite the fact that requests for injunctive relief under the ESA must be evaluated in light of "Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species," to obtain an injunction under Section 9, a plaintiff still "must make a showing that a violation of the ESA is at least likely in the future." *Id*. at 1511 (emphasis added); *cf. Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 804 (9th Cir. 2009) (finding Section 9 claim against developer regarding take of bald eagles moot because eagle had been delisted by the time appeal was decided, reasoning that the delisting made it impossible for developer to "violate" the ESA regarding the bald eagle).

The SRS Contractors also cite *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49 (1987). In *Gwaltney*, several weeks before plaintiffs filed a lawsuit under the citizen suit provision of the Clean Water Act ("CWA"), the defendant ceased violating its CWA permit. *Id*. at 53-54. The Fourth Circuit concluded that the *Gwaltney* plaintiffs could pursue their CWA citizen suit claim based entirely on past conduct. *Id*. at 56. The CWA's citizen suit provision provides that "any citizen may commence a civil action on his own behalf . . . against any person [or agency] . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365.[FN] The Supreme Court reversed, noting that Congress, by using the phrase "to be in violation" in the CWA's citizen suit provision, intended for citizens to be able to abate only ongoing violations, and thus required plaintiffs to "allege a state of either continuous or intermittent violation-that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id*. at 57. The Supreme Court further noted that a contrary conclusion would render the CWA's 60-day notice requirement "incomprehensible," because the purpose of that notice "is to give [the alleged violator] an opportunity to bring itself into compliance with the Act and thus render unnecessary a citizen suit." *Id*. at 59-60.

> [FN] The ESA's citizen suit provision contains similar language. 16 U.S.C. § 1540(g)(1)(A)(providing that "any person may commence a civil suit on his own behalf . . . to enjoin any person [or agency] . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof.").

The SRS Contractors make an analogous argument here based upon ESA's 60-day notice provision, the purpose of which is, at least in part, to give defendants "notice of a perceived violation" and "give them the opportunity to review their actions and take corrective measures if warranted." *Conservation Cong. v. Finley*, 774 F.3d 611, 618 (9th Cir. 2014) (internal citation and quotation omitted). The SRS Contractors argue that if a citizen suit could be brought for wholly past violations, this purpose of the 60-day notice provision would be thwarted. SRS MTD at 18.

Plaintiffs argue that *Gwaltney* does not apply to the ESA and that nothing in the ESA requires a citizen suit plaintiff to plead facts establishing a likelihood of future harm. [Internal record citation.] Plaintiffs point to *Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271 (D. Or. 2012), in which the defendants argued, at the summary judgment stage, that plaintiffs had to prove "that take is likely to occur in the future to prevail on their [Section] 9 claim." *Id.* at 1280. Rejecting this argument, the district court reasoned:

> In arguing that plaintiffs must prove a likelihood of future take to prevail on their § 9 claim, defendants confuse the forward looking nature of the relief offered by the ESA's citizen suit provision and the violation of the Act that justifies the injunction. In order to prevail on their § 9 claim, plaintiffs must prove that the Forest Service is "in violation of any provision of the" ESA. 16 U.S.C. § 1540(g)(1)(A). While injunctive relief is forward looking, it is often used to remedy past or present harms and the term "in violation" connotes past, present, or future violations of the ESA. To require a citizen plaintiff to prove that "take" is likely to occur in the future tips the balance away from the preservation of species and would thwart Congress' overriding purpose of providing "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and of providing "a program for the conservation of such . . . species." 16 U.S.C. § 1531(b); *Forest Conservation Council [v. Rosboro Lumber Co.]*, 50 F.3d [781,] 785 [ (9th Cir. 1985)]. That said, it is equally clear that the relative likelihood of future harm, as well as the need of a species for recovery from past harm, are factors a court should consider in tailoring the scope of injunctive relief.

*Id.* at 1280-81.

While not illogical, it is very difficult to square the reasoning of *Stout* with *Gwaltney*, which interpreted language from the CWA that is materially identical to the relevant ESA language. It is true that some complicating ESA jurisprudence exists. For example, as the district court in *Stout* pointed out, *id.* at 1281 n.7, prior to the Ninth Circuit's ruling in *Forest Conservation Council*, 50 F.3d at 785, it was not settled that a plaintiff

47

> could obtain relief under the ESA for wholly future harm to listed species. In that case, the Ninth Circuit noted that "[a] take may involve a past or current injury, or the prospect of an imminent threat of harm to a protected species." *Id.* at 784 (emphasis added). This holding is entirely consistent with *Stout*'s conclusion that the prospective nature of the injunctive relief permitted by the citizen suit provision does not require allegations of future harm to maintain a Section 9 claim.

*NRDC v. Norton*, No. 1:05-CV-01207-LJO-EPG, 2016 WL 6135858, at *24-26 (E.D. Cal. Oct. 20, 2016). In the context of the SRS Contractors' motion to dismiss, the Court declined to resolve this apparent conflict in the law, finding it unnecessary to do so because "Plaintiffs' claim is not based wholly on past violations."

> Plaintiffs allege generally that "the Bureau and the SRS Contractors have violated and are likely to continue to violate Section 9 of the ESA by unlawfully and without required authorization taking winter-run and spring-run Chinook." 4SC at ¶ 23; *see also id.* at ¶ 29 ("[T]he Bureau and SRS Contractors have taken, and are taking, winter-run and spring-run Chinook in violation of 16 U.S.C. § 1538(a)."). More specifically, paragraph 76 alleges [that] NMFS[] [itself concluded] that continued drought conditions would lead to similar mortality in the future:
>
>> It is now very clear through evaluating operations in both 2014 and 2015 that the volume of cold water available for real-time management in June through October is highly dependent on Keswick releases in April through early June. In 2016, should drought conditions persist, these releases in April through early June will need to be held to minimal levels to achieve adequate temperatures only.
>
> 4SC ¶ 76. Relatedly, paragraph 137 alleges "the duration and intensity of droughts are anticipated to increase in California." Taken together, along with the other allegations in the 4SC, these allegations are sufficient to allege plausibly that the Bureau and the SRS Contractors are likely to continue to violate Section 9. Id. at ¶ 137.11 The SRS Contractors' motion to dismiss on this ground [was therefore denied].

*Id.* at *26. The currently operative 6SC contains substantially similar allegations.

In the present motion to dismiss, Federal Defendants emphasize that Plaintiffs' motion for summary judgment focuses only on conduct that took place in 2014 and 2015, without explicitly "alleging" that Reclamation's approval of transfers will recur. *See* ECF No. 1210-1 at 34. Even assuming *Gwaltney* controls, that case only requires Plaintiffs to demonstrate "a state of either

continuous or intermittent violation-that is, a reasonable likelihood that a past polluter will continue to pollute in the future." 484 U.S. at 57. The complaint speaks generally of "releases" by Reclamation, *see, e.g.*, 6SC ¶ 161, and makes it clear that the problems caused by such releases are related to drought conditions, *see, e.g.*, *id*. ¶¶ 163-64, which are specifically alleged to be likely to recur in the future, *see id*. at ¶ 93.

With respect to the alleged recurrence of similar conditions in the future, the Plaintiffs present evidence to support the factual assertions that, among other things, climate change is expected to result in more frequent, longer, and drier droughts in the Sacramento River watershed and that these conditions will make it even more difficult to manage upstream cold water pools to maintain downstream river temperatures. PSUF #219-220. While Federal Defendants dispute the accuracy of Plaintiffs' characterization of the record as to the impact of climate change, FDR #219-220, this presents exactly the type of factual issue that it is intertwined with the merits. *See Rosales*, 824 F.2d at 802-803. In such a case, a court should dismiss for lack of jurisdiction only if the material facts are not in dispute and the moving party is entitled to prevail as a matter of law. As to the likelihood of future climatic conditions akin to (or more serious than) those present in 2014 and 2015, for purposes of this motion, the Court finds Plaintiffs have established a likelihood of future recurrence sufficient to withstand dismissal (or summary judgment) on this issue.

Relatedly, the Bureau cannot maintain plausibly that it has no intention of approving transfers in the future in light of the 10-year water transfer program at issue in the related case of *AquAlliance v. Bureau of Reclamation*, 287 F. Supp. 3d 969 (E.D. Cal. 2008). The Court takes judicial notice of the fact that the project challenged in that case involved an effort by water users and Reclamation to secure programmatic environmental approval for regular transfers from SRS Contractors to other users south of the Delta. *Id*. Nothing in the record of that case even remotely suggests Reclamation is inclined to abandon its plans to continue such transfers in the future. *See* Case No. 1:15-cv-00754, ECF No. 76 (requesting remand without vacatur suggesting that errors identified by the Court in environmental

approval documents are "discrete and readily corrected"). Federal Defendants urge the Court to disregard this related case because it concerns a 10-year transfer program that is not the conduct or action challenged in this case. ECF No. 1252 at 17. This belies logic. If Reclamation is seeking long-term approval for transfers it previously performed in an ad hoc manner, it is at least plausible to infer that Reclamation will in the future continue to make transfers like the ones alleged to have caused take in 2014 and 2015.

Federal Defendants also maintain that "while Reclamation may approve water transfers in the future, those approvals will occur under different conditions than existed in 2014 and 2015." ECF No. 1210-1 at 34. In support of this assertion, Federal Defendants cite a February 16, 2018 letter sent by NMFS to Reclamation regarding "February Reservoir Operations Forecast Per RPA 1.2.3," an exhibit offered by Plaintiffs. Poole Dec., Ex. 12 (ECF No. 1176-13) at 6. This document indicates that "NMFS and Reclamation are currently facing a very different set of conditions than those experience[d] throughout the 2012-2106 drought . . . ." *Id*. Federal Defendants appear to be using this document to suggest that the alleged take of salmon as a result of Reclamation's permitting of water transfers is unlikely to recur in the future. But, the thrust of the document as a whole simply points out there is "significant uncertainty" regarding Reclamation's ability to maintain temperature control sufficient to protect winter-run Chinook. *Id*.

> NMFS and Reclamation are currently facing a very different set of conditions than those experience throughout the 2012-2016 drought, and also the wet water year in 2017, with consideration of a decent volume of water in Shasta Reservoir, coupled with the forecasted water year having a reasonable likelihood of a dry classification. As a result, there is significant uncertainty regarding the ability to meet temperatures sufficiently cold enough to ensure the protection of winter-run throughout the 2018 temperature management season. With this uncertainty in mind, and in consideration of the current reinitiation of consultation on CVP/SWP operations NMFS reminds Reclamation of the requirements of section 7(d) of the Endangered Species Act to "not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2).

*Id.* This exhibit says nothing about transfers, nor do Federal Defendants point to any document in the record that promises or even suggests transfers will be reviewed any differently in the future.

Federal Defendants argue that the "releases" they are alleged to have caused – stemming from transfer approvals – are not likely to recur because, as Plaintiffs acknowledge, PSUF #32, Reclamation has reinitated consultation on the 2008 NMFS BiOp. *See* ECF No. 1252 at 17. But, in the absence of any information about the <u>outcome</u> of that reconsultation, the record reflects nothing concrete except the current regulatory situation—the same regulatory regime in place in 2014 and 2105.

In sum, the Court finds that dismissal is inappropriate on this ground because, viewing the disputed evidence (all of which is intertwined with the merits) in a light most favorable to Plaintiffs, Plaintiffs have established a that (1) the climatic circumstances present in 2014 and 2015 are likely to recur; and (2) Reclamation is likely to approve in the future transfers in a manner similar to the approval process observed in 2014 and 2015.

### e.  <u>Standing</u>

#### (1)  <u>Legal Framework</u>

Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001). "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1983). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To have standing, a plaintiff must show three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party

51

not before the court. Third, it must be likely, as opposed to merely
speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

In addition, where an organization or association is bringing suit on behalf of its members, that organization or association must demonstrate that: (1) its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Lujan*, 504 U.S. at 561.

Standing is evaluated on a claim-by-claim basis. "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for 'each form of relief sought.'" *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[S]tanding is not dispensed in gross. . . ." *Lewis v. Casey*, 518 U.S. 343, 358, n. 6 (1996).

> The actual-injury requirement would hardly serve the purpose . . . of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration.

*Id*. at 357.

Here, as mentioned, Federal Defendants move to dismiss the Section 9 claim against Reclamation on standing grounds. Because standing relates to a federal court's subject matter jurisdiction under Article III, it is properly raised in a motion to dismiss under Fed. R. Civ. P. 12(b)(1). However, as exemplified in the prior section, where jurisdictional facts are wrapped up in the merits, analysis of a 12(b)(1) speaking motion is performed like a summary judgment analysis. As essentially all the factual issues relevant to standing are wrapped up with the merits in this case, much if not all of following analysis effectively operates as a motion for summary judgment.

### (2)    Standing Analysis

Federal Defendants first argue that the Section 9 claim against reclamation should be dismissed because Plaintiffs' operative complaint contains no allegations that Reclamation's <u>water transfer approvals</u> injure Plaintiffs. *See* ECF No. 1210-1 at 30. Federal Defendants cite *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954-55 & n.9 (9th Cir. 2011) (en banc), for the proposition that where complaint "fails to sufficiently allege essential elements of Article III standing," that deficiency cannot be cured at summary judgment or trial, and the claims must be dismissed. ECF No. 1210-1 at 30. *Chapman* is not precisely on point. The plaintiff in *Chapman* filed a complaint under the Americans with Disabilities Act ("ADA"). Although Chapman alleged sufficiently that he is "physically disabled," that he visited the defendant's premises, and that there were numerous architectural barriers within, he did not allege "how his disability was affected by" those barriers to demonstrate that he "personally suffered discrimination under the ADA on account of his disability." *Id*. at 954.

The situation presented here is somewhat different. The 6SC did not separate out Reclamation's water transfer approvals from overall diversions. Rather, the 6SC alleged that BOR's deliveries of water to SRS Contractors caused the Bureau to lose control of water temperatures in the upper Sacramento River during the critical temperature management season for Chinook salmon. 6SC at ¶ 22. As

mentioned, the distinction between the Bureau's delivery of water to the SRS Contractors pursuant to the SRS Contracts and the Bureau's approval of transfers of SRS Contractor water to other water users came about as a result of Reclamation's own motion to dismiss. *NRDC v. Norton*, 236 F. Supp. 3d at 1240-41. Therefore, because this narrowing of the scope of the Section 9 claim against Reclamation only occurred after the pleadings had closed, the Court finds it appropriate to look beyond the 6SC to the evidence cited by the parties to determine whether Plaintiffs' standing "adequately appear[s] from all materials of record." *Warth*, 422 U.S. at 501-02. It is with these materials in mind that the Court turns to the elements of standing.

### (a) <u>Injury in Fact</u>

*Lujan* defines "injury-in-fact" as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." 504 U.S. at 560 (internal citations and quotations omitted). Here, Plaintiffs allege that their members "live, work, recreate, research, and worship in the Sacramento River watershed. They depend on the winter-run and spring-run Chinook for professional, recreational, and spiritual sustenance, and the health of these runs impacts the availability of the commercially and recreationally fished fall-run Chinook, on which PCFFA members rely for a substantial portion of their economic well-being and livelihood." 6SC ¶ 46. In addition, the 6SC alleges that Plaintiffs' members "either live in, work in, or frequently travel to the Sacramento River watershed, critical habitat for the winter-run and spring-run Chinook. Plaintiffs' use of the Sacramento River watershed for educational, professional, spiritual, and recreational activities, such as hiking, boating, bird watching, swimming, and fishing, would be detrimentally affected by the decline of the winter-run and spring-run Chinook." *Id.*; *see also* 6SC ¶¶ 46-48. Plaintiffs' standing declarations support these factual allegations. *See* ECF Nos. 1182-1182-7. Federal defendants point out that none of the standing declarations mention water transfer approvals in 2014 and 2015 or the issue of Stony Creek flows. ECF No. 1210-1 at 30. But these are issues related to causation. The Court can identify no authority that suggests causation and redress must be proved by member declarations.

The allegations in the 6SC, along with Plaintiffs' standing declarations, demonstrate sufficiently that members economic, recreational, and aesthetic interests are and would be harmed by the take of winter-run and spring-run Chinook. *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 859-60 (9th Cir. 2005) ("'Injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct.").

### (b)  <u>Causation</u>

"To show causation, the plaintiff must demonstrate a 'causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quoting *Lujan*, 504 U.S. at 560-61). A "chain of causation [may have] more than one link, but [may not be] hypothetical or tenuous." *Nat'l Audubon Soc'y v. Davis,* 307 F.3d 835, 849 (9th Cir. 2002). It is Plaintiff's burden to establish by a preponderance of the evidence that its theory of causation is at least "plausib[le]." *Id.*

In *San Joaquin River Group Authority v. National Marine Fisheries Service*, 819 F. Supp. 2d 1077, 1093-97 (E.D. Cal. 2011), the district court granted a defense motion for summary judgment where there was a complete lack of evidence of any causal connection between the challenged management measures (NMFS's decision to allow a certain amount of commercial recreational ocean fishing despite concerns for fish populations) and freshwater flow restrictions that might be imposed upon plaintiffs (agricultural water users) by a third party agency (the SWRCB). In contrast, in *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 905 F. Supp. 2d 1158, 1171-72 (E.D. Cal. 2012), the undersigned found a causal link "plausible," despite the presence of several links in the chain of causation. Specifically, in *San Luis*, the plaintiffs demonstrated that reduced pumping for 14 days in 2011 at Reclamation's Jones Pumping Plant in the southern Delta produced a "hole" in storage in the San Luis Reservoir that otherwise would not have been there and was unlikely to be "filled," and that

this produced a "credible threat" of future injury in the form of reduced water deliveries. *Id*.

Here, Plaintiffs' primary causation theory as it pertains to Federal Defendants has a number of "links," including the following: (1) Reclamation approved for transfer and actually did make releases to effectuate transfer of certain volumes of water during 2014 and 2015; (2) the volumes of water Reclamation transferred would otherwise have remained in storage and therefore been available for use in temperature management operations; (3) the lack of such water in storage caused temperature management to fail (or at least contributed to that failure); and (4) this caused take of winter-run and spring-run Chinook salmon. *See* ECF No. 1184 at 34-37; ECF No. 1247 at 38. Federal Defendants' motion to dismiss challenges directly only certain aspects of this causal chain. *See* ECF No. 1210-1 at 30-31 (arguing, for example, that the Court should not "infer that, because overall water management activities allegedly injure Plaintiffs, so too does Reclamation's approvals" and suggesting that Reclamation's approval of water transfers merely shifted where the water was diverted). Nonetheless, the Court has a *sua sponte* duty to examine standing at every stage of a case, *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008), so it must examine whether causation is present in a holistic manner. A chain of causation is acceptable, even if it has several "links," so long as those links are plausible, and "not hypothetical or tenuous." *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (citing *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984) (holding that the "length of the chain of causation" is not dispositive, but rather the "plausibility of the links that comprise the chain" govern the causation analysis)); *Maya v. Centex Corp*., 658 F.3d 1060, 1070 (9th Cir. 2011); *see also Envtl. Def. Ctr. v. EPA,* 344 F.3d 832, 867 (9th Cir. 2003) ("A plaintiff who shows that a causal relation is 'probable' has standing, even if the chain cannot be definitively established."). "Nor does standing require the defendant's action to be the 'sole source' of injury." *Moore v. Apple Inc*., 309 F.R.D. 532, 540 (N.D. Cal. 2015) (quoting *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011) (holding that a plaintiff "need not eliminate any other contributing causes to establish its standing")). "Proximate causation is <u>not</u> a requirement of Article III standing . . . ." *Lexmark Int'l, Inc. v.*

*Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) (emphasis added).

Viewing the undisputed evidence alongside any disputed evidence viewed in a light most favorable to Plaintiffs, some (not *de minimis*) volume of water was released from Keswick for transfer during the early months of the 2014 temperature management season. FDR #148; ECF No. 1210-1 at 37 n.25 (Federal Defendants admitting more than 40,000 AF of water was transferred in April through June 2014). In total, Reclamation approved at least 100,000 AF of SRS Contractor transfers by the end of September 2014. BOR 10859. Likewise, in 2015, Reclamation approved for transfer more than 200,000 AF of water in 2015, with some volume (again not *de minimis*) of that water being released for actual transfer in the early months of the temperature management season (May, June, and/or July). FDR #181 (indicating Plaintiffs were incorrect to assert certain volumes of water were actually transferred during May, June, and July 2015, but declining to offer alternative numbers, referring the Court instead to ambiguous documents in the AR); SRSR #181 (indicating that no water was actually transferred in 2015 until July and appearing to concede at least 38,000 AF was transferred in July); BOR 19271-76.

The Parties also dispute whether, in the absence of Reclamation approval, the overall volume of water subject to transfer would have remained in storage. Federal Defendants suggest it is pure speculation to assume that the SRS Contractors would not have otherwise used that water, and maintain that the absence of any such proof breaks the causal chain. *See* ECF No. 1210-1 at 29. Federal Defendants have presented legal authority and evidence indicating that the SRS Contractors were not permitted to transfer water unless that water otherwise would have been used. First, Federal Defendants cite Section 3405(a)(1)(I) of the 1992 Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4700 (1992), which limits transfers to "water that would have been consumptively used or irretrievably lost to beneficial use during the year or years of the transfer." In addition, Federal Defendants cite an agreement between Reclamation, GCID, and the San Luis & Delta-Mendota Water Authority "To Provide for Additional Water from the Central Valley Project for 2014." BOR 10575-581. On the second page of that Agreement, GCID agreed to "forbear up to a total of 16,500 acre-feet of

[water] it would have otherwise diverted under the Settlement Contract for use on lands depicted on Exhibit 'B' of the Settlement Contract." BOR 10576. Reclamation found certain types of transfers (from GCID to lands contiguous to GICD) would not be detrimental to fisheries in the Sacramento River in part because "GCID would only transfer water made available through an increase in its conservation of water, [as] there would be no change in the amount or timing of diversions from the Sacramento River as a result of this action." BOR 10352.

In an environmental review of transfers to the Tehama-Colusa Canal Authority (not an SRS Contractor) from various willing sellers, including some SRS Contractors, Reclamation explained that transfers of this nature would take place through forbearance agreements such as the one described above. BOR 11242. Practically, the seller would either use groundwater substitution or crop idling/crop shifting to effectuate the forbearance. BOR 11243-244. With groundwater substitution, sellers would choose to pump groundwater in lieu of diverting surface water supplies, making surface water available for transfer. BOR 11243. Crop idling involves the seller forgoing planting on a particular parcel of land they otherwise would have placed into production; crop shifting involves shifting production from a higher water use crop to a lower water use crop. BOR 11244. Reclamation uses various methods to calculate how much water would be freed for transfer using these methods. *Id*. It also appears that Reclamation uses a system of "compliance checks" to determine whether lands that were in production the year prior to the transfer actually are idled during the year of transfer. BOR 10775-784 (indicating transfers are subject to "compliance checks on idled lands" and including a table detailing specific parcels of SRS Contractor land, the crop planted the previous year, and the amount of water fallowing those parcels would free for transfer). The Court has examined several other transfer approval documents in the administrative record and notes that they too have requirements for compliance checks on idled lands. *E.g*., BOR 10785; BOR 10740; BOR 19428-43.

Plaintiffs present evidence that, if believed, demonstrates generally that the SRS Contractors do not use all of the water allocated to them each year. For example, in 2014 and 2015 the SRS Contractors

diverted or transferred approximately 1.3 MAF of the 1.6 MAF allocated to them.[23] Poole Decl., Exs. 6

(ECF No. 1176-7) (showing 2014 actual deliveries), 10 (ECF No. 1176-11) (showing 2015 monthly

deliveries), 87 (ECF No. 1179-16) (showing 2015 water transfers). Water usage tables from 2014 and

2015 show that at least some SRS Contractors did not use all of their "scheduled" allocations in April,

May, and June, even in those "Critical" years. *See* Poole Decl., Ex. 133 (ECF No. 1181-12). Evidence

from other years, including evidence discussed in the Court's request for supplemental briefing, shows

that the SRS Contractors typically divert less than their full contract allocation. *See* Poole Decl., Ex. 6

(ECF No. 1176-6) (showing total actual deliveries significantly under full contract amount even in 100%

allocation years); *see also* Second Poole Decl., Exs. 174-77 (ECF Nos. 1248-29 – 1248-32). Plaintiffs do

not present direct evidence to call into question the direct evidence that Reclamation has a system in

place to ensure transferred water <u>actually</u> is water that would have been used during that water year.

Nonetheless, Plaintiffs argue that, "taking all inferences in Plaintiffs' favor, a reasonable conclusion is

that the SRS Contractors would not have otherwise used the water they transferred in 2014 and 2015."

ECF No. 1267 at 3. The inference the Court presumes Plaintiffs advance is this: the circumstantial

evidence of the SRS Contractors routinely not using all their allocated water suggests that the process

used to identify water "available for transfer" is a mirage that allows the SRS Contractors to identify

water "available for transfer" even when it would not otherwise be used. But the connection between

Plaintiffs' evidence and that ultimate inference is far from clear.[24] To put it another way, even assuming

it is true that SRS Contractors, including those who engaged in transfers in 2014 and 2015, routinely

failed to use their full contract allocation in, how does this call into question the evidence suggesting all

---

[23] As discussed above, because 2014 and 2015 were "Critical" years, the SRS Contracts' shortage provision was in effect those years, reducing the total contract allocation by 25 percent (to 75% of the total). The total SRS Contractor allocation (across all such Contracts) is more than 2.1 MAF. PSUF #50. Seventy-five percent of that is approximately 1.6 MAF.

[24] Plaintiffs' focus on the use in some transfer documentation of the generic term "surplus," *e.g.*, BOR 7172, fails to acknowledge CVPIA § 3405(a)(1)(I), which applies to any and all transfers between CVP Contractors, including the SRS Contractors and other CVP users, and requires that transfer water be limited to water that would have been "consumptively used or irretrievably lost to beneficial use" during the year of transfer. The Court notes that it is not clear what "irretrievably lost to beneficial use" means in this context, as that term is not defined or used elsewhere in the CVPIA, but that language does not seem to be the basis of any of the transfers at issue in 2014 and 2015.

water transferred in 2014 and 2015 was specifically accounted for through groundwater substitution and/or crop idling/crop substitution? The Court finds that the record is seriously underdeveloped on this issue, making it extraordinarily difficult for the Court to determine whether a dispute of fact exists.

The Court need not get all the way to the bottom of the above-described dispute, as Plaintiffs advance an alternative theory of liability. They argue that Reclamation could have conditioned the transfers in ways that would have avoided harm to the species. ECF No. 1184 at 39-40; ECF No. 1124 at 38. Specifically, Plaintiffs suggest that Federal Defendants could have insisted upon delaying all (instead of just some) transfers until later in the water year in 2014 and 2015. *See* ECF No. 1247 at 39.[25] Federal Defendants protest that this cannot form the basis of Section 9 liability. *See* ECF No. 1210-1 at 37. As mentioned, the FWS has defined the term "harass" (a form of "take") to include "an intentional or negligent act or <u>omission</u> which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3 (emphasis added). Though FWS specifically removed the word "omission" from its regulatory definition of "harm" (another form of "take"), FWS explained in the Federal Register that the agency considers the term "act" in that definition to be "inclusive of either commissions or omissions which would be prohibited by section 9." Endangered and Threatened Wildlife and Plants; Final Redefinition of "Harm", 46 Fed. Reg 54,748-01, 54,750 (Nov. 4, 1981). There is some authority to suggest that for an omission to form the basis of Section 9 liability, it must involve some kind of <u>duty</u> to act. *See NY Coastal P'ship, Inc. v. U.S. Dept. of Interior*, 341 F.3d 112, 117 (2d Cir. 2003) ("While there is support for the notion that omissions—in the face of a duty to act—may constitute violations of the Endangered Species Act, plaintiffs-appellants identify no duty requiring defendants-appellees to act in a manner that would likely redress their alleged injuries.") (internal

---

[25] Plaintiffs try to portray this as something other than a challenge to agency inaction (or omission), by explaining that they are challenging affirmative decisions by Reclamation to approve the transfers, ECF No. 1247 at 39, but the Court finds it difficult to understand this theory of failure by Reclamation as anything other than an allegation of inaction or omission.

citation omitted). But, there is also authority to suggest that, at least for purposes of standing, the kind of "duty" that would require an agency to act in a manner that could benefit the species is broad enough to encompass Reclamation's conduct in this case. For example, in *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 148 F.3d 1231, 1247-53 (11th Cir. 1998), the Eleventh Circuit found that plaintiffs demonstrated a causal connection for standing purposes in a Section 9 case where it was asserted that a county had imposed minimum lighting restrictions on some but not other beach communities within the county's jurisdiction. The court found that the absence of such lighting restrictions was harmful to sea turtles nesting on the county's beaches. *Id*. at 1238. Critically, the Eleventh Circuit found that the county had "authority—and arguably a duty—to establish minimum standards" for the protection of the turtles under the county charter. *Id*. at 1249. The Parties have not thoroughly explored the relevant authorities, but for purposes of this motion the Court finds that Reclamation has a similar duty here under the CVPIA, which precludes Reclamation from approving a transfer that violates "Federal law," which includes the ESA. CVPIA § 3405(H). Therefore, while the record does not clearly reveal a dispute of fact over whether the SRS Contractors would have otherwise used the entire volume of water approved for transfer, Plaintiffs have established that Reclamation failed to act to require that all of the transfer activity take place late in the temperature management season, despite arguably having an obligation to do so.[26]

For purposes of standing, the remaining causal links are also proved to the degree required, keeping in mind that on summary judgment "the causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so

---

[26] It is unclear whether Federal Defendants' argument—that the causal chain is broken as to Reclamation because water approved for transfer would have been used by the transferee SRS Contractor in the absence of permission to transfer—applies in some measure to this alternative theory regarding the timing of transfers. In other words, it is possible that the record contains evidence (or that evidence could be elicited at trial) indicating that if Reclamation had insisted upon all transfers being delayed, some of the transfer agreements between willing SRS Contractor sellers and willing buyers would have fallen through, with the water reverting to being delivered under the SRS Contract, with timing set by those Contracts. But, Federal Defendants have not presented any evidence to the Court that suggests as much. In the absence of any such evidence, Plaintiffs' alternative causal theory is plausible.

1  airtight . . . as to demonstrate that plaintiffs would succeed on the merits." *Ocean Advocates*, 402 F.3d at

2  860. According to evidence submitted by Plaintiffs, "the volume of cold water available for real-time

3  management in June through October is highly dependent on [] releases [from Keswick Reservoir] in

4  April through early June." BOR 12569; *see also* BOR 8192 (NMFS BiOp RPA recognizing that releases

5  in the spring can be critical to providing "sufficient water to reduce adverse effects of high water

6  temperatures in the summer months for winter-run . . . "). NMFS concluded in January 2015 that "[t]he

7  effects of limited cold water storage and loss of temperature control out of Keswick Dam from early

8  September through the fall of 2014 led to substantial egg and fry mortality (Figure 1)." BOR 13442

9  (regarding winter-run); *see also* BOR 13449 (indicating that the peak of spring-run "spawning activity

10  corresponded with the high Sacramento River temperatures downstream of Keswick Dam throughout

11  the fall of 2014, and illustrates the potential for high egg and alevin mortality" and noting that

12  "extremely few juvenile spring-run Chinook salmon have been observed this year migrating downstream

13  . . . "). A February 2015 SWRCB Order indicated that "[d]espite temperature modeling that indicated

14  that temperatures could be maintained below 56 degrees throughout the 2014 temperature control season

15  immediately below the dam under the conditions that existed last year, temperature control was lost

16  several weeks before the end of the egg incubation life stage last year. As a result, the 2014 winter-run

17  brood year (BY) is estimated to have experienced 95 percent mortality." BOR 13528. That SWRCB

18  order similarly concluded that "[s]pring-run eggs in the Sacramento River underwent significant, and

19  potentially complete, mortality due to high water temperature downstream of Keswick Dam starting in

20  early September when water temperatures exceeded 56 degrees Fahrenheit." BOR 13529.[27] In contrast

21  to the analysis related to Plaintiffs' motion for summary judgment, here, it must be assumed that

22  Plaintiffs' evidence regarding the temperature needs of winter-run and spring-run are correct. In that

---

[27] The evidence described above amply supports the assertion that water temperatures did exceed 56°F during significant stretches of the temperature compliance period. The Court incorporates by reference those citations here.

light, temperatures above 56°F must be assumed to cause extensive egg mortality.

Although Federal Defendants argue that some of these statements may be misinterpreted if pulled out of context, FD #164, viewing the evidence in a light most favorable to Plaintiffs, this is support not only for the assertion that early-season releases for the purposes of transfers contributed to the failure of temperature management, but also for the assertion that the loss of temperature control harmed winter-run and spring-run. Federal Defendants' admission that Reclamation actually released water to effectuate transfers of more than 40,000 AF in April through June 2014, ECF No. 1210-1 at 37 n.25, plausibly suggests a causal link between Reclamation's actions and the ultimate results: loss of temperature control leading to harm to winter-run and spring-run. While this evidence is not undisputed, it is sufficiently compelling for purposes of this standing analysis.

To the extent the Court is required to separately evaluate whether the causal links are established for 2015, the result is the same. As mentioned, Plaintiffs assert, and for purposes of this motion the evidence supports, that Reclamation approved more than 100,000 AF of transfers in 2014. Of that, a certain portion (apparently 38,000 AF), was released for transfer in July, after which temperatures exceeded 56°F for the remainder of the temperature compliance season. BOR 13480-83. Even though Federal Defendants point to evidence that the temperature compliance requirements were changed (raised) during the latter part of the 2015 temperature compliance season, this is not dispositive of whether the higher temperatures caused take. By the end of the 2015 season, fisheries agencies estimated that winter-run Chinook egg and fry mortality had reached more than 97%. Poole Decl., Ex. 64 (ECF No. 1178-18) (NOAA Fisheries presentation indicating few winter-run eggs in 2015 survived due to "very little cold water in Shasta to cool the upper Sacramento"); Ex. 83 (ECF No. 1179-12) at 1, 3-4 (NMFS describing an 85% temperature dependent mortality to winter-run in 2015); Ex. 72 (ECF No. 1179-1) at 1 (indicating juvenile spring-run likely suffered higher than average mortalities in the mainstem Sacramento River).

The Court is cognizant of Federal Defendants' argument that Reclamation's approvals of

transfers actually delayed at least some water deliveries to later in the season, arguably providing some benefit to the species. However, reviewing the evidence in the manner required, the Court concludes that Plaintiffs plausibly have demonstrated a causal connection between their harm and those releases to fulfill transfer requests that were not delayed until the later months of the temperature compliance season.

For purposes of this analysis, the Court does not need to get into the weeds of whether the loss of temperature control was the proximate cause of take. Rather, Plaintiffs must establish a plausible causal connection between the transfer approvals and concrete injury to their interests. Here, for the reasons set forth above, the causal chain is not speculative and harm is traceable to Federal Defendants.

### (c)    <u>Redressability</u>

To satisfy the final requirement of Article III standing, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. Federal Defendants argue that Plaintiffs cannot demonstrate that their injuries would be redressed by a favorable decision on the Section 9 claim against Reclamation because the transfers in question simply shift the timing and point of diversion of water. *See* ECF No. 1210-1 at 29 & 31. Federal Defendants assert that "[i]f Reclamation did not approve transfer of SRS water, Reclamation would have to release the water for diversion and use by the SRS Contractors" which would "only exacerbate the alleged harms, as it removes a tool Reclamation used in 2014 and 2015 to reduce impacts to salmonids." ECF No. 1252 at 15. This fails to acknowledge that while some of the approved transfers delayed transfer until late in the temperature management seasons – to the benefit of the species – other approved transfers were not delayed. The Court finds that Plaintiffs' harms could be alleviated by enjoining Reclamation from approving water transfers under similar circumstances in the future. The obvious implication of this is that Reclamation could use its discretion to require transfers to be delayed until later in the temperature management season. While some SRS Contractors might refuse to transfer under those circumstances, reverting to using that water, the present record contains no evidence to suggest this would be a

common, let alone universal, response.

Federal Defendants also argue that standing cannot be based on wholly past activity. ECF No. 1210-1 at n.20; ECF No. 1252 at 15. This argument fails for the same reasons the related argument regarding *Gwaltney*, discussed above, fails.

### (d) Organizational Standing

Having found that the standing declarants would "otherwise have standing to sue in their own right," the second and third elements of organizational standing are also proved to a sufficient degree. *See Laidlaw,* 528 U.S. at 181. The named Plaintiff organizations seek to protect interests that are germane to their purpose(s), 6SC ¶¶ 33-36; ECF Nos. 1182-1182-7, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

For all the reasons set forth above, Federal Defendants' motion to dismiss on standing grounds is DENIED.

### f. Stony Creek

Although the Court previously found that Plaintiffs' Stony Creek theory cannot proceed because it was not encompassed by the Notice Letter, the Court alternatively finds that Plaintiffs have not established causation for standing purposes as to their Stony Creek theory. Although the GCID Contract indicates on its face that Reclamation may require GCID to divert up to 20,315 AF of water from Stony Creek, the Court previously raised the question of factual impossibility in light of record evidence indicating that there presently is no mechanism by which GCID can divert water from Stony Creek. *See NRDC v. Norton*, 236 F. Supp. 3d at 1240; *see also* Second Declaration of Richard Welsh, ECF No. 1052-2. Plaintiffs make no effort to provide any evidence that diversion from Stony Creek is factually possible (or that Reclamation can require diversions despite factual impossibility), despite having been warned of the Court's concern.

2. **Federal Defendants' Motion for Summary Judgment on the Merits of the Section 9 Claim Against Reclamation**

Federal Defendants move for summary judgment on Plaintiffs' Section 9 claim against Reclamation. Federal Defendants correctly point out that to succeed on their Section 9 claim, Plaintiffs must prove that Reclamation proximately cause the "take" of an ESA-listed species. 16 U.S.C. § 1538(a)(1)(b). Plaintiffs must also show that the take is unlawful. An incidental take statement issued following a Section 7(a)(2) consultation, for example, may exempt an action agency from Section 9 liability for any incidental take resulting from the proposed agency action. 16 U.S.C. § 1536(b)(4), (o).

a. **Proximate Cause**

Federal Defendants argue generally that they are entitled to summary judgment because Plaintiffs have focused their proof of proximate cause on "overall" water releases in 2014 and 2015.[28] ECF No. 1210-1 at 35-36. Federal Defendants break this argument down into several sub-points. First, they maintain that "Plaintiffs rest on obfuscation" by suggesting "that water transfers authorize the release of water." *Id*. at 36. Rather, Federal Defendants argue, "water transfers merely transfer the right to divert and use the water, to a point or points downstream of where it otherwise would have been diverted and used." *Id*. Relatedly, Federal Defendants also argue that Plaintiffs' proximate cause case against Reclamation must fail because Plaintiffs' theory "depends on speculative contingencies and the unfounded assumption that – without a water transfer – the SRS Contractors would not have exercised their rights to their Contract Total." *Id*. at 37.

While there certainly is record support for Federal Defendants' factual contentions, at least with respect to some portion of transferred water, as discussed above, there is also contrary record evidence suggesting that the water transfer process does more than simply transfer the right to divert and use the

---

[28] Unlike in the context of standing, the Court has no *sua sponte* obligation to evaluate on summary judgment the merits of the various aspects of Plaintiffs' proximate cause case. Therefore, the Court examines only those arguments raised by Federal Defendants' motion.

water. As Federal Defendants themselves point out, some transfers in 2014 and 2015 were delayed until later in the transfer season, arguably to the benefit of the species. But, it is also undisputed that that at least some of the water designated for transfer was actually released from Keswick Dam during the early months of the transfer season.[29] Plaintiffs' theory that Reclamation could have (and had some obligation to) condition <u>all</u> transfers in 2014 and 2015 on requiring them to be delivered later in the temperature management season has legs.[30] Although the volumes of water transferred early in the temperature management appear to be small (40,000 AF in 2014 and 38,000 AF in 2015) relative to overall deliveries to the SRS Contractors during 2014 and 2015 years, these are not inherently insignificant volumes of water. Critically, Federal Defendants do not present any evidence tending to demonstrate that these early season transfers did <u>not</u> cause take. As the moving party, they bear the initial burden of informing the Court of the basis for their motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id*. at 1102-1103.

The Court is fully aware of the fact that disputes surround much if not all of the evidence presented by Plaintiffs to support their case against Federal Defendants. On summary judgment,

---

[29] There is also evidence to support the factual assertion that overall transfers approved and actually released for diversion before the end of the 2014 water year appreciably diminished EOS storage, which contributed appreciably to Reclamation's inability to control temperatures the following year. But, as mentioned, it is far from clear whether Plaintiffs can demonstrate that water designated for transfer would have remained in storage. So, the Court has not considered that evidence in assessing proximate cause for purposes of this motion

[30] This finding is subject to further briefing at the trial stage on the extent to which Section 9 liability may be grounded upon an agency omission.

however, the Court may not weigh the relative value of disputed evidence. Proximate cause is a highly fact intensive inquiry generally inappropriate for resolution on summary judgment. The moving party's burden on summary judgment is to show that no reasonable trier of fact could find other than for them. A pertinent example of why summary judgment must be denied here comes from *Aransas Project v. Shaw*, 835 F. Supp. 2d 251, 265, 273 (S.D. Tex. 2011). That case concerned an environmental organization's allegation that a Texas state agency's failure to adequately manage the flow of fresh water into an estuary resulted in a taking of Whooping Cranes in violation of the ESA. The theory of take in that case was that the agency's regulatory decisions allowed for diversions of water, which resulted in reduced flow of fresh water into the ecosystem, which increased salinity, reducing the food and water supply for the Whooping Cranes, thus weakening and ultimately resulting in the death of twenty-three individual cranes whose deaths were demonstrated to have been caused by malnourishment. *See id*. at 264-65. The district court concluded that there were genuine issues of fact as to whether the defendant agency's actions were the proximate cause of take, and denied summary judgment. *Id*. at 273.[31]

Here, the Court believes it cannot find that no reasonable trier of fact would find for the Plaintiffs as against Reclamation on the question of proximate cause. The factual record, viewed as the Court must in a light most favorable to Plaintiffs, as to the overall volume of water approved for transfer by the end of the 2014 water year alone could support a finding of proximate cause as to harm to the species in 2015.

Federal Defendants' motion for summary judgment on the issue of proximate cause is DENIED.

**b.** **Incidental Take Statement**

Federal Defendants next argue that even if Plaintiffs are able to establish that Reclamation

---

[31] Ultimately, a bench trial was held in *Aransas*, resulting in a finding that Reclamation did proximately cause take. That finding, however, was reversed on appeal based upon the Fifth Circuit's review of how the district court applied the proximate cause standard to the facts adduced at the bench trial. *See generally Aransas*, 775 F.3d 641.

proximately caused take, any take incidental to the Reclamation's discretionary actions in 2014 and

2015 is not unlawful under the ESA. ECF No. 1210-1 at 38-39. In assessing this argument, it is helpful

to review the relevant provisions of the ESA. As noted, Section 9 prohibits "take" of a protected species

by any person. 16 U.S.C. § 1538(a). The ESA's citizen suit provision allows for enforcement of this

prohibition against state and federal agencies as well as private parties. 16 U.S.C. § 1540(g)(1)(A).

Section 7 of the ESA applies to federal agencies, and "operates to both impose further requirements on

federal actions and to exclude some federal acts from the scope of section 9." *S. Yuba River Citizens*

*League v. Nat'l Marine Fisheries Serv.*, 629 F. Supp. 2d 1123, 1125 (E.D. Cal. 2009). As discussed

above, every federal agency must ensure that actions it authorizes, funds, or carries out are not likely to

jeopardize the continued existence or harm the critical habitat of an ESA-listed species. 16 U.S.C.

§ 1536(a)(2). When effects on a listed species appear likely, the agency must go through a formal

consultation process with the relevant wildlife agency, which may result in the preparation of a

"biological opinion." *See id*. § 1536(b). If the BiOp concludes that the proposed action would jeopardize

the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not

go forward unless the wildlife agency can suggest a "reasonable and prudent alternative[]" ("RPA") that

avoids jeopardy, destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If a BiOp concludes that the

proposed action (or its RPA) will cause incidental taking of protected species, but that despite this

taking, the action will not jeopardize the species or threaten critical habitat, the wildlife agency issues an

ITS that

> shall provide the Federal agency and the applicant concerned, if any with a
> written statement that—
>
> (i) specifies the impact of such incidental taking on the species,
>
> (ii) specifies those reasonable and prudent measures that the Secretary
> considers necessary or appropriate to minimize such impact,
>
> (iii) ..., and
>
> (iv) sets forth the terms and conditions (including, but not limited to,

69

reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4). Section 7 further provides that "any taking that is in compliance with the terms and conditions specified in a written [ITS] ... shall not be considered to be a prohibited taking of the species concerned." ESA § 7(o)(2); 16 U.S.C. § 1536(o )(2).

Here, the 2009 NMFS BiOp resulted from formal consultation over operation of the CVP and SWP. The BiOp contained an RPA and an ITS. The RPA directs Reclamation in "Action Suite 1.2" to undertake certain actions to "reduce adverse impacts of the projects to winter-run and spring-run in the Sacramento River by maintaining sufficient carryover storage and optimizing the use of the cold water pool." BOR 8185. However, the RPA recognizes that "despite Reclamation's best efforts, severe temperature-related effects cannot be avoided in some years," and "includes exception procedures to deal with this reality." BOR 8186. Accordingly, the RPA "specifies other actions that Reclamation must take, within its existing authority and discretion, to compensate for these periods of unavoidably high temperatures." *Id.*

As discussed above, RPA Action 1.2.1 defines long-term "performance measures" with respect to EOS carryover storage at Shasta Reservoir and maintenance of temperature control at certain temperature compliance points. BOR 8187. If there is "significant deviation from those performance measures over a 10-year period, measured as a running average, which is not explained by hydrological cycle factors (e.g., extended drought), then Reclamation shall reinitiate consultation with NMFS." *Id.*

The BiOp contains a separate section setting forth the ITS. Within the ITS, NMFS defined certain "reasonable and prudent measures" ("RPM") as "non-discretionary" and required Reclamation to implement them "for the exemption in section 7(o)(2) to apply." BOR 8323. The ITS also included certain "terms and conditions." BOR 8377. It does not appear that the ITS directly incorporated into any RPM or term and condition the "performance measures" related to temperature compliance points

described in RPA Action 1.2.1. Nonetheless, a table contained within the ITS indicates that "incidental take will be exceeded if the water temperature exceeds 56°F upstream of the established TCP" and that "if the TCP performance goals in the RPA action are exceeded, then take is exceeded for this action, and Reclamation shall reinitiate consultation." *See* BOR 8325; 8336.

A federal agency holding an ITS is exempt from Section 9 liability for "any taking that is in compliance with the terms and conditions" of the ITS. 16 U.S.C. § 1536(o)(2). Federal Defendants argue that "Plaintiffs neither allege nor prove that Reclamation disregarded the ITS's terms and conditions." Remembering that this is Federal Defendants' cross-motion, the Court turns to the evidence to determine whether Federal Defendants have "persuade[d] the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102.

Federal Defendants point to record evidence suggesting ongoing collaboration and consultation between Reclamation and NMFS over Reclamation's operations, including changes to temperature management protocols and water transfer approvals. *See generally* ECF No. 1143, Appendix 1 (Documents Submitted in Lieu of Discovery), at Doc. 81. Critically, as a part of this coordination, Reclamation consulted with NMFS numerous times to address whether its drought operations fell within the scope of the RPA and ITS. In addition, in July 2015, NMFS approved the Bureau's Shasta Temperature Management Plan for the 2015 temperature management season, which included modifications to the temperature management objectives set forth in the RPA. *See* 12566-12582. Among other things, the Shasta Temperature Management Plan set as a goal to "[t]arget 57°F at [Clear Creek], not to exceed 58°F unless going above is needed to conserve cold water pool based on real-time temperature management team guidance." BOR 12579. NMFS concurred with this modification, BOR 12571, subject to constraining principles (e.g., that real-time operations be adjusted to attain temperatures as close to 57°F as possible at Clear Creek. BOR 12572. Overall, NMFS concurred that these changes were "consistent with RPA Action 1.2.3.C . . . . [and] were considered in the underlying analysis of the CVP/SWP Opinion." BOR 12574.

> The analysis in the CVP/SWP Opinion considered that droughts would occur and concluded that implementation of the RPA, including Action 1.2.3.C, is not likely to jeopardize the continued existence of Sacramento River winter-run Chinook salmon, Central Valley spring-run Chinook salmon . . . and will not result in the destruction or adverse modification of their designated critical habitats."

*Id*. This arguably demonstrates (or at least is strong evidence to suggest) that operations in 2015 complied with the terms and conditions of the ITS.

On the other hand, Plaintiffs point to evidence regarding overall temperature management trends suggesting that, notwithstanding any concurrences from NMFS regarding short term action, Reclamation may nonetheless be in violation of the ITS. The Court has not identified anything in the citations provided by Federal Defendants that changed the overall "performance measures" for EOS storage and temperature compliance set forth in the RPA:

> Performance measures for EOS carryover storage at Shasta Reservoir:
> - 87 percent of years: Minimum EOS storage of 2.2 MAF
> - 82 percent of years: Minimum EOS storage of 2.2 MAF and end-of-April storage of 3.8 MAF in following year (to maintain potential to meet Balls Ferry compliance point)
> - 40 percent of years: Minimum EOS storage 3.2 MAF (to maintain potential to meet Jelly's Ferry compliance point in following year)
>
> Measured as a 10-year running average, performance measures for temperature compliance points during summer season shall be:
> - Meet Clear Creek Compliance point 95 percent of time
> - Meet Balls Ferry Compliance point 85 percent of time
> - Meet Jelly's Ferry Compliance point 40 percent of time
> - Meet Bend Bridge Compliance point 15 percent of time

BOR 8187. As mentioned, Table 13-1 in the ITS indicates that "take is exceeded" when the performance goals in the RPA are exceeded. AR 8326, 8336. Plaintiffs' evidence shows that over the seven years since the RPA has been in place, Reclamation has met the TCP at Clear Creek only 80% of the time and at Balls Ferry only 67% of the time. Poole Decl., Ex. 73 (ECF No. 1179-2) at ECF 36; s*ee also id*. at ECF p. 36-37 (in the context of proposing an amendment to RPA Action Suite I.2, NMFS indicates in a draft document that "[b]ased on daily average temperature data of not in excess of 56°F, since issuance of the CVP/SWP operations Opinion, Reclamation has failed to meet the summer temperature compliance

point performance measure" resulting in substantial impacts to winter-run). The mathematical calculations presented in Plaintiffs' reply brief persuasively indicate that even if Reclamation met the TCP at Balls Ferry every day of the remaining three years' temperature management seasons, it would still fall short of achieving 85% compliance. ECF No. 1247 at 40 n.50.

The Court notes that the RPA itself suggests that the performance measures may be subject to exception in times of extended drought,[32] but it is unclear how any such exception should be applied. Among other things, the language carving out any such exception is omitted from the reference to the performance criteria set forth in the table contained within the ITS.[33] With that in mind, the Court must conclude that there are disputes as to the material fact in question: whether or not Reclamation complied with the terms and conditions of the ITS.[34]

Federal Defendants next suggest liability is inappropriate as a matter of law under the present circumstances because the relevant agencies have reinitated consultation. ECF No. 1210-1 at 40. A very similar argument was raised and rejected in *California Trout, Inc. v. United States Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1115-16 (C.D. Cal. 2015). That case concerned a dam and water transport and delivery structures on or near the Santa Ynez River. *Id*. at 1107. Hilton Creek, located below the facilities, was designated critical habitat for ESA-listed Southern California steelhead. *Id*. In 2000, NMFS prepared a BiOp applicable to the facilities which contained an ITS that described the amount of anticipated incidental take of steelhead and outlined RPMs requiring certain minimum flows at Hilton Creek. *Id*. In more recent years, because of low lake levels, the facilities depended on electric pumps to provide necessary flows to Hilton Creek, but California Trout alleged that there were

---

[32] The exact language of the RPA is as follows: "If there is significant deviation from these performance measures over a 10-year period, measured as a running average, which is not explained by hydrological cycle factors (e.g., extended drought), then Reclamation shall reinitiate consultation with NMFS." AR 8187.

[33] It may be that NMFS has addressed this issue somewhere in the thousands of pages cited by the Parties, many of which consist of string citations, or elsewhere in the record, but the Court is not aware at this time of any such explanation.

[34] The Court cannot feasibly and is not required to parse out all of the potential disputes of fact related to this issue. It is enough that there is at least one material dispute of fact rendering summary judgment inappropriate.

numerous malfunctions with the pumps, resulting in hundreds of fish mortalities and Reclamation's failure to abide by other terms and conditions of the ITS, including maintaining adequate water flows. *Id*. at 1108.

The defendants in *California Trout* argued that a Section 9 claim could not proceed because the defendant agencies had already reinitiated consultation. *Id*. at 1115. To support their contention that reinitiation was the only remedy available, defendants relied upon 50 C.F.R. § 402.16(a) and (c), which state that "[r]einitiation of formal consultation is required" in certain circumstances. *Id*. The district court held that neither these regulations nor the cases cited "state that such consultation is the only remedy available for Section 9 claims." *Id*. The district court reasoned:

> On the contrary, case law illustrates that takes outside the scope of an ITS can give rise to the requirement to reinitiate consultation *and* liability for violation of Section 9. *See, e.g., Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.,* 273 F.3d 1229, 1249 (9th Cir. 2001) (stating than an ITS "set[s] forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, *and* requiring the parties to reinitiate consultation.") (emphasis added); *S. Yuba* [], F. Supp. 2d [at] 1132–33 [] ("[W]hen the terms of an ITS are violated, the agency is liable under section 9[,]" and "an agency's violation . . . *may also* cause an actionable violation of [Section 7].") (emphasis added).

> Further, even if reinitiation of consultation has occurred, injunctive and declaratory relief remain available for Section 9 claims where the challenged action is ongoing. *See Greenpeace [Found. v. Mineta],* 122 F. Supp. 2d [1123,] 1129 (D. Haw. 2000) (finding that a Section 9 claim was not moot because defendant "has not shown that the harm underlying [the claims] has been eradicated, never to return."); *Defenders of Wildlife v. Martin,* 454 F. Supp. 2d 1085, 1099 (E.D. Wash. 2006) (granting a preliminary injunction and citing "evidence of past takes and likelihood of future harms[,]" which indicated that "violation of § 9's prohibition against 'take' in the form of harassment and harm are likely in the future.").

*California Trout*, 115 F. Supp. 3d at 1115-16. The Court finds the reasoning of *California Trout* on this issue to be sound. *See Oregon Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1005 (D. Or. 2010) ("Take that exceeds the conditions of the ITS invalidates the safe harbor provision of the ITS, leaving the agency that authorized the activity resulting in take liable for violating Section 9."); *see also Oregon*

*Natural Res. Council. v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007) (explaining that the exemption from liability is "limited" by the fact that "[t]he take must be in compliance with the terms and conditions of the [ITS]" <u>and</u> the fact that the action agency must re-initiate consultation under certain circumstances). Federal Defendants' argument that the Section 9 claim fails as a matter of law because the agencies have re-initiated consultation is without merit.[35] Whether or not Federal Defendants have violated the ITS is a fact question that must be resolved at trial.

## VII. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above, as to the sixth claim for relief:

(1)     Plaintiffs' motion for summary judgment is **DENIED**;

(2)     Federal Defendants' motion to dismiss is:

(a)     **GRANTED** as to the Stony Creek theory on the ground that Plaintiffs failed to provide proper notice of that claim in their Notice Letter; and

(b) **DENIED** in all other respects;

(3) Federal Defendants' cross motion for summary judgment on the merits of the Sixth Claim for Relief is **DENIED**; and

(4) The cross motions for summary judgment as to the second and fourth claims for relief will be resolved separately.

The Court is aware that this ruling leaves unresolved numerous issues not necessary to the disposition of these motions. For example, the parties dispute whether a "population level effect" is

_____

[35] Also without merit is Federal Defendants' assertion that "absurd results" would follow if a federal agency could be subject to Section 9 liability where the take limits of an ITS issued to that agency are exceeded. Federal Defendants specifically suggest that such an agency "would be instantaneously liable under a statute imposing criminal penalties any time the regulatory agency's 'estimates' of future take prove incorrect." ECF No. 1252 at 19. The Court refuses to overlook clear statutory language including "the United States" within the coverage of the ESA's citizen suit provision, *see* 16 U.S.C. § 1540(g)(1)(A) (permitting suits "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof"), on the hypothetical chance that some entity might attempt to enforce the criminal provisions of the ESA, which apply more narrowly to "any person."

required to constitute take by way of habitat modification. *Compare* ECF No. 1225 at 29 *with* ECF No. 1247 at 23. It may, in the end, be unnecessary to reach that question even at trial, as the bulk of the evidence produced thus far appears to go to population-level impacts, rather than impacts to individual fish.

The Parties are cautioned that at trial they should not assume anything more of the Court's expertise than is expressed in the background section of this Memorandum Decision. The briefs in this case gloss over foundational information underpinning many of the factual assertions made therein. The Parties will not be afforded that luxury at trial.

In addition, the Court requires additional information about the scheduled trial. Accordingly, on or before November 16, 2018, the Parties are directed (after meeting and conferring) to submit a joint estimate (with a rationale) of the anticipated length of the bench trial. On or before December 21, 2018, again after meeting and conferring, the Parties shall provide the Court with a joint outline of the legal and factual issues they believe the Court will be asked to resolve at trial. The latter must also include a list of witnesses and offers of proof regarding their anticipated schedule, as well as a proposed schedule for and list of anticipated motions *in limine*.

IT IS SO ORDERED.

Dated:   __**September 28, 2018**__          _____**/s/ Lawrence J. O'Neill**_____
                                                   UNITED STATES CHIEF DISTRICT JUDGE