**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, et al., <br><br> **Plaintiffs,** <br><br> vs. <br><br> DAVID BERNHARDT, Acting Secretary, U.S. Department of the Interior, et al., <br><br> **Defendants.** | Case No. 1:05-cv-01207 LJO-EPG <br><br> **MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT AS TO THE SECOND AND FOURTH CLAIMS FOR RELIEF (ECF NOS. 1175, 1205, 1206, 1207, 1209, 1210, 1214).** |
| SAN LUIS & DELTA MENDOTA WATER AUTHORITY, et al., <br><br> **Defendant-Intervenors.** | |
| ANDERSON-COTTONWOOD IRRIGATION DISTRICT, et al., <br><br> **Joined Parties.** | |

## I. <u>INTRODUCTION</u>

On March 12, 2018, Plaintiffs, a coalition of environmental interest groups led by the Natural Resources Defense Council ("NRDC"), filed the currently operative Sixth Supplemental Complaint ("6SC"), which includes numerous claims brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., against the U.S. Bureau of Reclamation ("Bureau" or "Reclamation"), the U.S. Fish and Wildlife Service ("FWS" or "Service") (collectively, "Federal Defendants"), and various Joined Defendants and Defendant

Intervenors. *See generally* ECF No. 1187. The remaining claims in the case[1] allege that the renewal, implementation, and approval of renewal and implementation of certain long-term water contracts violate the ESA and/or APA. *Id.*

Before the Court for decision are cross-motions for summary judgment on the second and fourth claims for relief in the 6SC. The fourth claim for relief alleges a 2015 Letter of Concurrence ("2015 LOC") authored by FWS was the culmination of an inadequate ESA consultation regarding the effects of certain long-term contract renewals on delta smelt ("2015 Contract Renewal Reconsultation"). 6SC at ¶¶ 189-194. Specifically, Plaintiffs challenge renewal of certain Sacramento River Settlement ("SRS") Contracts[2] and other contracts held by water users in the Delta Mendota Canal ("DMC")[3] unit of the Central Valley Project ("CVP"). The second claim for relief alleges that Reclamation acted unlawfully by accepting the 2015 LOC and implementing the long-term water supply contracts in reliance on the 2015 LOC. *Id.* at ¶¶ 176-182. The motions concerning the second and fourth claims are limited to the administrative record ("AR").[4]

---

[1] Final judgment has been entered on the first and third claims for relief. ECF No. 873. Plaintiffs have included the First Claim for Relief in the 6SC for informational purposes only. *See* ECF No. 1045 at 19. On September 28, 2018, the Court resolved related motions concerning the sixth claim for relief, which alleges that some holders of a certain type of long-term water contract, known as Sacramento River Settlement Contracts ("SRS Contracts" or "SRS Contractors" when referring to the holders), and Reclamation violated the ESA's prohibition against taking listed species because they caused substantial temperature-dependent mortality of Sacramento River winter-run Chinook salmon ("winter-run") and Central Valley spring-run Chinook salmon ("spring-run") eggs and fry in the Upper Sacramento River in 2014 and 2015. ECF No. 1269. Certain aspects of the sixth claim for relief remain to be resolved at a bench trial.

[2] The SRS Contractors that intervened or have been joined as defendants include: Carter Mutual, Meridian Farms, Natomas Central Mutual, Pelger Mutual, Pleasant Grove-Verona Mutual, and Sutter Mutual Water Companies; Anderson-Cottonwood, Glenn-Colusa, Maxwell, Princeton-Codora-Glenn, and Provident Irrigation Districts; Tisdale Irrigation and Drainage Company; Reclamation Districts 108 and 1004; Beverly Andreotti *et al.*; Christo Bardis *et al.*; Conaway Preservation Group; Howald Farms, Inc.; Oji Brothers Farm; Oji Family Partnership; Pacific Realty Associates, L.P.; Abdul and Tahmina Rauf; Henry Richter *et al.*; River Garden Farms; David and Alice te Velde Family Trust (formerly Sacramento River Ranch LLC); Windswept Land and Livestock Company; the City of Redding; and Knights Landing Investors, LLC (formerly Fred Tehhunfeld *et al.*). 6SC at 7 n.2.

[3] The DMC Contractors that intervened or have been joined as defendants include: Tranquility, West Stanislaus, Banta Carbona, Patterson, James, and West Side Irrigation Districts; the Eagle Field, Del Puerto, Fresno Slough, Mercy Springs, Oro Loma and Byron-Bethany Water Districts; and the Coehlo Family Trust. 6SC at 7 n.

[4] The AR has been submitted in pieces over time. A complete set of the entire AR applicable to the present motions has been compiled and lodged. *See* ECF Nos. 1261-62. For purposes of this Decision, the Court frequently relies on bates-stamped documents submitted by Reclamation and FWS. The Court respectively refers to these documents with the designation

## II. <u>GENERAL LEGAL FRAMEWORK</u>

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (*en banc*) ("*NRDC v. Jewell*") (citing 16 U.S.C. § 1533). FWS and the National Marine Fisheries Service ("NMFS") administer the ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11(a), 222.101(a), 223.102, 402.01(b). Section 7 of the ESA ("Section 7") requires federal agencies to ensure that their activities do not jeopardize the continued existence of listed endangered or threatened species or adversely modify those species' critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). An agency proposing to take an action (often referred to as the "action agency") must first inquire of FWS whether any threatened or endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. § 1536(c)(1). If endangered species may be present, the action agency may prepare a "biological assessment" ("BA") to determine whether such species "is likely to be affected" by the action. *Id.*; 50 C.F.R. § 402.12(b).

Section 7's implementing regulations provide that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat[s]." 50 C.F.R. § 402.14(a). "Once an agency has determined that its action 'may affect' a listed species or critical habitat, the agency must consult, either formally or informally, with the appropriate expert wildlife agency." *Karuk Tribe*, 681 F.3d at 1027 (internal citation omitted). "An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat." *Id.* (internal citation omitted). If the BA determines that a threatened or endangered species is "likely to be affected," the agency must formally consult with FWS. *See* 16

---

"BOR" and "FWS" followed by the bates number.

U.S.C. § 1536(a)(2); 50 C.F.R. 402.14. Formal consultation results in the issuance of a "biological opinion" ("BiOp") by FWS. *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action would jeopardize[5] the species or destroy or adversely modify critical habitat, *see id.* § 1536(a)(2), then the action may not go forward unless the wildlife agency can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id.* § 1536(b)(3)(A). If a BiOp concludes that the proposed action (or the action implemented in conjunction with actions described in the RPA) will incidentally take[6] protected species, but that despite this taking, the action will not jeopardize the species or threaten critical habitat, the wildlife agency

> shall provide the Federal agency and the applicant concerned, if any, with a written statement that—
>
> (i) specifies the impact of such incidental taking on the species,
>
> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
>
> (iii) . . . , and
>
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

*Id.* § 1536(b)(4). This written statement, with its "reasonable and prudent measures" ("RPM") and associated terms and conditions, is referred to as an "Incidental Take Statement" ("ITS"), which, if followed, exempts the action agency from the prohibition on takings found in ESA Section 9. *Id.* § 1536(b)(4), (o); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th

---

[5] In the context of the ESA, to "jeopardize the continued existence of" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

[6] "Take" is defined in the ESA as meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Incidental taking means any taking otherwise prohibited, if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 50 C.F.R. § 17.3.

Cir. 1999).

If the wildlife agency determines during informal consultation that the proposed action is "not likely to adversely affect any listed species or critical habitat," formal consultation is not required and the process ends. *Karuk Tribe*, 681 F.3d at 1027 (citing 50 C.F.R. § 402.14(b)(1)). "Thus, actions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." *Id*. (internal citation omitted).

## III. <u>FACTUAL AND PROCEDURAL HISTORY</u>

### A. <u>The Central Valley Project and the State Water Project</u>

The CVP and the State Water Project ("SWP"), "operated respectively by [Reclamation] and the State of California, are perhaps the two largest and most important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014) ("*San Luis v. Jewell*"). "These combined projects supply water originating in northern California to more than 20,000,000 agricultural and domestic consumers in central and southern California." *Id*. As part of CVP operations, Reclamation releases water stored in CVP reservoirs in northern California, which then flows down the Sacramento River to the Sacramento-San Joaquin Delta ("Delta"). *See id*. at 594. Pumping plants in the southern region of the Delta then divert the water to various users south of the Delta. *See id*. at 594-95.

### B. <u>Delta Smelt</u>

The delta smelt (*Hypomesus transpacificus*) is a "small, two-to-three inch species of fish endemic to the [Delta]." *Id*. at 595. In 1993, FWS concluded the delta smelt's population had declined by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA. *Determination of Threatened Status for the Delta Smelt*, 58 Fed. Reg. 12,854, 12,855-56 (Mar. 5, 1993). FWS further determined that "Delta water diversions," including those resulting from operations of the CVP and SWP, are the most significant "synergistic cause[ ]" of the decline in the delta smelt

population. *Id*. at 12,859.

**C.** **Long-Term Contract Renewal/Operations and Criteria Plan**

"In the 1960s, the Bureau entered into a number of long-term contracts pertaining to the CVP." *NRDC v. Jewell*, 749 F.3d at 780. "The [SRS] Contracts are forty-year agreements between the Bureau and holders of certain senior water rights." *Id*. "These contracts grant the Bureau some rights to the encumbered water while also providing senior rights holders a stable supply of water." *Id.* The DMC Contracts allow junior water users to draw water from the Delta-Mendota Canal. *Id*. By 2004, the DMC Contracts and the SRS Contracts had expired or were about to expire. *Id*. On June 30, 2004, the Bureau prepared an operational plan, the Operations Criteria and Plan ("OCAP"), to provide, among other things, a basis for renewing various contracts, including the DMC and SRS Contracts. *Id*.

**D.** **ESA § 7 Consultations Leading Up to Contract Renewal**

Pursuant to Section 7, the Bureau initiated consultation with FWS regarding the effect of the OCAP on the delta smelt. *Id*. at 780-81. FWS issued an initial BiOp in 2004 (the "2004 OCAP BiOp"), which concluded that the OCAP would not jeopardize the delta smelt. *Id*. at 781. The Bureau re-initiated consultation after the Ninth Circuit's decision in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir.), *amended*, 387 F.3d 968 (9th Cir. 2004), which invalidated a regulation upon which the 2004 OCAP BiOp relied. *NRDC v. Jewell*, 749 F.3d at 781. In 2005, FWS issued a revised BiOp (the "2005 OCAP BiOp"), which also concluded that the OCAP would not jeopardize the delta smelt. *Id*.

Also in 2004 and 2005, the Bureau prepared BAs that concluded renewal of the long-term Contracts would not adversely affect the delta smelt. *NRDC v. Jewell*, 749 F.3d at 781; *see also* BOR 000333, 001294. The Bureau requested additional consultation with FWS regarding its plans to renew the Contracts. *Id*.

> FWS responded via a series of letters, in which it concurred with the Bureau's determination that renewing the Contracts was not likely to adversely affect the delta smelt. Each FWS concurrence letter explained

that renewing the Contracts would increase the demand for water, but that, according to the 2004 and 2005 [OCAP] BiOps, this demand would not adversely affect the delta smelt. <u>The letters did not assess the Contracts' potential effects on the delta smelt beyond the reasoning borrowed from the now-invalidated 2004 Opinion and 2005 Opinion</u>.

*NRDC v. Jewell*, 749 F.3d at 781 (emphasis added); *see also* BOR 1 (Anderson-Cottonwood Irrigation District LOC), BOR 1660 (Natomas Central Municipal Water District LOC), BOR 1275 (DMC Contractors LOC); BOR 3340 (SRS Contractors LOC).

In 2004 and 2005, the Bureau renewed 141 SRS Contracts and 18 DMC Contracts based in part on FWS's concurrence letters. *NRDC v. Jewell*, 749 F.3d at 781.

**E.      Plaintiffs Challenge the 2004/2005 OCAP BiOp**

In February 2005, Plaintiffs initiated this lawsuit, challenging the 2004 OCAP BiOp. ECF No. 1. Subsequent amendments to the Complaint updated Plaintiffs' allegations to include challenges to the 2005 OCAP BiOp. ECF No. 403 (Second Amended Complaint ("SAC")). Among other things, the SAC alleged that the 2005 BiOp did not "adequately consider or address the effects of [the] long-term water service contracts on threatened and endangered species," *id.* ¶ 32, and that the Bureau "has taken and is taking actions that could foreclose implementation of reasonable and prudent alternatives that would avoid jeopardy, including but not limited to signing and implementing new long-term contracts promising delivery of substantially increased quantities of water, in violation of [ESA] section 7(d)." *Id.* ¶ 81. In 2007, the 2005 OCAP BiOp was set aside as unlawful. *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007). That ruling was not appealed.

**F.      Third Amended Complaint in This Case**

In June 2008, Plaintiffs filed the Third Amended Complaint ("TAC") in this case, directly challenging the sufficiency of FWS's ESA consultation undertaken in connection with the renewal of 41 SRS and DMC Contracts. *See* ECF No. 575 ¶¶ 44-47, 69, 72-73. In seeking to set aside these contracts, Plaintiffs argued that the Bureau violated § 7(a)(2) of the ESA by failing to consult adequately with the FWS prior to renewing the Contracts. *Id.* ¶ 85.

1    **G.      FWS Issues Revised Biological Opinion**

2          On December 15, 2008, FWS issued a revised BiOp (the "2008 OCAP BiOp"), which, contrary

3    to the findings of the 2004 and 2005 OCAP BiOps, concluded that the OCAP would jeopardize the delta

4    smelt and adversely modify its critical habitat. *NRDC v. Jewell*, 749 F.3d at 781. "In so doing, the 2008

5    [BiOp] explained that the Bureau's Plan must be modified from what the Bureau envisioned in 2004 and

6    2005, and the Opinion identified a 'reasonable and prudent alternative' [("RPA")] to the proposed Plan

7    that would avoid jeopardizing the delta smelt." *Id*. at 782. The 2008 OCAP BiOp's RPA identified

8    numerous actions that needed to be taken to prevent harm to delta smelt during CVP and SWP

9    operations, including limiting "negative flows" on a particular stretch of the San Joaquin River system in

10   the Delta. *San Luis v. Jewell*, 747 F.3d at 598. The exact parameters of the negative flow limitations

11   change according to the time of year (corresponding to delta smelt life stages), water temperatures,

12   and/or measurements of how many delta smelt are being "salvaged" at Project facilities. *Id*. at 598-99.

13   Another component of the RPA is designed to improve delta smelt habitat by increasing Bay-Delta

14   outflow during the fall to ensure that water of a particular salinity[7] (thought to be a proxy for delta smelt

15   presence) is located in particularly favorable regions on the Delta. *Id*. at 596, 599.

16         The 2008 OCAP BiOp also included an ITS, in which FWS presumed that its RPA would be

17   implemented. Assuming as much, FWS found that, although there would be take as a result of

18   CVP/SWP operations "smelt entrainment would be minimized when OMR flows were regulated

19   according to the FWS's proposed RPA." *Id*. at 599. FWS concluded that "this level of anticipated take is

20   not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat

21   when the RPA is implemented." *Id*.

22         The 2008 OCAP BiOp became the subject of numerous lawsuits. *See generally San Luis & Delta*

23

24   _____

25   [7] The target salinity, referred to in the record and these related cases as "X2," is represented by the point in the Delta at which the salinity is less than two parts per thousand. *San Luis v. Jewell*, 747 F.3d at 595.

8

*Mendota Water Auth. v. Salazar*, 1:09-cv-407-LJO-BAM. Plaintiffs in this matter intervened as defendants in support of the 2008 OCAP BiOp. *See id*.

**H.    District Court and Ninth Circuit Rulings on Plaintiffs' TAC**

In rulings in late 2008 and 2009 in this case, the previously assigned district judge held that Plaintiffs did not have standing to challenge renewal of the DMC Contracts and that Plaintiffs' challenge to the SRS Contracts failed as a matter of law because Federal Defendants lacked discretion to modify the SRS Contracts to benefit Plaintiffs' interests. *Nat. Res. Def. Council v. Kempthorne*, 2008 WL 5054115 (E.D. Cal. Nov. 19, 2008) ("*NRDC v. Kempthorne*"). A divided three-judge panel of the Ninth Circuit Court of Appeals affirmed. *Nat. Res. Def. Council v. Salazar*, 686 F.3d 1092 (9th Cir. 2012).

An *en banc* panel of the Ninth Circuit subsequently reversed and remanded. *NRDC v. Jewell*, 749 F.3d 776. The *en banc* decision first found that the issuance of the 2008 OCAP BiOp did not moot Plaintiffs' challenge to the Contracts:

> This action is not moot because the 2008 Opinion does not provide Plaintiffs with the relief that they seek. The 2008 Opinion concluded that the Bureau's Plan would likely jeopardize the delta smelt and adversely modify its critical habitat. In so doing, the 2008 Opinion explained that the Bureau's Plan must be modified from what the Bureau envisioned in 2004 and 2005, and the Opinion identified a "reasonable and prudent alternative" to the proposed Plan that would avoid jeopardizing the delta smelt.
>
> The remedy Plaintiffs seek is an injunction requiring reconsultation with the FWS and renegotiation of the challenged contracts based on the FWS' assessment. This relief remains available.

*Id.* at 782.

On the issue of standing related to the DMC Contracts, the previously assigned district judge held that Plaintiffs could not establish that their injury is fairly traceable to the Bureau's alleged procedural violation because: (1) the DMC Contracts contain a shortage provision that absolves the government from liability for breaches that result from complying with its legal obligations; (2) this provision permits the Bureau to take necessary actions to meet its legal obligations under the ESA;

(3) the Bureau could not have negotiated any contractual terms that better protect the delta smelt, and, therefore, any injury to the delta smelt is not traceable to the contract renewal process. *NRDC v. Kempthorne*, 2008 WL 5054115, at *11-18.

The Ninth Circuit rejected this reasoning, finding instead that "to establish standing, a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests." 749 F.3d at 783 (emphasis in original). The Ninth Circuit concluded that the consultation could have led to revisions that could have benefitted the delta smelt:

> Contrary to the district court's finding, the shortage provision does not provide the delta smelt with the greatest possible protection. Nothing about the shortage provision requires the Bureau to take actions to protect the delta smelt. The provision is permissive, and merely absolves the United States of liability if there is a water shortage resulting from, inter alia, "actions taken . . . to meet legal obligations." But even if we read the provision to place an affirmative obligation on the Bureau to take actions to benefit the delta smelt, the provision only concerns the quantity of water that will be made available to the DMC Contractors. There are various other ways in which the Bureau could have contracted to benefit the delta smelt, including, for example, revising the contracts' pricing scheme or changing the timing of water deliveries. Because adequate consultation and renegotiation could lead to such revisions, Plaintiffs have standing to assert a procedural challenge to the DMC Contracts.

*Id*. at 783-84.

With regard to the SRS Contracts, the previously assigned district judge held that, although Plaintiffs have standing to assert procedural challenges against those contracts, the Bureau was not required to consult under Section 7(a)(2) prior to renewing the SRS Contracts because the Bureau's discretion in renegotiating these contracts was "substantially constrained" in light of a line of cases, including *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007), which held that there is no duty to consult under the ESA for actions "that an agency is required by statute to undertake." *Nat. Res. Def. Council v. Kempthorne*, 621 F. Supp. 2d 954, 1000 (E.D. Cal. 2009), *decision clarified*, 627 F. Supp. 2d 1212 (E.D. Cal. 2009), *on reconsideration*, No. 1:05-CV-1207-OWW-SMS,

1    2009 WL 2424569 (E.D. Cal. Aug. 6, 2009). In holding that the Bureau was not required to consult

2    under Section 7(a)(2) prior to renewing the SRS Contracts, the previously assigned district judge

3    focused on Article 9(a) of the original SRS Contracts, which provides in pertinent part:

4            During the term of this contract and any renewal thereof it shall constitute
             full agreement as between the United States and the Contractor as to the

5            quantities of water and the allocation thereof between base supply and
             Project water which may be diverted by the Contractor from the

6            Sacramento River for beneficial use on the land shown on Exhibit B which
             said diversion, use, and allocation shall not be disturbed so long as the

7            Contractor shall fulfill all of its obligations hereunder, and the Contractor
             shall not claim any right against the United States in conflict with the

8            provisions hereof.

9    *Id*. at 979 (emphasis omitted). This provision, according to the district court, "substantially constrained"

10    the Bureau's discretion to negotiate new terms in renewing the contracts, thereby absolving the Bureau

11    of the duty to consult under *Home Builders*. *Id*.

12        The Ninth Circuit rejected this reasoning as well:

13            Section 7(a)(2)'s consultation requirement applies with full force so long
             as a federal agency retains "some discretion" to take action to benefit a

14            protected species. [citations] While the parties dispute whether Article 9(a)
             actually limits the Bureau's authority to renegotiate the Settlement

15            Contracts, it is clear that the provision does not strip the Bureau of all
             discretion to benefit the delta smelt and its critical habitat.

16

17            First, nothing in the original Settlement Contracts requires the Bureau to
             renew the Settlement Contracts. Article 2 of the original contracts

18            provides that "renewals *may* be made for successive periods not to exceed
             forty (40) years each." (emphasis added). This language is permissive and

19            does not require the Bureau to execute renewal contracts. Since the FWS
             has concluded that "Delta water diversions" are the most significant

20            "synergistic cause[ ]" of the decline in delta smelt, 58 Fed. Reg. at 12,859,
             it is at least plausible that a decision not to renew the Settlement Contracts

21            could benefit the delta smelt and their critical habitat.

22            But even assuming, *arguendo*, that the Bureau is obligated to renew the
             Settlement Contracts and that Article 9(a) limits the Bureau's discretion in

23            so doing, Article 9(a) simply constrains future negotiations with regard to
             "the quantities of water and the allocation thereof . . . ." Nothing in the

24            provision deprives the Bureau of discretion to renegotiate contractual
             terms that do not directly concern water quantity and allocation. And, as

25            [is the case] with respect to the DMC Contracts, the Bureau could benefit
             the delta smelt by renegotiating the Settlement Contracts' terms with

> regard to, *inter alia*, their pricing scheme or the timing of water distribution.
>
> For these reasons, we conclude that, in renewing the Settlement Contracts, the Bureau retained "some discretion" to act in a manner that would benefit the delta smelt. The Bureau was therefore required to engage in Section 7(a)(2) consultation prior to renewing the Settlement Contracts.

*NRDC v. Jewell*, 749 F.3d at 785. The matter was reversed and remanded for further proceedings. *Id.*

## I. Stay of this Case and Further FWS Consultation

On June 15, 2015, the Court stayed this litigation to allow Reclamation to reinitiate ESA-consultation on the contract renewals. ECF No. 979. On July 30, 2015, Reclamation requested FWS's concurrence that the impacts of these contract renewals on delta smelt were assessed in the 2008 FWS OCAP BiOp. FWS 13128 (request for reinitiation). Reclamation also included with that request a "Supplemental Information" document, dated July 2015, designed "as a supplement to" the 2004 and 2005 BA's submitted by Reclamation in connection with earlier round of contract renewal consultation. FWS 13131 ("Supplemental Information"). Incorporated within the Supplemental Information was another July 2015 document entitled "2015 Status of the Species and Status of Critical Habitat for the Delta Smelt". FWS 13175 ("2015 Smelt Status Update"). Reclamation clarified its submission to FWS on at least one occasion. *See, e.g.*, FWS 13266-68. On December 14, 2015, FWS responded by sending the 2015 LOC, concluding that "all of the possible effects to delta smelt and its critical habitat by operating the CVP to deliver water under the SRS and DMC Contracts were addressed in the [2008 OCAP BiOp]." FWS 13627.

## J. Reinitiation of Consultation on the OCAP

The Court takes judicial notice that in August 2016, Reclamation requested reinitiation of ESA consultation with both FWS and NMFS on the coordinated long-term operation of the CVP and SWP. *See* Doc. 1143, Appendix 1, Documents 78-79. The stated reasons for the reinitiation request included the existence of new information related to multiple years of drought, recent data regarding delta smelt populations, and new information available and expected as a result of ongoing work through

collaborative science processes. *Id*. The reinitated consultation is ongoing. Reclamation presently operates the CVP under the requirements of the 2008 OCAP BiOp and related RPA.

**K.** **October 20, 2016 Order**

In response to multiple motions to dismiss, the Court issued an order resolving some aspects of those motions and requesting supplemental briefing on others. *See* ECF No. 1045 (October 20, 2016 Order). Among other things, the Court found that allegations in the second claim for relief that pertain directly to Reclamation's reliance on the 2005 OCAP BiOp are moot in light of the fact that FWS issued the 2008 OCAP BiOp, which superseded and in large part rejected the 2005 OCAP BiOp. *Id*. at 19-20. While the Court found other allegations in the second claim pertaining to ongoing obligations and the 2015 consultation were not moot, the Court nevertheless concluded those remaining allegations must be dismissed for failure to comply with the ESA's 60-day notice requirement. *Id*. at 20-25.

**L.** **Stipulation to Amend to Revive Second Claim for Relief**

Subsequently, the Parties stipulated to amend the Complaint to permit Plaintiffs to re-file their second claim for relief in light of the fact that they had (after the October 20, 2016 Order) provided notice to Defendants. ECF No. 1067 (stipulation and order) & 1071 (Fifth Supplemental Complaint). This stipulation was without prejudice to Defendants' asserting additional affirmative defenses against the second claim. ECF No. 1067 at 1-2.

## IV. STANDARDS OF DECISION

**A.** **Administrative Procedure Act**

The Administrative Procedure Act's ("APA"), 5 U.S.C. §§ 701-06, standard of review applies to the ESA claims at issue in these cross motions. *San Luis v. Jewell*, 747 F.3d at 601. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be":

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\*\*\*

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and/or]

(D) without observance of procedure required by law[.]

\*\*\*

*Id.* § 706(2)(A). When assessing claims pursuant to the APA, a court, reviewing only the AR, must determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). In other words, a court's "review is guided by whether the agency's analysis is reasonable and offers sufficient detail to ensure that environmental consequences have been fairly evaluated." *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) (citations and quotation marks omitted).

A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977). Although a court's inquiry must be thorough, the standard of review is highly deferential; the agency's decision is "entitled to a presumption of regularity." *Id.* at 415.

Courts should defer to the agency on matters within the agency's expertise unless the agency completely failed to address a factor that was essential to making an informed decision. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005). A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). As the Ninth Circuit explained in *River Runners*:

> In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

*River Runners*, 593 F.3d at 1070. Reviewing courts must be at their "most deferential" when an agency makes predictions, "within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). In particular, an agency's "scientific methodology is owed substantial deference." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004), *superseded on other grounds by regulation as stated in Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1260 (9th Cir. 2017).

But "the deference accorded an agency's scientific or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001). Not only is deference not owed if "the agency has completely failed to address some factor consideration of which was essential to making an informed decision," courts are not required to defer when an agency has "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (internal citation and quotation omitted). Moreover, a court need not defer to an agency conclusion that runs counter to that of other agencies or other individuals with specialized expertise in a particular technical area. *See, e.g., Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013, 1016-17 (9th Cir. 1984) (agency decision under the Marine Mammal Protection Act was not supported by substantial evidence because agency ignored data that was product of "many years' effort by trained research personnel").

**B.**     **Summary Judgment**

Because review under the APA of Plaintiffs' second and fourth claims would be limited to the AR, a slightly modified approach to summary judgment is applied, whereby the Court determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to

make the decision it did." *Mainella*, 459 F. Supp. 2d at 90 (quoting *Occidental*, 753 F.2d at 769).

## V. DISCUSSION

As is the case with many of the major environmental/water cases before this Court, the administrative record in this case is enormous and, understandably, the parties' briefs are lengthy, with dozens of issues raised. The Court has spent many hundreds of hours attempting to address the matters raised as thoroughly as is reasonably possible.

### A. Consultation Requirement

*NRDC v. Jewell* required Reclamation to re-initiate Section 7 consultation with FWS over the impact of contract renewal on delta smelt and its habitat in light of the fact that the 2008 OCAP BiOp superseded the 2005 OCAP BiOp. 749 F.3d 776.[8] As mentioned, an agency planning to undertake a discretionary action has a duty to consult under Section 7 of the ESA for any discretionary agency action that "may affect" a listed species or designated critical habitat. *Karuk Tribe*, 681 F.3d at 1027 (internal citations omitted). The action agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat." *Id*. (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447-48 (9th Cir. 1996)). "Once an agency has determined that its action 'may affect' a listed species or critical habitat, the agency must consult, either formally or informally, with the appropriate expert wildlife agency. If the wildlife agency determines during informal consultation that the proposed action is 'not likely to adversely affect any listed species or critical habitat,' formal consultation is not required and the process ends." *Id*. (citing 50 C.F.R. § 402.14(b)(1)).

It is undisputed that Reclamation pursued informal (rather than formal) consultation in connection with the renewal of the DMC and SRS Contracts, both initially and upon reconsultation in

---

[8] Although *NRDC v. Jewell* only directly so held as to the SRS Contracts, 749 F.3d at 784-85, the obvious implication of the entire *NRDC v. Jewell* decision was that re-consultation was required as to the DMC Contracts as well.

1  2015, the latter of which resulted in the 2015 LOC. Informal consultation is an optional process

2  designed to determine whether an action is likely to adversely affect listed species or critical habitat. 50

3  C.F.R. § 402.13(a). Practically, an action agency may prepare a BA to analyze the possible effects of the

4  proposed action on listed species and designated critical habitat. 50 C.F.R. § 402.12; 16 U.S.C. § 1536

5  (a)(2). In an informal consultation, the action agency may request concurrence from the consulting

6  wildlife agency (FWS or NMFS) that there is no likelihood of jeopardy. *Id*. § 402.13. The consulting

7  agency then reviews the action proposed by the action agency. *See id*. §§ 402.12(j), 402.13(a),

8  402.14(g). If the consulting agency concurs that the proposed action is not likely to jeopardize species,

9  the informal consultation concludes. 50 C.F.R. §§ 402.12(k), 402.13.

10  Informal consultation under 50 C.F.R. § 402.13 does not require a specific form. *See* 51 Fed.

11  Reg. 19,926, 19,948 (June 3, 1996) (declining to "specify uniform levels of contact" or require notices

12  of initiation and/or termination). However, an informal consultation must meet the ESA's statutory

13  requirements, including considering the full scope of the action and relying on the best scientific data

14  available. *See Conservation Cong. v. Finley*, 774 F.3d 611, 615, 619-21 (9th Cir. 2014) (requiring

15  informal consultation to comply with ESA's substantive requirements for consideration of best available

16  science); *Pres. Our Island v. U.S. Army Corps of Engineers*, No. C08-1353RSM, 2009 WL 2511953, at

17  *10 (W.D. Wash. Aug. 13, 2009) (requiring informal consultation to consider full scope of impacts).

18  **B.**     **Consultation Structure in this Case**

19  As many of the issues presented in these motions turn, at least in part, on the structure of the

20  consultation in this case, some historical context on the consultation structure is helpful. The starting

21  point for background purposes is the passage in 1992 of the Central Valley Project Improvement Act

22  ("CVPIA"), which made significant changes to Reclamation's authority to administer and operate the

23  CVP. Title XXXIV, Pub. L. No. 102-575, § 3401 *et seq*., 106 Stat. 4700 (1992).[9] Among the many

24

25

___

[9] The entire text of the CVPIA is available at: https://www.usbr.gov/mp/cvpia/docs/public-law-102-575.pdf (last visited

actions and programs set forth therein, the CVPIA directed Reclamation to renew hundreds of CVP water service contracts. CVPIA § 3404(c) ("Secretary shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the [CVP]. . .").

Eventually, after developing programs to implement the CVPIA, Reclamation engaged in a programmatic Section 7 consultation with FWS on implementation of the CVPIA. As a result of that consultation, FWS issued in November 2000 its "Biological Opinion on Implementation of the CVPIA and Continued Operation and Maintenance of the CVP" ("CVPIA BiOp"). FWS 12002. The CVPIA BiOp indicates that "[a]ll existing, new, and renewed contracts will be administered in conformance with the requirements and goals of the CVPIA and related ESA consultations." FWS 12045; *see also* FWS 12046 ("Contracting Officer shall make CVP water available for delivery to the Contractor up to a maximum specified quantity in each year, consistent . . . with limitations imposed by existing biological opinions (e.g., OCAP and Los Vaqueros)."); FWS 12060 ("The operation of the CVP including associated deliveries to CVP contractors will be in compliance with the existing OCAP Biological Opinion or any subsequent revisions. . . ."). More specifically, in reviewing the various elements of CVPIA implementation, the CVPIA BiOp noted numerous times that impacts of many CVPIA elements on delta smelt were evaluated in the then-operative 1995 OCAP BiOp. FWS 12031 (indicating impacts on delta smelt of Contra Costa Canal Pumping Plant Mitigation discussed in 1995 OCAP BiOp); FWS 12051 (indicating impacts of water transfers on delta smelt discussed in 1995 OCAP BiOp); FWS 12060 (indicating impacts to delta smelt of various other aspects of reservoir operations discussed in 1995 OCAP BiOp).

Against this backdrop, the CVPIA BiOp set out a roadmap for ESA consultations related to CVPIA actions and programs, including water service contract renewals, explaining:

> This consultation is intended to address, in a comprehensive manner, the numerous and widely varied actions related to implementation of the

February 15, 2019).

18

> CVPIA . . . . [T]his biological opinion addresses the effects upon listed
> species resulting from implementation of this suite of actions as a whole,
> and provides a strategy, or process, to determine how ESA compliance
> will be accomplished for individual activities that cumulatively make up
> the program.

FWS 12006-07. The CVPIA BiOp provided "examples of possible consultation processes associated with these site-specific contract renewal actions," which included informal consultations:

> [f]or some districts, contract consultation could be conducted *informally*.
> For example, water districts at full build out, that have well-established
> district boundaries, that *may affect* listed species, and are in compliance
> with other applicable biological opinions (including transfer opinions),
> could possibly fall into this category.

FWS 12044 (emphasis in original).

Thus, the CVPIA outlined a two-track process whereby the operative OCAP BiOp would address aquatic impacts of overall CVP and SWP operations on delta smelt, with the CVPIA BiOp then serving as a programmatic[10] document for other contract-related impact analyses. These later contract-related analyses, possibly to include informal consultations, would then "tier"[11] off of the CVPIA BiOp

As discussed above, prior to contract renewal, Reclamation prepared separate BAs for the SRS and DMC Contract renewals. FWS 12798-955 (2003 SRS Renewal BA); FWS 12257-578 (2001 Draft DMC Renewal BA).

The 2003 SRS Contract Renewal BA contained extensive information on the geography, species, and habitat within the SRS Contractors' respective service areas, FWS12840-61, FWS12912-26, as well as information on the background of the SRS Contracts and an analysis of their terms. FWS12864-94. The 2001 Draft DMC Contract BA[12] covers similar topics, FWS 12257-578, including a review of the

---

[10] Nothing in the record indicates that the operative OCAP BiOp was meant to be "programmatic" vis-à-vis the various contract-related ESA analyses that would follow or tier off of the CVPIA BiOp.

[11] Tiering is another term of art that refers to the practice of evaluating projects at different levels of generality, sometimes involving the generation of a "programmatic" review at a large scale, followed by "project level" reviews. *See, e.g., Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1040 (9th Cir. 2015).

[12] The Court does not know why the DMC Contract BA in the record is marked as a "draft."

DMC Renewal Contracts' terms. FWS 12355-66. Reclamation's BAs focused on localized and regional impacts to the physical environment and listed species, deferring analysis of the impacts of delivery of water to the separate OCAP consultation process. *See* BOR 183 (2003 SRS Renewal BA indicating that OCAP consultation will evaluate "the long-term effects that could result from operating the CVP and SWP to deliver CVP water to the points of diversion of the Settlement Contractors in combination with other operational and regulatory requirements'); FWS 12277 (2001 Draft DMC Renewal BA indicating that any consultation for DMC long-term contract renewals "will be tiered from the Biological Opinion on Implementation of the CVPIA and Continued Operation and Maintenance of the CVP").

In 2005, FWS then provided LOCs for the SRS and DMC Contracts. *See, e.g.*, FWS 12958-95 (2005 SRS LOC); BOR 1275 (2005 DMC LOC). The 2005 LOC for the SRS Contracts explained the relationship between the contract renewal consultations and the OCAP consultation:

> The OCAP consultation analyzed the effects of numerous new actions on the delta smelt and its designated critical habitat, including storage of CVP and SWP water in reservoirs, water releases from reservoirs, river operations, operation of the Federal/State diversion facilities, and the CVP/SWP export-pumping operations in and through the Delta. The OCAP consultation addressed the operation of the CVP/SWP in the Sacramento Valley, and included all commitments of the SWP and CVP, such as meeting requirements of the CVPIA PBO (USFWS 2000), the obligations contained in the Central Valley Water Quality Control Board water right permits, obligations of CVP water service contracts, Sacramento River Settlement contracts, San Joaquin exchange contracts, and other requirements. <u>Therefore, the OCAP BO addressed all the aquatic effects of operating the CVP/SWP.</u>

> In contrast, the Service's consultations on the long-term water-service contract renewals and Settlement contract renewals are addressing the diversion of Sacramento River water at prescribed diversion points and times for the use of that water on a specified land area (the contractors' service area). All renewal contracts, while identifying a full contract amount, recognize that the delivery of full contract amount is subject to availability of water and other obligations of the CVP (such as CVPIA and biological ESA consultation requirements). In other words, the contracts create a demand (among other demands) for CVP water and the OCAP consultation addresses how the CVPISWP projects are operated to meet those demands. There clearly is a linkage between contract renewals and the operation of the CVP/SWP. These linkages must, and are being, addressed in separate but parallel consultations such that all possible

effects on listed species are being identified and consulted on [record citation].

FWS 12763 (emphasis added).

The 2005 SRS LOC also evaluated background information on the SRS Contractors, their service areas and diversion facilities, related consultations, water use and conservation, transfers, terrestrial and riparian species (e.g., giant garter snake, vernal pool plant and invertebrate species, valley elderberry longhorn beetle), and impacts of the contract renewal on those species. *See generally* FWS 12958-995. Certain key aspects of the SRS Contracts' terms were also discussed, including the shortage provisions, pricing provisions, and water conservation terms. FWS 12971-73. As to the delta smelt, 2005 SRS LOC indicated:

> On February 15, 2005, the Service issued [a] biological opinion [], which addressed the effects of delivering CVP water for renewed long-term water contracts and other actions on delta smelt and its critical habitat; the OCAP consultation analysis is incorporated by reference into this Settlement Contract renewal consultation. The OCAP consultation analyzed the effects of numerous new actions on the delta smelt and its designated critical habitat, including storage of CVP and SWP water in reservoirs, water releases from reservoirs, river operations, operation of the Federal/State diversion facilities, and the CVPIS WP export-pumping operations in the Delta.

FWS 12989-90 (emphasis added). The 2005 SRS LOC contained no other analysis of the impact of SRS Contract renewal on delta smelt.

The 2005 DMC LOC likewise explained the relationship between the contract renewal consultations and the OCAP consultation, concluding that the OCAP BiOp "addressed all the aquatic effects of operating the CVP/SWP." FWS 12585; *see also* FWS 12586 (OCAP biological opinion "is hereby incorporated by reference because it analyzed effects of the action addressed in this consultation, and the findings of this consultation cannot be made independently of the analysis and findings of the OCAP biological opinion. The OCAP analysis of effects to delta smelt and its critical habitat also must be made a part of the analysis of the total effects of the long term contract renewals.").

After the Ninth Circuit's decision in *NRDC v. Jewell*, Reclamation reinitiated consultation on the SRS and DMC Contract renewals. The 2015 LOC summarized the request as follows:

> Reclamation reinitiated consultation "on the effects of renewing [the DMC and SRS] contracts" on delta smelt (not any other species), consistent with the procedural findings by the Ninth Circuit. Reclamation is not proposing any different contract terms for the SRS and DMC contracts, or any change in operations to deliver water under the SRS and DMC contracts. The effects of full water deliveries under the renewed SRS and DMC contracts were analyzed by [FWS] as part of the proposed action in the 2008 [OCAP] BiOp. That BiOp superseded the 2005 OCAP BiOp, but the [2005] concurrence memoranda [related to contract renewal] still refer to the 2005 OCAP BiOp []. Reclamation requests that the Service issue amended concurrence memoranda to clarify that water deliveries under the SRS and DMC contracts were addressed in the 2008 [OCAP] BiOp as opposed to the 2005 OCAP BiOp [].

FWS 13721 (emphasis added). As mentioned, along with its request for reconsultation, Reclamation included its 2015 "Supplemental Information" document, designed "as a supplement to" the 2004 and 2005 BAs submitted by Reclamation in connection with earlier round of contract renewal consultation, FWS 13131, which in turn incorporated the 2015 Smelt Status Update. FWS 13175.

In the 2015 LOC (which covered in a single document renewal of both the SRS and DMC Contracts), FWS addressed the narrow request emphasized above in the following, somewhat confusing, paragraph:

> We are concerned about the continued decline of delta smelt as demonstrated by the historically low numbers in all recent survey efforts. Reclamation had identified Article 7(b) [13] of the SRS contracts as one that "may affect the availability of water under the SRS contracts" by requiring compliance with biological opinions prepared as a result of consultation regarding the execution of the SRS contracts. *See* Supplemental Information to the Sacramento River Settlement Contractors Biological Assessment, Long-term Contract Renewal; and Supplemental Information to the Long Term Renewal of Water Service Contracts in the Delta Mendota Canal Unit (July 2015). The DMC Contracts contain a similar provision. As articulated in Reclamation's letter dated December 11, 2015, we understand the 2008 [OCAP] BiOp is the result of a consultation

---

[13] Article 7(b) provides that the SRS Contractors must "comply with requirements applicable to the Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of [the Contractor's respective SRS] Contract pursuant to Section 7 . . . that are within the Contractor's legal authority to implement." Glenn-Colusa Irr. Dist. Contract, art. 7(b), BOR 2709.

> regarding the execution of the SRS and DMC contracts and any
> subsequent reinitiation of consultation on the coordinated operations of the
> CVP and SWP, which are subject to the 2008 [OCAP] BiOp, or the SRS
> and DMC contract renewals would also be one "regarding the execution of
> the contract" and would, therefore, be subject to the terms of Article 7(b).
> In future consultations to ensure adequate protection of delta smelt and its
> critical habitat under the Act, we may require greater certainty as to
> Reclamation's ability to provide needed outflow through the Delta. If
> increased outflows are needed and cannot be met under the SRS contracts,
> those contracts may need to be revisited to ensure consistency with the
> Act.

FWS 13721. Although the above language approaches the answer to Reclamation's question obliquely, it does answer the question in the affirmative: the 2008 OCAP BiOp addresses the impacts of water deliveries under the DMC and SRS Contracts. In addition, the 2015 LOC states that one effect of the 2015 LOC was to (i) replace all references to the 2004 and 2005 OCAP BiOps in the SRS and DMC Consultations; and (ii) amend the 2005 LOCs to reference the 2008 OCAP BiOp. FWS 13721.

## C.   Fourth Cause of Action: Challenge to FWS's 2015 Consultation

Plaintiffs' fourth claim for relief alleges that FWS violated the APA by failing to conduct an adequate reinitiated consultation on the effects of the SRS and DMC Contract renewals on delta smelt. 6SC ¶¶ 189-94. Plaintiffs disclaim that they are challenging the structure of the informal consultation conducted in 2015. ECF No. 1247 at 8 n.9. Rather, they claim that despite incorporating the revised 2008 OCAP BiOp for purposes of assessing impacts to delta smelt, the consultation is nonetheless insufficient. *Id.* ("While BOR and FWS may lawfully decide to tier the analysis of the contract renewals' impacts at either the programmatic level or a later project-level consultation, they must conduct that analysis *somewhere*.") (emphasis in original).

### 1.   Threshold Issues

The papers raise several threshold issues that must be resolved before assessing Plaintiffs' fourth cause of action.

#### a.   Continued Viability of the 2005 Contract Consultations

The parties appear to dispute the continued viability of the portions of the 2005 consultation

record that did not involve incorporation of the 2005 OCAP BiOp. As mentioned above and as the Ninth Circuit explained in *NRDC v. Jewell*, in 2004 and 2005, Reclamation prepared BAs that "concluded that renewal of the Contracts would not adversely affect the delta smelt." *NRDC v. Jewell*, 749 F.3d at 781.

> The Bureau also requested additional consultation with the FWS regarding its plans to renew the Contracts. The FWS responded via a series of letters, in which it concurred with the Bureau's determination that renewing the Contracts was not likely to adversely affect the delta smelt. Each FWS concurrence letter explained that renewing the Contracts would increase the demand for water, but that, according to the 2004 Opinion and the 2005 Opinion, this demand would not adversely affect the delta smelt. The letters did not assess the Contracts' potential effects on the delta smelt beyond the reasoning borrowed from the invalidated 2004 Opinion and 2005 Opinion.

*Id*. Plaintiffs argue that the above language from *NRDC v. Jewell* "leave[s] no room for Defendants' arguments that the 2005 [LOCs] remain valid or that pre-2005 consultations adequately assessed the effects of renewing the contracts." ECF No. 1247 at 3. Plaintiffs are correct that *NRDC v. Jewell* has consequences for the treatment of the 2005 contract consultations. *NRDC v. Jewell* confirms that to the extent the 2005 contract LOCs rely on the 2004 and 2005 OCAP BiOps, the contract consultations must be treated as invalid because the 2004 and 2005 OCAP BiOps were superseded by the 2008 OCAP BiOp. Although *NRDC v. Jewell* also held that the 2005 LOCs "did not assess the Contracts' potential effects on the delta smelt beyond the reasoning borrowed from the invalidated 2004 Opinion and 2005 Opinion," this does not mean that the Court must turn a blind eye to the entire content of the 2005 contract consultation. Upon re-consultation in 2015, the agencies did not completely abandon the 2005 consultation. As mentioned above, the 2015 LOC instead amended the 2005 consultation to replace any reference to the 2005 OCAP BiOp with the 2008 OCAP BiOp. FWS 13721. To the extent any analysis in the 2005 contract consultation did not rely on the now-invalidated 2005 OCAP BiOp, that information could still serve to support the conclusions of the 2015 LOC.

Relatedly, Defendants appear to assert that Plaintiffs must simply accept that such material is valid because any challenge to the 2005 contract consultation is now moot in light of the issuance of the

2008 OCAP BiOp. ECF No. 1045 at 20. While it is true that any challenge to the 2005 LOCs' reliance on the 2005 OCAP BiOp is moot, that does not extend to other aspects of the 2005 LOCs to the extent Defendants rely on other aspects of the 2005 LOCs to support the conclusions contained within the 2015 LOC. Defendants cannot have it both ways.

        **b.**    **Consequences of _NRDC v. Jewell_ for the 2015 LOC's Reliance on the 2008 OCAP BiOp**

As mentioned, the 2015 LOC concluded that the 2008 OCAP BiOp "is the result of a consultation regarding the execution of the SRS and DMC contracts." FWS 13721. Plaintiffs argue that this conclusion is precluded by _NRDC v. Jewell_. In support of this proposition, Plaintiffs rely principally on the following discussion of mootness in _NRDC v. Jewell_:

> This action is not moot because the 2008 Opinion does not provide Plaintiffs with the relief that they seek. The 2008 Opinion concluded that the Bureau's Plan would likely jeopardize the delta smelt and adversely modify its critical habitat. In so doing, the 2008 Opinion explained that the Bureau's Plan must be modified from what the Bureau envisioned in 2004 and 2005, and the Opinion identified a "reasonable and prudent alternative" to the proposed Plan that would avoid jeopardizing the delta smelt.
>
> The issuance of the 2008 Opinion does not moot this appeal. <u>The 2008 Opinion merely assesses the general effects of the Bureau's Plan, and it does not represent a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts before us. Although the DMC Contracts and Settlement Contracts were renewed based on now-invalidated opinions, the Bureau has never reconsulted with the FWS regarding the effects of renewing these contracts, nor has it sought to amend the challenged contracts to incorporate the protections proposed in the 2008 Opinion.</u> The remedy Plaintiffs seek is an injunction requiring reconsultation with the FWS and renegotiation of the challenged contracts based on the FWS' assessment. This relief remains available.

_NRDC v. Jewell_, 749 F.3d at 782. Citing _NRDC v. Jewell_, Plaintiffs argue that "[t]he Ninth Circuit, sitting _en banc_, already heard and rejected [Reclamation's] contention that the 2008 [] OCAP BiOp, which only evaluated the effects of system-wide aggregated water operations, adequately addressed the SRS and DMC contracts' effects on delta smelt." ECF No. 1184 at 12 (internal record citation omitted); _see also_ ECF No. 1247 at 5. This is a subtle argument, the core of which is Plaintiffs' reference to the

law of the case doctrine, *see id*., under which "a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *United States v. Jingles,* 702 F.3d 494, 499-500 (9th Cir. 2012) (quotations omitted). The doctrine applies where the issue in question was decided either "explicitly" or "by necessary implication" in the previous disposition." *Id*. at 500. Plaintiffs argue that the Ninth Circuit could not have rejected Defendants' mootness argument without affirmatively finding that: (1) the "DMC Contracts and Settlement Contracts were renewed based on now-invalidated opinions"; and (2) that Reclamation "never reconsulted with [] FWS regarding the effects of renewing those contracts." *NRDC v. Jewell*, 749 F.3d at 782. At the time *NRDC v. Jewell* was decided, these points were indisputably true, as Reclamation had not yet explicitly sought FWS's concurrence on the impact of the issuance of the 2008 OCAP BiOp. But that, standing alone, does not preclude as a matter of law or fact the possibility that the 2015 LOC, issued post- *NRDC v. Jewell*, represents the culmination of a proper, lawful ESA consultation. Plaintiffs suggest that *NRDC v. Jewell* stands for the proposition that "the 2008 BiOp did not consider 'the impact of the Bureau's decision to renew the specific contracts.'" ECF No. 1247 at 5 (citing *NRDC v. Jewell l*, 749 F.3d at 782). But, *NRDC v. Jewell* does not address (at least not in a dispositive manner) whether the 2008 OCAP BiOp "considered" the impact of contract renewal. Rather, *NRDC v. Jewell* held that the 2008 OCAP BiOp "does not <u>represent</u> a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts before us." 749 F.3d at 782 (emphasis added). There is a subtle but important difference between what the Ninth Circuit actually said and what Plaintiffs contend. Critically, *NRDC v. Jewell* leaves open the possibility that a future (post-*NRDC v. Jewell*) consultation could rely upon the 2008 OCAP BiOp to evaluate the impact of contract renewal on delta smelt. *NRDC v. Jewell* simply holds that as of the date of that decision, no such consultation had taken place. The Court interprets this finding in *NRDC v. Jewell* as a conclusion that, as of the date of the decision in *NRDC v. Jewell*, Reclamation and FWS had not *yet* <u>re-consulted</u> on SRS and DMC contract renewal in light of the 2008 OCAP BiOp. That re-consultation was the entire purpose of the stay this Court

1  permitted in 2015. Whether the informal re-consultation that resulted was otherwise lawful is a separate

2  question addressed below.

3          c.    **Plaintiffs' Characterization of the 2008 OCAP BiOp as "Programmatic"**

4          Plaintiffs concede that the structure of the re-consultation is permissible, ECF No. 1247 at 8 n.9,

5  but nonetheless maintain that the 2015 LOC is insufficient because it relies on the "programmatic" 2008

6  OCAP BiOp, which in turn did not consider the impacts of the specific project under consultation. *Id*. at

7  5, 8. Federal Defendants rejoin that Plaintiffs mischaracterize the relationship between the 2008 OCAP

8  BiOp and the 2015 LOC. According to Federal Defendants, the 2008 OCAP BiOp is not a traditional

9  "programmatic consultation" in which broad, program-level actions/policies are evaluated, leaving

10  analysis of project specific actions for later consultation. Federal Defendants argue that the consultation

11  that resulted in the 2008 OCAP BiOp was not "programmatic"; rather, it just happened to concern a very

12  broad project, namely "the coordinated operations of the SWP and CVP." ECF No. 1252 at 4-5. The

13  Court agrees. The 2008 OCAP BiOp considered an extraordinarily broad range of actions, including

14  delivery of water under the contracts. FWS 13882-14001. The 2015 LOC reviewed the 2008 OCAP

15  BiOp and found it considered all operations necessary to make full deliveries under the DMC and SRS

16  Contracts. FWS 13720 (explaining that the 2008 OCAP BiOp addressed delivery of the full contract

17  amounts of water under the SRS and DMC Contracts). With respect to <u>deliveries under the contracts in</u>

18  <u>question</u>, nothing was left over for later project-level review. The 2015 LOC simply incorporated by

19  reference the analysis in the 2008 OCAP BiOp.

20          Even if the 2008 OCAP BiOp could be characterized as a traditional programmatic consultation,

21  agencies may tier ESA analyses to the extent additional analysis would merely duplicate the

22  programmatic opinion. *See Native Ecosystems v. Krueger*, 63 F. Supp. 3d 1246, 1253 (D. Mont. 2014)

23  (remanding for further proceedings where programmatic BiOp specifically required site-specific BiOps

24  in circumstances presented in that case); *see also Swan View Coal. v. Weber*, 52 F. Supp. 3d 1133, 1155

25  (D. Mont.), *on reconsideration in part*, 52 F. Supp. 3d 1160 (D. Mont. 2014) (approving of project-

specific BiOp that supplemented programmatic environmental analysis because it, considered in conjunction with site-specific information and analysis contained within action agency's amended BA, considered sufficiently all issues).

Plaintiffs point to this Court's April 22, 2016 Order to support their present position on the insufficiency of the 2015 Contract Renewal Reconsultation. *See* ECF No. 1247 at 5-6. In the April 22, 2016 Order, the Court addressed Plaintiffs' separate claim that Reclamation was required to re-initiate consultation on the SRS Contracts because NMFS issued its own revised BiOp in 2009 concerning other listed aquatic species under NMFS jurisdiction. *See* ECF No. 1018 at 19-21. In the context of analyzing whether to permit Plaintiffs to supplement their Complaint, this Court evaluated Defendants' argument that the NMFS BiOp-triggered reinitiation claim was mooted by the fact that NMFS had reinitiated consultation on its 2009 BiOp in light of events related to a loss of temperature control in the upper Sacramento River in 2014 and 2015. *Id*. at 21. Citing *NRDC v. Jewell*, the Court noted that "[a]s the Ninth Circuit has made abundantly clear, system wide consultation . . . does not obviate the need for contract-specific consultation." *Id*. But, this again simply means that consultation specific to contract renewal must take place; it does not mean that the contract-specific renewal consultation cannot rely on a system-wide consultation document if the expert agency reasonably concludes that the system-wide consultation document contains relevant analyses.

The Court agrees with Defendants that because the 2008 OCAP BiOp analyzed the impacts to delta smelt of making full contract deliveries, FWS reasonably relied on that document to evaluate the effects of full contract deliveries in the context of SRS and DMC contract renewal.

### d.  <u>Consultation Does Not Require Evaluation of Alternatives</u>

Another threshold issue is raised in the briefs. Plaintiffs suggest the 2015 reinitated consultation on the SRS and DMC Contract renewal is legally inadequate because the agencies "never considered whether renewal of the contracts on different terms could inure to the benefit of the smelt and its habit." ECF No. 1247 at 6. Plaintiffs suggest this is "the very inquiry necessary to enable adequate consultation

28

on the contract renewals." *Id.* (citing *NRDC v. Jewell*, 749 F.3d at 783-85). Plaintiffs reference language in *NRDC v. Jewell*'s standing analysis. As mentioned, on the issue of Plaintiffs' standing related to the DMC Contracts, the previously assigned district judge held that Plaintiffs could not establish that their injury is fairly traceable to Reclamation's alleged procedural violation because: (1) the DMC Contracts contain a shortage provision that absolves the government from liability for breaches that result from complying with its legal obligations; (2) this provision permits the Bureau to take necessary actions to meet its legal obligations under the ESA, so (3) the Bureau could not have negotiated any contractual terms that better protect the delta smelt, and, therefore, any injury to the delta smelt is not traceable to the contract renewal process. *NRDC v. Kempthorne*, 2008 WL 5054115, at *11-18.

The Ninth Circuit rejected this reasoning, finding instead that "to establish standing, a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests." *NRDC v. Jewell*, 749 F.3d at 783 (emphasis in original). The Ninth Circuit concluded that the consultation could have led to revisions that could have benefitted the delta smelt:

> Contrary to the district court's finding, the shortage provision does not provide the delta smelt with the greatest possible protection. Nothing about the shortage provision requires the Bureau to take actions to protect the delta smelt. The provision is permissive, and merely absolves the United States of liability if there is a water shortage resulting from, inter alia, "actions taken ... to meet legal obligations." But even if we read the provision to place an affirmative obligation on the Bureau to take actions to benefit the delta smelt, the provision only concerns the quantity of water that will be made available to the DMC Contractors. There are various other ways in which the Bureau could have contracted to benefit the delta smelt, including, for example, revising the contracts' pricing scheme or changing the timing of water deliveries. Because adequate consultation and renegotiation could lead to such revisions, Plaintiffs have standing to assert a procedural challenge to the DMC Contracts.

*NRDC v. Jewell*, 749 F.3d at 783-84.

Plaintiffs attempt to argue this standing analysis into something it is not. While the Ninth Circuit concluded that Plaintiffs had <u>standing to challenge</u> DMC Contract renewal because Reclamation <u>could</u>

29

have, at least theoretically, elected to make changes to those contracts during the renewal process, nothing in *NRDC v. Jewell* (or any other authority of which the Court is aware) <u>required</u> Reclamation to make changes to those contracts (or even to consider doing so). As Federal Defendants correctly point out, the Ninth Circuit never ordered Reclamation to renegotiate the contracts. *See* ECF No. 1252 at 3 n.2.

Plaintiffs also raise a related, somewhat more subtle issue. They complain that neither the 2008 OCAP BiOp nor the 2015 LOC indicate which contract terms need to be modified in order to implement the 2008 BiOp's RPA. ECF No. 1247 at 9. In evaluating this argument, it is important to keep in mind that FWS's role in the consultation process is to give its opinion on the impact of a project as proposed. *See Def. of Wildlife v. FWS*, No. 16-CV-01993-LHK, 2016 WL 4382604 at *18 (N.D. Cal. Aug 17, 2016) ("[FWS] can evaluate only the Federal action proposed, not the action as [FWS] would like to see that action modified") (citing FWS & NMFS, *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities under Section 7 of the Endangered Species Act* (1998) at 4-33). FWS's task under ESA Section 7 is to provide an opinion as to whether "any action authorized, funded, or carried out" by an agency is likely to jeopardize the continued existence of the species at issue. 16 U.S.C. § 1536(a)(2). In formal consultation, like the 2008 OCAP BiOp consultation, FWS is to "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat," and "[f]ormulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(3), (4). FWS "is instructed only to determine 'whether *the action*, taken together with cumulative effects, is likely to jeopardize' endangered species." *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 77 (D.D.C. 2013) (quoting 50 C.F.R. § 402.14(g)(4) (emphasis in original); *see also Forest Conservation Council v. Espy*, 835 F. Supp. 1202, 1217 (D. Idaho 1993) ("Nor is [the consulting agency] required to develop and evaluate alternatives to the action proposed by the [action agency]; it must simply evaluate the effects of

the proposed action . . ."); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, No. 97-CV- 775, 1998 WL 1988556, at *10 (W.D. Wash. May 29, 1998) ("Under the ESA, [the consulting agency] must analyze the action *as proposed* by the proponent agencies.") (emphasis in original). FWS may propose modifications to the agency action, 50 C.F.R. § 402.13, but nothing requires the action agency to adopt any such modifications.

As discussed above, the 2008 OCAP BiOp concluded that the coordinated operations of the CVP and SWP would, as proposed, jeopardize delta smelt and adversely modify its critical habitat, but proposed RPA actions "that would allow the projects to continue operation without causing jeopardy to the species or adverse modification to its critical habitat." *San Luis v. Jewell*, 747 F.3d at 596. FWS does not need to explain why one approach to avoiding jeopardy is better than another, or pick an approach that may more effectively protect a species. *Id*. at 624. FWS concluded (a conclusion Plaintiffs supported at the time) that the RPA would allow the action to continue while avoiding jeopardy. The action under review in the 2008 OCAP BiOp included full delivery under the DMC and SRS Contracts. Critically, once FWS renders its opinion, Reclamation, as the action agency, determines whether and in what manner it shall proceed with the action in light of that opinion and notifies FWS of its final decision. 50 C.F.R. § 402.15(a)-(b); *see also id.* § 402.14(g)-(h). "[U]nder the ESA, [the action agency is] not required to pick the first reasonable alternative the FWS came up with in formulating the RPA. The [action agency is] not even required to pick the best alternative or the one that would most effectively protect the [species] from jeopardy." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522-23 (9th Cir. 1998). "The [action agency] need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the agency." *Id*. Additionally, the action agency "was not required to explain why he chose one RPA over another, or to justify his decision based solely on apolitical factors." *Id*.

In its most compelling iteration, Plaintiffs' argument is that FWS has failed to evaluate whether the renewed contract terms are compatible with the adjustments to operations required by the 2008

OCAP BiOp's RPA. ECF No. 1247 at 7. Plaintiffs point out, correctly, that the RPA actions require adjustments to project operations to reduce smelt entrainment, FWS 14143-46, such as by limiting exports from the delta during certain times of the year, FWS 14143-45. The implication of this argument is that FWS acted unlawfully by failing to evaluate whether the terms of the DMC and SRS Contracts will permit Reclamation to make the necessary modifications to the timing and quantity of water required by the RPAs. This argument has some facial appeal. How, despite having found that the coordinated operation of the CVP and SWP (the action under review in the 2008 OCAP BiOP) will cause jeopardy and/or adverse modification, can FWS lawfully conclude that the 2008 OCAP BiOp RPA will avoid that jeopardy/adverse modification without evaluating whether the contracts that drive much of CVP and SWP operational demand are compatible with implementation of the RPA? Relatedly, if the 2008 OCAP BiOp does not consider how contract implementation is compatible with the RPA, how can FWS rely on the 2008 OCAP BiOp in this consultation?

Despite this facial appeal, Plaintiffs' argument falls short for several reasons. First, the record plainly does not support Plaintiffs' argument as applied to the DMC Contracts. Reclamation's 2015 Supplemental Information document (which updates the 2005 BAs) concludes in no uncertain terms that the existing DMC Contracts contain shortage provisions that allow Reclamation to reduce deliveries to comply with legal obligations, including the 2008 OCAP BiOp's RPA. FWS 13145. As a result, there is no way that the DMC Contracts could be incompatible with implementation of the 2008 OCAP BiOp RPA. *Id.* The record plainly and rationally supports this conclusion, and Plaintiffs present no evidence to the contrary.

The Supplemental Information document does not contain such a clear statement as to the SRS Contracts, likely because Reclamation's capacity to impose shortages upon the SRS Contractors is far more limited. *See* FWS 13154 (explaining that the SRS Contracts specify a 25% reduction in deliveries in "Critical Years"). Nonetheless, Plaintiffs' suggestion that any of the contracts in dispute are incompatible with implementation of the RPA is seriously undermined by prior Ninth Circuit rulings in

related cases. In *San Luis v. Jewell*, 747 F.3d 581, the Ninth Circuit reviewed in great detail numerous challenges to the 2008 OCAP BiOp. One such challenge involved a regulation that defined RPAs as:

> alternative actions identified during formal consultation [1] that can be implemented in a manner consistent with the intended purpose of the action, [2] that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, [3] that is economically and technologically feasible, and [4] that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.02. The first three factors are sometimes referred to as the "non-jeopardy" factors. The plaintiffs in *San Luis v. Jewell* (some of the Defendants here) insisted that the ESA required explicit analysis of each of the four factors in § 402.02. *San Luis & Delta-Mendota Water Auth. v. Salazar*, 760 F. Supp. 2d 855, 949 (E.D. Cal. 2010), *aff'd in part, rev'd in part sub nom. San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014). The district court concluded that FWS had failed to perform a sufficient analysis because the agency had "articulated absolutely no connection between the facts in the record and the required conclusion that the RPA is (1) consistent with the purpose of the underlying action; (2) consistent with the action agency's authority; and (3) economically and technologically feasible." *Id*. at 955-56. The district court continued:

> the APA requires, and the public is entitled under the law to receive, some exposition in the record of why the agency concluded (if it did so at all) that all four regulatory requirements for a valid RPA were satisfied. The RPA Actions manifestly interdict the water supply for domestic human consumption and agricultural use for over twenty million people who depend on the Projects for their water supply. "Trust us" is not acceptable. FWS has shown no inclination to fully and honestly address water supply needs beyond the species despite the fact that its own regulation requires such consideration.

*Id*. at 957. "Put more simply, the district court found that both the FWS's regulation and the APA required the FWS to engage in a record exposition of the non jeopardy factors, and that the FWS did not do so." *San Luis v. Jewell*, 747 F.3d at 635.

The Ninth Circuit disagreed "both with the district court's legal analysis and with its reading of

the record." *Id*. After first concluding that explicit discussion of the non jeopardy factors was not required by either applicable regulations or the APA, *id*. at 635-36, the Ninth Circuit then went on to conclude, in the alternative, that "[e]ven if the APA did require the FWS to consider the nonjeopardy factors, the record shows that the FWS [] sufficiently considered them" in the 2008 OCAP BiOp. *Id*. at 637. Specifically, the Court held that "the record shows that the RPA is consistent with the purpose of the underlying action." *Id*. (emphasis added). Specifically, as *San Luis* recognized, Reclamation's OCAP BA identified the purpose of this action to be "operat[ing] the [Projects] to divert, store, redivert, and convey CVP and SWP . . . water consistent with applicable law." *Id*. The Ninth Circuit recognized that "[t]he RPAs—which largely deal with regulating the water that CVP/SWP export from the Delta–Bay— do not require any major changes in the way Reclamation runs its operations." *Id*. at 638. Relatedly, *San Luis* found that the record indicated that the RPA can be implemented "consistent with the scope of the Federal agency's legal authority." *Id*. at 638. Finally, the Ninth Circuit found support in the record for FWS's conclusion that the RPA "is both technologically and economically feasible" in part because "the RPAs propose regulatory changes in what Reclamation does on a day-to-day basis, but the RPAs do not require major changes affecting Reclamation's ability—financially or technologically—to comply with the RPAs." *Id*. at 638.

All told, this discussion in *San Luis*, particularly the finding that the RPA is consistent with the purpose of the underlying action—a purpose which includes deliveries under the DMC and SRS Contracts—has consequences for Plaintiffs' argument here. The Ninth Circuit's reasoning in *San Luis* strongly suggests it was reasonable for FWS's 2015 LOC to rely on the 2008 OCAP BiOp, even without either document separately evaluating whether the contract terms under review are compatible with the protective measures set forth in the 2008 OCAP BiOp RPA. This is not to say that *San Luis* is dispositive. The four factors of 50 C.F.R. § 402.02 addressed in *San Luis* are arguably narrower in scope, for example, than the broader, overall question Plaintiffs raise here: whether the SRS Contracts are compatible with the delta smelt protective measures set forth in the 2008 OCAP BiOp RPA.

Plaintiffs do point to recent (*i.e.*, post-2008) information they maintain calls for a different conclusion than the one set forth in *San Luis*. That information is discussed separately below. For purposes of the present inquiry, the Court only finds that, in light of *San Luis*, there is no support for Plaintiffs' generic suggestion that the consultation over contract renewal was unlawful simply because it failed to consider how the contract terms were compatible with the 2008 OCAP BiOp's RPA.

Relatedly, Plaintiffs also suggest that Reclamation needed to inform FWS of different alternatives to Reclamation's proposed action (*i.e.*, renewing or not renewing the contracts) for FWS to consider during the consultation. ECF No. 1247 at 17. Again, there is no such requirement in the ESA. Unlike in connection with review under NEPA, 42 U.S.C. §§ 4321, *et seq.*, ESA Section 7 consultations do not require an alternatives analysis. *Compare* 40 C.F.R. §§ 1501.2(c), 1502.14 (NEPA implementing regulations requiring exploration and analysis of all reasonable alternatives) *with* 50 C.F.R. §§ 402.12-402.15 (ESA implementing regulations revealing no such requirement). Under Section 7, the consulting agency analyzes the effects of the proposed action, not hypothetical alternatives to the proposed action. *See* 50 C.F.R. § 402.14.

### e.  Record Review as Applied to the 2015 LOC

The final threshold issue concerns the approach the Court must take to reviewing the record in the context of addressing Plaintiffs' fourth cause of action. Plaintiffs point out, correctly, that Defendants seek to defend the 2015 LOC by pointing beyond the analysis in the 2015 LOC itself to other information in the record. *See* ECF No. 1247 at 9. Specifically, Plaintiffs complain that, while FWS "*might* have relied on" that information, the agency "gave no indication that it did so." *Id.* (emphasis added). Plaintiffs cite *Humane Society of the United States. v. Locke,* 626 F.3d 1040 (9th Cir. 2010), for the proposition that FWS's decision "may be judged only on the rationale set forth in its concurrence letters," ECF No. 1247 at 11 (citing *Humane Soc'y,* 626 F.3d at 1049), and relatedly argue that a court "cannot gloss over the absence of a cogent explanation by the agency by relying on the post hoc rationalizations offered by defendants in their [litigation] . . . briefs." ECF No. 1247 at 9 (quoting

35

*Humane Soc'y*, 626 F.3d at 1049).

"It is a basic principle of administrative law that the agency must articulate the reason or reasons for its decision." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) ("*PCFFA*"). "Although a decision of less than ideal clarity may be upheld if the agency's path may reasonably be discerned," a court "cannot infer an agency's reasoning from mere silence. . . . Rather, an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* (internal quotation marks omitted). But, while the law requires that a rationale be reasonably discernable, nothing requires that all information pertaining to that rationale be included within the formal decision-making document. In reviewing agency action under the APA, a court must examine the "whole record." 5 U.S.C § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party. . . ."). "'The whole record' includes everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).

Contrary to Plaintiffs' suggestion, neither *Humane Society* nor *PCFFA* require an agency to articulate the entire rationale for its decision within the decision document itself. *Humane Society* involved a challenge to NMFS's decision to allow certain states in the Pacific Northwest to kill more than 80 California sea lions annually near Bonneville Dam on the Columbia River to prevent the sea lions from preying on ESA-listed fish migrating up the Columbia River. 626 F.3d at 1043-47. In authorizing these lethal removals, NMFS made findings under a provision of the Marine Mammal Protection Act ("MMPA") which "authorize[s] the intentional lethal taking of individually identifiable pinnipeds which are having a significant negative impact on the decline or recovery of salmonid fishery stocks which . . . have been listed as threatened . . . or endangered species under the [ESA]." 16 U.S.C. § 1389(b)(1). The Ninth Circuit found that NMFS had "not adequately explained its finding that sea lions are having a 'significant negative impact' on the decline or recovery of listed salmonid populations given earlier factual findings by NMFS that fisheries that cause similar or greater mortality among these

populations are not having significant negative impacts." *Id*. at 1048. Second, the Ninth Circuit concluded that the agency had "not adequately explained why a California sea lion predation rate of [one] percent would have a significant negative impact on the decline or recovery of these salmonid populations." *Id*. It was within this context that the Ninth Circuit explained: "We cannot gloss over the absence of a cogent explanation by the agency by relying on the post hoc rationalizations offered by defendants in their appellate briefs." *Id*. at 1049. While acknowledging that the agency defendants' briefs offered several explanations designed to reconcile NMFS's seemingly inconsistent findings, most of those explanations were deemed invalid because they were raised for the first time in defendants' briefs and were not mentioned by NMFS in the decision under review. The Ninth Circuit emphasized that such "post hoc rationalizations" may not be considered. *Id*. at 1050. But, this does not preclude consideration of a cogent explanation (or information from which a cogent explanation could have been reasonably discerned) had it been present somewhere in the administrative record other than the decision document itself. *See id*. ("Defendants' post hoc explanations serve only to underscore the absence of an adequate explanation <u>in the administrative record itself</u>.") (emphasis added); *see also San Luis v. Jewell*, 747 F.3d at 608-15 (upholding FWS's reliance on certain figures based on formal comments from state agency and meeting minutes of an interagency team because there was substantial evidence in the record to "discern the path the agency took to arrive" at the decision).

 *PCFFA* involved an ESA challenge to a three-phase RPA proposed by NMFS and adopted by Reclamation designed to protect ESA-listed fish species impacted by the operation of irrigation facilities on the Klamath River. 426 F.3d at 1088-89. The long-term goal of the RPA was to provide sufficient flows to support the fish populations, with Reclamation eventually providing more than half of the needed flows. *Id*. at 1088. However, the first two phases of the RPA, spanning eight of the ten years covered by the proposed project, did not provide for full implementation of the protective flow regime. *Id*. at 1090. The district court reasoned that NMFS had "implicitly considered, in imposing the three-phase RPA, that all phases would ensure against jeopardy." *Id*. at 1091. The Ninth Circuit reversed,

reasoning that "the RPA cannot be sustained . . . by reliance on the agency's unstated assumptions about the effects of Phases I and II." *Id.* The Ninth Circuit found the consultation unlawful because the BiOp in dispute contained "no analysis" of the effect of the first eight years of the plan on the listed species. *Id.* at 1092. There is language in *PCFFA* that suggests a court's review should be limited to rationales articulated within the decision document itself. *Id.* at 1092 ("when reviewing a biological opinion, we rely only 'on what the agency actually said' in the BiOp to determine whether the agency considered the appropriate factors") (quoting *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 10672 & n. 9 (9th Cir.), *amended on other grounds*, 387 F.3d 968 (9th Cir. 2004)). Likewise, *Gifford Pinchot*, on which *PCFFA* relies, indicates in a footnote:

> In considering [] BiOps, we may only rely on what the agency said in the record to determine what the agency decided and why. "[W]e cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals. Rather, 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.' " *Beno v. Shalala*, 30 F.3d 1057, 1073-74 (9th Cir. 1994) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50) (internal citation omitted). Here, fundamental principles of administrative law focus attention on what the agency actually said in the critical habitat analysis in the six BiOps. Even if "conservation" is implied by the [ ] attention to habitat [in a related, programmatic document] and by [that document's] reference[] in the BiOps, we cannot assume that the FWS considered species recovery unless the FWS, in the BiOps, said that it was making this consideration. Accepting "implied" consideration of recovery would reject the bedrock concept of record review.

*Gifford Pinchot*, 378 F.3d at 1072 n. 9. But, at their core, *PCFFA* and *Gifford Pinchot* were really concerned with post hoc arguments that an agency impliedly considered a particular topic in an ESA consultation. That is not what Defendants argue here. Rather, they advocate examination of the entire record to reveal what the relevant agencies actually considered. Nothing in *PCFFA* or *Gifford Pinchot* precludes this Court from examining the entire record to determine what FWS actually considered when issuing its 2015 LOC, which explicitly incorporates by reference numerous other documents. *See Gifford Pinchot*, 378 F.3d at 1072 n. 9 ("In considering [] BiOps, we may only rely on what the agency said in the record to determine what the agency decided and why."); *see also Save Our Cabinets v.*

*United States Fish & Wildlife Serv.*, 255 F. Supp. 3d 1035, 1054 (D. Mont. 2017) (looking beyond the decision document to other portions of the record to find a valid reason for excluding certain information from analysis in BiOp); *see also Oregon Wild v. U.S. Forest Serv.*, 193 F. Supp. 3d 1156, 1164 (D. Or. 2016) (finding it necessary to review an accompanying BA on which a LOC relied because "[t]he Court cannot meaningfully review the LOC, which the parties do not dispute qualifies as a final agency action, without referencing the BA on which it is explicitly and exclusively based"); 50 C.F.R. § 402.12 (a), (j)-(k) (explaining that upon preparation of a BA by the action agency and submission of that BA to the wildlife agency, the wildlife agency must respond "as to whether or not [it] concurs with the findings of the [BA]"; if the wildlife agency concurs, formal consultation is not required). The Court will look beyond the 2015 LOC to the entire record.

### 2. **Substantive Challenges to the 2015 LOC**

#### (1) **Was Formal Consultation Required?**

Plaintiffs maintain (somewhat halfheartedly) that "because the contracts are likely to adversely affect delta smelt," formal consultation was required. ECF No. 1247 at 14-15. The Court can identify no authority requiring formal consultation under the circumstances presented here. As described above, the consultation structure set up by the CVPIA BiOp indicated that informal consultation may be used in some consultation circumstances tiering off of the CVPIA BiOp. On this point, Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

Plaintiffs are correct that informal consultation nonetheless must comport with the substantive requirements of the ESA. Formal consultation applies when a proposed action is "likely to adversely affect" a listed species and requires the preparation of a biological opinion, but, relatedly, informal consultation concludes with the agencies' agreement in writing that the action "is not likely to adversely affect" the species. *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014); 50 C.F.R. §§402.13, 402.14. Whether formal or informal, a consultation cannot be arbitrary and capricious and must meet the ESA's statutory requirements, relying on the best scientific data available. *See id.* at 620 (applying best available

science standard to informal consultation); *Pres. Our Island v. U.S. Army Corps of Engineers*, No. C08-1353RSM, 2009 WL 2511953, at *7 (W.D. Wash. Aug. 13, 2009) (finding informal consultation arbitrary and capricious because it did not consider all forms of likely impact to species).

### (2) Are Certain of Plaintiffs' Arguments Improper Collateral Attacks on the 2008 OCAP BiOp?

Defendants argue that many of Plaintiffs' arguments "miss the mark" because they "relate to alleged flaws in the OCAP consultation process," not problems with the 2015 Contract Renewal Reconsultation. *See* ECF No. 1207-1 at 31. By way of an example of such an argument, the DMC Contractors point to Plaintiffs' argument that the 2008 OCAP BiOp's baseline assumptions were no longer valid in 2015 because "state-imposed flow requirements had been repeatedly waived at [Reclamation's] request." *Id*. at 30 (citing ECF No. 1184 at 15). The DMC Contractors argue that, while such an argument may be relevant to a claim that the OCAP consultation should be reinitiated, Plaintiffs have brought no OCAP reinitiation claim here. ECF No. 1207-1 at 31. Even if they had, the DMC Contractors are correct that Reclamation and FWS already reinitiated consultation on the 2008 OCAP BiOp in connection with Reclamation's requests for waivers from state-imposed flow requirements. *Id*. Those consultation efforts resulted in FWS concluding in numerous documents that the drought-related waivers "will result in no additional adverse effects on Delta Smelt or its critical habitat . . . beyond those previously analyzed in the 2008 [OCAP] BiOp." *See, e.g*., FWS 13305-07. Plaintiffs did not challenge those conclusion directly and point to no factual basis to question them now.

But, Plaintiffs raise numerous arguments, including the one discussed immediately below, that, although they appear at first glance to be challenges directed at the 2008 OCAP BiOp, in the context of this case operate as challenges to the reasonableness of FWS relying on the 2008 OCAP BiOp in the 2015 Contract Renewal Reconsultation. Such arguments are not impermissible collateral attacks on the 2008 OCAP BiOp; they go to the heart of the matter.

Plaintiffs next argue that the 2015 Contract Renewal Reconsultation was unlawful because it does not evaluate the full temporal scope of the action. ECF No. 1184 at 13. The proposed action at issue is the "long-term renewal of existing Settlement Contracts for the Sacramento River Settlement Contractors" each for a period of 40 years from 2005 and "the renewal of existing water service and repayment contracts for 20 DMC contractors for a period of 25 years, with the exception of the San Joaquin Cemetery contract, which was renewed for 40 years." FWS 13134. However, Plaintiffs correctly point out that the 2008 OCAP BiOp uses modeling and analysis that extends only to 2030.[14] FWS 14069-71; *see also* 14773 (BA prepared in connection with consultation leading up to 2008 OCAP BiOp demonstrating same temporal limitation as 2008 OCAP BiOp).

Because the DMC Contracts all terminate in 2030, *see* ECF No. 1207-1 at 24; FWS 12276 (DMC Contract renewal BA indicating its analysis "extends only through the first period of renewal for the 25-year long-term water service contract (i.e., from 2004 to 2030)"), this argument does not impact the DMC contracts. It is relevant to the SRS Contracts, however, which were renewed in 2005 on 40-year terms, *see* FWS 13134, and therefore extend until 2045.

Generally, the scope of ESA consultation must be "coextensive with the agency action." *See Conner v. Burford*, 878 F.2d 1441, 1458 (9th Cir. 1988). Before analyzing this "coextensive" requirement in detail, the Court must address another threshold argument. Federal Defendants maintain that Plaintiffs' argument conflates the scope of the 2008 OCAP BiOp with the scope of this action, namely renewal of the SRS Contracts. *See* ECF No. 1210-1 at 19. Federal Defendants are correct that Reclamation defined the "Proposed Action" under review in the 2015 Contract Renewal Reconsultation to include renewal of 145 SRS Contracts for a period of 40 years starting in 2005. FWS 13134. But the

---

[14] It is undisputed that this impact analysis contained in the 2008 OCAP BiOp does not extend beyond 2030. *See* Federal Defendants' Statement of Disputed and Undisputed Fact, ECF No. 1210-2 at 5, #22.

fact that the Proposed Action is properly <u>defined</u> in temporal scope (i.e., 2015 Contract Renewal Reconsultation documents define the temporal scope of consultation as extending through 2045 for the SRS Contracts) does not demonstrate that the 2015 Contract Renewal Reconsultation evaluated the impacts to delta smelt of the entire scope of that action. The 2015 Contract Renewal Reconsultation relies upon the 2008 OCAP BiOp to evaluate aquatic impacts of the Proposed Action on delta smelt, *see* FWS 13705, yet the years between 2030 and 2045 are not analyzed in the 2008 OCAP BiOp. As to this argument, contrary to Defendants' suggestions, Plaintiffs do not mount a collateral attack on the 2008 OCAP BiOp. Plaintiffs maintain the scope of the 2008 OCAP BiOp is not coextensive with the scope of the Proposed Action presently before the Court (i.e., contract renewal). This argument is an example of one that is not a challenge to the 2008 OCAP BiOp; it is a challenge to whether the 2015 Contract Renewal Reconsultation was sufficient.

Returning to the more central issue, the Court is faced with the task of determining whether the actual analysis undertaken by FWS in the 2015 Contract Renewal Reconsultation is sufficiently coextensive with the scope of the Proposed Action (*i.e.*, renewal of the SRS Contracts for 40 years). The difficulty is that the existing cases are not tight fits with the present circumstances. *Conner*, for example, concerned oil and gas leasing programs that encompassed a wide range of steps, starting with the issuance of leases and including post-leasing development and production. 878 F.2d at 1453. Yet, the BiOps for those leasing programs concluded there was insufficient information to render a comprehensive biological opinion beyond the initial lease stage. *Id*. Because "[t]he ESA requires that the [BiOp] detail 'how the agency action affects the species or its critical habitat,'" *id*. (quoting 16 U.S.C. § 1536(b)(3)(A), "the scope of the agency action is crucial because the ESA requires the [BiOp] to analyze the effect of the entire agency action." *Id*. The Ninth Circuit held that Section 7 required FWS to consider at the leasing phase "all phases of the agency action, which includes post-leasing activities, in its biological opinion." *Id*.

Still other cases expanded upon *Conner*'s analysis of an ESA consultation's scope by addressing

42

temporal scope issues. For example, *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), concerned an operation and management plan for a hatchery, the implementation of which had the potential to impact the ESA listed bull trout. *Id*. at 516. In its request for consultation, the agency charged with operating the hatchery defined the agency action as the operation and maintenance of the hatchery for a five-year period (from 2006 to 2011). *Id*. The resulting BiOp explained that the hatchery relied on this five-year time period "because it planned two modifications to Hatchery operations during and soon after that period that would require it to reinitiate formal consultation." *Id*. at 519.

FWS argued to the Ninth Circuit in *Wild Fish* that *Conner* was "inapposite because the five-year term of operations and management is the entire agency action." *Id*. at 522. The *Wild Fish* majority rejected this argument, reasoning that FWS's position did "not acknowledge [ ] that the Hatchery has been operating for seventy years and is expected to continue operating into the future. The Hatchery simply made a decision, endorsed by the Service, to define the action as a five-year term of operations, when it might as easily have chosen a thirty-year term or a one-year term." *Id*. The problem with this choice was a matter of degree. The Ninth Circuit reasoned that "limiting the analysis of the Hatchery's impact on the bull trout to a one-month term of operations would almost certainly be arbitrary and capricious," because "[t]he time period under study would likely be too short to capture any effects on the bull trout," particularly in light of the fact that even the disputed five-year BiOp recognized that the hatchery would have a negative impact over a five-year period. *Id*. The Ninth Circuit provided a helpful example:

> [I]f FWS were to analyze ongoing Hatchery operations as a series of ten five-year actions, it might find a likely net decrease of five to ten bull trout over each five-year period, and might conclude that an incremental reduction in the local population of that magnitude would not appreciably reduce the likelihood of survival and recovery of the interim recovery unit. But if instead the Service were to consider the entire reduction in the local population over fifty years, it might then find an appreciable impact on the interim recovery unit.

*Id*. at 522-23. The Ninth Circuit emphasized that under such an approach "a listed species could be

gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent." *Id*. at 522 (internal quotation omitted); *see also Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 254-55 (D.D.C. 2003) (finding unlawful a BiOp that considered the effects of a revised annual operating plan for a dam and reservoir system on the Missouri River "only in the context of one isolated year" rather than "in the context of its overall management of the Missouri River," because "[i]f FWS were allowed to apply such a limited scope of consultation to all agency activities, any course of agency action could ultimately be divided into multiple small actions, none of which, in and of themselves, would cause jeopardy"); *Intertribal Sinkyone Wilderness Council v. Nat'l Marine Fisheries Serv*., 970 F. Supp. 2d 988, 1006 (N.D. Cal. 2013) (finding unlawful a BiOp that limited review to the five year period of a particular proposed Navy training program in light of acknowledged, long-term, ongoing training activities).

Critically, however, *Wild Fish* does not set out a bright line rule for how an agency must define the temporal scope of an action:

> Although it is not for us to dictate precisely how long the term of the analysis should be in this case, <u>it must be long enough for [FWS] to make a meaningful determination</u> as to whether the ongoing operation of the Hatchery "reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery" of the Columbia River interim recovery unit [of bull trout].

628 F.3d at 523-24 (quoting 50 C.F.R. § 402.02) (emphasis added).

The parties also discuss *Oceana v. Pritzker*, 125 F. Supp. 3d 232 (D.D.C. 2015), which involved a BiOp addressing the impacts of NMFS's operation of seven fisheries in the Northwest Atlantic on an ESA-listed population of loggerhead turtles. Although NMFS's management of the fisheries was ongoing, NMFS limited the BiOp to a term of ten years. *See id*. at 247. The district court found that NMFS's use of a ten-year term was reasonable because the record demonstrated that it would be speculative to anticipate how the fisheries would be operated for more than ten years at a time. *Id*. The

plaintiff in that case, Oceana, argued that the chosen approach would leave the loggerheads vulnerable to just the kind of incremental jeopardy prohibited in *Wild Fish*, because it would "gradually push [the loggerheads] toward extinction in 10-year increments, so long as the effects within any 10 year period are sufficiently modest." *Oceana*, 125 F. Supp. 3d at 247 (internal record quotation omitted). The district court brushed aside Oceana's concerns, however, reasoning that although the project was limited in scope to a 10-year timeframe, NMFS did not limit its analysis of impacts to ten years; rather, the analysis contained in the BiOp was aimed at "determin[ing] if the continued operation of the seven fisheries over the next ten years is likely to jeopardize the continued existence of [loggerheads] . . . within the next ten years and beyond." *Id.* (internal record citation omitted). Put another way, NMFS's analysis was lawful because it determined "that the next ten years' worth of takes in these fisheries— amounting to 483 total takes per year in each of those ten years, of which 239 per year will be lethal— are not likely to jeopardize the continued existence of loggerheads into a longer-term future." *Id.* at 248. This Court assumes that the record in *Oceana* provided some additional detail regarding these projections into the "longer-term future." *See id.* at 249 (citing *Oceana* AR). Assuming as much, the parties in the present case have not pointed to any similar, explicit analysis of how the impacts evaluated through 2030 in the 2008 OCAP BiOp are (or are not) likely to jeopardize or adversely modify the critical habitat of delta smelt in the longer-term future. Therefore, there is no obvious parallel between *Oceana* and the present case.

The facts presented here are not directly analogous to those in *Conner* either. Unlike in *Conner*, the present case is not one in which an entire phase of agency action was excluded from analysis. Rather, as is discussed in greater detail below, the time horizon of the computer modeling performed in the 2008 OCAP BiOp to evaluate impacts of water deliveries on delta smelt extends only through 2030, rather than to 2045, but there is no obvious phase of operations that is excluded.

As for *Wild Fish*, that case concerned a project that was "ongoing" and therefore had no obvious or inherent temporal scope. As a result, the action agency was required to define a temporal scope as

part of the process of defining the agency action. Here, the SRS Contracts under review have a defined

scope of 40 years, a temporal scope that is mirrored by the 2015 Contract Renewal Reconsultation

documents. It is the incorporated 2008 OCAP BiOp that reviews an "ongoing" project (coordinated

operations of the CVP and SWP) and imposes upon that project an analytical limitation of 2030. No one

disputes that there is a mismatch between the scope of these two consultation processes. Is this *ipso*

*facto* a violation of the ESA because the project and the analysis are not coextensive? Or, is the relevant

question whether the actual analysis conducted permitted a meaningful evaluation of the impacts?

*PCFFA*, introduced elsewhere in this decision, helps shed light on this choice. As mentioned,

*PCFFA* involved a three-phase RPA designed to protect ESA-listed fish species. 426 F.3d at 1088-89.

The long-term goal of the RPA was to provide sufficient flows to support the fish populations, *id*. at

1088, but the first two phases of the RPA, spanning eight of the ten years covered by the proposed

project, provided only slightly more than half of the planned long-term flows. *Id*. at 1090. The BiOp for

the project was unlawful because it contained "no analysis" of the effect of the first eight years of the

plan on the listed species. *Id*. at 1092. But the Ninth Circuit did not find an ESA violation in *PCFFA*

based on the mismatch between the scope of the project (10 years) and the scope of the analysis (the last

2 years). Rather, *PCFFA* examined in detail why the mismatch was material/meaningful. The Ninth

Circuit explained that the BiOp's analysis in support of the planned long-term flows indicated

substantial increases in flows were needed during summer months to avoid jeopardy to the fish species.

*Id*. at 1093. Those flows were planned for the third and final phase of the project, but flows planned for

the first eight years were substantially lower. *Id*. The BiOp was unlawful because it did not explain why

eight years of the lower flows would not jeopardize the fish. *Id*. *PCFFA*, therefore, did not set out a per

se rule that a temporal mismatch alone requires a reviewing court to find a consultation unlawful.

Rather, that mismatch also must be material/meaningful in the context of the overall record.

Although it is not crystal clear, the Court finds that the balance of the caselaw frames the issue

here as: whether the mismatch between the temporal scope of the SRS Contract renewal (40 years) and

46

the relevant analysis of impacts to smelt (25 years) is material to the ultimate question presented in any consultation: whether a project will cause jeopardy or adverse modification to a species. Plaintiffs do not point to any record evidence tending to demonstrate that extending the analytical horizon from 2030 to 2045 would make a material difference to the outcome of the critical analyses in this case: (a) the conclusion of the 2008 OCAP BiOp, which found operation of the CVP and SWP (including deliveries under the SRS Contracts) will not jeopardize the continued existence or adversely impact the critical habitat of the delta smelt provided the applicable RPAs are implemented; and (b) the conclusion of the 2015 Contract Renewal Reconsultation, which found that the 2008 OCAP BiOp addressed all impacts to delta smelt related to deliveries under the DMC and SRS Contracts. Plaintiffs expressly decline to challenge the modeling choices FWS and Reclamation made in the 2008 OCAP BiOp. *See* ECF No. 1247 at 11. Rather, they "challenge FWS's exclusive reliance on that modeling seven years later to find the SRS Contracts would not jeopardize smelt through 2045." *Id*. at 11-12. But they point to no specific information tending to demonstrate that the temporal mismatch in this case is consequential. Plaintiffs appear to be relying predominantly on a strict reading of *Conner* to require the time horizon of an analysis used in a consultation to be completely coextensive with the agency action. *See id*. at 11 (citing *Conner*, 848 F.2d at 1458).

Moreover, the record reveals at least some affirmative rationale for the choice of 2030 as the time horizon used in the 2008 OCAP BiOp, which was performed in large part using a computer model known as CalSim-II. *See* BOR 6302. Of the many CalSim-II modeling scenarios relied upon in the 2008 OCAP BiOp were several "future" studies that used a "planning horizon" of 2030. *See, e.g.*, BOR 6322 (showing modeling assumptions for Studies 8.0 ("Future – (b)(2), Limited EWA") and 9.0-9.5 (various future climate change scenarios). The 2030 planning horizon matches planning horizons utilized in other then-operative decision-making documents relevant to the CVP and SWP, such as the California Water Plan Update. *See* FWS 14797 n. c; *see also Turtle Island Restoration Network v. United States Dep't of Commerce*, 878 F.3d 725, 739 (9th Cir. 2017) (rejecting challenge to BiOp addressing impacts of plan to

47

permit certain methods of fishing for swordfish, finding plaintiffs failed to demonstrate that 25-year scope of climate modeling was not sufficiently long to allow a meaningful determination because "[t]he [temporal] constraints in the available data supply a reasonable justification for the NMFS to limit its analysis"). Plaintiffs nowhere have taken issue with the 2008 BiOp's choice of 2030 as an appropriate "future" planning horizon.

One related argument merits additional discussion. Plaintiffs argue that Reclamation has "insisted that, following renewal, it cannot reduce the contracts' water quantities to benefit delta smelt." ECF No. 1184 at 18 n. 9 (citing FWS 13142-43). If true, this would be problematic: if future OCAP BiOps required additional protections for delta smelt, Reclamation would be locked into the 40-year SRS Contracts with no way (short of breach) to require implementation of those additional protections. But, the pages of the Supplemental Information document cited by Plaintiffs do not say what Plaintiffs suggest. Instead, those pages indicate that Reclamation has taken the position that it did not retain discretion to reduce water quantity terms <u>at contract renewal</u>. *See* FWS 13142 ("At contract renewal, due to requirements of Federal law, state water law, and/or the terms of its water right permits, Reclamation could not alter the quantities, allocations, or timing of SRS diversions from those set forth in the initial SRS contracts."). Elsewhere in the Supplemental Information, Reclamation takes the position that the SRS Contractors could be required, pursuant to Article 7(b)[15] of their contracts, to comply with requirements set forth in future BiOps "prepared as a result of a consultation regarding the execution of this Settlement Contract undertaken pursuant to Section 7." FWS 13144. This interpretation of Article 7(b) was adopted by FWS in its 2015 LOC:

> We are concerned about the continued decline of delta smelt as demonstrated by the historically low numbers in all recent survey efforts. Reclamation has identified Article 7(b) of the SRS contracts as one that "may affect the availability of water under the SRS contracts" by requiring compliance with biological opinions prepared as a result of consultation regarding the execution of the SRS contracts. [citation] The DMC

---

[15] *See* BOR 2709, *supra* note 13.

contracts contain a similar provision. As articulated in Reclamation's letter dated December 11, 2015, we understand the 2008 [OCAP] BiOp is the result of a consultation regarding the execution of the SRS and DMC contracts and any subsequent reinitiation of consultation on the coordinated operations of the CVP and SWP, which are subject to the 2008 [OCAP] BiOp, or the SRS and DMC contract renewals would also be one "regarding the execution of the contract" and would, therefore, be subject to the terms of Article 7(b). In future consultations to ensure adequate protection of delta smelt and its critical habitat under the Act, we may require greater certainty as to Reclamation's ability to provide needed outflows through the Delta. If increased outflows are needed and cannot be met under the SRS contracts, those contracts may need to be revisited to ensure consistency with the Act.

FWS 13721. When 2030 comes around, the CVP and SWP will not be able to operate lawfully without another valid OCAP BiOp (or equivalent) in place. At that time, if a future OCAP BiOp concludes additional protections are needed to avoid jeopardy to delta smelt or adverse modification to its critical habitat, the language in Reclamation's Supplemental Information, as interpreted and applied by FWS in its 2015 LOC, will require Federal Defendants to revisit the SRS Contracts if doing so is necessary to implement the recommended protections. This helps to highlight how the consultations in this case are distinct from those in any of the cases discussed above. Unlike in *Conner* or *Wild Fish*, the 2015 Contract Renewal Reconsultation must be considered in lock-step with the 2008 OCAP BiOp and any subsequent OCAP BiOp. The former depends on the latter in every way.[16]

Defendants cannot have it any other way. Either the present consultation fails because the analysis incorporated from the 2008 OCAP BiOp fails to evaluate the entire temporal scope of the SRS Contracts, or the SRS Contracts must be subject to future restrictions imposed by future OCAP BiOps. The 2015 LOC, and Reclamation's reliance on it, makes it clear that Federal Defendants have elected

---

[16] The district court in *Oceana* relied upon somewhat related reasoning by conditioning its finding of lawfulness of the consultation under review on the understanding that NMFS would have to ensure a new BiOp was issued before the ten-year period covered by the existing BiOp expired. *Oceana*, 125 F. Supp. 3d at 247. Although there is potential for this logic to be taken too far if applied to a timeframe that was so short it would allow for the incremental destruction of the species (*i.e.*, would not allow for a meaningful determination as to impacts), there is no such problem here in the context of the 2015 Contract Renewal Reconsultation. The 40-year time horizon of the 2015 Contract Renewal Reconsultation incorporates an analysis that has a shorter (25 year) time horizon. Nonetheless, the 25-year time horizon is not challenged in any real way as having precluded meaningful analysis of the impacts to delta smelt.

the latter. What such a scenario might mean for Reclamation from a contract law perspective is beyond the scope of the present case.

In sum, the temporal mismatch between the 2015 Contract Renewal Reconsultation and the 2008 OCAP BiOp does not violate the ESA's requirement that the scope of analysis performed in a consultation be coextensive with the scope of the project under review. This is because, in light of the reasoning in the 2015 LOC, the 25-year scope of analysis is not materially deficient simply because it fails to cover all 40 years of the SRS Contracts' lifespan. Plaintiffs have pointed to no substantive reason other than the pure temporal mismatch to reject the analysis provided. On the flipside, Federal Defendants have made their bed and they may have to lie in it if future OCAP consultations indicate impacts beyond the 25-year scope of the 2008 OCAP BiOp are not compatible with continued implementation of the SRS Contracts. On this point, Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

### (4) Failure to Analyze How Contracts Create Demand.

Plaintiffs argue that the 2015 LOC is invalid because the 2008 OCAP BiOp it relies on did not analyze how the renewed contracts would create a demand for CVP water and therefore fails to consider an important aspect of the jeopardy question. ECF No. 1184 at 13. But, as Federal Defendants point out, the 2008 OCAP BiOp incorporated the renewed contract terms into the operational assumptions used to model CVP and SWP operations. BOR 6353-88 (describing operational assumptions used in CalSim-II modeling, including SWP and CVP demands).

To the extent Plaintiffs take issue with the fact that the 2008 OCAP BiOp simply assumed these demands as a given, *see* ECF 1247 at 6 (noting that the 2008 OCAP BiOp "assumed certain levels of deliveries and exports for contracts, and then looked at the effect of operating the CVP/SWP to meet that aggregate demand"), Plaintiffs point to no authority suggesting the ESA requires anything more. Unlike under NEPA, 40 C.F.R. § 1502.14, in an ESA consultation, there is no requirement that a "no project" alternative be analyzed. FWS must analyze the project presented. Here, that project is contract renewal.

50

The 2008 OCAP BiOp's modeling assumptions included demands from the various CVP Contractors. On this point, Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

### (5)    Failure to Analyze Specific Terms

Plaintiffs next argue that the "2008 [OCAP] BiOp—and, hence, FWS's consultation—does not analyze the effects of the contracts' terms—especially quantity, shortage provisions, and liability waiver—on Delta outflow." ECF No. 1184 at 14. Relatedly, Plaintiffs also argue the 2008 OCAP BiOp "failed to evaluate the effects of the contracts' other terms, such as pricing, timing, and water conservation provisions, on Delta flows." *Id*.; *see also* ECF No. 1247 at 10.

Before evaluating these specific assertions, it is helpful to review how and where in this consultation structure the contract terms are discussed. All of the contract terms were reviewed in the context of the 2005 contract renewal consultation process. For the SRS Contracts, a 2003 BA produced by Reclamation compared the original SRS Contracts to the proposed renewal SRS Contracts, which contained some changed language. FWS 12872-96. Reclamation concluded that where the wording had not been changed, there would be no change to the physical environment, but where there would be substantive changes, those changes were "analyzed for their potential effect on the physical environment." FWS 12872. The section of this BA in which the contract terms are directly discussed did not evaluate impacts to listed species in any material way. However, a separate section referenced the then-ongoing consultation "on the effects of long-term operation of the federal CVP and the California SWP on listed species." FWS 12891. The 2003 SRS Contract renewal BA explained that "[t]he analyses for the OCAP consultation assume the Settlement Contractors divert their Total Contract quantity with deficiencies in critically dry years in accordance with the existing and renewal contracts. Because maximum contract deliveries are assumed for the Settlement Contractors, the OCAP consultation fully addresses any in-river effects to listed species that could result with continued delivery of water to the Settlement Contractors." FWS 12891-92.

A 2003 Draft BA for DMC Contract renewal reveals that a similar approach was taken with respect to those contracts, with contract terms being reviewed in a similar manner. FWS 12365-66; 12374-83. As to the impact of DMC Contract renewal on listed fish species, the 2003 Draft DMC Contract Renewal BA concluded: "The conditions for the export of water from the Delta are determined by separate criteria in [BiOps] governing CVP operations, by the CVPIA, and by hydrologic conditions. The implementation of long-term contract renewals for contract quantities no greater than those under the existing contracts would not result in any changes in conditions in the Delta and, therefore, would not be likely to adversely affect special-status fish species or their habitat." FWS 12392.

The 2005 OCAP BiOp and the 2008 OCAP BiOp did not evaluate all of the DMC and SRS contract terms in detail. Rather, those documents incorporated key aspects of the contracts within the assumptions built into the modeling program (CalSim-II) used to evaluate impacts to flows within the Delta and its tributaries and related impacts on delta smelt. *See, e.g.,* BOR 6305 (summarizing demand assumptions drawn from CVP and SWP contracts); BOR 6341 (showing SRS Contract shortage provisions incorporated into modeling).

After remand, Reclamation's 2015 Supplemental Information document reviewed key provisions from the SRS Contracts that "may affect the availability of water under the SRS Contracts and the liability of the United States for shortages," FWS 13144, and likewise examined those provisions of the DMC Contracts that may affect availability of water under those contracts. FWS 13145. The Supplemental Information document also discussed contractual terms related to pricing, along with applicable statutory authorities. FWS 13144-45. An appendix to the Supplemental Information document also reviewed all of the SRS Contract provisions, FWS 13152-56, and the DMC Contract provisions. FWS 13157- 65. As for the specific contract terms highlighted by Plaintiffs, those are addressed in turn.

### (a) Quantity Terms

First, Plaintiffs contend that the 2008 OCAP BiOp fails to evaluate how the quantity terms of the

contracts affect Delta outflow. As mentioned, the quantity terms of the contracts are reflected in the demand assumptions built into the modeling used in the 2008 OCAP BiOp. That modeling was, in part, specifically designed to and did evaluate the impact of its numerous inputs (including contract demands) on Delta outflow. *See* BOR 6305 (explanation of CalSim II's demand assumptions based on contract type); BOR 6306 (providing additional detail on how demands are modeled). The 2015 LOC confirmed that the 2008 OCAP BiOp evaluated full deliveries under both the SRS and DMC contracts. FWS 13721.

Plaintiffs conceded that the 2008 OCAP BiOp assumes maximum contract quantities, but insist that this is "beside the point" because the 2008 OCAP BiOp found that contract diversions and exports would jeopardize delta smelt. ECF No. 1247 at 9. Plaintiffs complain that "Defendants can point to no analysis in the 2008 OCAP BiOp as to whether any specific contract terms needed to be modified to comply with the RPA." *Id.* at 1247 at 9. This generic argument was addressed and rejected above. *Supra* Part V.C.1.d. On this point, Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

### (b)    Shortage Provisions

Plaintiffs also argue that the 2015 Contract Renewal Reconsultation is unlawful because it fails to analyze the effect of the contracts' shortage provisions on Delta outflow. ECF No. 1184 at 14. But, the 2008 OCAP BiOp considered the shortage provisions, *see* FWS 13873 (indicating that operations were assumed to be at 100% delivery to SRS Contractors, except in Shasta critical years, in which case delivery is reduced by 25%); FWS 13901-02 (discussing shortage provisions applicable to the DMC Contracts), as did the 2015 Supplemental Information document provided by Reclamation to FWS. *See, e.g.*, FWS 13144 (describing SRS Contract shortage provisions); FWS 13145 ("Based on the current contract terms, Reclamation has reduced the amount of project water available to the DMC contractors for agricultural purposes in every year since 2008, and allocations of project water for DMC agricultural purposes has been zero the last two years."); *see also* FWS 13169-74 (confirming delivery reductions to

DMC Contractors).

More specifically, in the 2008 OCAP BiOp, the SRS Contracts' shortage provision was built into CalSim-II's modeling assumptions. *See* BOR 6341 (indicating that demands from SRS Contractors would be modeled at 75% in "Shasta Critical years"). Relatedly, there was no need to incorporate specifically the DMC Contractors' agricultural shortage provisions into the 2008 OCAP BiOp's analysis because those terms are complete pass-through shortage provisions. In other words, if other operational parameters indicate reduced, or even no, water will be available for delivery to the DMC Contractors, the DMC Contractors' shortage provisions mean that Reclamation can reduce those deliveries accordingly. In reply, Plaintiffs make no mention of their contention that the 2008 OCAP BiOp failed to evaluate the shortage provisions. The argument has no merit. Plaintiffs' motion for summary judgment as to this issue is DENIED; Defendants' cross motions are GRANTED.

### (c) Pricing, Timing & Conservation Terms

Plaintiffs likewise argue that the 2015 Contract Renewal Reconsultation fails to comport with the ESA because it fails to evaluate the effects of contract pricing, timing, and water conservation terms on Delta flows. Plaintiffs suggest that FWS's failure in this regard is unlawful because "the Ninth Circuit expressly held that [Reclamation] can negotiate timing, pricing, conservation, and other terms to benefit delta smelt. *NRDC v. Jewell*, 749 F.3d at 784-85." ECF No. 1184 at 14-15. Plaintiffs argue that, as a result of this holding, "FWS failed to consider those important aspects of the problem," and therefore that "its consultation was arbitrary and capricious." *Id*.

Again, Plaintiffs are mixing apples and oranges (or at least grapefruits and oranges). Plaintiffs reference a section of *NRDC v. Jewell* in which the Ninth Circuit was addressing the previously assigned district judge's holding that Plaintiffs' challenges to the SRS Contracts failed as a matter of law. More specifically, the district court held that Section 7's consultation requirement did not apply to the SRS Contract renewal because the Bureau's discretion in negotiating those contracts was "substantially constrained." 749 F.3d at 784. The Ninth Circuit reversed, finding that consultation is required whenever

the agency has "some discretion" to take action for the benefit of a protected species. *Id*. The Ninth Circuit found that the consultation requirement was triggered for SRS Contract renewal because Reclamation retained at least some discretion to renegotiate the SRS Contracts' terms with regard to "inter alia, their pricing scheme or the timing of water distribution." *Id*. at 785. This holding, however, has no bearing on whether Reclamation was <u>required</u>[17] to renegotiate those terms, or, most importantly for the instant discussion, whether a consultation over impacts of the SRS Contracts on delta smelt required independent evaluation of the pricing and timing terms. What Plaintiffs really appear to be requesting – an evaluation of whether alternative pricing and timing terms would have further benefitted smelt – is not, as discussed above, required by the ESA.

Moreover, at least with respect to the timing terms of the renewed contracts, the timing of water deliveries was incorporated into CalSim-II's modeling parameters as set forth in appendix D to the 2008 OCAP BiOp. BOR 6305 ("Demands are preprocessed independent of CalSim-II and may vary according to the specified level of development (e.g. 2005, 2030) and according to hydrologic conditions. They are typically input into the model as a monthly time series."); BOR 6389 (explaining that CalSim-II is a monthly model). On this point, Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

### (d) Liability Waivers

Finally, Plaintiffs argue in a single line that the 2015 Contract Renewal Reconsultation was unlawful because it failed to evaluate how liability waivers in the renewed contracts impact Delta

---

[17] Reclamation, for its own part, disagrees with the Ninth Circuit as to its own ability to renegotiate materially the pricing and timing terms of the SRS Contracts. FWS 13142-43. But this is of no moment. Nothing in this case puts that dispute on the table, because nothing in the ESA required Reclamation to renegotiate those terms. Nor is Plaintiffs' citation to *Ridge Top Ranch, LLC v. U.S. Fish & Wildlife Serv.*, No. CIV. S-13-2462 LKK, 2014 WL 841229, at *14 (E.D. Cal. Mar. 4, 2014), particularly helpful, as that case simply stands for the proposition that FWS must engage in a proper ESA consultation even if the action agency suggests an improperly narrow scope for the consultation. That case is of little relevance because Plaintiffs fail to point to anything in the ESA that required Reclamation to renegotiate any of the SRS Contracts' terms, let alone that requires FWS to evaluate the potential for renegotiating those terms, so long as the impacts of the contracts actually negotiated are considered.

outflow. ECF No. 1184 at 14. This argument is not developed, and the Court will not generate an argument for Plaintiffs, particularly given that it is not facially apparent that the liability waivers would impact Delta Outflow in any manner independent from the other provisions of the contracts. To the extent this argument is articulated, Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

### (6) Failure to Consider Reclamation's Ability to Meet Existing Outflow Requirements of D-1641

Plaintiffs next argue that the 2015 Contract Renewal Reconsultation was unlawful because it "did not assess the contracts' effects on the undisputed need to improve Delta outflow in certain seasons as directed by the best available science, on the ability of [Reclamation] to meet existing outflow requirements under [State Water Resources Control Board ("SWRCB") Decision]-1641[18], or on the ability of [Reclamation] to comply with the requirement for increased fall outflow in the 2008 OCAP BiOp that FWS found was necessary to avoid jeopardy to delta smelt." ECF No. 1184 at 14. Plaintiffs maintain that "[n]o determination that the renewed contracts do not adversely modify delta smelt habitat or jeopardize the species can be complete without such analysis." *Id.* (citing *See* 50 C.F.R. § 402.02). Plaintiffs further argue that "[t]he absence of that analysis is particularly egregious given the evidence before FWS of [Reclamation]'s inability to meet contract terms while also complying with existing smelt protections during dry water years." *Id.* (internal record citations omitted).

The above argument is closely related to and arguably subsumed within another of Plaintiffs' arguments related to the validity of baseline assumptions used in the 2008 OCAP BiOp. Plaintiffs

---

[18] In 1995, the SWRCB promulgated flow-dependent water quality objectives for the San Francisco Bay/Sacramento–San Joaquin Delta ("Bay-Delta") in the Water Quality Control Plan for the Bay-Delta (the "1995 Bay Delta Plan"). *See SWRCB Cases*, 136 Cal. App. 4th 674, 687 (2006). In 2000, with the issuance of D-1641, the SWRCB attempted to allocate responsibility among various water rights holders for meeting the water quality objectives set forth in the 1995 Bay Delta Plan. *Id.* Much of that responsibility was allocated to the CVP and SWP in the form of directives to ensure maintenance of salinity and outflow objectives. *Id.* at 710-12. Federal Defendants are obligated to comply with these and other state law mandates, so long as they do not conflict with federal law, by virtue of section 8 of the Reclamation Act of 1902. Pub. L. No. 57-161, 32 Stat. 288, at § 8 (June 17, 1902); *California v. United States*, 438 U.S. 645, 675 (1978).

suggest that the 2015 Contract Renewal Reconsultation is invalid because the baseline assumptions (*e.g.*, those related to the state-imposed flow requirements of D-1641 designed in part to maintain suitable conditions in the delta) that underpin the 2008 OCAP BiOp are no longer valid. ECF No. 1184 at 15. It is arbitrary and capricious for an agency to "fail[] to incorporate degraded baseline conditions into its jeopardy analysis." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 929 (9th Cir. 2008). "The proper baseline analysis is . . . what jeopardy might result from the agency's proposed actions in the present and future human and natural contexts." *Id.* at 930 (quotation, alteration omitted); *see also* 50 C.F.R. § 402.02 (defining "environmental baseline").

Plaintiffs are correct that the analysis of impacts to smelt in the 2008 OCAP BiOp assumed the operation of state-imposed flow requirements. FWS 13872 (explaining that various CalSim-II modeling runs assumed Delta outflow would be controlled in part by D-1641), FWS 13884-87 (explaining how D-1641 operates to constrain the CVP and SWP). Plaintiffs argue that FWS "certainly knew this assumption was no longer valid when it issued its concurrence letter." ECF No. 1184 at 15. In 2014 and 2015, Reclamation applied to the SWRCB and received permission to deviate from D-1641's outflow requirements as part of a series of "Temporary Urgency Change Petitions" ("TUCPs"). *See* BOR 8959-8984 (Feb. 28, 2014 SWRCB order approving Jan. 29, 2014 TUCP request); BOR 9680-9689 (Mar. 18, 2014 SWRCB Order modifying Feb. 29, 2014 order); BOR 9874-9894 (Ap. 11, 2014 SWRCB Order modifying the same); BOR 9899-9919 (Apr. 18, 2014 SWRCB order modifying the same); BOR 13519-13554 (Feb. 3, 2015 SWRCB order approving in part and denying in part Jan. 23, 2015 TUCP request); BOR 13576-13608 (Mar. 5, 2015 order modifying the same); BOR 13609-13650 (Apr. 6, 2015 order modifying the same); BOR 12077-12118 (July 3, 2015 SWRCB order conditionally approving January 23, 2015 TUCP request).

Reclamation re-initiated consultation on the 2008 OCAP BiOp in light of the multiple consecutive drought years that occurred in 2014 and 2015, along with related drought response modifications to CVP and SWP operations. *See* BOR 8829 (FWS response to BOR's January 31, 2014

request for consultation); BOR 12959-12962 (Jan. 27, 2015 request to reinitiate consultation). In support

of their argument here, Plaintiffs point to FWS's March 27, 2015 letter in response to Reclamation's

January 27, 2015 re-initiation request. FWS 13571-73. Plaintiffs quote from that letter to suggest that

FWS recognized that Reclamation's "proposed modifications to D-1641 [in 2014 and 2015] were not

anticipated in the project description for the 2008 OCAP BiOp." ECF No. 1184 at 15 (citing FWS

13572). But, this is a partial quotation. The full sentence in that letter reads:

> Although the proposed modifications to D-1641 were not anticipated in
> the project description for the 2008 [OCAP] BiOp, the resulting effects to
> Delta Smelt based on the Biological Review provided by Reclamation,
> appear to be within the range of effects previously analyzed in the 2008
> [OCAP] BiOp.

FWS 13572. Placed in context, this statement is equivocal at best. As the remainder of the letter makes

clear, FWS concurred with Reclamation that the drought modifications under consideration in that re-

consultation would result in no additional adverse effects on delta smelt or its critical habitat beyond

those previously analyzed in the 2008 OCAP BiOp. FWS 13572.

While the particular document referenced by Plaintiffs and quoted above only covers a portion of

the overall drought responses taken in 2014 and 2015, all of the TUCP-related changes implemented

during that entire period were subject to consultation as cited in the above paragraphs. FWS concluded

that the proposed TUCP modifications, including modifications to D-1641 requirements, were "within

the range of effects previously analyzed in the [2008 OCAP BiOp]" and that the "proposed modification

will have no additional adverse effects on delta smelt or its critical habitat." BOR 8830. FWS issued

similar concurrences for each TUCP request, confirming that each set of temporary changes to

operations on delta smelt were within the effects analyzed in the 2008 OCAP BiOp. *See, e.g.*, BOR

8892-31; BOR 9033-36; BOR 12925-27; BOR 12965-12967. Plaintiffs do not (at least not here)

challenge the outcomes of these consultations. Instead, they simply argue that, overall, this pattern of

seeking and obtaining permission to deviate from the requirements of D-1641 has shifted the baseline

underpinning the 2008 OCAP BiOp. The problem is, given the reasoning provided in FWS's

concurrences issued in connection with these drought-related reconsultations and absent contrary evidence, any shift to the baseline is immaterial to the ultimate question: whether the action will jeopardize the delta smelt or adversely modify its critical habitat. The 2008 OCAP BiOp concluded that with the implementation of the RPA, operation of the SVP and SWP will not cause jeopardy or adverse modification. The drought-related reconsultations relatedly concluded that drought-related deviations from D-1641 would result in no additional impacts to delta smelt, and thus the deviations from D-1641 do not represent a material degradation to the baseline conditions. Plaintiffs' motion for summary judgment on this issue is DENIED; Defendants' cross motions are GRANTED.

### (7)    Consideration of Best Available Science

As mentioned, in 2015, this Court granted Federal Defendants' motion to stay this litigation while reconsultation took place, in part because the stay would "allow the agencies to revisit whether approval of the Contracts comports with the ESA in light of the most up-to-date information." ECF No. 979 at 12. Section 7 requires that agencies base consultations on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). "The purpose of the best available science standard is to prevent an agency from basing its action on speculation and surmise." *San Luis v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). "Under this standard, an agency must not disregard available scientific evidence that is in some way better than the evidence it relies on." *Id*. (quotation and alterations omitted). Even if the agency has a reasonable basis for disagreeing with the available information, it must acknowledge and address it in some way. *See id*. Plaintiffs argue that the 2015 Contract Renewal Reconsultation failed to consider the following pieces of "best available science": (1) survey information from the two years leading up to 2015 showing unprecedented low population numbers of delta smelt; (2) the fact that Reclamation had repeatedly sought and received significant waivers from state outflow and export requirements; (3) and relatively new (post-2008) scientific information demonstrating the need for increased Delta outflow to protect delta smelt and smelt habitat, including testimony before the SWRCB in 2010 and the 2015 "MAST Report." ECF No. 1184 at 16-17.

### (a)     <u>Survey Data</u>

Plaintiffs argue that FWS failed to analyze survey data showing that, in the two years leading up to the issuance of the 2015 LOC, the delta smelt population had reached unprecedented low levels. *See* FWS 13184, 13207, 13575, 15523-24, 16194-95 (collectively, showing that several surveys returned record-low catches in 2014 and 2015). However, as part of its consultation package, Reclamation provided to FWS Supplemental Information, which included an Appendix updating FWS on the Status of the Species, including the information about recent population surveys. FWS 13183 (discussing survey data through 2015, including the fact that the 2015 "population index was at an all-time historic low at 0.0"). FWS indicated that it considered this information as part of its review. FWS 13721 (2015 LOC indicating FWS considered Reclamation's Supplemental Information document, which in turn referenced the Status of the Species update as an Appendix thereto (*see* 13148)). Plaintiffs' are simply incorrect on this point.

### (b)     <u>New Hydrology and Flow Information</u>

Plaintiffs next argue that FWS failed to consider new information pertaining to hydrology and flows in the Delta, namely, that Reclamation repeatedly sought and received waivers from protective state outflow and export constraints. ECF No. 1184 at 16-17. This is essentially the same argument discussed above, couched in terms of the best available science standard. It fails for at least two reasons. First, the 2015 Status of the Species document discussed the TUCP-related waivers, as well as the continued downward trend in smelt populations "since [that] period of drought." FWS 13113-14. Second, as detailed above, FWS concluded in the context of the TUCP consultations that drought-related departures from the state outflow and export constraints would result in no additional impacts to delta smelt. Plaintiffs do not take issue with that conclusion. Therefore, the record demonstrates: (1) that FWS, by considering Reclamation's 2015 consultation submission, did in fact consider this new information about waivers from protective state outflow and export constraints; and (2) even if FWS had not done so, there is no basis upon which this Court could find FWS's failure to address directly

information pertaining to the TUCPs in this consultation violated the best available science standard, which makes it unlawful for an agency to "disregard available scientific evidence that is in some way better than the evidence it relies on." *Locke*, 776 F.3d at 995. Federal Defendants were not required to repeat analyses anew for the 2015 Contract Renewal Reconsultation. They may rely on and incorporate by reference other consultation efforts.

### (c)     Information Made Available After 2008 Indicating the Importance to Delta Smelt of Increasing Outflow

Plaintiffs next fault the 2015 Contract Renewal Reconsultation for failing to consider post-2008 scientific information, namely Department of the Interior testimony presented to the SWRCB in 2010 and the 2015 MAST Report. ECF No. 1184 at 17. The 2010 information to which Plaintiffs refer was produced as part of a public process organized by the SWRCB aimed at developing new flow criteria for the Delta ecosystem to protect public trust resources, as required by California's Delta Reform Act of 2009, California Water Code §§ 85000 *et seq. See* FWS 15637. As part of that process, FWS provided comments indicating that "[i]ncreased Delta inflows are needed to improve the quality and availability of habitat within the Delta." FWS 15587.

Relatedly, the 2015 MAST Report was the product of a team of scientists (the so-called Management, Analysis, and Synthesis Team) operating under the Interagency Ecological Program for the San Francisco Estuary ("IEP"). FWS 15316, 15336. The IEP has studied, among other things, the so-called "Pelagic Organism Decline" ("POD"), a reference to "the sudden, overlapping declines of San Francisco Estuary pelagic fishes since about 2002." FWS 13185-86. The MAST Report analyzed new quantitative modeling of the impacts of outflow on delta smelt and found that juvenile delta smelt abundance is strongly related to increased spring outflow. FWS 15471. FWS concluded in January 2015 in connection with one of the TUCP reconsultations that the "MAST report may provide valid new information that spring outflow has a positive impact on the relative abundance of Delta Smelt surviving to the early juvenile phase of their life cycle." FWS 13306 (Jan 30, 2015 letter from FWS to BOR).

Plaintiffs are incorrect to assert that the MAST Report was not considered in the context of this consultation. It was cited in the 2015 Status of the Species document and explicitly discussed therein. *See, e.g.*, FWS 13184-13186. Plaintiffs do not take issue with how the MAST Report was treated in the record. Their motion fails on this ground.

As for the earlier information related to the 2010 SWRCB process, it does not appear that in <u>this</u> consultation FWS directly considered its own testimony provided during the SWRCB process. That said, the FWS testimony in question appears to have been based on information closely related but precursor to that which formed the basis of the MAST Report, *see* FWS 15587 (FWS 2010 comments discussing relationship between location of X2 and suitable smelt habitat as well as X2's potential relationship to the POD), which was considered. Therefore, as the MAST Report was considered in this consultation, it is unclear what, if any, distinct information is raised in the 2010 SWRCB comments. It is not the Court's responsibility to uncover these nuances.

In sum, as to the use of best available science, Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

### (8)    Deferral of Analysis of Contract Effects

There is one remaining issue that requires careful consideration. Plaintiffs argue that FWS's 2015 LOC unlawfully deferred consideration of whether increased outflows are needed to protect delta smelt. As mentioned, the 2015 LOC concluded by stating:

> We are concerned about the continued decline of delta smelt as demonstrated by the historically low numbers in all recent survey efforts. Reclamation had identified Article 7(b) of the SRS contracts as one that "may affect the availability of water under the SRS contracts" by requiring compliance with biological opinions prepared as a result of consultation regarding the execution of the SRS contracts. *See* Supplemental Information to the Sacramento River Settlement Contractors Biological Assessment, Long-term Contract Renewal; and Supplemental Information to the Long Term Renewal of Water Service Contracts in the Delta Mendota Canal Unit (July 2015). The DMC Contracts contain a similar provision. As articulated in Reclamation's letter dated December 11, 2015, we understand the 2008 [OCAP] BiOp is the result of a consultation regarding the execution of the SRS and DMC contracts and any

subsequent reinitiation of consultation on the coordinated operations of the CVP and SWP, which are subject to the 2008 [OCAP] BiOp, or the SRS and DMC contract renewals would also be one "regarding the execution of the contract" and would, therefore, be subject to the terms of Article 7(b). In future consultations to ensure adequate protection of delta smelt and its critical habitat under the Act, we may require greater certainty as to Reclamation's ability to provide needed outflow through the Delta. If increased outflows are needed and cannot be met under the SRS contracts, those contracts may need to be revisited to ensure consistency with the Act.

FWS 13721.[19] As mentioned above, the Court reads this to mean that when 2030 comes around, the CVP and SWP will not be able to operate lawfully without another valid OCAP BiOp (or equivalent) in place. At that time, if a future OCAP BiOp concludes additional protections are needed to avoid jeopardy to delta smelt or adverse modification to its critical habitat, the language in Reclamation's Supplemental Information, as interpreted and applied by FWS in its 2015 LOC, will require Federal Defendants to revisit the SRS Contracts if doing so is necessary to implement the recommended protections.

At the heart of Plaintiffs argument is the proposition that FWS is required to perform a comprehensive biological review now, even if reconsultation might be triggered in the future. ECF No. 1184 at 17 (citing *Wild Fish*, 628 F.3d at 525 ("The duty to reinitiate consultation in the future, however, does not diminish the Service's obligation to prepare a comprehensive biological opinion now.")). But here again, the generic nature of Plaintiffs challenge leaves the Court without any basis upon which to find FWS acted unlawfully. While the paragraphs quoted above from the 2015 LOC are not models of

---

[19] Plaintiffs also point out that a draft of FWS's 2015 LOC stated that "the Service [wa]s concerned as to whether implementation of the [RPA] in the 2008 BiOp continues to avoid the likelihood of jeopardy to the species and/or adverse modification of its critical habitat." FWS 13264. Federal Defendants object to Plaintiffs' reliance on this draft document, ECF No. 1210-1 at 22-23, citing *Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) ("The federal courts ordinarily are empowered to review only an agency's final action, see 5 U.S.C. § 704, and the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decision making process arbitrary and capricious.") and *Nat'l Wildlife Fed'n v. U.S. Army Corp. of Eng'rs*, 384 F.3d 1163, 1174-75 (9th Cir. 2004) (rejecting argument that content of email and attachment undercut agency determination, and noting that email was an informal, inter-agency communication, and attachment was "preliminary and not the official view of [the] agency"). The Court does not believe is it necessary to consider the draft document here, because the draft document does not change the fundamental question raised by the final document, namely, whether or not FWS unlawfully deferred consideration of an important issue to future consultations.

clarity, FWS concurred with Reclamation's assertion that the effects on delta smelt of delivering water under the SRS and DMC contracts were incorporated into the 2008 OCAP BiOp, which in turn avoids jeopardy to the continued existence of the delta smelt and destruction or adverse modification of smelt critical habitat. FWS 13144 ("In addition, the effects of delivering water under the terms of the SRS Contracts were incorporated into the 2008 [OCAP BiOp], which avoids jeopardy to the continued existence of the delta smelt and destruction or adverse modification of its critical habitat."); FWS 13145 ("Reclamation is not proposing any changes to the DMC contracts, including different pricing terms or changes to the timing of deliveries, because the effects of delivering water under the terms of the DMC contracts were incorporated into the 2008 LTO BO, which includes a multi-faceted RPA that avoids jeopardizing the continued existence of the delta smelt and destruction or adverse modification of its critical habitat."). While FWS's 2015 LOC certainly expressed concern that reconsultation might result in a changed determination in the future, this cautionary note does not change the nature of the consultation that did take place and that is under review here. As to this Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

### (9)     Was FWS's Concurrence Contrary to the Evidence

Plaintiffs final argument regarding the fourth cause of action is that "FWS's conclusion that the 2008 [ ] OCAP BiOp ensures the contracts avoid jeopardy is also arbitrary because it runs counter to the evidence before FWS regarding the delta smelt's drastically reduced population, the contracts' impacts on Delta flows, and the year-round importance of flows to smelt habitat." ECF No. 1184 at 18. "An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1109 (9th Cir. 2012) (internal quotation omitted).

Plaintiffs fail to elaborate in detail on their contention that FWS's 2015 LOC runs counter to the evidence before it. ECF No. 1184 at 18. From what the Court can tell, Plaintiffs maintain that the post-2008 information mentioned in the best available science discussion above represented a distinct enough departure from past information that FWS could not possibly have relied upon the 2008 OCAP BiOp in light of that newer information. The Court does not believe the record supports this contention. For example, the Status of the Species document incorporated into Reclamation's Supplemental Information reviewed the new survey data in detail and suggested the latest trends, no matter how apparently dire, were not a great departure from the past. FWS 13183. In addition, the record, as discussed in detail above, *supra* Part V.C.6, suggests that the waivers from D-1641's flow requirements granted in 2014 and 2015 did not amount to material changes to the baseline. Plaintiffs do not present record evidence to suggest otherwise. Finally, Plaintiffs have not demonstrated that the MAST report, which was also discussed in the Status of the Species document, FWS 13183-86, represents a material departure from the scientific methods applied prior to its publication such that conclusions issued prior to 2015 would be rendered inherently invalid. *See San Luis v. Locke*, 776 F.3d at 994 ("This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise.").

As to this argument, Plaintiffs' motion for summary judgment is DENIED; Defendants' cross motions are GRANTED.

**D.      Second Cause of Action**

The Court has reviewed carefully all the remaining arguments in this case pertaining to the second cause of action and finds all but one argument is entirely (or at least dispositively) derivative of the issues raised and addressed above. *See* ECF No. 1184 at 18 (Plaintiffs arguing that "[the reconsultation BOR eventually initiated with FWS in 2015 failed to comply with Section 7 for all of the reasons described in [Plaintiffs' arguments regarding the fourth cause of action]").

The only argument that is not entirely derivative of the fourth claim for relief concerns how

Reclamation represented/requested consultation. Plaintiffs argue Reclamation wrongly instructed FWS to limit its consultation to whether the renewed contracts were addressed by the 2008 OCAP BiOp. ECF No. 1184 at 19 (citing Reclamation's reinitiation letter, FWS 13129-30, and a subsequent clarification of that request FWS 13266-68).[20] As to this argument, Plaintiffs do not represent holistically the nature of Reclamation's reconsultation request. Reclamation's request indicates that Reclamation "decided to reinitiate consultation with [FWS] on the existing [SRS] Contracts [ ] and [DMC] Contracts to determine if the renewal of those contracts, given [FWS's 2008 OCAP BiOp] avoids: (a) jeopardy to the delta smelt [ ]; and (b) destruction and adverse modification of delta smelt critical habitat." FWS 13128-29. Reclamation attached to its consultation request the Supplemental Information and incorporated the Status of the Species document to "assess whether the renewed SRS and DMC contracts avoid the likelihood of jeopardy to delta smelt and destruction or adverse modification of its critical habitat . . . ." FWS 13129. As discussed above, those incorporated documents in turn are not stuck in 2008. They examine information that postdates the 2008 OCAP BiOp. Accordingly, the consultation requested is not as myopic as Plaintiffs suggest. Plaintiffs also complain the Reclamation misrepresented to FWS that it lacked discretion to negotiate changes to the quantity, pricing, and timing of water diversions. But, as discussed above, *supra* Part V.C.1.d, even assuming this is true, it is not material to Plaintiffs' consultation claim. Reclamation was not required to renegotiate those terms and may present its project to FWS as it sees fit within the bounds of the law. Therefore, the Court finds there are no viable, non-derivative arguments in connection with the second cause of action. The Court will therefore not expend the resources required to address the jurisdictional threshold challenge to Plaintiffs' second cause of action, namely that Plaintiffs have not complied with the ESA's pre-suit notice requirements.

Therefore, Plaintiffs' motion for summary judgment as to the second cause of action is DENIED;

---

[20] Plaintiffs also, relatedly, appear to argue FWS acted unlawfully by limiting its consultation to whether the renewed contracts' impacts were addressed by the 2008 OCAP BiOp, thereby failing to consider more up-to-date information. ECF No. 1184 at 9. The argument underpinning this contention was rejected above, the Court having found that FWS did not fail to consider post-2008 information. *Supra* Part V.C.7.

Defendants' cross motions are GRANTED.

## VI. CONCLUSION AND ORDER

For the reasons set forth above, Plaintiffs' motion for summary judgment as to the fourth and second causes of action is DENIED and Defendants' cross-motions are GRANTED. The Clerk of Court is directed to terminate FWS as a Defendant. The case shall remain open, however, as the sixth claim for relief against numerous other Defendants remains alive and is set for a bench trial.

IT IS SO ORDERED.

Dated:   **February 26, 2019**            **/s/ Lawrence J. O'Neill**
                                        UNITED STATES CHIEF DISTRICT JUDGE