# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NATURAL RESOURCES DEFENSE COUNCIL**, *et al.*,<br><br>**Plaintiffs**,<br><br>vs.<br><br>**DAVID BERNHARDT, Acting Secretary, U.S. Department of the Interior**, *et al.*,<br><br>**Defendants.** | Case No. 1:05-cv-01207 LJO-EPG<br><br>**ORDER GRANTING MOTION TO STAY SIXTH CLAIM FOR RELIEF; AND DENYING WITHOUT PREJUDICE MOTIONS TO DISMISS SIXTH CLAIM.**<br><br>ECF NOS. 1323-24, 1381-82 |
| **SAN LUIS & DELTA MENDOTA WATER AUTHORITY**, *et al.*,<br><br>**Defendant-Intervenors.** | |
| **ANDERSON-COTTONWOOD IRRIGATION DISTRICT**, *et al.*,<br><br>**Joined Parties.** | |

## I. <u>INTRODUCTION</u>

Before the Court for decision in this long-standing, highly complex Endangered Species Act ("ESA") case are the following motions: two defense motions to dismiss the remaining aspects of the only remaining claim (the sixth claim for relief) in this case on mootness grounds; Plaintiffs' motion to stay the sixth claim in light of newly-filed, related litigation; Federal Defendants' related motion to dismiss the seventh claim for relief as moot; and Plaintiffs' request for entry of separate judgment under Federal Rule of Civil Procedure 54(b) as to the second, fourth, and fifth claims for relief. The matters were taken under submission on the papers pursuant to Local Rule 230(g). The Court has thoroughly reviewed and considered the briefs and authorities cited therein in light of the entire record. For the

1

reasons set forth below the motion to stay is GRANTED, and the motions to dismiss are DENIED WITHOUT PREJUDICE as MOOT. In the coming days, the Court plans to enter a separate order requesting supplemental briefing in connection with Federal Defendants' motion to dismiss the seventh claim for relief. The Court also will endeavor to rule on Plaintiffs' remaining request for entry of separate judgment before the end of the month. If it cannot complete that last task, that remaining motion will be handled by the jurist who will soon be assigned to this and related cases.

## II. BACKGROUND

On March 12, 2018, Plaintiffs, a coalition of environmental interest groups led by the Natural Resources Defense Council ("NRDC"), filed the currently operative Sixth Supplemental Complaint ("6SC"), which includes numerous claims brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, against the U.S. Bureau of Reclamation ("Bureau" or "Reclamation"), the U.S. Fish and Wildlife Service ("FWS" or "Service"), and various Joined Defendants and Defendant Intervenors. *See generally* ECF No. 1187.

Certain aspects of the sixth claim for relief arising under Section 9 of the ESA, 16 U.S.C. § 1538 ("Section 9"), remain unresolved. Generally, the sixth claim ("Section 9 Claim") alleges that certain holders of a type of long-term, priority water contract, known as the Sacramento River Settlement Contracts ("SRS Contracts" or "SRS Contractors" when referring to the holders), and Reclamation violated Section 9's prohibition against taking listed species because they caused substantial temperature-dependent mortality of Sacramento River winter-run Chinook salmon ("winter-run") and Central Valley spring-run Chinook salmon ("spring-run") eggs and fry (young fish) in the Upper Sacramento River in 2014 and 2015. 6SC at ¶¶ 201-205.

Section 9 of the ESA makes it unlawful for any person to "take," *i.e.*, to harm, kill or harass, any listed endangered species of fish or wildlife within the United States, 16 U.S.C. §§ 1538(a)(1)(take prohibition), 1532(12) (definition of "take"), unless an exemption from the take prohibition is obtained pursuant to certain other ESA provisions, *see id.* §§ 1536(b)(4), 1536(o), 1539(a). The Section 9 Claim

2

against the SRS Contractors focuses on the impact on Sacramento River temperatures of the SRS Contractors' diversion of water pursuant to their priority water rights. Without belaboring the point or delving into detail that is unnecessary to this order, it is safe to say that at the time this Court ruled on the parties' cross-motions for summary judgment concerning the Section 9 Claim, the SRS Contractors did not hold any permit or other form of exemption from Section 9's take prohibitions with respect to their primary, priority diversions from the Sacramento River. *See Nat. Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465, 484 (E.D. Cal. 2018).

The Section 9 Claim against Reclamation focuses on Reclamation's discretionary activities, including actions Reclamation took in 2014 and 2015 to facilitate voluntary transfers between the SRS Contractors and others, as one part of Reclamation's overall role in the coordinated operation of the federal Central Valley Project ("CVP") and State Water Project ("SWP") (collectively, the "Project").[1] ESA Section 7(a)(2) imposes a procedural duty on Reclamation to consult with FWS or the National Marine Fisheries Service ("NMFS"), depending on the protected species at issue,[2] to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitats of listed species. 16 U.S.C. § 1536(a)(2).

Reclamation has on numerous occasions engaged in consultation over the Project with both FWS and NMFS. Formal consultation results in the issuance of a "biological opinion" ("BiOp") by the relevant wildlife agency (FWS or NMFS). *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id*. §

---

[1] Reclamation coordinates with California's Department of Water Resources to operate the CVP and SWP. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 594, 597 (9th Cir. 2014).

[2] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), *as corrected* (Oct. 31, 2008). NMFS is granted jurisdiction over fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id*. NMFS exercises jurisdiction over the winter-run and spring-run Chinook salmon.

1536(a)(2), then the action may not go forward unless the wildlife agency can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If a BiOp concludes that the proposed action (or the action implemented in conjunction with actions described in the RPA) will cause incidental taking[3] of protected species, but that despite this taking, the action will not jeopardize the species or threaten critical habitat, the wildlife agency

> shall provide the Federal agency and the applicant concerned, if any with a written statement that—
>
> (i) specifies the impact of such incidental taking on the species,
>
> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
>
> (iii) . . . , and
>
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

*Id*. § 1536(b)(4). This written statement, with its "reasonable and prudent measures" ("RPM") and associated terms and conditions, is referred to as an "Incidental Take Statement" ("ITS"), which, if followed, exempts the action agency from the prohibition on takings found in Section 9. *Id*. § 1536(o); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

At the time of the filing of the 6SC, the Project was operating under dual "jeopardy" BiOps, one issued by FWS covering certain aquatic and terrestrial species under FWS jurisdiction, and a second issued by NMFS in 2009 ("2009 NMFS BiOp"), covering winter-run, spring-run, and several other species under NMFS jurisdiction. As a condition on Project operation, the 2009 NMFS BiOp imposed a number of conditions designed to protect winter-run and spring-run Chinook, including temperature management protocols applicable to operation of the dams that control the flow of water into the

---

[3] Incidental take is that which "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C § 1539(a)(1)(B).

4

Sacramento River (primarily, Shasta and Keswick Dams). *Zinke*, 347 F. Supp. 3d at 482-83, 521. Concurrent with the issuance of the 2009 NMFS BiOp, NMFS issued to Reclamation an ITP, exempting Reclamation from Section 9 take liability so long as the agency complies with the terms and conditions set forth therein, including requirements related to temperature control. *Id*. At all times, Plaintiffs' success on its Section 9 claim against Reclamation therefore hinged, at least in part, on proving that Reclamation's conduct was not in conformity with the ITS covering the coordinated operation of the Project. *See id*. at 523.

Since early 2019, the parties and the Court were aware that Reclamation and NMFS actively had been engaged in the process of revisiting and possibly revising the conclusions of and conditions set forth in the 2009 NMFS BiOp through a process of "reconsultation" under ESA Section 7. On August 15, 2019, the Court vacated the then-impending trial date because release of a revised BiOp appeared imminent–or at least imminent enough to make it impractical and wasteful for the parties and the Court to prepare for trial. ECF No. 1366. Critically, public records available at that time, including Reclamation's Biological Assessment ("BA")[4], suggested that, at the very least, the Court would have to examine closely any revised BiOp to determine its impact upon the pending claims. *See generally id*.

NMFS issued its revised BiOp October 22, 2019 ("2019 NMFS BiOp"). *See* ECF No. 1374 (Corrected Notice of Administrative Decisions).[5] The 2019 NMFS BiOp concluded that Reclamation's proposed plan for the coordinated operation of the Project would <u>not</u> cause jeopardy to the listed species addressed therein, including the winter-run and spring-run Chinook. 2019 NMFS BiOp at 797. The

---

[4] The ESA Section 7 consultation process normally begins with the preparation by the "action agency" (i.e., the agency proposing the project) of a BA, which is designed to determine whether any listed species "is likely to be affected" by the action. 16 U.S.C. § 1536(c)(1). If the BA determines that a threatened or endangered species "is likely to be affected," the agency must formally consult with the FWS or NMFS (sometimes referred to generically as "wildlife agencies"). *See id*. § 1536(a)(2); 50 C.F.R. § 402.14. Formal consultation results in the issuance of a BiOp by the relevant wildlife agency. *See id*. § 1536(b). In this case, Reclamation is the "action agency" that proposed the project under review, namely the coordinated operation of the CVP and SWP, so the reconsultation process began in earnest with Reclamation's issuance of a BA.

[5] The full text of the revised 2019 NMFS BiOp is available at https://www.fisheries.noaa.gov/resource/document/biological-opinion-reinitiation-consultation-long-term-operation-central-valley (last visited January 15, 2020). Hereafter, references to this document will simply be to the internal pages within the version available online.

5

jeopardy analysis in the 2019 NMFS BiOp relies in large part on measures designed to protect listed species Reclamation embedded within its proposed operational plan. *Id*. at 14-19. The 2019 NMFS BiOp contains a revised ITS, which sets forth updated terms and conditions under which incidental take caused by the Project is exempted from Section 9 take liability. *Id*. at 797-824. However, the 2019 NMFS BiOp itself indicates that "[t]he incidental take exemptions provided for in this [ITS] are effective only upon Reclamation's issuance of the Record of Decision [("ROD")[6]]." *Id*. at 797. As of the date of this decision, Reclamation has yet to issue a ROD.[7]

Following the issuance of the 2019 NMFS BiOp, the parties agreed to a schedule for the filing/renewal of the pending motions, understanding that the undersigned will be retiring from the bench at the end of January 2020. That effort resulted in the renewal, updating, and completion of briefing on two motions to dismiss, one filed by Federal Defendants (ECF Nos. 1323 & 1381), the other by the SRS Contractors (ECF Nos. 1324 & 1382), as well as the filing of a separate motion to stay and for separate entry of judgment as to certain claims in this case filed by Plaintiffs (ECF No. 1384).[8] Despite what appears to be the parties' best efforts to expedite and narrow the briefing to facilitate resolution of as many issues as possible by the undersigned, the motions are lengthy and complex. The Court has reviewed the arguments and relevant authorities with care and notes that the issues are numerous and nuanced, with several issues of first impression embedded therein.

---

[6] The issuance of a BiOp by one or both of the wildlife agencies (FWS and/or NMFS) does not end the ESA permitting process. The action agency still must accept or decline any conditions set forth therein and comply with any other regulatory requirements; the culmination of this last decision-making stage is normally the issuance of a ROD. *See Consol. Salmonid Cases*, 688 F. Supp. 2d 1013, 1025 (E.D. Cal. 2010). In the present case, as set forth in the next footnote, Reclamation is undertaking a review pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq*., prior to issuing a final decision.

[7] The Court takes judicial notice of Reclamation's release on December 19, 2019, of its Final Environmental Impact Statement on the Reinitiation of Consultation on the Coordinated Long-Term Operation of the Central Valley Project and State Water Project, available at https://www.usbr.gov/mp/nepa/nepa_project_details.php?Project_ID=39181 (last visited January 15, 2020). The website on which that document is posted indicates that Reclamation "will make a decision on the project no earlier than January 21, 2020." *Id*. Practically speaking, even if a Record of Decision issues between January 21, 2020 and the end of the month, given this Court's workload, that timeline does not afford sufficient time to revisit the issue.

[8] Plaintiffs have withdrawn a separate motion for reconsideration. *See* ECF Nos. 1335, 1383.

## A. Motions to Dismiss are Premature

Although the Court would prefer to aid its successor jurist by resolving as many issues as possible, certain matters cannot be resolved at this time. In particular, the Court agrees with Plaintiffs that the motions to dismiss are premature. Both the Federal Defendants' and SRS Contractors' motions are premised on the proposition that the interposition of a new regulatory regime as set forth in the 2019 NMFS BiOp renders Plaintiffs' remaining claims moot. *See generally* ECF Nos. 1381, 1382. But, "[r]egardless of whatever steps have been taken thus far, [Reclamation] can change its mind (or, more precisely, has not yet made up its mind) until it issues a [ROD]." *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 156-57 (D.D.C. 2011); *see also Consol. Salmonid Cases*, 688 F. Supp. 2d at 1025 ("[U]ntil Reclamation determined that it would provisionally accept the RPA[]s, the BiOp was not binding upon Reclamation.").

## B. Order of Motions

Even if Reclamation soon issues its ROD without materially changing any aspect of the Project, the Court would hesitate to act at this time in light of the inescapable reality that Plaintiffs have filed a challenge to the 2019 NMFS BiOp. *See Pac. Coast Fed'n of Fishermen's Assns., et al. v. Ross, et al.*, 3:19-cv-07897-LB. That lawsuit challenges the 2019 NMFS BiOp and a parallel "no-jeopardy" BiOp issued by FWS. Among the numerous grounds alleged therein, Plaintiffs allege that "Reclamation's plan eliminates important protections that were required by the 2009 Biological Opinion and intended to ensure adequate cold water to meet temperature requirements, and is likely to result in adverse water temperatures [in the lower Sacramento River], among other places, causing adverse impacts on winter-run and spring-run Chinook salmon and Central Valley steelhead." *Ross*, Docket No. 1, ¶ 89(c). The Prayer requests that the BiOps, including their ITSs, be held unlawful and set aside, and that the agencies be enjoined from relying on the BiOps until lawful BiOps have been produced. *Id*. at p. 47.

Plaintiffs' motion to stay argues that the most efficient way forward is to stay this case while that litigation proceeds because, if Plaintiffs' prevail in their challenge to the 2019 NMFS BiOp, the

7

challenged BiOp and its ITS may be set aside. If that occurs, their argument continues, the foundation underlying the remaining claims in this case, and the basis for Defendants' motions to dismiss, would shift again. *See* ECF No. 1384-1 at 4-10.

Defendants argue that the Court should address their jurisdictional motions first, citing *Ex Parte McCardle,* 74 U.S. 506, 514 (1868), for the very general proposition that "[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (emphasis added). It is undeniably true that a court of limited jurisdiction cannot resolve a claim on the merits if it lacks jurisdiction over that claim. However, Defendants' citation to this arcane language fails to acknowledge more nuanced jurisprudential rules that apply today, more than a century and a half after *McCardle* was decided. "[J]urisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). Thus, the Ninth Circuit has stated that courts have "leeway choose among threshold grounds for denying audience to a case on the merits." *Potter v. Hughes*, 546 F.3d 1051, 1055 (9th Cir. 2008) (internal quotation omitted). Because of the general rule that district courts are courts of limited jurisdiction, they normally should resolve matters of subject matter jurisdiction before other threshold issues. *Id.* at 1061. But there are exceptions to this rule. Specifically, where the other threshold issue "creates the jurisdictional issue," or the resolution of the threshold issue is "clear," while the jurisdictional issue is "difficult," it can be appropriate for the court to act on the other threshold issue without confirming jurisdiction. *Id*.

While the Court cannot locate any cases that apply *Potter* to the precise arrangement of circumstances presented here,[9] the Court believes the general principles of both *Potter* exceptions are

---

[9] Cases in this circuit have applied a *Potter*-inspired test to determine the order of business where a motion to remand is competing with a motion to stay a matter pending transfer to a Multi-District Litigation court. *See Conroy v. Fresh Del Monte Product, Inc*., 325 F. Supp. 2d 1049, 1053 (N.D. Cal. 2004) (explaining that first, a court should give preliminary scrutiny to the merits of the motion to remand; second, if the jurisdictional issue appears factually or legally difficult, the court should determine whether identical or similar jurisdictional issues have been raised in other cases that have been transferred to the MDL; and finally, if the jurisdictional issue is both difficult and similar or identical to those in cases transferred or likely to

8

applicable. First, the "other issue" relevant here is the existence of the parallel *Ross* litigation. Although Plaintiffs' lawsuit does not "create" the jurisdictional issue, the BiOp it challenges does. Therefore, the *Ross* lawsuit, which seeks to invalidate the 2019 NMFS BiOp has the potential to upend the essential bases underpinning Defendants' motions to dismiss.

Even if it is inappropriate to extend the first *Potter* exception in this manner, the second exception applies. The jurisdictional issues here are unusually difficult and complex. The general issue presented in the Defendants' mootness motions is whether it has become "impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 173 (2013). Among the many difficult questions presented by the unique circumstances presented here are the following, which are posed here simply as examples:

- Federal Defendants maintain that the remaining aspects of the Section 9 Claim against them "largely center" on whether Reclamation's past conduct violates the 10-year, long term performance measures in the 2009 NMFS BiOp ITS. ECF No. 1090 at 3. Federal Defendants argue that it is "mathematically impossible" for Plaintiffs to prove that Reclamation violated the 10-year performance standard, presumably because there will not have been ten years of performance under the 2009 NMFS BiOp ITS before the regulatory regime was changed. *Id*. at 4. Federal Defendants point out, correctly, that there is no substantially similar 10-year performance measure in the 2019 NMFS BiOp and ITS. *Id*. The Court notes, however, that while its analysis of Federal Defendants' motion for summary judgment focused on the 10-year performance standard, questions were raised in its ruling on that motion regarding whether there were other, enforceable aspects to the 2009 BiOp ITS. *See Zinke*, 347 F. Supp. 3d 482-83, 523 (denying Federal

---

be transferred, the court should stay the action); *see also Rubio v. Arndal*, No. 1:13-CV-0027-LJO-BAM, 2013 WL 796669, at *3 (E.D. Cal. Mar. 4, 2013) (relying on *Conroy* to stay matter while denying motion to remand as moot).

Defendants' motion for summary judgment, finding that, while it is unclear exactly how certain long-term performance measures are to be interpreted and applied, there are fact disputes as to whether Reclamation complied with the terms and conditions of the 2009 NMFS BiOp ITS); *see also id*. at 521 (noting that the 2009 BiOp appears to include a separate, possibly independent, take trigger in the 2009 NMFS BiOp ITS, which indicates that "incidental take will be exceeded if the water temperature exceeds 56°F upstream of the established [temperature compliance point ("TCP")]" and that "if the TCP performance goals in the RPA action are exceeded, then take is exceeded for this action, and Reclamation shall reinitiate consultation"). As a result, whether it is "mathematically impossible" for the 2009 BiOp ITS's long-term (10-year) performance measures to be violated may not be dispositive of the fate of Plaintiffs' remaining claims against Federal Defendants. If Reclamation was subject to a short-term temperature management requirement (e.g., if water temperature exceeded 56°F upstream of the TCP) in 2014 and/or 2015, would it be impossible for the Court to offer Plaintiffs relief if Plaintiffs' allegations plausibly suggest that requirement was violated and that similar conduct by Reclamation is likely to cause take outside the take limits of the 2019 NMFS BiOp's ITS in the future?

- In light of the factual allegation that three brood years in a row (2013, 2014, and 2015) suffered catastrophic losses, Plaintiffs argue that the population level harm from these losses to the species in question, which have three-year life cycles, is ongoing. Can this form a sufficient basis to impose injunctive relief under Section 9 against Defendants despite regulatory changes imposed by the 2019 NMFS BiOp's new ITS? In other words, assuming Plaintiffs can prove ongoing harm from the past violations, is it even necessary for Plaintiffs to demonstrate that Defendants will violate the 2019 NMFS BiOp's take limitations in the future to obtain remedial injunctive relief?

The answers to these questions are far from obvious. In contrast, as discussed below, the resolution of the motion to stay is relatively clear. While the Supreme Court has held that "engaging subject-matter jurisdiction at the outset of a case is often the most efficient way of going," *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587-88 (1999) (internal quotation marks and citation omitted), the Court believes this is one of those rare cases in which the most efficient path is to wait for the regulatory environment to resolve itself further.

**C.    Motion to Stay**

As mentioned, Plaintiffs move to stay what remains of the Section 9 Claim in light of their pending challenge to the 2019 NMFS BiOp.[10] United States district courts have inherent authority to stay proceedings, for the power to stay "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936); *accord Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").

> A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case.

*Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979). This is true even if the issues in such proceedings are not necessarily controlling with respect to the action before the court. *Id.* In exercising its discretion, a court must evaluate the competing interests affected by either granting or refusing a stay, including "the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Lockyer v. Mirant*

---

[10] Plaintiffs also indicate that the State of California may soon also challenge the 2019 NMFS BiOp. *See* ECF No. 1384-1 at 1.

11

*Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citation omitted). Put another way, "[i]n determining whether to stay proceedings, the Court considers the following factors: (1) judicial economy; (2) the moving party's hardship; and (3) potential prejudice to the non-moving party." *Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1052, 1057 (S.D. Cal. 2007). A court must "balance the length of the stay against the strength of the justification given for it." *Yong v. I.N.S.*, 208 F.3d 1116, 1119 (9th Cir. 2000). "If a stay is especially long or its term is indefinite," a court should "require a greater showing to justify it." *Id*. The party proposing a stay bears the burden of proving a stay is warranted under the discretionary *Landis* factors. *Clinton*, 520 U.S. at 708.

### 1. Judicial Economy

Here, the Court believes that judicial efficiency and the orderly course of justice favor a stay. First, as discussed above, Defendants' motions to dismiss the sixth claim are premised entirely on the changes to the operative regulatory regime embodied in the 2019 NMFS BiOp and related ITS. If Plaintiffs' challenge to the 2019 NMFS BiOp succeeds, the basis for Defendants' motions will either disappear entirely or be dramatically altered.[11] At the same time, the issues raised in those motions are unusually complex and difficult, risking the waste of scarce judicial resources should the Court endeavor to resolve them while Plaintiffs' separate challenge is pending. Defendants do not seriously dispute that a stay has the potential to save judicial and party resources.

### 2. Hardship to the Moving Party

Plaintiffs assert that they will be prejudiced if a stay is not entered in this case because: (1) they may be required to re-try at least some aspects of the case if the 2019 NMFS BiOp is set aside; and (2) they will be required to engage in another round of expensive discovery because any discovery that has taken place in this case proceeded in light of existing operations, not the 2019 NMFS BiOp. ECF

---

[11] The SRS Contractors are correct to point out that, even if Plaintiffs succeed on the merits of their challenge to the 2019 NMFS BiOp, vacatur of that BiOp or its ITS is not automatic. ECF No. 1388 at 7. The Court does not believe this changes the calculus. A stay does not declare any rights; it simply delays that process to another day.

12

No. 1384-1 at 8. Both of Plaintiffs' arguments assume their claims will survive Defendants' motions to dismiss, which is far from certain. Accordingly, because it is not possible at this stage to determine how likely it is that Plaintiffs will be required to expend their resources in the manner described, the Court is focusing instead on the judicial economy/ orderly course of business analysis.

### 3. <u>Prejudice to the Non-Moving Parties</u>

Defendants complain that, should the stay remain in place throughout the entirety of the challenge to the 2019 NMFS BiOp, the potential length of such a stay weighs against granting Plaintiffs' motion. The SRS Contractors point out that previous challenges to BiOps for the Project have taken upwards of five years. But, the Ninth Circuit does not direct courts to focus on the absolute length of a stay, but rather on whether "it appears likely that the other proceedings will be concluded within a reasonable time <u>in relation to the urgency of the claims presented to the court.</u>" *Lockyer*, 398 F.3d at 1111 (emphasis added). Through no particular parties' fault, the Section 9 Claim has been pending for more than three years. *See* ECF No. 1020 (Fourth Supplemental Complaint). While this might ordinarily warrant efforts to bring about a swift resolution, these cases typically take many years to adjudicate due to their complexity and the number of parties involved. Moreover, there is no indication that the material Plaintiffs plan to bring to bear is particularly likely to become any staler as time progresses. The key questions are likely to turn on scientific and hydrologic records from 2014 and 2015 that have been preserved. Likewise, to the extent there are relevant fact witnesses, depositions have already taken place.

The SRS Contractors make a separate prejudice argument that is worth some discussion. They point out, correctly, that Plaintiffs have argued in the context of their challenge to the 2019 NMFS BiOp that <u>this</u> action is not closely related *Ross*. ECF No. 1389-1 (*Ross*, Docket No. 5 at 3). The SRS Contractors maintain that, if these actions are indeed unrelated, the SRS Contractors will suffer prejudice from the inability to adjudicate claims alleged against them while awaiting adjudication of the separate claims asserted in *Ross*. *See* ECF No. 1388 at 6. The Court has no time for such fantasies. Having examined the complaint in *Ross*, the Court believes there is considerable overlap between the

13

claims set forth therein and the remaining claim in this case. Moreover, given past patterns in these related cases, the Court cannot rationally assume the SRS Contractors will sit *Ross* out, as they have intervened in essentially every other related case involving application of the ESA to the Project because the operative regulatory regime has the potential to materially impact their contractual rights.

The SRS Contractors also suggest that the Court should pass the question of whether or not a stay is appropriate to the next judge to be assigned to this matter. *See* ECF No. 1388 at 7-8. This is a matter of internal judicial administration that the undersigned has considered and rejects, because it would be wasteful for the court not to rule at this time given the time the undersigned has spent considering the pending motions. The judge to whom these cases will be transferred may, at any time (*sua sponte* or in response to a motion), reconsider the status of this stay.

In sum, Judges in the Eastern District of California have been presiding over these cases and the relevant regulatory regimes now for several decades, the undersigned for approximately nine of those years. Among the many lessons the undersigned will pass on to its successor (through various means, including transfer of staff with extensive experience in these matters) is the fact that the regulatory regime that governs the Projects is always shifting. In light of this, the Court must constantly weigh the practical implications of those shifts in light of its dual responsibilities to adjudicate cases and to avoid waste. Having considered this balance, the Court GRANTS Plaintiffs' motion to stay and DENIES WITHOUT PREJUDICE Defendants' motions to dismiss.

### III. CONCLUSION AND ORDER

For the reasons set forth above,

1. Plaintiffs' motion to stay the Setion 9 Claim (sixth cause of action) is GRANTED; and
2. Defendants' motions to dismiss the Section 9 Claim are DENIED WITHOUT PREJUDICE to their renewal upon the lifting of the stay.

Until further notice, every six months from the date of entry of this order, or fourteen days from the entry of judgment in *Ross*, whichever is sooner, the Parties are instructed to file a joint status report

providing an update on the status of *Ross*.

In the coming days, the Court plans to issue a request for supplemental briefing in connection with Federal Defendants' motion to dismiss the seventh claim for relief. In addition, it will endeavor to rule on Plaintiffs' remaining request for entry of separate judgment before the end of the month. If it cannot complete the latter task, that motion will be handled by district judge who will soon be assigned to this and related cases.

IT IS SO ORDERED.

Dated: **January 21, 2020**  /s/ Lawrence J. O'Neill
UNITED STATES DISTRICT JUDGE