1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   NATURAL RESOURCES DEFENSE              No. 1:05-cv-01207-DAD-EPG
     COUNCIL, *et al.*,
11                                          ORDER GRANTING REQUEST FOR ENTRY
                     Plaintiffs,            OF SEPARATE JUDGMENT PURSUANT TO
12                                          FEDERAL RULE OF CIVIL PROCEDURE
     v.                                     54(B)
13
     DAVID BERNHARDT, Acting Secretary,
14   U.S. Department of the Interior, *et al.*,
                                            ORDER DISMISSING AS MOOT SEVENTH
15                   Defendants.            CLAIM FOR RELIEF

16

17   SAN LUIS & DELTA MENDOTA
     WATER AUTHORITY, *et al.*,
18
                     Defendant-Intervenors.
19

20   ANDERSON-COTTONWOOD
     IRRIGATION DISTRICT, *et al.*,
21
                     Joined Parties.
22

23                              **INTRODUCTION**

24        On March 12, 2018, plaintiffs, a coalition of environmental interest groups led by the

25   Natural Resources Defense Council ("NRDC"), filed the currently operative Sixth Supplemental

26   Complaint ("6SC"), which includes numerous claims brought under the Administrative Procedure

27   Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531

28   *et seq.*, against the U.S. Bureau of Reclamation ("Bureau" or "Reclamation"), the U.S. Fish and

                                           1

1   Wildlife Service ("FWS") (collectively, "Federal Defendants"), and various Joined Defendants

2   and Defendant Intervenors.  (*See generally* Doc. No. 1187.)

3          Before the court for decision are two sets of remaining issues/motions.  First, plaintiffs

4   request entry of separate judgment pursuant to Federal Rule of Civil Procedure 54(b) on certain

5   claims in this case (the second, fourth, and fifth claims in the 6SC) even though other claims

6   remain unresolved.  (Doc. No. 1384).  The Federal Defendants (Doc. No. 1387) and certain

7   Defendant-Intervenors (Doc. No. 1388) oppose entry of separate judgment.[1]  Second, the parties

8   dispute the status of plaintiffs' seventh claim for relief, which seeks injunctive relief compelling

9   deposition testimony in this matter by certain federal government employees.  Federal Defendants

10  argue that plaintiffs' seventh claim must be dismissed due to lack of subject matter jurisdiction

11  (Doc. Nos. 1381, 1399), while plaintiffs maintain that they have already prevailed on, and are

12  therefore entitled to judgment in their favor as to, that claim (Doc. No. 1400).  For the reasons set

13  forth above, plaintiffs' motion for entry of separate judgment will be granted and the seventh

14  claim for relief will be dismissed as moot.

15                              **PROCEDURAL HISTORY**

16         Resolution of the remaining issues in this case requires a brief summary of relevant

17  aspects of the extensive and highly complex procedural history of this case, which has now been

18  pending before the court for more than fifteen years.

19  /////

20  /////

21  /////

22  /////

23

24  [1]  The court notes that Federal Defendants' and Defendant-Intervenors' arguments in opposition
    to entry of separate judgment are at least partially entangled with other arguments they made in
25  the context of their motions to stay and/or dismiss plaintiffs' sixth claim for relief.  On January
    22, 2020, the previously-assigned district judge stayed, rather than dismissed as moot, plaintiffs'
26  sixth claim for relief.  (Doc. No. 1394.)  Even though defendants' preferred outcome would have
    been dismissal of the sixth claim, allowing for entry of final judgment on all remaining claims in
27  the case, the court nonetheless interprets their briefs as asserting a general opposition to entry of
    separate judgment with respect to plaintiffs' second, fourth, and fifth claims for relief.
28

1   　　In February 2005, plaintiffs initiated this lawsuit, challenging an initial (issued in 2004)

2   version of an ESA biological opinion[2] ("BiOp") issued by FWS that evaluated the impact on the

3   ESA-listed delta smelt of the then-in-force coordinated operations plan for the Central Valley

4   Project ("CVP") and State Water Project ("SWP") (known as the Operations Criteria and Plan, or

5   "OCAP").  (Doc. No. 1.)  Subsequent amendments to the complaint updated plaintiffs' allegations

6   to include challenges to an updated version (issued in 2005) of FWS's BiOp ("2005 FWS BiOp").

7   (Doc. No. 403 (Second Amended Complaint ("SAC")).)  Plaintiffs raised numerous challenges to

8   the legal sufficiency of the 2005 FWS BiOp in their SAC.  (*Id*.)  Among other things, the SAC

9   alleged that the 2005 FWS BiOp did not "adequately consider or address the effects of [certain]

10   long-term water service contracts on threatened and endangered species," (*id*. at ¶ 32), and that

11   the Bureau "has taken and is taking actions that could foreclose implementation of reasonable and

12   prudent alternatives that would avoid jeopardy, including but not limited to signing and

13   implementing new long-term contracts promising delivery of substantially increased quantities of

14   water, in violation of [ESA] section 7(d)."  (*Id*. at ¶ 81.)  In 2007, summary judgment was granted

15   in favor of plaintiffs on their first claim for relief against FWS under the APA, and the 2005 FWS

16   BiOp was set aside as unlawful.  *Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322

17   (E.D. Cal. 2007) (Doc. No. 323).  The Bureau did not appeal.

18   　　During the remedies phase that followed the May 25, 2007, summary judgment order,

19   plaintiffs amended their complaint to add causes of action against the Bureau, in part to resolve

20   uncertainty as to the court's authority to enjoin the Bureau's implementation of the OCAP.  (*See*

21   Doc. Nos. 575, 567 at 2–3.)  Plaintiffs also pursued claims alleging that because the Bureau had

22   
23   ──────────
[2]  Section 7 of the ESA requires federal agencies to ensure that their activities do not jeopardize
24   the continued existence of listed endangered or threatened species or adversely modify those
species' critical habitats.  16 U.S.C. § 1536(a)(2).  An agency proposing to take an action (the
"action agency") must first inquire whether any threatened or endangered species "may be
25   present" in the area of the proposed action.  *See* 16 U.S.C. § 1536(c)(1).  If any ESA-listed
species may be present and the action agency preliminarily determines any such species "is likely
26   to be affected" by the proposed action, the agency must formally consult with either FWS or the
National Marine Fisheries Service ("NMFS"), depending on the species at issue.  *See id*.
27   § 1536(a)(2); 50 C.F.R. § 402.14.  Formal consultation results in the issuance of a "biological
opinion" by FWS and/or NMFS that evaluates whether the proposed action would jeopardize the
28   species or destroy or adversely modify its critical habitat.  *See* 16 U.S.C. §§ 1536(a)(2), 1536(b).

1   executed numerous long-term contracts to deliver water from the CVP in reliance on the now-

2   invalid 2005 FWS BiOp, those contracts should be enjoined and/or rescinded.  (*See* Doc. No. 761

3   at 3–4).[3]

4        The district court evaluated plaintiffs' challenges to these contracts in two batches:

5   challenges to contracts belonging to south-of-Delta water service contractors within the Delta-

6   Mendota Canal Unit of the CVP (collectively, the "DMC Contractors"); and challenges to

7   contracts held by a coalition of "senior" water rights holders, the Sacramento River Settlement

8   Contractors, (collectively, the "Settlement Contractors" or the "SRS Contractors").  As to the

9   DMC Contractors, the district court found that those contracts contained a "pass-through"

10  shortage provision which allowed the Bureau to reduce water allocations whenever necessary to

11  comply with the ESA.  (*Id*. at 38.)  As a result of that provision, the district court held that

12  plaintiffs did not have standing to challenge execution of those contracts because the contracts

13  themselves could cause them no harm.  (*See id*. at 40.)  After further briefing and analysis, the

14  district court found that plaintiffs' requested remedy regarding the SRS Contracts was unavailable

15  because the Bureau's discretion to reduce diversions under renewed versions of those contracts

16  was "substantially constrained" by terms of the prior contracts.  (*See generally* Doc. No. 834.)

17  On September 23, 2009, the district court entered final judgment as to plaintiffs' first, second, and

18  third causes of action as alleged in the then-operative third supplemental complaint.  (Doc. No.

19  873.)

20       Appeals were then taken as to certain issues related to the contractual remedies sought by

21  plaintiffs.  (Doc. Nos. 880, 887, 892.)  A divided three-judge panel of the Ninth Circuit affirmed

22  the  district court's order.  *Natural Res. Def. Council v. Salazar*, 686 F.3d 1092 (9th Cir. 2012).

23  The Ninth Circuit subsequently voted to hear the case *en banc*, and the *en banc* panel reversed.

24  *Natural Res. Def. Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014); (Doc. Nos. 931, 935).

25  /////

26

27  [3]  Certain of the contact-based claims against contractors who had not yet been joined were
    dismissed without prejudice to those contractors being properly added to the case.  (Doc. No. 761
28  at 4–5.)  Eventually, all the necessary contractors were joined to this action.  (*Id*. at 5.)

The previously assigned district judge summarized the Ninth Circuit's ruling as follows:

> On the issue of standing related to the DMC Contracts, this Court held that Plaintiffs could not establish that their injury is fairly traceable to the Bureau's alleged procedural violation because: (1) the DMC Contracts contain a shortage provision that absolves the government from liability for breaches that result from complying with its legal obligations; (2) this provision permits the Bureau to take necessary actions to meet its legal obligations under the ESA; so (3) the Bureau could not have negotiated any contractual terms that better protect the delta smelt, and, therefore, any injury to the delta smelt is not traceable to the contract renewal process. *NRDC v. Kempthorne*, No. 1:05-CV-1207 OWW [GSA], 2008 WL 5054115, at **11–18 (E.D. Cal. Nov. 19, 2008).

The Ninth Circuit rejected this reasoning, finding instead that, "to establish standing, a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests." *Id.* at 783 (emphasis in original). The Ninth Circuit concluded that the consultation could have led to revisions that would have benefitted the delta smelt:

> Contrary to the district court's finding, the shortage provision does not provide the delta smelt with the greatest possible protection. Nothing about the shortage provision requires the Bureau to take actions to protect the delta smelt. The provision is permissive, and merely absolves the United States of liability if there is a water shortage resulting from, inter alia, "actions taken . . . to meet legal obligations." But even if we read the provision to place an affirmative obligation on the Bureau to take actions to benefit the delta smelt, the provision only concerns the quantity of water that will be made available to the DMC Contractors. There are various other ways in which the Bureau could have contracted to benefit the delta smelt, including, for example, revising the contracts' pricing scheme or changing the timing of water deliveries. Because adequate consultation and renegotiation could lead to such revisions, Plaintiffs have standing to assert a procedural challenge to the DMC Contracts.

*Id.* at 783–84.

With regard to the Settlement Contracts, this Court held that, although Plaintiffs have standing to assert procedural challenges to the Settlement Contracts, the Bureau was not required to consult under Section 7(a)(2) prior to renewing the Settlement Contracts because the Bureau's discretion in renegotiating these contracts was "substantially constrained," in light of a line of cases, including *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007), which stand for the proposition that there is no duty to consult for actions "that an agency is required by statute to undertake." *Natural Res. Def. Council v. Kempthorne*, 621 F. Supp. 2d 954, 1000 (E.D. Cal. 2009), *decision clarified*, 627 F.

Supp. 2d 1212 (E.D. Cal. 2009), *on reconsideration*, No. 1:05-CV-1207 OWW SMS, 2009 WL 2424569 (E.D. Cal. Aug. 6, 2009).  In holding that the Bureau was not required to consult under Section 7(a)(2) prior to renewing the Settlement Contracts, the district court focused on Article 9(a) of the original Settlement Contracts, which provides in pertinent part:

> During the term of this contract and any renewals thereof: (1) It shall constitute full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between base supply and Project water which may be diverted by the Contractor from its source of supply for beneficial use on the land shown on Exhibit B ...; (2) The Contractor shall not claim any right against the United States in conflict with the provisions hereof.

*Id.* at 979.  This provision, according to the district court, "substantially constrained" the Bureau's discretion to negotiate new terms in renewing the contracts, thereby absolving the Bureau of the duty to consult under *Home Builders*. *Id.*

The Ninth Circuit rejected this reasoning:

> Section 7(a)(2)'s consultation requirement applies with full force so long as a federal agency retains "some discretion" to take action to benefit a protected species. [citations] While the parties dispute whether Article 9(a) actually limits the Bureau's authority to renegotiate the Settlement Contracts, it is clear that the provision does not strip the Bureau of all discretion to benefit the delta smelt and its critical habitat.

> First, nothing in the original Settlement Contracts requires the Bureau to renew the Settlement Contracts.  Article 2 of the original contracts provides that "renewals may be made for successive periods not to exceed forty (40) years each." (emphasis added).  This language is permissive and does not require the Bureau to execute renewal contracts.  Since the FWS has concluded that "Delta water diversions" are the most significant "synergistic cause[ ]" of the decline in delta smelt, 58 Fed. Reg. at 12,859, it is at least plausible that a decision not to renew the Settlement Contracts could benefit the delta smelt and their critical habitat.

> But even assuming, arguendo, that the Bureau is obligated to renew the Settlement Contracts and that Article 9(a) limits the Bureau's discretion in so doing, Article 9(a) simply constrains future negotiations with regard to "the quantities of water and the allocation thereof . . . ." Nothing in the provision deprives the Bureau of discretion to renegotiate contractual terms that do not directly concern water quantity and allocation.  And, as [is the case] with respect to the DMC Contracts, the Bureau could benefit the delta smelt by renegotiating the Settlement Contracts' terms

1

2

                     with regard to, inter alia, their pricing scheme or the timing
of water distribution.

3

4

                     For these reasons, we conclude that, in renewing the
Settlement Contracts, the Bureau retained "some discretion"
to act in a manner that would benefit the delta smelt. The
Bureau was therefore required to engage in Section 7(a)(2)
consultation prior to renewing the Settlement Contracts.

5

6

                     *NRDC v. Jewell*, 749 F.3d at 784–85. The matter was reversed and
remanded for further proceedings. *Id.*

7

(Doc. No. 979 at 7–9.)

8

        Meanwhile, while the appeal was pending, on December 15, 2008, FWS issued a revised

9

BiOp (the "2008 FWS BiOp"), which, contrary to the findings of the 2004 and 2005 BiOps,

10

concluded that the OCAP *would* jeopardize the delta smelt and adversely modify its critical

11

habitat. *NRDC v. Jewell*, 749 F.3d at 781.  The 2008 FWS BiOp became the subject of numerous

12

lawsuits. *See generally San Luis & Delta Mendota Water Auth. v. Salazar*, No. 1:09-cv-00407-

13

LJO-BAM.  Plaintiffs in this matter intervened as defendants in the challenge to the 2008 FWS

14

BiOp.

15

        In May 2015, after the Ninth Circuit's remand and in light of the new "jeopardy" BiOp

16

issued in 2008, the United States moved to stay further litigation with respect to plaintiffs'

17

challenges to the contracts, indicating that Federal Defendants intended to re-initiate ESA

18

consultation on the long-term contracts.  (Doc. Nos. 954, 955.)  This court granted a six-month

19

stay at that time.  (Doc. No. 979.)  Thereafter, in an effort to satisfy its ESA consultation

20

obligations, Reclamation requested FWS's concurrence that the impacts of long-term contract

21

renewals on delta smelt had already been assessed in the 2008 FWS BiOp.  (Doc. No. 1020

22

(Fourth Supplemental Complaint ("4SC")) at ¶¶ 103, 105.)  Later that year, FWS responded by

23

sending a "letter of concurrence" ("2015 LOC") concluding that "all of the possible effects to

24

delta smelt and its critical habitat by operating the CVP to deliver water under the SRS and DMC

25

Contracts were addressed in the [2008 FWS OCAP Smelt BiOp]."  (*Id.* at ¶ 106.)

26

        Thereafter, plaintiffs moved for (Doc. No. 999) and the court granted (Doc. No. 1018)

27

leave to amend their complaint to add three new claims in this action.  Plaintiffs' new fourth

28

claim for relief challenged the sufficiency of the ESA consultation between FWS and

Reclamation over the long-term contracts' impacts to delta smelt—the consultation that resulted in the 2015 LOC. (4SC at ¶¶ 177–182). Plaintiffs were also permitted to add two claims related to the alleged impacts of CVP and SWP operations on ESA-listed winter-run and spring-run Chinook salmon. (*Id*. at ¶¶ 183–193.) Plaintiffs alleged that "the Bureau's excessive releases" of water stored behind Shasta Dam, as well as "the SRS Contractors diversions" of that water, during the summer and fall of 2014 and 2015, caused the Bureau to "lose control of temperatures in the upper Sacramento River" which in turn "caused fatal increases in water temperatures that led to the near total loss of the 2014 and 2015 generations of winter-run and spring-run Chinook." (*Id*. at ¶ 192.) In their fifth claim for relief plaintiffs alleged that, in light of the die off events that took place in 2014 and 2015, Reclamation acted unlawfully by failing to reinitiate ESA consultation with NMFS[4] over the impacts of long-term contract renewal on winter-run and spring-run Chinook. (*Id*. at ¶ 186.) According to plaintiffs, the 2014 and 2015 die offs "revealed effects of the SRS contracts that were not previously considered." (*Id*.) Finally, plaintiffs were permitted to add a new related claim that Reclamation and the SRS Contractors illegally caused the direct loss (or "take") of winter-run and spring-run Chinook during 2014 and 2015 because Reclamation made excessive deliveries to the SRS Contractors that depleted the cold water reserves in Shasta Reservoir, causing temperature increases fatal to the 2014 and 2015 "brood years" of winter-run and spring-run Chinook. (*Id*. at ¶¶ 189–193 (Sixth Claim for Relief).)

On February 17, 2017, the parties stipulated to permit amendment of the complaint to allow plaintiffs to update their second claim for relief to add allegations to that claim pertaining to Reclamation's reliance on the 2015 LOC and to reflect that plaintiffs had complied with certain pre-suit notice procedures. (*See* Doc. No. 1067.) The resulting fifth supplemental complaint was

---

[4]  FWS and NMFS administer the ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), *as corrected* (Oct. 31, 2008). NMFS is granted jurisdiction over fish species which (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id*. FWS exercises jurisdiction over the delta smelt; NMFS over the winter-run and spring-run Chinook.

filed on March 1, 2017.  (Doc. No. 1071.)  For reasons related to a discovery dispute discussed in greater detail below, the parties again agreed to permit amendment of plaintiffs' complaint to add a seventh claim for relief seeking to compel the Department of Commerce ("DOC") to allow plaintiffs to depose two NMFS employees as fact witnesses in connection with the sixth claim for relief.  (Doc. No. 1186.)  The result was the filing of the currently-operative sixth supplemental complaint ("6SC") on March 12, 2018.  (Doc. No. 1188.)

On February 23, 2017, the previously assigned district judge dismissed plaintiffs' fifth claim for relief but allowed the sixth claim to move forward.  (Doc. No. 1069.)

On September 28, 2018, the previously assigned district judge resolved cross motions for summary judgment concerning the sixth claim for relief—the claim in which plaintiffs allege that the actions of Reclamation and the SRS Contractors resulted in the "take" of listed winter-run and spring-run chinook on the Upper Sacramento River—leaving certain aspects of that claim to be resolved at a bench trial.  (Doc. No. 1269.)  Resolution of that claim has been stayed pending the outcome of challenges to even more recent biological opinions governing CVP and SWP operations, which are now pending before the undersigned.  (Doc. No. 1394.)

On February 26, 2019, the court resolved cross motions for summary judgment on the second and fourth claims for relief.  (Doc. No. 1314.)  As explained above, in their fourth claim for relief plaintiffs alleged that the 2015 LOC authored by FWS was the culmination of an inadequate ESA consultation regarding the effects of long-term contract renewals on delta smelt. The second claim for relief alleged that Reclamation acted unlawfully by accepting the 2015 LOC and implementing the long-term water supply contracts in reliance on the 2015 LOC.  (*Id.* at ¶¶ 176–182.)  In a complex, 67-page ruling, the previously assigned district judge denied plaintiffs' motion for summary judgment and granted Federal Defendants' cross motion for summary judgment on both claims.

In sum, final judgment was entered as to the first and third claims on September 23, 2009, (Doc. No. 873); the fifth claim for relief was dismissed on February 23, 2017 (Doc. No. 1069); and the second and fourth claims were resolved on cross motions for summary judgment decided February 26, 2019 (Doc. No. 1314).  The discovery-related claim that is tied to plaintiffs' sixth

9

1    claim for relief will be resolved herein.  That will leave unresolved only the sixth claim for relief,

2    which, as mentioned, has been stayed.

3                    **PLAINTIFFS' REQUEST FOR ENTRY OF SEPARATE JUDGMENT**

4              Plaintiffs request entry of separate judgment on their second, fourth, and fifth claims for

5    relief.  Federal Rule of Civil Procedure 54(b) provides that "[w]hen an action presents more than

6    one claim for relief . . . or multiple parties are involved, the court may direct entry of a final

7    judgment as to one or more, but fewer than all, claims or parties only if the court determines that

8    there is no just reason for delay."  To do so, the district court "must first determine that it has

9    rendered a final judgment, that is, a judgment that is an ultimate disposition of an individual claim

10   entered in the course of a multiple claims action."  *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878

11   (9th Cir. 2005) (internal quotation marks omitted).  Second, "it must determine whether there is

12   any just reason for delay."  *Id.*  As the Supreme Court has explained, the rule was adopted "to

13   avoid the possible injustice of delaying judgment on a distinctly separate claim pending

14   adjudication of the entire case."  *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409 (2015)

15   (internal quotation marks and brackets omitted).  However, concerns about judicial economy

16   counsel that Rule 54(b) should be used sparingly.  *See Curtiss-Wright Corp. v. Gen. Elec. Co.*,

17   446 U.S. 1, 10 (1980) ("Plainly, sound judicial administration does not require that Rule 54(b)

18   requests be granted routinely."); *Morrison-Knudsen Co. v. Archer*, 655 F.2d 962, 965 (9th Cir.

19   1981) (directing that Rule 54(b) be "reserved for the unusual case in which the costs and risks of

20   multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced

21   by pressing needs of the litigants for an early and separate judgment as to some claims or

22   parties").  In deciding whether to grant judgment under the Rule, courts should consider "whether

23   the certified order is sufficiently divisible from the other claims such that the case would not

24   inevitably come back to this court on the same set of facts.'"  *Jewel v. Nat'l Sec. Agency*, 810

25   F.3d 622, 628 (9th Cir. 2015) (internal quotation marks and citation omitted).  That said, the

26   issues raised on appeal need not be "completely distinct" from the rest of the action, "so long as

27   resolving the claims would streamline the ensuing litigation."  *Id.*

28   /////

1          Applying the above standards to plaintiffs' second, fourth, and fifth claims requires an

2   understanding of how those claims relate to one another and to plaintiffs' remaining sixth claim

3   for relief.  The second and fourth claims concern the effects on delta smelt of the renewal by

4   Reclamation of long-term water contracts held by the DMC Contractors and the SRS Contractors.

5   Specifically, as mentioned above, the fourth claim challenges the 2015 re-initiated consultation

6   between FWS and Reclamation that was supposed to evaluate the impacts of the renewal of those

7   contracts upon the delta smelt.  (6SC at ¶¶ 189–94.)  Plaintiffs alleged that the re-initiated

8   consultation was arbitrary and capricious in violation of the APA.  (*Id.*)  Relatedly, in their second

9   claim, brought against Reclamation, plaintiffs contend that Reclamation failed to satisfy its own

10  obligations under the ESA by executing and implementing the long-term contracts in reliance

11  upon what it should have known was a faulty re-initiated consultation on the impacts to delta

12  smelt.  (*Id.* at ¶¶ 183–88.)  The fifth claim alleges Reclamation failed to re-initiate consultation on

13  the alleged impact of the long-term SRS Contracts on ESA-listed winter-run and spring-run

14  Chinook salmon, particularly in light of the significant die off events that took place in the Upper

15  Sacramento River in 2014 and 2015.  (*Id.* at ¶¶ 195-200.)  The sixth claim for relief, which arises

16  under Section 9 of the ESA,[5] alleges that both Reclamation and the SRS Contractors unlawfully

17  "took" ESA-listed winter-run and spring-run Chinook salmon in 2014 and 2015.  (*Id.* at ¶¶ 201–

18  205.)  Specifically, the sixth claim alleges that "excessive releases" made by Reclamation to

19  satisfy its contractual obligations to the SRS Contractors, and the SRS Contractors' own diversion

20  of water, depleted the cold water pool in the Upper Sacramento River leading to excessively high

21  temperatures that were the "predominant and direct cause" of the loss of almost the entire "brood

22  year" of winter-run and spring-run Chinook in 2014 and 2015.  (*See id.* at ¶ 204.)

23

24  [5]  Section 9 of the ESA makes it unlawful for "any person" to "take" a listed species.  16 U.S.C.
    § 1538(a)(l)(B).  The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap,
25  capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  As used in the
    statutory definition of "take," the term "harm" is further defined by regulation to mean "an act
26  which actually kills or injures fish or wildlife.  Such an act may include significant habitat
    modification or degradation which actually kills or injures fish or wildlife by significantly
27  impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding
    or sheltering."  50 C.F.R. § 222.102.
28

Generally speaking, there are some overlapping threads of fact and law that run between all of these claims. They all generally concern the impacts of long-term water contracts between Reclamation and various water contractors on ESA-listed species. But the commonalities do not extend very far beneath the surface. The second and fourth claims are distinct in many critical ways from plaintiffs' fifth and sixth claims. For example, the second and fourth claims concern impacts to delta smelt, while the fifth and sixth claims concern impacts to winter-run and spring run Chinook salmon. The second and fourth claims either embody or are derivative of a substantive challenge to a <u>completed</u> ESA re-initiated consultation over the impacts of long-term contract renewal on delta smelt (the consultation that resulted in the 2015 LOC), while the fifth claim alleges Reclamation unlawfully <u>failed to re-initiate</u> a parallel consultation on the impacts of certain long-term contracts on winter-run and spring-run Chinook. Moreover, the legal inquiries that apply to a substantive challenge to a <u>completed</u> ESA consultation are distinct from those that apply to a largely procedural challenge to an agency's <u>failure to re-initiate</u> consultation. The sixth claim is even more distinct from the second and fourth claims, since the sixth claim does not concern delta smelt, nor does it directly concern the ESA consultation process at all. Rather, as the previously-assigned district judge explained, the sixth claim invokes the "take" prohibition of ESA Section 9, which invokes many "concepts from tort law," and requires factual proof that the defendants' conduct proximately caused the "take" of the listed species. (*See* Doc. No. 1269 at 19.) With all of this in mind, and having examined the record in detail, the court finds there is little danger of inefficient duplication of appellate proceedings if an appeal with respect to plaintiffs' second and/or fourth claims were allowed to proceed at this time. The court will therefore enter separate judgment as to the second and fourth claims.

Whether entry of separate judgment is appropriate as to plaintiffs' fifth claim for relief is a somewhat more difficult question. The fifth claim overlaps in some respects with the sixth claim because plaintiffs invoke the 2014 and 2015 fish die offs in both of those claims. In the context of the fifth claim, plaintiffs cite to the 2014 and 2015 die offs as a principal reason why Reclamation should have re-initiated consultation on the SRS Contracts under 50 C.F.R. § 402.16, which requires re-initiation of consultation "where discretionary Federal involvement or

1   control over the action has been retained or is authorized by law and: . . . (b) If new information

2   reveals effects of the action that may affect listed species or critical habitat in a manner or to an

3   extent not previously considered."  In the context of the sixth claim, the 2014 and 2015 die offs

4   are central to plaintiffs' theory of their claim, because plaintiffs contend that defendants' actions

5   proximately caused those die offs.  At first glance, this commonality seems to suggest the fifth

6   and sixth claims are not sufficiently divisible for purposes of Rule 54(b).  But the devil is in the

7   details.  The previously assigned district judge's February 23, 2017, dismissal of plaintiffs' fifth

8   claim for relief focused little on the facts of the 2014 and 2015 die off and much more on how

9   plaintiffs framed their re-initiation claim and on whether Reclamation retained sufficient

10  "discretionary . . . involvement or control" over ongoing implementation of the SRS Contracts so

11  as to trigger the obligation to re-consult regarding the SRS Contracts.  (*See generally* Doc. No.

12  1069.)  Concluding after a detailed examination of plaintiff's claim and the relevant contractual

13  provisions that Reclamation did not retain sufficient discretion, the court dismissed the fifth claim

14  for relief.  (*Id*.)

15         The February 23, 2017 Order also dismissed part of plaintiffs' sixth claim for relief.

16  Specifically, the district court found that to the extent Reclamation was contractually obligated to

17  make water deliveries to the SRS Contractors, it could not be the proximate cause of "take" under

18  ESA Section 9 with respect to those mandatory deliveries.  (Doc. No. 1069 at 50–57.)  In

19  reaching this conclusion, the district court also discussed the extent to which Reclamation

20  retained any discretion over deliveries under the SRS Contracts, incorporating by reference its

21  analysis of the SRS Contracts' terms.  (*Id*. at 56.)  The undersigned does not believe that this

22  connection overwhelms the case for entry of separate judgment.  In fact, given that the sixth claim

23  for relief has been stayed, the court believes that it may be more efficient to permit plaintiffs to

24  appeal on the highly complex issues of first impression raised by their fifth claim for relief.  If the

25  appeal happens to change or clarify the legal landscape as to how the SRS Contract provisions are

26  to be interpreted, it is possible that such changes can be incorporated back into the sixth claim for

27  relief before that claim moves forward toward resolution.  This is a highly unique procedural

28  situation justifying a unique approach.  The court will therefore grant plaintiffs' motion as to their

1    fifth claim and will enter separate judgment as to that claim as well.

2                        **STATUS OF SEVENTH CLAIM FOR RELIEF**

3            The remaining issue concerns plaintiffs' seventh claim for relief.  In early 2018, plaintiffs

4    sought to depose as fact witnesses in this case two employees of NMFS, which is a branch of the

5    National Oceanic and Atmospheric Administration ("NOAA"), which is in turn a branch of DOC,

6    a non-party federal executive agency.  (*See generally* Doc. No. 1160.)  NOAA informed plaintiffs

7    that, pursuant to internal policy, it would not authorize the witnesses to appear for the depositions.

8    (*See id*. at 1, 3.)  Plaintiffs moved to compel the depositions; Federal Defendants, on behalf of

9    non-party DOC, moved to quash the deposition subpoenas.  (*See* Doc. Nos. 1153, 1154.)  During

10   the course of the resolving that discovery dispute, the assigned magistrate suggested, and the

11   parties agreed, to permit plaintiffs' amendment of the complaint to add a parallel claim for

12   injunctive relief under the APA naming DOC as a defendant, to ensure that the court had personal

13   jurisdiction over the dispute.  (*See generally* Doc. No. 1190 (Transcript of 2/15/2018 hearing) at

14   8, 15–16.)  The resulting seventh claim for relief invokes the APA to compel DOC to authorize

15   the disputed deposition testimony.  (Doc. No. 1187 at ¶¶ 206–212.)

16           On April 20, 2018, the magistrate judge denied the motion to quash and granted plaintiffs'

17   cross-motion to compel the testimony.  (Doc. No. 1204.)  The previously assigned district judge

18   construed the April 20, 2018, order as findings and recommendations because the magistrate

19   judge's determination would "either dispose of entirely or moot in part or in full" the seventh

20   claim for relief (Doc. No. 1239), and then adopted those recommendations in full on January 29,

21   2020 (Doc. No. 1244).  The depositions were then taken.  (*See* Doc. No. 1399 at 1.)

22           The fate of plaintiffs' seventh claim for relief remains in dispute, however.  The district

23   court's January 29, 2020 Order adopting the findings and recommendations reviewed relevant

24   authorities, which the court quotes here at length for the sake of expedience:

25           The F&Rs properly apply [*Exxon Shipping Co. v. Dep't of Interior*,
             34 F.3d 774 (9th Cir. 1994)], which plainly held that "district courts
26           should apply the federal rules of discovery when deciding on
             discovery requests made against government agencies, whether or
27           not the United States is a party to the underlying action."  34 F.3d at
             780.  *Exxon* concerned a collateral complaint brought by Exxon
28           against five federal agencies and their employees seeking to compel

                                         14

discovery requested as part of its defense in the underlying damages action arising out of the Exxon Valdez oil spill.  34 F.3d at 775. The agencies instructed eight federal employees not to submit to deposition and restricted the testimony of two others.  *Id*.  Exxon contended that these decisions violated the Federal Housekeeping Statute, 5 U.S.C. § 301, and the APA, 5 U.S.C. § 706(2)(A).  *Id*. The district court found that § 301 authorized the agencies actions and that the actions were not arbitrary and capricious under the APA.  *Id*.

The Ninth Circuit reversed, beginning its analysis with an explanation of why *United States ex. rel. Touhy v. Ragen*, 340 U.S. 462 (1951), did not support the district court's conclusion.  The Ninth Circuit explained that in *Touhy*, the Supreme Court held "that an FBI agent could not be held in contempt for refusing to obey a subpoena *duces tecum* when the Attorney General, acting pursuant to valid federal regulations governing the release of official documents, had ordered him to refuse to comply."  *Exxon,* 34 F.3d at 776 (citing *Touhy*, 340 U.S. at 469).  *Touhy* specifically left open the question of whether an agency head had the power to withhold evidence from a court without a specific claim of privilege.  *Touhy*, 340 U.S. at 467; *see also In re Recalcitrant Witness Richard Boeh v. Daryl Gates*, 25 F.3d 761, 764 & n.4 (9th Cir. 1994) (noting that *Touhy* did not decide the legality of agency heads' executive privilege claim).

The Ninth Circuit <u>answered that open question</u> in *Exxon*, at least with sufficient clarity to bind lower courts within this Circuit under the circumstances presented here.  The Ninth Circuit reasoned that § 301 "does not, by its own force, authorize federal agency heads to withhold evidence sought under a valid federal court subpoena."  34 F.3d at 777.  This conclusion was based upon an extensive evaluation of § 301's legislative history, *id*. at 777–78, as well as reference to prominent commentators on the issue, *id*. at 778 n.6 (quoting one commentator who reasoned that "[t]he proposition for which *Touhy* is often cited—that a government agency may withhold documents or testimony at its discretion—simply is not good law and hasn't been since 1958").

The Ninth Circuit next rejected the government's argument that principles of sovereign immunity granted to agency heads the authority to determine whether agency employees may testify.  The Ninth Circuit concluded that all of the cases cited for that proposition involved the power of a state court to subpoena federal officials, which does implicate sovereign immunity.  The Ninth Circuit refused to extend that logic to federal courts:

> Moreover, under the government's argument, sovereign immunity would authorize the executive branch to make conclusive determinations on whether federal employees may comply with a valid federal court subpoena.  Such a broad definition would raise serious separation of powers questions.  As the Supreme Court has said, "judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."  *United States v. Reynolds*,

1            345 U.S. 1, 9–10 (1953).

2        *Id.* at 778.  In addition, the Ninth Circuit concluded that "[t]he
         government's argument would also violate the fundamental
3        principle that the public has a right to every man's evidence."  *Id.* at
         779 (internal quotation and alteration omitted).

4
         Finally, the Ninth Circuit acknowledged the government's "serious
5        and legitimate concern that its employee resources not be
         commandeered into service by private litigants to the detriment of
6        the smooth functioning of government operations," but concluded
         "that district courts can, and will, balance the government's
7        concerns under the general rules of discovery."  *Id.* at 779.  The
         Ninth Circuit expanded upon this reasoning by pointing to the
8        numerous protections within the federal rules for <u>litigants and
         nonparties</u>:

9
              The Federal Rules of Civil Procedure explicitly provide for
10            limitations on discovery in cases such as this.  Rule 26(c)
              and Rule 45(c)(3) give ample discretion to district courts to
11            quash or modify subpoenas causing "undue burden."  The
              Federal Rules also afford nonparties special protection
12            against the time and expense of complying with subpoenas.
              *See* Fed. R. Civ. P. 45(c)(3)(A)(ii).  In addition, the Rules
13            can prevent private parties from exploiting government
              employees as tax-supported pools of experts.  *See* Fed. R.
14            Civ. P. 45(c)(3)(B)(ii), (iii) (a court may in its discretion
              disallow the taking of a non-retained expert's testimony
15            unless the proponent makes a showing of "*substantial need*"
              that "cannot be otherwise met without undue hardship" and
16            payment of reasonable compensation) (emphasis added).
              The Rules also recognize and protect privileged
17            information.  *See* Fed. R. Civ. P. 45(c)(3)(A)(iii).

18            In ruling on discovery requests, Rule 26(b)(2) instructs
              district courts to consider a number of factors relevant to the
19            government's expressed interests.  For example, a court may
              use Rule 26(b) to limit discovery of agency documents or
20            testimony of agency officials if the desired discovery is
              relatively unimportant when compared to the government
21            interests in conserving scarce government resources.  *See,
              e.g.*, *Moore v. Armour Pharmaceutical Co*., 927 F.2d 1194,
22            1198 (11th Cir.1991) (considering the "cumulative impact"
              of repeated requests for the testimony of Center for Disease
23            Control researchers working on a cure for the AIDS virus in
              upholding a decision to quash a subpoena under Rule 45).

24
         *Id.* at 779–80 (footnote omitted).  In sum, the Ninth Circuit issued a
25       broad holding:

26            Section 301 does not create an independent privilege to
              withhold government information or shield federal
27            employees from valid subpoenas.  <u>Rather, district courts
              should apply the federal rules of discovery when deciding
28            on discovery requests made against government agencies,</u>

                                16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> whether or not the United States is a party to the underlying action.  Under the balancing test authorized by the rules, courts can ensure that the unique interests of the government are adequately considered.

*Id*. at 780 (emphasis added).

Joined/Intervenor Defendants first attempt to distinguish *Exxon* on the ground that "the holding in *Exxon* was decided under a claim that was not brought under the [APA], and the court declined to reach the APA claim that the 'agencies' actions were arbitrary and capricious under § 706(2)(A) until after further district court review, and, if necessary, fact-finding." [(Doc No. 1240 at 2 (quoting *Exxon*, 34 F.3d at 780))].  It is true that immediately after the broad holding quoted above regarding the housekeeping statute, the Ninth Circuit declined to reach Exxon's APA claim as follows:

> Because of our disposition, we decline to reach Exxon's claim that the agencies' actions were arbitrary and capricious under § 706(2)(A) until after further district court review, and, if necessary, fact-finding.  Thus, we remand for the court to exercise its discretion on Exxon's discovery requests.

[34 F.3d at 780] The implication of this language is not entirely clear, but a related discussion in footnote 11 sheds some light on what the Ninth Circuit was getting at:

> The APA also authorizes judicial review of agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise unlawful."  5 U.S.C. § 706(2)(A) (1982).  Because § 301 provides authority for agency heads to issue rules of procedure in dealing with requests for information and testimony, an agency head will still be making the decisions on whether to comply with such requests in the first instance.  Thus, review under § 706(2)(A) will be available. However, we acknowledge that collateral APA proceedings can be costly, time-consuming, inconvenient to litigants, and may "effectively eviscerate [ ]" any right to the requested testimony.  *In re Recalcitrant Witness Boeh*, 25 F.3d at 770 n. 4 (Norris, J., dissenting) (if the plaintiff had a right to obtain the witness' testimony, "he had a right to obtain it when he needed it, which in this case was immediately, when the trial was still going on").  Therefore, the need for district court review in such instances is all the more compelling.

*Exxon*, 34 F.3d at 780 n.11. The Court believes this language is best interpreted as standing for the proposition that, while an APA collateral action may be available, it is not the only way to obtain review of an agency decision regarding a discovery dispute.  As the Ninth Circuit plainly articulated, "district courts should apply the federal rules of discovery when deciding on discovery requests made against government agencies, whether or not the United States is a party to the underlying action." *Id*. at 780.  At bottom,

1
2
3
4
5
6
7
8
9
10
11

> *Exxon* stands for the proposition that the fact that an APA claim might also be outstanding and worthy of resolution at some point should not stand in the way of a court resolving a discovery dispute in a timely manner pursuant to the Federal Rules of Civil Procedure.  What the Ninth Circuit did not discuss, and from what the Court can tell has yet to discuss anywhere, is what the consequences of the Rules-based discovery decision might be for any outstanding APA claim.  Might it not moot that claim?  Perhaps, but perhaps not.  There might be other aspects to an APA challenge to an agency's housekeeping determination regarding disclosure of evidence that could survive a Rules-based discovery decision. If a discovery ruling required only narrow disclosures, for example, a plaintiff might still want to move forward with a challenge under the APA asserting that the housekeeping determination was arbitrary, capricious or contrary to law.  All of this is to say that, while the dual track suggested by *Exxon* is somewhat perplexing, it is not nonsensical.  In this Circuit, treating a discovery dispute like the one presented here under the Federal Rules is not only lawful, <u>it is required</u>.  The magistrate judge properly concluded that the underlying discovery dispute could and should be resolved pursuant to the Federal Rules.

12  (Doc. No. 1244 at 3–7 (emphasis in original, footnotes omitted).)

13      In sum, based upon the above reasoning,[6] *Exxon* permits a party to pursue parallel avenues

14  for relief from a federal agency's refusal to comply with a subpoena:  A rules-based motion to

15  compel <u>and/or</u> an APA claim seeking judicial review of the agency's rationale for refusing to

16  comply.  Such claims are not identical to one another nor would they follow the same procedural

17  pathways to resolution.  The rules-based motion would likely permit speedier relief, while an

18  APA claim might provide alternative avenues for obtaining requested information.  Here, it is

19  undisputed that the parties pursued only a rules-based motion to completion.  What is less clear is

20  what happens now to plaintiffs' seventh claim for relief.  Federal Defendants maintain that the

21  court lacks subject matter jurisdiction over that claim.  (*Id*. at 2–3.)  Plaintiffs assert that the

22  court's order compelling the depositions "fully and finally resolved" the merits of their seventh

23  claim and therefore that the court should enter judgment in their favor with respect to that claim.

24  (Doc. No. 1400.)

25      The court takes up plaintiffs' contention first.  At the risk of being overly repetitive, as

26  both the previously-assigned judge and the Ninth Circuit's decision in *Exxon* explain, there are

27

28  ---
[6]  The undersigned finds that the reasoning presented by the previously assigned district judge is both persuasive and the law of this case.

18

distinctions between a rules-based motion to compel and a parallel APA claim.  One of those

distinctions of note is speed—a distinction the Ninth Circuit emphasized when it refused to cut

off the possibility of a rules-based motion to compel a non-party federal agency to comply with a

subpoena.  *See Exxon*, 34 F.3d at 780 n.1 ("[W]e acknowledge that collateral APA proceedings

can be costly, time-consuming, inconvenient to litigants, and may 'effectively eviscerate [ ]' any

right to the requested testimony . . . Therefore, the need for district court review in such instances

is all the more compelling.").  Another distinction is the scope of relief available.  As mentioned,

a separate APA claim <u>could</u> be used to pursue forms of relief either unavailable or not granted by

way of a motion to compel.  (*See* Doc. No. 1244 at 67 (explaining that "[i]f a discovery ruling

required only narrow disclosures, for example, a plaintiff might still want to move forward with a

challenge under the APA asserting that the [agency] determination was arbitrary, capricious or

contrary to law").)  Yet, here, despite having been given ample opportunity to explain their intent,

plaintiffs have indicated no plans to pursue any additional forms of relief.  In fact, plaintiffs

<u>disclaimed</u> any intent to frame the seventh claim as a "true" APA claim (i.e., one invoking 5

U.S.C. § 706(1) to compel agency action unlawfully withheld under or 5 U.S.C. § 706(2)(A) to

hold unlawful and set aside agency action that is arbitrary and capricious); rather, plaintiffs <u>admit</u>

they only invoked the APA in their seventh claim for relief because the APA contains a waiver of

sovereign immunity as to all non-monetary claims against federal agencies brought pursuant to 5

U.S.C. § 702.  (*See* Doc. No. 1203 at 2.)  The court therefore interprets the seventh claim as

entirely derivative of plaintiffs' rules-based motion.  Plaintiffs do not appear to refute that their

seventh claim seeks relief <u>identical</u> to the relief they sought by way of their motion to compel.

(*See* Doc. No. 1400.)  Plaintiffs fully pursued and succeeded on their motion to compel and the

depositions in question have taken place.  Plaintiffs did not pursue further proceedings, such as a

motion for judgment on the pleadings or for summary judgment, to formally "resolve"[7] their

/////

/////

---

[7]  Plaintiffs provide no authority to support their contention that they are automatically entitled to judgment on the seventh claim simply because they prevailed on their motion to compel.

seventh claim for relief because doing so would have been almost[8] entirely pointless.

The question then becomes: is the seventh claim moot?[9]  An issue is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal citation omitted). "The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *Id.* (internal citations and quotations omitted). If the parties cannot obtain any effective relief, any opinion about the legality of a challenged action is impermissibly advisory. *Id.* "Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997) (internal citation and quotation omitted). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* at 67.  Here, plaintiffs chose a procedural mechanism under the Rules to obtain relatively speedy relief.  Because they prevailed in obtaining all the relief they sought, they cannot continue to pursue identical relief in a separate claim.  The seventh claim for relief will therefore be dismissed as moot.

## CONCLUSION AND ORDER

For the reasons set forth above:

(1) Plaintiffs' seventh claim for relief is DISMISSED AS MOOT;

(2) Plaintiffs' request for entry of separate judgment under Federal Rule of Civil Procedure 54(b) as to their second, fourth, and fifth claims for relief is GRANTED;

---

[8]  It is conceivable that in continuing their fight as to this claim, the parties are attempting to position themselves with respect to a future motion for attorney's fees.  The court expresses no opinion at this point as to how its various rulings would impact its response to any such motion.

[9]  The parties' briefs discuss various bases upon which this court could exercise jurisdiction over plaintiffs' seventh claim for relief, including the doctrine of ancillary jurisdiction.  The court need not delve into those matters because it resolves the matter on the separate jurisdictional ground of mootness.

(3) Within fourteen (14) days of the date of this order, plaintiffs are directed to submit a proposed form of judgment consistent with this ruling; and

(4) The stay remains in place as to the remaining aspects of plaintiffs' sixth claim for relief.

IT IS SO ORDERED.

Dated: __**November 3, 2020**__        _Dale A. Drozd_
                                      UNITED STATES DISTRICT JUDGE